UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| VIACOM INTERNATIONAL INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION, and BLACK ENTERTAINMENT TELEVISION LLC, | ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) ) |
| YOUTUBE, INC., YOUTUBE, LLC, and GOOGLE INC., | ) ) ) |
| Defendants. | ) ) |

**07 CV 2103**

Civil Action No. _____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF
AND DAMAGES**

RECEIVED
MAR 1 3 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Viacom International Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television LLC (collectively, "Plaintiffs"), by and for their Complaint against Defendants YouTube, Inc. and YouTube, LLC (collectively, "YouTube"), and Google Inc. ("Google") (all collectively, "Defendants"), aver as follows:

## INTRODUCTION

1.      Over the past decade, the emergence of broadband networks, Internet protocol and inexpensive wireless networks has revolutionized the way Americans inform and entertain themselves.  Millions have seized the opportunities digital technology provides to obtain creative works and to express themselves creatively.  Entrepreneurs have made

fortunes providing the networks, the tools and the creative works that have fueled this revolution.  But these same innovations have also been misused to fuel an explosion of copyright infringement by exploiting the inexpensive duplication and distribution made possible by digital technology.  Some entities, rather than taking the lawful path of building businesses that respect intellectual property rights on the Internet, have sought their fortunes by brazenly exploiting the infringing potential of digital technology.

2.      YouTube is one such entity.  YouTube has harnessed technology to willfully infringe copyrights on a huge scale, depriving writers, composers and performers of the rewards they are owed for effort and innovation, reducing the incentives of America's creative industries, and profiting from the illegal conduct of others as well.  Using the leverage of the Internet, YouTube appropriates the value of creative content on a massive scale for YouTube's benefit without payment or license.  YouTube's brazen disregard of the intellectual property laws fundamentally threatens not just Plaintiffs, but the economic underpinnings of one of the most important sectors of the United States economy.

3.      YouTube's website purports to be a forum for users to share their own original "user generated" video content.  In reality, however, a vast amount of that content consists of infringing copies of Plaintiffs' copyrighted works, including such popular (and obviously copyrighted) television programming and motion pictures as "SpongeBob SquarePants," "The Daily Show with Jon Stewart," "The Colbert Report," "South Park," "Ren & Stimpy," "MTV Unplugged," "An Inconvenient Truth," "Mean Girls," and many others.  Unauthorized copies of these and other copyrighted works are posted daily on YouTube and each is viewed tens of thousands of times.  As Dow Jones reported, "[i]t's no secret that millions of Internet users every day watch copyright-infringing video clips on

YouTube."   Market Watch by Dow Jones, October 20, 2006.   In fact, Plaintiffs have identified more than 150,000 unauthorized clips of their copyrighted programming on YouTube that had been viewed an astounding 1.5 billion times.   And that is only a small fraction of the content on YouTube that infringes Plaintiffs' copyrights, because as described below, YouTube prevents copyright owners from finding on the YouTube site all of the infringing works from which YouTube profits.

4.     Defendants actively engage in, promote and induce this infringement. YouTube itself publicly performs the infringing videos on the YouTube site and other websites.   Thus, YouTube does not simply enable massive infringement by its users.   It is YouTube that knowingly reproduces and publicly performs the copyrighted works uploaded to its site.

5.     Defendants know and intend that a substantial amount of the content on the YouTube site consists of unlicensed infringing copies of copyrighted works and have done little or nothing to prevent this massive infringement.   To the contrary, the availability on the YouTube site of a vast library of the copyrighted works of Plaintiffs and others is the cornerstone of Defendants' business plan.   YouTube deliberately built up a library of infringing works to draw traffic to the YouTube site, enabling it to gain a commanding market share, earn significant revenues, and increase its enterprise value.

6.     YouTube has deliberately chosen not to take reasonable precautions to deter the rampant infringement on its site.   Because YouTube directly profits from the availability of popular infringing works on its site, it has decided to shift the burden entirely onto copyright owners to monitor the YouTube site on a daily or hourly basis to detect infringing videos and send notices to YouTube demanding that it "take down" the infringing works.   In

the meantime, YouTube profits handsomely from the presence of the infringing works on its site. And even after it receives a notice from a copyright owner, in many instances the very same infringing video remains on YouTube because it was uploaded by at least one other user, or appears on YouTube again within hours of its removal. YouTube has deliberately chosen this approach because it allows YouTube to profit from infringement while leaving copyright owners insufficient means to prevent it.

7.      Moreover, YouTube has deliberately withheld the application of available copyright protection measures in order to coerce rights holders to grant it licenses on favorable terms. YouTube's chief executive and cofounder Chad Hurley was quoted in the New York Times on February 3, 2007, as saying that YouTube has agreed to use filtering technology "to identify and possibly remove copyrighted material," but only after YouTube obtains a license from the copyright owner. Geraldine Fabrikant & Saul Hansell, *Viacom Tells YouTube: Hands Off*, N.Y. Times, Feb. 3, 2007, at C1. Those who refuse to be coerced are subjected to continuing infringement. *Id.*; *see also* Saul Hansell, *A Bet That Media Companies Will Want to Share Ad Revenue*, N.Y. Times, Sept. 30, 2006, at C1.

8.      YouTube has also implemented features that prevent copyright owners from finding infringing videos by searching the YouTube site. YouTube thereby hinders Plaintiffs' attempts to locate infringing videos to protect their rights. At the same time, YouTube allows its users to make the hidden videos available to others through other YouTube features like the "embed," "share," and "friends" functions. In this way, YouTube continues to profit from the infringement, while hindering Plaintiffs from preventing it.

9.      Defendant Google recently purchased YouTube for $1.65 billion, generating extraordinary riches for YouTube's founders and investors. In recognition of the undeniable

reality of massive infringement on the YouTube site, Google has reportedly issued substantial equity and entered into expensive licenses with certain providers of copyrighted content.

10.     Defendants' infringement has harmed and continues to harm the interests of authors, songwriters, directors, producers, performers, and many other creators.  If left unchecked, rampant infringement will gravely undermine Plaintiffs and other companies that generate creative works, and will threaten the livelihoods of those who work in and depend upon these companies.  Plaintiffs therefore have no choice but to seek immediate redress. Plaintiffs seek a declaration that Defendants' conduct willfully infringes Plaintiffs' copyrights, a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' copyrights, and statutory damages for Defendants' past and present willful infringement, or actual damages plus profits, of at least one billion dollars.

## JURISDICTION AND VENUE

11.     This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*

12.     This Court has original subject matter jurisdiction over all claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13.     This Court has personal jurisdiction over Defendants.   Google does continuous and systematic business in New York and this District.  It maintains an office and employs personnel in New York and this District, and is thus physically present in the state. *See* N.Y. C.P.L.R. § 301.  On information and belief, YouTube also does continuous and systematic business in New York and in this District.  *See id.*  All Defendants have also

transacted business within New York and contracted to supply goods or services in New York in connection with the matters giving rise to this suit. *See id.* § 302(a)(1). Defendants have also committed infringing acts outside of New York causing injury to Plaintiffs in New York, and Defendants regularly do or solicit business in New York, and/or derive substantial revenue from goods used or services rendered in New York, and/or expect or reasonably should expect their infringing conduct to have consequences in New York and derive substantial revenue from interstate commerce. *See id.* § 302(a)(3). In addition, Plaintiffs Viacom International Inc. and Comedy Partners have their principal places of business in New York and in this District, and have been injured in New York by Defendants' infringing conduct.

14.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(a).

## PLAINTIFFS AND PLAINTIFFS' BUSINESSES

15.    Plaintiff Viacom International Inc. ("Viacom"), one of the world's leading creators of programming and content across all media platforms, is a Delaware corporation with its principal place of business in New York, New York.

16.    Plaintiff Comedy Partners, an affiliate of Viacom, is a general partnership formed in New York with its principal place of business in New York, New York.

17.    Plaintiff Country Music Television, Inc., an affiliate of Viacom, is a Tennessee corporation with its principal place of business in Nashville, Tennessee.

18.    Plaintiff Paramount Pictures Corporation, an affiliate of Viacom, is a Delaware corporation with its principal place of business in Los Angeles, California.

19.     Plaintiff Black Entertainment Television LLC, an affiliate of Viacom, is a Washington, D.C. limited liability company with its principal place of business in Washington, D.C.

20.     Plaintiffs are among the world's preeminent creators, producers and distributors of copyrighted television programming, motion pictures, short form audiovisual works and other entertainment programming, who have invested and continue to invest many millions of dollars annually to create and disseminate these works because the Copyright Act protects their economic incentive to do so and tens of millions of consumers desire to experience the works.  Plaintiffs distribute and publicly perform those works, and/or license them for distribution and/or public performance, by telecast on cable and satellite television systems, in motion picture theaters, on DVD and other video formats, through their own websites and various authorized internet distribution channels, and over cell phones and other portable devices, among other ways.  Plaintiffs' television channels and trademarks include MTV, Nickelodeon, VH1, Comedy Central, Logo, MTV2, MTV Tres, Nick at Nite, Noggin, TV Land, CMT, mtvU, Nickelodeon, The N, and BET.  Plaintiffs' motion picture labels include Paramount Pictures, DreamWorks, Paramount Vantage, MTV Films, and Nickelodeon Films.

21.     Examples of legitimate licensed channels for the distribution of Plaintiffs' programs include Apple's iTunes Music Store, which sells secure digital downloads of television shows from several of Plaintiffs' television networks; Joost, an advertising-supported, Internet-based television service; and numerous others that currently exist or are just emerging.  The shows distributed through these licensed on-line distribution channels include "The Daily Show with Jon Stewart," "The Colbert Report," and "South Park" from

Comedy Central; "SpongeBob SquarePants," and "Dora the Explorer," among others, from Nickelodeon; and "Beavis and Butthead," "Laguna Beach," and "Jackass," among others, from MTV.

22.     Plaintiffs also offer streaming video clips of many of their most popular television shows and other works through their own websites, such as www.comedycentral.com. Plaintiffs derive advertising revenue and other benefits from the Internet traffic generated by the availability of these video clips on their websites.

23.     Defendants' conduct directly and secondarily infringes the copyrights in works owned by or exclusively licensed to Plaintiffs that are the subject of valid Certificates of Copyright Registration from the Register of Copyrights, including but not limited to those listed on Exhibit A attached to this Complaint.

### DEFENDANTS AND THE INFRINGING YOUTUBE SERVICE

24.     Defendant YouTube, Inc. is a Delaware corporation with its principal place of business in San Bruno, California.

25.     Defendant YouTube, LLC is a Delaware limited liability company with its principal place of business in San Bruno, California. On information and belief, YouTube, LLC is the successor in interest of YouTube, Inc. YouTube, Inc. and YouTube, LLC are referred to collectively herein as "YouTube."

26.     YouTube is a wholly owned and controlled subsidiary of Defendant Google Inc., a Delaware corporation with its principal place of business in Mountain View, California, and a place of business in the State of New York and this District. Pursuant to a transaction that was publicly announced on October 9, 2006, and closed on November 13, 2006, Google acquired YouTube for $1.65 billion.

27.     Defendants   operate   a   website   called   "YouTube,"   located   at www.youtube.com, one of the most prominent and popular websites on the Internet.  The recent $1.65 billion acquisition price for YouTube reflects the website's enormous popularity.  YouTube's value, however, is built largely on the unauthorized appropriation and exploitation of copyrighted works belonging to others, especially Plaintiffs.  As a result, a large part of YouTube's value is directly attributable to the availability of Plaintiffs' copyrighted works on YouTube's website.

28.     Google exercises substantial and continuing control over the continuing acts of YouTube that form the subject matter of this complaint.  Google's press release at the time of the closing of the $1.65 billion acquisition announced that YouTube would stay "on the same course" and, on information and belief, Google determined to have YouTube continue to withhold measures to prevent the massive copyright infringement known to be taking place on the site.  Google has also recently launched a feature on Google's own website whereby a search for videos returns thumbnails and results for videos on YouTube, thereby participating in, inducing, contributing to, and profiting from the infringement on YouTube. Additional  massive  damages  to  plaintiffs  and  others  have  been  caused  by  Google's preservation and backing of YouTube's infringing business model.

## NATURE OF THE ACTION

29.     Under Section 106 of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"), Plaintiffs have the distinct, severable, and exclusive rights to, among other things, reproduce, publicly perform, and publicly display their copyrighted works.  17 U.S.C. §§ 106(1), (4), (5).

30.     YouTube is a self-described "consumer media company" that "deliver[s] entertaining, authentic and informative videos across the Internet."  YouTube Dec. 15, 2005 Press    Release    (available    at    http://www.youtube.com/press_room_entry?entry= OcN9xXYar1g).  Defendants encourage individuals to upload videos to the YouTube site, where YouTube makes them available for immediate viewing by members of the public free of charge.  Although YouTube touts itself as a service for sharing home videos, the well-known reality of YouTube's business is far different.  YouTube has filled its library with entire episodes and movies and significant segments of popular copyrighted programming from Plaintiffs and other copyright owners, that neither YouTube nor the users who submit the works are licensed to use in this manner.  Because YouTube users contribute pirated copyrighted works to YouTube by the thousands, including those owned by Plaintiffs, the videos "deliver[ed]" by YouTube include a vast unauthorized collection of Plaintiffs' copyrighted audiovisual works.

31.     Though the videos available on YouTube are uploaded by users in the first instance, upon upload the videos become part of the YouTube library for performance and display on YouTube's own website, which Defendants control and directly profit from.  When a user uploads a video, YouTube copies the video in its own software format, adds it to its own servers, and makes it available for viewing on its own website.  A user who wants to view a video goes to the YouTube site by typing www.youtube.com into the user's web browser, enters search terms into a search and indexing function provided by YouTube for this purpose on its site, and receives a list of thumbnails of videos in the YouTube library matching those terms.  YouTube creates the thumbnails, which are individual frames from videos in its library – including infringing videos – for the purpose of helping users find what

they are searching for.  For example, users looking for Plaintiffs' popular works might type in search terms such as "MTV," "Stephen Colbert," "Beavis and Butthead," or "SpongeBob." YouTube then returns a list with thumbnails of matching videos in its library, and the user can select and view a video from the list of matches by clicking on the thumbnail created and supplied by YouTube for this purpose.  YouTube then publicly performs the chosen video by sending streaming video content from YouTube's servers to the user's computer, where it can be viewed by the user.  During the entire experience, YouTube prominently displays its logo, user interface, and advertising to the user.  Thus, the YouTube conduct that forms the basis of this Complaint is not simply providing storage space, conduits, or other facilities to users who create their own websites with infringing materials.  To the contrary, YouTube itself commits the infringing duplication, public performance, and public display of Plaintiffs' copyrighted works, and that infringement occurs on YouTube's own website, which is operated and controlled by Defendants, not users.

32.     YouTube also allows any person to "embed" any video available in the YouTube library into another website (such as a blog, MySpace page, or any other page on the web where the user can post material).  To do this, the user simply copies the "embed" code, which YouTube supplies for each video in its library, and then pastes that code into the other website, where the embedded video will appear as a television-shaped picture with the YouTube logo prominently displayed and a triangular icon that any user can click to play the video.  When a user clicks the play icon, the embedded video plays within the context of the host website, but it is actually YouTube, not the host site, that publicly performs the video by transmitting the streaming video content from YouTube's own servers to the viewer's computer.

33.     YouTube also makes it possible for a user to share an embedded video by clicking the word "share" that is displayed with the video.  After clicking "share," the user is taken to a location on YouTube's own website where there is a form for entering the email addresses of persons to share the video with.  YouTube then sends an email to each person listed in that form, with a link that takes the recipient to YouTube's own site to view the video.  These embedded videos therefore act as a draw to attract users to YouTube.

34.     Because of its prominent display of YouTube's logo and the share function that draws new users to YouTube's own website, the embed function has contributed significantly to the explosive growth in YouTube's popularity, network, and enterprise value.  But the videos that YouTube publicly performs and displays through the embed function to draw users back to YouTube's own site are frequently the most popular copyrighted works created and owned by Plaintiffs, not YouTube.

35.     YouTube and its users have not received a valid license, authorization, permission or consent to use the registered copyrighted works owned by Plaintiffs that have appeared and continue to appear on the YouTube website and are at issue in this action, including but not limited to those listed on Exhibit A hereto.  Instead, in violation of Plaintiffs' rights under copyright law, YouTube has willfully, intentionally, and purposefully reproduced, publicly performed, and publicly displayed the copyrighted works, and/or knowingly facilitated, enabled, induced, and materially contributed to infringing uses thereof, and/or refused to exercise its ability to control or supervise infringing uses thereof from which it obtains direct financial benefits.

36.     Defendants have actual knowledge and clear notice of this massive infringement, which is obvious to even the most casual visitor to the site.  The rampant

infringement of Plaintiffs' copyrights on YouTube is open and notorious and has been the subject of numerous news reports. *See, e.g.*, Saul Hansell, *A Bet That Media Companies Will Want to Share Ad Revenue*, N.Y. Times, Sept. 30, 2006, at C1.  YouTube's site is also filled with "red flags" from which infringing activity is apparent, such as description terms and search tags using Plaintiffs' well-known trademarks and other terms identifying their popular copyrighted works.  Indeed, the presence of infringing copyrighted material on YouTube is fully intended by Defendants as a critical part of their business plan to drive traffic and increase YouTube's network, market share and enterprise value, as reflected in the recent purchase price of $1.65 billion.

37.    Defendants profit handsomely from the infringement of Plaintiffs' copyrighted works, and receive financial benefits directly attributable to the infringing activity.  YouTube has built an infringement-driven business by exploiting the popularity of Plaintiffs' copyrighted works (and the works of other copyright owners) to draw millions of users to its website.  YouTube derives advertising revenue directly attributable to the infringing works, because advertisers pay YouTube to display banner advertising to users whenever they log on to, search for, and view infringing videos.  Through the embed function and in other ways, infringing videos also draw users to YouTube's site in the first instance, and YouTube then derives additional advertising revenue when those users search for and watch other videos on the site.  In either event, there is a direct causal connection between the presence of infringing videos and YouTube's income from the additional "eyeballs" viewing advertising on the site.  The draw of infringing works has also made an enormous contribution to the explosive growth of YouTube, resulting in the remarkable $1.65 billion valuation Google placed on it only a short time after its founding.  Thus,

infringement of Plaintiffs' works contributes substantially and directly to the value of YouTube's business.

38.     YouTube has the right and ability to control the massive infringement on its site.  As described above, the infringement is being committed on YouTube's own website, which Defendants control, not on other websites controlled by others.  YouTube has reserved to itself the unilateral right to impose Terms of Use to which users must agree when they accept YouTube's invitation to post videos to the site, and YouTube has the power and authority to police what occurs on its premises.  Through its Terms of Use, YouTube imposes a wide number of content-based restrictions on the types of videos uploaded to the site, and reserves and exercises the unfettered right to block or remove any video which, in its sole discretion, it deems "inappropriate."  YouTube proactively reviews and removes pornographic videos from its library, but refuses to do the same thing for videos that obviously infringe Plaintiffs' copyrights.  YouTube also demands that users grant YouTube a "worldwide . . . license to use, reproduce, distribute, prepare derivative works of, display, and perform" the videos they add to YouTube's library.  *See* Terms of Use, http://www.youtube.com/t/terms (last visited March 12, 2007).

39.     On information and belief, YouTube has also sent cease and desist letters to persons who provide software that can be used to make copies of videos from YouTube's library, asserting that such use is not "authorized."  In truth, YouTube opposes such copying because YouTube receives advertising revenue and new users only if viewers are drawn to YouTube's own site to view videos, not when users make copies that they can share with others independently of YouTube's site.  Thus, when it is in YouTube's financial interest to do so, it proactively polices conduct it regards as unauthorized, even on other websites.

40.     In stark contrast, because it profits directly from the infringement of Plaintiffs' works on its website, YouTube has failed to employ reasonable measures that could substantially reduce, or eliminate, the massive amount of copyright infringement on the YouTube site from which YouTube directly profits.  Even though Defendants are well aware of the rampant infringement on the YouTube website, and YouTube has the right and ability to control it, YouTube's intentional strategy has been to take no steps to curtail the infringement from which it profits unless notified of specific infringing videos by copyright owners, thereby shifting the entire burden – and high cost – of monitoring YouTube's infringement onto the victims of that infringement.  Although YouTube touts the availability of purported copyright protection tools on its site, at best these tools help copyright owners find a portion of the infringing files, and, as to that portion, only after the files have been uploaded.  These tools also prevent upload of the exact same video (or the exact same excerpt of a video) after YouTube receives a takedown notice from the owner.  However, users routinely alter as little as a frame or two of a video and repost it on YouTube where it will remain until YouTube receives a new takedown notice.  YouTube's consistent approach is to take no action to remove infringing videos from its library unless and until a copyright owner notifies it that that specific video is infringing.

41.     Even when YouTube responds to notices of specific infringing videos, its response has been ineffectual.  YouTube does not even try to block slightly altered copies of the very same video from being uploaded again immediately after being removed.  It does not block repeat infringers from signing up for the service again with a new account.  And it removes only the specific infringing clips at the specific web addresses (URLs) identified in

a takedown notice, rather than all infringing works that can be reasonably located using the representative lists and other information in the notice.

42.    YouTube adopted this hands-off policy knowing that copyright owners have a limited ability to monitor for infringing videos on its site and send takedown notices for the videos they find.  Copyright owners can monitor for infringing videos only after they are posted on the site, so there is an inevitable time lag between when a video is posted and the first reasonable time at which an owner can identify it and send a takedown notice.

43.    In addition, YouTube is deliberately interfering with copyright owners' ability to find infringing videos even after they are added to YouTube's library.  YouTube offers a feature that allows users to designate "friends" who are the only persons allowed to see videos they upload, preventing copyright owners from finding infringing videos with this limitation.  YouTube has also recently limited the search function so that it identifies no more than 1,000 video clips for any given search.  Thus, for example, if there are several thousand infringing clips from the "South Park" series on YouTube, the limitations YouTube has placed on the search function may prevent Plaintiffs from identifying all of the infringing clips.  In that case, even if Plaintiffs send takedown notices for the video clips they have been able to identify, and even if YouTube responds to the notices by removing those videos, many more infringing videos from the South Park series will still be available for viewing on YouTube.  Thus, Plaintiffs cannot necessarily find all infringing videos to protect their rights through searching, even though that is the only avenue YouTube makes available to copyright owners.  Moreover, YouTube still makes the hidden infringing videos available for viewing through YouTube features like the embed, share, and friends functions.  For example, many users are sharing full-length copies of copyrighted works and stating plainly

in the description "Add me as a friend to watch."  For all these reasons, no matter how much effort and money copyright owners expend to protect their rights, there will always be a vast collection of infringing videos available on YouTube to draw users to its site.  That is precisely what YouTube intends, because YouTube makes money from the collection of infringing videos on its site.

44.     YouTube's strategy also leaves Plaintiffs unable to meaningfully protect their rights in time-sensitive works, such as episodes of "The Daily Show" or "The Colbert Report" that appear on YouTube as soon as they air, or first-run movies like "An Inconvenient Truth" that appear in their entirety on YouTube before being distributed on home video, irreparably harming Plaintiffs' own markets for these works.  In this and many other ways, YouTube deprives Plaintiffs of economic returns to which they are entitled under the copyright laws, thereby undermining the system of incentives that copyright provides for the creation and dissemination of new works.

45.     YouTube's failure to take reasonable measures to prevent infringement of Plaintiffs' copyrights stands in stark contrast to the protection which YouTube offers for the content to which it has acquired licenses through various business partnerships with other copyright holders.  YouTube's cofounder and chief executive Chad Hurley has publicly stated that YouTube will use filtering technology to identify and remove copyrighted works for companies that grant licenses with YouTube, but not to companies that decline to grant licenses on YouTube's terms.  By limiting copyright protection to business partners who have agreed to grant it licenses, YouTube attempts to coerce copyright owners to grant it a license in order to receive the protection to which they are entitled under the copyright laws.  Although Google CEO Eric Schmidt recently stated in a media interview that Google intends

to make video anti-piracy tools generally available to all copyright owners, he did not provide a specific time frame for doing so and did not indicate whether non-licensees would be provided the same copyright protection as YouTube's business partners.  *See* Eric Auchard, *Google Sees Video Anti-piracy Tools as a Priority*, Reuters News, Feb. 21, 2007, *available at* http://www.reuters.com/article/ousiv/idUSN2136690720070222.    Even if Defendants at some future point provide copyright protection to all copyright holders, including non-licensees, that will not in any way compensate Plaintiffs for the very substantial harm that Defendants have already caused.

## CLAIMS FOR RELIEF

## COUNT I

### (Direct Copyright Infringement – Public Performance)

46.    Plaintiffs incorporate by reference paragraphs 1 - 45 as if set forth herein.

47.    Defendants, without the permission or consent of Plaintiffs, and without authority, are publicly performing and purporting to authorize the public performance of Plaintiffs' registered copyrighted audiovisual works.  Defendants cause these works to be publicly performed upon request by users.    Defendants' conduct constitutes direct infringement of Plaintiffs' exclusive rights under the Copyright Act to publicly perform their copyrighted audiovisual works.

48.    Defendants' acts of infringement have been willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

49.    As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c).    Alternatively, at Plaintiffs' election,

pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages plus Defendants' profits from infringement, as will be proven at trial.

50.    Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

51.    Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.   Plaintiffs have no adequate remedy at law.   Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' copyrights.

## COUNT II

### (Direct Copyright Infringement – Public Display)

52.    Plaintiffs incorporate by reference paragraphs 1 - 51 as if set forth herein.

53.    Defendants, without the permission or consent of Plaintiffs, and without authority, are publicly displaying and purporting to authorize the public display of Plaintiffs' registered copyrighted audiovisual works.   Defendants cause these works to be publicly displayed by showing individual images of infringing video clips in response to searches for videos on YouTube.   Defendants' conduct constitutes direct infringement of Plaintiffs' exclusive rights under the Copyright Act to publicly display their copyrighted audiovisual works.

54.    Defendants' acts of infringement have been willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

55.    As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum

statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages plus Defendants' profits from infringement, as will be proven at trial.

56.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

57.     Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' copyrights.

## COUNT III
### (Direct Copyright Infringement – Reproduction)

58.     Plaintiffs incorporate by reference paragraphs 1 - 57 as if set forth herein.

59.     Defendants, without authority, are making, causing to be made, and purporting to authorize the making of unauthorized copies of Plaintiffs' registered copyrighted audiovisual works. Defendants' conduct constitutes direct infringement of Plaintiffs' exclusive right under the Copyright Act to reproduce their copyrighted works.

60.     Defendants' acts of infringement have been willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

61.     As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages plus Defendants' profits from infringement, as will be proven at trial.

62.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

63.     Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.   Plaintiffs have no adequate remedy at law.   Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' copyrights.

## COUNT IV

### (Inducement of Copyright Infringement)

64.     Plaintiffs incorporates by reference paragraphs 1 - 63 as if set forth herein.

65.     YouTube users have infringed and are infringing Plaintiffs' rights in their registered copyrighted audiovisual works by, *inter alia*, uploading infringing copies of Plaintiffs' copyrighted works onto YouTube's website and publicly performing or displaying or purporting to authorize the public performance or display of such infringing videos, all without authorization.   YouTube users are therefore directly infringing Plaintiffs' exclusive rights of reproduction, public performance, and public display under 17 U.S.C. §§ 106(1), (4) and (5).

66.     Defendants are liable under the Copyright Act for inducing the infringing acts of YouTube users.   Defendants operate the YouTube website service with the object of promoting its use to infringe Plaintiffs' copyrights and, by their clear expression and other affirmative steps, Defendants are unlawfully fostering copyright infringement by YouTube users.

67.   Defendants are fully aware that Plaintiffs' audiovisual works are copyrighted and authorized for purchase through various outlets, including numerous lawfully authorized online digital download services.   Defendants are equally aware that YouTube users are employing the YouTube website and the services provided through that website to unlawfully reproduce, publicly perform, and publicly display Plaintiffs' copyrighted works. Defendants intend, encourage, and induce YouTube users to employ the YouTube site in this fashion.

68.   Defendants' acts of infringement have been willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

69.   As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c).   Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages plus Defendants' profits from infringement, as will be proven at trial.

70.   Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

71.   Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.   Plaintiffs have no adequate remedy at law.   Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' copyrights.

## COUNT V

### (Contributory Copyright Infringement)

72.   Plaintiffs incorporate by reference paragraphs 1 - 71 as if set forth herein.

73.   YouTube users have infringed and are infringing Plaintiffs' rights in their registered copyrighted audiovisual works by, *inter alia*, uploading infringing copies of Plaintiffs' copyrighted works onto YouTube's website and publicly performing or displaying or purporting to authorize the public performance or display of such infringing videos, all without authorization.  YouTube users are therefore directly infringing Plaintiffs' exclusive rights of reproduction, public performance, and public display under 17 U.S.C. §§ 106(1), (4) and (5).

74.   Defendants are liable as contributory copyright infringers for the infringing acts of YouTube users.  Defendants enable, induce, facilitate, and materially contribute to each act of infringement by YouTube users.

75.   Defendants have actual and constructive knowledge that YouTube users are employing the YouTube website to copy, publicly perform, and publicly display Plaintiffs' copyrighted works.  Plaintiffs' television shows and motion pictures are well known and recognizable, and even a cursory review of the YouTube website reveals numerous infringing videos of Plaintiffs' television shows, motion pictures, and other audiovisual works.

76.   Acting with this actual and constructive knowledge, Defendants enable, facilitate, and materially contribute to YouTube users' copyright infringement, which could not occur without Defendants' enablement.

77.    Defendants' acts of infringement have been willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

78.    As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages plus Defendants' profits from infringement, as will be proven at trial.

79.    Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

80.    Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' copyrights.

## COUNT VI

### (Vicarious Copyright Infringement)

81.    Plaintiffs incorporate by reference paragraphs 1 - 80 as if set forth herein.

82.    YouTube users have infringed and are infringing Plaintiffs' rights in their registered copyrighted audiovisual works by, *inter alia*, uploading infringing copies of Plaintiffs' copyrighted works onto YouTube's website and publicly performing or displaying or purporting to authorize the public performance or display of such infringing videos, all without authorization.  YouTube users are therefore directly infringing Plaintiffs' exclusive

rights of reproduction, public performance, and public display under 17 U.S.C. §§ 106(1), (4) and (5).

83.     Defendants are vicariously liable for the infringing acts of YouTube users. Defendants have both the right and the ability to supervise YouTube users' infringing conduct, and to prevent YouTube users from infringing Plaintiffs' copyrighted audiovisual works.

84.     Upon information and belief, YouTube currently engages in practices to enforce content restrictions and protect the copyrighted works of its business partners, but withholds these same protections for the copyrights of persons, including Plaintiffs, who have not granted licenses to YouTube.

85.     YouTube significantly and directly benefits from the widespread infringement by its users.  The availability of a vast collection of infringing copyrighted works on the YouTube site, including Plaintiffs' most popular works, acts as a substantial draw, attracting users to the website and increasing the amount of time they spend there once they visit. Defendants derive substantial advertising revenue tied directly to the volume of traffic they are able to attract to the YouTube site.

86.     Defendants' acts of infringement have been willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

87.     As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages plus Defendants' profits from infringement, as will be proven at trial.

88.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

89.     Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' copyrights.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     For a declaration that Defendants' YouTube service willfully infringes Plaintiffs' copyrights both directly and secondarily.

2.     For a permanent injunction requiring that Defendants and their agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or any of them, cease directly or indirectly infringing, or causing, enabling, facilitating, encouraging, promoting and inducing or participating in the infringement of, any of Plaintiffs' respective copyrights or exclusive rights protected by the Copyright Act, whether now in existence or hereafter created.

3.     For statutory damages pursuant to 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), for actual damages plus Defendants' profits from infringement, as will be proven at trial.

4.     For Plaintiffs' costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

5.     For pre- and post-judgment interest according to law.

6.     For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Donald B. Verrilli, Jr. (No. DV-2252)
William M. Hohengarten (No. WH-5233)
Amy L. Tenney
Scott B. Wilkens
Luke C. Platzer
Sharmila Sohoni
JENNER & BLOCK LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC  20005-3823
Telephone (202) 639-6000
Facsimile (202) 639-6066

*Attorneys for Plaintiffs*

March *13*, 2007