# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| VIACOM INTERNATIONAL INC., ) | |
| COMEDY PARTNERS, ) | |
| COUNTRY MUSIC TELEVISION, INC., ) | |
| PARAMOUNT PICTURES CORPORATION, ) | |
| and BLACK ENTERTAINMENT TELEVISION ) | |
| LLC, ) | |
| ) | |
| Plaintiffs, ) | Case No. 1:07-cv-02103 (LLS) |
| v. ) | (Related Case No. 1:07-cv-03582 (LLS) |
| ) | |
| YOUTUBE INC., YOUTUBE, LLC, and ) | |
| GOOGLE, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |

_____

## MEMORANDUM OF LAW IN SUPPORT OF VIACOM'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY AND INAPPLICABILITY OF THE DIGITAL MILLENNIUM COPYRIGHT ACT SAFE HARBOR DEFENSE

Stuart J. Baskin (No. SB-9936)
John Gueli (No. JG-8427)
Kirsten Nelson Cunha (No. KN-0283)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY  10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

Paul M. Smith (No. PS-2362)
William M. Hohengarten (No. WH-5233)
Scott B. Wilkens (*pro hac vice*)
Matthew S. Hellman (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, DC  20001
Telephone:  (202) 639-6000
Facsimile:  (202) 639-6066

Susan J. Kohlmann (No. SK-1855)
JENNER & BLOCK LLP
919 Third Avenue
New York, NY  10022
Telephone:  (212) 891-1690
Facsimile:  (212) 891-1699

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................1

SUMMARY JUDGMENT STANDARD ........................................................................4

ARGUMENT ..................................................................................................................5

I. DEFENDANTS ARE LIABLE UNDER *GROKSTER* BECAUSE THEY
INTENTIONALLY OPERATED YOUTUBE AS A HAVEN FOR MASSIVE
INFRINGEMENT...................................................................................................5

   A. Statement of Undisputed Facts Relevant to Point I ..................................5

      1. The Founders' Knowledge and Intent Concerning Infringement............5

      2. Google's Knowledge and Intent Concerning Infringement ...................12

      3. Defendants Cannot Walk Away from Their Contemporaneous Internal
Documents. .......................................................................................21

   B. Defendants' Intentional Operation of YouTube as an Infringement Haven
Makes Them Liable Under *Grokster*. ..................................................24

II. DEFENDANTS ARE VICARIOUSLY LIABLE BECAUSE THEY DERIVED A
DIRECT FINANCIAL BENEFIT FROM INFRINGEMENT THAT THEY HAD THE
RIGHT AND ABILITY TO CONTROL....................................................................30

   A. Statement of Undisputed Facts Relevant to Point II ...............................30

      1. Defendants' Direct Financial Benefit from Infringement......................30

      2. Defendants' Right and Ability to Control Infringement........................32

   B. Defendants' Financial Interest and Control Makes Them Vicariously Liable. .........38

      1. Direct Financial Benefit....................................................................38

      2. Right and Ability To Control ..............................................................40

III. DEFENDANTS ARE ALSO LIABLE AS DIRECT INFRINGERS. ...............................42

   A. Statement of Facts Relevant to Point III................................................42

   B. Defendants' Own Conduct Constitutes Direct Infringement ....................45

**IV. DEFENDANTS DO NOT QUALIFY FOR THE DMCA DEFENSE**............................**47**

    **A. Defendants' Knowledge and Intent Defeat the DMCA Defense**...................**50**

    **B. Defendants' Direct Financial Benefit and Right and Ability to Control Infringement Defeat the DMCA Defense**........................................................**56**

    **C. The Infringement on YouTube Does Not Result from the Specified Core Internet Functions to Which The DMCA Applies.**........................................**61**

**CONCLUSION** ....................................................................................................**67**

## TABLE OF AUTHORITIES

**CASES**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)....................38, 39, 40, 41, 58

*In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003) .........................................50, 51

*ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001) ..............................49

*Arista Records, Inc. v. Mp3Board, Inc.*, No. 00 CIV. 4660 (SHS),
    2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002).........................................................................38

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y.
    2009) ........................................................................................................26, 38, 45, 50

*Associated General Contractors of California, Inc. v. California Council
    of Carpenters*, 459 U.S. 519 (1983)......................................................................................62

*Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co.*,
    331 U.S. 519 (1947)..............................................................................................................59

*Buck v. Jewell-La Salle Realty Co.*, 283 U.S. 191 (1931) ............................................................37

*Capital Records, Inc. v. Mp3Tunes, LLC*, No. 07 Civ. 9931(WHP), 2009
    WL 3364036 (S.D.N.Y. Oct. 16, 2009)................................................................................45

*Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008),
    *cert. denied*, 129 S. Ct. 2890 (2009)........................................................................44, 45, 46

*Columbia Pictures Industries, Inc. v. Fung*, No. CV 06-5578
    (C.D. Cal. Dec. 21, 2009). .....................................25, 26, 47, 48, 50, 52, 55, 57, 62

*Costar Group, Inc. v Loopnet, Inc.*, 164 F. Supp. 2d 688 (D. Md. 2001),
    *aff'd*, 373 F.3d 544 (4th Cir. 2004)........................................................................................55

*Crawford v. Metropolitan Government of Nashville and Davidson County*,
    129 S. Ct. 846 (2009).............................................................................................................61

*Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003) ........................................................................63

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004)...................................................................38

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ..............................................................................................49

*Fonovisa Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)............................................38

iii

*Frank G. v. Board of Education of Hyde Park*, 459 F.3d 356
    (2d Cir. 2006).........................................................................................59

*Giordano v. United States*, 32 F. Supp. 2d 640 (S.D.N.Y. 1999)...................51

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992)........62

*Io Group, Inc. v. Veoh, Networks, Inc.*, 586 F. Supp. 2d 1132
    (N.D. Cal. 2008)................................................................................56, 64

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 380 F.3d 1154
    (9th Cir. 2004), *rev'd*, 545 U.S. 913 (2005) ...................................24

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, 545 U.S. 913
    (2005).................................................1, 24, 25, 26, 28, 29, 41, 52, 60

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966
    (C.D. Cal. 2006)...............................................................................26, 28

*Neder v. United States*, 527 U.S. 1 (1999)...........................................55, 56

*Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195
    (N.D. Cal. 2004)..................................................................................49

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ....28, 39

*Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102 (9th Cir. 2007)..........52, 55, 56, 64

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146
    (C.D. Cal. 2002)..............................................................................39, 51

*Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543
    (N.D. Tex. 1997), *aff'd*, 168 F.3d 486 (5th Cir. 1999) ...................45

*Religious Technology Center v. Netcom On-Line Communication Services,
Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) .....................................45, 47

*Reed Elsevier, Inc. v. Muchnick*, No. 08-103, 2010 WL 693679
    (U.S. Mar. 2, 2010) ...........................................................................28

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) ....37, 41, 55

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417
    (1984)................................................................................................23

*Tur v. YouTube, Inc.*, No. CV064436, 2007 WL 1893635
    (C.D. Cal. June 20, 2007) ...............................................................48, 57

*U.S. West Communications., Inc. v. Hamilton*, 224 F.3d 1049
 (9th Cir. 2000) ........................................................................... 58-59

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081
 (C.D. Cal. 2008) ............................................................................. 64

*UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099
 (C.D. Cal. 2009) ................................................................ 52, 57, 58

*United States v. ASCAP (In re Application of YouTube, LLC)*, 616
 F. Supp. 2d 447 (S.D.N.Y. 2009) .................................................. 39

*United States ex rel. Romano v. N.Y. Presbyterian*, 426 F. Supp. 2d 174
 (S.D.N.Y. 2006) ............................................................................... 5

*Watt v. Alaska*, 451 U.S. 259 (1981) .................................................... 58

## STATUTES

17 U.S.C. § 106 ................................................................................. 44

17 U.S.C. § 512(a) .............................................................................. 4

17 U.S.C. § 512(b) ............................................................................ 61

17 U.S.C. § 512(c) ............................................................... 4, 48, 62

17 U.S.C. § 512(c)(1)(A) .............. 4, 47-48, 49, 51, 53, 54, 55, 62

17 U.S.C. § 512(c)(1)(B) .................... 4, 48, 55, 56, 59, 60, 62

17 U.S.C. § 512(c)(1)(C) ........................................... 48, 54, 57

17 U.S.C. § 512(d) ...................................................... 4, 62

17 U.S.C. § 512(k)(1)(A) ..................................................... 60

17 U.S.C. § 512(m) ............................................... 58, 59, 60

17 U.S.C. § 512(n) ............................................................ 62

Fed. R. Civ. P. 56(c) ........................................................... 4

## LEGISLATIVE MATERIALS

H.R. Rep. No. 105-551(I) (1998) ........................................ 47, 58, 61

H.R. Rep. No. 105-551(II) (1998) ............ 48, 51, 53, 55, 59, 60, 61

S. Rep. No. 105-190 (1998) ........................................................................................48, 51, 55, 62

**OTHER AUTHORITIES**

Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster *Goats*,
    50 Ariz. L. Rev. 577 (2008) .........................................................................................52, 53, 61

II Paul Goldstein, *Goldstein on Copyright* (3d ed. 2009) .............................................................52

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2009) ......................................59

*The New Oxford American Dictionary* (2d ed. 2005) ...................................................................61

*Webster's Third New International Dictionary* (1986) ..................................................................61

<u>**PRELIMINARY STATEMENT**</u>

Plaintiffs Viacom International Inc. et al. ("Viacom") move for partial summary judgment on Defendants' liability for copyright infringement and concurrently to invalidate Defendants' reliance on the Digital Millennium Copyright Act ("DMCA") as a defense to that infringement. The starting point for this motion is this undisputable fact: tens of thousands of videos on YouTube, resulting in hundreds of millions of views, were taken unlawfully from Viacom's copyrighted works without authorization. Statement of Undisputed Facts ("SUF") ¶¶ 6-9. Fostering and countenancing this piracy were central to YouTube's economic business model. The fundamental issue is whether Defendants are liable for that intentional infringement of copyrights or whether, alternatively, they may hide behind a policy of willful blindness and seek to shift responsibility to clean up their site to victimized content owners like Viacom. Under both common and statutory law, the answer is clear: Defendants are liable for the rampant infringement they have fostered and profited from on YouTube. Once summary judgment is entered, trial will be dramatically shortened, focusing on assessing damages arising from Defendants' policies of hosting and benefiting from massive copyright infringement.

*First*, Defendants are liable under *Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, 545 U.S. 913 (2005), because they operated YouTube with the unlawful objective of profiting from (to use their phrase) "truckloads" of infringing videos that flooded the site. YouTube's founders single-mindedly focused on geometrically increasing the number of YouTube users to maximize its commercial value. They recognized they could achieve that goal only if they cast a blind eye to and did not block the huge number of unauthorized copyrighted works posted on the site. The founders' deliberate decision to build a business based on piracy enabled them to sell their start-up business to Google after 16 months for $1.8 billion. The Supreme Court in *Grokster* found no legal or societal justification for such intentional copyright infringement.

Prior to the acquisition, Google itself had tried to compete with YouTube by complying with the law, without permitting infringement on Google's own Google Video site. Google executives well recognized that YouTube was a "pirate site," a "rogue enabler of content theft" and a "video Grokster" whose "business model is completely sustained by pirated content." But after buying its former rival, Google abandoned its scruples in order to continue growing the YouTube user base until well into 2008. It abandoned its own anti-piracy practices and instead embraced YouTube's illegal business model. As acquiror, Google assumed liability for YouTube's pre-acquisition infringement. And once its acquisition was consummated, Google readily embraced and perpetuated YouTube's piracy and willful blindness.

It did not have to be this way. Defendants had at their disposal readily available and inexpensive techniques, including fingerprinting and filtering technologies, to block the uploading of pirated works and clean up the site. They instead made a deliberate business decision not to broadly deploy these techniques and instead to hold content owners hostage to Defendants' efforts to commercialize the site. More specifically, at the beginning of 2007, Google and YouTube began to use digital fingerprinting to screen out infringing works for copyright owners who agreed to a content license agreement with them. But for other copyright owners – including Viacom – they engaged in a form of high-tech extortion: refusing, until May 2008, to apply that same technology to protect Viacom <u>unless</u> it first agreed to license its intellectual property to YouTube.[1] Defendants' intentional conduct and business decisions render them liable for the resulting infringement under *Grokster*.

---

[1] Because of this change in May 2008, this motion seeks summary judgment only for the period prior to May 2008. While Google and YouTube may still be liable for the more limited infringement that continued after fingerprinting was used to limit piracy of Viacom's works, we do not ask the Court to address potential liability for post-May 2008 infringement in this motion and, if Viacom's summary judgment motion is granted, do not intend to do so at trial.

*Second*, Google and YouTube are liable under long-standing principles of vicarious copyright liability because they had a direct financial interest in the infringement on YouTube and the right and ability to control it. Defendants' financial interest in infringing clips that attracted viewers and thereby advertising revenue is direct and obvious. So is the $1.8 billion YouTube's founders and early investors walked away with through this strategy. And Defendants had readily available ways to control the infringement on YouTube. Indeed, they were deploying these very techniques for other companies, and said they would do so for Viacom – but <u>only</u> if Viacom gave them a license for popular Viacom programs. Defendants' refusal to control the infringement from which they profited makes them vicariously liable.

*Third*, Google and YouTube are liable for their own directly infringing conduct. Defendants have tried to portray themselves as passive and innocent conduits or mere receptacles for infringing clips posted by users. In reality, the majority of infringing acts were volitionally initiated by Defendants themselves, such as the creation and public performance of new infringing copies for additional distribution channels months or years after infringing videos were first uploaded. Indeed, uploading users are compelled to subscribe to terms of service that grant to YouTube a worldwide license to "use, reproduce, distribute, prepare derivative works, display, and perform" uploaded videos. YouTube performs all of these functions, and they constitute acts of direct infringement under the copyright laws.

The principles establishing liability summarized above parallel many of the reasons why Defendants also are not protected by the limited defense created by the DMCA. Defendants contend they qualify for the DMCA safe harbor because they removed specific infringing clips located and listed by Viacom in takedown notices. To them, the DMCA is just a takedown notice statute. Embracing Defendants' position would render most of the statute enacted by

Congress a nullity, for responding to takedown notices is only one of numerous preconditions to DMCA immunity. Google and YouTube fail to meet at least three other preconditions.

*First*, Defendants had "actual knowledge" and were "aware of facts or circumstances from which infringing activity [was] apparent," but failed to do anything about it. 17 U.S.C. § 512(c)(1)(A). Indeed, they fully intended to facilitate that infringement. Such *Grokster* intent defeats any DMCA defense, which is available only to innocent service providers, not intentional wrongdoers or those who elect to remain willfully blind to pervasive piracy.

*Second*, Google and YouTube "receive[d] a financial benefit directly attributable to the infringing activity" and had "the right and ability to control such activity." *Id.* § 512(c)(1)(B). Using statutory language taken from vicarious liability case law, Congress intended this prong of the DMCA to exclude businesses that are liable under that common law vicarious liability standard. Because Defendants are vicariously liable, they cannot take refuge in the DMCA.

*Third*, Defendants' infringement does not result from providing "storage at the direction of a user," *id.* § 512(c), or the other specific functions listed in § 512(a)-(d). Defendants engage in directly and secondarily infringing activities that are neither storage nor at the direction of a user. For example, on their own initiative Defendants copy and purport to license infringing videos for distribution over third-party platforms under commercial deals that Defendants – not their users – negotiate. That is not storage, and it is not protected by the DMCA.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where "there is no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the movant must "'demonstrate the absence of a genuine issue of material fact. . . . The burden is then on the non-moving party to set forth specific facts raising a genuine

4

issue of fact for trial.'"  *United States ex rel. Romano v. N.Y. Presbyterian*, 426 F. Supp. 2d 174, 177 (S.D.N.Y. 2006) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 324 (1986)).

<u>ARGUMENT</u>

I. **DEFENDANTS ARE LIABLE UNDER *GROKSTER* BECAUSE THEY INTENTIONALLY OPERATED YOUTUBE AS A HAVEN FOR MASSIVE INFRINGEMENT.**

    A. **Statement of Undisputed Facts Relevant to Point I**[2]

        1. <u>The Founders' Knowledge and Intent Concerning Infringement</u>

YouTube was founded in 2005 by Chad Hurley, Steve Chen, and Jawed Karim as a "consumer media company" to "deliver entertaining, authentic and informative videos across the Internet."  SUF ¶¶ 10, 13-15.  All three founders had worked at the Internet start-up PayPal, whose creators made a fortune when it was sold to eBay for $1.3 billion in 2002.  SUF ¶¶ 11-12. That was the founders' plan for YouTube too.  They aimed to quickly establish YouTube as the most popular video site on the Internet, and then cash in by selling it.  SUF ¶¶ 30, 36, 49-50 (Karim:  "our dirty little secret . . . is that we actually just want to sell out quickly").  Because attracting a huge "user base" of fans was essential to this plan, founder Chen urged his associates to "concentrate all of our efforts in building up our numbers as aggressively as we can through whatever tactics, <u>however evil</u>."  SUF ¶ 85 (emphasis added); *see* SUF ¶ 36 (Karim:  "Where our value comes in is USERS.").  Thus, the founders consciously aimed to attract users by emulating notorious pirate services like "napster," "kazaa," and "bittorrent."  SUF ¶ 29.  That plan worked. By exploiting copyrighted works without a license, YouTube became the leading Web video site, resulting in enormous wealth for its founders and venture capital investors who, after a mere year and a half, flipped the site to Google for $1.8 billion.  SUF ¶¶ 16-27.

---

[2] For the Court's convenience, this Memorandum divides the Statement of Undisputed Facts into subsections relevant to the point under discussion.

From the beginning, the founders understood that YouTube was a magnet for unauthorized copyrighted content. As early as April 2005, they emailed each other about users uploading "copyrighted material" – such as Viacom's "South Park" show, which they repeatedly mentioned. SUF ¶¶ 31-32. Soon the infringement was so blatant that YouTube's own Internet service provider complained that YouTube was violating its user agreement because, as Chen explained, "we're hosting copyrighted content." SUF ¶ 33. But the founders did nothing in response. *Id.* (Chen: "i'm not about to take down content because our ISP is giving us shit.").

The fact that YouTube was flooded with obviously infringing media clips was a constant focus throughout the summer of 2005. As the founders' internal emails unambiguously show, they wanted to continue exploiting infringing videos to rapidly expand their user base, while groping for ways "to avoid the copyright bastards" – as they referred to copyright owners whose works were being infringed. SUF ¶¶ 34-38. Right after the Supreme Court handed down the *Grokster* decision condemning the intentional operation of an Internet service that fosters infringement, Hurley recognized the obvious parallel to YouTube and emailed the other founders: "we need views, [but] I'm a little concerned with the recent Supreme Court ruling on copyrighted material." SUF ¶ 39. Yet, the founders could not bring themselves to reject their reliance on the infringing videos that were critical to fueling the site's explosive growth. *Id.* ("we need views").

Thus, during the summer of 2005, the founders removed some of the most obvious infringing videos from YouTube to give the impression of copyright compliance; but they deliberately and intentionally chose to leave up other infringing clips when they thought the additional site traffic was worth the legal risk. SUF ¶¶ 43-48. Chen explained: "That way, the perception is that we are concerned about this type of material and we're actively monitoring it.

6

[But the] actual removal of this content will be in varying degrees.  <u>That way . . . you can find</u> <u>truckloads of . . . copyrighted content . . . [if] you [are] actively searching for it</u>."  SUF ¶ 60. (emphasis supplied).  In particular, the founders decided to keep infringing "comedy clips" – a Viacom specialty.  SUF ¶ 52.  Choosing to pursue their get-rich-quick scheme through piracy, Hurley told the others:  "save your meal money for some lawsuits!"  SUF ¶ 38.

The founders' contempt for copyright was so strong that they uploaded infringing videos themselves.  One email noted that founder "Jawed [was] putting stolen videos on the site."  SUF ¶ 40; *see also* ¶ 41.  Chen admonished: "We're going to have a tough time defending the fact that we're not liable for the copyrighted material on the site because we didn't put it up when one of the co-founders is blatantly stealing content from other sites and trying to get everyone to see it." *Id.*  In another case, Chen emailed about a video, saying "steal it!"  SUF ¶ 44.  When Hurley expressed concern about "steal[ing] the movies," Chen countered:  "[W]e need to attract traffic. . . .  [T]he only reason why our traffic surged was due to a video of this type." *Id.*

By September 2005, the founders largely abandoned even the half-hearted attempt to create the illusion of respect for copyrights and adopted a policy that YouTube followed until at least May 2008:  they decided to keep substantially all infringing videos on the site as a draw to users, unless and until YouTube received a "takedown notice" from the actual copyright owner identifying a specific infringing clip by URL and demanding its removal from the site, in which case YouTube would remove the specific clip at that URL – but no others.[3]  This decision is reflected in a key September 3, 2005, email exchange between the three founders, which started

---

[3]  YouTube employees only rarely and sporadically removed videos without receiving a takedown notice after adopting this policy in September 2005.

when Hurley emailed the others re "copyright material!!!": "<u>aaahhh, the site is starting to get out of control with copyrighted material</u>."  SUF ¶ 54 (emphasis added).

Rather than responding by proposing steps to clean up the site, Chen strongly argued against removing the illegal videos because of the effect on traffic.  In fact, the September 3 internal email exchange resulted in the first of several internal YouTube documents that quantified the vast extent and importance of infringement on the site.  SUF ¶¶ 54-58.  Chen twice wrote that 80% of user traffic depended on pirated videos.  SUF ¶¶ 55, 57.  He opposed removing infringing videos on the ground that "<u>if you remove the potential copyright infringements . . . site traffic and virality will drop to maybe 20% of what it is</u>."  SUF ¶ 55 (emphasis added).  Karim proposed they "just remove the <u>obviously copyright infringing stuff</u>." *Id.* (emphasis added).  But Chen again insisted that even if they removed only such <u>obviously</u> infringing clips, site traffic would drop at least 80%.  SUF ¶ 56  ("if [we] remove all that content[,] we go from 100,000 views a day down to about 20,000 views or maybe even lower").[4]

Chen's 80% figure closely matched outside estimates of the pervasiveness of infringement on the YouTube site.  For example, in April 2006, Peter Chernin, the Chief Executive Officer of News America, parent of the Fox television network and the 20th Century Fox film studio,  made a widely reported speech noting that News America conducted a survey and found that "more than 80 percent of video on [YouTube] is copyrighted content."  SUF ¶ 145.  The report of this survey was broadly circulated within Google Video, eliciting this response from one senior executive:  "Holy cow." *Id.*

To justify keeping the "obviously copyright infringing stuff" on the site, the YouTube founders in the fall of 2005 adopted the policy of willful blindness to infringement:  they

---

4 ████████████████████████████████████████████████████████████

determined to embrace the avowed pretense that the hundreds of thousands of clips on YouTube that were stolen from popular movies and TV shows were actually owned by the uploading users. In the September 3 email exchange, Chen explained the policy as follows: "[T]he copyright infringement stuff[,] I mean, we can presumably claim that we don't know who owns the rights to that video and by uploading, the user is claiming that they own that video[,] we're protected by DMCA for that. [W]e'll take it down if we get a cease and desist [i.e., a takedown notice]." SUF ¶ 57; *see also* ¶ 53. Using the example of a clip pirated from a CNN show, he outlined how YouTube would benefit from the policy of willful blindness and toleration of infringement: "[I] really don't see what will happen. what? someone from cnn sees it? he happens to be someone with power? he happens to want to take it down right away. he gets in touch with cnn legal. 2 weeks later, we get a cease & desist [takedown] letter. we take the video down." SUF ¶ 47; *see also* ¶¶ 120, 128. In the meantime, the infringing video remains on YouTube as a draw to users.

YouTube's policy of willful blindness is highlighted by an abrupt flip flop on community flagging for copyright violations. On September 3, a worried Hurley pushed for YouTube to start "community flagging" for infringing videos – that is, to have users flag uploaded videos as likely violative of copyright laws for follow-up scrutiny by YouTube employees. SUF ¶ 58. This is the method YouTube uses with great success to find and remove pornography from the site. SUF ¶¶ 67-68, 70, 73. With such a system to identify and remove copyrighted material, Hurley hoped "then we won't be liable" for infringement. SUF ¶ 58. Within five days, Chen had "hooked up" "Flagging for Inappropriate/copyrighted content." SUF ¶¶ 61-62.

This practice lasted all of two weeks. Hurley quickly came to realize that copyright flagging would work all too well, thereby undermining YouTube's willful blindness strategy.

On September 23, 2005, Hurley wrote to the other founders that they should discontinue copyright flagging "asap" to avoid being put on notice of infringement:

> can we remove the flagging link for "copyrighted" <u>today</u>. . . . [B]asically if we don't remove them <u>we could be held liable for being served a notice</u>. it's actually better if we don't have the link there at all because then the copyright holder is responsible for serving us notice of the material and not the users.

SUF ¶ 64 (emphasis added). On its face, this constituted a willful decision to blind YouTube to notice of copyright infringement and to shift the entire burden to copyright owners.

This strategy of willful blindness left users free to flood the site with illegal content. In February 2006, Maryrose Dunton, one of YouTube's earliest employees and its lead Product Manager, provided another quantification of the vast extent of piracy on the site. She reported to Chen that she "did a little exercise on Friday and went through all the most viewed/most discussed/top favorites/top rated [videos on YouTube] to try and figure out what percentage is or has copyrighted material. <u>it was over 70%</u>." SUF ¶ 95 (emphasis added). Dunton then sarcastically added that she had "flagged" the copyrighted videos for removal – showing she understood they were infringing. *Id.* When deposed, she confirmed she did <u>not</u> really flag the videos; they remained on YouTube as a draw to users. SUF ¶ 96, *see also* ¶¶ 78, 88. That a YouTube executive joked with a founder about 70% of the most popular videos on YouTube being infringing and did nothing about it speaks volumes.

And that was no mere slip of the pen. A month later, Dunton told another senior YouTube employee in an instant message that "the truth of the matter is probably 75-80% of our views come from copyrighted material." SUF ¶ 104. She agreed with the other employee that YouTube has some "good original content" but "it's just such a small percentage." *Id.*

In the same time period, presumably after a legal presentation, Dunton engaged in an exchange with another YouTube employee who asked rhetorically: "was it me, or was the

lawyer thing today a cover-your-ass thing from the company?"  SUF ¶ 93.  Dunton responded, "oh totally . . . did you hear what they were saying?  it was really hardcore . . . if we even see copyrighted material on the site, as employees we're supposed to report it."  *Id.*  She continued: "I guess the fact that I started like 5 groups based on copyrighted material probably isn't so great."  *Id.*  To which the other employee replied:  "but it's a cover your ass . . . so the board can say we told maryrose not to do this."  *Id.*

Also during this period, a senior YouTube engineer discussed with Dunton setting up an anti-infringement tool to send automated email alerts to copyright owners when illegal content was uploaded.  SUF ¶¶ 112-13.  The engineer noted that implementing the tool "isn't hard" and would "take another day or w/e [weekend]."  SUF ¶ 114.  But Dunton explained "I hate making it easier for these a-holes" – referring to copyright owners – and told the engineer to "forget about the email alerts stuff" because "we're just trying to cover our asses so we don't get sued." *Id.*

YouTube even emphasized the popularity of known infringing videos to potential investors.  A case in point is "Lazy Sunday," taken from NBC's show "Saturday Night Live," which was an enormous hit on YouTube.  SUF ¶ 92; *see also* ¶ 84.  Even after YouTube received takedown notices from NBC for this video, YouTube highlighted the video's success to potential investors and its own board to show how it was using infringing professional content to draw viewers and to become the most popular video site on the Internet.  SUF ¶¶ 89-92, 98-99.

A true smoking gun is a memorandum personally distributed by founder Karim to YouTube's entire board of directors at a March 22, 2006 board meeting.  SUF ¶¶ 109-11.[5]  Its words are pointed, powerful, and unambiguous.  Karim told the YouTube board point-blank:

> As of today episodes and clips of the following well-known shows can still be found:  Family Guy, South Park, MTV Cribs, Daily Show, Reno 911, Dave Chapelle.  This content is an easy target for critics who claim that copyrighted content is entirely responsible for YouTube's popularity.  Although YouTube is not legally required to monitor content (as we have explained in the press) and complies with DMCA takedown requests, we would benefit from *preemptively* removing content that is blatantly illegal and likely to attract criticism.

*Id.* (emphasis added).[6]  All of the shows underlined above and identified by Karim in this memorandum to the YouTube board as "blatantly illegal" are Viacom programs.  SUF ¶¶ 5-6.  But the board and YouTube did nothing.

Having rapidly expanded YouTube by using infringing video clips in this way, the founders sold the site to Google for $1.8 billion in November 2006, a mere 1-1/2 years after its founding.  SUF ¶¶ 16-19.  Hurley and Chen walked away with several hundred million dollars each, and Karim, who had left YouTube, received approximately $60 million.  SUF ¶¶ 21-23.

### 2.    Google's Knowledge and Intent Concerning Infringement

Senior executives of Google, YouTube's principal competitor, well appreciated the vastness of the piracy on YouTube months before Google acquired it (and then embraced its copyright practices).  When it acquired YouTube, Google assumed and became fully liable for the acts of YouTube and its founders for the period 2005-2006.  Just as importantly, Google is

---

[5] This is one of the highly inculpatory documents that Defendants never produced in discovery.  *See infra* at 21-23.  Fortunately, it was preserved and produced by Karim after he left YouTube.

[6]  While Karim implied the DMCA protected YouTube's conduct, Defendants have elected not to assert an advice of counsel defense and have accordingly blocked discovery into their actual beliefs about this issue.  Moreover, as shown in Point IV below, Karim's own acknowledgement of "copyrighted content" that is "blatantly illegal" in reality defeats any DMCA defense.

also liable for its own post-acquisition policies and practices. Google now jointly operates the YouTube website. Answer to Amended Compl. ¶ 27. And Google has perpetuated and built upon YouTube's history of infringement, taking advantage of widespread piracy both as a draw for users and to coerce content owners into licensing their content to Google.

Before acquiring YouTube, Google had its own Internet video site, Google Video, which (like YouTube) allowed users to upload videos, but (unlike YouTube) reviewed each video at upload and blocked those that infringed copyrights. SUF ¶¶ 133-36. The person in charge of such screening reported to a senior Google executive: "We catch around 10% of all online user uploaded videos during review. Of these approximately 90% is disapproved due to copyright violation, and the rest due to policy (porn, violence, etc.)." SUF ¶ 137 (emphasis added).

But Google's good intentions and compliance with the law were not paying off. YouTube was way ahead of Google Video in the race to build up a user base. SUF ¶¶ 146, 154. Google executives understood that YouTube's success was largely due to what they euphemistically labeled its "[l]iberal copyright policy" of freely allowing infringing material. SUF ¶¶ 140-45, 148, 150-52, 155-57, 159.

Losing the user race to YouTube because of the latter's copyright infringement, Google Video executives engaged in a "heated debate" in 2006 "about whether we should relax enforcement of our copyright policies in an effort to stimulate traffic growth." SUF ¶ 158. A top senior executive, Peter Chane, Google Video's Business Product Manager, argued point blank that Google Video should "beat YouTube" by "calling quits on our copyright compliance standards." SUF ¶ 149. Chane specifically advocated switching Google Video to YouTube's "reactive DMCA only" policy because "**YouTube gets content when it's hot** (Lazy Sunday,

Stephen Colbert, Lakers wins at the buzzer)" and it "[t]akes us too long to acquire content directly from the [legitimate] rights holder."  SUF ¶ 156 (emphasis in original).

Others at Google questioned whether it should follow YouTube's strategy of winning by breaking the law.  A memorandum prepared by a top Google executive, and distributed to the most senior executives of Google Video, recorded Google co-founder Sergey Brin as asking whether it was right for Google to "chang[e] policy [t]o increase traffic <u>knowing beforehand that we'll profit from illegal [d]ownloads</u>."  SUF ¶¶ 162-63 (emphasis added).[7]  Another executive listed the "Top 10 reasons why we shouldn't stop screening for copyright violations"; the first was "It crosses the threshold of Don't be Evil to facilitate distribution of other people's intellectual property."  SUF ¶ 164.[8]  In contrast, Google's Chief Executive Eric Schmidt was quoted in support of relaxing Google Video's copyright enforcement policies.  SUF ¶ 160.

In May 2006, Google held a Google Product Strategy (or "GPS") meeting attended by top executives, including CEO Schmidt.  The GPS focused on Google Video.  SUF ¶ 147. Before the meeting, David Eun, a senior Google executive responsible for negotiating license agreements with content owners, sent an email to Schmidt summarizing the internal "heated debate whether we should relax enforcement of our copyright policies in an effort to stimulate traffic growth" to beat YouTube at its own game.  SUF ¶¶ 158-59.  Eun told Schmidt:

> I think we should beat YouTube . . . – but not at all costs.  <u>A large part of their traffic is from pirated content.</u>  When we compare our traffic numbers to theirs, we should acknowledge that we are comparing our "legal traffic" to <u>their mix of</u>

<hr>

[7] At his deposition, Brin claimed not to have made this statement.  Hohengarten Decl. ¶ 352 & Ex. 318 at 61:17-62:19.  Regardless, the statement attributed to him was widely circulated among top Google officials.

[8] This language had particular significance at Google, whose informal motto is "Don't Be Evil." SUF ¶ 164.  Thus, "cross[ing] the threshold of Don't be Evil" indicated a conscious turning point for the company toward intentional wrongful conduct.

<u>traffic from legal and illegal content</u>.  One senior media executive told me they are monitoring YouTube very closely and referred to them as a "<u>video Grokster</u>."

*Id*. (emphasis added).[9]

Likewise, Google Video executives vividly described YouTube's illegal practices to the GPS meeting's attendees.  In a memorandum marked "final" for integration into the material prepared for the GPS, the Google Video team advised senior Google executives:

- YouTube is "a <u>'rogue enabler' of content theft</u>"

- "YouTube's content is all free, and <u>much of it is highly sought after pirated clips</u>"

- "YouTube's business model is <u>completely sustained by pirated content</u>.  They are at the mercy of companies not responding with DMCA requests."

- "[Content owners] (mainly) perceive YouTube as <u>trafficking mostly illegal content</u> – it's <u>a video Grokster</u>"

SUF ¶ 157 (emphasis added).

Despite Google's keen awareness that infringement was the linchpin to YouTube's success, in October 2006 Google decided to buy its rival – and its valuable user base built up with illegal content – for $1.8 billion.  SUF ¶¶ 16-19.  Significantly, the vast extent of infringement on YouTube was confirmed by Google's own pre-acquisition due diligence conducted by Google executives and its financial advisor, Credit Suisse.  SUF ¶¶ 166-82.

Credit Suisse analyzed a sample of videos from YouTube that Google deemed representative of site traffic, and determined that more than <u>60%</u> of the video views in the YouTube sample were "premium," their shorthand for "the content is copyright[ed] (either in whole or in substantial part)" or "removed [and] taken down" in response to a takedown notice

---

[9] When deposed, Schmidt professed not to remember this email about "pirated content" all over YouTube, five months before Google acquired it.  Hohengarten Decl. ¶ 348 & Ex. 314 at 75:14-82:4.  The issue was not lost on other Google executives.  For example, on May 10, 2006, Ethan Anderson, International Business Product Manager for Google Video, stated:  "I can't believe you're recommending buying YouTube. . . .  they're 80% illegal pirated content."  SUF ¶ 153.

(and thus plainly infringing).  SUF ¶ 170.  Credit Suisse also estimated that <u>YouTube had a license for only 10% of those premium copyrighted video views</u>.  SUF ¶ 174; *see also* SUF ¶ 171 (premium content on YouTube included "Legitimate <u>and Illegitimate</u>" uploads) (emphasis added).  In other words, 54% (90% of 60%) of the video views in the due diligence sample were of <u>premium copyrighted content that was admittedly unauthorized by the content owner</u>.

This analysis was incorporated into the board book prepared by Credit Suisse and presented to the Google board of directors on the day it authorized the purchase of YouTube, October 9, 2006.  SUF ¶¶ 175-76.  The board book emphasized the "tremendous growth" in YouTube's user base and its "loyal global following."  SUF ¶ 178.  Credit Suisse advised the Google board that virtually the entire financial value of YouTube, with a base case value of <u>$2.7 billion</u>, derived from Google's ability to monetize that vast entrenched user base in the future.  SUF ¶ 180.  The book then told the board that "60% of total video streams on yellow website" – their code name for YouTube – are 'Premium.'"  SUF ¶ 181.  The board also was advised that Credit Suisse's valuation "[a]ssumes 10% of premium content providers allow [YouTube] to monetize their content in [fiscal year 2007]" – confirming that 90% of premium copyrighted content was simply being displayed on the site without permission.  SUF ¶ 182.  Google's entire board thus was on clear notice of the vast scope of YouTube's copyright infringement.[10]  Notwithstanding this knowledge, the board authorized the purchase.  SUF ¶ 16.[11]

---

[10] The board was even warned about "uncertain legal issues."  SUF ¶ 177.  This was a euphemism for copyright infringement liability, as everyone well knew, for indemnification for copyright liability was a hotly negotiated deal term during the merger negotiations.  Recognizing what it was buying, an early Google term sheet sought indemnification for copyright liability suits up to 12.5% of the purchase price.  SUF ¶ 183.  Recognizing what they were selling, YouTube's founders and investors strongly resisted, and a lesser copyright indemnification provision was agreed to by the parties in the merger agreement.  SUF ¶¶ 184-85.  After Viacom filed this suit, Defendants purportedly discovered a "scrivener's error" in the original merger

Whether the correct quantification of the scope of YouTube's piracy was that it attracted 80% of site traffic (per Steve Chen), accounted for 80% of its content (News America), 70% of its most popular videos and 75-80% of the resulting views (Maryrose Dunton), 80% of all content (Ethan Anderson), or 54% of all views (Credit Suisse), it was unavoidably clear, as Chad Hurley summed it up, that YouTube was "out of control with copyrighted material." Still, having paid an immense sum for a website literally overrun with illegal content, Google's highest priority was to preserve YouTube's competitive advantage and continue aggressively to grow the user base. After the deal closed, the mandate to aggressively grow came by way of an edict from Google CEO Schmidt. He instructed the YouTube team that their focus should be "to grow playbacks to 1b/day [one billion per day]." SUF ¶ 188. That goal remained unchanged until March 2008, when Chad Hurley wrote that "three weeks ago Eric shifted his thinking on YouTube's focus. So, since that time we have rapidly been redirecting our efforts from user growth to monetization." SUF ¶ 201.

With its initial focus on user growth, Google reversed its own earlier copyright compliance policies and adopted YouTube's willful blindness strategy. Instead of screening as was done at Google Video, now every infringing video would remain freely available on YouTube until a copyright owner could detect it and send a takedown notice. SUF ¶ 189. And Defendants' executives continued to be well aware of the massive infringement on YouTube, just as they had been in the pre-acquisition period. For example, an employee charged with

---

agreement and increased the size of the indemnification provision for copyright infringement. SUF ¶ 186.

[11] The acquisition price authorized by the board was $1.65 billion in Google stock based on a 30-day average of the stock price at the time of closing. SUF ¶ 16. When the deal actually closed on November 13, 2006, the purchase price was $1.775 billion. SUF ¶ 19.

selecting videos for prominent placement on the site reported that "we're running into issues finding enough videos because they have so many copyrighted violations." SUF ¶ 192. Google executives emailed clips that infringed Viacom's copyrights to each other – but did nothing to stop the infringement. SUF ¶¶ 190-91, 193-94. And a post-acquisition "YouTube Content Policy Training" manual even highlighted Viacom's "*Daily Show*" by name as an example of content to "Approve" when reviewing videos flagged for terms-of-use violations. SUF ¶ 69. Thus, as Google founder Brin had candidly stated during Google's internal debate on this issue a few months earlier, the company was consciously "changing [its] policy to increase traffic knowing beforehand that we'll profit from illegal downloads." SUF ¶ 162. This changed only in mid-2008, after Schmidt "shifted his thinking on YouTube's focus," and Google began to use filtering technologies to curtail infringement.

Given Google's earlier history of respecting copyright, Viacom negotiated with Google from November 2006 until February 2007 over a possible "content partnership" agreement to license some of Viacom's copyrighted works to appear on YouTube. SUF ¶ 203. During the negotiations, Viacom made clear that without such a license, the appearance of Viacom works on YouTube was unauthorized. SUF ¶ 204. Viacom also insisted on compensation for past infringement of its works as part of any license. SUF ¶ 205. Google offered a package that it valued at a minimum of $590 million for a content license from Viacom. SUF ¶ 206. Importantly, Google's offer and term sheet included an explicit guarantee that Google would use digital fingerprinting technology to prescreen all uploads to YouTube and block any videos from Viacom works not licensed under the agreement. SUF ¶ 207. Ultimately, however, the negotiations broke down, and Defendants never obtained a license from Viacom. SUF ¶ 208.

On February 2, 2007, Viacom sent takedown notices for more than 100,000 infringing videos on YouTube. SUF ¶ 210.

With the collapse of the deal to license Viacom's videos, Google and YouTube withdrew their offer to use fingerprint technology to protect Viacom's content. This was so even though Viacom strongly urged the two companies to cooperate in good faith to clean up the site. Viacom's General Counsel, Michael Fricklas, pressed Defendants to use fingerprinting to prevent infringement of Viacom's works, and offered to have Viacom's technology experts cooperate with Defendants as needed to that end. SUF ¶ 209. Google's General Counsel, responding to Viacom and NBC Universal on February 16, 2007, rejected cooperation and refused to use fingerprint technologies for Viacom or NBCU in the absence of a license agreement. SUF ¶¶ 217-18. Defendants did not deploy fingerprinting to prevent infringement of Viacom's works for another year and a half – long after this suit was filed. SUF ¶¶ 217-22.

Parallel to Viacom's efforts to elicit cooperation from YouTube and Google, the Motion Picture Association of America ("MPAA") engaged in a similar discussion on behalf of all the movie studios, including Viacom's Paramount. The history of the MPAA's failed efforts on behalf of all the movie studios vividly illustrates YouTube's and Google's attitude and practices.

The MPAA was represented in its talks with Defendants by its Executive Vice President and Chief Strategic Officer. SUF ¶¶ 223-24. Starting around April 2006, the MPAA negotiated with YouTube because "there was a lot of copyrighted content on the site that was owned or controlled by the motion picture studios." SUF ¶ 223. "The discussion was about encouraging YouTube to do two things: deal with the content that we identified on the site that was copyrighted, infringement content from the motion picture studios; and two, and relatedly integrating filtering software that would address that copyrighted content." SUF ¶ 225. But after

months of futile discussions, YouTube refused to work with the MPAA or to utilize or even agree to test fingerprint and filtering technologies. YouTube's expressed reason was stark and candid: piracy was drawing users to the site. As the MPAA's EVP testified: "[t]here were a range of reasons given including the fact that the copyrighted content on YouTube was a major lure for their users." SUF ¶ 226.[12]

Google announced its acquisition of YouTube on October 9, 2006. That revived negotiations with the MPAA. On October 13 and November 9, 2006, the MPAA transmitted two specific written proposals to the Defendants calling for cooperation and the testing of filtering technologies, including the technology of a company called Audible Magic, from whom YouTube already had a license in hand. SUF ¶¶ 227-28; *infra* at 35. The MPAA even agreed to pay for the test. SUF ¶¶ 227-28. That was a generous concession, since the cost of filtering was comparatively trivial, SUF ¶ 311, and Google hardly needed the financial boost, its cash hoard having grown to $11.2 billion by the end of 2006, SUF ¶ 28.

Google and YouTube did not respond for months. Then, in January 2007, Defendants flatly rejected cooperation or filtering to prevent piracy unless the studios granted Defendants licenses and revenue sharing agreements: "[F]or those companies who were not and did not develop a licensing agreement with Google, they weren't going to be doing this sort of a pilot

---

[12] This testimony is particularly powerful since YouTube executives made the exact same statement to Google Video executives in 2006, which the latter even reduced to writing. On Friday, January 13, 2006, Peter Chane and a Google Video colleague met with YouTube's CEO Chad Hurley and another senior YouTube executive Chris Maxcy. SUF ¶¶ 140-41. Two days later, Chane wrote an email to Jonathan Rosenberg, the head of product development for all of Google, explaining that YouTube was able to display copyrighted content unavailable on Google Video because Google had a "zero tolerance policy to copyrighted content," whereas YouTube had no such policy and was using piracy on the site to draw user traffic. Chane wrote to Rosenberg: "[T]hey are aware of this [lax enforcement policy] (I spoke with them on friday) and they plan on exploiting this in order to get more and more traffic." SUF ¶ 141.

initiative or filtering." SUF ¶ 229. That reflected the thinking of Google Senior Vice President Jonathan Rosenberg, who had earlier told Chane that the "lesson" from YouTube was to "play faster and looser and be aggressive until either a court says 'no' or a deal gets struck." SUF ¶ 160.

Within the month, having been rebuffed both individually and as a member of the MPAA, Viacom commenced this suit.[13]

3.     Defendants Cannot Walk Away from Their Contemporaneous Internal Documents.

The internal emails and memoranda of YouTube's founders and Google's senior executives discussed above make a compelling and indisputable record of Defendants' intent to use infringing videos clips to build the YouTube business. Viacom's position is not dependent

---

[13] Having rejected all cooperation and filtering, the Defendants today hide behind their willful blindness policy and argue that they cannot be expected to differentiate between illegal and authorized clips. Hence, they argue, the responsibility for copyright compliance on YouTube should rest with the victimized content owners, with YouTube free to lure users to the site with "truckloads" of pirated materials unless and until the content owners detect them and request their removal listing specific infringing URLs. In this vein, much of Defendants' deposition time has been expended questioning whether Viacom employees had uploaded some videos to YouTube as promotional material, thereby authorizing their presence there. This whole exercise is a red herring. First, none of the infringing clips at issue in this lawsuit were uploaded to YouTube by Viacom or its authorized agents. SUF ¶ 9. Second, the number of uploads to YouTube that Viacom did authorize (for which Viacom is not suing for infringement) was very limited compared to the 63,000 unauthorized infringing clips claimed by Viacom in this litigation. Hohengarten Decl. Ex. 2 (Solow Decl.) ¶¶ 17, 30-32. Third, of that small number of authorized clips, virtually all were uploaded to YouTube using official Viacom account names, and YouTube was fully aware of this fact. *Id.* ¶ 31-32. Fourth, Defendants' own offer to use fingerprinting in connection with a license to block unauthorized works while permitting authorized uploads makes clear that Defendants had yet another way to distinguish between legal and illegal uploads had they wanted to. That is the entire point of fingerprinting. Had they cooperated, Defendants' entire authorization argument relied upon in this litigation would have been resolved and gone up in smoke. Instead, they chose the path of non-cooperation and willful blindness, forcing Viacom and other studios to play a cat and mouse game with illegal uploaders, with Defendants enjoying the financial rewards from this piracy in the interim.

on extrapolations or interpretations from these documents. Defendants' own words, in plain English, speak for themselves – clearly and forcefully.

And this is a case where these written words speak all the more powerfully given the Defendants' failure to preserve and produce many key documents and the ostensible memory failures of their key executives when deposed. Among the most compelling documents are the internal emails and memoranda of YouTube's founders. <u>Almost none of these key internal documents were produced by Google or YouTube</u>, which claims they were all lost. Hohengarten Decl. ¶ 263. Among others, Chad Hurley, a founder and YouTube's Chief Executive from its inception to today, revealed for the first time of his deposition that he "lost all" of his YouTube emails for the key time period of this case. *Id.* ¶ 264. Fortunately, Karim, who left YouTube in 2006 and preserved these materials on his own personal computer, discharged his duties to this Court and produced them. *Id.* ¶¶ 218-63. Otherwise they would have never surfaced in this litigation.

Similarly unusual are the document destruction practices followed by Google's CEO Eric Schmidt. He claims to use and email from "probably 30" different computers. *Id.* ¶ 348 & Ex. 314, at 7:7-10. As set forth above, Schmidt was deeply involved in the decision to acquire YouTube and its post-acquisition policies. Yet, for the key period from June 2006 (when Google started intensely to focus on YouTube's policies and practices and debated whether to acquire it) through February 2007 (when negotiations fell apart with Viacom and the MPAA, resulting in this lawsuit), Schmidt's search for responsive materials "yielded 19 documents." *Id.* ¶¶ 266, 348 & Ex. 314 at 18. The absence of emails and documents is explained by a practice litigation-conscious in the extreme. Schmidt explained: "[i]t has been my practice for 30 years to not retain my emails unless asked specifically." *Id.* ¶ 348 & Ex. 314 at 18. He went on to testify:

"It was my practice to delete or otherwise cause the emails that I had read to go away as quickly as possible." *Id.* at 18-19.[14]

Similar bizarre practices surfaced when senior executives testified about these key documents. When Mr. Hurley was shown the email chains preserved by Mr. Karim, he developed serial amnesia. This is no lawyer's exaggeration: we include pages 177-317 of Mr. Hurley's testimony (Hohengarten Decl. ¶ 346 & Ex. 312) and invite the Court to review it. To the same effect is the testimony of Larry Page, one of Google's two co-founders and top three executives, who essentially disclaimed memory on any topic relevant to this litigation, even including, for example, whether he was in favor of Google's acquisition of YouTube, even though it was Google's largest corporate transaction to date and viewed as transformative to its business. Hohengarten Decl. ¶ 349 & Ex. 315, at 129:23-134:15. We enclose Mr. Page's entire deposition as Exhibit 315 to the Hohengarten Declaration. This Court can decide whether these key executives and witnesses behaved with the level of candor and respect for the legal process that this Court has a right to expect from senior executives of important public companies.

Due to these practices, we and the Court will never know what else was "lost" or made to "go away as quickly as possible." Fortunately, the documents that fortuitously survived and were produced still provide ample indisputable evidence of unlawful intent. Given Defendants' wholesale failures to preserve relevant documents or recall key salient facts, the surviving documents speak all the more loudly as undisputed facts that warrant summary judgment.

---

[14] This practice is certainly ironic coming from the CEO of a company that prominently markets its email service to the public as providing "lots of space" and "free storage" for emails. Hohengarten Decl. ¶ 316 & Ex. 288.

### B. Defendants' Intentional Operation of YouTube as an Infringement Haven Makes Them Liable Under *Grokster*.

Defendants' conduct squarely makes them liable for the infringement on YouTube under the Supreme Court's *Grokster* decision. In *Grokster*, the high court ruled that Internet businesses – like all other businesses – are liable for infringement when they operate a website with the unlawful intention, purpose, or objective that it will be used at least in part for infringing activity. The Court recognized no legal or social benefit in rewarding such piracy.

*Grokster* addressed whether two Internet "peer-to-peer" services were legally liable for facilitating infringement by their users who copied and distributed popular music and movies over the services. The lower courts in *Grokster* had ruled that the peer-to-peer services were immune from liability under the Supreme Court's earlier decision in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), because the services had "substantial noninfringing uses" – that is, they could be used for authorized exchanges of copyrighted works in addition to unauthorized infringement. *Grokster*, 545 U.S. at 927-28; *id.* at 931-32 (summarizing *Sony* holding). The Supreme Court likewise assumed the defendants' services had substantial noninfringing uses. *Id.* at 933-35. But the Supreme Court held that notwithstanding other substantial noninfringing uses, the services were still liable for the infringement they facilitated because they had the actual intent, purpose, or objective of facilitating infringement with their product. *Id.* at 937-40. Thus, "a copyright holder may proceed against a technology provider where a provable <u>specific intent to infringe</u> (of the kind the Court describes) is present." *Id.* at 962-63 (Breyer, J., concurring) (emphasis added).

The *Grokster* decision is squarely applicable here. First, the Supreme Court emphatically rejected the knowledge standard applied by the Ninth Circuit in that case, which had held that the peer-to-peer services could be secondarily liable for facilitating infringement <u>only</u> if they had

"knowledge of <u>specific</u> infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, 380 F.3d 1154, 1162 (9th Cir. 2004) (emphasis added), *rev'd*, 545 U.S. 913 (2005). The Supreme Court held that requiring "'specific knowledge of infringement'" was "error." 545 U.S. at 934. The *Grokster* Court recognized that acting with an unlawful purpose, intent or objective is the epitome of culpable conduct, and a defendant may not escape liability merely because it does not – or even could not – know of each specific act of infringement whereby its unlawful purpose comes to fruition. *See id.* at 922-23 (peer-to-peer services are liable even though they could not identify the specific works that were being illegally downloaded).[15]

The Supreme Court also emphasized that although the intentional facilitation of infringement is often called "inducement," this form of liability is not limited to situations in which a message encouraging infringement is actually communicated to users (*e.g.*, through advertising). Rather, as explained above, *Grokster* held that a business is liable whenever it operates with a purpose of facilitating infringement, regardless of whether it communicates that message. Advertisements or other messages are only one form of "direct evidence of unlawful purpose." 545 U.S. at 935. Liability ultimately rests on the existence of the unlawful purpose itself, which can also be established by other kinds of evidence. Thus, whether "messages" encouraging infringement "were communicated is not to the point," because such messages are merely one way of "prov[ing] by a defendant's own statements <u>that his unlawful purpose</u>

---

[15] Viacom notes that Defendants still have not produced data from YouTube's Logging Database that could show that senior YouTube and Google executives did, in fact, watch and know of many of the specific infringing videos at issue in this case. Nonetheless, there is abundant evidence in Defendants' emails and other communications to show that Defendants were well aware of specific cases of infringement of Viacom's copyrights without doing anything about it. *See*, *e.g.*, SUF ¶¶ 32, 59, 69, 105, 110, 116-17, 122, 130, 132, 165. As *Grokster* makes clear, however, such specific knowledge is not needed for inducement liability based on an overarching intent to profit from infringement.

disqualifies him from claiming protection." *Id.* at 938 (emphasis added). As a recent decision explained: "Importantly, liability may attach [under *Grokster*] even if the defendant does not induce specific acts of infringement. Instead, the court may 'infer[] a patently illegal objective from statements and actions showing what [the defendant's] objective was.'" *Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578, slip op. at 23 (C.D. Cal. Dec. 21, 2009) (citation and footnote omitted) (quoting *Grokster*, 545 U.S. at 941) (Hohengarten Decl. ¶ 2, Ex. 1).

Indeed, in *Grokster* the Supreme Court inferred the defendants' unlawful purpose from three factors that are direct echoes of the facts in this case: (1) the defendants were "aiming to satisfy a known source of demand for copyright infringement," which showed an "intent on the part of each to bring about infringement"; (2) "neither company attempted to develop filtering tools or other mechanisms to diminish the infringing activity," which "underscore[d] [the defendants'] intentional facilitation of their users' infringement"; and (3) the defendants made "money by selling advertising space," so that the "commercial sense of their enterprise turn[ed] on high-volume use, which the record show[ed] [was] infringing," which in the context of the entire record supported a finding of "unlawful intent." 545 U.S. at 939-40.

The *Grokster* Court also emphasized that this kind of unlawful intent can and should be found on summary judgment, effectively directing summary judgment for the plaintiffs in that case. *Grokster*, 545 U.S. at 941. On remand, the *Grokster* district court in fact entered summary judgment against the peer-to-peer services based on their "unlawful objective to promote infringement" shown through "voluminous documentary evidence." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 971, 984, 985 (C.D. Cal. 2006). Other recent cases – including in this District – have also not hesitated to enter summary judgment

against businesses like YouTube and Google on this same basis. *Fung*, slip op. at 35; *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 150-54 (S.D.N.Y. 2009).

Here, the evidence of YouTube's and Google's unlawful objective of operating the YouTube site as a haven for infringement is even more powerful than in *Grokster*, *Usenet*, or *Fung*. YouTube's founders made a conscious decision to build their user base "as aggressively as we can through whatever tactics, however evil." SUF ¶ 85. They knew the site was "out of control with copyrighted material" – including videos taken from Viacom programs they identified by name – but they decided <u>not</u> to block even "the obviously copyright infringing stuff," because if they did "site traffic [would] drop to maybe 20% of what it is." SUF ¶¶ 54-58. They disabled community flagging for infringement (but not for other improper content) to avoid obtaining "notice" from users and to shift the entire burden to copyright owners. SUF ¶¶ 64-65. They sneered at rights holders as "copyright bastards" and "a-holes," killed simple engineering fixes that would have made it easier to detect infringement, and admitted they were "just trying to cover our asses." SUF ¶¶ 34, 74-77, 107, 112-15, 119, 131, 135. They celebrated the popularity of known infringing clips to investors. SUF ¶ 99. And they cynically mocked the very idea they would flag videos for removal after an executive identified 70 percent of the most popular clips as infringing. SUF ¶¶ 95-96. At least one of the founders was himself "putting stolen videos on the site," while another urged his colleagues to "Steal it!" because "our traffic surged . . . due to a video of this type." SUF ¶ 44. It is no wonder Hurley was "concerned with the recent supreme court ruling on copyrighted material" in *Grokster*. SUF ¶ 39. But the allure of using infringing videos to build the user base and get rich quick was too great. Instead of stemming the floodtide of infringement, the founders opted to "save [their] meal money for some lawsuits." SUF ¶ 38.

Likewise, Google decided to buy YouTube after its own executives warned senior management that YouTube was a "'rogue enabler' of content theft," a "video Grokster," "trafficking mostly illegal content," whose "business model is completely sustained by pirated content," with a "large part of their traffic … from pirated content." SUF ¶¶ 157-59. Google's own board book, documenting traffic of 60% "premium" content of which only 10% was authorized, validated these warnings. SUF ¶¶181-82. Google then adopted YouTube's copyright policy to "increase traffic knowing beforehand that we'll profit from illegal [d]ownloads." SUF ¶ 162. And when a license from Viacom was not forthcoming, Defendants refused to use the fingerprinting technology they already had in hand or other proactive measures to block Viacom videos, knowing they had no license from Viacom. SUF ¶¶ 203-17. They even rejected proposals by Viacom and the MPAA that they jointly test filtering techniques, an investigation that the MPAA agreed to largely fund. SUF ¶¶ 209, 217, 227-28. Unless they were awarded a content license, Defendants refused to prevent illegal uploading and imposed the entire burden on Viacom and the other studios to search YouTube 24/7 for infringing clips – while Defendants reaped the profits. *Id.*

In short, "unequivocal indications of unlawful purpose in [Defendants'] internal communications," *Grokster*, 545 U.S. at 938, plainly show that Google and YouTube "knew [their] business model depended on massive infringing use, and acted to grow [their] business accordingly," *Grokster*, 454 F. Supp. 2d at 989. In addition, the other indicia of unlawful purpose noted in *Grokster* are also present here. First, Defendants were "aiming to satisfy a known source of demand for copyright infringement." 545 U.S. at 939. Whether Chen had it precisely right in September 2005 when he estimated infringement-driven traffic at 80%, or Dunton at 70% in February 2006, or Google's diligence team at 54% in October 2006, "the

28

staggering scale of infringement makes it more likely that [Defendants] condoned illegal use, and provides the backdrop against which all of [Defendants'] actions must be assessed." *Grokster*, 454 F. Supp. 2d at 985.[16] Second, as detailed *infra* at 34-37, Defendants refused until May 2008 to implement readily available "filtering tools or other mechanisms to diminish the infringing activity" in order to protect Viacom's works. 545 U.S. at 939. That overall failure "underscores [their] intentional facilitation of . . . infringement." *Id.* It also highlights their deliberate strategy of willful blindness. Third, as described *infra* at 29-31, Defendants "make money by selling advertising space, by directing ads to the screens of computers employing their [service]." *Grokster*, 545 U.S at 940. "[T]he more the [service] is used, the more ads are sent out and the greater the advertising revenue becomes. Since the extent of the [service's] use determines the gain to [Defendants], the commercial sense of their enterprise turns on high-volume use, which the record shows is infringing." *Id.* That describes YouTube to a tee: If Defendants stopped the infringement, it would slash site traffic and with it current as well as future advertising revenue.

Google and YouTube were not just innocent and unwitting accomplices to infringement perpetrated by YouTube users. Defendants operated YouTube with the unlawful objective of using infringing material to explosively build their user base and become the dominant video website on the Internet. *Grokster* establishes beyond question that they are liable for the infringement they intentionally made possible.

---

[16] Moreover, Defendants' infringement of Viacom's works has been far more extensive than indicated by the already large number of accused clips at issue in this litigation due to infringement of content for which Viacom owns, but has not registered, the copyright. *See Reed Elsevier, Inc. v. Muchnick*, No. 08-103, 2010 WL 693679, at *3, *11 (U.S. Mar. 2, 2010) (court has subject-matter jurisdiction to adjudicate infringement claims for unregistered works and include them in relief such as settlement); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1154 n.1 (9th Cir. 2007) (registration requirement "does not limit the remedies a court can grant").

## II. DEFENDANTS ARE VICARIOUSLY LIABLE BECAUSE THEY DERIVED A DIRECT FINANCIAL BENEFIT FROM INFRINGEMENT THAT THEY HAD THE RIGHT AND ABILITY TO CONTROL.

Even apart from their unlawful intent, Defendants are secondarily liable for the infringement on YouTube under principles of vicarious copyright liability, because they derived a direct financial interest from the infringement and had the right and ability to control it.

### A. Statement of Undisputed Facts Relevant to Point II

#### 1. Defendants' Direct Financial Benefit from Infringement

Like TV stations and other media outlets, YouTube makes money by selling ads that appear on YouTube and are seen by users who come to the site to find and watch videos – including the majority of users drawn by infringing videos. YouTube initially focused its efforts on building up a base of users who would spend time on the site and return in the future. SUF ¶¶ 29-30, 35-37, 44, 57, 188; *supra* at 5-8. Once that user base reached a critical mass, YouTube sought to "monetize" it, principally through advertising. SUF ¶¶ 201, 236, 238-40.

YouTube's monetization has centered on selling advertising that appears at different places on the YouTube site. From a few months after YouTube's founding until January 2007, ads appeared on the "watch page" (the webpage on YouTube where a user views a selected video) for videos without regard to whether YouTube had a license agreement with the owner. SUF ¶¶ 241-46. For example, when a viewer watched an infringing clip from Viacom's hit programs such as "The Daily Show," "South Park," "Rugrats" and many others, an advertisement appeared next to the video and YouTube earned revenue from that advertising. SUF ¶¶ 247, 251 (screen shots of advertising on the watch pages for Viacom works). The scope of the user base watching those ads was staggering. In the pre-acquisition board book, Google's financial advisor projected there would be 126 billion watch page views in 2007. SUF ¶ 246.

Displaying ads on the watch pages of infringing videos represents the most clear-cut direct financial benefit imaginable, and Google quickly came to realize that it was fatal to its efforts to evade liability. So the practice came to a screeching halt in January 2007. SUF ¶ 248. An internal email among senior Google advertising executives explained:

> A major decision in the works that you should be aware of – <u>for legal reasons</u> (that I don't fully understand what has changed, and our GC will be back in SF on Monday to articulate) all <u>ads/monetization on the watch pages for user generated content will need to come down</u>. This will have a tremendous impact on inventory.

SUF ¶ 250 (emphasis added). But, of course, this abrupt change in policy could not change the fact that YouTube advertised on watch pages during the explosive growth year of 2006. Thus, YouTube in this litigation cannot even hope to disclaim receipt of a direct financial benefit through users watching illegal videos.

Even thereafter, Defendants continued to place ads on other pages of the YouTube site and thereby profited from users drawn by infringing material. First, they sold ads appearing on the YouTube homepage. SUF ¶¶ 252-53. Second, they sold ads that appear on search results pages – the largest source of revenue on YouTube. SUF ¶¶ 254-57. Third, they sold ads that appear on browse pages, *i.e.*, pages organizing videos by category or other characteristics such as "most watched." SUF ¶ 260. Thus, if a user went to YouTube looking for clips that infringed Viacom's copyrights in popular shows like "South Park," either via the home page, a term search, or browsing, YouTube made money from the ads served to that user drawn by infringing material. SUF ¶¶ 259, 266. Google's pre-acquisition board book projected more than 154 billion views of the home and search results pages alone in 2007. SUF ¶ 179. Fourth, YouTube displayed ads on every upload page, *i.e.*, the webpage shown to an uploading user during the upload process. SUF ¶ 262. Thus, Defendants made money from infringement of the accused

clips infringing Viacom's copyrights here by advertising to the user as he or she uploaded the infringing video. Fifth, even after January 2007, YouTube showed "house ads" and suggested "related videos" on the watch pages of infringing videos, thereby driving traffic to other parts of the site with advertising. SUF ¶¶ 263-65, 335-36.

Moreover, as noted previously, by Defendants' own internal written admissions, 54 to 80 percent of the video views and site traffic on YouTube was drawn by unauthorized copyrighted clips. *See supra* 16-17. As a Google executive overseeing monetization of YouTube explained, "Users are searching for lots of things, but primarily for premium content." SUF ¶ 195. Having those popular videos was critical to building up a monetizable user base. *See supra* 8-9. That was why the founders adopted their willful blindness strategy, and what Google found so financially attractive about YouTube when it agreed to pay $1.8 billion. (Point I *supra*).

2.    <u>Defendants' Right and Ability to Control Infringement</u>

In addition, YouTube and (after the acquisition) Google have always had the right and ability to control the infringement on YouTube. They simply chose not to. YouTube has always had and exercised the unfettered <u>right</u> to remove videos from the site and terminate user accounts <u>for any reason</u> at YouTube's complete discretion. SUF ¶ 267 (YouTube terms of use); SUF ¶ 268 ("The terms of use states specifically that we have the right to remove content at our sole discretion for any reason whatsoever"). And YouTube does in fact constantly remove videos and terminate user accounts based on the judgment of YouTube employees that videos uploaded by a user include content that YouTube does not want to have on its site, such as hate speech, violence, or erotic videos. SUF ¶¶ 269-73. Thus, YouTube, not its uploading users, exercises the ultimate editorial judgment and control over the content available on the site.

YouTube has also always had the <u>practical ability</u> to prevent a large amount of the blatant copyright infringement on the site – if it wanted to. But it consistently refused to do so.[17] For example, until November 2005, YouTube employees reviewed every uploaded video to screen out pornography, hate speech, and violence. SUF ¶ 269. Yet, YouTube deliberately decided <u>not</u> to remove even "blatantly" or "obviously" infringing videos. *Supra* at 7-10. It easily could have. During the same period, Google Video used human review to block 10% of all uploads for terms-of-use violations – of which a 90% were due to copyright infringement. SUF ¶ 137. Google abandoned that practice around the time it bought YouTube. SUF ¶ 138.

As site traffic grew, YouTube had the ability to identify infringing videos in the same way it keeps pornography and hate speech off the site to the present day. In Fall 2005, YouTube instituted "community flagging" for identifying suspect videos. SUF ¶ 61-62. This tool enlists YouTube's users to flag videos they believe are inappropriate with a click of a mouse on a menu supplied by YouTube. SUF ¶ 63. A flagged video is then put in a queue for review by YouTube employees, who make the decision whether to remove it. SUF ¶ 66. Community flagging has expedited removal of pornography and other content YouTube regards as undesirable. SUF ¶ 70.

YouTube instituted community flagging for copyright violations in September 2005 too. SUF ¶¶ 61-62. That lasted two weeks. SUF ¶ 65. As discussed above, YouTube stopped community flagging for copyright not because it was ineffective, but because it would generate

---

[17] The only, very limited exception is that YouTube employed a technology called "hash-based identification" to prevent a new upload of a video file that is <u>exactly identical</u> to one that was removed pursuant to a takedown notice or other policy violation. SUF ¶ 274. However, such identification will not prevent the same content from being uploaded as a video file that differs in even the slightest way from the first. SUF ¶ 275. And even this minimal protection against infringement was triggered only if a copyright owner first sent a takedown notice. SUF ¶ 276.

red flags and put YouTube on "notice" of specific copyright violations. SUF ¶ 64. YouTube had a practical tool to detect infringement, and opted to disable it for precisely that reason.

YouTube has also always had the ability to find infringing clips by searching for keywords associated with copyrighted content (*e.g.*, "daily show") using YouTube's own search feature and index. This is the method that copyright owners are forced to use to find videos that infringe their copyrights on YouTube in order to send takedown notices. SUF ¶¶ 277-78. YouTube could, of course, do it too. Indeed, until October 2006, YouTube employees sporadically engaged in just such term searches for copyrighted material. SUF ¶ 272. But they removed only <u>some</u> of the infringing content they found, and left other blatantly infringing clips on the site when they thought the increased site traffic outweighed the risk of getting caught. *Supra* at 11-12. Google had used the same technique for its Google Video website using search terms for many Viacom programs before it acquired YouTube. SUF ¶ 139.

In fact, Defendants' practical ability to combat infringement in this way is greatly superior to having copyright owners deploy the same method. Rights holders can only search for infringing videos <u>after</u> the videos are live on the YouTube site, resulting in inevitable delay during which Defendants reap the profits – before removal through a takedown notice. SUF ¶ 279. In fact, as discussed above, YouTube's business plan was predicated on using this delay in detection and takedown to generate site traffic with infringing videos in the interim. *Supra* at 9. In contrast, Defendants, as the operators of the YouTube site with unique control over it, can use keyword searching (human or automated) to identify and block likely infringing videos <u>during the upload process</u>, thereby preventing the infringement <u>before</u> it happens. SUF ¶ 280.

Indeed, YouTube almost implemented an automated search tool, but abandoned it precisely because it would be effective. SUF ¶ 112-14. In an instant message exchange between

YouTube engineer Matt Rizzo and YouTube executive Maryrose Dunton, Rizzo explained that setting up that tool "isn't hard" and would only "take another day or w/e [weekend]." SUF ¶ 114. But Dunton said "[I] hate this feature. I hate making it easier for these a-holes" – referring to copyright owners – and directed the engineer "to forget about" the tool *Id.* As she explained, "we're just trying to cover our asses so we don't get sued." *Id.*

Last, but not least, from the start YouTube had access to a more sophisticated tool to identify and filter out infringing videos, technology known as digital fingerprinting. A digital fingerprint is a unique digital identifier of the content in the audio and/or video track of an audio-visual work. SUF ¶ 281. In order to identify probable infringement, a digital fingerprinting service maintains a reference database of the digital fingerprints of copyrighted works obtained from copyright owners (much as the FBI maintains a reference database of fingerprints). SUF ¶ 282. Then, when a video is uploaded to YouTube, the technology can instantaneously take the digital fingerprint of the uploaded video (much like a real fingerprint taken from a crime scene) and compare it to the reference database of fingerprints of copyrighted works. SUF ¶ 283. If there is a fingerprint match – indicating that the audio and/or video track of the uploaded video matches a copyrighted work in whole or in part – then YouTube can automatically block the upload or take other action, such as flagging the video for employee review. SUF ¶ 284. Computers readily accomplish this function during the upload process so that infringing videos never go live on the site. SUF ¶ 285.

Audio fingerprinting services have been in widespread commercial use to forestall copyright infringement over the Internet since well before YouTube started business. SUF ¶¶ 286-90. Early on, copyright owners urged YouTube to use such fingerprinting technology to stop infringement. SUF ¶¶ 225, 291. Initially YouTube refused to implement fingerprinting at

all.  SUF ¶ 226.  In October 2006, however, as Google was acquiring YouTube, YouTube contracted with a established fingerprinting vendor called Audible Magic to fingerprint videos uploaded to the site and check them against reference fingerprints of copyrighted works.  SUF ¶ 292.  This Audible Magic technology was available when YouTube was founded, and the cost was minimal for the dominant Internet video site:  $200,000 to $300,000.  SUF ¶¶ 287, 311.

But even after Defendants began using Audible Magic fingerprinting on YouTube, they refused requests by copyright owners to use that technology to prevent infringement of any owner's copyrights – <u>unless the owner first granted YouTube a content license and revenue sharing deal</u>.  SUF ¶¶ 293-98.  Specifically, during 2006 and 2007, Defendants negotiated with most major content owners for legitimate licenses for their intellectual property on YouTube.  In every such negotiation, Defendants agreed to utilize filtering and fingerprinting to protect the owner's intellectual property – as part of a license agreement.  SUF ¶¶ 299-310.  Thus, YouTube offered to use fingerprinting for Warner Music in September 2006, for CBS in October 2006, for Turner in October 2006, for Disney in December 2006, for Viacom in 2006 and again in February 2007, for NBC Universal in February 2007, for EMI in March 2007, and for Universal Music in June 2007 – all in connection with license agreements.  *Id.*

Yet there was a catch – and a giant one.  Until 2008, Defendants refused to use this existing fingerprinting technology, even though it had an Audible Magic license in place to do so, for a content owner to prevent theft of its intellectual property <u>unless</u> the owner agreed to grant YouTube a content partnership license.  SUF ¶¶ 296-98.  Thus, Google and YouTube used fingerprinting as a pressure point:  if a company wanted its intellectual property protected, it had to agree to grant a content license for many of its works or face having its shows uploaded without restraint onto YouTube.  *Id.*  In fact, YouTube structured its relationship with Audible

Magic to check uploaded works only against the reference fingerprints for works of companies that had granted YouTube a license. SUF ¶¶ 294-96. Reference fingerprints of all other works were simply ignored. *Id.*

As noted, Defendants offered to use Audible Magic fingerprinting as part of a potential content partnership license from Viacom. SUF ¶ 207. But after those license negotiations ended in an impasse, Google's General Counsel rebuffed the request of Viacom's General Counsel to cooperate to stem infringement using the same Audible Magic fingerprinting that Google had just offered as part of a license deal. SUF ¶¶ 209, 217; *supra* at 18-19. At the same time, it rebuffed similar offers to cooperate from movie studios through the MPAA, which also proposed that YouTube deploy the Audible Magic technology it already had in hand. *Supra* at 19-20.

Shortly thereafter, Viacom filed this lawsuit. Still Defendants refused to use fingerprinting or the other proactive measures at their disposal to stem the infringement of Viacom's copyrights on YouTube. SUF ¶¶ 217-20. Finally, at the first status conference before this Court in July 2007, months after this suit was filed, Defendants' counsel announced for the first time that Defendants would now implement their own proprietary video fingerprinting technology and would make it available to all copyright owners. SUF ¶ 314. Despite this promise, Defendants did not in fact deploy this Google proprietary system to block infringement of Viacom's copyrights until May 2008. SUF ¶ 222. All the while, Defendants operated Audible Magic's technology on YouTube (and continued to do so until the end of 2009), but refused to use that existing tool to protect Viacom's rights during the interim period before the Google technology was up and running. SUF ¶¶ 293-98. Thus, from YouTube's founding in 2005 until May 2008, Google and YouTube had the right and ability to take major steps to

control infringement through existing technology but refused to do so. In the meantime, YouTube swelled its user base and became the dominant video site on the Internet.

**B.     Defendants' Financial Interest and Control Makes Them Vicariously Liable.**

Defendants are liable under established rules of vicarious copyright liability, long applied in this Circuit, which arises when "the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials – even in the absence of actual knowledge." *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963); *see also id.* at 308 (vicarious liability "plac[es] responsibility where it can and should be effectively exercised"). Both elements of vicarious liability exist here.

1.      Direct Financial Benefit

Defendants derive an obvious and direct financial benefit from the infringing activity on YouTube. The Second Circuit's *Shapiro* decision built on cases holding dancehall operators liable for infringing performances by bands they engaged because the infringement provided "the proprietor with a source of customers and enhanced income." 316 F.2d at 307; *see also Buck v. Jewell-La Salle Realty Co.*, 283 U.S. 191, 198 (1931) ("One who hires an orchestra for a public performance for profit is not relieved from a charge of infringement merely because he does not select the particular program to be played"). Those cases exemplify a firmly established rule in copyright law: a direct financial benefit exists whenever infringing material is a "draw" for customers. *Fonovisa Inc. v. Cherry Auction, Inc*., 76 F.3d 259, 263-64 (9th Cir. 1996).

The "draw" standard was applied to the Napster peer-to-peer service, which users employed to exchange infringing copies of sound recordings. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001). Napster had a direct financial interest in infringement even though it had never earned any revenue, because infringing recordings were a "draw" for

users, and Napster's "future revenue [was] directly dependent upon 'increases in userbase.'" *Id.* at 1023. Courts in this District have applied the "draw" standard of financial interest in similar situations. *Arista Records, Inc. v. Mp3Board, Inc.*, No. 00 CIV. 4660 (SHS), 2002 WL 1997918, at *11 (S.D.N.Y. Aug. 29, 2002); *Usenet.com*, 633 F. Supp. 2d at 156-57.

Google and YouTube incontestably derived a direct financial interest from the infringement on the YouTube site under this draw standard. As in *Napster*, YouTube's founders built up its user base using the draw of infringing material with plans to monetize that user base in the future – which they did by flipping the business to Google for $1.8 billion. *Supra* at 5-8. And infringing videos were the major draw for the site – accounting for 54 to 80 percent of video views and site traffic using Defendants' own estimates – during the period when YouTube established its dominance. *Supra* at 16-17; *see also* SUF ¶¶ 196-200, 202. Thus, although "[t]here is no requirement that the draw be 'substantial'" for there to be a direct financial interest in infringement, *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004), here the infringing draw was in fact enormous.

In addition – and in this respect unlike Napster, which had no current revenues – Defendants have earned actual ad revenue from the draw of infringing videos on YouTube. As Judge Connor explained, "YouTube is supported entirely by advertising revenues" and its "unique drawing power . . . is almost wholly attributable to its broad and varied store of streaming videos." *United States v. ASCAP (In re Application of YouTube, LLC)*, 616 F. Supp. 2d 447, 449 (S.D.N.Y. 2009). That "drawing power" was largely due to infringement. *Supra* at 16-17. That constitutes a direct financial benefit, and Defendants effectively conceded as much when, "for legal reasons," they stopped placing ads on watch pages of infringing videos in early 2007, after Google's acquisition. SUF ¶ 250. Of course, that could not undo the fact

that they earned revenues from ads on the watch pages of infringing clips before 2007. SUF ¶¶ 241, 247, 251. And even without watch page ads, Defendants directly benefit from infringement by placing ads on the home, search, browse and upload pages that are viewed by users drawn by infringement. SUF ¶¶ 252-66. Thus, "[t]he more new visitors [Defendants'] infringing site attracts, the more money [Defendants] make[]." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1181 (C.D. Cal. 2002). That is a direct financial interest in infringement.

## 2. Right and Ability To Control

Defendants also have the right and ability to control the infringing activity on YouTube. This element is satisfied when the defendant has and exercises the right to block users or content for any reason at its complete discretion. *E.g.*, *Napster*, 239 F.3d at 1023.[18] Moreover, the defendant need not have perfect or absolute control over the infringing conduct. For example, the Ninth Circuit emphasized that Napster had limited control over infringing use of its peer-to-peer service because it only controlled an imperfect index of recordings available for download, not the recordings themselves. *Id.* at 1023-24. But that limited control was sufficient for vicarious liability. *Id.* at 1024. While perfection was not required, Napster's "reserved right to police [had to] be exercised to its fullest extent." *Id.* at 1023.

Defendants have, and frequently exercise, the <u>right</u> to remove videos from YouTube at their complete discretion <u>for any reason whatsoever</u>. They routinely remove videos containing adult material, hate speech, nudity, violence, and any other content that Defendants, in their sole

---

[18] Some cases have suggested the defendant must also have some additional "practical ability" to "stop or limit the . . . infringing conduct." *E.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173-74 (9th Cir. 2007). Although that standard has not been applied in this Circuit, as we show below, Defendants also have such practical ability.

judgment, deem offensive or incompatible with the kind of media and entertainment destination they want to operate to attract the broadest array of viewers. SUF ¶¶ 267-72. This kind of broad power has been viewed as the epitome of the right and ability to control. *Napster*, 239 F.3d at 1023 ("The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise"). When a media business removes material at its discretion, then that business is exercising ultimate editorial control over the content on the site, even if users select works for submission in the first instance.

And Defendants have always had the practical ability to use their editorial control over the YouTube site to limit infringement. As we have described in detail, YouTube had an array of techniques available to it to find infringing uploads, ranging from human review, to community flagging, manual or automated term searches using YouTube's own index, and digital fingerprinting. *Supra* at 31-37. Yet Defendants deliberately chose not to deploy those techniques, instructing human reviewers and keyword searchers not to remove blatantly infringing videos; shutting down community flagging for infringement after two weeks because it might put them on notice of infringement; killing a keyword filter because they did not want to help "these a-holes" (*i.e.*, copyright owners); and refusing to use digital fingerprinting unless the rights holder granted a license. *Supra* at 9-11, 17-20. Indeed, YouTube and Google actually made use of their practical ability to curtail infringement for favored license partners by using Audible Magic fingerprinting beginning in early 2007 – but refused to use the very same tools to prevent infringement of <u>Viacom's</u> copyrights until at least May 2008. SUF ¶¶ 222, 295-98.

This is a textbook case where vicarious liability arises because Defendants deliberately refused to exercise their "reserved right to police . . . to its fullest extent." *Napster*, 239 F.3d at 1023. As the Second Circuit has explained, where a defendant has "the power to police carefully

the conduct of its" users, vicarious liability "will simply encourage it to do so, thus placing responsibility where it can and should be effectively exercised." *Shapiro*, 316 F.2d at 308; *see also Napster*, 239 F.3d at 1023 ("Turning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability."). YouTube and Google are vicariously liable.

## III.     DEFENDANTS ARE ALSO LIABLE AS DIRECT INFRINGERS.

In addition to being secondary infringers, YouTube and Google are direct infringers in their own right. Unlike peer-to-peer networks, where the infringing conduct occurs on the computers of users, *Grokster*, 545 U.S. at 919-20, here Defendants actively and volitionally participate in infringing acts that occur on facilities they control and operate, pursuant to processes they have developed and frequently modify, typically with no input from users at all.

### A.     Statement of Facts Relevant to Point III

Although users initially select the videos they will submit or "upload" to YouTube, YouTube and Google are inextricably implicated in all of the actual acts of reproduction, public performance and display, and distribution that constitute direct infringement. When a user submits a video for upload, YouTube makes an exact copy of it in its original format (*i.e.*, the format in which it is uploaded by the user). SUF ¶ 315. In addition, YouTube makes one or more additional copies of every video during the upload process in a different format called Flash. SUF ¶¶ 316, 318.[19] YouTube makes these additional copies on its own initiative because it is an entertainment site, and YouTube's use of the Flash format allows it to perform videos for virtually any visitor to its site via the Internet. SUF ¶ 319. As YouTube's longest-employed engineer testified, "[t]he system performed . . . the replication as a course of its normal operation, . . . uninstructed by the user." SUF ¶ 321. In addition, well after initial upload, "[f]or

---

[19] Making copies in different file formats is called "transcoding." SUF ¶ 317.

particularly popular videos that are watched very frequently" on YouTube, YouTube makes and sends "a replica" of the video to a "content distribution partner to facilitate timely streaming to all users." SUF ¶ 322. YouTube then performs the infringing videos by streaming them on demand to the computers of millions of users. SUF ¶ 323. That is, of course, YouTube's entire purpose as a "media entertainment" site. On top of that, YouTube distributes a complete copy of an infringing video to the computer of any user who views it, which is retrievable for playback and permanent storage. SUF ¶ 323.

YouTube and Google also have granted licenses to other major companies to distribute YouTube's library of videos broadly over other "platforms" beyond YouTube's Internet-accessible site. YouTube has contracts with Apple to distribute videos over iPhones and AppleTV, SUF ¶ 324; with Sony, Panasonic, and TiVo, SUF ¶¶ 325-27; and with the world's largest cellular companies such as Cingular, Verizon Wireless, and Vodafone, SUF ¶ 328. Such third-party platforms often are not compatible with YouTube's Flash format. Thus, to distribute videos over these new platforms, in 2007 Defendants began working through YouTube's library of videos uploaded in the past so that Defendants could make even more new copies of those videos in at least two more file formats that work with these different third-party platforms. SUF ¶ 330. YouTube made these new copies on its own initiative, without any request by its users, many of whom had uploaded the original videos months or years before. *Id.* The uploading users also had no input into the commercial terms agreed between Defendants and the companies that operate the third-party platforms, which typically involve revenue sharing from advertising under terms negotiated by Defendants. SUF ¶¶ 324-28.

Defendants also take many other proactive steps to induce users to watch videos and thus generate advertising revenues without any input from the users who upload videos. YouTube

43

employs "editors" to scour the site for interesting videos that YouTube, on its own initiative, then "features" with conspicuous positioning on its home page. SUF ¶ 331. YouTube gives prominent placement to videos that are most viewed, most frequently tagged as "favorites" by users, or currently being watched on the site. SUF ¶ 333. YouTube indexes videos and provides a search function so that viewers can find videos using search terms, suggests related videos to users whenever they are watching a video, and provides a host of ways to browse through videos. SUF ¶¶ 334-42. These features keep users glued to the YouTube site, allowing Defendants to earn more advertising revenue – just as a TV station profits by keeping viewers glued to the screen. As founder Jawed Karim explained, "users who keep coming back . . . are really valuable because they spend time watching. And if they watch, then it's just like TV, which means lots of value." SUF ¶ 35. And, of course, Defendants, not users, negotiate the advertising deals that generate revenue for their entertainment business.

Tellingly, YouTube requires uploading users to accept Terms of Service providing that the user "grant[s] YouTube a worldwide, non-exclusive, royalty-free, sublicenseable and transferable license to use, reproduce, distribute, prepare derivative works of, display, and perform" each uploaded video. SUF ¶ 345. That purported license on its face covers multiple acts of direct infringement. YouTube also requires a user to warrant that he or she owns the copyright for videos a user uploads, or has permission from the copyright owner to do so. SUF ¶ 346. Thus, YouTube's Terms of Service acknowledge that Defendants need a valid license from the actual copyright owner to copy and perform a video on the YouTube site. But, as previously discussed, Defendants know the purported "licenses" they obtain from uploading users under YouTube's terms of use are shams for almost all of the professionally produced videos that fill the site, only 10% of which are legitimately licensed. *Supra* at 16.

44

Because they know the purported licenses they obtain from uploading users for most professional media content are a sham, Defendants have sought content partnership licenses from content owners – again showing they know their conduct constitutes infringement absent a license. SUF ¶¶ 203, 347, 299-310. In doing so, Defendants demand a release for their prior infringing activities "arising out of or in connection with, the unauthorized reformatting, duplication, distribution, hosting, performance, transmission or exhibition of" the content owners' intellectual property. SUF ¶ 347. By their own words, Defendants demonstrate their understanding that a license is required for these directly infringing activities.

### B. Defendants' Own Conduct Constitutes Direct Infringement

Defendants are committing direct infringement. As noted, unlike peer-to-peer networks, all the infringing acts on YouTube are being committed on facilities operated and controlled by Defendants themselves, not their users. Defendants themselves engage in the copying, public performances and displays, and distribution of copies that infringe Viacom's exclusive rights under copyright. *See* 17 U.S.C. § 106; SUF ¶¶ 315-16, 318, 320-23, 330, 343-44.

Moreover, Defendants' involvement in these infringing acts meets and exceeds the level of "volition" required for direct infringement by copying under Second Circuit case law. *See Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 130-31 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 2890 (2009). Although direct infringement is a strict liability tort, *see id.* at 130, the Court of Appeals concluded that it still requires some element of "volitional conduct," a requirement derived from a line of cases beginning with *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*"). *See Cartoon Network*, 536 F.3d at 131; *see also id.* at 130 ("The question is who made this copy").

*Netcom* concerned a company that simply provided basic Internet functions that others used to transmit infringing material, and reasoned that "the mere fact that Netcom's system <u>incidentally</u> makes temporary copies of plaintiffs' works does not mean Netcom has caused the copying." *Netcom*, 907 F. Supp. at 1368-69 (emphasis added). In *Cartoon Network*, the Second Circuit reached the same conclusion about a service called RS-DVR that made a <u>single copy</u> of a copyrighted work as an automated response to a user's request for that copy, where access to the resulting copy was strictly limited to the user who requested it. 536 F.3d at 130. The Second Circuit reasoned that this service was simply the equivalent to a remote-storage DVR or VCR, and that the home viewer who records a program on a DVR or VCR is the person who makes the copy and thus the direct infringer. *Id.* at 131.

But as two Judges in this District have recognized, the "volitional conduct" standard of *Cartoon Network* is satisfied where – as here – the defendants' intentional conduct transforms them "'from passive providers of a space in which infringing activities happened to occur to active participants in the process of copyright infringement.'" *Usenet.com*, 633 F. Supp. 2d at 148 (quoting *Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997)); *accord Capital Records, Inc. v. Mp3Tunes, LLC*, No. 07 Civ. 9931(WHP), 2009 WL 3364036, at *4 (S.D.N.Y. Oct. 16, 2009); *see also Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 552-53 (N.D. Tex. 1997), *aff'd*, 168 F.3d 486 (5th Cir. 1999). These cases stand for the proposition that when defendants themselves operate the computers and other facilities where infringing acts take place and do so with the intent of providing a haven for infringement, their conduct exceeds the minimal level of "volition" required to commit direct infringement – which is, after all, a strict liability tort, *see Cartoon Network*, 536 F.3d at 130. And, as shown

above in Point I, Defendants have operated YouTube with the actual intent to infringe. The volitional element of their direct infringement is easily satisfied.

The volitional aspect of Defendants' infringement is also demonstrated by another sharp contrast with the service addressed in *Cartoon Network*. In that case, the RS-DVR service made a <u>single</u> copy of a program as an automatic response to a customer request for the copy, and then stored that copy for that customer alone. *Cartoon Network*, 536 F.3d at 130. Here, in stark contrast, Defendants do not simply make a <u>single, personal copy</u> of an infringing video when a user submits it for upload. To the contrary, YouTube makes multiple additional transcoded copies without any prompt or request by the user, and then performs that video to millions of viewers on demand. And long after the uploading user submits a video – possibly months or even years later – Defendants make additional server copies of the videos depending on viewing demand and how Defendants choose to manage their system. Defendants have also made additional copies long after upload in different transcoded formats on their own initiative so that they could distribute the videos over third-party platforms under distribution deals that Defendants – not their users – negotiated. Defendants did not commit that infringing conduct in response to user requests. They did it on their own initiative, just like any other media company whose business is the financial exploitation and distribution of entertainment content. They are therefore liable as direct infringers.

## IV. DEFENDANTS DO NOT QUALIFY FOR THE DMCA DEFENSE.

As shown above, Defendants are plainly liable under three bases with deep roots in copyright law. The extent of copyright infringement on YouTube has been so extensive, and Defendants' conscious decisions to welcome and cast a blind eye to such piracy so clear cut, that Defendants have only one place to attempt to hide: they claim the DMCA immunizes their

conduct. But Congress through the DMCA did not immunize the kind of extremely culpable conduct at issue in *Grokster* (and here), or quietly and by implication repudiate cases like *Shapiro* and years of copyright law by creating a safe haven for willful or willfully blind infringers who refuse to remove infringing material unless they receive takedown notices. For many of the same reasons described above in establishing liability, Defendants cannot escape liability for their infringing conduct by seeking refuge in the DMCA safe harbor.

The DMCA was inspired by *Netcom*, the case that introduced the concept of a "volitional act" into direct liability. *See* H.R. Rep. No. 105-551(I), at 11 (1998); *supra*, Point III. *Netcom* reasoned that businesses carrying out specified core Internet functions should not be liable as direct infringers for incidental infringement in the absence of volitional conduct – but <u>should</u> be held accountable under the more stringent standards that apply to secondary infringement claims. *See Netcom*, 907 F. Supp. at 1373. Thus, the preconditions of the DMCA immunity reflect and largely track traditional secondary liability standards. If Defendants are liable for infringement under these long established standards, they thereby also lose resort to the DMCA. *See Fung*, slip op. at 36 ("In many ways, the Digital Millennium Copyright Act is simply a restatement of the legal standards establishing secondary copyright infringement – in many cases, if a defendant is liable for secondary infringement, the defendant is not entitled to Digital Millennium Copyright Act immunity").

The wording and logic of the statute makes this clear. The DMCA safe harbor is closed to a service provider that has "actual knowledge" or is "aware of facts or circumstances from which infringing activity is apparent," but does not "act[] expeditiously" to stop it. 17 U.S.C. § 512(c)(1)(A). The DMCA also incorporates vicarious liability standards by denying immunity to defendants that "receive a financial benefit directly attributable to the infringing activity" and

have "the right and ability to control such activity." *Id.* § 512(c)(1)(B). Moreover, the DMCA does not eviscerate copyright by immunizing any and every infringing activity on the Internet, but protects only incidental infringement unavoidably caused by performing specified core Internet functions, such as providing "storage at the direction of a user." *Id.* § 512(c). To qualify for the DMCA defense, a provider must show that it passes all of these tests (and others). *E.g.*, *Tur v. YouTube, Inc.*, No. CV064436, 2007 WL 1893635, at *2-*3 (C.D. Cal. June 20, 2007). As we show next, Google and YouTube fail all three.

Defendants nonetheless maintain that the DMCA immunizes them for their infringing conduct solely because Defendants remove the specific infringing videos identified by URL in takedown notices from copyright owners. If that were true, then the DMCA would be just a takedown notice statute, and all else meaningless surplusage. Defendants' problem is that the plain statutory language makes clear that responding to takedown notices is only one of several preconditions of the DMCA defense. *See* 17 U.S.C. § 512(c)(1)(C); *see also* S. Rep. No. 105-190, at 45 (1998) ("Section 512 does not require use of the notice and take-down procedure"); *Fung*, slip op. at 37-38; *Tur v. YouTube*, 2007 WL 1893635, at *3.

The DMCA in short does not place the entire burden on copyright holders to continually monitor all sites like YouTube for infringing activity and send an unending series of takedown notices, while the website owners intentionally profit from infringing activity they could control. Rather, the DMCA "balance[s] the interests" of copyright owners and service providers, H.R. Rep. No. 105-551(II), at 21, by imposing "strong incentives" for them "to cooperate to detect and deal with copyright infringement," S. Rep. No. 105-190, at 20; *see id.* at 8 (DMCA gives "copyright owners reasonable assurance . . . against massive piracy" over the Internet). As the Ninth Circuit cautioned about another limited Internet immunity, the Internet's "vast reach into

49

the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress and thus give online businesses an unfair advantage over their real-world counterparts, which must comply with laws of general applicability." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164 n.15 (9th Cir. 2008) (en banc).

A.     **Defendants' Knowledge and Intent Defeat the DMCA Defense.**

As shown in Point I above, Defendants operated YouTube with knowledge and awareness of, and intent to use, copyright infringement as the key to their success in attracting the largest user base of any Internet video site.  That runs afoul of the DMCA, which is unavailable to a business that either has "actual knowledge" or is "aware of facts or circumstances from which infringing activity is apparent" and does not "expeditiously" take action to stop the infringement.  17 U.S.C. § 512(c)(1)(A).  As the Fourth Circuit explained, "[t]he DMCA's protection of an <u>innocent</u> service provider disappears at the moment the service provider loses its innocence . . . .  At that point, the Act shifts responsibility to the service provider to disable the infringing matter."  *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (emphasis added); *see also Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1200-01 (N.D. Cal. 2004) (DMCA only "limits . . . liability . . . for incidental" – not intentional – "acts of copyright infringement").

As the undisputed facts set out above make clear, to say there were red flags everywhere on YouTube is a gross understatement.  Defendants were not merely aware of red flags signaling rampant infringement; they rallied around them.  Their own documents are contemporaneous admissions that they knew infringing videos generated 54 to 80 percent of the traffic on YouTube <u>and</u> that YouTube's business plan intentionally rested on such infringement-driven

traffic. This is exactly the kind of intentional guilt the Supreme Court condemned in *Grokster*. And *Grokster* liability inherently defeats the DMCA:

> inducement liability [under *Grokster*] and the Digital Millennium Copyright Act safe harbors are inherently contradictory. Inducement liability is based on active bad faith conduct aimed at promoting infringement; the statutory safe harbors are based on passive good faith conduct aimed at operating a legitimate internet business. Here, as discussed *supra*, Defendants are liable for inducement [under *Grokster*]. There is no safe harbor for such conduct.

*Fung*, slip op. at 43; *accord Usenet*, 633 F. Supp. 2d at 142 ("if Defendants . . . encouraged or fostered . . . infringement, they would be ineligible for the DMCA's safe harbor provisions").[20]

Defendants nonetheless contend their knowledge and awareness that vast quantities of copyright works were being uploaded is irrelevant under the DMCA unless they had <u>specific</u> knowledge that a <u>particular</u> clip was infringing. Absent specific knowledge, they argue, YouTube and Google are free to willfully blind themselves to the vast dumping of copyrighted works on the site and just sit back and await DMCA takedown notices, while they intentionally profit from rampant infringement in the meantime.

This is not and rationally could not be the law. An entertainment business may not intentionally exploit copyrighted works to attract a large audience, but escape liability by closing its eyes to the specific infringing videos by which it implements that plan. Willful blindness does not negate Defendants' culpability. It intensifies it. As Judge Richard Posner explained for the Seventh Circuit in rejecting a "specific knowledge" theory for purposes of contributory infringement, "<u>[w]illful blindness is knowledge</u>, in copyright law . . . as it is in the law

---

[20] In *Usenet*, Judge Baer entered a default sanction on the DMCA defense and thus did not directly rule on the merits of the defense. *See* 633 F. Supp. 2d 142. However, his ruling that intentional fostering of infringement defeats the DMCA was a key part of the reasoning supporting the default, and therefore was an unambiguous holding in the case in full agreement with *Fung*, the only other case to address this issue under the DMCA.

generally." *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) (emphasis added); *see also id.* at 655 ("The [DMCA] does not abolish contributory infringement"); *Fung*, slip op. at 42. For defendants to prevail, they must have this Court read the concept of willful blindness out of copyright law and the DMCA statute even though it is applied universally, even in the criminal law, as a form of knowledge. *E.g.*, *Giordano v. United States*, 32 F. Supp. 2d 640, 641-42 (S.D.N.Y. 1999) (Stanton, J.) (enhancing sentence under knowledge standard because defendant "willfully blinded himself to such knowledge to such degree that he is chargeable with knowledge as a matter of law").

In addition to conflicting with case law, Defendants' position is contradicted by the plain language of the DMCA itself. The word "specific" (or similar language) does <u>not</u> appear as a limitation in § 512(c)(1)(A), and courts may not read such a limitation into a statute when Congress did not include it. *See*, *e.g.*, *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2145 (2008). The statutory language expressly looks to whether Defendants either have "actual knowledge" <u>or</u> are "aware of facts and circumstances from which <u>infringing activity</u>" – not specific infringing videos – "is apparent." 17 U.S.C. § 512(c)(1)(A)(i), (ii) (emphasis added). "The term 'activity' is intended to mean activity using the material on the system or network" or "wrongful activity that is occurring at the site on the provider's system or network." S. Rep. 105-190, at 44. Thus, the defense is closed to a defendant that "becomes aware of a 'red flag' [and] takes no action." H.R. Rep. 105-551(II), at 53; *see id.* at 57 (explaining that parallel § 512(d) safe harbor is not available to a defendant who "turned a blind eye to 'red flags' of obvious infringement"); *see Perfect 10 v. Cybernet*, 213 F. Supp. 2d at 1177 (DMCA does not "endorse business practices that would encourage content providers to turn a blind eye to the source of massive copyright infringement while continuing to knowingly profit").

52

In short, there is no "specific knowledge" requirement in the DMCA – particularly where Defendants <u>intentionally</u> foster infringement. Defendants' proposed "specific knowledge of infringement" requirement is the very same "error" that the Supreme Court rejected for purposes of secondary liability in *Grokster*, 545 U.S. at 934; *see also Fung*, slip op. at 36 (DMCA generally tracks standards for secondary liability). Congress did not intend to immunize the kind of extreme, mass culpability at issue in *Grokster* – and this case – by absolving intentional infringers as long as they remain willfully ignorant of the specific clips that are infringing.

As Columbia Law Professor Jane Ginsburg explains, under the DMCA "awareness triggers a <u>proactive obligation</u> to block access in order to qualify for the statutory immunity." Jane C. Ginsburg*, Separating the* Sony *Sheep from the* Grokster *Goats*, 50 Ariz. L. Rev. 577, 596 (2008) (emphasis added); *see also* II Paul Goldstein, *Goldstein on Copyright* § 8.3.2, at 8:41 (3d ed. 2009) (DMCA incorporates "inquiry notice" standard). Once Defendants were aware that YouTube was filled with infringing material (which was in fact their very plan), they were required to look into the matter further, not close their eyes to it. Their failure to identify which individual videos were infringing stemmed from their willful blindness policy of taking no action in the face of red flags, which only underscores their liability.

In their pre-motion letter to the Court, Defendants assert they have no obligation to take action in the face of red flags of infringement under the interpretation of the DMCA in *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007), and *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1108 (C.D. Cal. 2009). That is incorrect. Neither case involved the kind of <u>intentional</u> *Grokster* wrongdoing at issue here. As the *Fung* decision from the same Circuit makes clear, these cases certainly do not stand for the proposition that the DMCA shields such intentional conduct from infringement liability. Further, even in the

absence of such intent, the DMCA places the burden on the service provider – not copyright owners – to expeditiously remove material when faced with a red flag. 17 U.S.C. § 512(c)(1)(A)(ii), (iii) ("aware[ness] of facts or circumstances from which infringing activity is apparent" triggers duty to "expeditiously remove, or disable access to, the material"); H.R. Rep. 105-551(II), at 53 (DMCA defense is forfeited when defendant "becomes aware of a 'red flag' … and takes no action.") Thus, the DMCA does not sanction willful blindness. Especially after *Grokster*, such a reading offends all sensible considerations of policy by placing the entire responsibility to police a website not on the service provider that financially benefits from massive infringement, but upon the content owners who are its victims. As Columbia Law Professor Ginsburg explains:

> *CCBill* notwithstanding, "apparent" does not mean "in fact illegal," nor does it mean "conclusively exists." Such an interpretation would allow the service provider to "turn a blind eye" to infringements because the provider could claim that the possibility that some files might be fair use means that infringement can never be "apparent" as to any file. By the same token, § 512(m)'s dispensation of service providers from "affirmatively seeking facts indicating infringing activity," should not entitle the service provider to remain militantly ignorant.

Ginsburg, *supra*, 50 Ariz. L. Rev. at 598 (footnotes omitted).

The contrary reading that Defendants extract from *Perfect 10 v. CCBill* and *UMG v. Veoh* cannot be reconciled with the DMCA's statutory language, which, as noted above, employs both actual and willful blindness variants of knowledge. It cannot be reconciled with the legislative history as described above, which openly embraces the concepts of willful blindness and "red flag" knowledge. It cannot be reconciled with the case law outside of the Ninth Circuit, including Judge Posner's decision for the Seventh Circuit in *Aimster*, the Fourth Circuit in *ALS Scan*, this Court in *Usenet*, and the Central District of California in *Fung*. It cannot be reconciled with the scholarly recognition that the DMCA imposes "a proactive obligation" to inquire and an

"inquiry notice" standard. And it cannot be reconciled with *Grokster*'s condemnation of businesses that are intentionally built on infringement while trying to hide behind their willful ignorance of particular infringing acts. Any such reading offends all sensible considerations of policy, for it places the responsibility to police a website not on the service provider that financially benefits from massive infringement, but upon the content owners who are the victims.

The DMCA struck a balance whereby a service provider, armed with actual or red flag knowledge of substantive illicit <u>activity</u> on the site, must inquire further and act to clean up the site. It is for that reason that both Viacom individually and the MPAA on behalf of the film industry generally offered to cooperate with YouTube and Google to assist in identifying illegal videos and adopt procedures for blocking illegal uploads – overtures of shared responsibility and cooperation rebuffed by Google and YouTube until long after this lawsuit was filed. *Supra* at 18-20. Defendants chose to remain willfully blind. That is their undoing under the DMCA.

Because Defendants were well aware of and even intended to facilitate the rampant infringement on YouTube, they forfeited the protection of the DMCA <u>unless</u> they "act[ed] expeditiously to remove, or disable access to, the material." 17 U.S.C. § 512(c)(1)(A)(iii). They did <u>not</u> meet this requirement by idly waiting for copyright owners to send takedown notices, and only then removing the specific infringing videos identified in such notices. An entirely different prong of § 512(c) requires a service provider to remove infringing material in response to takedown notices. *Id.* § 512(c)(1)(C). The duty to remove infringing material based on knowledge or awareness is an independent and distinct requirement of the DMCA. *Id.* § 512(c)(1)(A). That requirement would be completely meaningless if it were only triggered by takedown notices already covered by § 512(c)(1)(C). The legislative history confirms what is plain from the structure of the statute:

A service provider wishing to benefit from the limitation on liability under subsection (c) must 'take down' or disable access to infringing material residing on its system or network of which it has actual knowledge or that meets the 'red flag' test, <u>even if the copyright owner or its agent does not notify it of a claimed infringement</u>.

S. Rep. 105-190, at 45 (emphasis added); *see* H.R. Rep. 105-551(II), at 54 (same).

Google and YouTube made no effort to do this until May 2008, when they finally broadly used filtering technology to block clips that infringe Viacom's copyrights. Before that, Defendants refused to remove "the copyright infringement stuff" <u>unless</u> they first received a takedown notice for a specific video. SUF ¶¶ 38, 189, 220. Massive infringement would thereby be maintained on their site as a draw to viewers and advertisers. *Supra* at 8-9. That violates § 512(c)(1)(A)'s requirement to remove infringing material triggered by knowledge or awareness of infringing activity. Defendants cannot take refuge in the DMCA.

**B.** **Defendants' Direct Financial Benefit and Right and Ability to Control Infringement Defeat the DMCA Defense.**

Defendants also fall outside the DMCA because they "receive a financial benefit directly attributable to the infringing activity" and have "the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). This prong of the DMCA tracks the traditional standard for common law vicarious copyright liability. *CCBill*, 488 F.3d at 1117; *see Shapiro*, 316 F.2d at 307. And where, as here, "Congress uses terms that have accumulated settled meaning under common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999) (quotation marks omitted). Thus, the standard for this prong of the DMCA is the same as for vicarious liability. *CCBill*, 488 F.3d at 1117; *Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 704 (D. Md. 2001), *aff'd*, 373 F.3d 544 (4th Cir. 2004); *see also Fung*, slip op. at 36 (DMCA generally incorporates standards for secondary copyright liability).

As shown above in Point II, Defendants are liable for the infringement on YouTube under the common law of vicarious copyright liability. Therefore, under the plain language of § 512(c)(1)(B) incorporating that standard, Defendants cannot use the DMCA to escape liability. They could have curtailed the infringement from which they were profiting, but succumbed to the lure of immediate riches. The DMCA does not immunize such conduct.

Defendants could evade that conclusion only if direct financial benefit and right and ability to control meant one thing in the common law and another under the DMCA. No such argument is possible, however, because the Supreme Court has established a high hurdle for overcoming the presumption that statutory language incorporates settled common law meanings: statutory terms with accumulated common law meaning "must" be read to incorporate that meaning – the only exception being if the statute "dictates" otherwise. *Neder*, 527 U.S. at 21.

That defeats any perverse attempt to distort the DMCA to immunize conduct that would otherwise incur common law vicarious liability, for nothing in the DMCA "dictates" departure from the common law. First, with respect to the direct financial interest prong, the cases expressly and unanimously hold that the "draw" standard applies in the same way under the DMCA as under the common law. *E.g.*, *CCBill*, 488 F.3d at 1117 ("we hold that 'direct financial benefit' [in the DMCA] should be interpreted consistent with the similarly-worded common law standard for vicarious copyright liability," and therefore that "the relevant inquiry is whether the infringing activity constitutes a draw for subscribers") (quotation marks omitted).

Moreover, as required by *Neder*, courts have also recognized that the "right and ability to control" element of the DMCA must "be interpreted consistently with common law." *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1150 (N.D. Cal. 2008). For example, in *Fung*, the Court granted summary judgment due to defendant's right and ability to control under

the DMCA by applying the control standard for vicarious liability, under which "the 'ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise.'" *Fung*, slip op. at 39 n.27 (quoting *Napster*, 239 F.3d at 1023). Similarly, in prior litigation against YouTube, the court held that YouTube would have the right and ability to control under the DMCA if the record showed that it had "the technical capabilities needed to detect and prescreen allegedly infringing videotapes." *Tur v. YouTube*, 2007 WL 1893635, at *3. That is the case here. The undisputed facts show that YouTube and Google have both the right to block access for any reason, and the practical ability to curtail infringement. They thus have "the right and ability to control." *Supra* Point II. [21]

Despite the *Neder* rule, other decisions have suggested that the control prong of the DMCA should be different from the control prong of vicarious liability – without ever explaining exactly what "the right and ability control" means under the DMCA. *E.g.*, *UMG*, 665 F. Supp. 2d at 1113. *UMG* reasoned that the DMCA "dictate[s] a departure from the common law standard" because: (1) the DMCA presupposes that a service provider can terminate repeat infringers and remove infringing content in response to takedown notices; and (2) 17 U.S.C. § 512(m)(1) provides that "[n]othing in this section shall be construed to condition the applicability of subsections (a) through (d) on . . . a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 665 F. Supp. 2d at 1113-14.

Neither reason permits departure from the common law standard for vicarious liability. First, the DMCA merely presupposes the ability to remove infringing material <u>in response to takedown notices</u>, *see* 17 U.S.C. § 512(c)(1)(C), which is different from the more pervasive

---

[21] The *Tur* court denied summary judgment against YouTube on the record there because <u>no</u> discovery had been taken to show that YouTube had such practical ability. 2007 WL 1893635, at *3-*4. In contrast, the extensive record here amply demonstrates practical ability.

control standard for vicarious liability turning on whether the defendant has reserved the right to remove material it does not approve of "for any reason whatsoever," *Napster*, 239 F.3d at 1023. Because the control standard for vicarious liability is not redundant or contradictory under the DMCA, the statute does not "dictate" departure from the settled common law meaning.

Nor does § 512(m) "dictate" such a departure. Far from intending to override the common law standard, Congress made clear that notwithstanding § 512(m), the DMCA's "'<u>right and ability to control' language . . . codifies the second element of vicarious liability</u>." H.R. Rep. 105-551(I), at 26 (emphasis added). *UMG* cavalierly dismissed this legislative history because it related to an earlier version of the DMCA. *UMG*, 665 F. Supp. 2d at 1115-16. However, that earlier version contained the same two provisions at issue here: the "right and ability to control" language, and the exact language that was ultimately enacted in § 512(m) (with changes only to the subsection references).[22] Since Congress intended to codify the common law standard in a version of the DMCA that included the same language that was eventually enacted in § 512(m), it is absurd to say that § 512(m) "dictates" departure from that common law standard.

Moreover, *UMG*'s reading of § 512(m) is so sweeping that it deprives "the right and ability to control" of <u>all</u> meaning, whether under the common law standard or any other conceivable interpretation of those words. When a court perceives some tension between two statutory provisions, its duty is <u>not</u> to read one so broadly that it effectively repeals the other. It is to harmonize the two. *E.g.*, *Watt v. Alaska*, 451 U.S. 259, 266-67 (1981). That is especially

---

[22] *Compare* 17 U.S.C. § 512(m)(1) ("Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on . . . a service provider monitoring its service or affirmatively seeking facts indicating infringing activity"), *with* H.R. Rep. 105-551(I), at 8 (language of earlier bill: "Nothing in subsection (a) shall be construed to condition the applicability of subsection (a) on a provider . . . monitoring its service or affirmatively seeking facts indicating infringing activity").

true when the provisions were enacted together in the same Act.  *E.g.*, *U.S. West Commc'ns., Inc. v. Hamilton*, 224 F.3d 1049, 1053 (9th Cir. 2000).  And in resolving the tension between two provisions, a court should adopt a reading consistent with the objects of the statutory scheme as a whole.  *E.g.*, *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 371 (2d Cir. 2006).

Here, the meaning of "right and ability to control" in § 512(c)(1)(B) is clear.  Congress's adoption of the common law terminology, the legislative history, and the plain meaning of the words "right and ability to control" all confirm that this language in the DMCA must encompass situations like here, where Defendants in fact have both the legal right and the practical ability to control infringement on the YouTube website.

This plain understanding of "right and ability" is readily harmonized with § 512(m).  The title of § 512(m) is "Protection of Privacy," and the provision "is designed to protect the privacy of Internet users."  H.R. Rep. 105-551(II), at 64 (referring to § 512(m) as § 512(*l*)).  Given the ambiguity of the word "monitor" in § 512(m) and the need to harmonize it with § 512(c)(1)(B), Congress's purpose of protecting privacy must inform § 512(m)'s interpretation.  *See Brotherhood of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (headings should be used to "shed light on some ambiguous word or phrase" in statute); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12B09[B], at 12B-99 (2009) ("the caption of [§ 512(m)] reads 'Protection of Privacy' . . . [and] courts should . . . bear it in mind when applying Section 512").  As the caption makes clear, Congress did not want to force service providers to intrusively "monitor" <u>private</u> materials on their system, such as users' emails.  But

the infringing videos on YouTube are offered by uploaders for the whole world to see. No privacy interest is affected by YouTube's right and ability to control <u>public</u> infringement.[23]

It would defy logic to conclude that Defendants lacked the "right and ability to control" infringement under the DMCA when, as a matter of undisputed fact, they had both the legal right and the practical ability to do so. Indeed, the undisputed facts here negate the DMCA defense under any reading. Defendants actually implemented Audible Magic fingerprinting technology to control infringement for favored business partners, but when doing so, they deliberately kept up a large number of videos that infringe Viacom's copyrights, based on their calculation that the risk of litigation was outweighed by the reward of drawing users to the site. *Supra* at 35-36. That kind of conscious toleration of known infringement forfeits the DMCA defense under any conceivable reading of congressional intent.

### C.   The Infringement on YouTube Does Not Result from the Specified Core Internet Functions to Which The DMCA Applies.

Defendants fall outside the DMCA for an additional reason: their infringement does not result from providing the <u>specified</u> core Internet functions covered by the defense. The DMCA is very specific about the four functions it covers, 17 U.S.C. § 512(a)-(d). Defendants' liability does not arise from these specific functions. In particular, their liability is not "by reason of the

---

[23] In addition, § 512(m) only provides that monitoring should not be treated as a free-standing "condition" of the safe harbor. That is not the case under the common law vicarious liability standard, because the right and ability to control is not a stand-alone condition of liability, but an obligation that arises when it is paired with financial gain, that is when a service provider has a direct financial interest. *Grokster*, 545 U.S. at 939 (holding that even though defendants "lacked an <u>independent duty to monitor</u> their users' activity," "failure to develop filtering tools" is "factor" for imposing liability) (emphasis added). And the "right and ability" to control infringement is not the same as "monitoring" under § 512(m); filtering and blocking uploads before they hit the site is not the same as monitoring users' viewing of videos on the site. In sum, § 512(m) does not trump incorporation of the vicarious liability standard in § 512(c)(1)(B).

storage at the direction of a user" of infringing material under § 512(c).[24]  YouTube is not a storage or web hosting service.  It is a media and entertainment business no different from a TV station – except for its lack of respect for copyright law.

"Storage" is not defined in the DMCA and therefore has its ordinary meaning.  *See, e.g.*, *Crawford v. Metro. Gov't of Nashville*, 129 S. Ct. 846, 850 (2009).  In the computer context, to "store" means to "record (information) in an electronic device (as a computer) from which the data can be obtained as needed."  *Webster's Third New International Dictionary* 2252 (1986).  Accordingly, the legislative history indicates that storage covers "<u>providing server space for a user's web site</u>, for a chatroom, or other forum in which material may be posted at the direction of a users."  H.R. Rep. 105-551, at 53 (emphasis added).  This example distinguishes two kinds of businesses.  The first is the purely passive business of "providing server space" (also known as web hosting) to others for their operation of websites.  *Id.*; *see The New Oxford American Dictionary* 1903 (2d ed. 2005) ("Web hosting":  "the activity or business of providing storage space and access for Web sites").  The other is the "user's" business that employs the server space to <u>operate</u> a "web site . . . in which material may be posted at the direction of a user."  H.R.

---

[24] Defendants' conduct also does not fall within the functions covered by subsections (a), (b) or (d).  Defendants do not come within the § 512(a) safe harbor for transmission, because they do not meet the strict definition of a "service provider" for that subsection, *see* 17 U.S.C. § 512(k)(1)(A), which is limited to those who "play[] the role of a 'conduit' for the communications of others," like a common carrier or telecommunications company.  H.R. Rep. 105-551(II), at 51.  They also do not come within the § 512(b) safe harbor for system caching, because it applies only where one user requests material from another user, and the intermediate service provider that carries the transmission then makes an "intermediate and temporary" copy in the course of the transmission, § 512(b)(1)(A)-(C); *see* H.R. Rep. 105-551 (II), at 52.  Finally, Defendants do not come within the § 512(d) safe harbor for "referring or linking" to infringing material on other websites, because Defendants' core infringing conduct of making and publicly performing multiple copies of copyrighted videos and thumbnails takes place on the YouTube site itself.  *See* H.R. Rep. 105-551(II), at 51 (explaining that § 512(d) applies only if a service provider "lacks actual knowledge of infringement *on the other site*") (emphasis added).

Rep. 105-551(II), at 53. The legislative history makes clear that "storage" applies only to the first kind of business – "providing server space" – <u>not</u> to operation of the "user's web site." As Columbia Professor Ginsburg explains: "The examples of service providers given in the House Report consist entirely of enterprises who provide 'space' for third-party websites and fora, not the operators of the websites themselves." Ginsburg, *supra*, 50 Ariz. L. Rev. at 594.

That reflects the DMCA's fundamental purpose. The legislative history explains: "In the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability. For example, service providers must make . . . electronic copies . . . in order to <u>host</u> World Wide Web sites." S. Rep. 105-190, at 8 (emphasis added). Thus, § 512(c) is intended to protect services like web hosts that passively provide server storage as an empty vessel for someone else's websites or other activities. It does not protect companies that actively operate the websites as online entertainment centers. *See Fung*, slip op. 38 n. 26 (only "passive . . . storage of infringing materials" is covered by § 512(c)).

That is further confirmed by § 512(c)'s language limiting the safe harbor to "infringement of copyright <u>by reason of</u> the storage at the direction of a user." 17 U.S.C. § 512(c) (emphasis added). This language requires a tight nexus, not merely any kind of loose connection. As the Supreme Court has made clear in interpreting other statutes, "by reason of" requires <u>proximate</u> cause, not mere but-for causation. *See Holmes v. Secs. Investor Protection Corp.*, 503 U.S. 258, 263-64 (1992); *Associated Gen. Contractors of Cal., Inc. v. California Council of Carpenters*, 459 U.S. 519, 529-30 (1983). Similarly, "infringement by reason of the

storage at the direction of a user" in § 512(c) requires that storage at the direction of the user be the underline_proximate cause of infringement, not merely one of many but-for causes.[25]

Defendants do not qualify for the § 512(c) safe harbor because their copyright infringement results not from web hosting, but from operating YouTube as a "consumer media company." SUF ¶ 15. YouTube's entire business is predicated on the public performance of videos – just like a television station – not on the storage of videos. A true storage service such as a "web host, like a delivery service or phone company, is an intermediary and normally is indifferent to the content of what it transmits." *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003). In stark contrast, YouTube is a "consumer media company" that uses content to attract viewers to whom it shows advertising. SUF ¶¶ 15, 44, 55, 230-36. As their emails indicate, Defendants care intensely about which videos YouTube has available and how they are presented, because that is how they lured an audience and advertising dollars. *Supra* at 5-8.

To that end, Defendants engage in an array of directly and secondarily infringing activities after users initially submit videos for upload, summarized *supra*, Point III.A. Those activities are neither limited to storage nor performed at the direction of the uploading users. Defendants make multiple copies of videos without any request by uploading users. SUF ¶¶ 315-16, 320-23, 330. Defendants publicly perform and distribute videos on watch pages designed by Defendants in order to attract advertising revenue pursuant to advertising practices and deals that are determined, negotiated and priced by Defendants, not their users. *Supra* at 29-

---

[25] The limited scope of § 512(c) is also indicated by comparison with the other § 512 safe harbors, which apply only to specified basic Internet functions, namely transmission, system caching, and indexing. 17 U.S.C. § 512(a), (b), (d). The DMCA itself explicitly states that each safe harbor applies underline_only to the specific function described in that subsection: "Subsections (a), (b), (c), and (d) describe underline_separate and distinct functions for purposes of applying this section." 17 U.S.C. § 512(n) (emphasis added).

30.  Defendants, not the uploading users, decide what other videos will be suggested to users as "related" to a video being viewed on any given watch page.  SUF ¶ 334.  The uploading user also has no say whether and how Defendants place ads on the home, search results, and browse pages throughout the rest of the YouTube site, which is organized and includes functions like search that Defendants, not their users, create and continually change to maximize the amount of time revenue-generating viewers surf YouTube.

Most tellingly, Defendants negotiated distribution deals purporting to grant licenses from YouTube to third parties like Apple and Verizon Wireless authorizing performance of YouTube's library of videos – including infringing videos – on the third parties' platforms.  To carry out these deals, Defendants make and perform ever more copies of infringing videos, often months or years after the videos were first uploaded by users.  SUF ¶ 330.  Copying and licensing infringing videos on Defendants' own initiative for distribution over third-party platforms is not "storage at the direction of a user."  As this example drives home, Defendants are taking material submitted by users and exploiting it for their own purposes, such that a "majority of functions . . . remain outside of the safe harbor."  *CCBill*, 488 F.3d at 1117.

Although two courts addressing the Veoh video website interpreted "storage" more broadly, their readings are not persuasive and, in any event, do not help Google and YouTube.  The *Veoh* courts read "storage" to cover any "automatic" action performed by a service provider's computer systems that "facilitates access" to user-uploaded content.  *See Io*, 586 F. Supp. 2d at 1147; *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1086 (C.D. Cal. 2008).  But, as explained *supra*, at 60-61, the DMCA expressly states that § 512(c) covers only infringement "by reasons of" the specific function of storage, not infringement resulting from <u>other</u> functions.  And even if § 512(c) did apply to other automatic functions in response to

user commands – and it does not – that would not help Defendants, because much of their infringing conduct is performed without any user input at all. For example, Defendants themselves initiated the copying and distribution required to carry out the third-party platform deals they negotiated. YouTube and Google never sought to operate a mere storage or web hosting service. They were seeking to build a media entertainment empire comparable to other major television and film distribution outlets – and did just that. SUF ¶ 94 ("we should be comparing ourselves to, say, abc/fox/whatever"). They are therefore ineligible for the § 512 defense.

## <u>CONCLUSION</u>

Viacom's motion for partial summary judgment should be granted.

Respectfully submitted,


By: __/s/ Stuart J. Baskin_____        By: _/s/ Paul M. Smith_____

Stuart J. Baskin (No. SB-9936)                    Paul M. Smith (No. PS-2362)
John Gueli (No. JG-8427)                          William M. Hohengarten (No. WH-5233)
Kirsten Nelson Cunha (No. KN-0283)                Scott B. Wilkens (*pro hac vice*)
SHEARMAN & STERLING LLP                           Matthew S. Hellman (*pro hac vice*)
599 Lexington Avenue                              JENNER & BLOCK LLP
New York, NY  10022                               1099 New York Avenue, NW
Telephone:  (212) 848-4000                        Washington, DC  20001
Facsimile:  (212) 848-7179                        Telephone:  (202) 639-6000
                                                  Facsimile:  (202) 639-6066

                                                  Susan J. Kohlmann (No. SK-1855)
                                                  JENNER & BLOCK LLP
                                                  919 Third Avenue
                                                  New York, NY  10022
                                                  Telephone:  (212) 891-1690
                                                  Facsimile:  (212) 891-1699