UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| COLUMBIA PICTURES INDUSTRIES, INC., *et al.*, | ) ) | CV 06-5578 SVW (JCx) |
| | ) | ORDER GRANTING PLAINTIFFS' |
| Plaintiffs, | ) | MOTION FOR SUMMARY JUDGMENT ON |
| | ) | LIABILITY [249] |
| v. | ) | |
| | ) | |
| GARY FUNG, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.  INTRODUCTION

In September 2006, Plaintiffs[1] filed a Complaint alleging copyright
infringement against Defendant Gary Fung ("Fung").  [Doc. No. 1.]
Plaintiffs' Complaint contends that Fung operated a file-sharing
service as well as related computer servers as a part of an ongoing
file-sharing network that profits from alleged copyright infringement

---

[1] The Plaintiffs in this action are: Columbia Pictures Industries,
Inc.; Disney Enterprises, Inc.; Paramount Pictures Corporation;
Tristar Pictures, Inc.; Twentieth Century Fox Film Corporation;
Universal City Studios LLLP; Universal City Studios Productions LLLP;
and Warner Bros. Entertainment, Inc.

by its users.  Plaintiffs then filed a First Amended Complaint adding Defendants Isohunt Web Technologies, Inc. ("Isohunt, Inc.") and Does 1 through 10. [Doc. No. 13.].  (The Court refers to Fung and Isohunt, Inc. collectively as "Defendants.")

Plaintiffs now bring this Motion for Summary Judgment [Doc. No. 249] on the grounds that Defendants' users have infringed their copyrights and are liable under theories of inducement, contributory infringement, and vicarious infringement.  The Court requested Supplemental Briefing in an Order dated April 3, 2008.  [Doc. No. 342.] The Court requested further Supplemental Briefing and augmentation of the record in an Order dated August 25, 2009. [Doc. No. 358.]

The material facts supporting Plaintiffs' claims are almost wholly unrebutted.  Generally, Defendants' rest their case on legal arguments and meritless evidentiary objections, and offer little of their own evidence that directly addressed Plaintiffs' factual assertions. Accordingly, summary judgment is appropriate in the present case. Having considered the moving papers, as well as arguments presented at hearing and in supplemental briefing, the Court Grants Plaintiffs' Motion for Summary Judgment on Liability.

II.  FACTUAL BACKGROUND

A.  The Torrent Structure

Plaintiffs own or control a large quantity of copyrights within the entertainment and popular media fields.  (Plaintiffs' Statement of Undisputed Facts ("Pls.' SUF"), ¶ 1).  Defendant Fung maintains and operates a number of websites, including www.isohunt.com,

1  www.torrentbox.com, www.podtropolis.com, and www.ed2k-it.com

2  (collectively "Fung sites" or "Defendants' sites"), that allow users to

3  download files to their computers.

4     Plaintiffs maintain that Fung and his websites facilitate their

5  users' infringement of copyrighted files.  Specifically, Plaintiffs

6  assert that, through his operation and promotion of the websites, Fung

7  allows users to download infringing copies of popular movies,

8  television shows, sound recordings, software programs, video games, and

9  other copyrighted content free of charge.  Users of the Fung sites have

10  downloaded works that are copyrighted by Plaintiffs; these downloads

11  have taken place without authorization from Plaintiffs.  (Pls.' SUF, ¶¶

12  2-3.)

13     The Fung sites are an evolutionary modification of traditional

14  "peer-to-peer" sharing sites such as Napster and Grokster.  A peer-to-

15  peer service provides a method for users of a network to exchange files

16  quickly and easily between the individuals on the network – other

17  "peers".  <u>See, e.g.</u>, <u>Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,</u>

18  <u>Ltd</u>, 545 U.S. 913, 919 (2005).  (<u>See also</u> Horowitz[2] Decl., at ¶ 12.)

19  _____

20  [2] Ellis Horowitz is a Professor of Computer Science and Electrical
    Engineering at the University of Southern California.  Mr. Horowitz
    has served as a tenured professor since 1983 and his relevant
21  research has been in the field of software development.  (Horowitz
    Decl., at ¶¶ 3, 5.)
22     On summary judgment, expert opinions are admissible under the
    general requirements of Fed. R. Evid. 702, which requires that the
23  testimony be based on sufficient facts and be the product of reliable
    principles and methods, and that the witness has applied the
24  principles and methods reliably to the facts of the case.  On summary
    judgment, expert testimony is also subject to Fed. R. Civ. P.
25  56(e)(1), which requires a showing [1] that "the affiant is competent
    to give an expert opinion and [2] the factual basis for the opinion
26  is stated in the affidavit, even though the underlying factual
    details and reasoning upon which the opinion is based are not."
27  <u>Bulthuis v. Rexall Corp.</u>, 789 F.2d 1315, 1318 (9th Cir. 1985).
28                                      [cont'd on next page]

The content of the files shared therefore resides on the computers of
individual users rather than on central servers. (Horowitz Decl., at ¶
12.)

Through use of the Fung sites, which are commonly known as
"BitTorrent" or "torrent" sites, users download content directly from
the computers of other users and not directly from the servers of the
Defendants, thus operating as a sharing service of the peer-to-peer
variety. (See Horwitz Decl., at ¶ 16.) In a BitTorrent network,
however, the download process is unique from that of previous systems
such as Napster and Grokster.[3] Rather than downloading a file from an

[cont'd from prev. page]
        Here, Horowitz's testimony is admissible on summary judgment.
See also Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124,
130-31, 133, 150, 152 (S.D.N.Y. 2009) (relying on Horowitz's
testimony).
        Further, the Court notes that both parties' experts (Dr.
Horowitz and Dr. Waterman for Plaintiffs, and Dr. Gribble for
Defendants) are generally unrebutted. (See also footnotes 7 and 13,
infra, for a discussion of the other experts' qualifications.)
        Generally, the Court relies on the experts with respect to three
matters: first, the technological structure of Defendants' websites,
which is agreed-upon in all material respects by Dr. Gribble (for
Defendants) and Dr. Horowitz (for Plaintiffs); second, the statistics
regarding Defendants' users' downloading activities, which is set
forth by Dr. Waterman (for Plaintiffs) and wholly unaddressed by
Defendants' evidence; and third, the dispute over whether or not
Defendants were technologically capable of filtering copyright-
infringing materials from their websites, upon which Dr. Gribble and
Dr. Horowitz disagree (and is discussed in greater detail infra, Part
IV.B.4).
        Accordingly, the experts' declarations set forth admissible
facts. Where unrebutted, these facts allow summary judgment in favor
of the party proferring the expert testimony on that particular
issue. Where the experts' disagreement raises a genuine dispute, the
Court will address the dispute accordingly.

[3] Napster involved a peer-to-peer network with a central "search index"
that served as Napster's collective directory for the files available
on the server at any given time. In order to download the files from
another user in the Napster network, the individual would search the
Napster server for the desired file and then select the desired file
                                        [cont'd on next page]

individual user, users of a bit-torrent network will select the file that they wish to download, and, at that point, the downloading will begin from a number of host computers that possess the file simultaneously. (See id. at ¶¶ 23-24.) BitTorrent technology relies on a variety of mechanisms in order to accomplish the ultimate downloading of an given file, including: (1) a software application that users download, which is commonly referred to as a "client application"; (2) websites, also known as "torrent sites," which allow users to select "dot-torrent files" that they wish to download; and (3) servers, also known as "trackers," that manage the download process. (Horwitz Decl., at ¶ 17.) The client applications and trackers work together through the use of a "BitTorrent protocol" which standardizes the client-client and client-tracker communications. (Id.) These components essentially work together to allow individuals to visit a torrent site, download files, and keep track of those downloads – as well as discover additional persons to download from – through the use

---

[cont'd from prev. page]
from a list of available users in the network. Similar to other peer-to-peer networks, the actual files shared never passed through or resided on the Napster servers. See A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1011-1013 (9th Cir. 2001).

   In contrast, the technology in the Grokster and Kazaa networks provided a distinct form of the peer-to-peer network. Unlike Napster, there was no central indexing of available files. Instead, an individual scanning through the Grokster software would enter a search term and the software itself, through use of a supernode – or indexing computer – would contact other computers seeking matching files. When a result was found matching the query, the information regarding the results (the IP address and other information) would be sent to the requesting computer. The searching user would then download directly from the relevant computer and the file would be placed in the designated folder of the requesting computer. See Grokster, 545 U.S. at 921. In a variation of this network, known as Gnutella, the process is similar but involves no supernodes. Instead, the peer computers communicate directly with each other through the network and requests go directly to other connected users. See id. at 922.

of trackers.  In such a system the downloading of the desired content

is occurring from multiple source points at the same time and allowing

larger downloads to move more expeditiously.  During this simultaneous

downloading process users form what is known as a "swarm," which allows

for quick exchange of the downloading material.[4]

Accordingly, in order to download files from others in a

BitTorrent network, users must engage in a number of steps.  First,

users must install a BitTorrent client application.  (Horowitz Decl., ¶

18.)  Standing alone, a BitTorrent client application does not possess

the ability to search other computers for files.  Instead, as part of

the second step, users must visit a torrent site for the purpose of

locating dot-torrent files containing the content that they wish to

download.  (Id. at ¶ 19.)[5]  These torrent sites maintain indexes of

available torrent files for download that users may search, or, in the

alternative, users may upload torrent files to share with others

through the torrent site.  (Id.)  These torrent files are referred to

as "dot-torrent" files in reference to their file extension name.[6]  The

dot-torrent files do not contain the actual content item searched for;

---

[4] Plaintiffs acknowledge that one of the Fung sites, www.ed2k-it.com, is based on another form of technology known as "eDonkey."  (Mot., at 6 n.4.)  The Court agrees with Plaintiffs' expert that "the basic elements of eDonkey and BitTorrent technology play similar roles," and that the minor technical distinctions are not material to the present dispute.  (See Horowitz Decl. ¶¶ 30-34.)  Notably, Defendants do not provide any arguments specifically premised on the difference in technology of "eDonkey."

[5] Torrent sites are websites accessible through the use of an Internet browser.  (Horowitz Decl., ¶ 20.)

[6] Accordingly, the extension of those files searched on a torrent site would be ".torrent" in contrast to prior incarnations of peer-to-peer networks where users would search for a file with an extension such as ".mp3" or ".doc".

1    rather, the dot-torrent file contains the data used by the BitTorrent

2    client to retrieve the content through a peer-to-peer transfer.  (Id.

3    at ¶ 21.)  In the third step, once the user clicks on the desired dot-

4    torrent file, the BitTorrent client will locate and download the actual

5    content item.  (Id. at ¶ 22.)  This is accomplished through the use of

6    trackers that are contained within the dot-torrent file.  The dot-

7    torrent file contains "hash" values that are used to identify the

8    various pieces of the content file and the location of those pieces in

9    the network.  The BitTorrent client application then simultaneously

10   downloads the pieces of the content file from as many users as are

11   available at the time of the request, and then reassembles the content

12   file on the requesting computer when the download is complete.  (Id. at

13   ¶ 23.)  Once a user downloads a given content file, he also becomes a

14   source for future requests and downloads.  (Id.)

15        The advantage of BitTorrent technology is the cumulative nature of

16   its downloading and economies of scale.  As more users download a given

17   file, there are more sources for the file pieces necessary for others.

18   This process, whereby individuals maybe be uploading and/or downloading

19   from many sources at any given time is known as a "swarm."  (Id. at ¶

20   24.)  This prevents a backlog of users waiting to download from one

21   individual user with the source file.

22        **B.   Sites Maintained by Defendant Fung**

23        Defendant Fung operates a number of websites, including

24   www.isohunt.com ("Isohunt"), www.torrentbox.com ("Torrentbox"),

25   www.podtropolis.com ("Podtropolis"), and www.ed2k-it.com ("eDonkey").

26   The structure and manner in which users download files from these sites

27   differs in certain respects.  The BitTorrent websites – Isohunt,

28

Torrentbox, and Podtropolis – all provide users the ability to search for and download BitTorrent files.  (Horowitz Decl., at ¶ 26.)  As explained by Defendants' expert Steven Gribble,[7] "the defendants' Web sites collect, receive, index, and make available descriptions of content, including so-called 'dot-torrent files,' and they also provide access to 'open-access' BitTorrent Trackers."  (Gribble Decl. ¶ 4A.)

Users of BitTorrent websites click on a "download torrent" button or link on the website that will begin the downloading process described above.  (Id. at ¶ 27.)  The elements of the downloading process work together to bring the desired content to the user's computer without any further actions by the user.  (Id.)  As one of Plaintiffs' experts explains: "[t]he only purpose of a dot-torrent file is to enable users to identify, locate, and download a copy of the actual content item referenced by the dot-torrent file. . . .  Once a user has clicked the 'download' torrent button or link, the . . . desired content file should begin downloading to the user's computer without any further action or input from the user."  (Horowitz Supp. Decl., ¶¶ 5-6.)

The BitTorrent websites, as set forth in further detail below, also contain a number of categories from which users can select files to download, including "Top Searches," "Top 20 Movies," "Top 20 TV Shows," "Box Office Movies."  (SUF ¶¶ 8-12, 47-55.)[8]  For example, the

---

[7] Steven Gribble is an Associate Professor of Computer Science and Engineering at the University of Washington.  Dr. Gribble's research focuses on computer systems and computer security, and has focused in the past on the operations of peer-to-peer systems.  (Gribble Decl. ¶ 1.)

For the reasons discussed in footnote 2, *supra*, Gribble's testimony is admissible on summary judgment.

[8] The "Box Office Movies" feature, although once available, is no
[cont'd on next page]

Isohunt home page contains a listing of "Top Searches," which provides a listing of the most commonly searched-for terms by users of the websites.  This category contained code filtering out pornography-related terms from the "Top Searches" display.  (Id. at ¶ 59.)  The items found within the "Top Searches" category are all associated with copyrighted content.  (SUF, at ¶ 8.)  Much the same holds true for the "Top 20 Most Downloaded Torrents" on Defendant Fung's Torrentbox site.  (Id. at 9.)  Another of Defendants' sites, Podtropolis, simply contains lists of the "Top 20 Movies" and "Top 20 TV Shows," all of which correspond to copyrighted content.  (Id. at ¶ 10.)  The ed2k-it website contains files in lists entitled "High Quality DVD Rips" and "TV Show Releases," all of which correspond to copyrighted content.[9]  (Id. at ¶ 11.)

Plaintiffs note that the meta tags[10] used on Fung's websites often included the term "warez" as a header for every page.[11]  Plaintiffs also

---

[cont'd from prev. page]
longer an element of the website.  (Horowitz Decl., ¶ 39-40; Defs.' SGI, ¶ 57.)  There is no dispute, however, that this category was once on the BitTorrent website.

[9] Defendant Fung attempts to dispute these facts, but not on the grounds that the factual statements are inaccurate.  Instead, he contends that these elements of the website provide only a small sample of what is available on the website.  Whether or not this is true, it does not rebut the factual accuracy of the claims that Plaintiffs set forth.  Defendant Fung also asserts that the lists created by these categories are user-generated and, therefore, simply reflect user demand on the site.  This argument ignores the fact that Defendants created and operated the websites in a manner that placed these "user-generated" categories on the websites.

[10] Meta tags are terms commonly embedded into web pages in order to allow search engines to more quickly categorize the substance of a given webpage.

[11] The term "warez" is a term used to refer to pirated content.  See Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 133 (S.D.N.Y. 2009).  (See also SUF, at ¶ 25.)

point to certain other elements of the webpage that related to known copyrighted material. Defendants, on the home page of the Isohunt website, asked users to upload dot-torrent files of Box Office Movies and also maintained a list of the top twenty grossing movies in U.S. theaters at the time. (SUF, at ¶¶ 50-51.) These lists served the function of getting users to upload dot-torrent files of the latest blockbuster films and have them posted on the Isohunt website. (Id. at 52-54.)[12]

Plaintiffs engaged in a randomized statistical analysis of the works available on the Isohunt and Torrentbox sites. According to Plaintiffs' expert Richard Waterman,[13] approximately 95% of downloads occurring through Defendants' sites are downloads of copyright-infringing content. (See Waterman Decl. ¶¶ 6-7.) Waterman's study of the Torrentbox downloads used actual user downloads from log files that were made available upon discovery requests. Waterman further states that 95.6% of all dot-torrent files downloaded from Torrentbox are for either copyrighted or highly likely copyrighted material. (Id. at ¶ 31.) In a study of the Isohunt website, Waterman found that approximately 90% of files available and 94% of dot-torrent files downloaded from the site are copyrighted or highly likely copyrighted. (Id. at ¶¶ 24, 28.) Though Defendants raise conclusory boilerplate objections to Waterman's declaration, Defendants fail to call

---

[12] Plaintiffs acknowledge that, at some point, the "Box Office Movies" feature was discontinued on the website. (SUF, at ¶ 54.)

[13] Richard Waterman is an Adjunct Associate Professor of Statistics at the University of Pennsylvania's Wharton School of Business. (Waterman Decl. ¶ 1.) Dr. Waterman operates a statistics consultancy and has testified in a similar case involving secondary copyright infringement. See Arista Records LLC, 633 F. Supp. 2d at 143-44.
    For the reasons discussed in footnote 2, supra, Waterman's testimony is admissible on summary judgment.

Waterman's factual conclusions into doubt.  (See Defs.' Evidentiary

Objections, at 10-19.)  Despite Defendants' repeated assertions that

the evidence is based on "junk science," (id.) Defendants fail to rebut

Waterman's statement that he relied on the standard statistical

sampling techniques used in his field.  (Waterman Decl. ¶ 8 n.1.)  It

is also noteworthy that numerous courts have relied on such statistical

sampling.  See Arista Records, 633 F. Supp. 2d at 144-45; MGM Studios,

Inc. v. Grokster, Ltd., 454 F. Supp. 2d 966, 985 (C.D. Cal. 2006); A &

M Records, Inc. v. Napster, 114 F. Supp. 2d 896, 902-03 (N.D. Cal.

2000), aff'd, 239 F.3d 1004 (9th Cir. 2001).  To the extent that the

evidence suggests an unrealistic level of accuracy, the Court notes

that Waterman's data shows that these numbers are accurate to a 95%

confidence level, and include margins of error of plus-or-minus 5% or

less.  (See Waterman Decl. ¶¶ 13, 14, 18, 25, 29, 32, 34.)  Further,

Plaintiffs provide the specific data upon which Waterman based his

categorization of available files as infringing, likely infringing, and

non-infringing. (See Pls.' Ex. T, Waterman Depos., at 39, 48; Friedman

Decl. ¶¶ 11, 15, 16.)  In any event, for the purposes of this case, the

precise percentage of infringement is irrelevant: the evidence clearly

shows that Defendants' users infringed on a significant scale.  It

simply does not matter whether 75% (to pick a number) of available

materials were copyrighted or 95% of available materials were

copyrighted; and even if this distinction did matter, Defendants have

simply failed to satisfy their summary judgment burden by submitting

admissible evidence that raises a triable dispute regarding Plaintiffs'

evidence that a substantial percentage of the available files included

copyright-infringing or highly likely copyright-infringing content.

1  See _Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp._, 475 U.S.

2  574, 586-87 (1986) ("When the moving party has carried its burden under

3  Rule 56(c), its opponent must do more than simply show that there is

4  some metaphysical doubt as to the material facts.  In the language of

5  the Rule, the nonmoving party must come forward with 'specific facts

6  showing that there is a _genuine issue for trial_.'") (internal citations

7  omitted).

8              **C.  Fung's Participation in the Websites**

9        In addition to the general structure of the pages maintained by

10  Defendants, Defendant Fung has personally made a number of statements

11  regarding the copyrighted nature of the works available on his sites.

12  In one such post on the Isohunt website Defendant Fung responded to a

13  user's post by stating "they accuse us for [sic] thieves, and they r

14  [sic] right. Only we r [sic] 'stealing' from the lechers (them) and not

15  the originators (artists)." (SUF, at ¶ 14.)  In an interview Fung

16  stated: "Morally, I'm a Christian. 'Thou shalt not steal.'  But to me,

17  even copyright infringement when it occurs may not necessarily be

18  stealing." (_Id._ at ¶ 15.)  In another post Fung stated: "We completely

19  oppose RIAA & Co. so do not be alarmed by our indexing activities. . .

20  ." (_Id._ at ¶ 18.)   In another interview Fung also stated that users

21  were attracted to his website by the availability of a blockbuster film

22  of the time, _The Da Vinci Code_.  (_Id._ at ¶ 20.)  Fung's other

23  statements included references to aiding individuals in the download

24  of then-popular movie titles such as _Matrix Reloaded_ and _Lord of the_

25  _Rings: Return of the King_, pointing users to links where they could

26  download copies of these movies through the torrent sites.  (_Id._ at ¶¶

27  27-29.)  Other statements made on the website encouraged or made

28

available the downloading of illegal content by users who were browsing the discussion forums on Fung's websites. (Id. at ¶¶ 33-46.)

Plaintiffs also provide details relating to the assistance that Fung would give website users in downloading copyrighted material within the forum discussions of the various websites. In one such instance, in response to a user query on how to make a DVD from a downloaded copy of the film *Pirates of the Caribbean*, Fung provided a link to a website that would allow the individual to burn a DVD of the downloaded copy. (SUF, at 68.) Fung provided users with assistance on a number of occasions regarding how they could go about playing or extracting the copyrighted films that they downloaded from the Defendants' websites. (Id. at 70, 72.) Fung also provided assistance to a user who was searching for episodes of the television series *Star Trek: Enterprise*; Fung provided links to search possible search queries that would turn up the work. (Id. at 71.) Fung also provided technical advice regarding the use of "trackers" in response to emails containing dot-torrent files connected with copyrighted television programs, such as the NBC series *The Office*. (Id. at 79.)

## III. SUMMARY JUDGMENT STANDARD

### A. Rule 56 Standard

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Fed.

///

R. Civ. P. 56(c); <u>Tarin v. County of Los Angeles</u>, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  <u>See</u> <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  When a party moves for summary judgment under Rule 56(c), that party bears the burden of affirmatively establishing all elements of its legal claim.  <u>See</u> <u>Southern Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885 (9th Cir. 2003) (per curiam) (adopting District Court order as its own); <u>see also</u> <u>Fontenot v. Upjohn Co.</u>, 780 F.2d 1190, 1194 (5th Cir. 1986) ("[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor.") (emphasis in original).

Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial.  <u>See</u> <u>Celotex</u>, 477 U.S. at 323-34; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.  <u>Addisu v. Fred Meyer</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is precluded only if there is a genuine dispute "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party" over facts that might affect the outcome of the suit under the governing law.  <u>See</u> <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>Aprin v. Santa Clara Valley Transp. Agency</u>, 261 F.3d 912, 919 (9th Cir. 2001) (the nonmoving party must identify specific

1  evidence from which a reasonable jury could return a verdict in its

2  favor).

3  **B.  Evidentiary Standards**

4  Under the Local Rules of this Court, the Court may base its

5  judgment on the facts stated in the moving party's "Statement of

6  Uncontroverted Facts and Conclusions of Law," L.R. 56-1, but only to

7  the extent that the facts are "adequately supported by the moving

8  party" -- i.e., with evidence in the record -- and are uncontroverted

9  by evidence submitted or identified by the opposition.  L.R. 56-3.

10  "A trial court can only consider admissible evidence in ruling on

11  a motion for summary judgment." <u>Orr v. Bank of Am.</u>, 285 F.3d 764, 773

12  (9th Cir. 2002); <u>see also</u> Fed. R. Civ. P. 56(e).  Of course, the court

13  need only consider evidentiary objections if the Court actually relies

14  on such evidence.  Thus, to the extent that the Court relies on

15  evidence to which a party has properly objected, the Court will address

16  these objections in the course of this Order.

17

18  **IV.  ANALYSIS**

19

20  **A.  Preliminary Issues Regarding Secondary Liability**

21  **1.  Secondary Theories of Liability**

22  Plaintiffs move for summary judgment against defendants on three

23  separate grounds: inducement of copyright infringement, material

24  contribution to copyright infringement, and vicarious copyright

25  infringement.  The Court will only address the first theory, because

26  Defendants' inducement liability is overwhelmingly clear.  Discussion

27  of Plaintiffs' alternative theories of liability would be unnecessarily

28

duplicative with respect to the central question at issue in this Motion: Defendants' secondary liability for its users' copyright infringement.

The first two theories (material contribution and inducement) are known collectively as "contributory liability." Perfect 10 v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 795 (9th Cir. 2007) ("One contributorily infringes when he (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement."), cert. denied, 128 S.Ct. 2871 (2008). Despite the analytical similarities between the inducement and material contribution theories, it is now established in this Circuit that inducement and material contribution are distinct theories of contributory liability through which defendants can be found liable. Id.; see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197, 1227 (C.D. Cal. 2007) ("Grokster V") ("material contribution and inducement are two doctrinal subsets of the contributory infringement theory of liability."). Generally, inducement requires that the defendant has undertaken purposeful acts aimed at assisting and encouraging others to infringe copyright, see Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, 545 U.S. 913, 936-37 (2005) ("Grokster III"); in contrast, material contribution (in the context of "computer system operator[s]") applies if the defendant "has actual knowledge that specific infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1172 (9th Cir. 2007) (internal citations and quotations omitted) (emphasis in

original).  The third theory, vicarious liability, is similar to contributory liability but includes some contours that differ from these other theories of liability.  A defendant "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it."  Grokster III, 545 U.S. at 930.

## 2.    Actual Infringement by Defendants' Users

With respect to all three of Plaintiffs' theories of liability, Plaintiffs must first demonstrate that there has been direct infringement of their copyrights by third parties.  Amazon, 508 F.3d at 1169 (citing A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 n.2 (9th Cir. 2001)) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.").  Plaintiffs have provided direct evidence of copyright infringement by Defendants' users, and Defendants have not introduced any evidence creating a triable issue of fact on this issue.

To establish copyright infringement, Plaintiffs must show that they own the copyrights that have been infringed, and that third parties have made unauthorized copies, downloads, or transfers of this material.  17 U.S.C. § 106(1), (3).  Implicit in 17 U.S.C. § 106 is a further requirement at issue in the present case: that the infringement of Plaintiffs' copyrights occur inside the United States.  The Ninth Circuit has determined that "United States copyright laws do not reach acts of infringement that take place entirely abroad."  Subafilms, Ltd. v. MGM-Pathe Comm'ns Co., 24 F.3d 1088, 1098 (9th Cir. 1994) (en banc), cert. denied sub nom. Subafilms, Ltd. v. United Artists Corp., 513 U.S. 1001 (1994).  As a later panel of that court wrote, "in order for U.S. copyright law to apply, at least one alleged infringement must be

completed entirely within the United States." <u>Allarcom Pay Television,</u>
<u>Ltd. v. Gen'l Instrument Corp.</u>, 69 F.3d 381, 387 (9th Cir. 1995).

In the context of secondary liability, an actor may be liable for
"activity undertaken abroad that knowingly induces infringement within
the United States." 3 <u>Nimmer on Copyright</u>, § 12.04(D)(2) (citing
<u>Armstrong v. Virgin Records, Ltd.</u>, 91 F. Supp. 2d 628, 634 (S.D.N.Y.
2000); <u>Blue Ribbon Pet Prods., Inc. v. Rolf C. Hagen (USA) Corp.</u>, 66 F.
Supp. 2d 454, 462-64 (E.D.N.Y. 1999)). Once Plaintiffs have
established that an act of infringement has taken place within the
United States, Defendants may be held liable for their conduct that
constitutes inducement, material contribution, or vicarious
infringement, even if Defendants' conduct took place abroad. <u>Id.</u>[14]

Here, there is not a genuine factual dispute over whether the
users of Fung's websites infringed Plaintiffs' copyrights. It is
undisputed that Plaintiffs "own or control the copyrights, or exclusive
rights under copyright" for the works at issue in this case. (SUF, ¶
1.) It is also undisputed that Plaintiffs have not authorized the
distribution of their copyrighted works by Defendants or Defendants'
users. (SUF, ¶ 3.)

The only purported dispute with respect to third parties' direct
infringement is whether Plaintiffs have provided any evidence that
users of Fung's sites have violated 17 U.S.C. § 106(1) and § 106(3) by
reproducing and distributing Plaintiffs' copyrighted works. (SUF, ¶ 2;
SGI, ¶ 2.)

Defendants argue that Plaintiffs must provide evidence that both

---

[14] The Court notes that Defendants have operated computer servers in
Maryland and Texas. <u>Columbia Pictures Inds., Inc. v. Fung</u>, 447 F.
Supp. 2d 306, 310 (S.D.N.Y. 2006) (order granting motion for change
of venue and transferring case to this Court).

the transferor and the transferee are located in the United States. (See Defs.' Supp. Opp. at 3-4.)  However, United States copyright law does not require that both parties be located in the United States. Rather, the acts of uploading and downloading are each independent grounds of copyright infringement liability.  Uploading a copyrighted content file to other users (regardless of where those users are located) violates the copyright holder's § 106(3) distribution right. Downloading a copyrighted content file from other users (regardless of where those users are located) violates the copyright holder's § 106(1) reproduction right.  A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1014 (9th Cir. 2001).  Accordingly, Plaintiffs need only show that United States users either uploaded or downloaded copyrighted works; Plaintiffs need not show that a particular file was both uploaded and downloaded entirely within the United States.

Defendants also assert that Plaintiffs rely on inadmissible hearsay and inadmissible statistical data.  (SGI, ¶ 3.)  Contrary to Defendants' assertions, Plaintiffs' expert evidence is admissible; and, in any event, Plaintiffs provide direct evidence of specific acts of infringement.  There is abundant evidence of copyright infringement using Defendants' websites.

Plaintiffs' expert Richard Waterman conducted a study showing that more than 95% of files available through Defendants' websites are copyrighted or are highly likely to be copyrighted.  (SUF, ¶¶ 5-6.) Even taking into account Waterman's margins of error (5% or less), such overwhelming statistical evidence is sufficient to establish that Defendants' websites allowed third party users to access copyrighted material, and that users of Defendants' websites made copyrighted

1    material available for others to access.[15]

2        Plaintiffs' broad statistical evidence is corroborated by evidence

3    of specific instances of downloads and transfers of copyrighted works

4    through Defendants' websites.  In his deposition, Defendant Fung

5    admitted to using the Isohunt website to download copyrighted broadcast

6    television shows such as *The Simpsons* and *Lost*.  (SUF, ¶¶ 2, 57, 122.)

7    Similarly, Fung admitted to downloading the copyrighted film *The Lord*

8    *of the Rings: The Fellowship of the Ring*.  (SUF, ¶ 58.)  Declarant

9    Chris Masciarelli stated that he used Defendants' website isohunt.com

10   to download a copyrighted work entitled *Family Guy Presents Stewie*

11   *Griffin: The Untold Story*.  (SUF, ¶ 2; Masicarelli Decl.).

12       Although Defendants argue that there is no clear evidence that any

13   infringement took place in the United States, Plaintiffs have presented

14   admissible evidence of domestic infringement involving a copyright

15   owned by each of Plaintiffs.  Plaintiffs provide evidence based on

16   internet protocol ("IP") address[16] data and usage-summary data produced

17   _____

18   [15] As noted *supra*, this expert evidence is admissible and unrebutted.
     Notably, other courts dealing with similar issues have relied on
     similar studies based on statistical samples of the relevant products
     or services.  These courts have approved the basic statistical
     methodologies employed by Plaintiffs' expert.  See, e.g., Arista
     Records LLC v. Usenet.com, Inc., 633 F. Supp.  2d 124, 145 (S.D.N.Y.
     2009); Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 454 F.
     Supp. 2d 966, 985 (C.D. Cal. 2006); A & M Records, Inc v. Napster,
     Inc., 114 F.Supp.2d 896, 902-03 & n.6 (N.D. Cal. 2000), *aff'd in part*
     *and rev'd on other grounds*, 239 F.3d 1004 (9th Cir. 2001).

23   [16]   "An IP address is a standard way of identifying a computer that
     is connected to the Internet.  With an IP address, a party could
     identify the Internet Service Provider providing internet service to
     the user of the computer corresponding to such IP address."  (June 8,
     2007 Order Granting in Part and Denying in Part Plaintiffs' Motion to
     Require Defendants to Preserve and Produce Server Log Data and for
     Evidentiary Sanctions) (Magistrate Judge) (citing United States v.
     Heckenkamp, 482 F.3d 1142, 1144 (9th Cir. 2007)) [docket no. 146].)
         Defendants' own expert has opined that IP-based location
                                              [cont'd on next page]

by Defendants themselves.  Plaintiffs have also have used IP-address

data to locate Defendants' users and show that particular infringing

downloads took place in the United States.  (Pozza Supp. Decl. ¶¶ 3, 4,

Ex. 5; see also Masciarelli Decl.)  Further, in an examination of

roughly 400 downloads (the only available evidence containing users' IP

addresses), approximately 50% of the actual downloads using Defendants

websites were made from the United States.  (Waterman Supp. Decl. ¶ 7;

Horowitz Supp. Decl. ¶ 21 & Ex. 1.)[17]

Plaintiffs have also provided evidence that, contrary to

Defendants' wholly unsupported assertions, dot-torrent files downloaded

from Defendants' sites correspond to and automatically cause the

downloading of Plaintiffs' copyrighted content.[18]  (Bedser Supp. Decl.,

¶ 4; Ishikawa Supp. Decl., Ex. 2; Grodsky Supp. Decl., Ex. 2; Sehested

---

[cont'd from prev. page]
analysis is highly accurate.  (Gribble Decl. ¶ 30.)  Plaintiffs'
expert agrees.  (Horowitz Supp. Decl. ¶ 11.)

[17] Defendants' own usage summaries show that approximately 25% of
Defendants' users are located in the United States.  (Horowitz Supp.
Decl. ¶ 24, Ex. 5.)  This 25% figure is further supported by evidence
from Alexa and Quantcast, which are third-party sources of internet
traffic information.  (See Horowitz Supp. Decl. ¶ 24 & Ex. 6.)
Defendants do not object to the exhibits which contain this 25%
figure.  (See Defs.' Objections to Horowitz Supp. Decl, ¶ 14; Defs.'
Objections to Waterman Supp. Decl., ¶ 3.)

[18] The fact that the dot-torrent files automatically cause content
files to be downloaded and assembled (see also supra Part II.A)
rebuts Defendants' assertions that users' act of downloading dot-
torrent files does not constitute actual copyright infringement.  It
may be true that the act of downloading a dot-torrent file is not
itself a copyright-infringing action; but once that dot-torrent file
triggers the process of downloading a content file, copyright
infringement has taken place.  Because dot-torrent files
*automatically* trigger this content-downloading process, it is clear
that dot-torrent files and content files are, for all practical
purposes, synonymous.  To conclude otherwise would be to elevate form
over substance.

Supp. Decl., Ex. 2).  Finally, Plaintiffs have linked the United States-based downloads (as identified by Plaintiffs' experts) with copyrighted works owned by each of the individual Plaintiffs. (Whitehead Supp. Decl., Ex. 1; Clinton Supp. Decl. Ex. 1; Sunderland Supp. Decl., Ex. 1; Kang Supp. Decl., Ex. 1; Cherkoori Supp. Decl., Ex. 1; Kaplan Supp. Decl., Ex. 1.)

Accordingly, Plaintiffs' evidence conclusively establishes that individuals located in the United States have used Fung's sites to download copies of copyrighted works.  Defendants fail to introduce any evidence that raises a triable issue regarding the fact that Plaintiffs' copyrights have been infringed by third parties.

### B.  Inducement of Infringement

Plaintiffs first seek summary judgment under the "inducement" theory articulated in the Supreme Court case <u>Metro-Goldwyn-Mayer Studios, Inc. v. Grokster</u>, 545 U.S. 913 (2005) ("<u>Grokster III</u>").  In an opinion by Justice Souter, the Supreme Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties."  <u>Grokster III</u>, 545 U.S. at 936-37.  The Supreme Court further explained,

> [M]ere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor [of the device] to liability.  Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves.  <u>The inducement rule, instead, premises liability on purposeful, culpable</u>

1    _expression and conduct_, and thus does nothing to compromise

2    legitimate commerce or discourage innovation having a lawful

3    promise.

4    _Id._ at 937 (emphasis added).  Importantly, liability may attach even if

5    the defendant does not induce specific acts of infringement.  _Id._ at

6    940 n.13 (emphasis added).[19]  Instead, the court may "infer[] a patently

7    illegal objective from statements and actions showing what [the

8    defendant's] objective was."  _Id._ at 941.

9        An unlawful objective to promote infringement can be shown by a

10   variety of means.  "The classic instance of inducement is by

11   advertisement or solicitation that broadcasts a message designed to

12   stimulate others to commit violations."  _Id._ at 937; _see also_ _Visa_

13   _Int'l.,_ 494 F.3d at 800.  For example, in _Grokster III_, the defendants

14   "respond[ed] affirmatively to requests for help in locating and playing

15   copyrighted materials."  545 U.S. at 938.

16       However, showing that the defendant sent out a specific message is

17   "not [the] exclusive way of" demonstrating inducement.  _Grokster III_,

18   545 U.S. at 938.  The Supreme Court in _Grokster III_ highlighted three

19   _____

20   [19] In its opinion, the Supreme Court noted the defendant's argument
     that a court must make a determination of their liability on the

21   basis of specific past acts that encouraged inducement.  Defendants
     here offer a similar argument.  The Supreme Court, however, rejected
     such a proposition, stating:

22       This contention misapprehends the basis for their potential
         liability.  It is not only that encouraging a particular

23       consumer to infringe a copyright can give rise to secondary
         liability for the infringement that results.  Inducement

24       liability goes beyond that, and the distribution of a product
         can itself give rise to liability where evidence shows that _the_

25       _distributor intended and encouraged the product to be used to_
         _infringe_.  In such a case, the culpable act is not merely the

26       encouragement of infringement but also the distribution of the
         tool intended for infringing use.

27   _Grokster III_, 545 U.S. at 940 n.13 (internal citations omitted,

28   emphasis added).

facts from which a reasonable factfinder could infer intent to foster infringement in that case.  First, the Court noted that the defendant's owns communications and advertising designs had expressed an intent to target Napster users, a community well-known for copyright infringement.  Although it was not known whether some of the advertising designs were actually communicated to the public, "whether the messages were communicated is not to the point on this record."  Id. at 938.  "The function of the message in the theory of inducement is to prove by a defendant's own statements that his unlawful purpose disqualifies him from claiming protection."  Id.  Second, the Court found it probative that defendants did not attempt to develop filtering tools or other means of diminishing the use of its products for infringement.  Taken alone, the failure to develop a filter would be insufficient to support liability; but viewed in conjunction with other evidence it underscored the defendants' unlawful objective.  Id. at 939 n.12.  Third, the Court considered the fact that the defendants' business model depended on high-volume use of its software, which was overwhelmingly infringing, as circumstantial evidence of intent to induce infringement.  Id. at 939-40.  Again, this evidence would not alone justify the imposition of liability, but it supported an inference of unlawful intent when viewed in context with other evidence in the record.  Id.  Based on these elements of the factual record, the Court held that the defendants' "unlawful objective is unmistakable."  Id. at 940.

On remand from the Supreme Court, the District Court took into account other factors in finding the defendants' intent to induce infringement, including the "the staggering scale of infringement"

occurring through use of defendants' products, technical assistance provided by the defendants to users for the playback of copyrighted content, and affirmative steps taken by defendants to ensure that their products would be capable of infringing use.  Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 454 F. Supp. 2d 966, 985-92 (C.D. Cal. 2006) ("Grokster IV").

Upon review of all the evidence in the present case, the Court determines that evidence of Defendants' intent to induce infringement is overwhelming and beyond reasonable dispute.

### 1.  Defendants' message to users

Plaintiffs present a variety of undisputed evidence that Defendants disseminated a message "designed to stimulate others" to commit infringements.  Grokster III, 545 U.S. at 916.  The clearest instance of Defendants' solicitation of infringing activity is the "Box Office Movies" feature of Defendants' Isohunt site.  As Defendant Fung admitted in his deposition, this feature essentially involved Defendants' periodic posting of a list of the top 20 highest-grossing films then playing in United States, which linked to detailed web-pages concerning each film.[20]  Each of these pages contained "upload torrent" links allowing users to upload dot-torrent files for the films.  Though Defendants eventually discontinued this feature, they did not remove pages that had already been created.  (SUF, ¶¶ 50-55.)  By implementing this feature, therefore, Defendants engaged in direct solicitation of infringing activity.  Defendant Fung, in his subsequent declaration filed with Defendants' Opposition, denies that this feature was

---

[20] It goes without saying that the highest-grossing films currently in theaters are copyrighted works.  See Grokster V, 454 F. Supp. 2d at 992 ("it is common knowledge that most popular music and movies are copyrighted").  Defendants have not rebutted this obvious inference.

intended to induce copyright infringement and asserts that the web-pages "did not lead anywhere."  (Fung Decl., ¶ 58.)  However, "actions speak louder than words," <u>Arista Records</u>, 633 F. Supp. 2d at 153 n.20, and Fung cannot dispute the objective historical fact that the websites included a "Box Office Movies" feature at one time.  This feature evidences Defendants' intent to encourage their users' infringement.

In addition to the "Box Office Movies" feature, Plaintiffs present other evidence that Defendants disseminated messages designed to stimulate inducement.  In particular, Plaintiffs demonstrate that, Defendants' websites present available torrent files (the vast majority of which contain infringing content) in browseable categories and provide further information about the works contained in the files. (SUF, ¶¶ 47-48.)  Defendants also generate lists of the most popular files in categories like "Top 20 Movies." (SUF, ¶ 49.)  Defendants do not dispute the presence of such information on their web-site, but instead merely assert that the lists' content originates from users or from automated processes that simply reflect user activity.  (SGI ¶ 11; Fung. Decl., ¶¶ 54-55, 57).  Defendants' assertions ignore the material fact that Defendants designed the websites and included a feature that collects users' most commonly searched-for titles.  The fact that these lists almost exclusively contained copyrighted works (<u>see</u> SUF ¶¶ 8-13) and that Defendants never removed these lists is probative of Defendants' knowledge of ongoing infringement and failure to stop this infringement.

Plaintiffs also provide evidence of what the Supreme Court has termed the "classic instance of inducement" — a statement that "broadcasts a message designed to stimulate others to commit

26

violations." <u>Grokster III</u>, 545 U.S. at 938.  Defendant Fung made statements on the Isohunt website encouraging or assisting infringement.  He posted on his website a message telling the website's users that they should "try Peer Guardian," a software application that can be used to frustrate copyright enforcement against file sharers. (SUF, ¶ 94.)  <u>Accord</u> <u>Grokster III</u>, 545 U.S. at 937-38.  Fung also provided a link to a torrent file for the recent film *Lord of the Rings: Return of the King* on the Isohunt site and stated, "if you are curious, download this."  (SUF, ¶ 29.)  Additionally, Fung created a promotional page inviting users to upload torrent files for *Matrix Reloaded*, another recent film. (SUF, ¶ 28.)

It is also undisputed that certain key terms known to the pirating community, such as "warez," were meta tags embedded in the websites for reference by search engines.  Additionally, the Fung websites have honorary ranking systems for those who posted a certain number of forum users messages; ranks include titles such as "I pir4te, therefore I am" and "All Day I Dream About W4rez."  (SUF, ¶ 22.)  In other words, the websites bestowed honors by identifying users as copyright infringers. This is strong circumstantial evidence that Defendants promoted their users' infringing activities by consciously fostering a community that encouraged – indeed, celebrated – copyright infringement.

Perhaps most tellingly, Fung has personally engaged in a broad campaign of encouraging copyright infringement.  In a statement on the Isohunt website, Fung stated: "they accuse us for [sic] thieves, and they r [sic] right. Only we r [sic] 'stealing' from the lechers (them) and not the originators (artists)."  (SUF, at ¶ 14.)  In an interview with another website Fung stated: "Morally, I'm a Christian. 'Thou

shalt not steal.'  But to me, even copyright infringement when it
occurs may not necessarily be stealing."  (Id. at ¶ 15.)  Fung's
statements provide further evidence that he has encouraged third
parties to engage in copyright infringement.  These statements also
provide probative evidence regarding Fung's intent in creating the
Defendant websites to aid others' infringement.

       **2.  Defendants' assistance to users engaging in infringement**

There is also evidence that Defendants directly assisted users in
engaging in infringement.  As in Grokster III, Defendants in the
present case have "respond[ed] affirmatively to requests for help in
locating and playing copyrighted materials."  545 U.S. at 938.

Defendant Fung personally posted messages in the Isohunt
discussion forums in which he provided technical assistance to users
seeking copyrighted works.  Specifically, in response to an Isohunt
user who posted a message stating he did not know how to watch a file
containing Lord of the Rings: Return of the King which he had recently
downloaded, Defendant Fung provided directions on how to extract and
play the video file.  (SUF, ¶ 69.)  The record is replete with such
instances of technical assistance provided to users by Defendant Fung
through the forum.  (See, e.g., SUF, ¶ 70 (Fung provided technical
assistant to users who downloaded the film Kill Bill); SUF, ¶ 71 (Fung
provided assistance to user searching for Star Trek: Enterprise
episodes by giving search tips); SUF, ¶ 79 (Fung explained how to
attach a tracker URL to a dot-torrent file sent to him by an Isohunt
user, and recommended the user use the tracker at torrentbox.com).)

In addition to Fung's personal statements, statements by the
"moderators" of Fung's websites provide further evidence of the

Defendant websites' active inducement of infringing activities.  There are numerous individuals who are known as "moderators" or "admins." The term "moderators" refers to "individuals whose job it is to look after the running of the forums from day to day." (SGI, ¶ 41.) Moderators can edit, delete, and reorganize postings in the forums. (SGI, ¶ 42.)  Some moderators, referred to as "admins," also have the ability to ban selected abusive users and remove user-posted dot-torrent files.  (Id.)  There is no substantive dispute by Defendants regarding their relationship to these individuals.  Defendants assign this status and give these individuals authority to moderate the forums and user discussions.  These individuals were under the control of Defendants and assigned duties related to the administration of the web forums.  Therefore, there is an agency relationship between these individual moderators (or "admins") and Defendants.[21]

---

[21] An agency relationship is created "by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf." Restatement (Third) of Agency, § 3.01 (2006); see Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 & n.31 (1989) (looking to Restatement to determine federal common law of agency under Copyright Act).

Under common law principles of agency, the "moderators" were the Defendants' agents with respect to their interactions with the online message boards and forums.  Even though there is no evidence that the moderators were specifically authorized to post messages in these forums, the websites' act of designating them as "moderators" and providing them with specific forum-related powers leads a "third party reasonably [to] believe[] the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency, § 2.03 (2006) (describing "apparent authority").

There is no genuine dispute that agency is established here, as Defendants introduce no evidence that would provide a triable issue to rebut Plaintiffs' prima facie showing of agency. Defendants merely assert that Plaintiffs evidence "suggests triable issues of fact."  (Opp. at 19 n.10.)  Unsupported assertions do not give rise to a genuine dispute of fact.  Plaintiffs' evidence, unless refuted,

[cont'd on next page]

The Defendant websites are full of statements by moderators who assisted users seeking to download files or provided links to other websites containing the requested items. In a post on the Isohunt forums, moderator "Estranged" provided instructions regarding DVD ripping and conversion. (SUF, ¶ 45.) In a post on Torrentbox, moderator "Skull and Bones" referred a user to 353 dot-torrent files including *King Kong* and *Silent Hill*, which were "very good quality" and stated that "[m]ost of your films are here at Torrentbox or search on isohunt.com." (SUF, ¶ 46.) In a post on the website Podtropolis, moderator "NewAgePirate" responded to a user who posted a list with films such as *The Godfather*, *Clockwork Orange*, and *One Flew Over the Cuckoo's Nest*, with a post that stated "Great list by the way man. Great to have you here." (SUF, ¶ 35.) All of these statements demonstrate that there was an active role played by the administrators of the websites within the forum, encouraging and providing technical assistance for users seeking to engage in infringing activities.

All of these statements demonstrate the assistance Defendant Fung and the corporate Defendant provided to the websites' users in infringing Plaintiffs' copyrights. Such actions demonstrate that Defendants did not maintain a hands-off approach to the operation of the sites. Instead, various of Defendants' representatives gave technical assistance and aid in the organized forum discussions that furthered the third parties' infringement using the sites.

Defendant Fung argues that the First Amendment protects any statements made by him or the agents. Such an argument, however, is

[cont'd from prev. page]
compels a finding of an agency relationship. Plaintiffs' evidence has not been refuted, and agency is accordingly established.

unavailing.  The central premise of the Supreme Court's decision in
Grokster III is that a defendant's statements can be probative of an
intent to induce infringement.  Explicit statements by defendants will
often form the most substantial form of proof in inducement or material
contribution cases.  See generally Grokster III, 545 U.S. 913; Napster,
239 F.3d 1004.  Additionally, the statements themselves are not the
activity prohibited by this doctrine, but rather are evidence of the
"intent to induce," which is the underlying wrongful act.  It is well-
established that such statements are not protected by the First
Amendment:

> The first amendment does not provide a defense to a criminal
> charge simply because the actor uses words to carry out his
> illegal purpose.  Crimes . . . frequently involve the use of
> speech as part of the criminal transaction. . . .  To the extent
> . . . that [the defendant] appears to contend that he is immune
> from search or prosecution because he uses the printed word in
> encouraging and counseling others in the commission of a crime, we
> hold expressly that the first amendment does not provide a defense
> as a matter of law to such conduct.

United States v. Barnett, 667 F.2d 835, 842 (9th Cir. 1982).[22]

---

[22] In one of the main arguments in Defendants' Opposition, Defendants
offer an extended discussion of the intersection between the First
Amendment and the internet.  (Opp. at 18-23.)  Quoting from a broad
selection of caselaw, Defendants largely appear to advocate that the
First Amendment immunizes any and all activity on the internet.
Defendants' various First Amendment arguments are inapposite and
unavailing.  See Religious Tech. Ctr. v. Netcom On-Line Communcations
Svcs., 907 F. Supp. 1361, 1377-78 (N.D. Cal. 1995); see generally 4
Nimmer on Copyright § 19E.03-04.
    Notably, it appears that copyright law incorporates First
Amendment considerations by providing for "fair use" defenses and by
distinguishing between uncopyrightable "ideas" and copyrightable
[cont'd on next page]

### 3.  Defendants' implementation of technical features promoting copyright infringement

Defendants' implementation of certain technical features in their web-sites is also probative of Defendants' intent to induce copyright infringement.  Most obviously, Defendants' websites allow users to locate dot-torrent files.  Once downloaded to a users' computer, torrent files automatically engage in a "swarm" downloading process that permits users to download a single content file simultaneously from many other users.  (SUF ¶¶ 23-24.)  This process expedites the exchange of large, content-rich files such as television programs and movies.

Defendant Fung also implemented a "spider" program, which locates and obtains copies of dot-torrent files from other web-sites, including well-known infringing sites such as "The Pirate Bay." (SUF, ¶¶ 86-87.)  Defendant Fung additionally directs the program to specific web pages containing terms like "seinfeld-videos," which one would infer contains infringing content from the television show *Seinfeld*.  (SUF, ¶ 88.)

---

[cont'd from prev. page]
"expressions."  See Los Angeles News Svc. v. Tullo, 973 F.2d 791, 795-96 (9th Cir. 1992).  Further, secondary copyright liability is sensitive to First Amendment concerns in that it generally regulates *intentional* behavior.  See Grokster, 545 U.S. at 937; Amazon, 508 F.3d at 1772; cf. Universal City Studios v. Reimerdes, 111 F. Supp. 2d 294, 339-41 (S.D.N.Y. 2000) ("Anything that would impose *strict liability* on a web site operator for the entire contents of any web site to which the operator linked . . . would raise grave constitutional concerns") (emphasis added), *aff'd on other grounds sub nom.* Universal City Studios v. Corley, 273 F.3d 429 (2d Cir. 2002).

Finally, and most importantly, it must be emphasized that the present case involves *conduct* not *expression*, and to the extent that Defendants' expression is being curtailed, they should recall that they "could have expressed their theme without copying [Plaintiffs'] protected expression."  Walt Disney Prods. v. Air Pirates, 581 F.2d 751, 759 (9th Cir. 1978), *cert. denied sub nom.* O'Neill v. Walt Disney Prods., 439 U.S. 1132 (1979).

Defendants do not rebut this obvious inference.

Defendants also organized files using a program that matches content filenames with specific terms. Some of the specific terms used by the program describe likely infringing content, such as "Screener" or "PPV".[23] (SUF, ¶¶ 91-92.)

Defendants no do not dispute these facts except to assert that the spider programs were automated, generic components that operated in a copyright-neutral manner. (SGI, ¶¶ 89-91.) Essentially, Defendants argue that they merely assembled a website that combined already-existing technologies, and that they did not include any unique innovations that were specifically tailored to assist the distribution of copyrighted works. These assertions are inapposite. The unrebutted factual evidence shows that Fung designed programs which improved the functioning of his websites with respect to infringing uses. Combined with other evidence regarding Defendants' improper purposes, these technological features support a finding of inducement liability.[24]

---

[23] "Screener" refers to an advance copy of a film given to critics for review, while "PPV" refers to "pay-per-view." Defendants offer no authority contesting these standard meanings.

[24] Given that Defendants' "unlawful objective is unmistakable," see Grokster III, 545 U.S. at 940, the Court refrains from addressing the factual disputes regarding whether or not Defendants were technologically capable of implementing filtering mechanisms to reduce copyright infringement through their websites. (See SUF, ¶¶ 103, 107; SGI ¶¶ 110-11, 143.) In Grokster III, the defendants' failure to implement a copyright filter was probative circumstantial evidence of the defendants' intent to induce infringement. However, the failure to implement a copyright filter is not a determinative factor in analyzing a defendant's inducement of infringement. Rather, the relevant question is whether "the summary judgment record [establishes that the defendants] acted with a purpose to cause copyright violations by use of software suitable for illegal use." Id. at 938. This improper purpose can be shown in a variety of ways; the factors considered by the Supreme Court in Grokster were not exhaustive or exclusive. See Grokster III, 545 U.S. at 938-39.

[cont'd on next page]

1         **4.**   **Defendants' business model depends on massive infringing**

2            **use**

3     Plaintiffs assert that Defendants' business model depended on

4 massive infringing use.  In the instant litigation, just as with the

5 programs at issue in Grokster III, Defendants' business generates its

6 revenue almost exclusively by selling advertising space on the sites.

7 (SUF, ¶ 109; Pltf. Ex. 1, Fung Dep., at 326-27.)  Similarly, the

8 revenue depends on users visiting Defendants' sites and viewing the

9 advertising.  (SUF, ¶ 110.)  As discussed previously, Defendant Fung

10 acknowledges that the availability of popular works is what attracts

11 users to the sites.  (See, e.g., Ex. 173 (interview of Fung admitting

12 that the availability of the then-popular *Da Vinci Code* film was a key

13 attraction to his website).)  Defendant Fung also solicited

14 advertisement on the basis of the availability of works on his website.

15 For example, in an email to a potential advertiser, moviegoods.com,

16 Fung wrote that Isohunt would "make a great partner, since TV and

17 movies are at the top of the most frequently searched by our visitors."

18 (SUF, ¶ 112; Pls.' Ex 174.)

19     In short, there is no factual dispute that the availability of

20 copyright material was a major draw for users of Fung's websites, and

21 there is no dispute that Defendants derive revenue from the websites

---

22 [cont'd from prev. page]

23     In the present case, given Defendants' overwhelming affirmative conduct to encourage and assist copyright infringement, Plaintiffs

24 are entitled to summary judgment in their favor even if Defendants were incapable of creating an effective copyright filter.  Indeed,

25 Plaintiffs have established that Defendants engaged in "[t]he classic instance of inducement . . . by advertisement or solicitation that

26 broadcasts a message designed to stimulate others to commit violations."  See Grokster III, 545 U.S. at 937.  Given that

27 Defendants so clearly acted to induce infringement, it is immaterial that they may or may not have been able to prevent such infringement

28 by implementing a copyright filter.

and that this revenue increases along with the number of users.  (SUF ¶¶ 109-110, 132-133.)[25]  This is further evidence of Defendants' intent to assist infringing uses.

### 5.    Additional Considerations

Throughout their legal memoranda and supporting evidentiary papers, Defendants argue that there is no evidence of infringing activity.  This argument obviously fails in light of the evidence discussed *supra*, Part IV.A.2.  However, to the extent that Defendants subjectively believe that their users have not engaged in copyright infringement, Defendants' "ostrich-like refusal to discover the extent to which its system was being used to infringe copyright is merely another piece of evidence" of Defendants' purposeful, culpable conduct in inducing third party infringement.  See In re Aimster Copyright Litig., 334 F.3d 643, 655 (7th Cir. 2003).

### 6.    Summary of Inducement

The undisputed evidence shows that Defendants (both Fung and the websites) engaged in "purposeful, culpable expression and conduct" aimed at promoting infringing uses of the websites.  See Grokster III, 545 U.S. at 937.  Accordingly, Plaintiff's motion for summary judgment on Defendants' liability for inducement of infringement is GRANTED.

### C.  Alternative Theories of Secondary Liability

Having determined that Defendants are liable under an inducement theory for their users' infringing activities, the Court refrains from addressing Plaintiff's Motion for Summary Judgment on the theories of material contributory infringement and vicarious infringement.

---

[25] Defendants assert that "there is no detail, no dollar amounts," (Opp. at 35), but Plaintiffs correctly point out that the present Motion involves *liability* not *damages*, so such detail is unnecessary. (Reply at 12.)

1

2    **V.    DEFENDANTS' DIGITAL MILLENNIUM COPYRIGHT ACT AFFIRMATIVE DEFENSES**

3

4        The Digital Millennium Copyright Act provides affirmative defenses

5    for providers of certain internet services.  In many ways, the Digital

6    Millennium Copyright Act is simply a restatement of the legal standards

7    establishing secondary copyright infringement - in many cases, if a

8    defendant *is* liable for secondary infringement, the defendant *is not*

9    entitled to Digital Millennium Copyright Act immunity; if a defendant

10    *is not* liable for secondary infringement, the defendant *is* entitled to

11    Digital Millennium Copyright Act immunity.  The two sets of rules do

12    not entirely overlap, but this framework is helpful for understanding

13    the Act's statutory text and structure.  <u>Cf.</u> <u>A&M Records, Inc. v.</u>

14    <u>Napster, Inc.</u>, 239 F.3d 1004, 1025 (9th Cir. 2001) ("We do not agree

15    that . . . potential liability for contributory and vicarious

16    infringement renders the Digital Millennium Copyright Act inapplicable

17    per se.").

18        Here, the relevant section of the Digital Millennium Copyright

19    Act, 17 U.S.C. § 512(d), reads:

20        **Information location tools.**--A service provider shall not be

21        liable for monetary relief, or, except as provided in subsection

22        (j), for injunctive or other equitable relief, for infringement of

23        copyright by reason of the provider referring or linking users to

24        an online location containing infringing material or infringing

25        activity, by using information location tools, including a

26        directory, index, reference, pointer, or hypertext link, if the

27        service provider-

28

**(1)** **(A)** does not have actual knowledge that the material or activity is infringing;

**(B)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

**(C)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

**(2)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

**(3)** upon notification of claimed infringement as described in subsection (c)(3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity, except that, for purposes of this paragraph, the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link.

17 U.S.C. § 512(d).

In other words, a provider of "information location tools" (such as Defendants' websites[26]) must satisfy the three conjunctive

---

[26] See Perfect 10, Inc. v. Cybernet Ventures, Inc., 213 F. Supp. 2d
[cont'd on next page]

requirements of § 512(d) in order to obtain safe harbor.  These three

safe harbor requirements are that the defendant: [1] does not know (§

512(d)(1)(A)) or have reason to know (§ 512(d)(1)(B)) of infringing

activities, or does not remove infringing materials upon receipt of

such knowledge (§ 512(d)(1)(C); and [2] does not profit from

infringement where it has the power to control the infringement (§

512(d)(2)); and [3] upon receiving notice (in the statutorily-

prescribed manner) from the copyright holder, removes the infringing

material (§ 512(d)(3)).

In the present case, Plaintiffs have established that Defendants

have reason to know of their users' infringing activities.  Defendants

have not satisfied their summary judgment burden by identifying facts

---

[cont'd from prev. page]
1146, 1175 (C.D. Cal. 2002) ("[S]ection 512(d) . . . creates a 'safe
harbor' for copyright infringement resulting from the use of
information location tools by service providers, which include
directories, indexes, references, pointers and hypertext links.").
         Defendants also argue that they fall within the safe harbor
provisions of 17 U.S.C. § 512(a) ("transitory digital network
communications") and 17 U.S.C. § 512(c) ("information residing on
systems or networks at direction of users"), but these categories are
inapplicable to Defendants' particular technologies as well as
Defendants' substantive conduct upon which Plaintiffs are suing.
Defendants themselves assert that "[n]o infringing materials are
posted on or pass through defendants' systems," (Opp. at 34), which
is factually supported by the record because Defendants' websites are
used to download dot-torrent files, not content files (Gribble Decl.
¶ 21; Fung Decl. ¶¶ 9, 52).  Because infringing materials do not pass
through or reside on Defendants' system, Defendants may not rely on §
512(a) and § 512(c).
         In addition, Plaintiffs claims are unrelated to secondary
liability "by reason of the *storage* [of data] . . . on a system or
network controlled or operated by" Defendants, 17 U.S.C. § 512(c)(1)
(emphasis added), or "by reason of [Defendants'] *transmitting,
routing, or providing connections for*[] material through a system or
network controlled or operated by" Defendants, 17 U.S.C. § 512(a)
(emphasis added).  Plaintiffs' claims are premised on active
inducement of infringement, not passive transmission or storage of
infringing materials.

1  showing that Defendants were "not aware of facts or circumstances from

2  which infringing activity [wa]s apparent."  17 U.S.C. § 512(d)(1)(B).

3  Further, Defendants have not introduced any evidence that they "act[ed]

4  expeditiously to remove, or disable access to, the [infringing]

5  material" once they became aware that this infringing activity was

6  apparent.  (See generally Defs.' SGI ¶¶ eee-lll.)  Thus, Defendants are

7  not entitled to statutory safe harbor under 17 U.S.C. § 512(d).[27]

8      In order to obtain safe harbor, a defendant cannot have knowledge

9  of ongoing infringing activities.  This "knowledge" standard is defined

10 as "actual knowledge" or "willful ignorance."  According to the widely-

11 cited House and Senate Report on the law, "if the service provider

12 becomes aware of a 'red flag' from which infringing activity is

13 apparent, it will lose the limitation of liability if it takes no

14 action."  H.R. Rep. 105-551(II), at 53; see also Perfect 10, Inc. v.

15 CCBill LLC, 488 F.3d 1102, 1114 (9th Cir. 2007).  The Congressional

16 Report notes that the service provider is only liable if it "turned a

---

17  [27]  The Court refrains from addressing at length the second prong of
18  the safe harbor rule, the § 512(d)(2) "financial benefit"
    requirement.  Defendants have profited from their users'
19  infringement, see supra Part IV.B.5, and Defendants undisputedly have
    the ability to block users from Defendants' websites.  (SUF ¶¶ 136-
20  139; see also SUF ¶ 106, SGI ¶ 109; SGI ¶¶ 141-142; Fung Decl. ¶ 61.)
    As the Ninth Circuit explained in Napster, the "ability to block
21  infringers' access to a particular environment for any reason
    whatsoever is evidence of the right and ability to supervise."  239
22  F.3d at 1023.
         Accordingly, Defendants have also failed to raise a triable
23  issue of fact regarding the second requirement for receiving § 512(d)
    safe harbor, because they "receive a financial benefit directly
24  attributable to the infringing activity," and they have "the right
    and ability to control such activity."  17 U.S.C. § 512(d)(2).
25       As for the third safe harbor requirement, there appears to be a
    triable issue of fact as to the adequacy of the statutory notice that
26  Plaintiffs provided to Defendants.  (See Parker Decl. ¶¶ 9, 12-14.)
    However, because Defendants have not identified any triable issues of
27  facts regarding the first two safe harbor requirements, summary
    judgment is appropriate in Plaintiffs' favor.
28

blind eye to 'red flags' of obvious infringement." H.R. Rep. 105-551(II), at 57. Other courts have applied this test as requiring "willful ignorance of readily apparent infringement." <u>UMG Recordings, Inc. v. Veoh Networks Inc.</u>, __ F. Supp. 2d __, 2009 WL 3422839, at *7 (C.D. Cal. 2009) (citing <u>Corbis Corp. v. Amazon.com, Inc.</u>, 351 F. Supp. 2d 1090, 1108 (W.D. Wash. 2004)).

Even under this stringent "willful ignorance" test, it is apparent that Defendants have "turned a blind eye to 'red flags' of obvious infringement." <u>See</u> H.R. Rep. 105-551(II), at 57. Most importantly, Defendant Fung himself has engaged in unauthorized downloads of copyrighted material; even if those downloads were done abroad and were not actionable under United States copyright law (and thus would not provide "actual knowledge" of illegal activity for purposes of 17 U.S.C. § 512(d)(1)(A)), Fung's actions show that Fung was aware that infringing material was available on the Defendant websites. Given the "worldwide" nature of the world-wide web, it would have been obvious that United States-based users could access these same infringing materials and thus engage in infringing acts. Defendants provide no evidence to rebut this obvious conclusion that United States-based users would have been able to download the same copyrighted works that Fung himself downloaded.

Furthermore, Plaintiffs introduce evidence <u>produced by Defendants themselves</u> that shows that approximately 25% of Defendants' websites' users were based in the United States. (Horowitz Supp. Decl. ¶ 24, Ex. 5.) This evidence further shows that, at its height, over ten million unique users visited Defendants' websites each month (<u>see</u> Horowitz Supp. Decl., Ex. 5 at 25; Horowitz Supp. Decl., ¶ 19 n.4), which

strongly suggests that some <u>2.5 million</u> United States citizens visited Defendants' websites each month.  Further, this evidence shows that at one point, Defendants' websites were accessed <u>over 50 million times</u> from the United States in a single month.  (Horowitz Supp. Decl., Ex. 5 at 32.)  Upon accessing Defendants' websites, these American users would have found that 90% to 95% of the available materials contained copyrighted content.  (<u>See</u> Waterman Decl. ¶¶ 6, 7, 24, 28, 31.) Defendants fail to introduce any evidence rebutting this overwhelming evidence, and thus fail to raise a triable issue of fact as to whether Defendants had actual knowledge of copyright infringement or were willfully ignorant of ongoing copyright infringement.

There is a variety of other evidence of Defendants' willful ignorance to ongoing infringement.  Defendants designed their website to include lists such as "Top Searches," "Top 20 Movies," "Top 20 TV Shows," and "Box Office Movies," and Defendants designed these lists to automatically update to reflect user activities.  These lists included numerous copyrighted works.  (SUF ¶¶ 8-12, 47-55.)  <u>See</u> <u>Grokster V</u>, 454 F. Supp. 2d at 992 ("it is common knowledge that most popular music and movies are copyrighted").  Thus, unless Defendants somehow refused to look at their own webpages, they invariably would have been known that (1) infringing material was likely to be available and (2) most of Defendants' users were searching for and downloading infringing material.

In addition, Plaintiffs submit overwhelming statistical evidence of the prevalence of copyrighted material available through Defendants' websites.  (SUF ¶¶ 5-7.)  This evidence shows that 90%-95% of the material was likely to be copyright infringing, a percentage that is

nearly identical to the facts in <u>Napster</u>, in which "eighty-seven percent of the files available on Napster may be copyrighted." 239 F.3d at 1011.  In that case, the district court rejected the defendant's plainly meritless arguments seeking safe harbor under § 512(d).  <u>A&M Records, Inc. v. Napster, Inc.</u>, 114 F. Supp. 2d 896, 919 & n.24 (N.D. Cal. 2000), *aff'd in part and rev'd in part*, 239 F.3d 1004 (9th Cir. 2001).  Given that Defendants' own statistics show that millions of Defendants' users are located in the United States (Horowitz Supp. Decl. ¶ 24, Ex. 5), Defendants were certainly "aware of a 'red flag' from which infringing activity is apparent."  H.R. Rep. 105-551(II), at 57.  Defendants do not introduce any evidence to raise a triable issue of fact on this question.

In light of this overwhelming evidence, the only way Defendants could have avoided knowing about their users' infringement is if they engaged in an "ostrich-like refusal to discover the extent to which [their] system[s] w[ere] being used to infringe copyright."  <u>See</u> <u>In re Aimster Copyright Litig.</u>, 334 F.3d 643, 655 (7th Cir. 2003).  In other words, to avoid actual knowledge of infringement, Defendants would have had to engage in willful blindness.

There is one last reason why Defendants are unable to benefit from the 17 U.S.C. § 512 safe harbors.  As stated by Judge Posner in <u>In re Aimster Copyright Litig.</u>, 334 F.3d 643, 655 (7th Cir. 2003):

> The common element of its safe harbors is that the service
> provider must do what it can reasonably be asked to do to prevent
> the use of its service by 'repeat infringers.'  17 U.S.C. §
> 512(i)(1)(A).  Far from doing anything to discourage repeat
> infringers of the plaintiffs' copyrights, Aimster invited them to

do so, showed them how they could do so with ease using its system, and by teaching its users how to encrypt their unlawful distribution of copyrighted materials disabled itself from doing anything to prevent infringement.

In other words, inducement liability and the Digital Millennium Copyright Act safe harbors are inherently contradictory. Inducement liability is based on active bad faith conduct aimed at promoting infringement; the statutory safe harbors are based on passive good faith conduct aimed at operating a legitimate internet business. Here, as discussed *supra*, Defendants are liable for inducement. There is no safe harbor for such conduct.

Accordingly, Defendants are not entitled to the affirmative defenses provided by the Digital Millennium Copyright Act.

**VI.  DEFENDANTS' RULE 56(f) REQUEST**

Defendants argue that they must conduct more discovery. Defendants seek information regarding the practices of online search companies such as Google and Yahoo. (Opp., at 33-35; Rothken 56(f) Decl. ¶ 6.) Defendants also seek information related to the likelihood that Defendants' technologies will be used for non-infringing tasks in the future. (Rothken 56(f) Decl. ¶¶ 7-9.) Finally, Defendants seek information related to the potential for Plaintiffs to create a centralized database listing copyright-infringing works and copyright-infringing users.[28]

---

[28] Defendants further seek information regarding the prevalence of Defendants' non-United States users (Rothken 56(f) Decl. ¶ 5); however, Plaintiffs' supplemental evidence regarding U.S.-based

[cont'd on next page]

1    Rule 56(f) requires "specified reasons" that are "essential" to

2    the opposition.  Defendants meet neither requirement.

3    Such discovery is utterly irrelevant to the present Order, which

4    relates specifically to Defendants' efforts directed at inducing third

5    parties' infringement.  Inducement liability does not turn on whether

6    *other actors* would or not be liable (as with Google and Yahoo), or

7    whether Defendants' websites' *future uses* might be lawful.  Nor does

8    inducement liability turn on whether Plaintiffs could have mitigated

9    their damages by making efforts to reduce third party infringement.

10   Rather, inducement liability turns on whether Defendants, through their

11   own conscious conduct, actively encouraged others to infringe

12   Plaintiffs' copyrights.  Defendants provide no evidence as to how the

13   further discovery would diminish their liability in the instant action.

14   Indeed, the relevant evidence, as presented by Plaintiffs' Motion for

15   Summary Judgment and discussed throughout the present Order, is largely

16   undisputed and, further, is in Defendants' possession.

17   Accordingly, Defendants' Rule 56(f) request is DENIED.

18

19   **VII.  CONCLUSION**

20

21   This case contains the same general pattern presented in <u>Metro-</u>

22   <u>Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.</u>, 545 U.S. 913 (2005), <u>A&M</u>

23   _____

24   [cont'd from prev. page]
     infringement has directly answered each one of Defendants'

25   purportedly unanswered questions.  Defendants failed to renew or
     amend their Rule 56(f) request in light of Plaintiffs' new evidence,

26   and their previous requests for additional discovery have been mooted
     by Plaintiffs evidence.  Further, in light of the IP address-based

27   location methods discussed *supra*, Defendants have been in possession
     of the sought-after evidence throughout the course of this

28   litigation.

1   Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001), and,

2   more recently, Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d

3   124 (S.D.N.Y. 2009).  The Defendants in the present case attempt to

4   distinguish their situation on three main grounds: first, that the

5   BitTorrent technology is different from the other technologies because

6   users do not download content files through Defendants' websites;

7   second that Defendants' conduct is protected by the First Amendment;

8   and third, that Defendants' users are located across the globe, not

9   just in the United States.

10      On the evidence presented to the Court, none of these arguments

11   raises a triable question of fact for the jury to decide.  Defendants'

12   technology is nothing more than old wine in a new bottle.  Instead of

13   logging into a proprietary network in order to download files from each

14   others' computers, Defendants' users access Defendants' generally-

15   accessible website in order to download those files.  And instead of

16   downloading content files directly through Defendants' website,

17   Defendants' users download dot-torrent files that automatically trigger

18   the downloading of content files.  These technological details are, at

19   their core, indistinguishable from the previous technologies.  In fact,

20   Defendants' technologies appear to improve upon the previous

21   technologies by permitting faster downloads of large files such as

22   movies.  Such an improvement quite obviously increases the potential

23   for copyright infringement.

24      Regarding Defendants' second main argument, caselaw establishes

25   that Defendants are misguided if they think that the First Amendment

26   provides blanket protection to all internet-based activities,

27   particularly where those activities involve copyright infringement.

28

Finally, Defendants third main argument ignores the unrebutted fact that millions of United States citizens have accessed Defendants' websites, and a substantial proportion of the files made available to them through those websites contained copyrighted or highly-likely copyrighted works.  Further, Plaintiffs have provided undisputed evidence of specific infringing acts done in the United States.

Thus, as in <u>Grokster</u>, summary judgment is appropriate on the question of inducement liability.  For the foregoing reasons, the Court GRANTS Plaintiff' Motion for Summary Judgment on Liability as to inducement of infringement.  The Court sets a status conference for January 11, 2010, at 1:30 p.m.

IT IS SO ORDERED.

DATED: __December 21, 2009_____

                                        _____
                                        STEPHEN V. WILSON
                                        UNITED STATES DISTRICT JUDGE