# Schapiro Exhibit 1

**TIME** | Nation | World | Business | Arts | Sci-Health | Photos | Current Issue | Search

# Best Inventions 2006

**TIME**

> WEB SHOPPING GUIDE    > TECH BUYER'S GUIDE    > BEST INVENTIONS    > GADGET OF THE YEAR

>> previous | next

**More Categories:**
Best Inventions for:
>> Transportation
>> The Home
>> Meals and Cooking
   Clothing
   Toys
   Medicine
   Safety
   The Military
>> Using Light







BEST INVENTION                                    ✉ E-MAIL

>> YOUTUBE

Meet Peter. Peter is a 79-year-old English retiree. Back in WW II he served as a radar technician. He is now an international star.

One year ago, this would not have been possible, but the world has changed. In the past 12 months, thousands of ordinary people have become famous. Famous people have been embarrassed. Huge sums of money have changed hands. Lots and lots of Mentos have been dropped into Diet Coke. The rules are different now, and one website changed them: YouTube.

It's been an interesting year in technology. Nintendo invented a video game you control with a magic wand. A new kind of car traveled 3,145 miles on a single gallon of gas. A robot learned to ride a bike. Somebody came up with a nanofabric umbrella that doesn't stay wet. But only YouTube created a new way for millions of people to entertain, educate, shock, rock and grok one another on a scale we've never seen before. That's why it's Time's Invention of

Exhibit A

11

the Year for 2006.

But if YouTube is the Invention of the Year, who exactly invented it?

Let's be clear: we know who started it. That would be three twentysomething guys named Steve Chen, Chad Hurley and Jawed Karim. At a Silicon Valley dinner party one night in 2004 they started talking about how easy it was to share photos with your friends online but what a pain it was to do the same thing with video.

So they did something about it. They hacked together a simple routine for taking videos in any format and making them play in pretty much any Web browser on any computer. Then they built a kind of virtual video village, a website where people could post their own videos and watch and rate and comment on and search for and tag other people's videos. Voil^: YouTube.

But even though they built it, they didn't really understand it. They thought they'd built a useful tool for people to share their travel videos. They thought people might use it to pitch auction items on eBay. They had no idea. They had opened a portal into another dimension.

The minute people saw YouTube they did its creators a huge favor: they hijacked it. Instead of posting their home movies, they posted their stand-up routines and drunken ramblings and painful-looking snowboarding wipeouts. They uploaded their backyard science projects, their delivery-room footage and their interminable guitar solos. They sent in eyewitness footage from the aftermath in New Orleans and the war in Baghdad—from both sides. They promulgated conspiracy theories. They sat alone in their basements and poured their most intimate, embarrassing secrets into their webcams. YouTube had tapped into something that appears on no business plan: the lonely, pressurized, pent-up video subconscious of America. Having started with a single video of a trip to the zoo in April of last year, YouTube now airs 100 million videos—and its users add 70,000 more—every day.

What happened? YouTube's creators had stumbled onto the intersection of three revolutions. First, the revolution in video production made possible by

Exhibit A
12

cheap camcorders and easy-to-use video software. Second, the social revolution that pundits and analysts have dubbed Web 2.0. It's exemplified by sites like MySpace, Wikipedia, Flickr and Digg—hybrids that are useful Web tools but also thriving communities where people create and share information together. The more people use them, the better they work, and more people use them all the time—a kind of self-stoking mass collaboration that wouldn't have been possible without the Internet.

The third revolution is a cultural one. Consumers are impatient with the mainstream media. The idea of a top-down culture, in which talking heads spoon-feed passive spectators ideas about what's happening in the world, is over. People want unfiltered video from Iraq, Lebanon and Darfur—not from journalists who visit there but from soldiers who fight there and people who live and die there.

The videos may not be slick, but they're real—and anyway, slick is overrated. Slick is 2005. The yardstick on YouTube is authenticity. That's why celebrities like Paris Hilton and P. Diddy can compete with a cute sleepy kitty and a guy doing a robot dance—and lose. That's why Peter's crusty, good-natured reminiscences have made him the all-time second-most-subscribed-to uploader on YouTube. That's why Michael J. Fox let his Parkinson's tremors show. That's why politicians have suddenly started to act like real human beings in their campaign ads, and why some—like Senator George Allen of "Macacagate" fame—have been busted for getting a little too real.

Less than a year after its launch, YouTube has become a media giant in its own right. Last month the company moved out of its 30-person office above a pizzeria in San Mateo, Calif., and into an office building in nearby San Bruno. Oh, and on Oct. 16 Hurley and Chen sold the company to Google for $1.65 billion.

With that kind of money behind it, YouTube has to start conducting itself with a little more legal and financial gravitas. That means making money—mostly through advertising—and convincing the TV, movie and music executives who find copyrighted material on YouTube that it's a revenue opportunity and not grounds for litigation. The learning curve is still steep. "The people marketing content see it as a

Exhibit A

13

great new platform, but the legal side of the business doesn't know how to react," Hurley says. "We have instances where someone within the company uploaded something, and the other side's asking you to take it down."

But YouTube isn't Napster. It already has partnerships with NBC, CBS, Universal Music, Sony BMG and Warner Music. And come on—it's the one place on the Net where people willingly, knowingly click on ads, like Nike's legendary clip of sharpshooting soccer star Ronaldinho. If you can't find money on YouTube, you're in the wrong economy, buddy.

YouTube is ultimately more interesting as a community and a culture, however, than as a cash cow. It's the fulfillment of the promise that Web 1.0 made 15 years ago. The way blogs made regular folks into journalists, YouTube makes them into celebrities. The real challenge old media face isn't protecting their precious copyrighted material. It's figuring out what to do when the rest of us make something better. As Hurley puts it, "How do you stay relevant when people can entertain themselves?" He and his partners may have started YouTube, but the rest of us, in our basements and bedrooms, with our broadband and our webcams, invented it.

# Schapiro Exhibit 2

# VIDEO EXHIBIT: FILED MANUALLY

# Schapiro Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL INC., COMEDY )
PARTNERS, COUNTRY MUSIC )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION LLC, )   Case No.
                                      ) 1:07CV02103

                Plaintiffs, )
                          )

         vs. )

                          )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
                          )
                Defendants. )
_____)

VIDEOTAPED DEPOSITION OF TOM FRESTON

New York, New York

Friday, September 11th, 2009

REPORTED BY:
ERICA RUGGIERI, CSR, RPR
JOB NO: 17617

1

2

3

4          September 11, 2009

5             9:52 a.m.

6

7          VIDEOTAPED DEPOSITION OF TOM

8     FRESTON, held at the offices of Mayer

9     Brown, 1675 Broadway, New York, New York,

10    pursuant to notice, before Erica L.

11    Ruggieri, Registered Professional Reporter

12    and Notary Public of the State of New

13    York.

14

15

16

17

18

19

20

21

22

23

24

25

A P P E A R A N C E S


FOR THE PLAINTIFFS:

      JENNER & BLOCK, LLP
      BY:  SUSAN KOHLMANN, ESQ.
      919 Third Avenue 37th Floor
      New York, NY 10022-3908
      (212)891-1690
      Skohlmann@jenner.com


FOR THE DEFENDANTS

      MAYER BROWN, LLP
      BY:  ANDREW SCHAPIRO, ESQ.
          CHRISTINE M. HERNANDEZ, ESQ.
      1675 Broadway
      New York, New York  10019
      (212) 506-2146
      Aschapiro@mayerbrown.com


FOR THE WITNESS

      KENDALL BRILL KLIEGER, LLP
      BY:   RICHARD B. KENDALL, ESQ.
      10100 Santa Monica Blvd., Suite 1725
      Los Angeles, California  90067



ALSO PRESENT:

      MARK C. MORRIL, ESQ., Viacom

      SALLIANNE BROWN, Videographer

1                           FRESTON

2                  MR. KENDALL:  Vague and

3            ambiguous and overbroad.

4                  A.    I would say generally speaking.

5    10:11:44    Q.    And certainly as you sit here

6            today, you can't think of anything that VO

7            is not -- you are not aware of anything

8            that VO is not doing that you think it

9            should be doing to protect content owners,

10   10:11:56   correct?

11                 MS. KOHLMANN:  Objection.

12                 MR. KENDALL:  Objection, calls

13           for expert testimony.  Foundation.

14           Calls for speculation.

15   10:12:03   A.    Again it's hard for me to say.

16           I'm not that close to their day-to-day

17           operations.

18                 Q.    Nevertheless --

19                 A.    My assumption --

20   10:12:12          MR. KENDALL:  Wait, wait.  Asked

21           and answered and same objections.

22                 Q.    Go ahead.

23                 A.    My assumptions is that they are

24           doing their best to abide by the copyright

25   10:12:21   rules.

1          FRESTON

2          Q.    And do you know of anything that

3     VO does in that regard, that YouTube does

4     not do?

5   10:12:29          MS. KOHLMANN:  Objection.

6                     MR. KENDALL:  Objection.  Calls

7          for speculation.  Lacks foundation.

8          Calls for expert testimony.  Calls for

9          a legal conclusion.  Overbroad.  Vague

10  10:12:38     and ambiguous.

11         A.    I'm not by any means an expert

12    on everything that YouTube does, or VO,

13    for that matter.

14              It was VO's position that they

15  10:12:51  were going to go out of their way to

16    secure deals with professional content

17    producers.  I know that for a fact.  They

18    secured many, but I can't say how it might

19    have compared vis-a-vis to --

20  10:13:10     Q.    I just want to restate my

21    question, which is, with regard to

22    user-generated content, as you sit here

23    today, do you know of anything that VO

24    does with regard to copyright that YouTube

25  10:13:22  does not do?

1                    FRESTON

2           MR. KENDALL:  I have all the

3        same objections.

4           A.    But no.

5  10:13:25    Q.    While you were at Viacom, Viacom

6        acquired, from time to time, on-line

7        properties; is that correct?

8           A.    Yes.

9           Q.    Are you familiar with -- I

10 10:13:50  believe it was under your stewardship that

11       Viacom acquired a company called Atom

12       Entertainment; is that correct?

13          A.    Yes.

14          Q.    And Atom Entertainment, at one

15 10:14:03  time, had a service called Addicting

16       Clips; is that correct?

17          A.    Yes.

18          Q.    In the course of making -- in

19       the course of acquiring Atom Entertainment

20 10:14:24  and Addicting Clips, am I right to assume

21       that Viacom conducted due diligence?

22          MR. KENDALL:  Lacks foundation.

23       Assumes facts not in evidence, and

24       calls for speculation.

25 10:14:40    A.    Due diligence was done.

1          FRESTON

2          Q.    But it was always done when

3     there was an acquisition at Viacom, right?

4          A.    Always.

5  10:14:48        MR. KENDALL:  Objection,

6          overbroad.

7          Q.    And the Addicting Clips service

8     respected copyright, correct?

9               MR. KENDALL:  Calls for a legal

10 10:15:00       conclusion.  Lacks foundation.  Calls

11         for expert testimony.

12              Again, I'll caution you not to

13         provide expert testimony.

14         A.    I'm having trouble recalling

15 10:15:11  exactly what the format of Addicting Clips

16    was, but the overriding operating

17    philosophy was that whatever they were

18    doing was -- did not have copyright

19    issues.

20 10:15:26  Q.    And do you recall whether

21    Addicting Clips, on its website -- I'm not

22    asking you for expert testimony.  To be

23    honest, I'm not sure what that objection

24    means, caution you not to provide expert

25 10:15:41  testimony.  You are not an expert.  I'm

```
 1                    FRESTON
 2              MR. SCHAPIRO:  To the best of
 3          our knowledge, both were sent to the
 4          witness.  But we can ask him.
 5  11:12:56        MR. KENDALL:  Why don't you find
 6          that out.  Maybe the witness recalls
 7          that something was sent to him or
 8          maybe not, but let's not assume it
 9          until we get there.
10  11:13:04    Q.    Do you recall reviewing a
11          Powerpoint that looked like this, or
12          something like this?
13              MR. KENDALL:  Vague and
14          ambiguous.
15  11:13:08    A.    Well, I know I would have
16          received a presentation about YouTube,
17          most likely in Powerpoint format.  This
18          would look -- well, this is a Powerpoint
19          format.
20  11:13:22    Q.    So without asking whether this
21          was the exact one, in this Powerpoint --
22          which was produced by some people at
23          Viacom, apparently -- YouTube is described
24          as "The dominant platform for consumers as
25  11:13:36   they migrate to video to express
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

FRESTON

1
2          themselves."

3                    Do you recall whether that was

4          your view of YouTube at the time?

5  11:13:42    A.    Well, I think that was a view

6          that was supported by traffic statistics.

7                    Q.    And in the second bullet point,

8          YouTube is described, or a YouTube

9          purchase is described as "a transformative

10 11:13:57 acquisition for MTV Networks/Viacom in the

11         Internet space."

12                   Do you recall whether that was

13         your view of a possible YouTube

14         acquisition?

15 11:14:06    A.    Definitely.

16                   Q.    On page 4, which is Bates

17         stamped 10132348, there is a slide

18         entitled "YouTube Is a Video Utility

19         Serving an Extremely Long Tail of

20 11:14:47 Content."

21                   Do you know what the "long tail"

22         means?

23                   A.    It means a lot of things that

24         may individually get very small usage

25 11:15:00 levels but, on aggregate, rolls up to a

1　　　　　　　　　　　　FRESTON

2　　　lot of usage.

3　　　　　Q.　　So when you say, "It means a lot

4　　　of things," you are not testifying it has

5　11:15:09　many meanings, you're saying the meaning

6　　　of it is?

7　　　　　A.　　In this case it would mean that

8　　　there is an extremely large archive

9　　　library of content, much of which may have

10　11:15:23　very limited appeal.

11　　　　　Q.　　And the second bullet point

12　　　says, "Consumption of branded content on

13　　　YT is low.　There are no movie trailers in

14　　　the top 30, nor are there any clips from

15　11:15:44　popular TV shows."

16　　　　　　Do you understand "branded

17　　　content" to mean movie or TV content?

18　　　　　A.　　That would generally mean

19　　　professionally produced content, as

20　11:15:58　opposed to user-generated content.

21　　　　　Q.　　So the team that produced this

22　　　Powerpoint is saying that among the top

23　　　30, there were no movie trailers or clips

24　　　from TV shows, correct?

25　11:16:09　　　　MR. KENDALL:　Wait.　I'm going

# Schapiro Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
———————————————————x

VIACOM INTERNATIONAL, INC., COMEDY
PARTNERS, COUNTRY MUSIC TELEVISION,
INC., PARAMOUNT PICTURES CORPORATION,
and BLACK ENTERTAINMENT TELEVISION,
LLC,

        Plaintiffs,

        vs.          NO. 07-CV-2103

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

        Defendants.
———————————————————x

THE FOOTBALL ASSOCIATION PREMIER
LEAGUE LIMITED, BOURNE CO., et al.,
on behalf of themselves and all
others similarly situated,

        Plaintiffs,

        vs.          NO. 07-CV-3582

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

        Defendants.
———————————————————x

VIDEOTAPED DEPOSITION OF MICHAEL WOLF
NEW YORK, NEW YORK
FRIDAY, APRIL 17, 2009

JOB NO.: 16687

1

2

3

4

5

6

7

8                           APRIL 17, 2009
                             10:02 a.m.

9

10

11               VIDEOTAPED DEPOSITION OF MICHAEL

12      WOLF, held at the offices of CAHILL GORDON &

13      REINDEL, LLP, 80 Pine Street, New York, New

14      York, pursuant to subpoena, before JENNIFER

15      OCAMPO-GUZMAN, a Shorthand Reporter and

16      Notary Public of the State of New York.

17

18

19

20

21

22

23

24

25

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022  (212)705-8585

584ffb46-7a6e-4834-9ab5-d178479cf79c

1

2  A P P E A R A N C E S:

3

4  FOR THE PLAINTIFFS VIACOM INTERNATIONAL,

5  INC.:

6      JENNER & BLOCK, LLP

7      BY:  SUSAN J. KOHLMANN, ESQ.

8      919 Third Avenue, 37th Floor

9      New York, New York 10022-3908

10     (212) 891-1690 skohlmann@jenner.com

11

12 FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE,

13 LLC and GOOGLE, INC.:

14     WILSON SONSINI GOODRICH & ROSATI, PC

15     BY:  BART E. VOLKMER, ESQ.

16     650 Page Mill Road

17     Palo Alto, California 94304-1050

18     650-565-3508 bvolkmer@wsgr.com

19

20

21

22

23

24

25

584ffb46-7a6e-4834-9ab5-d178479cf79c

```
1
2        APPEARANCES (Continued):
3
4        FOR THE DEPONENT:
5            CAHILL GORDON & REINDEL, LLP
6            BY:  ADAM ZUROFSKY, ESQ.
7            BY:  CHRISTOPHER A. GORMAN, ESQ.
8                 80 Pine Street
9                 New York, New York 10005-1702
10           (212) 701-3137 azurofsky@cahill.com
11           (212) 701-3119 cgorman@cahill.com
12
13
14       ALSO PRESENT:
15           CARLOS KING, Videographer
16
17
18
19
20
21
22
23
24
25
```

```
                       1                    Wolf
11:23:01               2        A.    I think Judy was looking for a
11:23:05               3   large scale acquisition, which would be
11:23:10               4   comparable to the acquisition by News Corp of
11:23:17               5   MySpace.
11:23:17               6        Q.    And you thought that -- pardon me.
11:23:22               7             And she thought that an acquisition
11:23:26               8   by Viacom of YouTube would be comparable to
11:23:30               9   the News Corp acquisition of MySpace?
11:23:33              10             MR. ZUROFSKY:  Objection to form,
11:23:34              11        calls for speculation.  The document
11:23:37              12        speaks for itself.
11:23:38              13             MS. KOHLMANN:  Objection.
11:23:39              14        A.    Once again, I'd be speculating.
11:23:42              15   It's hard for me to remember her state of
11:23:47              16   mind here and so it's possible that's what
11:23:49              17   she meant.
11:23:50              18        Q.    Is that how you viewed it at the
11:23:54              19   time, that an acquisition of YouTube by
11:23:56              20   Viacom would be comparable to the News Corp
11:23:58              21   acquisition of MySpace?
11:24:05              22        A.    At the time, and, again, I would
11:24:07              23   just be thinking about my points of view
11:24:08              24   then, I was looking at -- we wanted to look
11:24:13              25   at YouTube as an acquisition on its own
```

584ffb46-7a6e-4834-9ab5-d178479cf79c

|       |    |                                           |
|-------|----|-------------------------------------------|
|       | 1  | Wolf                                      |
|11:24:16| 2 | merits, not necessarily how that would have |
|11:24:20| 3 | compared to the acquisitions that were done |
|11:24:23| 4 | by other companies. |
|11:24:24| 5 | Q. And when you wrote, "We should get |
|11:24:34| 6 | our best minds together and figure out how to |
|11:24:36| 7 | make it a business," did MTV Networks end up |
|11:24:38| 8 | putting its best minds together to look at a |
|11:24:43| 9 | potential acquisition of YouTube? |
|11:24:44| 10 | MR. ZUROFSKY: Objection to form. |
|11:24:45| 11 | But answer, you can answer. |
|11:24:48| 12 | A. At the time I considered these to |
|11:24:50| 13 | be our best minds and, therefore -- and, yes, |
|11:24:52| 14 | we did put them together. |
|11:25:03| 15 | MR. VOLKMER: Let's mark Exhibit 5. |
|11:25:16| 16 | (Exhibit Wolf-5, E-mail dated |
|11:25:16| 17 | 7/6/06, Bates No. VIA00613122, marked |
|11:25:16| 18 | for identification, this date.) |
|11:25:34| 19 | MR. VOLKMER: This is a July 6, |
|11:25:37| 20 | 2006, e-mail that Adam Cahan sent to |
|11:25:42| 21 | Judy McGrath and Michael Wolf. The |
|11:25:43| 22 | subject line is "Update from the plane." |
|11:25:47| 23 | Q. If you'd just let me know when |
|11:25:48| 24 | you've had a chance to review that document, |
|11:25:50| 25 | Mr. Wolf? |

|  |  |  |
|---|---|---|
|  | 1 | Wolf |
| 11:25:51 | 2 | A. Okay. Thank you. |
| 11:26:35 | 3 | Q. And if could you turn to the fifth |
| 11:26:37 | 4 | paragraph, and the title of that paragraph is |
| 11:26:39 | 5 | "YouTube"? |
| 11:26:40 | 6 | A. Yes. |
| 11:26:43 | 7 | Q. Mr. Cahan writes, "We had a very |
| 11:26:45 | 8 | deep conversation over an hour about the |
| 11:26:47 | 9 | potential" -- "about the potential, the risk |
| 11:26:49 | 10 | and why strategically it is so critical." |
| 11:26:52 | 11 | Do you know who Mr. Cahan is |
| 11:26:55 | 12 | referring to when he says "we" in that |
| 11:26:57 | 13 | sentence? |
| 11:27:05 | 14 | A. I didn't write this memo. It was |
| 11:27:07 | 15 | written by Mr. Cahan, and -- and I don't know |
| 11:27:09 | 16 | who was on the plane with him, so I don't |
| 11:27:12 | 17 | know who the "we" was. |
| 11:27:13 | 18 | Q. Based on your experience and your |
| 11:27:20 | 19 | position at the time, who would you guess was |
| 11:27:22 | 20 | the person on the plane or the people on the |
| 11:27:25 | 21 | plane with Mr. Cahan? |
| 11:27:27 | 22 | MR. ZUROFSKY: Objection, calls for |
| 11:27:31 | 23 | speculation. |
| 11:27:31 | 24 | MS. KOHLMANN: Objection. |
| 11:27:31 | 25 | A. I'd be taking a guess and I really |

584ffb46-7a6e-4834-9ab5-d178479cf79c

| | | |
|---|---|---|
| | 1 | Wolf |
| 13:42:51 | 2 | MR. ZUROFSKY: Objection to form. |
| 13:42:53 | 3 | A. It could be that we were discussing |
| 13:42:55 | 4 | those deal -- those terms or it could be |
| 13:42:57 | 5 | that -- that those were the deal terms we |
| 13:43:00 | 6 | were proposing. I really can't tell by this |
| 13:43:02 | 7 | memo and I can't remember when I wrote it. |
| 13:43:03 | 8 | Q. Could it also be the case that |
| 13:43:07 | 9 | those deal terms that we just went over had |
| 13:43:10 | 10 | not been discussed between the parties as of |
| 13:43:14 | 11 | October 3, 2006? |
| 13:43:15 | 12 | MR. ZUROFSKY: Objection to form. |
| 13:43:17 | 13 | MS. KOHLMANN: Objection to form. |
| 13:43:18 | 14 | A. It's possible, yes. |
| 13:43:20 | 15 | Q. You're just not sure one way or the |
| 13:43:22 | 16 | other? |
| 13:43:25 | 17 | A. I'm not sure. Lots of information. |
| 13:43:26 | 18 | Lots of things that go past what I was doing |
| 13:43:30 | 19 | as the president of the company and I just |
| 13:43:33 | 20 | can't remember what happened in each of these |
| 13:43:36 | 21 | situations. |
| 13:43:36 | 22 | Q. When Viacom and MTVN were |
| 13:43:46 | 23 | negotiating with YouTube in the summer and |
| 13:43:49 | 24 | fall of 2006, was it aware of the presence of |
| 13:43:53 | 25 | Viacom content on the YouTube website? |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                                    |
|----------|----|----------------------------------------------------|
|          | 1  | Wolf                                               |
| 13:43:56 | 2  | MR. ZUROFSKY:  Objection to form.                  |
| 13:43:57 | 3  | A.    First of all, I don't know if                |
| 13:43:59 | 4  | Viacom was negotiating with YouTube.  I was        |
| 13:44:02 | 5  | in charge of MTV Networks.  I don't know if        |
| 13:44:05 | 6  | Viacom, there was any other independent of         |
| 13:44:09 | 7  | MTV Networks' negotiation.                         |
| 13:44:11 | 8  | Q.    Okay.  So I'll rephrase the                  |
| 13:44:12 | 9  | question.                                          |
| 13:44:13 | 10 | When MTVN was negotiating with                     |
| 13:44:16 | 11 | YouTube in the summer and fall of 2006, was        |
| 13:44:18 | 12 | it aware of the presence of Viacom content on      |
| 13:44:20 | 13 | the YouTube website?                               |
| 13:44:22 | 14 | MR. ZUROFSKY:  Objection to form.                  |
| 13:44:24 | 15 | A.    I don't recall one way or the                |
| 13:44:26 | 16 | other.                                             |
| 13:44:30 | 17 | Are you asking about this memo or                  |
| 13:44:32 | 18 | just in general?                                   |
| 13:44:33 | 19 | Q.    I'm not asking about the memo, just          |
| 13:44:36 | 20 | in general.  And this goes throughout the          |
| 13:44:38 | 21 | entire period of the negotiations between          |
| 13:44:39 | 22 | YouTube and Google and MTVN, at any time in        |
| 13:44:44 | 23 | those negotiations was MTVN aware of the           |
| 13:44:48 | 24 | presence of Viacom content on the YouTube          |
| 13:44:50 | 25 | website?                                           |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          | 1  | Wolf |
|----------|----|------|
| 13:44:52 | 2  | MR. ZUROFSKY: Objection to form. |
| 13:44:55 | 3  | MS. KOHLMANN: Objection. |
| 13:44:56 | 4  | A. We were certainly aware that our |
| 13:45:02 | 5  | content was on YouTube. |
| 13:45:03 | 6  | Q. And during the negotiations did |
| 13:45:11 | 7  | Viacom allow that content to stay up on |
| 13:45:13 | 8  | YouTube? |
| 13:45:14 | 9  | MR. ZUROFSKY: Objection to form. |
| 13:45:15 | 10 | MS. KOHLMANN: Objection. |
| 13:45:16 | 11 | A. The decision would have been ours, |
| 13:45:20 | 12 | not Viacom's. It was going to be -- but MTV |
| 13:45:26 | 13 | Networks, to the best of my recollection, we |
| 13:45:28 | 14 | allowed the content to be there. |
| 13:45:30 | 15 | Q. And why did you allow it to be |
| 13:45:34 | 16 | there? |
| 13:45:35 | 17 | MR. ZUROFSKY: Objection. |
| 13:45:37 | 18 | A. I'd be only speculating today |
| 13:45:42 | 19 | because I can't remember specifically, but I |
| 13:45:43 | 20 | would guess that, that we thought that we |
| 13:45:47 | 21 | could do a deal with YouTube and that also at |
| 13:45:53 | 22 | the same time we thought that having the |
| 13:45:55 | 23 | content there was valuable in terms of |
| 13:45:59 | 24 | helping the ratings of our shows. |
| 13:46:24 | 25 | MR. VOLKMER: Let's go off the |

584ffb46-7a6e-4834-9ab5-d178479cf79c

```
                              Wolf
13:46:25    2      record.
13:46:26    3            THE VIDEOGRAPHER:  The time is
13:46:27    4      1:44 p.m., and we're off the record.
13:51:31    5            (A brief recess was taken.)
13:51:31    6            THE VIDEOGRAPHER:  The time is
13:51:42    7      1:50 p.m., and we're back on the record.
13:51:44    8      BY MR. VOLKMER:
13:51:44    9            Q.  On Monday, October 9, 2006, Google
13:51:53   10      issued a press release announcing that it was
13:51:55   11      acquiring YouTube.  Do you remember having a
13:51:58   12      conversation with Eric Schmidt the preceding
13:52:01   13      weekend in which you discussed Google's
13:52:03   14      potential acquisition of YouTube?
13:52:06   15            A.  I don't remember the exact dates of
13:52:08   16      the things that you're describing to me, but
13:52:11   17      I certainly remember having discussion with
13:52:14   18      Eric Schmidt before, before the potential
13:52:19   19      acquisition, before the acquisition of
13:52:21   20      YouTube took place.
13:52:22   21            Q.  And what do you recall about that
13:52:24   22      conversation?
13:52:29   23            A.  To the best of my ability to
13:52:33   24      recall, I remember him telling me that they
13:52:36   25      were considering acquiring YouTube, that I
```

584ffb46-7a6e-4834-9ab5-d178479cf79c

|       |                                           |
|-------|-------------------------------------------|
|       | 1   Wolf                                  |
| 14:13:16 | 2   possibility that if a deal was not reached, |
| 14:13:20 | 3   that Viacom would either do takedown notices |
| 14:13:26 | 4   -- I think most part, MTV Network people did |
| 14:13:30 | 5   not discuss litigation.  I think they |
| 14:13:32 | 6   discussed takedown notices.  And the Viacom |
| 14:13:35 | 7   legal people were discussing litigation.  And |
| 14:13:43 | 8   other Viacom senior executives. |
| 14:13:51 | 9       Q.   Mr. Cahan was an MTV Networks |
| 14:13:56 | 10  employee, right? |
| 14:13:57 | 11      A.   Yes. |
| 14:13:59 | 12          MR. VOLKMER:  I would like to mark |
| 14:14:00 | 13      Exhibit 15. |
| 14:14:23 | 14          (Exhibit Wolf-15, E-mail dated |
| 14:14:23 | 15      10/9/06, Bates No. VIA02090176, marked |
| 14:14:23 | 16      for identification, this date.) |
| 14:15:31 | 17      A.   I've read the memo. |
| 14:15:32 | 18      Q.   And this is an e-mail sent by Adam |
| 14:15:36 | 19  Cahan to Michael Wolf on October 9, 2006. |
| 14:15:39 | 20  Mr. Cahan writes in the first sentence, "I |
| 14:15:42 | 21  feel very strongly the time is now for Google |
| 14:15:44 | 22  to negotiate with us, otherwise, we need to |
| 14:15:46 | 23  threaten all content comes down from |
| 14:15:49 | 24  YouTube," and in the concluding sentence of |
| 14:15:51 | 25  that paragraph, he says, "If we threaten we |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|   |   |
|---|---|
| | 1 |
| 14:15:54 | 2 |
| 14:15:56 | 3 |
| 14:15:56 | 4 |
| 14:15:59 | 5 |
| 14:16:03 | 6 |
| 14:16:05 | 7 |
| 14:16:07 | 8 |
| 14:16:10 | 9 |
| 14:16:11 | 10 |
| 14:16:14 | 11 |
| 14:16:15 | 12 |
| 14:16:16 | 13 |
| 14:16:19 | 14 |
| 14:16:22 | 15 |
| 14:16:25 | 16 |
| 14:16:27 | 17 |
| 14:16:29 | 18 |
| 14:16:30 | 19 |
| 14:16:36 | 20 |
| 14:16:38 | 21 |
| 14:16:42 | 22 |
| 14:16:44 | 23 |
| 14:16:44 | 24 |
| 14:16:45 | 25 |

1      Wolf

2  can use it in negotiations for a better

3  deal."

4           So the policy that Mr. Cahan is

5  advocating here is that MTVN should not

6  request the removal of its content but should

7  keep that content up on YouTube and threaten

8  to remove it to gain leverage in the

9  negotiations, right?

10          MR. ZUROFSKY:  Objection.

11          MS. KOHLMANN:  Objection.

12      A.    These are the kind -- we are

13  anxious to get to a deal and these are the

14  kind of levers that we would use in any deal

15  that we were considering.  We try to figure

16  out what -- where, where we had leverage and

17  where we did not.

18      Q.    And you thought that you had

19  leverage by threatening to issue takedown

20  notices against YouTube, correct?

21      A.    That was the --

22          MR. ZUROFSKY:  Objection.  Go

23      ahead.

24      A.    That was the general thinking at

25  MTV Networks at the time.

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    | Wolf |
|----------|----|------|
| 14:16:54 | 2  | Q. So if all of the MTVN content had |
| 14:16:57 | 3  | disappeared from YouTube in that time frame, |
| 14:16:59 | 4  | MTVN would have been in a worse negotiating |
| 14:17:02 | 5  | position, right? |
| 14:17:03 | 6  | MR. ZUROFSKY: Objection. |
| 14:17:04 | 7  | MS. KOHLMANN: Objection. |
| 14:17:05 | 8  | A. You're asking me a hypothetical |
| 14:17:09 | 9  | question, sir? |
| 14:17:11 | 10 | Q. I am. |
| 14:17:12 | 11 | A. I can just give you an answer, you |
| 14:17:16 | 12 | know, based on my own opinion. I think on |
| 14:17:22 | 13 | one side, MTV Networks would have had less |
| 14:17:25 | 14 | leverage. On the other side, YouTube were |
| 14:17:33 | 15 | hardly worse off not having MTV Networks' |
| 14:17:37 | 16 | content. |
| 14:17:37 | 17 | Q. But in this time frame, MTVN did |
| 14:17:51 | 18 | not have a policy of requesting that YouTube |
| 14:17:54 | 19 | remove its content when it became aware of |
| 14:17:56 | 20 | the presence of that content, right? |
| 14:17:59 | 21 | MR. ZUROFSKY: Objection. |
| 14:18:00 | 22 | MS. KOHLMANN: Objection. |
| 14:18:00 | 23 | A. I don't recall what our stance was |
| 14:18:10 | 24 | with YouTube, but to the best of my |
| 14:18:12 | 25 | recollection, we did not ask for takedowns |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                          |
|----------|----|------------------------------------------|
|          | 1  | Wolf                                     |
| 15:31:05 | 2  | A.   Yes.                                |
| 15:31:09 | 3  | Q.   And is that 20 percent figure also  |
| 15:31:11 | 4  | based on a back-of-the-envelope calculation |
| 15:31:15 | 5  | as opposed to a scientific study?        |
| 15:31:18 | 6  | MS. KOHLMANN:  Objection.                |
| 15:31:19 | 7  | A.   I don't recall at that point.  By   |
| 15:31:22 | 8  | then we were looking at the number of clips. |
| 15:31:24 | 9  | We were looking at the number of views for |
| 15:31:27 | 10 | top clips and -- and it did appear that MTV |
| 15:31:37 | 11 | Networks' content was -- was a large      |
| 15:31:40 | 12 | percentage or was a significant percentage of |
| 15:31:43 | 13 | YouTube consumption.                     |
| 15:31:46 | 14 | Q.   And had MTVN or Viacom undertaken a  |
| 15:31:53 | 15 | scientific study to make that determination? |
| 15:31:56 | 16 | MR. ZUROFSKY:  Objection.                |
| 15:31:57 | 17 | MS. KOHLMANN:  Objection.                |
| 15:31:58 | 18 | A.   I'm not sure how scientific either  |
| 15:32:05 | 19 | ratings on the internet or television, that |
| 15:32:09 | 20 | kind of analysis is.  I do know one way or |
| 15:32:13 | 21 | the other, that we had engaged our research |
| 15:32:20 | 22 | people to examine and analyze the YouTube, |
| 15:32:28 | 23 | the consumption of YouTube clips, that it's |
| 15:32:32 | 24 | reflected here or not, I don't remember.  |
| 15:32:33 | 25 | Q.   And in this message, you say that   |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|        |    |                                                |
|--------|----|------------------------------------------------|
|          | 1  | Wolf                                         |
| 15:32:37 | 2  | MTVN had undertaken a very quick analysis and |
| 15:32:40 | 3  | it was back of the envelope. Does that lead  |
| 15:32:46 | 4  | to the conclusion that this was more along   |
| 15:32:48 | 5  | the lines of a nonscientific study?          |
| 15:32:50 | 6  | MS. KOHLMANN: Objection.                     |
| 15:32:52 | 7  | MR. ZUROFSKY: Objection.                     |
| 15:32:52 | 8  | A. It could be, it could not be. I           |
| 15:32:54 | 9  | just don't remember at the time.             |
| 15:32:55 | 10 | Q. But you wrote this message to             |
| 15:33:06 | 11 | Mr. Schmidt saying that this was a           |
| 15:33:07 | 12 | back-of-the-envelope calculation, right?     |
| 15:33:09 | 13 | A. Yes, I did.                               |
| 15:33:10 | 14 | Q. And that was an accurate statement        |
| 15:33:12 | 15 | as far as you were concerned, correct?       |
| 15:33:15 | 16 | MR. ZUROFSKY: Objection.                     |
| 15:33:17 | 17 | MS. KOHLMANN: Objection.                     |
| 15:33:18 | 18 | A. Yes.                                      |
| 15:33:54 | 19 | Q. If you can turn to the second to          |
| 15:33:57 | 20 | last paragraph, the one that starts, "As you |
| 15:34:01 | 21 | can imagine," and the second sentence is, "As |
| 15:34:06 | 22 | importantly we're drawing increasingly       |
| 15:34:11 | 23 | uncomfortable with the time passing and feel |
| 15:34:13 | 24 | that we cannot allow our content to be at    |
| 15:34:15 | 25 | YouTube in its current form."                |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                      |
|----------|----|--------------------------------------|
|          | 1  | Wolf                                 |
| 15:34:18 | 2  | A.   Yes.                            |
| 15:34:19 | 3  | Q.   Are you telling Mr. Schmidt there |
| 15:34:21 | 4  | that to date Viacom and MTVN had been |
| 15:34:24 | 5  | allowing its content to be on YouTube? |
| 15:34:28 | 6  | MR. ZUROFSKY:  Objection.             |
| 15:34:29 | 7  | MS. KOHLMANN:  Objection.             |
| 15:34:30 | 8  | A.   While we were issuing takedown   |
| 15:34:42 | 9  | notices against some of the content, there |
| 15:34:44 | 10 | was other content which we were allowing to |
| 15:34:46 | 11 | continue to be on YouTube.            |
| 15:34:49 | 12 | MR. VOLKMER:  Okay.  We need to       |
| 15:34:51 | 13 | change the tape.                      |
| 15:34:52 | 14 | THE VIDEOGRAPHER:  The time is        |
| 15:34:53 | 15 | 3:33, and this ends tape number 2 in the |
| 15:34:55 | 16 | videotaped deposition of Michael Wolf. |
| 15:34:58 | 17 | (A brief recess was taken.)           |
| 15:40:56 | 18 | THE VIDEOGRAPHER:  The time is        |
| 15:42:10 | 19 | 3:40 p.m., and this begins tape number 3 |
| 15:42:13 | 20 | in the videotaped deposition of Michael |
| 15:42:16 | 21 | Wolf.                                 |
| 15:42:16 | 22 | MR. VOLKMER:  I would like to mark    |
| 15:42:17 | 23 | Exhibit 20.                           |
| 15:42:26 | 24 | (Exhibit Wolf-20, E-mail dated        |
| 15:42:26 | 25 | 12/19/06, Bates No. VIA00174505, marked |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                            |
|----------|----|--------------------------------------------|
|          | 1  | Wolf                                       |
| 15:42:27 | 2  | for identification, this date.)            |
| 15:42:27 | 3  | Q.   This is an e-mail exchange that       |
| 15:42:37 | 4  | Viacom produced in this litigation between |
| 15:42:39 | 5  | Michael Wolf and Adam Cahan on December 19, |
| 15:42:46 | 6  | 2006, and in the last in time e-mail Mr.   |
| 15:42:49 | 7  | Cahan writes, "I think when we issue the   |
| 15:42:52 | 8  | takedown we will hear from them."          |
| 15:42:55 | 9  | Did you take this to mean that             |
| 15:42:58 | 10 | Mr. Cahan suspected that when Viacom issued a |
| 15:43:02 | 11 | mass takedown to YouTube that Google would |
| 15:43:04 | 12 | come back to the negotiating table?        |
| 15:43:07 | 13 | MR. ZUROFSKY:  Objection.                  |
| 15:43:09 | 14 | A.   Yes.                                  |
| 15:43:15 | 15 | Q.   And was that part of the              |
| 15:43:17 | 16 | negotiating strategy?                      |
| 15:43:19 | 17 | MR. ZUROFSKY:  Objection.                  |
| 15:43:19 | 18 | MS. KOHLMANN:  Objection.                  |
| 15:43:20 | 19 | A.   Yes.                                  |
| 15:43:31 | 20 | Q.   And what were the reasons that MTVN   |
| 15:43:34 | 21 | employed that strategy of issuing a massive |
| 15:43:37 | 22 | takedown to YouTube in order to get Google to |
| 15:43:40 | 23 | come back to the negotiating table?        |
| 15:43:41 | 24 | MR. ZUROFSKY:  Objection.                  |
| 15:43:42 | 25 | MS. KOHLMANN:  Objection.                  |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|  | 1 | Wolf |
|---|---|---|

15:43:42    2    A. In the normal course of a

15:43:48    3    negotiation, each side uses the levers that

15:43:52    4    it would have. And one of the levers and one

15:43:58    5    of the different terms of the negotiation

15:44:00    6    would be how many clips that Viacom would

15:44:05    7    allow or MTV Networks really would allow to

15:44:10    8    have on YouTube. This is no different than

15:44:14    9    the kind of negotiations we would be in with

15:44:18    10    a cable operator where we would say to a

15:44:20    11    cable operator come X date we will be -- our

15:44:25    12    channel will go black. This is the kind of

15:44:28    13    back and forth that happens in this kind of a

15:44:31    14    negotiation.

15:44:32    15    Q. So the threat of a massive takedown

15:44:52    16    was one of the levers that MTVN was using to

15:44:57    17    extract better terms from Google?

15:44:59    18    MR. ZUROFSKY: Objection.

15:45:00    19    MS. KOHLMANN: Objection.

15:45:01    20    A. It was one of the different levers

15:45:05    21    that MTV Networks was using in order to get

15:45:11    22    to the deal that we wanted.

15:45:16    23    Q. And actually issuing a massive

15:45:18    24    takedown was also one of the levers?

15:45:21    25    MR. ZUROFSKY: Objection.

|          |    |                                              |
|----------|----|----------------------------------------------|
|          | 1  | Wolf                                         |
| 15:45:22 | 2  | MS. KOHLMANN: Objection.                     |
| 15:45:22 | 3  | A.   I don't know if we had issued, at       |
| 15:45:30 | 4  | that point, a massive takedown.              |
| 15:45:32 | 5  | Q.   Mr. Cahan says, "So far we have         |
| 15:45:37 | 6  | 29,000 clips I expect that number to double,"|
| 15:45:42 | 7  | suggested massive takedown had not yet       |
| 15:45:44 | 8  | issued, correct?                             |
| 15:45:45 | 9  | MS. KOHLMANN: Objection.                     |
| 15:45:46 | 10 | MR. ZUROFSKY: Objection.                     |
| 15:45:47 | 11 | A.   I don't know.  I don't know if he       |
| 15:45:50 | 12 | meant we've taken down 29,000 clips, or I    |
| 15:45:54 | 13 | really just don't know.  It's not clear from |
| 15:45:56 | 14 | this memo.                                   |
| 15:45:56 | 15 | Q.   Do you have any independent             |
| 15:45:58 | 16 | recollection of MTVN accumulating clips so   |
| 15:46:04 | 17 | that they could send one massive takedown to |
| 15:46:06 | 18 | YouTube as opposed to sending takedown       |
| 15:46:09 | 19 | notices as they became aware of the content? |
| 15:46:11 | 20 | MR. ZUROFSKY: Objection.                     |
| 15:46:12 | 21 | MS. KOHLMANN: Objection.                     |
| 15:46:13 | 22 | A.   I recall that as part of my             |
| 15:46:18 | 23 | discussion with one of the MTV Networks'     |
| 15:46:23 | 24 | lawyers, I recall that we did discuss that   |
| 15:46:26 | 25 | they would identify a large number of clips  |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|   |   |   |
|---|---|---|
|  | 1 | Wolf |
| 15:46:29 | 2 | and -- |
| 15:46:31 | 3 | MS. KOHLMANN: I'm going to just |
| 15:46:33 | 4 | caution you not to disclose any |
| 15:46:35 | 5 | attorney-client privileged information. |
| 15:46:37 | 6 | THE WITNESS: Okay. |
| 15:46:37 | 7 | MR. ZUROFSKY: You said that that |
| 15:46:38 | 8 | lawyer was acting on your behalf of MTV |
| 15:46:40 | 9 | Networks, that is an attorney-client |
| 15:46:43 | 10 | relationship with them. |
| 15:46:44 | 11 | A. Okay. Then -- |
| 15:46:53 | 12 | Q. Setting aside any communications |
| 15:46:56 | 13 | you had with MTV or Viacom lawyers, do you |
| 15:47:00 | 14 | have any independent recollection of Viacom |
| 15:47:02 | 15 | or MTVN accumulating clips to send to YouTube |
| 15:47:07 | 16 | in one massive takedown notice instead of |
| 15:47:10 | 17 | sending notices as they became aware of the |
| 15:47:12 | 18 | content? |
| 15:47:13 | 19 | MR. ZUROFSKY: Objection. |
| 15:47:14 | 20 | MS. KOHLMANN: Objection. |
| 15:47:15 | 21 | A. In general we identified the clips |
| 15:47:22 | 22 | and then had a sense for how many clips would |
| 15:47:27 | 23 | be available so that we could decide when and |
| 15:47:31 | 24 | if we sent a takedown notice, what would be |
| 15:47:35 | 25 | the number of clips and in what shows. |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|       |                                                      |
|-------|------------------------------------------------------|
|       | 1        Wolf                                         |
| 15:47:38 | 2    Q.   Do you recall there being certain       |
| 15:47:49 | 3    criteria that MTVN applied in making          |
| 15:47:53 | 4    determinations about whether to send takedown |
| 15:47:56 | 5    notices or clips?                             |
| 15:48:00 | 6        MS. KOHLMANN:  Objection.                 |
| 15:48:01 | 7    A.   I don't recall specifically.  There     |
| 15:48:03 | 8    may have been some.  I just don't remember.   |
| 15:48:05 | 9    Q.   Do you remember there being any          |
| 15:48:08 | 10   criteria that were based on length of the     |
| 15:48:11 | 11   clip in determining whether or not MTVN       |
| 15:48:17 | 12   should issue takedown notices?                |
| 15:48:19 | 13       MS. KOHLMANN:  Objection.                 |
| 15:48:20 | 14       MR. ZUROFSKY:  Objection.                 |
| 15:48:21 | 15   A.   I don't recall.                          |
| 15:48:21 | 16   Q.   What about particular networks or        |
| 15:48:31 | 17   franchises, do you remember whether a         |
| 15:48:34 | 18   particular clip was associated with a network |
| 15:48:37 | 19   or franchise being a factor in whether Viacom |
| 15:48:41 | 20   would issue a takedown notice?                |
| 15:48:43 | 21       MS. KOHLMANN:  Objection.                 |
| 15:48:43 | 22   A.   And, again, I'm really -- it's very      |
| 15:48:51 | 23   difficult to remember these things.  I        |
| 15:48:54 | 24   believe that there were clips that we did not |
| 15:48:56 | 25   want to take down, for example, clips from    |

584ffb46-7a6e-4834-9ab5-d178479cf79c

|   |   |
|---|---|
|          | 1  | Wolf |
| 15:49:01 | 2  | John Stewart and Steven Colbert, and that |
| 15:49:04 | 3  | there were other clips that we felt we should |
| 15:49:09 | 4  | take down.  I just don't remember what were |
| 15:49:11 | 5  | the types of clips that we took down and not. |
| 15:49:14 | 6  | Q.  And why do you think that Viacom |
| 15:49:16 | 7  | wanted the John Stewart and Steven Colbert |
| 15:49:19 | 8  | clips to stay up on the YouTube site? |
| 15:49:21 | 9  | MR. ZUROFSKY:  Objection. |
| 15:49:22 | 10 | MS. KOHLMANN:  Objection. |
| 15:49:23 | 11 | A.  This was an MTV Networks' decision. |
| 15:49:25 | 12 | Q.  Okay.  I'll restate the question. |
| 15:49:26 | 13 | Thank you. |
| 15:49:27 | 14 | Why do you think that MTVN wanted |
| 15:49:29 | 15 | the John Stewart and Steven Colbert clips to |
| 15:49:32 | 16 | stay up on the YouTube website? |
| 15:49:35 | 17 | MR. ZUROFSKY:  Objection. |
| 15:49:36 | 18 | MS. KOHLMANN:  Objection. |
| 15:49:36 | 19 | A.  And so I'm really giving you my |
| 15:49:42 | 20 | speculation today. |
| 15:49:42 | 21 | Q.  Sure. |
| 15:49:42 | 22 | A.  But we were concerned that both |
| 15:49:49 | 23 | John Stewart and Steven Colbert believed that |
| 15:49:53 | 24 | their presence on YouTube was important for |
| 15:49:58 | 25 | their ratings as well as for their |

584ffb46-7a6e-4834-9ab5-d178479cf79c

```
 1              Wolf
```

15:50:00  2  relationship with their audiences, and -- and

15:50:06  3  to a large extent the MTV Networks senior

15:50:10  4  team shared that belief.

15:50:12  5      Q.   And did you share that belief?

15:50:15  6      A.   I did.

15:50:15  7      Q.   Can you think of any other programs

15:50:18  8  that fell under that category you just

15:50:20  9  discussed other than Mr. John Stewart's show

15:50:24  10  and Mr. Colbert's show?

15:50:28  11      A.   There are probably others.  I

15:50:32  12  can't, you know, I can't remember which ones

15:50:34  13  specifically, but overall in a company where

15:50:38  14  the networks are aimed at a younger audience

15:50:42  15  which would tend to be the same audience as

15:50:44  16  YouTube, we need to strike the right balance

15:50:47  17  between clips that we left up and clips that

15:50:50  18  we decided to take down.

15:51:50  19      MR. VOLKMER:  I am going to mark

15:51:52  20      Exhibit 21.

15:51:52  21      (Exhibit Wolf-21, E-mail dated

15:51:52  22      12/23/06, Bates No. VIA00173284, marked

15:52:14  23      for identification, this date.)

15:52:14  24      Q.   This is an e-mail that Viacom

15:52:50  25  produced in this litigation, it's from Adam

584ffb46-7a6e-4834-9ab5-d178479cf79c

|          |    |                                                    |
|----------|----|----------------------------------------------------|
|          | 1  | Wolf                                               |
| 15:52:53 | 2  | Cahan to Judy McGrath and Michael Wolf dated       |
| 15:52:57 | 3  | December 23, 2006.                                 |
| 15:52:58 | 4  | In the first paragraph, Mr. Cahan                  |
| 15:53:01 | 5  | writes, "As you know, we are gearing up for a      |
| 15:53:03 | 6  | very significant takedown at YouTube by            |
| 15:53:07 | 7  | January 2nd, 3rd, by last count the number         |
| 15:53:09 | 8  | was 50 to 70,000 clips, I suspect that number      |
| 15:53:14 | 9  | will grow before we are complete."                 |
| 15:53:16 | 10 | So is it your understanding that                   |
| 15:53:21 | 11 | Viacom was continuing the project of               |
| 15:53:23 | 12 | identifying clips and not asking that they be      |
| 15:53:27 | 13 | removed so that there could be one massive         |
| 15:53:29 | 14 | takedown notice sent?                              |
| 15:53:31 | 15 | MS. KOHLMANN:  Objection.                          |
| 15:53:31 | 16 | A.   I don't know if it was MTV                    |
| 15:53:34 | 17 | Networks.  I'm sorry.  I don't know if it was      |
| 15:53:36 | 18 | MTV Networks or Viacom.  Could you repeat          |
| 15:53:40 | 19 | your question?                                     |
| 15:53:40 | 20 | Q.   Sure.  Was it your understanding             |
| 15:53:42 | 21 | that either Viacom or MTVN was continuing a        |
| 15:53:46 | 22 | project of identifying clips and not asking       |
| 15:53:49 | 23 | that they be removed so that there would be       |
| 15:53:52 | 24 | one massive takedown notice sent to YouTube?       |
| 15:53:55 | 25 | MR. ZUROFSKY:  Objection.                          |

584ffb46-7a6e-4834-9ab5-d178479cf79c

# Schapiro Exhibit 5

From:     "Toffler, Van" <Van.Toffler@mtvstaff.com>
Date:     Mon, 10 Jul 2006 22:32:20 -0400
To:       "McGrath, Judy" <Judy.McGrath@mtvstaff.com>
Subject:  Re: Terrible day

I do think some of it cuts to the bone.  What happened to our what the fuck ways.  It takes 3 months and 58 meetings
to get a 1million dollar acquisition done at our company.  We're fast becoming those we scorned

-----Original Message-----
From: McGrath, Judy
To: Toffler, Van
Sent: Mon Jul 10 22:10:36 2006
Subject: Re: Terrible day

Because it's our fucking company. What did you think of that fine analyst report? Tom should be fired? He's out of his
mind over it. Dinner with Sumner tonite. He should pay attention to the rest of it....stop running the company for wall
street.

------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Toffler, Van
To: McGrath, Judy
Sent: Mon Jul 10 21:59:38 2006
Subject: Re: Terrible day

Why not, can't prove the revenue potential?

-----Original Message-----
From: McGrath, Judy
To: Toffler, Van
Sent: Mon Jul 10 21:51:43 2006
Subject: Re: Terrible day

Probably not buying YouTube, if I had to wager.

------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Toffler, Van
To: McGrath, Judy
Sent: Mon Jul 10 21:48:23 2006
Subject: Re: Terrible day

He researches well, but in my exp hasn't been too great on our awards shows.  Yet if produced could be fine and get
the boys.
On bacara, Rich and I sent the message that it is no longer cool.
Gonna get notes on the shows.
Still trying to deal with our ad shortfall.  It hurts as all else is doing well.
We buying YouTube?

-----Original Message-----
From: McGrath, Judy
To: Toffler, Van
Sent: Mon Jul 10 21:30:28 2006

VIA 00885981

Subject: Re: Terrible day

If you have the 10 second delay, I'd do it. Needs some big personality. Love him  Do the hip hop kids like him? I didn't ask about Bacara to give you a hard time, I figured it was booked. I was curious about the material. Meanwhile, a resort in Santa Barbara looks bad this year. ███████████████████████
Xx

--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Toffler, Van
To: McGrath, Judy
Sent: Mon Jul 10 21:11:06 2006
Subject: RE: Terrible day

Asked Brian to get out of Bacara, but it was booked 6 months ago and woulda cost them 50k to cancel so they scaled it back to a core team to screen shows.  I'm not going , neither are christina or rich.
I'm going out on Thursday to see the first cut of jackass as well as the freedom writers materials.  Should be interesting.
So the kids want knoxville to host vma's , what do you think?



CONFIDENTIAL

# Schapiro Exhibit 6

From:     "Bakish, Robert" <bb@viacom.com>
Date:     Mon, 24 Jul 2006 15:21:50 -0400
To:       "Witt, Jason" <Jason.Witt@mtvstaff.com>
Subject:  RE: YouTube Term Sheet

yeah, i thought it was a bit steep, but not worried about it

will do

_____

From: Witt, Jason
Sent: Monday, July 24, 2006 3:21 PM
To: Bakish, Robert
Subject: RE: YouTube Term Sheet

Banners makes $5 min CPM for hosting/serving a bit egregious, but totally viable launching pt.  Thx for forwarding.
Have your asst let me know when we talk to them again if not a problem.

thx.

jw

_____

From: Bakish, Robert
Sent: Monday, July 24, 2006 3:19 PM
To: Witt, Jason
Subject: RE: YouTube Term Sheet

not a bad place to start.  on ad inventory, they want to experiment.  but they are not thinking video pre-roll.  probably
banners instead.

_____

From: Witt, Jason
Sent: Monday, July 24, 2006 3:15 PM
To: Bakish, Robert
Subject: RE: YouTube Term Sheet

Interesting.  We sell, 50/50 economics with $5 min effective CPM for trafficking by them [the latter of which I think is
probably not outrageous, although we could get better].
No content obligations but no promotional obligations either.
They agree to start filtering pirated content.
Where are they on video ad inventory?
Not a terrible bid.

_____

From: Bakish, Robert
Sent: Monday, July 24, 2006 3:11 PM
To: Witt, Jason
Subject: FW: YouTube Term Sheet

fyi. this just in

_____

HIGHLY CONFIDENTIAL

From: Chris Maxcy [mailto:chris@youtube.com]
Sent: Monday, July 24, 2006 2:59 PM
To: Cahan, Adam; Bakish, Robert
Cc: 'zahavah'; 'Kevin Donahue'
Subject: YouTube Term Sheet

Adam & Bob,

At long last, attached is a preliminary draft of the Term Sheet we've discussed.  Please let me know when you are
available to discuss.

Best,

Chris

_____

Chris Maxcy

VP, Business Development

YouTube, Inc.

chris@youtube.com

██████████████

www.youtube.com

# Schapiro Exhibit 7

Subject:   YouTube business development
From:      "Cahan, Adam" <EX:/O=VIACOM/OU=MTVUSA/CN=RECIPIENTS/CN=CAHANA>
To:        McGrath, Judy; Wolf, Michael
Cc:        Bakish, Robert
Date:      Thu, 13 Jul 2006 20:51:24 +0000

Judy/Michael -

Just got off the phone with the head of YouTube business development. We have an innovative deal with them on the table - still in negotiation. While it clearly needs to be vetted in terms of all the other options on the table, here is the basic construct. The good part is that we will be seen as an innovator/first to market. The realistic part is that it is highly unlikely to involve equity, but we shall see...

Components-
*      Advertising: we would be the first video provider to sell ads on their site. We would own 100% of the inventory on our content pages/views, rev share - they opened at 50/50 we are likely to end either 80/20 or 70/30 depending upon other sweeteners. No pre-roll video ads - rich media banners
*      Skinning/branding: we would be the first content provider to skin/brand a player. We convinced them that this was due to rights issues
*      Filtering: They are working on an audio filtering process whereby any content we contribute would have an audio tag they would automatically match to user submitted content, if there is a match they will tag the content as our and we can determine 3 options - claim it as ours and gets into the rev share model, take it down, or simply allow it as UGC and ignore
*      Exclusivity:  none
*      User information: attempting for user information under the umbrella that it makes the sales better on our end (they collect some behavioral and registration but early in their development)

What we are hoping to get in addition:
*      Promotional credit/guarantee: as part of the deal we are looking for some inventory to promote our content/ shows on their homepage
*      Equity - we have not opened this in the discussion yet but our return offer will be to try for some form of warrants/ equity in the company as part of a guarantee for content. Not sure this will be on the table but will look for it

Additional informational learned on the call:
*      Premium advertising: They claim to be working with the studios, Sony, Panasonic among others. Claim the advertising is premium, and have had little pushback from advertisers given the perception of YouTube brand as "cool"
*      International: claim for now that advertisers have not been demanding separation - clearly a very big driver of our model
*      Homepage/navigation pages - claim for now that up to 33% is in navigation/homepage. Not sure we agree but our model was at 5% - would swing value
*      Sun Valley - Chad Hurley, YouTube Ceo, is in Sun Valley at the Allen & Company event. We are very likely in a new zipcode unfortunately

Next steps:
*      Should get a term sheet early next week - negotiate our split into a 70/30 deal (in our favor)
*      Will engage with ad sales to go over terms and ability to sell/ what inventory etc

# Schapiro Exhibit 8

From:      "Toffler, Van" <Van.Toffler@mtvstaff.com>
Date:      Sat, 7 Oct 2006 15:32:57 -0400
To:        "Cahan, Adam" <Adam.Cahan@mtvn.com>, "McGrath, Judy" <Judy.
           McGrath@mtvstaff.com>
Subject:   Re: Youtube and google

How can we be a spoiler?

-----Original Message-----
From: Cahan, Adam
To: Toffler, Van; McGrath, Judy
Sent: Sat Oct 07 15:13:15 2006
Subject: Re: Youtube and google

He's doing it. We need to play the spoiler now and see if we can extract value here.

-----Original Message-----
From: Toffler, Van
To: Cahan, Adam; McGrath, Judy
Sent: Sat Oct 07 15:01:44 2006
Subject: Re: Youtube and google

He fuckin better-that's an epic transaction that could harsh our collective buzz

-----Original Message-----
From: Cahan, Adam
To: Toffler, Van; McGrath, Judy
Sent: Sat Oct 07 14:51:38 2006
Subject: Re: Youtube and google

Michael's going to call eric today.

-----Original Message-----
From: Cahan, Adam
To: Toffler, Van; McGrath, Judy
Sent: Sat Oct 07 14:44:28 2006
Subject: Re: Youtube and google

I would characterize it as early discussions - we've met to see where we can take a commerical relationship.  if there
is a business model that would work. Nothing committed to but wanted to understand how they would want to work
together.

The youtube proposal comes down to a 70/30 for us and we sell the ads, they are looking for some way to set a
minimum on that 30 which we have continued to say no to. In addition they will provide us with a tool to "claim" user
generated content with the right to take it down or have it be a part of the overall monetization. Their hope is that the
ugc component will grow the pie for us. They have also proposed branded channel pages, and promotion that will go
with the deal.

Frankly if their name was yahoo we likely would have taken it but on the ad sales side there is concern about the
ability to achieve a high cpm on their site. Also the deal is an easier fit where we own the majority of the content eg
comedy central v. Mtv.

My perspective would be that if youtube/google does happen we need to act very quickly to say "now that there is
money involved we are taking down content and demanding a payment". Need to have a bit of a strong arm
approach to the negotiations and push for significantly better terms while we have them worried.

-----Original Message-----

CONFIDENTIAL                                                                  VIA00613094

From: Toffler, Van
To: Cahan, Adam; McGrath, Judy
Sent: Sat Oct 07 14:31:54 2006
Subject: Re: Youtube and google

Sorry, what relationship are we working with you tube?

-----Original Message-----
From: Cahan, Adam
To: McGrath, Judy; Toffler, Van
Sent: Sat Oct 07 14:23:11 2006
Subject: Youtube and google

May have spoken too soon. Apparently the ad deal broke down late last night and potential acquisition is back on the table.

You never know with google because larry page really makes the final call. So can go either way.

If this does go through, we may need to revisit the wiki in light of the broader commercial relationship that we have been working on with youtube.

Let's see where things end up but we'll need to move very quickly if the acquisition happens.

# Schapiro Exhibit 9

Subject: FW: Google
From: "Dooley, Tom" <EX:/O=VIACOM/OU=CORPUSA/CN=RECIPIENTS/CN=DOOLEYT>
To: Dauman, Philippe
Cc: Date: Wed, 29 Nov 2006 20:09:29 +0000

I think we should cut off the heads of Adam and Michael (and perhaps Judy) and send them to Eric in a box wrapped in a printed copy of their latest term sheet.
With a note that says "Before you respond - Remember our heritage - we are the people that brought you the Godfather."

>_____
>From: Cahan, Adam
>Sent: Wednesday, November 29, 2006 2:16 PM
>To: Dauman, Philippe; Dooley, Tom
>Cc: McGrath, Judy; Wolf, Michael; Stirratt, Nada
>Subject: Google
>
>Philippe -
>
>In the off chance that you want to resurrect the negotiations with Google, there is an opportunity to structure this in a manner that works, to provide us with $48.4M/Year (non-recoupable fee) and 70/30 advertising protecting our accounts. It would be better than any of the alternatives we have seen.
>
>That said, as you rightly point out, they have returned a document that does not reflect any of our discussions. My sense is that this is a negotiating tactic on their part (albeit a very poor choice) to provide them with leverage to "trade off" components they never expected to get.
>
>Overall our message to Google:
>*  Current deal does not reflect any of our discussions, and is much further reaching than discussed prior and not on the table - ie "all content" at Viacom sites, Television promotion, etc.
>*  Guarantee in "commitment fee" is non-recoupable (believe this was the intent) and needs a mechanism for growth based on content and/or usage because Google controls the advertising inventory (ie design, units, etc), audience via promotion and navigation - ie all the monetization. The platform puts our existing digital businesses at risk that represent $400M/Year. E.g. Google can decide no "video ads" which makes the yield/ value on our content much lower.
>*  Major deal issues: Content must be 3 minutes or under, no MFN against MTVN sites - MTVN not Viacom, commitment fee non recoupable (believe this was the intent), Ad sales sub 400 (against all content), no recouping of Google costs.
>
>DETAILED POINTS
>VIDEO COMMITMENT
>*  Commitment Fee - $242M is a non-recoupable commitment fee. Need a mechanism to grow annually based on a "content usage" or "volume" true up. Ie. Establish a threshhold on usage, the minimum is our $242M, if we exceed the number of streams globally, or the content pool itself is of a certain scale our "guarantee" grows on an annual basis. Aligns our incentives to give them more content and have it be used.
>*  Net advertising - Will not agree to Google's operating costs - have always said it was net of our agency fees. The purpose of the 30% is to cover their costs, they can monetize against all the other assets (ie search pages, homepage, navigation page, music videos, user generated, etc)
>PERFORMANCE OBLIGATION (CONTENT):
>*  Point 1 (USER UPLOADED) - All uploaded content 3 minutes not 10 minutes for User uploaded. Not sure what "affiliates" means here - potentially opens redistribution issues
>*  Point 2 (VIACOM SITES) - Not possible and never discussed, the point here is that we are enabling vast amounts of user upload which far outweigh the number of clips we currently have - ie 7800 results for South Park, we do not have 7800 clips. We cannot agree to MFN against our sites as this triggers other MFNs with our cable operators.
>*  POINT 3 (VIACOM CONTENT) - Viacom content - never discussed. This would mean Paramount.
>AD SALES CONDITION:

>\*   Top 400 Advertisers - Fall back is potentially 300. Against all content, brands, etc
>\*   Ad formats - must include approval by MTVN>

**Schapiro Exhibit 10**

Subject: Thoughts on final steps, strategy with GT
From: "Cahan, Adam" <EX:/O=VIACOM/OU=MTVUSA/CN=RECIPIENTS/CN=CAHANA>
To: McGrath, Judy; Wolf, Michael
Cc: Date: Sat, 23 Dec 2006 00:27:34 +0000

Judy/Michael -

As you know we are gearing up for a very significant takedown at YouTube by January 2/3 - by last count the number was ~50-70K clips. I suspect that number will grow before we are complete.

While I certainly don't want us to expect it, my suspicion is that faced with a dramatic takedown of this scale Google will provide us the economics we have requested.

That said it is absolutely critical that we play two facets of this strategy. 1. The takedowns in one dramatic event (as opposed to drips..) and 2. The story for consumers/ popular press.

Everyone seems prepared to take a very "defensive" position for popular press, I am really uncomfortable with this. We need to completely flip this on its head - use it as offense and make this about consumers. While we may have looked the bullies with YouTube, this is clearly not the case with Google. The time has really come to call them out on their own game.... the consumers...

At last count, Google is a $140B market cap company with 10k employees, and $10B in cash. We are the underdog here not the big bad media company. We have to control this spin to create an "I Want My MTV" with Google as Echostar... We need a campaign that resembles "We are really saddened that Google could not come up with a reasonable offer to enable consumers to access the content they are seeking. That a company with $10B in cash cannot find a way to work with a content company seems crazy." We follow with a plea to consumers to "email Google and tell them Bring The Clips Back."

Trust me more than anything we can do, challenging Google as a Microsoft-like evil-doer will get the founders enraged and want to solve this. They won't be able to tolerate a consumer perception shift.

This clearly requires a significant amount of coordination on our part... Would need Carol and others deeply involved to ensure we look the rebel again.

Wanted to check with both on your thoughts about this approach. I think it is the most powerful thing we can do here. If we play defense we will look like big media company goes after the consumer.

Thoughts?