# SCHAPIRO DECLARATION EXHIBITS CONTINUED



# Schapiro Exhibit 11

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---o0o---

THE FOOTBALL ASSOCIATION )
PREMIER LEAGUE LIMITED AND )
BOURNE CO., ET AL., ON BEHALF )
OF THEMSELVES AND ALL OTHERS )
SIMILARLY SITUATED,, )
)
PLAINTIFFS, )
vs. ) 07 CIV. 3582(LLS)
)
YOUTUBE, INC., YOUTUBE, LLC )
AND GOOGLE, INC.,, )
)
DEFENDANTS. )
)
_____ )
)
VIACOM INTERNATIONAL INC., )
COMEDY PARTNERS, COUNTRY MUSIC)
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, AND )
BLACK ENTERTAINMENT )
TELEVISION, LLC, )
)
PLAINTIFFS, )
vs. ) 07 CIV. 2103 (LLS)
)
YOUTUBE, INC., YOUTUBE, LLC )
AND GOOGLE, INC.,, )
)
DEFENDANTS. )
)
_____ )

VIDEOTAPED DEPOSITION OF COURTNEY NIEMAN
WEDNESDAY, DECEMBER 16, 2009
PALO ALTO, CALIFORNIA

Job No. 18293

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---o0o---

```
THE FOOTBALL ASSOCIATION       )
PREMIER LEAGUE LIMITED AND      )
BOURNE CO., ET AL., ON BEHALF   )
OF THEMSELVES AND ALL OTHERS    )
SIMILARLY SITUATED,,            )
                                )
        PLAINTIFFS,             )
            vs.                 )  07 CIV. 3582(LLS)
                                )
YOUTUBE, INC., YOUTUBE, LLC     )
AND GOOGLE, INC.,,              )
                                )
        DEFENDANTS.             )
                                )
_____)
VIACOM INTERNATIONAL INC.,      )
COMEDY PARTNERS, COUNTRY MUSIC  )
TELEVISION, INC., PARAMOUNT     )
PICTURES CORPORATION, AND       )
BLACK ENTERTAINMENT             )
TELEVISION, LLC,                )
                                )
        PLAINTIFFS,             )
            vs.                 )  07 CIV. 2103 (LLS)
                                )
YOUTUBE, INC., YOUTUBE, LLC     )
AND GOOGLE, INC.,,              )
                                )
        DEFENDANTS.             )
_____)
```

VIDEOTAPED DEPOSITION OF COURTNEY NEIMAN,

TAKEN ON BEHALF OF THE DEFENDANTS, AT 9:28 A.M.,

WEDNESDAY, DECEMBER 16, 2009 AT 650 PAGE MILL ROAD,

PALO ALTO, CALIFORNIA BEFORE MARY JACKSON, CSR NO.

8688, PURSUANT TO NOTICE.

1               A P P E A R A N C E S

2     For the Plaintiff Viacom:

3               JENNER & BLOCK, LLP

4               1099 New York Avenue, NW, Suite 900

5               Washington, D.C. 20001
                BY:  JAMES COX, ESQ.
6               (202) 637-6361
                jamescox@jenner.com

7

8     For the Plaintiffs The Football Association Premier
      League Limited:
9
                PROSKAUER ROSE, LLP
10              2049 Century Park E, Suite 3200
                Los Angeles, California 90067
11              BY:  GIL PELES, ESQ.
                (310) 284-5611
12              gpeles@proskauer.com

13

      For the Non-Party BayTSP:
14
                KENDALL, BRILL & KLIEGER, LLP
15              10100 Santa Monica Boulevard, Suite 1725
                Los Angeles, California 90067
16              BY:  PHILIP KELLY, III, ESQ.
                (310)272-7908
17              pkelly@kbkfirm.com

18
      For the Defendants Google and YouTube:
19
                WILSON, SONSINI, GOODRICH & ROSATI
20              650 Page Mill Road
                Palo Alto, California 94304
21              BY:  DAVID KRAMER, ESQ.
                     BART VOLKMER, ESQ.
22              (650) 493-9300
                dkramer@wsgr.com
23              bvolkmer@wsgr.com

24        ALSO PRESENT:  OSAMA HUSSAIN, BayTSP Counsel

25                       STUART PETTIGREW, Videographer

```
 1              identification.)
 2   12:08                 MR. KRAMER:   Q.   Do you recognize
 3              Exhibit 15?
 4   12:08          A.   Yes, I do.
 5   12:08          Q.   What is it?
 6   12:08          A.   It's a -- hang on.  I'm getting to the
 7              page where there's actually printing.  Holy smokes.
 8              We cut down a forest to do this one.
 9   12:08          Q.   Mm-hmm.
10   12:08          A.   I don't recall this format of this report.
11              However, I do recall the report in general.  It was
12              part of the weekly process of informing our clients
13              what we did based on their instructions.
14   12:08          Q.   In Exhibit 15, there is an e-mail exchange
15              on the cover page between Bay and Viacom
16              representatives including Ms. Hallie, Mr. Cahan,
17              you're included as a cc.  In the first in time
18              message, Ms. Arizala says, "Please review the
19              enclosed YouTube, Google Video, MySpace and Yahoo!
20              Video approved notice sent rule."
21   12:09          A.   Mm-hmm.
22   12:09          Q.   Do you know what that's a reference to?
23   12:09          A.   It would be, here's the report for the
24              actions you told us to take.
25   12:09          Q.   But I'm specifically asking about the
```

"approved notice sent rule," not the report itself.

12:09 A. I don't know what -- what Deana -- why she chose that phrase. But in my dealings with Deana as a manager, that's -- I would ask her what she meant by that.

12:09 Q. The last four pages of Exhibit 15 --

12:09 A. Yeah.

12:09 Q. -- are one-page charts entitled MTV Agent Asset Rule List for each of the four services Ms. Arizala mentions in her message: YouTube, MySpace, Google Video, and Yahoo! And there is a list of shows in common among each of the four lists. Do you see that?

12:10 A. Yes.

12:10 Q. Do you recognize this as the rules that BayTSP was to follow with respect to each of those services at the time?

12:10 A. I recall that this table was the representation of what client services, Deana, myself, understood as to how BayTSP was to enforce these titles.

12:10 Q. Got it. You were involved in helping to prepare these asset agent rule lists?

12:10 A. Inasmuch as the manager of client services e-mails, phone calls, yeah, I'm sure it came up.

1   12:11        Q.   Okay.

2   12:11        A.   Please do this; please do that.

3   12:11        Q.   If you take a look at the -- let me see if
4               I can do it this way.  Can you explain to me what
5               these rules were looking at, these charts as of
6               November 6th, 2006?

7   12:11        A.   Yes.  We will take, for example, column
8               one would be the content order.  So Spice TV, Comedy
9               Central, Viacom in general, Country Music
10              Television, blah, blah, blah.  The second one would
11              be the specific network of that content holder that
12              those titles belong to.  And then notices were to be
13              sent on the complete entire show versus a clip, some
14              subset, and, with God as my witness, I don't
15              remember what -- other than looking at it here, that
16              the rule would be to -- would be used to define what
17              is a clip.

18  12:12        Q.   On which action should be taken, right?

19  12:12        A.   Yeah.  So full was fairly straightforward.
20              It's the whole episode.  Whereas -- whether it had
21              commercials or not was irrelevant.  It was, did you
22              have the whole show?  Clip would have been anything
23              less than the whole show.  So two and a half would
24              be in minutes as opposed to seconds or days or
25              greater.

1   12:12          Q.   So these charts reflect that at this time,

2          the full episode rule was in effect at YouTube,

3          right?

4   12:12          MR. COX:  Objection.  Document speaks for

5          itself.

6   12:12          MS. COLEMAN-BISHOP:  Mischaracterizes --

7          objection mischaracterizes the document.

8   12:13          THE WITNESS:  Okay.  I'm lost.

9   12:13          MR. KRAMER:  Q.   Sure.

10  12:13          A.   Because I don't -- as I read this, these

11         rules for engagement were for -- "please review the

12         enclosed YouTube, Google Video, MySpace, Yahoo!

13         Video."

14  12:13          Q.   We have one page for each of the four

15         services that you just mentioned, and on each page

16         there are the rules that you just described, but

17         they differ.

18  12:13          A.   Oh, okay.

19  12:13          Q.   So for the page entitled YouTube Approved

20         Notice Sent, which is the first of the four

21         charts --

22  12:14          A.   Yes.  There is full rule -- full assets is

23         the rule for the YouTube page; full assets is for

24         the Google page; full assets and some clips for

25         MySpace; and full assets and some clips for Yahoo!

1       That's what that tells me.

2   12:14      Q.   And my question is, do you have any

3   insight into why the rules for YouTube and Google

4   Video were different than the rules for MySpace and

5   Yahoo! at the time?

6   12:14      A.   No.

7   12:14      MS. COLEMAN-BISHOP:  Objection.  Calls for

8   speculation.

9   12:14      THE WITNESS:  No, I do not.

10  12:14      MR. KRAMER:  Q.   Were you communicating

11  Viacom's takedown rules to YouTube at the time?

12  12:14      A.   No.

13  12:14      Q.   Why not?

14  12:14      A.   We didn't communicate our practices to

15  anyone.  To -- I mean inasmuch as I didn't tell

16  YouTube or MySpace or AT&T or Canada Net, I didn't

17  tell -- I and none of my staff would have

18  communicated any rules.  We just sent the DMCA

19  notice.

20  12:15      Q.   Were you under instructions not to reveal

21  Viacom's takedown rules to YouTube?

22  12:15      A.   If it's in the -- if it's in my NDA or

23  work rules.  I don't remember somebody giving me an

24  explicit instruction.  I don't recall somebody

25  saying, don't tell, but --

1    12:15            Q.   Do you think it would have helped YouTube

2                follow Viacom's wishes with respect to having its

3                content appear on YouTube --

4    12:15                MS. COLEMAN-BISHOP:   Objection.   Calls for

5                speculation.   No matter where you go with the

6                question, it's going to call for speculation.

7    12:15                MR. KRAMER:   Yeah, but you have to let me

8                get the question so the record's clear, and then

9                you can object.   And if I think your objection --

10   12:16                MS. COLEMAN-BISHOP:   Don't lecture me on

11               how to defend a --

12   12:16                MR. KRAMER:   No, Counsel, it's not just

13               proper.   It's just not proper.   You have to let me

14               get the question out so we can make the record, and

15               then if you have an objection, you can make it.   I

16               can decide whether I want to restate the question or

17               not.   But if you object in the middle of the

18               question, we don't even know whether your objection

19               is going to be meritorious.   So just wait until I

20               get the question out.   That's all.   Just courtesy.

21               Okay?

22   12:16                MR. KRAMER:   Q.   Do you think it would

23               have helped YouTube follow Viacom's wishes with

24               respect to having its content appear on YouTube if

25               Viacom had communicated these kinds of rules to

1       putting them together and creating a new -- a new

2       piece of art, a new whatever you want to call it,

3       putting a new voice stream over a clip for humor

4       sake.  That's -- taking more than one piece of

5       original work and reworking it to come up with

6       something else.

7   1:11        And that's when I -- someone told me about

8       Andy Warhol.  I mean I knew of the images.  I just

9       didn't realize that was of consequence.  He took

10      something everybody knew, an icon, and did something

11      to it and made it different.  So Andy Warhol's

12      pictures, in my mind, were a mash-up.

13  1:11        What defines a clip?  I don't know that I

14      ever got that answered.  You know, let's go to the

15      clip.  You know, in sports, I don't know.  So I

16      don't know.  It was -- it was struggling to

17      understand the process.

18  1:11        Q.  So the next question on the list is one

19      about which I'd like to ask you.  You asked

20      Mr. Ishikawa, "Is setting any time limit arbitrary?"

21      Sitting here today, do you believe that setting time

22      limits for the clips that should be taken down

23      versus the clips that should be left up was an

24      arbitrary process?

25  1:12        MS. COLEMAN-BISHOP:  Object to form.

| 1 | 1:12 | THE WITNESS: I don't have an opinion. |

1   1:12        THE WITNESS:  I don't have an opinion.

2   1:12        MR. KRAMER:  Q.  Okay.  How about back

3   when you were a manager at BayTSP?

4   1:12        A.  Same answer.  I didn't have an opinion.

5   Did what I was told.

6   1:12        MR. COX:  Same objection.

7   1:12        MR. KRAMER:  Fair enough.

8   1:12        MS. COLEMAN-BISHOP:  Can I ask a quick

9   question here?

10  1:12        MR. KRAMER:  Sure.

11  1:12        MS. COLEMAN-BISHOP:  Courtney, what

12  exactly is a mash-up?  What is your understanding of

13  one?

14  1:12        THE WITNESS:  Two or more pieces of

15  original work being put together to create a third.

16  1:12        MS. COLEMAN-BISHOP:  Okay.

17  1:13        (Whereupon Exhibit No. 18 was marked for

18  identification.)

19  1:13        MR. KRAMER:  Q.  Okey doke.  Exhibit 18

20  is an e-mail exchange between BayTSP and MTVN

21  representatives on which you were copied with the

22  subject line, Video Takedown 11/14/2006.  And

23  contained within the e-mail exchange itself, there

24  is a report entitled MTV Network's Video Takedown

25  Update.  That's at the bottom of the first page.

1     The title is on the bottom of the first page.  Then

2     the report starts on page 2.

3   1:14        A.   Yes.

4   1:14        Q.   Let me ask you if you've seen reports like

5     this at BayTSP?

6   1:14        A.   Yes.

7   1:14        Q.   This is a report on the application of the

8     Viacom takedown effort through BayTSP on that day,

9     November 14th, 2006, right?

10  1:14        A.   Yes.

11  1:14        Q.   And in the chart at the top of page 2

12    there are the four services that we looked at

13    earlier: YouTube, MySpace, Yahoo! Video, and Google

14    Video, right?

15  1:14        A.   Yes.

16  1:14        Q.   So am I reading the chart correctly in

17    saying that it shows on that day BayTSP sent

18    takedown notices for 22 episodes and 36 clips on

19    YouTube?

20  1:14        A.   Yes.

21  1:14        Q.   Okay.  In the next column it says, "Passed

22    on."  Do you know what that means?

23  1:15        A.   Means we determined what we saw didn't

24    fall within the rules that we had been given, too

25    long, too short, it wasn't the clip.

| | | |
|---|---|---|
| 1 | 1:15 | Q. So on that day, Bay found and sent |

1  1:15        Q.  So on that day, Bay found and sent

2  takedown notices to YouTube for 58 videos containing

3  what it thought was Viacom content?

4  1:15        A.  Yes.

5  1:15        Q.  And on that day, it also found and left

6  out or passed on 555 videos on the YouTube service,

7  right?

8  1:15        A.  Of the ones they reviewed, yes.

9  1:15        Q.  So 555 clips that were passed on because

10  they fell outside of Viacom's takedown rules, right?

11  1:15        MR. COX:  Objection.  Asked and answered.

12  1:15        THE WITNESS:  Trying to make sure I

13  understand.  I believe that is correct.

14  1:16        MR. KRAMER:  Q.  And the reason that

15  BayTSP left up on YouTube those 555 clips it found

16  was because Viacom directed BayTSP to leave them up,

17  right --

18  1:16        MR. COX:  Objection.  Calls for

19  speculation.

20  1:16        MR. KRAMER:  Q.  -- as part of its

21  instructions?

22  1:16        A.  No, that would not be correct.

23  1:16        Q.  Why is that not correct?

24  1:16        A.  We were not given instructions, per se, of

25  what to leave up.

| | | |
|---|---|---|
| 1 | 1:16 | Q.   Fair enough.  The converse of an |
| 2 | | instruction to take something down, however, is it |
| 3 | | implicitly to leave it up, right? |
| 4 | 1:16 | A.   Yes. |
| 5 | 1:16 | Q.   Okay.  In the next table down in the |
| 6 | | document, there's a chart labeled P2P? |
| 7 | 1:17 | A.   Yes. |
| 8 | 1:17 | Q.   Can you explain what that shows? |
| 9 | 1:17 | A.   Those were files that we found on those |
| 10 | | three P2P networks: Gnutella, eDonkey and |
| 11 | | BitTorrent. |
| 12 | 1:17 | Q.   That you believed contained Viacom |
| 13 | | content? |
| 14 | 1:17 | A.   Yes. |
| 15 | 1:17 | Q.   And so on that day, BayTSP representatives |
| 16 | | identified 7,626 pieces of Viacom content on the |
| 17 | | BitTorrent service, correct? |
| 18 | 1:17 | A.   That's what this report would suggest. |
| 19 | 1:17 | Q.   So Bay had found a far greater volume of |
| 20 | | what it thought was Viacom content on P2P networks |
| 21 | | that day than it had found on YouTube, right? |
| 22 | 1:17 | MR. COX:  Object to the form. |
| 23 | 1:18 | THE WITNESS:  It would be an inaccurate |
| 24 | | comparison. |
| 25 | 1:18 | MR. KRAMER:  Q.   Hmm.  Well, I suppose I |

1    should ask you why that's an inaccurate comparison.

2  1:18          A.   Why can't you make a Yugo go as fast as a

3    drag race rail car?

4  1:18          Q.   I take it you're a fan of car racing.  I'm

5    getting that sense.

6  1:18          A.   It is not designed to do so.  Why can't

7    you find bags of oranges that have counts of upwards

8    to 1,000 like you would if you bought a bag of

9    peanuts?  It's apples and oranges.  You can't make

10   that comparison.

11 1:18          The kind of things you can find on a P2P

12   network have a broader base, a global base, than you

13   would find on a particular video service regardless

14   of service.  So --

15 1:19          Q.   Can you elaborate on that?

16 1:19          A.   There's no relationship between the number

17   we found or passed on a service -- on a single point

18   of source, MySpace server, than we would find on the

19   untold -- and I say that because I don't know -- the

20   untold number of BitTorrent servers that are out

21   there on the planet Earth.  There's more

22   possibilities to find things on BitTorrent than you

23   would find on YouTube or MySpace or whatever just

24   because of the sheer number of source points.

25 1:19          Q.   Okay.  Let's -- let me come it at slightly

|   |   |   |
|---|---|---|
| 1 | | differently.  In the chart beneath the P2P chart |
| 2 | | there's a list by asset of Viacom content -- |
| 3 | 1:20 | A.  Mm-hmm. |
| 4 | 1:20 | Q.  -- that rolls up into the 22 episodes, 36 |
| 5 | | clips and 556 clips passed on for the day, right? |
| 6 | 1:20 | A.  Yes. |
| 7 | 1:20 | Q.  And so on that given day Viacom |
| 8 | | encountered 316 different pieces of content on the |
| 9 | | YouTube service that appeared to contain content |
| 10 | | from South Park, it took down one clip? |
| 11 | 1:20 | A.  Yes. |
| 12 | 1:20 | Q.  It took down one clip, and it passed on |
| 13 | | 315, correct? |
| 14 | 1:20 | A.  Yes. |
| 15 | 1:20 | Q.  So I'm reading that correctly.  The counts |
| 16 | | for the P2P services that appear in the chart above |
| 17 | | the asset-by-asset breakdown -- |
| 18 | 1:20 | A.  Mm-hmm. |
| 19 | 1:20 | Q.  -- those counts were for the same list of |
| 20 | | assets that appear in the breakdown beneath it, |
| 21 | | right? |
| 22 | 1:20 | MR. COX:  Object to form, lacks |
| 23 | | foundation. |
| 24 | 1:21 | THE WITNESS:  I don't know in that -- the |
| 25 | | start of this, I don't know if the P2P chart refers |

1         to the assets below or the asset above, the European

2         Music Awards 2006 or to the asset list below.  I

3         don't remember.

4  1:21             MR. KRAMER:  Q.  Take a look, if you

5         would, at the page that starts -- the page that ends

6         with the Bates No. BayTSP 522.  See that's the topic

7         heading P2P Not Sent?

8  1:21             A.  Excuse me.  Yes.

9  1:21             Q.  And there's a breakdown by asset which

10         matches the same assets in the --

11  1:21             A.  Okay.

12  1:21             Q.  -- prior YouTube chart, right?

13  1:21             A.  Yes.  Okay.

14  1:21             Q.  So the totals in the P2P chart for each of

15         the three P2P services, Gnutella, eDonkey and

16         BitTorrent, those correspond to the specific list of

17         assets that BayTSP was charged with identifying for

18         YouTube as well, correct?

19  1:22             A.  Yes.

20  1:22             MR. COX:  Object to the form.

21  1:22             MR. KRAMER:  Q.  So am I reading the

22         chart correctly that on this day, November 14, 2006,

23         with respect to P2P services, BayTSP identified some

24         6500 pieces of content on P2P networks that it

25         believed contained content from Viacom's show South

| | | | |
|---|---|---|---|
| 1 | 1:34 | A. | No. |

2  1:34   Q.   Why not?

3  1:34   A.   There were no rules at the time for a time
4  limitation -- when I first became aware of YouTube,
5  MySpace, video sharing, videos were five minutes,
6  videos were an hour, videos were two hours.  There
7  was no rule that said, okay, you can't put up just
8  part of it.  And there was nothing there -- from the
9  videos that I watched, I don't recall ever seeing an
10  entire movie, hundred and two minutes in its
11  entirety.  But I can think of a number of times,
12  including now, where you can see whole content on
13  YouTube.

14  1:35             I like watching the Glenn Beck show.  It
15  is approximately a 38-minute, sucking out
16  commercials, and some people put it up in two parts.
17  Some people put it up in six parts.  Some people put
18  it up in -- so the point is, nothing about the clip
19  identifies its source.

20  1:35   Q.   Okay.  But couldn't you tell if it was a
21  full episode of South Park, that it wasn't
22  authorized to be there?

23  1:35   A.   No.

24  1:35   Q.   The whole thing was there.  Doesn't that
25  give it away?

| 1 | 1:35 | MR. COX:  Object to the form. |

1  1:35  MR. COX:  Object to the form.

2  1:36  THE WITNESS:  No.

3  1:36  MR. KRAMER:  Q.  Do you think it's likely

4  that someone with authority to do it at Viacom was

5  uploading full episodes of South Park to YouTube?

6  1:36  MS. COLEMAN-BISHOP:  Objection.  Asked and

7  answered, argumentative.  She's already said no.

8  She's not able to identify whether or not any one of

9  these full episodes had any authority to be posted

10  or did not.

11  1:36  MR. KRAMER:  Okay.

12  1:36  MS. COLEMAN-BISHOP:  There's no way to

13  tell from a full episode whether or not the person

14  that uploaded it had authority.  No matter how many

15  times you ask the question, you're going to get the

16  same answer.  The answer's no.

17  1:36  THE WITNESS:  I'm with her.

18  1:36  MR. KRAMER:  Q.  You agree with the

19  sentiment your attorney just expressed?

20  1:36  A.  Yeah.  There is no connection between what

21  you see in YouTube, the person who posted it, and

22  the person who produced it.  There is no

23  identifiable link.

24  1:36  Q.  Meaning there's no way to tell --

25  1:36  A.  Correct.

| | | |
|---|---|---|
| 1 | 1:36 | Q.   -- whether it's authorized? |
| 2 | 1:36 | A.   Correct. |
| 3 | 1:37 | (Whereupon Exhibit No. 21 was marked for |
| 4 | | identification.) |
| 5 | 1:37 | MS. COLEMAN-BISHOP:  Can we go off the |
| 6 | | record just one second? |
| 7 | 1:37 | MR. KRAMER:  Sure.  Off the record. |
| 8 | 1:37 | THE VIDEOGRAPHER:  The time is 1:38.  Off |
| 9 | | the record. |
| 10 | 1:37 | (Whereupon a recess was taken.) |
| 11 | 1:37 | THE VIDEOGRAPHER:  Time is 1:38.  On the |
| 12 | | record. |
| 13 | 1:37 | MR. KRAMER:  Q.   Okay. |
| 14 | 1:37 | A.   Okay. |
| 15 | 1:37 | Q.   Ms. Nieman, Exhibit 21 is a similar e-mail |
| 16 | | exchange you had with someone named Misty at YouTube |
| 17 | | the same day as Exhibit 20, right? |
| 18 | 1:38 | A.   Yes. |
| 19 | 1:38 | Q.   Your message starts with the same list of |
| 20 | | clips on YouTube and the same requests, "Please take |
| 21 | | this down immediately."  Misty responds that she |
| 22 | | removed the videos but she, too, thought that the |
| 23 | | account might have been set up by Comedy Central. |
| 24 | | Do you see that? |
| 25 | 1:38 | MR. COX:  Object to the characterization |

1    of the document.

2  1:38          THE WITNESS:  I don't know what Misty was

3       thinking.  As I read this, she had some belief that

4       they may have come from a valid source.

5  1:38          MR. KRAMER:  Q.  And you wrote, "Referring

6       to this account, South Park Studios, they are

7       associated with Comedy Central, but MTVN has the

8       exclusive rights"?

9  1:38          A.   Yes.

10  1:38          Q.   So you thought at that point that the user

11      South Park Studios was associated with Comedy

12      Central, right?

13  1:38          A.   I believe our client informed us of that.

14  1:39          Q.   Do you recall who specifically?

15  1:39          A.   No, I do not.

16  1:39          Q.   Can you turn back to Exhibit 8, which is

17      the work digest for Project 1 for MTV?

18  1:39          A.   Got it.

19  1:39          Q.   And if you could look at the second page

20      of Exhibit 8 --

21  1:39          A.   Yes.

22  1:39          Q.   Under where it says, "Description of

23      Activity," it says, "YouTube is no longer an active

24      protocol in Project 1 because of the implementation

25      of Project 2."  Do you know what that means?

1   1:49         Q.   Then it has a description of activity

2           under the project details section in this digest?

3   1:50         A.   Mm-hmm.

4   1:50         Q.   Does that accurately reflect your

5           understanding of the project that BayTSP was tasked

6           with by Viacom?

7   1:50         A.   Give me a moment.

8   1:50         MR. COX:  Objection.  Vague, ambiguous,

9           lacks foundation.

10  1:50         THE WITNESS:  Yes, that is an accurate

11          description of what we were engaged to do.

12  1:50         MR. KRAMER:  Q.   Okay.  Do you recall

13          Viacom giving BayTSP a specific instruction to

14          accumulate a large list of clips on the YouTube

15          service that BayTSP believed contained Viacom

16          content rather than send takedowns as BTS -- as

17          BayTSP became aware of those clips?

18  1:51         MR. COX:  Object to the form.

19  1:51         THE WITNESS:  Yes.

20  1:51         MR. KRAMER:  Q.   And who gave that

21          instruction?

22  1:51         A.   I don't recall.  My recollection, it would

23          have been Evelyn.  Evelyn would have been the one

24          who informed me.

25  1:51         Q.   Viacom instructed BayTSP to accumulate

1       clips it identified so that Viacom could send one

2       massive takedown request to YouTube instead of

3       sending takedowns as BayTSP became aware of clips,

4       right?

5   1:51            MR. COX:  Objection.  Calls for

6       speculation.

7   1:51            THE WITNESS:  I don't know the motivation

8       for it.  I don't -- I don't know.

9   1:51            MR. KRAMER:  Q.   Okay.  So when BayTSP

10      would identify clips of content on the YouTube

11      service in the course of this project that BayTSP

12      believed contained Viacom content, BayTSP's

13      instructions were not to send a takedown notice

14      until 100,000 clips were accumulated, right?

15  1:52            MR. COX:  Object to the form.

16  1:52            THE WITNESS:  I believe the instruction

17      was to hold the clips.  I don't remember a specific

18      number being conveyed to us initially.  At some

19      point somebody may have said 50, 80, 100, 200.  I

20      don't know.  I know the instructions were to hold

21      those notices.

22  1:52            MR. KRAMER:  Q.  Well, the description of

23      the activity that is in the work digest for this

24      project says once 100,000 infringements have been

25      met, that was the --

| | | | |
|---|---|---|---|
| 1 | 1:52 | A. | Yes. |
| 2 | 1:52 | Q. | That was the figure? |

3    1:52      A.    That's in February. This project began in

4                  December. When this began, I don't remember anybody

5                  giving us a target.

6    1:52      Q.    Well, Exhibit 8, which is -- sorry. Not

7                  Exhibit 8. Exhibit 22 also refers to 100,000 clip

8                  figure, right?

9    1:53      A.    It does, but I don't remember it.

10    1:53      Q.    Hmm. You don't remember -- you do

11                 remember that it was part of the project. You just

12                 don't remember when the instruction to collect up

13                 100,000 was given?

14    1:53      A.    Yes.

15    1:53      Q.    Okay. Don't you recall being informed

16                 that Viacom was queuing up takedown notices as part

17                 of a strategy for dealing with YouTube?

18    1:53      MR. COX: Object to the form.

19    1:53      THE WITNESS: No.

20    1:54      (Whereupon Exhibit No. 24 was marked for

21                 identification.)

22    1:54      MR. KRAMER: Q. Exhibit 24 is an e-mail

23                 exchange between Mr. Ishikawa, Bay's CEO, and Donna

24                 Cooper of Black Entertainment Television, dated

25                 January 24th, 2007, on which you are copied. Has

1               the subject BET Asset List.

2  1:54         A.   Yes.

3  1:54         Q.   In the last in time e-mail to Ms. Cooper,

4               which you received, Mr. Ishikawa writes that BayTSP

5               was, quote, queuing up the takedown notices as

6               instructed by Adam at MTVN.  Do you see that?

7  1:54         A.   Yes.

8  1:54         Q.   You received this e-mail, did you not?

9  1:55         A.   Well, yes, it came into my inbox.

10  1:55         Q.   You were informed in this e-mail, were you

11               not, that BayTSP had been instructed by Adam at MTVN

12               to queue up takedown notices, right?

13  1:55         MR. COX:  Objection.  Document speaks for

14               itself.

15  1:55         THE WITNESS:  I may have read this.  It

16               didn't register.  When I would receive e-mails

17               regarding things, I looked at:  Does this matter to

18               me; are they giving me a different set of

19               instructions; what to take down; are we getting a

20               new asset; are we taking down an asset?  Okay.

21               Nothing in this rings any bells to me other than

22               that there's a woman named Donna Cooper who has some

23               influence or direction over BET.  But it doesn't

24               tell me to start or stop anything, so I wouldn't

25               have paid attention to it.

```
 1              client services.
 2   1:58               MR. KRAMER:  Q.   Okay.
 3   1:58               A.   BayTSP, whoever would be, would be the
 4              head of that project.  My role in that project,
 5              would be to oversee Deana who was the Paramount and
 6              Sarah who was Viacom.  But beyond that, we didn't --
 7              client services never dictated what was done, how it
 8              was done, why it was done, when it was done.
 9   1:59               Q.   What did it do?
10   1:59               A.   We were told, review the infringements,
11              send notices, build reports to inform our clients of
12              what was sent.  That's it.  That's what client
13              services did.
14   1:59               Q.   The Sarah you're referring to is whom?
15   1:59               A.   Cruz.
16   1:59               Q.   And her job was what?
17   1:59               A.   She was a client services manager.
18   1:59               Q.   For what client?
19   1:59               A.   I believe it was Viacom.
20   1:59               Q.   And Deana Arizala was Paramount?
21   1:59               A.   Yes.
22   1:59               Q.   And they both reported to you?
23   1:59               A.   Yes.
24   1:59               Q.   So at this time, Viacom was learning of
25              the presence of clips on the YouTube service that
```

1       BayTSP believed contained its content, and BayTSP

2       was instructed not to send out notices for those

3       clips, right?

4   2:00          MR. COX:  Object to form, asked and

5       answered.

6   2:00          THE WITNESS:  I don't know what -- I don't

7       know what Viacom was doing.  I don't know what

8       anybody at Viacom was doing.  I just know, my level

9       on down, don't send notices, just hold them.

10  2:00          MR. KRAMER:  Q.  Okay.  So BayTSP was

11      instructed to do that by Viacom, hold the notices

12      and not send them to YouTube?

13  2:00          MR. COX:  Object to the form.

14  2:00          THE WITNESS:  Based solely on the chain of

15      command, client tells service, do this; service does

16      that.  So in this case Viacom is client, BayTSP is

17      service.  Client tells services, don't send notices,

18      we don't send notices.

19  2:01          MR. KRAMER:  Q.  In the client contact

20      information section of the work digest --

21  2:01          A.  Okay.

22  2:01          Q.  That's Exhibit 23.

23  2:01          A.  Got it.

24  2:01          Q.  On the page that ends with the numbers

25      128.

```
1   2:01              A.   Okay.  Give me a second.  I'm almost

2                there.  Yes.

3   2:01              Q.   There are two attorneys from Viacom's law

4                firm, Jenner & Block, listed, Mr. Hohengarten and

5                Ms. Tenney?

6   2:02              A.   Mm-hmm.

7   2:02              Q.   How were they involved in this mass

8                takedown project?

9   2:02              MS. COLEMAN-BISHOP:  Objection.

10               Attorney-client privilege.

11  2:02              Anything that you may have any knowledge

12               as to any communications with these two attorneys,

13               instruct you not to answer the question so far as

14               they would have been involved in any legal advice

15               given to your former employer.

16  2:02              THE WITNESS:  I don't know who they are.

17  2:02              MR. KRAMER:  That takes care of that

18               instruction.

19  2:02              MR. KRAMER:  Q.   There was a group of

20               people in Washington, D.C. working on this project,

21               right?

22  2:02              A.   Haven't a clue.

23  2:02              Q.   Okay.  Do you recognize the name Warren

24               Solow, other than the fact that it appears in this

25               document?  Do you remember hearing the name?
```

| | | | |
|---|---|---|---|
| 1 | 3:06 | Q. | Okay. |
| 2 | 3:06 | A. | More than one month. |
| 3 | 3:06 | Q. | BayTSP finally executed on this strategy |

4    of sending one mass takedown notice, right?

| 5 | 3:06 | A. | Yes. |
| 6 | 3:06 | Q. | Do you remember the date? |
| 7 | 3:06 | A. | No. |
| 8 | 3:06 | Q. | I'll represent to you that it was |

9    February 2nd, 2007.  We'll come back to that.  So

10    what happened on that date with respect to the

11    transmission of the notice?

12    3:06          A.    They went out, I believe, in blocks.  In

13    other words, we didn't -- we didn't have one e-mail

14    with 100,000 or whatever it was.  I believe they

15    went out in blocks.  I don't remember what the block

16    size was.  And I believe they were all transmitted

17    within hours -- two, three -- I don't know for sure.

| 18 | 3:06 | Q. | Do you remember -- |
| 19 | 3:06 | A. | And then -- |
| 20 | 3:06 | Q. | Go ahead. |
| 21 | 3:06 | A. | And then nothing else happened.  Nobody |

22    breathed a sigh of relief or tipped a glass or

23    anything.  We just -- we sent notices, which is what

24    we were doing all along.

25    3:07          Q.    This was just ordinary practice?

| | | |
|---|---|---|
| 1 | 3:07 | A.   Yes. |
| 2 | 3:07 | Q.   Really? |
| 3 | 3:07 | A.   Yes, thousands of notices goes out of the |
| 4 | | BayTSP every day, even as we speak. |
| 5 | 3:07 | Q.   The transmission of this mass takedown |
| 6 | | notice to YouTube was just standard ordinary |
| 7 | | operating procedure for BayTSP? |
| 8 | 3:07 | MR. COX:  Objection.  Asked and answered. |
| 9 | 3:07 | THE WITNESS:  No.  The transmission of |
| 10 | | notices is standard operating procedure. |
| 11 | 3:07 | MR. KRAMER:  Q.  But this was a big deal, |
| 12 | | right? |
| 13 | 3:07 | A.   For Viacom, I don't know. |
| 14 | 3:07 | Q.   Was it a big deal for Bay? |
| 15 | 3:07 | A.   No.  It was different, but it wasn't a big |
| 16 | | deal. |
| 17 | 3:07 | Q.   How is it different? |
| 18 | 3:07 | A.   Because normally we find and send.  This |
| 19 | | was a find, hold, send.  That's all. |
| 20 | 3:07 | Q.   Who from Viacom gave the launch command to |
| 21 | | BayTSP? |
| 22 | 3:07 | A.   I don't remember. |
| 23 | 3:08 | (Whereupon Exhibit No. 29 was marked for |
| 24 | | identification.) |
| 25 | 3:08 | MR. KRAMER:  Q.   Exhibit 29 is a |

1           transcript of an AOL Instant Message chat between

2           you and others on BayTSP on February 2nd, 2007,

3           right?

4   3:08        A.    Mm-hmm.

5   3:08        Q.    It's just a recording of a conversation

6           that people were having online at the time, right?

7   3:08        A.    Yes.

8   3:08        Q.    Your AOL Instant Message chat name is

9           BayTSP C-A-N-N-E, correct?

10   3:08        A.    Correct.

11   3:08        Q.    Who is BayTSP Spider?

12   3:08        A.    I don't know.

13   3:08        Q.    Bay Deana, is that Deana Arizala?

14   3:09        A.    Yes.

15   3:09        Q.    BayTSP Spider, Mark Ishikawa?

16   3:09        A.    I can't remember.  It could be.  I don't

17           know.

18   3:09        Q.    Did you regularly communicate using

19           Instant Message at BayTSP?

20   3:09        A.    No.

21   3:09        Q.    Did you regularly have joint conversations

22           with all of these people on Instant Messaging?

23   3:09        A.    No.  Instant Messaging was the -- was an

24           exception.

25   3:09        Q.    Why was it that you were having a chat

# Schapiro Exhibit 12

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC.              )
TELEVISION, INC., PARAMOUNT           )
PICTURES CORPORATION, and BLACK       )
ENTERTAINMENT TELEVISION, LLC,        )
                                      )
             Plaintiffs,              )
                                      )
      vs.                             )  NO. 07-CV-2103
                                      )
YOUTUBE, INC., YOUTUBE, LLC,          )
and GOOGLE, INC.,                     )
                                      )
             Defendants.              )
_____)
                                      )
THE FOOTBALL ASSOCIATION PREMIER      )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all       )
others similarly situated,            )
                                      )
             Plaintiffs,              )
      vs.                             )  NO. 07-CV-3582
                                      )
YOUTUBE, INC., YOUTUBE, LLC, and      )
GOOGLE, INC.,                         )
                                      )
             Defendants.              )
_____)


VIDEOTAPED DEPOSITION OF WARREN SOLOW
            NEW YORK, NEW YORK
           DECEMBER 18TH, 2009

JOB NO. 18304

1

2          VIDEOTAPED DEPOSITION OF WARREN

3     SOLOW, held at the offices of Wilson,

4     Sonsini, Goodrich & Rosati, PC, 1301

5     Avenue of the Americas New York, New

6     York, pursuant to notice, before

7     Maureen Ratto, Registered Professional

8     Reporter and Notary Public of the State

9     of New York on December 18, 2009, at

10     10:10 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     A P P E A R A N C E S

2

3     FOR THE PLAINTIFFS:

4     JENNER & BLOCK, LLP

5     BY: SUSAN J. KOHLMANN, ESQ.

6     919 Third Avenue, New York, NY 10022

7     (212)891-1690

8     skohlmann@jenner.com

9

10    FOR THE DEFENDANTS:

11    WILSON, SONSINI, GOODRICH & ROSATI

12    BY:  MICHAEL H. RUBIN, ESQ.

13    650 Page Mill Road, Palo Alto, CA 94304

14    650-849-3311

15    MRUBIN@wsgr.com

16

17

18

19

20

21

22

23

24

25

1  statement.  I am simply telling you

2  that you first need to establish that

3  something that occurred in October of

4  2006 relates to the February, 2007 mass

5  11:54:05  takedown request that is the subject of

6  the 30(b)(6).  Once you do that, I will

7  not obstruct you from asking him

8  questions about it.  But you are not

9  to -- allowed to ask him a series of

10  11:54:17  questions then ask that, perhaps

11  determine that it has nothing to do

12  with the mass takedown request and then

13  you will have been allowed to ask on

14  the record a series of questions that

15  11:54:28  have nothing to do with the scope of

16  this examination.  So you have my

17  position.

18  If there is a question pending,

19  you can raise it and -- and we will go

20  11:54:37  from there.  And I am more than happy

21  to have that be the way in which we are

22  going to conduct a 30(b)(6) because in

23  my belief that is the proper way to

24  conduct a 30(b)(6).

25  11:54:49  MR. RUBIN:  That's fine.  It

1    will be case-wide from now on.

2         Q.    Mr. Solow, I'm sorry.  I hope

3    you weren't distracted by that colloquy

4    as well.

5  11:54:58    A.    No.  I have nothing else to do.

6         Q.    What was the rule in place for

7    which clips would be included in the

8    February 2nd, 2007 mass takedown?

9         A.    I do not -- I -- I don't believe

10 11:55:24   that I could list out all the rules as

11    they existed for that mass takedown off

12    the top of my head.

13         Q.    You were designated to testify

14    on that topic today, weren't you?

15 11:55:41    A.    Yes.

16         Q.    And you prepared to testify on

17    that topic today, didn't you?

18         A.    Yes.

19         Q.    And you're unable to do so?

20 11:55:47    MS. KOHLMANN:  Objection.

21    Misstates the record.

22         A.    I -- if I were testifying as to

23    the, you know, the substance of crime

24    and punishment, I would hope that I

25 11:56:04   would not be asked to recite crime and

1    punishment verbatim from memory.

2         Q.    Is it your testimony that the

3    rule set for which clips will be

4    removed from YouTube in connection with

5    11:56:16   the February 2nd, 2007 mass takedown is

6    as complicated as crime and punishment?

7         MS. KOHLMANN:   Objection.

8         A.    It could be for some people.

9         Q.    Would it that be complicated for

10   11:56:25   YouTube?

11        MS. KOHLMANN:   Objection.

12        A.    No.  Because they would be able

13   to refer to a list of rules as opposed

14   to being asked to do it off the top of

15   11:56:36   their head.

16        Q.    Has YouTube been provided the

17   list of rules?

18        MS. KOHLMANN:   Objection, lacks

19   foundation.

20   11:56:41   A.    I don't know.

21        Q.    As you sit here testifying on

22   behalf of Viacom as a corporate

23   representative, you don't know whether

24   YouTube had been provided the list of

25   11:56:49   rules that governed which clips were

1  included and excluded from the February

2  2nd, 2007 mass takedown?

3        MS. KOHLMANN:  Objection as to

4  form.  You can answer.

5  11:57:01  A.    I do not.

6      Q.    Were the rules set forth in

7  Exhibit 2 the rules that governed the

8  February 2nd, 2007 mass takedown?

9      A.    No.

10  11:57:19  Q.    In what way did the rules in

11  Exhibit 2 differ from the rules that

12  established which clips would be

13  included in the February 2nd, 2007 mass

14  takedown?

15  11:57:33  A.    I don't know specifically how

16  they differed.  I do know that the fall

17  and winter of '06, going into '07, was

18  a time where with every day we were

19  acquiring additional knowledge as to

20  11:57:57  the characteristics of the massive

21  infringement going on at YouTube and we

22  learned at the time --

23      Q.    I'm not asking for a speech

24  about Viacom's litigation position, I'm

25  11:58:08  actually asking for a very specific