# SCHAPIRO DECLARATION EXHIBITS CONTINUED

# Schapiro Exhibit 13

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL INC., COMEDY )
PARTNERS, COUNTRY MUSIC )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION LLC, )
)
              Plaintiffs, )
)
          vs. ) Case No. 1:07CV02103
)
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
)
            Defendants. )
_____)
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
)
            Plaintiffs, )
)
          vs. ) Case No. 07CV3582
)
YOUTUBE, INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
)
            Defendants. )
_____)

DEPOSITION OF MICHELE GANELESS
NEW YORK, NEW YORK
MONDAY, NOVEMBER 3, 2008

Novemeber 3, 2008

9:49 a.m.

VIDEOTAPED DEPOSITION OF MICHELE
GANELESS, held at the offices of Wilson
Sonsini Goodrich & Rosati, LLP, 1301
Avenue of the Americas, New York,
New York, pursuant to notice, before Erica
L. Ruggieri, Registered Professional
Reporter and Notary Public of the State of
New York.

A P P E A R A N C E S

FOR THE LEAD PLAINTIFFS AND PROSPECTIVE
CLASS:

  JENNER & BLOCK, LLP
   BY: SUSAN J. KOHLMANN, ESQ.
  919 Third Avenue
  New York, New York 10022
  (212) 891-1690
  Skohlmann@jenner.com


FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE,
LLC and GOOGLE, INC.:

  FOR THE DEFENDANTS YOUTUBE, INC.,
  YOUTUBE, LLC and GOOGLE, INC.:
  WILSON SONSINI GOODRICH & ROSATI, LLP
  BY: DAVID H. KRAMER, ESQ.
    BART E. VOLKMER, ESQ.
  650 Page Mill Road
  Palo Alto, California 94304
  (650) 565-3508
  Dkramer@wsgr.com
Bvolkner@wsgr.com




ALSO PRESENT:
  SALLIAN BROWN, Videographer
  MICHELENA HALLIE, MTV Networks

M. GANELESS

    A.    Again, I don't really understand the specifics of the joint venture.

    Q.    What about before the joint venture was created, is it the case that a Viacom-owned entity owned the rights to distribute South Park content online, prior to the creation of the joint venture, to your knowledge?

    MS. KOHLMANN:  I object to the question, to the extent, if I'm understanding it correctly, you are suggesting that she testified one way or the other what happened after the joint venture was formed.

    But you can answer.

    A.    To the best of my understanding, a Viacom or Comedy Central entity owned the rights to South Park, the TV show, and how it was distributed on all platforms.

    Q.    And that's prior to the creation of the joint venture, right?

    A.    That is my understanding.  But you'd have to check with the lawyers.

    Q.    Which lawyer would know?

M. GANELESS

A.     Joella West.

Q.     To the best of your knowledge, Ms. Ganeless, have Viacom senior

03:13:41 executives made any public statement with respect to a correlation between the traffic to Viacom's online sites and the removal of content from YouTube in the February 2007 take-down notice we talked

03:13:56 about?

MS. KOHLMANN:  I'm sorry, can you just read that back one more time?

(Record read.)

A.     Yes.  I believe they have.  I

03:14:23 can't remember specifically when or where, but I remember comments being made.

Q.     Aren't you aware that Messrs. Dooley and Dauman made statements concerning the correlation between the

03:14:34 traffic to Viacom's online sites and the removal of content from YouTube in the February 2007 take-down notice, in connection with a March 1st, 2007 earnings call for Viacom?

03:14:48 MS. KOHLMANN:  Objection.

M. GANELESS

You can answer.

A.     I remember them making comments
in the press.  I can't remember where, but
03:14:55    it's very likely it was the earnings call.

Q.     As you sit here today, do you
have any recollection of what those
statements were, correlating traffic to
the online sites owned by Viacom and the
03:15:11    removal of content from YouTube?

A.     I remember there were increases.
I can't remember what the numbers were.

Q.     You remember that they reported
that there were increases, right?

03:15:24    A.     I remember that the Philippe and
Tom reported traffic increases, yes.

Q.     You remember that they reported
substantial traffic increases to Viacom's
online sites, following the removal of
03:15:36    content from YouTube in February 2007,
right?

MS. KOHLMANN:  Objection as to
form.

You can answer.

03:15:42    A.     I don't remember the specific

M. GANELESS

numbers, but I do remember them reporting

increases in traffic.  But I'd have to

look at the reports to remember the

03:15:52   numbers.

Q.    I'm not asking you the specific

numbers yet.  I'm asking you whether you

recall that they reported substantial

increases in traffic to Viacom's online

03:16:01   sites, following the take-down of content

from YouTube in February 2007.

MS. KOHLMANN:  Objection as to

form.

You can answer.

03:16:10   A.    I can't remember how big the

gains were, but I do remember gains.

Q.    You remember that they reported

figures that you believed were inflated,

right?

03:16:20   MS. KOHLMANN:  Objection.

A.    It's possible.  I don't

remember.

Q.    You really have no recollection

of whether you believed that Mr. Dooley

03:16:30   overstated the increase in traffic to

1           M. GANELESS

2           Viacom's online sites, following the

3           February 2007 take-down?

4                   MS. KOHLMANN:  Objection as to

5  03:16:37     form.

6                   A.    I don't remember.

7                   MR. KRAMER:  Let's go with that

8               as 18.

9                   (Ganeless Exhibit 18, March 1,

10 03:18:57     2007 e-mail thread, bearing Bates

11              numbers VIA00183316 to 17, marked

12              for identification, as of this

13              date.)

14                  MR. KRAMER:  Before we get

15 03:17:12     there, hang onto that for one second.

16                  Q.    Do you recall communicating,

17              Ms. Ganeless, with anyone about the

18              accuracy of statements made by Mr. Dooley

19              and Mr. Dauman on the earnings call about

20 03:17:27   the increase in traffic to Viacom's online

21              sites, following the February 2007

22              take-down to YouTube?

23                  MS. KOHLMANN:  Objection as to

24              form.

25 03:17:35         You can answer.

M. GANELESS

1

2      A.    I am trying to remember that,

3      but I do not remember right now.

4      Q.    Okay.  Let's go with Exhibit 18.

5  03:17:55      MS. KOHLMANN:  Do you have other

6      copies of that?

7      MR. KRAMER:  Did I not give it

8      to you?

9      MS. KOHLMANN:  Thanks.

10  03:18:03      Q.    Ms. Ganeless, if Mr. Dooley or

11      Mr. Dauman made a misrepresentation of

12      fact on an earnings call, that would have

13      been a big deal, wouldn't it?

14      MS. KOHLMANN:  Objection.

15  03:18:25      A.    I'm sorry, I'm just reading.

16      Can you restate the question.

17      Q.    Yeah.  If Mr. Dooley or

18      Mr. Dauman made a misrepresentation of

19      fact on an earnings call, could that have

20  03:18:42      been a big deal to you?

21      MS. KOHLMANN:  Objection.

22      You can answer.

23      A.    Yes.

24      Q.    Especially if that

25  03:18:46      misrepresentation of fact concerned Comedy

M. GANELESS

Central, correct?

    A.    Yes.

    Q.    So in Exhibit 18, Mr. Cucci --

03:18:56  sorry, Exhibit 18 is an e-mail thread

produced to us by Viacom, dated March 1st,

2007.  It bears Bates number VIA00183316

to 17, and it starts with an e-mail

message from Mr. Cucci to you,

03:19:15  Ms. Ganeless, and Erik Flanagan at

9:32 a.m. on March 1, in which he states,

"On the earnings call Dooley mentioned

Comedy traffic is up 90 percent since

YouTube take-down."

03:19:26        Does that refresh your

recollection about a statement that a

Viacom senior executive made about the

correlation between the traffic to

Viacom's online Comedy site and the

03:19:36  removal of content from YouTube in

February 2007?

    A.    I remember this now.

    Q.    Okay.  You remember that

Mr. Dooley stated, on an earnings call,

03:19:46  that Comedy traffic was up 90 percent

1          M. GANELESS

2     since the YouTube take-down on March 1st,

3     2007?

4          MS. KOHLMANN:  Objection.

5  03:19:55     You can answer.

6          A.   What I actually remember is that

7     after all of this, we -- it was clarified

8     that the 90 percent was -- that John had

9     heard it wrong, I believe; although again

10 03:20:11  my memory is sketchy.  But that that

11    90 percent referred to year-over-year

12    gains, not -- that's why the number didn't

13    look familiar to me, I think.

14         Q.   You don't recall Mr. Dooley

15 03:20:24  actually saying that Comedy traffic was up

16    90 percent since the YouTube take-down on

17    March 1st, 2007?

18         A.   I didn't listen to the earnings

19    call, so I was -- I was investigating,

20 03:20:38  after John Cucci sent me this e-mail.  And

21    I remember, the piece I remember is that

22    after we did all of the investigating

23    that, the 90 percent referred to a

24    year-over-year gain.

25 03:20:53     Q.   So if Mr. Dooley had said that

M. GANELESS

it was up 90 percent since February

2000 -- sorry.  If Mr. Dooley had said on

the earnings call that traffic to Viacom's

03:21:05   Comedy sites was up 90 percent from

February 2007 to March 2007, that would

have been a misrepresentation, correct?

                MS. KOHLMANN:  Objection.

        A.      Based on the data here, yes,

03:21:28   that would have been a misrepresentation.

        Q.      And in fact, when you heard that

Mr. Dooley had said that Comedy traffic

was up 90 percent since the YouTube

take-down on March 1st, 2007, you

03:21:39   recognized right away that that number

didn't jibe with any of your internal

data, right?

                MS. KOHLMANN:  Objection as to

        form.

03:21:46            You can answer.

        A.      Yes, I believe I said here in

the e-mail that number doesn't jibe with

any of our internal data.

                MR. KRAMER:  Let's have this one

03:22:01   marked as 19, please.

1           M. GANELESS

2                (Ganeless Exhibit 19, final

3                transcript of Viacom's Q4 2006

4                earnings conference call on March 1,

5   03:22:30     2007, marked for identification, as

6                of this date.)

7                THE WITNESS:  Thank you.

8                Q.    Ms. Ganeless, I'm not going to

9        ask you to read the whole thing.

10  03:22:24          Exhibit 19 is the final

11       transcript of Viacom's Q4 2006 earnings

12       conference call on March 1, 2007 starting

13       at 8:30 eastern time.  And I'd ask you to

14       turn to page 15 at the bottom, where a

15  03:22:38  stock analyst named Imran Khan from JP

16       Morgan is asking Viacom the following

17       question:  "Secondly, you said your

18       traffic growth was significant, after you

19       asked YouTube to take out your content.  I

20  03:22:54  was wondering if you can quantify what

21       kind of video download you are seeing.

22       Thank you."

23                Did I read that correctly?

24                A.    I'm sorry, I wasn't following

25  03:23:07  along specifically.

M. GANELESS

Q.    At the bottom of page 15, Imran

Khan, an analyst with JP Morgan has some

questions during the earnings call.  And

03:23:15   he says, "Secondly, you said that your

traffic growth was significant after you

asked Google to take out your content.  I

was wondering if you can quantify what

kind of video download you are seeing.

03:23:29   Thank you."

Do you see that?

A.    Yes, I do.

Q.    Then, if you turn to page 16 of

the March 1st, 2007 transcript, do you see

03:23:38   where Tom Dooley, Viacom's chief financial

and administrative officer states, "In

terms of the kind of growth that we have

experienced on our online sites, Comedy is

up over 90 percent, Nickelodeon is up in

03:23:54   the 30s, and MTV.com was up in the mid-50

percentage growth, as a result -- in the

period after we did the take-down."

Do you see that?

A.    I do.

03:24:07   Q.    Do you recall discussing, via

M. GANELESS

e-mail or otherwise, Mr. Dooley's
statement that I just read?

    A.    I remember it from the e-mail
03:24:14  you just showed me.

    Q.    Do you recall whether you
believed Mr. Dooley's statement to be
accurate, the first time you heard it?

    A.    As I just said from the other
03:24:24  e-mail, I did not believe it to be
accurate, because it didn't jibe with any
of the numbers that had I seen.

    Q.    Now, you said that you believed
that Mr. Dooley had been referring to
03:24:34  year-over-year growth, when he said that
Comedy was up over 90 percent.  But if you
read the transcript, that's not what he
was saying, right?

    A.    What I believe I testified to
03:24:44  was that I remembered, at the end of our
investigating, that 90 percent was
referring to year-over-year growth.  I had
not seen a transcript of the earnings
report, so I didn't know if he had said it
03:24:58  correctly or not.

                          M. GANELESS

1

2          Q.    Well, Mr. Cucci told you that

3    Mr. Dooley said that traffic on Viacom's

4    Comedy sites was up 90 percent since the

5  03:25:09   YouTube take-down.  And he said that on

6    March 1st, 2007, right?

7          A.    Yes.

8          Q.    So Mr. Cucci accurately reported

9    Mr. Dooley's statements on the earnings

10  03:25:19   call?

11               MS. KOHLMANN:  I'm going to

12          object, if you are suggesting that --

13               MR. KRAMER:  Counsel, no

14          speaking objections.

15  03:25:23          MS. KOHLMANN:  I am going to --

16               MR. KRAMER:  No speaking

17          objections here counsel.  That is

18          improper.

19               MS. KOHLMANN:  Do you want the

20  03:25:28   record to be inappropriate?

21               I'm not coaching the witness.

22               MR. KRAMER:  Just object, just

23          object.  Do not make a speaking

24          objection at this point in the

25  03:25:36   deposition.

1          M. GANELESS

2               MS. KOHLMANN:  I'm entitled to

3          object and state that you are

4          mischaracterizing what the statement

5   03:25:40   on page 15 says.

6               MR. KRAMER:  That's coaching the

7          witness.

8               MS. KOHLMANN:  It is not

9          coaching the witness.

10  03:25:45        MR. KRAMER:  Do not make

11          speaking objections.

12               MS. KOHLMANN:  It is not

13          coaching the witness.

14          Q.   Mr. Dooley said that traffic was

15  03:26:05   up over 90 percent, after the YouTube

16          take-down on Viacom's Comedy sites, right?

17               MS. KOHLMANN:  Objection.

18          A.   In the earnings report that you

19          just showed me, Mr. Dooley said, "Comedy

20  03:26:22   is up over 90 percent, Nickelodeon is up

21          in the 30s, MTV.com was up in the mid-50

22          percentage growth as a result -- in the

23          period after we did the take-down."

24          Q.   Right.  So Mr. Dooley was

25  03:26:37   telling analysts on the earnings call that

M. GANELESS

Viacom's Comedy traffic increased

90 percent since the YouTube take-down,

right?

03:26:46          MS. KOHLMANN:  Objection.

A.      Based on what it says here, it

looks like he is saying Comedy traffic is

up 90 percent, since -- in the period

after we did the take-down.

03:27:11          Q.      And that's how Mr. Cucci reports

it to you in his e-mail, which we looked

at as Exhibit 18, right?

A.      That is correct.

Q.      Okay.  And you knew that that

03:27:21   was inaccurate at the time you heard it,

correct?

A.      I knew that I had not seen that

number before.

Q.      You knew that the notion that

03:27:30   traffic was up 90 percent since the

YouTube take-down did not jibe with any of

your internal data, right?

MS. KOHLMANN:  Objection.

A.      Yes, I knew -- I said in this

03:27:41   e-mail, the number doesn't jibe with any

M. GANELESS

of our internal data.

Q.    You knew Mr. Dooley's statement

was false --

03:27:46          MS. KOHLMANN:  Objection.

Q.    -- right?

MS. KOHLMANN:  Objection.

A.    I knew that that 90 percent did

not refer to the number after the YouTube

03:27:57    take -- the time period after the YouTube

take-down.  I found out that it referred

to an increase from a year ago.

Q.    So you knew that Mr. Dooley, at

the time he made the statements on the

03:28:10    earnings call, had made a

misrepresentation of fact about the growth

in traffic on Comedy Central since the

YouTube take-down, right?

MS. KOHLMANN:  Objection.

03:28:17          You can answer.

A.    I don't know if he was

misrepresenting it or if he didn't

understand it.  I have no way of knowing

what he -- why he said that.

03:28:30          Q.    So he could have been lying?

1          M. GANELESS

2              MS. KOHLMANN:  Objection.

3          A.    I have no reason to believe he

4     was lying.

5  03:28:35    Q.    Didn't you later tell

6     Mr. Flanagan you didn't see how

7     Mr. Dooley's statement could be accurate

8     on any metric?

9          A.    It is possible I said that.  I

10 03:28:47  still don't know what Tom Dooley was

11    basing his comments on.

12         Q.    It's possible that you said

13    that, or you did say that?

14         A.    I don't remember exact

15 03:28:55  conversations from that time, but that

16    sounds like something I likely said.

17         Q.    Because you know it's not

18    accurate, Mr. Dooley's statement, on any

19    metric?

20 03:29:05    A.    I remember there being a lengthy

21    investigation about what the 90 percent

22    was and that that 90 percent metric did

23    not jibe with our internal data.

24         Q.    Did you inform any -- well,

25 03:29:17  let's talk about that investigation.

```
 1                      M. GANELESS

 2              Who was involved in that

 3       investigation?

 4              A.    I believe it was our research

 5  03:29:24  group.  From this e-mail, it was certainly

 6       our research group.  That's who I remember

 7       looking into it.

 8              Q.    Did you inform any Viacom board

 9       members that Mr. Dooley's statement on the

10  03:29:36  earnings call was untrue?

11              MS. KOHLMANN:  Objection.

12       Misstates the record.

13              A.    I had no conversations with

14       Viacom board members.

15  03:29:49      Q.    So no, you didn't tell anyone

16       that you thought Mr. Dooley's statement

17       was false?

18              A.    Again, having not seen -- having

19       not listened to or seen the transcript, I

20  03:29:58  only had John Cucci's recollection of what

21       he said to base it on, so I didn't know if

22       what John said about what Dooley said was

23       accurate.  I merely looked into that 90

24       percent number, based on John's question.

25  03:30:09      Q.    And after you recognized that
```

1                          M. GANELESS

2          the number didn't jibe with any of your

3          internal, data did you take any action to

4          have Mr. Dooley's statement to analysts

5  03:30:28  corrected?

6                  MS. KOHLMANN:  Objection,

7              misstates the record.

8              A.    I didn't know exactly what

9          Mr. Dooley said to the analysts.  I only

10  03:30:34  had John Cucci's recollection.

11             Q.    Did you have any reason to doubt

12         Mr. Cucci's recollection?

13             A.    Specific data references, in

14         earnings calls he makes specific data

15  03:30:51  references to lots and lots of different

16         data.  I had no idea whether or not -- and

17         until you showed me this just now, I had

18         no idea whether it was said correctly in

19         the earnings call or not said correctly.

20  03:31:02  I just knew exactly what that 90 percent

21         meant.

22             Q.    Who is Mr. Cucci?

23             A.    Cucci is the COO of the MTV

24         Entertainment group.

25  03:31:09      Q.    So if the COO is reporting to

1          M. GANELESS

2          you that Mr. Dooley has just said that

3          traffic to Comedy sites is up 90 percent

4          since the YouTube take-down, wouldn't you

5  03:31:19  take that seriously?

6              MS. KOHLMANN:  Objection.

7          A.    I take it seriously.  I looked

8          into what that 90 percent referred to, and

9          I got back to Mr. Cucci.

10 03:31:29    Q.    And when Mr. Cucci reported it

11         to you, did you have any reason to doubt

12         that Mr. Cucci had reported accurately

13         what Mr. Dooley had said on the phone, on

14         the earnings call?

15 03:31:40    A.    I remember having a conversation

16         with John Cucci, saying he must have been

17         referring to something else, because that

18         doesn't jibe with our internals.  I have a

19         vague recollection of John saying he was

20 03:31:51  going to check.

21              I don't know how that all ended

22         up, other than the 90 percent number

23         referring to year over year.  I don't know

24         if John misheard on the earnings call.  I

25 03:32:07  never checked back to see the transcript

M. GANELESS

1

2     of the earnings call.  All I did was check

3     to see what that 90 percent meant.

4          Q.   Didn't you care about the fact

5  03:32:17  that a Viacom senior official might have

6     been making -- didn't you care that a

7     Viacom senior official was making a

8     misrepresentation on the earnings call to

9     stock analysts?

10 03:32:26          MS. KOHLMANN:  Objection,

11          misstates the record.

12          A.   I assumed that John Cucci

13     misheard what Dooley said.

14          Q.   Why did you assume that

15 03:32:35  Mr. Cucci would mishear something that he

16     reported to you and asked you to

17     investigate?

18          MS. KOHLMANN:  Objection.

19          A.   I can't remember exactly why.

20 03:32:50  But I assumed John was listening to that

21     earnings call in the course of the day;

22     and when he heard that, it didn't jibe,

23     and so we looked into exactly why -- what

24     that 90 percent was referring to.

25 03:33:02          I don't know if John followed up

1          M. GANELESS

2          with, with any of the board members.

3              Q.    Did you follow up with any of

4          the board members about the statement that

5  03:33:11  you believed Mr. Dooley had made on the

6          earnings call?

7              MS. KOHLMANN:  Objection.

8              A.    I didn't know exactly what

9          Mr. Dooley said on the earnings call.  I

10 03:33:17  only had John Cucci's recollection.

11             Q.    So based on John Cucci's

12         recollection, you knew -- sorry.

13             Based on what John Cucci

14         reported to you, you believed there was a

15 03:33:27  misrepresentation that was made on the

16         Viacom's earnings call by Mr. Dooley,

17         right?

18             MS. KOHLMANN:  Objection.

19             Misstates the record.

20 03:33:33  A.    I did not say that.  I said I

21         believed that he must have -- that Tom

22         Dooley must have been referring to a

23         different metric, when he said 90 percent.

24             Now that you have shown me the

25 03:33:49  record, I know that to be false.

                    M. GANELESS

1

2          Q.    Do you -- go ahead.

3          A.    I didn't look at the transcript.

4          Q.    Why not?

5   03:33:57   A.    Not enough time in the day.

6          Q.    Not enough time in the day to

7   address the fact that a Viacom senior

8   official may have been misrepresenting a

9   fact, in response to an analyst's question

10  03:34:07  on an earnings call?

11              MS. KOHLMANN:  Objection.

12         A.    No.

13         Q.    Don't you think that should be a

14  priority?

15  03:34:13        MS. KOHLMANN:  Objection.

16         A.    In my day-to-day, the priority

17  is getting the best shows up on the air

18  and the many people as possible to watch

19  them.

20  03:34:21  Q.    Well, you had enough time to

21  exchange a number of e-mails about that

22  representation by Mr. Dooley that day,

23  right?

24         A.    I absolutely had time to make a

25  03:34:33  number of e-mail exchanges.

M. GANELESS

I assumed the transcript of the

earnings call would be quite long and

so -- not in the habit of getting a

03:34:41    transcript of earnings calls.

Q.    So if all the information you

had was Mr. Cucci's representation about

what Mr. Dooley had said, and you knew

that number didn't jibe with any of your

03:34:59    internal data, what did you do to ensure

that there was a correction?

MS. KOHLMANN:  Other than what

she's already testified to.

MR. KRAMER:  Which is nothing.

03:35:11    MS. KOHLMANN:  No, that

misstates the record.

A.    What I did was let John Cucci

know and Colleen Fahey-Rush, who is the

vice president of research for MTV

03:35:22    Networks.  I let them know that that

number didn't jibe with any numbers that I

had.  I asked them to investigate it.

We discovered that that 90

percent represented a year-over-year

03:35:35    growth, and that was the end of my

                              M. GANELESS

1     

2    involvement in it.

3          Q.    You're sure?

4          A.    That's my recollection.

5    03:35:43    Q.    You responded to Mr. Cucci as if

6    his report was accurate, right?

7                MS. KOHLMANN:  Objection.

8          A.    I don't remember how I responded

9    to Mr. Cucci.  I just forwarded it on to

10   03:35:56   the research group to say, can you find

11   out how that number was compiled.

12               MR. KRAMER:  Let's have this one

13               marked as 23.

14               (Ganeless Exhibit 20, e-mail

15   03:37:32   thread, bearing Bates number

16               VIA00225061, marked for

17               identification, as of this date.)

18               MR. KRAMER:  I'm sorry, what

19               number are we up to?  20.

20   03:37:09   THE WITNESS:  Thank you.

21          Q.    Ms. Ganeless, Exhibit 20 starts

22   with the same message from Mr. Cucci, and

23   your message follows.  Then there's some

24   back and forth between you and others at

25   03:37:22   Viacom concerning the original message

M. GANELESS

1

2      from Mr. Cucci.  It's a document produced

3      to us by Viacom, bearing Bates number

4      VIA00225061.

5  03:37:38         Do you see on March 1, 2007, at

6      10:04 a.m., you say to Mr. Flanagan, "We

7      will probably never know, but I don't see

8      how that can be accurate on any metric."

9      Right?

10  03:37:51    A.    Yes.

11         Q.    What you were saying is you

12      don't see how Mr. Dooley could report

13      accurately that traffic is up 90 percent

14      since the YouTube take-down on Viacom's

15  03:38:03  Comedy sites?

16              MS. KOHLMANN:  Objection.

17         A.    What I was saying is that

18      90 percent didn't reflect any of the data

19      that I had.  I later found out it

20  03:38:14  reflected a year-over-year growth.

21         Q.    But Mr. Dooley wasn't talking

22      about year-over-year growth, and no one

23      was talking about year-over-year growth

24      here.  What we were talking -- what

25  03:38:25  Mr. Dooley was talking about, and what