# SCHAPIRO DECLARATION EXHIBITS CONTINUED

# Schapiro Exhibit 92

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC TELEVISION, )
INC., PARAMOUNT PICTURES CORPORATION, )
AND BLACK ENTERTAINMENT TELEVISION, )
LLC, )
                                        )
                      PLAINTIFFS, )   CASE NO.
                                        )   07-CV-2103
      vs.                               )
                                        )
YOUTUBE, INC., YOUTUBE, LLC, AND )
GOOGLE, INC., )
                                        )
                     DEFENDANTS. )
                                        )
_____ )

THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., ET AL., )
ON BEHALF OF THEMSELVES AND ALL )
OTHERS SIMILARLY SITUATED, )
                                        )
                      PLAINTIFFS, )   CASE NO.
                                        )   07-CV-3582
      vs.                               )
                                        )
YOUTUBE, INC., YOUTUBE, LLC, AND )
GOOGLE, INC., )
                                        )
                     DEFENDANTS. )
                                        )
_____ )

VIDEOTAPED 30(B)(6) DEPOSITION OF
X-RAY DOG MUSIC, INC. through TIMOTHY A. STITHEM
TUESDAY, DECEMBER 8, 2009
LOS ANGELES, CALIFORNIA

Job No. 18195

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC TELEVISION, )
INC., PARAMOUNT PICTURES CORPORATION, )
AND BLACK ENTERTAINMENT TELEVISION, )
LLC, )
                   )
            PLAINTIFFS, )   CASE NO.
                   )   07-CV-2103
       vs. )
                   )
YOUTUBE, INC., YOUTUBE, LLC, AND )
GOOGLE, INC., )
                   )
            DEFENDANTS. )
_____ )
                   )
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., ET AL., )
ON BEHALF OF THEMSELVES AND ALL )
OTHERS SIMILARLY SITUATED, )
                   )
            PLAINTIFFS, )   CASE NO.
                   )   07-CV-3582
       vs. )
                   )
YOUTUBE, INC., YOUTUBE, LLC, AND )
GOOGLE, INC., )
                   )
            DEFENDANTS. )
_____ )


VIDEOTAPED 30(B)(6) DEPOSITION OF X-RAY DOG

MUSIC, INC. through TIMOTHY A. STITHEM, taken on

behalf of the Defendants, at 10:05 a.m., Tuesday,

December 8, 2009, at 350 South Grand Avenue, Los

Angeles, California, before Elizabeth Borrelli,

CSR No. 7884, pursuant to notice.

1       APPEARANCES OF COUNSEL

2

3           FOR CLASS PLAINTIFFS AND THE DEPONENT:

4           BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP

5           BY:  BENJAMIN GALDSTON, ESQ.

6           12481 High Bluff Drive

7           Suite 300

8           San Diego, California 92130-3582

9           (858) 720-3188

10          (858) 436-0188 (fax)

11          beng@blbglaw.com

12

13         FOR DEFENDANT YOU TUBE:

14         MAYER BROWN, LLP

15         BY:  BETH ANN SCHULTZ, ESQ.

16         1675 Broadway

17         New York, New York 10019-5820

18         (212) 506-2355

19         (212) 849-5855 (fax)

20         baschultz@mayerbrown.com

21            - AND -

22

23

24

25

1    APPEARANCES (Continued):

2

3          MAYER BROWN, LLP

4          BY:  MICHELE K. KEEGAN, ESQ.

5          1999 K Street, N.W.

6          Washington, D.C. 20006-1101

7          (202) 263-3868

8          (202) 762-4292 (fax)

9          mkeegan@mayerbrown.com

10

11   ALSO PRESENT:

12          MITCH LERMAN, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

1    13:32    posted promotional materials for Cloverfield as

2             opposed to -- a licensed use as opposed to an

3             unlicensed use?

4                      MR. GALDSTON:  Object to the form of the

5    13:32    question.  Lacks foundation and calls for

6             speculation and is compound.

7                      THE WITNESS:  Yeah, I'm not really sure

8             how to answer that question, because no one

9             sitting -- any general person sitting anywhere is

10   13:32    going to know whether something has been licensed or

11            not unless you follow up with those entities.

12            People at Paramount would answer the question.

13            People at X-Ray Dog who owned a piece of work would

14            answer the question.

15   13:32    BY MS. SCHULTZ:

16                     Q.   I'm going to show you what has been

17            marked -- what will be marked as Exhibit 6.  It's

18            XD00063860.

19                     (Whereupon Exhibit 6 was marked for

20   13:33            identification.)

21                     THE WITNESS:  Are you done with this one?

22            BY MS. SCHULTZ:

23                     Q.   Yes.

24                     Now, this looks like a licensing agreement

25   13:33    for the use of Dethrone -- Dethroned --

1   13:33      A.   Uh-huh.

2              Q.   -- in a nonbroadcast trailer for the video

3       game Transformers Deep Six; is that correct?

4              A.   Appears to be.  Let me just keep looking

5   13:33   through it quickly.

6                   Okay.

7              Q.   Paragraph 4, License Use, states that,

8       "The licensee may use the work in trailers,

9       advertisements and promotional materials in

10  13:34   nontheatrical trailer for Internet use only."

11                  Do you see that?

12             A.   Yes, I do.

13             Q.   Does the Internet include a posting of

14      that material on YouTube?

15  13:34              MR. GALDSTON:  Object to the form of the

16      question.  It calls for a legal conclusion.

17                  THE WITNESS:  The trailer for the video

18      game or any specific advertisement created with our

19      work in it can be posted on the Internet.  The

20  13:34   client has the right to use it on any website it

21      seems -- deems appropriate for their marketing

22      campaign.

23      BY MS. SCHULTZ:

24             Q.   So that means that the licensee could post

25  13:34   that material on YouTube, correct?

1    13:34      A.   I wouldn't restrict them not to.

2               Q.   Do you know whether the licensee posted

3    any content on YouTube pursuant to this license?

4               A.   I'm not aware of it.

5    13:35           MR. GALDSTON:  Object to the form of the

6    question.  Calls for a legal conclusion.

7               THE WITNESS:  I'm not aware of...

8    BY MS. SCHULTZ:

9               Q.   Did you ever inquire as to whether the

10   13:35      licensee or its designee posted promotional

11   materials for Too Human on YouTube -- on -- I'm

12   sorry -- Transformers Deep Six on YouTube?

13              A.   Who would I inquire with?  The licensee?

14   I have not personally.

15   13:35      Q.   And how would YouTube be able to determine

16   if the Ayzenberg Group or its designee -- I'm sorry.

17   Let's use the Ayzenberg.

18              How would YouTube be able to determine if

19   the Ayzenberg Group or its designee posted

20   13:36      promotional materials for Transformers Deep Six on

21   YouTube?

22              MR. GALDSTON:  Object to the form of the

23   question.  Calls for speculation.

24              THE WITNESS:  I'm not sure how YouTube

25   13:36      does its practices of determining what goes on their

1   13:36   website.  I can't speculate on what they do or don't

2           do.

3           BY MS. SCHULTZ:

4               Q.  Is looking at the clip enough to determine

5   13:36   whether it's an authorized use or not?

6               MR. GALDSTON:  Object to the form of the

7           question.  Calls for speculation.

8               THE WITNESS:  Yeah, I'm not sure how I

9           could answer that.  I feel like we've kind of

10  13:36   answered this already.

11              Any person looking at something won't know

12          unless they've done their homework.

13          BY MS. SCHULTZ:

14              Q.  And that homework would be...

15  13:36       A.  Making sure that the rights for all

16          copyright owners with attached things were taken

17          care of.

18              Q.  Paragraph 6 states that, "The licensing

19          fee is a special rate."

20  13:37          What does that mean?

21              MR. GALDSTON:  Well, I object.  The

22          document speaks for itself.  And I think you've

23          mischaracterized.  Mischaracterizes the document.

24              THE WITNESS:  Yeah, I can't honestly say

25  13:37   why it says, "special rate."

```
 1   13:45   correct?

 2                   MR. GALDSTON:  Objection.  Lacks

 3           foundation.  You're asking about this e-mail, not

 4           the license --

 5   13:46           MS. SCHULTZ:  Yes.

 6                   MR. GALDSTON:  -- that was actually

 7           presumably subsequently executed, correct?

 8                   MS. SCHULTZ:  Correct.

 9                   MR. GALDSTON:  Okay.

10   13:46           THE WITNESS:  I think it's also going on

11           the record that I'm -- my recollection is that this

12           didn't cover any of the two works in suit either.

13           BY MS. SCHULTZ:

14               Q.  When you entered into licenses that were

15   13:46   for use of the works on the Internet, did you inform

16           YouTube that you had licenses out there that

17           permitted certain uses of your works?

18               A.  That's a pretty compound question.  If you

19           could break that up for me, it would be great.

20   13:46       Q.  Did there ever come a time that you

21           notified YouTube that there was an authorized use of

22           your work that could be posted on YouTube?

23                   MR. GALDSTON:  And you're excluding

24           through the discovery process in this case?

25   13:47           MS. SCHULTZ:  Yes.
```

| | | |
|---|---|---|
| 1 | 13:47 | MR. GALDSTON:  So prior to this -- |
| 2 | | MS. SCHULTZ:  Prior to. |
| 3 | | MR. GALDSTON:  Okay. |
| 4 | | THE WITNESS:  Okay. |
| 5 | 13:47 | I'm not sure what that just meant, but... |
| 6 | | MR. GALDSTON:  She's framing it in time. |
| 7 | | So other than the mechanisms of the discovery in |
| 8 | | this action, prior to the litigation... |
| 9 | | THE WITNESS:  To be honest with you, I'm |
| 10 | 13:47 | not going to inform all the various websites that we |
| 11 | | have licenses in place.  That would be mundane |
| 12 | | administration work that I don't need to do. |
| 13 | | We're having a hard enough time tracking |
| 14 | | the people who use our music unauthorized, let alone |
| 15 | 13:47 | telling people this is authorized.  Again, I would |
| 16 | | never get anything done.  This is a small company. |
| 17 | | BY MS. SCHULTZ: |
| 18 | | Q.   So you've never informed YouTube of an |
| 19 | | authorized licensed work? |
| 20 | 13:47 | A.   I haven't informed any websites of any |
| 21 | | authorized work. |
| 22 | | Q.   Including YouTube? |
| 23 | | A.   If you want to put it that way, yes. |
| 24 | | Q.   Does X-Ray Dog enter into blanket |
| 25 | 13:48 | licensing agreements? |

```
 1    13:48              MR. GALDSTON:  Object to the form of the
 2          question.
 3                       THE WITNESS:  Well, not necessarily a true
 4          blanket.  There's merry -- there's very different
 5    13:48 approaches to a blanket license.  And the standard
 6          generic blanket license, no, we do not.
 7          BY MS. SCHULTZ:
 8               Q.    What is -- what would -- how would you
 9          define a standard blanket license?
10    13:48      A.    A client pays a fee, and they do not have
11          to report nor track the music they use under that
12          fee.
13               Q.    Has XRD ever entered into a licensing
14          agreement where a licensee may choose from a pool of
15    13:49 XRD works to use over a specified period of time?
16               A.    Not that I'm aware of.  That doesn't sound
17          like something we would do.
18               Q.    I'm going to hand you what's going to be
19          marked as Exhibit 8.  It's XD00063639.
20    13:49           (Whereupon Exhibit 8 was marked for
21                     identification.)
22          BY MS. SCHULTZ:
23               Q.    Let me know when you're finished.
24               A.    Okay.
25    13:50      Q.    Was this license executed?
```

1    14:06    forward.

2              A.    Okay.

3              Q.    You know, you -- you get a little -- you

4         know, I mean, sometimes I just don't know exactly

5    14:06    what it is, and --

6              A.    Yes.

7              Q.    -- so if it's a list of subpublishers,

8         that helps me, because I didn't necessarily know

9         that.

10   14:06    A.    Okay.

11             Q.    Are these all of the subpublishers that

12        XRD has entered contracts with?

13                   MR. GALDSTON:    At present?

14                   MS. SCHULTZ:    At present is fine.

15   14:06          THE WITNESS:    Yeah.    Was there a date on

16        this sheet?

17        BY MS. SCHULTZ:

18             Q.    There was not.

19                   MS. KEEGAN:    The e-mail.

20   14:06          MS. SCHULTZ:    It was -- the e-mail was in

21        '07.

22                   THE WITNESS:    Okay.

23                   Then I can't really say at present,

24        because it's '09.    So without knowing immediately

25   14:06    offhand if any of these have changed -- well, a

1    14:06   couple have, but -- so as of 2007, this would be

2            accurate.

3            BY MS. SCHULTZ:

4                Q.   And I think you just explained it, but it

5    14:07   says, "Statement received."  Is that what -- that

6            would be when you receive a statement from the

7            subpublisher?

8                A.   Correct.

9                Q.   And you would receive those, you said,

10   14:07   about twice a year, every --

11               A.   Yes.

12               Q.   Okay.

13                    And can these subpublishers execute

14           licenses for use of XRD's works on the Internet?

15   14:07       A.   Yes.

16               Q.   Does that include YouTube?

17                    MR. GALDSTON:  Object to the form of the

18           question.

19                    THE WITNESS:  Is YouTube on the Internet?

20   14:07   BY MS. SCHULTZ:

21               Q.   You tell me.

22               A.   Then I would say yes.

23               Q.   What is EMI?

24               A.   EMI is a large publishing company.

25   14:08       Q.   And what is EMI's relationship with X-Ray

1    14:08   Dog?

2              A.    They have several subpublishing agents in

3         various territories.

4              Q.    Do you know which territories?

5    14:08   A.    Well, off the top of my head, but looking

6         at this list -- well, first of all, they have

7         territories in -- they have companies in every

8         territory.  We just chose not to go with some of

9         them.

10   14:08            Here it's Hungary.  Ireland, which we've

11        since discontinued working with.  Italy, same thing.

12        Scandinavia, we're still in business with them.

13        Sweden.  Taiwan.  And technically U.K.  KPM Music is

14        a division of EMI.

15   14:08            MS. SCHULTZ:  I'm going to hand you what's

16        going to be marked as Exhibit 10, which is

17        XD00057132.

18                    (Whereupon Exhibit 10 was marked for

19                     identification.)

20   14:09            THE WITNESS:  Do I need this one still?

21        No?

22        BY MS. SCHULTZ:

23             Q.    After you get a chance to look at the

24        agreement, if you could just let me know what this

25   14:09   agreement is.

1    14:17    e-mail?

2             A.    I don't use the e-mail.  It just is -- I

3    receive everything.

4             Q.    Okay.

5    14:17          The bottom e-mail message is from

6    weison@ms2.hinet.net.

7                   Do you know who that is?

8             A.    I have no idea.

9             Q.    Okay.

10   14:17          And from what you just said, does it make

11   sense, would that individual have sent an e-mail to

12   your website?

13            A.    Yep.

14            Q.    Okay.

15   14:17          So that e-mail went to your website e-mail

16   address?

17            A.    Yep.  We have several friends, maybe

18   hundreds, that kind of look out for us and let us

19   know when things look fishy, as this clearly was.

20   14:17    Q.    So what that person did was send you a

21   YouTube clip and ask you, did they pay you anything?

22            A.    Yep.

23                  And the answer was no.

24            Q.    And you wrote, "Here's a really good one

25   14:18    for the YouTube file," dot, dot, dot, question mark.

1    14:18    A.    Uh-huh.

2              Q.    What does that mean?

3              A.    It would mean another infringement on

4    You- -- or I'm sorry -- another unauthorized use on

5    14:18    YouTube that we needed to look into.

6              Q.    And then you say, "Would be nice to know

7    if this was licensed," dot, dot, dot, dot, "but I'm

8    not sure what language it is" --

9              A.    Right.

10   14:18    Q.    -- dot, dot, dot.

11             By looking at the YouTube clip, it wasn't

12   enough to let you know whether that was an

13   authorized use or not of your work?

14             MR. GALDSTON:  Object to the form of the

15   14:18    question.  Calls for speculation.

16             THE WITNESS:  Yeah, because we would have

17   to consult with our foreign publisher.

18             But in this case, since it was a language

19   I couldn't tell, Asian language of some sort, I was

20   14:19    not even clear on which Asian country it would be.

21   BY MS. SCHULTZ:

22             Q.    Why does not knowing what language the

23   video was in make it difficult to know whether it

24   was a licensed use?

25   14:19    A.    Well, I'm not very proficient on the

1   14:19   different Asian -- you know, the language, the way

2           it's spelled out, you know, in its written form.  I

3           couldn't tell.

4               Q.   Do you remember this clip?

5   14:19       A.   Off the top of my head, no.

6               Q.   And it sounds like from before you said

7           you figured out that it was an unlicensed use?

8               MR. GALDSTON:  Object to the form of the

9           question.

10  14:19       THE WITNESS:  It didn't appear to be an

11          authentic production.  It appeared to be a homemade

12          animated video.

13          BY MS. SCHULTZ:

14              Q.   And so did you ever determine whether it

15  14:20   was an authorized use?

16              A.   I can't say yes or no.  I can't recall

17          exactly what the outcome was.

18              Q.   Did anyone at X-Ray Dog follow up on this?

19              A.   I believe we tried, yes.

20  14:20       Q.   And what did you do?

21              A.   I forwarded this to -- well, Mitch and

22          Lauren, who were handling some of the international

23          people contacts, publishers, and then they put forth

24          a question to their contacts.

25  14:20           I can't recall if there was an answer or a

| | | |
|---|---|---|
| 1 | 14:20 | license or if we added it to our Excel list of |
| 2 | | YouTube unauthorized usages. |
| 3 | | Q.  You're not sure whether it got added? |
| 4 | | A.  I couldn't say 100 percent right now. |
| 5 | 14:20 | Q.  Do you know how many hours XRD spent |
| 6 | | trying to figure this out? |
| 7 | | A.  I would only guess several. |
| 8 | | Q.  And if it was difficult for XRD to |
| 9 | | determine if this was a licensed use, how would |
| 10 | 14:21 | YouTube be able to tell if this was an authorized |
| 11 | | use? |
| 12 | | MR. GALDSTON:  Object to the form of the |
| 13 | | question.  Calls for speculation.  And has been |
| 14 | | asked and answered. |
| 15 | 14:21 | THE WITNESS:  Yeah.  It would have to be a |
| 16 | | system set up where whoever is broadcasting |
| 17 | | materials has an agreement in place with whoever is |
| 18 | | posting that that they have the rights to do such |
| 19 | | things. |
| 20 | 14:21 | BY MS. SCHULTZ: |
| 21 | | Q.  So that's the system you believe should be |
| 22 | | set up for YouTube? |
| 23 | | MR. GALDSTON:  Object to the form of the |
| 24 | | question.  It's argumentative.  Calls for |
| 25 | 14:21 | speculation. |

1   14:21          THE WITNESS:  Yeah, I believe there is a

2          fiduciary duty or a duty by anyone broadcasting to

3          the world video information material that it's not

4          violating any other people's copyrights, which is

5   14:22   clearly the case with YouTube, which many of the

6          clips up there freely admit that, "I don't own the

7          copyright of this Star Wars video, nor this piece of

8          music from X-Ray Dog Music, but I'm posting it up

9          here anyway."  It says it right there.  Many of

10  14:22   these clips do the same thing.

11          So, unfortunately, we have no control over

12          stopping that.  Because people do it daily.

13          Hundreds.  We stop 10, 10 more show up.  It doesn't

14          stop.

15  14:22  BY MS. SCHULTZ:

16          Q.   What's the system you would propose that

17          YouTube follow to prevent unauthorized uses on its

18          site?

19          MR. GALDSTON:  Object to the form of the

20  14:22   question.  Calls for speculation.  Asked and

21          answered.  Lacks foundation.

22          THE WITNESS:  I'm not an expert.  I

23          can't -- I can't speak to that.  I just -- I feel

24          like any entity that is large and broadcasting to

25  14:23   the world should have some responsibility to make

# Schapiro Exhibit 93



**X-RAY DOG**
MUSIC, INC.

1023 North Hollywood Way, Suite 103 Burbank, CA 91505 (818) 597-4859

### SYNCHRONIZATION AND MASTER USE LICENSE

This Synchronization and Master Use Agreement ("Agreement") is entered into as of the 17th day of June, 2009 by and between THE AYZENBERG GROUP located at 49 East Walnut Street Pasadena, CA 91103 ("Licensee") and X-RAY DOG MUSIC, INC., A California Corporation located at 1023 North Hollywood Way, Suite 103 Burbank, CA 91505 ("Licensor"), who owns or controls 100% of the Synchronization and Master Use rights to the musical composition and sound recording listed herein below (the "Property"), in connection with Licensee's desire to use the Property as set forth herein.

WHEREAS, Licensor owns or controls the copyright in the musical composition and the master sound recording entitled **"Dethroned"** composed by **Paul Dinletir (ASCAP)** and music published by X-RAY DOG PUBLISHING (ASCAP) (hereinafter referred to as the "Composition" or the "Master" or jointly as the "Property"); and

WHEREAS, Licensee is engaged in the production of a non-broadcast trailer for the VIDEO GAME **"Transformers Deep 6"** (hereinafter referred to as the "VIDEO GAME"); and

WHEREAS, Licensee desires to utilize the Property in connection with the production and exploitation of trailers, advertisements and promotional materials for the VIDEO GAME; and,

NOW THEREFORE, in consideration of the promises, conditions, and warranties hereinafter set forth, Licensor and Licensee hereby agree as follows:

1.     **Term:** IN PERPETUITY

2.     **Territory:** WORLDWIDE

3.     **Nature of Use:** Background Instrumental [for no more than :60 seconds for the NON-BROADCAST spot] in synchronized or time relation to visual or audio material from the VIDEO GAME, for the purpose of advertising and promoting the VIDEO GAME.

4.     **Licensed Use:** Subject to the limitations set forth herein, Licensor hereby grants to Licensee the right to use the Property for trailers, advertisements and promotional materials, including derivatives of the foregoing for the VIDEO GAME, in the following media: *Non-Theatrical Trailer for internet use only.*

5.     **Limitations:** Notwithstanding the foregoing, and without limitation, this License does not grant to Licensee any right or authority to:

        a.     separately use the title of the Property or the story, if any, of the Property;

        b.     incorporate the Property on or in compact discs, phonograph records and/or tapes including any sound track recording;

Highly Confidential             XD00063860

c.   Incorporate the Property in non-linear flash openings on websites as a featured (non-background) music usage.

d.   incorporate the Property in any so-called "making-of" programs, except as set forth in paragraph 7 below;

e.   add vocals to an instrumental only Composition, or edit/modify the Master other than for timing, without Licensor's prior written consent; or

f.   Use the Property for any non-promotional purpose, which for purposes herein shall mean any purpose for which Licensee is paid, or by barter receives, any type of consideration.

g.   use the Property in any interactive or non-linear context;

h.   Permit the downloading of an audio only recording of the Property.

6.   **Consideration:** In full consideration of the rights granted herein, Licensee shall pay Licensor a special rate of **$2,000.00** upon execution hereof or upon release of any trailer, advertisement or promotional material embodying the Property pursuant to the terms herein, whichever occurs first.

7.   ~~Option/"Making Of": Licensee shall have the option, which shall be deemed exercised upon written notice within twelve (12) months from the date hereof and payment of an additional fee to Licensor in the amount of $1,500.00, to extend the terms of this License to include the use of the Property in so-called "making of" programs for exploitation as set forth in paragraphs 1, 2, 3, 4 and 5 above.~~

8.   **Performance Royalties:** Nothing herein shall be construed to limit Licensor's right to receive performance royalties for the Composition from the applicable performing rights society.

9.   **Media Buy Schedules:** Licensee agrees to promptly provide Licensor, at Licensor's request, with all media buy schedules pursuant to date and time of network Television or other media performances.

10.   **Cue Sheets/ISCI Codes:** Licensee agrees to promptly provide Licensor, at Licensor's request, with all studio cue sheets, including International Standard Commercial Identification ("ISCI") codes.

11.   **Re-Use Fees:** The Licensor shall make any and all payments to all musicians, vocalists, arrangers and copyists whose performances are embodied in the Property which may be required under the American Federation of Musicians Labor Agreement, the American Federation of Television and Radio Artists Labor Agreement, or any other applicable and binding union agreement in connection with the use of the Property by Licensee in accordance with this License. Licensor hereby agrees to defend, indemnify and hold Licensee harmless from and against any and all claims, demands or actions with respect to such fees and payments, with a maximum liability no greater than the consideration received by Licensor hereunder.

12.   **Warranties and Representations:** Licensor hereby warrants and represents that it has the legal right and authority to enter into this License and to grant those rights granted to Licensee hereunder and that such grant will not infringe on the rights of any other person or entity. If said warranty shall be breached in whole or in part, Licensor's total liability shall be limited to repaying to Licensee the consideration theretofore paid by Licensee under this License to the extent of such breach.

13.   **Notices:** All notices hereunder shall be sent certified mail, return receipt requested, or delivered by hand to the applicable address set forth hereinabove unless and until written notice, via registered mail, to the contrary is received by the applicable party. Copies of all notices to Licensor shall be sent to Berger, Kahn, attn.: Owen J. Sloane, 4215 Glencoe Avenue, 2nd Floor, Marina Del Rey, California 90292.

Highly Confidential                                                                              XD00063861

14. **Cure and Remedies**: In the event that Licensee, or its assigns, licensees, or sub-licensees, breaches this License and fails to cure such breach within thirty (30) days after written notice of such breach is given by Licensor to Licensee, then this License will automatically terminate. Such termination shall render the distribution, licensing, or use of the Property as unauthorized uses, subject except as set forth in paragraph 15 below to the rights and remedies provided by the laws, including copyright, and equity of the various countries within the territory.

15. **No Injunctive Relief**: Provided this License is terminated by reason of paragraph 14 above for failure to timely pay any license fees hereunder, Licensor's rights and remedies shall be limited to Licensor's right, if any, to recover damages in an action at law and in no event shall Licensor be entitled by reason of such breach to enjoin, restrain or seek to enjoin or restrain the distribution or other exploitation of the VIDEO GAME.

16. **Assignment**: Licensee shall have the right to assign this Agreement or any of its rights hereunder at any time to any person, firm or entity provided that such assignment shall not be effective as to Licensor unless and until written notice in accordance with paragraph 13 above is given by Licensee to Licensor. Licensor may not assign any of the obligations hereunder unless such assignee acquires all or substantially all of Licensor's stock and/or assets.

17. **Applicable Law**: This License shall be governed by and construed under the laws of the State of California, and any actions or proceedings between the parties hereto to enforce any provisions of this License shall be conducted in the County of Los Angeles.

18. **Miscellaneous**:

    a.  If any part of this License shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such a determination, the remainder of this License shall remain in full force and effect.

    b.  This License is binding upon, and shall inure to the benefit of the parties and their respective successors and/or assignees of the parties hereto, but in no event shall Licensee be relieved of its obligations hereunder without the express written consent of Licensor.

    c.  No waiver by either party of a breach or default hereunder of the other party shall be deemed a waiver of any other provisions hereof or of any subsequent breach or default by such party.

    d.  The section headings and captions contained herein are for reference purposes and convenience only and shall not in anyway affect the meaning or interpretation of this License.

    e.  This License sets forth the entire understanding of the parties hereof with respect to the subject matter hereof, and may be modified solely by a written instrument signed by both parties hereto.

Highly Confidential

XD00063862

IN WITNESS WHEREOF, and intending to be legally bound thereby, the parties acknowledge that they have read, are aware of the contents hereto, and have executed this License on the date and year first written above.

Date: 6/26/2009  By: _Jennifer_____

X-RAY DOG MUSIC, INC., A California Corporation ("LICENSOR") Jennifer Duran – Manager of Licensing & Finance

Date: 6/30/09  By: _____

THE AYZENBERG GROUP / It's Authorized Agent ("LICENSEE")

Title: PRODUCER_____  Print Name: MEHERA WHEDON_____

REF: Invoice Number: 2463
*Effective as of: 6/17/2009*
Project Title: Transformers Deep 6 Video Game Trailer
Usage: Internet Streaming Non- Broadcast / WW in Perpetuity
Client: The Ayzenberg Group

Total Amount Due: **$2,000.00**

Originally Requested By: Mehera Whedon



X-RAY DOG
MUSIC, INC.

1023 North Hollywood Way, Suite 103 Burbank, CA 91505 (818) 597-4859

Highly Confidential  XD00063863

# Schapiro Exhibit 94

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


VIACOM INTERNATIONAL INC., COMEDY   )
PARTNERS, COUNTRY MUSIC             )
TELEVISION, INC., PARAMOUNT         )
PICTURES CORPORATION, and BLACK     )
ENTERTAINMENT TELEVISION LLC,       )
              Plaintiffs,     )
        vs.                      ) Case No. 1:07CV02103
YOUTUBE, INC., YOUTUBE, LLC,        )
and GOOGLE, INC.,                   )
                       )
              Defendants.     )
_____)
THE FOOTBALL ASSOCIATION PREMIER    )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all     )
others similarly situated,          )
                       )
              Plaintiffs,     )
        vs.                      ) Case No. 07CV3582
YOUTUBE, INC., YOUTUBE, LLC, and    )
GOOGLE, INC.,                       )
                       )
              Defendants.     )
_____)


DEPOSITION OF MICHEL GRACH
NEW YORK, NEW YORK
THURSDAY, DECEMBER 3, 2009

REPORTED BY:
ERICA RUGGIERI, CSR, RPR
JOB NO. 18235

December 3, 2009

9:47 a.m.


VIDEOTAPED DEPOSITION OF MICHEL
GRACH, held at the offices of Mayer Brown,
LLP, 1675 Broadway, New York, New York,
pursuant to notice, before Erica L.
Ruggieri, Registered Professional Reporter
and Notary Public of the State of New
York.

3

A P P E A R A N C E S:


FOR THE PLAINTIFFS:

    PROSKAUER ROSE, LLP

    BY:  NOAH GITTERMAN, ESQ.

    1585 Broadway

    New York, N.Y. 10036-8299

    (212) 969-3200

    Ngitterman@proskauer.com


FOR THE DEFENDANTS:

    MAYER BROWN, LLP

    BY:  BRIAN WILLEN, ESQ.

       JASON KIRSCHNER, ESQ.

    1675 Broadway

    New York, New York  10019

    Bwillen@mayerbrown.com

    Jkirschner@mayerbrown.com



ALSO PRESENT:

    MANUEL ABREU, Videographer

    ABDOU FALL, Interpreter

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

1          GRACH

2    the ambience."  And then it has a link to

3    YouTube.

4              Do you see that?

5    03:26:19    A.    Yes.

6              Q.    Do you know what the context for

7    this e-mail is?

8              MR. GITTERMAN:  Objection to the

9              form.  Lacks foundation.

10   03:26:31    A.    No.  I read it's regarding the

11   BNP Paribas, but I don't know.

12              Q.    Do you know why Mr. DuBois would

13   have sent a YouTube link which would allow

14   the people to whom he sent it to, "See the

15   03:26:51   video animations made and the ambience"?

16              MR. GITTERMAN:  Objection to the

17              form.  Lacks foundation.  Calls for

18              speculation.

19              A.    I don't know.  Lionel DuBois is

20   03:27:03   in charge of animation for the BNP Paribas

21   Masters, which we organize, and apparently

22   is very creative.

23              Q.    But in preparing for this

24   deposition, in particular for topic 5, you

25   03:27:35   didn't investigate the circumstances

GRACH

1

2      surrounding Mr. Dubois's sending of an

3      e-mail that included a link to YouTube?

4           A.    No.

5  03:27:42    Q.    So I think you testified earlier

6      that there was at least one occasion on

7      which FFT uploaded videos to YouTube?

8           A.    Yes.

9           Q.    Has FFT ever had a channel on

10 03:28:10 YouTube?

11          A.    I don't think so.

12               MR. GITTERMAN:  Objection to the

13          form.  Vague and ambiguous as to

14          channel.

15 03:28:15    Q.    Are you familiar with an account

16     on YouTube called FFT multimedia.

17          A.    I think that's the account that

18     Christoph creates without authorization.

19          Q.    Who is Christoph Thoreau?

20 03:28:38    A.    Christoph Thoreau is not

21     anymore, no longer with, working for the

22     French Tennis Federation.  He was in

23     charge of the website.

24          Q.    Which website?

25 03:28:55    A.    Sorry.  FFT.fr.

1                         GRACH

2          Q.    Do you know when the FFT

3     multimedia account was created on YouTube?

4          A.    Exactly, no.

5     03:29:11    Q.    And Mr. Thoreau was an employee

6     of FFT at the time that he created the

7     account?

8          A.    Yes.

9          Q.    Do you know how many videos were

10    03:29:24 uploaded to the FFT multimedia account?

11         A.    No.

12         Q.    Have you investigated

13    circumstances surrounding FFT's uploading

14    of videos to the multimedia account, in

15    03:29:35 preparation for this deposition?

16                    MR. GITTERMAN:   Objection to the

17         form.   Vague and ambiguous.

18         A.    I didn't go into details.

19                    I think that's something which

20    03:29:49 has already been discussed last time, last

21    deposition.   He opened this account

22    without authorization.   He was not

23    necessarily aware of everything.   And we

24    ask him to close the account.

25    03:30:21    Q.    So you don't know the date the

1                    GRACH

2          account was created?

3                    A.    No, the exact date.

4                    Q.    Do you know the date the account

5    03:30:26   was closed?

6                    A.    The exact date, no.

7                    Q.    Do you know whether FFT uploaded

8          videos to the FFT multimedia account after

9          the date on which it joined this lawsuit?

10   03:30:54   A.    I'm going to be consistent with

11         what I told you.

12                   Q.    The answer is no?

13                   A.    Yeah.

14                   Q.    You don't know.

15   03:31:07         Why did Mr. DuBois upload videos

16         to YouTube?

17                   A.    That's a very good question.

18         Apart from the fact that he shouldn't do

19         so.  I don't know.  I don't know why he

20   03:31:36   did it.

21                   Q.    Do you think the purpose was to

22         promote FFT's tennis tournaments?

23                   MR. GITTERMAN:  Objection to the

24              form.  Vague and ambiguous.  And the

25   03:31:47         witness did already testify to this

```
 1                        GRACH
 2            situation at his prior deposition,
 3            fully and completely.
 4                 MR. WILLEN:  No, this is
 5   03:31:53  squarely covered by topic 5, which you
 6            did not object to.  You had an
 7            obligation to prepare this witness on
 8            this topic to give this testimony.
 9            The fact that you didn't do so is a
10   03:32:04  significant problem, but we are
11            dealing with it the best we can.  So
12            we will take it up later.
13                 MR. GITTERMAN:  We have prepared
14            the witness, and in fact you had the
15   03:32:13  answer over a year ago.
16                 MR. WILLEN:  Not the answers to
17            the questions that I just asked.
18                 MR. GITTERMAN:  I think those
19            exact questions were asked over a year
20   03:32:26  ago, but you can ask them again.
21                 Q.   Was the purpose for which the
22       videos were uploaded to the FTT multimedia
23       account to promote that FFT was operating?
24                 MR. GITTERMAN:  Objection to the
25   03:32:49  form.  Vague and ambiguous as to
```

1          GRACH

2          promote.

3          A.    I can't answer on behalf of -- I

4     don't know what was his intention and

5  03:33:04   goal.  But what I can answer is that he

6     has done it.

7          Q.    Do you know what the particular

8     videos were that were uploaded to the FFT

9     multimedia account?

10 03:33:17   A.    No.

11         Q.    You haven't watched them or seen

12    them?

13         A.    No.

14         Q.    Do you know whether any of those

15 03:33:22   videos contained match footage of any

16    tournaments that FFT organizes?

17         A.    Let me put it this way:  If we

18    are talking about BNP Paribas --

19         Q.    I don't know.  I'm asking you.

20 03:33:52   A.    Okay.

21         Q.    Sure, I'll ask.  Do you know

22    whether any of the videos that were

23    uploaded to the FTT multimedia account

24    contained match footage from the BNPPM?

25 03:34:12   A.    That's Christoph Thoreau thing.

1                              GRACH

2              Q.    I'm not sure what you mean.

3              A.    I don't know.

4              Q.    Do you know whether FFT uploaded

5    03:34:32   to the FFT multimedia account promotional

6              videos for the FFT itself?

7                   MR. GITTERMAN:  Objection to the

8                   form.  Vague and ambiguous.

9              A.    I did not watch the video

10   03:34:52   pieces, so I can't answer.

11                  The only thing I know, and the

12             fact -- an account has been created by an

13             employee who was not allowed to do so

14             officially, didn't get the authorization

15   03:35:12   and that this account has been removed.

16             That's it.

17             Q.    Did FTT ever have any

18             communications with YouTube about the FTT

19             multimedia account?

20   03:35:32        MR. GITTERMAN:  Objection to the

21                   form.  Vague and ambiguous.

22             A.    Sorry, repeat the question.

23             Q.    Sure.  Did FFT have any

24             communications with YouTube about the FFT

25   03:35:52   multimedia account?

GRACH

    MR. GITTERMAN:  Objection to the form.  Vague and ambiguous as to communications.

03:36:01    A.    Officially, no.  As Christoph might have some communications with YouTube, but it was not official.

    Q.    Christoph was an employee of the FFT at the time the account was created?

03:36:16    A.    Yeah.

    Q.    Have you ever heard the term "viral marketing"?

    A.    Yes.

    Q.    What is viral marketing?

03:36:38    A.    It is features you create especially for Internet and some -- I don't know -- in order for the end user to promote, to make notice.

    Q.    Have you heard the term "buzz"?

03:37:00    A.    Buzz, certainly.

    Q.    The purpose of viral marketing is to create buzz?

    A.    Buzz, right.

    MR. WILLEN:  Let's look at a

03:37:17    document.

1               GRACH

2               (Grach Exhibit 18, 11/13/07

3               e-mail from Lionel DuBois, Bates

4               number FT00096527, marked for

5   03:37:20    identification, as of this date.)

6                   MR. WILLEN:  This is a document

7               produced by FFT, bearing the Bates

8               number FT00096527.  That's an e-mail

9               from Lionel DuBois, dated November 13,

10  03:37:33    2007.  This is also a French language

11              e-mail that has been translated.

12                  MR. GITTERMAN:   Same objection

13              to the translation.

14              Q.    Do you recognize this e-mail?

15  03:38:20    A.    Yes.

16              Q.    This is an e-mail from Lionel

17              DuBois, dated November 13, 2007 --

18              A.    Sorry, I don't recognize this

19              e-mail.  I recognize -- I never seen this

20  03:38:34    e-mail.

21              Q.    So --

22              A.    Sorry.

23              Q.    The subject is "Post Master's

24              buzz."  Do you see that?

25  03:38:40    A.    Yeah.

GRACH

1

2     Q.    And Mr. DuBois says, "FYI, I

3     asked whether we could put one or two Dip

4     ITW on YouTube, just to create a little

5  03:38:51  buzz."

6              Do you see that?

7     A.    Yes.

8     Q.    Who is Dip?

9     A.    Dip is a player, a French --

10 03:39:02  Arnold de Pasquale, who -- and now we use

11    them -- use him, sorry, to do some

12    interviews for our website.

13    Q.    So do you understand the

14    reference to Dip ITW to be a reference to

15 03:39:25  Dip interviews?

16    A.    Yes.

17    Q.    And so Mr. DuBois is asking

18    whether he we can put one or two of the

19    Dip interviews on YouTube to create a

20 03:39:37  little buzz, right?

21    A.    Yes.

22    Q.    Would this be an example --

23          MR. GITTERMAN:  Objection to the

24    form.  Lack of foundation.

25 03:39:47  Q.    Would this be an example of

```
 1                        GRACH
 2          viral marketing?
 3                    MR. GITTERMAN:  Objection to the
 4              form.  Vague and ambiguous, lacks
 5   03:39:57    foundation.  Doesn't say whether this
 6              was ever done.
 7                    MR. WILLEN:  You know what,
 8              you've got to stop with the speaking
 9              objections.  They are inappropriate.
10   03:40:15    A.    Sorry.
11              Q.    I think my question was, would
12          this be an example of viral marketing?
13                    MR. GITTERMAN:  Same objections.
14              A.    If creating a buzz is come from
15   03:40:35  the viral marketing, the answer is yes.
16              Q.    And do you know, after the date
17          of this interview, whether in fact Dip
18          interviews were uploaded to YouTube
19          through the FFT multimedia account?
20   03:41:01    A.    That ring a bell to me.  I don't
21          remember exactly if, at the end of the
22          day, it has been -- it has been shown on
23          YouTube or not.  But I don't know.  I
24          don't know.
25   03:41:38            MR. WILLEN:  Let's watch a
```

```
 1                    GRACH

 2            video.  This is a video that was

 3            posted to YouTube at

 4            http://www.YouTube.com/watch?

 5   03:41:53  V=4GLULT9_P-C.

 6                    (Whereupon, the video is

 7            played.)

 8            Q.    Have you ever seen that video

 9       before?

10   03:44:11       MR. GITTERMAN:  Before you

11            answer that, has this video been

12            produced in the case?

13                  MR. WILLEN:  It is.  I will

14            check on that, though.

15   03:44:18       MR. GITTERMAN:  Is it still up

16            on YouTube?

17                  MR. WILLEN:  No.  But I think we

18            may be able to get to the bottom of

19            that.

20   03:44:24  Q.    Do you recognize this?

21            A.    I recognize the video.

22            Q.    This is a Dip interview?

23            A.    Dip interview.

24            Q.    With Richard Gaskey?

25   03:44:33  A.    Yes.
```



**Schapiro Exhibit 95**

**From:** Lionel Dubois [ldubois@fft.fr]
**Sent:** Friday, September 07, 2007 1:11 PM
**To:** 'Jean-François Caujolle'
**Subject:** TR: Djokovic: Cet homme est fou

Que fait-on avec les images de Mansour, il m'a relancé là dessus. Et si on le diffuse je dois faire une sélection d'images, sauf si je lui demande de le faire!
Je ne sais même pas si son dvd sera référencé à bercy.
tiens des images plus actuelles:

http://fr.youtube.com/watch?v=xYA_7RUSarU

au passage, si adidas nous demande de passer des spots sur les écrans, ce serait une bonne idée que ces images en soient le contenu.

*********************************************************************************************************

Le présent message et tous les documents inclus contiennent des informations privilégiées et confidentielles destinées uniquement à l'usage du ou des destinataire(s) ci-dessus. Si vous n'êtes pas le destinataire de ce message, nous vous rendons attentifs sur le fait que la diffusion, la reproduction ou l'usage de ce message est strictement interdit. Si vous avez reçu ce message par erreur ou sans autorisation, merci de nous en avertir immédiatement par retour e-mail et de détruire ce message de votre système. Si vous avez besoin d'assistance, merci d'adresser un message à helpdesk@adidas.fr. Merci par avance.


This email and any attachments contain privileged and confidential information intended only for the use of the addressee(s). If you are not an intended recipient of this email, you are hereby notified that any dissemination, copying or use of information within it is strictly prohibited. If you received this email in error or without authorisation, please notify us immediately by reply e-mail and delete the e-mail from your system. If you need any further assistance, please send an email to helpdesk@adidas.fr. Thanks in advance.

*********************************************************************************************************



EXHIBIT

EXHIBIT 16
12/3

PENGAD 800-631-6989

Confidential

FT00096512

**From:** Lionel Dubois [ldubois@fft.fr]
**Sent:** Friday, September 07, 2007 1:11 PM
**To:** 'Jean-Francois Caujolle'
**Subject:** TR: Djokovic: This man is crazy

What do we do with Mansour's images, he contacted me about it. And if we are posting it, I have to make a selection of the images, otherwise I ask him to do it!
I don't even know if his dvd will be referenced at bercy.
here are more current images:

http://fr.youtube.com/watch?v=xYA 7RUSarU

by the way, if adidas asks us to put spots on the screens, it would be a good idea for these images to be the content.

---

This email and any attachments contain privileged and confidential information intended only for the use of the addressee(s). If you are not an intended recipient of this email, you are hereby notified that any dissemination, copying or use of information within it is strictly prohibited. If you received this email in error or without authorisation, please notify us immediately by reply e-mail and delete the e-mail from your system. If you need any further assistance, please send an email to helpdesk@adidas.fr. Thanks in advance.

This email and any attachments contain privileged and confidential information intended only for the use of the addressee(s). If you are not an intended recipient of this email, you are hereby notified that any dissemination, copying or use of information within it is strictly prohibited. If you received this email in error or without authorisation, please notify us immediately by reply e-mail and delete the e-mail from your system. If you need any further assistance, please send an email to helpdesk@adidas.fr. Thanks in advance.

# Schapiro Exhibit 96

**From:** Lionel Dubois [ldubois@fft.fr]
**Sent:** Thursday, December 06, 2007 1:56 PM
**To:** ██████████████████████████████
**Cc:** ████████████████████████
**Subject:** Envoi d'un message : descriptifs animations BNPPM 07

**Attachments:** Programme Prévisionnel BNP PM 2007 + Animations.pdf; descriptifs animations BNPPM 07.doc

Bonjour,

Je fais suite à notre conversation téléphonique, veuillez trouver ci-joint un descriptif des animations, un programme du tournoi avec les animations, et un lien youtube qui vous permettra de voir aussi les animations vidéos faites et l'ambiance.

http://fr.youtube.com/watch?v=lo_TZF1OAjY

Cordialement,

<<...>> <<...>>

Lionel Dubois



Confidential

FT00096491

**From:** Lionel Dubois [ldubois@fft.fr]
**Sent:** Thursday, December 06, 2007 1:56 PM
**To:** ████████████████████████████
**Cc:** ████████████████████████
**Subject:** Sending a message: descriptions, animations BNPPM 07

**Attachments:** Programme Previsionnel BNP PM 2007 + Animations.pdf; descriptifs animations BNPPM 07.doc

Hello,

I am following up on our telephone conversation, please find enclosed a description of the animations, a tournament program with the animations, and a YouTube link which will allow you to also see the video animations made and the ambiance.

http://fr.youtube.com/watch?v=lo TZF1OAjY

Sincerely,


<<...>> <<...>>

Lionel Dubois



**Schapiro Exhibit 97**

**From:** Lionel Dubois [ldubois@fft.fr]
**Sent:** Tuesday, November 13, 2007 9:59 AM
**To:** 'LONGUEPEE Frédéric'; 'Jean-François Caujolle'
**Subject:** buzz post masters

Pour info j'ai demandé si on pouvait mettre une ou deux itw de Dip sur "You tube", histoire de créer un peu de buzz.
Ainsi que le mix video art.
Si ce n'est pas sur "you tube", je suggère de les envoyer par mail à nos contacts, je pense que ça pourrait bien circuler, notamment l'ITW de santoro et de clément/llodra.
Enfin, the Original Sound track du bnppm 07 devrait sortir sous peu (avec 15 titres).

Fred,
on avait parlé de signature automatique des mails FFT qui serait brandé , le lien pourrait être www.tennis-billets.fr avec un logo sympa, mais les gens ne l'utiliseront pas si on ne le donne pas tout fait.

A+


Lionel Dubois



FFT - Direction de Roland Garros

2, avenue Gordon Bennett

75016 Paris

Tel: 01.47.43.48.38 / Fax: 01.47.43.40.80

IMPORTANT. Ce message est exclusivement destiné à la personne à laquelle il est adressé. Les informations qu'il contient sont confidentielles. Si vous l'avez reçu par erreur, nous vous serions reconnaissant de le renvoyer à son expéditeur et de le supprimer de votre système informatique. Sur le fait, en première copie ou l'envoyer à quiconque. Le destinataire reconnaît et accepte que ce message ne peut, à aucun cas être considéré comme liant les parties à quelque titre que ce soit et constituer une preuve littérale au sens des articles 1316 et 1316-1 du code civil français. Le présent message ne saurait être considéré comme faisant l'objet d'une signature électronique au sens des textes légaux et réglementaires en vigueur.

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the information it contains. E-mail messages are confidential. Please do not send, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back to the sender and delete it completely from your computer system. The addressee recognizes and accepts that the present message is not binding as between the parties and cannot be used as an instrument of proof under the French civil code or any other laws.

PENGAD 800-631-6989

EXHIBIT

EXHIBIT 18
12/3

The present message shall not be considered as constituting an electronic signature under existing laws and regulations.

Confidential

**From:** Lionel Dubois [ldubois@fft.fr]
**Sent:** Tuesday, November 13, 2007 9:59 AM
**To:** 'LONGUEPEE Frederic'; 'Jean-Francois Caujolle'
**Subject:** post masters buzz

FYI: I asked whether we could put one or two Dip itw on "You tube," just to create a little buzz. As well as the mix video art.
If it is not on "you tube," I suggest sending them to our contacts by email. I think they could circulate very well, especially the ITW of santoro and clement/llodra.
Finally, the Original Sound track of bnppm 07 should come out soon (with 15 titles).

Fred,
We spoke about automatic signature on the FFT emails that would be branded, the link could be www.tennis-billets.fr with a nice logo, but people will not use it if we don't give it to them completely.

Talk to you soon

Lionel Dubois

FFT – Roland Garros Management

2, avenue Gordon Bennett

75016 Paris

Tel: 01.47.43.48.38 / Fax: 01.47.43.40.80

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the information it contains. E-mail messages are confidential. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward if back to the sender and delete it completely from your computer system. The addressee recognizes and accents that the present message is not binding as between the parties and cannot be used as an instrument of proof under the French civil code or any other laws. The present message shall not be considered as constituting an electronic signature under existing laws and regulations.

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the information it contains. E-mail messages are confidential. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward if back to the sender and delete it completely from your computer system. The addressee recognizes and accents that the present message is not binding as between the parties and cannot be used as an instrument of proof under the French civil code or any other laws.

Confidential                                                                      FT00096527

The present message shall not be considered as constituting an electronic signature under existing laws and regulations.

Confidential

FT00096528

# Schapiro Exhibit 98

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE FOOTBALL ASSOCIATION PREMIER LEAGUE LIMITED, BOURNE CO. (together with its affiliate MURBO MUSIC PUBLISHING, INC.), MUSIC FORCE MUSIC PUBLISHING COMPANY, INC., CAL IV ENTERTAINMENT LLC, ROBERT TUR d/b/a LOS ANGELES NEWS SERVICE, NATIONAL MUSIC PUBLISHERS' ASSOCIATION, THE RODGERS & HAMMERSTEIN ORGANIZATION, STAGE THREE MUSIC (US), INC., EDWARD B. MARKS MUSIC COMPANY, FREDDY BIENSTOCK MUSIC COMPANY d/b/a BIENSTOCK PUBLISHING COMPANY, ALLEY MUSIC CORPORATION, X-RAY DOG MUSIC, INC., FÉDÉRATION FRANÇAISE DE TENNIS, THE MUSIC FORCE LLC, and SIN-DROME RECORDS, LTD. on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>  *v.*<br><br>YOUTUBE, INC., YOUTUBE, LLC and GOOGLE, INC.,<br><br>       Defendants. | Case No. 07 Civ. 3582 (LLS)<br><br>**THE MUSIC FORCE MEDIA GROUP LLC, THE MUSIC FORCE LLC, AND SIN-DROME RECORDS, LTD.'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSION** |

Pursuant to Rule 36(a) of the Federal Rules of Civil Procedure, Named Plaintiff The

Music Force Media Group LLC, The Music Force LLC, and Sin-Drome Records, Ltd.

(collectively, "Music Force") hereby responds and objects to the Requests for Admission (the

"Requests") propounded by Defendants YouTube, Inc., YouTube LLC and Google, Inc.

("YouTube" or "Defendants").

## GENERAL OBJECTIONS

The following general objections and statements ("General Objections") apply to each of the particular Requests propounded by Defendants and are hereby incorporated within each response set forth below. All of the responses set forth below are subject to and do not waive the General Objections:

1.      Music Force objects to the Requests on the ground that Music Force is still in the process of gathering and analyzing information relevant to these Requests. Music Force has not completed its review and analysis of all discovery obtained by the parties in this and the related *Viacom* action. Additionally, defendants and non-parties have produced more than 1.5 million pages of documents since October 13, 2009. Music Force has not yet examined each document produced by defendants or otherwise in this action for the purpose of determining which individual allegations of the Second Amended Class Action Complaint ("Complaint") it might support, nor has Music Force completed depositions that may more fully reveal facts and information relevant to these Requests. As discovery is not yet closed, including deposition and expert discovery, and the production of remaining data and/or documents, Music Force's responses to these Requests is preliminary and tentative subject to completion of discovery and following an adequate opportunity to review and analyze all discovery in this action.

2.      In responding to these Requests, Music Force does not concede the relevance, materiality or admissibility of any of the admissions or responses sought herein. Music Force's responses are made subject to and without waiving any objections as to relevancy, materiality, admissibility, vagueness, ambiguity, competency or privilege.

3.      Music Force does not waive any of its rights to object on any ground to the use of its responses herein.

4.      Music Force objects to the Requests to the extent that they set forth compound, conjunctive or disjunctive statements.

5.      Music Force objects to the each request, instruction or definition to the extent that they seek to impose obligations beyond those imposed or authorized by the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Southern District of New York ("Civil Local Rules"), or the applicable standing orders and orders of this Court.

6.      Music Force objects to the each request, instruction or definition to the extent that they seek information, documents, or other materials that are neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence.

7.      Music Force objects to the each request, instruction or definition to the extent that they seek information, documents, or other materials protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

8.      Music Force objects to the each request, instruction or definition to the extent that they seek documents or information generated or compiled by or at the direction of Music Force's counsel.

9.      Music Force objects to the each request, instruction or definition to the extent that they seek information which is publicly available or which is already within Defendants' possession, custody or control.

10.     Music Force objects to the each request, instruction or definition to the extent that they are vague, ambiguous, overly broad or unduly burdensome.

11.     Music Force objects to the each request, instruction or definition to the extent that they purport to require separate responses for each "Accused Clip" as compound and unduly burdensome.

12.     Music Force objects to each request to the extent that they fail to specify an applicable time period and are thereby vague, ambiguous and overbroad.

13.     Music Force objects to each request as premature to the extent that it calls for expert opinion, particularly with respect to requests that require a legal conclusion.

14.     Music Forces object to the each request, instruction or definition to the extent that they purport to require Music Forces to respond to Defendants' characterizations of legal contentions or call for the application of law to fact to the extent such request seeks disclosure of privileged information.

15.     Music Force objects to the definitions of "the MF Entities", "you" and "your" as overly broad and unduly burdensome, and further objects to the extent it seeks to impose obligations broader than those specified by Federal Rules of Civil Procedure 26, and Civil Local Rule 26.3(c)(5).  Music Force further objects on the grounds that the definition includes an unknown and unknowable number of "present and former agents, employees, representatives, accountants, investigators, attorneys," "person[s] acting or purporting to act on its behalf", and "other person[s] otherwise subject to its control, which controls it, or is under common control with them."  Moreover, this definition includes "affiliates," "divisions," and "units" without any explanation of those terms' meaning.  Music Force further objects to the extent these definitions call for privileged information and to the extent they seek information outside of Plaintiffs' possession, custody or control.  In responding to the requests, Plaintiffs will construe the terms

"the MF Entities", "you" and "your" to mean Named Plaintiffs collectively referred to herein as Music Force.

16.     Music Force objects to the definitions of "Work(s) In Suit" and "Accused Clip(s)" as compound, vague and ambiguous.  Music Force further objects to the extent these definitions call for privileged information.  Music Force further objects to the definitions of "Work(s) In Suit" and "Accused Clip(s)" to the extent such definitions attempt to limit the number or identity of infringed works or instances of infringement for which Music Force seeks recovery.  As set forth at paragraph 74 of the Second Amended Complaint, the infringed works specified by Music Force in this litigation are "representative of Protected Works that are and have been infringed by Defendants and/or YouTube's users."  Similarly, the infringements identified in Exhibit A to the Complaint and within the Complaint are representative and not an exhaustive list of the ongoing and massive infringement by defendants.  Music Force reserves all rights to identify additional infringements and infringed works.

17.     Music Force objects to the definition of "substantially DMCA-compliant takedown notice" on the grounds that such definition vague and ambiguous as it requires a qualitative judgment and lacks common or ready definition.

18.     Music Force objects to the definition of "YouTube Copyright Protection Service" on the grounds that such definition vague and ambiguous as it requires a qualitative judgment and lacks common or ready definition.

19.     Where Music Force indicates a lack of information or knowledge sufficient to admit or deny a specific request, this lack of information or knowledge follows a reasonable inquiry by Music Force, and the information known or readily obtainable by Music Force is insufficient to enable the party to admit or deny.

20.     Music Force reserves the right to supplement or amend these responses.  These responses should not be construed as, and do not constitute, a waiver of Music Force's right to prove additional facts at summary judgment or trial or any other rights.

21.     These general objections are continuing and are incorporated by reference in Music Force's answers to each of the Requests set forth below.  Any objection or lack of objection to any portion of these Requests is not an admission.  Music Force reserves the right to amend, supplement, modify, or correct these responses and objections as appropriate.

**MUSIC FORCE'S RESPONSES AND OBJECTIONS TO SPECIFIC
REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1**

Admit that at all relevant times YouTube was a "service provider" as that term is used in 17 U.S.C. § 512(k)(1)(B).

**RESPONSE TO REQUEST FOR ADMISSION NO. 1**

Music Force incorporates each of the foregoing General Objections.  Music Force objects to this Request on the grounds that it is vague and ambiguous, including the term "at all relevant times." Music Force further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Music Force admits that the YouTube website in part, provides or operates facilities for, among other things, "online services or network access" as those terms are used in 17 U.S.C. § 512(k)(1)(B), and otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 2**

Admit that at all relevant times, YouTube stored material "at the direction of a user" as that phrase is used in 17 U.S.C. § 512(c)(1).

## RESPONSE TO REQUEST FOR ADMISSION NO. 2

Music Force incorporates each of the foregoing General Objections.  Music Force objects to this Request as vague and overbroad, including with respect to the terms "at all relevant times" and "material," which are undefined terms.  Music Force further objects to this Request to the extent it calls for a legal conclusion.  YouTube is a media entertainment enterprise that engages in an array of directly and secondarily infringing activities that are neither storage nor at the direction of a user, such as, without limitation, transforming, copying and distributing material without the direction of a user.  Subject to and without waiving the foregoing objections, Music Force denies this Request.

### REQUEST FOR ADMISSION NO. 3

Admit that the material you allege to infringe your copyrights in this case was stored on the youtube.com service "at the direction of a user" as that phrase is used in 17 U.S.C. § 512(c)(1).

## RESPONSE TO REQUEST FOR ADMISSION NO. 3

Music Force incorporates each of the foregoing General Objections.  Music Force objects to this Request for Admission as vague and overbroad, including with respect to the term "material," which is an undefined term.  Music Force further objects to this Request to the extent it calls for a legal conclusion.  Subject to and without waiving the foregoing objections, Music Force denies this Request.

### REQUEST FOR ADMISSION NO. 4

Admit that all of your copyright infringement claims in this action allege infringement of copyrights "by reason of the storage at the direction of a user" of material that resides on a system or network controlled or operated by or for YouTube, as set forth in 17 U.S.C. § 512(c)(1).

**RESPONSE TO REQUEST FOR ADMISSION NO. 4**

Music Force incorporates each of the foregoing General Objections.  Music Force objects to this Request for Admission as vague and overbroad, including with respect to the term "material," which is an undefined term.  Music Force further objects to this Request to the extent it calls for a legal conclusion.  Subject to and without waiving the foregoing objections, Music Force denies this Request.

**REQUEST FOR ADMISSION NO. 5**

Admit that at all relevant times, YouTube had "designated an agent to receive notifications of claimed infringement" as set forth in 17 U.S.C. § 5l2(c)(2).

**RESPONSE TO REQUEST FOR ADMISSION NO. 5**

Music Force incorporates each of the foregoing General Objections.  Music Force objects to this Request on the grounds that it is vague and ambiguous, including the term "at all relevant times."  Subject to and without waiving the foregoing objections, Music Force denies this Request.

**REQUEST FOR ADMISSION NO. 6**

Admit that on every occasion that you sent YouTube a DMCA takedown notice relating to an accused clip, YouTube responded "expeditiously," as that phrase is used in 17 U.S.C. § 512(c)(1)(A)(iii), to remove or disable access to the material claimed to be infringing.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6**

Music Force incorporates each of the foregoing General Objections.  Music Force objects to this Request on the grounds that it is vague and ambiguous, including the term "material".  Music Force further objects to this Request to the extent it calls for a legal conclusion.  Subject to and without waiving the foregoing objections, Music Force denies this Request.

### REQUEST FOR ADMISSION NO. 7

Admit that on every occasion that you sent YouTube a DMCA takedown notice relating to an accused clip, YouTube responded within seventy-two business hours to remove or disable access to the material claimed to be infringing.

### RESPONSE TO REQUEST FOR ADMISSION NO. 7

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request on the grounds that it is vague and ambiguous, including the term "material."

Subject to and without waiving the foregoing objections, Music Force denies this Request.

### REQUEST FOR ADMISSION NO. 8

Admit that for all of the accused clips, prior to receiving a DMCA takedown notice from you identifying those specific clips, YouTube did not have "actual knowledge" that the material was infringing, as described in 17 U.S.C. § 512(c)(1)(A)(i).

### RESPONSE TO REQUEST FOR ADMISSION NO. 8

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Music Force denies this Request.

### REQUEST FOR ADMISSION NO. 9

Admit that on no occasion did YouTube fail to expeditiously remove or disable access to an accused clip to the extent YouTube became aware of facts or circumstances from which infringing activity was apparent, as described in 17 U.S.C. § 512(c)(1)(A)(ii).

### RESPONSE TO REQUEST FOR ADMISSION NO. 9

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request as compound. Music Force further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Music Force denies this Request.

### REQUEST FOR ADMISSION NO. 10

Admit that YouTube lacked the right and ability to control the infringing activity alleged by you in this case, as described in 17 U.S.C. § 512(c)(l)(B).

### RESPONSE TO REQUEST FOR ADMISSION NO. 10

Music Force incorporates each of the foregoing General Objections.  Music Force objects to this Request to the extent it calls for a legal conclusion.  Subject to and without waiving the foregoing objections, Music Force denies this Request.

### REQUEST FOR ADMISSION NO. 11

Admit that YouTube did not receive a financial benefit directly attributable to the infringing activity alleged by you in this case, as described in 17 U.S.C. § 512(c)(1)(B).

### RESPONSE TO REQUEST FOR ADMISSION NO. 11

Music Force incorporates each of the foregoing General Objections.  Music Force objects to this Request to the extent it calls for a legal conclusion.  Subject to and without waiving the foregoing objections, Music Force denies this Request.

### REQUEST FOR ADMISSION NO. 12

Admit that at all relevant times, access to and use of the youtube.com service was provided to users by YouTube free and without charge.

### RESPONSE TO REQUEST FOR ADMISSION NO. 12

Music Force incorporates each of the foregoing General Objections.  Music Force objects to the request as compound.  Music Force further objects to the terms "at all relevant times", "access" and "use" as vague and ambiguous.  For example, "use" of and "access" to the youtube.com website includes various activities, such as advertising.  Subject to and without waiving the foregoing objections, Music Force denies that "use" of the youtube.com website was provided free and without charge.

## REQUEST FOR ADMISSION NO. 13

Admit that during all time periods relevant to this case, the revenues generated by the youtube.com service never exceeded the costs of operating the youtube.com service.

## RESPONSE TO REQUEST FOR ADMISSION NO. 13

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request on the grounds that it is vague and ambiguous, including the terms "all time periods relevant to this case", "revenues", "generated", "service", "costs", and "operating". Music Force further objects to this Request on the grounds that it is premature, as discovery is ongoing and Music Force has not completed its review of relevant discovery obtained from Defendants.

## REQUEST FOR ADMISSION NO. 14

Admit that at all relevant times YouTube had adopted and reasonably implemented, and informed its subscribers and account holders of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of YouTube who were repeat infringers, as described in 17 U.S.C. § 512(i)(1)(A).

## RESPONSE TO REQUEST FOR ADMISSION NO. 14

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request as vague and ambiguous, including the terms "at all relevant times", "reasonably implemented" and "appropriate circumstances". Music Force further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Music Force denies this Request.

## REQUEST FOR ADMISSION NO. 15

Admit that at no time relevant to this lawsuit have there been any "standard technical measures" in existence as that term is defined in 17 U.S.C. §§ 512(i)(1)(B) and 512(i)(2).

## RESPONSE TO REQUEST FOR ADMISSION NO. 15

Music Force incorporates each of the foregoing General Objections.  Music Force objects to this Request as vague and ambiguous, including the term "in existence".  Music Force further objects to this Request to the extent it calls for a legal conclusion.  Music Force further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case.  Subject to and without waiving the foregoing objections, Music Force denies Request.

## REQUEST FOR ADMISSION NO. 16

Admit that there has been no broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process resulting in the development of "standard technical measures," as defined in 17 U.S.C. § 512(i)(2).

## RESPONSE TO REQUEST FOR ADMISSION NO. 16

Music Force incorporates each of the foregoing General Objections.  Music Force objects to this Request on the grounds that it is vague and ambiguous, including the terms "broad consensus", and "open fair, voluntary, multi-industry standards process".  Music Force further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case.  Music Force further objects to this Request to the extent it calls for a legal conclusion.  Music Force further objects to this Request to the extent it is not bounded by any time period.

## REQUEST FOR ADMISSION NO. 17

Admit that you do not claim in this case that YouTube failed to comply with 17 U.S.C. §§ 512(i)(1)(B) *(i.e.,* YouTube accommodates and not interfere with "standard technical measures" to the extent any exist).

**RESPONSE TO REQUEST FOR ADMISSION NO. 17**

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Music Force denies Request.

**REQUEST FOR ADMISSION NO. 18**

Admit that the presence on the youtube.com website of videos embodying the works in suit can have the effect of increasing consumer demand for those works.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18**

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request on the grounds that it is vague and ambiguous, including the phrases "can have the effect" and "consumer demand." Music Force further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Music Force further objects to this request on the ground that it seeks Music Force's opinion regarding an incomplete hypothetical question, not the admission or denial of a fact. Subject to and without waiving the foregoing objections, Music Force denies that the presence of videos on youtube.com has the effect of increasing consumer demand, including, without limitation, when the works are being made available for free on youtube.com and are a substitution of the products sold or licensed by Music Force to third parties for a fee and/or otherwise damage Music Force's business.

**REQUEST FOR ADMISSION NO. 19**

Individually for each Accused Clip, admit that you did not send a DMCA takedown notice to YouTube within one week of becoming aware of that clip's presence on YouTube.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19**

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request on the grounds that it is vague and ambiguous, including the term "becoming aware." Music Force further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. Music Force further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Music Force further object to this request on the ground that it misconstrues the parties' respective obligations under applicable law. Subject to and without waiving the foregoing objections, Music denies this Request to the extent that DMCA takedown notices were sent to YouTube within one week of Music Force discovering the infringing content. Music Force states that, because of the huge volume of infringements of its works on the YouTube website, it notified YouTube in a manner compliant with the DMCA as expeditiously as possible after determining that each YouTube video that it claims as infringing in the Complaints in this action infringed its content.

### REQUEST FOR ADMISSION NO. 20

Individually for each Accused Clip, admit that you did not send a DMCA takedown notice to YouTube within one month of becoming aware of that clip's presence on YouTube.

### RESPONSE TO REQUEST FOR ADMISSION NO. 20

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request on the grounds that it is vague and ambiguous, including the term "becoming aware." Music Force further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. Music Force further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Music Force further object to this request on the

ground that it misconstrues the parties' respective obligations under applicable law. Subject to and without waiving the foregoing objections, Music denies this Request to the extent that DMCA takedown notices were sent to YouTube within one month of Music Force discovering the infringing content. Music Force states that, because of the huge volume of infringements of its works on the YouTube website, it notified YouTube in a manner compliant with the DMCA as expeditiously as possible after determining that each YouTube video that it claims as infringing in the Complaints in this action infringed its content.

### REQUEST FOR ADMISSION NO. 21

Individually for each Accused Clip, admit that you did not send a DMCA takedown notice to YouTube within two months of becoming aware of that clip's presence on YouTube.

### RESPONSE TO REQUEST FOR ADMISSION NO. 21

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request on the grounds that it is vague and ambiguous, including the term "becoming aware." Music Force further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. Music Force further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Music Force further object to this request on the ground that it misconstrues the parties' respective obligations under applicable law. Subject to and without waiving the foregoing objections, Music denies this Request to the extent that DMCA takedown notices were sent to YouTube within two months of Music Force discovering the infringing content. Music Force states that, because of the huge volume of infringements of its works on the YouTube website, it notified YouTube in a manner compliant with the DMCA

as expeditiously as possible after determining that each YouTube video that it claims as infringing in the Complaints in this action infringed its content.

### REQUEST FOR ADMISSION NO. 22

Admit that You never requested YouTube to give You access to use a YouTube Copyright Protection Service.

### RESPONSE TO REQUEST FOR ADMISSION NO. 22

Music Force incorporates each of the foregoing General Objections. Music Force objects on the grounds that YouTube has used several euphemisms to refer a number of "tools" that it offers to content owners. Music Force objects to this Request on the grounds that it is vague and ambiguous, including the term "YouTube Copyright Protection Service." Music Force further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. Music Force further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Music Force further objects to this request on the ground that it misconstrues the parties' respective obligations under applicable law. Subject to and without waiving the forgoing objections, and to the extent that "YouTube Copyright Protection Service" refers one or more of Defendants' "tools", Music Force states that Defendants have not made these tools readily available to Plaintiffs on reasonable terms.

### REQUEST FOR ADMISSION NO. 23

Admit that YouTube never denied any request by You to use a YouTube Copyright Protection Service.

### RESPONSE TO REQUEST FOR ADMISSION NO. 23

Music Force incorporates each of the foregoing General Objections. Music Force objects on the grounds that YouTube has used several euphemisms to refer a number of "tools" that it

offers to content owners. Music Force objects to this Request on the grounds that it is vague and ambiguous, including the term "YouTube Copyright Protection Service." Music Force further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. Music Force further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Music Force further objects to this request on the ground that it misconstrues the parties' respective obligations under applicable law. Subject to and without waiving the forgoing objections, and to the extent that "YouTube Copyright Protection Service" refers one or more of Defendants' "tools", Music Force states that Defendants have not made these tools readily available to Plaintiffs on reasonable terms.

### REQUEST FOR ADMISSION NO. 24

Individually, for each Accused Clip, admit that You were not the owner of the copyright allegedly infringed by the Accused Clip at the time the accused clip was uploaded to YouTube.

### RESPONSE TO REQUEST FOR ADMISSION NO. 24

Music Force incorporates each of the foregoing General Objections. Subject to and without waiving the foregoing objections, Music Force denies this Request.

### REQUEST FOR ADMISSION NO. 25

Individually, for each Accused Clip, admit that the MF Entities were not the sole owners of the copyright allegedly infringed by the Accused Clip at the time the Accused Clip was uploaded to YouTube.

### RESPONSE TO REQUEST FOR ADMISSION NO. 25

Music Force incorporates each of the foregoing General Objections. Subject to and without waiving the foregoing objections, Music Force admits that Robert Caldwell is a co-

owner of the copyrights listed in ¶33A-D of the Second Amended Complaint but that Henry

Marx and the Music Force fully control and administer each of such copyright.

### REQUEST FOR ADMISSION NO. 26

Individually, for each Accused Clip, admit that the MF Entities and their employees were not the only entities and persons with the right or authorization to upload videos to YouTube containing the Work in Suit alleged infringed by the Accused Clip at the time the Accused Clip was uploaded to YouTube.

### RESPONSE TO REQUEST FOR ADMISSION NO. 26

Music Force incorporates each of the foregoing General Objections. Subject to and

without wavier of the foregoing objections, Music Force denies this Request.

### REQUEST FOR ADMISSION NO. 27

Individually, for each Accused Clip, admit that Robert Caldwell would have had the right to upload the Accused Clip to YouTube.

### RESPONSE TO REQUEST FOR ADMISSION NO. 27

Music Force incorporates each of the foregoing General Objections. Subject to and

without wavier of the foregoing objections, Music Force denies this Request and further states

that Robert Caldwell did not upload any of the Accused Clips to YouTube.

### REQUEST FOR ADMISSION NO. 28

Individually, for each Accused Clip, admit that Robert Caldwell would have had the right to authorize the presence of the Accused Clip on YouTube.

### RESPONSE TO REQUEST FOR ADMISSION NO. 28

Music Force incorporates each of the foregoing General Objections. Subject to and

without wavier of the foregoing objections, Music Force denies this Request and further states

that that Robert Caldwell did not authorize the presence of the Accused Clips on YouTube.

### REQUEST FOR ADMISSION NO. 29

Individually, for each Accused Clip, admit that other videos containing the Work in Suit allegedly infringed by the Accused Clip had been uploaded to YouTube by someone with the right or authorization to do so.

### RESPONSE TO REQUEST FOR ADMISSION NO. 29

Music Force incorporates each of the foregoing General Objections. Music Force objects to this Request on the grounds that the phrase "other videos" is vague and ambiguous. Music Force further objects to this Request on the grounds that the failure to specify an applicable time period renders the Request vague and ambiguous. Subject to and without waiving the foregoing objections, Music Force denies this request.

### REQUEST FOR ADMISSION NO. 30

Admit that You have uploaded videos containing copyrighted works to YouTube.

### RESPONSE TO REQUEST FOR ADMISSION NO. 30

Music Force incorporates each of the foregoing General Objections. Subject to and without waiving the foregoing objections, Music Force incorporates by reference its Responses To Requests For Admissions Nos. 40-42 below and further states that such uploads were made without the knowledge or authorization of Henry Marx and did not involve the works in suit.

### REQUEST FOR ADMISSION NO. 31

Admit that You have created a YouTube user account.

### RESPONSE TO REQUEST FOR ADMISSION NO. 31

Music Force incorporates each of the foregoing General Objections. Music Force incorporates by reference its Responses To Requests For Admissions Nos. 38-39 and No. 44 below and further states that such accounts were made without the knowledge or authorization of Henry Marx.

19

### REQUEST FOR ADMISSION NO. 32

Admit that a YouTube user account was created using an email address owned or controlled by You.

### RESPONSE TO REQUEST FOR ADMISSION NO. 32

Music Force incorporates each of the foregoing General Objections. Music Force incorporates by reference its Responses To Request For Admission Nos. 38-39, 44 below and further states that such accounts were created without the knowledge or authorization of Henry Marx.

### REQUEST FOR ADMISSION NO. 33

Admit that videos containing copyrighted works have been uploaded to YouTube using an account created with an email address owned or controlled by You.

### RESPONSE TO REQUEST FOR ADMISSION NO. 33

Music Force incorporates each of the foregoing General Objections. Music Force incorporates by reference its Responses To Request For Admissions Nos. 40-42, 44 and 45-47 below and further states that such uploads were made without the knowledge or authorization of Mr. Marx and did not involve the works in suit.

### REQUEST FOR ADMISSION NO. 34

Admit that Robert Caldwell distributed copies of the Works in Suit in which he did not own distribution rights.

### RESPONSE TO REQUEST FOR ADMISSION NO. 34

Music Force incorporates by reference the General Objections. Music Force objects to this Request on the grounds that it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence. Music Force further objects to this Request on the grounds that it fails to specify an applicable

20

time period and is thereby vague, ambiguous and overbroad. Subject to and without waiver of the foregoing objections, Music Force lacks specific knowledge of the actions of the non-party Robert Caldwell necessary to admit or deny this Request.

### REQUEST FOR ADMISSION NO. 35

Admit that Robert Caldwell's wife encouraged him to distribute copies of the Works in Suit in which he did not own distribution rights.

### RESPONSE TO REQUEST FOR ADMISSION NO. 35

Music Force incorporates by reference the General Objections. Music Force objects to this Request on the grounds that it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence. Music Force further objects to this Request on the grounds that it fails to specify an applicable time period and is thereby vague, ambiguous and overbroad. Subject to and without waiver of the foregoing objections, Music Force lacks specific knowledge of the actions of the non-party wife of Robert Caldwell necessary to admit or deny this Request.

### REQUEST FOR ADMISSION NO. 36

Admit that You do business as Hyena Records.

### RESPONSE TO REQUEST FOR ADMISSION NO. 36

Music Force incorporates by reference the General Objections. Subject to and without waiver of the foregoing objections, Music Force admits that Hyena Records is a d/b/a of The Music Force Media Group.

### REQUEST FOR ADMISSION NO. 37

Admit that You do business as Big Deal Records.

## RESPONSE TO REQUEST FOR ADMISSION NO. 37

Music Force incorporates by reference the General Objections. Subject to and without waiver of the foregoing objections, Music Force admits that Big Deal Records is a d/b/a of The Music Force Media Group.

### REQUEST FOR ADMISSION NO. 38

Admit that You created the "hyenarecords" YouTube account.

## RESPONSE TO REQUEST FOR ADMISSION NO. 38

Music Force incorporates by reference the General Objections. Subject to and without waiver of the foregoing objections, Music Force admits that as a result of its inquiry into responding to these Requests, it learned that former Hyena Records participating partner Joel Dorn created the "hyenarecords" YouTube account without Henry Marx's knowledge or authorization.

### REQUEST FOR ADMISSION NO. 39

Admit that You created the "bigdealrecords" YouTube account.

## RESPONSE TO REQUEST FOR ADMISSION NO. 39

Music Force incorporates by reference the General Objections. Subject to and without waiver of the foregoing objections, Music Force admits that as a result of its inquiry into responding to these Requests, it learned that former Music Force employee Layla Ross created the "bigdealrecords" YouTube account without Henry Marx's knowledge or authorization.

### REQUEST FOR ADMISSION NO. 40

Admit that You have uploaded videos containing copyrighted works to YouTube using the "hyenarecords" YouTube account.

**RESPONSE TO REQUEST FOR ADMISSION NO. 40**

Music Force incorporates by reference the General Objections.  Music Force objects to

the phrase "videos containing copyrighted works" as vague and ambiguous.  Music Force objects

to the extent that that the failure to specify an applicable time period renders the Request vague

and ambiguous.  Subject to and without waiver of the foregoing objections, Music Force admits

that as a result of its inquiry into responding to these Requests, it learned that former Hyena

Records participating partner Joel Dorn created the "hyenarecords" YouTube account without

Henry Marx's knowledge or authorization and caused to be uploaded a very limited number of

videos (approximately eleven) to YouTube.  Music Force further admits that none of the videos

are related to the Works in Suit and that all such uploads appear to have occurred approximately

two or more years ago.

**REQUEST FOR ADMISSION NO. 41**

Admit that You have uploaded videos containing copyrighted works to YouTube using
the "bigdealrecords" YouTube account.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41**

Music Force incorporates by reference the General Objections.  Music Force objects to

the phrase "videos containing copyrighted works" as vague and ambiguous.  Music Force objects

to the extent that that the failure to specify an applicable time period renders the Request vague

and ambiguous.  Subject to and without waiver of the foregoing objections, Music Force admits

that as a result of its inquiry into responding to these Requests, it learned that former Music

Force employee Layla Ross created the "bigdealrecords" YouTube account without Henry

Marx's knowledge or authorization and caused to be uploaded approximately one video to

YouTube. Music Force further admits that none of the videos are related to the Works in Suit and that all such uploads appear to have occurred approximately two and one-half or more years ago.

## REQUEST FOR ADMISSION NO. 42

Admit that videos containing copyrighted works have been uploaded to YouTube using the "grumpoM" YouTube Account.

## RESPONSE TO REQUEST FOR ADMISSION NO. 42

Music Force incorporates by reference the General Objections. Music Force objects to the phrase "videos containing copyrighted works" as vague and ambiguous. Music Force objects to the extent that that the failure to specify an applicable time period renders the Request vague and ambiguous. Subject to and without waiver of the foregoing objections, Music Force denies this Request to the extent that it appears that no videos have been uploaded to YouTube using the "grumpoM" YouTube Account.

## REQUEST FOR ADMISSION NO. 43

Admit that Henry Marx created the "grumpoM" YouTube account.

## RESPONSE TO REQUEST FOR ADMISSION NO. 43

Music Force incorporates by reference the General Objections. Subject to and without waiving the foregoing objections, Music Force denies this request.

## REQUEST FOR ADMISSION NO. 44

Admit that someone created the "grumpoM" YouTube account using an email address owned or controlled by Henry Marx.

## RESPONSE TO REQUEST FOR ADMISSION NO. 44

Music Force incorporates by reference the General Objections. Subject to and without waiver of the foregoing objections, Music Force admits that as a result of its inquiry into responding to these Requests, it learned that former Music Force employee Layla Ross created

24

the "grumpoM" YouTube account using an email address owned or controlled by Henry Marx without Henry Marx's knowledge or authorization.

## REQUEST FOR ADMISSION NO. 45

Admit that only Henry Marx and his internet service providers have authorized access to the ▮▮▮▮▮▮▮ email address.

## RESPONSE TO REQUEST FOR ADMISSION NO. 45

Music Force incorporates by reference the foregoing General Objections. Subject to and without waiver of the foregoing objections, Music Force admits that only Henry Marx has authorized access to the ▮▮▮▮▮▮▮ email address but that on specific occasions former Music Force employees were provided access to the ▮▮▮▮▮▮▮ email address for limited purposes, none of which involved YouTube.

## REQUEST FOR ADMISSION NO. 46

Admit that only Henry Marx and his internet service providers have authorized access to the ▮▮▮▮▮▮▮ email address.

## RESPONSE TO REQUEST FOR ADMISSION NO. 46

Music Force incorporates by reference the foregoing General Objections. Subject to and without waiver of the foregoing objections, Music Force admits that only Henry Marx has authorized access to the ▮▮▮▮▮▮▮ email address but that on specific occasions former Music Force employees were provided access to the ▮▮▮▮▮▮▮ email address for limited purposes, none of which involved YouTube.

## REQUEST FOR ADMISSION NO. 47

Admit that only Henry Marx and his internet service providers have authorized access to the ▮▮▮▮▮▮▮ email address.

**RESPONSE TO REQUEST FOR ADMISSION NO. 47**

Music Force incorporates by reference the foregoing General Objections. Subject to and without waiver of the foregoing objections, Music Force admits that only Henry Marx has authorized access to the ▉▉▉▉▉▉▉▉▉ email address but that on specific occasions former Music Force employees were provided access to the ▉▉▉▉▉▉▉▉ email address for limited purposes, none of which involved YouTube.

**REQUEST FOR ADMISSION NO. 48**

Admit that Robert Caldwell filed a "First Amended Verified Complaint" in federal district court on March 4, 2008 alleging claims against You and Henry.

**RESPONSE TO REQUEST FOR ADMISSION NO. 48**

Music Force incorporates by reference the foregoing General Objections. Music Force objects to this Request on the grounds that it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, the Music Force admits that on March 4, 2008, Robert Hunter Caldwell, *et al.* filed a complaint in the United States District Court for the Central District of California against Henry G. Marx, *et al.* Music Force further admits that such complaint was dismissed with prejudice on July 9, 2009 and that Mr. Caldwell subsequently issued an apology to Mr. Marx in which he stated that the foregoing lawsuit was totally without merit.

**REQUEST FOR ADMISSION NO. 49**

Admit that, in a March 4, 2008 complaint filed by Robert Caldwell against You and Henry Marx, Robert Caldwell sued Henry Marx for, among other claims, "fraud."

## RESPONSE TO REQUEST FOR ADMISSION NO. 49

Music Force incorporates by reference the foregoing General Objections. Music Force objects to this Request on the grounds that it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, the Music Force admits that on March 4, 2008, Robert Hunter Caldwell, *et al.* filed a complaint in the United States District Court for the Central District of California against Henry G. Marx, *et al.* and that such complaint included a claim for fraud. Music Force further admits that such complaint was dismissed with prejudice on July 9, 2009 and that Mr. Caldwell subsequently issued an apology to Mr. Marx in which he stated that the foregoing lawsuit was totally without merit.

## REQUEST FOR ADMISSION NO. 50

Admit that, in a March 4, 2008 complaint filed by Robert Caldwell against You and Henry Marx, Robert Caldwell alleged that Henry Marx engaged in a fraud against him in connection with, among other alleged acts and omissions, "the misrepresentation by omission and failure to disclose the existence of an opportunity to acquire a share of the ownership interest in the copyright composition 'What You Won't Do For Love,' Marx's intent to acquire the interest, or the fact that he had done so."

## RESPONSE TO REQUEST FOR ADMISSION NO. 50

Music Force incorporates by reference the foregoing General Objections. Music Force objects to this Request on the grounds that it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, the Music Force admits that on March 4, 2008, Robert Hunter Caldwell, *et al.* filed a complaint in the United States District Court for the Central District of California against Henry G. Marx, *et al.* and that ¶133 of such complaint stated and alleged, in part, "the misrepresentation by omission and failure to

disclose the existence of an opportunity to acquire a share of the ownership interest in the copyright composition 'What You Won't Do For Love,' Marx's intent to acquire the interest, or the fact that he had done so." Music Force further admits that such complaint was dismissed with prejudice on July 9, 2009 and that Mr. Caldwell subsequently issued an apology to Mr. Marx in which he stated that the foregoing lawsuit was totally without merit.

### REQUEST FOR ADMISSION NO. 51

Admit, consistent with allegations in counterclaims filed by You against Robert Caldwell on August 1, 2007, that as of August 1, 2008, "What You Won't Do For Love [was] Robert Caldwell's only bona fide hit as a recording artist".

### RESPONSE TO REQUEST FOR ADMISSION NO. 51

Music Force incorporates by reference the foregoing General Objections. Music Force objects to this Request on the grounds that it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, Music Force admits that Henry Marx, *et al.* filed a counterclaim on August 1, 2008 against Robert H. Caldwell, *et al.* and that ¶18 of such counterclaim alleged "[t]o date, "What You Won't Do For Love" is Caldwell's only bono fide hit as a recording artist."

### REQUEST FOR ADMISSION NO. 52

Admit that one of the issues disputed during litigation between You and Robert Caldwell was whether Robert Caldwell was the sole author of the song "Stuck on You."

### RESPONSE TO REQUEST FOR ADMISSION NO. 52

Music Force incorporates by reference the foregoing General Objections. Music Force specifically objects to this Request on the grounds that it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery

of admissible evidence and that the phrase "one of the issues disputed during litigation" is vague and ambiguous. Subject to and without waiver of the foregoing objections, Music Force admits that, consistent with ¶79 of counterclaim filed by Henry Marx, *et al.*, against Robert H. Caldwell *et al.*, on August 1, 2008, Henry Marx co-wrote "Stuck on You".

**AS TO OBJECTIONS**:

| Dated: New York, New York<br>      January 8, 2010 | *Attorneys for The Music Force Media Group LLC, The Music Force LLC, and Sin-Drome Records, Ltd.*<br><br>  */s/ Christopher M. McGrath*<br>Christopher Lovell (CL-2595)<br>Christopher M. McGrath (CM-4983)<br>LOVELL STEWART HALEBIAN LLP<br>61 Broadway, Suite 501<br>New York, New York 10006<br>Telephone: (212) 608-1900<br>Facsimile: (212) 719-4775<br><br>    *-and-*<br><br>Jeffrey L. Graubart (JG-1338)<br>LAW OFFICES OF JEFFREY L.<br>   GRAUBART, P.C.<br>350 West Colorado Boulevard, Suite 200<br>Pasadena, California 91105-1855<br>Telephone: (626) 304-2800<br>Facsimile: (626) 304-2807<br><br>    *-and-*<br><br>Steve D'Onofrio (SD-8794)<br>5335 Wisconsin Avenue, N.W. Suite 950<br>Washington, D.C. 20015<br>Telephone: (202) 686-2872<br>Facsimile: (202) 686-2875 |

**Schapiro Exhibit 99**

 **YouTube**
Broadcast Yourself ™

[Search] Search

Home  Videos  Channels  Shows

puritchi    Sign Out

Subscriptions  History  Upload

 grumpom's Channel  Subscribe  ▶  All  Uploads  Favorites  ▶



What You Won't Do for Love
Boyz II Men featuring MC Lyte
Throwback

 iTunes
 Buy Song

Advertisement

0:18 / 4:56

**Uploads (0)**
see all

**Favorites (2)**

**What You Won't Do For Love (featuring The L Word cast)**
rachelsna... - 19,894 views

**The Human Value "Give Me"**
thehumanv... - 2,362 views

see all

Info  Comments  Favorite  Share  Playlists  Flag

## What You Won't Do For Love (featuring The L Word cast)
45 ratings ★★★★☆

From: rachelsnavygirl | September 15, 2006 | 19,894 views

What You Won't Do For Love - music by Boyz II Men and MC Lyte - music video featuring the cast of the Showtime lesbian
drama series The L Word (rachelshelley.com)

**View comments, related videos, and more**



### grumpom
Subscribe
Add as Friend  |
Block User  |  Send Message

## Channel Comments

| There are no comments for this user. |
|---|

**Add Comment**

## Profile

| Channel Views: | 51 |
|---|---|
| Age: | 59 |
| Joined: | May 25, 2006 |
| Last Sign In: | 6 days ago |
| Videos Watched: | 336 |
| Subscribers: | 0 |
| Country: | United States |

[Post Comment]

## Recent Activity

**grumpom subscribed to herbg**
(4 months ago)

EXHIBIT NO. 11
Marx
11-3-09
KEL
jmsteno.com

Subscriptions (1)



herbg

# Schapiro Exhibit 100

Dear Oliver,

As requested, I set out below responses to Richard Scudamore's letter to the Club dated 7 September 2009 and your additional queries dated 22 September 2009.

**Letter dated 7 September 2009**

1. The Club has its own dedicated YouTube channel: http://www.youtube.com/user/avtvextra.
2. No such documents exist.
3. The Club had a prior contractual relationship with PremierGoals, but this was terminated in April 2008 due to PremierGoals having breached certain requirements of the Deed of Licence. A copy of the expired contract is attached.

**Your email dated 22 September 2009**

(a) I have already provided you with copies of our International Club TV Block contracts.
(b) No such documents exist. The Club has not entered into any agreements in relation to International Club Mobile Contracts.
(c) No such documents exist. The Club does not make home video devices available to the United States.

**YouTube Channel**

Following your correspondence, the Club has carried out an internal review of each of the videos on its YouTube channel. We appreciate that while the Deed of Licence does not prevent the Club from operating a YouTube channel, it does restrict the extent to which certain content (namely Footage, Archive Footage, Sound Materials and Stills, as defined in the Deed of Licence) may be included in such a website.

The Club has over 70 videos on the website, the vast majority of which we believe to be fully in accordance with the terms of the Deed of Licence (being "behind-the-scenes" or non-PL footage). We have discovered, however, that there were 7 videos which did not fully comply with the Deed of Licence. These are as follows:-

http://www.youtube.com/watch?v=iofrx-HNqE - Still photos and commentary from the Birmingham match 13/09/09. (viewers estimate: 1,100)

http://www.youtube.com/watch?v=wS_roSN0hB4 - Still photos and commentary from the Liverpool match 24/08/09. (viewers estimate: 1,500)

http://www.youtube.com/watch?v=th7X2ldHuQs - Still photos and commentary from the Blackburn match 07/02/09. (viewers estimate: 600)

http://www.youtube.com/watch?v=XSNXxVI3ejQ - Still photos and commentary from the Bolton match 13/12/08. (viewers estimate: 600)

http://www.youtube.com/watch?v=yAHGTzS90xM - Still photos and Commentary from the Arsenal match 15/11/08. (viewers estimate: 3,100)

http://www.youtube.com/watch?v=BxqBrzAK6qU - Match footage (2 x 5 seconds) (viewers estimate: 500)

http://www.youtube.com/watch?v=IM8N81yXLAU - Match footage (1 x 5 seconds) (viewers estimate: 77)

All of these videos have now been taken down from the website and are no longer accessible. I have arranged to meet with our media and marketing team to discuss the issues raised by our internal review. I have also explained the terms of the Deed of Licence to the relevant Club personnel in detail to ensure that all content placed onto Club websites in future will comply with the terms of the Deed of Licence.

In particular, other than on the Club's official website (www.avfc.co.uk) which is the UK Club Website and International Club Website for the purposes of the Deed of Licence, going forward the Club will ensure that no Footage, Archive Footage or Sound Materials (as defined in the Deed of Licence) will be featured on any Club websites and no Stills or Sequences of Stills (as defined in the Deed of Licence) will be featured on any Club websites within seven days starting from midnight on the day of the relevant Club Match.

Please give me a call to discuss when you have a moment.

**Joanne Price**
**In-House Lawyer**
Aston Villa Football Club
Villa Park | Birmingham | B6 6HE
Tel:      0121 327 2299 x293
Mob:    07796 270643
Fax:      0121 327 7451
email:   joanne.price@avfc.co.uk
W:        www.avfc.co.uk

Aston Villa FC Limited, Aston Villa Football Club Limited and Aston Villa Limited (together "Aston Villa") - Registered Office address Villa Park, Birmingham B6 6HE.  Company registration numbers 2502822, 3375789 and 46572 respectively.

The information contained in this e-mail and any attachments is intended for the addressee only and may contain legally privileged or confidential information. If you are not the intended recipient you must not use, disclose, copy, distribute, alter, or take any action in reliance on the information and Aston Villa will not accept liability for any loss or damage howsoever arising, directly or indirectly in reliance on it and gives no warranty or representation as to its accuracy or reliability. If you are not the addressee, please notify us immediately on 0121 327 2299 and delete the material from your computer and destroy any copies.

Aston Villa reserves the right to monitor and record incoming and outgoing email messages for the purposes of investigating or detecting unauthorised use of its system and ensuring its effective operation.  Aston Villa will not accept liability for any loss or damage as a result of any virus being passed on.  Any opinions expressed in this email or any attachment are those of the individual sender not Aston Villa, except where the message states otherwise and the sender is authorised to state them to be the views of Aston Villa.



# Schapiro Exhibit 101

| From: | Oliver Weingarten <OWeingarten@premierleague.com> |
|---|---|
| Sent: | Friday, October 2, 2009 5:51 AM |
| To: | Casimir Knight <Casimir.Knight@ChelseaFC.com> |
| Cc: | Alan Shaw <Alan.Shaw@ChelseaFC.com>; Amanda Dungate <amanda.dungate@chelseafc.com>; Virginia Leather <vleather@premierleague.com> |
| Subject: | RE: You Tube documentation response |

Cas
Thanks for this. Will get back in touch if need be.
Amanda, is there any chance you could send scanned copies of the relevant Agreements please?
Best,
Oliver

---

**From:** Casimir Knight [mailto:Casimir.Knight@ChelseaFC.com]
**Sent:** 01 October 2009 16:41
**To:** Oliver Weingarten
**Cc:** Alan Shaw; Amanda Dungate
**Subject:** You Tube documentation response

Dear Oliver,

I am writing with reference to your recent correspondence requesting information and documentation in respect of the Premier League's litigation against YouTube and its parent company Google.

1.  Club's use of Youtube

-
Chelsea Digital Media set up a club branded YouTube channel in February 2007. The primary purpose of this channel is to promote the club and Chelsea TV within this environment. As per the Premier Leaguer regulations, none of the video/media submitted to our Youtube channel contains any match footage whatsoever. While we accepted YouTube's standard terms and conditions via their website when setting up this channel, there is no other relevant documentation relating this that we have to send on to you.

2.  Club's belief about the effect on their businesses of the availability of football related videos on Youtube

-
We believe the availability of football related content via Youtube does not have a material impact on the club's activity nor the ability for the club to exploit its media rights.

3.  Documents reflecting the club's making available Premier League footage by way of licensing

-
Chelsea Digital Media has not licensed the use of any match footage to any website, aside from our official international club websites which are a Chinese language website operated in partnership with Premier Goals and a Russian language website – operated in partnership with the Chelsea Fan Club (Russia).

-
CDM have licensed the club's international (ex UK and Eire) TV rights as follows –

1. North America – Setanta US (until June 2010)
2. All other international territories - IMG Media (until June 2013)

We also have an agreement with the Gifted Group, to whom we have licensed our DVD rights. Relevant documentation relating to the international TV and DVD rights has been posted to you separately by Amanda using special delivery.

I hope this adequately covers this off and do not hesitate to contact Alan or myself if you need to.

All the best and see you soon,


Cas Knight
**Managing Director**
**Chelsea Digital Media**

Phone: 020 7915 1980
Ext: 1280
Casimir.Knight@ChelseaFC.com

**www.ChelseaFC.com**

-------------------------------------------------------------------------------------
CHELSEA FC PLC is registered in England and Wales. Company No. 02536231. Registered office: Stamford
Bridge, Fulham Road, London SW6 1HS, United Kingdom.

The information contained in this e-mail or in any attachments is confidential and is intended solely
for the named addressee only. Access to this e-mail by anyone else is unauthorised. If you are not
the intended recipient, please notify Chelsea FC plc immediately by returning this e-mail to sender.
Do not read, use or disseminate the information. Opinions expressed in this e-mail are those of the
sender and not necessarily the company. Although an active anti-virus policy is operated, the company
accepts no liability for any damage caused by any virus transmitted by this e-mail, including any
attachments.
-------------------------------------------------------------------------------------



# Schapiro Exhibit 102

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


VIACOM INTERNATIONAL, INC., COMEDY      )
PARTNERS, COUNTRY MUSIC TELEVISION,     )
INC., PARAMOUNT PICTURES CORPORATION,   )
AND BLACK ENTERTAINMENT TELEVISION,     )
LLC,                                    )
                                        )
                    PLAINTIFFS, )    CASE NO.
                                )    07-CV-2103
            vs.                         )
                                        )
YOUTUBE, INC., YOUTUBE, LLC, AND        )
GOOGLE, INC.,                           )
                                        )
                    DEFENDANTS. )
_____)
                                        )
THE FOOTBALL ASSOCIATION PREMIER        )
LEAGUE LIMITED, BOURNE CO., ET AL.,     )
ON BEHALF OF THEMSELVES AND ALL         )
OTHERS SIMILARLY SITUATED,              )
                                        )
                    PLAINTIFFS, )    CASE NO.
                                )    07-CV-3582
            vs.                         )
                                        )
YOUTUBE, INC., YOUTUBE, LLC, AND        )
GOOGLE, INC.,                           )
                                        )
                    DEFENDANTS. )
_____)


VIDEOTAPED 30(B)(6) DEPOSITION OF JEFFREY DUNCAN
THURSDAY, NOVEMBER 12, 2009
LOS ANGELES, CALIFORNIA

Job No. 18088

1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4     VIACOM INTERNATIONAL, INC., COMEDY    )
      PARTNERS, COUNTRY MUSIC TELEVISION,   )
      INC., PARAMOUNT PICTURES CORPORATION, )

5     AND BLACK ENTERTAINMENT TELEVISION,    )
      LLC,                                  )

6                                       )
                   PLAINTIFFS, )  CASE NO.

7                              )  07-CV-2103

8            vs.                 )

9     YOUTUBE, INC., YOUTUBE, LLC, AND       )
      GOOGLE, INC.,                     )

10                     DEFENDANTS. )
      _____)

11                                       )
      THE FOOTBALL ASSOCIATION PREMIER       )

12     LEAGUE LIMITED, BOURNE CO., ET AL.,    )
      ON BEHALF OF THEMSELVES AND ALL        )

13     OTHERS SIMILARLY SITUATED,            )
                                       )

14                     PLAINTIFFS, )  CASE NO.
                            )  07-CV-3582

15            vs.                 )

16     YOUTUBE, INC., YOUTUBE, LLC, AND       )
      GOOGLE, INC.,                     )

17                              )
                   DEFENDANTS. )

18      _____)

19

20        VIDEOTAPED 30(B)(6) DEPOSITION OF STAGE THREE

21    (US), INC. through JEFFREY DUNCAN, taken on behalf of

22    the Defendants, at 10:06 a.m., Thursday, November 12,

23    2009, at 350 South Grand Avenue, Los Angeles,

24    California, before Elizabeth Borrelli, CSR No. 7884,

25    pursuant to notice.

1        APPEARANCES OF COUNSEL

2

3            FOR PLAINTIFF STAGE THREE MUSIC (US), INC.:

4                LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

5                BY:  DAVID STELLINGS, ESQ.

6                250 Hudson Street

7                8th Floor

8                New York, New York 10013

9                (212) 355-9500

10               dstellings@lchb.com

11

12           FOR DEFENDANT YOU TUBE:

13               MAYER BROWN LLP

14               BY:  ARIC S. JACOVER, ESQ.

15               71 South Wacker Drive

16               Chicago, Illinois 60606-4637

17               (312) 782-0600

18               (312) 706-8674 (fax)

19               asjacover@mayerbrown.com

20                    - AND -

21

22

23

24

25

1      APPEARANCES (Continued):

2

3                MAYER BROWN LLP

4                BY:  FIDELIS I. AGBAPURUONWU, ESQ.

5                1999 K Street, N.W.

6                Washington, D.C. 20006-1101

7                (202) 263-3868

8                (202) 762-4292 (fax)

9                fagbapuruonwu@mayerbrown.com

10

11               ALSO PRESENT:

12               MARK HOWARD, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

1    11:23       Q.    But you're not -- but neither co-owner is

2              required to get approval from the other before

3              licensing, correct?

4                     A.    Typ- --

5    11:24            MR. STELLINGS:  Object to the form of the

6              question.

7                     THE WITNESS:  Like I said, typically, no,

8              but there are -- there are some instances where it

9              is required.

10   11:24    BY MR. JACOVER:

11                    Q.    In what instances is approval required?

12                    A.    That would depend on the composition, the

13             specific composition.

14                    Q.    And what about the specific composition

15   11:24    would require that the co-owner get approval?

16                    A.    When there's either a legal document or

17             some type of an arrangement where the co-owner has

18             requested that they be contacted prior to licensing

19             the composition.

20   11:24            Q.    Does Stage Three have any agreements with

21             co-owners of compositions that it administers?

22                    A.    We do with Joe Egan, who's the co-writer

23             of the song "Stuck in the Middle With You," which is

24             included in one of the works in suit here.

25   11:25            And he has given us permission to enter

```
1   11:25   into this suit and function on his behalf.

2              Q.   And does -- is approval required from Joe

3           Egan to license his songs?

4              A.   He is one of the -- that is one of the

5   11:25   instances where we will go to his camp for approval

6           on a license.

7              Q.   Are there any others, any other songs?

8              A.   I can't recall off the top of my head

9           without having the song files to reference.

10  11:25      Q.   Do you know if there are any other songs

11          that are works in suit in this case where Stage

12          Three would need to get approval from a co-owner

13          before licensing?

14             A.   Yes, I know that.

15  11:26      Q.   And what's the answer?

16             A.   The answer is no.

17             Q.   Okay.

18                  Does Joe Egan own the other 50 percent of

19          "Stuck in the Middle With You"?

20  11:26      A.   He does, he and his publishing entity.

21             Q.   If you could turn to page 94389.

22                  You'll see there's the column labeled

23          "Subpublisher (if applicable)"?

24             A.   I see that.

25  11:27      Q.   How many subpublishers does Stage Three
```

1   11:27   have?

2           A.   Off the top of my head I'd have to say

3   roughly eight.

4           Q.   And what territories are they responsible

5   11:27   for?

6           MR. STELLINGS:  Objection.  It's

7   repetitive.  Ms. Slim already testified about this

8   issue.

9           You can tell him what you know.

10  11:27       THE WITNESS:  Sure.  That she did; yeah, I

11  did read that in Mary Ann's deposition, that she

12  pretty thoroughly went over all of that.

13          Shall I repeat?

14  BY MR. JACOVER:

15  11:27   Q.   Well, it wasn't clear how many

16  subpublishers there were, so I'm just trying to get

17  a little more information on that.

18          A.   Would you like me to name them

19  individually?

20  11:27   Q.   Sure.

21          A.   Okay.  This is from memory here, so...

22          Q.   Okay.

23          A.   I'll do the best I can with it.

24          For the territory of Canada, we have Peer

25  11:28   Music Canada.

| | | |
|---|---|---|
| 1 | 11:28 | For Germany we have Wintrup Music. |
| 2 | | For France we have Premiere Music. |
| 3 | | For all Latin-speaking territories we have |
| 4 | | Clippers Music, out of Spain. |
| 5 | 11:28 | For the territory of South Africa we have |
| 6 | | Gresham. |
| 7 | | For the territory of Japan we have |
| 8 | | Watanabe. |
| 9 | | Spell it?  Okay. |
| 10 | 11:28 | For the territory of Australia we have |
| 11 | | Native Tongue. |
| 12 | | For minor eastern European territories we |
| 13 | | have EMI. |
| 14 | | For Sweden and one or two of the other |
| 15 | 11:29 | Nordic countries we have Bonnier. |
| 16 | | And for several other minor European |
| 17 | | territories we have -- we have Shubert. |
| 18 | | And I believe that that's pretty |
| 19 | | inclusive. |
| 20 | 11:30 | I might be missing one or two. |
| 21 | | Q.   Okay. |
| 22 | | A.   But that's most of the world there. |
| 23 | | Q.   And do the Stage Three subpublishers, do |
| 24 | | they administer any of the works in suit? |
| 25 | 11:30 | A.   Only in their territory. |

```
 1   11:30      Q.   Are the subpublishers required to get

 2              approval from Stage Three before issuing licenses?

 3              A.   Yes.

 4              Q.   Does that approval have to be written?

 5   11:30      A.   It is written, yes.

 6              Q.   And does Stage Three track all of the

 7              subpublisher licenses?

 8              A.   Can you explain what you mean by "track"?

 9              Q.   Does Stage Three keep track of the

10   11:31      licenses issued by its subpublishers, either in a

11              database or something like that?

12              A.   Well, the sync licenses are kept track of

13              in this document that we're looking at here

14              (indicating).

15   11:31      Q.   And these include sync licenses issued by

16              subpublishers, as well?

17              A.   Yes, that we know of -- yes, the ones we

18              know of.

19              Q.   Are there some that you don't know of?

20   11:31      A.   Typically, no.  Yeah, it's accurate to say

21              no.

22              Q.   Well, I'm a little confused.  You said

23              "the ones we know of," which seems to imply that

24              there are ones that you don't know of.

25   11:31      A.   And then I said "typically, no," and then
```

| | | |
|---|---|---|
| 1 | 15:03 | (Whereupon Exhibit 12 was marked for |
| 2 | | identification.) |
| 3 | | (Whereupon Exhibit 13 was marked for |
| 4 | | identification.) |
| 5 | 15:03 | BY MR. JACOVER: |
| 6 | | Q. So these exhibits have been marked Stage |
| 7 | | Three (US) Exhibits 11, 12 and 13. |
| 8 | | And have you had a chance to look these |
| 9 | | over? |
| 10 | 15:05 | Have you -- have you seen each of these |
| 11 | | documents before? |
| 12 | | A. I have not seen these documents |
| 13 | | specifically. |
| 14 | | Q. Have you seen other take-down notices sent |
| 15 | 15:05 | by BayTSP on behalf of Stage Three? |
| 16 | | A. I have. |
| 17 | | Q. So do you know whether those other |
| 18 | | take-down notices have been produced by Stage Three |
| 19 | | in discovery in this case? |
| 20 | 15:05 | A. I do not specifically -- no, I don't know |
| 21 | | that. |
| 22 | | Q. Do you recall approximately what the dates |
| 23 | | were for those other -- the other take-down notices |
| 24 | | that you've seen? |
| 25 | 15:06 | A. I do not. |

1  15:06     Q.   Do you recall what year they were sent?

2          A.   Late 2008, early 2009.

3          Q.   Okay.

4               So, again, to the extent that these other

5  15:06   take-down notices have not been produced, we will

6          request production.

7               MR. STELLINGS:  I mean, for the record,

8          it's my understanding that we've produced to

9          defendants all of the take-down notices.  But I

10  15:06   understand that you are saying that you haven't

11          identified them, and, therefore, I will try to

12          figure out what's been produced and what has not

13          been produced, if anything.

14               MR. JACOVER:  Okay.

15  15:06   BY MR. JACOVER:

16          Q.   For the take-down notices that you have

17          seen, do you know if YouTube responded promptly to

18          those take-down notices?

19          A.   They did.

20  15:07     Q.   Has Stage Three ever had a problem with

21          YouTube not responding promptly to a DMCA-compliant

22          take-down notice?

23          A.   We have not.

24          Q.   Do you know how the URLs that are listed

25  15:07   in the take-down notices that you've seen were

1    15:07    identified?

2                      MR. STELLINGS:  Object to the form of the

3              question.

4                      You can answer.

5    15:07            THE WITNESS:  BayTSP identified those

6              URLs.

7              BY MR. JACOVER:

8                 Q.    And did anyone at Stage Three review those

9              URLs?

10   15:07      A.    The process that I explained before is

11             that BayTSP collects all URLs.  They are then sent

12             to our lawyers for review.

13                Q.    So since you haven't seen these particular

14             take-down notices before, I'll just represent to you

15   15:08     that they have URLs for several works that are not

16             works in suit in this case.

17                      So my question is, why did Stage Three

18             decide to send take-down notices for those works

19             instead of adding them to the works in suit?

20   15:08            MR. STELLINGS:  You can answer to the

21             extent that it doesn't implicate any communications

22             from your lawyers.

23                      THE WITNESS:  Any answer that I give would

24             implicate conversations I had with my lawyers.

25   11:02    BY MR. JACOVER:

| | | |
|---|---|---|
| 1 | 15:09 | Q. Why did Stage Three decide to bring this |
| 2 | | lawsuit with respect to the works in suit instead of |
| 3 | | just sending take-down notices, as they did for some |
| 4 | | of the works in suit in the exhibits I just showed |
| 5 | 15:09 | you? |
| 6 | | MR. STELLINGS: I'll object. |
| 7 | | You can answer to the extent that you can |
| 8 | | do so without implicating attorney-client |
| 9 | | communications. |
| 10 | 15:09 | THE WITNESS: Again, I mean, any answer |
| 11 | | that I would give would implicate attorney-client |
| 12 | | conversations. |
| 13 | | And we have been discussing this in detail |
| 14 | | for a long, long time, and every bit of it we've |
| 15 | 15:09 | discussed. |
| 16 | | BY MR. JACOVER: |
| 17 | | Q. I'm sorry. Every bit of it we discussed |
| 18 | | what? |
| 19 | | A. We've discussed. |
| 20 | 15:10 | MR. STELLINGS: You mean with your |
| 21 | | lawyers? |
| 22 | | THE WITNESS: In regards to -- yeah. |
| 23 | | BY MR. JACOVER: |
| 24 | | Q. Okay. |
| 25 | 15:10 | A. The take-down notices and specifically |

1    15:10    regarding your question.

2                  Q.    Stage Three has never brought -- hasn't

3         brought any lawsuits or other actions against the

4         individuals that posted the clips in these take-down

5    15:10    notices or in any of the other take-down notices

6         you've seen; is that right?

7                  A.    There was -- there was an action brought

8         upon as a result of one -- one clip that we -- that

9         we saw relating to the Baltimore Ravens.

10   15:11    Q.    Okay.

11                 A.    I don't -- I'm sorry.  I don't -- I'm not

12        a lawyer.

13                 Q.    When you're looking at your lawyer, it

14        makes it seem as if you're looking to him for --

15   15:11    A.    I'm looking for him to stop me if I get

16        close to saying something that, you know, exposes

17        attorney-client conversations.

18                 Q.    Okay.

19                 A.    That's all I'm doing there.

20   15:11    Q.    The whole object as needed.

21                 A.    I speak very quickly sometimes, though.

22                 Q.    So can you just describe to me the

23        situation relating to the Baltimore Ravens.

24                 A.    The Baltimore Ravens had a contest at one

25   15:11    of their games where they played the song "Walk This

1   15:11   Way" and had fans from the audience dance to it.

2           And one of the contestants posted himself dancing to

3           "Walk This Way" on the field and posted it to

4           YouTube.

5   15:12           We became aware of this clip and contacted

6           the Baltimore Ravens, asking them why they didn't

7           come to us for a license or come to the -- and they

8           used the original master -- or coming to the label

9           for a license.

10  15:12       Q.   Did you take --

11              A.   And --

12              Q.   Oh, go ahead.

13              A.   And we ended up settling with the

14          organization.

15  15:12       Q.   Did you take any action with regard to the

16          clip that was posted on YouTube?

17              A.   A take-down notice was sent.

18              Q.   And did you take any action against the

19          individual that had posted the clip?

20  15:12       A.   No.

21              Q.   Has Stage Three ever retracted a take-down

22          notice that it had sent?

23              A.   Yes.

24              Q.   In what instances do you remember?

25  15:13       A.   We sent -- I'm sorry?

1    15:13    Q.    Yeah, please describe the instances in

2              which Stage Three has retracted a take-down notice?

3              A.    There was one instance where take-down

4              notices were sent to Eagle Rock Communications.

5    15:13    Q.    And what was the situation with Eagle Rock

6              Communications?

7              A.    Eagle Rock is a record label who produced

8              a DVD of ZZ Top live, and Stage Three entered into a

9              mechanical license with them for that DVD that also

10   15:13    included a synchronization license, because it's

11             a -- it's got a video sync, as well, and it did,

12             indeed, include -- the license did include granting

13             of the rights to post clips of the DVD on the

14             internet for -- in whole or in part.

15   15:14    Q.    The unlimited internet rights?

16             A.    It was all media, yes.

17             Q.    And so had Eagle Rock Communications

18             posted a video on a website?

19             A.    Eagle Rock had posted on YouTube, on their

20   15:14    YouTube channel, several of the ZZ Top -- clips of

21             the ZZ Top DVD.

22             Q.    And so Stage Three sent a take-down notice

23             regarding those clips?

24             A.    BayTSP did.

25   15:14    Q.    And how did you come to be aware that

| | | |
|---|---|---|
| 1 | 15:14 | those clips were, in fact, authorized to be on |
| 2 | | YouTube? |
| 3 | | A.   We received an e-mail from an |
| 4 | | administrative personnel at Eagle Rock. |
| 5 | 15:15 | Q.   And what did that e-mail inform you? |
| 6 | | A.   That we've been sent take-down notices by |
| 7 | | BayTSP for the Stage Three Music content, and we |
| 8 | | feel we have the right to post this content. |
| 9 | | Please, can we discuss this.  Along those lines. |
| 10 | 15:15 | Q.   And how did Stage Three respond? |
| 11 | | A.   We did have a conversation with Eagle |
| 12 | | Rock.  We did review the license.  And we did |
| 13 | | ultimately allow them to keep their content posted |
| 14 | | on YouTube. |
| 15 | 15:15 | Q.   Is that video still up on YouTube, to your |
| 16 | | knowledge? |
| 17 | | A.   It is. |
| 18 | | Q.   So how did BayTSP come to identify this as |
| 19 | | an infringing clip for which it sent a take-down |
| 20 | 15:16 | notice? |
| 21 | | A.   Using the software that they use to |
| 22 | | identify these clips in the first place. |
| 23 | | Q.   So would you classify this as a mistake |
| 24 | | when they sent a take-down notice to YouTube? |
| 25 | 15:16 | A.   I think "an oversight" is better. |

1    15:16          Q.   An oversight on BayTSP's part?

2                    A.   No, oversight on behalf of our lawyers.

3                    Q.   How so?

4                    A.   In that it was -- or it could -- you know,

5    15:17    excuse me.  Let me back up.  That could also be an

6              oversight on Stage Three's part, as well.  Because,

7              as I've mentioned a couple times now, BayTSP sends

8              all occurrences of our content on YouTube to our

9              lawyers.  Our lawyers review it.  And there were

10   15:17    instances where some of those URLs were discussed.

11            And this was -- this should have been one of those

12            instances that was discussed.  And it's possible

13            that we -- I don't recall exactly.  We reviewed a

14            lot of these.  And I don't -- again, I don't recall

15   15:17    exactly how it happened, but this could have been

16            one that was caught.  So I say "oversight."

17            Mistake.

18                    Q.   Same thing?

19                    A.   In that -- in that neighborhood.

20   15:18          Q.   Has Stage Three provided any guidelines to

21            its lawyers about when it should discuss a

22            particular URL on YouTube?

23                    A.   No.  Again Stage Three doesn't give legal

24            advice to our lawyers.  We take legal advice from

25   15:18    our lawyers.

1   15:18        Q.   Well, you said that this was one -- an

2              instance that should have been discussed.  I'm

3              trying to understand how you determined which URLs

4              are -- which URLs prompt this discussion -- further

5   15:18      discussion on whether --

6                   A.   Those decisions --

7                   Q.   -- they are authorized?

8                   A.   I'm sorry.  I'll let you finish.

9                   Q.   I'm finished.

10  15:18        A.   Those decisions were made by our lawyers.

11             They then sent us the URLs that they wanted to

12             discuss with us, not the other way around, yeah.

13                  Q.   So this particular URL was not sent to

14             Stage Three, then?

15  15:19        A.   I don't know specifically.  Like I say,

16             there were a couple.  So I don't know if this made

17             it to us.  But somewhere Stage Three should have

18             been able to identify that as a -- and ultimately we

19             did identify it as a licensed use.

20  15:19        Q.   But not until after the take-down notice

21             had been sent, correct?

22                  A.   Correct.

23                  Q.   Were there any written communications

24             regarding this retraction of the take-down notice?

25  15:19        A.   I believe there were e-mails.

1   15:40       Q.   In Torrance's e-mail she includes a

2           YouTube link of the "Ax Men" trailer concerning this

3           song "Back Road Boogie", right?

4               A.   Yes.

5   15:40       Q.   So if you could turn, then, to the first

6           page of this document, Professor Ferrara responds to

7           Ms. Torrance's e-mail, and he says, "I listened to

8           the trailer and to 'La Grange'.  There are many

9           instrumental parts and elements in the one-minute

10  15:40   long trailer requiring a great deal of musical

11          transcription.  That transcription must then be

12          compared to a transcription of 'La Grange'.  I

13          estimate that this will require approximately four

14          hours of transcription and analysis."

15  15:40            Do you see that?

16              A.   Yes.

17              Q.   Is that the typical process that a

18          musicologist would go through in analyzing one of

19          these soundalikes to determine if they are

20  15:41   infringing?

21                   MR. STELLINGS:  Objection.

22                   You can answer if you know.

23                   THE WITNESS:  There is no typical.

24                   I can tell you that in this instance "La

25  15:41   Grange" is a song that is rooted in the American

1   15:41   blues tradition, and there are many subtleties that

2           need to be taken into account.  And that's why, I

3           think, it required that amount of work.

4           BY MR. JACOVER:

5   15:41       Q.   And that's why hiring a musicologist was

6           necessary in this case, correct?

7                   MR. STELLINGS:  Objection.

8                   You can answer.

9                   THE WITNESS:  We hired the musicologist --

10  15:41   well, this is -- I don't want to divulge what we've

11          discussed with our other -- our other sets of

12          lawyers that we do consult with.

13                  MR. STELLINGS:  Okay.  And you shouldn't.

14                  THE WITNESS:  Because we did have

15  15:42   discussions with our lawyer regarding this

16          infringement.

17          BY MR. JACOVER:

18               Q.   And did you take any action with respect

19          to this soundalike "Back Road Boogie"?

20  15:42       A.   We sent -- yes.  We sent a cease and

21          desist after having tried to do a -- to license the

22          composition.

23               Q.   And did Professor Ferrara provide the

24          requested analysis?

25  15:42       A.   He did.

1    15:42        Q.    And what were the -- what was the results

2              of his analysis?

3                    A.    He concluded ultimately that it was not an

4              infringement.

5    15:43        Q.    So if he concluded this was not an

6              infringement, why did you send a cease and desist

7              regarding this compo- -- regarding "Back Road

8              Boogie"?

9                    A.    It was a timing issue.  While he was still

10   15:43     in the process of reviewing it, we jumped the gun a

11            bit and sent a cease and desist.  By the time we

12            received the full report from the musicologist, we

13            then stood down.

14                   Q.    Did you send a take-down notice to YouTube

15   15:43     regarding the clip that had been posted on the site?

16                   A.    No.

17                   Q.    Why not?

18                   A.    It was an -- it was an advertisement for

19            the show.  And it's not our composition.  So if it's

20   15:44     not our composition, we can't be sending take-down

21            notices.

22                   Q.    When you say "it's not our composition,"

23            you're referring to "Back Road Boogie"?

24                   A.    "Back Road Boogie" is not a Stage Three

25   15:44     composition.

| | | |
|---|---|---|
| 1 | 15:44 | Q. Well, if you had determined that it was an |
| 2 | | infringement, "Back Road Boogie" was an infringement |
| 3 | | of "La Grange", would you then have sent a take-down |
| 4 | | notice to YouTube? |
| 5 | 15:44 | MR. STELLINGS: Objection. Hypothetical. |
| 6 | | You can answer. |
| 7 | | THE WITNESS: Had we determined it was an |
| 8 | | infringement, it would -- it would depend. If we |
| 9 | | issued a license after the fact, we might have |
| 10 | 15:45 | granted all media rights and, therefore, not sent |
| 11 | | out a take-down notice. |
| 12 | | BY MR. JACOVER: |
| 13 | | Q. In which case it would be authorized to be |
| 14 | | on the site? |
| 15 | 15:45 | A. In which case it would be authorized to be |
| 16 | | on the site, unless YouTube was excluded from that |
| 17 | | language. |
| 18 | | Q. Should YouTube have taken any action in |
| 19 | | response to this clip appearing on the site? |
| 20 | 15:45 | MR. STELLINGS: Object to the form of the |
| 21 | | question. |
| 22 | | You can answer. |
| 23 | | THE WITNESS: Should they have, according |
| 24 | | to me? |
| 25 | 15:45 | BY MR. JACOVER: |

1   16:13        A.    I do.

2                Q.    Is he your -- Stage Three's Australian

3   subpublisher?

4                A.    No.  He's an employee -- he's a former

5   16:13   employee of Native Toungue, who is Stage Three's

6   Australian's subpublisher.

7                Q.    So he's affiliated -- or used to be

8   affiliated with Australia's Stage Three

9   subpublisher?

10  16:13        A.    He was, yes.

11               Q.    And he was affiliated with them at this

12  time, I presume, correct?

13               A.    He was.

14               Q.    And this is February 15, 2007, was when he

15  16:13   sent his e-mail, correct?

16               A.    That's what it says, yes.

17               Q.    If you could turn to page 4 of this -- of

18  the attachment.

19                     There's a heading "Previous Releases" and

20  16:14   then a subheading "Previous Videos."

21                     Do you see that?

22               A.    I do.

23               Q.    And under that subheading there are three

24  YouTube links for the videos:  "Sixteen Military

25  16:14   Wives," "Los Angeles I'm Yours," and "The Solidering

| | | |
|---|---|---|
| 1 | 16:14 | Life." |
| 2 | | A. "Soldiering." |
| 3 | | Q. I guess that's spelled wrong. |
| 4 | | A. It is. |
| 5 | 16:14 | Q. "The Soldiering Life." |
| 6 | | A. You said it right; they spelled it wrong. |
| 7 | | Q. Okay. |
| 8 | | Do you have any idea why these YouTube |
| 9 | | links were included in this marketing plan? |
| 10 | 16:14 | A. This was created by EMI Capital, |
| 11 | | Australia. And I do not know why they would include |
| 12 | | YouTube links. |
| 13 | | Q. And what is EMI Capital Australia? |
| 14 | | A. It's a record label. |
| 15 | 16:14 | Q. And are they affiliated at all with Stage |
| 16 | | Three's subpublisher in Australia? |
| 17 | | A. What do you mean by "affiliated"? |
| 18 | | Q. Did they -- I shouldn't say "affiliated." |
| 19 | | Did they work with Australia's Stage |
| 20 | 16:15 | Three -- sorry -- Stage Three's Australia |
| 21 | | subpublisher? |
| 22 | | A. It appears that they have worked with |
| 23 | | them, yes. |
| 24 | | Q. And do you know who may have posted these |
| 25 | 16:15 | clips on YouTube? |

 1    16:15            MR. STELLINGS:  Object to the form of the

 2               question.

 3                    THE WITNESS:  I do not know.

 4          BY MR. JACOVER:

 5    16:15      Q.    Do you know if Stage Three made any effort

 6               to determine if these videos were authorized to be

 7               on YouTube?

 8                    A.    I believe that take-down notices were sent

 9               for all of our content that was on YouTube that was

10    16:15      not authorized.

11                    Q.    And is that based on your presumption that

12               BayTSP finds and removes all of Stage Three's

13               content?

14                    A.    Yes.

15    16:16      Q.    Do you know if anyone at Stage Three ever

16               instructed its subpublisher not to post or link to

17               videos on YouTube?

18                    A.    No one instructed our subpublishers not to

19               do that.

20    16:16      Q.    Are you aware of any Stage Three artists

21               that have an official channel on YouTube?  I should

22               say Stage Three writers.

23                    A.    Writers.  Yeah.

24                    The only one I'm aware of is the one that

25    16:16      I mentioned before, which was the Aerosmith writers.

1    16:16        Q.    Did they have an official YouTube channel?

2                 A.    Yes.

3                 Q.    Okay.

4                 A.    So it's the one that contains the

5    16:16   interviews and Brad Whitford driving a --

6                 Q.    Are you aware of any other --

7                 A.    -- racecar.

8                 Q.    Sorry.

9                       Are you aware of any other Stage Three

10   16:17   writers that have an official channel on YouTube?

11                A.    I am not.

12                      MR. JACOVER:  I'm going to show you two

13         exhibits at once, which we will have marked as Stage

14         Three (US) Exhibits 17 and 18, both of which consist

15   16:17   of printouts from two different websites.

16                      (Discussion off the record.)

17                      MR. JACOVER:  Can we go off the record for

18         one second?

19                      MR. STELLINGS:  Do you want to take a

20   16:18   quick bathroom break now?

21                      MR. JACOVER:  Sure.  Take a quick break.

22                      THE VIDEOGRAPHER:  We are going off the

23         record at 4:19 p.m.

24                      (Recess.)

25   16:19   //

1   16:40      A.   Okay.

2                    Now, making -- you asked me, should

3        YouTube know whether or not the content posted here

4        is authorized or unauthorized by looking at it,

5   16:41   right?

6            Q.   Well, not quite what I asked, but let's --

7            A.   Let's say you did.

8            Q.   Let's say that's the question, okay.

9            A.   Okay.  And then my response to that is,

10  16:41   rather than -- my other question I answered, I was

11       answering in the frame of this is all the damages

12       that have already been done, it was saying -- this

13       is from the inception of YouTube to now.  My answer

14       relating to this was business model for YouTube

15  16:41   going forward, that it should not allow any

16       content -- it's already allowed all this content --

17       unauthorized content on its website as it stands,

18       but I'm saying going forward, YouTube should know

19       what content is authorized simply by insisting that

20  16:41   anyone who uploads videos to their website have a

21       legitimate license in place.

22                    That was really long.  And I hope you

23       understood what I was getting at.

24            Q.   I think so.

25  16:42      A.   I mean, it's -- here's another way of

1   16:42   answering that question, and this is easier and

2           clearer.

3                   Q.   Okay.  Go ahead.

4                   A.   We know that -- I might have bitten off

5   16:42   more than I can chew, but I'll continue.  We know

6           that Stage Three and YouTube don't have any

7           agreement between the two companies, so with that in

8           mind, 99 percent of whatever is posted on YouTube is

9           unauthorized, just by virtue of knowing that any of

10  16:43   Stage Three content that ends up on YouTube is

11          unauthorized, with the exception of the occasional

12          video trailer and advertisement where we grant all

13          media rights.

14                  It would actually be easier for Stage

15  16:43   Three to say, okay, here are the, you know, 15 or 20

16          instances where it's actually okay for a production

17          company or a studio to upload YouTube videos where

18          we've granted these rights; here are the 15 or 20

19          instances of that.

20  16:43           Q.   And has Stage Three ever done that?

21                  A.   No.

22                  Q.   Has Stage Three ever informed YouTube of

23          the instances when the content was authorized to be

24          on the site?

25  16:43           A.   We're in the process of doing that right

1   16:43   now --

2           Q.   What --

3           A.   -- via this suit.

4           Q.   My question is, has Stage Three ever

5   16:44   informed YouTube of content that is authorized to be

6           on the site?

7           A.   We've, via BayTSP, informed them of what's

8           not authorized to be on their site.

9           Q.   That's not my question.

10  16:44        You just said it would be easier if

11          Stage -- hold on.

12          A.   Yes.

13          Q.   -- if Stage Three would inform YouTube of

14          the content that is authorized to be on the site.

15  16:44   And my question is -- it's very simple -- has Stage

16          Three ever informed YouTube --

17          A.   No.

18          Q.   -- of that content?

19          A.   No.

20  16:44   Q.   Okay.

21          A.   But I'm saying that -- and I would like to

22          finish my thought here --

23          Q.   Sure.

24          A.   -- which is, so if we were to inform you

25  16:44   of the roughly 15 or 20 authorized uses, you could