# SCHAPIRO DECLARATION EXHIBITS CONTINUED



# Schapiro Exhibit 103

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE FOOTBALL ASSOCIATION PREMIER LEAGUE LIMITED, BOURNE CO. (together with its affiliate MURBO MUSIC PUBLISHING, INC.), CAL IV MUSIC PUBLISHING COMPANY, INC., CAL IV ENTERTAINMENT LLC, ROBERT TUR d/b/a LOS ANGELES NEWS SERVICE, NATIONAL MUSIC PUBLISHERS' ASSOCIATION, THE RODGERS & HAMMERSTEIN ORGANIZATION, STAGE THREE MUSIC (US), INC., EDWARD B. MARKS MUSIC COMPANY, FREDDY BIENSTOCK MUSIC COMPANY d/b/a BIENSTOCK PUBLISHING COMPANY, ALLEY MUSIC CORPORATION, X-RAY DOG MUSIC, INC., FÉDÉRATION FRANÇAISE DE TENNIS, THE MUSIC FORCE LLC, and SIN-DROME RECORDS, LTD. on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> YOUTUBE, INC., YOUTUBE, LLC and GOOGLE, INC., <br><br> Defendants. | Case No. 07 Civ. 3582 (LLS) <br><br> **CAL IV ENTERTAINMENT LLC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSION TO CAL IV ENTERTAINMENT LLP.** |

Pursuant to Rule 36(a) of the Federal Rules of Civil Procedure, Named Plaintiff Cal IV Entertainment LLC ("Cal IV") hereby responds and objects to the Requests for Admission (the "Requests") propounded by Defendants YouTube, Inc., YouTube LLC and Google, Inc. ("YouTube" or "Defendants").

# GENERAL OBJECTIONS

The following general objections and statements ("General Objections") apply to each of the particular Requests propounded by Defendants and are hereby incorporated within each response set forth below. All of the responses set forth below are subject to and do not waive the General Objections:

1. Cal IV objects to the Requests on the ground that Cal IV is still in the process of gathering and analyzing information relevant to these Requests. Cal IV has not completed its review and analysis of all discovery obtained by the parties in this and the related *Viacom* action. Additionally, defendants and non-parties have produced more than 1.5 million pages of documents since October 13, 2009. Cal IV has not yet examined each document produced by defendants or otherwise in this action for the purpose of determining which individual allegations of the Second Amended Class Action Complaint ("Complaint") it might support, nor has Cal IV completed depositions that may more fully reveal facts and information relevant to these Requests. As discovery is not yet closed, including deposition and expert discovery, and the production of remaining data and/or documents, Plaintiff's responses to these Requests is preliminary and tentative subject to completion of discovery and following an adequate opportunity to review and analyze all discovery in this action.

2. In responding to these Requests, Cal IV does not concede the relevance, materiality or admissibility of any of the admissions or responses sought herein. Cal IV's responses are made subject to and without waiving any objections as to relevancy, materiality, admissibility, vagueness, ambiguity, competency or privilege.

3. Cal IV does not waive any of its rights to object on any ground to the use of its responses herein.

4. Cal IV objects to the Requests to the extent that they set forth compound, conjunctive or disjunctive statements.

5. Cal IV objects to each request, instruction or definition to the extent that they seek to impose obligations beyond those imposed or authorized by the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Southern District of New York ("Civil Local Rules"), or the applicable standing orders and orders of this Court.

6. Cal IV objects to each request, instruction or definition to the extent that it would require the disclosure of information that is outside the scope of information relevant to this case or that is otherwise improper.

7. Cal IV objects to each request, instruction or definition to the extent that it would require the disclosure of information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

8. Cal IV objects to each request, instruction or definition to the extent that it would require the disclosure of information generated or compiled by or at the direction of Cal IV's counsel.

9. Cal IV objects to each request, instruction or definition to the extent that it would require compilation or review of information otherwise within Defendants' possession, custody or control or more easily accessible to Defendants.

10. Cal IV objects to each request, instruction or definition to the extent that they are vague, ambiguous, overly broad or unduly burdensome.

11. Cal IV objects to each request, instruction or definition to the extent that they purport to require separate responses for each "Accused Clip" as compound and unduly burdensome.

12.     Cal IV objects to each request to the extent that they fail to specify an applicable time period and are thereby vague, ambiguous and overbroad.

13.     Cal IV objects to each request as premature to the extent that it calls for expert opinion.

14.     Cal IV objects to each request to the extent that it calls for a legal conclusion.

15.     Cal IV objects to each request, instruction or definition to the extent that they purport to require Cal IV to respond to Defendants' characterizations of legal contentions or call for the application of law to fact to the extent such request seeks disclosure of privileged information.

16.     Cal IV objects to the definitions of "Cal IV", "Cal IV's", "you" and "your" as overly broad and unduly burdensome, and further objects to the extent it seeks to impose obligations broader than those specified by Federal Rules of Civil Procedure 26, and Civil Local Rule 26.3(c)(5). Cal IV further objects on the grounds that the definition includes an unknown and unknowable number of "present and former agents, employees, representatives, accountants, investigators, attorneys," "person[s] acting or purporting to act on its behalf", and "other person[s] otherwise subject to its control, which controls it, or is under common control with them." Moreover, this definition includes "affiliates," "divisions," and "units" without any explanation of those terms' meaning. Cal IV further objects to the extent these definitions call for privileged information and to the extent they seek information outside of Plaintiffs' possession, custody or control. In responding to the Interrogatories, Plaintiffs will construe the terms "Cal IV", "Cal IV's", "you" and "your" to mean Named Plaintiff Cal IV.

17.     Cal IV objects to the definitions of "Work(s) In Suit" and "Accused Clip(s)" as compound, vague and ambiguous. Cal IV further objects to the extent these definitions call for

privileged information.  Cal IV further objects to the definitions of "Work(s) In Suit" and "Accused Clip(s)" to the extent such definitions attempt to limit the number or identity of infringed works or instances of infringement for which Cal IV seeks recovery.  As set forth at paragraph 74 of the Second Amended Complaint, the infringed works specified by Cal IV in this litigation are "representative of Protected Works that are and have been infringed by Defendants and/or YouTube's users."  Similarly, the infringements identified in Exhibit A to the Complaint and within the Complaint are representative and not an exhaustive list of the ongoing and massive infringement by Defendants.  Cal IV reserves all rights to identify additional infringements and infringed works.

18.     Cal IV objects to the definition of "substantially DMCA-compliant takedown notice" as vague and ambiguous as it requires a qualitative judgment and lacks common or ready definition.

19.     Where Cal IV indicates a lack of information or knowledge sufficient to admit or deny a specific request, this lack of information or knowledge follows a reasonable inquiry by Cal IV, and the information known or readily obtainable by Cal IV is insufficient to enable the party to admit or deny.

20.     Cal IV reserves the right to supplement or amend these responses.  These responses should not be construed as, and do not constitute, a waiver of Cal IV's right to prove additional facts at summary judgment or trial or any other rights.

21.     These general objections are continuing and are incorporated by reference in Cal IV's answers to each of the Requests set forth below.  Any objection or lack of objection to any portion of these Requests is not an admission.  Cal IV reserves the right to amend, supplement, modify, or correct these responses and objections as appropriate.

## CAL IV'S RESPONSES AND OBJECTIONS TO SPECIFIC
## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**

Admit that at all relevant times YouTube was a "service provider" as that term is used in 17 U.S.C. § 512(k)(1)(B).

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**  Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the term "at all relevant times." Cal IV further objects to this Request to the extent it calls for a legal conclusion.  Subject to and without waiving the foregoing objections, Cal IV admits that the YouTube website in part, provides or operates facilities for, among other things, "online services or network access" as those terms are used in 17 U.S.C. § 512(k)(1)(B), and otherwise denies the request.

**REQUEST FOR ADMISSION NO. 2:**

Admit that at all relevant times, YouTube stored material "at the direction of a user" as that phrase is used in 17 U.S.C. § 512(c)(1).

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**  Cal IV objects to this Request as vague and overbroad, including with respect to the terms "at all relevant times" and "material," which are undefined terms. Cal IV further objects to this Request to the extent it calls for a legal conclusion. YouTube is a media entertainment enterprise that engages in an array of directly and secondarily infringing activities that are neither storage nor at the direction of a user, such as, without limitation, transforming, copying and distributing material without the direction of a user. Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 3:**

Admit that the material you allege to infringe your copyrights in this case was stored on the youtube.com service "at the direction of a user" as that phrase is used in 17 U.S.C. § 512(c)(1).

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**  Cal IV objects to this Request for Admission as vague and overbroad, including with respect to the term "material," which is an undefined term. Cal IV further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 4:**

Admit that all of your copyright infringement claims in this action allege infringement of copyrights "by reason of the storage at the direction of a user" of material that resides on a system or network controlled or operated by or for YouTube, as set forth in 17 U.S.C. § 512(c)(1).

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**  Cal IV objects to this Request for Admission as vague and overbroad, including with respect to the term "material," which is an undefined term. Cal IV further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 5:**

Admit that at all relevant times, YouTube had "designated an agent to receive notifications of claimed infringement" as set forth in 17 U.S.C. § 5l2(c)(2).

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**  Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the term "at all relevant times."  Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 6:**

Admit that on every occasion that you sent YouTube a DMCA takedown notice relating to an accused clip, YouTube responded "expeditiously," as that phrase is used in 17 U.S.C. § 512(c)(1)(A)(iii), to remove or disable access to the material claimed to be infringing.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:** Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the term "material." Cal IV further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 7:**

Admit that on every occasion that you sent YouTube a DMCA takedown notice relating to an accused clip, YouTube responded within seventy-two business hours to remove or disable access to the material claimed to be infringing.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:** Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the term "material." Subject to and without waiting the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 8:**

Admit that for all of the accused clips, prior to receiving a DMCA takedown notice from you identifying those specific clips, YouTube did not have "actual knowledge" that the material was infringing, as described in 17 U.S.C. § 512(c)(1)(A)(i).

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:** Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the term "material." Cal IV further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 9:**

Admit that on no occasion did YouTube fail to expeditiously remove or disable access to an accused clip to the extent YouTube became aware of facts or circumstances from which infringing activity was apparent, as described in 17 U.S.C. § 512(c)(1)(A)(ii).

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:** Cal IV objects to this Request as compound. Cal IV further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 10:**

Admit that YouTube lacked the right and ability to control the infringing activity alleged by you in this case, as described in 17 U.S.C. § 512(c)(l)(B).

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:** Cal IV objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 11:**

Admit that YouTube did not receive a financial benefit directly attributable to the infringing activity alleged by you in this case, as described in 17 U.S.C. § 512(c)(1)(B).

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:** Cal IV objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 12:**

Admit that at all relevant times, access to and use of the youtube.com service was provided to users by YouTube free and without charge.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**  Cal IV objects to this Request as compound. Cal IV further objects to the terms "at all relevant times," "access" and "use" as vague and ambiguous.  For example, "use" of and "access" to the youtube.com website includes various activities, such as advertising. Subject to and without waiving the foregoing objections, Cal IV denies that "use" of the youtube.com website was provided free and without charge.

### REQUEST FOR ADMISSION NO. 13:

Admit that at all relevant times YouTube had adopted and reasonably implemented, and informed its subscribers and account holders of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of YouTube who were repeat infringers, as described in 17 U.S.C. § 512(i)(1)(A).

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**  Cal IV objects to this Request as vague and ambiguous, including the terms "at all relevant times," "reasonably implemented" and "appropriate circumstances." Cal IV further objects to this Request to the extent it calls for a legal conclusion.  Subject to and without waiving the foregoing objections, Cal IV denies this Request.

### REQUEST FOR ADMISSION NO. 14:

Admit that at no time relevant to this lawsuit have there been any "standard technical measures" in existence as that term is defined in 17 U.S.C. §§ 512(i)(1)(B) and 512(i)(2).

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**  Cal IV objects to this Request as vague and ambiguous, including the term "in existence."  Cal IV further objects to this Request to the extent it calls for legal conclusion. Cal IV further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 15:**

Admit that you do not claim in this case that YouTube failed to comply with 17 U.S.C. §§ 512(i)(1)(B) *(i.e.,* YouTube accommodates and not interfere with "standard technical measures" to the extent any exist).

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:** Cal IV objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections, Cal IV denies this Request.

**REQUEST FOR ADMISSION NO. 16:**

Admit that the presence on the youtube.com website of videos embodying the works in suit can have the effect of increasing consumer demand for those works.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:** Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the phrases "can have the effect" and "consumer demand." Cal IV further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Cal IV further objects to this request on the ground that it seeks Cal IV's opinion regarding an incomplete hypothetical question, not the admission or denial of a fact. Subject to the foregoing objections, Cal IV denies this Request on the grounds that the presence of Cal IV content on youtube.com constitutes a substitution of the products sold or and licensed by Cal IV to third parties for a fee.

**REQUEST FOR ADMISSION NO. 17:**

Admit that you agreed to YouTube's Terms of Service when you created an account on the YouTube server.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:** Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the term "Terms of Service." Subject to

and without waiving the foregoing objections, Cal IV states that it created a YouTube account in order to sign up for the Content Verification Program and further states that in order to sign up for the Content Verification Program, Cal IV was required by YouTube to agree to whatever terms YouTube unilaterally imposed on the YouTube account.

### REQUEST FOR ADMISSION NO. 18:

Admit that while you signed up for YouTube's Content Verification Program, you did not use it.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:** Cal IV objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. Cal IV further objects to this Request on the grounds that YouTube has used several euphemisms to refer to a number of "tools" that it offers to content owners. To the extent that the Content Verification Program "tool" is an electronic substitute for a DMCA takedown notice, Cal IV states that after signing up for the Content Verification Program, it determined that because of the huge volume of infringements of its works on the YouTube website, use of the Content Verification Program would not be an effective means of protecting Cal IV's copyrighted content and that it has not used this "tool" and otherwise denies this Request.

### REQUEST FOR ADMISSION NO. 19:

Admit that you have not signed up to use YouTube's Content ID tool.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:** Cal IV objects to this Request on the grounds that YouTube has used several euphemisms to refer to a number of "tools" that it offers to content owners. To the extent that Content ID is a "tool" that refers to digital

fingerprinting technology, Cal IV states that Defendants have not made their digital

fingerprinting technology readily available to Plaintiffs on reasonable terms.

**REQUEST FOR ADMISSION NO. 20:**

Individually for each accused clip, admit that you did not send a DMCA takedown notice

to YouTube within one week of becoming aware of that clip's presence on YouTube.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:** Cal IV objects to this Request on

the grounds that it is vague and ambiguous, including the term "becoming aware." Cal IV

further objects to this Request on the ground that it calls for the disclosure of information

protected by the attorney-client privilege and/or the work-product doctrine. Cal IV further

objects to this Request on the ground that the requested matter is outside the scope of

information relevant to this case. Cal IV further objects to this request on the ground that it

misconstrues the parties' respective obligations under applicable law. Subject to and without

waiving the foregoing objections, Cal IV denies this Request to the extent that Cal IV and/or its

agents have sent DMCA takedown notices to YouTube within one week of Cal IV discovering

the infringing content. Cal IV states that, because of the huge volume of infringements of its

works on the YouTube website, it notified YouTube in a manner compliant with the DMCA as

expeditiously as possible after determining that each YouTube video that is claims as infringing

in the Complaints in this action infringed its content.

**REQUEST FOR ADMISSION NO. 21:**

Individually for each accused clip, admit that you did not send a DMCA takedown notice

to YouTube within one month of becoming aware of that clip's presence on YouTube.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:** Cal IV objects to this Request on

the grounds that it is vague and ambiguous, including the term "becoming aware." Cal IV

further objects to this Request on the ground that it calls for the disclosure of information

protected by the attorney-client privilege and/or the work-product doctrine. Cal IV further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Cal IV further objects to this request on the ground that it misconstrues the parties' respective obligations under applicable law.  Subject to and without waiving the foregoing objections, Cal IV denies this Request to the extent that Cal IV and/or its agents have sent DMCA takedown notices to YouTube within one month of Cal IV discovering the infringing content.  Cal IV states that, because of the huge volume of infringements of its works on the YouTube website, it notified YouTube in a manner compliant with the DMCA as expeditiously as possible after determining that each YouTube video that it claims as infringing in the Complaints in this action infringed its content.

### REQUEST FOR ADMISSION NO. 22:

Individually for each accused clip, admit that you did not send a DMCA takedown notice to YouTube within two months of becoming aware of that clip's presence on YouTube.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**  Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the term "becoming aware."  Cal IV further objects to this Request on the ground that it calls for the disclosure of information protected by the attorney-client privilege and/or the work-product doctrine. Cal IV further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Cal IV further objects to this request on the ground that it misconstrues the parties' respective obligations under applicable law.  Subject to and without waiving the foregoing objections, Cal IV denies this Request to the extent that Cal IV and/or its agents have sent DMCA takedown notices to YouTube within two months of Cal IV discovering the infringing content. Cal IV states that, because of the huge volume of infringements of its works on the YouTube website, it notified YouTube in a manner compliant with the DMCA as

expeditiously as possible after determining that each YouTube video that it claims as infringing in the Complaints in this action infringed its content.

**REQUEST FOR ADMISSION NO. 23:**

Admit that you retracted DMCA takedown notices sent to YouTube for one or more of your works.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:** Cal IV objects to this Request on the grounds that the terms "retracted" and "your works" are vague and ambiguous as used in this Request. Cal IV further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Cal IV further objects to this Request to the extent it calls for a legal conclusion. Subject to and without waiving the foregoing objections and as further set forth in Cal IV's response to Interrogatory No. 14 and Cal IV witnesses' deposition testimony, Cal IV states that on one occasion it retracted its request to take down two video clips that were posted by Carey Ott—a songwriter employed by Cal IV at the time as an independent contractor over whom Cal IV had no control—as a courtesy to Mr. Ott. Cal IV otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 24:**

Admit that you have issued licenses for works in suit that grant the license the right to exhibit and distribute the work on websites, including YouTube.com.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:** Cal IV objects to this Request on the grounds that the terms "exhibit", "distribute" and "the work" are vague and ambiguous as used in this Request. Cal IV further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Cal IV further objects to this Request on the ground that any rights extended to a licensee of Cal IV content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights

under such license. Subject to and without waiving the foregoing objections, Cal IV denies that language granting rights in a license can be read in isolation and states that is must be read in light of other terms and restrictions in that license. Cal IV states that it has granted a limited number of licenses that grant certain rights, subject to various limitations, including without limitation, limitations on duration, territory, and use of musical compositions only in connection with particular video footage and in some cases, limitations to particular websites; among such licenses, there are an even smaller number that have granted licensees the right to use certain musical compositions on YouTube in combination with certain specified footage and in exchange for the payment of a license fee, subject to such additional restrictions, such as duration, territory and other restrictions of the type described above.

## REQUEST FOR ADMISSION NO. 25:

Admit that the license agreement produced at CAL00002218 grants the licensee the right to exhibit and distribute the work on websites, including YouTube.com.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:** Cal IV objects to this Request on the grounds that the terms "exhibit", "distribute," "the work" and "on websites" are vague and ambiguous. Cal IV further objects to this Request on the grounds that the requested matter is not relevant to this case, because there is no evidence that Defendants or the uploader of any infringing clip has represented that they have a license to post Cal IV content on YouTube. Cal IV further objects on the ground that any rights extended to a licensee of Cal IV content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights under such license. Subject to and without waiving the foregoing objections, Cal IV denies that language granting rights to exploit content in "all media now known or hereafter devised," "online programming services" or "downloads and/or streams" standing alone authorizes a licensee to exploit Cal IV content on websites generally or on YouTube.com

specifically. Cal IV states that the license produced at the bates number above grants certain rights to exploit Cal IV content on the internet subject to the express terms of the agreement, including the fee paid by the licensee in exchange for said rights.

### REQUEST FOR ADMISSION NO. 26:

Admit that the license agreement produced at CAL0000233 grants the licensee the right to exhibit and distribute the work on websites, including YouTube.com.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:** Cal IV objects to this Request on the grounds that the terms "exhibit", "distribute," "the work" and "on websites" are vague and ambiguous. Cal IV further objects to this Request on the grounds that the requested matter is not relevant to this case, because there is no evidence that Defendants or the uploader of any infringing clip has represented that they have a license to post Cal IV content on YouTube. Cal IV further objects on the ground that any rights extended to a licensee of Cal IV content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights under such license. Subject to and without waiving the foregoing objections, Cal IV denies that language granting rights to exploit content in "all media now known or hereafter devised," "promotional downloading for marketing purposes," "streaming and temporary downloading" and "permanent downloading" standing alone authorize a licensee to exploit Cal IV content on websites generally or on YouTube.com specifically and further states that the license produced at the bates number above specifically excludes "theatrical, out-of-context and/or non-sequential / non-linear uses," such as YouTube.com. Cal IV states that the license produced at the bates number above grants certain rights but excludes "theatrical, out-of-context and/or non-sequential / non-linear uses."

**REQUEST FOR ADMISSION NO. 27:**

Admit that the license agreement produced at CAL 0000219-20 grants the licensee the right to exhibit and distribute the work on websites, including YouTube.com.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:** Cal IV objects to this Request on the grounds that the terms "exhibit", "distribute," "the work" and "on websites" are vague and ambiguous. Cal IV further objects to this Request on the grounds that the requested matter is not relevant to this case, because there is no evidence that Defendants or the uploader of any infringing clip has represented that they have a license to post Cal IV content on YouTube. Cal IV further objects on the ground that any rights extended to a licensee of Cal IV content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights under such license. Subject to and without waiving the foregoing objections, Cal IV denies that language granting rights to exploit in "any and all linear media, whether now known or hereafter devised" and "Internet (whether downloading, streaming or otherwise)" standing alone authorize a licensee to exploit Cal IV content on websites generally or on YouTube.com specifically. Cal IV states that the license produced at the bates number above grants certain rights to exploit Cal IV content subject to the express terms of the agreement, including the fee paid by the licensee in exchange for said rights and the limitation that rights conferred by the license apply "only in synchronization or timed relationship to the Motion Picture and trailers."

**REQUEST FOR ADMISSION NO. 28:**

Admit that the license agreement produced at CAL00002597-601 grants the licensee the right to exhibit and distribute the work on websites, including YouTube.com.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:** Cal IV objects to this Request on the grounds that the terms "exhibit", "distribute," "the work" and "on websites" are vague and

ambiguous. Cal IV further objects to this Request on the grounds that the license produced at the bates numbers is not applicable to the works-in-suit. Cal IV further objects to this Request on the grounds that the requested matter is not relevant to this case, because there is no evidence that Defendants or the uploader of any infringing clip has represented that they have a license to post Cal IV content on YouTube. Cal IV further objects on the ground that any rights extended to a licensee of Cal IV content do not extend to parties such as unauthorized uploaders of content or YouTube, neither of whom derive any rights under such license. Subject to and without waiving the foregoing objections, Cal IV denies that language granting rights to exploit in "a streamed transmission" "audio and/or audiovisual download offered via official show website and all other associated and branded websites," "audio download/streaming realtone or ringback," "Internet Streaming via official show websites" and "Internet Streaming via affiliated websites (e.g., www.hulu.com)" standing alone authorize a licensee to exploit Cal IV content on websites generally or on YouTube.com specifically. In addition, Cal IV denies that the license produced at the bates number above grants rights to exploit Cal IV content on YouTube.com, because the express terms of the agreement permit exploitation of Cal IV content only on "official show websites" and "affiliated websites (e.g., www.hulu.com)."

**REQUEST FOR ADMISSION NO. 29:**

Admit that on no occasion did you inform YouTube of the existence of the license agreements set forth in Requests 27-30.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:** Cal IV objects to this Request as unintelligible on the ground that no license agreements are set forth in Requests 29 and 30. Cal IV further objects to this Request on the ground that the requested matter is outside the scope of information relevant to this case. Subject to and without waiving the foregoing objections, Cal IV denies this Request to the extent it implies that Cal IV has any obligation to inform YouTube

of the existence of these license agreements.  As a business practice, it is ordinarily incumbent upon the party exploiting content, *i.e.* YouTube, to seek and obtain appropriate license as well as information concerning the owner and/or administrator of content it is exploiting.  Such information is readily and publicly available including through public databases identifying Cal IV as the administrator of and/or owner of the works in suit and other Cal IV content.  Cal IV further denies this Request for the reasons set forth in its responses to Requests nos. 27-30.

### REQUEST FOR ADMISSION NO. 30:

Individually for each accused clip, admit that you did not consult with the co-owner(s) of the work-in-suit to ensure that the clip was not authorized to appear on the YouTube.com site.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**  Cal IV objects to this request on the grounds that it is vague and ambiguous, including the terms "consult", "ensure" and "co-owner(s)."  Cal IV further objects to this Request on the grounds the requested matter is outside the scope of information relevant to this case.  Subject to and without waiving the foregoing objections, Cal IV denies this Request to the extent it implies that Cal IV is obligated to consult with a co-owner (if any) to ensure that each accused clip was unauthorized to be on the YouTube website, and states that, with respect to each accused clip, it either has the right to take legal action without consulting with a co-owner (if any), or it obtained approval from a co-owner (if any) to take legal action against Defendants.

### REQUEST FOR ADMISSION NO. 31:

Individually for each accused clip, admit that you did not consult with the writer (i.e., a writer signed with Cal IV) of the work-in-suit to ensure that the clip was not authorized to appear on the YouTube.com site.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**  Cal IV objects to this request on the grounds that it is vague and ambiguous, including the terms "consult," "ensure" and "writer." Cal IV further objects to this Request on the grounds that the requested matter is outside the scope of information relevant to this case.  Subject to and without waiving the foregoing objections, Cal IV denies this Request to the extent it implies that Cal IV is obligated to consult with the "writer" to ensure that each accused clip was unauthorized to be on the YouTube website, and states that, with respect to each accused clip, Cal IV either has no obligation to consult with the "writer" of the work prior to taking action against Defendants for infringements of Cal IV's works, or that it obtained the necessary authorizations (if any were necessary) to take action against Defendants.

### REQUEST FOR ADMISSION NO. 32:

Individually for each accused clip, admit that you did not consult with any of your licensees to ensure that the clip was not authorized to appear on the YouTube.com site.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**  Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the words "consult" and "ensure."  Cal IV further objects to this Request on the grounds that the requested matter is outside the scope of information relevant to this case.  Subject to and without waiving the foregoing objection, Cal IV denies that, with respect to each accused clip, any of the infringing clips involved licensed materials within the scope of the license.

### REQUEST FOR ADMISSION NO. 33:

Admit that some of your works in suit are co-owned by third parties.

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**  Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the terms "co-owned" and "third parties."

Cal IV further objects to this Request on the grounds that it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objections, Cal IV denies this Request as to the work-in-suit "Sharing the Night Together" and admits this Request as to the work-in-suit "If You're Going Through Hell."

### REQUEST FOR ADMISSION NO. 34:

Admit that for the works in suit co-owned by third parties, the co-owners are not required to consult with you or seek your permission before licensing the work.

**RESPONSE TO REQUEST FOR ADMISSION NO. 34:**  Cal IV objects to this Request on the grounds that it is vague and ambiguous, including the terms "co-owned," "third parties," "co-owners," and "consult."  Cal IV further objects to this Request on the grounds that it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objections, Cal IV denies this Request as inapplicable to the work-in-suit "Sharing the Night Together."  Cal IV denies this Request with regard to work-in-suit "If You're Going Through Hell" insofar as it applies to licensing for the YouTube website.

### REQUEST FOR ADMISSION NO. 35:

Admit that your writers (i.e. writers signed by Cal IV) have posted videos on YouTube.

**RESPONSE TO REQUEST FOR ADMISSION NO. 35:**  Cal IV objects to this request on the grounds that it is vague and ambiguous, including the term "writer." Cal IV further objects to this Request on the grounds that it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Cal IV denies this Request to the extent

it related to Cal IV's works-in-suit.  Cal IV states that to its knowledge and as further set forth in Cal IV's response to Interrogatory No. 14 and Cal IV witnesses' deposition testimony, Carey Ott—a songwriter previously employed by Cal IV as an independent contractor over whom Cal IV had no control—posted videos on YouTube, but was not authorized to do so at the time of posting Cal IV otherwise denies the Request.

AS TO OBJECTIONS:

Dated: January 8, 2010
San Francisco, CA

_____

Daniel Girard
Christina Connolly Sharp
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108

*-and-*

Gerald E. Martin
Laurel Johnston
BARRETT JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201

*-and-*

Kevin Doherty
BURR & FORMAN
700 Two American Center
3102 West End Avenue
Nashville, TN 37203

*Attorneys for Cal IV Entertainment LLC*



# Schapiro Exhibit 104

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC. )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION, LLC, )
                                        )
          Plaintiffs, )
                                          )
vs.                              ) NO. 07-CV-2203
                                          )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
                                          )
          Defendants. )
_____)

THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
                                          )
          Plaintiffs, )
vs.                              ) NO. 07-CV-3582
                                          )
YOUTUBE, INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
                                          )
          Defendants. )
_____)

VIDEOTAPED DEPOSITION OF BRIAN K. BRADFORD
SAN FRANCISCO, CALIFORNIA
THURSDAY, MARCH 12, 2009

BY: ANDREA M. IGNACIO HOWARD, CSR, RPR, CLR
JOB NO. 16590

1           MARCH 12, 2009

2              9:53 A.M.

3

4      VIDEOTAPED DEPOSITION OF BRIAN K. BRADFORD

5      WILSON SONSINI GOODRICH & ROSATI, LLP,

6      One Market Street, Spear Tower, San Francisco

7      California, pursuant to notice, and before,

8      ANDREA M. IGNACIO HOWARD, CLR, RPR, CSR

9      License No. 9830.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022   (212)705-8585

65d375b6-dfdf-4802-a95b-b668dacc616d

```
 1      A P P E A R A N C E S:

 2

 3          FOR THE PLAINTIFFS CAL IV ENTERTAINMENT:

 4              GIRARD GIBBS LLP

 5              By:  CHRISTINA C. SHARP, Esq.

 6              601 California Street, 14th Floor

 7              San Francisco, California 94108-2819

 8              (415) 981-4800 chc@girardgibbs.com

 9

10          FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE, LLC and

11          GOOGLE, INC.:

12              MAYER BROWN LLP

13              By:  GREGORY FRANTZ, Esq.

14                   ILANA D. GOLANT, Esq.

15              1675 Broadway

16              New York, New York 10019-5820

17              (212) 506-2423 gfrantz@mayerbrown.com;

18                       igolant@mayerbrown.com

19

20          ALSO PRESENT:  Lou Meadows, Videographer.

21

22                       ---oOo---

23

24

25
```

65d375b6-dfdf-4802-a95b-b668dacc616d

1          BRADFORD

11:05:06    2    different names listed as copyright claimants?  Do you

11:05:09    3    see that?

11:05:10    4         A    Yes.

11:05:10    5         Q    Can you explain who each claimant is?

11:05:13    6         A    Gravitron Music and Whaddayadef Music are the

11:05:28    7    copyright claimants on behalf of Sam Tate and Kathleen

11:05:34    8    Wright, person known as Annie Tate, and Cal IV is

11:05:39    9    the rep- -- the claimant on behalf of Dave Berg.

11:05:43   10         Q    Are Gravitron Music and Whaddayadef Music,

11:05:46   11    are those the same company or are they different

11:05:49   12    companies?

11:05:49   13         A    I'm not completely sure because that's -- you

11:05:53   14    know, that -- that's a third party.  From what my

11:05:56   15    understanding is, Gravitron Music is the SESAC

11:06:01   16    publisher for a company called Carnival Music Company

11:06:06   17    based in Nashville.  And Sam Tate and Annie Tate were

11:06:14   18    under contract with that company when they wrote the

11:06:23   19    song and -- and it appears that part of their deal

11:06:27   20    included co-publishing interest, which, I believe,

11:06:30   21    is -- that's where the Whaddayadef Music is probably

11:06:32   22    the name of their co-publishing interest.

11:06:35   23         Q    And at the time this registration was filed,

11:06:38   24    which, as you'll note, was June 19th, 2006, did your

11:06:42   25    company, in fact, have an ownership interest in this

65d375b6-dfdf-4802-a95b-b668dacc616d

|          |    |                                              |
|----------|----|----------------------------------------------|
|          | 1  | BRADFORD                                     |
| 11:06:44 | 2  | copyright?                                    |
| 11:06:44 | 3  | MS. SHARP:  The question may call for a legal |
| 11:06:46 | 4  | conclusion.                                   |
| 11:06:48 | 5  | Answer to the extent you know the answer.     |
| 11:06:52 | 6  | THE WITNESS:  Yes.                            |
| 11:06:55 | 7  | MR. FRANTZ:  Q.  And why do you say your      |
| 11:06:56 | 8  | company had an ownership interest?            |
| 11:06:59 | 9  | MS. SHARP:  Again, legal conclusion.          |
| 11:07:01 | 10 | THE WITNESS:  As I discussed earlier, Dave    |
| 11:07:05 | 11 | Berg was under contract with us at the time of writing |
| 11:07:09 | 12 | this composition.                             |
| 11:07:16 | 13 | MR. FRANTZ:  Q.  And when did your company     |
| 11:07:17 | 14 | acquire the ownership interest?               |
| 11:07:19 | 15 | A    Upon creation of the work.               |
| 11:07:20 | 16 | Q    What percent ownership in the -- in the  |
| 11:07:23 | 17 | overall work did your company acquire?        |
| 11:07:25 | 18 | MS. SHARP:  Same objection.                   |
| 11:07:26 | 19 | THE WITNESS:  Our -- our controlled           |
| 11:07:30 | 20 | administrative interest is one-third.         |
| 11:07:33 | 21 | MR. FRANTZ:  Q.  And was it one-third the      |
| 11:07:35 | 22 | whole time or did that change at some point?  |
| 11:07:38 | 23 | A    Initially, Dave Berg had a co-publishing |
| 11:07:44 | 24 | arrangement with -- with Cal IV.  The name of his |
| 11:07:52 | 25 | co-publisher was Berg -- BergBrain Music, and at the |

BRADFORD

| | | |
|---|---|---|
| 11:08:02 | 2 | time the -- the contractual split between Cal IV and |
| 11:08:05 | 3 | his co-pub was of -- of the controlled administered |
| 11:08:12 | 4 | share, Cal IV had two-thirds, and BergBrain Music had |
| 11:08:17 | 5 | one-third, but that -- the BergBrain Music pur- -- |
| 11:08:23 | 6 | catalog was purchased by Cal IV, and, thus, the full |
| 11:08:26 | 7 | share became Cal IV's share. |
| 11:08:35 | 8 | Q   And with respect to the overall copyright |
| 11:08:37 | 9 | today, what percentage of the copyright does Cal IV |
| 11:08:40 | 10 | own? |
| 11:08:41 | 11 | MS. SHARP:  Same objection. |
| 11:08:49 | 12 | THE WITNESS:  Today it's one-third. |
| 11:08:58 | 13 | MR. FRANTZ:  Okay. |
| 11:08:58 | 14 | Q   Now, look at the second page. |
| 11:08:59 | 15 | Do you see at the bottom of the second page |
| 11:09:01 | 16 | in -- in Section No. 9 is a reference to "Bluewater |
| 11:09:04 | 17 | Music Services Corp/Attn: Dan Ekback"?  Do you see |
| 11:09:12 | 18 | where I'm looking? |
| 11:09:14 | 19 | A   Yes. |
| 11:09:14 | 20 | Q   Okay.  Do you know who Dan Ekback of |
| 11:09:17 | 21 | Bluewater Music Services Corp is? |
| 11:09:23 | 22 | A   Yes. |
| 11:09:23 | 23 | Q   Who is he? |
| 11:09:24 | 24 | A   At the time, he was -- I'm not sure exactly |
| 11:09:28 | 25 | what his title was, but he was an upper-level |

65d375b6-dfdf-4802-a95b-b668dacc616d

| | 1 | BRADFORD |
|---|---|---|
| 11:09:36 | 2 | administrative specialist with Bluewater Music |
| 11:09:40 | 3 | Services Corp. |
| 11:09:43 | 4 | Q   And who's Bluewater Music Services Corp, if |
| 11:09:48 | 5 | you know? |
| 11:09:48 | 6 | A   Bluewater is -- I -- well, I -- I'm not |
| 11:09:52 | 7 | completely sure what all they do.  Obviously, that's a |
| 11:09:57 | 8 | third party, but from my understanding is they are -- |
| 11:10:06 | 9 | and a -- a copyright administration service for other |
| 11:10:10 | 10 | publishers. |
| 11:10:12 | 11 | Q   And if you look at Section 8, just above |
| 11:10:16 | 12 | where we're looking, very small box that's checked |
| 11:10:20 | 13 | that says "Authorized agent of Gravitron Music, |
| 11:10:29 | 14 | Whaddayadef Music," does that mean that this copyright |
| 11:10:33 | 15 | was filed by Bluewater on behalf of Gravitron Music |
| 11:10:38 | 16 | and Whaddayadef Music? |
| 11:10:42 | 17 | A   Dan Ekback, from -- from my understanding of |
| 11:10:45 | 18 | this, Dan Ekback of Bluewater Music Services was -- |
| 11:10:50 | 19 | was/is the administrator for Gravitron, Whaddayadef, |
| 11:10:57 | 20 | and they filed the copyright registration. |
| 11:10:59 | 21 | Q   Did Cal IV have any involvement in the filing |
| 11:11:02 | 22 | of the copyright registration? |
| 11:11:04 | 23 | A   No. |
| 11:11:06 | 24 | Q   Did Cal IV know about the filing of the |
| 11:11:10 | 25 | copyright registration? |

65d375b6-dfdf-4802-a95b-b668dacc616d

```
              1                    BRADFORD
11:47:58      2    songwriter's agreement immediately upon its creation,
11:48:03      3    which was in 2005, I believe -- is that correct?
11:48:06      4         A    Let me look at this schedule here.
11:48:16      5              Date of creation April 19th, 2005.
11:48:19      6         Q    Okay.  So your testimony is that the
11:48:21      7    copyright was assigned from Berg to Cal IV, at least a
11:48:26      8    certain interest of that was assigned immediately upon
11:48:29      9    creation; is that correct?
11:48:33     10         A    Yes.
11:48:33     11         Q    So why is there any need for the assignment
11:48:36     12    documents in 2007?
11:48:42     13         A    It's a -- are you -- which one are you -- are
11:48:45     14    you referring to?  Exhibit 9?
11:48:47     15         Q    I'm referring to both Exhibit 8 and
11:48:49     16    Exhibit 9.
11:48:49     17         A    Okay.  Exhibit 8 was necessary because of the
11:48:51     18    asset sale and purchase agreement, or asset purchase
11:48:54     19    and sale agreement.
11:48:56     20              Exhibit 9 was necessary as a prescribed step
11:49:05     21    with -- that was -- that -- that was an obligation
11:49:14     22    under the songwriter agreement.  It's more of a
11:49:18     23    formality to list the compositions within the
11:49:24     24    agreement.
11:49:27     25         Q    But there was nothing improper about -- about
```

65d375b6-dfdf-4802-a95b-b668dacc616d

BRADFORD

the copyright being registered in Cal IV's name back
in 2006, because Cal IV had already acquired the
copyright immediately upon its creation; is that
correct?

    A    Correct.

    Q    Okay.  Now, are there co- -- other co-owners
of the work "If You're Going Through Hell"?

    A    We discussed that earlier.  The publishers
for Sam Tate and Annie Tate, Gravitron Music and
Whaddayadef Music.

    Q    And how do you know about those co- -- other
co-owners?

        MS. SHARP:  Form.

        THE WITNESS:  Well, how -- how do I know that
they are the co-owners, or how do I know about the
co-owners?

        MR. FRANTZ:  Q.  Well, how do you know that
they are the co-owners of that work?

    A    Because when Dave Berg turned the song in to
us, on our -- in our process of deliveries and, you
know, we -- we need to know who he wrote songs with,
he told us that Sam Tate and Annie Tate co-wrote the
song with him, and we knew that they were contracted
writers with Carnival Music Company, which is, you

65d375b6-dfdf-4802-a95b-b668dacc616d

| | 1 | BRADFORD |
|---|---|---|
| 11:50:53 | 2 | know, the -- you know, the -- their SESAC company is |
| 11:50:57 | 3 | Gravitron Music. That's a subsidiary of Carnival, so |
| 11:51:01 | 4 | they were under agreement with them. |
| 11:51:05 | 5 | Q   And if there were some change in the |
| 11:51:08 | 6 | ownership status with respect to the other co-owners |
| 11:51:11 | 7 | of this work, would you be notified of that? |
| 11:51:15 | 8 | A   Not necessarily. |
| 11:51:23 | 9 | Q   Do you agree that the other co-owners of the |
| 11:51:26 | 10 | work are entitled to grant licenses with respect to |
| 11:51:30 | 11 | the work? |
| 11:51:34 | 12 | A   As -- as the -- controlling and administering |
| 11:51:41 | 13 | their exclusive rights, I would say yes. |
| 11:51:43 | 14 | Q   Do you know whether any of the co-owners, the |
| 11:51:46 | 15 | other co-owners have, in fact, granted any such |
| 11:51:49 | 16 | licenses with respect to "If You're Going Through |
| 11:51:52 | 17 | Hell"? |
| 11:51:55 | 18 | A   I honestly -- I -- I wouldn't know what kind |
| 11:51:57 | 19 | of licenses they grant.  I don't have access to their |
| 11:52:02 | 20 | documents. |
| 11:52:04 | 21 | Q   Could you acquire such information? |
| 11:52:10 | 22 | A   Probably not. |
| 11:52:12 | 23 | Q   When you say "Probably not," why do you say |
| 11:52:15 | 24 | that? |
| 11:52:18 | 25 | A   Because they would have no reason to give me |

65d375b6-dfdf-4802-a95b-b668dacc616d

|         |    |                                              |
|---------|----|----------------------------------------------|
|         | 1  | BRADFORD                                     |
| 11:52:23 | 2  | copies of their licenses.                   |
| 11:52:24 | 3  | MR. FRANTZ:  Let's mark a new exhibit,       |
| 11:52:27 | 4  | Exhibit 10, please.                          |
| 11:52:28 | 5  | (Document marked Bradford Exhibit 10         |
| 11:52:38 | 6  | for identification.)                         |
| 11:52:38 | 7  | THE WITNESS:  Are we done with these         |
| 11:52:40 | 8  | exhibits?  Can I get them out of my way?     |
| 11:52:42 | 9  | MR. FRANTZ:  We are for the most part, but   |
| 11:52:43 | 10 | there is a chance I may come back to them.   |
| 11:52:46 | 11 | THE WITNESS:  Okay.                          |
| 11:52:52 | 12 | MS. SHARP:  There you go, sir.               |
| 11:52:54 | 13 | I'm sorry.  Exhibit?                         |
| 11:52:55 | 14 | MR. FRANTZ:  10.                             |
| 11:53:04 | 15 | THE WITNESS:  Okay.                          |
| 11:53:05 | 16 | MR. FRANTZ:  Can you identify -- let me just |
| 11:53:07 | 17 | note for the record that its -- the Bates No. is CAL |
| 11:53:14 | 18 | '1593 through '97.                           |
| 11:53:15 | 19 | Q   Can you identify the document?           |
| 11:53:18 | 20 | A   This is a "Lyric Reprint License Agreement" |
| 11:53:24 | 21 | between Cal IV and Country Music Media Group for "If |
| 11:53:28 | 22 | You're Going Through Hell."                  |
| 11:53:28 | 23 | Q   All right.                               |
| 11:53:28 | 24 | And when you look at the first page of the   |
| 11:53:30 | 25 | document, do you see that it says Cal IV controls |

65d375b6-dfdf-4802-a95b-b668dacc616d

| | | |
|---|---|---|
| | 1 | BRADFORD |
| 11:53:33 | 2 | 33.34 percent of the work? |
| 11:53:39 | 3 | MS. SHARP: Where are you looking, Counsel? |
| 11:53:41 | 4 | MR. FRANTZ: I'm looking in Section 1, the |
| 11:53:44 | 5 | last sentence of Section 1. |
| 11:53:47 | 6 | THE WITNESS: Yes. |
| 11:53:48 | 7 | MR. FRANTZ: Okay. |
| 11:53:49 | 8 | Q And am I correct that at that time, which is |
| 11:53:54 | 9 | August 14th, 2006, what that meant is that Cal IV |
| 11:53:58 | 10 | itself owned 22 percent and BergBrain owned |
| 11:54:04 | 11 | 11 percent? Is that correct? |
| 11:54:08 | 12 | MS. SHARP: Misleading question. |
| 11:54:09 | 13 | You can answer, if you understand it. |
| 11:54:10 | 14 | THE WITNESS: Well, to be more specific, Cal |
| 11:54:14 | 15 | IV 22.23, and BergBrain 11.11. That's correct. |
| 11:54:19 | 16 | MR. FRANTZ: Okay. |
| 11:54:25 | 17 | Q And if you flip to the last page, which is |
| 11:54:28 | 18 | '1597, do you see towards the top in the column on the |
| 11:54:37 | 19 | right it says "Controlled Percentage: 0"? |
| 11:54:42 | 20 | A Yes. |
| 11:54:42 | 21 | Q What does that mean? |
| 11:54:47 | 22 | A This -- well, this is -- for one thing, this |
| 11:54:49 | 23 | is a printout from RightTrack in our system, and |
| 11:54:56 | 24 | the -- RightTrack is not a -- a very modernized |
| 11:55:03 | 25 | program. It's a very old program. Basically, I use |

65d375b6-dfdf-4802-a95b-b668dacc616d

                          1                    BRADFORD

17:29:48    2    sentence we just read, this is, again, your e-mail,

17:29:52    3    you say, "However, our license agreements must be

17:29:57    4    specific to each use."

17:29:59    5            What did you mean by that?

17:30:03    6       A    Probably specific to each use.  The -- each

17:30:08    7    use, being whatever video he intended to post.

17:30:14    8       Q    "Each use," does that mean each URL?

17:30:20    9       A    I -- I would say a -- the URL was indicative

17:30:24   10    of the use.

17:30:25   11       Q    Does "each use" mean something besides each

17:30:32   12    URL?

17:30:36   13       A    Well, I would say that the -- the posting of

17:30:39   14    a video, which generates a unique URL, is a specific

17:30:45   15    use.

17:30:49   16       Q    Because if we keep reading, you say, "In this

17:30:52   17    case, the URL of each video posting needs to be listed

17:30:55   18    in the license agreement."

17:30:57   19            So what I'm trying to understand here was,

17:30:59   20    were you contemplating that the license would apply

17:31:02   21    only to particular URLs?

17:31:06   22       A    Yes, I believe that was the intention.

17:31:07   23       Q    So does this mean that for two identical

17:31:10   24    clips, one on YouTube could be infringing and one

17:31:13   25    would not be infringing, depending on whether the

65d375b6-dfdf-4802-a95b-b668dacc616d

|          | 1  | BRADFORD |
|----------|----|----------|
| 17:31:15 | 2  | particular URL was listed in the license agreement? |
| 17:31:19 | 3  | Is that correct? |
| 17:31:24 | 4  |    A   Well, this was -- this issue was specific to |
| 17:31:28 | 5  | Carey's videos that were being posted on his behalf, |
| 17:31:34 | 6  | and those were the ones that we were amenable to |
| 17:31:41 | 7  | agreeing to, and so I would say other uses of the same |
| 17:31:47 | 8  | clip, yes, they would be infringing uses. |
| 17:31:51 | 9  |    Q   And is there any way for YouTube to determine |
| 17:32:00 | 10 | whether two identical clips, either one of those clips |
| 17:32:05 | 11 | is licensed and the other is not licensed? |
| 17:32:08 | 12 |       MS. SHARP:  Objection; calls for speculation. |
| 17:32:09 | 13 |       THE WITNESS:  Well, as I stated before, |
| 17:32:11 | 14 | the -- they're responsible for making sure that the |
| 17:32:15 | 15 | content on -- on their website is legit. |
| 17:32:19 | 16 |       MR. FRANTZ:  Q.  Have you provided YouTube |
| 17:32:21 | 17 | with the list -- or not with the list, but with all |
| 17:32:23 | 18 | your licenses? |
| 17:32:30 | 19 |    A   Which licenses? |
| 17:32:31 | 20 |    Q   All of your licenses respecting all of your |
| 17:32:34 | 21 | compositions. |
| 17:32:34 | 22 |       MS. SHARP:  Objection; vague. |
| 17:32:35 | 23 |       THE WITNESS:  Why? |
| 17:32:38 | 24 |       MR. FRANTZ:  Because if YouTube doesn't have |
| 17:32:39 | 25 | a full list of the licenses at issue, how could it |

65d375b6-dfdf-4802-a95b-b668dacc616d

| | | |
|---|---|---|
| | 1 | BRADFORD |
| 17:32:42 | 2 | possibly determine whether you, in your discretion, |
| 17:32:45 | 3 | determined to issue a particular license for a |
| 17:32:48 | 4 | particular URL? |
| 17:32:49 | 5 | MS. SHARP: Objection; calls for speculation. |
| 17:32:50 | 6 | THE WITNESS: I -- I don't believe that |
| 17:32:53 | 7 | burden is ours. |
| 17:33:10 | 8 | MR. FRANTZ: All right. Let's mark the next |
| 17:33:12 | 9 | exhibit. |
| 17:33:17 | 10 | (Document marked Bradford Exhibit 29 |
| 17:33:19 | 11 | for identification.) |
| 17:33:19 | 12 | MR. FRANTZ: This is Exhibit 29, and it's CAL |
| 17:33:24 | 13 | '866 to '67. |
| 17:33:40 | 14 | THE WITNESS: Okay. |
| 17:33:40 | 15 | MR. FRANTZ: Q. Can you identify these |
| 17:33:41 | 16 | e-mails? |
| 17:33:44 | 17 | A Well, this is related to the Carey Ott |
| 17:33:47 | 18 | situation, and it looks like there's certain URLs |
| 17:33:51 | 19 | involved. |
| 17:33:57 | 20 | Q And it appears that you did decide to retract |
| 17:34:01 | 21 | your -- your notification to YouTube; isn't that |
| 17:34:06 | 22 | correct? |
| 17:34:07 | 23 | A It appears that way, yes. |
| 17:34:08 | 24 | Q Do you recall this? |
| 17:34:10 | 25 | A I mean, it's not in my -- you know, it's not |

65d375b6-dfdf-4802-a95b-b668dacc616d

BRADFORD

17:34:19　2　right on the top of my mind right now, but, you know,

17:34:23　3　looking at the e-mail, yeah, it sounds familiar to me.

17:34:25　4　　　Q　Why did you decide to retract this takedown

17:34:27　5　notice?

17:34:30　6　　　A　Because it was part of the process with Carey

17:34:38　7　Ott.　You know, it was -- it was at our discretion.

17:34:40　8　　　Q　And flipping to page '867, do you see -- I

17:34:53　9　don't know how to pronounce that name, Bohagey Bowes;

17:34:56　10　do you see that reference?

17:34:58　11　　　A　Yes.

17:34:58　12　　　Q　Do you know who Mr. Bowes is?

17:35:01　13　　　A　I don't.　I think he probably has something

17:35:03　14　to do with Carey Ott's manager, but that's a guess.

17:35:10　15　　　Q　Do you see where Mr. Bowes says in this

17:35:13　16　e-mail, "There has been a mix-up involving the

17:35:16　17　copyright which is now resolved"?

17:35:20　18　　　A　I see that.

17:35:21　19　　　Q　Do you agree with Mr. Bowes, that there was,

17:35:24　20　in fact, a mixup involving the copyright?

17:35:27　21　　　A　Well, I guess he's referring to this issue

17:35:29　22　with Carey Ott that we've been discussing.　You know,

17:35:36　23　whether or not it's a mixup, I don't, you know,

17:35:39　24　necessarily agree with that term, but there was

17:35:42　25　definitely a situation involving this, yes.

65d375b6-dfdf-4802-a95b-b668dacc616d

# Schapiro Exhibit 105

**From:** Copyright Service [copyright@youtube.com]
**Sent:** Thursday, November 16, 2006 9:09 PM
**To:** Oliver Weingarten
**Subject:** Welcome to the YouTube Content Verification Program

Thank you for signing up for our Content Verification Program!  I have
created an account for you.

The username is: 1lp1f
The password is: dd44tt

The password and email address for this content verification account can
be changed by you at anytime.  Simply login to the account and click on
the 'my profile' link in the navigation bar.  Once on this page, click
on the 'edit' link next to the 'hello, I'm 1lp1f'.  On this next page
you will see fields for email address and password that can be changed.

Also, attached is a short tutorial so you have everything you need to
get started!

Thank you again!

Misty
The YouTube Team

PL00000458



**Schapiro Exhibit 106**

.

---

**From:**     Oliver Weingarten [OWeingarten@premierleague.com]
**Sent:**     Tuesday, January 09, 2007 6:33 AM
**To:**       Tammy Knox
**Subject:**  FW: Content Verification Program - Videos flagged by l1p1f

---

**From:** YouTube Service [mailto:service@youtube.com]
**Sent:** 09 January 2007 11:29
**To:** Oliver Weingarten
**Subject:** Content Verification Program - Videos flagged by l1p1f

# YouTube | Broadcast Yourself™

The following videos have been flagged as infringing by l1p1f (the content owner) and need to be reviewed for deletion:

http://www.youtube.com/watch?v=1k6Fb50Msz8&search=Premier%20League
http://www.youtube.com/watch?v=sMftr4aEnz8&search=Premier%20League
http://www.youtube.com/watch?v=CzgNbx2B588&search=Premier%20League
http://www.youtube.com/watch?v=HpoeWtKiVXc&search=Premier%20League
http://www.youtube.com/watch?v=HXpkyKiZIII&search=Premier%20League
http://www.youtube.com/watch?v=YqTHZNzUjl8&search=Premier%20League
http://www.youtube.com/watch?v=qetLce-6wxs&search=Premier%20League
http://www.youtube.com/watch?v=ChqG8MmWYWU&search=Premier%20League
http://www.youtube.com/watch?v=1AW_HopEJjY&search=Premier%20League
http://www.youtube.com/watch?v=8HGguc0Uiao&search=Premier%20League
http://www.youtube.com/watch?v=c-wPpBBe_nE&search=Premier%20League
http://www.youtube.com/watch?v=Ni1HXEbsiX4&search=Premier%20League
http://www.youtube.com/watch?v=QxPUIcmnOYA&search=Premier%20League
http://www.youtube.com/watch?v=q2FAdGQ9Z3c&search=Premier%20League
http://www.youtube.com/watch?v=qA4f9QKwL4k&search=Premier%20League
http://www.youtube.com/watch?v=_QErY9hY88Q&search=Premier%20League
http://www.youtube.com/watch?v=v6arANTA1pc&search=Premier%20League
http://www.youtube.com/watch?v=0Bijovul9N8&search=Premier%20League
http://www.youtube.com/watch?v=aw2qhTpQNMM&search=Premier%20League
http://www.youtube.com/watch?v=sDT6kDKiBt4&search=Premier%20League
http://www.youtube.com/watch?v=5LLuBqG-Q9M&search=Premier%20League
http://www.youtube.com/watch?v=HwCGv6YPFEI&search=Premier%20League
http://www.youtube.com/watch?v=ebZX0QbDVzQ&search=Premier%20League
http://www.youtube.com/watch?v=dTS404a_ngk&search=Premier%20League
http://www.youtube.com/watch?v=hO8LMfJ-ULg&search=Premier%20League
http://www.youtube.com/watch?v=4zTuoQcsGqc&search=Premier%20League
http://www.youtube.com/watch?v=--E76iAA7lc&search=Premier%20League
http://www.youtube.com/watch?v=sOgMJAo1bcw&search=Premier%20League

PL00000574

http://www.youtube.com/watch?v=VMHD6iqq2qg&search=Premier%20League
http://www.youtube.com/watch?v=AAzuTTuLzcl&search=Premier%20League
http://www.youtube.com/watch?v=3d1C6jMOUXY&search=Premier%20League
http://www.youtube.com/watch?v=_cRl6lGwZM8&search=Premier%20League
http://www.youtube.com/watch?v=l9JfCZiuDcw&search=Premier%20League
http://www.youtube.com/watch?v=eMSTQX2GMiA&search=Premier%20League
http://www.youtube.com/watch?v=iv6KGoHq4no&search=Premier%20League
http://www.youtube.com/watch?v=VzDr_LKszmQ&search=Premier%20League
http://www.youtube.com/watch?v=D-ozm4taei0&search=Premier%20League
http://www.youtube.com/watch?v=10OoQMl_tHY&search=Premier%20League
http://www.youtube.com/watch?v=7Bpckhcoalk&search=Premier%20League
http://www.youtube.com/watch?v=IFmVDwm_ty4&search=Premier%20League
http://www.youtube.com/watch?v=zMAdAFjswNM&search=Premier%20League
http://www.youtube.com/watch?v=bCGWafp5N54&search=Premier%20League
http://www.youtube.com/watch?v=gXjMHL3Hy9A&search=Premier%20League
http://www.youtube.com/watch?v=j8GbtuJ_Y4Q&search=Premier%20League
http://www.youtube.com/watch?v=edKFzZ6-XGI&search=Premier%20League
http://www.youtube.com/watch?v=xQYSd6vWhVE&search=Premier%20League
http://www.youtube.com/watch?v=InY9X76VJlo&search=Premier%20League
http://www.youtube.com/watch?v=8_wstMSn9fM&search=Premier%20League
http://www.youtube.com/watch?v=0Dn_sgGKrRA&search=Premier%20League
http://www.youtube.com/watch?v=3-qLYOwv7x8&search=Premier%20League
http://www.youtube.com/watch?v=Y2Yh4hKqsgA&search=Premier%20League
http://www.youtube.com/watch?v=LXr2X-GiV38&search=Premier%20League
http://www.youtube.com/watch?v=L_apuruBeNw&search=Premier%20League
http://www.youtube.com/watch?v=uibvkspZvhY&search=Premier%20League

If you are the content owner, you are receiving this email as verification that we have received your deletion requests.

Copyright © 2006 YouTube, Inc.



# Schapiro Exhibit 107

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


THE FOOTBALL ASSOCIATION PREMIER   )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all    )
others similarly situated,        )
                              )
         Plaintiffs,     )
                              )
           vs.           ) Case No. 07CV3582
                              )
YOUTUBE, INC., YOUTUBE, LLC, and   )
GOOGLE, INC.,                   )
                              )
         Defendants.     )
  _____)




DEPOSITION OF GEORGINA LOTH
NEW YORK, NEW YORK

WEDNESDAY, DECEMBER 2, 2009






REPORTED BY:
ERICA RUGGIERI, CSR, RPR
JOB NO.: 18233

December 2, 2009

1:08 p.m.


                VIDEOTAPED DEPOSITION OF

GEORGINA LOTH, held at the offices of

Mayer Brown, 1675 Broadway, New York,

New York, pursuant to notice, before

Erica L. Ruggieri, Registered

Professional Reporter and Notary

Public of the State of New York.

1

2          A P P E A R A N C E S:

3

4     FOR THE PLAINTIFFS:

5          PROSKAUER ROSE, LLP

6          BY:  NOAH GITTERMAN, ESQ.

7          1585 Broadway

8          New York, N.Y. 10036-8299

9          (212) 969-3200

10         ngitterman@proskauer.com

11

12    FOR THE DEFENDANTS:

13         MAYER BROWN, LLP

14         BY:  BRIAN WILLEN, ESQ.

15              JASON KIRSCHNER, ESQ.

16         1675 Broadway

17         New York, New York  10019

18         bwillen@mayerbrown.com

19         jkirschner@mayerbrown.com

20

21    ALSO PRESENT:

22         EMILIE MONTANE, FFT

23         CARLOS KING, Videographer

24         ABDOU FALL, Interpreter

25         JOANNA DEZIO, Ph.D, Interpreter

                        LOTH

1

2    boxes.  Period.

3           Q.    What does the CMS tool do?

4           A.    The CMS enables the content

5  06:22:53  owners to find videos sorted by keywords,

6           and then we can -- for each videos, we can

7           choose to remove, to ask to remove it on

8           it.

9           Q.    Did FFT ever sign up for the

10 06:22:53  content verification tool?

11          A.    As what?

12          Q.    Did FFT ever sign up to use the

13          content verification tool?

14                MR. GITTERMAN:  Objection to the

15 06:22:53       form.  I assume you mean FFT and not

16               Net Result.

17                MR. KIRSCHNER:  I said FFT.

18          A.    I don't know if it's content

19          verification tool, so.  I don't know this

20 06:22:53  is the same as the content verification

21          tool.

22                MR. KIRSCHNER:  I'd like to

23               mark, as Exhibit 4, a document

24               produced by FFT, bearing the Bates

25 06:22:54       label FT16689 through 94.

```
 1                          LOTH
 2                    (Loth Exhibit 4, document
 3                 produced by FFT, bearing Bates label
 4                 FT16689 through 94, marked for
 5   06:22:54      identification, as of this date.)
 6               Q.    Does this refresh your
 7       recollection as to whether FFT signed up
 8       to use the content verification program?
 9               A.    Yes.
10   06:22:54     Q.    Did FFT sign up to use the
11       content verification program?
12               A.    Yes.
13               Q.    Why did FFT sign up to use CVT?
14               A.    We sign to find an easy way to
15   06:22:54   remove our content, the content infringing
16       on YouTube.
17               Q.    Was the content verification
18       program helpful?
19                    MR. GITTERMAN:   Objection to the
20   06:22:54      form.   Vague and ambiguous.
21               A.    I think it helps Net Result to
22       remove the 550, 550 clips that's specified
23       here.
24               Q.    And how did FFT learn about the
25   06:22:56   content verification program?
```

1                          LOTH

2              MR. GITTERMAN:  Objection to

3         form.

4              A.    If I remember well, we sent

5    06:22:56   the -- Net Results send the take-down

6         notices, and YouTube respond saying, okay,

7         we will remove it; but by the way, we can

8         show you the content verification program.

9              Q.    So YouTube informed FFT about

10   06:22:56   the existence of this tool?

11             A.    Informed Net Results.

12             Q.    Has FFT had any problems using

13        CVP?

14             MR. GITTERMAN:  Objection to

15   06:22:56   form.  Vague and ambiguous, lacks

16        foundation.  I don't know that you've

17        established that FFT uses it.

18             A.    In 2007 this is Net Results.  We

19        use the CVP.

20   06:22:56   Q.    So Net Results used CVP in 2007?

21             A.    Yes.

22             Q.    And FFT actually used it, used

23        CVP itself, after that point?

24             MR. GITTERMAN:  Objection to

25   06:22:56   form.

1                          LOTH

2              A.    In 2009.

3              Q.    And Net Result was using CVP on

4         FFT's behalf in 2007, correct?

5    06:22:56     A.    Yes.

6              Q.    Are you aware of YouTube's

7         content ID program?

8              A.    Content ID program.

9              Q.    Are you aware of YouTube's

10   06:22:56  fingerprinting technology?

11                  MR. GITTERMAN:  Objection to

12             form.

13             A.    We know about fingerprinting

14        YouTube technology.

15   06:22:56     Q.    How did you learn about

16        YouTube's fingerprinting technology?

17             A.    YouTube speak about

18        fingerprinting technology before, just

19        before 2009 events.

20   06:22:57     Q.    So YouTube contacted FFT to

21        inform it that it had fingerprinting

22        technology?

23                  MR. GITTERMAN:  Objection to the

24             form.

25   06:22:57     A.    Yes.

LOTH

Q.    The amended complaint?

A.    I don't know everything.  I have
an idea.

06:23:23    Q.    FFT -- in the amended complaint
FFT asserted three allegedly infringing
videos, correct?

A.    What?  I don't know if it's
three.  At least three.

06:23:23    MR. GITTERMAN:  I'm going to
also object to this as being beyond
the notice topics.

Q.    My next question may tie the
loop.

06:23:23    As of the date of the amended
complaint, had FFT sent take-down notices
for all of the videos it listed in the
complaint?

A.    It's my understanding, yes.

06:23:24    Q.    What is that understanding based
on?

A.    Because those clips have been
removed, and we did something to remove
it -- them, to remove them.

06:23:24    Q.    How do you know those clips had

LOTH

been removed?

    A.    Because we had the URL, and we came back to see.

06:23:24    Q.    On May 8th, 2009 FFT submitted a revised list of allegedly infringing videos in this case, correct?

    MR. GITTERMAN:  Objection.  I think this goes beyond the notice

06:23:24    topics.

    If you know anything about it, you can answer.

    A.    I don't know the dates.  I know there is a list with more than 500.

06:23:25    Q.    As of the date of that list, had FFT sent take-down notices to YouTube for all of the videos listed?

    A.    I don't know if it's one take-down notice per video.  What I know

06:23:25    is all videos has been removed.

    Q.    So you had removed all of the allegedly infringing videos asserted in this case?

    A.    Yes.

06:23:25    MR. GITTERMAN:  Objection to the

```
1                          LOTH
2           form.  Vague and ambiguous.
3                Q.    When did YouTube remove those
4           videos?
5   06:23:25     A.    I don't know.  I don't know
6           exactly when.
7                Q.    Was it within a day of the
8           take-down notice?
9                A.    I don't know if it was 24 hours,
10  06:23:25   48 hours, I don't know.
11               Q.    But it was a short time after
12          the take-down notice, correct?
13                     MR. GITTERMAN:  Objection to
14               form.  Vague and ambiguous.
15  06:23:26     A.    Depends what you call short.  It
16          should be in the first place.  Short is
17          never enough.
18               Q.    Did YouTube remove the videos
19          within days of the take-down notice?
20  06:23:26     A.    I don't know.
21               Q.    But it was days, correct?
22               A.    Sorry, yes, it was days.
23                     MR. KIRSCHNER:  Let's take a
24               short break, if that's okay.
25  06:23:26            THE VIDEOGRAPHER:  The time is
```

1          LOTH

2          5:48 p.m., and we are off the record.

3          (Whereupon, there is a recess in

4          the proceedings.)

5   06:23:26          THE VIDEOGRAPHER:  The time is

6          6:03 p.m., and we are back on the

7          record.

8          Q.    I'd like to play you some videos

9          and ask you some questions about the

10  06:23:26  videos, okay?  So I'm going to play you a

11         video that was posted at the URL

12         http:\\www.YouTube.com/\watchV=A5Q6RBR3TW.

13         (Whereupon, the video was

14         played.)

15  06:23:26          MR. GITTERMAN:  Actually, before

16         you ask a question, was this video

17         produced in the case?

18         MR. KIRSCHNER:  Yes.

19         MR. GITTERMAN:  Do you know what

20  06:23:26  Bates number it was produced at?

21         MR. KIRSCHNER:  I don't have the

22         Bates number on it, but I can get it

23         for you.

24         MR. GITTERMAN:  Okay.  I mean

25  06:23:26  I'm going to object to the use of this



# Schapiro Exhibit 108

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

THE FOOTBALL ASSOCIATION PREMIER          )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all           )
others similarly situated,                )
                                          )
                    Plaintiffs,           )
          vs.                             )
                                          )
                                          ) NO. 07-CV-3582
                                          )
YOUTUBE, INC., YOUTUBE, LLC, and          )
GOOGLE, INC.,                             )
                                          )
                    Defendants.           )
_____)


VIDEOTAPED DEPOSITION OF

KEITH HAUPRICH
NEW YORK, NEW YORK
THURSDAY, SEPTEMBER 24, 2009


BY:  REBECCA SCHAUMLOFFEL
JOB NO. 17720

A P P E A R A N C E S :


FOR THE LEAD PLAINTIFFS AND
PROSPECTIVE CLASS:
        PROSKAUER ROSE LLP
        By: WILLIAM HART, ESQ.
            1585 Broadway
            New York, New York 10036-8299
            WHART@PROSKAUER.COM



FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE,
LLC and  GOOGLE, INC.:
        MAYER BROWN LLP
        By:  ARIC JACOVER, ESQ.
             TERRI MAZUR, ESQ.
             RICHARD S. PIANKA, ESQ.
             1675 Broadway
             New York, New York 10019
             (212) 506-2146
             Ajacover@mayerbrown.com
             Tmazur@mayerbrown.com
             Rpianka@mayerbrown.com


ALSO PRESENT:


Manuel Abreu, Videographer


            ---oOo---

1          KEITH HAUPRICH

2          Q.    Was Cherry Lane aware that

3     the content verification tool was

4     available before that date?

5  11:26:04    A.    I believe that Cherry Lane

6     had been sending -- excuse me.  I

7     believe, in this instance, Cherry Lane

8     had sent a DMCA notice to YouTube that

9     they were not able to comply with in

10 11:26:21  Misty's E-mail to Basa.  She asked that

11    we resubmit the list of URLs in either

12    the body of an E-mail or plain text or

13    HTML because we wanted to remove the

14    links.

15 11:26:36          Subsequent to this, or with

16    this correspondence, is when we became

17    aware of the content verification tool;

18    with the receipt of this E-mail.

19         Q.    So you weren't aware of the

20 11:26:45  availability of this tool before

21    April 9th, 2007?

22         A.    Sitting here today, I do not

23    believe that Cherry Lane was aware of

24    the content verification tool prior to

25 11:26:56  this E-mail exchange.

KEITH HAUPRICH

1

2          Q.     And you said that Cherry

3     Lane did sign up to use the content

4     verification tool; is that right?

5  11:27:05     A.     Yes.

6          Q.     When did Cherry Lane sign up

7     to use that tool?

8          A.     I believe it to be spring of

9     2007.  It would have been most likely

10 11:27:19  in connection with this E-mail

11    correspondence.

12         Q.     Does April 2007, does that

13    sound about right, as to when Cherry

14    Lane signed up to use the content

15 11:27:29  verification tool?

16              MR. HART:  Sorry.  Just have

17         that read back, please.

18              (Whereupon, the

19         aforementioned question was read

20 11:27:46     back by the Court Reporter.)

21         A.     Yes.

22         Q.     Did Cherry Lane use the

23    content verification tool to find its

24    content on --

25 11:27:55          MR. HART:  Objection.

KEITH HAUPRICH

1

2          Sorry, go ahead.

3          Q.     -- on YouTube?

4          MR. HART:  Objection to

5  11:27:59    form.

6          A.     From April 2007 to date, the

7  content verification tool is one of the

8  ways we try to monitor our content on

9  YouTube.  It is triage.  Not cosmetic

10  11:28:17  surgery.

11              So all the tools are made

12  available to us, we are eager to use,

13  including the content verification

14  tool.

15  11:28:24    Q.     Did Cherry Lane also use the

16  content verification tool to remove its

17  content on YouTube?

18          A.     Yes, the content

19  verification tool was one of the means

20  11:28:36  we used to monitor our content on

21  YouTube.

22          Q.     What I asked was whether

23  Cherry Lane had used the content

24  verification tool to remove its

25  11:28:49  content, not just to monitor it.

1             KEITH HAUPRICH

2             A.    Yes, the content

3      verification tool is one of the ways we

4      remove content.

5   11:29:02      Q.    Does Cherry Lane still use

6      the content verification tool to find

7      and remove its content on YouTube?

8             A.    Yes, that is one of the

9      ways.

10  11:29:19      Q.    Did Cherry Lane ever have

11     any problems accessing its account for

12     the content verification tool?

13            A.    Accessing the account, no.

14            Q.    Was Cherry Lane's account

15  11:29:45  for the content verification tool ever

16     blocked?

17            A.    Was our access blocked?

18            Q.    Right.

19            A.    No.

20  11:29:53      Q.    Was it ever closed?

21            MR. HART:  The account?

22            MR. JACOVER:  The account.

23            Q.    Was the account ever closed?

24            A.    Meaning blocked or otherwise

25  11:30:07  inaccessible, not that I am aware of.

1                    KEITH HAUPRICH

2          Q.    And has the content

3     verification tool been useful to Cherry

4     Lane in finding its content on YouTube?

5  11:30:21          MR. HART:  Objection to

6               form.

7          A.    Can you repeat the question,

8     please.

9          Q.    Sure.  Has the content

10  11:30:37   verification tool been useful for

11     Cherry Lane in finding its content on

12     YouTube?

13                    MR. HART:  I maintain my

14               objection as to form.  Useful.

15  11:30:48      A.    It is very useful in finding

16     content.  We submit -- when we give

17     notice to take down the content, we use

18     the verification tool to refind the

19     same video coupled with the same sound

20  11:31:01   bite time and time again.

21                    So even though the initial

22     URL goes down the first time, content

23     of the same audio visual work and the

24     same song constantly appears that is

25  11:31:13   readily identifiable by the content

1    KEITH HAUPRICH

2    verification tool.

3         Q.    And just so I understand

4    what you are saying, you are referring

5  11:31:21  to content that is posted under

6    different URLs; is that right?

7         A.    That sounds about right.

8         Q.    Has the content verification

9    tool also been useful for Cherry Lane

10 11:31:36  in removing its content from YouTube?

11         MR. HART:  Asked and

12    answered.  Form.  Useful.

13         A.    As one of the ways to try to

14    control unauthorized use of content, we

15 11:31:51  use it in that context.  I am going to

16    say it is useful in that context.

17         Q.    Are you familiar with

18    content identification tools that are

19    based on fingerprinting technology?

20 11:32:05  A.    No, but I would like to be.

21    This is the subject matter that's been

22    -- this is the topic that's been

23    subject to an ongoing letter campaign

24    by Google and their unwillingness to

25 11:32:17  enter into an engagement letter.

1        KEITH HAUPRICH

2              Q.    So you're not familiar with

3        how fingerprinting technology works?

4              MR. HART:  Objection to

5   11:32:23    form.  You mean generally or with

6        specific reference to the Google

7        technology?

8              MR. JACOVER:  Generally.

9              MR. HART:  I think there may

10  11:32:32    have been a disconnect with the

11       previous answer.  But go ahead.

12             Q.    Go ahead.

13             A.    Am I generally aware of

14       fingerprinting technology in the

15  11:32:40    general sense?  Is that the question?

16             Q.    I am asking if you

17       understand -- yes, are you familiar

18       with fingerprinting technology,

19       generally?

20  11:32:48    A.    Yes.

21             Q.    And are you familiar with

22       how it works, generally?

23             A.    Generally, yes.

24             Q.    Can you give me -- can you

25  11:32:59    just try to tell me how it works, in



# Schapiro Exhibit 109

| | |
|---|---|
| **From:** | Courtney Nieman |
| **Sent:** | Thursday, February 08, 2007 8:53 PM |
| **To:** | 'Cahan, Adam' |
| **Cc:** | Mark M. Ishikawa; Travis Hill; Evelyn Espinosa |
| **Subject:** | RE: YouTube Content Verification Program |

The Content Verification Tool is a proprietary based tool developed and maintained by YouTube. The use is very simple and effective. Instead of just going to YouTube and searching for videos, users, tags, the process is augmented when you log in to YouTube using the content provider account.

When you perform a a search - you are provided with a check box next to each result. If the result belongs to Viacom, you click the check box. At the end of the page you then click on SUBMIT, and the CVT will open a small window with the list of checked links. Continue the process until you have reviewed every clip.

When you are ready to take down the list - you can re-review the links or just select all links in the list, and submit. The links will go down with in 1-4 hours (during business hours) 12-24 (after business hours) Pacific. YouTube will then email you a report of the links you requested to take down. The do not issue a follow up report on the actual take down. The take down data is not entered into a database that could be used for reporting purposes.

We use this tool for "urgent" take downs only. We need to be able to report on our activities on behalf of the client. Let me know if you want a demonstration - we can set something up to show you how it works.


Courtney Nieman


**From:** Cahan, Adam [mailto:Adam.Cahan@mtvn.com]
**Sent:** Thursday, February 08, 2007 12:22 PM
**To:** Mark M. Ishikawa; Travis Hill; Courtney Nieman
**Subject:** FW: YouTube Content Verification Program

The BD head at YouTube just asked me to sign up for the content verification tool that they provide. He said that Bay currently uses it.

This is a web-based protocol. Is it effective? Why/Why not?

**From:** Chris Maxcy [mailto:chris@youtube.com]
**Sent:** Mon 2/5/2007 6:02 PM
**To:** Cahan, Adam
**Subject:** YouTube Content Verification Program

Adam,

We would like to take this opportunity to offer access to a new tool that we created solely to assist content owners to locate and notify us of potentially infringing content on YouTube.com.

YouTube's Content Verification Program provides an easy-to-use interface where content owners may request removal of infringing content by simply checking a box. After you have submitted a short, one page form in order to verify your identity, this system automatically provides the proper DMCA notification that we need in order to remove your content. This is the fastest way to ensure removal of content from the site - 24 hours a day, 365 days a year.

All a content owner needs to do to participate in the program and gain access to this tool is complete and submit to YouTube a short form that can be found here:

http://youtube.com/t/copyright_program

6/23/2008

Once your application has been submitted, we will follow up by providing you with a tutorial and login information to get you started and on your way!

We are committed to working in cooperation with content owners to keep infringing content off of the YouTube site! Please let me know if you have any questions.

Best,

Chris


Ps: Adam, this is the tool that I mentioned earlier today. BayTSP has been using it extensively for sometime now. Please let me know if you have any questions.

HIGHLY CONFIDENTIAL                                    BAYTSP 004282800



# Schapiro Exhibit 110

| To: | heather@youtube.com <heather@youtube.com>; julie@youtube.com <julie@youtube.com> |
| From: | Cameron.DiNunzio@sonybmg.com <Cameron.DiNunzio@sonybmg.com> |
| Cc: | kevin@youtube.com <kevin@youtube.com>; Bob.Hoch@sonybmg.com <Bob.Hoch@sonybmg.com> |
| Bcc: | |
| Received Date: | 2006-06-01 20:03:06 GMT |
| Subject: | RE: Christina Aguilera leak |

Thanks much Heather.   Much appreciated!!

From: heather gillette [mailto:heather@youtube.com]
Sent: Thursday, June 01, 2006 5:50 PM
To: DiNunzio, Cameron, RCA NY1540; julie@youtube.com
Cc: 'Kevin Donahue'
Subject: RE: Christina Aguilera leak

Hi there Cameron,

I removed both of the videos and one user was a repeat infringer so they were deleted as well.  The user that remains is XmBx.  We use a technology that should catch future uploads of the exact same videos and not allow them to be uploaded again.  If the video does not get edited by the user, it should be recognized and not allowed again.

Thank you, and please let me know if you have any further questions,

Heather Gillette

Director, Customer Support/Copyright Agent

YouTube, Inc.

From: Kevin Donahue [mailto:kevin@youtube.com]
Sent: Thursday, June 01, 2006 2:16 PM
To: Cameron.DiNunzio@sonybmg.com; julie@youtube.com
Cc: 'heather gillette'
Subject: RE: Christina Aguilera leak

Hi Cam,

I'm forwarding this to Heather Gillette who manages copyright issues here at YouTube. Heather will remove these as soon as possible. I've cc'd Heather on this email in case you'd like to follow-up with her directly.


Best,
Kevin

_____

From: Cameron.DiNunzio@sonybmg.com [mailto:Cameron.DiNunzio@sonybmg.com]
Sent: Thursday, June 01, 2006 12:59 PM
To: kevin@youtube.com; julie@youtube.com
Subject: Christina Aguilera leak


Hi guys,

Can you please have these posts deleted immediately? If possible, can those usernames be monitored in case they try to post it again?


http://www.youtube.com/watch?v=LjEq0c9s4v0&search=ain%27t%20no%20other%20man

http://www.youtube.com/watch?v=3lZFyWvR-cl&search=ain%27t%20no%20other%20man


Thanks much. Please let me know if you have any questions. . .

Cam



+ + + + + + + + + + + + + + + + + + + + + + +


Cam DiNunzio

RCA Records

Digital Marketing

550 Madison Avenue

11th Floor

New York, NY 10022

Phone: 212-833-6093

Highly Confidential

Fax: 212-833-6258

www.rcarecords.com

_____

# Schapiro Exhibit 111

| To: | 'Scott, Doug' <DScott@ea.com> |
|---|---|
| From: | heather gillette <heather@youtube.com> |
| Cc: | 'Kevin Donahue' <kevin@youtube.com>; chris@youtube.com <chris@youtube.com> |
| Bcc: | |
| Received Date: | 2006-07-25 21:49:55 GMT |
| Subject: | RE: take down clip on site |

Doug,

Yes, YouTube utilizes MD5 algorithm technology. This technology permits us to take a digital "fingerprint" of an infringing video when it is removed from our site. If someone thereafter tries to upload a copy of that video it is automatically rejected regardless of whether the person is using a different user or file name. There are a couple of ways around this, however, if someone else tries to upload a copy that is a little different in length or with different audio it may not be recognized as this same file.

Let me know if you have any more questions on this,

Heather

_____

From: Scott, Doug [mailto:DScott@ea.com]
Sent: Tuesday, July 25, 2006 4:46 PM
To: heather gillette
Cc: Kevin Donahue; chris@youtube.com
Subject: RE: take down clip on site

Hi Heather,

Thanks! We'll probably need to get that user information we discussed in order to make sure that it doesn't get reposted. Are there any ways to prevent that file from being uploaded again?

Thanks,

Doug

_____

From: heather gillette [mailto:heather@youtube.com]
Sent: Tuesday, July 25, 2006 4:42 PM

To: Scott, Doug
Cc: 'Kevin Donahue'; chris@youtube.com
Subject: RE: take down clip on site


Doug, I was able to remove it just now!


Nice talking to you,


Heather

_____

From: Scott, Doug [mailto:DScott@ea.com]
Sent: Tuesday, July 25, 2006 4:33 PM
To: Scott, Doug; Kevin Donahue; chris@youtube.com
Cc: heather@youtube.com
Subject: RE: take down clip on site


Sorry, phone number is ████████ or ████████.

_____

From: Scott, Doug
Sent: Tuesday, July 25, 2006 4:29 PM
To: 'Kevin Donahue'; chris@youtube.com
Cc: 'heather@youtube.com'
Subject: RE: take down clip on site


Thank you.  Heather, can you call me?  How long should it take to get it down?

Thanks,

Doug

_____

From: Kevin Donahue [mailto:kevin@youtube.com]
Sent: Tuesday, July 25, 2006 4:21 PM
To: chris@youtube.com; Scott, Doug
Subject: RE: take down clip on site

I just spoke with Heather - she's going to take it down asap.

---

From: Chris Maxcy [mailto:chris@youtube.com]
Sent: Tuesday, July 25, 2006 4:17 PM
To: 'Scott, Doug'; kevin@youtube.com
Subject: RE: take down clip on site

Hi Doug,

This is the fastest way to take down content is to send us the YouTube URL and make sure to copy (copyright@youtube.com).

Best,

Chris

---

From: Scott, Doug [mailto:DScott@ea.com]
Sent: Tuesday, July 25, 2006 4:03 PM
To: kevin@youtube.com; Chris Maxcy
Subject: take down clip on site

Hi Kevin and Chris,

We need to have a clip on YouTube taken down immediately.  What's the process?  Can you call me at ████ ████████?

Thanks,

Doug

P.S. It's a clip from a Pay Per View special that we have airing in a week and it contains highly sensitive material.

GOO001-01858443

# Schapiro Exhibit 112

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


VIACOM INTERNATIONAL, INC., COMEDY :

PARTNERS, COUNTRY MUSIC TELEVISION, :

INC., PARAMOUNT PICTURES            :

CORPORATION, AND BLACK              :

ENTERTAINMENT TELEVISION, LLC,      : CASE NO.

                                    : 07-CV-2203

           Plaintiffs,            :

         vs.                       :

YOUTUBE, INC., YOUTUBE, LLC, AND    :

GOOGLE, INC.,                       :

                                    :

          Defendants.            :

      Videotaped deposition of DEBORAH
KADETSKY, taken on behalf of the Defendants, in
the above-entitled matter before Suzanne Stotz,
a Certified Shorthand Reporter (License No.
1845) and Notary Public of the State of New
York, taken at the offices of MAYER BROWN, LLP,
1675 Broadway, New York, New York, on Tuesday,
August 18, 2009, commencing at 10:08 a.m.

JOB No. 17414

1    APPEARANCES OF COUNSEL

2

3    FOR PLAINTIFFS:

4        SHEARMAN & STERLING, LLP
         BY:  KIRSTEN CUNHA, ESQ.
5                And
         BY:  JEENA SHAH, ESQ.
6        599 Lexington Avenue
         New York, New York 10022-6069
7        212-848-4000
         kirsten.cunha@shearman.com
8        jeena.shah@shearman.com

9

10   FOR DEFENDANTS YOUTUBE and GOOGLE:

11       MAYER BROWN, LLP
         BY:  ANDREW H. SCHAPIRO, ESQ.
12               And
         BY:  CHRISTINE M. HERNANDEZ, ESQ.
13       1675 Broadway
         New York, New York 10019-5820
14       212-506-2672
         aschapiro@mayerbrown.com
15       chernandez@mayerbrown.com

16

17   ALSO PRESENT:

18       Sallean Browne, Videographer

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 1 | 10:15:42 | you have created? |
| 2 | 10:15:42 | A. We primarily used an account with |
| 3 | 10:15:46 | the name VH1 staff. |
| 4 | 10:15:47 | Q. Did you create that personally? |
| 5 | 10:15:49 | A. I did. |
| 6 | 10:15:50 | Q. You said you primary used the VH1 |
| 7 | 10:15:53 | staff account. What other accounts? |
| 8 | 10:15:56 | A. Prior to that account, one of our |
| 9 | 10:15:58 | interns did use their account to help us with a |
| 10 | 10:16:01 | promotion. |
| 11 | 10:16:02 | Q. And when you say, "The intern |
| 12 | 10:16:05 | used," do you remember if it was a male or a |
| 13 | 10:16:09 | female? |
| 14 | 10:16:09 | A. I don't recall. |
| 15 | 10:16:10 | Q. And when you say the intern used |
| 16 | 10:16:12 | his or her account, meaning a personal account |
| 17 | 10:16:16 | in the intern's own name? |
| 18 | 10:16:19 | A. I don't recall the specifics, but I |
| 19 | 10:16:21 | believe that to be true. |
| 20 | 10:16:22 | Q. Any other YouTube accounts that you |
| 21 | 10:16:23 | have created for VH1? |
| 22 | 10:16:26 | A. No. |
| 23 | 10:16:28 | Q. How about any other YouTube |
| 24 | 10:16:30 | accounts that others working for you or with |
| 25 | 10:16:34 | you have created? |

| 1  | 10:16:34 | A. | No, not to my knowledge. |
| 2  | 10:16:38 | Q. | Was there ever an account or user |
| 3  | 10:16:41 | name called reaction 2006? |
| 4  | 10:16:43 | A. | That's the intern account. |
| 5  | 10:16:44 | Q. | That's the intern account? |
| 6  | 10:16:46 | A. | Uh-huh. |
| 7  | 10:16:46 | Q. | Do you know if there were other |
| 8  | 10:16:48 | intern accounts in personal names? |
| 9  | 10:16:50 | A. | I don't know. |
| 10 | 10:16:56 | Q. | Do you have a personal YouTube |
| 11 | 10:16:58 | account? |
| 12 | 10:16:59 | A. | I do. |
| 13 | 10:17:00 | Q. | And what is your user name? |
| 14 | 10:17:03 | A. | I don't remember exactly, but it is |
| 15 | 10:17:05 | an iteration of my name. |
| 16 | 10:17:07 | Q. | Do you recall when you created |
| 17 | 10:17:09 | that? |
| 18 | 10:17:10 | A. | Not specifically, no. |
| 19 | 10:17:11 | Q. | Have you ever uploaded videos to |
| 20 | 10:17:14 | your personal account? |
| 21 | 10:17:14 | A. | I have. |
| 22 | 10:17:17 | Q. | What kind of videos? |
| 23 | 10:17:19 | A. | I specifically remember creating it |
| 24 | 10:17:22 | for vacation videos to share with friends and |
| 25 | 10:17:25 | family. |

| 1  | 10:17:25 | Q. | Do you recall when you created it? |
|----|----------|----|------------------------------------|

1   10:17:25    Q.   Do you recall when you created it?

2   10:17:27    A.   I don't recall when I created it.

3   10:17:29    Q.   Have you ever uploaded to that --

4   10:17:34    do you recall roughly when you created it?

5   10:17:36    A.   I don't.

6   10:17:37    Q.   Were you working at VH1?

7   10:17:39    A.   I don't recall.

8   10:17:42    Q.   Do you recall when the last time

9   10:17:45    you used it?

10   10:17:46    A.   That I do recall.  It was a year

11   10:17:50    ago in January or February after coming back

12   10:17:53    from a trip to India and posting those videos.

13   10:17:56    Q.   Do you know if you've ever posted

14   10:18:00    any Viacom content to your personal account?

15   10:18:03    A.   Not that I recall, no.  I would

16   10:18:06    have no reason to.

17   10:18:07    Q.   Have you posted any material that

18   10:18:12    you did not create yourself to that account?

19   10:18:15    A.   No.

20   10:18:20    Q.   Now, getting back to the VH1

21   10:18:24    accounts that you mentioned, did you or your

22   10:18:30    staff ever upload videos to those accounts?

23   10:18:34    A.   To the VH1 accounts?

24   10:18:36    Q.   Yes.

25   10:18:36    A.   Yes.

| | | |
|---|---|---|
| 1 | 11:53:24 | Q.     And there is no text in the e-mail, |
| 2 | 11:53:30 | there's just the URL -- there is a URL to -- |
| 3 | 11:53:36 | YouTube URL, right? |
| 4 | 11:53:37 | A.     Yes. |
| 5 | 11:53:38 | Q.     I assume this is the -- this would |
| 6 | 11:53:40 | be a link to the Brooke clip that you posted? |
| 7 | 11:53:43 | A.     That's right. |
| 8 | 11:53:45 | Q.     And if they clicked on this URL and |
| 9 | 11:53:48 | went to the Brooke clip that you posted, they |
| 10 | 11:53:52 | could see how many views it had, as with any |
| 11 | 11:53:56 | YouTube video? |
| 12 | 11:53:57 | A.     Sure. |
| 13 | 11:54:02 | Q.     Now, in addition to posting content |
| 14 | 11:54:06 | on YouTube, sometimes you were involved in |
| 15 | 11:54:13 | asking YouTube to take material down, correct? |
| 16 | 11:54:16 | A.     That's true. |
| 17 | 11:54:17 | Q.     And that might be for a variety of |
| 18 | 11:54:19 | reasons, right? |
| 19 | 11:54:20 | A.     Sure. |
| 20 | 11:54:21 | Q.     Sometimes if it was unauthorized |
| 21 | 11:54:24 | content, right? |
| 22 | 11:54:26 | A.     Yes. |
| 23 | 11:54:26 | Q.     Sometimes if it was a clip that |
| 24 | 11:54:33 | just for promotional reasons you didn't want up |
| 25 | 11:54:36 | at that time, correct, like with something |

| | | |
|---|---|---|
| 1 | 11:54:38 | called the poop scene? |
| 2 | 11:54:40 | A.    That was actually, to my |
| 3 | 11:54:43 | recollection, not a promotional clip, that was |
| 4 | 11:54:47 | an unauthorized clip. |
| 5 | 11:54:49 | Q.    And you wanted their help in taking |
| 6 | 11:54:51 | that down? |
| 7 | 11:54:51 | A.    Uh-huh. |
| 8 | 11:54:54 | Q.    Do you remember the names of some |
| 9 | 11:54:58 | of the people who you dealt with at YouTube |
| 10 | 11:55:01 | when you were seeking help -- actually, let me |
| 11 | 11:55:06 | back up.  How about when you set up your |
| 12 | 11:55:08 | director's account, do you recall whether you |
| 13 | 11:55:08 | had some direct contact with people at YouTube |
| 14 | 11:55:11 | to help you get set up? |
| 15 | 11:55:12 | A.    Absolutely, uh-huh. |
| 16 | 11:55:13 | Q.    Do you remember their names? |
| 17 | 11:55:15 | A.    There were three people that I |
| 18 | 11:55:17 | communicated with on various levels, Kevin |
| 19 | 11:55:21 | Donohue or Donohue, Taylor Cascino and Heather |
| 20 | 11:55:27 | Gillette. |
| 21 | 11:55:28 | Q.    And were Kevin, Taylor and Heather |
| 22 | 11:55:32 | helpful to you? |
| 23 | 11:55:33 | A.    Yes. |
| 24 | 11:55:34 | Q.    Were they also the people who you |
| 25 | 11:55:36 | would reach out to if sometimes you needed a |

| | | |
|---|---|---|
| 1 | 11:55:38 | clip taken down? |
| 2 | 11:55:39 | A.     They were the only people I knew, |
| 3 | 11:55:41 | so yes, I asked. |
| 4 | 11:55:42 | Q.     Were they helpful in that context |
| 5 | 11:55:44 | also? |
| 6 | 11:55:45 | A.     Always. |
| 7 | 11:55:58 | MR. SCHAPIRO:  Let's mark Exhibit |
| 8 | 11:55:59 | 13. |
| 9 | 11:55:59 | (Whereupon Exhibit No. 13, E-mail |
| 10 | 11:55:59 | chain Bates number GOO 001-00856030 and |
| 11 | 11:55:59 | GOO 001-00856031, was marked for |
| 12 | 11:56:33 | identification.) |
| 13 | 11:56:33 | A.     Okay. |
| 14 | 11:56:36 | MR. SCHAPIRO:  Actually, you know |
| 15 | 11:56:37 | what I want to do, if I may, can I |
| 16 | 11:56:44 | substitute, and I'll save us some time.  I |
| 17 | 11:56:47 | have the same e-mail, but it has one |
| 18 | 11:56:52 | additional entry, and rather than doing |
| 19 | 11:56:54 | this in two steps, is it possible to |
| 20 | 11:56:56 | switch out that Exhibit 13 and instead use |
| 21 | 11:57:00 | what I'm about to give you as 13?  It will |
| 22 | 11:57:03 | save you time.  Sorry about that.  Let's |
| 23 | 11:57:06 | make this Exhibit 13. |
| 24 | 11:58:04 | (Whereupon Exhibit 13 was |
| 25 | 11:58:10 | remarked.) |

| 1 | 11:58:10 | A. | Okay. |

2   11:58:13      Q.    So here is an e-mail chain between

3   11:58:18   you and some folks at YouTube, correct?

4   11:58:20      A.    Yes.

5   11:58:20      Q.    And it starts out with you

6   11:58:24   saying -- writing to Heather Gillette saying,

7   11:58:28   "Hi, Heather, I spoke to Kevin this morning

8   11:58:30   about wanting to take down a few posted clips

9   11:58:32   from one of our shows," and then you give him

10   11:58:35   three URL's, correct?

11   11:58:37      A.    That's right.

12   11:58:41      Q.    And do you remember what these

13   11:58:44   were, as you sit here?

14   11:58:45      A.    I don't.  I don't specifically

15   11:58:48   know.

16   11:58:48      Q.    And then Heather writes back to you

17   11:58:53   a little later the same day saying, "These have

18   11:58:57   been removed, Deborah, thanks," correct?

19   11:59:00      A.    Yes.

20   11:59:01      Q.    Then you have -- in the top you

21   11:59:03   thank her, but you have an additional request,

22   11:59:05   right?

23   11:59:05      A.    Yes.

24   11:59:06      Q.    Can you tell us what that

25   11:59:07   additional request was?

| | | |
|---|---|---|
| 1 | 12:07:57 | their attention," you mean to whose attention? |
| 2 | 12:08:00 | A. Bringing the request to remove |
| 3 | 12:08:03 | particular clips to YouTube's attention. |
| 4 | 12:08:05 | Q. I'm sorry, no, you said about the |
| 5 | 12:08:08 | discretion, "I don't remember exactly if that |
| 6 | 12:08:11 | had to do with really not bringing to their |
| 7 | 12:08:13 | attention to the fact that these scenes existed |
| 8 | 12:08:16 | or" -- |
| 9 | 12:08:17 | A. About the nature of the content of |
| 10 | 12:08:18 | the scenes. |
| 11 | 12:08:18 | Q. But you're saying, "Their |
| 12 | 12:08:20 | attention." YouTube's attention? |
| 13 | 12:08:22 | A. YouTube's attention. |
| 14 | 12:08:24 | Q. Now, around this time sometime in |
| 15 | 12:08:28 | this day you are sending the e-mail to YouTube |
| 16 | 12:08:32 | asking if they can take VH1 out of the takedown |
| 17 | 12:08:35 | message, correct? |
| 18 | 12:08:36 | A. Yes. |
| 19 | 12:08:36 | Q. And on the second page here, second |
| 20 | 12:08:41 | from the top, Michael Hirschorn sends you a |
| 21 | 12:08:45 | couple of URL's and says, "Here are a couple. |
| 22 | 12:08:56 | If you then look at explore more videos you |
| 23 | 12:08:58 | will see the rest. They are all something poop |
| 24 | 12:09:00 | titles. The introducing something ones |
| 25 | 12:09:04 | obviously are clips you sent out." |

| 1 | 12:09:06 | Did you understand him to mean that |
| 2 | 12:09:09 | clips that said, "Introducing Flavor Flav," or |
| 3 | 12:09:12 | whatever it might be were clips that you, as |
| 4 | 12:09:17 | part of your job, sent out and the poop ones |
| 5 | 12:09:22 | were not? |
| 6 | 12:09:23 | A.      Correct. |
| 7 | 12:09:23 | Q.      And do you know how a user might |
| 8 | 12:09:28 | know that? |
| 9 | 12:09:29 | MS. CUNHA:  Objection to form.  It |
| 10 | 12:09:30 | calls for speculation. |
| 11 | 12:09:32 | A.      If they were posted to our official |
| 12 | 12:09:36 | account, the account name would identify it as |
| 13 | 12:09:39 | being VH1, and there was various obvious |
| 14 | 12:09:41 | promotional messaging attached to it. |
| 15 | 12:09:42 | Q.      Do you know if a user would know |
| 16 | 12:09:45 | whether you were or were not also putting out |
| 17 | 12:09:49 | other videos outside of your account name? |
| 18 | 12:09:51 | MS. CUNHA:  Objection to form.  It |
| 19 | 12:09:52 | calls for speculation. |
| 20 | 12:09:53 | A.      I don't know. |
| 21 | 12:09:55 | Q.      Then right on the front page you |
| 22 | 12:10:02 | say to Tony Carbone, you say, "Refreshing the |
| 23 | 12:10:06 | pages, and it looks like they're going to use |
| 24 | 12:10:09 | this instead.  They rule."  And then you quote, |
| 25 | 12:10:13 | "This video has been removed by the user." |

| | | |
|---|---|---|
| 1 | 12:10:16 | Does that refresh your recollection |
| 2 | 12:10:20 | about how this ended up getting resolved? |
| 3 | 12:10:23 | A.    The fact that they removed the |
| 4 | 12:10:25 | videos, yes. |
| 5 | 12:10:26 | Q.    And that the message didn't say, |
| 6 | 12:10:30 | "By VH1"? |
| 7 | 12:10:31 | A.    Sure. |
| 8 | 12:10:33 | Q.    And you were happy about that, that |
| 9 | 12:10:35 | they worked with you, you said, "They rule"? |
| 10 | 12:10:39 | A.    They were very helpful, yes. |
| 11 | 12:10:42 | Q.    Can you think of any instances in |
| 12 | 12:10:45 | which Heather or Kevin or others at YouTube |
| 13 | 12:10:48 | were not helpful to you? |
| 14 | 12:10:50 | A.    No, we had a very good |
| 15 | 12:10:51 | relationship. |
| 16 | 12:10:59 | Q.    By the way, when Mr. Hirschorn |
| 17 | 12:11:01 | says, "There are people who have uploaded other |
| 18 | 12:11:04 | scenes from episode one, which you might want |
| 19 | 12:11:06 | to let slide, but let's try discretely to get |
| 20 | 12:11:09 | this one off," do you know whether the other |
| 21 | 12:11:11 | scenes from episode one were taken down? |
| 22 | 12:11:13 | A.    I don't know for certain.  If they |
| 23 | 12:11:16 | provided to me, then the request was made. |
| 24 | 12:11:21 | Q.    Do you have any recollection that |
| 25 | 12:11:22 | they were provided to you? |

| 1 | 12:11:23 | A. I don't recall. |
| 2 | 12:11:49 | MR. SCHAPIRO: 15. |
| 3 | 12:11:49 | (Whereupon Exhibit No. 15, E-mail |
| 4 | 12:11:49 | chain Bates number VIA 10405976, was |
| 5 | 12:12:26 | marked for identification.) |
| 6 | 12:12:26 | A. Okay. |
| 7 | 12:12:29 | Q. Here is an instance in which around |
| 8 | 12:12:33 | the same time period a few days later you asked |
| 9 | 12:12:37 | the folks at YouTube to take down some |
| 10 | 12:12:40 | additional clips, correct? |
| 11 | 12:12:41 | A. Correct. |
| 12 | 12:12:41 | Q. And you said to Tony Carbone, "I |
| 13 | 12:12:46 | got to send something to our friends at |
| 14 | 12:12:48 | YouTube. She wrote me back in a flash that |
| 15 | 12:12:51 | they're down already. So great." |
| 16 | 12:12:53 | A. Yes. |
| 17 | 12:12:53 | Q. Was it generally your experience |
| 18 | 12:12:56 | that the folks at YouTube were pretty quick in |
| 19 | 12:12:58 | responding to your requests? |
| 20 | 12:12:59 | A. Definitely, yes. |
| 21 | 12:13:03 | Q. Let's take a look at -- actually, |
| 22 | 12:13:06 | strike that. |
| 23 | 12:13:16 | MR. SCHAPIRO: There is one more |
| 24 | 12:13:17 | along these lines. We will make it |
| 25 | 12:13:19 | Exhibit 16. |

| | | |
|---|---|---|
| 1 | 12:13:19 | (Whereupon Exhibit No. 16, E-mail |
| 2 | 12:13:19 | chain Bates number VIA 02088065, was |
| 3 | 12:14:01 | marked for identification.) |
| 4 | 12:14:01 | A.    Okay. |
| 5 | 12:14:06 | Q.    And you only -- this is an e-mail |
| 6 | 12:14:09 | that was produced to us by Viacom in this |
| 7 | 12:14:12 | litigation, and I think you only appear in -- |
| 8 | 12:14:15 | or you only appear in this thread once, |
| 9 | 12:14:15 | correct? |
| 10 | 12:14:18 | A.    Apparently, yes. |
| 11 | 12:14:22 | Q.    But do you know who Adam Cahan is? |
| 12 | 12:14:26 | A.    I don't. |
| 13 | 12:14:28 | Q.    Do you know what the e-mail |
| 14 | 12:14:32 | extension MTVN.com stands for? |
| 15 | 12:14:38 | A.    MTV Networks. |
| 16 | 12:14:42 | Q.    And down at the bottom of this, the |
| 17 | 12:14:46 | first in time e-mail, this person Adam Cahan at |
| 18 | 12:14:51 | MTV Networks is writing to some folks at |
| 19 | 12:14:54 | YouTube, and he says -- and describes this as |
| 20 | 12:15:00 | incredibly urgent and says, "NY student, |
| 21 | 12:15:04 | someone internal at MTV Networks, has released |
| 22 | 12:15:08 | upcoming episodes of our celeb reality Flavor |
| 23 | 12:15:13 | Flav episode."  Do you remember when this |
| 24 | 12:15:15 | occurred? |
| 25 | 12:15:17 | A.    I don't. |

| 1  | 12:15:19 | Q. Was that an unusual thing for |
| 2  | 12:15:21 | someone internal at MTV Networks to release |
| 3  | 12:15:26 | upcoming episodes of a VH1 show? |
| 4  | 12:15:29 | A. Sure, that was unusual. |
| 5  | 12:15:31 | Q. And celeb reality Flavor Flav was a |
| 6  | 12:15:34 | VH1 show? |
| 7  | 12:15:36 | A. Probably. There is not enough |
| 8  | 12:15:39 | description for me to think otherwise, but I am |
| 9  | 12:15:41 | not sure. |
| 10 | 12:15:42 | Q. One of the people at YouTube who |
| 11 | 12:15:44 | was on this chain is someone named Zahavah |
| 12 | 12:15:47 | Levine. Have you ever heard that name? |
| 13 | 12:15:49 | A. I haven't. |
| 14 | 12:15:50 | Q. She says, "We will take it down |
| 15 | 12:15:52 | right away." And then somehow you end up on |
| 16 | 12:15:56 | this chain. |
| 17 | 12:15:59 | A. I have no idea. |
| 18 | 12:16:00 | Q. Can you think of why someone would |
| 19 | 12:16:01 | have included you on this? |
| 20 | 12:16:03 | A. I don't recognize any of these |
| 21 | 12:16:04 | other names. |
| 22 | 12:16:06 | Q. Well, Tony Carbone is there. |
| 23 | 12:16:08 | A. But not until after the Zahavah |
| 24 | 12:16:12 | e-mail. Perhaps they thought I could help |
| 25 | 12:16:18 | escalate their request. I don't know. |

1    12:16:20     Q.    So you sent an FYI?

2    12:16:23     A.    Yes.

3    12:16:23     Q.    To all the people listed here,

4    12:16:26    including Tina Imm, Jeff Olde, Tony Carbone,

5    12:16:30    saying, "FYI, folks, it looks like the video

6    12:16:33    has been officially removed."

7    12:16:35     A.    Yes.

8    12:16:35     Q.    And then Adam Cahan sent something

9    12:16:38    to YouTube saying, "Really appreciate the

10   12:16:41    speedy action here.  Goes a long way with our

11   12:16:42    programmers.  Owe you one."  Smiley.  Is that

12   12:16:45    consistent with your experience with YouTube?

13   12:16:47     A.    Yes.

14   12:16:48     Q.    And is this an instance where

15   12:16:56    apparently someone internally put up some

16   12:16:59    Viacom material that shouldn't have gone out?

17   12:17:06     A.    Just by reading this e-mail, it

18   12:17:08    seems to be that way, but I wasn't aware of who

19   12:17:11    that person was or the situation.

20   12:17:13     Q.    Now, just because a video had some

21   12:17:55    of the promotional elements that you described,

22   12:17:57    like a call to tune in, that doesn't mean that

23   12:18:02    the clip itself is authorized to be on YouTube,

24   12:18:04    does it?

25   12:18:05     A.    Not necessarily.

| 1 | 12:18:39 | MR. SCHAPIRO: Exhibit 17. |
| 2 | 12:18:39 | (Whereupon Exhibit No. 17, E-mail |
| 3 | 12:18:39 | chain Bates number VIA 10405260, was |
| 4 | 12:18:42 | marked for identification.) |
| 5 | 12:18:42 | Q. This is an e-mail chain. It is |
| 6 | 12:18:48 | ultimately between you and Sonia Ocasio. I |
| 7 | 12:18:52 | will give you a minute to read it. |
| 8 | 12:18:54 | A. Okay. Okay. |
| 9 | 12:19:19 | Q. And the second from the top |
| 10 | 12:19:25 | Ms. Ocasio, am I pronouncing that right? |
| 11 | 12:19:28 | A. Yes. |
| 12 | 12:19:28 | Q. Asks you, "Who do you think is," |
| 13 | 12:19:30 | and then there is a URL for what seems to be a |
| 14 | 12:19:34 | YouTube user PJoseph73. It says, "Who do you |
| 15 | 12:19:38 | think is PJoseph73? He puts up all of our VH1 |
| 16 | 12:19:43 | promos. And you answer, "Good question. I |
| 17 | 12:19:45 | have no idea." As you sit here today, do you |
| 18 | 12:19:50 | have any idea who PJoseph73 is? |
| 19 | 12:19:53 | A. I don't. |
| 20 | 12:19:54 | Q. If you wanted to find out whether |
| 21 | 12:19:56 | PJoseph73 had authority to put up those promos |
| 22 | 12:20:00 | or not, what would you do? |
| 23 | 12:20:06 | MS. CUNHA: Objection to form. |
| 24 | 12:20:12 | A. I've never gone through that |
| 25 | 12:20:14 | process, so I don't know. |

# Schapiro Exhibit 113

| | |
|---|---|
| To: | heather gillette <heather@youtube.com> |
| From: | Kadetsky, Deborah <Deborah.Kadetsky@vh1staff.com> |
| Cc: | Kevin Donahue <kevin@youtube.com> |
| Bcc: | |
| Received Date: | 2006-08-11 16:37:54 CST |
| Subject: | RE: 3 clips to remove |

hey guys, thanks so much for the quick turnaround. we're wondering if the message about the video being removed could be edited? We really just wanted to ask if "VH1" could be edited out, so that it just reads:

This video has been removed at the request of copyright owner because its content was used without permission

Just trying to be sensitive to internal concerns...

thanks,
deb

---

From: heather gillette [mailto:heather@youtube.com]
Sent: Friday, August 11, 2006 2:15 PM
To: Kadetsky, Deborah
Cc: 'Kevin Donahue'
Subject: RE: 3 clips to remove

These have been removed Deborah, thanks!

---

From: Kadetsky, Deborah [mailto:Deborah.Kadetsky@vh1staff.com]
Sent: Friday, August 11, 2006 10:05 AM
To: heather@youtube.com
Cc: Kevin Donahue
Subject: 3 clips to remove

Hi Heather,
I spoke to Kevin this morning about wanting to take down a few posted clips from one of our shows:

http://www.youtube.com/watch?v=zcqJGiVRv9E
http://www.youtube.com/watch?v=EK1VeNVIO-8
http://www.youtube.com/watch?v=e46Yjexm648

Please let me know if you need any additional info from me?

Regards,
Deb

---

Deborah Kadetsky
Online Marketing Director
deborah.kadetsky@vh1staff.com
phone: 212.846.7864
fax: 212.846.1870

GOO001-00856031

# Schapiro Exhibit 114

Subject:    RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"
From:       Kadetsky, Deborah <EX:/O=VIACOM/OU=MTVUSA/CN=RECIPIENTS/CN=USER
            ACCOUNTS/CN=USER/CN=KADETSKD>
To:         Carbone, Tony
Cc:         Date:      Fri, 11 Aug 2006 19:25:53 +0000

Have to run, but will send out an email later when I see that they've all been updated.

Peace out.

-----Original Message-----
From: Carbone, Tony
Sent: Friday, August 11, 2006 3:16 PM
To: Kadetsky, Deborah
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Very cool

-----Original Message-----
From: Kadetsky, Deborah
Sent: Friday, August 11, 2006 3:10 PM
To: Carbone, Tony
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Actually refreshing the pages, and it looks like they're going to use this instead. They rule.

"This video has been removed by the user."

-----Original Message-----
From: Carbone, Tony
Sent: Friday, August 11, 2006 2:13 PM
To: Kadetsky, Deborah
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

http://youtube.com/watch?v=EK1VeNVIO-8
http://youtube.com/watch?v=e46Yjexm648
http://youtube.com/watch?v=zcqJGiVRv9E
http://youtube.com/watch?v=v4kpOsw2nyM
http://youtube.com/watch?v=_4pNNo2JnIU
http://youtube.com/watch?v=rT5oxKyHEfs
http://youtube.com/watch?v=N53lovKcRX4

-----Original Message-----
From: Kadetsky, Deborah
Sent: Friday, August 11, 2006 2:02 PM
To: Carbone, Tony
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

I'm so thankful I have no idea what that scene is/was!

-----Original Message-----
From: Carbone, Tony
Sent: Friday, August 11, 2006 2:01 PM
To: Hirschorn, Michael; Kadetsky, Deborah; Zurier, Ben - VH1; Calderone, Tom; Gay, Richard; Nelson,
Laura E - VH1; Feie, Tom
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"
Importance: High

Hey hey - we got ryan pulling add'l links now.

The almost-notorious tampon scene nearly just snuck thru at part of vspot's 202 aftershow, but it's been removed from Sunday nite's lineup as well.

-tc

-----Original Message-----
From: Hirschorn, Michael
Sent: Friday, August 11, 2006 12:30 PM
To: Kadetsky, Deborah; Carbone, Tony; Zurier, Ben - VH1; Calderone, Tom; Gay, Richard; Nelson, Laura E - VH1; Feie, Tom
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

http://www.youtube.com/watch?v=EK1VeNVIO-8
http://www.youtube.com/watch?v=e46Yjexm648

Here are a couple. If you then look at "explore more videos" you'll see the rest. They are all somethin' poop titles. The introducing somethin' ones, obviously, are clips you sent out

-----Original Message-----
From: Kadetsky, Deborah
Sent: Friday, August 11, 2006 12:14 PM
To: Hirschorn, Michael; Carbone, Tony; Zurier, Ben - VH1; Calderone, Tom; Gay, Richard; Nelson, Laura E - VH1; Feie, Tom
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Good news, they do have a process in place for removal of videos, and do it all the time. Since nobody has the right to post content that they didn't produce, it's an easy message/action to take.

Our contacts just need the individual links to the videos we'd like to block. I'm happy to facilitate the communication, but would appreciate it if someone has the bandwith to identify all the videos and send them to me as youtube links. Let me know if this is reasonable?

Thanks much,
deb

-----Original Message-----
From: Hirschorn, Michael
Sent: Thursday, August 10, 2006 7:26 PM
To: Kadetsky, Deborah; Carbone, Tony; Zurier, Ben - VH1; Calderone, Tom; Gay, Richard; Nelson, Laura E - VH1; Feie, Tom
Subject: Re: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Good instinct

-----Original Message-----
From: Kadetsky, Deborah
To: Hirschorn, Michael; Carbone, Tony; Zurier, Ben - VH1; Calderone, Tom; Gay, Richard; Nelson, Laura E - VH1; Feie, Tom
Sent: Thu Aug 10 19:25:18 2006
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Not sure...they may turn a blind eye? My first step will be to ask if they have a process in place before taking action.  I'll let you know how that goes...

VIA 10405834

Also keep in mind, I imagine we'll either need to identify all the videos we want flagged or set up a qualifying description for youtube to follow.

I'll keep you posted. Should know lots more tomorrow.

deb

-----Original Message-----
From: Hirschorn, Michael
Sent: Thursday, August 10, 2006 7:14 PM
To: Carbone, Tony; Zurier, Ben - VH1; Calderone, Tom; Gay, Richard; Nelson, Laura E - VH1; Feie, Tom
Cc: Kadetsky, Deborah
Subject: Re: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

At this point assume they get these requests all the time, no?

-----Original Message-----
From: Carbone, Tony
To: Hirschorn, Michael; Zurier, Ben - VH1; Calderone, Tom; Gay, Richard; Nelson, Laura E - VH1; Feie, Tom
CC: Kadetsky, Deborah
Sent: Thu Aug 10 18:57:35 2006
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Copying Deb Kadetsky...she's probably the best person to reach out to youtube about this.  We discussed earler, but she had some questions about what's the best way to structure this request to youtube so as to be as discreet as possible.

-----Original Message-----
From: Hirschorn, Michael
Sent: Thursday, August 10, 2006 12:27 PM
To: Carbone, Tony; Zurier, Ben - VH1; Calderone, Tom; Gay, Richard; Nelson, Laura E - VH1; Feie, Tom
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Tony, the poop scene has been uploaded several times to youtube. Can we ask them to take it down. People have uploaded other scenes from ep 1, which we might want to let slide, but let's try (discreetly) to get this one off

-----Original Message-----
From: Carbone, Tony
Sent: Monday, August 07, 2006 2:11 PM
To: Zurier, Ben - VH1; Hirschorn, Michael; Calderone, Tom; Gay, Richard; Nelson, Laura E - VH1; Feie, Tom
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

110k streams just for today and climbing.  64% of vspot traffic.  Our low threshold for hit is about 100k per WEEK for episodic franchises, so this is very strong, but not on pace to break any records.

Post finale last year, FOL did about 750 on Monday and 2M for the week.

-----Original Message-----
From: Zurier, Ben - VH1
Sent: Monday, August 07, 2006 12:51 PM
To: Hirschorn, Michael; Calderone, Tom; Carbone, Tony; Gay, Richard; Nelson, Laura E - VH1; Feie, Tom
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Tony -- any feel for Vspot/online traffic over the weekend yet?

-----Original Message-----
From: Hirschorn, Michael
Sent: Monday, August 07, 2006 12:41 PM
To: Calderone, Tom; Carbone, Tony; Zurier, Ben - VH1; Gay, Richard; Nelson, Laura E - VH1; Feie, Tom
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Tony, can u ck if the show or the clip is on bit torrent? I can't do it from here. It wasn't on youtube a couple hours ago

-----Original Message-----
From: Calderone, Tom
Sent: Monday, August 07, 2006 12:18 PM
To: Carbone, Tony; Zurier, Ben - VH1; Gay, Richard; Hirschorn, Michael; Nelson, Laura E - VH1; Feie, Tom
Subject: RE: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Would still hold tight and not run this....thanks

-----Original Message-----
From: Carbone, Tony
Sent: Monday, August 07, 2006 11:52 AM
To: Zurier, Ben - VH1; Gay, Richard; Hirschorn, Michael; Calderone, Tom; Nelson, Laura E - VH1; Feie, Tom
Subject: FOL2 Stair/Floor Scene - VSPOT "Director's Cut"

Keeping the same dis list we had going into the weekend re FOL premiere, sorry if I'm spamming, just let me know and I can remove you from the thread...

Don't know where Tina left this with you all, but I believe she said we wanted to keep an eye on press, etc. for a couple days before making a decision on this one way or another.

We had 51M cut a VSPOT extra "Director's Cut" of the scene in question.  Link below.  You'll need a PC to view it.  If you need, I can get you a VHS, just let me know location.  The scene is similar to the first edit (that I saw) of the show.

http://www.vh1.com/vspot/player.jhtml?vid=100389

Thanks,

-tc