# SCHAPIRO DECLARATION EXHIBITS CONTINUED

# Schapiro Exhibit 171

# CONTENT IDENTIFICATION AND MANAGEMENT AGREEMENT

| RIGHTS OWNER FULL LEGAL NAME:<br><br>**Viacom Inc. (and its wholly-owned affiliate entities) (hereinafter the "Rights Owner")** | TYPE OF ENTITY:<br>[X] Corporation<br>[ ] Limited Liability Company<br>[ ] Sole Proprietorship<br>[ ] Other [specify _____] |
|---|---|
| **COUNTRY (AND STATE IF IN THE UNITED STATES) OF INCORPORATION OR RESIDENCE: New York** | **TAX IDENTIFICATION NUMBER: N/A** |

|  | BUSINESS CONTACT | TECHNICAL CONTACT | ACCOUNTING CONTACT |
|---|---|---|---|
| Name: | Stanley Pierre-Louis | Alan Bell | |
| Title: | VP, Associate General Counsel | Executive VP, CTO | |
| Address: City, State: Postal Code: Country: | Viacom, Inc. 1515 Broadway New York, NY 10036 | Paramount Pictures Corporation 5555 Melrose Avenue Hollywood, CA 90038 | |
| Phone: | (212) 846-4811 | (323) 956-8990 | |
| Fax: | (201) 553-7714 | (818) 571-1335 | |
| Email: | stanley.pierre-louis@viacom.com | Alan_Bell@Paramount.com | |

**CONTENT LICENSE OPTION:**
[ ] Rights Owner agrees to license and monetize content pursuant to the Content License Agreement.
[ ] Rights Owner agrees to license and monetize content pursuant to a separate license agreement with Google dated [_____] titled [_____].
[X] Rights Owner does not agree to license and monetize content, and elects only to block or track content.

Rights Owner and Google hereby agree to this Content Identification and Management Agreement ("Agreement").

**Effective Date:** February 1, 2008

Google Inc.

BY: _David K. Eun_
NAME: DAVID EUN
Vice President, Content Partnerships
TITLE: Google, Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043
10:45:55
-08'00'

Viacom Inc.
(and its wholly-owned affiliate entities)
BY: _____
NAME: Michael D. Fricklas
TITLE: Executive VP, General Counsel
1515 Broadway
New York, NY 10036

Google's content identification and management system ("System") and content preparation software ("Software") are designed to help Rights Owner identify its Works on YouTube and set Usage Policies for those Works. The following terms govern Rights Owner's use of the System and Software.

**1. Definitions.**

"**Block**" means the Usage Policy available in the System for Rights Owner to specify that a user video be blocked from playback on YouTube in the territories selected by Rights Owner.

"**ID File**" means the unique binary data that describes a Work and is used for the automatic identification of that Work or a portion thereof. ID Files may be provided by Rights Owner to Google or created by Google using the Reference Files.

"**Monetize**" means the Usage Policy available in the System for Rights Owner to license to Google in the territories selected by Rights Owner a user video matching an ID File or claimed by Rights Owner using the search functionality that may be offered by the System.

"**Reference Files**" means the Works provided by Rights Owner to Google pursuant to this Agreement.

"**Software**" has the meaning given in the preamble.

"**System**" has the meaning given in the preamble.

"**Track**" means the Usage Policy available in the System for Rights Owner where it does not specify that the user video be blocked from playback on YouTube, but also does not grant any licenses thereto.

"**Usage Policy**" means Monetize, Track, or Block, or such other policies as may be made available by Google from time to time.

"**Work**" means audio and audiovisual works owned or controlled by Rights Owner.

"**YouTube**" means YouTube.com and subdomains.

**2. Reference Files and ID Files.** (a) Rights Owner will deliver to Google the Reference Files or ID Files created using the Software. If Rights Owner provides Reference Files, Google will create corresponding ID Files. Rights Owner shall retain all rights, including without limitation copyright rights, in Reference Files. Rights Owner will provide metadata associated with each Reference File or ID File (such as title, description, the Usage Policy, and the territorial scope of each Usage Policy) via an XML feed or otherwise pursuant to Google's reasonable specifications. Rights Owner will make commercially reasonable efforts to ensure that the metadata delivered to Google is accurate and current. Google will provide appropriate format, resolution, and bit-rate specifications for the delivery of Reference Files, ID Files, and metadata. (b) Rights Owner may inactivate from use in the System any of its Reference Files and ID Files at any time and thereby terminate Google's license to use the Reference Files and ID Files. Google will store the Reference Files and ID Files on secure servers and will protect Reference Files and ID Files from unauthorized access as specified in Exhibit A. Google will develop the capability to delete or destroy, at Rights Owner's Request, any or all of Rights Owner's Reference Files and ID Files; provided, however, that nothing herein alters either party's document retention or discovery obligations in connection with any pending or future litigation between the parties, and Google's retention of ID Files or Reference Files in compliance with any such obligations will not be deemed a breach of this Agreement. Google will use commercially reasonable efforts to implement such capability no later than July 31, 2008.

**3. User Video Matches.** The System will compare all videos uploaded to YouTube, including all videos designated "private" and those available through versions of YouTube localized for particular countries, against the ID Files to identify matches and apply the Usage Policies assigned by Rights Owner to any matches. Google will use commercially reasonable efforts to improve the System with the goal of minimizing the time between video upload and application of the Usage Policies set by Rights Owner. The System may also provide Rights Owner the capability to perform text searches for user videos that may contain the Works and assign Usage Policies for such materials. Rights Owner may change any Usage Policy at any time. If a particular ID File has not yielded any matches within a one-year period of time, Google may by written notice request from Rights Owner permission to remove such ID file from the System, which Rights Owner may authorize in its sole discretion. Google may replace old ID Files with new ID Files of a particular work at any time in connection with System upgrades and technical

2

modifications. Rights Owner shall not knowingly make false claims on user videos. Knowingly false claims may lead to termination of this Agreement by Google.

**4. Disputes.** Google may establish reasonable procedures to resolve claims that appear to be in good faith by a user that a Work has been blocked due to error, mistake, or otherwise. Rights Owner will cooperate with Google to resolve such disputes. If, during the course of evaluating such claims, Rights Owner reviews content designated as private by the user, Rights Owner will not disclose the content to any third party except as necessary to complete its evaluation process or in contemplation of, or participation in, a judicial proceeding. Notwithstanding the foregoing, nothing herein shall limit Rights Owner's rights and remedies under applicable law against a user with respect to any video under review.

**5. Licenses and Ownership. (a)** Google grants to Rights Owner a non-exclusive, non-transferable, royalty-free, limited license to use the System and Software solely for the purpose of creating ID Files and identifying and managing its Works on YouTube. By providing Reference Files and/or ID Files, Rights Owner grants Google a non-exclusive, non-transferable, royalty-free, limited license to store, copy (including the right to make temporary cache and storage copies), modify or reformat, excerpt, analyze, use to create algorithms and binary representations, and otherwise use those files solely in connection with the System and subject to the terms of this Agreement. **(b)** Rights Owner shall not sell, lease, lend, convey, modify, adapt, translate, prepare derivative works from, decompile, reverse engineer, disassemble or attempt to derive source code from the System or Software. All rights or licenses not explicitly granted by the parties herein are specifically reserved. Except for the licenses specifically granted above, all of Rights Owner's intellectual property rights in the Reference Files and ID Files (whether provided by Rights Owner to Google or created by Google) remain with Rights Owner, and all of Google's intellectual property rights in YouTube, the Software, the System and related information and files remain with Google. For the avoidance of doubt, Rights Owner does not grant Google the right to modify, adapt, prepare derivative works, store or reproduce Reference Files and ID Files except as necessary to comply with the terms of this Agreement, nor does Rights Owner grant Google the right to publicly perform, publicly display, or distribute Reference Files and ID Files. Upon any termination of this Agreement, both parties will delete all ID Files from their respective storage systems.

**6. Confidentiality.** Neither party will disclose the terms of this Agreement to any third party (except to outside counsel or retained experts), or issue any public announcement regarding the terms of this Agreement, without the other party's prior written agreement. The parties shall not disclose to any third parties nonpublic information disclosed by one party to the other under this Agreement, and shall protect such information applying the same degree of care used by the parties to protect their own confidential information. If this Agreement or any confidential information of either party is required to be produced by law, the noticed party will promptly notify the other party and, to the extent practicable, cooperate to obtain an appropriate protective order prior to disclosing any confidential information. Except with respect to the terms and existence of this Agreement, this Agreement imposes no obligation upon Google or Rights Owner with respect to the other party's confidential information that: (i) a party knew before receiving it from the other party pursuant to this Agreement or a party knew before participating in the System; (ii) becomes publicly available through no fault of the other party; (iii) is rightfully received by the other party from a third party without a duty of confidentiality; or (iv) is independently developed without reference to Google's confidential information.

**7. Representations and Warranties, Indemnities.** Each party represents and warrants that it has authority to grant the licenses set forth in Section 5. Rights Owner represents and warrants that it believes in good faith, after reasonable investigation, that it has all rights required to set the Usage Policies that it has set with respect to its Works. Each party shall indemnify, defend and hold harmless the other party, and their respective directors, officers, employees, and agents from any third party claims arising out of a breach of that party's representations and warranties.

3

**8. DISCLAIMERS, LIMITATIONS OF LIABILITY.** EXCEPT FOR THE EXPRESS WARRANTIES MADE BY THE PARTIES IN SECTION 7, THE PARTIES DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS IN SECTION 7, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES OR PENALTIES ARISING FROM ANY ACTION TAKEN PURSUANT TO THIS AGREEMENT. PRIOR TO RIGHTS OWNER PROVIDING REFERENCE FILES TO GOOGLE FOR THE PREPARATION OF ID FILES, THE PARTIES AGREE TO ENTER INTO GOOD FAITH NEGOTIATIONS LIMITING GOOGLE'S AGGREGATE LIABILITY FOR ANY CAUSE OF ACTION ARISING FROM OR RELATED TO BREACHES OF THE SECURITY PROVISIONS IN EXHIBIT A RESULTING IN A REFERENCE FILE BEING WRONGFULLY COPIED OR ACQUIRED BY ANY THIRD PARTY. FOR THE AVOIDANCE OF DOUBT, NOTHING HEREIN SHALL BE DEEMED A RELEASE OR WAIVER BY RIGHTS OWNER WITH RESPECT TO CLAIMS FOR DAMAGES ARISING FROM THE PRESENCE OF A WORK ON YOUTUBE THAT HAS NOT BEEN LICENSED TO GOOGLE BY RIGHTS OWNER; PROVIDED, HOWEVER, GOOGLE SHALL NOT BE LIABLE TO RIGHTS OWNER FOR ANY AMOUNT UNDER ANY THEORY OF LIABILITY WITH RESPECT TO THOSE ID FILES FOR WHICH RIGHTS OWNER AFFIRMATIVELY ELECTS THE "TRACK" USAGE POLICY.

**9. NO EFFECT ON PENDING, FUTURE, OR RELATED LITIGATION.** Notwithstanding the foregoing, nothing in this Agreement shall limit or expand in any way whatsoever Google's and/or Rights Owner's pursuit or introduction of evidence in any litigation or contemplated litigation between them, including but not limited to *Viacom International, Inc. et al v. YouTube, Inc. et al.*, Case No. 1:07-cv-02103-LLS, filed on March 13, 2007, and currently pending in the United States District Court for the Southern District of New York. Furthermore, nothing in this Agreement shall be cited as a defense against or agreement to the production of any relevant material in discovery in any lawsuit, subject to any protective order entered in such lawsuit, and nothing in this Agreement shall operate in any respect as a release or waiver of any of the claims in any lawsuit except as expressly provided in Section 8.

**10. Termination. (a)** Either party may end this Agreement on 30 days written notice. All licenses granted in this Agreement will expire upon termination. **(b)** Sections 1, 5(b), 6-8, 9(b), and 10 survive termination.

**11. Miscellaneous.** The parties are independent contractors, and nothing in this Agreement creates an agency, partnership, or joint venture. Neither party may assign rights or obligations under this Agreement to any third party without the prior written consent of the other. This Agreement sets forth the entire agreement between the parties and supersedes any prior or contemporaneous agreements regarding its subject matter. This Agreement may be amended only in a writing signed by both parties. If this Agreement conflicts with any other agreement applying to Google's use of Works on YouTube, these terms control. Each party will send any notices hereunder in writing and to the attention of the Legal Department at the address listed on the first page of this Agreement. If any provision of this Agreement conflicts with applicable laws or is adjudicated to be illegal, that provision will be deemed eliminated from the Agreement and the Agreement will remain in effect so long as the essential purpose can still be achieved. This Agreement is governed by the laws of the State of California (excluding its choice of law rules) and applicable federal laws. Except with respect to claims or actions involving users pursuant to Section 4, any litigation to enforce the terms of this Agreement will be brought in any state or federal court of competent jurisdiction in Santa Clara County, California; each party consents to venue and exclusive personal jurisdiction of such courts. This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which, when taken together, will constitute a single instrument.

4

Highly Confidential          Expert – Lics          GO0001-02244044

**EXHIBIT A**
SECURITY DOCUMENT

5

Highly Confidential

Expert — Lics

GOO001-02244045

# Security Overview for Video ID at Google

## Introduction

Securing networked servers against would-be hackers is key to ensuring the success of any system. When it comes to partner collaboration, the importance is paramount. Google invests billions of dollars in technology, people, and process to ensure data at Google is safe, secure, and private. Google's dedicated team of security professionals is responsible for designing in security from the onset, reviewing all design, code, and finished product to ensure it meets strict Google security and data privacy standards. The same infrastructure used to host various applications at Google and to secure hundreds of thousands of user's data is also used to manage millions of consumers' data and billions of dollars in advertising transactions. Customer information and files are safe and secure.

This document describes the security measures and controls that Google has put in place to ensure the security of customer data. The key aspects covered include:

- Physical security and internal information security at Google data centers
- Change management processes, data backup/destruction, privacy policy
- Infrastructure for Video ID data

This document describes a snapshot of the current procedures for security. Google reserves the right to adjust these measures as our systems change and attackers adapt.

## Security Team

Google employs a large team of information security experts to design and maintain our defense systems, and to make security a core part of the development philosophy and culture. Because we must protect the data of hundreds of millions of end users, we take extra care to make sure that all applications and services that we launch are secure.

Google's security team consists of some of the most accomplished security veterans in the IT industry. Many have experience running security operations at Fortune 500 companies, including some of the most well known financial service institutions. Examples of the backgrounds of individuals on the security team include:

- Chief Information Security Officer at Charles Schwab

- Director of Secure Networking Research at Bell Labs

- Technical Director for Information Security at Charles Schwab

- Senior Network Forensics Specialist from the National Nuclear Security Administration

The security team is involved in all aspects of the security process at Google, including the construction of a custom security infrastructure tuned to Google's unique platforms. They are responsible for the perimeter defense systems described below, as well as the security review process for applications described later in the document.

## Data Center Environment and Physical Security

### Google Data Center Infrastructure

Google maintains a vast number of geographically distributed data centers located primarily in the USA and the European Union. Data centers are unmarked and in undisclosed locations to maximize security.

### Physical Security Staffing

At the Google data centers, there is a Security Operations Center, which is manned 24 hours a day, 7 days a week by a physical security services organization. The security organization deploys three shifts of 8 hours to provide continuous coverage. The security operations centers contain the monitors for the Closed Circuit TV (CCTV) cameras and all alarm systems. Internal and external patrols of the data center are performed each shift. The data centers are housed in facilities that require electronic key access, with alarms that are linked to the guard station manned 24 hours a day, 7 days a week.

## Physical Security Access Procedures

Formal access procedures exist for allowing physical access to the data centers. All entrants to the data center must identify themselves as well as show proof of identity to security operations. Valid proof of identity is a photo ID issued by Google and a governmental entity. Only authorized Google employees and contractors are allowed entry to the data centers. Data center managers must approve any visitors in advance for the specific data center and internal areas they wish to visit.

Only authorized Google employees and contractors who permanently work at the data centers are permitted to request card access to these facilities. Data center card access requests must be made through e-mail, and requires the approval of the requestor's manager and the Data Center Director. All other Google employees and authorized contractors requiring temporary data center access must sign in at the guard station, present an Google badge (Google employees or contractors) or ID issued by their employer (authorized contractors) and reference an approved data center access record identifying the individual as approved.

## Physical Security Devices

The data centers employ electronic card key and biometric access control system that are linked to a system alarm. The access control system monitors and records each individual's access to perimeter doors, shipping/receiving, the raised floor, and other critical areas. Unauthorized activity and failed access attempts are logged by the access control system, investigated as appropriate, and reported to the security manager. The security manager reviews and approves these reports. Authorized access throughout the business operations and data centers is restricted based on zones and the individual's job responsibilities.

All entrants to the data centers must pass through a mantrap. The mantrap is designed to physically limit access to one person at a time (floor sensors and automatic 180 degree turnstile) and prohibits the "handing off" of a badge back to a secondary person.

The fire doors at the data centers are alarmed and can only be opened from the inside. The fire doors are fitted with push bars to open. There is a specified delay on the push bar unless a fire alarm has been activated. If a person tries to exit the building through a fire door without a fire alarm having been triggered, an alarm would register in the security operations center.

CCTV cameras are in operation both inside and outside the data centers. The positioning of the cameras has been designed to cover strategic areas including, among others, the perimeter, doors to the data center building, shipping/receiving and the raised floor.

Security operations personnel manage the CCTV monitoring, recording and control equipment. The CCTV equipment is connected by secure cables throughout the data centers. Cameras record on site via digital video recorders 24 hours a day, 7 days a week. The surveillance records are retained for 60-90 days based on activity.

## Environmental Safeguards

### Redundancy

The data centers are designed with resiliency and redundancy. The redundancy is intended to minimize the impact of common equipment failures and environmental risks. Infrastructure systems have been designed to eliminate single points of failure. Dual circuits, switches, networks or other necessary devices are utilized to provide this redundancy. Critical facilities infrastructure at the data centers have been designed to be robust, fault tolerant and concurrently maintainable. Preventative and corrective maintenance is performed without interruption of services.

All environmental equipment and facilities have documented preventative maintenance procedures that detail the procedure and frequency of performance in accordance with the manufacturer's or internal specifications. Preventative and corrective maintenance of the Google data center equipment is scheduled through the standard change process. Preventative maintenance is performed on all infrastructure systems according to documented procedures.

### Power

The data center electrical power systems are designed to be fully redundant and maintainable without impact to continuous operations, 24 hours a day, and 7 days a week. A primary as well as an alternate power source, each with equal capacity, is provided for every critical infrastructure component in the data center. This redundancy begins with dual utility power feeds, primary and alternate, to parallel utility switchboards sized so that any one can provide power to the entire facility. The output power is then routed to Automated Transfer Switches (ATS), which supply all building loads including uninterruptible power supplies (UPS), building and mechanical services, and heating, ventilation and air conditioning systems.

Battery backup power is provided by UPS batteries, which supply consistently reliable power protection during utility brownouts, blackouts, over voltage, under voltage, and out-of-tolerance frequency conditions. During normal operations, the utility power charges the battery modules as well as supplies power to the data center raised floor. If utility power is interrupted, the UPS batteries provide back-up until the diesel generator systems take over. In the event of unavailability of both electrical utility and diesel generators, the UPS batteries can provide emergency electrical power to run the data center at full capacity for 10 minutes.

If utility power is interrupted or is out of specification, the power supply will automatically switch to battery mode to continue to supply power to the data center without interruption. When utility power returns, the switch will remain in bypass so that the data center operations team can ascertain the issue has been corrected and can bring the systems back to normal mode in a controlled manner.

Solid State Transition Transfer Switches (SSTTS) are also in place. Should UPS power fail, the SSTTS can be used to transparently transfer all loads from the external dual utility power feeds to the diesel generators.

Diesel engine generators are in place to provide power to critical equipment and customer loads. The generators are capable of providing enough emergency electrical power to run the data center at full capacity typically for a period of days. These generators automatically startup and provide power within seconds in the event of a power outage.

The automatic startup and power distribution is controlled by a programmable logic controller, which has a redundant backup.

Google has short notice diesel refueling contracts in place.

### Climate and Temperature

Air-cooling is required to maintain a constant operating temperature for servers and other computing hardware, which prevents over heating and reduces the possibility of service outage. Computer room air conditioning units are powered by both normal and emergency electrical systems. Security operations teams monitor these units and perform periodic inspections and preventative maintenance.

### Fire Detection and Suppression

At the data center, automatic fire detection and suppression equipment has been installed to prevent damage to computing hardware. The fire detection systems utilize heat, smoke, and/or water detection sensors that are located in the data center ceiling as well as underneath the raised floor.

In the event fire or smoke is detected, the detection system will sound audible and/or visible alarms in the zone affected, at the security operations console and at the remote monitoring desk of the local fire department. .

In addition, there are fire extinguishers located throughout the data centers.

# Logical Software Infrastructure Security Measures

## Google Server Environment

Google's servers are designed in-house from the ground up, and Google maintains control over the entire hardware and software stack. The operating system is based on Linux, and has been customized to solely run Google services. Since these are not meant to be general purpose systems like a typical OS, the core services and binaries of the OS have been stripped down, hardened, and heavily modified to leave only those necessary to run Google's applications.

As a result of this degree of control and homogeneity over the entire stack, Google designs its security infrastructure in a very different way from traditional systems. Rather than having to guard against a wide array of unknown inputs into many third party applications, Google can anticipate exactly what types of queries can come into the system and only accept this whitelisted set of queries. This philosophy is utilized throughout the security framework to only accept what is expected, and this provides a highly secure application environment.

## Firewalls and Intrusion Detection

Google employs multiple layers of firewalls and intrusion detection to ensure that that our external attack surface is protected.

Intrusion detection is intended to provide insight into ongoing attack activities and provide adequate information to respond to incidents. Many companies make extensive use of third-party technologies (e.g., Network Intrusion Detection Systems - NIDS, Host-based Intrusion Detection Systems - HIDS) to look for known attacks against commonly-installed software, and Security Operations Centers (SOCs) to respond when they arise.

We take a different approach by:

- Tightly controlling the size and make-up of our attack surface through preventative measures
- Employing intelligent detect controls at data entry points
- Employing technologies that automatically remedy dangerous situations.

Most of our Internet-exposed attack surface is comprised of Google-created software and the internal environment is large and complex. Traditional IDS products are not economical, efficient or useful in these situations and we have needed to rely on smarter methods of detecting exploitation.

When we approach intrusion detection concepts, we break down our attack surface according to anticipated input vectors (i.e., how hackers will attempt to break in). All of Google's hosting infrastructure is custom-built so we have the ability to tightly define our perimeter and the entrance points into our network.

While we cannot talk in detail about the exact defenses without potentially compromising Google's defense system, some of the major areas of coverage that achieve the goals above are as follows:

- As mentioned previously, the OS on every system is stripped down, modified, and hardened to avoid third party vulnerabilities on running systems
- All IP traffic is routed through custom front end servers that detect and stop malicious requests
- Traffic is examined for exploitation of programming errors via methods such as cross-site scripting, and high priority alerts are generated when such an exploit is found
- To prevent buffer overflow attacks, all open source software that is Internet facing or that processes external data goes through several levels of code review, audit, and modification before allowed into production. All changes are contributed back to the open source community.
- Systems are checked continually for binary modifications, and any unrecognized modifications are purged
- Router ACLs are used to provide perimeter defense, and an internally routable IP space is used to make sure external connections are never made to internal systems
- Layer 3 filtering is used to mitigate packet-level attacks

## Multi-tenant Distributed Data Environment

Google applications run in a multi-tenant distributed environment. Rather than segregating customer data to one machine or set of machines, data from all customers is

distributed amongst a shared infrastructure of tens of thousands of homogeneous machines.

This provides a variety of security benefits for user data, including:

- **Data Distribution** – Data is spread across thousands of systems. As a result, no one system has all of a user's data or all of a company's data. This makes it impossible for an intruder to target and remove a set of systems containing data for any particular customer. It would be like searching for a needle in a haystack.

- **Infrastructure Homogeneity** – Because all systems are the same, security fixes can be very quickly diagnosed and deployed for the entire infrastructure. Google does not need to worry that a particular machine has a different version of the infrastructure software than other systems. Additionally, even if an intruder were to physically breach a datacenter, they would not be able to identify one system from another since they all physically look the same.

- **Failover and Scalability** – Because all systems are the same, any of these systems can be spun up to serve customer data. As a result, the infrastructure can scale and fail over based on dynamic needs.

- **Data Obfuscation** – All user data is stored in a homogeneous Google-proprietary filesystem that does not follow traditional file system storage and access methods (such as NFS or CIFS). As a result, the data is obfuscated and not easily readable by anyone even if they were to breach the system.

## Infrastructure for Video ID

### Upload Servers

Customers will utilize an SFTP dropbox on specific servers attached to the internet. The login requires a static IP, a public key (sent to YouTube) and a private key (staying at the customer site), and a user account. This login is restricted to SFTP only and uses well tested security methods (SSH2, RSA, or DSA). Once logged onto the server, all customers will be separated with a chroot into their sub-directories (and only their subdirectories). The customer can upload multiple video and XML data files into that subdirectory or a child. After uploads have completed, all files are moved into a processing directory and are no longer accessible to the customer. Files will remain on the server for a period of up to 21 days and then are purged.

These servers are separate machines from the streaming servers at YouTube and cannot stream the uploaded files. The machines can only be accessed internally by a limited number of admin account owners.

### Database Servers

The database servers receive the files from the upload server (via a private Google network). The videos are transcoded and ID files are created to be used by the Video ID service. Videos are stored indefinitely (320x240 resolution) in the event a new ID file is required in a Video ID upgrade. The videos and ID files are stored under GFS on Google

machines that not accessible via the Internet. Like the upload servers, these servers can only be accessed internally by a limited number of admin account owners.

## Google's Own Data on Same Infrastructure

One of the strongest endorsements of Google's security infrastructure is that Google stores our own data on the same infrastructure as our customers. Any security hole would expose critical Google intellectual property and business information, so extreme care and examination was taken to ensure safety and security of the infrastructure.

# Internal Security and Change Management Processes

Security is a process that must be a part of the overall culture and operation of the organization. Google takes many measures to ensure that security is central to the process.

## Internal Data Access Processes and Policies

### Access Policy

LDAP, Kerberos and a Google proprietary system utilizing RSA keys provides Google with secure and flexible access mechanisms. These account mechanisms grant only approved access rights to site hosts, logs, customer information and configuration information. We require the use of unique user IDs, strong passwords, and carefully monitored access lists to ensure appropriate usage of accounts. The granting or modification of access rights are is based on a user's job responsibilities on a need to know basis and must be approved by data owners. Approvals are managed by workflow tools that maintain audit records of all changes.

Furthermore, it is Google's policy to provided system access to individuals who have been trained and require this level of access to perform authorized tasks. Access to systems is logged to create an audit trail for accountability.

Where passwords or are employed for authentication at Google (e.g., login to workstations), password policies that follow best-practices are implemented. These standards include password expiry, restrictions on password reuse and sufficient password strength. For access to extremely sensitive information (e.g., Credit Card data), Google uses hardware tokens.

## Code Development Review Process

### Design

Major parts of the system and application architecture are documented in a design document before any development has begun. The lead developer will detail the architecture, impact, and security considerations, and circulate amongst the engineering team for open review and approval. Security-focused engineers are involved in the product development process during all phases of the development cycle.

## Development and Test

Code change requests as well as system and hardware maintenance are standardized, categorized, and prioritized according to need. To the extent possible, the process and corresponding procedures are documented and designed to drive a controlled framework as well as the proper segregation of duties for the initiation, design, test, approval and migration of changes. The process outlines the change classification and corresponding activities to be performed during each of the phases, which are dependent on the impact the change will have to the system.

The change management process starts with a developer checking out a source code file to make a change. Once development is completed, the developer performs unit tests, if applicable, and a review is performed before the code is checked back into the repository. Google requires that a review independent of the developer be assigned.

Once a file has been properly approved, the release process begins. Code is compiled into a binary, and the binary is transferred to the QA environment where integration testing is performed. Depending on the type of change, dedicated QA resources may exist. If QA resources are unavailable, the lead engineers will take responsibility for performing load and regression testing within the QA environment. Once QA is complete, the binary is moved for migration to production.

## Launch

A change is scheduled to be "pushed" to the production environment by the automated change management tool. The push process determines which production files will be migrated by checking the production configuration files which are also managed through the change management process.

Software developers are required to go through a security review when launching any new service on Google infrastructure. During this review, a security engineer from the Google security team will look at the following:

- Review the design document, and review the notes from any previous design review

- Build and run the application or use a test instance of the application to familiarize themselves with the application functionality

- Test against the running application for common known security vulnerabilities

- Review the code for security-sensitive areas such as input validation, file and network I/O, database access, cross-site scripting, and others

The security review is part of the launch checklist process which every application must pass before going into production.

## Incident Reporting and Reaction Process

Google employs multiple proactive efforts to monitor for security incidents, including but not limited to inbound security reports, open source alerts, automated perimeter systems, and community alerts. When an Information Security incident occurs, Google security

responds immediately based on the level of threat. Notification of an incident may be generated automatically by monitoring systems or manually by a Google employee. Google works very closely with the security community to track reported issues in Google services and open source tools. More information can be found at http://www.google.com/intl/en/corporate/security.html

When notified of a problem, a Google security engineer makes a risk assessment and begins following prescribed response plans for the issue. Google has documented escalation procedures and communication protocols to address when and how incidents should be escalated as well as who should be notified.

Google continually monitors the production system in a variety of ways such as automated systems that look for predefined events (e.g., router crashes) and the use of statistical dashboards to diagnose and analyze issues (e.g., bandwidth utilization). Thresholds are configured on these monitoring systems so that the system health of network components, servers and other devices can be monitored closely. System reliability teams and customer support technicians respond to alerts generated when the monitoring system detects thresholds have been reached.

## Personnel Hiring, Background Check, and Security Training Process

Google has formalized global hiring practices designed to ensure new, rehired, or transferred employees are qualified for their functional responsibility. At a minimum, these practices include verification of the individual's education and previous employment as well as a referral check. Where local labor law or statutory regulations permit, Google may conduct criminal, credit, and/or security checks on all potential employees. The specifics or extent of background checks performed is dependent on the position for which the individual is applying.

Training of personnel is accomplished through the employee's development plan as well as supervised on-the-job training. The development plan is intended to help employees determine which learning activities should be completed to obtain or retain the skills and competencies for their job. This includes any special training necessary for the individual's technical position.

Upon acceptance of employment, all employees are required to execute a confidentiality agreement as well as acknowledge receipt and compliance with Google's Employee Handbook. The confidentiality and privacy of customer information and data is emphasized in the handbook as well as during new employee orientation.

All employees are required to attend security training as part of new hire orientation. At this training, they are instructed about the security policy of the company and escalation procedures.

Every employee has a written job description, and every job description includes the responsibility to communicate timely significant issues and exceptions to an appropriate higher level of authority within the Company.

## Data Replication and Data Disposal

### Data Replication

Data redundancy is built into the GFS file system, and all data that is written in GFS is replicated at least three times to separate systems. Such protections make sure that a customer's data is protected in the event of a disaster.

### Distributed Data Center Architecture

Google does not rely on just one datacenter to run our applications. We operate a geographically distributed set of datacenters to keep services running in the event of incidents and disasters at a single datacenter. Google runs datacenters in over a dozen locations worldwide, and has plans to build several more Google-owned datacenters in the near future. These datacenters are connected via high-speed private links to ensure secure and fast data transfer between datacenters.

Datacenter locations are undisclosed to the public, and data centers are unmarked to ensure optimal data security.

Google's data center management staff is also distributed in multiple geographies to ensure around the clock coverage and system administration that is not location dependent.

### Video and ID File Data

"Reference Only" videos are used exclusively for Video ID; the video and ID files for Video ID are in database servers, separate from YouTube video servers. These videos and ID files can be disabled via XML actions. (Note that it is possible to disable the video and still keep the existing ID file active). When either the video or the video-and-ID files are disabled, they become immediately inactivated from the Video ID services. Within 48 hours, disabled ID files are purged and a new Video ID database is fully written across datacenters; this removes all remnants of the ID files. Video files are not deleted from the Video ID servers or backup files.

### Data Destruction

Production disks go through a series of data destruction processes when they are removed from our systems. Disks are first logically wiped before they are physically accessed by our production staff. They are then removed from the system and confirmed to be wiped.

## Compliance with Safe Harbor

Google adheres to the US safe harbor privacy principles of Notice, Choice, Onward Transfer, Security, Data Integrity, Access and Enforcement, and is registered with the U.S. Department of Commerce's safe harbor program. This is detailed in the Google privacy policy.

http://www.google.com/privacypolicy.html

version 1.0-01/2008

# Schapiro Exhibit 172

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------X

VIACOM INTERNATIONAL, INC., COMEDY
PARTNERS, COUNTRY MUSIC
TELEVISION, INC., PARAMOUNT
PICTURES CORPORATION, and BLACK
ENTERTAINMENT TELEVISION, LLC,

        Plaintiffs,

vs.                        No. 07-CV-2103

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

        Defendants.

-----------------------------------X

THE FOOTBALL ASSOCIATION PREMIER
LEAGUE LIMITED, BOURNE CO., et al.,
on behalf of themselves and
all others similarly situated,

        Plaintiffs,

vs.                        No. 07-CV-3582

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

        Defendants.

-----------------------------------X

HIGHLY CONFIDENTIAL
VIDEOTAPED DEPOSITION OF SCOTT PAUL ROESCH
PALO ALTO, CALIFORNIA
THURSDAY, SEPTEMBER 25, 2009

JOB NO. 17714

2

1                       SCOTT ROESCH

2                   SEPTEMBER 25, 2009

3                      8:42 A.M.

4

5       HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF SCOTT

6   PAUL ROESCH, at WILSON SONSINI GOODRICH & ROSATI, 601

7   California Avenue, Palo Alto, California, pursuant to

8   notice, before me, KATHERINE E. LAUSTER, CLR, CRR, RPR,

9   CSR License No. 1894.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          SCOTT ROESCH

2     A P P E A R A N C E S:

3     FOR THE PLAINTIFFS, VIACOM INTERNATIONAL, INC.:

4             JENNER & BLOCK, LLP
              By:  SCOTT B. WILKENS, ESQ.
5             1099 New York Avenue, NW, Suite 900
              Washington, DC  20001
6             Telephone:   202.639.6000
              fax:     202.661.4832
7             swilkens@jenner.com

8                     and

9             MTV NETWORKS
              BY:  MICHELENA HALLIE, ESQ.
10            Senior Vice President, Deputy General Counsel
              Litigation/Intellectual Property
11            1515 Broadway
              New York, New York  10036
12            Telephone:  212.846.6849
              Fax:  212.846.1774
13            michelena.hallie@mtvn.com

14

15    FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE, LLC, and
      GOOGLE, INC.:

16            WILSON, SONSINI, GOODRICH & ROSATI, LLP
              By:  MICHAEL H. RUBIN, ESQ.
17                 CAROLINE WILSON, ESQ.
              650 Page Mill Road
18            Palo Alto, California 94304-1050
              phone:   650.493.9300
19            fax:     650.493.6811
              mrubin@wsgr.com
20            cwilson@wsgr.com

21

      Also Present:  ARMANDO CARRASCO, Videographer
22

23

24

25

1             SCOTT ROESCH

2   09:00:38  of -- or say "they," I guess -- was in early '99.

3   09:00:41  And then after that another -- I know there was at

4   09:00:46  least one additional round, but I -- I don't recall

5   09:00:48  when.

6   09:00:49      Q.   So you don't -- you can't recall the

7   09:00:50  number of venture financing rounds that Atom had?

8   09:00:54      A.   The number of rounds?

9   09:00:55           MR. WILKENS:  Objection.  Asked and

10  09:00:55  answered.

11  09:00:56           THE WITNESS:  No.

12  09:00:57  BY MR. RUBIN:

13  09:00:59      Q.   Do you know how much money was raised, in

14  09:01:01  total, through venture financing for Atom?

15  09:01:07      A.   I -- I don't know the specific number.

16  09:01:10      Q.   Do you have a rough number?

17  09:01:12           MR. WILKENS:  Objection.

18  09:01:16           THE WITNESS:  I -- I believe it was

19  09:01:17  20 million, possibly slightly higher for the Atom --

20  09:01:22  you know, for the pre Shock Wave merger atom Films,

21  09:01:27  and again, that's not -- that wasn't my area of

22  09:01:30  responsibility.  So that's -- I'm doing that based

23  09:01:32  on memory.

24  09:01:33  BY MR. RUBIN:

25  09:01:33      Q.   Sure.

```
 1                        SCOTT ROESCH

 2    09:01:36          You would say that the investors also

 3    09:01:38    respected copyright, wouldn't you?

 4    09:01:41          MR. WILKENS:  Objection to the form of the

 5    09:01:43    question.

 6    09:01:44          THE WITNESS:  I -- I -- you know, I

 7    09:01:45    didn't -- I know the investors well.  So I -- I -- I

 8    09:01:52    don't know.  I think so.

 9    09:01:54    BY MR. RUBIN:

10    09:01:57      Q.   How did Atom Films generate revenue at

11    09:02:01    that period of time?

12    09:02:02      A.   Through online advertising and

13    09:02:04    distribution licensing fees.

14    09:02:05    BY MR. RUBIN:

15    09:02:06      Q.   In connection with the online advertising,

16    09:02:08    what types of ads did Atom sell?

17    09:02:11      A.   We sold, you know, display advertisements

18    09:02:14    on web pages, banner ads of varying shapes and

19    09:02:19    sizes, as well as video play roll advertising.

20    09:02:23      Q.   What types of display advertisements did

21    09:02:27    Atom sell?  And to be specific, were they CPC ads or

22    09:02:31    CPM ads?

23    09:02:33      A.   They were primarily CPM ads, although

24    09:02:37    there were a few CPC ads.

25    09:02:40      Q.   And what is a CPC ad?
```

1                          SCOTT ROESCH

2     09:02:42      A.    That is an advertisement where the site is

3     09:02:47   paid on the number of clicks, as opposed to the

4     09:02:50   number of impressions in the CPM model.

5     09:02:52      Q.    So the CPM model, the site is paid on the

6     09:02:57   number of impressions?

7     09:02:59      A.    Yes.

8     09:02:59      Q.    The number of views of that page?

9     09:03:01      A.    The number of views of that particular

10    09:03:03   advertisement.

11    09:03:06      Q.    Did Atom Films ever use the YouTube

12    09:03:09   website to find the content for its distribution

13    09:03:13   model?

14    09:03:14           MR. WILKENS:  Objection to the form.

15    09:03:17           THE WITNESS:  Yes.

16    09:03:24   BY MR. RUBIN:

17    09:03:24      Q.    How often?

18    09:03:25      A.    It was one of many things we did to find

19    09:03:30   content, one of many sources, I would say.

20    09:03:33      Q.    Can you recall any specific examples of

21    09:03:36   Atom's use of the YouTube website as a source for

22    09:03:41   finding content?

23    09:03:42      A.    I know that many independent creators and

24    09:03:52   comedians will host videos of their work on YouTube,

25    09:03:56   and it's fairly common that when we're discussing a



# Schapiro Exhibit 173

From:     "Cahan, Adam" <Adam.Cahan@mtvn.com>
Date:     Sun, 9 Jul 2006 14:14:47 -0400
To:       "Wolf, Michael" <Michael.Wolf@mtvn.com>, "McGrath, Judy" <Judy.
          McGrath@mtvstaff.com>
Subject:  Update.

just finished a call: nick, blair, stef, nada, denmark, wade, bob

Key takeaways:

- we all believe this is a transformative acquisition that we should pursue. In its early stages of developing a business model but that is clearly at an inflection point in traffic growth. We view youtube moving beyond social sharing of video into a utility for video search more broadly.

- youtube has now reached 20m uniques US as of may. The number we believe is at the inflection point with closest competitor at 50 percent

- non-us traffic may be as big as 3x - one source - alexa that tracks non-us but not ideal source. Means we will need to come up with a perspective on how easily we can monetize those audience (ie ad networks, uk v. Other) as they play into cost.

- business model. 3 pieces.

1 premium branded display like advertising on the homepage where we see film/enter as the key category. Already disney, weinstein are there. Mtvn has exposure at 17 percent of our total dollars to this category.

2. Targeted advertising related to search and video consumption - think of this as advertisers bidding to be played and the link of relevance to the video. So someone search for scary and along side the "natural" results are paid performance videos for trailers etc.

3 ros inventory for non targeted pageviews - nada's specialty and where they are today

- on the cost side: mostly bandwidth cost that blair is developing based on his model.

Next steps:

-adam/blair/stef/nick - building out strategic rationale presentation with inputs from our call this morning.
- adam/blair/stef/nada/nick pulling together business model based on key drivers and inputs from call

Think it would make sense for us to have a check-in late today/early tomorrow. We can do with a quick subset of the group just to get everyone on same page.

# Schapiro Exhibit 174



  

## 3. I Still Want My...

**Judy McGrath**
**Title:** Chairman/CEO, MTV Networks
**Age:** 54

**Christina Norman**
**Title:** President, MTV
**Age:** 43

**Why them?** It has been 25 years since "Video Killed The Radio Star," and MTV's leading ladies are facing their greatest challenge—bringing the network into the digital age—with their usual intrepid spirit. Yes, the kids are increasingly flocking to YouTube, iTunes and MySpace. But Norman proved her prowess in reinventing a brand to suit its audience with VH1, and she plans no less with MTV's digital assault (and that of sister nets mtvU, MTV2, MTV Espanol). Witness the very cool Overdrive broadband site and Urge, MTV and Microsoft's more music-centric answer to iTunes. McGrath also juggles VH1, Nickelodeon, BET and Comedy Central, finding new ways to foster the interactivity that's oxygen to young audiences. The company's new Virtual Laguna Beach online service—where fans can live the experience via digitized avatars—will be followed by virtual club-hopping spot VMTV and LogoWorld, an online offshoot of its gay and lesbian channel. She's also partnering up to grow. Besides the Microsoft union, McGrath has greenlit purchases of sticky kids critter site Neopets and homegrown-film domain iFilm. We're also jazzed about MTV's recent $175 million purchase of music game-maker Harmonix. I mean who isn't clamoring for an offshoot of video game Guitar Hero? - CAO

---

**Judy McGrath**

**Defining career moment:** "The launch, care and feeding of MTV is right up there. That, and my first contest spot 'Devo Goes Hawaiian'."
**Person I most admire in the cable industry and why:** "The employees of MTV Networks, past present and future."
**Person (other than my current boss) I'd most like to work for:** Bill Gates and Warren Buffett Foundation.
**In my free time, I like to:** "Family. Read good fiction and bad magazines. See music. Go on YouTube."
**Favorite city:** New York
**Favorite song:** "Too many to mention. From Duke Ellington through Neil Young to Nirvana and a new one I really like, The Weepies."
**Favorite TV shows not on my network:** "Rescue Me," "Weeds" and "Nip/Tuck"
**Favorite piece of tech:** "My Blackberry."
**Least favorite piece of tech:** "My Blackberry."
**The world would be a better place if:** "Jon Stewart and Stephen Colbert were REAL news, not FAKE news... if we stopped the genocide in Darfur... and if everyone in this country participated in the voting process like it really mattered."

Click **here** to return to the 2006 CFAX 100 List

**CABLE JOBS**
- Search for VP Level Cable Jobs
- Search for Affiliate Sales & Marketing Jobs
- Search for Digital Media Jobs
- Search All Jobs

Employers! Post your Jobs and Search for Candidates Now

**CABLEFAX 100 DATABASE**


Find Who's Who in Cable
enter›

**VIDEO**


PLAY VIDEO ▸

More Videos »

**CABLE SHOW DATABASE**


Update your Show Listing »
Search the Database »

**CALENDAR**

Aug 13 CableFAX Webinar:...

Aug 18 CableFAX Onsite...

Sep 16 CableFAX Program...

Sep 23-25 WICT Executive...

Nov 16-18 WICT BMLI Alumnae...

View Entire Calendar »



EXHIBIT
McGrath 5
7/29/09
PENGAD 800-631-6989

# Schapiro Exhibit 175

From: Walker, Gregg <Gregg.Walker@viacom.com>
Date: Mon, 10 Jul 2006 11:53:30 -0400
To: Davis, Wade <Wade.Davis@viacom.com>
Subject: RE: YouTube - Update

>_____
>From:     Walker, Gregg
>Sent:     Monday, July 10, 2006 11:51 AM
>To: Davis, Wade
>Subject:  YouTube - Update
>Importance:    High
>
>Wade,
>
>On the YouTube Call right now.  Judy and Michael are pushing to have the attached deck sent to
Freston ASAP with some text edits (and no numbers).  The model is not ready yet.  Bakish is working
on it with Blair and Stef Schwartz, amongst others.
>
>Mike Dolan just jumped on the call as I was typing this email.  So the email might be moot.  Mike
demanded that we have a model in place before we get too far down the road.  He emphasized that
the company doesn't have any revenue ($6mm per year).  Mike is OK with the info being shared with
Freston before the model is completed and signed off by all players.
>
>Gregg
>
>Gregg Walker
>Vice President, Mergers & Acquisitions
>Viacom
>1515 Broadway - 53rd Floor
>New York, NY 10036
>(212) 846-6977
>F: (212) 846-1497
>gregg.walker@viacom.com
>

List of attachments:
  REVISED DECK (Outlook item)

guys i re-worked this for the 11a.  i realize it is last minute but take a look..tx

List of attachments:
  06.7.10.beagle.ppt



# Project Beagle

**Discussion with Judy McGrath and Michael Wolf**

**July 10, 2006**

Highly Confidential

# Today's Objective

- **Quickly bring you up to speed on the last few days of work looking at Youtube**
- **Find a time to go through some numbers later today**
- **Jointly explore what this means to all of us**
- **Agree on next steps, including the nature of dialog with the rest of the Viacom decision makers**

1

VIA 10132345



**YouTube Overview**

Highly Confidential

# Youtube at a Glance

- Founded February 2005
- Site motto: "Broadcast Yourself" -- Features and usage
  - Users can instantly upload, watch, tag and share videos.
  - Getting to comprehensive - search millions of videos uploaded by community members
  - Personalize the experience by subscribing to member videos, saving favorites, and creating playlists. Developing a persona on YouTube
  - Embed YouTube videos on websites using video implants or APIs
  - Users can make their posted videos public or private
  - Ability to watch and share videos from mobile phones or PDAs
- Management:
  - Chad Hurley – CEO & co-founder – prior Paypal
  - Steve Chen – CTO & co-founder – Prior Paypal
  - Sales and bus dev. mostly x-Yahoo! (Chris Maxcy)
- Investors:
  - YouTube announced its first round of funding in November 2005 for $3.5 million from venture-capital firm Sequoia Capital.
  - In April 2006, YouTube received an additional $8 million in a second round of funding from Sequoia – investment led by Roelof Botha, former CFO of PayPal

3

Highly Confidential

VIA 10132347

# YouTube is a "Video Utility" -- Serving an Extremely "Longtail" of Content

- YouTube is a utility people use to contribute, share and consume video
  - **Users currently upload ~70K videos per day and invest in tagging, cataloging and sharing their videos**
- Consumption of "branded" content on YT is low
  - There are no movie trailers in the top 30, nor are there <u>any</u> clips from popular TV shows
  - Only four of the top 30 most watched videos of all time on YouTube are music videos, one of which is in German
- In fact, in the "branded area," Ifilm does significantly more streams than Youtube, even though Ifilm is much smaller from a user base perspective
  - o *Pirates of the Caribbean 2* trailers consumption on YT = 250k; consumption on IFILM = 1m
  - o Even the much-discussed SNL "Lazy Sunday" sketch and its myriad spoofs have been seen more times on IFILM than on YouTube
- <u>Net-net</u>, Youtube is much closer to video search than VOD

4

Highly Confidential

VIA 10132348

# YouTube is Showing Break Out Growth



NIELSEN NETRATINGS MONTHLY UNIQUES

MediaMetrix – May 2006

Daily Reach (per million)

Alexa Rankings – July 2006

- In video, YouTube is a clear leader with **20M uniques** (NetRatings) growing 100% month-on-month

- YouTube has a massive global reach: it is a top 10 site in 8 countries, a top 20 site in 18 countries, and a top 50 site in 49 countries. Overall, Alexa ranks it 19th in the world; approximately 80% of traffic is non-US

5

Highly Confidential

VIA 10132349

# The Site is Extremely "Sticky" -- Particularly vs. Competitive Sites



- **Relative to the competition it is experiencing** 3-5X time spent with an average of 36 minutes per unique per month (MMX).

6

Highly Confidential

# However, Youtube's Advertising Business is in its Infancy



- **We do not believe Youtube has any significant ad business**
- **The company has (correctly) been focused on the user experience and has not implemented any invasive advertising**
  - **Focuses on Banners**
  - **No "pre-roll" video inventory**
- **However, it has recently done business with Disney, NBC, and Weinstein as well as ad networks**

7

Highly Confidential

VIA 10132351



Fit With MTVN/Viacom

Highly Confidential

# As Video Consumption Moves to the Web, YouTube has Emerged As a First Choice Asset for the Company

- YouTube is the dominant platform for consumers as they migrate to using video to express themselves
    - It is quickly becoming a "video social network"
    - There is currently no other asset that approaches this position
- YouTube would be a transformative acquisition for MTV Networks / Viacom in the internet space; we would:
    - Immediately become the leading global deliverer of video online
    - Have an unrivaled global video distribution footprint, with dominance in almost every country
    - Own the world's largest repository of digital video that is relevant to our audiences

9

Highly Confidential

VIA 10132353

**Four Key Success Factors for Youtube as Part of MTVN/Viacom...**

1. **Maintain consumer leadership position**

2. **Crack the ad model**

3. **Evolve the content model to fully incorporate "branded content"**

4. **Maintain "technology company" status**

**...Each is Discussed in turn**

10

Highly Confidential

VIA 10132354

## 1) Consumer Leadership: While YouTube is Number One, the Space is Competitive, Meaning its Position Cannot Be Taken for Granted

- A range of companies – including the portals, the social networks and pure-play start-ups are aggressively pursuing this space, creating alternatives for consumers
- Therefore, Youtube must focus not only on continuing to attract new consumers, but maintaining existing ones -- The key here will likely be to increase "switching costs"
  - Today, Youtube has a "limited audience lock-in"
    - Unlike MySpace, there is less investment in personal profiles and personalities
    - Youtube will have to focus on adding features which make it harder to move
  - With limited switching costs audiences are likely to migrate to other sources should the site's appeal be diminished – ad integration will be a particularly sensitive issue
- At the same time, it would be beneficial to be more than the world's Funniest Home Videos

11

Highly Confidential

VIA 10132355

## 2) Advertising: Success Will Require Tapping the Branded and Ad Network Spaces as Well as Creating A New "Ad Sense-Like" Product

- **YouTube's traffic is fragile with respect to attempts to monetize it through traditional "inserted" video advertising.**
- **Audience tolerance for pre and post-roll video advertising will be low compared to websites that are used predominantly for the consumption of professional programming that is not available elsewhere (e.g. IFILM, Overdrive)**
- **The model we have built assumes three revenue generation models, two of which already exist and are well understood, one of which is new and therefore untested.**
- **The proposed monetization mechanisms are:**
  - **Branded Premium Advertising & Sponsorships**
  - **Cost per View / "Video Ad Sense" Model**
  - **Run Of Site / Advertising Network**

12

Highly Confidential

VIA 10132356

# The Markets We Know – Branded and Ad Networks

- "Branded" revenue will be generated from key real estate, and will likely be in the form of auctioned premium advertising and sponsorships

    - Paid Placement – home page based sponsored video (i.e. one block where film studios bid for placement of their trailers)

    - Premium Content – over time the use of ad supported premium clips/content in a separate section (i.e., Movie of the week, first looks, releases, film trailers, etc).

    - That said, there is some concerns surrounding generation of significant revenue from entertainment advertisers (e.g. studios) include:

        - Likely lack of ability to *drive* traffic to home page and other destinations within the site,

        - Most popular and therefore valuable content – such as huge movie releases (trailers, etc.) – will likely be available freely anyway.

- In addition, we assume the use of advertising networks for yield management – initially domestically and over time internationally

13

Highly Confidential

VIA 10132357

# The "Video Ad Sense-Like" Opportunity

- Users have so much freedom of choice for the consumption of media that marketers can no longer assume they can "buy time" within it.

- Advertisers are becoming obliged to offer compelling content and services. Google's advertising model made this clear, whereby advertisers not only bid for the privilege of real estate but advertising that does not make good use of available real estate is penalized.

- We propose a revenue model for YouTube that treats advertising and content as near-equals, as in Google's "natural vs. sponsored" search results. Cost per view paid video advertising would appear throughout the YouTube site, alongside the programming.

- Advertisers would bid for keyword-space, and could ultimately upload their own creative.

- Audiences would be receptive to the advertisers' content because it would never be forced upon them but offered more as a *service* or as additional content to them, and advertising content that doesn't perform (is not watched) would be automatically discounted and would ultimately disappear.

14

14

Highly Confidential

# 3) Evolve the content model to fully incorporate "branded content

- **Today, Youtube incorporates some branded content**
- **However, the experience is not maximized and the business model is not fully defined**
- **On a going forward basis, Youtube needs to evolve to deal with both of these issues**

15

Highly Confidential

# 4) Maintain "Technology Company" status

## KEY SUCCESS FACTORS

- **Ability to hire and retain technical talent**: requires significant technical talent to develop targeted advertising and search related competencies. E.g., developing cost per play models that match categories of video to advertisers. As a corporately owned company it will be more challenging to incentivize new hires
- **Ongoing investment in infrastructure:** YouTube is at an early stage of infrastructure development and will require ongoing investments in storage/caching, and servers to maintain speed and effectiveness
- **Investment in innovation:** As a platform, YouTube requires ongoing investment in innovation to maintain the relevance of its searches and sharing technology

16

Highly Confidential

VIA 10132360

# Viacom / YouTube – Sources of Value Added

- Provide users with fame on television i.e., The crowd decides, we put it on air - best of appears weekly on Comedy Central and MTVN, provides additional incentive for users to upload, vote and promote themselves on YouTube

- Brands/ editorial fit enables us to both source talent, innovative content for consumption across platforms. We are one of the few providers willing to put edgier content on TV. Ie. User generated music video, user generated ads on television

- Video content – breadth and depth can power YouTube to the next level of relevance. By providing all of our clip based video in raw form – i.e. non branded editorial experience- simple search and obtain. We can push YouTube to become a more comprehensive destination and source for broader syndication

- Promotion – fit with our target audience and demo. We can reinforce and drive traffic/ promotion to YouTube.

17

Highly Confidential

VIA 10132361

# Financial Model

- **We currently are in the midst of finalizing out operating projections**
  - **Advertising revenue**
  - **Video storage and delivery costs**
  - **General company management costs**
- **In addition, the Viacom M&A team is on board and waiting to overlay the requisite financial items**
- **We anticipate having something for you to review later day**

18

## Summary and Next Steps

- **Refine model**
- **Integrate your input**
- **Socialize the opportunity with other key members of the Viacom management team (Dolan/Freston)**
- **Depending on the outcome of these steps, potentially engage with the controlling VC this week**

19

Highly Confidential

VIA 10132363



**Schapiro Exhibit 176**

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


VIACOM INTERNATIONAL INC., COMEDY  )
PARTNERS, COUNTRY MUSIC            )
TELEVISION, INC., PARAMOUNT        )
PICTURES CORPORATION, and BLACK    )
ENTERTAINMENT TELEVISION LLC,      )
                                   )
            Plaintiffs,            )
            vs.                    ) Case No.
YOUTUBE, INC., YOUTUBE, LLC,       ) 1:07CV02103
and GOOGLE, INC.,                  )
                                   )
            Defendants.            )
_____   )
THE FOOTBALL ASSOCIATION PREMIER   )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all    )
others similarly situated,         )
                                   )
            Plaintiffs,            )
            vs.                    ) Case No.
YOUTUBE, INC., YOUTUBE, LLC, and   ) 07CV3582
GOOGLE, INC.,                      )
                                   )
            Defendants.            )
_____   )


VIDEOTAPE DEPOSITION OF ROBERT TUR
NEW YORK, NEW YORK
Thursday, November 12, 2009


JOB NO. 18091

1

2

3

4                           November 12, 2009

5                           9:46 a.m.

6

7            VIDEOTAPED DEPOSITION OF ROBERT TUR,

8    held at the offices of Wilson Sonsini

9    Goodrich & Rosati, 1301 Avenue of the

10   Americas, New York, New York, pursuant to

11   notice, before before Erica L. Ruggieri,

12   Registered Professional Reporter and

13   Notary Public of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

A P P E A R A N C E S

FOR THE LEAD PLAINTIFFS AND PROSPECTIVE
CLASS:

    PROSKAUER ROSE, LLP
    BY:  HAL SHAFTEL, ESQ.
        NOAH GITTERMAN, ESQ.
    1585 Broadway
    New York, N.Y. 10036-8299
    (212) 969-3230
    (212) 969-2900
    Hshaftel@proskauer.com


FOR THE PLAINTIFF VIACOM INTERNATIONAL,
INC.:

    JENNER & BLOCK, LLP
    BY: ROCHELLE P. LUNDY, ESQ.
    1099 New York Avenue, NW
    Suite 900
    Washington, DC  20001
    (202) 639-6000
    (202) 661-4916
    LundyR@jenner.com


FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE,
LLC and GOOGLE, INC.:

    WILSON SONSINI GOODRICH & ROSATI
    BY:  BART E. VOLKMER, ESQ.
    650 Page Mill Road
    Palo Alto, California 94304-1050
    (650) 493-9300
    Mvolkmer@wsgr.com



ALSO PRESENT:

CARLOS KING, Videographer

1          TUR

2          the Central District of California?

3                    MR. SHAFTEL:  I object to the

4                    term "drop."

5   06:04:07     A.     There may have been.  I don't

6          remember, as I sit here today.

7                    Q.     Do you know if Viacom played any

8          role in the drafting of the brief that I

9          have marked as Exhibit 26, the opposition

10  06:04:30     on YouTube's summary judgment motion?

11                   A.     I don't know.

12                   Q.     Do you know if NBC played in

13         role in the drafting of that brief?

14                   A.     I don't know.

15  06:05:06              MR. VOLKMER:  Let's mark

16         Exhibit 27.

17                    (Tur Exhibit 27, article

18                    entitled, The Man Who Could Kill

19                    YouTube, marked for identification,

20  06:05:48          as of this date.)

21                   Q.     Do you recognize the article I

22         have marked as Exhibit 27, entitled, The

23         Man Who Could Kill YouTube?

24                   A.     Yes.

25  06:06:05     Q.     If you could turn to the fifth

1                           TUR

2              paragraph.

3                   A.    Yes.

4                   Q.    The author, Tur, understands why

5     06:06:24   people love YouTube, a democratic clearing

6              house for everything from family reunions

7              to detainee abuse and knows that most

8              videos are actually owned by their

9              posters.  He also recognizes the

10    06:06:36   promotional value and potential revenue

11             stream from a site visited by hundreds of

12             thousands of people each day."

13                  Was Mr. Bellomi accurately

14             reporting your views?

15    06:06:49        MR. SHAFTEL:  Objection.

16                  Take whatever time you need to

17             view the entirety of the document.

18                  A.    Yes, he's accurate.

19                  Q.    Turn to the next page.  And the

20    06:07:21   second paragraph from the bottom that

21             starts "Tur thrives on risk."  Turn to

22             that paragraph -- I think it's the third

23             sentence of that paragraph.  The author

24             writes, "He doesn't think much of content

25    06:07:43   owners who aren't fighting to make video

1                                        TUR

2              sharing sites vet every clip posted."

3                         Do you see that?

4                    A.    Yes.

5    06:07:52         Q.    Do you believe that sites like

6              YouTube should vet every clip that is

7              uploaded to their service?

8                    A.    Every clip that they assert a

9              shared ownership in, sure.

10   06:08:19         Q.    If you turn to the third page of

11             this article, and the sixth full

12             paragraph.  The author writes, "Tur says

13             he has been approached by Viacom to step

14             aside so the big boys can duke it out."

15   06:08:43         A.    Yes.

16                   Q.    Who approached you from Viacom

17             asking you to step aside?

18                   A.    Attorney-client.

19                   Q.    Did you have communications with

20   06:08:58    anyone from Viacom, pertaining to your

21             Central District case?

22                   A.    No, not directly.

23                   Q.    You learned about this fact that

24             you had been approached by Viacom to step

25   06:09:12    aside from your lawyer; is that correct?

# Schapiro Exhibit 177



EXHIBIT

PENGAD 800-631-6989

**Esquire**

---

[🖨 Click to Print]         Close

---

# The Man Who Could Kill YouTube

**Bob Tur is the little guy who is suing one giant (Google) to do what another giant (Viacom) probably never will -- shut YouTube down**

**By: Matthew Belloni**



**A single bottle broke the calm,** shattering in the late-afternoon sun. Then another...and another. A few men walked into Tom's Liquor and walked out quicker than would be possible if they'd paid. A family followed, tossing groceries into the intersection of Florence and Normandie in the heart of South Central Los Angeles. Bob Tur, a pilot and photojournalist, hovered above the unfolding chaos in his helicopter, along with his copilot, his camerawoman wife, his lawyer, and a 9mm semiautomatic pistol. Fifteen years later, he still recalls the details of the scene with the precision of a war memory. There was Larry Tarvin, who was pulled from his truck and kicked in the ribs, shoulder, and face. That's when the shots started. Tur's chopper began taking hits as the throng below pummeled another trucker, Reginald Denny, with a cement block, a tire iron, and a fire extinguisher.

Tur knew this was coming, he says, having spent weeks in advance of the Rodney King verdict interviewing gangbangers, church leaders, whomever, asking what would happen if the jury acquitted four white cops. The Crips told Tur they'd try to kill as many white people as possible. So when the call came at 3:15 p.m. on April 29, 1992, Tur, whose fledgling news-video company was pioneering helicopter coverage of breaking events, knew where to go. He arrived on the scene before anyone else and recorded many of the images people now associate with the L.A. riots.

Over the years, he estimates, the Denny tape has generated about $5 million in licensing fees. But Tur has spent almost an equal amount filing lawsuits to protect his content. All of which led to the day last spring when he happened upon an article in *The Wall Street Journal* about an upstart video-sharing Website whose users were uploading clips of dogs skateboarding and grandmothers belching and, oh yeah, copyrighted news footage. Tur logged on and, after two clicks, watched his Denny video. A few weeks later, like a small bottle tossed before the mob of big entertainment companies like Viacom began their battle for control of digital media, Tur became the first person to sue YouTube for copyright infringement.

Tur wants YouTube shuttered until its parent company, Google, can guarantee his videos and other copyrighted content won't reappear after being taken down. And even if there's a filtering technology out there that really works (despite Google's April announcement of such a technology, Tur is skeptical), he wants a court to say the law doesn't shield YouTube-like services, so he's protected from whatever site becomes the next big thing.

Tur understands why people love YouTube, a democratic clearinghouse of everything from family reunions to detainee abuse, and knows that most videos uploaded are actually owned by their poster. He also recognizes the promotional value and potential revenue stream from a site visited by hundreds of thousands of people

each day. But, Tur says, unlike Viacom and other big media companies, his case is about principle, not profit -- a claim that would be more suspect if it weren't for his history of fighting similar cases up to precedent-setting courts. He sees his suit as a backlash against Web 2.0 new-media demagoguery -- a check on the Shawn Fannings, the Toms from MySpace, and the Chad Hurleys and Steve Chens, who have built empires, he claims, not by creating but by figuring out how to redistribute content online. Which is why Bob Tur just may shape the future of digital media.

**"I sued these guys** when they had no money, no business plan, and I had nothing to gain but keeping my videos off their site," Tur says over lunch near his Santa Monica office, where he's finishing a new police-chase show for MSNBC. He is trim, boyish, and fidgety, with neatly cropped hair, wire-rim glasses, and a corduroy-jacket-and-jeans combo that's more Hollywood than necessary for a guy who spends most of his days in an editing bay.

Tur narrates many of his own live news events -- Malibu brushfires and bank heists and eternally long police chases -- with a kind of nervous excitement that keeps viewers glued to their TVs. He shows the same enthusiasm talking about copyright. "When I saw that Google bought YouTube for $1.65 billion, I was dumbfounded! Why would Google get into bed with thieves? They've built a huge audience on the backs of copyright holders -- and then they say *I* have to monitor *them*? Someone has to stand up against this piracy."

The U.S. Constitution is clear in its desire to protect "authors and inventors" -- a premise that has enabled the American entertainment and technology industries to create about $5 trillion worth of the country's largest export: intellectual property. But the same body of copyright law that encouraged Sony to spend $270 million making *Spider-Man 3* and that will require, until 2030, that a royalty be paid every time someone publicly sings Mildred and Patty Hill's "Happy Birthday to You" is now under unprecedented attack. At least it is if you believe Bob Tur and content-producing companies like Viacom, which sparked a media frenzy when it announced its own massive lawsuit against YouTube-Google in March. Tur, meanwhile, has received almost no press.

Don't let that fool you. Viacom says it's willing and more than able to spend years in litigation on its dramatic-sounding *billion-dollar* suit, but the reality is, it doesn't want to. Viacom's case is about leverage -- about negotiating a little more money every time someone on YouTube watches a clip of Jason dissing L.C. on *The Hills* (MTV), Jon Stewart kvetching on *The Daily Show* (Comedy Central), the fart mask in *Jackass: Number Two* (Paramount), or content from any other Viacom property. And it's certainly not alone in this desire. An awkward mating dance is currently sweeping Hollywood, as traditional entertainment companies desperate to go where the cool kids hang out court heavily trafficked sites like YouTube and News Corp's MySpace. Hell, even Viacom's sister company, CBS, has a deal with YouTube. Both Viacom and Google know that litigating all the way and answering the question of whether services like YouTube are *actually legal* could jeopardize revenue for both companies.

"If I believed Viacom would take the case far enough to set a precedent that might benefit small copyright owners, I would certainly step out of the way," says Tur. "But I don't believe they're serious. They want me out so they have more time to negotiate. I think the use of litigation to cut yourself better deals is despicable."

Tur thrives on risk. He's been a medic, a licensed private investigator, a rescue pilot, and Carrie Fisher's boyfriend. At forty-seven, he's had five angioplasties, three technical heart attacks, and a triple bypass, and he still does triathlons. He raises his voice and gesticulates wildly when making a point and uses *we* as if speaking for a community when discussing his case. ("When we're done, there might not be a YouTube worth visiting.... If we lose, Google will put us out of business.") He doesn't think much of content owners who aren't fighting to make video-sharing sites vet every clip posted. Tur says new-media agitator and Dallas Mavericks owner Mark Cuban has wimped out by blogging that YouTube steals content and then refusing to sue when films from his movie company are uploaded. "I don't need to spend time trying to fight a behemoth like Google," says Cuban, who has been following Tur's case closely. "Their arrogance makes Microsoft look like a bunch of choirboys. They can afford to spend more money on lawyers than I can on NBA fines."

In 1982, the late MPAA head Jack Valenti famously compared the new VCR to the Boston Strangler -- years before home video became the largest profit source for studios. Yet even after the content industry banded together to win a Supreme Court victory that effectively eviscerated Napster and its clones, the music industry is still hurting, due in part to rampant piracy. Would Bob Tur have risked his life and sustained about

$200,000 in damage to his chopper if he'd known his riot footage would be available free on the Internet a few hours later? He says no, and that the federal law enacted to balance innovation with content protection -- the Orwellian-sounding Digital Millennium Copyright Act -- has become a farce.

The DMCA basically says that an "online service provider" is not responsible for the conduct of its users as long as it takes down content when asked, isn't aware of or actively encouraging illegal content, and doesn't earn money "directly attributable" to a violation. But the law was enacted back in 1998, way before the first links from last night's *Colbert Report* began appearing in your in-box. Is YouTube legal? The truth is, nobody knows for sure because no court has ruled on whether the DMCA even applies to the site, let alone whether it's protected.

Tur intends to change that, and he's made his career backing up his will with his money. In the '80s, when he decided he wanted to fly helicopters, he paid a fire-department training squad to give him the thousand hours of training he needed. He dumped his life savings into a $2 million chopper. When he heard police considered O.J. Simpson the prime suspect in the murders of Nicole Brown Simpson and Ronald Goldman, Tur believed O.J. would go to his ex-wife's grave site and kill himself. He flew toward the cemetery but instead found O.J.'s white Bronco heading north on the freeway; he was alone over Simpson for twenty-five minutes. The footage aired live on CBS, but Tur maintained ownership. His company, Los Angeles News Service, has made millions from O. J. alone.

Even in an industry as lawsuit happy as entertainment, Tur is an extraordinarily litigious man. He has devoted years bringing copyright-infringement cases against heavyweights like the Walt Disney Co., CBS, and the Reuters news service up to influential appellate courts. "You often see the little guy push cases in ways the big companies don't," says John Palfrey, a professor of Internet law at Harvard. "Tur doesn't have much interest in the business concerns, so he's more likely to bring one of these cases to fruition."

**Tur's suit will likely hinge** on how the DMCA is interpreted, so he's become an expert on the details. He claims YouTube has placed ads directly adjacent his videos, therefore profiting directly from them. YouTube has since stopped doing this, which Tur believes proves it knew it was wrong. But Tur insists YouTube is still breaking the law by selling any advertising *anywhere* on a site that features copyrighted material -- a fact he says YouTube's top guys must know.

"The law talks about red-flag knowledge," says Cuban, no stranger to the DMCA. "If you know there is infringement and it's obvious to all involved, that's red-flag knowledge. Want to bet that if you look at the search history of Sergey and Larry, they have watched infringing videos? Is there anyone that doesn't know they can find stolen videos on YouTube? That's going to be a red flag to any judge."

Tur says he has been approached by Viacom to step aside so the big boys can duke it out. Michael Fricklas, Viacom's top lawyer, says Tur's case is strong but Viacom's is stronger: It's alleging hundreds of thousands of infringements while Tur is basically complaining about a few thousand views of Denny and O.J. Plus, a big media company is simply better equipped to subpoena the needed documents and top-level testimony it will require to win the case. If YouTube *employees* have posted copyrighted clips, as has been rumored, Viacom is going to know it before trial. "I'm not sure Tur can afford to get to that point," says Fricklas, who maintains that Viacom is willing to deploy every legal weapon in its formidable arsenal for as long as it takes. But he also acknowledges that Viacom would settle if Google offered damages for what's already occurred and either an effective filter or a reasonable license fee.

A possible sign that Google is also taking Tur's case pretty seriously is its refusal to speak about it -- though Michael Kwun, the Google lawyer spearheading both the Viacom and Tur defenses, has commented fairly freely on the Viacom suit. In *The Washington Post*, Kwun alleged the suit is "an attack on the way people communicate on the Web and on the platforms that allow people to make the Internet their own."

YouTube also has plenty of defenders who aren't on its payroll. "What universe do [Tur and Viacom] live in where they think they don't have to police their copyrights? I can't wait to see these bozos get slaughtered in court," says Cory Doctorow, the digital-rights advocate, coeditor of the popular Boing Boing blog, and science-fiction author. "Copyright holders have an incredible gift under the DMCA. They can force YouTube to take down videos without the expense of going to a judge." Indeed, the DMCA arguably offers content owners the best of both worlds because it lets them decide on a case-by-case basis whether the promotional value of letting "Dick in a Box" bounce around the Internet is better for them than clamping down on it. Doctorow

scoffs when it's suggested that content producers may be deterred by placing an expensive burden of policing a massive Web community like YouTube on a company like Viacom (which maintains that it spends $100,000 per month sending YouTube takedown letters) or on an individual like Tur. "Look around. It's laughable to say the Internet discourages creativity. If these guys can't figure out a way to make money online, they should find another business. The Constitution doesn't guarantee Viacom long-term profitability."

Tur realizes his case, which could drag on for years, is probably the biggest risk of his career. But he'll keep pressing, he says, because he doesn't trust anyone else -- not Viacom or the plaintiffs in a separate class-action suit filed in May -- to step up, and it won't be long before Web video merges with traditional TV.

"If we lose, what's to stop Google from setting up pay-per-view services or even exhibition halls for Web video -- and they could let users show whatever they want to and just take it down the next day after they get a letter."

Tur is getting riled up again. He steadies himself.

"I'm going broke," he says. "I've mortgaged my kids' futures for these cases. I've lost my wife -- she got tired of fighting and wanted more security. I've almost died from the stress of it. But the incentive must be to create. And if someone like me doesn't stand up for content creators, we sure as hell can't count on the big corporations to do it for us."

Tur apologizes, but he's got to get back to his editing bay. He's been working night and day finishing the MSNBC show. The network has bought only one episode, he explains, and it better be good so they'll buy more. And at least for now, that's how Bob Tur makes his living.

**Find this article at:** http://www.esquire.com/features/Youtube0707

---

| 🖨 Click to Print | | Close |

---