CONFIDENTIAL

---

AMENDED AND RESTATED AGREEMENT AND PLAN OF MERGER

by and among

GOOGLE INC.,

SNOWMASS HOLDINGS INC.,

YOUTUBE, INC.

and

Each of the other parties identified on the signature pages hereto
as Stockholder Parties

Dated as of November 3, 2006

---

CONFIDENTIAL



EXHIBIT NO. 2
Estrada
12-8-09
KEL

HIGHLY CONFIDENTIAL

TP000055

**Table of Contents**

Page

ARTICLE 1 DEFINITIONS.................................................................................................2

    1.1    Certain Definitions ..............................................................................................2

    1.2    General Interpretive Principles ........................................................................10

ARTICLE 2 THE MERGER ............................................................................................11

    2.1    The Merger.......................................................................................................11

    2.2    Effective Time .................................................................................................11

    2.3    Effect of the Merger.........................................................................................11

    2.4    Certificate of Incorporation; Bylaws ...............................................................11

    2.5    Directors and Officers......................................................................................11

    2.6    Conversion of Securities ..................................................................................11

    2.7    Appraisal .........................................................................................................15

    2.8    Exchange of Certificates. .................................................................................16

    2.9    Escrow Account. ..............................................................................................17

    2.10    Adjustment Provisions. ....................................................................................19

    2.11    Tax Consequences and Withholding. ...............................................................20

    2.12    Further Assurances...........................................................................................20

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND
    THE FOUNDERS...........................................................................................20

    3.1    Organization.....................................................................................................21

    3.2    Certificate of Incorporation and Bylaws..........................................................21

    3.3    Capitalization. ..................................................................................................21

    3.4    Authorization and Enforceability......................................................................23

    3.5    No Conflict; Required Filings and Consents. ....................................................24

i

| 3.6 | Compliance | 24 |
|---|---|---|
| 3.7 | Financial Statements | 25 |
| 3.8 | Absence of Changes. | 25 |
| 3.9 | No Undisclosed Liabilities | 27 |
| 3.10 | Tax Matters. | 27 |
| 3.11 | Title to Assets; Leases. | 28 |
| 3.12 | Intellectual Property. | 29 |
| 3.13 | Privacy and Security. | 30 |
| 3.14 | Material Contracts. | 30 |
| 3.15 | Absence of Restrictions on Business Activities | 32 |
| 3.16 | Insurance | 33 |
| 3.17 | Absence of Action. | 33 |
| 3.18 | Employment and Labor Matters. | 33 |
| 3.19 | Employee Benefit Plans and Agreements. | 34 |
| 3.20 | Environmental, Health and Safety Matters. | 38 |
| 3.21 | Export Control Laws. | 38 |
| 3.22 | No Restrictions on the Merger; Takeover Statutes | 39 |
| 3.23 | Certain Business Practices | 39 |
| 3.24 | Interested Party Transactions | 39 |
| 3.25 | Brokers or Finders. | 39 |
| 3.26 | Disclaimer of Other Representations and Warranties | 40 |
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES OF STOCKHOLDER PARTIES | 40 |
| 4.1 | Authority; Enforceability | 40 |
| 4.2 | No Conflict; Required Filings and Consents. | 40 |
| 4.3 | Investment Representations. | 41 |

HIGHLY CONFIDENTIAL

TP000057

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF PARENT AND
MERGER SUB ................................................................................................................41

    5.1    Organization and Qualification..............................................................................41

    5.2    Authority; Enforceability .....................................................................................42

    5.3    No Conflict; Required Filings and Consents. ........................................................42

    5.4    Absence of Action..................................................................................................43

    5.5    Merger Sub.............................................................................................................43

    5.6    Parent Common Stock ...........................................................................................43

    5.7    Parent SEC Filings ................................................................................................43

    5.8    Disclaimer of Other Representations and Warranties............................................43

ARTICLE 6 COVENANTS ........................................................................................................44

    6.1    Operation of the Company Prior to Closing .........................................................44

    6.2    No Solicitation of Other Proposals. ......................................................................47

    6.3    Stockholders Consents. ..........................................................................................48

    6.4    Filings; Efforts; Notices. .......................................................................................49

    6.5    Access to Information. ............................................................................................50

    6.6    Nondisclosure .......................................................................................................51

    6.7    Public Announcements ..........................................................................................51

    6.8    Takeover Statutes..................................................................................................51

    6.9    Escrow Agreement.................................................................................................51

    6.10    Equity Awards. .....................................................................................................51

    6.11    Indemnification. ....................................................................................................52

    6.12    Tax-Free Reorganization Treatment................. ...................................................54

    6.13    Reservation and Listing of Parent Common Stock................................................54

    6.14    Parent Information; Form S-4; Information Statement/Prospectus. ......................54

    6.15    Company Expenses................................................................................................56

HIGHLY CONFIDENTIAL

6.16   Company Corporate Records ................................................................................56

6.17   FIRPTA Notice ....................................................................................................56

6.18   Schedule of Total Outstanding Shares ................................................................56

6.19   Investor Rights Agreement .................................................................................56

6.20   Legend on Share Certificates ..............................................................................56

ARTICLE 7 CLOSING CONDITIONS .................................................................................57

7.1   Conditions Precedent to Obligations of Each Party ............................................57

7.2   Conditions Precedent to Obligations of Parent and Merger Sub ...........................58

7.3   Conditions Precedent to Obligation of the Company ...........................................59

ARTICLE 8 TERMINATION ................................................................................................60

8.1   Termination .........................................................................................................60

8.2   Effect of Termination .........................................................................................61

ARTICLE 9 INDEMNIFICATION ........................................................................................61

9.1   Survival of Representations and Warranties ........................................................61

9.2   Indemnification by the Company Stockholders ...................................................61

9.3   Exclusive Remedy .............................................................................................62

9.4   Indemnification Claims .......................................................................................62

9.5   Third Party Claim Procedures .............................................................................64

9.6   Limitations on Indemnification ...........................................................................64

9.7   Adjustment to Purchase Price .............................................................................65

9.8   Several Obligations .............................................................................................66

9.9   Stockholders Agent .............................................................................................66

ARTICLE 10 MISCELLANEOUS ........................................................................................67

10.1   Entire Agreement ..............................................................................................67

10.2   Successors .........................................................................................................67

iv

| | | |
|---|---|---|
| 10.3 | Assignments | 67 |
| 10.4 | Notices | 67 |
| 10.5 | Submission to Jurisdiction | 68 |
| 10.6 | Resolution of Conflicts; Arbitration. | 69 |
| 10.7 | Release | 70 |
| 10.8 | Counterparts | 70 |
| 10.9 | Governing Law | 70 |
| 10.10 | Amendments and Waivers | 70 |
| 10.11 | Severability | 71 |
| 10.12 | Construction | 71 |
| 10.13 | Incorporation of Exhibits, Schedules and Disclosure Letters | 71 |
| 10.14 | Remedies | 71 |
| 10.15 | Effectiveness of Amendment and Restatement. | 71 |

HIGHLY CONFIDENTIAL

TP000060

## Index of Defined Terms

Action......................................................1.1
Adjusted Exchange Ratio.................2.10(a)
Adjusted Total Outstanding Shares ...2.10(a)
Affiliate..................................................1.1
Aggregate Merger Consideration
   Value............................................9.6(c)
Aggregate Share Consideration ................1.1
Agreement................................. Preamble
Acquisition Proposal...........................6.2(a)
Assumed Company Options ................2.6(c)
Assumed Company RSUs....................2.6(e)
Assumed Warrants..........................2.6(d)(ii)
Approvals.............................................3.1(a)
beneficial owner....................................1.1
beneficial ownership ...............................1.1
Bridge Note.............................................1.1
Business Day............................................1.1
California Law .....................................2.7(a)
Certificate of Merger.................................2.2
Certificates ........................................2.8(a)
Closing Date.............................................1.1
COBRA.............................................3.19(b)
Code ...........................................Recitals
Commitment ...........................................1.1
Company..................................... Preamble
Company 401(k) Plans.....................6.10(c)
Company Balance Sheet ..........................3.7
Company Common Stock........................1.1
Company Disclosure Schedule ...............1.1
Company Employees ..........................3.19(a)
Company Favorable Outcome ...........2.9(c)
Company Material Adverse Effect ...........1.1
Company Option Plan.............................1.1
Company Options ...................................1.1
Company Preferred Stock........................1.1
Company Registered IP ....................3.12(a)
Company Representatives...................6.2(a)
Company RSUs.......................................1.1
Company Series A Preferred Stock ..........1.1
Company Series B Preferred Stock..........1.1
Company Stock........................................1.1
Company Stockholders ............................1.1
Company Transaction Expenses ..............1.1
Company Warrants .................................1.1
Confidentiality Agreement......................6.6

Consent .................................................1.1
Contract.................................................1.1
Copyright Action ...................................1.1
Court .....................................................1.1
D&O Insurance ................................6.11(b)
Damages.................................................1.1
DGCL..........................................Recitals
Dissenting Share Payments................2.7(c)
Dissenting Shares...............................2.7(a)
Effective Date ...............................Recitals
Effective Time ........................................2.2
Employee Plans...................................3.19(a)
Enforceable ...........................................1.1
Environmental, Health and Safety
   Requirements ..................................1.1
Equity Interest ......................................1.1
ERISA....................................................1.1
ERISA Affiliate .................................3.19(a)
Escrow Account...................................2.9(a)
Escrow Agent.......................................2.9(a)
Escrow Agreement..............................2.9(a)
Escrow Shares......................................2.9(a)
Exchange Act..........................................1.1
Exchange Ratio ......................................1.1
Export Approvals ..................................3.21
Financial Statements ...............................3.7
Forfeited Shares ..............................2.10(a)
Form S-4 ...........................................6.14(b)
Founders.................................................1.1
Fundamental Representations.................9.1
GAAP....................................................3.7
Governmental Authority ..........................1.1
HIPPA.............................................3.19(b)
HSR Act................................................1.1
Indebtedness..........................................1.1
Indemnification Claim ......................9.4(a)
Indemnified Copyright Action.................1.1
Indemnifying Party ................................9.5
Infringe............................................3.12(b)
Initial Escrow Release Date................2.9(b)
Intellectual Property...............................1.1
IP Policies ........................................3.2(d)
Knowledge.............................................1.1
Law ......................................................1.1
Liability.................................................1.1

HIGHLY CONFIDENTIAL

TP000061

Lien ...............................................................1.1
Material Contracts..............................3.14(a)
Maximum Annual Premium ..............6.11(b)
Merger...................................................Recitals
Merger Sub....................................... Preamble
Merger Sub Common Stock.....................1.1
Notice of Claim....................................9.4(a)
Order .........................................................1.1
Ordinary Course of Business ...................1.1
Organizational Documents.......................1.1
Original Agreement ..........................Recitals
Outstanding Claim .....................................1.1
Outstanding Company Options.............3.3(a)
Outstanding Stockholders Agent
    Expenses .........................................9.9(b)
Parent ............................................. Preamble
Parent Benefit Plans...........................6.10(c)
Parent Closing Price..................................1.1
Parent Common Stock ...............................1.1
Parent Disclosure Letter................................5
Parent Indemnification Notice .............9.5(a)
Parent Indemnified Parties........................9.2
Parent Material Adverse Effect................1.1
Parent RSUs...............................................1.1
PBGC....................................................3.19(i)
Permit........................................................1.1
Permitted Lien...........................................1.1
Person........................................................1.1
Pro Rata Share...........................................1.1
Purchase Price Adjustment Statement2.10(a)
Real Property ......................................3.11(b)
Registration Rights Agreement.........Recitals

Regulation ..................................................1.1
Regulation D .......................................6.14(a)
Relevant Persons......................................10.7
Requisite Stockholder Vote ......................3.4
Resolved Claim Notice ........................9.4(b)
Restricted Shares.....................................6.20
Restricted Stock........................................1.1
Retained Escrow Consideration.......2.9(b)(i)
Retained Escrow Excess ......................2.9(c)
SEC ...........................................................1.1
Second Step Merger .............................6.4(c)
Securities Act............................................1.1
Stock-Based Rights............................3.3(c)
Stockholder Consents.......................Recitals
Stockholder Parties ........................ Preamble
Stockholders Agent ..............................9.9(a)
Subsidiary .................................................1.1
Surviving Corporation ..............................2.1
Support Agreements..........................Recitals
Systems .....................................................1.1
Takeover Statutes....................................3.22
Tax Return .................................................1.1
Taxes..........................................................1.1
Third-Party Claim .....................................9.5
Threatened.................................................1.1
Threshold ..............................................9.6(a)
Total Outstanding Shares..........................1.1
Transaction Agreements ...........................1.1
280G Approval......................................6.3(d)
2006 Retention Cash Bonus Plan.............1.1
Unilateral Resolved Claim Notice .......9.4(b)
WARN ...............................................3.18(b)

**AMENDED AND RESTATED AGREEMENT AND PLAN OF MERGER**

This AMENDED AND RESTATED AGREEMENT AND PLAN OF MERGER, dated as of November 3, 2006 (the "Agreement") among Google Inc., a Delaware corporation ("Parent"), Snowmass Holdings Inc., a Delaware corporation ("Merger Sub"), YouTube, Inc., a Delaware corporation (the "Company"), and each of the stockholders of the Company listed on the signature pages hereof (collectively, the "Stockholder Parties").

**RECITALS:**

WHEREAS, the Board of Directors of Parent has determined that it is in the best interests of its stockholders for Parent to acquire the Company upon the terms and subject to the conditions set forth herein;

WHEREAS, Parent, Merger Sub and the Company have previously entered into an Agreement and Plan of Merger, dated as of October 9, 2006 (the "Effective Date", and such agreement, the "Original Agreement"), which they desire to amend and restate to effect certain changes with respect to the terms of such acquisition and their agreements with respect thereto, effective as of the date hereof;

WHEREAS, the Boards of Directors of Merger Sub and the Company have each approved the merger (the "Merger") of Merger Sub with and into the Company, in accordance with Section 251 of the Delaware General Corporation Law (the "DGCL") and subject to the conditions set forth herein, which Merger will result in, among other things, the Company becoming a wholly owned subsidiary of Parent;

WHEREAS, the Board of Directors of the Company has unanimously (i) approved and declared the Merger advisable upon the terms and subject to the conditions set forth in this Agreement and (ii) recommended the adoption of this Agreement and approval of the Merger by the stockholders of the Company;

WHEREAS, concurrently with execution and delivery of this Agreement and as a condition to the willingness of, and an inducement to, Parent and Merger Sub to enter into this Agreement, each of the Stockholder Parties has executed and delivered a voting agreement and proxy with respect to all shares of Common Stock and Preferred Stock owned by them or which they have the right to vote in favor of the adoption of this Agreement and approval of the Merger, substantially in the form of Exhibit A hereto (collectively, the "Support Agreements");

WHEREAS, immediately following the execution and delivery of this Agreement, it is anticipated that each of the Stockholder Parties will execute and deliver to the Company, and the Company shall thereafter deliver to Parent, a true, correct and complete copy of an Action by Written Consent, in the form attached as an exhibit to the Support Agreements, providing for the adoption of this Agreement and approval of the Merger (the "Stockholder Consents");

WHEREAS, concurrently with execution and delivery of the Original Agreement and as a condition to the willingness of, and an inducement to, the Company and the Stockholder

Parties to enter into this Agreement, Parent and the Company Stockholders have executed and delivered the Registration Rights Agreement, substantially in the form of Exhibit B hereto (the "Registration Rights Agreement"), which shall be effective only at and as of the Effective Time;

WHEREAS, concurrently with execution and delivery of the Original Agreement and as a condition to the willingness of, and an inducement to, Parent and Merger Sub to enter into this Agreement, each of the Founders has executed and delivered a non-competition agreement, substantially in the form of Exhibit C hereto, each of which shall be effective only at and as of the Effective Time; and

WHEREAS, for United States federal income tax purposes, the Merger is intended to qualify as a "reorganization" pursuant to the provisions of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and the parties intend, by executing this Agreement, to adopt a "plan of reorganization" within the meaning of Treasury Regulation Section 1.368-2(g) and Proposed Treasury Regulation Section 1.368-3.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements herein contained, and intending to be legally bound hereby, Parent, Merger Sub and the Company hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1     Certain Definitions.  The following are the definitions of certain defined terms used in this Agreement:

"Action" means any claim, suit, action, arbitration, cause of action, complaint, criminal prosecution or proceeding, whether at law or at equity, before or by any Court or Governmental Authority, any arbitrator or other tribunal.

"Affiliate" means, with respect to a Person, another Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such first Person. For this definition, "control" (and its derivatives) means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Equity Interests, as trustee or executor, by Contract or credit arrangements or otherwise.

"Aggregate Share Consideration" means the quotient of (x) (i) $1,650,000,000 minus (ii) the aggregate amount of any principal and interest outstanding under any Bridge Note as of the Effective Time (but excluding any such principal amounts (and any interest relating thereto) that the Company and Parent mutually agree in writing prior to the loan or advancement of such principal amount shall be excluded) divided by (y) the Parent Closing Price.

"beneficial owner" (including the terms "beneficial ownership" and "to beneficially own") with respect to a Person's ownership of any securities means such Person or any of such Person's Affiliates or associates (as defined in Rule 12b-2 under the Exchange Act)

2

who is deemed to beneficially own, directly or indirectly, such securities within the meaning of Rule 13d-3 under the Exchange Act.

"Bridge Note" means any promissory note issued by the Company payable to Parent or Merger Sub with respect to amounts loaned or advanced by Parent or Merger Sub to the Company during the period on or after the Effective Date and prior to the Effective Time.

"Business Day" means any day, other than a Saturday, Sunday or one on which banks are authorized by Law to be closed in either New York, New York or San Francisco, California.

"Closing Date" means the second Business Day after the satisfaction or waiver of the conditions set forth in ARTICLE 7 (excluding conditions that, by their terms, are to be satisfied on the Closing Date, but subject to the satisfaction or waiver of such conditions on the Closing Date), or such other date as the parties hereto agree in writing.

"Commitment" means (a) options, warrants, convertible securities, exchangeable securities, subscription rights, conversion rights, exchange rights, or other Contracts that could require a Person to issue any of its Equity Interests or to sell any Equity Interests it owns in another Person; (b) any other securities convertible into, exchangeable or exercisable for, or representing the right to subscribe for any Equity Interest of a Person or owned by a Person; (c) statutory pre-emptive rights or pre-emptive rights granted under a Person's Organizational Documents or any Contract; and (d) stock appreciation rights, phantom stock, profit participation, or other similar rights with respect to a Person.

"Company Common Stock" means the common stock, $0.001 par value per share, of the Company.

"Company Disclosure Schedule" means a schedule as of the Effective Date delivered by the Company to Parent concurrently with the execution of the Original Agreement, which, among other things, will identify exceptions and other matters with respect to the representations, warranties and covenants of the Company contained in certain sections and subsections of this Agreement; *provided, however*, that the disclosure set forth in a specific section or subsection of the Company Disclosure Schedule shall also qualify the representations, warranties or covenants set forth in any other sections or subsections of this Agreement (whether or not a specific cross-reference is included therein) if and to the extent that it is reasonably apparent on the face of such disclosure that such disclosure applies to such other sections or subsections.

"Company Material Adverse Effect" means any event, change, condition or circumstance that has had, or would reasonably be expected to result in, individually or in the aggregate, a material adverse effect on the business, operations, properties, assets, rights, liabilities, condition (financial or otherwise) or results of operations of the Company; *provided, however*, that no event, change, condition or circumstance (by itself or when aggregated with any other events, changes, conditions or circumstances) to the extent resulting from any of the following shall be deemed to be or constitute a "Company Material Adverse Effect," and no event, change, condition or circumstance (by itself or when aggregated with any other such

3

events, changes, conditions or circumstances) to the extent resulting from any of the following shall be taken into account when determining whether a "Company Material Adverse Effect" has occurred or may, would or could occur: (i) changes in applicable law, GAAP or international accounting standards; (ii) general economic (including financial, banking and/or securities markets), regulatory or political conditions to the extent that they that do not disproportionately affect the Company in any material respect relative to similarly situated participants in the industry in which the Company operates; (iii) compliance by the Company with the terms and conditions of this Agreement (other than actions taken in the Ordinary Course of Business), or changes resulting from the Company's failure to take any action as a result of prohibitions and restrictions set forth in this Agreement; (iv) the announcement or pendency of the transactions contemplated by this Agreement; (v) acts of terrorism or war to the extent that they do not disproportionately affect the Company in any material respect relative to similarly situated participants in the industry in which the Company operates; (vi) any Action brought by any stockholders of the Company (other than the Stockholder Parties), on their own behalf or on behalf of the Company, arising out of or in connection with the transactions contemplated by this Agreement or (vii) the items set forth in Section 1.1(a) of the Company Disclosure Schedule.

"Company Option Plan" means the YouTube, Inc. 2005 Stock Plan, as amended.

"Company Options" means options to purchase shares of Company Common Stock.

"Company Preferred Stock" means the Company Series A Preferred Stock and the Company Series B Preferred Stock.

"Company RSUs" means restricted stock units for shares of Company Common Stock.

"Company Series A Preferred Stock" means the Series A Preferred Stock, $0.001 par value per share, of the Company.

"Company Series B Preferred Stock" means the Series B Preferred Stock, $0.001 par value per share, of the Company.

"Company Stock" means the Company Common Stock and Company Preferred Stock.

"Company Stockholders" means the holders of shares of Company Common Stock and Company Preferred Stock.

"Company Transaction Expenses" means all costs, fees and expenses incurred (whether or not invoiced) by the Company in connection with all efforts to sell the Company or its business, whether to Parent or any other party, including preparation and due diligence, and in connection with this Agreement and the other Transaction Agreements and any other documents prepared or delivered in connection therewith, and the transactions contemplated hereby and thereby, including fees and expenses of advisors, investment bankers, lawyers and accountants arising out of, relating to or incidental to the discussion, evaluation, financing, negotiation and documentation of the transactions contemplated hereby and thereby.

4

"Company Warrants" means warrants to purchase shares of Company Stock.

"Consent" means any consent, approval, notification, registration, waiver or other similar action.

"Contract" means any contract, agreement, arrangement, commitment, letter of intent, memorandum of understanding, license, lease, promise, instrument, or other similar understanding, whether written or oral, in each case that is legally binding as of the date in question.

"Copyright Action" means any Action filed or otherwise instituted in any Court against the Company, Parent or any of their respective Subsidiaries with respect to copyright infringement and related matters (including, for the avoidance of doubt, any similar or related claims made in connection with such copyright infringement Action) with respect to www.youtube.com ("Company Site").

"Court" means any court or arbitration tribunal of the United States, any domestic state, or any foreign country, and any political subdivision or agency thereof.

"Damages" means all damages, losses, payments, amounts paid in settlement, obligations, fines, penalties and expenses and other costs (including reasonable and documented fees and expenses of attorneys, accountants and other professional advisors and including any such fees, costs and expenses incurred in connection with investigating, defending against or settling any action or proceeding).

"Enforceable" means, with respect to a Contract, that such Contract is the legal, valid, and binding obligation of the applicable Person, enforceable against such Person in accordance with its terms, except as such enforceability may be subject to the effects of bankruptcy, insolvency, reorganization, moratorium, or other similar Laws relating to or affecting the rights of creditors, and general principles of equity regardless of whether such enforceability is considered in a proceeding in equity or at law.

"Environmental, Health and Safety Requirements" means all Orders and Laws concerning or relating to worker/occupational health and safety, or pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control, or other action or failure to act involving cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, or radiation, each as amended and as now in effect.

"Equity Interest" means (a) with respect to a corporation, any and all shares of capital stock and any Commitments with respect thereto, (b) with respect to a partnership, limited liability company, trust or similar Person, any and all units, interests or other partnership/limited liability company interests, and any Commitments with respect thereto, and (c) any other equity ownership or participation in a Person.

5

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange Ratio" means the quotient obtained by dividing (x) the Aggregate Share Consideration; by (y) Total Outstanding Shares.

"Founders" means Chad M. Hurley and Steve S. Chen.

"Governmental Authority" means any legislature, agency, bureau, branch, department, division, commission, court, tribunal, magistrate, justice, multi-national organization, quasi-governmental body, or other similar recognized organization or body of any federal, state, county, municipal, local, provincial or foreign government.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indebtedness" means (i) all indebtedness (whether or not contingent) for borrowed money, (ii) all obligations (contingent or otherwise) for the deferred purchase price of assets, property or services (other than current trade payables incurred in the Ordinary Course of Business), (iii) all obligations evidenced by notes, bonds, debentures or other similar instruments, (iv) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property, (v) all obligations, contingent or otherwise, as an account party under acceptance, letter of credit or similar facilities, (vi) all obligations under any currency, interest rate or other hedge agreement or any other hedging arrangement, (vii) all direct or indirect guarantee, support or keep well obligations in respect of obligations of the kind referred to in clauses (i) through (vi) above, and (viii) all obligations of the kind referred to in clauses (i) through (vii) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and Contract rights) owned by the Company, whether or not the Company has assumed or become liable for the payment of such obligation.

"Indemnified Copyright Action" has the meaning set forth in Section 1.1(b) of the Company Disclosure Schedule.

"Intellectual Property" means all U.S. and foreign intellectual property rights, arising under any of the following: (i) patents and patent applications, (ii) trade secret rights or corresponding rights and rights in information with respect to confidential technology, inventions, discoveries, processes, designs and know-how; (iii) copyrights, neighboring rights, moral rights, rights against bootlegging, and corresponding rights throughout the world; including in copyrightable works (including rights in Systems, Documentation and related items, graphics, audiovisual works, photography and advertising and promotional materials); (iv) rights in trademarks, trade names, service marks, brand names, corporate names, domain names, logos, trade dress and other source indicators; (v) rights of privacy and publicity; and (vi) all similar, corresponding or equivalent rights throughout the world

6

HIGHLY CONFIDENTIAL

TP000068

"Knowledge" or "knowledge" means the actual knowledge of, with respect to any of the representations and warranties set forth in ARTICLE 3, the Persons identified in Section 1.1(c) of the Company Disclosure Schedule.

"Law" means any law (statutory, common, or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation, executive order, or other similar authority enacted, adopted, promulgated, or applied by any Governmental Authority, each as amended and now in effect.

"Liability" means any liability or obligation, whether known or unknown, asserted or unasserted, absolute or contingent, matured or unmatured, conditional or unconditional, latent or patent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Lien" means any security interest, pledge, mortgage, lien (statutory or other), charge, option to purchase, lease or otherwise acquire any interest or any claim, restriction, covenant, title defect or limitation, hypothecation, assignment, deposit arrangement or other encumbrance of any kind or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement).

"Merger Sub Common Stock" means the common stock, $0.01 par value per share, of Merger Sub.

"Order" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, approval, award, judgment, injunction, or other similar determination or finding issued, granted or made by any Governmental Authority or Court.

"Ordinary Course of Business" means the ordinary course of business consistent with past practice of the relevant Person and its Subsidiaries.

"Organizational Documents" means the articles of incorporation, certificate of incorporation, charter, bylaws, articles of formation, articles of association, regulations, operating agreement, certificate of limited partnership, partnership agreement, limited liability company agreement and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

"Outstanding Claim" means the amount in dollars of any Indemnification Claim made by any Parent Indemnified Party pursuant to ARTICLE 9 that shall be outstanding and unresolved, or resolved in whole or in part in favor of the Parent Indemnified Party but not yet paid.

"Parent Closing Price" means the average daily closing price of a share of Parent Common Stock for the thirty (30) consecutive trading day period ending two trading days prior to the Effective Time (with the closing price for each day being the last reported sales price regular way or, in case no such reported sale takes place on such day, the average of the reported closing bid and asked prices regular way, in either case on the principal national securities

7

exchange on which such securities are listed and admitted to trading, or, if not listed and admitted to trading on any such exchange on the Nasdaq Global Select Market, or if not quoted on the Nasdaq Global Select Market, the average of the closing bid and asked prices in the over-the-counter market as furnished by any New York Stock Exchange member firm selected from time to time by the Company for that purpose).

"Parent Common Stock" means the Class A Common Stock, par value $0.001 per share, of Parent.

"Parent Material Adverse Effect" means any event, change, condition or circumstance that has had, or would reasonably be expected to result in, individually or in the aggregate, a material adverse effect on the business, operations, properties, assets, rights, liabilities, condition (financial or otherwise) or results of operations of Parent and its Subsidiaries, taken as a whole; *provided, however,* that no event, change, condition or circumstance (by itself or when aggregated with any other events, changes, conditions or circumstances) to the extent resulting from any of the following shall be deemed to be or constitute a "Parent Material Adverse Effect," and no event, change, condition or circumstance (by itself or when aggregated with any other such events, changes, conditions or circumstances) to the extent resulting from any of the following shall be taken into account when determining whether a "Parent Material Adverse Effect" has occurred or may, would or could occur: (i) changes in applicable law, GAAP or international accounting standards; (ii) general economic (including financial, banking and/or securities markets), regulatory or political conditions to the extent that they that do not disproportionately affect Parent and its Subsidiaries in any material respect relative to similarly situated participants in the industry in which Parent operates; (iii) compliance by Parent with the terms and conditions of this Agreement (other than actions taken in the Ordinary Course of Business), or changes resulting from Parent's failure to take any action as a result of prohibitions and restrictions set forth in this Agreement; (iv) the announcement or pendency of the transactions contemplated by this Agreement; (v) acts of terrorism or war to the extent that they do not disproportionately affect Parent and its Subsidiaries in any material respect relative to similarly situated participants in the industry in which Parent operates; or (vi) any Action brought by any stockholders of Parent, on their own behalf or on behalf of Parent, arising out of or in connection with the transactions contemplated by this Agreement.

"Parent RSUs" means restricted stock units for shares of Parent Common Stock.

"Permit" means any license, permit, order, consent, approval, registration, authorization, qualification or filing with and under all Laws and Governmental Authorities and all industry or other non-governmental self-regulatory organizations.

"Permitted Lien" means any of the following: (i) statutory liens for Taxes, which are not yet due and payable, (ii) statutory or common law liens to secure landlords, lessors or renters under leases or rental agreements confined to the premises rented, (iii) deposits or pledges made in connection with, or to secure payment of, workers' compensation, unemployment insurance, old age pension or other social security programs mandated under applicable Laws, (iv) statutory or common law liens in favor of carriers, warehousemen, mechanics and materialmen, to secure claims for labor, materials or supplies and other like liens,

8

HIGHLY CONFIDENTIAL

(v) restrictions on transfer of securities imposed by applicable state and federal securities Laws and (vi) liens imposed on the underlying fee interest in leased property.

"Person" means any individual, sole proprietorship, partnership, limited liability company, corporation, association, joint stock company, trust, trustee, entity, joint venture, labor organization, unincorporated organization, Governmental Authority, executor, administrator or other legal representative.

"Pro Rata Share" means, with respect to each Company Stockholder, the product obtained by multiplying (x) the aggregate number of Escrow Shares, by (y) a fraction, the numerator of which is the aggregate number of shares of Parent Common Stock issued to such Company Stockholder pursuant to Section 2.6(b) of this Agreement (without taking into account the deduction of any portion of the Escrow Shares to be deposited with the Escrow Agent on behalf of such Company Stockholder pursuant to this Agreement in respect of such Company Stockholder's shares of Company Stock), and the denominator of which is the sum of (x) the aggregate number of shares of Parent Common Stock issued or issuable to Company Stockholders pursuant to Section 2.6(b) of this Agreement (without taking into account the deduction of any portion of the Escrow Shares), minus (y) all shares of Restricted Stock that are forfeited prior to the one year anniversary of the Closing Date; *provided, however,* that the Pro Rata Share of each Company Stockholder may be adjusted from time to time to reflect appropriately any adjustments contemplated by this Agreement.

"Regulation" means any rule, regulation, policy or interpretation of any Governmental Authority having the effect of Law.

"Restricted Stock" means all unvested shares of Company Common Stock issued upon exercise of Company Options, and any other shares of Company Stock subject to forfeiture under any Contract between an employee and the Company.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Subsidiary" means, with respect to any Person, any corporation, partnership, trust, limited liability company or other entity in which such Person (and/or one or more Subsidiaries of such Person) holds stock or other ownership interests representing (A) more that 50% of the voting power of all outstanding stock or ownership interests of such entity, (B) the right to receive more than 50% of the net assets of such entity available for distribution to the holders of outstanding stock or ownership interests upon a liquidation or dissolution of such entity or (C) a general or managing partnership interest or similar position in such entity.

"Systems" means software, firmware, middleware, applications, code, databases, systems, networks, circuits and websites.

"Taxes" means all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state, local or foreign taxing authority, including, but not limited to, profits, estimated, gross receipts, windfall profits, severance, property, intangible property, occupation, production, sales, use, license, excise, emergency excise, franchise, capital

9

gains, capital stock, employment, withholding, transfer, stamp, payroll, goods and services, value added, alternative or add-on minimum tax, or any other tax, custom, duty or governmental fees or other taxes, including any interest, penalties, fines or additions attributable thereto, whether disputed or not.

"Tax Return" means any return, report, estimate, declaration, information return or other document (including any related, attached or supporting information) filed or required to be filed with any taxing authority with respect to Taxes.

"Threatened" means a demand or statement has been made (orally or in writing) or a notice has been given (orally or in writing), that would lead a prudent person to reasonably conclude that a cause of Action is likely to be asserted, commenced, taken, or otherwise initiated.

"Total Outstanding Shares" means the sum of (x) the aggregate number of shares of Company Common Stock outstanding as of immediately prior to the Effective Time (including all shares of Restricted Stock), plus (y) the aggregate number of shares of Company Common Stock issuable upon the conversion of all shares of Company Preferred Stock outstanding immediately prior to the Effective Time (including all shares of Restricted Stock), plus (z) the aggregate number of shares of Company Common Stock issuable upon the exercise or conversion in full of all Company Options, Company Warrants and any other Commitment to purchase or otherwise acquire shares of Company Stock outstanding immediately prior to the Effective Time (including upon vesting of Company RSUs), in each case whether or not currently exercisable, convertible or vested; *provided, however*, that "Total Outstanding Shares" shall not include (i) any shares of Company Stock otherwise issuable upon the exercise of Company Options and Company Warrants that are unvested as of immediately prior to the Effective Time but cancelled as of the Effective Time (or will be automatically cancelled within three months thereafter pursuant to the post-termination "tail" exercise period thereof without the ability or right to exercise prior to such termination), or (ii) any shares of Company Stock otherwise issuable upon the conversion of that certain convertible note set forth in Section 3.3(a)(ii) of the Company Disclosure Schedule.

"Transaction Agreements" means, collectively, the Support Agreements, the Registration Rights Agreement, the Escrow Agreement and the Non-Competition Agreements.

"2006 Retention Cash Bonus Plan" means the Company bonus plan described on Schedule 1.1(d) hereto.

1.2    General Interpretive Principles. The name assigned to this Agreement and the article, Section and subsection captions used herein are for convenience of reference only and shall not be construed to affect the meaning, construction or effect hereof. The terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa. Unless otherwise specified, the terms "hereof," "herein" and similar terms refer to this Agreement as a whole (including the Company Disclosure Schedule, the Parent Disclosure Letter and Exhibits hereto), and references herein to Articles or Sections refer to Articles or Sections of this Agreement. Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. For purposes of this Agreement, the words,

10

"include," "includes" and "including," when used herein, shall be deemed in each case to be followed by the words "without limitation." For purposes of this Agreement (other than ARTICLE 2 hereof), references to the "Company" shall be deemed to include the Company's Subsidiaries. Unless stated otherwise, the terms "dollars" and "$" shall mean United States dollars.

ARTICLE 2

THE MERGER

2.1     The Merger. At the Effective Time and subject to and upon the terms and conditions of this Agreement and in accordance with Section 251 of the DGCL, (a) Merger Sub shall be merged with and into the Company, (b) the separate corporate existence of Merger Sub shall cease, and (c) the Company shall, as the surviving corporation in the Merger, continue its existence under Delaware law as a wholly owned subsidiary of Parent. The Company as the surviving corporation after the Merger is hereinafter sometimes referred to as the "Surviving Corporation."

2.2     Effective Time. On the Closing Date, the parties hereto shall cause the Merger to be consummated by filing a certificate of merger (the "Certificate of Merger") with the Secretary of State of the State of Delaware in such form as required by and executed in accordance with the relevant provisions of the DGCL (the date and time of such filing, or such later date and time as may be specified in such filing by mutual agreement of Parent, Merger Sub and the Company, being the "Effective Time").

2.3     Effect of the Merger. At the Effective Time, the effect of the Merger shall be as provided in the applicable provisions of the DGCL. Without limiting the foregoing, from and after the Effective Time, the Surviving Corporation shall have all the properties, rights, privileges, purposes, and powers and debts, duties, and liabilities of the Company.

2.4     Certificate of Incorporation; Bylaws. The Certificate of Incorporation of the Company at the Effective Time shall be the Certificate of Incorporation of the Surviving Corporation until thereafter changed or amended in accordance with the provisions thereof and applicable Law. The bylaws of the Company at the Effective Time shall be the bylaws of the Surviving Corporation until thereafter changed or amended in accordance with applicable Law.

2.5     Directors and Officers. The directors of Merger Sub immediately prior to the Effective Time shall be the initial directors of the Surviving Corporation, each to hold office in accordance with the Certificate of Incorporation and the bylaws of the Surviving Corporation until their respective successors are duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the Surviving Corporation's Certificate of Incorporation and bylaws. The officers of Merger Sub immediately prior to the Effective Time shall be the initial officers of the Surviving Corporation.

2.6     Conversion of Securities. Subject to the terms and conditions of this Agreement, at the Effective Time, by virtue of the Merger and without any action on the part of Merger Sub, Company or the holders of any of the following securities:

11

(a) <u>Conversion of Merger Sub Common Stock</u>. Each share of Merger Sub Common Stock that is issued and outstanding immediately prior to the Effective Time shall be converted into one validly issued, fully paid and nonassessable share of Common Stock, $0.001 par value per share, of the Surviving Corporation, and the shares of the Surviving Corporation into which the shares of Merger Sub Common Stock are so converted shall be the only shares of the Surviving Corporation that are issued and outstanding immediately after the Effective Time. Following the Effective Time, each certificate evidencing ownership of shares of Merger Sub Common Stock shall evidence ownership of such shares of the Surviving Corporation.

(b) <u>Conversion of Company Stock</u>.

(i) Each share of Series A Preferred Stock that is issued and outstanding immediately prior to the Effective Time (other than any shares to be canceled pursuant to Section 2.6(f) and any Dissenting Shares) pursuant to the terms thereof will be deemed converted to Company Common Stock and such Company Common Stock will be automatically converted (subject to Section 2.6(h)) into the right to receive such number of shares of Parent Common Stock as is equal to the Exchange Ratio, upon surrender of the certificate representing such share of Series A Preferred Stock in the manner provided in Section 2.8 and subject to the deposit of the Escrow Shares pursuant to Section 2.9.

(ii) Each share of Series B Preferred Stock that is issued and outstanding immediately prior to the Effective Time (other than any shares to be canceled pursuant to Section 2.6(f) and any Dissenting Shares) pursuant to the terms thereof will be deemed converted to Company Common Stock and such Company Common Stock will be automatically converted (subject to Section 2.6(h)) into the right to receive such number of shares of Parent Common Stock as is equal to the Exchange Ratio, upon surrender of the certificate representing such share of Series B Preferred Stock in the manner provided in Section 2.8 and subject to the deposit of the Escrow Shares pursuant to Section 2.9.

(iii) Each share of Company Common Stock that is issued and outstanding immediately prior to the Effective Time (other than any shares of Company Common Stock to be canceled pursuant to Section 2.6(f) and any Dissenting Shares), will be automatically converted (subject to Section 2.6(h)) into the right to receive such number of shares of Parent Common Stock as is equal to the Exchange Ratio, upon surrender of the certificate representing such share of Company Common Stock in the manner provided in Section 2.8 and subject to the deposit of the Escrow Shares pursuant to Section 2.9. The shares of Parent Common Stock exchangeable for any shares of Restricted Stock will continue to have, and be subject to, the same terms and conditions as the Restricted Stock, including with regards to vesting.

(iv) No fraction of a share of Parent Common Stock will be issued by virtue of the Merger, but in lieu thereof, a cash payment shall be made pursuant to Section 2.6(g).

12

HIGHLY CONFIDENTIAL

TP000074

(c)     Company Options.  Unless the terms of an agreement evidencing a Company Option or the provisions of the Company Option Plan applicable to a Company Option provide otherwise, each Company Option that is issued and outstanding immediately prior to the Effective Time, whether or not then exercisable, will be assumed by Parent and converted into an option to purchase Parent Common Stock ("Assumed Company Options").  Each Company Option so assumed and converted will continue to have, and be subject to, the same terms and conditions, except that (i) each converted Company Option shall be exercisable (or will become exercisable in accordance with its terms) for that number of whole shares of Parent Common Stock equal to the product of the number of shares of Company Common Stock that were issuable upon exercise of such Company Option immediately prior to the Effective Time multiplied by the Exchange Ratio (rounded down to the nearest whole share), and (ii) the per share exercise price for the shares of Parent Common Stock issuable upon exercise of such converted Company Option shall be equal to the quotient determined by dividing the exercise price per share of Company Common Stock at which such Company Option was exercisable immediately prior to the Effective Time by the Exchange Ratio (rounded up to the nearest whole cent); *provided, however*, that the terms of each of the Company Options will provide (x) for an equitable adjustment in the event that any Escrow Shares are delivered by the Escrow Agent to a Parent Indemnified Party so that the holder of such Company Option will bear a pro rata portion (relative to the Total Outstanding Shares) of the aggregate indemnifiable Damages giving rise to such delivery of Escrow Shares and (y) upon exercise of such Company Option, a portion of the Parent Common Stock issued upon such exercise (equal to the portion of Company Stock then held in the Escrow Account relative to the number of shares of Parent Common Stock previously delivered to the Company Stockholders pursuant to this Agreement) will be retained by Parent in escrow and transferred to either Parent or the holder of such Company Option, as applicable, at the same time and in the same relative proportion as the Escrow Shares are transferred out of the Escrow Account.  The conversion of Company Options provided for in this Section 2.6(c) with respect to any Company Options that are "incentive stock options" (as defined in Section 422 of the Code) shall be effected in a manner consistent with Section 424(a) of the Code and otherwise in a manner intended to preserve incentive stock option treatment to the extent permitted by applicable law

(d)     Company Warrants.

(i)     All Company Warrants that pursuant to their terms do not provide for assumption of such Company Warrants in connection with the Merger shall be cancelled at the Closing.  Prior to the Effective Time, the Company shall take all actions necessary to effect the transactions anticipated by this Section 2.6(d) under all Company Warrant agreements, including delivering all notices required thereby.  Within five (5) Business Days following the Effective Date, the Company shall notify the holders of such Company Warrants, which such notice shall be in compliance with the terms of such Company Warrants and shall specify the vested and unvested portions thereof, that such Company Warrants will be cancelled at the Closing.  Materials to be submitted to the holders of Company Warrants in connection with the notice required under this Section 2.6(d) shall be subject to review and reasonable approval by Parent.

(ii)     All Company Warrants that pursuant to their terms provide for assumption of such warrant in connection with the Merger (the "Assumed Warrants")

13

shall be assumed by Parent and converted into a warrant to purchase Parent Common Stock. Each Assumed Company Warrant will continue to have, and be subject to, the same terms and conditions (including with respect to vesting), except that (A) each Assumed Company Warrant shall be exercisable (or will become exercisable in accordance with its terms) for that number of whole shares of Parent Common Stock equal to the product of the number of shares of Company Common Stock that were issuable upon exercise of such Company Warrant immediately prior to the Effective Time multiplied by the Exchange Ratio (rounded down to the nearest whole share) and (B) the per share exercise price for the shares of Parent Common Stock issuable upon exercise of such Assumed Company Warrant shall be equal to the quotient determined by dividing the exercise price per share of Company Common Stock at which such Company Warrant was exercisable immediately prior to the Effective Time by the Exchange Ratio (rounded up to the nearest whole cent); *provided, however,* that the terms of each of the Company Warrants will provide (x) for an equitable adjustment in the event that any Escrow Shares are delivered by the Escrow Agent to a Parent Indemnified Party so that the holder of such Company Warrant will bear a pro rata portion (relative to the Total Outstanding Shares) of the aggregate indemnifiable Damages giving rise to such delivery of Escrow Shares and (y) upon exercise of such Company Warrant, a portion of the Company Stock issued upon such exercise (equal to the portion of Escrow Shares then held in the Escrow Account relative to the number of shares of Parent Common Stock previously delivered to the Company Stockholders pursuant to this Agreement) will be retained by Parent in escrow and transferred to either Parent or the holder of such Company Warrant, as applicable, at the same time and in the same relative proportion as the Escrow Shares are transferred out of the Escrow Account.

(e)    Company RSUs. Each Company RSU that is issued and outstanding immediately prior to the Effective Time will be assumed by Parent and converted (subject to Section 2.6(h)) into a Parent RSU for that number of shares of Parent Common Stock as is equal to the Exchange Ratio ("Assumed Company RSUs"), *provided, however,* that the terms of each Parent RSU will provide (i) for an equitable adjustment in the event that any Escrow Shares are delivered by the Escrow Agent to a Parent Indemnified Party so that the holder of such Parent RSU will bear a pro rata portion (relative to the Total Outstanding Shares) of the aggregate indemnifiable Damages giving rise to such delivery of Escrow Shares and (ii) upon vesting of such Parent RSU, a portion of the Parent Common Stock issued (equal to the portion of Company Stock then held in the Escrow Account relative to the number of shares of Parent Common Stock previously delivered to the Company Stockholders pursuant to this Agreement) will be retained by Parent in escrow and transferred to either Parent or the holder of such Parent RSU, as applicable, at the same time and in the same relative proportion as the Escrow Shares are transferred out of the Escrow Account. Each Parent RSU will continue to have, and be subject to, the same terms and conditions as the Company RSU, including with regards to vesting.

(f)    Cancellation of Company-Owned and Parent-Owned Stock. Each share of Company Stock held by the Company immediately prior to the Effective Time shall be canceled and extinguished without any conversion thereof.

14