(g) <u>Fractional Shares</u>. No fraction of a share of Parent Common Stock will be issued by virtue of the Merger, but in lieu thereof each former holder of shares of Company Stock who would otherwise be entitled to a fraction of a share of Parent Common Stock (after aggregating all fractional shares of Parent Common Stock that otherwise would be received by such holder) shall, upon surrender of such holder's Certificate(s), receive from Parent an amount of cash in dollars (rounded to the nearest whole cent), without interest, less the amount of any withholding taxes with respect to the shares represented by such certificate as contemplated by Section 2.11(b), which are required to be withheld with respect thereto, equal to the product of (i) such fraction, multiplied by (ii) the closing sale price of one share of Parent Common Stock as quoted on the Nasdaq Global Select Market for the trading day that is one trading day prior to the Closing Date.

(h) <u>Adjustments to Exchange Ratio</u>. The Exchange Ratio shall be adjusted to reflect appropriately the effect of any stock split, reverse stock split, stock dividend (including any dividend or distribution of securities convertible into Parent Common Stock or Company Stock), reorganization, recapitalization, reclassification or other like change with respect to Parent Common Stock or Company Stock occurring on or after the Effective Date and prior to the Effective Time.

### 2.7  <u>Appraisal</u>

(a) Notwithstanding any other provisions of this Agreement to the contrary, any shares of Company Stock held by a holder who has not effectively withdrawn or lost such holder's appraisal, dissenters' or similar rights for such shares under the DGCL or under Chapter 13 of the California Corporations Code ("<u>California Law</u>"), as applicable (collectively, the "<u>Dissenting Shares</u>"), shall not be converted into or represent a right to receive Parent Common Stock as set forth in Section 2.6 hereof, but the holder thereof shall only be entitled to such rights as are provided by DGCL and California Law.

(b) Notwithstanding the provisions of Section 2.7(a), if any holder of Dissenting Shares shall effectively withdraw or lose (through failure to perfect or otherwise) such holder's appraisal or dissenters' rights under the DGCL and California Law, as applicable, then, as of the later of the Effective Time and the occurrence of such event, such holder's shares shall automatically be converted into and represent only the right to receive the consideration for Company Stock, as applicable, set forth in Section 2.6, without interest thereon, upon surrender of the certificate representing such shares.

(c) The Company shall give Parent (i) prompt notice of any written demand for appraisal received by the Company pursuant to the applicable provisions of the DGCL or California Law, and (ii) the opportunity to participate in all negotiations and proceedings with respect to such demands. The Company shall not, except with the prior written consent of Parent, make any payment with respect to any such demands or offer to settle or settle any such demands. Notwithstanding the foregoing, to the extent that Parent, the Surviving Corporation or the Company makes any payment or payments in respect of any Dissenting Shares in excess of the consideration that otherwise would have been payable in respect of such shares in accordance with this Agreement ("<u>Dissenting Share Payments</u>"), Parent shall be entitled to recover the amount of such Dissenting Share Payments pursuant to ARTICLE 9 hereof.

15

2.8    Exchange of Certificates.

(a)    Exchange Procedures. No later than promptly after the Effective Time, Parent shall mail to each holder of record of a certificate or certificates ("Certificates") that immediately prior to the Effective Time represented outstanding shares of Company Stock whose shares were converted into the right to receive shares of Parent Common Stock pursuant to Section 2.6(b), cash in lieu of any fractional shares pursuant to Section 2.6(g) and any dividends or other distributions pursuant to Section 2.8(b), (i) a letter of transmittal in customary form (which shall include a joinder provision pursuant to which the signatory thereto shall agree to be bound by the provisions set forth in ARTICLE 9 hereof) and (ii) instructions for use in effecting the surrender of the Certificates in exchange for certificates representing shares of Parent Common Stock. Upon surrender of Certificates for cancellation to Parent together with such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, and such other documents as may reasonably be required by Parent (including any required Form W-9 or Form W-8), the holders of such Certificates shall be entitled to receive in exchange therefor (x) certificates representing the number of whole shares of Parent Common Stock (after aggregating all Certificates surrendered by such holder) into which such holder is entitled pursuant to Section 2.6(b), less the number of shares of Parent Common Stock to be deposited in the Escrow Account pursuant to Section 2.9, (y) a check in the amount of dollars in lieu of fractional shares that such holders have the right to receive pursuant to Section 2.6(g) and (z) any dividends or distributions payable pursuant to Section 2.8(b), and the Certificates so surrendered shall forthwith be canceled. Until so surrendered, outstanding Certificates will be deemed from and after the Effective Time, for all corporate purposes, to evidence only the right to receive upon surrender thereof the number of whole shares of Parent Common Stock to which such holder is entitled pursuant to Section 2.6(b), an amount in cash in lieu of the issuance of any fractional shares in accordance with Section 2.6(g) and any dividends or distributions payable pursuant to Section 2.8(b). No interest will be paid or accrued on any cash payable in lieu of fractional shares of Parent Common Stock or on any unpaid dividends or distributions payable to holders of Certificates. In the event of a transfer of ownership of shares of Company Stock that is not registered in the transfer records of the Company, a certificate representing the proper number of shares of Parent Common Stock and cash payable in lieu of fractional shares may be issued to a transferee if the Certificate representing such shares of Company Stock is presented to Parent, accompanied by all documents required to evidence and effect such transfer and by evidence that any applicable stock transfer taxes have been paid.

(b)    Distributions With Respect to Unexchanged Shares. No dividends or other distributions declared or made after the date hereof with respect to Parent Common Stock with a record date after the Effective Time will be paid to the holders of any unsurrendered Certificates with respect to the shares of Parent Common Stock represented thereby until the holders of record of such Certificates shall surrender such Certificates. Subject to applicable law, following surrender of any such Certificates, Parent shall deliver to the record holders thereof, without interest, (i) promptly after such surrender, the amount of any cash payable with respect to a fractional share of Parent Common Stock to which such holder is entitled pursuant to Section 2.6(g) and the amount of dividends or other distributions with a record date after the Effective Time theretofore paid with respect to the whole shares of Parent Common Stock represented thereby, and (ii) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time but prior to surrender and a payment

16

date occurring after surrender, payable with respect to such whole shares of Parent Common Stock.

(c) <u>Lost, Stolen or Destroyed Certificates.</u> In the event that any Certificates shall have been lost, stolen or destroyed, Parent shall issue and pay in exchange for such lost, stolen or destroyed Certificates, upon the making of an affidavit of that fact by the holder thereof, certificates representing the shares of Parent Common Stock into which the shares of Company Stock represented by such Certificates were converted pursuant to Section 2.6(b), cash for fractional shares, if any, as may be required pursuant to Section 2.6(g) and any dividends or distributions payable pursuant to Section 2.8(b).

(d) <u>No Further Ownership Rights in Company Stock.</u> All shares of Parent Common Stock, cash in lieu of fractional shares of Parent Common Stock and dividends or other distributions with respect to Parent Common Stock issued in accordance with the terms hereof shall be deemed to have been issued in full satisfaction of all rights pertaining to such shares of Company Stock, and there shall be no further registration of transfers on the records of the Surviving Corporation of shares of Company Stock that were outstanding immediately prior to the Effective Time. If after the Effective Time Certificates are presented to the Surviving Corporation for any reason, they shall be canceled and exchanged as provided in this ARTICLE 2.

(e) <u>Liability.</u> Notwithstanding anything to the contrary in this Section 2.8, neither Parent, the Company, the Surviving Corporation nor any party hereto shall be liable to a holder of shares of Company Stock for any amount properly paid to a public official pursuant to any applicable abandoned property, escheat or similar law.

2.9 <u>Escrow Account.</u>

(a) Subject to Section 2.9(b), at the Closing, Parent shall deliver, and the Company Stockholders shall be deemed to have received and deposited, a certificate or certificates representing twelve and one-half percent (12.5%) of the Aggregate Share Consideration issuable in the Merger in respect of all shares of Company Stock pursuant to Section 2.6(b) (the "<u>Escrow Shares</u>") to a non-interest bearing escrow account (the "<u>Escrow Account</u>") to be established by Parent with an escrow agent to be designated by Parent and approved by the Company prior to the Closing (the "<u>Escrow Agent</u>"), to be held by the Escrow Agent pursuant to the terms of an escrow agreement, in substantially the form attached hereto as <u>Exhibit D</u> together with such other modifications as shall be required by the Escrow Agent that are reasonably satisfactory to Parent and the Stockholders Agent (the "<u>Escrow Agreement</u>"). Each Company Stockholder shall be deemed to have deposited into the Escrow Account such Company Stockholder's Pro Rata Share of the Escrow Shares, and such shares shall be deducted from the shares of Parent Common Stock otherwise issuable to each such Company Stockholder pursuant to Section 2.6. Such Escrow Shares shall provide security for the satisfaction of claims for indemnification made by the Parent Indemnified Parties pursuant to ARTICLE 9 (subject to the exceptions set forth in Section 9.6). Any fees and expenses of the Escrow Agent shall be paid by Parent. The Escrow Shares shall be retained in the Escrow Account until released pursuant to this Section 2.9 or Section 9.3. During the period in which the Escrow Shares are retained in the Escrow Account, they will be held for the benefit of the Company Stockholders

17

(and the Company Stockholders shall be entitled to receive cash dividends on, and vote, such shares of Parent Common Stock), unless and until and to the extent it has been determined that any Parent Indemnified Party is entitled to retain any of the Escrow Shares in respect of indemnification claims pursuant to ARTICLE 9. In the event that a Company Stockholder holds Restricted Stock at the Effective Time, then the shares of Parent Common Stock to be issued in the Merger in respect of such Company Stockholder's shares of Company Stock which are not Restricted Stock shall be withheld and deposited in Escrow Account first and, thereafter, any shares of Parent Common Stock to be issued in the Merger in respect of such Company Stockholder's Restricted Stock shall be withheld and deposited in escrow to the extent necessary to satisfy such Company Stockholder's escrow deposit obligations in this Section 2.9 (it being understood and hereby agreed that any Escrow Shares so deposited in escrow which are restricted shall vest prior to any restricted shares of Parent Common Stock held by such Company Stockholder that are not so deposited in escrow). The release of any Escrow Shares in satisfaction of any indemnification obligations under ARTICLE 9 shall be made, with respect to each Company Stockholder, first with any Escrow Shares then being held in Escrow Account that are not restricted and then, if such Escrow Shares are insufficient to satisfy such indemnification obligation and only to the extent of such insufficiency, with Escrow Shares that are restricted. In the event that a Person holds Assumed Company Options and/or Assumed Company RSUs at the Effective Time, then a portion of the Company Stock issued upon the exercise thereof shall be withheld and deposited in the Escrow Account to the extent necessary to satisfy such holder's escrow deposit obligations as a Company Stockholder set forth in this Section 2.9.

(b)    Within two (2) Business Days following the one-year anniversary of the Closing (the "Initial Escrow Release Date"), Parent and the Stockholders Agent shall each instruct the Escrow Agent in writing to take the following actions:

(i)    The Escrow Agent shall be instructed to retain aggregate Escrow Shares with a value (valuing such Escrow Shares at the Parent Closing Price) that is equal to the sum of the aggregate Outstanding Claims at such time, if any (or such lesser amount of Escrow Shares as shall be remaining in the Escrow Account at such time) (collectively, the "Retained Escrow Consideration").

(ii)    With respect to the Escrow Shares, if any, that are in excess of the Retained Escrow Consideration, the Escrow Agent shall be instructed to promptly (and, in any event, no later than two (2) Business Days after delivery of such instructions) deliver all of such Escrow Shares to the Company Stockholders in proportion to their respective Pro Rata Shares.

(c)    In the event and to the extent that after the Initial Escrow Release Date (i) any Outstanding Claim, a Notice of Claim for which was delivered prior to the Initial Escrow Release Date, is resolved against the relevant Parent Indemnified Party(ies) (such amount, a "Company Favorable Outcome") and (ii) the value of the Retained Escrow Consideration (valuing such Escrow Shares at the Parent Closing Price) exceeds the aggregate Outstanding Claims at such time, after giving effect to such Company Favorable Outcome (such excess, if any, the "Retained Escrow Excess"), each of Parent and the Stockholders Agent shall promptly instruct the Escrow Agent in writing to forthwith promptly (and, in any event, no later than two

18

(2) Business Days after delivery of such instructions) distribute all of such Retained Escrow Excess to the Company Stockholders in proportion to their respective Pro Rata Shares.

(d)  In the event and to the extent that after the Initial Escrow Release Date any Outstanding Claim, a Notice of Claim for which was delivered prior to the Initial Escrow Release Date, is resolved in favor of the relevant Parent Indemnified Party(ies), each of Parent and the Stockholders Agent shall promptly instruct the Escrow Agent in writing to promptly (and, in any event, no later than two (2) Business Days after delivery of such instructions) deliver Retained Escrow Consideration to such Parent Indemnified Party(ies) in the manner set forth in Section 9.4.

2.10  Adjustment Provisions.

(a)  No later than fifteen (15) Business Days following the one-year anniversary of the Closing, Parent shall prepare and deliver to the Stockholders Agent a statement (the "Purchase Price Adjustment Statement") setting forth the Adjusted Exchange Ratio, calculated as set forth below. Parent shall make available to the Stockholders Agent all relevant books and records relating to the Purchase Price Adjustment Statement upon reasonable prior request. For purposes of this Section 2.10:

"Adjusted Exchange Ratio" means the quotient obtained by dividing (x) the Aggregate Share Consideration, by (y) the Adjusted Total Outstanding Shares.

"Adjusted Total Outstanding Shares" means (x) the Total Outstanding Shares, minus (y) all Forfeited Shares.

"Forfeited Shares" means the sum of (x) all shares of Restricted Stock that were outstanding immediately prior to the Effective Time that (i) prior to the one year anniversary of the Closing Date were forfeited to the Company following the termination of the relevant holder's employment, and (ii) were not Escrow Shares or, if they were Escrow Shares, would have been released from the Escrow Account to the relevant holder on the one-year anniversary of the Closing Date, plus (y) all Company Options and Company RSUs that were outstanding immediately prior to the Effective Time and that were terminated (and not exercised) before the one-year anniversary of the Closing Date.

(b)  If the Adjusted Exchange Ratio is greater than the original Exchange Ratio, then (i) Parent shall, as promptly as practicable, issue an additional number of shares of Parent Common Stock with respect to each share of Company Stock that was outstanding immediately prior to the Effective Time to the holders thereof at such Effective Time equal in amount to (x) the number of shares of Parent Common Stock that would have been issuable at the Effective Time with respect to such share of Company Stock if the Exchange Ratio had been equal to the Adjusted Exchange Ratio, minus (y) the number of shares of Parent Common Stock issued at the Effective Time (and including any fractional shares in lieu of which cash was issued pursuant to Section 2.6(g) with respect to such share of Company Stock) with respect to such share of Company Stock, (ii) the number of shares of Parent Common Stock issuable pursuant to each Assumed Company Option and Assumed Company RSU shall be adjusted to equal that number that it would have equaled if the Exchange Ratio had been equal to the Adjusted

19

Exchange Ratio, and (iii) Parent shall issue to each holder of an Assumed Company Option and an Assumed Company RSU as of the Effective Time who exercised such Assumed Company Option or whose Assumed Company RSU vested, as the case may be, prior to the effective time of such adjustment a number of shares of Parent Common Stock equal in amount to (A) the number of shares of Parent Common Stock that would have been issuable upon such prior exercise of such Assumed Company Option or the vesting of such Assumed Company RSU, as the case may be, had the number of shares of Parent Common Stock issuable upon such exercise or vesting event been calculated after giving effect to the adjustment provided in clause (ii) of this Section 2.10(b), minus (B) the number of shares of Parent Common Stock previously issued upon such exercise or vesting event. Any shares of Parent Common Stock issued pursuant to this clause (iii) shall be subject to the same forfeiture, transfer and repurchase provisions that are applicable to the shares of Parent Common Stock issued at the relevant time of exercise. No fraction of a share of Parent Common Stock will be issued pursuant to this Section 2.10 and in lieu thereof, a cash payment shall be made using the methodology set forth in Section 2.6(g).

2.11  Tax Consequences and Withholding.

(a)  Consequences. It is intended by the parties hereto that the Merger shall constitute a "reorganization" within the meaning of Section 368(a) of the Code and that the exchange of Company Stock for the Aggregate Share Consideration pursuant to Section 2.6 shall be treated as an exchange described in Section 354(a) of the Code. The parties hereto shall comply with all tax filing requirements under Sections 368 and 354 of the Code and shall not make any tax filing that is inconsistent with the foregoing intent. The parties hereto adopt this Agreement as a "plan of reorganization" within the meaning of Treasury Regulation Section 1.368-2(g) and Proposed Treasury Regulation Section 1.368-3(a).

(b)  Withholding. Each of Parent and the Surviving Corporation shall be entitled to deduct and withhold from any consideration payable or otherwise deliverable pursuant to this Agreement to any former Company Stockholder, holder of Company Warrants, or holder of Company Options such amounts as may be required to be deducted or withheld therefrom under the Code or under any provision of state, local or foreign tax law or under any other applicable law. To the extent such amounts are so deducted and withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

2.12  Further Assurances. If, at any time before or after the Effective Time, the Company or Parent reasonably believes or is advised that any further instruments, deeds, assignments or assurances are reasonably necessary or desirable to consummate the Merger or to carry out the purposes and intent of this Agreement at or after the Effective Time, then the Company, Parent, the Surviving Corporation and their respective officers and directors shall execute and deliver all such proper deeds, assignments, instruments and assurances and do all other things reasonably necessary or desirable to consummate the Merger and to carry out the purposes and intent of this Agreement.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE FOUNDERS

HIGHLY CONFIDENTIAL

Except as set forth in the Company Disclosure Schedule (it being understood and hereby agreed that the disclosure set forth in a specific section or subsection of the Company Disclosure Schedule shall qualify the representations and warranties set forth in the corresponding section and subsection of this ARTICLE 3 and any other representations and warranties set forth in any other sections or subsections of this ARTICLE 3 (whether or not a specific cross-reference is included therein) if and to the extent that it is reasonably apparent on the face of such disclosure that such disclosure applies to such other sections or subsections), the Company and each of the Founders hereby represents and warrants, severally and not jointly, to Parent and Merger Sub as follows:

3.1 <u>Organization</u>.

(a) The Company is a corporation duly organized, validly existing and in good standing under Delaware law and has all the requisite corporate power and authority, and is in possession of all franchises, grants, authorizations, licenses, permits, easements, consents, waivers, qualifications, certificates, Orders and approvals (collectively, "<u>Approvals</u>") necessary to own, lease and operate its properties and to carry on its business as it is now being conducted other than those Approvals the failure of which to have would not result in a Company Material Adverse Effect. The Company is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except as would not have a Company Material Adverse Effect. Section 3.1(a) of the Company Disclosure Schedule lists every state or foreign jurisdiction in which the Company has Employees or facilities or otherwise has conducted its business since inception. Section 3.1(a) of the Company Disclosure Schedule lists the directors and officers of the Company as of the Effective Date.

(b) The Company has no Subsidiaries.

(c) The Company does not own any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for, directly or indirectly, any equity or similar interest in, any Person.

(d) There is no pending or, to the Knowledge of the Company, Threatened Action for the dissolution, liquidation, insolvency or rehabilitation of the Company.

3.2 <u>Certificate of Incorporation and Bylaws</u>. The Company has heretofore furnished to Parent a true and complete copy of its Certificate of Incorporation and bylaws, as modified, supplemented, amended or restated to the Effective Date. Such Certificate of Incorporation and bylaws are in full force and effect, and no other organizational documents are applicable to or binding upon the Company. None of such Certificate of Incorporation or bylaws restricts or limits the ability of the holders of Company Stock to act by written consent in lieu of a meeting.

3.3 <u>Capitalization</u>.

(a) As of the Effective Date, the authorized capital stock of the Company consists of (i) 25,000,000 shares of Company Common Stock, of which 12,454,000 shares are issued and outstanding and 1,251,700 shares are duly reserved for future issuance pursuant to

21

TP000083

outstanding Company Options (the "Outstanding Company Options"), (ii) 5,100,000 shares of Company Series A Preferred Stock, of which 5,085,714 shares are issued and outstanding; and (iii) 2,060,000 shares of Company Series B Preferred Stock, of which 2,000,000 shares are issued and outstanding. Each share of Company Series A Preferred Stock is convertible on a 1:1 basis into Company Common Stock and each share of Company Series B Preferred Stock is convertible on a 1:1 basis into Company Common Stock. None of the outstanding shares of Company Stock are subject to, nor were they issued in violation of, any purchase option, call option, right of first refusal or offer, preemptive right, subscription right or any similar right. All Outstanding Company Options were granted under the Company Option Plan. Section 3.3(a) of the Company Disclosure Schedule sets forth a correct and complete list of (i) each holder of Company Stock and the number of shares of Company Stock held by such holder and the extent to which such Company Stock is subject to vesting or forfeiture and the vesting schedule (if any) and (ii) each Company Option and other right to purchase Company Stock or other capital stock of the Company, if any, outstanding as of the Effective Date, together with the number of shares of Company Stock or any other capital stock of the Company subject to such option, warrant or right, the extent to which such option, warrant or right is vested and/or exercisable, the date of grant or issuance, the exercise price (and, in the case of Company Options, whether such option is a non-qualified stock option or intended to be an incentive stock option), and the vesting schedule and expiration date of each such option, warrant and right, and the total number of such options, warrants and rights. Each Company Option was granted with an exercise price per share equal to or greater than the per share fair market value (as such term is used in Code Section 409A and the Department of Treasury regulations and other interpretive guidance issued thereunder) of the Common Stock underlying such Company Option on the grant date thereof and was otherwise issued in compliance with all applicable Laws. There are no Company Options for any class of Company Stock other than Common Stock. Except as set forth above, no shares of voting or non-voting capital stock, other Equity Interests, or other voting securities of the Company are issued, reserved for issuance or outstanding. No Company Option shall entitle the holder thereof to receive anything after the Merger in respect of such Company Option except as provided in this Agreement. All outstanding shares of Company Stock are, and all shares which may be issued upon the exercise of Company Options will be, duly authorized, validly issued, fully paid and nonassessable and not subject to any purchase option, call option, right of first refusal or offer, preemptive right, subscription right or similar right. True and correct copies of each of the Company Warrants have been made available to Parent, and there are no outstanding warrants to purchase Company Stock other than the Company Warrants. Following the Merger, each of the Assumed Company Warrants will become exercisable for shares of Parent Common Stock as provided in Section 2.6(d). Except for the Company Stock, there are no bonds, debentures, notes, other Indebtedness or any other securities of the Company with voting rights (or convertible into, or exchangeable for, securities with voting rights) on any matters on which Company Stockholders of the Company may vote. There are no declared or accrued but unpaid dividends with respect to any shares of Company Stock. There have been no anti-dilution or similar adjustments made to the conversion terms or adjustments made to the exercise price of any Company Preferred Stock, or any warrants, notes, options or other Commitments since the issuance thereof. The certificate delivered by the Company pursuant to Section 6.18 shall be true and correct.

22

(b)     The Company is not subject to any obligation or requirement to provide funds for or to make any investment (including in the form of a loan or capital contribution) to or in any Person.

(c)     Except as described in Section 3.3(a) above or set forth in Section 3.3(a) of the Company Disclosure Schedule, there are no outstanding securities, options, warrants, calls, rights, convertible or exchangeable securities or Contracts or obligations of any kind (contingent or otherwise) to which the Company is a party or by which it is bound obligating the Company to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock or other voting securities of the Company or other Equity Interest or obligating the Company to issue, grant, extend or enter into any such security, option, warrant, call, right, Equity Interest or Contract. There are no outstanding obligations of the Company (contingent or otherwise) to repurchase, redeem or otherwise acquire any shares of capital stock (or options or warrants to acquire any such shares) or other Equity Interests of the Company. There are no stock-appreciation rights, stock-based performance units, "phantom" stock rights or other Contracts or obligations of any character (contingent or otherwise) pursuant to which any Person is or may be entitled to receive any payment or other value based on the revenues, earnings or financial performance, stock price performance or other attribute of the Company or any of its businesses, assets, rights or properties or calculated in accordance therewith (other than ordinary course payments or commissions to sales representatives of the Company based upon revenues generated by them without augmentation as a result of the transactions contemplated hereby) (collectively, "Stock-Based Rights") or to cause the Company to file a registration statement under the Securities Act, or which otherwise relate to the registration of any securities of the Company. There are no voting trusts, proxies or other Contracts of any character to which the Company or, to the Knowledge (as defined herein) of the Company, any of the Company Stockholders is a party or by which any of them is bound with respect to the issuance, holding, acquisition, voting or disposition of any shares of capital stock or similar interests of the Company.

3.4     Authorization and Enforceability. The Company has all necessary corporate power and authority to execute and deliver this Agreement and each other Transaction Agreement to which it is a party and each instrument required to be executed and delivered by it at the Closing, and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by the Company of this Agreement and each other Transaction Agreement to which it is a party, the performance of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby, have been approved by the Company's Board of Directors, duly and validly authorized by all requisite corporate action and subject only to the adoption of this Agreement and approval of the Merger by the Company Stockholders, no other actions or proceedings on the part of the Company are necessary to authorize the execution, delivery and performance of this Agreement and each other Transaction Agreement to which it is a party or to consummate the transactions so contemplated. The affirmative vote of the holders of (i) a majority of the outstanding shares of Company Stock, voting together as a single class, (ii) a majority of the outstanding shares of Company Common Stock, voting as a separate class, and (iii) a majority of the outstanding shares of Company Preferred Stock, voting together as a separate class is the only vote of the Company Stockholders necessary to adopt this Agreement and approve the Merger under the DGCL, California Law and the Company's Certificate of Incorporation and

23

bylaws (the "Requisite Stockholder Vote"). Upon receipt of the Stockholder Consents, no further vote of the holders of any class or series of the capital stock of the Company is necessary to adopt this Agreement and approve the Merger. Each of this Agreement and each other Transaction Agreement to which the Company is a party has been duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery thereof by Parent and Merger Sub, constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

     3.5    No Conflict; Required Filings and Consents.

     (a)    The execution and delivery by the Company of this Agreement, the other Transaction Agreements to which it is a party or any instrument required by this Agreement to be executed and delivered by the Company do not, and the performance of this Agreement, the Escrow Agreement or any instrument required by this Agreement to be executed and delivered by the Company, shall not, (i) conflict with or violate the Certificate of Incorporation or bylaws or equivalent organizational documents of the Company, (ii) conflict with or violate in any respect any Law or Order in each case applicable to the Company or by which any of its properties, rights or assets is bound or affected, other than those violations or breaches that would not be reasonably expected to be material to the Company, or (iii) result in any breach or violation of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or impair the Company's rights or alter the rights or obligations of any party under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of any payment obligation, or result in the creation of a Lien on any of the properties, rights or assets of the Company pursuant to, any bond, indenture, Contract, permit, franchise or other instrument or obligation to which the Company is a party or by which the Company or any of its properties, rights or assets is bound or affected, except, with respect to this clause (iii) as would not be reasonably expected to be material, individually or in the aggregate, to the Company.

     (b)    The execution and delivery by the Company of this Agreement, the other Transaction Agreements to which it is a party or any instrument required by this Agreement to be executed and delivered by the Company at the Closing do not, and the performance of this Agreement, other Transaction Agreements to which it is a party and any instrument required by this Agreement to be executed and delivered by the Company at the Closing, shall not, require the Company to, except as set forth in Section 3.5(a) of the Company Disclosure Schedule, obtain any Approval of any Person or Approval of, observe any waiting period imposed by, or make any filing with or notification to, any Governmental Authority, except for the filing of the Certificate of Merger in accordance with Delaware law, and other than those consents, approvals, actions, filings or notices, the failure of which to be obtained or made, would not be reasonably expected to be material, individually or in the aggregate, to the Company.

     3.6    Compliance. The Company is in compliance with, and is not in default or violation of, (i) the Certificate of Incorporation and bylaws of the Company, (ii) any Law or

24

Order or by which any of its properties, rights or assets are bound or affected, and (iii) the terms of all bonds, indentures, Contracts, permits, franchises and other instruments or obligations to which it is a party or by which any of it or any of its properties, rights or assets are bound or affected, except in the case of clauses (ii) and (iii) for noncompliance, defaults or violations that would not be reasonably expected to be material, individually or in the aggregate, to the Company. The Company is in material compliance with the terms of all applicable Approvals. The Company has not received notice of any revocation or modification of any material Approval of any Governmental Authority or that the Company is not in compliance with any material Approval or any Law or Order.

3.7    Financial Statements. Section 3.7 of the Company Disclosure Schedule contains a copy of the unaudited consolidated balance sheet of the Company as of August 31, 2006 (the "Company Balance Sheet") and the unaudited consolidated statements of income and cash flows of the Company for the period from January 1, 2006 to August 31, 2006 (collectively, the "Financial Statements"). The Financial Statements were prepared in accordance with United States generally accepted accounting principles ("GAAP"), except for the absence of footnote disclosure, applied on a consistent basis throughout the periods involved and fairly present, in all material respects, the consolidated financial position of the Company as at the respective dates thereof and the consolidated results of its operations and cash flows for the periods indicated.

3.8    Absence of Changes.

(a)    During the period from August 31, 2006 to the Effective Date, the Company has conducted its business only in the ordinary and usual course and in a manner consistent with past practice.

(b)    During the period from June 30, 2006 to the Effective Date, there has not been any change, development, circumstance, condition, event, occurrence, damage, destruction or loss that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    During the period from June 30, 2006 to the Effective Date, there has not been any change by the Company in its accounting methods, principles or practices, any revaluation by the Company of any of its assets, including writing down the value of inventory or writing off notes or accounts receivable.

(d)    During the period from August 31, 2006 to the Effective Date, the Company has not taken any of the following actions:

(i)    (A) made any distributions in respect of any of its Equity Interests, (B) redeemed or otherwise acquired any of its Equity Interests (except for forfeitures of Company Options pursuant to agreements outstanding on the Effective Date) or (C) issued any Equity Interests or any Commitments;

(ii)    (A) granted any increase in the compensation or fringe benefits of any present or former director, officer or employee of the Company (except for increases in salary or wages of employees (other than the Executives) in the Ordinary Course of Business), (B) paid any severance or termination pay to any present or former director,

25

officer or employee of the Company, (C) issued any Equity Interests, or (D) established, adopted, entered into, amended or terminated any Employee Plan except as required by applicable Law;

      (iii)    incurred or assumed any Liabilities for borrowed money or guaranteed any such Liabilities;

      (iv)    canceled any indebtedness or waived any claims or rights of having a value, in the aggregate, in excess of one hundred thousand dollars ($100,000);

      (v)    other than as required by concurrent changes in United States or Canadian generally accepted accounting principles, made any change in any method of accounting or accounting practice or policy;

      (vi)    made or incurred any capital expenditure, other than (A) in the Ordinary Course of Business or (B) not exceeding, in the aggregate, one hundred thousand dollars ($100,000);

      (vii)    sold, assigned, transferred, leased, licensed, sublicensed or otherwise disposed of, in whole or in part, any of its material assets, rights or properties (including Intellectual Property) other than (a) replacement of equipment and other tangible assets in the Ordinary Course of Business, (b) the disposition of unused and obsolete equipment in immaterial amounts or (c) licenses of Intellectual Property to end users in the Ordinary Course of Business;

      (viii)    made any loan, advance, or capital contribution to or investment in any Person (other than routine travel and business expense advances made to directors or employees in the Ordinary Course of Business);

      (ix)    created or incurred any Lien (other than Permitted Liens) on any of the assets, rights or properties (whether tangible or intangible) of the Company, other than purchase money security interests in connection with the acquisition of immaterial amounts of equipment in the Ordinary Course of Business;

      (x)    discharged or otherwise obtained the release of any Lien or paid or otherwise discharged any Liability, other than (A) current Liabilities in the Ordinary Course of Business or (B) other Liabilities not exceeding, in the aggregate, one hundred thousand dollars ($100,000);

      (xi)    merged with, entered into a consolidation with or acquired an interest in any Person or acquired by merging or consolidating with, or by purchasing a substantial portion of the assets, rights or properties of, or by any other manner, any business or any corporation, partnership, association, limited liability company, trust or other business organization or division thereof; or

      (xii)    agreed, whether in writing or otherwise, to do any of the foregoing.

HIGHLY CONFIDENTIAL

3.9    No Undisclosed Liabilities. The Company does not have any liabilities or obligations of any nature (whether absolute, accrued, fixed, contingent or otherwise), except liabilities or obligations (a) disclosed in the Company Balance Sheet, (b) incurred since August 31, 2006 in the Ordinary Course of Business (excluding any incurrence of Indebtedness), none of which are material to the Company, (c) disclosed in the Company Disclosure Schedule, or (d) that would not, individually or in the aggregate, have a Company Material Adverse Effect. The Company is not a party to, or has any commitment to become a party to, (i) any Contract associated with off balance sheet financing, including any arrangement for the sale of receivables or (ii) any interest rate, currency or other hedging arrangement or Contract relating to derivatives. All Indebtedness of the Company and Liens securing such Indebtedness, may in accordance with the terms of such Indebtedness, be prepaid, extinguished and released at or prior to the Closing and, assuming that any Indebtedness identified in Section 3.9 of the Company Disclosure Schedule is repaid as of the Closing, the Surviving Corporation shall have no other Indebtedness immediately after such repayment.

3.10    Tax Matters.

(a)    All Tax Returns required to be filed by, or on behalf of, the Company have been timely filed, and all such Tax Returns were true, correct and complete in all material respects. All Taxes of the Company due and payable have been fully and timely paid. With respect to any taxable period (or portion thereof) ending on or before the date of the Company's most recent balance sheet included in the Financial Statements for which Tax Returns have not been filed, or for which Taxes have accrued but are not yet due or owing, the Company has made due and sufficient current accruals for such Taxes on the Company Balance Sheet. The Company has not requested, or been granted any waiver of any federal, state, local or foreign statute of limitations with respect to, or any extension of a period for the assessment of, any Tax. No extension or waiver of time within which to file any Tax Return of, or applicable to, the Company has been granted or requested which has not since expired. The Company has no liability for unpaid Taxes accruing after the date of the Company Balance Sheet, except for Taxes arising in the Ordinary Course of Business subsequent to the date of the Company Balance Sheet.

(b)    The Company has duly and timely withheld and paid over to the appropriate Governmental Authorities all Taxes and other amounts required to be so withheld and paid over for all periods under all applicable Laws.

(c)    No audits, investigations or other proceedings are pending or being conducted with respect to Taxes of the Company and there are no matters under discussion, audit or appeal with any Governmental Authority relating to Taxes.

(d)    (i) The Company has not received any written notice of any assessment or intent to make any assessment by any Governmental Authority regarding Taxes for which the Company may be liable; and (ii) no written claim has been made by a Governmental Authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction or is obliged to act as withholding agent under the laws of that jurisdiction.

27

                    TP000089

(e)     There are no Tax Liens (other than Taxes not yet due and payable) on any of the assets, rights or properties of the Company.

(f)     The Company is not a party to or bound by or has a continuing obligation under any agreement providing for the allocation, sharing or indemnification of Taxes.

(g)     The Company (A) is not and has never been a member of an affiliated group (other than a group the common parent of which is Company) filing a consolidated federal income Tax Return or (B) has any liability for Taxes of any person arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law, or as a transferee or successor, by contract, or otherwise.

(h)     The Company has not taken any action or knows of any fact or circumstance that could reasonably be expected to prevent the Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code.

(i)     The Company has not executed or entered into a closing agreement pursuant to Section 7121 of the Code or any predecessor provision thereof or any similar provision of state, local or foreign law.

(j)     The Company has not been either a "distributing corporation" or a "controlled corporation" in a distribution occurring during the last five years in which the parties to such distribution treated the distribution as one to which Section 355 of the Code is applicable.

(k)     The Company will not be required to include amounts in income, or exclude items of deduction, in a taxable period beginning after the Closing Date as a result of (i) a change in method of accounting occurring prior to the Closing Date, (ii) an installment sale or open transaction arising in a taxable period (or portion thereof) ending on or before the Closing Date, (iii) a prepaid amount received, or paid, prior to the Closing Date or (iv) deferred gains arising prior to the Closing Date.

(l)     The Company has not engaged in any transaction that could reasonably be expected to give rise to (i) a list maintenance obligation with respect to any Person under Section 6112 of the Code or the regulations thereunder or (ii) a disclosure obligation as a "reportable transaction" under Section 6011 of the Code and the regulations thereunder.

3.11   Title to Assets; Leases.

(a)     Section 3.11(a) of the Company Disclosure Schedule sets forth the tangible properties and assets, real, personal and mixed, used and/or held for use in the conduct of the business of the Company with an individual value of more than $200,000. The Company has good title to all of their material real or personal properties (whether owned or leased), free and clear of all Liens other than Permitted Liens.

(b)     The Company does not own any real property or interest therein. Section 3.11(b) of the Company Disclosure Schedule contains a list of all leases of real property to which the Company is a party or by which any of them holds a leasehold interest (collectively, "Real Property"), and a true and correct copy of each such lease has been provided to Parent.

28

Each Real Property lease to which the Company is a party is in full force and effect in accordance with its terms. All rents and additional rents due to date from the Company on each such lease have been paid. The Company has not received written notice that it is in material default thereunder. There exists no default by the Company under such lease, except for defaults that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. There are no leases, subleases, licenses, concessions or any other Contracts to which the Company is a party granting to any Person other than the Company any right to possession, use occupancy or enjoyment of any of the Real Property or any portion thereof. The Company is not obligated under or bound by any option, right or first refusal, purchase Contract, or other Contract to sell or otherwise dispose of any Real Property or any other interest in any Real Property.

3.12    Intellectual Property.

(a)    Section 3.12(a) of the Company Disclosure Schedule sets forth all Intellectual Property registrations and applications (together with patent, registration or serial numbers and country or jurisdiction) owned by or purported to be owned by the Company ("Company Registered IP"). All of the above patents, registrations and applications are unexpired, are current with respect to all necessary filings and fees, and, to the knowledge of Seller are valid and enforceable. No actions are due within 90 days after the Effective Date to prosecute, maintain and perfect same. All Intellectual Property owned or purported to be owned by the Company is owned free of all Liens other than Permitted Liens.

(b)    The (i) Company owns, has a license or other right to use all of the Intellectual Property used or held for use in the conduct of its business as currently conducted or proposed to be conducted by the Company in accordance with current contractual commitments and (ii) Company's operation of the business as currently conducted or as currently proposed to be conducted by the Company in accordance with current contractual commitments and its use of Intellectual Property in connection therewith does not infringe (either directly or under a contributory, vicarious or inducement theory), misappropriate, violate or otherwise breach ("Infringe") the Intellectual Property rights of any Person. No Person is Infringing the material Intellectual Property (or accessing, using, modifying or disclosing without authorization any confidential Intellectual Property) used or held for use in the business as currently conducted. The Company takes all necessary actions consistent with its reasonable business judgment to maintain and protect its material Intellectual Property, including trade secrets and confidential information. All Persons (including current and former employees and independent contractors) who create or contribute to material proprietary Intellectual Property owned by the Company have assigned to such parties in writing all of their rights therein that did not initially vest with the Company by operation of law.

(c)    The Company has obtained certain trademark searches in connection with the operation of its business in certain countries and jurisdictions as it determined to be appropriate in its discretion.

(d)    Section 3.12(d) of the Company Disclosure Schedule sets forth certain policies and procedures that the Company has implemented with respect to Infringement (the "IP

HIGHLY CONFIDENTIAL

Policies"). The Company has operated their business in compliance with the IP Policies in all material respects.

(e) The Company complies with all U.S. and state Laws, and to the Company's Knowledge with all foreign and multinational Laws, with respect to the protection of personal privacy, personally identifiable information regulated thereunder, sensitive personal information and any special categories of personal information (including that of its website visitors, clients, customers and those persons included in any demographic or other analyses performed for clients), whether any of same is accessed or used by the Company.

3.13 Privacy and Security.

(a) The Company takes necessary or desirable actions consistent with industry practice to protect the confidentiality, integrity and security of their Systems (and all information and transactions and content stored or contained therein or transmitted thereby) against any unauthorized use, access, interruption, modification or corruption.

(b) Section 3.13(b) of the Company Disclosure Schedule sets forth a description of the backup systems maintained by the Company.

3.14 Material Contracts.

(a) Section 3.14(a) of the Company Disclosure Schedule sets forth a true and complete list of all of the following Contracts to which the Company is a party or by which any of its properties, rights or assets are bound as of the Effective Date (collectively, together with those entered into after the Effective Date and prior to the Effective Time, "Material Contracts"):

(i) employment Contracts for the employment of any individual on a full-time or part-time basis (other than contracts providing for at-will employment) or consulting Contracts with any employee or consultant of the Company under which the Company has any current or future monetary Liability, and all severance, change in control or similar Contracts with any current or former Company Stockholders , directors, officers, employees, consultants or agents of the Company that obligate the Company to make any payment to any current or former Company Stockholders , directors, officers, employees, consultants or agents of the Company following either the consummation of the transactions contemplated hereby, termination of employment (or the relevant relationship), or both;

(ii) labor or collective bargaining Contracts (if any);

(iii) Contracts reasonably likely to involve revenues, receipts, expenditures or liabilities individually in excess of $100,000 per annum or $500,000 per annum in the aggregate;

(iv) Contracts that contain any uncapped indemnification or similar obligations of the Company that could reasonably be expected to result in $100,000 or more of liabilities of the Company under such Contract;

30

(v)   promissory notes, loans, indentures, evidences of Indebtedness or other instruments and Contracts relating to the borrowing or lending of money, whether as borrower, lender or guarantor and any interest rate swaps, caps, floors or option Contracts or any other interest rate risk management arrangement or foreign exchange Contracts;

(vi)   any Contract creating a Lien (other than a Permitted Lien) upon any assets, rights or properties (including any such Liens placed on the Company Intellectual Property), other than purchase money security interests in connection with the acquisition of equipment in the Ordinary Course of Business;

(vii)   Contracts containing any limitation on the freedom of the Company or affiliates to engage in any line of business or compete with any Person or operate at any location in the world;

(viii)   joint venture or partnership agreements or Contracts creating or governing any similar arrangements;

(ix)   Contracts that grant a power of attorney, agency or similar authority to another Person;

(x)   content, development, distribution or similar Contracts pursuant to which any third party is entitled or obligated to develop or distribute any content or products or provide any services on behalf of the Company or pursuant to which the Company is entitled or obligated to develop or distribute any content or products or provide any services on behalf of any third party other than the Company's standard form of click-through agreement entered into in the Ordinary Course of Business with end users;

(xi)   Contracts for the acquisition, directly or indirectly (by merger or otherwise) of assets, rights or properties (whether tangible or intangible), including any capital stock of another Person, for consideration in excess of $75,000;

(xii)   Contracts for the sale of assets or properties (including Equity Interests) of the Company after the Effective Date, other than (A) the disposition of unused and obsolete equipment in immaterial amounts, (B) sales of products from the websites of the Company in the Ordinary Course of Business;

(xiii)   Contracts involving the issuance or repurchase of any capital stock of the Company, other than, with respect to the issuance of Common Stock, the options or warrants listed in Section 3.3(a) of the Company Disclosure Schedule or relating to the transfer, voting or encumbering of any share of Company Stock;

(xiv)   performance or payment guarantees, keep well arrangements and other similar credit support obligations or arrangements;

(xv)   leases or subleases in respect of (a) any Real Property or (b) any material rights, assets or property;

31

(xvi)   Contracts under which the Company has granted or received exclusive rights; and

(xvii)   Contracts concerning the licensing or acquisition of Intellectual Property, including licenses, development agreements, option agreements, website hosting and service agreements, online advertising agreement, software escrow agreements, "open source," "copyleft" or other similar types of license (including any GNU, Mozilla, Berkeley, Open Source, MIT or Apache licenses), excluding nondisclosure agreements, commercially available licenses, "off-the-shelf" licenses for back-office functions or the operation of the Company's websites and excluding click-through licenses with end users.

True and complete copies of all Material Contracts have been made available to Parent by the Company. Section 3.14(a) of the Company Disclosure Schedule separately sets forth a true and complete list of all Contracts that would purport to bind Parent or any of its Affiliates (other than the Company) following the consummation of the Merger.

(b)   Each Material Contract is in full force and effect, is a valid and binding obligation of the Company and, to the Company's Knowledge, of each other party thereto and is enforceable, in accordance with its terms, against the Company and, to the Company's Knowledge, against each other party thereto, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing, and such Material Contracts will continue to be valid, binding and enforceable in accordance with their respective terms and in full force and effect immediately following the consummation of the transactions contemplated hereby, with no material alteration or acceleration or increase in fees or liabilities, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

(c)   The Company is in compliance with all applicable terms and requirements of each Material Contract under which the Company has any obligation or liability or by which any of the Company's assets, rights or properties is bound, except to the extent any non-compliance would not have a Material Adverse Effect.

(d)   The Company has not given to, or received from, any other Person, at any time during the prior twelve months, any written notice regarding any actual or alleged violation or breach of, or default under, any Material Contract.

(e)   No party to such Contract has repudiated any material provision of the Contract to the Company in writing.

3.15   _Absence of Restrictions on Business Activities_. There is no Contract or Order binding upon the Company or any of its properties, rights or assets which has had or could reasonably be expected to have the effect of prohibiting or materially impairing the business of

HIGHLY CONFIDENTIAL                                                                TP000094

Parent, the Company or any of Parent's Subsidiaries or the conduct of business by Parent, the Company or any of Parent's Subsidiaries, following the consummation of the Merger. The Company is not subject to any non-competition, non-solicitation, standstill or similar restriction on their respective businesses. The Company has not granted any exclusive rights of any kind.

3.16    Insurance. Section 3.16 of the Company Disclosure Schedule sets forth a true and complete list of all insurance policies and fidelity bonds covering the assets, rights, business, equipment, properties, operations, employees, consultants, officers and directors of the Company. Section 3.16 of the Company Disclosure Schedule sets forth a true and complete list of all pending claims made pursuant to each such insurance policy carrier (including any predecessor policy) and there is no claim by the Company pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds. All premiums payable under all such policies and bonds have been paid and, to the Knowledge of the Company, the Company is otherwise in full compliance with the terms of such policies and bonds (or other policies and bonds providing substantially similar insurance coverage), and the Company shall maintain in full force and effect all such insurance during the period from the Effective Date through the Closing Date. To the Knowledge of the Company, there is not any threatened termination of or material premium increase with respect to any of such policies or bonds.

3.17    Absence of Action. There is no (a) Action pending on behalf of or against or, to the Knowledge of the Company, Threatened (including cease and desist letters or requests or invitations for a license) on behalf of or against the Company or any of its properties, rights or assets or (b) Action which questions or challenges (i) the validity of this Agreement or the Escrow Agreement or (ii) any action taken or to be taken by the Company pursuant to this Agreement or any of the other Transaction Agreements or in connection with the transactions contemplated hereby. The Company is not subject to any outstanding Action or Order, and the Company has not received any demand letter or similar written request with respect to any outstanding Action or Order. There is no material Action which the Company intends to initiate.

3.18    Employment and Labor Matters.

(a)      Section 3.18(b) of the Company Disclosure Schedule identifies (i) all directors and officers of the Company and (ii) all employees and consultants employed or engaged by the Company and, for each individual identified in clauses (i) or (ii), sets forth each such individual's rate of pay or annual compensation, job title and date of hire, the number and type of shares of Company Stock, Company Options and Company Warrants (or other options, warrants or similar rights to acquire shares of Company Stock) beneficially owned or held by · such individual, current paid time-off eligibility for the current calendar year (including accrued paid time off from prior years), leave status (including type of leave, and, to the extent provided by the employee, the stated return or leave expiration date), visa status, prior employment termination notice period required (if any) eligibility for company car, and average overtime payments, if any, per month for the preceding twelve-month period. To the Company's Knowledge, none of the Company's employment policies or practices is currently being audited or investigated by any Governmental Authority or Court. To the Company's Knowledge, there is no pending or Threatened Action, unfair labor practice charge, or other charge or inquiry against the Company brought by or on behalf of any Company Employee, prospective employee,

33

labor organization or other employee representative, or other individual or any Governmental Authority with respect to employment policies or practices brought by or before any Court or Governmental Authority.

(b) To the Company's Knowledge, there are no controversies pending or Threatened, between the Company and any Company Employee. The Company is not a party to any collective bargaining agreement or other written labor union contract applicable to Persons employed by the Company, nor are there, to the Company's Knowledge, any activities or proceedings of any labor union to organize any such Company Employee. There have been no strikes, slowdowns, work stoppages, disputes, or lockouts, by or with respect to any Company Employee. To the Knowledge of the Company, there are no material employment-related grievances pending or Threatened. The Company is not a party to, or otherwise bound by, any consent decree with, or citation or other Order by, any Governmental Authority relating to Company Employees or employment policies or practices. The Company is in material compliance with all applicable Laws, contracts, and policies relating to employment, employment practices, wages, hours, and terms and conditions of employment, including the obligations of the Worker Adjustment and Retraining Notification Act of 1988, as amended ("WARN"), and all other notification and bargaining obligations arising under any collective bargaining agreement, by Law or otherwise. The Company has not effectuated a "plant closing" or "mass layoff" as those terms are defined in WARN, affecting in whole or in part any site of employment, facility, operating unit or employee of the Company, without complying with all provisions of WARN or implemented any early retirement, separation or window program, nor has the Company planned or announced any such action or program for the future. To the Company's Knowledge, there are no pending or Threatened or reasonably anticipated claims or actions against the Company or any Company trustee under any worker's compensation policy or long-term disability policy. The services provided by each of the Company Employees is terminable at the will of the Company and any such termination would result in no Liability to the Company. Except as would not reasonably be expected to have a Company Material Adverse Effect, and to the extent required by Law or by Contract, with respect to Company Employees, the Company has (i) withheld and reported all amounts required to be withheld and reported with respect to wages, salaries and other payments to Company Employees, (ii) is not liable for any arrears in wages, severance pay or any taxes or any penalty for failure to comply with any of the foregoing, and (iii) is not liable for any payment to any trust or other fund governed by or maintained by or on behalf of any Governmental Authority with respect to unemployment compensation benefits, social security or other benefits or obligations for Company Employees (other than routine payments to be made in the normal course of business and consistent with past practice).

3.19 Employee Benefit Plans and Agreements.

(a) Section 3.19(a) of the Company Disclosure Schedule contains a true and complete list of each "employee benefit plan" (within the meaning of Section 3(3) of the ERISA, and all stock purchase, stock option, severance, employment, change-in-control, welfare benefit, fringe benefit, bonus, incentive, compensation, deferred compensation, employee loan and all other employee benefit plans, agreements, programs and policies, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise), whether formal or

34

informal, oral or written, funded or unfunded under which (i) any current or former employee, director, consultant or independent contractor of the Company (the "Company Employees") has any present or future right to benefits and which are, or are required to be, contributed to, sponsored by or maintained by the Company or any other current or former person or entity under common control with the Company within the meaning of Section 4145(b), (c), (m), or (o) of the Code and the regulations issued thereunder ("ERISA Affiliate"), or (ii) the Company or any of its ERISA Affiliates may have any present or future Liability. All such plans, agreements, programs, policies and arrangements shall be collectively referred to as the "Employee Plans".

        (b)      With respect to each Employee Plan, the Company has made available to the Parent a current, accurate and complete copy (or, to the extent no such copy exists, an accurate description) thereof and all amendments thereto and, to the extent applicable: (i) any related trust agreement or other funding instrument; (ii) the most recent determination letter, if applicable; (iii) any summary plan description and other written communications (or a description of any oral communications) by the Company to the Company Employees concerning the extent of the benefits provided under a Employee Plan; (iv) all material written agreements and contracts relating to each Employee Plan, including administrative service agreements and group insurance contracts; (v) all correspondence to and from any government agency; (vi) all Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, ("COBRA") forms and related notices; (vii) the form of all Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA") Privacy Notices and all Business Associate Agreements to the extent required under HIPAA; (viii) all policies relating to fiduciary liability insurance covering the fiduciaries of the Company; (ix) all registration statements, annual reports (Form 11-K and all attachments thereto) and prospectuses; and (x) for the most recent year (to the extent such reports are due and completed) (A) the Form 5500 and attached schedules, (B) audited financial statements, (C) actuarial valuation reports and (D) discrimination tests.

        (c)      (i) Each Employee Plan has been established and administered in all material respects in accordance with its terms, and, to the extent applicable, in material compliance with the applicable provisions of ERISA, the Code and other applicable Laws; (ii) each Employee Plan which is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination or opinion letter as to its qualification, and, to the Company's Knowledge, nothing has occurred, whether by action or failure to act, that could reasonably be expected to cause the loss of such qualification; (iii) to the Company's Knowledge, no event has occurred and no condition exists that would subject the Company, either directly or by reason of their affiliation with ERISA Affiliates, to any tax, fine, lien, penalty or other liability imposed by ERISA, the Code or other applicable Laws; (iv) no nonexempt "prohibited transaction" (as such term is defined in Section 406 of ERISA and Section 4975 of the Code) has occurred with respect to any Employee Plan; (v) no Employee Plan is a split-dollar life insurance program or otherwise provides for loans to executive officers (within the meaning of The Sarbanes-Oxley Act of 2002); and (vi) the Company has not incurred any current or projected liability in respect of post-employment or post-retirement health, medical or life insurance benefits for current, former or retired employees of the Company, except as required to avoid an excise tax under Section 4980B of the Code or otherwise except as may be required pursuant to any other applicable law.

HIGHLY CONFIDENTIAL

(d)    No Employee Plan is an "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA) that is subject to Part 3 of Subtitle B of Title I of ERISA, Title IV of ERISA or Section 412 of the Code, and neither the Company nor any ERISA Affiliate has an obligation to contribute, or has incurred (or will reasonably be expected to incur) any liability in respect of a contribution, to any such plan.  No Employee Plan is a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA) and neither the Company nor any ERISA Affiliate has at any time sponsored or contributed to, or has or had any liability or obligation in respect of, any multiemployer plan or to any plan described in Section 413 of the Code.

(e)    Neither the Company nor any ERISA Affiliate has ever maintained, established, sponsored, participated in or contributed to any self-insured plan that provides benefits to Company Employees (including any such plan pursuant to which a stop-loss policy or contract applies).

(f)    Neither the Company nor any ERISA Affiliate has ever maintained, established, sponsored, participated in, or contributed to any Employee Plan with respect to which the Company nor any ERISA Affiliate will or may have any liability, for the benefit of Company Employees who perform services outside the United States.

(g)    Except as would not reasonably be expected to have a Company Material Adverse Effect, the Company and each ERISA Affiliate has, prior to the Effective Time, complied with COBRA, HIPAA, the Family Medical Leave Act, the Women's Health and Cancer Rights Act of 1998, the Newborns' and Mothers' Health Protection Act of 1996, and any similar provisions of foreign or state Law applicable to Company Employees.  To the Knowledge of the Company, the Company has no unsatisfied obligations to any Company Employees or qualified beneficiaries pursuant to COBRA, HIPAA or any state Law governing health care coverage or extension.

(h)    Except as would not reasonably be expected to have a Company Material Adverse Effect, each of the Company and its ERISA Affiliates has classified all individuals who perform services for it correctly under the Employee Plans, ERISA and the Code as common law employees, independent contractors or leased employees.

(i)    With respect to any Employee Plan, (i) no actions, suits or claims (other than routine claims for benefits in the ordinary course) are, to the Company's Knowledge, pending or threatened, (ii) to the Company's Knowledge, no facts or circumstances exist that could give rise to any such actions, suits or claims, (iii) no written or oral communication has been received from the Pension Benefit Guaranty Corporation (the "PBGC") in respect of any Employee Plan subject to Title IV of ERISA concerning the funded status of any such plan or any transfer of assets and liabilities from any such plan in connection with the transactions contemplated herein, and (iv) to the Company's Knowledge, no administrative investigation, audit or other administrative proceeding by the Department of Labor, the PBGC, the Internal Revenue Service or other governmental agencies are pending, threatened or in progress (including any routine requests for information from the PBGC).  Neither the Company nor any of its ERISA Affiliates is subject to any penalty or tax with respect to any Employee Plan under Section 502(i) of ERISA or Sections 4975 through 4980 of the Code.  The Company and each of

36