its ERISA Affiliates has timely made all contributions and other payments required by and due under the terms of each Employee Plan.

(j)     No Employee Plan exists that, as a result of the execution of this Agreement, shareholder approval of this Agreement, or the transactions contemplated by this Agreement (whether alone or in connection with any subsequent event(s)), could (i) result in severance pay or any increase in severance pay upon any termination of employment after the Effective Date, (ii) accelerate the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any of the Employee Plans, (iii) limit or restrict the right of the Company to merge, amend or terminate any of the Employee Plans, (iv) cause the Company to record additional compensation expense on its income statement with respect to any outstanding Company Option, (v) result in "parachute payments" (as defined in Section 280G of the Code), including any payments under any of the Employee Plans which would not be deductible under Section 280G of the Code.

(k)     Each "nonqualified deferred compensation plan" (as defined in Section 409A(d)(1) of the Code) has been operated since January 1, 2005 in good faith compliance with Section 409A of the Code and IRS Notice 2005-1. No qualified deferred compensation plan has been "materially modified" (within the meaning of IRS Notice 2005-1) at any time after October 3, 2004. No Employee Plan provides any Company Employee with any amount of additional compensation if such Company Employee is provided compensation subject to the excise taxes applicable under Section 409A or 4999 of the Code.

(l)     There has been no amendment to, written interpretation of or announcement (whether or not written) by Company relating to, or any change in employee participation or coverage under, any Employee Plan that would increase the expense of maintaining such Employee Plan above the level of the expense incurred in respect thereof for the most recent fiscal year ended prior to the Effective Date except increases in premiums made by applicable insurance carriers.

(m)     The Company has not made any plan or commitment to establish, modify or enter into any new Employee Plan (except to the extent required by law or to conform any such Employee Plan to the requirements of any applicable law, or as required by this Agreement). To the Company's Knowledge, no Company Employee listed on Section 3.19(a) of the Company Disclosure Schedule intends to terminate his or her employment for any reason. Section 3.19(a) of the Company Disclosure Schedule contains an accurate and complete list of all persons that currently have a consulting or advisory relationship with the Company.

(n)     To the Company's Knowledge, no stockholder, or Company Employee is obligated under any Contract, subject to any Order of any Governmental Authority that would interfere with such Person's efforts to promote the interests of the Company or that would interfere with the Company's business. Neither the execution nor delivery of this Agreement, nor the carrying on of the Company's business as presently conducted or proposed to be conducted nor any activity of such Company Employees in connection with the carrying on of the Company's business as presently conducted or proposed to be conducted will, to the Company's Knowledge, conflict with or result in a breach of the terms, conditions, provisions of,

37

HIGHLY CONFIDENTIAL                                    TP000099

or constitute a default under, any contract or agreement under which any of such Company Employees are now bound.

3.20    Environmental, Health and Safety Matters.

(a)    Except as would not reasonably be expected to have a Company Material Adverse Effect: (i) the Company is in compliance with all Environmental, Health and Safety Requirements in connection with the ownership, use, maintenance or operation of its business or assets or properties; (ii) there are no pending, or to the Company's Knowledge, any threatened allegations by any Person that the properties or assets of the Company are not, or that its business has not been conducted, in compliance with all Environmental, Health and Safety Requirements; (iii) the Company has not retained or assumed any Liability of any other Person under any Environmental, Health and Safety Requirements; and (iv) to the Knowledge of the Company, there are no past or present facts, circumstances of conditions that would reasonably be expected to give rise to any Liability of the Company with respect to Environmental, Health and Safety Requirements.

(b)    The Company has made available to Parent a copy of all studies, audits, assessments or investigations containing material information concerning compliance with, or liability or obligations under, Environmental, Health and Safety Requirements affecting the Company that are in the possession or control of the Company, each of which is identified in Section 3.20 of the Company Disclosure Schedule.

3.21    Export Control Laws.

(a)    The Company has at all times conducted its export transactions in accordance with (i) all applicable U.S. export and reexport controls, including the United States Export Administration Act and Regulations and Foreign Assets Control Regulations and (ii) all other applicable import/export controls in other countries in which the Company conducts business. Without limiting the foregoing:

(i)    the Company has obtained all export and import licenses, license exceptions and other consents, notices, waivers, approvals, orders, authorizations, registrations, declarations and filings with any Governmental Authority required for (x) the export, import and reexport of products, services, software and technologies and (y) releases of technologies and software to foreign nationals located in the United States and abroad ("Export Approvals");

(ii)    the Company is in compliance with the terms of all applicable Export Approvals;

(iii)    there are no pending or, to the Knowledge of the Company, threatened claims against the Company with respect to such Export Approvals;

(iv)    to the Knowledge of the Company, there are no actions, conditions or circumstances pertaining to the Company's export transactions that may give rise to any future claims; and

38

(v)     no Export Approvals for the transfer of export licenses to Parent or the Surviving Corporation are required, or such Export Approvals can be obtained expeditiously without material cost.

(b)     Section 3.21(b) of the Company Disclosure Schedule sets forth the true, complete and accurate export control classifications applicable to the Company's products, services, software and technologies.

3.22     No Restrictions on the Merger; Takeover Statutes. No "fair price", "moratorium", "control share acquisition" or other similar antitakeover statute or regulation enacted under state or federal laws in the United States (with the exception of Section 203 of the DGCL) ("Takeover Statutes") is applicable to the Merger or the other transactions contemplated hereby. The action of the Board of Directors of the Company in approving this Agreement and the transactions contemplated hereby and thereby is sufficient to render inapplicable to this Agreement and the transactions contemplated hereby and thereby the restrictions on "business combinations" (as defined in Section 203 of the DGCL) as set forth in Section 203 of the DGCL. Complete and correct copies of the resolutions referred to above have been delivered to Parent on or prior to the Effective Date.

3.23     Certain Business Practices. To the Company's Knowledge, neither the Company nor any director, officer, employee, consultant or agent of the Company has (i) used any funds for unlawful contributions, gifts, entertainment or other unlawful payments relating to political activity, (ii) made any unlawful payment to any foreign or domestic government official or employee or to any foreign or domestic political party or campaign or violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, (iii) consummated any transaction, made any payment, entered into any Contract or arrangement or taken any other action in violation of Section 1128B(b) of the Social Security Act, as amended, or (iv) made any other unlawful payment.

3.24     Interested Party Transactions. There are no existing, and since December 31, 2005 there has been no Contract, transaction, Indebtedness or other arrangement (including any direct or indirect ownership interest in any property or assets used in or necessary for use in the conduct of business by the Company), or any related series thereof, between the Company, on the one hand, and any of the directors, officers, Company Stockholders or other Affiliates of the Company, or any of their respective Affiliates or family members, on the other (except for amounts due as normal salaries and bonuses or amounts due under employment agreements and in reimbursement of ordinary expenses in the Ordinary Course of Business). All such Contracts, transactions, Indebtedness and other arrangements shall be terminated (except for amounts due as normal salaries and bonuses or amounts due under employment agreements and in reimbursement of ordinary expenses) on or prior to the Closing Date without any liability or obligation of the Company.

3.25     Brokers or Finders. The Company has not employed any broker or finder, or incurred any liability for any brokerage or finders' fees or any similar fees or commissions in connection with the transactions contemplated by this Agreement. The Company has heretofore furnished to Parent true and complete copies of all agreements pursuant to which any Person

39

identified on in Section 3.25 of the Company Disclosure Schedule would be entitled to any payment relating to the Merger and the other transactions contemplated by this Agreement.

3.26 <u>Disclaimer of Other Representations and Warranties</u>. The Company does not make, and has not made, any representations or warranties in connection with the Merger and the transactions contemplated hereby other than those expressly set forth herein. Except as expressly set forth herein, no Person has been authorized by the Company to make any representation or warranty relating to the Company or its business, or otherwise in connection with the Merger and the transactions contemplated hereby and, if made, such representation or warranty may not be relied upon as having been authorized by the Company.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF STOCKHOLDER PARTIES

Each of the Stockholder Parties, severally and not jointly, represents and warrants to Parent and Merger Sub as follows:

4.1 <u>Authority; Enforceability</u>. Such Stockholder Party has all requisite power and authority to execute and deliver this Agreement and each of the other Transaction Agreements to which such Person is a party, and each instrument required to be executed and delivered by it at the Closing, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. With respect to each such Stockholder Party that is not an individual, the execution and delivery by such Stockholder Party of this Agreement, each of the other Transaction Agreements to which such Person is a party and each instrument required to be executed and delivered by it at the Closing and the performance of their respective obligations hereunder and thereunder have been duly and validly authorized, and no other proceedings on the part of such Stockholder Party are necessary to authorize the consummation of the transactions contemplated hereby. This Agreement and each of the other Transaction Agreements to which such Stockholder Party is a party have been duly executed and delivered by such Stockholder Party and, assuming due authorization, execution and delivery hereof by the other parties hereto and thereto, constitute legal, valid and binding obligations of such Stockholder Party, enforceable against such Stockholder Party in accordance with their terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

4.2 <u>No Conflict; Required Filings and Consents.</u>

(a) The execution and delivery by such Stockholder Party of this Agreement and each of the other Transaction Agreements to which such Person is a party do not, and the performance of this Agreement and the other Transaction Agreement to which such Person is a party will not, (i) conflict with the organizational documents of such Stockholder Party (if not an individual), or (ii) conflict with or violate in any material respect any Law or Order in each case applicable to such Stockholder Party or by which such Person's properties, rights or assets is bound or affected.

40

HIGHLY CONFIDENTIAL

(b)     The execution and delivery by such Stockholder Party of this Agreement do not, and the performance by such Stockholder Party of this Agreement will not, require such Stockholder Party to obtain the Approval of any Person or Governmental Authority, except for antitrust filings under the HSR Act or any applicable foreign jurisdictions.

4.3     Investment Representations.

(a)     Such Stockholder Party is acquiring the Parent Common Stock for its own account for investment and not with a view to, or for sale in connection with, any distribution thereof, nor with any present intention of distributing or selling the same; and, except as contemplated by this Agreement and the Exhibits hereto, such Stockholder Party has no present or contemplated agreement, undertaking, arrangement, obligation, indebtedness or commitment providing for the disposition thereof.

(b)     Such Stockholder Party is an "accredited investor" as defined in Rule 501(a) under the Securities Act of 1933.

(c)     Such Stockholder Party has carefully reviewed the representations concerning Parent contained in this Agreement and has made detailed inquiry concerning Parent, its business and its personnel; the officers of Parent have made available to such Stockholder Party any and all written information which it has requested and have answered to such Stockholder Party's satisfaction all inquiries made by such Stockholder Party; and such Stockholder Party has sufficient knowledge and experience in finance and business that such Person is capable of evaluating the risks and merits of its investment in Parent and such Stockholder Party is able financially to bear the risks thereof. Such Stockholder Party has not been presented with or solicited by or through any leaflet, public promotional meeting, television advertisement or any other form of general advertising or solicitation in connection and concurrently with this Agreement and the transactions contemplated hereby

(d)     Such Stockholder Party understands that the Parent Common Stock issuable in the Merger has not been registered under the Securities Act and are "restricted securities" within the meaning of Rule 144 under the Securities Act; and such Parent Common Stock cannot be sold, transferred or otherwise disposed of unless the resale of such shares is subsequently registered under the Securities Act or an exemption from registration is then available.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Subject to the exceptions and disclosures set forth in writing in the disclosure letter delivered by Parent to the Company on the Effective Date (the "Parent Disclosure Letter"), each of the Parent and Merger Sub, jointly and severally, represents and warrants to the Company and the Stockholder Parties as follows:

5.1     Organization and Qualification. Parent is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all the requisite

41

HIGHLY CONFIDENTIAL

corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted. Merger Sub is a corporation duly incorporated, validly existing and in good standing under the laws of the state of Delaware. Merger Sub is a newly-formed entity that has been formed solely for the purposes of the Merger and will not carry on any business or engage in any activities other than those reasonably related to the Merger.

5.2 Authority; Enforceability. Each of Parent and Merger Sub has all requisite corporate power and authority to execute and deliver this Agreement and each of the other Transaction Agreements to which such Person is a party, and each instrument required to be executed and delivered by it at the Closing, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each of Parent and Merger Sub of this Agreement, each of the other Transaction Agreements to which such Person is a party and each instrument required to be executed and delivered by it at the Closing and the performance of their respective obligations hereunder and thereunder have been duly and validly authorized by the Board of Directors of each of Parent and Merger Sub and, immediately following the execution hereof, by Parent as the sole stockholder of Merger Sub. Except for filing of the Certificate of Merger, no other corporate proceedings on the part of Parent or Merger Sub are necessary to authorize the consummation of the transactions contemplated hereby. This Agreement and each of the other Transaction Agreements to which Parent or Merger Sub is a party have been duly executed and delivered by each of Parent and Merger Sub (as the case may be) and, assuming due authorization, execution and delivery hereof by the Company, constitute legal, valid and binding obligations of each of Parent and Merger Sub, enforceable against each of Parent and Merger Sub in accordance with their terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

5.3 No Conflict; Required Filings and Consents.

(a) The execution and delivery by Parent and Merger Sub of this Agreement and each of the other Transaction Agreements to which such Person is a party do not, and the performance of this Agreement and each of the other Transaction Agreements to which such Person is a party by Parent or Merger Sub will not, (i) conflict with or violate the certificate of incorporation or bylaws of Parent or the certificate of incorporation or bylaws of Merger Sub, or (ii) conflict with or violate in any material respect any Law or Order in each case applicable to Parent or Merger Sub or by which its or any of their respective properties, rights or assets is bound or affected.

(b) The execution and delivery by Parent and Merger Sub of this Agreement do not, and the performance by Parent and Merger Sub of this Agreement shall not, require Parent or Merger Sub to obtain the Approval of, observe any waiting period imposed by, or make any filing with or notification to, any Person or Governmental Authority, except for the filing of the Certificate of Merger in accordance with Delaware law, antitrust filings under the HSR Act or any applicable foreign jurisdictions, compliance with applicable requirements of the Securities Act and compliance with any applicable foreign of state securities or "blue sky" laws, such

42

Approvals as have already been obtained and such Approvals as would not have a Parent Material Adverse Effect.

5.4    Absence of Action. As of the Effective Date, there is no material Action pending against or, to the Knowledge of Parent, threatened against Parent or Merger Sub which questions or challenges (i) the validity of this Agreement or the Escrow Agreement or (ii) any action taken or to be taken by Parent or Merger Sub pursuant to this Agreement or the Escrow Agreement or in connection with the transactions contemplated hereby.

5.5    Merger Sub. The authorized capital stock of Merger Sub consists solely of 1,000 shares of Merger Sub Common Stock. There are 100 shares of Merger Sub Common Stock issued and outstanding, all of which are held directly by Parent. All of the outstanding shares of Merger Sub Common Stock have been duly authorized and validly issued and are fully paid and nonassessable. Merger Sub was formed by Parent solely for the purpose of consummating the Merger and the other transactions contemplated by this Agreement. Merger Sub does not hold, nor has it held, any assets or incurred any liabilities, nor has Merger Sub carried on any business activities, other than in connection with the Merger and the transactions contemplated by this Agreement.

5.6    Parent Common Stock. The shares of Parent Common Stock to be issued pursuant to ARTICLE 2 of this Agreement have been duly authorized and when issued and delivered in accordance with the terms of this Agreement will have been validly issued and will be fully paid and non-assessable and the issuance thereof is not subject to any preemptive or other similar right.

5.7    Parent SEC Filings. Parent has delivered to the Company its annual report on Form 10-K for its fiscal year ended December 31, 2005, its quarterly reports on Form 10-Q for its fiscal quarters ended March 31, 2006 and June 30, 2006 and each of its reports or registration statements filed with the SEC since January 1, 2006. As of its filing date, each such report or statement filed pursuant to the 1934 Act did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. Each such registration statement, as amended or supplemented, if applicable, filed pursuant to the 1933 Act did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. The audited consolidated financial statements and unaudited consolidated interim financial statements included in the Form 10-K and Form 10-Qs referred to in the first sentence of this Section 5.7 were prepared in accordance with GAAP (except, in the case of the unaudited financial statements, for the absence of footnote disclosure) applied on a consistent basis throughout the periods involved and fairly present, in all material respects, the consolidated financial position of Parent and its Subsidiaries as at the respective dates thereof and the consolidated results of its operations and cash flows for the periods indicated.

5.8    Disclaimer of Other Representations and Warranties. Parent and Merger Sub do not make, and have not made, any representations or warranties in connection with the Merger and the transactions contemplated hereby other than those expressly set forth herein. Except as expressly set forth herein, no Person has been authorized by Parent or Merger Sub to make any

43

representation or warranty relating to Parent or Merger Sub or their respective businesses, or otherwise in connection with the Merger and the transactions contemplated hereby and, if made, such representation or warranty may not be relied upon as having been authorized by Parent or Merger Sub.

## ARTICLE 6

## COVENANTS

6.1     Operation of the Company Prior to Closing. The Company covenants and agrees that, between the execution hereof and the Effective Time, except as expressly contemplated by this Agreement or unless Parent shall otherwise consent in writing in advance, the Company shall conduct its business in the Ordinary Course of Business and in compliance in all material respects with all applicable Laws. The Company shall use its commercially reasonable efforts to preserve intact the business organization and assets, rights and properties (including Intellectual Property) of the Company, to keep available the services of the present officers and key employees of the Company, to maintain in effect Material Contracts and to preserve the present relationships of the Company with the material customers, clients, licensees, suppliers and other Persons with which the Company has significant business relations. By way of amplification and not limitation, between the execution hereof and the Effective Time, except as expressly contemplated by this Agreement or as set forth in Section 6.1 of the Company Disclosure Schedule, the Company shall not directly or indirectly do any of the following without the prior written consent of Parent:

(a)     amend or otherwise change the Certificate of Incorporation or bylaws or equivalent organizational documents of the Company or alter through merger, liquidation, reorganization, restructuring or in any other fashion the corporate structure or ownership of the Company, or create or form any Subsidiary;

(b)     issue, grant, sell, transfer; deliver, pledge, promise, dispose of or encumber, or authorize the issuance, grant, sale, transfer, deliverance, pledge, promise, disposition or encumbrance of, or alter or modify the terms of rights or obligations under any shares of capital stock of any class (common or preferred), or any options, warrants, convertible or exchangeable securities or other rights of any kind to acquire any shares of capital stock or any other ownership interest or Stock-Based Rights of the Company (except for (i) the issuance of Common Stock issuable pursuant to the Company Options outstanding on the Effective Date, in accordance with the terms thereof as in effect on the Effective Date, (ii) the issuance prior to the Effective Time of Company Options with an exercise equal to fair market value (as determined pursuant to the Department of the Treasury guidance issued as of the date of such grant under Section 409A of the Code) to newly hired employees in the Ordinary Course of Business) and (iii) the issuance of Company RSUs as contemplated on Schedule 6.1(b)(iii); adopt, ratify or effectuate a stockholders' rights plan or agreement or similar plan or Contract; or redeem, purchase or otherwise acquire, directly or indirectly, any of the capital stock of the Company;

(c)     declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any of its capital stock; split,

44

combine or reclassify any of its capital stock, or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for, shares of its capital stock; or amend the terms of, repurchase, redeem or otherwise acquire any of its securities;

(d)     sell, transfer, deliver, lease, license, sublicense, mortgage, pledge, encumber, impair or otherwise dispose of (in whole or in part), or create, incur, assume or cause to be subjected to any Lien on, any of the assets, rights or properties of the Company (including any Intellectual Property or accounts receivable), except for the sale of inventory and licenses in the Ordinary Course of Business;

(e)     (i) acquire (by merger, consolidation, acquisition of stock or assets or otherwise) or organize any corporation, limited liability company, partnership, joint venture, trust or other entity or Person or any business organization or division thereof or (ii) acquire any rights, assets or properties other than in the Ordinary Course of Business or (iii) acquire any Equity Interest or other securities of any Person;

(f)     (i) incur or modify any Indebtedness or issue any debt securities or any warrants or rights to acquire any debt security, except for payments or prepayments to reduce Indebtedness, (ii) assume, guarantee or endorse or otherwise become responsible for, the obligations of any Person, (iii) enter into any off-balance sheet financing arrangement or any accounts receivable or payable financing arrangement (other than entering into capital leases for servers or operating leases for personal computers in the Ordinary Course of Business), (iv) make any loans or advances or (v) enter into any other financial commitments other than, in the case of clause (v), in the Ordinary Course of Business;

(g)     authorize or make any capital expenditures outside of the Ordinary Course of Business;

(h)     (i) increase the compensation or fringe benefits of any Company Employee (except for increases in salary or wages for non-executive employees with an annualized salary of less than $100,000 in the Ordinary Course of Business, or the payment of accrued or earned but unpaid bonuses as set forth in Section 6.1(h) of the Company Disclosure Schedule) (ii) hire or offer to hire any new employees or terminate or encourage any Company Employee to resign from the Company (except for new hires made in the Ordinary Course of Business), (iii) grant any severance or termination pay (in cash or otherwise) to any present or former Company Employee, except pursuant to any Contract or Employee Plan in effect on the Effective Date in connection with the termination of any such Company Employee, (iv) loan or advance any money or other property to any present or former Company Employee, (v) establish, adopt, enter into, amend or terminate (or grant any waiver or consent under) any Employee Plan or any plan, agreement, program, policy, trust, fund or other arrangement that would be an Employee Plan if it were in existence as of the Effective Date, except for any amendments required by ERISA or the Code or other applicable Law, or (vi) grant any equity or equity-based awards or Stock-Based Rights or accelerate the vesting schedule of any such award or rights (except (i) issuances of Stock Options prior to the Effective Time to newly hired employees in the Ordinary Course of Business and (ii) as required by the terms of such agreements outstanding on the Effective Date as are set forth in Section 6.1(h) of the Company Disclosure Schedule);

45

HIGHLY CONFIDENTIAL

TP000107

(i)      change any accounting policies, procedures or practices (including with respect to reserves, revenue recognition, timing for payments of accounts payable and collection of accounts receivable) unless required by a change in Law or GAAP used by it;

(j)      revalue any of its material assets, rights or properties including writing down the value of inventory or writing off notes or accounts receivable other than in the Ordinary Course of Business;

(k)      (i) enter into any Contract that if entered into prior to the Effective Date would be a Material Contract; (ii) modify, amend, extend or supplement in any material respect, transfer or terminate or fail to renew any Material Contract or waive, release or assign any rights or claims thereto or thereunder; (iii) enter into or extend any lease with respect to Real Property with any third party; (iv) modify, amend or transfer in any way or terminate any license agreement, standstill or confidentiality agreement with any third party, or waive, release or assign any rights or claims thereto or thereunder; or (v) enter into, modify, amend or supplement any Contract to provide exclusive rights or obligations or any non-competition or similar obligations or restrictions;

(l)      (i) make or change any Tax election or change any method of tax accounting, (ii) settle or compromise any federal, state, local or foreign Tax liability, (iii) file any amended Tax return, (iv) enter into any closing agreement relating to any Tax, (v) agree to an extension of a statute of limitations or (vi) surrender any right to claim a Tax refund;

(m)      pay, discharge, satisfy, settle or otherwise compromise any Action or waive, assign or release any material rights or claims except, in the case of Action, any settlement of an Action not related to the transactions contemplated by this Agreement, which settlement would not: (i) impose any injunctive or similar Order on the Company or restrict in any way the business of the Company or (ii) exceed $500,000 in cost, liability or value to the Company; or otherwise discharge or otherwise obtain the release of any Lien or pay or otherwise discharge any Liability, other than current Liabilities incurred in the Ordinary Course of Business;

(n)      commence a lawsuit other than (i) for the collection of bills in the Ordinary Course of Business and (ii) in such cases where it in good faith determines that failure to commence suit would result in the material impairment of a valuable aspect of its business or result in a loss of rights of substantial value, provided that it consults with Parent prior to the filing of such a suit, or (iii) for a breach of this Agreement or the other documents contemplated hereby;

(o)      other than as permitted under Section 6.1(h), engage in, enter into or modify or amend any Contract, transaction, Indebtedness, commitment or other arrangement with, directly or indirectly, any of the directors, officers, employees, consultants, Company Stockholders or other Affiliates of the Company, or any of its Affiliates or family members, except that the Company shall be permitted to enter into Contracts with recruiting or search firms in connection with hiring new employees;

46

      

(p)     fail to maintain in full force and effect all self insurance and insurance, as the case may be, currently in effect, except that existing policies may be replaced by new or successor policies of substantially similar coverage;

(q)     terminate, amend or fail to renew or preserve any (A) material Permit or (B) Company Intellectual Property registration or application;

(r)     commence any proceeding for any voluntary liquidation, dissolution, or winding up of the Company, including but not limited to initiating any bankruptcy proceedings on its behalf; or

(s)     authorize, recommend, propose or announce an intention to do any of the foregoing, or agree or enter into any Contract or commitment to do any of the foregoing.

6.2     No Solicitation of Other Proposals.

(a)     From the Effective Date until the earlier of the Effective Time or the termination of this Agreement in accordance with its terms, neither the Company nor any Stockholder Party shall, nor shall such Person permit any of their respective Affiliates or Subsidiaries to authorize or permit any of its respective stockholders, directors, officers, employees, consultants, advisors, representatives or agents (collectively, the "Company Representatives") to, directly or indirectly, (i) solicit, initiate, entertain, knowingly facilitate or encourage, or take any action to solicit, initiate, entertain or knowingly facilitate or encourage, any inquiries regarding or the making of any proposal or offer that constitutes or would reasonably be expected to result in an Acquisition Proposal (as defined herein) or (ii) participate or engage in any discussions or negotiations with, or provide any information to or take any other action with the intent to facilitate the efforts of, any Person concerning any Acquisition Proposal or any inquiry which would reasonably be expected to result in an Acquisition Proposal. For purposes of this Agreement, the term "Acquisition Proposal" shall mean any inquiry, proposal or offer from any Person (other than Parent, Merger Sub or any of their Affiliates) relating to (i) any merger, consolidation, reorganization or other direct or indirect business combination, recapitalization, liquidation, winding-up of, or similar transaction, involving the Company, (ii) the issuance or acquisition of shares of capital stock or other equity securities of the Company representing 10% or more of any class of the outstanding capital stock or voting power of the Company, (iii) any tender, exchange offer or other offer or bid that if consummated would result in any Person, together with all Affiliates thereof, beneficially owning shares of capital stock or other equity securities of the Company representing 10% or more of any class of the outstanding capital stock or voting power of the Company or (iv) the sale, lease, exchange, license (whether exclusive or not), or other disposition of a substantial portion of the Intellectual Property or a substantial portion of the business or other assets, rights or properties of the Company, other than licenses to end users in the Ordinary Course of Business. The Company and each Stockholder Party shall immediately cease and cause to be terminated, and shall cause their respective Subsidiaries and all Company Representatives to immediately terminate and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that would reasonably be expected to result in, an Acquisition Proposal. Without limiting the foregoing, any action or conduct by any Affiliate or Subsidiary of the Company or Company Stockholder party hereto or any Company

47

TP000109

Representative that would be a violation of this Section 6.2(a) if taken by the Company, whether or not such Person is purporting to act on behalf of the Company, shall be deemed to be a breach of this Section 6.2(a) by the Company.

(b)     In addition to the other obligations of the Company set forth in this Section 6.2, the Company shall promptly advise Parent orally and in writing of any request for information with respect to any Acquisition Proposal, or any inquiry with respect to an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same. The Company shall promptly inform Parent of the status and content of any developments regarding any Acquisition Proposal from a third party and any change in the price, structure or form of the consideration or material terms of and conditions regarding any Acquisition Proposal or of any other changes in status and content of the Acquisition Proposal.

6.3     Stockholders Consents.

(a)     Immediately following the execution of this Agreement, the Company shall use its reasonable best efforts to deliver to Parent a true, correct and complete copy of the Stockholder Consent, evidencing the adoption of this Agreement and approval of the Merger by the Requisite Stockholder Vote.

(b)     The Company shall promptly, but in no event later than 5 calendar days after the date hereof, deliver (i) notice of the adoption of this Agreement and approval of the Merger to the Company Stockholders who have not executed the Stockholder Consent, pursuant to and in accordance with the applicable provisions of the DGCL and California Law and (ii) the requisite notice of appraisal, dissenters' or similar rights under the DGCL and California Law.

(c)     Neither the Board of Directors of the Company nor any committee thereof shall (1) approve or recommend, or propose to approve or recommend, any Acquisition Proposal other than the Merger, (2) withdraw or modify or propose to withdraw or modify in a manner adverse to Parent or Merger Sub its approval or recommendation of the Merger, this Agreement or the transactions contemplated hereby, (3) approve, enter, or permit or cause the Company to enter, into any letter of intent, agreement in principle, acquisition agreement or other similar Contract or instrument related to any Acquisition Proposal, or (4) resolve or announce its intention to do any of the foregoing.

(d)     As soon as practicable following the Effective Date, the Company shall submit to the Company Stockholders for approval (in a manner reasonably satisfactory to Parent) by such number of Company Stockholders as is required by the terms of Section 280G(b)(5)(B) of the Code, any payments and/or benefits that Parent or the Company reasonably determine may separately or in the aggregate, constitute "parachute payments" (within the meaning of Section 280G of the Code and the regulations promulgated thereunder), such that such payments and benefits shall not be deemed to be "parachute payments" under Section 280G of the Code, and prior to the Effective Time the Company shall deliver to Parent evidence reasonably satisfactory to Parent (i) that a Stockholder vote was solicited in conformance with Section 280G and the regulations promulgated thereunder and the requisite Stockholder approval was obtained with respect to any payments and/or benefits that were subject to the Company Stockholder vote

48

(the "280G Approval"), or (ii) that the 280G Approval was not obtained and as a consequence, that such "parachute payments" shall not be made or provided, pursuant to the waivers of those payments and/or benefits which were executed by the affected individuals on the Effective Date.

     6.4    <u>Filings; Efforts; Notices.</u>

     (a)    As promptly as practicable (and in any event within 7 Business Days) after the Effective Date, each of Parent and the Company shall, as applicable, make (or cause to be made) all filings, notices, petitions, statements, registrations, submissions of information, application or submission of other documents required by any Governmental Authority in connection with the transactions contemplated hereby, including (i) Notification and Report Forms with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice as required by the HSR Act, and (ii) any other filings necessary to satisfy Section 7.1(c). Each of the parties hereto will cause all documents that it is responsible for filing with any Governmental Authority pursuant to this Section 6.4(a) to comply in all material respects with all applicable Laws and will promptly supply the other with any information that may reasonably be required in order to effectuate any such filings or any amendment or supplement thereto.

     (b)    Each of Parent and the Company shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things reasonably necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including using its or his reasonable best efforts to accomplish the following: (i) the taking of all acts reasonably necessary to cause the conditions precedent set forth in ARTICLE 7 to be satisfied, (ii) the obtaining of all necessary actions or nonactions, waivers, consents, approvals, orders and authorizations from Governmental Authorities and the making of all necessary registrations, declarations and filings and the taking of all reasonable steps as may be necessary to avoid any Action by any Governmental Authority, (iii) the obtaining of necessary Consents from third parties, and (iv) the defending of any Actions challenging this Agreement or the consummation of the transactions contemplated hereby.

     (c)    The parties hereto agree that upon Company's request received no less than 10 Business Days prior to the Closing Date, they will amend this Agreement to provide that the Surviving Corporation will merge with and into a wholly-owned subsidiary (which may be a limited liability company) of Parent immediately following closing (the "Second Step Merger"), and the parties further agree that in such event, each party will waive any breach of the representations and warranties in ARTICLE 3, ARTICLE 4 or ARTICLE 5 to the extent resulting from such Second Step Merger.

     (d)    Each of Parent and the Company will notify the other promptly upon the receipt of (i) any comments from any officials of any Governmental Authority in connection with any filings made pursuant hereto, (ii) any request by any officials of any Governmental Authority for amendments or supplements to any filings made pursuant to, or information provided to comply in all material respects with, any Law, (iii) any Action pending or, to its knowledge, Threatened against such party hereto that challenges the transactions contemplated by this Agreement and (iv) any notice or other communication from any Person alleging that the

49

HIGHLY CONFIDENTIAL

TP000111

Consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.

(e) Notwithstanding anything to the contrary contained in this Agreement, no party shall be required to agree (and without the prior written consent of Parent, the Company shall not agree) to (i) any license, sale or other disposition or holding separate (through establishment of a trust or otherwise) of any shares of its capital stock or of any of its businesses, assets, rights or properties, its subsidiaries or affiliates, (ii) the imposition of any limitation on the ability of Parent, its subsidiaries or affiliates or the Company to conduct their respective businesses or own any capital stock, assets, rights or properties or to acquire, hold or exercise full rights of ownership of their respective businesses and, in the case of Parent, the businesses of the Company, or (iii) the imposition of any impediment on Parent, its subsidiaries or affiliates or the Company under any statute, rule, regulation, executive order, decree, order or other legal restraint governing competition, monopolies or restrictive trade practices.

(f) The Company shall give any notices to third Persons, and use commercially reasonable efforts to obtain any consents or Approvals from third Persons (i) necessary, proper or advisable to consummate the transactions contemplated by this Agreement or (ii) otherwise required under any Contracts in connection with the consummation of the transactions contemplated hereby or by the Escrow Agreement, provided that without the prior written consent of Parent, the Company shall not make any monetary payments or agree to or be required to modify any Contract, make any payment or agree to provide any additional security (including a Parent guaranty) to obtain any such consent. If the Company shall fail to obtain any such Approval from a third Person, the Company shall use its reasonable efforts, and will take any such actions reasonably requested by Parent (and Parent agrees to cooperate therewith as reasonably requested), to limit the adverse effect upon the Company and Parent, their respective Subsidiaries, and their respective businesses resulting, or which would result after the Effective Time, from the failure to obtain such consent.

6.5 Access to Information.

(a) Except as and to the extent prohibited by applicable law, the Company shall afford to Parent and to Parent's officers, employees, accountants, counsel, financial advisors and other representatives, access at all reasonable times on reasonable notice during the period prior to the Effective Time to all the properties, books, contracts, commitments, personnel and records of the Company (provided, that such access shall not unreasonably interfere with the business or operations of such party). Without limitation of the foregoing, except as and to the extent prohibited by applicable law, during such period the Company shall furnish promptly to Parent all other information concerning its business, properties and personnel as Parent may reasonably request. No review pursuant to this Section 6.5 shall affect or be deemed to modify any representation or warranty contained herein, the covenants or agreements of the parties hereto or the conditions to the obligations of the parties hereto under this Agreement. Any access to the Company's offices shall be subject to the Company's reasonable security measures.

(b) Each of the Company Stockholders agrees that in connection with any Third Party Claim, it will use its reasonable best efforts to be available to Parent as a witness and to make available any books, records or other documents within its control or which it

50

TP000112

otherwise has the ability to make available (other than materials covered by the attorney-client privilege), to the extent reasonably be required by Parent, regardless of whether such Third Party Claim is a matter with respect to which indemnification may be sought hereunder.

6.6     Nondisclosure. The parties hereto acknowledge that Parent and the Company previously executed a non-disclosure agreement dated as of October 5, 2006 (as amended, supplemented and otherwise modified from time to time, the "Confidentiality Agreement"), which Confidentiality Agreement will continue in full force and effect in accordance with its terms.

6.7     Public Announcements. Neither the Company nor the Company Stockholders shall (nor will they permit, as applicable, any of their respective officers, directors, members, stockholders, agents, representatives or affiliates to), directly or indirectly, issue any statement or communication to any third party (other than its agents that are bound by confidentiality restrictions) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the consent of Parent. Parent shall not issue any statement or communication to any third party (other than its agents that are bound by confidentiality restrictions) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without first consulting the Company, except that this restriction shall be subject to Parent's obligation to comply with applicable securities laws and the rules of The Nasdaq Global Select Market; *provided, however*, that Parent shall consult in advance to the extent reasonably practical with the Company in good faith regarding the nature, content, scope and timing of any statement or communication regarding the subject matter of this Agreement proposed to be made by Parent prior to the Effective Time pursuant to applicable securities laws and the rules of The Nasdaq Global Select Market. Notwithstanding the foregoing, this Section 6.7 shall not prevent Parent from issuing any statement or communication that is reasonably necessary in response to an inquiry by or a public statement or announcement made by any third Person with respect to the transactions contemplated by this Agreement.

6.8     Takeover Statutes. If any Takeover Statute or other anti takeover Regulation, charter provision or Contract is or shall become applicable to the Merger or the transactions contemplated hereby, the Company and the Board of Directors of the Company shall grant such Approvals and take such actions as are necessary under such Laws and provisions so that the transactions contemplated hereby and thereby may be consummated as promptly as practicable on the terms contemplated hereby and thereby without adverse effect under, and otherwise act to eliminate or minimize the effects of, such Law, provision or Contract.

6.9     Escrow Agreement. On or before the Closing Date, the Company and Parent will execute and deliver, and will use commercially reasonable efforts to cause the Escrow Agent and the Stockholders Agent to execute and delivery, the Escrow Agreement.

6.10     Equity Awards.

(a)     Notices. As soon as reasonably practicable, but in no event later than 20 Business Days following the Effective Time, Parent will (i) issue to each holder of an Assumed

51

Company Option a document evidencing the assumption of such Company Option by Parent and (ii) issue to each holder of an Assumed Company RSU a document evidencing the assumption of such Company RSU by Parent.

(b)    Form S-8.  Parent shall file a registration statement on Form S-8 for the shares of Parent Common Stock issuable with respect to Assumed Company Options and Assumed Company RSUs no later than 5 Business Days after the Effective Time and shall exercise commercially reasonable efforts to maintain the effectiveness of such registration statement for so long as any of such Assumed Company Options and Assumed Company RSUs remains outstanding.

(c)    Termination of Benefit Plans.  Unless otherwise notified in writing by Parent no later than ten Business Days prior to the Closing Date, Company shall take (or cause to be taken) all actions necessary or appropriate to terminate, effective no later than the date immediately preceding the Closing Date, any Company Plan that contains a cash or deferred arrangement intended to qualify under Section 401(k) of the Code (the "Company 401(k) Plans") in accordance with the provisions of the Company 401(k) Plans a(which shall be subject to Parent's reasonable review and approval) and applicable Law.  In furtherance of the foregoing, the Company's Board of Directors shall adopt resolutions authorizing the termination of the Company 401(k) Plans effective no later than the day immediately preceding the Closing Date and the Company shall provide Parent with evidence that such Company 401(k) Plans have been terminated in accordance with such resolutions.

(d)    Disclaimer.  Notwithstanding anything in this Agreement to the contrary, no Company Employee or any other Person shall have any third party beneficiary rights under this Section 6.10 and no provision of this Agreement shall be deemed to (i) guarantee employment for any period of time for, or preclude the ability of either party to terminate any continuing employee at will at any time, with or without cause, for any reason or no reason, or (ii) require either party to continue any Parent Benefit Plan or any Plan, or prevent the amendment, modification or termination thereof, after the Effective Time.

(e)    Prior to the Closing, the Company will take all actions set forth in Section 6.10(e) of the Company Disclosure Schedule.

6.11    Indemnification.

(a)    For six (6) years after the Effective Time, Parent shall, and shall cause the Surviving Corporation and its Subsidiaries to, honor and fulfill in all respects the obligations of the Company under any and all indemnification agreements in effect immediately prior to the Effective Time identified in Section 6.11(a) of the Company Disclosure Schedule between the Company and any of its current or former directors and officers and any person who becomes a director or officer of the Company prior to the Effective Time.  In addition, for a period of six (6) years following the Effective Time, Parent shall (and shall cause the Surviving Corporation and its Subsidiaries to) cause the certificate of incorporation and bylaws (and other similar organizational documents) of the Surviving Corporation and its Subsidiaries to contain provisions with respect to indemnification and exculpation that are at least as favorable as the indemnification and exculpation provisions contained in the articles of incorporation and bylaws

52

(or other similar organizational documents) of the Company immediately prior to the Effective Time, and during such six (6) year period, such provisions shall not be amended, repealed or otherwise modified in any respect, except as required by Law.

(b) For a period of six (6) years after the Effective Time, the Surviving Corporation shall maintain in effect the Company's current directors' and officers' liability insurance ("D&O Insurance") in respect of acts or omissions occurring at or prior to the Effective Time, covering each person covered by the D&O Insurance immediately prior to the Effective Time (a complete and accurate copy of which has been heretofore delivered to Parent), on terms with respect to the coverage and amounts no less favorable than those of the D&O Insurance in effect on the Effective Date; *provided, however,* that the Surviving Corporation may, at its option, (i) substitute therefor policies of the Surviving Corporation containing terms with respect to coverage and amount no less favorable to such persons or (ii) request that the Company obtain such extended reporting period coverage under its existing insurance program (to be effective as of the Effective Time), provided further, however, that in satisfying its obligations under this Section 6.11(b) the Surviving Corporation shall not be obligated to pay annual premiums in excess of 200% of the amount paid by the Company for coverage for its last full fiscal year (such 200% amount, the "Maximum Annual Premium"), provided that that if the annual premiums of such insurance coverage exceed such amount, Parent and the Surviving Corporation shall be obligated to obtain a policy with the greatest coverage available for a cost not exceeding the Maximum Annual Premium. Prior to the Effective Time, notwithstanding anything to the contrary in this Agreement, Parent shall have the right to purchase a six-year "tail" prepaid policy on the D&O Insurance on terms and conditions no less advantageous than the D&O Insurance and, in the event that Parent purchases such a "tail" policy prior to the Effective Time, Parent and the Surviving Corporation shall maintain such "tail" policy in full force and effect and continue to honor their respective obligations thereunder, in lieu of all other obligations of Parent and the Surviving Corporation under the first sentence of this Section 6.11(b) for so long as such "tail" policy shall be maintained in full force and effect.

(c) If Parent or the Surviving Corporation or any of its successors or assigns shall (i) consolidate with or merge into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Parent or the Surviving Corporation, as the case may be, shall assume all of the obligations of Parent or the Surviving Corporation, as the case may be, set forth in this Section 6.11.

(d) The obligations under this Section 6.11 shall not be terminated, amended or otherwise modified in such a manner as to adversely affect any indemnified party under this section (or any other person who is a beneficiary under the D&O Insurance or the "tail" policy referred to in paragraph (b) above (and their heirs and representatives)) without the prior written consent of such affected indemnified party or other person who is a beneficiary under the D&O Insurance or the "tail" policy referred to in paragraph (b) above (and their heirs and representatives). Each of the Indemnified Parties or other persons who are beneficiaries under the D&O Insurance or the "tail" policy referred to in paragraph (b) above (and their heirs and representatives) are intended to be third party beneficiaries of this Section 6.11, with full rights of enforcement as if a party thereto. The rights of the indemnified parties under this section (and

HIGHLY CONFIDENTIAL TP000115

other persons who are beneficiaries under the D&O Insurance or the "tail" policy referred to in paragraph (b) above (and their heirs and representatives)) under this Section 6.11 shall be in addition to, and not in substitution for, any other rights that such persons may have under the certificate or articles of incorporation, bylaws or other equivalent organizational documents, any and all indemnification agreements of or entered into by the Company, or applicable Law (whether at law or in equity).

(e)     The obligations and liability of Parent, the Surviving Corporation and its Subsidiaries under this Section 6.11 shall be joint and several.

(f)     The provisions of this Section 6.11 shall in no way affect the rights of the Parent Indemnified Parties or the obligations of the Company Stockholders arising under ARTICLE 9, and any Liabilities subject to indemnification pursuant to Section 6.11(a) or to be covered by D&O Insurance pursuant to Section 6.11(b) shall in no event include any Damages for which any Company Stockholder is liable (either directly or through an obligation to indemnify another Person) pursuant to the terms hereof.

6.12     Tax-Free Reorganization Treatment. Parent and the Company intend that the Merger will qualify as a reorganization within the meaning of Section 368(a) of the Code, and that the exchange of Company Stock for the Aggregate Share Consideration pursuant to Section 6.12 shall be treated as an exchange described in Section 354(a) of the Code, and each shall, and shall cause its respective Subsidiaries to, use its reasonable best efforts to cause the Merger to so qualify and be treated accordingly. Neither Parent, Merger Sub nor the Company shall take any action, cause or permit any action to be taken, or fail to take any action, that would reasonably be expected to cause the Merger to fail to qualify as a reorganization within the meaning of Section 368(a) of the Code. The parties hereto shall comply with all tax filing requirements under Sections 368 and 354 of the Code and shall not make any tax filing that is inconsistent with the foregoing intent.

6.13     Reservation and Listing of Parent Common Stock. Effective at or prior to the Effective Time, Parent shall reserve (free from preemptive rights) out of its reserved but unissued shares of Parent Common Stock, for the purposes of effecting the conversion of the issued and outstanding shares of Company Stock and assumption of Company Options pursuant to this Agreement, sufficient shares of Parent Common Stock to provide for such conversion and assumption and Exchange. Parent shall take all action necessary to cause the shares of Parent Common Stock to be issued in the Merger, and the shares of Parent Common Stock issuable upon the exercise of Assumed Options, to be approved for listing on the Nasdaq Global Select Market at or prior to the Effective Time.

6.14     Parent Information; Form S-4; Information Statement/Prospectus.

(a)     A reasonable period prior to the Closing, Parent shall deliver to each Company Stockholder who is not an "accredited investor" within the meaning of Regulation D ("Regulation D") promulgated by the SEC under the Securities Act the information that is required to be provided to such Company Stockholders under Regulation D so that the issuance of shares of Parent Common Stock in the Merger will qualify for an exemption from the registration and prospectus delivery requirements of the Securities Act under Regulation D. The

54

Company shall provide any disclosure or other information regarding the Company reasonably required by Parent for inclusion in any disclosure materials delivered by Parent to the Company Stockholders pursuant to this Section 6.14(a) and the Company agrees that all information provided by it for such purpose will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. Any and all information provided by Parent to the Company Stockholders pursuant to this Section 6.14(a) (other than any information provided by the Company expressly for inclusion therein) will comply in all material respects with Regulation D and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

      (b)     In the event that all of the conditions to closing set forth in Section 7.1 and Section 7.2 (other than those conditions that by their terms are to be satisfied at the Closing) have been satisfied or waived, but Parent shall determine that the issuance of shares of Parent Common Stock in the Merger will not qualify for an exemption from the registration and prospectus delivery requirements of the Securities Act under Regulation D, then Parent and the Company shall promptly prepare (and file with the SEC) a registration statement on Form S-4, which shall include the information statement required by Regulation 14C under the Exchange Act (the "Form S-4"), to cover the issuance of shares of Parent Common Stock in the Merger. Parent shall cause the Form S-4 to comply as to form and substance with all requirements of the Securities Act and the rules and regulations promulgated thereunder and to provide the information required by Regulation 14C under the Exchange Act. The Company shall furnish all information as may be reasonably requested by Parent in connection with the preparation of the Form S-4, and Parent shall furnish all information as may be reasonably requested by the Company in connection with the preparation of the information statement to be included in the Form S-4. Parent shall use its reasonable best efforts to have the Form S-4 declared effective under the Securities Act as promptly as practicable after such filing. The information supplied or to be supplied by either party for inclusion in the Form S-4 shall not at the time the Form S-4 is filed with the SEC or declared effective by the SEC, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. If at any time prior to the Effective Time, any information relating to the Company or Parent, or any of their respective Affiliates, directors, or officers, should be discovered by the Company or Parent which should be set forth in an amendment or supplement to the Form S-4 (or the information statement included therein) so that the Form S-4 (and the information statement included therein) would not include any misstatement of material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, the party which discovers such information shall promptly notify the other party hereto and, promptly thereafter, Parent shall file with the SEC an appropriate amendment or supplement to the Form S-4 (or the information statement included therein) describing such information. Parent shall promptly notify the Company of (i) the time when the Form S-4 has been declared effective, (ii) the receipt of any comments from the SEC or the staff of the SEC for amendments or supplements to the Form S-4 or for additional information and shall supply each other with copies of all correspondence between it or any of its representatives, on the one hand, and the SEC or staff of the SEC, on the other hand, with respect

HIGHLY CONFIDENTIAL                                                  TP000117

to the Form S-4 or the Merger, and (iii) of the issuance of any stop order of the SEC in respect of the Form S-4.

6.15    Company Expenses. Prior to the Closing, the Company shall use its commercially reasonable efforts to submit to Parent documentation reasonably satisfactory to Parent from all investment banks, law firms, accountants, consultants or other professional advisors to the Company in connection with the transactions contemplated by the Transaction Agreements, including the Merger, evidencing the amount of all Company Transaction Expenses payable to any of the foregoing.

6.16    Company Corporate Records. Prior to the Closing, the Company shall make available to Parent a complete copy of all minute books of all stockholders, Board of Directors and committee meetings, corporate seals, stock ledgers, true and complete copies of the Certificate of Incorporation and bylaws (or similar organizational documents), and other similar records and items reasonably requested by Parent of the Company, including all stock certificates or similar evidence of ownership of the common stock or other equity interests held by the Company, directly or indirectly.

6.17    FIRPTA Notice. Prior to the Closing, the Company shall deliver to Parent a certificate in form and substance reasonably satisfactory to Parent, duly executed and acknowledged, certifying any facts that would exempt the transactions contemplated hereby from withholding under Section 1445 of the Code.

6.18    Schedule of Total Outstanding Shares. At least two (2) Business Days prior to the Closing Date, the Company shall deliver to Parent a certificate, executed for and on behalf of the Company by each of the Company's Chief Executive Officer and Chief Financial Officer, setting forth as of the Closing Date (a) each share or other unit of Company Stock, Company Options, Company Warrants, Restricted Stock, Company RSUs and any other Commitment to purchase or otherwise acquire shares of Company Stock outstanding (including the holders thereof and, to the extent applicable, the exercise prices therefor) and (b) a calculation in reasonable detail of the Total Outstanding Shares.

6.19    Investor Rights Agreement. The Company will use its reasonable best efforts to cause the applicable Company Stockholders to, and the Stockholder Parties shall, cause the Amended and Restated Investor Rights Agreement, dated as of March 30, 2006, among the Company and the other persons listed on the signature pages thereof, to be amended so as to terminate upon consummation of the Merger

6.20    Legend on Share Certificates. The certificates representing the shares of Parent Common Stock issuable in the Merger hereunder shall include an endorsement typed conspicuously thereon of the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER STATE SECURITIES LAWS. THESE SECURITIES MAY NOT BE RESOLD OR TRANSFERRED UNLESS REGISTERED OR EXEMPT FROM REGISTRATION UNDER SUCH ACT AND APPLICABLE

56

HIGHLY CONFIDENTIAL                                        TP000118

STATE SECURITIES LAWS, AND HEDGING TRANSACTIONS INVOLVING THESE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT OF 1933, AS AMENDED."

In the event that any shares of Parent Common Stock issuable hereunder shall cease to be Restricted Shares, the Company shall, upon the written request of the holder thereof, issue to such holder a new certificate representing such shares of Parent Common Stock without the first paragraph of the legend required by this Section 6.20. For purposes of the foregoing, "Restricted Shares" means all shares of Parent Common Stock issuable hereunder other than shares of Parent Common Stock (i) the offer and sale of which have been registered under a registration statement pursuant to the Securities Act and sold thereunder, (ii) with respect to which a sale or other disposition has been made in reliance on and in accordance with Rule 144 (or any successor provision) under the Securities Act, or (iii) with respect to which the holder thereof shall have delivered to Parent either (A) an opinion of counsel in form and substance reasonably satisfactory to Parent, delivered by counsel reasonably satisfactory to Parent, or (B) a "no action" letter from the SEC, in either case to the effect that subsequent transfers of such shares of Parent Common Stock may be effected without registration under the Securities Act.

## ARTICLE 7

## CLOSING CONDITIONS

7.1     Conditions Precedent to Obligations of Each Party. The obligation of each party hereto to consummate the Merger is subject to the satisfaction of each condition precedent listed below.

(a)     Requisite Stockholder Vote. The Requisite Stockholder Vote shall have been obtained.

(b)     No Injunctions; Illegality. No temporary restraining order, preliminary or permanent injunction or other Order (whether temporary, preliminary or permanent) issued by any Court or Governmental Authority of competent jurisdiction or other legal restraint or prohibition in the United States shall be in effect which prevents the Merger. No Law shall have been enacted, entered, enforced or deemed applicable to the Merger in the United States which remains in effect and makes the Merger illegal in the United States as of the Closing Date.

(c)     Regulatory Approvals. The waiting period (and any extension thereof) under the HSR Act relating to the transactions contemplated hereby shall have expired or terminated early, and the relevant parties hereto shall have timely obtained from each other Governmental Authority all other Consents that are necessary for the consummation of the transactions contemplated hereby as mutually agreed by the Company and Parent.

(d)     Listing. To the extent required by the rules of The Nasdaq Stock Market, the shares of Parent Common Stock to be issued in the Merger, and the shares of Parent Common Stock issuable upon the exercise of all Assumed Options, shall have been authorized for listing on the Nasdaq Global Select Market.

HIGHLY CONFIDENTIAL                                              TP000119

(e)     Registration Statement; Information Statement/Prospectus. In the event that Parent shall determine that the issuance of shares of Parent Common Stock in the Merger will not qualify for an exemption from the registration and prospectus delivery requirements of the Securities Act under Regulation D, then (i) the Form S-4 shall have been declared effective by the SEC and no stop or order shall have been issued or proceedings for that purpose initiated by the SEC in respect thereof, and (ii) the information statement/prospectus included in the Form S-4 shall have been delivered by the Company to the Company Stockholders at least 20 Business Days prior to the Closing Date in accordance with Regulation 14C under the Exchange Act.

7.2     Conditions Precedent to Obligations of Parent and Merger Sub. The obligation of each of Parent and Merger Sub to consummate the Merger is subject to the satisfaction (or prior written waiver by Parent in its sole discretion) of each condition precedent listed below.

(a)     Accuracy of Representations and Warranties. Subject to the terms of Section 7.2(a) of the Company Disclosure Schedule, (i) the representations and warranties of the Company set forth in this Agreement (disregarding all qualifications and exceptions contained therein regarding materiality or a Company Material Adverse Effect) shall be true and correct as of the Effective Date and as of the Closing Date as though made on and as of such date, except as contemplated by this Agreement or where the failure of any such representation or warranty to be so true and correct as of the Effective Date or as of the Closing Date would not have a Company Material Adverse Effect (unless any such representation or warranty is made only as of a specific date, in which event such representation or warranty shall be true and correct only as of such specific date, except as contemplated by this Agreement or where the failure of any such representation or warranty to be so true and correct would not have a Company Material Adverse Effect), and (ii) the representations contained in Section 3.3 (Capitalization), Section 3.4 (Authorization and Enforceability), Section 3.22 (No Restrictions on Merger) and Section 3.25 (Brokers or Finders), shall be true and correct in all material respects as of the Effective Date and as of the Closing Date as though made on and as of such date.

(b)     Compliance with Obligations. The Company shall have performed in all material respects all agreements, obligations and covenants herein required to be performed or observed by it on or prior to the Closing Date.

(c)     Officer's Certificate. Parent shall have received an officer's certificate duly executed by the Chief Executive Officer and Chief Financial Officer of the Company to the effect that each of the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied.

(d)     No Material Adverse Change. Since the Effective Date, there shall not have occurred any Company Material Adverse Effect that is continuing.

(e)     Tax Opinion. Parent shall have received the opinion (and shall be entitled to rely on such opinion) of Wilson Sonsini Goodrich & Rosati, Professional Corporation, dated as of the Effective Time, to the effect that the Merger (taken together with the Second Step Merger, if applicable) will qualify as a reorganization within the meaning of Section 368(a) of the Code. The issuance of such opinion shall be conditioned upon receipt by such counsel of customary representation letters from each of Parent, Merger Sub and Company, in each case, in

58