UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC.                )
TELEVISION, INC., PARAMOUNT             )
PICTURES CORPORATION, and BLACK         )
ENTERTAINMENT TELEVISION, LLC,          )
                                        )
                Plaintiffs,             )
                                        )
vs.                                     ) NO. 07-CV-2203
                                        )
YOUTUBE, INC., YOUTUBE, LLC,            )
and GOOGLE, INC.,                       )
                                        )
                Defendants.             )
_____)
                                        )
THE FOOTBALL ASSOCIATION PREMIER        )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all        )
others similarly situated,              )
                                        )
                Plaintiffs,             )
vs.                                     ) NO. 07-CV-3582
                                        )
YOUTUBE, INC., YOUTUBE, LLC, and        )
GOOGLE, INC.,                           )
                                        )
                Defendants.             )
_____)


VIDEOTAPED DEPOSITION OF BRENT HURLEY
SAN FRANCISCO, CALIFORNIA
TUESDAY, AUGUST 26, 2008


BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CLR
CSR LICENSE NO. 9830
JOB NO. 15688

1                    AUGUST 26, 2008

2                     11:02 a.m.

3

4          VIDEOTAPED DEPOSITION OF BRENT HURLEY

5          SHEARMAN & STERLING, 525 Market Street,

6          San Francisco, California, pursuant to notice,

7          before ANDREA M. IGNACIO HOWARD, CLR, RPR, CSR

8          License No. 9830.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A P P E A R A N C E S:

2

3        FOR THE PLAINTIFFS VIACOM INTERNATIONAL, INC.:

4            JENNER & BLOCK

5            By:  DONALD B. VERRILLI, Jr., Esq.

6                 GINGER D. ANDERS, Esq.

7            1099 New York Avenue, NW, Suite 900

8            Washington, D.C. 20001

9            (202) 639-6000  dverrilli@jenner.com

10

11        FOR THE LEAD PLAINTIFFS AND PROSPECTIVE CLASS:

12            BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

13            By:  DAVID R. HASSEL, Esq.

14            1285 Avenue of The Americas

15            New York, New York 10019

16            (212) 554-1533  davidh@blbglaw.com

17

18        FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE, LLC and

19        GOOGLE, INC.:

20            MAYER BROWN LLP

21            By:  MATTHEW D. INGBER, Esq.

22                 BRIAN WILLEN, Esq.

23            1675 Broadway

24            New York, New York 10019

25            (212) 506-2146  mingber@mayer.com

1        A P P E A R A N C E S   (Continued.)

2

3            ALSO PRESENT:

4                    GOOGLE

5                    By:   ADAM L. BAREA, Litigation Counsel

6                    1600 Amphitheater Parkway

7                    Mountain View, California 94043

8                    (650) 214-4879   adambarea@google.com

9

10                   KELLY TRUELOVE, Ph.D., Consultant

11                   KEN REESER, Videographer.

12

13                            ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

1                              HURLEY

2  11:06:55 2005 --

3  11:06:56   A   That's correct.

4  11:06:57   Q   -- correct?

5  11:06:57       What was your personal net worth when you

6  11:07:00 left Fisher Investments in July 2005?

7  11:07:08   A   I don't recall specifically, but given the

8  11:07:14 college student loans I still had, I was underwater.

9  11:07:19   Q   And then you took a position at YouTube in

10 11:07:23 August 2005; is that correct?

11 11:07:24   A   That's correct.

12 11:07:24   Q   And your title was director of finance and

13 11:07:28 operations; is that correct?

14 11:07:31   A   Yeah.  Initially I didn't have a title --

15 11:07:33   Q   I see.

16 11:07:34   A   -- but --

17 11:07:34   Q   But eventually it became --

18 11:07:36   A   -- that's what it became, yeah.

19 11:07:37   Q   Okay.  And what's your present personal net

20 11:07:39 worth?

21 11:07:42   A   It's a few million.

22 11:07:47   Q   A few million.

23 11:07:48       More than 5 million?

24 11:07:50   A   Yes.

25 11:07:50   Q   Okay.  More than 10 million?

1                          HURLEY

2  11:30:57 could explain why that would be?

3  11:30:59   A   Well, as I said, I produced some of the

4  11:31:02 slides to compose the board reports.  It was a

5  11:31:05 collaboration effort, and once I e-mailed the board

6  11:31:09 reports, there were no -- the slides for the board

7  11:31:13 reports , they were really of no use to me.  We were

8  11:31:18 on to the next month, and so if I made -- I would

9  11:31:27 delete them.  I don't know.  It's possible.

10 11:31:33   Q   Okay.  Now, there was a period of time prior

11 11:31:40 to the acquisition when you were the person

12 11:31:43 responsible for finances at YouTube; correct?

13 11:31:46   A   That's right.

14 11:31:46   Q   And I take it that as part of your duties,

15 11:31:52 you prepared financial projections; is that correct?

16 11:31:56   A   That's correct.

17 11:31:56   Q   And did you prepare those on your office

18 11:32:02 laptop?

19 11:32:03   A   Uh-huh.

20 11:32:04   Q   And where did you store those?

21 11:32:08   A   Just on the --

22 11:32:09       MR. INGBER:  Objection; assumes facts not in

23 11:32:12 evidence.

24 11:32:13       THE WITNESS:  Huh?

25 11:32:13       MR. INGBER:  Go ahead.  You can answer.

1                          HURLEY

2  11:32:15        MR. VERRILLI:  Q.  Where did you store those?

3  11:32:16   A    On the laptop.

4  11:32:17   Q    On the laptop?

5  11:32:18   A    Uh-huh.

6  11:32:18   Q    Okay.  Anywhere else?

7  11:32:21   A    They were sent through e-mail, but they

8  11:32:24 weren't stored.  We didn't have a server, a company

9  11:32:27 server.

10 11:32:28   Q    And financial projections, I take it, then

11 11:32:32 were not developed on the Wiki?

12 11:32:37   A    No.

13 11:32:37   Q    Okay.  So is it possible then that you

14 11:32:45 deleted financial projections that you had prepared on

15 11:32:48 your office laptop?

16 11:32:51        MR. INGBER:  At any time?

17 11:32:54        MR. VERRILLI:  Yeah.

18 11:32:54   Q    At any time while -- prior to the

19 11:32:58 acquisition.

20 11:32:59   A    It's possible, but it's more likely that the

21 11:33:02 model evolved over time as the company grew, so it

22 11:33:06 wasn't that the first version was thrown out and let's

23 11:33:09 start with a new one.  It was just that you just

24 11:33:12 refine as you get more data.

25 11:33:15   Q    Did you keep hard copies of your financial

1                          HURLEY

2   11:33:17 projections?

3   11:33:19   A    There were excerpts that were included in

4   11:33:21 some of the board reports, but a spreadsheet is much

5   11:33:28 easier to use than a printout.

6   11:33:30   Q    Right.

7   11:33:31          And I'm just trying to understand.  You

8   11:33:34 didn't save the spreadsheets over time that you did?

9   11:33:38   A    Of course I saved them.

10  11:33:42   Q    Okay.  And you saved them on your office

11  11:33:45 laptop?

12  11:33:45          MR. INGBER:  Again, are we talking about

13  11:33:47 pre-acquisition?

14  11:33:47          MR. VERRILLI:  Yes, just pre -- I'm sorry.

15  11:33:49 Pre-acquisition, yes.

16  11:33:51          THE WITNESS:  I'm sorry.  As far as saving,

17  11:33:54 do you mean the actual model that's being refined over

18  11:33:58 time, or snapshots of the model?

19  11:34:00          MR. VERRILLI:  The snapshots of the model.

20  11:34:03          THE WITNESS:  No, not necessarily.

21  11:34:05          MR. VERRILLI:  Q.  So you would erase the

22  11:34:08 financial projections that you made --

23  11:34:10   A    No.

24  11:34:10   Q    -- in January once you got to February or

25  11:34:15 March; is that what you're saying?

1                               HURLEY

2  11:34:15    A    No, we would refine.

3  11:34:17         MR. INGBER:  Objection; misstates the

4  11:34:18 witness's testimony.

5  11:34:19         THE WITNESS:  We wouldn't erase.  We would

6  11:34:21 refine.  Again, as you get more data, we would add

7  11:34:25 that to the model.

8  11:34:25         MR. VERRILLI:  Q.  I just want to get

9  11:34:26 clarity, Mr. Hurley.  You did not maintain a

10 11:34:30 historical projection of what your projections were at

11 11:34:33 various points in time?

12 11:34:34    A    No, because the projections are refined over

13 11:34:37 time as you get data.

14 11:34:39    Q    Sure.

15 11:34:40         But it wasn't relevant to you to know in June

16 11:34:44 how accurate your predictions in January had been?

17 11:34:49    A    Not necessarily.

18 11:34:51    Q    So you just erased them?

19 11:34:52         MR. INGBER:  Objection; asked and answered.

20 11:34:54         THE WITNESS:  We didn't erase.  We refined

21 11:34:56 as we got more data.

22 11:34:58         MR. INGBER:  Mischaracterizes the witness's

23 11:35:00 testimony.

24 11:35:00         THE WITNESS:  We got better projections.

25 11:35:02         MR. VERRILLI:  Right.

1                          HURLEY

2  11:35:02   Q    And so you overwrote the old data?

3  11:35:04        MR. INGBER:  Objection; asked and answered;

4  11:35:06 mischaracterizes the witness's testimony.

5  11:35:08        Go ahead.

6  11:35:09        THE WITNESS:  Yeah.  Again, we just refined

7  11:35:11 them and then tried to improve them.

8  11:35:12        MR. VERRILLI:  Q.  Well, would refining them,

9  11:35:16 as you are using that word, include overriding the

10 11:35:20 hold data in the spreadsheet?

11 11:35:26   A    It's possible that -- well, of course when

12 11:35:29 you get more information, if you learn that one thing

13 11:35:32 is -- is wrong, and it's not accurate, then you remove

14 11:35:35 that from the model, and you add the new, better

15 11:35:38 information to give you a better forecast.

16 11:35:41   Q    And you wouldn't save anywhere in any form

17 11:35:44 the old information?

18 11:35:48        MR. INGBER:  Objection; asked and answered.

19 11:35:50        THE WITNESS:  Yeah.  You refine the model.

20 11:35:53 You get the better model.  You don't keep the old

21 11:35:56 model around.

22 11:35:56        MR. VERRILLI:  Q.  When you created these

23 11:35:58 financial projections, did you make any backup copies?

24 11:36:03        MR. INGBER:  Objection; vague.

25 11:36:04        THE WITNESS:  Again, I saved it to my local

1                              HURLEY

2  11:36:12 machine.

3  11:36:13        MR. VERRILLI:  Q.  And were you working in

4  11:36:15 Microsoft Excel?

5  11:36:17   A   Yeah.

6  11:36:18   Q   And how frequently did you do financial

7  11:36:21 projections?

8  11:36:27   A   I mean --

9  11:36:28        MR. INGBER:  Again, just focusing

10 11:36:29 pre-acquisition?

11 11:36:29        MR. VERRILLI:  Yes.

12 11:36:31        THE WITNESS:  Okay.  It was one of my many

13 11:36:35 duties.  It depends what time, what time period.  Over

14 11:36:42 time, I focused more and more on finance and

15 11:36:45 operations.

16 11:36:46        MR. VERRILLI:  Q.  Well --

17 11:36:47   A   Again, it was -- over time, the model also

18 11:36:50 got better, so it was just continual refinements.

19 11:36:55   Q   And starting in January 2006 through the

20 11:37:04 period of the acquisition by Google --

21 11:37:06   A   Yes.

22 11:37:06   Q   -- did you do financial projections on --

23 11:37:08 more frequently than once a month?

24 11:37:15   A   Certainly once a month to -- for the board

25 11:37:18 reports and also to measure the -- the data that we

1                              HURLEY

2  11:37:21 got from the previous month to include that in the

3  11:37:24 model.

4  11:37:24    Q    So at least once a month?

5  11:37:32    A    Yes.

6  11:37:32    Q    You did them for the board reports?

7  11:37:35    A    Yes.

8  11:37:35    Q    And then I take it you did them also for

9  11:37:39 other reasons in addition to the board reports?

10 11:37:43        MR. INGBER:  Objection; assumes facts not in

11 11:37:45 evidence.

12 11:37:45        THE WITNESS:  We did it for the company to --

13 11:37:52 I mean, to project where the -- how the site was

14 11:37:58 growing --

15 11:37:58        MR. VERRILLI:  Q.  And --

16 11:37:59    A    -- what the company was up to.

17 11:38:00    Q    -- and you maintained no historical record of

18 11:38:03 your projections from month to month?  That's what

19 11:38:06 you're testifying to?

20 11:38:07        MR. INGBER:  Objection to form; asked and

21 11:38:09 answered several times.

22 11:38:10        THE WITNESS:  Yeah.  Again, the model was

23 11:38:14 refined, and each month we would measure the stocks,

24 11:38:23 and then insert those as fact, and then the

25 11:38:26 forward-looking projection we would refine over time.

1                          HURLEY

2   11:38:28        So the historic data was captured in that

3   11:38:31 model.  It was just that the model would continue to

4   11:38:34 shape and evolve over time.

5   11:38:35        MR. VERRILLI:  Okay.

6   11:38:40   Q    Mr. Hurley, can you explain to me how one

7   11:38:45 would go about uploading a video clip onto YouTube?

8   11:38:51   A    Sure.  Just --

9   11:38:52        MR. INGBER:  Objection; vague as to time.

10  11:38:56        MR. VERRILLI:  Well, let's -- okay.  Let's

11  11:38:58 make the time frame from the period between

12  11:39:02 January 1st, 2006, and the time of the acquisition.

13  11:39:05        During that time frame, can you explain to me

14  11:39:08 how one would go about uploading a video clip onto

15  11:39:12 YouTube?

16  11:39:12   A    Sure.  I can give you the general work flow.

17  11:39:16        You create an account on YouTube.  You verify

18  11:39:22 your e-mail address for that account.  You go to our

19  11:39:26 upload screen, click the upload button, select the

20  11:39:32 video file you want to upload, include the metadata

21  11:39:39 fields that we ask for, a description, title, tags,

22  11:39:44 category, and then hit upload.

23  11:39:48   Q    And that's all it takes to upload?

24  11:39:51   A    Generally, yeah, pretty much.

25  11:39:52   Q    And did you ever upload videos to YouTube

1

2    12:13:29 plan for a start-up is hardly planned, because things

3    12:13:33 change so quickly.  It's more reactive.

4    12:13:35        MR. VERRILLI:  Q.  Well, you had a business

5    12:13:38 model at least that you were pursuing; right?

6    12:13:41     A   Again, the models at that time were so -- it

7    12:13:47 was just, again, best guesses and they were just

8    12:13:50 guesses.

9    12:13:52     Q   Well, you -- one possibility was to pursue an

10   12:14:02 advertising based business model; correct?

11   12:14:04     A   Yes.

12   12:14:04     Q   Do you have any others?

13   12:14:12     A   That was the primary.  I don't recall any

14   12:14:15 other specific plans.

15   12:14:16     Q   So the only one you can recall is an

16   12:14:20 advertising based business model?

17   12:14:22     A   Well, first and foremost we were focused on

18   12:14:25 creating a great user experience, so it's very

19   12:14:29 secondary.  That may sound odd creating a business and

20   12:14:34 not worrying about first and foremost money, but that

21   12:14:39 was the case.  I mean, we were really trying to build

22   12:14:43 a great experience for the user.

23   12:14:44     Q   And you didn't care about the money?

24   12:14:47     A   Not in -- initially, no.

25   12:14:49     Q   When did you start caring about the money?

```
1                                    HURLEY

2  12:14:51          MR. INGBER:  Objection to form.

3  12:14:52          THE WITNESS:  Well, it could be viewed that

4  12:14:58 we -- we are now just starting to focus on money.

5  12:15:03 Even after the acquisition, Google allowed us to

6  12:15:07 continue to focus on the user and to create a great

7  12:15:10 user experience.

8  12:15:11          MR. VERRILLI:  Q.  Well, your brother was

9  12:15:12 focused on the money in that e-mail on August 17th,

10 12:15:16 2005; wasn't he?

11 12:15:17     A    No; he was focused on a successful company.

12 12:15:19     Q    "A multi-billion dollar success" is what it

13 12:15:23 said; right?

14 12:15:23          MR. INGBER:  Objection; asked and answered,

15 12:15:25 Don.

16 12:15:26          THE WITNESS:  Creating a great product that

17 12:15:28 leads to success.

18 12:15:29          MR. VERRILLI:  Q.  And as far as you know, in

19 12:15:40 2005, no one employed at YouTube was thinking about

20 12:15:45 getting acquired?

21 12:15:46     A    In -- at what time period?

22 12:15:48     Q    In 2005.

23 12:15:50     A    No.

24 12:15:54     Q    So it would surprise you to learn --

25 12:15:56     A    Not to my knowledge.
```

1                          HURLEY

2  12:15:56    Q  -- so it would surprise you to learn that

3  12:15:58 your brother was actually communicating with other

4  12:16:00 YouTube employees in 2005 about getting acquired?

5  12:16:03         MR. INGBER:  Objection to form.

6  12:16:05         He testified that the answer was no, not to

7  12:16:08 his knowledge.

8  12:16:08         MR. VERRILLI:  So I asked him whether he'd be

9  12:16:11 surprised if that were the case.

10 12:16:14         THE WITNESS:  Again, we had a -- a similar

11 12:16:17 vision of focusing on the users and creating a great

12 12:16:20 product.  Anything like that, the money, any kind of

13 12:16:26 acquisition was very secondary and not at the

14 12:16:32 forefront of our thinking.

15 12:16:32         MR. VERRILLI:  Okay.

16 12:16:35    Q  Well, this -- we're talking about the

17 12:16:41 advertising based business model.

18 12:16:44    A  Uh-huh.

19 12:16:44    Q  Describe to me what an advertising based

20 12:16:47 business model is as you understand it.

21 12:16:52    A  As I understand it, similar websites, you get

22 12:17:00 traffic, people come to you, the site, and then you

23 12:17:03 can insert ads onto those pages and -- and earn

24 12:17:07 revenue from those ads.

25 12:17:09    Q  So one goal of an advertising based business

1                              HURLEY

2 12:17:13 model is to build up a large community of users of the

3 12:17:18 website; right?

4 12:17:23    A    Yeah.

5 12:17:24    Q    Okay.  And another goal in an advertising

6 12:17:29 based business model is to entice advertisers to place

7 12:17:36 ads on the website in order to earn revenue; right?

8 12:17:44    A    That's one way.  It's not necessarily the

9 12:17:47 way, and that's not the way we initially had it.

10 12:17:49    Q    Okay.  What -- how did you initially have it?

11 12:17:52    A    Just with the various ad networks online that

12 12:17:56 you can employ.  It's not that you have a direct sales

13 12:17:59 force selling ads for your site.  They just auto

14 12:18:02 insert those ads.

15 12:18:03    Q    But you did have a sales force selling ads

16 12:18:06 for your site by the second quarter of 2006; correct?

17 12:18:09    A    That's right.

18 12:18:09    Q    And you had planned well before the second

19 12:18:12 quarter of 2006 to have a sales force selling ads

20 12:18:16 directly by the second quarter of 2006; correct?

21 12:18:19        MR. INGBER:  Objection to form; vague and

22 12:18:20 ambiguous.

23 12:18:22        What do you mean by "well before"?

24 12:18:25        THE WITNESS:  Yeah, I don't recall

25 12:18:26 specifically when we planned that, to add a sales

1                                HURLEY

2  12:18:33 force.

3  12:18:34        MR. VERRILLI:  Q.  You don't recall?

4  12:18:36    A    No.   Initially it was a -- it -- it would --

5  12:18:42 it would be easier for us if we didn't have a sales

6  12:18:45 force, if we could just use the ad networks that would

7  12:18:49 automatically do things on their own.

8  12:18:53    Q    So going back to Exhibit 1, your resume, one

9  12:18:57 thing that it says is that you prepared and delivered

10 12:19:00 due diligence for the following transactions, and one

11 12:19:03 of them is Series A and B financing; do you see that

12 12:19:06 there?

13 12:19:07    A    Uh-huh.

14 12:19:07    Q    That was with Sequoia; correct?

15 12:19:10    A    That's right.

16 12:19:10    Q    And then it says "Equipment loan and lease";

17 12:19:13 do you see that?

18 12:19:14    A    That's right.

19 12:19:14    Q    That was with Triple Point; correct?

20 12:19:16    A    That's right.

21 12:19:16    Q    You don't recall making representations to

22 12:19:19 Triple Point that you had plans to have a direct

23 12:19:21 advertising sales force in the field in advance of the

24 12:19:25 second quarter of 2006?

25 12:19:28    A    I don't remember specifically.  Again, I

1

HURLEY

2   12:29:31 reviewing the videos before they were uploaded?

3   12:29:34    A    Not before.  They would immediately go live

4   12:29:38 to the site, and that was actually one of the reasons

5   12:29:43 that we introduced the community flagging, is that

6   12:29:48 they may upload -- I would go to bed at night.  I was

7   12:29:51 the only guy doing this.  Somebody may upload a video

8   12:29:54 in the middle of the night that was inappropriate, and

9   12:29:56 then in the morning this video may show up on one of

10  12:30:00 the most viewed pages, but there wasn't an easy way to

11  12:30:04 -- I would have to work through all the way back until

12  12:30:06 the middle of the night to be able to find that and

13  12:30:08 take that video down.

14  12:30:12    So the community flagging was an ability for

15  12:30:15 people to flag it and that it would automatically go

16  12:30:18 into a queue.

17  12:30:21    Q    But you -- you were reviewing -- I just want

18  12:30:24 to get the facts clear.  Until the end of

19  12:30:28 November 2005 you were reviewing every video that was

20  12:30:34 unloaded onto the site?

21  12:30:35    A    Well, it depends.  Reviewing, I would look at

22  12:30:38 thumbnails of videos.  I wasn't actually watching

23  12:30:41 videos.  It was -- it would be impossible to do that.

24  12:30:44    Q    Did you review a thumbnail of every video

25  12:30:47 that was uploaded to the site?

1

HURLEY

2  12:30:52   A    Yeah, I would do my best.  I was the only one

3  12:30:54 doing it.

4  12:30:55   Q    It must have been an -- must have been a real

5  12:30:57 job, but -- but I just want to get clear.

6  12:31:02        That's what you were attempting to do, was to

7  12:31:03 review a thumbnail of every video uploaded to the

8  12:31:07 site?

9  12:31:07   A    It was very ad hoc.  Again, just looking at

10 12:31:10 thumbnails, and if I saw some bare flesh, then I would

11 12:31:14 remove it, but outside of sort of spotting porn,

12 12:31:18 trying to catch other kind of inappropriate videos was

13 12:31:21 very difficult to do.  They would go through if they

14 12:31:25 were, you know, violence videos, stuff like that.

15 12:31:31        You can't see that with just a thumbnail, so

16 12:31:33 it would go live.  Again, that's why we started

17 12:31:37 building these tools so that the community could help

18 12:31:39 police it.

19 12:31:40        So we looked to other sites, similar to

20 12:31:44 online sites, like Craigslist and sort of these open

21 12:31:48 forums and what they had done is sort of best

22 12:31:50 practices to -- to rely on the community to be able to

23 12:31:55 help keep -- keep the community itself safe.

24 12:31:58   Q    Did you look at Google Video's practices as a

25 12:32:01 model?

1                                    HURLEY

2  12:47:21   Q   You've just been handed a document,

3  12:47:24 Mr. Hurley.  It's been marked Exhibit 7.

4  12:47:27       Could you take a look at it, please.

5  12:47:29   A   Uh-huh.  Okay.

6  12:48:06   Q   This is an e-mail from you; is that correct?

7  12:48:14   A   That's correct.

8  12:48:14   Q   And it was sent on the 24th of November 2005;

9  12:48:20 correct?

10 12:48:21   A   Yes.

11 12:48:21   Q   And --

12 12:48:23       MR. INGBER:  Just for the record, there's

13 12:48:24 actually two e-mails in this chain.

14 12:48:26       MR. VERRILLI:  Thank you.  The e-mail at the

15 12:48:28 top half of the page is the one we're referring to.

16 12:48:31   Q   You understand that, Mr. Hurley; right?

17 12:48:34   A   Yes.

18 12:48:34   Q   And the -- the -- the e-mail was sent on the

19 12:48:40 24th of November; correct?

20 12:48:42   A   Yeah.

21 12:48:43   Q   That was the day before the Thanksgiving

22 12:48:45 holiday; right?

23 12:48:46   A   Yes, yeah.

24 12:48:47   Q   Right.

25 12:48:49       And you are sending a message here to other

1        HURLEY

2   12:48:57 YouTube employees who are going to help you review

3   12:49:01 videos over the holiday weekend; correct?

4   12:49:03   A    That's correct.

5   12:49:03   Q    Okay.  And you're giving them instructions

6   12:49:06 about what to do; correct?

7   12:49:08   A    Yes.

8   12:49:08   Q    Okay.  And one of the instructions you give

9   12:49:16 them says "As far as copyright stuff is concerned, be

10  12:49:20 on the lookout for Family Guy, South Park and

11  12:49:25 full-length anime episodes."

12  12:49:29        Do I have that pronunciation correct by the

13  12:49:31 way?

14  12:49:31   A    Sure.  I don't know.  Anime.

15  12:49:36   Q    But that's one of the instructions you gave

16  12:49:38 to the reviewers; right?

17  12:49:42   A    Yes.

18  12:49:42   Q    And so when a reviewer found a Family Guy

19  12:49:49 episode, what was the reviewer supposed to do?

20  12:49:53   A    I assume try to take it down.

21  12:49:58   Q    And when the reviewer found a South Park

22  12:50:01 episode, what was the reviewer supposed to do?

23  12:50:04   A    Try to take it down.

24  12:50:05   Q    And when the reviewer found a full-length

25  12:50:09 anime episode, what was the reviewer supposed to do?

1                        HURLEY

2  12:50:13    A    Try to take it down.

3  12:50:14    Q    Okay.  But it was -- but the instruction goes

4  12:50:17 on to say that "music videos and news programs are

5  12:50:21 fine to approve"; right?

6  12:50:25    A    Uh-huh.

7  12:50:25         MR. INGBER:  Give an audible response.

8  12:50:27         THE WITNESS:  Yes.

9  12:50:32         MR. VERRILLI:  Q.  Can I ask you to go back

10 12:50:35 and look at Exhibit 2, please.  Let me know when

11 12:50:51 you're ready.

12 12:50:52    A    Okay.

13 12:51:00    Q    Are you ready?

14 12:51:01    A    Yeah, I'm ready.

15 12:51:02    Q    Okay.  So this is an e-mail that you sent

16 12:51:04 approximately a month and a half earlier; correct?

17 12:51:07    A    That's correct.

18 12:51:08    Q    Okay.  And the subject is "Admin

19 12:51:12 Improvements"; correct?

20 12:51:14    A    That's right.

21 12:51:14    Q    What does "Admin" mean?

22 12:51:18    A    That was the review where the queue of videos

23 12:51:24 when we would look at the thumbnails would be.

24 12:51:27    Q    Okay.  Can you go down to this number four

25 12:51:32 here?  You see it --

1                           HURLEY

2   14:36:26 you were involved in the review process, you never

3   14:36:29 relied exclusively on the community flagging to

4   14:36:32 prevent pornography from appearing on the site;

5   14:36:37 correct?

6   14:36:38          MR. INGBER:  Objection to form.

7   14:36:39          THE WITNESS:  I think as I had said before,

8   14:36:41 we didn't have community flagging at the outset, so of

9   14:36:46 course we were just trying, ad hoc, trying to control

10  14:36:51 the site.

11  14:36:52          MR. VERRILLI:  Q.  But you continued when --

12  14:36:57 during the time when you were involved in review,

13  14:37:00 YouTube continued to review proactively for

14  14:37:04 pornography even after you had the community flagging

15  14:37:07 system in place; correct?

16  14:37:12     A    Not to my knowledge.

17  14:37:16          Is this after I stopped doing any kind of

18  14:37:18 reviews?

19  14:37:19     Q    When you were doing it.

20  14:37:20     A    When I was doing it?

21  14:37:22     Q    When you were doing it.

22  14:37:27     A    Not to my knowledge.  I know we stopped

23  14:37:30 reviewing all videos, and we had introduced a flag and

24  14:37:36 reviewed the flag videos.

25  14:37:38     Q    And did YouTube ever implement the flagging

1                              HURLEY

2  15:17:58        MR. INGBER:  Hold on.  I don't want you to

3  15:18:00 guess.

4  15:18:00        THE WITNESS:  Oh, sorry.  Yeah.  Yeah, I'm

5  15:18:04 not sure.  It may or might -- may not actually be part

6  15:18:08 of private videos.

7  15:18:10        MR. VERRILLI:  Q.  The fact is that YouTube

8  15:18:15 proactively reviewed every private video uploaded to

9  15:18:18 make sure there was no inappropriate content; correct?

10 15:18:20        MR. INGBER:  Objection; vague as to time.

11 15:18:24        THE WITNESS:  Initially we reviewed any

12 15:18:26 video.

13 15:18:26        MR. VERRILLI:  Q.  And after YouTube stopped

14 15:18:28 reviewing any video, it continued to review all

15 15:18:31 private videos uploaded to ensure there was no

16 15:18:34 inappropriate content; correct?

17 15:18:39     A   Again, I'm not sure as far as timing.  I

18 15:18:43 transitioned those duties over to Heather and the

19 15:18:46 other team members.

20 15:18:49     Q   But you created a document that specifically

21 15:18:51 says that all private videos will be screened for

22 15:18:54 inappropriate content; didn't you?

23 15:18:56        MR. INGBER:  Objection.

24 15:18:57        Show him the document if you feel it will

25 15:19:02 refresh his recollection.

1                          HURLEY

2  15:34:05 I'm not -- I'm not surprised.  It's just that I don't

3  15:34:11 specifically remember doing it.

4  15:34:12      MR. VERRILLI:  Q.  You don't have any reason

5  15:34:13 to think that this is incorrect; do you?

6  15:34:16   A   No.

7  15:34:20   Q   Okay.  Could we give the witness Exhibit 14,

8  15:34:24 please.

9  15:34:39           Here you go.  14.

10 15:34:42      MR. INGBER:  Is this the document with the

11 15:34:43 subject line "Board Preso"?

12 15:34:49      MR. VERRILLI:  No, I'm sorry.  I got ahead of

13 15:34:51 myself.

14 15:34:51      MR. INGBER:  I think we're going on to 14 and

15 15:34:53 heading to 17 if you're marking a new 16?

16 15:34:57      MR. VERRILLI:  No, I think I jumped ahead,

17 15:35:00 because I premarked this.  That's what I think is

18 15:35:03 causing the confusion here.  I think we are at 15.

19 15:35:05      MR. INGBER:  Yeah, you're right.

20 15:35:06      MR. VERRILLI:  And this document is 14.  It's

21 15:35:08 a document, the tag line says "June Results."  Okay.

22 15:35:12 It's my -- I'm the source of that confusion.

23 15:35:22      MR. INGBER:  This is 14.

24 15:35:44           Don, which -- what's the Bates number on the

25 15:35:46 document that you've labeled Exhibit 13?

1                              HURLEY

2  15:35:49        MR. VERRILLI:  Exhibit 13?

3  15:35:50        MR. INGBER:  Yes.

4  15:35:51        MR. VERRILLI:  Exhibit 13 is the "Board

5  15:35:55 Preso."

6  15:35:56        MR. INGBER:  Okay.

7  15:35:56        MR. VERRILLI:  It's 00762173.

8  15:36:03        MR. INGBER:  Okay.  Got it.

9  15:36:05        MR. VERRILLI:  Okay.

10 15:36:06   Q   Mr. Hurley, have you had a chance to review

11 15:36:08 this document?

12 15:36:09   A   Yes.

13 15:36:09   Q   And the first page of this document is an

14 15:36:13 e-mail, and it's from you to another person at

15 15:36:17 YouTube; correct?

16 15:36:18   A   Uh-huh, that's right.

17 15:36:19   Q   And it's dated June -- forgive me, and it's

18 15:36:23 dated August 18th, 2006; correct?

19 15:36:29   A   August 18th, yeah.

20 15:36:30   Q   Okay.  And it attaches -- it has an

21 15:36:35 attachment; correct?

22 15:36:36   A   That's correct.

23 15:36:36   Q   And did you prepare this attachment?

24 15:36:39   A   Yes.

25 15:36:39   Q   Okay.  And you're familiar with it?

1                          HURLEY

2  15:36:42    A    Yes.

3  15:36:42    Q    Okay.  I just want you to explain some things

4  15:36:49 to me about this document, and I'm going to ask if we

5  15:36:52 could start on Bates numbered page 0073364.

6  15:37:09    A    Okay.

7  15:37:10    Q    There is a column to the left that says

8  15:37:12 "date"; right?

9  15:37:13    A    Yeah.

10 15:37:14    Q    Is that the date on which the particular

11 15:37:16 advertisement ran?

12 15:37:17    A    Yes.

13 15:37:17    Q    Okay.  And the next column says "Channel";

14 15:37:21 right?

15 15:37:22    A    Yeah.

16 15:37:22    Q    What does that mean?

17 15:37:24    A    Just the ad unit on the site depending on

18 15:37:32 which page it was on.

19 15:37:33    Q    Okay.  So let me just ask some questions so I

20 15:37:35 can get clarification as to what this means.

21 15:37:37         For example, on 6/1/2006 it says "Channel

22 15:37:43 Watch Top."  Does that mean the advertisement appeared

23 15:37:46 at the top of the watch page?

24 15:37:48    A    Yes.

25 15:37:48    Q    Okay.  And the next one, 6/1/2006, says

1          HURLEY

2  15:37:52 "Results Top."  Does that mean that the advertisement

3  15:37:55 appeared at the top of the results page?

4  15:37:57    A    The top of the search results page, I

5  15:37:59 believe.

6  15:37:59    Q    Okay.  I'm just trying to understand what --

7  15:38:02 what you meant by the words you used here.

8  15:38:04    A    Uh-huh.

9  15:38:04    Q    That's what it means --

10 15:38:06    A    Yeah.

11 15:38:06    Q    -- search results page?

12 15:38:08         Okay.  And below it, I'm not going to go

13 15:38:12 through each one.  I just want to gain a general

14 15:38:15 understanding of what these terms mean.

15 15:38:17         "6/1/2006 Results Right."  That means that

16 15:38:20 the ad appeared on the right-hand side of the search

17 15:38:24 results page --

18 15:38:25    A    True.

19 15:38:26    Q    -- is that correct?

20 15:38:26    A    Yeah.

21 15:38:27    Q    Okay.  And on the next one, it says "Browse

22 15:38:31 Right"; what does that mean?

23 15:38:35    A    Those are the browse pages of most viewed or

24 15:38:38 most discussed videos.

25 15:38:39    Q    Okay.  And then "Channels Top," what does

1                          HURLEY

2   15:38:46 that mean?

3   15:38:48    A    I believe that's your own YouTube channel

4   15:38:51 when you create your account.  That's sort of like

5   15:38:55 similar to your profile on other sites.

6   15:38:57    Q    Okay.  How about "Members Top"?  What does

7   15:39:00 that mean?

8   15:39:01    A    I'm not sure what that means.

9   15:39:07    Q    How about "Groups Top"?

10  15:39:09    A    I assume that's just the top of the groups

11  15:39:13 browse page.

12  15:39:13    Q    How about "Tribal Top"?

13  15:39:16    A    I'm not sure.  We did have an ad network

14  15:39:22 called Tribal Fusion.  I don't know why they had a

15  15:39:25 separate unit there, what that means.

16  15:39:27    Q    And the -- without going through this

17  15:39:32 document line by line, this is a summary of the

18  15:39:37 advertisements that ran on YouTube in June 2006; is

19  15:39:44 that correct?

20  15:39:44    A    Yeah.

21  15:39:44    Q    And the data on the right-hand column is

22  15:39:48 basically measuring how well the advertisements did in

23  15:39:50 terms of what revenue they generated, how much

24  15:39:53 attention they got, that sort of thing; right?

25  15:39:55        MR. INGBER:  Objection; vague.

1                          HURLEY

2  15:39:56        THE WITNESS:  Yeah, it shows clicks and

3  15:39:58 earnings.

4  15:39:59        MR. VERRILLI:  Okay.

5  15:40:00   Q   And what this -- one of the things that this

6  15:40:03 document tells us is that in June 2006, YouTube was

7  15:40:07 running ads on the watch pages; right?

8  15:40:12   A   Yes.

9  15:40:12   Q   And that in June 2006, it was running ads on

10 15:40:16 the results pages; correct?

11 15:40:18   A   Yes.

12 15:40:18   Q   And in June 2006, it was running ads on the

13 15:40:22 browse pages; correct?

14 15:40:23   A   Yes.

15 15:40:23   Q   And in June 2006, it was running

16 15:40:27 advertisements on the channels pages; correct?

17 15:40:29   A   Correct.

18 15:40:30   Q   And in June 2006, it was running ads on the

19 15:40:33 members pages; correct?

20 15:40:36   A   Yeah, whatever those members' names are, yes.

21 15:40:41   Q   Okay.  And so any of the pages listed in this

22 15:40:43 document, it is a page on which advertising ran on

23 15:40:49 YouTube in June 2006; correct?

24 15:40:53   A   Yes.

25 15:40:53   Q   Okay.  And I don't know if I asked you about

1                                    HURLEY

2    15:40:56 this one.  I'm sorry.

3    15:40:57        "6/1/2006 Home Right," what does that mean?

4    15:41:03    A    I assume it's the home page.

5    15:41:05    Q    Okay.  So the right-hand side of the home

6    15:41:08 page, is that what that would mean?

7    15:41:11    A    Yeah, I can't be sure.

8    15:41:15    Q    Well, you wrote the document; didn't you?

9    15:41:18    A    This is a dump that Alex would dump out of, I

10   15:41:22 believe, double click.  So this is a spreadsheet that

11   15:41:26 he created.  I created the -- the -- the top

12   15:41:31 spreadsheet.

13   15:41:35    Q    Okay.  Let me mark this as exhibit....

14   15:42:02        (Document marked Hurley Exhibit 16

15   15:42:03         for identification.)

16   15:42:27        MR. VERRILLI:  Q.  I'm just going to ask you

17   15:42:37 a question about the first page, but you should feel

18   15:42:39 free to take all the time you want to look at the

19   15:42:42 document.

20   15:43:42    A    Okay.

21   15:43:43    Q    Okay.  Exhibit 16 is -- the first page of it

22   15:43:55 consists of an e-mail chain, and the first e-mail

23   15:44:01 listed is an e-mail from you to Sean Dempsey; right?

24   15:44:06    A    That's right.

25   15:44:06    Q    Who's Sean Dempsey?

```
                   1                    HURLEY
15:44:09           2        A    I believe he's on the corporate development
15:44:11           3     team at Google.
15:44:15           4        Q    Okay.  Did you interact with him during the
15:44:17           5     course of due diligence on the Google acquisition of
15:44:21           6     YouTube?
15:44:21           7        A    Very briefly.  We may -- this may be one of
15:44:25           8     like two e-mails we exchanged.
15:44:27           9        Q    Okay.  You were involved in that due
15:44:29          10     diligence process though; correct?
15:44:33          11        A    Yes.
15:44:33          12        Q    Okay.  And it's CCed to Storm Duncan;
15:44:38          13     correct?
15:44:38          14        A    Uh-huh.
15:44:38          15        Q    And who's he?
15:44:40          16        A    I don't recall who Storm is, but he looks
15:44:42          17     like a banker from Credit Suisse.
15:44:47          18        Q    Okay.  And in this message to Sean Dempsey,
15:44:51          19     you were answering some questions that he posed to
15:44:53          20     you; correct?
15:44:56          21        A    Yes.
15:44:56          22        Q    And item number three in your answer says
15:44:59          23     "Yes, we are running ROS ads on both the search, watch
15:45:03          24     and browse pages."  That's what it says; right?
15:45:06          25        A    That's what it says.
```

```
                    1                      HURLEY
15:45:07    2        Q    What's "ROS" stand for?
15:45:10    3        A    Just Run of Site.
15:45:12    4        Q    What is a run-of-site ad?
15:45:17    5        A    Jeez, I don't know the specific definition.
15:45:45    6    Yeah, I don't know the specific definition.
15:45:48    7        Q    Did you know it at the time you wrote this
15:45:50    8    e-mail?
15:45:51    9        A    Yeah, I guess if I was --
15:45:55   10             MR. INGBER:  Don't guess.
15:45:56   11             THE WITNESS:  Well, yeah, I don't recall.
15:46:04   12             MR. VERRILLI:  Q.  Well, whatever a
15:46:08   13    run-of-site ad is, you're confirming in this e-mail
15:46:11   14    that as of October 2006 those ads were running on the
15:46:15   15    search watch and browse pages; correct?
15:46:17   16        A    That's what it says.
15:46:18   17        Q    And it would be important for you to be
15:46:20   18    accurate in conveying this information to Google as
15:46:23   19    part of the due diligence for this deal; correct?
15:46:26   20        A    Yes.
15:46:26   21        Q    So it's safe to assume that this was an
15:46:30   22    accurate statement of what YouTube was, in fact, doing
15:46:32   23    in October 2006 with respect to run-of-site ads;
15:46:36   24    correct?
15:46:36   25             MR. INGBER:  Objection to form.
```

1                              HURLEY

2   15:46:37        THE WITNESS:  Yeah.  Again, I don't recall

3   15:46:45 specifically, but that's what the e-mail says, so I

4   15:46:48 have no reason to believe it's false.

5   15:46:50        MR. VERRILLI:  Q.  Well, my question to you

6   15:46:52 is whether -- I believe my question to you is -- I

7   15:46:55 apologize if I'm confused here -- was whether it was

8   15:46:59 important to be accurate in conveying this information

9   15:47:04 on Exhibit 16 to Google in the course of this due

10  15:47:07 diligence process.

11  15:47:08        MR. INGBER:  Asked and answered.

12  15:47:11        MR. VERRILLI:  Q.  And what was the answer?

13  15:47:12    A    Yes.

14  15:47:23        MR. VERRILLI:  Okay.  Could we mark this

15  15:47:25 document, please, as, I guess, what, 17?  Yes, 17.

16  15:47:35        (Document marked Hurley Exhibit 17

17  15:47:37         for identification.)

18  15:47:37        MR. VERRILLI:  Q.  We've only got a few

19  15:47:38 minutes left on the tape, so after we discuss this

20  15:47:41 document, why don't we take a break; okay?

21  15:47:43    A    Sure.

22  15:50:04    Q    You ready?

23  15:50:06    A    Okay.

24  15:50:06    Q    Okay.  The cover page of Exhibit 17 is an

25  15:50:09 e-mail from Maryrose Dunton to Micah Schaffer and

1                                    HURLEY

2  15:50:15 Heather Gillette; correct?

3  15:50:17   A    That's correct.

4  15:50:18   Q    It's dated January 1st, 2006, -- January

5  15:50:22 10th, 2006; correct?

6  15:50:23   A    Yes.

7  15:50:23   Q    Okay.  It has an attachment to it; correct?

8  15:50:28   A    That's correct.

9  15:50:28   Q    The attachment is titled "YouTube Feature

10 15:50:33 Description"; correct?

11 15:50:34   A    That's correct.

12 15:50:35   Q    The feature name is "Admin Improvements";

13 15:50:38 correct?

14 15:50:38   A    Correct.

15 15:50:38   Q    The document lists three innovators; correct?

16 15:50:44   A    Correct.

17 15:50:44   Q    One of them is Brent; correct?

18 15:50:47   A    Yes.

19 15:50:47   Q    That's you; correct?

20 15:50:48   A    Yes.

21 15:50:48   Q    Okay.  So you were one of the innovators of

22 15:50:51 this admin improvements feature; correct?

23 15:50:54   A    Yes, I worked on this feature.

24 15:50:56   Q    Okay.  Do you recall doing so?

25 15:50:59   A    Yes.  Well, I recur -- I recall working with

1                              HURLEY

2  15:51:09 lawyer -- with lawyers on this feature.

3  15:51:11        MR. INGBER:  Okay.  Don't -- that's fine.

4  15:51:13        MR. VERRILLI:  I didn't ask him anyway.

5  15:51:15        MR. INGBER:  I understand.  I want to caution

6  15:51:17 him not to reveal any attorney-client communications.

7  15:51:20        MR. VERRILLI:  Okay.

8  15:51:21    Q    The -- you know what, in light of that, I'm

9  15:51:24 thinking what I'd like to do is finish my questions on

10 15:51:29 this.  I don't know if it's going to run over the

11 15:51:31 tape, but I would like to finish my questions on this

12 15:51:34 document, and then we can take a break; okay?

13 15:51:37    A    Okay.

14 15:51:37    Q    So what I'd like to first direct your

15 15:51:39 attention to with respect to this document,

16 15:51:44 Mr. Hurley, is the item number one on the page,

17 15:51:50 "Screening of Only Flagged/Private Videos"; you see

18 15:51:54 that there?

19 15:51:55    A    Yeah.

20 15:51:55    Q    This document indicates that moving forward

21 15:52:01 all private videos will be screened; correct?

22 15:52:05        MR. INGBER:  Objection to form.

23 15:52:06        THE WITNESS:  That's what the document says.

24 15:52:15        MR. VERRILLI:  Q.  And that was the policy

25 15:52:16 going forward as of the time this document was

1                              HURLEY

2  15:52:18 created; right?

3  15:52:20       MR. INGBER:  Objection to form.

4  15:52:21       THE WITNESS:  Again, I didn't create this

5  15:52:25 document.  I contributed to these features, but I

6  15:52:31 don't recall specifically.  Again, I had moved on to

7  15:52:33 other things.  This was sort of my last project that I

8  15:52:38 was working on until I like really transitioned over

9  15:52:42 to finance and operation duties.  So I don't recall

10 15:52:49 the specific policy going forward or....

11 15:52:56       MR. VERRILLI:  Q.  It does indicate that all

12 15:53:00 private videos will be screened; right?

13 15:53:06    A    It says "Moving forward, only flagged and

14 15:53:08 private videos will be reviewed."

15 15:53:10    Q    And then the last of the bullets there under

16 15:53:13 point one indicates that all private videos will be

17 15:53:17 screened; right?

18 15:53:23       MR. INGBER:  Objection to form.  The document

19 15:53:25 speaks for itself.

20 15:53:29       THE WITNESS:  Break out admin into three tabs

21 15:53:31 with videos filtered.  Private videos is one of those.

22 15:53:36       MR. VERRILLI:  Q.  So does this mean that any

23 15:53:38 video that was uploaded as a private video would

24 15:53:43 automatically be routed to admin for review?

25 15:53:47       MR. INGBER:  Objection; lacks foundation.

1                                    HURLEY

2   15:53:54        THE WITNESS:  Again, I don't recall.  I

3   15:53:56 wasn't involved with the daily admin tool at this

4   15:54:00 point.

5   15:54:00        MR. VERRILLI:  Q.  Well, is listing you as an

6   15:54:04 innovator another embellishment?

7   15:54:06        MR. INGBER:  Objection; argumentative.

8   15:54:09        THE WITNESS:  Again, I -- I contributed to

9   15:54:10 this, but I didn't actually implement it.

10  15:54:12        MR. VERRILLI:  Q.  Well, did you contribute

11  15:54:14 to the decision that all private videos would be

12  15:54:16 screened?

13  15:54:17        MR. INGBER:  Objection.

14  15:54:17        And I'll allow you to answer only to the

15  15:54:22 extent you're not revealing privileged attorney-client

16  15:54:35 communications.

17  15:54:37        THE WITNESS:  I don't recall specifically

18  15:54:38 what I added.  I just know that I worked on this

19  15:54:42 project primarily with our lawyers, but as far as

20  15:54:51 specific things, and again, I wasn't an engineer, I'm

21  15:54:57 not really a product person, I just had been reviewing

22  15:54:59 the videos in the early days.  So my input was helpful

23  15:55:05 to try to come up with these tools.

24  15:55:08        MR. VERRILLI:  Q.  And you don't have any

25  15:55:11 reason to doubt that all private videos were, in fact,

1                              HURLEY

2   15:55:14 screened after this feature was implemented; do you?

3   15:55:16          MR. INGBER:  Objection; lacks foundation.

4   15:55:18          You can answer.

5   15:55:19          THE WITNESS:  Again, I don't recall

6   15:55:24 specifically, but I don't have any reason to believe

7   15:55:27 that -- that it wasn't.

8   15:55:30          MR. VERRILLI:  Q.  Well, to your knowledge,

9   15:55:33 were the other elements of the changes in practice

10  15:55:40 identified in this document actually implemented?

11  15:55:44          MR. INGBER:  Objection to form.

12  15:56:13          THE WITNESS:  I can't recall specifically.  I

13  15:56:20 know you have to confirm your e-mail address, so I

14  15:56:23 can -- I know that is a feature that's on the site

15  15:56:25 now.

16  15:56:27          I don't ever recall having an e-mail alert

17  15:56:30 for flagged at YouTube, so I can't recall, so I can't

18  15:56:38 really give specifics on all this stuff.  Again,

19  15:56:41 because I wasn't directly --

20  15:56:41          MR. VERRILLI:  Q.  And --

21  15:56:44          THE WITNESS:  -- involved in the day-to-day.

22  15:56:45          MR. VERRILLI:  Q.  Sorry.  I didn't mean to

23  15:56:47 interrupt you.

24  15:56:47          Under "Scope," the first item is "Screening

25  15:56:50 of Only Flagged/Private Video"; do you see that?

1                                        HURLEY

2   15:56:54    A    I see that.

3   15:56:55    Q    Okay.  So is one of the changes that this

4   15:57:01 feature described in this exhibit bringing about is an

5   15:57:10 end to the review on a proactive basis of all of

6   15:57:15 the -- of thumbnails of all of the videos that are

7   15:57:19 being uploaded to YouTube?

8   15:57:21         MR. INGBER:  Objection to form.

9   15:57:24         THE WITNESS:  It's -- I don't recall the

10  15:57:41 specific timetable, but I believe we stopped reviewing

11  15:57:44 all videos earlier around that Thanksgiving time

12  15:57:49 period because it was -- it was impossible to do, so

13  15:57:57 that's why we were creating these tools.

14  15:58:01         MR. VERRILLI:  Q.  Well, was the decision to

15  15:58:08 stop reviewing all videos based on the advice that

16  15:58:14 your lawyers gave you?

17  15:58:18         MR. INGBER:  Objection; that question in

18  15:58:21 itself may call for the disclosure of privileged

19  15:58:26 attorney-client communications.  So I'm going to

20  15:58:29 instruct the witness not to answer.

21  15:58:30         MR. VERRILLI:  Okay.  I'm not trying to be

22  15:58:32 difficult about this.  We have an issue about advice

23  15:58:34 of counsel.

24  15:58:35         MR. INGBER:  I understand.

25  15:58:35         MR. VERRILLI:  I'm going to make a record,

1               HURLEY

2  15:58:38 okay, and you can instruct the witness not to answer,

3  15:58:40 and it will be fine.

4  15:58:41   Q   So what I'm trying to get at here,

5  15:58:43 Mr. Hurley, is whether you relied on the advice of

6  15:58:47 counsel in shaping the policies set forth in this

7  15:58:51 document?

8  15:58:52        MR. INGBER:  Is that a question?

9  15:58:55        MR. VERRILLI:  Yes.

10 15:58:55        MR. INGBER:  Okay.  I instruct you not to

11 15:58:58 answer to the extent that it will reveal privileged

12 15:59:01 attorney-client communications.

13 15:59:09        Actually, strike that.  I instruct you not to

14 15:59:12 answer the question on the ground that it will reveal

15 15:59:14 attorney-client communications.

16 15:59:16        MR. VERRILLI:  Okay.

17 15:59:20   Q   Tell me the names of the attorneys with whom

18 15:59:23 you were conferring during the process that led up to

19 15:59:27 these policy changes?

20 15:59:30   A   Brian Knapp and Kathy Kirkman.

21 15:59:34   Q   And were they lawyers at the Wilson, Sonsini

22 15:59:37 firm?

23 15:59:37   A   Yes.

24 15:59:37   Q   Okay.  Anyone else?

25 15:59:40   A   Not that I recall.

1                           HURLEY

2   15:59:42   Q   Did YouTube have an in-house lawyer at this

3   15:59:44 time?

4   15:59:47   A   I'm not sure.

5   15:59:54        THE VIDEOGRAPHER:  We're really getting low

6   15:59:55 on tape now.

7   15:59:58        MR. VERRILLI:  Okay.  Let's take our break

8   16:00:00 now.

9   16:00:00        THE VIDEOGRAPHER:  This is the end of

10  16:00:01 videotape number two in the deposition of Brent Hurley

11  16:00:04 on August 26th, 2008.

12  16:00:07        The time is 3:59 p.m. -- :54 p.m.

13  16:00:12        We're off the record.

14  16:00:13        (Recess taken.)

15  16:23:51        THE VIDEOGRAPHER:  This is the beginning of

16  16:23:53 videotape number three in the deposition of

17  16:23:57 Brent Hurley on August 26th, 2008.  The time is

18  16:24:00 4:23 p.m.

19  16:24:01        We are back on the record.

20  16:24:04        MR. VERRILLI:  Q.  Mr. Hurley, before the

21  16:24:06 break, we were talking about Exhibit 17.  Could you

22  16:24:11 take another look at that?

23  16:24:12   A   Sure.

24  16:24:12   Q   This was the YouTube feature description.

25  16:24:21   A   Yes.

1                          HURLEY

2   16:57:33 please.  So just to remind you, Exhibit 3 is an e-mail

3   16:57:59 from you to Jawed Karim dated November 22nd, 2005,

4   16:58:05 correct?

5   16:58:05     A    Correct.

6   16:58:05     Q    You're responding to an e-mail that Mr. Karim

7   16:58:09 sent to you on November 22nd asking you why YouTube

8   16:58:14 got rid of the copyright flagging; correct?

9   16:58:16     A    Yes.

10  16:58:16     Q    Now, it's true, isn't it, that YouTube for a

11  16:58:19 time had a copyright flagging feature; correct?

12  16:58:22     A    Yes.

13  16:58:22     Q    Okay.  Explain to me how that feature worked

14  16:58:25 when it was in operation?

15  16:58:31     A    As you see in this e-mail, it shows there are

16  16:58:35 a number of things you could flag a video for on being

17  16:58:40 feature this to promote, try to get your video on the

18  16:58:46 front page inappropriate, miscategorized and

19  16:58:51 copyright.

20  16:58:54     Q    So explain to me, please, how the feature

21  16:58:58 worked.

22  16:58:58     A    Although there are these different buckets,

23  16:59:01 they just were flagged and -- and put into the queue.

24  16:59:05     Q    So while this feature was operative, if a

25  16:59:09 YouTube user flagged a video for copyright, then it

1                              HURLEY

2  16:59:13 would go into the queue; correct?

3  16:59:16    A    Yeah.

4  16:59:17    Q    And it would be reviewed to determine whether

5  16:59:19 it was likely to be an unauthorized upload of

6  16:59:22 copyrighted work; correct?

7  16:59:31    A    Yeah, I think that was the thinking at the

8  16:59:37 time.

9  16:59:38    Q    You used the word "yeah" when you started

10 16:59:42 that answer.  You meant "yes"?

11 16:59:45    A    Yes.

12 16:59:45    Q    Okay.  And then there came a point where

13 16:59:50 YouTube made a policy decision to remove the copyright

14 16:59:55 flagging feature; correct?

15 16:59:58    A    Yes.

16 16:59:58    Q    So when you had the feature, you were

17 17:00:04 reviewing videos, "you" meaning YouTube -- let me --

18 17:00:09 let me start over so we don't have any lack of

19 17:00:11 clarity.

20 17:00:11        When the feature was in place, YouTube was

21 17:00:14 reviewing videos to determine whether they were likely

22 17:00:18 to be unauthorized uploads of copyrighted works;

23 17:00:23 correct?

24 17:00:25        MR. INGBER:  Hold on.

25 17:00:40        Objection to the form of the question to the

1                              HURLEY

2  17:00:42 extent it mischaracterizes the witness's testimony.

3  17:00:44      MR. VERRILLI:  You can answer the question.

4  17:00:48      THE WITNESS:  Could you repeat the question,

5  17:00:49 please?

6  17:00:49      MR. VERRILLI:  Could you read it back,

7  17:00:50 please.

8  17:01:10      (Whereupon, record read by the Reporter as

9  17:01:10 follows:

10 16:59:58      "Question:  So when you had the feature, you

11 17:00:04          were reviewing videos, "you" meaning YouTube

12 17:00:08          -- let me -- let me start over so we don't

13 17:00:10          have any lack of clarity.

14 17:00:11      "When the feature was in place, YouTube was

15 17:00:14          reviewing videos to determine whether they

16 17:00:18          were likely to be unauthorized uploads of

17 17:00:22          copyrighted works; correct?")

18 17:01:12      THE WITNESS:  So again, this e-mail was dated

19 17:01:25 November 22nd.  I think the subsequent e-mail was like

20 17:01:30 two days later where we stopped reviewing all the

21 17:01:35 thumbnails of the videos being uploaded.  At this

22 17:01:39 time, we had received notices from content owners

23 17:01:43 asking us to remove things from the site.  So, you

24 17:01:48 know, we were trying to address the problem and create

25 17:01:51 different features to -- to again address this

1                           HURLEY

2  17:01:55 problem.  One of these was that this copyright flag

3  17:02:01 that we had but then quickly realized that it was

4  17:02:06 completely ineffective, there was -- people could flag

5  17:02:13 things that they, you know, weren't the copyright

6  17:02:15 owner.  They might be upset with one of their friends

7  17:02:21 and flag a video.

8  17:02:23          There was just a whole host of things, and we

9  17:02:25 were in no position to know who -- if -- if the

10 17:02:32 content was -- was authorized and also whoever was

11 17:02:36 flagging the video, if they were authorized to make

12 17:02:39 the judgment call to have it removed or request to

13 17:02:42 have it removed.

14 17:02:44          MR. VERRILLI:  Q.  Well, the user who flagged

15 17:02:47 it didn't make a judgment call to remove it; correct?

16 17:02:49          MR. INGBER:  Objection; calls for

17 17:02:51 speculation.

18 17:02:54          MR. VERRILLI:  Q.  Let me rephrase it.

19 17:02:55     A    Yeah.

20 17:02:55     Q    YouTube made the decision whether to remove

21 17:02:57 the flagged videos, not the user; correct?

22 17:03:01     A    Remove this copyright flag?

23 17:03:03     Q    Any flagged video.  YouTube made the decision

24 17:03:06 to remove a flagged video, not the user; correct?

25 17:03:10          MR. INGBER:  Objection; argumentative.

1                              HURLEY

2  17:03:11          THE WITNESS:  After a video is flagged, we

3  17:03:16 review it to, you know, use our best efforts to -- to

4  17:03:19 see if the video violates the terms of use, and then

5  17:03:23 yes, we remove it from the site.

6  17:03:25          MR. VERRILLI:  Right.

7  17:03:25     Q    The flagging by the user does not

8  17:03:27 automatically result in the removal?

9  17:03:29     A    No.

10 17:03:30     Q    The removal occurs when YouTube makes a

11 17:03:33 judgment that the video should be removed; correct?

12 17:03:37     A    That is correct.

13 17:03:37     Q    And for --

14 17:03:38     A    And I'd just like to add that, you know,

15 17:03:41 things like porn are -- are easy to sort of see that

16 17:03:44 they violated the terms of use.  You look at the

17 17:03:47 video, you know all the information you need is

18 17:03:49 contained in that video, so we can remove those in

19 17:03:56 confidence that they are, in fact, violations of the

20 17:03:58 Terms of Use.

21 17:04:01          Again, other pieces of content which may be

22 17:04:04 unauthorized, we have no way of knowing if, in fact,

23 17:04:09 the content owner did authorize and did see the site

24 17:04:13 with their videos.

25 17:04:15          One example that's pointed to a lot is the

1    HURLEY

2    17:30:45        THE WITNESS:  Yeah.  So my understanding of

3    17:30:47 an MD5 hash, it's a unique thumbprint of the video

4    17:30:52 file, but the exact video file needs to be uploaded to

5    17:30:55 produce a matching fingerprint.

6    17:30:58        So if -- if you took one clip and it was a --

7    17:31:04 a two-minute clip of this video and we got a notice,

8    17:31:09 or it was inappropriate and we took it down, if

9    17:31:13 another user tried to upload it but they had edited,

10   17:31:16 so it was only one of the two minutes, then it would

11   17:31:20 be a different thumbprint, so it wouldn't be able to

12   17:31:24 recognize that.

13   17:31:25        MR. VERRILLI:  Right.

14   17:31:26   Q    So it was ineffective unless the -- unless

15   17:31:30 the subsequent upload was exactly identical to the

16   17:31:34 clip that had been taken down; correct?

17   17:31:36        MR. INGBER:  Objection to form.

18   17:31:41        THE WITNESS:  It was the best solution at the

19   17:31:43 time.  And again it was a -- a feature that we

20   17:31:46 introduced that, to my knowledge, no other video site

21   17:31:49 had introduced showing that we were actively trying to

22   17:31:55 address this, this issue.

23   17:31:57        MR. VERRILLI:  Q.  Well, if you had gotten an

24   17:31:59 MD5 hash of an entire episode of a television show,

25   17:32:04 then any clip that was uploaded that matched any part

1                    HURLEY

2  17:32:10 of the television show would have been blocked;

3  17:32:13 wouldn't it?

4  17:32:14        THE WITNESS:  No.

5  17:32:14        MR. INGBER:  Objection to form.

6  17:32:15        THE WITNESS:  That's exactly what I said

7  17:32:17 wouldn't happen.  That's what I was outlining the

8  17:32:20 fundamental limitations of this MD5 hash, that it

9  17:32:24 needed to be the exact same video.

10 17:32:28        MR. VERRILLI:  Q.  So it didn't really block

11 17:32:30 very many uploads; did it?

12 17:32:35        MR. INGBER:  Objection; vague.

13 17:32:36        THE WITNESS:  Yeah, I -- I don't have that

14 17:32:38 information, but again, it was a best tool that we had

15 17:32:46 at the time.  We were trying to rapidly come up

16 17:32:48 with -- with tools to address this.

17 17:32:50        MR. VERRILLI:  Q.  You think that was the

18 17:32:51 best available technology at the time, to prevent the

19 17:32:54 unauthorized upload of copyrighted works?

20 17:32:58        MR. INGBER:  Objection to form.

21 17:33:02        THE WITNESS:  To my knowledge.

22 17:33:02        MR. VERRILLI:  Q.  You never heard of Audible

23 17:33:06 Magic at that time?

24 17:33:09     A   I can't recall.

25 17:33:11     Q   Did you ever here of Audible Magic?

1                         HURLEY

2  17:35:54 witness, we have to repeat our questions.

3  17:35:56        MR. INGBER:  Okay.

4  17:35:57        MR. VERRILLI:  I'm sorry for that, but that's

5  17:35:58 just the way it is.

6  17:35:59        MR. INGBER:  Just because you're not getting

7  17:36:00 the answers you necessarily want, Don, doesn't make a

8  17:36:04 witness evasive.

9  17:36:05        MR. VERRILLI:  Q.  So let's continue to

10 17:36:07 discuss the Content Verification Program; okay?

11 17:36:14    A    (Witness nods head.)

12 17:36:14    Q    That program was designed to have two phases;

13 17:36:21 right?

14 17:36:27    A    I don't -- I don't recall specifically.  I

15 17:36:30 know we were adding new features just like we're

16 17:36:34 adding new features to the site.  Just like rapidly

17 17:36:38 throughout the entire life of the company.

18 17:36:40    Q    You designed the program; right?

19 17:36:43    A    I -- yeah, I -- I had the lead working with

20 17:36:47 our lawyers and also other product people at the -- at

21 17:36:51 YouTube.

22 17:36:52        MR. VERRILLI:  Okay.  Can we mark this,

23 17:36:53 please, as an exhibit?

24 17:36:53            (Document marked Hurley Exhibit 20

25 17:37:10             for identification.)

1                              HURLEY

2  17:37:10        MR. INGBER:  Thank you.

3  17:37:11        MR. VERRILLI:  Q.  Let me know when you're

4  17:37:14 ready, Mr. Hurley.

5  17:38:07   A   Okay.

6  17:38:07   Q   You ready?

7  17:38:08   A   Yeah.

8  17:38:10   Q   The first page of this document is an e-mail

9  17:38:13 from you to Maryrose Dunton; correct?

10 17:38:18   A   Correct.

11 17:38:18   Q   And it's dated March 1st, 2006; correct?

12 17:38:22   A   That's correct.

13 17:38:22   Q   And it was forwarding an attachment; correct?

14 17:38:27   A   That's correct.

15 17:38:28   Q   And the attachment describes something called

16 17:38:31 a "Content Mgmt System Program Spec"; right?

17 17:38:34   A   That's correct.

18 17:38:35   Q   And is this document describing the Content

19 17:38:41 Verification Program?

20 17:38:45   A   This was a spec sheet, so this was an outline

21 17:38:50 of what we envisioned it might become, but it wasn't

22 17:38:54 that the program actually, I believe, launched.

23 17:38:58        So it wasn't a -- it wasn't a rundown of what

24 17:39:01 we had created.  It was a -- this is what we, you

25 17:39:05 know, would like to create.

1                         HURLEY

2  17:39:07   Q    Do you remember how long after you sent this

3  17:39:11 document to Ms. Dunton you actually launched the

4  17:39:14 program?

5  17:39:16   A    I don't recall specifically.  I believe that

6  17:39:21 it would be rolled out there.  There are a number of

7  17:39:23 features listed here, so I don't think it's one day we

8  17:39:27 turned everything on.  It was probably over a series

9  17:39:29 of pushes.

10 17:39:32   Q    Well, when did you start pushing the features

11 17:39:37 out?

12 17:39:38   A    This -- this is at a time where I was

13 17:39:42 transitioning again over to the finance and operation

14 17:39:47 roles.  This was sort of my last project with the

15 17:39:51 reviewing of videos.  So I worked on the spec sheet in

16 17:39:56 conjunction with -- with counsel, but then I sort of

17 17:40:02 dropped off, and -- and then the actual product people

18 17:40:06 and engineers then executed and actually created this,

19 17:40:11 but by that -- by that time I rolled off onto other

20 17:40:15 duties.

21 17:40:16   Q    So you're not aware that you launched the

22 17:40:20 Content Verification Program approximately ten days

23 17:40:24 after this e-mail was sent?

24 17:40:25   A    I don't recall.

25 17:40:29   Q    This was a program that you were in charge

1                         HURLEY

2   17:40:30 of?

3   17:40:31    A    Again, it wasn't -- there's a distinction.  I

4   17:40:34 helped brainstorm about these tools and -- and things

5   17:40:38 that we could do.  Again, there -- there weren't any

6   17:40:41 other video sites that were employing these things, so

7   17:40:44 I was -- I was -- I was looking at other sites like

8   17:40:48 eBay.  You can see the URLs that reference eBay's sort

9   17:40:53 of similar program that I was looking at.

10  17:40:56         But again, I wasn't the -- the "product

11  17:40:59 manager" for this.  I had been transitioning over, so

12  17:41:04 this is -- these are the -- the brainstorming of these

13  17:41:08 tools that I interjected and passed over to folks like

14  17:41:13 Maryrose and then the other engineers to actually

15  17:41:14 implement.

16  17:41:15    Q    Who -- who was the project manager?

17  17:41:17    A    I believe it was Maryrose.

18  17:41:19    Q    And do you know which engineers worked with

19  17:41:22 her?

20  17:41:22    A    I don't recall, no.

21  17:41:25    Q    Okay.  So in Phase I of this plan that you

22  17:41:30 came up with, you notice the last bullet says "Ability

23  17:41:35 to save searches and have newly added video results

24  17:41:42 emailed to you on a user-defined frequency"; do you

25  17:41:44 see that?

1                              HURLEY

2   17:41:45    A    Yes.

3   17:41:45    Q    Can you describe to me what that feature was

4   17:41:47 intended to be?

5   17:41:48         MR. INGBER:  Hold on a second.  I just want

6   17:41:50 to caution the witness that to the extent your

7   17:41:53 testimony will reveal privileged attorney-client

8   17:41:56 communications, don't answer, but otherwise you can go

9   17:41:58 ahead and answer.

10  17:41:59         THE WITNESS:  Again, this was a feature

11  17:42:05 directed primarily at the content owners making it

12  17:42:08 easier for them to monitor their content so it

13  17:42:13 would -- they could define at their direction what --

14  17:42:18 what keywords that they would like to save as sort of

15  17:42:22 a predefined search, and then could e-mail to them so

16  17:42:27 they could just look at -- look at -- they could --

17  17:42:31 the vision was that they could define the searches,

18  17:42:35 the frequency that they receive these e-mails so they

19  17:42:38 could get them daily, weekly, monthly, but it would

20  17:42:42 be, again, at their direction.

21  17:42:44    Q    So I just want to get clarity on how this

22  17:42:47 worked.  I'm going to give you a hypothetical, and you

23  17:42:49 tell me if this is accurate.

24  17:42:51    A    Okay.

25  17:42:52    Q    Okay.

1                              HURLEY

2  17:42:52        So I'm a content owner, and I am using this

3  17:42:59 CVP tool to take down clips of The Daily Show.

4  17:43:06    A    Okay.

5  17:43:06    Q    And to -- as part of my effort in the search

6  17:43:11 that I have to undergo to find these clips on YouTube

7  17:43:14 and get them taken down, I use a keyword search, and I

8  17:43:20 search for the key words "Daily Show."

9  17:43:24        So does this feature then provide that

10 17:43:29 whenever a video is subsequently uploaded with the tag

11 17:43:35 that includes the words "Daily Show," I can get an

12 17:43:40 e-mail telling me that that's happened?

13 17:43:42        MR. INGBER:  Objection to form.

14 17:43:43        You can answer it.

15 17:43:45        THE WITNESS:  I believe that was the -- the

16 17:43:48 vision, but I don't believe this was ever a feature

17 17:43:54 that ever came to life.

18 17:43:55        MR. VERRILLI:  Right.

19 17:43:56    Q    Never happened; correct?

20 17:43:57    A    Yeah.

21 17:43:57    Q    Okay.  Do you know why?

22 17:44:00        MR. INGBER:  Again, don't answer if you're

23 17:44:04 going to reveal any communications with counsel.

24 17:44:06        THE WITNESS:  Again, after submitting these

25 17:44:13 suggestions for -- for tools that we could create, I

1

2  17:44:17 dropped off of it, so I didn't actually implement the

3  17:44:20 program.  So I couldn't say why some features were

4  17:44:26 adopted and others were not, because I wasn't actually

5  17:44:30 implementing the program myself.

6  17:44:33        MR. VERRILLI:  Q.  In your communication with

7  17:44:34 Maryrose Dunton about this program that we're

8  17:44:37 discussing, did she ever tell you that she hated the

9  17:44:40 e-mail feature that we've been discussing?

10  17:44:44    A    I don't recall.

11  17:44:46    Q    Were you aware that, in fact, she hated this

12  17:44:49 feature?

13  17:44:50    A    I don't recall.

14  17:44:52    Q    So it's possible she did tell you?

15  17:44:54        MR. INGBER:  Objection; asked and answered.

16  17:44:57        THE WITNESS:  No, I don't recall receiving.

17  17:45:03        MR. VERRILLI:  Q.  Were you aware that she

18  17:45:06 referred to the content owners who would benefit to

19  17:45:10 this e-mail fingers as "A-holes."

20  17:45:15        MR. INGBER:  Objection.

21  17:45:15        THE WITNESS:  No, I'm not aware of that.  I

22  17:45:20 don't recall that.

23  17:45:20        MR. VERRILLI:  Q.  Were you aware that she

24  17:45:23 did not want to do anything to help the content owners

25  17:45:25 she referred to as "A-holes"?

1                               HURLEY

2  17:45:25        MR. INGBER:  Objection to form.  I don't know

3  17:45:27 what you're talking about, but to the extent it

4  17:45:30 mischaracterizes a document or testimony --

5  17:45:35        MR. VERRILLI:  You really don't want me to

6  17:45:36 pull out this document; do you?  I mean, you know, you

7  17:45:40 had World War III last week about it.

8  17:45:44        MR. INGBER:  I'm not going to tell you how to

9  17:45:46 conduct your deposition, but you're asking questions

10 17:45:50 and apparently referring to testimony or a document,

11 17:45:53 and so I'm just preserving my objection for the

12 17:45:55 record.

13 17:45:55        MR. VERRILLI:  Fine.

14 17:45:56   Q    And all I want to know is whether you were

15 17:45:57 aware of these things.

16 17:45:58   A    I don't recall.

17 17:45:59   Q    Were you aware she actively discouraged

18 17:46:02 rolling out this e-mail feature behind your back?

19 17:46:05        MR. INGBER:  Objection to form.

20 17:46:06        THE WITNESS:  No, I don't recall.

21 17:46:07        MR. VERRILLI:  Q.  Were you aware that

22 17:46:12 Matt Rizzo also actively opposed rolling out this

23 17:46:16 e-mail feature?

24 17:46:17        MR. INGBER:  Objection.

25 17:46:17        THE WITNESS:  No, I don't recall.  Again, I

1                              HURLEY

2  17:46:19 wasn't -- I wasn't implementing these suggestions.

3  17:46:24        MR. VERRILLI:  Q.  Were you aware that

4  17:46:25 Maryrose Dunton and Matt Rizzo agreed together to try

5  17:46:31 to delay the rollout of this e-mail feature?

6  17:46:34        MR. INGBER:  Objection.

7  17:46:35        THE WITNESS:  Again, I -- I don't know,

8  17:46:38 because I wasn't implementing these suggestions.  I

9  17:46:42 don't know why some were implemented and others were

10 17:46:45 not.

11 17:46:45        MR. VERRILLI:  Q.  How many employees were

12 17:46:46 there at YouTube during this March 2006 time frame?

13 17:47:01     A   I don't recall specifically, but if I had --

14 17:47:03 I would -- I would say probably around 30.

15 17:47:06     Q   Okay.  And Matt Rizzo was one of them?

16 17:47:10     A   I can't recall specifically when he was

17 17:47:12 hired.

18 17:47:13     Q   You know who he is?

19 17:47:14     A   Yes.

20 17:47:15     Q   And he's -- he was an employee of YouTube?

21 17:47:17     A   Yes.

22 17:47:17     Q   He still is an employee of YouTube?

23 17:47:20     A   Yes.

24 17:47:20     Q   He's an engineer?

25 17:47:22     A   Yes.

1    HURLEY

2  17:47:22   Q   Okay.  Were you aware that he referred to the

3  17:47:26 content owners who would benefit from this e-mail

4  17:47:30 system as "assholes"?

5  17:47:33        MR. INGBER:  Objection to form.

6  17:47:33        THE WITNESS:  No, I'm not aware.

7  17:47:35        MR. VERRILLI:  Q.  Were you aware that

8  17:47:36 Maryrose Dunton and Matt Rizzo agreed to go to Chad

9  17:47:41 Hurley and tell him that YouTube should not implement

10 17:47:46 this e-mail feature?

11 17:47:48        MR. INGBER:  Same objection to the extent

12 17:47:51 you're mischaracterizing documents in this case.

13 17:47:55        THE WITNESS:  Yeah.  Again, I can't recall.

14 17:47:58 I wasn't -- I wasn't part of those conversations, so I

15 17:48:02 don't --

16 17:48:02        MR. VERRILLI:  Q.  Well, did your brother

17 17:48:03 Chad ever come to you and ask you about this e-mail

18 17:48:07 notification system?

19 17:48:10   A   I don't recall.

20 17:48:10   Q   Okay.  Now, in this -- back to the document.

21 17:48:17 There's Phase II here described.

22 17:48:20   A   Uh-huh.

23 17:48:21   Q   The first bullet point says "Voluntary

24 17:48:26 monitoring and removal by YouTube by potentially

25 17:48:30 infringing videos"; do you see that?