UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


----------------------------------X

VIACOM INTERNATIONAL, INC., COMEDY
PARTNERS, COUNTY MUSIC
TELEVISION, INC., PARAMOUNT
PICTURES CORPORATION, and BLACK
ENTERTAINMENT TELEVISION, LLC,

        Plaintiffs,

vs.                                    No. 07-CV-2203

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

        Defendants.

----------------------------------X
THE FOOTBALL ASSOCIATION PREMIER
LEAGUE LIMITED, BOURNE CO., et al.,
on behalf of themselves and
all others similarly situated,

        Plaintiffs,

vs.                                    No. 07-CV-3582

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

        Defendants.

----------------------------------X
HIGHLY CONFIDENTIAL
VIDEOTAPED DEPOSITION OF DAVID DRUMMOND
SAN FRANCISCO, CALIFORNIA
THURSDAY, FEBRUARY 12, 2009
Job No.: 16392

1                     DAVID DRUMMOND

2                  FEBRUARY 12, 2009

3                     9:16 A.M.

4

5          HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF DAVID

6     DRUMMOND, at SHEARMAN & STERLING, LLP 525 Market Street,

7     Suite 1500, San Francisco, California, pursuant to

8     notice, before me, KATHERINE E. LAUSTER, CLR, CRR, RPR,

9     CSR License No. 1894.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAVID DRUMMOND

A P P E A R A N C E S:


FOR THE PLAINTIFFS, VIACOM INTERNATIONAL, INC.:
    SHEARMAN & STERLING, LLP
    By:  STUART J. BASKIN, Esq.
        COLLEEN M. MERINGOLO, Esq.
    599 Lexington Avenue
    New York, New York  10022-6069
    phone:  917.885.4802
    fax:    646.848.4974
    e-mail: sbaskin@shearman.com
            colleen.meringolo@shearman.com


FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE, LLC, and
        GOOGLE, INC.:

    MAYER BROWN, LLP
    By:  ANDREW SCHAPIRO, Esq.
        DAVID McGILL, Esq.
    1675 Broadway
    New York, New York  10019-5820
    phone:  917.282.8073
    fax:    212.262.1910
    e-mail: aschapiro@mayerbrown.com
            dmcgill@mayerbrown.com


FOR THE LEAD PLAINTIFFS AND PROSPECTIVE CLASS:

    PROSKAUER ROSE, LLP
    By:  TANYA L. FORSHEIT, Esq.
    2049 Century Park East, Suite 3200
    Los Angeles, California  90067-3206
    phone:  310.284.4508
    fax:    310.557.2193
    e-mail: tforsheit@proskauer.com


Also Present:

    CATHERINE LACAVERA, Google

    STUART PETTIGREW, Videographer

1                              DAVID DRUMMOND

2  10:11:10   Suisse, First Boston?

3  10:11:12        A.    Yes.

4  10:11:13        Q.    And George Boutros headed -- was the head

5  10:11:15   banker?

6  10:11:16        A.    Yes, that's true.

7  10:11:17        Q.    And he had a partner named Storm Duncan,

8  10:11:19   who worked with you as well?

9  10:11:22        A.    Yes.

10 10:11:22        Q.    And have they been your long-standing M&A

11 10:11:27   advisors with Google?

12 10:11:29        A.    I'm not sure it's accurate to call them

13 10:11:31   "long-standing."  We haven't used bankers for many

14 10:11:36   M&A transactions, but we have used them twice.

15 10:11:40        Q.    What other deal did you use them on?

16 10:11:43        A.    The DoubleClick transaction.

17 10:11:44        Q.    And did they render advice to the Google

18 10:11:47   board of directors in connection with the YouTube

19 10:11:50   acquisition?

20 10:11:51        A.    They rendered a fairness opinion.

21 10:11:54        Q.    Okay.  Did they also address the board?

22 10:11:56        A.    In the context of delivering that fairness

23 10:11:59   opinion, yes, I believe they did.

24 10:12:01        Q.    And did they prepare a book for

25 10:12:02   distribution to the board?

DAVID DRUMMOND

10:12:04    A.    I believe that they did.

10:12:05    Q.    Now, so the ladies and gentlemen of the

10:12:08    jury can understand, would you tell them what a -- a

10:12:11    fairness opinion is?

10:12:14    A.    Well, my understanding of a fairness

10:12:16    opinion is a -- an opinion rendered by a financial

10:12:20    expert or a firm experienced in financial matters,

10:12:24    such as an investment bank, rendering an opinion as

10:12:29    to the -- the fairness to the shareholders of -- of

10:12:35    an acquisition from a financial point of view.

10:12:40    Q.    And prior to rendering that opinion, is it

10:12:43    your understanding that the investment bank performs

10:12:46    analytical analysis in connection with the

10:12:49    acquisition?

10:12:53    A.    Yes, it is.

10:12:54    Q.    Now, you personally approached YouTube in

10:12:57    the first instance; is that correct?

10:13:01    A.    In the round of conversations that

10:13:04    ultimately led to the acquisition, that's true.

10:13:06    Q.    Now, when the negotiations began, whose

10:13:09    idea was it within Google to approach YouTube?

10:13:16    A.    I don't recall whether the idea started

10:13:17    with any particular individual.  I know I and some

10:13:24    others thought that -- that it was a -- a worthwhile

                    1                    DAVID DRUMMOND

10:17:39    2         Q.   So it's your recollection that this was a

10:17:41    3    pricing issue, as far as he was concerned?  It was

10:17:44    4    too expensive?

10:17:45    5         A.   (No audible response.)

10:17:46    6         Q.   An acquisition of YouTube would be too

10:17:48    7    expensive?

10:17:49    8         A.   I -- I recall him having concerns about a

10:17:52    9    price.

10:17:52    10        Q.   And no other concerns?

10:17:54    11        A.   I don't remember what other concerns he

10:17:56    12    might have had.

10:17:57    13        Q.   Now -- now, is it fair to say that your

10:18:52    14    initial offer to YouTube was in the range of

10:18:56    15    $615 million?

10:19:00    16        A.   Yes, I think that's correct.

10:19:02    17        Q.   And the final offer added a billion

10:19:07    18    dollars to that, basically?

10:19:09    19        A.   Yes.

10:19:10    20        Q.   Now, I take it that the acquisition was

10:19:16    21    embodied in a merger agreement?

10:19:18    22        A.   Yes, that's correct.

10:19:20    23             MR. BASKIN:  And let me show you, just so

10:19:22    24    we're working off the same page what we'll mark as

10:19:39    25    Drummond 2.

DAVID DRUMMOND

| | | |
|---|---|---|
| 10:19:40 | 2 | (Drummond Exhibit Number 2 was marked for |
| 10:19:40 | 3 | identification.) |
| 10:19:40 | 4 | MR. BASKIN:  I think that's about as many |
| 10:19:40 | 5 | as we've got. |
| 10:20:10 | 6 | BY MR. BASKIN: |
| 10:20:10 | 7 | Q.   Is that a copy of the merger agreement, |
| 10:20:13 | 8 | Mr. Drummond? |
| 10:20:13 | 9 | A.   It appears to be. |
| 10:20:15 | 10 | Q.   And did you work on the acq- -- |
| 10:20:16 | 11 | negotiation of the merger agreement? |
| 10:20:18 | 12 | A.   Yes, I did. |
| 10:20:19 | 13 | Q.   How about the scrivening of the merger |
| 10:20:22 | 14 | agreement?  Did you work on the scrivening of the |
| 10:20:25 | 15 | merger agreement? |
| 10:20:26 | 16 | MR. SCHAPIRO:  You might define |
| 10:20:27 | 17 | "scrivening" for the ladies and gentlemen of the |
| 10:20:29 | 18 | jury. |
| 10:20:30 | 19 | BY MR. BASKIN: |
| 10:20:30 | 20 | Q.   Do you know what "scrivening" means, |
| 10:20:33 | 21 | Mr. Drummond? |
| 10:20:34 | 22 | A.   Yes. |
| 10:20:34 | 23 | Q.   Did you work on the scrivening of the |
| 10:20:37 | 24 | merger agreement? |
| 10:20:38 | 25 | A.   I didn't actually write the language, if |

1                          DAVID DRUMMOND

10:20:40    2       that's what you mean, but I was -- certainly

10:20:42    3       reviewed drafts, and reviewed provisions, and was

10:20:45    4       asked to comment on them.

10:20:46    5              Q.   Now, before you entered into this

10:20:49    6       agreement, and before you submitted the transaction

10:20:53    7       to your board for its approval, would I be correct

10:20:57    8       that Google performed a due diligence investigation

10:21:00    9       of YouTube's operations and financing conditions?

10:21:03    10             A.   Yes, that's true.

10:21:04    11             Q.   And that's customary, isn't it, to perform

10:21:07    12      a due diligence?

10:21:08    13             A.   Yes.

10:21:09    14             Q.   And maybe you could tell the ladies and

10:21:10    15      gentlemen of the jury what a due diligence is.

10:21:15    16             A.   Well, a due diligence investigation is

10:21:18    17      generally what a company will do when they're

10:21:22    18      attempting -- when you're going to invest the

10:21:25    19      company funds, or, for instance, in acquiring a

10:21:29    20      company, to review the -- the asset that you're

10:21:32    21      buying, the company that you're buying, and try to

10:21:35    22      understand its -- its business, and whether or not

10:21:42    23      it's worth some particular amount of money that is

10:21:45    24      proposed to be paid for it.

10:21:48    25             Q.   And it is generally your practice -- your

1                    DAVID DRUMMOND

10:21:50    2    experience that the target company makes available

10:21:54    3    to the would-be acquirer the information the

10:21:59    4    would-be acquirer wants to see?

10:22:01    5         A.   Yes, that's my understanding.

10:22:03    6         Q.   And is it fair to say that's what happened

10:22:05    7    here as well?

10:22:07    8         A.   Yes, that's correct.

10:22:07    9         Q.   And prior to the acquisition, did you --

10:22:09   10    strike that.

10:22:10   11              Were a large array of documents set up in

10:22:15   12    what might be characterized as a war room?

10:22:20   13         A.   (No audible response.)

10:22:21   14         Q.   Or would you -- would you use a different

10:22:23   15    phrase?

10:22:25   16         A.   I don't -- I don't recall the -- the

10:22:27   17    actual venue, or how things were set up.  I know

10:22:30   18    that they -- we spent a fair bit of time at Wilson

10:22:34   19    Son- -- Sonsini, both negotiating the transaction

10:22:38   20    and -- and review -- you know, performing due

10:22:42   21    diligence.

10:22:43   22         Q.   And did you have access to the senior

10:22:46   23    executives of YouTube to ask them questions?

10:22:49   24         A.   Yes, we did.

10:22:50   25         Q.   And did you do that from time to time in

|  | 1 | DAVID DRUMMOND |

10:22:52  2  the course of the due diligence?

10:22:53  3      A.   Yes, we did.

10:22:54  4      Q.   And in connection with that, do you recall

10:22:57  5  any question you asked them that they refused to

10:22:59  6  answer?

10:23:01  7      A.   No, I don't.

10:23:02  8      Q.   Do you recall -- strike that.

10:23:04  9      Who else, other than -- I take it you

10:23:06  10  weren't doing all the due diligence yourself?

10:23:09  11      A.   That's correct.

10:23:09  12      Q.   Who else worked on due diligence in -- in

10:23:12  13  addition to you, sir?

10:23:15  14      A.   At Google, Matt Sucherman.  He was an

10:23:20  15  in-house Google lawyer who then was in charge of our

10:23:24  16  corporate law group.

10:23:29  17      We also had some other Google lawyers

10:23:35  18  involved in the process.  Alex MacGillivray, Glenn

10:23:44  19  Brown, our outside counsel was Simpson Thatcher.

10:23:52  20  There were at least two lawyers from there.

10:23:58  21      Q.   How about nonlawyers who participated in

10:24:01  22  due diligence?  I assume Credit Suisse First Boston

10:24:08  23  did; is that true?

10:24:10  24      A.   They -- they didn't play as much of a role

10:24:12  25  in what I would call the due diligence, but in terms

d73193d5-399c-40a6-9c0b-19ed49874c83

DAVID DRUMMOND

10:24:17　2　of other Google people, I know that Salar Kamangar

10:24:30　3　was one of our product managers.  I believe he was a

10:24:33　4　VP at that time.

10:24:34　5　　　　Q.　How about Sean Dempsey?

10:24:37　6　　　　A.　Of course.  I'm forgetting Sean Dempsey,

10:24:39　7　who was -- worked on the corporate development team,

10:24:42　8　and Salman Ullah, who was his -- his boss, who ran

10:24:46　9　-- at the time, ran corporate development for

10:24:50　10　Google, who reported to me.

10:24:51　11　　　　Q.　Now, is there also an individual named

10:25:00　12　James Kim?  That sounds familiar to you?

10:25:03　13　　　　A.　Yes.

10:25:04　14　　　　Q.　A banker at Credit Suisse?

10:25:07　15　　　　A.　(Witness nods head.)

10:25:08　16　　　　Q.　Is that correct?

10:25:09　17　　　　A.　I won't dispute that.  I think that's

10:25:11　18　true.

10:25:12　19　　　　Q.　Well, it may not be now, but he was then;

10:25:14　20　correct?

10:25:15　21　　　　A.　That sounds correct, but I -- I don't

10:25:17　22　remember him well.

10:25:18　23　　　　Q.　And did he also participate in the due

10:25:21　24　diligence?

10:25:21　25　　　　A.　He may have, but I -- I don't remember his

1

DAVID DRUMMOND

2  12:25:46  payments it should make arising out of copyright

3  12:25:49  litigation?

4  12:25:50      A.   I -- I don't remember what our initial

5  12:25:52  position is.  I remember that we agreed on a --

6  12:25:55  on -- on a -- what's called a -- you know, a -- a

7  12:26:00  cap or an amount, and expresses a percentage of the

8  12:26:04  purchase price.

9  12:26:05      Q.   Now, in particular, if you'll turn to

10  12:26:09  page -- to the exhibit -- to the merger agreement.

11  12:26:15  I don't remember what exhibit number is.  If you

12  12:26:19  would -- we'll count down for a second --

13  12:26:22          MS. MERINGOLO:  Exhibit 2.

14  12:26:23  BY MR. BASKIN:

15  12:26:23      Q.   Exhibit 2.  So I understand how this

16  12:26:25  works, sir, if you first turn to page 61 and 62 of

17  12:26:34  the merger agreement --

18  12:26:38          MR. SCHAPIRO:  Sorry.  Are you giving

19  12:26:39  Bates numbers or the page numbers?

20  12:26:41  BY MR. BASKIN:

21  12:26:41      Q.   Page numbers of the document.  It would be

22  12:26:44  Bates numbers -123 and -124.

23  12:27:00          Section 9.2 sets up indemnification by the

24  12:27:06  company stockholders, the company being YouTube;

25  12:27:11  right, sir?

DAVID DRUMMOND

12:27:12    A.    Yes.

12:27:12    Q.    Then among the items, I -- that were to be

12:27:15    identify -- indemnified, if you go to the top of

12:27:19    page 62, was any indemnified copyright action,

12:27:24    including any damages arising prior to or after the

12:27:29    effective time; right, Mr. Drummond?

12:27:33    A.    Yes, I see that.

12:27:34    Q.    Now, on page 17 of the agreement, as I

12:27:36    understand it, an escrow account was set up; right,

12:27:47    sir?

12:27:48    A.    Yes.

12:27:48    Q.    And if I understand how this functioned,

12:27:50    under the escrow account 12.5 percent of the

12:27:58    aggregate share consideration, that is, 12.5 percent

12:28:06    of $1.65 billion, was to be set up in an escrow

12:28:13    account; correct?

12:28:15    A.    That's correct.

12:28:16    Q.    So that's roughly -- what?  200 --

12:28:19    $200 million was to be escrowed?

12:28:30    A.    Sorry.  It's 12.5 percent of -- it's --

12:28:32    the -- the shares.

12:28:32    Q.    Okay.

12:28:33    A.    This is a share deal.

12:28:37    Q.    Now, then, if I'm right, if you turn to

| | | DAVID DRUMMOND |
|---|---|---|
| 1 | | |
| 2 | 12:28:45 | page 64, and the -- and it continues on page 65, |
| 3 | 12:29:06 | Section 9.6(b) limited the actual indemnification |
| 4 | 12:29:17 | for copyright violations to 5 percent of the total |
| 5 | 12:29:23 | number of escrow shares initially deposited in the |
| 6 | 12:29:28 | escrow account; right, Mr. Drummond? |
| 7 | 12:29:30 | A.   Yes, I see that. |
| 8 | 12:29:32 | Q.   So then roughly do the math.  You would |
| 9 | 12:29:40 | take $1.65 billion and multiply that by |
| 10 | 12:29:46 | 12.5 percent, which I think is $206 million, and |
| 11 | 12:29:53 | then you would take 5 percent of that, and so the |
| 12 | 12:29:55 | initial escrowed amount for copyright violations was |
| 13 | 12:30:02 | approximately $10 million, as set forth in this |
| 14 | 12:30:05 | agreement; correct? |
| 15 | 12:30:07 | A.   That would be the -- probably the better |
| 16 | 12:30:10 | reading of the language in the original agreement, |
| 17 | 12:30:13 | yes. |
| 18 | 12:30:14 | Q.   Well, it's the only reading, but you -- |
| 19 | 12:30:16 | there's a scrivener's error; right? |
| 20 | 12:30:21 | A.   That's correct. |
| 21 | 12:30:22 | Q.   And this is where the scrivener erred; |
| 22 | 12:30:26 | correct? |
| 23 | 12:30:26 | A.   This is where the error took place, yes. |
| 24 | 12:30:29 | Q.   Now, the net effect was -- |
| 25 | 12:30:32 | Mark this as Exhibit -- |

1                          DAVID DRUMMOND

12:30:44    2              THE REPORTER:  11.

12:30:45    3              MR. BASKIN:  11.

12:30:51    4              (Drummond Exhibit Number 11 was marked for

12:30:51    5              identification.)

12:31:31    6    BY MR. BASKIN:

12:31:32    7        Q.    Let me ask you to look at Exhibit 11,

12:31:34    8    Mr. Drummond.

12:31:52    9              Does Exhibit 11 appear to you to be a --

12:31:56    10   e-mail communicating to the Sequoia folks the fully

12:32:02    11   executed amendment to the merger agreement?

12:32:06    12       A.    Yes, that's what it appears to be.

12:32:08    13       Q.    And have you seen this prior to today,

12:32:10    14   sir?

12:32:13    15       A.    (No audible response.)

12:32:14    16       Q.    By that, I -- by "this," I mean have you

12:32:17    17   seen the amendment prior to today?

12:32:19    18       A.    Yes.

12:32:19    19       Q.    I'm not talking about the actual

12:32:21    20   transmittal to Sequoia guys.

12:32:23    21       A.    Yes, I believe I've seen the -- the

12:32:24    22   amendment.

12:32:25    23       Q.    Now, if I understand what happened by this

12:32:27    24   amendment, Section 9.6(b) -- well, strike that.

12:32:33    25             It starts by having a couple whereas

d73193d5-399c-40a6-9c0b-19ed49874c83

|    |   | DAVID DRUMMOND |
|----|---|----------------|

12:32:36  2    clauses, the second one which provides that this

12:32:41  3    corrects a mutual mistake resulting from a

12:32:44  4    scrivener's error; correct?

12:32:46  5        A.    That's correct.

12:32:48  6        Q.    And the mistake was in Section 9.6(b), as

12:32:55  7    we discussed before; right, Mr. Drummond?

12:32:57  8        A.    That's right.

12:32:58  9        Q.    And basically, what this does, if I

12:33:01  10   understand it correctly, it changes the size of the

12:33:07  11   escrow available to Google for copyright

12:33:11  12   infringement actions from 5 percent of the total

12:33:17  13   number of escrowed shares, to 5 percent of the

12:33:23  14   aggregate share price -- aggregate share

12:33:27  15   consideration; is that right?

12:33:28  16       A.    That's right.

12:33:29  17       Q.    So now, instead of having 5 percent of

12:33:32  18   approximately, I believe, $200 million available as

12:33:41  19   an indemnification for copyright infringement, this

12:33:45  20   amendment makes available 5 percent of

12:33:48  21   $1.65 billion; correct?

12:33:51  22       A.    That's correct.

12:33:53  23       Q.    So basically, it increased the escrow from

12:34:02  24   about $10.3 million available for copyright

12:34:07  25   infringement actions to $82.5 million?  Something in

                              DAVID DRUMMOND

12:34:12    2    that range, sir?

12:34:15    3         A.    Well, it corrected the error in the

12:34:17    4    original agreement.

12:34:18    5         Q.    And the effect of correcting the error was

12:34:20    6    basically the indemnification flowing to Google

12:34:23    7    increased by 800 percent?

12:34:25    8         A.    Well, I guess I would argue it never

12:34:28    9    increased.  The -- the agreement was the agreement,

12:34:31    10   and it was just a -- incorrectly memorialized.

12:34:36    11        Q.    Now, what do you recall occasioned the

12:34:38    12   discovery of the scrivener's error?

12:34:46    13        A.    You know, I don't -- I don't recall who

12:34:49    14   actually noticed it.  It was brought to my

12:34:52    15   attention, I believe, by Matt Sucherman who had

12:34:58    16   worked on -- on the deal.

12:35:01    17        Q.    Well, the amendment was executed, it looks

12:35:04    18   like, approximately April 18th, 2007; is that

12:35:07    19   correct?

12:35:07    20        A.    That's what it says.

12:35:08    21        Q.    And Viacom filed this lawsuit in March of

12:35:13    22   2006; is that right, Mr. Drummond?

12:35:18    23        A.    That sounds generally correct.  I don't

12:35:20    24   know.  I'd have to refer to something to -- to get

12:35:22    25   that exact --

1                    DAVID DRUMMOND

12:35:24    2        Q.    And was it the commencement of the Viacom

12:35:26    3    litigation that occasioned the discovery of the

12:35:30    4    scrivener's error?

12:35:33    5        A.    I don't know if it was -- if it was or

12:35:35    6    not.

12:35:36    7        Q.    You have no memory of discussing with

12:35:39    8    anyone why the scrivener error happened?  Strike

12:35:45    9    that.

12:35:48   10             Now, when your team was performing -- I

12:36:13   11    want to move on in a second to what were some of

12:36:24   12    Google Video's practices prior to the acquisition of

12:36:27   13    YouTube, but before doing that, I want to return one

12:36:31   14    more time to the issue of whether YouTube was

12:36:38   15    monetizing or selling ads around the watch pages.

12:36:43   16             And let me hand you, sir, what we will

12:36:45   17    mark as Exhibit 12.

12:37:11   18             (Drummond Exhibit Number 12 was marked for

12:37:11   19             identification.)

12:37:34   20    BY MR. BASKIN:

12:37:35   21        Q.    Mr. Drummond, have you seen Exhibit 12

12:37:39   22    prior to today?

12:37:40   23        A.    I don't recall seeing it.  And you'll note

12:37:43   24    that it doesn't appear to have been sent to me.

12:37:47   25        Q.    Correct.

DAVID DRUMMOND

15:34:12  2    owners, and I was aware that EMI was one of the --

15:34:17  3    the -- the parties we were talking to.

15:34:19  4        Q.   And is it a fact that YouTube was

15:34:21  5    unwilling to offer this to any content owner, in and

15:34:25  6    around March 2007, who did not enter into a license

15:34:29  7    agreement with YouTube?

15:34:31  8        A.   I don't recall what -- whether that was

15:34:33  9    true in a categorical fashion.  I -- what I recall

15:34:37  10   is that we were going to undertake to do this with

15:34:41  11   people who were working with us.

15:34:43  12       Q.   Can you offer the ladies and gentlemen of

15:34:45  13   the jury the name of one content owner in 2007 who

15:34:52  14   did not enter into a license agreement with YouTube

15:34:56  15   for whom you were willing to do audio

15:34:59  16   fingerprinting?

15:35:00  17       A.   No, I can't name a -- any content owner.

15:35:03  18       Q.   Are you aware of any technological reason

15:35:06  19   why you could not include companies that did not

15:35:10  20   enter into licenses with you within audio

15:35:14  21   fingerprinting?

15:35:15  22       A.   I'm not a technologist, so I'm not

15:35:19  23   particularly qualified to answer that question.

15:35:22  24       Q.   Did you have --

15:35:23  25       A.   I'm not aware of -- of whether it's

d73193d5-399c-40a6-9c0b-19ed49874c83

1                    DAVID DRUMMOND

15:35:26    2    technologically possible or impossible.  I -- my

15:35:31    3    guess is that it's -- well, I'm not going to guess.

15:35:35    4        Q.   If Viacom was willing to provide your

15:35:37    5    fingerprint vendor with its fingerprints of its

15:35:41    6    videos, is there any reason Viacom could not have

15:35:44    7    been included in this program, Mr. Drummond?

15:35:47    8             MR. SCHAPIRO:  Objection.  Calls for

15:35:48    9    speculation.

15:35:53    10            THE WITNESS:  I guess -- can you repeat

15:35:55    11   the question?

15:35:56    12   BY MR. BASKIN:

15:35:56    13       Q.   If Viacom was prepared to provide its

15:36:00    14   fingerprints of its videos to Audio (sic) Magic or

15:36:04    15   any other vendor that YouTube was already using, is

15:36:09    16   there some reason you can think of why Viacom could

15:36:11    17   not have been included in this program along with

15:36:15    18   EMI?

15:36:16    19       A.   At -- at what time period are you talking

15:36:19    20   about?

15:36:20    21       Q.   In and around March of 2007.

15:36:23    22       A.   As I testified before, at that time I'm

15:36:29    23   not -- I don't recall whether there would have been

15:36:32    24   a reason.

15:36:32    25            As I said, we -- we were working with --

1                          DAVID DRUMMOND

15:36:36    2    we were willing to do these things with partners who

15:36:40    3    were going to work with us.  So assuming Viacom was

15:36:42    4    going to work with us, we would have -- they could

15:36:45    5    have availed themselves of the same thing.

15:36:48    6        Q.    And by "work with" you, do you mean

15:36:49    7    provide you with fingerprints, or do you mean grant

15:36:52    8    you a license?

15:36:53    9        A.    Work with us to provide -- provide us the

15:36:57   10    content, and I don't think most -- most companies

15:36:59   11    wouldn't be willing to -- to provide us the content

15:37:02   12    without an agreement, but --

15:37:03   13        Q.    Do you mean if Viacom -- Viacom had to

15:37:07   14    agree to provide you with its content in order to

15:37:11   15    avail itself of video fingerprinting?  Is that what

15:37:16   16    you testified?

15:37:17   17        A.    At some point I believe that was true.  I

15:37:19   18    can't pinpoint the time.

15:37:21   19        Q.    Now, if Viacom was already providing its

15:37:26   20    fingerprinting to Audio (sic) Magic with respect to

15:37:29   21    other websites, do you know how much it would have

15:37:34   22    cost YouTube to include Viacom in the program that

15:37:41   23    it allowed for EMI?

15:37:44   24        A.    No, I don't, nor am I aware that Viacom

15:37:47   25    was providing anything to any- -- anyone.

d73193d5-399c-40a6-9c0b-19ed49874c83

1            DAVID DRUMMOND

2  15:59:01        Could you read to yourself the -- the

3  15:59:03  paragraph begins:

4  15:59:06        Deployment of such preventive measures

5  15:59:09        cannot be conditioned on first reaching a

6  15:59:12        commercial agreement.

7  15:59:13  Do you see that, Mr. Drummond?

8  15:59:39        A.    Yes, I -- I've read that paragraph.

9  15:59:41        Q.    Now, Mr. Cotton seemed to believe that it

10 15:59:44  was your, Google's, express policy to offer its

11 15:59:49  advanced technology only to copyright owners that

12 15:59:54  submit to YouTube's commercial demands.  Was that an

13 15:59:59  accurate characterization of your position?

14 16:00:01        MR. SCHAPIRO:  Objection as to what

15 16:00:02  Mr. Cotton believes.

16 16:00:04        THE WITNESS:  Yeah, I don't know what

17 16:00:05  Mr. -- I can't comment on what Mr. Cotton believes.

18 16:00:08  As I stated -- as I said before, we had a -- our

19 16:00:12  position was that we were -- we were offering the

20 16:00:14  techniques that we've discussed before to help

21 16:00:18  content owners identify content to partners.

22 16:00:26  BY MR. BASKIN:

23 16:00:26        Q.    Meaning people that entered into licenses

24 16:00:29  with you?

25 16:00:29        A.    People that we -- we had business

1                          DAVID DRUMMOND

2    16:00:31   relationships with.

3    16:00:32       Q.   And if an NBC or Viacom was unwilling to

4    16:00:36   license their content to you --

5    16:00:38       A.   Well, we knew that it was their view that,

6    16:00:40   you know, as expressed in this letter, that we

7    16:00:43   needed to -- to deploy this technology to meet legal

8    16:00:47   obligations.  Obviously, we disagreed with that.

9    16:00:50       Q.   And I take it, in fact, you did not deploy

10   16:00:52   the technology for either Viacom or NBC; is that

11   16:00:57   correct?

12   16:00:57       A.   I don't recall that we did.

13   16:01:02       Q.   Now, by the way, in reaching that

14   16:01:04   conclusion that you had no obligation to do so, was

15   16:01:11   that on advice of counsel, or how did you come about

16   16:01:15   that -- that conclusion?

17   16:01:15       A.   It's privileged, I believe.  It was on

18   16:01:17   advice of counsel.

19   16:01:36           MR. BASKIN:  And I'll first direct this to

20   16:01:53   your attorney, but do you want to tell us which

21   16:01:55   counsel gave that advice that you're relying on?

22   16:01:59           MR. SCHAPIRO:  No.

23   16:02:05           MR. BASKIN:  Okay.  Now -- after Google

24   16:03:33   acquired YouTube -- just one second.  Oh, here it

25   16:04:50   is.

1                          DAVID DRUMMOND

2   16:10:54   program to assist it in its take-down notice that it

3   16:11:00   sent to you in February 2007?

4   16:11:03       A.   No, I wasn't aware of that, or don't

5   16:11:06   recall being aware of that.

6   16:11:09       Q.   And you see where the -- apparently the

7   16:11:13   technical people say:

8   16:11:15       Technically it is do-able.  It's not hard to

9   16:11:18       create a new content owner account and set

10  16:11:21       them up.

11  16:11:22   See that, sir?

12  16:11:23       A.   Well, you're assuming that Matthew Liu was

13  16:11:27   a technical person.  Since I don't know who he was,

14  16:11:31   I don't know that we can assume that, but I -- I see

15  16:11:33   the first two lines of the e-mail.

16  16:11:35       Q.   Was there a -- intentional decision on the

17  16:11:38   part of Google and YouTube not to include Viacom

18  16:11:41   within the CYC tool in and around February 2007,

19  16:11:44   because it would not enter into a license agreement

20  16:11:48   with YouTube?

21  16:11:51       A.   I don't recall whether it was a specific

22  16:11:53   decision.  As I've told you before, we had a -- we

23  16:11:55   had a -- an approach where we were going to offer

24  16:11:58   this new -- the CYC tool to partners.

25  16:12:16            I'd like a --

1                           DAVID DRUMMOND

2   16:36:53     A.    Well, I -- as I sit here today, I don't

3   16:36:55   have any reason to take issue with it or validate

4   16:37:00   it.

5   16:37:04     Q.    Now, if a member -- if the runner of one

6   16:37:07   of these private sites or the owner of one of these

7   16:37:10   private sites -- I'm not sure what the proper

8   16:37:12   terminology is.  Do you know what it is?

9   16:37:14     A.    No, I don't.

10  16:37:16     Q.    Well, why don't we agree on "operator" of

11  16:37:19   one of the private sites?  Is that --

12  16:37:21     A.    That's fine.

13  16:37:22     Q.    Okay.  If the operator of one of these

14  16:37:25   private sites decides to upload entire movies or

15  16:37:33   television shows onto the private sites, is there

16  16:37:39   any way a content owner can access these private

17  16:37:45   accounts to take down those movies or TV --

18  16:37:48   television shows?

19  16:37:50     A.    I'm not aware of ways in which they could

20  16:37:53   do that.

21  16:37:56     Q.    Now, does YouTube today use its CYC-type

22  16:38:31   technology to scan private accounts for violations

23  16:38:40   of either policy or copyright?

24  16:38:42     A.    You know, I'm not -- I'm not -- I don't

25  16:38:46   actually know whether we do that or not.