UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL INC., COMEDY )
PARTNERS, COUNTRY MUSIC )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION LLC, )
                                )
            Plaintiffs,          )
                                )
vs.                              ) NO. 07-CV-2103
                                )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE INC., )
                                )
            Defendants.          )
_____)
                                )
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
                                )
            Plaintiffs,          )
vs.                              ) NO. 07-CV-3582
                                )
YOUTUBE, INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
                                )
            Defendants.          )
_____)


30(b)(6) VIDEOTAPED DEPOSITION OF STORM DUNCAN
SAN FRANCISCO, CALIFORNIA
WEDNESDAY, JULY 16, 2008


BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CLR
CSR LICENSE NO. 9830
JOB NO. 15373

1

2

3

4                    JULY 16, 2008

5                     9:14 a.m.

6

7          30(b)(6) VIDEOTAPED DEPOSITION OF STORM DUNCAN,

8          held at the offices of SHEARMAN & STERLING,

9          525 Market Street, San Francisco, California,

10         pursuant to notice, before ANDREA M. IGNACIO

11         HOWARD, CLR, RPR, CSR License No. 9830.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   A P P E A R A N C E S:

2

3       FOR THE PLAINTIFFS VIACOM INTERNATIONAL INC.:

4           JENNER & BLOCK, LLP

5               By:  BILL HOHENGARTEN, Esq.

6                   SCOTT B. WILKENS, Esq.

7           1099 New York Avenue, NW, Suite 900

8           Washington, D.C. 20001

9           (202) 639-6000  swilkens@jenner.com

10

11      FOR THE LEAD PLAINTIFFS AND PROSPECTIVE CLASS:

12          BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP

13              By:   JOHN C. BROWNE, Esq.

14          1285 Avenue Of The Americas

15          New York, New York 10019

16          (212) 554-1533  johnb@blbglaw.com

17

18      FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE, LLC and

19      GOOGLE, INC.:

20          WILSON SONSINI GOODRICH & ROSATI, LLP

21              By:  BART E. VOLKMER, Esq.

22          650 Page Mill Road

23          Palo Alto, California 94304-1050

24          (650) 493-9300  bvolkmer@wsgr.com

25

1      A P P E A R A N C E S:  (Continued.)

2

3         FOR THE DEPONENT:

4              DUVAL & STACHENFELD, LLP

5              By:  ALLAN N. TAFFET, Esq.

6              300 East 42nd Street

7              New York, New York 10017

8              (212) 692-5523  ataffet@dsllp.com

9

10         ALSO PRESENT:  Ken Reeser, Videographer.

11

12                       ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25

| 09:18:46 | 1 | A | No. |

09:18:46　　2　　　　Q　Is there any reason why you cannot give

09:18:49　　3　　complete and accurate testimony today?

09:18:52　　4　　　　A　No.

09:18:52　　5　　　　Q　What is the highest degree you've obtained

09:18:59　　6　　educationally?

09:19:00　　7　　　　A　A masters degree.

09:19:02　　8　　　　Q　Is that an MBA or --

09:19:05　　9　　　　A　Yes, MBA from University of Michigan.

09:19:08　　10　　　Q　And when was that awarded?

09:19:10　　11　　　A　1994.

09:19:15　　12　　　Q　And who is your current employer?

09:19:17　　13　　　A　Credit Suisse.

09:19:17　　14　　　Q　And what is your job title?

09:19:19　　15　　　A　Managing director.

09:19:20　　16　　　Q　And is there a particular group or -- group

09:19:29　　17　　at Credit Suisse that you work in?

09:19:31　　18　　　A　I'm in the mergers and acquisitions group.

09:19:34　　19　　　Q　And within that group, is there any

09:19:38　　20　　subdivision technology or anything like that that

09:19:42　　21　　you're primarily located in?

09:19:45　　22　　　A　Yeah.  I'd say most of my time is spent in

09:19:47　　23　　the technology arena.

09:19:48　　24　　　Q　And how long have you held that position?

09:19:52　　25　　　A　Of managing director?

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | | |
|---|---|---|---|
| 09:19:54 | 1 | Q | Yes. |
| 09:19:54 | 2 | A | I think it's been about four or five years |
| 09:19:57 | 3 | now. | |

09:19:54    1         Q    Yes.

09:19:54    2         A    I think it's been about four or five years

09:19:57    3    now.

09:19:57    4         Q    And were you working for Credit Suisse before

09:20:04    5    that, before you became a managing director?

09:20:06    6         A    Yes.

09:20:06    7         Q    For how long?

09:20:08    8         A    I've been with Credit Suisse since about the

09:20:10    9    end of 1999.

09:20:15    10        Q    And what was your position before you became

09:20:17    11    a managing director?

09:20:19    12        A    Director.

09:20:21    13        Q    And did you focus on the same types of

09:20:24    14    matters that you focus on now, mergers and

09:20:27    15    acquisitions in the technology area?

09:20:30    16        A    Yes.

09:20:30    17        Q    And between receiving your MBA in 1994 and

09:20:39    18    moving to Credit Suisse in 1999, were you employed

09:20:43    19    somewhere else or other places?

09:20:45    20        A    Yes.

09:20:45    21        Q    Where?

09:20:48    22        A    What is now UBS.  It was a start of my

09:20:52    23    career.  I was at Merrill Lynch and Lehman Brothers.

09:20:56    24        Q    And were those all investment-banker-type

09:21:01    25    positions?

| | | |
|---|---|---|
| 09:39:48 | 1 | Q And can you tell me what this document is? |
| 09:39:55 | 2 | A It's a set of discussion materials |
| 09:39:57 | 3 | surrounding Project Yellow, I think, which is our code |
| 09:40:02 | 4 | name for YouTube that addresses a profile of Yellow |
| 09:40:07 | 5 | and sector overview, as well as some preliminary |
| 09:40:09 | 6 | financial analyses, and then there's some exhibits in |
| 09:40:12 | 7 | the back, but I think that's the primary gist of what |
| 09:40:15 | 8 | it's trying to accomplish. |
| 09:40:16 | 9 | Q Okay. And you said in your answer that |
| 09:40:18 | 10 | Yellow is the code name for YouTube? |
| 09:40:23 | 11 | MR. VOLKMER: Objection to the form of the |
| 09:40:24 | 12 | question. |
| 09:40:25 | 13 | THE WITNESS: Yes. |
| 09:40:27 | 14 | MR. HOHENGARTEN: Q. And is Green also used |
| 09:40:31 | 15 | in this documentation as a code name or alternative |
| 09:40:35 | 16 | name for Google? |
| 09:40:38 | 17 | MR. VOLKMER: Objection to the form of the |
| 09:40:39 | 18 | question. |
| 09:40:42 | 19 | THE WITNESS: Yes, it appears that's the case |
| 09:40:56 | 20 | as well. |
| 09:40:58 | 21 | MR. HOHENGARTEN: Q. And you stated that |
| 09:41:12 | 22 | this document begins with a profile of YouTube; is |
| 09:41:17 | 23 | that what -- is that correct? |
| 09:41:19 | 24 | MR. VOLKMER: Objection to the form of the |
| 09:41:20 | 25 | question. |

| 09:41:21 | 1 | THE WITNESS:  The first table -- in the table |
| 09:41:22 | 2 | of contents, the first section is a profile of Yellow |
| 09:41:25 | 3 | and sector overview. |
| 09:41:27 | 4 | MR. HOHENGARTEN:  Q.  And which -- which |
| 09:41:35 | 5 | pages that follow constitute that part of the |
| 09:41:38 | 6 | document? |
| 09:41:40 | 7 | A    The divider pages, page two, and then I think |
| 09:41:43 | 8 | the section ends on page 12. |
| 09:41:57 | 9 | Q    And you're referring to Bates page 2231? |
| 09:42:01 | 10 | A    So Bates -- |
| 09:42:02 | 11 | Q    The Bates numbers are those numbers on the |
| 09:42:06 | 12 | lower right. |
| 09:42:07 | 13 | A    So the divider page is Bates 2221 as a |
| 09:42:12 | 14 | starter one for the divider page.  The section begins |
| 09:42:14 | 15 | on 2222 and ends on 2231. |
| 09:42:18 | 16 | Q    And then starting on Bates page 2232, is that |
| 09:42:46 | 17 | the beginning of a financial analysis, a preliminary |
| 09:42:53 | 18 | financial analysis? |
| 09:42:55 | 19 | A    Yeah, the title page of 2232 is "Preliminary |
| 09:42:57 | 20 | Financial Analysis," and the subsection is |
| 09:43:00 | 21 | "Illustrative --" sorry "-- Illustrative Model." |
| 09:43:02 | 22 | Q    And what is an "Illustrative Model" or what |
| 09:43:06 | 23 | is this "Illustrative Model"? |
| 09:43:08 | 24 | A    The -- an "Illustrative Model" in the context |
| 09:43:11 | 25 | of how I'm viewing it here is that we didn't have any |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

11:03:27    1    Suisse that the purchase price they are paying is fair

11:03:29    2    to their shareholders from a financial point of view,

11:03:32    3    and actually I don't have the fairness opinion in

11:03:34    4    front of me, so it could be to the Board of Directors

11:03:37    5    or some other constituency, but to some constituency,

11:03:43    6    the transaction is fair from a financial perspective.

11:03:45    7      Q    But it would be for an opinion provided to

11:03:48    8    Google or its Board of Directors, and you're doing

11:03:50    9    this for Google; correct?

11:03:51    10      A    Yes, that's correct.

11:03:52    11      Q    So is it fair to Google or for Google?

11:03:54    12      A    Or Google's shareholders, and I'm sure we'll

11:03:57    13    get there at some point.  I can answer that more

11:03:59    14    specifically who we addressed it to, but....

11:04:02    15      Q    And had Credit Suisse been asked to begin its

11:04:16    16    analyses to provide a fairness opinion before the time

11:04:18    17    of this e-mail?

11:04:28    18      A    It's not inherently obvious to me from this

11:04:32    19    e-mail that that's the case, but I would think it

11:04:34    20    would be odd to just get an e-mail with this snip of

11:04:38    21    information only, so I would assume there was a

11:04:41    22    conversation before this e-mail.

11:04:42    23      Q    And as the corporate representative of Credit

11:04:46    24    Suisse, can you say when Credit Suisse's engagement

11:04:50    25    began on the project to provide a fairness opinion?

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

11:04:56  1      A    So we had been engaged on -- engaged being a

11:05:00  2    very nonlegal term -- so actively involved on this

11:05:04  3    project for a number of months.  I think even prior to

11:05:07  4    August we had conversations with Sequoia and with

11:05:10  5    Google trying to put the two companies together.

11:05:13  6          We had the August set of conversations which

11:05:15  7    we talked about, and then -- and your question might

11:05:19  8    be specifically referring to this.  It appears as

11:05:22  9    though they came to some purchase price on this term

11:05:25  10   sheet on October 5th that was attached to the e-mail

11:05:28  11   on October 5th.

11:05:29  12         So I would assume somewhere very close to the

11:05:31  13   vicinity of October 5th they called us up and said,

11:05:34  14   "Hey, can you provide a fairness opinion?"

11:05:36  15     Q    Okay.  And you mentioned Sequoia in your

11:05:40  16   answer.  What is that?

11:05:42  17     A    Sure.  Is there a date on this, too?  It

11:05:46  18   might help clarify it.

11:05:48  19         The -- and just for the benefit, the date on

11:05:52  20   the term sheet has a draft of October 3rd.  So if it's

11:05:55  21   a draft of October 3rd, you could probably interpolate

11:05:59  22   something between the 3rd and the 5th as being when

11:06:02  23   they would have called us to do the fairness opinion.

11:06:06  24         Sequoia is a venture capital firm, and I'm

11:06:09  25   going a little bit off of memory here, that's -- if my

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | |
|---|---|---|
| 11:06:14 | 1 | memory is correct, it is one of the significant |
| 11:06:16 | 2 | investors in YouTube. |
| 11:06:18 | 3 | Q   And from your prior answer, your prior answer |
| 11:06:25 | 4 | indicated that Credit Suisse had also talked to |
| 11:06:29 | 5 | Sequoia in connection with a possible purchase of |
| 11:06:32 | 6 | YouTube; is that right? |
| 11:06:42 | 7 | A   I'm pretty sure that we had conversations |
| 11:06:44 | 8 | with Sequoia around YouTube that were beyond just or |
| 11:06:49 | 9 | specifically just an acquisition that were certainly |
| 11:06:54 | 10 | in advance of this, and I think actually when you |
| 11:06:57 | 11 | showed me a previous exhibit, we actually had been |
| 11:07:00 | 12 | asked to hold off on continuing those conversations, |
| 11:07:06 | 13 | Exhibit 6, to preserve the delicacy of Google's |
| 11:07:13 | 14 | approach. |
| 11:07:18 | 15 | Q   And keep that exhibit handy, but we'll mark |
| 11:07:49 | 16 | also Exhibit 9. |
| 11:07:53 | 17 | (Document marked Duncan Exhibit 9 |
| 11:08:07 | 18 | for identification.) |
| 11:08:07 | 19 | MR. HOHENGARTEN:  Sorry. |
| 11:08:08 | 20 | Q   Which is Bates Nos. CSSU 2908 through 2913. |
| 11:09:16 | 21 | A   Okay. |
| 11:09:16 | 22 | Q   And Exhibit 9 is a cover e-mail followed by a |
| 11:09:27 | 23 | letter and a term sheet; correct? |
| 11:09:31 | 24 | MR. VOLKMER:  Object to the form of the |
| 11:09:34 | 25 | question. |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| 11:09:35 | 1 | THE WITNESS: Exhibit 9 has three components |
| 11:09:41 | 2 | to it. It has an e-mail track record as page 2908. |
| 11:09:46 | 3 | As page 2909, it has a letter from David Drummond at |
| 11:09:51 | 4 | Google to Chad and Steve at YouTube, and then the |
| 11:09:54 | 5 | remaining pages appear to be a term sheet. |
| 11:09:57 | 6 | MR. HOHENGARTEN: Q. And as the corporate |
| 11:10:03 | 7 | representative of Credit Suisse, is it your |
| 11:10:05 | 8 | understanding that this term sheet is the final term |
| 11:10:07 | 9 | sheet for Google's acquisition of YouTube? |
| 11:10:12 | 10 | A On the first page there's a line from Matt |
| 11:10:16 | 11 | Sucherman to Salman Ullah and Sean Dempsey saying that |
| 11:10:20 | 12 | this is not the countersigned. It doesn't say what |
| 11:10:24 | 13 | this says. "It's not countersigned by target but it |
| 11:10:27 | 14 | is the final." |
| 11:10:28 | 15 | Q And as a recipient of this, you understood it |
| 11:10:32 | 16 | to be the final term sheet; correct? |
| 11:10:35 | 17 | A That's correct. I had -- I assumed that was |
| 11:10:36 | 18 | the truth. |
| 11:10:37 | 19 | Q And sitting here today, you have no reason to |
| 11:10:39 | 20 | doubt that; correct? |
| 11:10:45 | 21 | A That's right. |
| 11:10:45 | 22 | Q Is the term sheet provided to Credit Suisse |
| 11:10:55 | 23 | in connection -- is it being provided in connection |
| 11:10:58 | 24 | with the request for a fairness opinion about the |
| 11:11:00 | 25 | transaction? |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

11:11:07    1        A    I think that's a fair assumption.  The --

11:11:10    2    again, the next sentence on here says the

11:11:13    3    countersigned copies are in my office, and he asked

11:11:15    4    Salman if things are in motion for a fairness opinion.

11:11:19    5        So, you know, as -- I think that's fair to

11:11:22    6    assume that at this point that we're fully starting to

11:11:26    7    have a conversation with Google around doing a

11:11:28    8    fairness opinion, and that's starting to get supported

11:11:32    9    by some of these documents you've provided me.

11:11:34    10       Q    Is the term sheet something that is typically

11:11:36    11   provided to Credit Suisse when it's asked to give a

11:11:38    12   fairness opinion?

11:11:41    13       A    You know, the fairness opinion is dependent

11:11:46    14   upon knowing what the economics of the transaction

11:11:49    15   are, so we could get that from a definitive agreement

11:11:51    16   or a term sheet.

11:11:52    17       So to get the balls rolling, we'd probably

11:11:57    18   depend upon a term sheet at the end of the day that

11:11:59    19   the definitive agreement is going to have the final

11:12:03    20   term, which is what we would really rely upon.

11:12:10    21       Q    When you say "the definitive agreement," do

11:12:12    22   you mean the final merger agreement or acquisition

11:12:16    23   agreement?

11:12:18    24       A    That's right.

11:12:34    25       Q    And under this term sheet, was the proposed

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | |
|---|---|---|
| 11:12:46 | 1 | price, the agreed-to price at which Google would |
| 11:12:52 | 2 | purchase YouTube $1.65 billion? |
| 11:12:55 | 3 | MR. VOLKMER: Object to the form of the |
| 11:12:57 | 4 | question. |
| 11:13:02 | 5 | THE WITNESS: The face value of that offer on |
| 11:13:05 | 6 | the term sheet is $1.65 billion. |
| 11:13:10 | 7 | MR. HOHENGARTEN: Q. And is there some other |
| 11:13:13 | 8 | way of measuring the offer other than the face value? |
| 11:13:18 | 9 | A Sure. |
| 11:13:18 | 10 | So on Bates 2910, under "Acquisition |
| 11:13:23 | 11 | Consideration," there's a sentence in there that says |
| 11:13:27 | 12 | that that Google is going to issue a number of shares |
| 11:13:30 | 13 | of Google Class A Common Stock, the "Shares," in |
| 11:13:34 | 14 | quotes, equal to $1,650,000,000 based on the average |
| 11:13:41 | 15 | daily closing price of the shares for 30 days |
| 11:13:44 | 16 | immediately preceding the closing of the acquisition. |
| 11:13:49 | 17 | So what that means is is that 1.65 billion is |
| 11:13:53 | 18 | an optical number. The value that they're actually |
| 11:13:56 | 19 | going to get is a number of shares equal to |
| 11:13:58 | 20 | $1.65 billion divided, you know, a share price of $30 |
| 11:14:03 | 21 | on average divided into that 1.65 billion. So that |
| 11:14:06 | 22 | will be a number of shares they'll get, and that will |
| 11:14:07 | 23 | have a value that will be different than $1.65 billion |
| 11:14:12 | 24 | by definition. |
| 11:14:12 | 25 | Q Based on variation of price per shares? |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| 11:14:15 | 1 | A    That's right. |
| 11:14:15 | 2 | Q    And again, Credit Suisse was retained in |
| 11:14:18 | 3 | order to provide an opinion that the purchase price |
| 11:14:20 | 4 | was fair; correct? |
| 11:14:27 | 5 | A    Gosh, I'd have to see the fairness opinion to |
| 11:14:30 | 6 | see if that's the exact phraseology, because I |
| 11:14:33 | 7 | don't -- I'm not trying to parse your words.  That's |
| 11:14:36 | 8 | not fair of me to do, but I think it's that the |
| 11:14:38 | 9 | acquisition consideration was fair, which would be the |
| 11:14:42 | 10 | shares that they issued, not the $1.65 billion. |
| 11:14:42 | 11 | Q    Okay.  Thank you. |
| 11:14:43 | 12 | And what I want to know is whether -- do you |
| 11:14:46 | 13 | know what that consideration was in dollar value in |
| 11:14:49 | 14 | the end? |
| 11:14:50 | 15 | A    The fairness opinion is given at the time of |
| 11:14:53 | 16 | execution of the definitive agreement.  And as such, |
| 11:14:56 | 17 | we would have made an assumption as to the number of |
| 11:14:58 | 18 | shares that were issued that, in reality -- so to |
| 11:15:01 | 19 | answer your question specifically, I think the number |
| 11:15:02 | 20 | of shares declined substantially from signing to |
| 11:15:05 | 21 | closing, because I think Google's stock price went up, |
| 11:15:08 | 22 | so they were issued fewer shares. |
| 11:15:10 | 23 | I don't recall without going into some of the |
| 11:15:12 | 24 | books that you might provide to me what our fairness |
| 11:15:15 | 25 | opinion -- what shares our fairness opinion exactly |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| 11:15:18 | 1 | were based upon and what it actually ended up being at |
| 11:15:20 | 2 | the end of the day. |
| 11:15:42 | 3 | Q    We'll come back to that. |
| 11:15:44 | 4 | A    Okay.  Sounds good.  Thanks. |
| 11:16:04 | 5 | Q    We'll mark Exhibit 10. |
| 11:16:06 | 6 | A    Should I put these away? |
| 11:16:08 | 7 | Q    Yes. |
| 11:16:09 | 8 | (Document marked Duncan Exhibit 10 |
| 11:16:10 | 9 | for identification.) |
| 11:16:10 | 10 | MR. HOHENGARTEN:  Q.  Which is Bates Nos. |
| 11:16:24 | 11 | CSSU 28545 to 2852.  Sorry.  Let me -- it's CSSU 2845 |
| 11:16:37 | 12 | to 2852. |
| 11:16:47 | 13 | A    Thank you.  Okay. |
| 11:17:36 | 14 | Q    Can you describe what Exhibit 10 is? |
| 11:17:39 | 15 | MR. VOLKMER:  Object to the form of the |
| 11:17:41 | 16 | question. |
| 11:17:42 | 17 | THE WITNESS:  Exhibit 10 has a number of |
| 11:17:45 | 18 | pages.  The first page of which is an e-mail chain. |
| 11:17:48 | 19 | Actually, the first two pages of which are an e-mail |
| 11:17:52 | 20 | chain, Bates 2845 and 2846; and then Bates 2847 to |
| 11:18:00 | 21 | Bates 2852 are an engagement letter between Credit |
| 11:18:04 | 22 | Suisse and Google. |
| 11:18:05 | 23 | MR. HOHENGARTEN:  Q.  And as the corporate |
| 11:18:12 | 24 | representative of Credit Suisse, can you tell me |
| 11:18:14 | 25 | whether this is the final engagement letter between |

| 11:18:18 | 1 | Credit Suisse and Google related to this fairness |
| 11:18:20 | 2 | opinion? |
| 11:18:21 | 3 | A    It appears to be, yeah, the final executed |
| 11:18:24 | 4 | copy, yes. |
| 11:18:25 | 5 | Q    In looking at Bates page 2847 of Exhibit 10, |
| 11:18:35 | 6 | under "Compensation," it provides that the company |
| 11:18:40 | 7 | agrees to pay Credit Suisse a fee of 2,000 -- sorry. |
| 11:18:46 | 8 | $2,500,000 payable upon rendering of our opinion; |
| 11:18:50 | 9 | correct? |
| 11:18:50 | 10 | A    That's correct. |
| 11:18:50 | 11 | Q    And the company he's referring to is Google; |
| 11:18:54 | 12 | right? |
| 11:18:56 | 13 | A    That's correct. |
| 11:19:02 | 14 | Q    And Google was obligated to make that payment |
| 11:19:07 | 15 | upon the rendering of Credit Suisse's opinion |
| 11:19:09 | 16 | regardless of whether -- whether Credit Suisse said |
| 11:19:12 | 17 | the consideration for the transaction was fair or not |
| 11:19:17 | 18 | fair; correct? |
| 11:19:18 | 19 | A    That's correct. |
| 11:19:18 | 20 | Q    And at the bottom of that same page, 2847, it |
| 11:19:32 | 21 | says "In connection with Credit Suisse's engagement, |
| 11:19:34 | 22 | the Company will furnish, or cause to be furnished to |
| 11:19:38 | 23 | Credit Suisse all information concerning the Company |
| 11:19:39 | 24 | and, to the extent available to the Company, Target |
| 11:19:43 | 25 | that Credit Suisse reasonably deems necessary or |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | |
|---|---|---|
| 11:49:48 | 1 | Q   And having reviewed this e-mail as a |
| 11:49:51 | 2 | corporate representative of Credit Suisse, you |
| 11:49:53 | 3 | testified that Zach Maurus also went to Wilson Sonsini |
| 11:49:58 | 4 | for due diligence? |
| 11:50:00 | 5 | A   He did.  It helped refresh an additional |
| 11:50:02 | 6 | name.  Thank you. |
| 11:50:02 | 7 | Q   And having now been refreshed in that way, do |
| 11:50:05 | 8 | you recall anybody else who was there from Credit |
| 11:50:06 | 9 | Suisse? |
| 11:50:09 | 10 | A   I don't think Chris Scarborough was there, |
| 11:50:14 | 11 | which is who sent the e-mail, so I think it was just |
| 11:50:17 | 12 | Zach and I and Jim Kim.  Amrit Rao might have attended |
| 11:50:23 | 13 | at some point.  I'm not sure, so that's another -- a |
| 11:50:25 | 14 | fourth possibility. |
| 11:50:26 | 15 | Q   And can you spell that name? |
| 11:50:28 | 16 | A   R-A-O. |
| 11:50:28 | 17 | Q   And how is the first name spelled? |
| 11:50:31 | 18 | A   A-M-R-I-T. |
| 11:50:33 | 19 | Q   Thank you. |
| 11:50:48 | 20 | We'll mark Exhibit 13 which is CSSU 2686. |
| 11:50:59 | 21 | (Document marked Duncan Exhibit 13 |
| 11:51:18 | 22 | for identification.) |
| 11:51:18 | 23 | THE WITNESS:  Thank you.  Okay. |
| 11:52:01 | 24 | MR. HOHENGARTEN:  Q.  Exhibit 13 is an e-mail |
| 11:52:03 | 25 | chain.  The latest e-mail, top e-mail in the chain, is |

| 11:52:07 | 1 | from Sean Dempsey of Google to Zach Maurus, Storm |
| 11:52:13 | 2 | Duncan, and James Kim; correct? |
| 11:52:15 | 3 | A    That's correct. |
| 11:52:15 | 4 | Q    Dated October 6th, 2006; correct? |
| 11:52:18 | 5 | A    That's correct. |
| 11:52:18 | 6 | Q    And it's forwarding a Snowmass video |
| 11:52:21 | 7 | analysis; correct? |
| 11:52:22 | 8 | A    That's correct. |
| 11:52:23 | 9 | Q    And you testified earlier that Snowmass |
| 11:52:28 | 10 | referred to the transaction of Google acquiring |
| 11:52:31 | 11 | YouTube; correct? |
| 11:52:32 | 12 | A    That's correct. |
| 11:52:35 | 13 | Q    And the e-mail from Sean Dempsey is |
| 11:52:38 | 14 | forwarding an e-mail from Salman Ullah, also dated |
| 11:52:43 | 15 | October 6th; correct? |
| 11:52:45 | 16 | A    Correct. |
| 11:52:47 | 17 | Q    And it shows a breakdown of types of videos |
| 11:52:52 | 18 | on YouTube or some analysis of that; is that right? |
| 11:52:57 | 19 | MR. VOLKMER:  Objection to the form of the |
| 11:52:59 | 20 | question. |
| 11:52:59 | 21 | MR. HOHENGARTEN:  Actually, let me rephrase |
| 11:53:00 | 22 | that question. |
| 11:53:01 | 23 | Q    Can you describe what this Snowmass video |
| 11:53:05 | 24 | analysis is? |
| 11:53:06 | 25 | MR. VOLKMER:  Objection to the form of the |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| 11:53:08 | 1 | question. |
| 11:53:08 | 2 | THE WITNESS: The title of the e-mail is |
| 11:53:12 | 3 | "Snowmass video analysis" that was sent from Salman to |
| 11:53:16 | 4 | Salman, and within it there's a detail of videos, I |
| 11:53:26 | 5 | guess, which is -- includes 424, I guess 123 which |
| 11:53:31 | 6 | aren't valid URLs. I'm not sure what that comes in |
| 11:53:34 | 7 | terms of the total quantity. |
| 11:53:37 | 8 | And then it says a subdivision of that 424 -- |
| 11:53:48 | 9 | sorry. That 424 less the 123 describing them by two |
| 11:53:53 | 10 | -- three categories, a premium category, a removed |
| 11:53:58 | 11 | category, and a no category, which is no copyright but |
| 11:54:02 | 12 | includes commercials, trailers, public service promos |
| 11:54:06 | 13 | and true UGC. |
| 11:54:09 | 14 | Q That's the no category, what you were just |
| 11:54:10 | 15 | describing? |
| 11:54:11 | 16 | A That's right. |
| 11:54:12 | 17 | Q And the premium category, do you understand |
| 11:54:15 | 18 | what that is? |
| 11:54:18 | 19 | A Yeah. It says it's content that is |
| 11:54:20 | 20 | copyrighted either in whole or in substantial part, |
| 11:54:23 | 21 | and it also included, removed where links were -- that |
| 11:54:28 | 22 | were taken down. |
| 11:54:31 | 23 | Q Do you understand what removed where -- were |
| 11:54:34 | 24 | links that were taken down means? |
| 11:54:36 | 25 | A Probably not from a technical perspective, |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | |
|---|---|---|
| 11:55:36 | 1 | MR. VOLKMER: And renew that objection. |
| 11:55:39 | 2 | THE WITNESS: No. The way I read it, it's |
| 11:55:40 | 3 | 63 percent of the net total, not the gross total. So |
| 11:55:43 | 4 | the percentage of the total would be 189 over 424 |
| 11:55:47 | 5 | which would be a smaller percentage than the 63. |
| 11:55:50 | 6 | MR. HOHENGARTEN: Okay. Let me step back. |
| 11:56:02 | 7 | Q As the corporate representative of Credit |
| 11:56:04 | 8 | Suisse, what is your understanding of the purpose of |
| 11:56:07 | 9 | providing this information to Credit Suisse? |
| 11:56:09 | 10 | MR. VOLKMER: Objection to the form of the |
| 11:56:11 | 11 | question. |
| 11:56:11 | 12 | THE WITNESS: This is more information |
| 11:56:18 | 13 | that -- that is being provided to us coincident with, |
| 11:56:22 | 14 | I think, with what we just discussed in Exhibit 11 to |
| 11:56:29 | 15 | help us facilitate doing some modeling around the |
| 11:56:33 | 16 | valuation or the financial performance first, and then |
| 11:56:36 | 17 | the valuation second of YouTube. |
| 11:56:39 | 18 | MR. HOHENGARTEN: Q. And it's a -- one way |
| 11:56:41 | 19 | of breaking down video content on YouTube into |
| 11:56:45 | 20 | categories; correct? |
| 11:56:47 | 21 | A Yes. |
| 11:56:48 | 22 | Q And it's relevant to the valuation insofar as |
| 11:56:53 | 23 | the ability to monetize these different categories may |
| 11:56:58 | 24 | be different; correct? |
| 11:57:00 | 25 | A That is one way they could be differentiated, |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| 11:57:04 | 1 | yes. |

    Q   Do you know whether in your final valuation
models, which we'll get to, but at this point whether,
in fact, you differentiated between these categories
according to the ability to monetize them?

    A   It would probably be easier to answer that
question when I have that stuff in front of me.

    Q   Okay.

    A   You want me to guess?

    Q   No, I don't want you to guess.

    A   Okay.

    Q   But -- but having worked on this project, I
thought you might be able to give me a -- an answer
based on what you know right now.

    A   Okay.  Yeah.

        MR. VOLKMER:  I'm going to object to the form
of this question --

        THE WITNESS:  Okay.

        MR. VOLKMER:  -- to the extent there's a
question pending.

        MR. HOHENGARTEN:  Well, it was my original
question, actually.  I can read it.

    Q   Do you know whether in your final valuation
models, which we'll get to, but at this point whether,
in fact, you differentiated between these categories

| 11:58:01 | 1 | according to the ability to monetize them? |
| 11:58:06 | 2 | MR. VOLKMER: I'm going to renew the |
| 11:58:08 | 3 | objection. |
| 11:58:12 | 4 | THE WITNESS: Thank you. |
| 11:58:13 | 5 | Let's wait until we get to those, and then |
| 11:58:15 | 6 | I'll give you a better answer. |
| 11:58:16 | 7 | MR. HOHENGARTEN: Q. Let's walk through the |
| 11:58:17 | 8 | breakdown here though -- |
| 11:58:19 | 9 | A Sure. |
| 11:58:19 | 10 | Q -- still. |
| 11:58:19 | 11 | We started to talk about it but I want to try |
| 11:58:22 | 12 | to go through it a little more methodically to make |
| 11:58:25 | 13 | sure that I understand the information that's being |
| 11:58:27 | 14 | supplied here. |
| 11:58:28 | 15 | A Okay. |
| 11:58:29 | 16 | Q There is -- the first line gives a gross |
| 11:58:30 | 17 | total and it says "424"; correct? |
| 11:58:36 | 18 | A That's correct. |
| 11:58:36 | 19 | Q In parenthesis, and you mentioned this in a |
| 11:58:40 | 20 | prior answer, it says "Includes 123 that aren't valid |
| 11:58:45 | 21 | URLs"; correct? |
| 11:58:47 | 22 | A That's correct also. |
| 11:58:47 | 23 | Q Do you understand what the 424 refers to? |
| 11:58:55 | 24 | A My recollection of the 424 is that it's a -- |
| 11:58:59 | 25 | it says at the top of the e-mail, "Some manual |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| 11:59:02 | 1 | analysis we did," was that it was a study that the |
| 11:59:07 | 2 | Google folks had performed studying, you know, a |
| 11:59:10 | 3 | number of randomly generated or chosen videos, and |
| 11:59:16 | 4 | that 424 is the number that they had randomly chosen |
| 11:59:19 | 5 | and -- and were able to categorize with these |
| 11:59:25 | 6 | subcategorizations. |
| 11:59:27 | 7 | Q   Okay.  And the "includes 123 that aren't |
| 11:59:30 | 8 | valid URLs," do you understand what the meaning of |
| 11:59:36 | 9 | that is? |
| 11:59:38 | 10 | A   I would assume -- I don't know YouTube's |
| 11:59:42 | 11 | technology underpinnings well enough, but I would |
| 11:59:46 | 12 | assume that meant at one point there was a video that |
| 11:59:49 | 13 | had been put up and it kind of looks as though you can |
| 11:59:52 | 14 | click on it, but when you click on it, that video is |
| 11:59:55 | 15 | no longer there, so it's no longer valid.  That would |
| 11:59:58 | 16 | be my understanding. |
| 11:59:59 | 17 | Q   And that number is subtracted from -- the 123 |
| 12:00:03 | 18 | that aren't valid URLs are -- are subtracted from the |
| 12:00:07 | 19 | gross total to provide a net total of videos of 301; |
| 12:00:13 | 20 | is that correct? |
| 12:00:13 | 21 | A   That's correct. |
| 12:00:14 | 22 | Q   And then that net total of 301 videos that's |
| 12:00:18 | 23 | regard -- that treated as 100 percent for purposes of |
| 12:00:20 | 24 | the analysis; right? |
| 12:00:21 | 25 | A   That's correct, yes. |

| 12:00:22 | 1 | Q   And then that's divided into two categories. |
| 12:00:26 | 2 | The first category is called "No," and the second |
| 12:00:29 | 3 | category is called "Pram/Rem," which I believe means |
| 12:00:37 | 4 | premium/removed; correct? |
| 12:00:40 | 5 | A   Yes. |
| 12:00:40 | 6 | MR. VOLKMER:  Object to the form of the |
| 12:00:41 | 7 | question. |
| 12:00:43 | 8 | MR. HOHENGARTEN:  Q.  The first category is |
| 12:00:44 | 9 | "No"; correct? |
| 12:00:46 | 10 | A   Yes. |
| 12:00:46 | 11 | Q   And the second category is labeled here |
| 12:00:48 | 12 | "Prem/rem"; correct? |
| 12:00:53 | 13 | A   There's actually just two labelings.  So the |
| 12:00:55 | 14 | definition down below expands upon that to say that it |
| 12:00:58 | 15 | means premium/removed. |
| 12:01:03 | 16 | Q   Okay.  And that category of premium/removed |
| 12:01:08 | 17 | under this analysis is 63 percent of the net total of |
| 12:01:12 | 18 | videos sampled; correct? |
| 12:01:15 | 19 | MR. VOLKMER:  Objection to the form of the |
| 12:01:17 | 20 | question. |
| 12:01:37 | 21 | (Whereupon, record read by the Reporter as |
| 12:01:37 | 22 | follows: |
| 12:01:04 | 23 | "Question:  Okay.  And that category of |
| 12:01:05 | 24 | premium/removed under this analysis is |
| 12:01:11 | 25 | 63 percent of the net total of videos |

| 12:01:14 | 1 | sampled; correct?") |
| 12:01:37 | 2 | THE WITNESS: So the -- the premium/removed |
| 12:01:40 | 3 | category is 189 of the 424, and 189 of the 301. So |
| 12:01:46 | 4 | the percentage 63 percent is 63 percent of the net |
| 12:01:49 | 5 | total, so hopefully that answers your question, I |
| 12:01:52 | 6 | think. |
| 12:01:52 | 7 | MR. HOHENGARTEN: Q. It's 63 percent of the |
| 12:01:54 | 8 | net total which excludes the URLs that aren't valid? |
| 12:01:58 | 9 | A That's correct, which is, I think, the |
| 12:02:00 | 10 | definition of net total for purposes of this, which I |
| 12:02:03 | 11 | think you established as well, so sure. |
| 12:02:08 | 12 | Q And the "No" category is 37 percent of that |
| 12:02:11 | 13 | net total; correct? |
| 12:02:14 | 14 | A That's correct, yes. |
| 12:02:15 | 15 | Q So setting aside the URLs that aren't valid, |
| 12:02:21 | 16 | the remaining sample of videos, the net total, breaks |
| 12:02:25 | 17 | down into 63 percent that are premium removed and |
| 12:02:28 | 18 | 37 percent that are no; correct? |
| 12:02:30 | 19 | A That's correct. |
| 12:02:31 | 20 | Q And the premium/removed category includes |
| 12:02:37 | 21 | content that is copyrighted in whole or substantial |
| 12:02:42 | 22 | part, plus removed, which are links that were taken |
| 12:02:44 | 23 | down; right? |
| 12:02:48 | 24 | A Yeah, that's how it's categorized here |
| 12:02:51 | 25 | from -- from the Google folks. |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | |
|---|---|---|
| 12:02:56 | 1 | Q   And the no category is categorized here by |
| 12:03:07 | 2 | the people from Google as no copyright but includes |
| 12:03:12 | 3 | commercials, trailers, public service, promos, and |
| 12:03:16 | 4 | true UGC; right? |
| 12:03:18 | 5 | A   That's correct. |
| 12:03:18 | 6 | Q   What is -- what is your understanding of the |
| 12:03:21 | 7 | phrase "true UGC"? |
| 12:03:23 | 8 | MR. VOLKMER:  Objection to the form of the |
| 12:03:25 | 9 | question. |
| 12:03:26 | 10 | THE WITNESS:  I think that the initials UGC |
| 12:03:30 | 11 | probably stand for user-generated content. |
| 12:03:33 | 12 | MR. HOHENGARTEN:  Q.  And true UGC? |
| 12:03:45 | 13 | A   I'm not sure.  I mean, true UGC is just |
| 12:03:50 | 14 | honest UGC.  Honestly, you know, user generated.  I |
| 12:03:55 | 15 | would assume it's implying the users had generated |
| 12:03:58 | 16 | that content through their cell phones, or through a |
| 12:04:01 | 17 | video camera, or something along those lines. |
| 12:04:03 | 18 | Q   Okay.  And that true UGC is encompassed in |
| 12:04:06 | 19 | the no category; right? |
| 12:04:07 | 20 | A   That's correct. |
| 12:04:07 | 21 | Q   Now, the no category also includes |
| 12:04:10 | 22 | commercials, trailers, public service announcements, |
| 12:04:13 | 23 | and promotions; right? |
| 12:04:15 | 24 | A   That's correct. |
| 12:04:16 | 25 | Q   And together the true UGC, plus those other |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| 12:04:19 | 1 | categories, are 37 percent of the net total sample; |
| 12:04:24 | 2 | right? |
| 12:04:24 | 3 | A    That's correct. |
| 12:04:25 | 4 | Q    And the other 63 percent is either premium, |
| 12:04:29 | 5 | which is defined as copyrighted content or removed, |
| 12:04:34 | 6 | which is links taken down? |
| 12:04:35 | 7 | MR. VOLKMER:  Objection to the form of the |
| 12:04:37 | 8 | question. |
| 12:04:49 | 9 | (Whereupon, record read by the Reporter as |
| 12:04:49 | 10 | follows: |
| 12:04:26 | 11 | "Question:  And the other 63 percent is |
| 12:04:28 | 12 | either premium, which is defined as |
| 12:04:31 | 13 | copyrighted content or removed, which is |
| 12:04:35 | 14 | links taken down?") |
| 12:04:49 | 15 | MR. TAFFET:  I'll join in that objection. |
| 12:04:51 | 16 | THE WITNESS:  Yeah, I think that -- I think |
| 12:04:53 | 17 | we actually clarified what premium and removed was |
| 12:04:56 | 18 | earlier, and I think it's written explicitly on |
| 12:04:59 | 19 | Exhibit 13.  So I just read it for your clarification, |
| 12:05:02 | 20 | not for your clarification, but for the clarification |
| 12:05:03 | 21 | of the answer. |
| 12:05:04 | 22 | The premium/removed means the content is |
| 12:05:09 | 23 | copyright either in whole or in substantial part, and |
| 12:05:13 | 24 | then also the second part is "and removed were links |
| 12:05:16 | 25 | that were taken down." |

| | | |
|---|---|---|
| 12:05:17 | 1 | MR. HOHENGARTEN:  Okay. |
| 12:05:23 | 2 | Q   Did Credit Suisse itself review any YouTube |
| 12:05:27 | 3 | videos or sample of videos in connection with |
| 12:05:30 | 4 | providing a fairness opinion? |
| 12:05:32 | 5 | A   No. |
| 12:05:34 | 6 | Q   Do you know, as the corporate representative |
| 12:05:38 | 7 | of Credit Suisse, did you receive any other |
| 12:05:42 | 8 | information about a breakdown of video categories from |
| 12:05:45 | 9 | Google other than this e-mail, Exhibit 13, that we've |
| 12:05:50 | 10 | just been talking about? |
| 12:05:52 | 11 | MR. VOLKMER:  Object to the form of the |
| 12:05:54 | 12 | question. |
| 12:06:48 | 13 | THE WITNESS:  We might have received other |
| 12:06:49 | 14 | categorization.  I guess when we go through more |
| 12:06:53 | 15 | documents, that might help refresh my memory.  Sitting |
| 12:06:55 | 16 | here right now, I can't remember which documents might |
| 12:06:58 | 17 | have given us additional information. |
| 12:06:59 | 18 | Certainly there's some additional kind of |
| 12:07:01 | 19 | characterization of the videos in Exhibit 8 that you |
| 12:07:04 | 20 | showed me previously, but it wasn't re-categorizing it |
| 12:07:12 | 21 | any differently than had been shown here. |
| 12:08:02 | 22 | MR. HOHENGARTEN:  Mark exhibit -- what was |
| 12:08:04 | 23 | that one? |
| 12:08:05 | 24 | THE WITNESS:  13 was the last one. |
| 12:08:06 | 25 | MR. HOHENGARTEN:  Exhibit 14, which is CSSU |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

12:08:11    1    4069 through 4074.

12:08:22    2             (Document marked Duncan Exhibit 14

12:08:34    3              for identification.)

12:08:34    4             MR. HOHENGARTEN:  Sorry.

12:10:29    5             THE WITNESS:  Okay.

12:10:30    6             MR. HOHENGARTEN:  Q.  Exhibit 14 is an e-mail

12:10:39    7    chain with an attachment; correct?

12:10:48    8         A    There were two attachments, it looks like,

12:10:50    9    but yes, at least on the attached line up top it says

12:10:54    10   there's two.

12:10:55    11        Q    Yes, you're right.

12:10:57    12             The attachments at the top says "agua

12:11:00    13   model.xls" and "agua model.xls," the same names;

12:11:05    14   correct?

12:11:05    15        A    They do say the same name.

12:11:09    16        Q    Either with attachment or attachments.

12:11:18    17        A    Sure.  Absolutely.  That's a little confusing

12:11:21    18   as well but yes, it looks like there are either one or

12:11:24    19   two attachments.  There are definitely two

12:11:26    20   attachments.  I'm not sure if they're different and

12:11:28    21   named the same or named the same and the same.

12:11:30    22        Q    And the -- the e-mail is being sent by James

12:11:34    23   Kim of Credit Suisse to Salman Ullah of Google and

12:11:39    24   Storm Duncan and James Kim of -- of Credit Suisse;

12:11:43    25   right?

| | | | |
|---|---|---|---|
| 12:11:45 | 1 | A | And David Drummond. |
| 12:11:46 | 2 | Q | Thank you, and David Drummond. |
| 12:11:48 | 3 | A | And a whole bunch of people cced as well. |
| 12:11:51 | 4 | Q | And the e-mail says "Attached please find the |
| 12:11:54 | 5 | | latest version of the model"; correct? |
| 12:11:57 | 6 | A | It does. |
| 12:11:58 | 7 | Q | And do you know what's meant by "the |
| 12:12:02 | 8 | | model" there? |
| 12:12:05 | 9 | A | It appears to be the -- the beginning of a |
| 12:12:12 | 10 | | model or more than the beginning.  A substantial -- a |
| 12:12:16 | 11 | | substantially further enhanced draft of a model |
| 12:12:21 | 12 | | incorporating some monetization around YouTube. |
| 12:12:30 | 13 | Q | And what kind of a model is this?  Is it a |
| 12:12:34 | 14 | | cash flow model? |
| 12:12:47 | 15 | A | This has a -- what is the Bates numbers?  Is |
| 12:12:52 | 16 | | that the name again? |
| 12:12:53 | 17 | Q | Yes, that's what those numbers at the bottom |
| 12:12:56 | 18 | | are. |
| 12:12:56 | 19 | A | Bates Nos. 4071 and 4072 seem to be a |
| 12:13:01 | 20 | | projection model.  4073 has a valuation.  Hard to tell |
| 12:13:06 | 21 | | if that's a discounted cash flow model or not, but it |
| 12:13:08 | 22 | | appears that it could be, and then 4074 is a further |
| 12:13:17 | 23 | | projection model with again some valuation at the |
| 12:13:23 | 24 | | bottom that -- hard to tell if it's a DCF or not. |
| 12:13:27 | 25 | Q | When you say "DCF," you mean discounted cash |

| 12:13:29 | 1 | flow? |
| 12:13:40 | 2 | A Yes. |
| 12:13:40 | 3 | Q And looking at Bates page 4071 -- |
| 12:13:52 | 4 | A Okay. |
| 12:13:53 | 5 | Q -- this is the first of the first two |
| 12:13:55 | 6 | pages -- of the two pages which you said were a |
| 12:14:07 | 7 | projection model; right? |
| 12:14:10 | 8 | A Yes. |
| 12:14:10 | 9 | Q And what's being projected here? |
| 12:14:27 | 10 | A The project of the financial performance of |
| 12:14:35 | 11 | YouTube, and I'm not sure if it's as part of Google or |
| 12:14:41 | 12 | not. It doesn't specifically say. |
| 12:14:47 | 13 | Q Okay. And so to do that projection, is it |
| 12:14:52 | 14 | looking at projecting revenue that YouTube would be |
| 12:14:56 | 15 | able to bring in in the future? |
| 12:14:59 | 16 | A Yes. |
| 12:15:00 | 17 | Q And then is it also looking at the cost of |
| 12:15:03 | 18 | that revenue or expenses to get net revenue measured |
| 12:15:08 | 19 | in a variety of ways? |
| 12:15:12 | 20 | A It does come to net revenues well, and then |
| 12:15:15 | 21 | also further costing that down to the EBIDTA level and |
| 12:15:19 | 22 | the EBIT level, and the net operating profit after tax |
| 12:15:24 | 23 | level free cash flow, which is NOPAT and then FCF at |
| 12:15:28 | 24 | the very bottom. |
| 12:15:32 | 25 | Q And for a layperson, are those different ways |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | |
|---|---|---|
| 13:17:29 | 1 | for identification.) |
| 13:17:29 | 2 | THE WITNESS:  Okay. |
| 13:17:29 | 3 | MR. HOHENGARTEN:  Q.  And Exhibit 17.  First |
| 13:17:39 | 4 | page of Exhibit 17 is a cover e-mail with an |
| 13:17:42 | 5 | attachment; is that correct? |
| 13:17:44 | 6 | A   Yes. |
| 13:17:44 | 7 | Q   And it's being sent by Amrit Rao to Storm |
| 13:17:53 | 8 | Duncan, yourself, cc Chris Scarborough and James Kim; |
| 13:17:57 | 9 | right? |
| 13:18:00 | 10 | A   Yes, that's correct. |
| 13:18:01 | 11 | Q   On October 9th, 2006; correct? |
| 13:18:07 | 12 | A   Yes. |
| 13:18:07 | 13 | Q   And it -- subject is "Green Board Materials"; |
| 13:18:15 | 14 | right? |
| 13:18:16 | 15 | A   Correct. |
| 13:18:16 | 16 | Q   And then there's an attachment which is |
| 13:18:23 | 17 | indicated that its file name is "Materials for Green |
| 13:18:26 | 18 | Board.pdf; correct? |
| 13:18:30 | 19 | A   That's correct as well. |
| 13:18:31 | 20 | Q   And the remainder of Exhibit 16 after the |
| 13:18:35 | 21 | e-mail, after the first page, is that attachment; |
| 13:18:38 | 22 | correct? |
| 13:18:40 | 23 | A   Exhibit 17 -- |
| 13:18:42 | 24 | Q   I'm sorry. |
| 13:18:42 | 25 | A   -- and yes. |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| 13:18:48 | 1 | Q Thank you for correctly identifying the |
| 13:18:50 | 2 | exhibit number as 17. |
| 13:18:51 | 3 | A Absolutely. |
| 13:18:58 | 4 | Q And is this presentation -- this is a |
| 13:19:01 | 5 | presentation to the Google board about the YouTube |
| 13:19:07 | 6 | acquisition; is that right? |
| 13:19:09 | 7 | MR. VOLKMER: Objection to the form of the |
| 13:19:10 | 8 | question. |
| 13:19:11 | 9 | THE WITNESS: This is a presentation to the |
| 13:19:15 | 10 | Google board, and I think it is our fairness |
| 13:19:20 | 11 | presentation. |
| 13:19:22 | 12 | MR. HOHENGARTEN: Q. Your fairness |
| 13:19:24 | 13 | presentation? |
| 13:19:25 | 14 | A Yes. |
| 13:19:25 | 15 | Q And what is a fairness presentation? |
| 13:19:30 | 16 | A It's a -- as you recall from the earlier |
| 13:19:34 | 17 | topics that we discussed, we were asked to provide a |
| 13:19:37 | 18 | fairness opinion, and this is the book that allows |
| 13:19:41 | 19 | them to understand how we came to our fairness |
| 13:19:43 | 20 | opinion. |
| 13:19:49 | 21 | Q In -- was this book or presentation actually |
| 13:19:53 | 22 | presented to the Google board? |
| 13:19:55 | 23 | A It was. |
| 13:19:55 | 24 | Q Were you present for that presentation? |
| 13:20:10 | 25 | A I was. |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

13:20:10　　1　　　Q　Was this book or presentation presented to

13:20:13　　2　　other Google personnel at any other time?

13:20:18　　3　　　　　MR. VOLKMER:　Objection to the form of the

13:20:19　　4　　question.

13:20:24　　5　　　　　(Whereupon, record read by the Reporter as

13:20:24　　6　　follows:

13:20:11　　7　　　　　"Question:　Was this book or presentation

13:20:12　　8　　　　　presented to other Google personnel at any

13:20:16　　9　　　　　other time?")

13:20:28　　10　　　　THE WITNESS:　I don't recall.　It wouldn't

13:20:36　　11　　surprise me if we also shared it with the operating

13:20:39　　12　　team of Salman Ullah, Sean Dempsey, but I don't recall

13:20:48　　13　　specifically if we did or didn't.

13:20:55　　14　　　　MR. HOHENGARTEN:　Q.　We'll also come back to

13:20:56　　15　　this --

13:20:57　　16　　　Q　Okay.

13:20:57　　17　　　Q　-- but let's just get a couple more exhibits.

13:21:02　　18　　　　We'll mark Exhibit 18, which is CSSU 2882

13:21:10　　19　　through 2885.

13:21:24　　20　　　　(Document marked Duncan Exhibit 18

13:21:25　　21　　　　for identification.)

13:21:25　　22　　　　THE WITNESS:　Thank you.　Okay.

13:21:47　　23　　　　MR. HOHENGARTEN:　Q.　Exhibit 18 is a cover

13:21:49　　24　　e-mail from James Kim to Salman Ullah and Matthew --

13:21:57　　25　　matthew@google.com and Sean Dempsey; correct?

13:22:02    1       A    Yes.

13:22:02    2       Q    Do you know who matthew@google.com is?

13:22:09    3       A    I don't recall off the top of my head.  I

13:22:11    4    thought I saw him on the previous exhibit, but I don't

13:22:14    5    know if you want me to use your time looking for that

13:22:17    6    or not.

13:22:24    7       Q    And the attachment to this e-mail is Credit

13:22:29    8    Suisse's final fairness opinion in connection with

13:22:32    9    Google's acquisition of YouTube; is that right?

13:22:35    10      A    That's correct.  It's the executed version.

13:22:38    11      Q    And the opinion provides that -- let me start

13:23:12    12    that question over.

13:23:13    13           It's -- according to this opinion, it's

13:23:19    14    Credit Suisse's opinion that the aggregate

13:23:21    15    consideration to be paid by Google in the merger is

13:23:23    16    fair to Google from a financial point of view;

13:23:25    17    correct?

13:23:50    18      A    Yes, and this opinion also outlines an answer

13:23:58    19    to an earlier question you had as to how the

13:24:02    20    consideration is defined.

13:24:03    21      Q    I was just about to ask that, and what is

13:24:05    22    the -- how is the aggregate consideration defined

13:24:16    23    here?

13:24:16    24      A    An aggregate number of shares of Class A

13:24:20    25    Common Stock of Google equal to the quotient of

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

13:24:24  1  1.65 billion divided by the average daily closing

13:24:29  2  price of a Google Class A Common Stock for the 30

13:24:32  3  consecutive trading day period ending two trading days

13:24:36  4  prior to the closing date of the merger.

13:24:40  5  Q  So it's a certain number of shares of stock

13:24:43  6  determined by a formula set out there; is that right?

13:24:46  7  A  That's correct.

13:24:46  8  Q  And when providing this opinion, were you

13:24:52  9  able to estimate the -- the value of that stock --

13:24:57  10  MR. VOLKMER:  Objection to the form of the

13:24:58  11  question.

13:24:58  12  MR. HOHENGARTEN:  Q.  -- and the date of the

13:25:00  13  transaction?

13:25:00  14  MR. VOLKMER:  Sorry about that.

13:25:07  15  MR. HOHENGARTEN:  Q.  On the date of the

13:25:10  16  transaction?

13:25:13  17  A  Can you define "date of the transaction"?  Is

13:25:18  18  that --

13:25:21  19  Q  The date that they would hand over the

13:25:23  20  shares.

13:25:23  21  A  No, no.

13:25:24  22  Q  You didn't -- you didn't make an attempt to

13:25:27  23  estimate what the value would be or projection to

13:25:30  24  provide this opinion?

13:25:31  25  A  No.

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| 13:25:31 | 1 | Q   In order to provide an opinion, do you assume |
| 13:25:37 | 2 | a value of $1.65 billion of the stock on the date that |
| 13:25:43 | 3 | the aggregate consideration is paid? |
| 13:25:46 | 4 | MR. VOLKMER:  Object to the form. |
| 13:25:49 | 5 | THE WITNESS:  We would never project what |
| 13:25:52 | 6 | Google's stock -- any company's stock price would be |
| 13:25:56 | 7 | in the future, in addition to Google's. |
| 13:25:57 | 8 | MR. HOHENGARTEN:  Q.  How -- how are you able |
| 13:26:13 | 9 | to determine that a number of shares of stock -- let |
| 13:26:21 | 10 | me rephrase that. |
| 13:26:22 | 11 | What are you measuring the fairness of here? |
| 13:26:26 | 12 | MR. VOLKMER:  Objection to the form of the |
| 13:26:28 | 13 | question. |
| 13:26:30 | 14 | THE WITNESS:  We're measuring the fairness |
| 13:26:31 | 15 | of -- from a financial -- it's the first sentence, |
| 13:26:31 | 16 | actually. |
| 13:26:36 | 17 | The fairness from a financial point of view |
| 13:26:37 | 18 | of Google, Inc., of the aggregate consideration |
| 13:26:40 | 19 | provided for the agreement and plan of merger to be |
| 13:26:42 | 20 | entered into by Google and YouTube and certain |
| 13:26:46 | 21 | stockholders of YouTube. |
| 13:26:48 | 22 | MR. HOHENGARTEN:  Q.  And for an aggregate |
| 13:26:49 | 23 | consideration defined as a certain number of shares of |
| 13:26:54 | 24 | stock? |
| 13:26:54 | 25 | A   That's correct, yeah.  For the purposes of |

13:26:55    1    how we do that, derive that analysis, we come up with

13:26:58    2    a certain number of -- or sorry -- it's based upon a

13:27:02    3    certain number of shares that is derived from that

13:27:05    4    formula that we gave.

13:27:34    5        Q    And if you look back at Exhibit 17 --

13:27:44    6        A    Sure.

13:27:45    7        Q    -- which is the board presentation, Bates

13:27:53    8    page 3563, page two also, it's labeled as --

13:28:01    9        A    Okay.

13:28:01   10        Q    -- it shows the -- as a summary of financial

13:28:06   11    analyses of Yellow, it shows the aggregate

13:28:09   12    consideration as 1 -- $1.65 billion; correct?

13:28:16   13        A    Correct.

13:28:16   14        Q    So I'm wondering if you -- that's the number

13:28:20   15    you used in performing your fairness evaluation?

13:28:23   16        A    Yes.  So it is, to answer your question

13:28:27   17    directly, and I think to clarify the distinction

13:28:29   18    between what you had been asking and what you're

13:28:31   19    getting at now, that is a proxy for what the

13:28:36   20    shareholders -- I shouldn't say a proxy -- that is the

13:28:40   21    value, if that transaction had closed right then, of

13:28:42   22    the consideration that they would receive in essence.

13:28:46   23            We can't predict what that will be in the

13:28:48   24    future, so we don't attempt to do that, and as it

13:28:51   25    correlates to the fairness opinion, our fairness

| | | |
|---|---|---|
| 13:28:54 | 1 | opinion is as of the date we give it. |
| 13:28:56 | 2 | So -- so we use the value on that date even |
| 13:28:58 | 3 | though we know full well that in the future that value |
| 13:29:01 | 4 | could change.  It's no different than any other |
| 13:29:03 | 5 | transaction, I guess, to be fair.  If we -- you know, |
| 13:29:05 | 6 | if you know Viacom bought Time Warner and issued |
| 13:29:09 | 7 | stock, the day of the announcement of that |
| 13:29:11 | 8 | transaction, we would do the analysis and say it's |
| 13:29:14 | 9 | fair knowing fully well that as soon as the |
| 13:29:18 | 10 | transaction is announced the Viacom stock would change |
| 13:29:22 | 11 | in value substantially. |
| 13:29:23 | 12 | Q   Okay. |
| 13:29:23 | 13 | A   And therefore the consideration is received |
| 13:29:25 | 14 | by, you know, the target company. |
| 13:29:27 | 15 | Q   Then you say as a proxy you use the -- the |
| 13:29:30 | 16 | value on the date of the opinion, and that value was |
| 13:29:37 | 17 | $1.65 billion? |
| 13:29:39 | 18 | A   Yeah. |
| 13:29:39 | 19 | MR. VOLKMER:  Object to the form of the |
| 13:29:41 | 20 | question. |
| 13:29:41 | 21 | THE WITNESS:  Let me slow down. |
| 13:29:42 | 22 | I'd like to take back the word "proxy," |
| 13:29:44 | 23 | because that's not a very good term here, because it's |
| 13:29:47 | 24 | not a proxy for what the value will be in the future. |
| 13:29:49 | 25 | The fairness opinion we're giving is opining |

| 13:29:52 | 1 | to the value on that day, and we use the 1.65 billion |
| 13:29:55 | 2 | as the value on that day knowing fully well it will |
| 13:29:59 | 3 | fluctuate up or down, as the case may be. |
| 13:30:02 | 4 | MR. HOHENGARTEN: Okay. |
| 13:30:10 | 5 | Q And returning to Exhibit 18, which is the |
| 13:30:19 | 6 | fairness opinion. |
| 13:30:19 | 7 | A Okay. |
| 13:30:20 | 8 | Q On page -- at the bottom of page 2883, going |
| 13:30:25 | 9 | on to 2884, the last paragraph, the second sentence, |
| 13:30:31 | 10 | let me read, "With respect to the financial forecasts |
| 13:30:35 | 11 | for YouTube that we have reviewed (including potential |
| 13:30:38 | 12 | synergies and strategic benefits anticipated by the |
| 13:30:42 | 13 | management of Google to result from the merger), the |
| 13:30:44 | 14 | management of Google has advised us, and we have |
| 13:30:47 | 15 | assumed, that such forecasts have been reasonably |
| 13:30:50 | 16 | prepared on bases reflecting the best currently |
| 13:30:51 | 17 | available estimates and judgments of the management of |
| 13:30:54 | 18 | Google as to the future financial performance of |
| 13:30:56 | 19 | YouTube after giving effect to the merger and that the |
| 13:31:02 | 20 | financial forecast reflected in the forecasts utilized |
| 13:31:05 | 21 | in our analyses will be utilized in the amounts and at |
| 13:31:05 | 22 | the times indicated thereby." |
| 13:31:10 | 23 | Did I read that correctly? |
| 13:31:11 | 24 | A I thought you had transcribed a few words on |
| 13:31:13 | 25 | the second half of that where it says "after giving |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

13:31:19    1    effect to the merger and that the financial results

13:31:21    2    reflect in the forecast utilized in our analyses will

13:31:25    3    be realized in the amounts and at the times indicated

13:31:27    4    thereby."

13:31:28    5        Q    And that's correct.

13:31:29    6             Is that a correct statement?

13:31:42    7        A    You might need to define that question.  Is

13:31:44    8    it a correct statement that what you said is correct

13:31:47    9    or --

13:31:47    10       Q    No.

13:31:48    11       A    -- is it a correct statement that --

13:31:50    12       Q    Is that sentence in that letter a correct

13:31:52    13   statement?

13:32:01    14       A    Gosh, that's a very unusual question, because

13:32:04    15   the sentence says we're assuming that what you gave us

13:32:06    16   is accurate, and you're asking me if that's a correct

13:32:09    17   statement.

13:32:09    18            I think that's a question for Google, not for

13:32:13    19   us; right?

13:32:14    20       Q    Well, let me focus on a couple of words in

13:32:17    21   this sentence where it says "The management of Google

13:32:21    22   has advised us, and we have assumed, that such

13:32:23    23   forecasts have been reasonably prepared," and it goes

13:32:26    24   on.

13:32:27    25            I want to know whether the management of

| | | |
|---|---|---|
| 13:32:30 | 1 | Google actually advised you to that effect. |
| 13:32:32 | 2 | A   Great.  Thank you for clarifying that.  That |
| 13:32:35 | 3 | was the source of my confusion. |
| 13:32:38 | 4 | Yes, so they did advise us to use the set of |
| 13:32:40 | 5 | projections that we've identified in a previous |
| 13:32:42 | 6 | exhibit. |
| 13:32:46 | 7 | Q   And they also advised you that those |
| 13:32:54 | 8 | forecasts reflected the best current estimates and |
| 13:32:58 | 9 | judgements of the management of Google as to the |
| 13:33:00 | 10 | future financial performance of YouTube after giving |
| 13:33:03 | 11 | effect to the merger? |
| 13:33:05 | 12 | MR. VOLKMER.  Object to the form of the |
| 13:33:06 | 13 | question. |
| 13:33:08 | 14 | THE WITNESS:  Yes, at the time of this |
| 13:33:12 | 15 | letter. |
| 13:33:29 | 16 | MR. HOHENGARTEN:  Q.  And you can set that |
| 13:33:30 | 17 | aside. |
| 13:33:31 | 18 | A   Okay.  Thanks. |
| 13:33:35 | 19 | Q   We'll mark Exhibit 19, which is CSSU 2065 |
| 13:33:55 | 20 | through 2093. |
| 13:33:57 | 21 | (Document marked Duncan Exhibit 19 |
| 13:33:59 | 22 | for identification.) |
| 13:34:17 | 23 | THE WITNESS:  Can I ask my counsel a question |
| 13:34:19 | 24 | or no off the record? |
| 13:34:22 | 25 | MR. TAFFET:  Yeah. |

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

| 13:34:23 | 1 | THE VIDEOGRAPHER:  Off the record? |
| 13:34:25 | 2 | MR. HOHENGARTEN:  We'll go off the record. |
| 13:34:27 | 3 | THE VIDEOGRAPHER:  The time is 1:34 p.m. |
| 13:34:34 | 4 | We are off the record. |
| 13:34:35 | 5 | (Recess taken.) |
| 13:35:34 | 6 | THE VIDEOGRAPHER:  The time is 1:35 p.m. |
| 13:35:42 | 7 | We are back on the record. |
| 13:35:43 | 8 | MR. HOHENGARTEN:  Okay. |
| 13:35:44 | 9 | Q   Mr. Duncan, just before we took a break for |
| 13:35:46 | 10 | you to confer with your counsel, we handed you |
| 13:35:49 | 11 | Exhibit 19 which had been identified. |
| 13:35:51 | 12 | A   Yes. |
| 13:35:51 | 13 | Q   Have you had an opportunity to look at it? |
| 13:36:07 | 14 | A   Okay. |
| 13:36:09 | 15 | Q   And Exhibit 19 is a cover e-mail from |
| 13:36:13 | 16 | Amrit Rao attaching a number of materials; correct? |
| 13:36:21 | 17 | A   Yes. |
| 13:36:21 | 18 | Q   And the date of the e-mail is Sunday, |
| 13:36:25 | 19 | October 8th, 2007; correct? |
| 13:36:27 | 20 | A   Yeah, 2006. |
| 13:36:29 | 21 | Q   Thank you. |
| 13:36:29 | 22 | The date of the e-mail is Sunday, |
| 13:36:32 | 23 | October 8th, 2006; correct? |
| 13:36:35 | 24 | A   Correct, yes. |
| 13:36:35 | 25 | Q   Thank you. |

13:36:36    1        A    Absolutely.

13:36:38    2        Q    The cover e-mail, could you -- could you read

13:36:46    3    the first three lines of the cover e-mail, the content

13:36:49    4    of it?

13:36:50    5        A    Sure.  Down.

13:36:51    6        Q    Yeah.

13:36:51    7        A    "Dear IBC Members:  Attached please find

13:36:55    8    materials pertaining to project Snowmass in advance of

13:37:00    9    the Monday 9:00 a.m. Eastern, 6:00 a.m. Pacific call

13:37:05    10    October 9th."

13:37:07    11        Q    Thank you.

13:37:08    12            And who are IBC members?

13:37:11    13            MR. TAFFET:  You know, at this point, why

13:37:14    14    don't we go off the record a moment and see if we

13:37:16    15    can --

13:37:17    16            MR. HOHENGARTEN:  We can go off the record.

13:37:18    17            THE VIDEOGRAPHER:  Should we change tapes?

13:37:20    18            MR. HOHENGARTEN:  Sure.

13:37:20    19            MR. TAFFET:  Yeah.

13:37:22    20            THE VIDEOGRAPHER:  Still have to get us off.

13:37:25    21            This is the end of videotape number two in

13:37:27    22    the continuing deposition of Storm Duncan on

13:37:31    23    July 16th, 2008.  The time is 1:37 p.m.

13:37:35    24            We're off the record.

13:37:37    25            (Recess taken.)

14:32:13    1        A    Correct.

14:32:15    2        Q    The definition of "premium content" in

14:32:17    3    Exhibit 19 does not appear in the final version in

14:32:21    4    Exhibit 17; correct?

14:32:24    5        A    Correct.

14:32:24    6        Q    Do you have any reason to believe that the

14:32:26    7    definition changed between exhibit -- the draft in

14:32:31    8    Exhibit 19 and the final version in Exhibit 17?

14:32:34    9        MR. VOLKMER:  Object to the form of the

14:32:35   10    question.

14:32:36   11        THE WITNESS:  I guess a couple of things.

14:32:39   12    One is I'm not sure why it wasn't carried over so that

14:32:43   13    in and of itself might mean the definition changed.  I

14:32:47   14    don't know the answer to that, and the second

14:32:48   15    supporting, I guess, statements or what I just said is

14:32:51   16    that this as an example on -- on Exhibit 19 says

14:32:57   17    "Copyrighted content such as movie/TV trailers, music

14:33:01   18    videos, etc.," my recollection is that in the early

14:33:03   19    document nonpremium content included trailers, if I

14:33:07   20    remember right, although we might want to go back

14:33:09   21    there and cross-reference, because I'm getting

14:33:11   22    definitioned out a little bit or definition confused a

14:33:15   23    little bit.

14:33:15   24        So that might be another reason it might have

14:33:18   25    changed between the two.  I think, you know, it's --

14:33:20   1    on Exhibit 17, the premium video was stuff that

14:33:27   2    required providers to allow Yellow to monetize their

14:33:34   3    content.  So I think that's how I would view the

14:33:36   4    definition on page nine in the absence of having

14:33:40   5    something specifically defining.

14:33:50   6         MR. HOHENGARTEN:  Q.  And now still sticking

14:33:51   7    with Exhibit 17, the final board model, you can set

14:33:54   8    Exhibit 19 aside.

14:33:56   9         A    Okay.

14:33:57   10        Q    Sticking with Exhibit 17, the final board

14:34:00   11   model on page 3570, just to confirm, the assumption of

14:34:08   12   the projection model there is that in 2007, 10 percent

14:34:12   13   of the premium content providers have given that

14:34:15   14   permission that's required for Yellow to monetize the

14:34:19   15   content; correct?

14:34:21   16        MR. VOLKMER:  Object to the form.

14:34:41   17        (Whereupon, record read by the Reporter as

14:34:41   18   follows:

14:33:57   19        "Question:  Sticking with Exhibit 17, the

14:33:59   20        final board model on page 3570, just to

14:34:07   21        confirm, the assumption of the projection

14:34:09   22        model there is that in 2007, 10 percent of

14:34:12   23        the premium content providers have given

14:34:15   24        that permission that's required for Yellow

14:34:17   25        to monetize the content; correct?")

| | | |
|---|---|---|
| 15:43:55 | 1 | my memory. |
| 15:43:57 | 2 | Q  Let's turn to Exhibit 21. |
| 15:43:59 | 3 | A  Okay. |
| 15:44:05 | 4 | Q  Exhibit 21 consists of handwritten notes also |
| 15:44:08 | 5 | interspersed with some other pages.  Just focusing on |
| 15:44:12 | 6 | that handwritten notes at the moment, are those your |
| 15:44:16 | 7 | notes? |
| 15:44:17 | 8 | A  Looks like my handwriting, for lack of a |
| 15:44:23 | 9 | better way of putting it. |
| 15:44:25 | 10 | Q  And this set of documents that we've labeled |
| 15:44:35 | 11 | Exhibit 21 was produced to us all as one set, I |
| 15:44:39 | 12 | believe.  Would this be maintained as a single file by |
| 15:44:49 | 13 | you?  Do you recall? |
| 15:44:52 | 14 | A  No, I don't recall.  My guess is it was |
| 15:44:54 | 15 | probably just a stack of stuff and somehow I think you |
| 15:44:56 | 16 | guys interpret it as one document.  I think it's a |
| 15:45:00 | 17 | lot -- |
| 15:45:00 | 18 | Q  Okay. |
| 15:45:00 | 19 | A  -- of documents that were probably sitting |
| 15:45:02 | 20 | together. |
| 15:45:10 | 21 | Q  Looking at the first page of Exhibit 21 -- |
| 15:45:16 | 22 | A  Okay. |
| 15:45:17 | 23 | Q  -- actually, do you know what these are notes |
| 15:45:22 | 24 | of on the first page -- notes from? |
| 15:45:38 | 25 | A  It looks like notes on diligence, like asking |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

15:45:42    1    questions of them of what they're doing and how it's

15:45:44    2    going.

15:45:45    3        Q    Would they be notes of the due diligence

15:45:49    4    meetings with YouTube personnel at Wilson Sonsini's

15:45:52    5    offices?

15:45:52    6        A    That's highly possible, yeah.  I don't know

15:45:54    7    the answer, but it seems like that's definitely a

15:45:57    8    possibility here.

15:45:58    9        Q    When you take notes in a due diligence

15:46:01    10   setting, do you make every effort to accurately record

15:46:06    11   what's going on?

15:46:08    12           MR. VOLKMER:  Objection to the form.

15:46:10    13           THE WITNESS:  If this was done in the

15:46:13    14   context -- context of me doing due diligence, I try to

15:46:17    15   write as much as I can down.

15:46:20    16           MR. HOHENGARTEN:  Q.  And as accurately as

15:46:22    17   possible?

15:46:22    18       A    Yeah.  I wouldn't make up stuff.  Yeah,

15:46:26    19   absolutely.  Some of it might not be what I heard.  It

15:46:29    20   might be my interpretation or might be other people's

15:46:32    21   interpretation that I don't agree with.  So that

15:46:32    22   doesn't mean there's not much truth in here either

15:46:39    23   communicated to me or --

15:46:39    24       Q    Okay.

15:46:39    25       A    -- that's how it was, but....

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | |
|---|---|---|
| 15:46:42 | 1 | Q   Several lines -- just a few lines down from |
| 15:46:44 | 2 | the top there's a -- reads "Brent/Gideon"; correct? |
| 15:46:49 | 3 | A   Uh-huh. |
| 15:46:50 | 4 | Q   Does that indicate that you met with Brent |
| 15:46:53 | 5 | Hurley and Gideon Yu during due diligence? |
| 15:46:57 | 6 | A   It could.  Typically that's not what I would |
| 15:47:00 | 7 | put in my notes, but maybe because this was a while |
| 15:47:03 | 8 | ago, I had a different style back then.  So it could |
| 15:47:06 | 9 | either mean that those were the two folks that were |
| 15:47:08 | 10 | giving me the information or could mean follow-up with |
| 15:47:13 | 11 | Brad and Gideon or something. |
| 15:47:13 | 12 | So I don't want to give you 100 percent |
| 15:47:15 | 13 | comfort on that, but it seems logical that it could |
| 15:47:18 | 14 | have been the two folks that were there. |
| 15:47:20 | 15 | Q   And you say it's not what -- that's not what |
| 15:47:21 | 16 | you would normally write who you met with in your |
| 15:47:25 | 17 | notes.  Where would you normally write? |
| 15:47:26 | 18 | A   I probably normally have like -- you know, |
| 15:47:27 | 19 | although this is up at the top, but I probably have |
| 15:47:30 | 20 | like a category of like Credit Suisse people, you |
| 15:47:32 | 21 | know, lawyers, client people, et cetera, in different |
| 15:47:35 | 22 | columns, and I don't have it, but this was a while |
| 15:47:38 | 23 | ago.  Maybe my style has changed since then.  Maybe I |
| 15:47:44 | 24 | should go back to my old style. |
| 15:47:52 | 25 | Q   If you could flip back a couple of pages -- |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | |
|---|---|---|
| 15:47:55 | 1 | A   Okay. |
| 15:47:56 | 2 | Q   -- to page 1865 -- |
| 15:47:59 | 3 | A   All righty. |
| 15:48:01 | 4 | Q   -- in Exhibit 21.  At the top of that page, |
| 15:48:10 | 5 | could you read the first two lines at the top of that |
| 15:48:12 | 6 | page, since it's your handwriting. |
| 15:48:14 | 7 | A   Sure. |
| 15:48:15 | 8 | That doesn't mean it will be correct when I |
| 15:48:18 | 9 | read it either.  "No copyright issues; DMCA (no |
| 15:48:24 | 10 | issues).  Don't target because we can't profit from |
| 15:48:29 | 11 | these pages." |
| 15:48:35 | 12 | Q   And do you know what "DMCA" is referring to |
| 15:48:38 | 13 | there? |
| 15:48:40 | 14 | MR. TAFFET:  Just for point of clarity, if |
| 15:48:43 | 15 | it's -- there seems to be a 1, 2, and 3, if you go to |
| 15:48:48 | 16 | the prior page.  This is a continuation of number two. |
| 15:48:50 | 17 | I don't know if that -- |
| 15:48:51 | 18 | MR. HOHENGARTEN:  Okay. |
| 15:48:51 | 19 | MR. TAFFET:  -- changes the witness's answer, |
| 15:48:53 | 20 | but it's.... |
| 15:48:54 | 21 | MR. HOHENGARTEN:  Thank you, Mr. Taffet. |
| 15:48:55 | 22 | Q   Why don't we, so we have the full context, |
| 15:48:57 | 23 | that's helpful, have you look at page 1864.  The last |
| 15:49:02 | 24 | two lines have a number two circled. |
| 15:49:09 | 25 | Could you read those two lines? |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| 15:49:12 | 1 | A You mean the "Search Deal" and the |
| 15:49:15 | 2 | "Partnerships"? |
| 15:49:16 | 3 | Q I believe -- |
| 15:49:17 | 4 | A The first two lines of two you're saying? |
| 15:49:19 | 5 | Yeah. |
| 15:49:19 | 6 | Q Look at the bottom two lines of the page. |
| 15:49:21 | 7 | A Okay. Yeah. Got it. My bad. I |
| 15:49:23 | 8 | misunderstood you. |
| 15:49:23 | 9 | So it says "Partnerships (Studio\Labels) most |
| 15:49:31 | 10 | aggressively monetized." |
| 15:49:33 | 11 | Q Is it your understanding that the next two |
| 15:49:36 | 12 | lines on that page are a part of the same set of notes |
| 15:49:40 | 13 | about point two? |
| 15:49:40 | 14 | A Yeah, it looks to be a carryover. That's |
| 15:49:42 | 15 | right. I think that's fair. |
| 15:49:47 | 16 | Q And in that context, what does "No copyright |
| 15:49:54 | 17 | issues DMCA refer to"? |
| 15:49:56 | 18 | MR. VOLKMER: Objection to the form of the |
| 15:49:57 | 19 | question. |
| 15:49:58 | 20 | THE WITNESS: I would assume it's under the |
| 15:50:04 | 21 | subcategory of "Partnerships (Studio/Labels)." |
| 15:50:18 | 22 | MR. HOHENGARTEN: Q. Do you recall whether |
| 15:50:19 | 23 | this was something that is notes of something you were |
| 15:50:21 | 24 | told? |
| 15:50:23 | 25 | A Yeah, I think that's what all of this is, is |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

15:50:25    1    the note.  Oh, you're referring specifically to my

15:50:28    2    comment where I might put down my own opinion?

15:50:30    3        Q    Yes.  You asked -- exactly --

15:50:31    4        A    Oh, sorry.

15:50:32    5        Q    -- where you said a number, so....

15:50:34    6        A    I would not have expressed my own opinion on

15:50:37    7    that statement, so it was definitely told to me by

15:50:39    8    someone else.

15:50:40    9        Q    And do you recall who that person was?

15:50:45   10        A    I don't.

15:50:45   11        Q    And --

15:50:50   12        A    Someone from YouTube.

15:50:51   13        Q    And do you recall the significance of the

15:50:55   14    last line that we've been discussing, don't -- which

15:50:58   15    is on page 1865 -- that says "Don't target because we

15:51:03   16    can't profit from these pages"?

15:51:04   17            MR. VOLKMER:  Object to the form of the

15:51:06   18    question.

15:51:15   19            (Whereupon, record read by the Reporter as

15:51:15   20    follows:

15:50:52   21            "Question:  And do you recall the

15:50:54   22             significance of the last line that we've

15:50:56   23             been discussing, don't -- which is on page

15:51:00   24             1865 -- that says 'Don't target because we

15:51:03   25             can't profit from these pages'?")

| 15:51:16 | 1 | THE WITNESS:  You good with that question? |
| 15:51:20 | 2 | MR. HOHENGARTEN:  Q.  If you understood it. |
| 15:51:22 | 3 | I'll rephrase it if you didn't. |
| 15:51:24 | 4 | A    Yeah, if you could rephrase it.  I think -- |
| 15:51:25 | 5 | Q    Okay.  Looking at page 1865 -- |
| 15:51:27 | 6 | A    Yeah. |
| 15:51:27 | 7 | Q    -- we've been discussing a number of lines. |
| 15:51:30 | 8 | The last one reads "Don't target because we can't |
| 15:51:33 | 9 | profit from these pages"; correct? |
| 15:51:35 | 10 | A    Uh-huh. |
| 15:51:35 | 11 | Q    Do you recall the significance of that |
| 15:51:38 | 12 | statement? |
| 15:51:39 | 13 | A    I think by "significance" you mean the |
| 15:51:41 | 14 | importance of it? |
| 15:51:42 | 15 | Q    What does it mean? |
| 15:51:43 | 16 | A    Okay.  The meaning of it.  Sorry.  Got it. |
| 15:51:45 | 17 | Thank you. |
| 15:51:45 | 18 | It -- my gut tells me that there's something |
| 15:52:04 | 19 | that I missed between the "No copyright issues DMCA |
| 15:52:08 | 20 | line," and "Don't target because we can't profit from |
| 15:52:10 | 21 | these messages --" I'm sorry "-- from these pages," |
| 15:52:13 | 22 | because it seems as though what they're saying here is |
| 15:52:15 | 23 | that some of this stuff was monetized or there weren't |
| 15:52:21 | 24 | copyright issues, and then other stuff wasn't targeted |
| 15:52:23 | 25 | for revenue monetization, because they can't profit |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | |
|---|---|---|
| 15:52:25 | 1 | from those pages. |
| 15:52:27 | 2 | Q    And to the best of your recollection, |
| 15:52:30 | 3 | somebody from YouTube would have explained that to |
| 15:52:32 | 4 | you? |
| 15:52:32 | 5 | A    Yes. |
| 15:52:32 | 6 | Q    But you don't recall who specifically? |
| 15:52:34 | 7 | A    No. |
| 15:52:37 | 8 | MR. HOHENGARTEN:  I think we need to change |
| 15:52:38 | 9 | video tapes. |
| 15:52:42 | 10 | THE VIDEOGRAPHER:  This is the end of video |
| 15:52:44 | 11 | tape number three in the continuing deposition of |
| 15:52:47 | 12 | Storm Duncan on July 16th, 2008.  The time is |
| 15:52:55 | 13 | 3:52 p.m. |
| 15:52:56 | 14 | We are off the record. |
| 15:52:57 | 15 | (Recess taken.) |
| 16:04:54 | 16 | THE VIDEOGRAPHER:  This is the beginning of |
| 16:04:57 | 17 | video tape number four in the continuing deposition of |
| 16:05:01 | 18 | Storm Duncan on July 16th, 2008.  The time is |
| 16:05:06 | 19 | 4:05 p.m.  We're off the record -- we're back on the |
| 16:05:10 | 20 | record. |
| 16:05:11 | 21 | MR. HOHENGARTEN:  Okay. |
| 16:05:12 | 22 | Q    Continuing with Exhibit 21, if you would turn |
| 16:05:18 | 23 | to Bates page 1957, and do you see roughly in the |
| 16:05:32 | 24 | middle of the page there's a line that begins with |
| 16:05:35 | 25 | "60 percent"? |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

16:05:35    1       A    Uh-huh.

16:05:35    2       Q    Can you read that line and the next line

16:05:38    3   please?

16:05:38    4       A    Sure.  "60 percent is 'Premium.'

16:05:42    5   Professionally produced.  Legitimate and

16:05:49    6   illegitimate."

16:05:50    7       Q    And do you recall what the significance or

16:05:52    8   meaning of those notes are?

16:05:57    9           MR. VOLKMER:  Object to the form of the

16:05:58    10  question.

16:06:01    11          MR. HOHENGARTEN:  Q.  Did you understand my

16:06:02    12  question?

16:06:02    13      A    The meaning of those notes are?  So are you

16:06:05    14  asking what do I mean by "legitimate and

16:06:09    15  illegitimate," or --

16:06:09    16      Q    That would be part of my question certainly.

16:06:11    17      A    You want to break it down into parts then?

16:06:14    18      Q    What do you mean by "legitimate,

16:06:17    19  illegitimate"?

16:06:18    20      A    Okay.  I think.

16:06:19    21          MR. VOLKMER:  I'm going to object to the form

16:06:20    22  of that question.

16:06:22    23          You can proceed.

16:06:23    24          THE WITNESS:  Can you read it back?

16:06:24    25          MR. HOHENGARTEN:  Q.  Actually.  I'll just --

16:06:26    1        A    Okay.

16:06:28    2        Q    What is meant in these notes by "legitimate"

16:06:31    3    and "illegitimate"?

16:06:34    4        A    Okay.  Okay.  My recollection is that there's

16:06:39    5    professionally produced content which is by, you know,

16:06:42    6    a studio or someone professional that would own that

16:06:46    7    content, and legitimate and illegitimate is whether it

16:06:51    8    was put up in agreement with YouTube and that producer

16:06:53    9    or put up by someone else without the agreement of

16:06:57   10    that producer.

16:06:58   11        Q    Okay.  And does -- does -- do those notes

16:07:02   12    reflect something that somebody told you as opposed to

16:07:04   13    your own thoughts?

16:07:09   14        A    Definitely something that someone told me as

16:07:12   15    opposed to my own thoughts to your question.

16:07:16   16        Q    And do you recall who?

16:07:32   17        A    I don't.

16:07:34   18        Q    Do you recall whether it was somebody from

16:07:36   19    YouTube?

16:08:07   20        A    I don't.

16:08:07   21        Q    Do you recall whether it was somebody from

16:08:10   22    Google?

16:08:10   23        A    I don't.

16:08:10   24        Q    And do you recall roughly when this

16:08:14   25    information was imparted to you?

| 16:08:20 | 1 | MR. VOLKMER: Object to the form of the |
| 16:08:21 | 2 | question. |
| 16:08:22 | 3 | THE WITNESS: Somewhere between Thursday and |
| 16:08:24 | 4 | Monday of that weekend. |
| 16:08:26 | 5 | MR. HOHENGARTEN: Q. Some time during the -- |
| 16:08:28 | 6 | during the due diligence process for your fairness |
| 16:08:30 | 7 | evaluation? |
| 16:08:31 | 8 | A That's correct. |
| 16:08:31 | 9 | Q Mr. Browne is now going to ask a few |
| 16:08:37 | 10 | questions. |
| 16:08:38 | 11 | A Okay. |
| 16:08:38 | 12 | Q He represents the class. |
| 16:08:40 | 13 | MR. BROWNE: Okay. Can we go off the record |
| 16:08:43 | 14 | for a few minutes? Thanks. |
| 16:08:45 | 15 | THE VIDEOGRAPHER: The time is 4:08 p.m. |
| 16:08:47 | 16 | We are off the record. |
| 16:08:48 | 17 | (Recess taken.) |
| 16:10:41 | 18 | (Document marked Duncan Exhibit 22 |
| 16:11:01 | 19 | for identification.) |
| 16:11:01 | 20 | THE VIDEOGRAPHER: The time is 4:11 p.m. |
| 16:11:04 | 21 | We're back on the record. |
| 16:11:06 | 22 | EXAMINATION BY MR. BROWNE |
| 16:11:06 | 23 | MR. BROWNE: Q. Good afternoon, Mr. Duncan. |
| 16:11:08 | 24 | My name is John Browne. I represent the English |
| 16:11:11 | 25 | Premier League and the Class in this case, and I just |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

| | | |
|---|---|---|
| 16:16:24 | 1 | MR. BROWNE:  Q.  And then earlier when we |
| 16:16:25 | 2 | were talking about the meaning of IP issues in that |
| 16:16:27 | 3 | sentence, you -- you sort of had a definition in your |
| 16:16:31 | 4 | mind as what you thought of as IP issues, stealing |
| 16:16:34 | 5 | source code, something else you may have said. |
| 16:16:36 | 6 | Were you -- do you exclude from that phrase |
| 16:16:38 | 7 | IP issues, copyright issues? |
| 16:16:41 | 8 | MR. VOLKMER:  Object to the form of the |
| 16:16:42 | 9 | question. |
| 16:16:44 | 10 | THE WITNESS:  Yeah, when I -- when I think of |
| 16:16:48 | 11 | IP issues just, you know, when this e-mail crossed me |
| 16:16:52 | 12 | in a technology deal, my immediate reaction is |
| 16:16:55 | 13 | intellectual property issues, not copyright issues. |
| 16:16:58 | 14 | MR. BROWNE:  Okay. |
| 16:16:59 | 15 | Q   Do you know whether -- whether, in fact, you |
| 16:17:02 | 16 | guys decided to dive deeper into the IP issues in |
| 16:17:09 | 17 | connection with your due diligence? |
| 16:17:12 | 18 | MR. VOLKMER:  Object to the form of the |
| 16:17:13 | 19 | question. |
| 16:17:14 | 20 | THE WITNESS:  Zach attended the diligence |
| 16:17:21 | 21 | with me, so I would assume that if he had an issue |
| 16:17:25 | 22 | with it, and we had a chance to deal with it, which we |
| 16:17:28 | 23 | did that day but, you know, we would have vetted all |
| 16:17:31 | 24 | of our questions. |
| 16:17:32 | 25 | MR. BROWNE:  Q.  Other than the types of IP |

| | | |
|---|---|---|
| 16:17:36 | 1 | issues that you -- that you described to me, were |
| 16:17:39 | 2 | aware in the time frame that you received this e-mail |
| 16:17:41 | 3 | of -- of copyright issues that were facing YouTube? |
| 16:17:44 | 4 | A   Yeah, yes. |
| 16:17:45 | 5 | Q   And what were those? |
| 16:17:47 | 6 | MR. VOLKMER:  Object. |
| 16:17:48 | 7 | THE WITNESS:  Sorry. |
| 16:17:48 | 8 | MR. VOLKMER:  Object to the form of the |
| 16:17:49 | 9 | question. |
| 16:17:50 | 10 | THE WITNESS:  I think we had just talked |
| 16:17:52 | 11 | about the primary copyright issue which is whether |
| 16:17:56 | 12 | something is put up on the site by a publisher.  We |
| 16:17:59 | 13 | have an agreement with that publisher or that it was |
| 16:18:02 | 14 | put up by someone else that didn't have the permission |
| 16:18:04 | 15 | from that publisher to put it up. |
| 16:18:07 | 16 | MR. BROWNE:  Q.  Is that something that you |
| 16:18:09 | 17 | guys looked into, that Credit Suisse looked into in |
| 16:18:12 | 18 | connection with due diligence? |
| 16:18:13 | 19 | A   I think -- I think that's what we spent a lot |
| 16:18:16 | 20 | of time earlier today on when we were going through |
| 16:18:19 | 21 | the model which is the percentage.  You know, Google's |
| 16:18:23 | 22 | goal was to -- to -- you know, let's go back to |
| 16:18:28 | 23 | Exhibit 16 if that's -- that's what I remember. |
| 16:18:32 | 24 | You know, Google's goal on this premium video |
| 16:18:35 | 25 | content was to have the permission content which was |

8ef1c908-0a03-4a77-add7-6ef7c2dea8a6

16:18:37    1    that 10 percent, 50 percent we spent so much time on

16:18:41    2    earlier to get the permission to have that content on

16:18:44    3    that legitimate side, the permission side, and that's

16:18:48    4    what I think the whole purpose of that entire

16:18:50    5    conversation was earlier today was how do you -- how

16:18:53    6    do they anticipate monetizing that.

16:18:55    7         MR. BROWNE:  Right.

16:18:56    8    Q    Other than that -- correct me if I'm wrong --

16:18:57    9    other than YouTube or, I'm sorry, Google giving you

16:18:59   10    some information about what was premium content and

16:19:02   11    how much was not premium content on the site, and then

16:19:06   12    Credit Suisse using that information to create the

16:19:09   13    model, what, if anything else, did Credit Suisse do to

16:19:16   14    diligence copyright issues?

16:19:17   15         MR. VOLKMER:  Object to the form of the

16:19:18   16    question.

16:19:21   17         THE WITNESS:  So we had a lot of

16:19:22   18    conversations.  You know, we -- we aren't copyright

16:19:26   19    attorneys, so we didn't do copyright diligence, if

16:19:29   20    that's the specific answer to your question.

16:19:30   21         You know, we obviously spent a lot of time

16:19:32   22    that day with YouTube and with Google talking about

16:19:35   23    the monetization plan which is, I think, the source of

16:19:37   24    how this model came about.

16:19:39   25         MR. BROWNE:  Okay.

| 16:19:40 | 1 | Q Did you spend a lot of time that day or any |
| 16:19:42 | 2 | other day talking with anyone at Google or YouTube |
| 16:19:46 | 3 | about specific copyright issues aside from the |
| 16:19:50 | 4 | monetization point? |
| 16:19:56 | 5 | A So is there a copyright issue where they're |
| 16:20:00 | 6 | not monetizing it you're saying? |
| 16:20:02 | 7 | Q Let me -- let me just start asking a |
| 16:20:04 | 8 | different way. |
| 16:20:04 | 9 | A Okay. |
| 16:20:05 | 10 | Q You -- you dealt with the monetization of the |
| 16:20:07 | 11 | copyright -- copyrighted material, is that correct, in |
| 16:20:12 | 12 | your valuation model? |
| 16:20:13 | 13 | MR. VOLKMER: Object to the -- |
| 16:20:14 | 14 | MR. TAFFET: Objection to the form. |
| 16:20:15 | 15 | MR. VOLKMER: Object to the form of the |
| 16:20:16 | 16 | question. |
| 16:20:18 | 17 | MR. BROWNE: Q. Did you? |
| 16:20:20 | 18 | A No. |
| 16:20:21 | 19 | Q Okay. When you guys -- when -- when Credit |
| 16:20:27 | 20 | Suisse was conducting its due diligence, I'm just |
| 16:20:32 | 21 | going to try it in a very broad way -- |
| 16:20:34 | 22 | A Sure. |
| 16:20:35 | 23 | Q -- what did you do? Tell me everything you |
| 16:20:37 | 24 | did with respect to copyright issues that were facing |
| 16:20:40 | 25 | YouTube. |