UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL INC., COMEDY )
PARTNERS, COUNTRY MUSIC )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION LLC, )
                                 )
              Plaintiffs,        ) Case No. 1
                                 )
              vs.                )  07CV02103
                                 )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
                                 )
              Defendants. )
_____)
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
                                 )
              Plaintiffs, ) Case No. 2
                                 )
              vs. )  07CV3582
                                 )
YOUTUBE, INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
              Defendants. )
_____)

DEPOSITION OF DAVID EUN
NEW YORK, NEW YORK
THURSDAY, AUGUST 7, 2008

REPORTED BY:
ERICA RUGGIERI, CSR, RPR
JOB NO. 15377

August 7, 2008

9:36 a.m.


        VIDEOTAPED DEPOSITION OF DAVID EUN,

held at the offices of Jenner & Block,

919 Third Avenue, New York, New York,

pursuant to notice, before before Erica L.

Ruggieri, Registered Professional Reporter

and Notary Public of the State of New

York.

A P P E A R A N C E S

FOR THE LEAD PLAINTIFFS AND PROSPECTIVE
CLASS:

      PROSKAUER ROSE, LLP
      BY:  ELIZABETH A. FIGUEIRA, ESQ.
      1585 Broadway
      New York, N.Y. 10036-8299
      (212) 969-3230
      (212) 969-2900
      Efigueira@proskauer.com


FOR THE PLAINTIFF VIACOM INTERNATIONAL,
INC.:

      JENNER & BLOCK, LLP
      BY:  WILLIAM M. HOHENGARTEN, ESQ.
          MELISSA A. COX, ESQ.
      1099 New York Avenue, NW
      Suite 900
      Washington, DC  20001
      (202) 639-6000
      (202) 661-4916
      Whohengarten@jenner.com
      Mcox@jenner.com


FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE,
LLC and GOOGLE, INC.:

       WILSON SONSINI GOODRICH & ROSATI
       BY:  MICHAEL H. RUBIN, ESQ.
       650 Page Mill Road
       Palo Alto, California 94304-1050
       (650) 493-9300
       Mrubin@wsgr.com

A P P E A R A N C E S:  (Cont'd)


FOR THE DEFENDANTS YOUTUBE, INC.,
YOUTUBE, LLC and GOOGLE, INC.:

        MAYER BROWN, LLP
        BY:  A. JOHN P. MANCINI, ESQ.
             ERIC D. DOWELL, ESQ.
        1675 Broadway
        New York, New York  10019
        (212) 506-2500
        Jmancini@mayerbrown.com
        Edowell@mayerbrown.com


FOR GOOGLE, INC.:

        GOOGLE, INC.
        BY:  ADAM L. BAREA, Esq.
        1600 Amphitheatre Parkway
        Mountain View, California  94043
        (650) 214-4879
        (650) 618-1806
        Adambarea@google.com


FOR VIACOM:
        BY:  STANLEY PIERRE-LOUIS
        1515 Broadway
        New York, New York  10036
        (212) 846-4811
        Stanley.pierre-louis@viacom.com




ALSO PRESENT:

MANUEL ABREU, Videographer

1                    D. EUN

2       But let's, for now, go on to what you did

3       after you left Time Warner.

4            A.    Okay.

5            Q.    Where did you go to work next?

6            A.    Google.

7            Q.    And you are currently employed

8       by Google, correct?

9            A.    Yes.

10           Q.    And you started there when?

11           A.    February 2006.

12           Q.    And has your position -- have

13      your responsibilities at Google changed or

14      evolved over time?

15           A.    No, I still hold the same

16      position.

17           Q.    And what is that position?

18           A.    I'm vice president of content

19      partnerships.

20           Q.    And what responsibilities do you

21      have as vice president of content

22      partnerships at Google?

23           A.    I manage groups that are

24      responsible for negotiating deals and

25      managing partnerships with owners of

1                      D. EUN

2       Video.

3                 Remind me again when you first

4       began working for Google.

5            A.    February 2006.

6            Q.    And at that time one of your

7       areas of responsibility was content for

8       Google Video, correct?

9            A.    Content partnerships for Google

10      Video, yes.

11           Q.    And at that time, Google did not

12      own YouTube, correct?

13           A.    Yes.

14           Q.    Google Video and YouTube were

15      competitors at that time?

16                 MR. MANCINI:  Objection to form.

17           A.    Yes, very much so.

18           Q.    So you had no responsibility for

19      managing what Google -- strike that.

20                 So you had no responsibility for

21      managing what YouTube was doing in

22      February 2006, when you first went to

23      Google?

24           A.    I had never heard of YouTube,

25      initially.  And then they became the

1                          D. EUN

2      archenemy.

3          Q.    And then there came a time when

4      Google acquired YouTube; is that correct?

5          A.    Yes.

6          Q.    And when was that?

7          A.    I think we announced it like the

8      fall of 2006, I think.  Right.  Yeah,

9      around the fall.  And then it was approved

10     in November.  I think it was right before

11     Thanksgiving.

12         Q.    November 2006 it was approved?

13         A.    Yeah.  I think it was 2006.

14     Yes, yes.

15         Q.    Okay.  Let's start by focusing

16     on Google Video at the time you first went

17     to Google.

18         A.    Okay.

19         Q.    Can you describe the services,

20     the service or services, that Google Video

21     provided when you first began working at

22     Google?

23         A.    The primary business objective,

24     you mean, of Google Video?

25         Q.    Yes.

D. EUN

A.    Google Video had relationships

with owners of content to provide what was

referred to as a DTO, download to own,

service, where you could, as a user, you

could buy individual, let's say, Charlie

Rose episodes for a price that the owner

would determine, using Google proprietary

DRM and a Google proprietary player.

Q.    And what is DRM?

A.    Digital rights management.

Q.    And can you explain what digital

rights management means?

A.    Well, I'm not an engineer, but I

guess my, the layman's way of looking at

it is, if a content owner gives us content

to sell on their behalf, as a technology

partner, they would be concerned that only

the people who bought it would have --

would be able to actually view it.  So the

DRM is basically an engineering system.

It's a protection scheme to fulfill that.

Q.    It prevents additional copies,

above a certain number from being made?

A.    Well, I mean those types of

D. EUN

1    process is resolved, the treatment
2    will continue as designated.
3         MR. HOHENGARTEN:  We are going
4    to continue to honor the "highly
5    confidential" designation.  We don't
6    think it's proper, but we are going to
7    continue to honor it, pending meet and
8    confer.
9         MR. MANCINI:  Of course, we
10    dispute your position that you don't
11    think it's proper, but we will meet
12    and confer.
13    BY MR. HOHENGARTEN:
14         Q.    Okay.  Mr. Eun, have you had a
15    chance to look at Eun Exhibit 1?
16         A.    I have started reading it.
17         Q.    Okay.  Let me know when you've
18    had a chance to look over it.
19         A.    Okay.
20         Q.    Okay.  And just for your
21    background, the documents that have this
22    number on the bottom which I'm calling a
23    Bates number that begins with G, in the
24    lower right-hand corner, are documents

1                          D. EUN
2       that were produced to us by Google in
3       connection with this case, so they came
4       from Google originally.
5                   And Exhibit 1 is a thread of
6       e-mails, correct?
7            A.    Yes.
8            Q.    And the top e-mail is from you
9       to another Google employee.
10                  Can you pronounce his or her
11      name?
12           A.    Which one?
13           Q.    Bhanu.  There's two, I'm sorry.
14      Yeah, both of them.
15           A.    I don't know how to pronounce
16      Bhanu's last name, but it is Bhanu
17      Narasimhan, and the second person is
18      Nikesh Arora.
19           Q.    And who were they?
20           A.    Bhanu worked in the ops group at
21      Google, and her team provided review of
22      video at Google Video.
23                  Nikesh Arora is currently
24      president of our Europe, Middle East and
25      Africa region.

1 D. EUN

2 Q. And you said Bhanu, I'll use the

3 first name in this case, responsibilities

4 included review of video for Google Video,

5 correct?

6 A. She didn't work for me. I don't

7 know what all her responsibilities were.

8 But I do know that part of her

9 responsibilities were to review videos.

10 Q. And on Eun Exhibit 1, the lower

11 e-mail, which would have been the first in

12 time, is an e-mail from Bhanu describing

13 that review of video process; is that

14 correct?

15 MR. MANCINI: Objection. The

16 document speaks for itself.

17 A. I don't specifically recall

18 this, but that's what it looks like.

19 Q. On the second page of Exhibit 1,

20 Bates page 923211, under "Content reviewed

21 in U.S. only," it says, "We disapprove for

22 policy, (porn, violence, et cetera) or

23 copyright," correct.

24 MR. MANCINI: Objection. The

25 document speaks for itself.

1                     D. EUN
2       A.    Yes, that's what the e-mail
3  says.
4       Q.    Is that consistent with your
5  understanding of Google Video's video
6  review process at the time of this e-mail?
7             MR. MANCINI:  Objection to form.
8       A.    Yes, it is.
9       Q.    What is your understanding of
10  Google Video's process for disapproving
11  videos for copyright reasons --
12             MR. MANCINI:  Objection to form.
13       Q.    -- in March 2006?
14             MR. MANCINI:  So Objection to
15        form, and objection to the extent it's
16        seeking legal opinion that is not
17        discoverable in this deposition.
18             I don't think you are asking for
19        that.
20             MR. HOHENGARTEN:  I'm asking for
21        the process, a description of the
22        process.
23       A.    So what was the question?  My
24  understanding of the process at the time,
25  for a review?

732e9d39-864f-4b7b-b44f-89692f19ba06

D. EUN

1  supervisor, who is my peer, saying, hey,
2  you know, we have got to figure this out.
3     Q.    Okay.  Just to clarify one thing
4  on the record.  You referred to "our CEO,"
5  and that's Eric Schmidt, right?
6     A.    That's right.
7     Q.    And in your e-mail response,
8  which is at the top of the first page of
9  Exhibit 6, to Susan Wojcicki --
10    A.    Yes.
11    Q.    -- can you read the second
12 paragraph down?
13    A.    In my e-mail?
14    Q.    Yes.
15    A.    Yes.  "I also ran into Peter,
16 and he had this idea to 'beat YouTube' by
17 calling quits on our copyright compliance
18 standards."
19    Q.    Was that what you were just
20 referring to as the divide in policy?
21    A.    It was sort of how much over
22 DMCA compliant do we want to be?  You
23 know, what's the best business decision?
24    Q.    Peter here is Peter Chane, whom

1                    D. EUN
2      you mentioned before, right?
3          A.     That's right.  So he was in the
4      product -- he was the product manager for
5      Google Video.
6          Q.     And he reported to Susan
7      Wojcicki?
8          A.     Yes.
9          Q.     You referred to going above what
10     your lawyer said you needed to do for DMCA
11     compliance, right?
12              MR. MANCINI:  Objection to the
13          characterization of testimony.
14         A.     That was always the presumption.
15         Q.     Okay.  And in your answer
16     previously you said, I think, that the
17     argument that we were using was, it's, you
18     know, it's not a question, with all due
19     respect to our lawyers, about what's legal
20     or not, because we are all talking about
21     within the realm of legality.
22              What was your understanding
23     about what was within the realm of
24     legality?
25     DIR       MR. MANCINI:  Objection, to the

732e9d39-864f-4b7b-b44f-89692f19ba06

1             D. EUN

2      thinking about the legal, because that was

3      never the question about whether we

4      shouldn't be legal.  In fact, the article

5      also talks about, you know, I think Google

6      has failed to take off for the simple

7      reason, because it's more annoying to use

8      than YouTube.  They talked about how

9      YouTube was just easy to use.

10             So at the time, it's very much a

11      product of the Google culture, we are

12      focusing on the user to try to make it

13      simple and intuitive to use.  And so our

14      focus was really on how do we create the

15      best experience for the consumers.  But I

16      think, I don't know if I'm being clear,

17      but that was really the focus of the back

18      and forth.

19         Q.    And going back to what you wrote

20      in your e-mail in Exhibit 6, which you

21      read aloud before, which says, "I also ran

22      into Peter and he had this idea to 'beat

23      YouTube' by calling quits on our copyright

24      compliance standards."

25             How would "calling quits on our

1                        D. EUN

2       copyright compliance standards" help

3       Google Video beat YouTube?

4            A.    Well --

5                 MR. MANCINI:  Objection.

6            A.    I believe -- I believe, if I

7       recall at the time, sometimes, you know,

8       we make the lawyers the bad cops and --

9       you know, in the company.  And I think the

10      feeling was that they had put so many

11      extra, like, things for the product people

12      to do, including reviewing and taking

13      time; and so the, I think the feeling was,

14      because we are complying with these

15      standards, these, you know, standards that

16      our lawyers are adding on, it's affecting

17      our ability to provide the best service

18      possible to our users.  And in fact,

19      Susan's original e-mail to Eric here talks

20      about an instant upload which will be

21      faster than YouTube.

22                So I think there was a -- I

23      don't remember, I don't recall it

24      specifically.  I think there was,

25      generally there was this uneasiness about

1          D. EUN

2     the fact that YouTube was able to share,

3     have people upload their videos and share

4     it much more quickly, and our lawyers were

5     preventing us from being able to do that.

6          But again, it was -- I mean

7     honestly it was never a question of like,

8     you know, whether something would be

9     illegal or not.  In fact, Peter is not a

10    lawyer, I wasn't.  I didn't really become

11    familiar with this until we got closer to

12    the YouTube acquisition.

13    Q.   Okay.  And let me follow up on

14    the instance live point you made.

15         You are referring to something,

16    I believe, that Susan Wojcicki --

17    A.   She writes, she writes, "We are

18    working on the instant upload."

19    Q.   And which page is that on, just

20    so we are on the same page?

21    A.   749.

22    Q.   749, okay.  And so, one, if I

23    understood correctly, one of the

24    competitive advantages of YouTube was that

25    videos would be uploaded very quickly?

1                          D. EUN

2          A.    Well, more quickly than we would

3     upload it.

4          Q.    And I'm trying to understand if

5     Google's copyright compliance standards

6     affected the upload time of videos.

7          A.    It absolutely did.

8                MR. MANCINI:  Objection to form.

9          Q.    How did Google's copyright

10    compliance standards affect the upload

11    time for videos?

12         A.    Well, at least the view, that

13    was the perception at the time.  The

14    perception was, because Google Video had

15    this group, Bhanu's group, proactively

16    viewing stuff, you know, whether it was

17    for a hate crime or porn or, you know,

18    copyright stuff, you know, it was an

19    extra -- it would take more time.

20         Q.    So when a user went to upload a

21    video to Google Video, would it get -- the

22    video would be reviewed by Bhanu's group,

23    before the upload would be complete?

24               MR. MANCINI:  Objection to form.

25         A.    Yeah, I think so.

1              D. EUN

2         A.    Yes.

3              So to be clear, we did do

4    proactive screening of copyright, from

5    what it says here.  So -- you had asked me

6    about that earlier, but.  I mean I wasn't

7    involved with this, but we obviously did.

8         Q.    Okay.  So the existing policy at

9    the time of this draft document was a zero

10   tolerance on copyright as well as porn,

11   violence and hate.  And that was enforced

12   with proactive screening before the video

13   went live, correct?

14        A.    Yeah.  I have no reason to

15   dispute that what this is is the current

16   policy was not, you know, was not anything

17   but the current policy back then.

18        Q.    Okay.  And the proposal is to

19   keep rejecting full works -- to keep

20   rejecting all porn, violence and hate, but

21   to accept partial works up to ten minutes

22   long and respond to take-down requests,

23   correct?

24        A.    That's what it says, yes.

25        Q.    And was that proposal ever

1          D. EUN

2          THE WITNESS:  Would it be

3      possible to take a bio break?

4          MR. HOHENGARTEN:  Absolutely.

5          THE VIDEOGRAPHER:  The time is

6      2:20 p.m.  We are going off the

7      record.

8          (Whereupon, there is a recess in

9      the proceedings.)

10          THE VIDEOGRAPHER:  The time is

11      2:33 p.m.  We are back on the record.

12          MR. HOHENGARTEN:  We will mark

13      Exhibit 13, which is G00001-00925742

14      through 43.

15          (Eun Exhibit 13, document,

16      Bates stamped G00001-00925742

17      through 43, marked for

18      identification, as of this date.)

19      A.    Okay.

20      Q.    Exhibit 13 is an e-mail from

21  Hunter Walker to the video team, dated

22  May 17th, 2006.

23          Who is Hunter Walker?

24      A.    It's Hunter Walk.

25      Q.    I'm sorry, you're right.  Who is

1                           D. EUN

2      Hunter Walk?

3                MR. MANCINI:  Objection to

4           characterization of the document.

5           A.    He used to be in the product

6      group on Google Video and has since become

7      the head of product at YouTube.

8           Q.    And what does being the head of

9      product at YouTube entail, just briefly?

10          A.    Basically, the role that Peter

11     Chane had at Google Video, Hunter now has

12     that for YouTube.

13          Q.    And this e-mail describes Google

14     Video rolling out a web-based video

15     uploader with instant live, correct?

16                MR. MANCINI:  Objection.  The

17          document speaks for itself.

18          A.    Apparently, yes.

19          Q.    Do you recall that rollout of a

20     web-based video uploader with instant

21     live?

22          A.    I don't.

23          Q.    At the time, May 17th, 2006,

24     would the rollout of a web-based video

25     uploader with instant live be something

1          D. EUN
2    we want to conduct our business?  Is this
3    Googley?"
4          Q.    And Sergey Brin --
5          A.    Sergey.
6          Q.    Sergey Brin is one of the
7    co-founders of Google, correct?
8          A.    That's correct.
9          Q.    What is GPS?
10         A.    It's a product review where the
11   different functions come in and where you
12   make a presentation to EMG.  So some of
13   the slides that we -- that you showed me
14   before would have, might have been
15   discussed at a GPS.
16         Q.    Okay.  And in this point 6 you
17   are describing a point that Sergey Brin
18   made at the last GPS, correct?
19         A.    I don't recall the e-mail, and I
20   don't recall the particular GPS.  In fact,
21   I don't recall Sergey talking that much
22   about video.
23         Q.    Well, do you believe you didn't
24   author this e-mail?
25         A.    No, no, no.

1                    D. EUN

2    News.

3         Q.    And what about video, do you

4    also let content owners choose to opt out

5    of having their videos included on Google

6    Video?

7              MR. MANCINI:  Objection to form.

8         A.    So -- I don't work directly with

9    Google Video anymore, but on Google Video

10   it is now a search engine for video, and

11   anyone can always opt out.

12        Q.    Okay.

13        A.    So if they don't want to be

14   searched, they don't have -- they won't.

15        Q.    And we will actually skip ahead

16   in time a little bit from what we have

17   been talking about, to after Google

18   acquired YouTube.

19              Can video content owners opt out

20   of participating, having their content

21   uploaded to YouTube?

22              MR. MANCINI:  Objection to form.

23        A.    Well, we have content

24   partnerships agreements.  So they are the

25   ones who decide which content they want to

1                           D. EUN

2          Q.     Do you know whether other people

3     in the Google Video team were included in

4     the decision-making at an earlier date?

5               MR. MANCINI:  Objection to form.

6          A.     Well, when I went to the, to do

7     the due diligence, I recall going over

8     with Susan Wojcicki.  So she was on the

9     Google Video team.

10         Q.     But did she learn about the

11    acquisition plans before you did?

12         A.     I don't know.

13         Q.     Did it strike you as strange

14    that you didn't learn about the plans

15    earlier than that?

16              MR. MANCINI:  Objection to form.

17         A.     No.  Because again, it's --

18    Google's functionally run, and this was

19    something that our corporate development

20    group, it's sort of like the internal M&A

21    group was driving.

22              Personally, I wish that I had

23    been included a little bit sooner, but.

24              MR. HOHENGARTEN:  Let's mark

25         Exhibit 17, which is G00001-00498728

1          D. EUN

2     that you control as a partner.

3               And on those pages, again, if

4     the partner elects to, because you can

5     still be a partner and say, I don't want

6     you to monetize, and a lot of non-profits,

7     for example, do that.  You can also put

8     ads on the channel partner pages.

9          Q.   Okay.  But so there's the

10    partner pages or partner channel pages?

11         A.   Yes.

12         Q.   The watch pages?

13         A.   Yes.

14         Q.   And there's also the search

15    page, search results page and home results

16    page of YouTube; is that right?

17         A.   That's right.  That's a good

18    point, yes.

19         Q.   And when the users come looking

20    for content, whether it's from one of your

21    content partners or somebody else, if they

22    go to those pages in the process of

23    looking for that content, they receive ads

24    on those pages, correct?

25               MR. MANCINI:  I just want to

1                            D. EUN

2              object, counsel, because the witness

3              has testified that he's not the most

4              knowledgeable about this subject.  But

5              I'll allow to you ask the questions.

6         A.    If we have sold an ad, they

7    could see advertising, yes.

8         Q.    And when you say -- when this

9    chart says, "Monetizable, no," next to

10   "Content uploaded by general users," it's

11   not saying that somebody who searches for

12   that content wouldn't see an ad on the

13   search results page?

14        A.    That's right.

15        Q.    Now, for the content that is

16   monetizable, just still looking at

17   page 351, obviously, according to this

18   chart, the vast majority of views,

19   600 million compared to 4 million, are for

20   videos that are uploaded by general users;

21   is that right?

22        A.    That's right.

23        Q.    But those 600 million videos are

24   not monetizable, correct?

25              MR. MANCINI:  Objection, asked