UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -x
VIACOM INTERNATIONAL INC., COMEDY:
PARTNERS, COUNTRY MUSIC          :
TELEVISION, INC., PARAMOUNT      :
PICTURES CORPORATION, and BLACK  :
ENTERTAINMENT TELEVISION LLC     :
       Plaintiffs,            :
                              :
       v.                     : Case No.
                              : 07CV-2103
YOUTUBE, INC., YOUTUBE, LLC,     :
and GOOGLE, INC.,                :
                              :
       Defendants.            :
- - - - - - - - - - - - - - - -x
THE FOOTBALL ASSOCIATION PREMIER :
LEAGUE LIMITED, BOURNE CO.,      :
et, al., on behalf of themselves :
and all others similarly situated:
                              :
       Plaintiffs,            :
                              : Case No.
       v.                     : 07CV-3582
                              :
YOUTUBE, INC., YOUTUBE, LLC,     :
and GOOGLE, INC.,                :
                              :
       Defendants.            :
- - - - - - - - - - - - - - - -x
      ****HIGHLY CONFIDENTIAL****
    Videotaped Deposition of DEAN GARFIELD
         Washington, D.C.
      Tuesday, November 2, 2009
         10:24 a.m.

BY:  Okeemah S. Henderson, LSR
JOB NO. 18039

```
 1      A P P E A R A N C E S:
 2      FOR THE PLAINTIFFS VIACOM INTERNATIONAL,
        INC.:
 3           STUART J. BASKIN, ESQUIRE
             SHEARMAN & STERLING, LLP
 4           599 Lexington Avenue
             New York, NY 10022
 5           (212) 848-4000
 6      FOR THE PLAINTIFFS VIACOM INTERNATIONAL,
        INC.:
 7           MICHAEL B. DESANCTIS, ESQUIRE
             LUKE C. PLATZER, ESQUIRE
 8           JENNER & BLOCK, LLP
             1099 New York Avenue, NW Suite 900
 9           Washington, DC 20001
             (202) 639-6000
10
        FOR THE DEFENDANTS YOUTUBE:
11           DAVID H. MCGILL, ESQUIRE
             MAYER BROWN, LLP
12           1675 Broadway
             New York, NY  10019
13           (212) 506-2507
14      FOR THE DEFENDANTS THE FOOTBALL ASSOCIATION:
             LAUREN A. MCMILLEN, ESQUIRE
15           BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
             1285 Avenue of the Americas
16           New York, NY  10019
             (212) 554-1593
17
        FOR THE WITNESS, DEAN GARFIELD:
18           KELLY M. KLAUS, ESQUIRE
             MUNGER TOLLES & OLSEN LLP
19           355 South Grand Avenue, 35th Flr
             Los Angeles, CA  90071
20           (213) 683-9238
21
        ALSO PRESENT:
22
             Conway Barker, Videographer
23           Orit Michiel
24
25
```

1

I-N-D-E-X

2

3        Deposition of DEAN GARFIELD

4             November 2, 2006

5    EXAMINATION BY:                        PAGE:

6    Mr. Baskin                              6

7    Mr. McGill                              58

8    EXHIBITS                               PAGE

9      1    E-Mail chain dated 4/28/06        14

10     2    E-Mail chain dated 8/18/06        23

11     3    E-Mail chain dated 9/25/06        25

12     4    E-Mail chain dated 10/12/06       31

13     5    E-Mail chain dated 10/17/06       37

14     6    E-Mail dated 10/23/06             39

15     7    E-Mail chain with proposal 11/8/06 41

16     8    E-Mail dated 1/19/07              47

17     9    E-Mail chain dated 1/31/07        48

18    10    E-Mail chain dated 2/27/07        53

19    11    Article                          94

20    12    Article from Gazette            107

21    13    The Tech online newsletter      110

22    14    E-Mail chain dated 10/17/06     120

23    15    Article                         134

24

25

1          P-R-O-C-E-E-D-I-N-G-S

2              (10:24 a.m.)

10:23   3          THE VIDEO OPERATOR:  This is the

10:23   4    beginning of tape No. 1 in the videotape

10:23   5    deposition of Dean Garfield taken by Mr. Baskin

10:23   6    in the matter of Viacom International

10:23   7    Incorporated, et al versus YouTube,

10:23   8    Incorporated.  Case No. 07-CV-2103 and the

10:23   9    Football Association Premier League Limited

10:24   10   Bourne Company, et al. versus YouTube

10:24   11   Incorporated, et al in the United States

10:24   12   District Court for the Southern District of New

10:24   13   York.

10:24   14          This deposition is being held at Jenner &

10:24   15   Block, LLP, 1099 New York Avenue, Northwest

10:24   16   Washington, D.C. on November 2nd, 2009.  The

10:24   17   time is approximately 10:24.  The Court

10:24   18   Reporter is Okeemah Henderson.  The video

10:24   19   camera operator is Conway Barker, both on

10:24   20   behalf of David Feldman Worldwide.  Will

10:24   21   counsel please identify yourselves and state

10:24   22   whom you represent.

10:24   23          MR. BASKIN:  I am Stuart Baskin of

10:24   24   Shearman & Sterling, and I am counsel for

10:24   25   Viacom in this litigation.

10:24    1          MR. PLATZER:  Luke Platzer of Jenner

10:24    2    & Block, also counsel for Viacom in this

10:24    3    litigation.

10:24    4          MS. MCMILLEN:  Lauren McMillen of

10:24    5    Bernstein Litowitz Berger & Grossmann, counsel

10:24    6    for the Football Association Premier League

10:25    7    Limited and other class plaintiffs in this

10:25    8    litigation.

10:25    9          MR. DESANCTIS:  Michael DeSanctis of

10:25   10    Jenner & Block with the Viacom plaintiffs.

10:25   11          MR. MCGILL:  David McGill from Mayer

10:25   12    Brown, here on behalf of YouTube and Google.

10:25   13          MR. KLAUS:  Kelly Klaus from Munger

10:25   14    Tolles & Olsen appearing on behalf of the

10:25   15    witness, and with me is Orit Michiel of the

10:25   16    Motion Picture Association of America.

10:25   17          THE VIDEO OPERATOR:  Would you please

10:25   18    swear in the witness.

        19    Whereupon,

        20          DEAN GARFIELD,

        21    called as a witness, having been first duly

        22    sworn to tell the truth, the whole truth, and

        23    nothing but the truth, was examined and

        24    testified as follows:

        25

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BASKIN:

10:25    Q.    Good morning, sir.  Could you recite your full name for the record?

10:25    A.    Certainly.  It is Dean, D-E-A-N, Christopher Garfield, G-A-R-F-I-E-L-D.

10:25    Q.    And which state do you reside in, sir?

10:26    A.    I reside in Washington, D.C.

10:26    Q.    How are you currently employed?

10:26    A.    I'm employed by the Information Technology Industry Council.

10:26    Q.    What is your position with the Information Technology Industry Council?

10:26    A.    We simply call it ITI.  I'm the president and CEO.

10:26    Q.    And without belaboring, since this is not of direct relevance to the suit, can you tell us what the ITI does?

10:26    A.    ITI is the premiere voice, advocate, thought leader for the information communications technology sector.  We represent the major household name brands before global policymakers.

10:26        So our member companies include --

1    10:26  actually all of the technology in this room is

2    10:26  made by those companies.  So IBM, HP, Dell,

3    10:26  Apple, Microsoft just to name a few.  We have

4    10:26  43 members.

5    10:26      Q.    How long have you been president and

6    10:27  CEO of ITI?

7    10:27      A.    For about eight months.

8    10:27      Q.    And prior to that -- strike that.

9    10:27  Can you just tell the ladies and gentlemen of

10   10:27  the jury a little bit about your educational

11   10:27  background and what degrees you hold?

12   10:27      A.    I can.  How far back do you want me

13   10:27  to go?

14   10:27      Q.    I don't think we have to go to

15   10:27  kindergarten.  Why don't we start with college.

16   10:27      A.    College, I went to Middlebury

17   10:27  college and I received a BA.  Post then went to

18   10:27  grad school and law school, so Woodrow Wilson

19   10:27  School at Princeton.  I have a masters in

20   10:27  public administration international affairs and

21   10:27  jointly with that went to law school at NYU

22   10:27  where I received my JD.

23   10:27      Q.    Just briefly again, can you walk us

24   10:27  through your employment crinology after you

25   10:27  received your educational degrees?

1  10:27    A.    Post my law postgraduate degree, I

2  10:28  worked at a firm in New York, Kaye Scholer

3  10:28  Fierman Hays & Handler, worked there for six

4  10:28  and a half years approximately.

5  10:28    Q.    That would be a law firm?

6  10:28    A.    Yes.  Correct.  Post working at Kaye

7  10:28  Scholer both in New York and Washington, D.C.,

8  10:28  I worked at the Recording Industry Association

9  10:28  of America representing the major U.S. record

10 10:28  labels.

11 10:28    After that I moved on to working for the

12 10:28  Motion Picture Association of America

13 10:28  representing the major and motion picture

14 10:28  companies and then about nine months ago, left

15 10:28  there to work at ITI.

16 10:28    Q.    Are you currently married, sir?

17 10:28    A.    Yes, I am.

18 10:28    Q.    Do you have any children?

19 10:28    A.    Yes, I do.  I have two children and

20 10:28  one wife.

21 10:28    Q.    You mentioned that prior to working

22 10:28  for the Motion Picture Association, which we'll

23 10:28  get to in a few minutes, you worked for an

24 10:29  organization called the Recording Industry

25 10:29  Association.  Did that go by initials also?

1   10:29    A.    Yes, it does.  It went by and it

2   10:29  still does go by RIAA.

3   10:29    Q.    In brief again, what was your

4   10:29  position with the RIAA?

5   10:29    A.    I think it changed over time but

6   10:29  essentially I was a litigator and at some

7   10:29  point, I think I was the head litigator or

8   10:29  something like that.

9   10:29    Q.    How long did you remain with the RIA

10  10:29  RIAA?

11  10:29    A.    Four years.

12  10:29    Q.    During the course of this trial, the

13  10:29  jury will see some documents referencing

14  10:29  something called Grokster.  Could you in brief

15  10:29  just tell the jury -- do you know what

16  10:29  Grokster, what the reference is a court case

17  10:29  named Grokster?

18  10:29    A.    Yes, I do.

19  10:29    Q.    Were you involved with that court

20  10:29  case?

21  10:29    A.    Yes, I was.

22  10:29    Q.    Can you just again, not belaboring

23  10:29  it, for 30 seconds just advise the ladies and

24  10:29  gentlemen of the jury what Grokster is so that

25  10:29  when they hear reference to it they know what

1    10:29  it means?

2    10:29      A.    Grokster was a litigation that was

3    10:29  filed jointly by the Recording Industry

4    10:30  Association and the Motion Picture Association

5    10:30  against a company that developed a software

6    10:30  tool that encouraged users to engage in

7    10:30  copyright infringement.

8    10:30      Q.    During your time as principal lawyer

9    10:30  for the RIAA, did you have responsibilities

10   10:30  include addressing issues of copyright

11   10:30  infringement and policy?

12   10:30      A.    Yes, it did.

13   10:30      Q.    Now, you mentioned after your four

14   10:30  years or so at the RIAI (sic) you moved over to

15   10:30  an organization called the Motion Picture

16   10:30  Association, correct?

17   10:30      A.    Yes.  I worked at the RIAA for about

18   10:30  four years and then moved to MPAA.

19   10:30      Q.    MPAA and the acronym stands for

20   10:30  Motion Picture Association of America; is that

21   10:30  correct?

22   10:30      A.    Correct.

23   10:30      Q.    What companies comprise the MPAA?

24   10:30      A.    The MPAA consists of the major U.S.

25   10:31  motion picture companies but they are also the

1   10:31 global leaders in developing and marketing

2   10:31 motion pictures.

3   10:31     Q.    I think the jury may be familiar

4   10:31 with some of the names.  Can you just recount

5   10:31 for us some of the names of members of the

6   10:31 MPAA?

7   10:31     A.    Sure.  So our members included

8   10:31 Disney, Sony, Warner Brothers, Universal, and I

9   10:31 suspect that I'm leaving out someone.

10  10:31     Q.    Does Century Fox refresh your

11  10:31 recollection?

12  10:31     A.    Thank you.  Jim Gianapolis

13  10:31 (phonetic) and Peter Turner will be pleased

14  10:31 that I forgot their company, yes, so Fox is

15  10:31 also one of our members.  And at some point in

16  10:31 time we had other members but some of those

17  10:31 companies (inaudible).

18  10:31     Q.    Would it be fair to summarize it for

19  10:31 the jury that the constituency of the MPAA is

20  10:32 essentially the major film studios that create

21  10:32 movies and many TV shows?

22  10:32     A.    Correct.

23  10:32     Q.    And by the way, one studio that you

24  10:32 did mention was also Paramount, correct?

25  10:32     A.    Yes.

1  10:32     Q.    And that one you understand is owned

2  10:32  by my client, Viacom; is that correct?

3  10:32     A.    Correct.

4  10:32     Q.    What were your responsibilities --

5  10:32     A.    That's why I said including just so

6  10:32  I wouldn't offend anyone.

7  10:32     Q.    What was your position, sir, at the

8  10:32  MPAA?

9  10:32     A.    My role at the MPAA also changed

10 10:32  over time, just as it did at the RIAA.  When I

11 10:32  came into the MPAA, I was essentially the head

12 10:32  litigation attorney and then over time it

13 10:32  progressed, and when I left I was an executive

14 10:32  vice president and the chief strategic officer.

15 10:32     So I came in in a legal role.  I continued

16 10:33  to have a legal role for much of my career

17 10:33  there but my title changed and I took on

18 10:33  broader responsibilities over time.

19 10:33     Q.    Was one of your responsibilities at

20 10:33  the MPAA addressing issue of piracy of movies

21 10:33  and television shows on the internet?

22 10:33     A.    Yes, it was.

23 10:33     Q.    Now, can you just explain again

24 10:33  briefly, you need not belabor it but for the

25 10:33  ladies and gentlemen of the jury, why the film

1  10:33 studios that comprise the MPAA are concerned

2  10:33 with issues of piracy or legal content on the

3  10:33 internet?

4  10:33      A.    Well, the in simplest terms,

5  10:33 creating a movie is a very expensive

6  10:33 investment.  When I was at the MPAA, the

7  10:33 average cost for a movie was over $105 million

8  10:33 and so it was a significant investment made and

9  10:33 certain expectations and plans for recouping

10  10:34 that investment over time through legitimate

11  10:34 channels.

12  10:34      So to the extent that those creative works

13  10:34 were being exploited in nonlegitimate channels,

14  10:34 it would reduce the likelihood of getting a

15  10:34 return on that investment.

16  10:34      Q.    If I could direct your attention to

17  10:34 the year 2006, did you personally engage in

18  10:34 discussions with a company called YouTube?

19  10:34      A.    Yes, I did.  I know that I did in

20  10:34 2006 but the exact timing in 2006 is not

21  10:34 something that I recall.

22  10:34          MR. BASKIN:  Now, let me hand you

23  10:34 just as a matter of dating the context.  Let me

24  10:35 hand you what I would ask the Court Reporter to

25  10:35 mark as Garfield Exhibit 1.

1   10:35   (Garfield Deposition Exhibit No. 1 was marked

2   10:35               for identification.)

3   10:35           BY MR. BASKIN:

4   10:35       Q.    It's a short document, Mr. Garfield.

5   10:35   So just if you take a second if you will and

6   10:35   look at Garfield Exhibit 1.

7   10:35       A.    (The witness complies.) Okay.

8   10:35       Q.    Now, first, sir, just for the record

9   10:36   can you identify for us and confirm that

10  10:36   Garfield Exhibit 1 consists of a document

11  10:36   reflecting an E-mail chain in which you were a

12  10:36   participant in or around April, 2006?

13  10:36       A.    Correct.

14  10:36       Q.    Does this document -- does Garfield

15  10:36   Exhibit 1 help to establish in your mind that

16  10:36   you were in discussions with YouTube at least

17  10:36   in and around April, 2006?

18  10:36       A.    Yes, it does.

19  10:36       Q.    Can you just tell briefly, the

20  10:36   ladies and gentlemen of the jury, what was

21  10:36   generally the topic of your discussions with

22  10:36   YouTube in and around April, 2006?

23  10:36       A.    The discussion was about encouraging

24  10:37   YouTube to do two things; deal with content

25  10:37   that we identified on the site that was

1   10:37 copyrighted, infringement content from the

2   10:37 motion picture studios; and two, and relatedly

3   10:37 integrating filtering software that would

4   10:37 address that copyrighted content.

5   10:37      Q.    Now, as of April, 2006 did the MPAA

6   10:37 find that a substantial amount of the film

7   10:37 studios copyrighted content was being exhibited

8   10:37 on the YouTube website?

9   10:37           MR. MCGILL:  Objection.  Leading.

10  10:37      A.    In April, 2006 there was a lot of

11  10:37 copyrighted content on the site that was owned

12  10:37 or controlled by the motion picture studios and

13  10:37 that was one of the reasons I reached out the

14  10:37 YouTube.

15  10:37           BY MR. BASKIN:

16  10:37      Q.    Now, you made reference two answers

17  10:37 ago to a desire to institute discussions

18  10:38 regarding filtering on the YouTube website.  If

19  10:38 you look at Exhibit 1 for a second, you will

20  10:38 see on a couple of places, certainly in the

21  10:38 first on the top E-mail and on the very bottom

22  10:38 E-mail, you make reference to technical

23  10:38 discussions or technical folks, or instituting

24  10:38 technical folks into the dialogue.

25  10:38           Was that a reference to individuals'

10:38  1   knowledgeable of the issue of filtering and

10:38  2   fingerprinting technologies?

10:38  3          A.    Correct.

10:38  4          MR. MCGILL:  Objection to the

10:38  5   characterization of the document.

10:38  6          A.    Correct.  As I mentioned, there was

10:38  7   a two-fold purpose to the discussion and one of

10:38  8   the purposes was to talk about integrating

10:38  9   filtering technology software.  And so I think

10:38  10  on that very first call, I was the only one

10:38  11  participating while YouTube had other folks and

10:38  12  I wanted to make sure folks from our side who

10:39  13  had the technical expertise were also part of

10:39  14  the discussion.

10:39  15         BY MR. BASKIN:

10:39  16         Q.    Now, I think the second E-mail on

10:39  17  Garfield Exhibit 1 references at least three

10:39  18  participants of YouTube.  Was one such

10:39  19  participant a man named Chris Maxcy, M-A-X-C-Y?

10:39  20         A.    Correct.  Yes.

10:39  21         Q.    Do you recall what Mr. Maxcy's title

10:39  22  was at YouTube at the time or what his position

10:39  23  was?

10:39  24         A.    I don't recall what his title was.

10:39  25  I was introduced to Chris as a result of Chris

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

10:39   1   wanting to build a stronger relationship with

10:39   2   the Motion Picture Association and

10:39   3   conversations he had with Dan Glickman, so I

10:39   4   followed up with him based on that.

10:39   5       Q.    Then there was reference to two

10:39   6   other individuals, a Steven Chen.  Do you see

10:39   7   that, sir?

10:39   8       A.    Yes, I do.

10:39   9       Q.    And a Zahavah Levine?

10:39   10      A.    Yes, I do.

10:39   11      Q.    Mr. Chen is denominated by Mr. Maxcy

10:39   12  as co-founder and chief technology officer of

10:40   13  YouTube.  Was that your understanding in April

10:40   14  of 2006?

10:40   15      A.    I don't recall if I had an

10:40   16  understanding in April, 2006.

10:40   17      Q.    And Ms. Levine, Zahavah Levine is

10:40   18  identified as general counsel and vice

10:40   19  president of business affairs.  Was that your

10:40   20  understanding in that time period?

10:40   21      A.    I did have an understanding of

10:40   22  Zahavah's role because I knew Zahavah even

10:40   23  before this conversation.

10:40   24      Q.    You knew her prior to her arrival at

10:40   25  YouTube?

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

| | | |
|---|---|---|
| 10:40 | 1 | A.    Yes, I did. |
| 10:40 | 2 | Q.    Now, you mentioned a concept which |
| 10:40 | 3 | you referred to as filtering or fingerprinting |
| 10:40 | 4 | and the jury may sometimes here it at copyright |
| 10:40 | 5 | identification tools.  Based on your experience |
| 10:40 | 6 | at the RIAA and the MPAA, were you familiar |
| 10:40 | 7 | with many of the filtering technologies that |
| 10:41 | 8 | were available as of the middle of 2006? |
| 10:41 | 9 | A.    Yes, I was. |
| 10:41 | 10 | Q.    Was there one such company that |
| 10:41 | 11 | employed or deployed filtering technology |
| 10:41 | 12 | called Audible Magic? |
| 10:41 | 13 | A.    Yes. |
| 10:41 | 14 | Q.    Were you in 2006 familiar with |
| 10:41 | 15 | Audible Magic technology? |
| 10:41 | 16 | A.    Very. |
| 10:41 | 17 | Q.    In laymens term and briefly, can you |
| 10:41 | 18 | explain to the ladies and gentlemen of the jury |
| 10:41 | 19 | what these filtering and fingerprinting |
| 10:41 | 20 | technologies what they do?  Assuming what they |
| 10:41 | 21 | did in 2006 and I'll just add if it's changed a |
| 10:41 | 22 | lot since then, then you can tell us.  But |
| 10:41 | 23 | going back to 2006, can you explain to the |
| 10:41 | 24 | ladies and gentlemen of the jury what these |
| 10:41 | 25 | filtering technologies or fingerprinting |

10:41  1    technologies did?

10:41  2         A.    Actually, fingerprinting

10:41  3    technologies is an apt way to describe it

10:41  4    because they work in a very similar fashion to

10:42  5    a human fingerprint.  So just as can recognize

10:42  6    a human fingerprint, they way they would work

10:42  7    is they would take a digital stamp of a file,

10:42  8    in this context an audio-visual file, capture

10:42  9    that visual, that fingerprint and then in

10:42  10   subsequent occasions be able to tie the

10:42  11   fingerprint to the particular audio-visual

10:42  12   content.

10:42  13        So it's a way of identifying a piece of

10:42  14   content beyond just the name of the movie or

10:42  15   the song.

10:42  16        Q.    I assume companies like Audible

10:42  17   Magic use computers and technology to do these

10:42  18   matches?

10:42  19             MR. MCGILL:  Objection to form.

10:42  20        A.    They do use computer and other

10:42  21   technologies in order to be able to align a

10:42  22   particular audio-visual work with its digital

10:43  23   fingerprint.

10:43  24             BY MR. BASKIN:

10:43  25        Q.    Now, in and around 2006, had the

10:43  1    MPAA assessed the effectiveness of filtering on

10:43  2    fingerprint technologies in protecting the

10:43  3    movie industry's intellectual properties on

10:43  4    internet websites that deploy those

10:43  5    technologies?

10:43  6        MR. MCGILL:  Objection to form.

10:43  7    Vague.

10:43  8        A.    The MPAA did conduct an analysis.  I

10:43  9    don't recall the exact timing of that analysis

10:43  10   and whether it were concluded in April of 2008.

10:43  11   I'm sorry 2006.

10:43  12       BY MR. BASKIN:

10:43  13       Q.    In 2006 and for that matter into

10:43  14   2007, do you know what was the MPAA's

10:43  15   assessment of the effectiveness of

10:43  16   fingerprinting and filtering technologies in

10:43  17   protecting the movie industry's intellectual

10:44  18   property on websites that deploy those

10:44  19   technologies?

10:44  20       MR. KLAUS:  If I can just interpose

10:44  21   it's not an objection but in the course of

10:44  22   answering the question, Mr. Garfield, if I

10:44  23   could just caution you to confine your

10:44  24   responses to matters that were publically

10:44  25   discussed or discussed with others and not to

10:44  1    reveal internal communications that may be work

10:44  2    product.

10:44  3            MR. BASKIN:  I will strike the

10:44  4    question.  That's a fair reservation on the

10:44  5    part of your counsel.  Let me phrase it this

10:44  6    way:

10:44  7            In 2006 and 2007, from time to time you

10:44  8    discussed with the press the MPAA's assessment

10:44  9    of effectiveness of fingerprint technologies;

10:44  10   isn't that right sir?

10:44  11           MR. MCGILL:  Objection.  Leading.

10:44  12   A.    I do have a recollection of speaking

10:44  13   to the press and generally publically about

10:44  14   fingerprinting technologies at some points in

10:44  15   2006.  Yes.

10:44  16           BY MR. BASKIN:

10:44  17   Q.    And again without belaboring the

10:45  18   deposition, can you tell the ladies and

10:45  19   gentlemen of the jury what you remember were

10:45  20   the positions you were expressing to the press

10:45  21   in and around that time period regarding the

10:45  22   effectiveness of these fingerprinting and

10:45  23   filtering technologies if websites chose to

10:45  24   deploy them?

10:45  25           MR. MCGILL:  Objection.  Vague.

10:45  1      A.   In simplest terms, the technologies

10:45  2   were highly viable and were worthy of further

10:45  3   investment and integration into audio-visual

10:45  4   sites that have an interest in discerning

10:45  5   between content that's copyrighted and content

10:45  6   that's not.

10:45  7       BY MR. BASKIN:

10:45  8      Q.   Now, let's return if we can to your

10:45  9   discussions with YouTube in 2006, and at first,

10:45  10   I want to focus on the time period before its

10:45  11   acquisition by Google.  Do you have -- well,

10:45  12   let me show you some documents, maybe that

10:45  13   would help you differentiate between those two

10:46  14   time intervals.  But in your discussions with

10:46  15   YouTube in 2006, you said you were you've

10:46  16   already testified you were tempting to discuss

10:46  17   with them their deploying filtering and

10:46  18   fingerprinting on their website; is that

10:46  19   correct?

10:46  20       MR. MCGILL:  Objection to the

10:46  21   characterization.

10:46  22      A.   It was one of the things that we

10:46  23   were talking about.  Correct.

10:46  24       BY MR. BASKIN:

10:46  25      Q.   And let me show you if I can just so

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

10:46   1    we can date it.  Let me show you a document

10:46   2    that we'll mark as Garfield Exhibit 2, mostly

10:47   3    for the purpose of dating your discussions.  I

10:47   4    understand your memory is not crisp on the

10:47   5    dates.  Is that a fair way of characterizing

10:47   6    it?

10:47   7        A.    That's a fair characterization.  I

10:47   8    have a firm recollection of much of our

10:47   9    conversations but the exact dates I don't have

10:47   10   a strong grasp on.

10:47   11        MR. BASKIN:  Let me hand you if I can

10:47   12   what we'll mark as Garfield No. 2.

10:47   13    (Garfield Deposition Exhibit No. 2 was marked

10:47   14         for identification.)

10:47   15        BY MR. BASKIN:

10:48   16        Q.    Sir, first can you identify for us

10:48   17   Garfield Exhibit 2 as consisting of again an

10:48   18   E-mail chain of which you were a participant?

10:48   19        A.    Yes, I can.

10:49   20        Q.    Now, using Garfield Exhibit 2 as

10:49   21   really as a dating mechanism, is it accurate

10:49   22   that your discussions with YouTube regarding

10:49   23   instituting, filtering or fingerprinting on

10:49   24   their network, on their website persisted

10:49   25   certainly into August, 2006?

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

10:49  1      A.    Yes, it did.

10:49  2      Q.    Do you recall during this time

10:49  3  period whether the MPAA was discussing with

10:49  4  YouTube particular fingerprinting and filtering

10:49  5  vendors that YouTube might deploy on their

10:49  6  website to protect intellectual property of

10:49  7  movie studios?

10:50  8      A.    My recollection is at some point in

10:50  9  these conversations we talked about a range of

10:50  10 technology companies that were competing in the

10:50  11 content recognition, fingerprinting phase, and

10:50  12 so yes, I don't recall discussing one company

10:50  13 with them.  I recall talking to them about a

10:50  14 range of companies.

10:50  15     Q.    And I'll show you some documents in

10:50  16 a few minutes that might help refresh your

10:50  17 memory but do you recall even absent some

10:50  18 documents whether one such company was Audible

10:50  19 Magic that you were discussing with them?

10:50  20     A.    Yes, I do recall that.

10:50  21     Q.    Let me show you and just so I

10:50  22 understand the protocol in the case.

10:50  23     David, I'm going to be showing him a

10:50  24 Google document now, which happens to be an

10:50  25 E-mail chain with him but because as I

| 10:50 | 1 | understand that that's even though it's |
| 10:50 | 2 | denominated highly confidential for purpose of |
| 10:51 | 3 | the deposition, the stipulation allows us to |
| 10:51 | 4 | show witnesses documents, but I want to show it |
| 10:51 | 5 | to you to make sure you're comfortable in |
| 10:51 | 6 | showing it to him before I do.  Okay? |
| 10:51 | 7 | MR. MCGILL:  Sure.  I appreciate |
| 10:51 | 8 | that. |
| 10:51 | 9 | MR. BASKIN:  So why don't we mark as |
| 10:51 | 10 | Garfield Exhibit 3 the document in my hand. |
| 10:51 | 11 | I'm going to give YouTube's counsel a copy.  I |
| 10:51 | 12 | will not give out any other copies until -- I |
| 10:51 | 13 | might give one to co-counsel. |
| 10:51 | 14 | MR. MCGILL:  You can go ahead and |
| 10:51 | 15 | mark it.  We have no objection. |
| 10:51 | 16 | (Garfield Deposition Exhibit No. 3 was marked |
| 10:51 | 17 | for identification.) |
| 10:51 | 18 | BY MR. BASKIN: |
| 10:52 | 19 | Q.    Does Garfield Exhibit 3 help you |
| 10:52 | 20 | refresh your recollection when you have lunch? |
| 10:52 | 21 | But beyond that, can you identify Garfield |
| 10:52 | 22 | Exhibit 3, although it is not a document from |
| 10:52 | 23 | the MPAA, can you identify it again as a |
| 10:52 | 24 | document consisting of an E-mail chain in which |
| 10:52 | 25 | you are a participant in and around September, |

10:53    1    2006?

10:53    2         A.    Yes.

10:53    3         Q.    And based on that, can you confirm

10:53    4    that your discussions with YouTube regarding

10:53    5    instituting possibly filtering systems

10:53    6    continued into September, 2006?

10:53    7         A.    Yes, I can.

10:53    8         Q.    Now, if you look at the very last

10:53    9    E-mail on the chain, you'll see that Mr. Maxcy,

10:53    10   Chris Maxcy, wrote to you on and about

10:53    11   September 25th.  "We are very close to getting

10:53    12   our fingerprinting systems licensed and wanted

10:53    13   to take you up on your offer to do some testing

10:53    14   of your members."  Do you see that?

10:53    15        A.    It says testing for your members.  I

10:53    16   don't know if that makes a difference but.

10:53    17        Q.    You're right.  Thank you for that.

10:53    18   But the question that I have for you, as you

10:53    19   sit here today, do you recall which

10:53    20   fingerprinting system Mr. Maxcy advised you

10:53    21   they were very close to licensing as of the end

10:54    22   of September, 2006?

10:54    23        MR. MCGILL:  Objection to the

10:54    24   characterization of the document.

10:54    25        A.    I don't recall.

10:54    1         BY MR. BASKIN:

10:54    2       Q.   Now, I could represent to you that

10:54    3   YouTube, the acquisition of YouTube by Google

10:54    4   for approximately $1.7 billion was announced in

10:54    5   early October, 2006 and my question for you is,

10:54    6   sir, am I correct that this testing described

10:54    7   by Mr. Maxcy on Garfield Exhibit 3 did not

10:54    8   occur as of October, 2006; is that correct,

10:54    9   sir?

10:54   10        MR. MCGILL:  Objection.  Lacks

10:54   11   foundation.

10:54   12       A.   We did not engage in a testing with

10:55   13   them as of October, 2006.

10:55   14        BY MR. BASKIN:

10:55   15       Q.   So just so the record is clear, for

10:55   16   the ladies and gentlemen of the jury, in the

10:55   17   six or seven months between April, 2006, which

10:55   18   was I believe the date on Garfield Exhibit 1

10:55   19   and October, 2006, did YouTube ever agree to

10:55   20   use available filtering technologies to protect

10:55   21   the film industry's content on its website?

10:55   22        MR. MCGILL:  Objection to form.  Also

10:55   23   lacks foundation.

10:55   24       A.   I'm sorry.  Could you read the

10:55   25   question back?

10:55  1          BY MR. BASKIN:

10:55  2          Q.    In the six months between the time

10:55  3     you started the negotiations in April until the

10:55  4     acquisition by Google in October, and we're

10:55  5     going get to what happened post acquisition,

10:55  6     would it be fair to say that YouTube never

10:56  7     agreed to use available fingerprinting

10:56  8     technologies on its website to protect the

10:56  9     MPAA's members in intellectual property?

10:56  10         MR. MCGILL:  Same objections.

10:56  11         A.    To the best of my knowledge they had

10:56  12    not agreed to do that.

10:56  13         BY MR. BASKIN:

10:56  14         Q.    Now, in fact in the course of your

10:56  15    negotiations with YouTube prior to the

10:56  16    acquisition by Google, did you have a

10:56  17    conversation with YouTube executives on the

10:56  18    topic of why they would not filter?

10:56  19         MR. MCGILL:  Objection.  Lacks

10:56  20    foundation.

10:56  21         A.    We had multiple conversations about

10:56  22    that topic.  Yes.

10:56  23         BY MR. BASKIN:

10:56  24         Q.    And do you recall prior to October

10:56  25    2006 -- strike that.  Can you describe to the

| | | |
|---|---|---|
| 10:55 | 1 | BY MR. BASKIN: |
| 10:55 | 2 | Q.    In the six months between the time |
| 10:55 | 3 | you started the negotiations in April until the |
| 10:55 | 4 | acquisition by Google in October, and we're |
| 10:55 | 5 | going get to what happened post acquisition, |
| 10:55 | 6 | would it be fair to say that YouTube never |
| 10:56 | 7 | agreed to use available fingerprinting |
| 10:56 | 8 | technologies on its website to protect the |
| 10:56 | 9 | MPAA's members in intellectual property? |
| 10:56 | 10 | MR. MCGILL:  Same objections. |
| 10:56 | 11 | A.    To the best of my knowledge they had |
| 10:56 | 12 | not agreed to do that. |
| 10:56 | 13 | BY MR. BASKIN: |
| 10:56 | 14 | Q.    Now, in fact in the course of your |
| 10:56 | 15 | negotiations with YouTube prior to the |
| 10:56 | 16 | acquisition by Google, did you have a |
| 10:56 | 17 | conversation with YouTube executives on the |
| 10:56 | 18 | topic of why they would not filter? |
| 10:56 | 19 | MR. MCGILL:  Objection.  Lacks |
| 10:56 | 20 | foundation. |
| 10:56 | 21 | A.    We had multiple conversations about |
| 10:56 | 22 | that topic.  Yes. |
| 10:56 | 23 | BY MR. BASKIN: |
| 10:56 | 24 | Q.    And do you recall prior to October |
| 10:56 | 25 | 2006 -- strike that.  Can you describe to the |

10:56   1   ladies and gentlemen of the jury as best you

10:57   2   can recall what reason you were given by

10:57   3   YouTube executives or executive, and we'll hash

10:57   4   out who that was in a second, as to why they

10:57   5   were not filtering in and around in 2006.

10:57   6           MR. MCGILL: Again objection. Lacks

10:57   7   foundation.

10:57   8         A.     So just if I can disaggregate that a

10:57   9   bit. There were ups and flows in the

10:57   10   conversation with YouTube where they at various

10:57   11   points in time over that six-month period, I

10:57   12   think it was expressed an interest but never

10:57   13   came to a firm agreement on integrating any

10:57   14   content recognition or fingerprinting

10:57   15   technologies.

10:57   16       At some point in those discussions when

10:57   17   asked what's taking so long and why hasn't this

10:57   18   progressed to an actual agreement, there were a

10:58   19   range of reasons given including the fact that

10:58   20   the copyrighted content on YouTube was a major

10:58   21   lure for their users. I don't remember the

10:58   22   exact date of that conversation, but I firmly

10:58   23   recall that conversation and that being one of

10:58   24   the reasons offered.

10:58   25       I do also recall that there were

10:58  1    additional reasons.  I don't recall what all of

10:58  2    those other reasons were but that one stood out

10:58  3    in my mind.

10:58  4              BY MR. BASKIN:

10:58  5         Q.    And who communicated to you as best

10:58  6    you can recall that a reason for not signing up

10:58  7    with filtering was because copyrighted content

10:58  8    on YouTube website was serving as a lure for

10:58  9    the users?

10:58  10             MR. MCGILL:  Objection.

10:58  11   Mischaracterization.

10:58  12        A.    My conversations with YouTube often

10:58  13   included multiple people, so I don't recall

10:58  14   specifically.  I do recall that in that

10:58  15   conversation I think Zahavah Levine and Steve

10:59  16   Chen were a part of that discussion.  And I

10:59  17   also recall that there was a third person who

10:59  18   was a technology, someone with a technology

10:59  19   expertise.

10:59  20         I don't recall which person specifically

10:59  21   said that but I do recall very strongly that

10:59  22   that was one of the reasons offered.  It stood

10:59  23   out in my mind.

10:59  24             BY MR. BASKIN:

10:59  25        Q.    Now, do you recall whether among the

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

| | | |
|---|---|---|
| 10:59 | 1 | other reasons that you mentioned being recited |
| 10:59 | 2 | to you was the notion that having copyrighted |
| 10:59 | 3 | content on their website provided YouTube with |
| 11:00 | 4 | a leverage in its negotiations with the movie |
| 11:00 | 5 | studios? |
| 11:00 | 6 | MR. MCGILL:  Objection.  Leading. |
| 11:00 | 7 | A.    I don't recall. |
| 11:00 | 8 | BY MR. BASKIN: |
| 11:00 | 9 | Q.    Now, after Google's acquisition of |
| 11:00 | 10 | YouTube, again I represent to you it happened |
| 11:00 | 11 | in October, 2006, it was announced at least I |
| 11:00 | 12 | think, the merger was consummated thereafter |
| 11:00 | 13 | but it was announced in early October, 2006. |
| 11:00 | 14 | Did you engage in discussions with |
| 11:00 | 15 | YouTube/Google on the topic of instituting, |
| 11:00 | 16 | filtering or fingerprinting on the YouTube |
| 11:00 | 17 | website? |
| 11:00 | 18 | A.    Close to the acquisition or the |
| 11:00 | 19 | announcement yes.  Absolutely. |
| 11:00 | 20 | MR. BASKIN:  Just so we can date |
| 11:00 | 21 | things and put a little flesh on the bones, let |
| 11:00 | 22 | me show you what we will mark as Garfield |
| 11:01 | 23 | Exhibit 4. |
| 11:01 | 24 | (Garfield Deposition Exhibit No. 4 was marked |
| 11:01 | 25 | for identification.) |

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

11:03  1          A.    Okay.

11:03  2                BY MR. BASKIN:

11:03  3          Q.    Mr. Garfield, first once again can

11:03  4    you identify for us Garfield Exhibit 4 as

11:03  5    consisting of an E-mail and attachment or an

11:03  6    adjunct of an E-mail that was sent by you to

11:03  7    Mr. Maxcy at YouTube in and around October 12,

11:03  8    2006?

11:03  9          A.    Yes, I can.

11:03  10         Q.    Now, by the way, did Mr. Maxcy ever

11:04  11   tell you how it felt to be rich?

11:04  12         A.    I don't recall.  I recall that we

11:04  13   had some phone conversation but it was largely

11:04  14   in jest.

11:04  15         Q.    Now, you will see attached at the

11:04  16   bottom of Garfield Exhibit 4 there is something

11:04  17   called denominated as a proposal through

11:04  18   October 13, 2006 copyright identification and

11:04  19   filtering pilot test.  Do you see that, sir?

11:04  20         A.    I do.

11:04  21         Q.    Was this a test and a proposal that

11:04  22   you were proffering to Google and YouTube in or

11:04  23   around October, 2006?

11:04  24         A.    Yes.

11:04  25         Q.    Can you in your own words maybe in

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

| | | |
|---|---|---|
| 11:04 | 1 | laymen's language explain to the ladies and |
| 11:04 | 2 | gentlemen of the jury what were the basic |
| 11:05 | 3 | content of this proposal that you proffered to |
| 11:05 | 4 | YouTube and Google in and around October, 2006? |
| 11:05 | 5 | MR. MCGILL: Objection. The document |
| 11:05 | 6 | speaks for itself? |
| 11:05 | 7 | A. As I mentioned before, the way |
| 11:05 | 8 | content recognition technologies generally work |
| 11:05 | 9 | at a high level is just like fingerprinting. |
| 11:05 | 10 | So with the fingerprint, you take a |
| 11:05 | 11 | fingerprint, that fingerprint is connected with |
| 11:05 | 12 | a particular person. |
| 11:05 | 13 | In simplified terms the same content works |
| 11:05 | 14 | with consent recognition which is take a |
| 11:05 | 15 | digital fingerprint of a file and that's |
| 11:05 | 16 | associated with that file, that has a name. |
| 11:05 | 17 | And the idea was integrating that same, those |
| 11:05 | 18 | same technologies into the publication process |
| 11:05 | 19 | at YouTube/Google. |
| 11:05 | 20 | So as we understood in advance of a file |
| 11:05 | 21 | making it up on the site after a user submits |
| 11:05 | 22 | it, YouTube engaged in certain processes and we |
| 11:06 | 23 | were suggesting simply integrating content |
| 11:06 | 24 | recognition into those processes as a way of |
| 11:06 | 25 | recognizing and then removing unless they were |

11:06    1    otherwise licensed, copyrighted motion picture

11:06    2    content.

11:06    3       Q.    Now, if I could direct your

11:06    4    attention in particular to the second page of

11:06    5    Garfield Exhibit 4, there's reference to MPAA

11:06    6    test.  Do you see that, sir?

11:06    7       A.    Correct.

11:06    8       Q.    And in particular the proposed test

11:06    9    contemplated using Audible Magic's music

11:06    10    filtering service in the test.  Had you learned

11:06    11    by then that that was the fingerprinting

11:06    12    technology that Google and YouTube were

11:06    13    instituting or had a license institute on the

11:07    14    site?

11:07    15       MR. MCGILL:  Objection.

11:07    16    Mischaracterization of the document.

11:07    17       A.    I did learn at some point in time

11:07    18    that Audible Magic and YouTube had a business

11:07    19    relationship and that YouTube was working with

11:07    20    Audible Magic.  I don't recall the exact date

11:07    21    and this document doesn't help me to recall.

11:07    22       BY MR. BASKIN:

11:07    23       Q.    Do you recall, it's not in the

11:07    24    document, maybe you have an independent

11:07    25    recollection, do you recall approximately the

| | | |
|---|---|---|
| 11:06 | 1 | otherwise licensed, copyrighted motion picture |
| 11:06 | 2 | content. |
| 11:06 | 3 | Q. Now, if I could direct your |
| 11:06 | 4 | attention in particular to the second page of |
| 11:06 | 5 | Garfield Exhibit 4, there's reference to MPAA |
| 11:06 | 6 | test. Do you see that, sir? |
| 11:06 | 7 | A. Correct. |
| 11:06 | 8 | Q. And in particular the proposed test |
| 11:06 | 9 | contemplated using Audible Magic's music |
| 11:06 | 10 | filtering service in the test. Had you learned |
| 11:06 | 11 | by then that that was the fingerprinting |
| 11:06 | 12 | technology that Google and YouTube were |
| 11:06 | 13 | instituting or had a license institute on the |
| 11:07 | 14 | site? |
| 11:07 | 15 | MR. MCGILL: Objection. |
| 11:07 | 16 | Mischaracterization of the document. |
| 11:07 | 17 | A. I did learn at some point in time |
| 11:07 | 18 | that Audible Magic and YouTube had a business |
| 11:07 | 19 | relationship and that YouTube was working with |
| 11:07 | 20 | Audible Magic. I don't recall the exact date |
| 11:07 | 21 | and this document doesn't help me to recall. |
| 11:07 | 22 | BY MR. BASKIN: |
| 11:07 | 23 | Q. Do you recall, it's not in the |
| 11:07 | 24 | document, maybe you have an independent |
| 11:07 | 25 | recollection, do you recall approximately the |

| | | |
|---|---|---|
| 11:07 | 1 | cost of engaging in this test what it would |
| 11:07 | 2 | have cost YouTube and Google to use Audible |
| 11:07 | 3 | Magic's service for purposes of this test? |
| 11:07 | 4 | MR. MCGILL: Objection. Calls for |
| 11:07 | 5 | speculation. |
| 11:07 | 6 | A. I don't recall the call structure |
| 11:07 | 7 | for Audible Magic. I knew it at one point but |
| 11:07 | 8 | I don't recall what it was, but my recollection |
| 11:07 | 9 | was at some point we spoke to YouTube/Google |
| 11:08 | 10 | about us deferring the cost. |
| 11:08 | 11 | In fact in the memo one of the things that |
| 11:08 | 12 | it points out is minimizing the out-of-pocket |
| 11:08 | 13 | expense. So I know that I was always mindful |
| 11:08 | 14 | of not just with YouTube but with all of our |
| 11:08 | 15 | and my overtures to use a generated sites like |
| 11:08 | 16 | YouTube was to make sure that whatever we |
| 11:08 | 17 | propose were dealing with copyright |
| 11:08 | 18 | infringement was cost efficient for the site, |
| 11:08 | 19 | if you will. So not adding a significant, new |
| 11:08 | 20 | expense to their operating cost and that was |
| 11:08 | 21 | the same in this context with YouTube. |
| 11:08 | 22 | Q. And I'm going to show you in a |
| 11:09 | 23 | second a second iteration from this proposal |
| 11:09 | 24 | from about a month later. Do you recall |
| 11:09 | 25 | whether your offer to have the MPAA defray the |

BY MR. BASKIN:

Q.    Nothing further except for one line
in the document.  If you turn in the middle of
the first page you will see that Mr. Kelly
Liang wrote, "We look forward to launching a
content filtering pilot with the MPAA some time
towards the end of the year."  Do you see that,
Mr. Garfield?

MR. MCGILL:  Objection.  Document
speaks for itself.

A.    Yes, I do see that.

BY MR. BASKIN:

Q.    And do you remember who Mr. Liang
was at this point in time?  I think he was
introduced in an earlier E-mail?

A.    I do recall.  My recollection was
that Chris transitioned some of the
conversation and his involvement to Kelly who
in addition to I think having some business
role also had some technical expertise and so
there were other folks from Google/YouTube who
continued to be a part of the conversation but
Kelly helped to drive a lot of it over this
ladder part of the year.

MR. BASKIN:  Now, in that period, I'd

11:18   1    like to show you next what we will mark as

11:18   2    Garfield Exhibit 7.

11:18   3        (Garfield Deposition Exhibit No. 7 was marked

11:20   4                for identification.)

11:20   5        A.    I traveled a lot when I worked at

11:20   6    the MPAA, that's clear from these E-mails.  So

11:20   7    I'm ready.  I have reviewed it.

11:20   8                MR. BASKIN:  You mean you physically

11:20   9    traveled to --

11:20   10       A.    Yes.  Every evening it says I'm on

11:20   11   the road or I'm traveling here or traveling

11:20   12   there.

11:20   13               BY MR. BASKIN:

11:20   14       Q.    First, can you identify for us

11:20   15   Garfield Exhibit 7 as an E-mail and

11:20   16   accompanying proposal that you E-mailed to

11:21   17   Kelly Liang in and around November 8, 2006?

11:21   18       A.    Yes.

11:21   19       Q.    Now, based on the E-mail paragraph

11:21   20   beginning Hi Kelly, it makes reference to "I am

11:21   21   attaching below a revised proposal based on our

11:21   22   last discussion as well as the RFI we

11:21   23   discussed."  Do you see that, sir?

11:21   24       A.    I do.

11:21   25       Q.    Can you just explain, first of all

11:21  1    to the ladies and gentlemen of the jury, what

11:21  2    the reference to RFI is?

11:21  3        A.    The reference to RFI is a reference

11:21  4    to a request for information and I don't know

11:21  5    if that's an apt term, it's a term that we used

11:21  6    at the time.  It was really a request for

11:21  7    proposals in around that time the MPAA

11:22  8    sponsored and ran a request for proposals

11:22  9    around content recognition technologies.

11:22  10        Q.    And as you sit here now, other than

11:22  11    the reference in that paragraph do you recall

11:22  12    the proposal dated November 9, 2006 was a

11:22  13    result of your discussions with Mr. Liang?

11:22  14        A.    Yes.  There were changes in the

11:22  15    document that reflect our conversation and some

11:22  16    of those changes are reflected in the end of

11:22  17    the document.

11:22  18        Q.    For example, if you turn to page

11:22  19    that's Bates, the second page of the document,

11:22  20    it appears that the test period from the first

11:22  21    proposal to the second has grown from 30 to 45

11:22  22    days.  Is that one of the changes that you were

11:22  23    just referring?

11:22  24        A.    Yes, it is, as well as coming up

11:22  25    with Key Metrics, which I recall that YouTube

| | | |
|---|---|---|
| 11:23 | 1 | and Google were interested in and we are were |
| 11:23 | 2 | as well, so it wasn't a huge deal to agree |
| 11:23 | 3 | that's something that should be included. |
| 11:23 | 4 | Q. Can you tell again the ladies and |
| 11:23 | 5 | gentlemen of the jury what you mean by Key |
| 11:23 | 6 | Metrics, what that phrase refers to? |
| 11:23 | 7 | A. It was an attempt to have clarity |
| 11:23 | 8 | going into the pilot and how we would evaluate |
| 11:23 | 9 | whether the tests worked and were successful, |
| 11:23 | 10 | and so defining the measurements up front would |
| 11:23 | 11 | prevent misunderstandings midway or after the |
| 11:23 | 12 | pilot. |
| 11:23 | 13 | Q. Now, there is a reference under test |
| 11:23 | 14 | parameters one of the metrics was number |
| 11:23 | 15 | fingerprints generated from manual review |
| 11:23 | 16 | (blacklist and white list). Do you see that? |
| 11:24 | 17 | A. I do. |
| 11:24 | 18 | Q. The reference to blacklist or white |
| 11:24 | 19 | list was also found in a couple of bullet |
| 11:24 | 20 | points above that you'll see as well. Can you |
| 11:24 | 21 | explain to the ladies and gentlemen of the jury |
| 11:24 | 22 | what was meant by blacklist and white list? |
| 11:24 | 23 | MR. MCGILL: Objection. Calls for |
| 11:24 | 24 | speculation. |
| 11:24 | 25 | A. I was the one who was largely |

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

11:24  1    drafting this document, so I can tell you how I

11:24  2    was using the terminology.  So there I guess

11:24  3    there are multiple ways but two popular ways of

11:24  4    dealing with recognizing content and then

11:24  5    filtering it in or out.  So the filtering

11:24  6    process is essentially like a strainer and so

11:24  7    you have content going through the strainer;

11:24  8    some things make it through the strainer and

11:24  9    some things end up being caught in the

11:25  10    strainer.

11:25  11         If you take a blacklist approach, then you

11:25  12    identify a list of stuff that should be

11:25  13    excluded out and that should be caught in the

11:25  14    strainer.  If you take a white list approach,

11:25  15    you create a list of stuff that should make it

11:25  16    true as opposed to a list that should be kept

11:25  17    out.  That's the blacklist versus white list.

11:25  18    Was that clear?

11:25  19         Q.    Well, we're going to go into it a

11:25  20    little bit more but it was certainly a good

11:25  21    first articulation.  So let's take it a little

11:25  22    bit further.  If I understand your answer, you

11:25  23    were saying that the blacklist would consist of

11:25  24    fingerprints of videos which the studios would

11:25  25    disapprove for uploading and hence would be

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

11:25  1    captured by the strainer; is that correct, sir?

11:25  2         A.    Correct.

11:25  3         Q.    And by contrast, the white list

11:25  4    would consist of fingerprints of videos which

11:26  5    the studios authorized or approved for

11:26  6    uploading and hence, they would pass through

11:26  7    the strainer; is that correct?

11:26  8         A.    Correct.

11:26  9         Q.    Why might a studio choose to have a

11:26  10   white list, have it placed on a white list --

11:26  11   strike that.  Why might a studio choose to have

11:26  12   placed on a white list videos that were

11:26  13   authorized to be uploaded on the website?

11:26  14        A.    Well, I can just tell you what I

11:26  15   knew based on my using the language which is

11:26  16   that there were, it was simply a recognition of

11:26  17   fact that the studios were authorizing and

11:27  18   doing deals with sites like YouTube, Google

11:27  19   where they would authorize certain content to

11:27  20   be used.

11:27  21        So in order for this to be effective so as

11:27  22   not to train out or eliminate content that the

11:27  23   studios actually wanted to make available on

11:27  24   any of these sites, we would have that approach

11:27  25   of having a white list.

11:27  1        Q.    So to sort of sum up for the jury,

11:27  2    the second proposal after your discussions with

11:27  3    Mr. Liang contemplated that this fingerprinting

11:27  4    and filtering technology would be used to

11:27  5    distinguish between videos that were uploaded

11:27  6    with authorization and videos that should be

11:27  7    blocked because they were uploaded without

11:27  8    authorization; is that correct?

11:27  9        MR. MCGILL:  Objection to the

11:27  10   characterization and the leading nature.

11:27  11       A.    I'm sorry.  I just misheard you.

11:27  12   Could you just say it again?  I just want to

11:28  13   make sure I heard you properly?

11:28  14       BY MR. BASKIN:

11:28  15       Q.    This proposal as of November, 2006

11:28  16   contemplated using fingerprinting and filtering

11:28  17   technology to distinguish between videos that

11:28  18   were being uploaded with the permission of the

11:28  19   studios versus videos that were being uploaded

11:28  20   without authorization and permission?

11:28  21       MR. MCGILL:  Same objection.

11:28  22       A.    Yes.  Correct.  That was the

11:28  23   contemplation.  Just one thing on Kelly Liang.

11:28  24   We've been saying mister.  I don't recall if

11:28  25   Kelly is a man or a woman.  Sorry.

6aae5b97-da0d-45e9-bdd3-aa65af92aafa

| | | |
|---|---|---|
| 11:37 | 1 | pilot and their filtering processes would be |
| 11:37 | 2 | used for their business partners and those who |
| 11:37 | 3 | established a licensing relationship with |
| 11:37 | 4 | Google/YouTube but not with the studios |
| 11:37 | 5 | generally. |
| 11:37 | 6 | BY MR. BASKIN: |
| 11:38 | 7 | Q. The jury may not understand what you |
| 11:38 | 8 | mean or what they meant by the fact that the |
| 11:38 | 9 | technology, the filtering technology would be |
| 11:38 | 10 | reserved for their business or licensing |
| 11:38 | 11 | partners. Can you explain to the ladies and |
| 11:38 | 12 | gentlemen of the jury what that means, sir? |
| 11:38 | 13 | What was meant by licensing and business |
| 11:38 | 14 | partners? |
| 11:38 | 15 | A. The way I interpreted it was we were |
| 11:38 | 16 | having a conversation earlier about the white |
| 11:38 | 17 | list and the blacklist and filtering and |
| 11:38 | 18 | filtering out. The studios developed, marketed |
| 11:38 | 19 | movies, television shows, they then make a |
| 11:38 | 20 | decision on partners with whom they're going to |
| 11:38 | 21 | exploit those copyrighted works, so market and |
| 11:38 | 22 | distribute those copyrighted works. |
| 11:39 | 23 | So Google essentially conveyed that they |
| 11:39 | 24 | would work on getting authorization from the |
| 11:39 | 25 | studios and licenses from the studios and |

| | | |
|---|---|---|
| 11:39 | 1 | others and those who would license, they would |
| 11:39 | 2 | then in the context of that licensing |
| 11:39 | 3 | arrangement work in integrate filtering.  But |
| 11:39 | 4 | for those companies who were not and did not |
| 11:39 | 5 | develop a licensing arrangement with Google, |
| 11:39 | 6 | they weren't going to be doing this sort of a |
| 11:39 | 7 | pilot initiative or filtering. |
| 11:39 | 8 | MR. BASKIN:  I think we have to break |
| 11:39 | 9 | for the tape.  Shall we break for the tape now? |
| 11:39 | 10 | THE VIDEO OPERATOR:  This is the end |
| 11:39 | 11 | of tape 1.  Off the record at 11:39. |
| 11:49 | 12 | This is the beginning of tape 2 in the |
| 11:49 | 13 | deposition of Mr. Garfield.  On the record at |
| 11:49 | 14 | 11:49. |
| 11:49 | 15 | BY MR. BASKIN: |
| 11:50 | 16 | Q.    Sir, again to help you with the |
| 11:50 | 17 | dates a little bit.  Let me show you what we |
| 11:50 | 18 | will mark as Garfield Exhibit 10. |
| 11:50 | 19 | (Garfield Deposition Exhibit No. 10 was marked |
| 11:51 | 20 | for identification.) |
| 11:51 | 21 | A.    Okay.  I have read it. |
| 11:51 | 22 | BY MR. BASKIN: |
| 11:51 | 23 | Q.    Sir, first, again can you identify |
| 11:51 | 24 | for us Garfield Exhibit 10 as consisting of an |
| 11:51 | 25 | E-mail chain in which you were a participant |

1  12:11 date?

2  12:11      A.      Just to be clear, I left the MPAA in

3  12:11 at the end of 2008, so it was about a year, a

4  12:11 little over a year after the case was filed I

5  12:11 was gone.  So we talked about it intermittently

6  12:11 but it wasn't a constant topic of conversation

7  12:11 and the MPAA wasn't involved in the litigation,

8  12:11 so there wasn't a reason for me to talk about

9  12:11 it a lot or frequently.

10  12:11      Q.      I take it the reason that you have

11  12:11 spoken with him on occasion about it was

12  12:11 because Paramount pictures was one of the

13  12:11 member studios of the MPAA; is that correct?

14  12:11      A.      Correct.  Correct.

15  12:11      Q.      And I think we established this

16  12:11 already, Paramount is owned by Viacom?

17  12:11      A.      Correct.

18  12:11      Q.      I think you testified earlier that

19  12:11 your position at the MPAA was executive vice

20  12:11 president but did you also hold the title of

21  12:11 chief strategic officer?

22  12:11      A.      Yes, I did.

23  12:11      Q.      And when did you get that title if

24  12:12 you can recall?

25  12:12      A.      My recollection was that it was

1    12:12 late -- I would like to say it was late 2005

2    12:12 but I really don't recall.  I'm sorry.

3    12:12     Q.    Now, putting aside the specific

4    12:12 issue of this litigation I take it that in your

5    12:12 capacity as chief strategic officer for the

6    12:12 MPAA you were in regular communication with

7    12:12 Viacom about copyright enforcement issues; is

8    12:12 that fair to say?

9    12:12     A.    Yes.  That's fair to say.

10   12:12     Q.    And what are some of the topics that

11   12:12 you would discuss within that overall framework

12   12:12 with Viacom?

13   12:12          MR. KLAUS:  I would just caution you

14   12:12 that in the course of your communications with

15   12:12 Viacom, to the extent those reflect privileged

16   12:12 communications you should not reveal them and

17   12:12 if you have a question about how far down from

18   12:13 the very general topic of copyright enforcement

19   12:13 do some specific topics go, that's something we

20   12:13 can step outside and try to disentangle.

21   12:13          MR. MCGILL:  Just to make sure the

22   12:13 record is clear, your position is that any

23   12:13 privileged information that was related to

24   12:13 Viacom from the MPAA would retain its

25   12:13 privileged nature?