UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC.               )
TELEVISION, INC., PARAMOUNT            )
PICTURES CORPORATION, and BLACK        )
ENTERTAINMENT TELEVISION, LLC,         )
                                       )
                 Plaintiffs,           )
                                       )
vs.                                    )  NO. 07-CV-2203
                                       )
YOUTUBE, INC., YOUTUBE, LLC,           )
and GOOGLE, INC.,                      )
                                       )
                 Defendants.           )
_____)
                                       )
THE FOOTBALL ASSOCIATION PREMIER       )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all        )
others similarly situated,             )
                                       )
                 Plaintiffs,           )
vs.                                    )  NO. 07-CV-3582
                                       )
YOUTUBE, INC., YOUTUBE, LLC, and       )
GOOGLE, INC.,                          )
                                       )
                 Defendants.           )
_____)

HIGHLY CONFIDENTIAL
VIDEOTAPED DEPOSITION OF OMID KORDESTANI
SAN FRANCISCO, CALIFORNIA
THURSDAY, FEBRUARY 12, 2009

BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
JOB NO. 16382

1          FEBRUARY 12, 2009

2            9:33 A.M.

3

4     HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF

5     OMID KORDESTANI, at SHEARMAN & STERLING,

6     525 Market Street, 15th Floor, San Francisco

7     California pursuant to notice, before me,

8     ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR, CSR

9     License No. 9830.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A P P E A R A N C E S:

2

3        FOR THE PLAINTIFFS VIACOM INTERNATIONAL INC.:

4            JENNER & BLOCK, LLP

5            By:  SUSAN J. KOHLMANN, Esq.

6                 ERIC HAREN, Esq.

7            919 Third Avenue, 27th Floor

8            New York, New York 10022-3908

9            (212) 891-1690  skohlmann@jenner.com

10

11       FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE, LLC and

12       GOOGLE, INC.:

13           MAYER BROWN, LLP

14           By:  JOHN MANCINI, Esq.

15           1675 Broadway

16           New York, New York 10019

17           (212) 506-2146  jmancini@mayer.com

18

19           WILSON SONSINI GOODRICH & ROSATI

20           By:  CAROLINE WILSON, Esq.

21           650 Page Mill Road

22           Palo Alto, California 94304-1050

23           (650) 320-4741 cwilson@wsgr.com

24

25

1        A P P E A R A N C E S:  (Continued.)

2

3           FOR THE LEAD PLAINTIFFS AND PROSPECTIVE CLASS:

4               BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

5               By:  BENJAMIN GLADSTON, Esq.

6               12481 High Bluff Drive, Suite 300

7               San Diego, California 92130-3188

8               (858) 720-3188  beng@blbglaw.com

9

10          ALSO PRESENT:  Adam Barea, Google, Inc.

11                          Kelly Truelove, Consultant

12                          Lou Meadows, Videographer.

13

14                          ---oOo---

15

16

17

18

19

20

21

22

23

24

25

1          KORDESTANI

2

3               SAN FRANCISCO, CALIFORNIA

4               THURSDAY, FEBRUARY 12, 2009, 9:33 A.M.

5

6   09:34:16          THE VIDEOGRAPHER:  On the record.

7   09:34:17          This is today's videotaped deposition of

8   09:34:22 Omid Kordestani, taken on February 12, 2009, at

9   09:34:28 Shearman & Sterling, 525 Market Street, 15th Floor, in

10  09:34:32 San Francisco, California.  In the matter of Viacom

11  09:34:32 International, Inc., vs. YouTube, Inc., and The

12  09:34:32 Football Premier -- excuse me -- The Football

13  09:34:32 Association Premier League Limited, et al., vs.

14  09:34:44 YouTube, Inc., et al.

15  09:34:44          Case No. 07-CV-2103 and 07-CV-3582, in the

16  09:34:52 United States District Court, for the Southern

17  09:34:54 District of New York.

18  09:34:55          My name is Lou Meadows, and I represent

19  09:34:59 David-Feldman Worldwide.  Located at 600 Anton

20  09:35:05 Boulevard, Suite 1100, in Costa Mesa, California.

21  09:35:07          We are now commencing at 9:33 a.m.

22  09:35:09          Will all present please identify themselves

23  09:35:13 and state whom you represent.

24  09:35:13          MS. KOHLMANN:  Susan Kohlmann from Jenner &

25  09:35:18 Block, representing the Viacom plaintiffs.

1                              KORDESTANI

2   09:35:20        MR. HAREN:  Eric Haren from Jenner & Block,

3   09:35:21 representing the Viacom plaintiffs.

4   09:35:21        MR. GALDSTON:  Benjamin Galdston of Bernstein

5   09:35:24 Litowitz, representing the Premier League and Class

6   09:35:28 plaintiffs.

7   09:35:28        MR. TRUELOVE:  Kelly Truelove, consultants

8   09:35:29 for Viacom plaintiffs.

9   09:35:30        MR. MANCINI:  John Mancini, Mayer Brown,

10  09:35:33 counsel for defendants Google and YouTube.

11  09:35:40        MS. WILSON:  Caroline Wilson from Wilson

12  09:35:41 Sonsini, counsel for defendants Google and YouTube.

13  09:35:41        MR. BAREA:  Adam Barea, Google, Inc.

14  09:35:44        THE VIDEOGRAPHER:  Thank you.

15  09:35:45        We are getting a little bit of BlackBerry

16  09:35:49 transmission.  Somebody forgot.

17  09:35:51        And will the court reporter please administer

18  09:35:52 the oath.  Thank you.

19  09:35:52

20  09:35:52                  OMID KORDESTANI,

21  09:35:53 having been sworn as a witness, testified as follows:

22  09:35:53

23  09:36:07             EXAMINATION BY MS. KOHLMANN

24  09:36:07        MS. KOHLMANN:  Q.  Good morning,

25  09:36:09 Mr. Kordestani.

KORDESTANI

09:43:46    Q    1999.

09:43:47         And were you vice president of business

09:43:50 development when you left Netscape in 1999?

09:43:53    A    Yes.

09:43:53    Q    And when you left Netscape, where did you go?

09:43:57    A    Google.

09:43:58    Q    Okay.  Now, Mr. Kordestani, you're Google's

09:44:05 business founder; are you not?

09:44:07    A    It's a --

09:44:07         MR. MANCINI:  Objection to form.

09:44:09         THE WITNESS:  It's a title that they've

09:44:12 affectionately given me.

09:44:13         MS. KOHLMANN:  Q.  It's on their website --

09:44:16    A    Right.

09:44:16    Q    -- isn't it, on your bio --

09:44:16    A    Yes.

09:44:18    Q    -- correct?

09:44:18         So as Google's business founder, what did --

09:44:21 what did you do to earn that title?  Why did they call

09:44:24 you that?

09:44:27    A    I was the first business executive, business

09:44:29 employee and responsible for building Google's

09:44:31 business operations.

09:44:32    Q    In fact, they say you developed and

1                          KORDESTANI

2  09:44:35 implemented the company's initial business model;

3  09:44:38 isn't that right?

4  09:44:39    A    Yes.

5  09:44:39    Q    Okay.   What was the company's initial

6  09:44:41 business model?

7  09:44:42    A    Licensing our search services and

8  09:44:51 advertising, search advertising.

9  09:44:53    Q    Can you explain to me what you mean by

10 09:44:56 licensing your search services?

11 09:44:59    A    We power search for companies, corporations,

12 09:45:03 and the other websites.

13 09:45:07    Q    Okay.   And the other part of the business

14 09:45:10 model that you developed and implemented was search

15 09:45:13 advertising; is that what you said?

16 09:45:15    A    Yes.

17 09:45:15    Q    So can you explain what search -- what you

18 09:45:18 mean by "search advertising"?

19 09:45:20    A    It's related to advertise on search terms and

20 09:45:26 targets, advertising to users search queries.

21 09:45:38    Q    So correct me if I'm wrong, did you say it's

22 09:45:44 the ability to advertise on search terms and targets?

23 09:45:48    A    And target advertising to users' queries,

24 09:45:50 search queries.

25 09:45:52    Q    Okay.   Okay.

2   09:45:55       So -- and that was the company's initial

3   09:46:00 business model; is that correct?

4   09:46:02    A   Yes.

5   09:46:02    Q   And has that business model changed over

6   09:46:08 time?

7   09:46:08       MR. MANCINI:  Objection; vague.

8   09:46:10       THE WITNESS:  What do you mean by that?

9   09:46:11       MS. KOHLMANN:  Q.  What's the business model

10  09:46:12 today?  Is it different?

11  09:46:13    A   It's primary advertising still today.

12  09:46:15    Q   Search advertising?

13  09:46:17    A   Yes.

14  09:46:17    Q   Advertising where -- on -- on the same --

15  09:46:23 with the same criteria, targeting, targeted

16  09:46:27 advertising with search terms?

17  09:46:30       MR. MANCINI:  Objection; vague.

18  09:46:31       THE WITNESS:  The question is?  What is the

19  09:46:32 question again?

20  09:46:32       MS. KOHLMANN:  Q.  What is the business model

21  09:46:34 today?  And how is it different?

22  09:46:36    A   Majority of our revenue is still from search

23  09:46:38 advertising.

24  09:46:41    Q   And has the way in which the revenue from

25  09:46:45 searches is derived changed at all from when you

1                          KORDESTANI

2   09:46:48 initially created the -- the Google business model?

3   09:46:52        MR. MANCINI:  Objection to form.

4   09:46:53        THE WITNESS:  Has the way -- what do you mean

5   09:46:55 by that?

6   09:46:56        MS. KOHLMANN:  Q.  Are -- are there different

7   09:46:57 ways in which the advertising gets done and you

8   09:46:59 rec- -- you monetize value?

9   09:47:02        MR. MANCINI:  Objection to form.

10  09:47:03        THE WITNESS:  Algorithms and underlying

11  09:47:10 technology has evolved.

12  09:47:12        MS. KOHLMANN:  Q.  And how has it evolved?

13  09:47:16    A    More sophisticated in the way we target

14  09:47:18 advertising, paying attention to quality of ads.

15  09:47:25    Q    And in the time from when you arrived at

16  09:47:29 Google and today, the company acquired DoubleClick;

17  09:47:35 didn't it?

18  09:47:36    A    Yes.

19  09:47:36    Q    And DoubleClick has certain capabilities to

20  09:47:39 enhance the targeting of ads; doesn't it?

21  09:47:42        MR. MANCINI:  Objection; lacks foundation.

22  09:47:43        THE WITNESS:  Could you clarify the question?

23  09:47:47        MS. KOHLMANN:  Q.  Why don't you tell me what

24  09:47:49 DoubleClick added to the equation.

25  09:47:50        MR. MANCINI:  Objection to form.

1                              KORDESTANI

09:47:51    2          MS. KOHLMANN:  You can answer.

09:47:52    3          THE WITNESS:  DoubleClick provides an

09:47:58    4    advertising platform that helps both advertisers and

09:48:04    5    publishers manage their advertising campaigns and

09:48:11    6    advertising yield from their properties better.

09:48:14    7          MS. KOHLMANN:  Q.  How does it enable

09:48:16    8    advertisers to manage the advertising yield from their

09:48:19    9    properties better?

09:48:23    10         A    It -- it -- it -- they have a suit of

09:48:26    11   products for both advertisers and publishers that

09:48:31    12   helps them manage their advertising campaigns online.

09:48:35    13         Q    We'll come back to DoubleClick.

09:48:37    14         So in 1999, when you started at Google, what

09:48:40    15   was your title?

09:48:43    16         A    It would be vice president of sales and

09:48:45    17   business development.

09:48:47    18         Q    And what were your duties and

09:48:50    19   responsibilities?

09:48:52    20         A    Establishing all the revenue operations and

09:48:56    21   customer relationships, partnerships.

09:49:00    22         Q    And did there come a point in time when your

09:49:03    23   title changed?

09:49:06    24         A    I -- I was promoted to senior vice president.

09:49:07    25         Q    Do you know when that was?

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022  (212)705-8585

|   |   |
|---|---|
| | 1 |

KORDESTANI

09:49:10　　2　　　A　　Don't remember the exact date.

09:49:11　　3　　　Q　　Okay.　Any other titles that you've held

09:49:15　　4　　while at Google?

09:49:19　　5　　　A　　The title may have slightly changed to sales

09:49:22　　6　　and operations, but it's basically worldwide sales and

09:49:27　　7　　operations and business development.

09:49:29　　8　　　Q　　Okay.　Setting aside the titles --

09:49:31　　9　　　A　　Yeah.

09:49:31　　10　　　Q　　-- for a moment, how has your job changed

09:49:34　　11　　over the course of the last ten years?

09:49:37　　12　　　　　　MR. MANCINI:　Objection to form.

09:49:38　　13　　　　　　THE WITNESS:　Could you clarify the question?

09:49:40　　14　　　　　　MS. KOHLMANN:　Q.　Well, do you do today what

09:49:41　　15　　you did in 1999?

09:49:44　　16　　　A　　Pretty much.

09:49:45　　17　　　Q　　Are there any added responsibilities since

09:49:47　　18　　you started with the company in 1999?

09:49:51　　19　　　A　　The company has got larger operations, have

09:49:54　　20　　become larger, but the fundamental job is the same.

09:49:58　　21　　　Q　　Do you get involved in, for example,

09:50:00　　22　　acquisitions?

09:50:01　　23　　　　　　MR. MANCINI:　Objection to form.

09:50:03　　24　　　　　　THE WITNESS:　I'm not directly involved for

09:50:05　　25　　acquisitions.

1                          KORDESTANI

10:02:44   2        MS. KOHLMANN:   Q.   From the time you started

10:02:46   3    in 1999 'til three months ago when it became the

10:02:51   4    operating committee, what was the function of the

10:02:56   5    Executive Management Group?

10:02:57   6        A    It's -- it's Eric Schmidt, senior of staff

10:03:03   7    meeting.

10:03:04   8        Q    And how often did the Executive Management

10:03:08   9    Group meet?

10:03:09   10       A    Once a week.

10:03:16   11       Q    And was that an in-person meeting or a

10:03:18   12   telephone conference?

10:03:20   13       A    Primarily in person.   Some people travel,

10:03:23   14   sometimes call in.

10:03:24   15       Q    And were agendas prepared for those meetings?

10:03:28   16       A    Yes.

10:03:28   17       Q    And were there sometimes presentations made

10:03:35   18   at the meetings?

10:03:37   19       A    Yes.

10:03:37   20       Q    And if there was an action to be taken at the

10:03:43   21   company, such as a change in policy, was that brought

10:03:47   22   before the Executive Management Group?

10:03:50   23       MR. MANCINI:   Objection to form.

10:03:51   24       THE WITNESS:   Depends how -- how -- if

10:03:58   25   they're important, the discussion of that policy was.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022   (212)705-8585

|        |    | KORDESTANI |
|--------|----|---|

10:04:00  2    MS. KOHLMANN:  Okay.

10:04:01  3    Q   Who prepared the agenda?

10:04:04  4    A   Typically Eric, and others contributed to

10:04:08  5    items for discussion.

10:04:09  6    Q   Did you, at times, contribute items for

10:04:12  7    discussion?

10:04:12  8    A   Yes.

10:04:12  9    Q   How were the agendas distributed?  On e-mail?

10:04:16  10   A   On e-mail.

10:04:17  11   Q   And were notes taken of the EMG meetings?

10:04:24  12   A   Typically it's -- I'm not an official note

10:04:29  13   taker, but typically, you know, you would take notes,

10:04:31  14   depending on your -- your interest, your area.

10:04:35  15   Q   So each individual member --

10:04:37  16   A   Yeah.

10:04:37  17   Q   -- of the EMG took notes?

10:04:40  18   A   Yeah.

10:04:40  19   Q   But there were no notes taken of the meeting

10:04:42  20   that were saved in any particular way?

10:04:45  21   MR. MANCINI:  Objection to characterization.

10:04:46  22   MS. KOHLMANN:  Q.  As far as you're aware?

10:04:48  23   A   There -- there were not an official notes,

10:04:50  24   other than, you know, action items from the meeting.

10:04:52  25   Q   And were the action items something that each

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022   (212)705-8585

KORDESTANI

| | | |
|---|---|---|
| 10:04:54 | 2 | individual prepared or action items were prepared and |
| 10:04:58 | 3 | came out of the meeting? |
| 10:05:00 | 4 | MR. MANCINI: Objection to form. |
| 10:05:01 | 5 | THE WITNESS: What do you mean coming out of |
| 10:05:05 | 6 | the meeting? |
| 10:05:05 | 7 | MS. KOHLMANN: Q. When you say action |
| 10:05:06 | 8 | items -- |
| 10:05:06 | 9 | A Yeah. |
| 10:05:07 | 10 | Q -- were generally prepared, who prepared the |
| 10:05:09 | 11 | action items? |
| 10:05:10 | 12 | A Discussed in the meeting, and Eric's |
| 10:05:12 | 13 | assistant would then keep track of those. |
| 10:05:16 | 14 | Q And would Eric's assistant typically e-mail |
| 10:05:19 | 15 | the action items to the participants in the meeting |
| 10:05:23 | 16 | after the meeting occurred? |
| 10:05:26 | 17 | A It would be typically in the next agenda as |
| 10:05:32 | 18 | a -- as a series of action logs. |
| 10:05:34 | 19 | Q And where are those agendas kept? |
| 10:05:39 | 20 | A They -- they -- I assume it was in -- in |
| 10:05:45 | 21 | e-mail form or in a document that was then printed. |
| 10:05:48 | 22 | Q So -- so, for example, you would have agendas |
| 10:05:52 | 23 | in your own e-mail box that you would have received |
| 10:05:55 | 24 | from any EMG meeting you attended? |
| 10:05:57 | 25 | A Yes. |

1            KORDESTANI

10:05:58    2        Q    It would be an attachment to an e-mail?

10:06:01    3        A    It would be an attachment, or it would be an

10:06:04    4    online document.

10:06:05    5        Q    Okay.  And if they were printed, did you ever

10:06:07    6    print out the agendas?

10:06:10    7        A    Yes.

10:06:10    8        Q    And you would bring it to the meeting with

10:06:12    9    you?

10:06:13    10       A    Typically, yes.

10:06:14    11       Q    And what did you -- did you take notes on the

10:06:16    12   agendas sometimes?

10:06:18    13       A    Yes.

10:06:18    14       Q    And you have files in your office for those

10:06:22    15   agendas?

10:06:22    16       A    No.

10:06:22    17       Q    What do you do with the agendas?

10:06:24    18       A    After I speak with my staff, I usually shred

10:06:29    19   them or put them in a shred box.

10:06:31    20       Q    And that's when you -- sorry.

10:06:32    21       A    Then I put them in a shred box, yeah.

10:06:34    22       Q    Okay.  That's been your practice for the last

10:06:36    23   several years?

10:06:37    24       A    Yes.

10:06:37    25       Q    Has that been your practice in the last year

```
                1                    KORDESTANI
10:06:40        2    as well?
10:06:42        3        A    Absolutely.
10:06:42        4        Q    Did you receive a litigation hold in
10:06:45        5    connection with this action, Mr. Kordestani?
10:06:47        6        A    Yes.
10:06:47        7        Q    And what did that say?
10:06:49        8        A    That if there are any documents in my office
10:06:50        9    or filing cabinets or disks, computers, that all of
10:06:55       10    that has to be made available.
10:06:57       11        Q    Does the litigation hold refer to any
10:07:04       12    obligation to not destroy documents?
10:07:07       13        A    Yes.
10:07:07       14        Q    What does it say with respect to that?
10:07:12       15             MR. MANCINI:  Objection.
10:07:13       16             Are -- have we been allowing testimony about
10:07:16       17    the contents of the litigation hold in this case?
10:07:19       18             MS. KOHLMANN:  Yes, I think so.  I mean, you
10:07:23       19    can take a position one way or the other.  I don't
10:07:26       20    think there's any -- anything privileged about what
10:07:30       21    the litigation hold says, and he's already testified
10:07:33       22    what it said with respect to --
10:07:35       23             MR. MANCINI:  He's -- so I'll -- I'll allow
10:07:38       24    him to answer and preserve the objection.
10:07:40       25             MS. KOHLMANN:  Okay.
```

fb970580-dc85-4292-af65-65ccf487cba5

|  | 1 | KORDESTANI |

10:07:40  2        You can answer.

10:07:41  3        THE WITNESS:  What's the question again?

10:07:47  4        MS. KOHLMANN:  Q.  Did the litigation hold

10:07:51  5   discuss the preservation of documents?  Did the

10:07:59  6   litigation hold say anything about just not destroying

10:08:03  7   documents, to your recollection?

10:08:06  8        A   I believe so, and I immediately inform my

10:08:09  9   assistant and IT folks that we're going to collect all

10:08:14  10  the documentation for our legal department, that all

10:08:15  11  of that be done according to the -- that document.

10:08:19  12       Q   But -- but you nevertheless destroyed the

10:08:21  13  agendas for the EMG after you attended meetings?

10:08:25  14       MR. MANCINI:  Objection.  I think that's an

10:08:26  15  unfair mischaracterization.  He also said --

10:08:28  16       MS. KOHLMANN:  John --

10:08:29  17       MR. MANCINI:  -- he had electronic copies.

10:08:30  18  That's an unfair charac- --

10:08:30  19       MS. KOHLMANN:  -- you are allowed to say

10:08:31  20  objection.

10:08:31  21       MR. MANCINI:  That's unfair.

10:08:32  22       MS. KOHLMANN:  I've allowed you a lot of

10:08:33  23  latitude 'til now.  You're coaching the witness.

10:08:35  24       MR. MANCINI:  I'm not.

10:08:36  25       MS. KOHLMANN:  Please just say "Objection."

fb970580-dc85-4292-af65-65ccf487cba5

KORDESTANI

10:08:37    2        MR. MANCINI: It is an unfair --

10:08:38    3        MS. KOHLMANN: It's going to be a long day.

10:08:40    4        MR. MANCINI: It's an unfair

10:08:41    5    characterization, Susan, of the testimony, and you

10:08:43    6    know it.

10:08:44    7        MS. KOHLMANN: I don't think so, and the

10:08:46    8    record will speak for itself.

10:08:50    9    Q So just -- do you have physical files in your

10:08:52    10    office in London, Mr. Kordestani?

10:08:56    11    A I have filing cab -- I have filing cabinets,

10:08:57    12    but no physical files. I don't take -- I don't like

10:09:00    13    to keep a lot of paper.

10:09:01    14    Q So the filing cabinets are empty?

10:09:04    15    A Pretty much.

10:09:05    16    Q Okay. And you have file cabinets in

10:09:07    17    California?

10:09:07    18    A Yes.

10:09:07    19    Q And your assistant maintains whatever files

10:09:11    20    you have in Cal- -- in -- in your office here in

10:09:13    21    Mountain View?

10:09:15    22    A Yes.

10:09:15    23    Q And do you -- how do you maintain your

10:09:20    24    e-mails? What system -- first of all, I assume you --

10:09:25    25    you use Google?

fb970580-dc85-4292-af65-65ccf487cba5

```
                 1                      KORDESTANI
```

10:09:27    2       A    Yes.

10:09:27    3       Q    And do you -- is there a -- do you delete

10:09:34    4    e-mails regularly from your in-box?

10:09:38    5       A    Mostly spam, but we use a version of the

10:09:48    6    Google e-mail system that doesn't require a lot of

10:09:51    7    deleting.

10:09:51    8       Q    Why is that?

10:09:52    9       A    It's just easier to search for documents then

10:09:56    10   file or delete.

10:09:57    11      Q    So -- so it's just one big in-box and you can

10:10:00    12   search at -- at will basically and nothing gets

10:10:02    13   deleted?

10:10:03    14      A    Some things get deleted, but -- but mostly I

10:10:06    15   delete spam, as I said.

10:10:08    16      Q    So you would have -- would your -- would

10:10:10    17   there be on your e-mail, for example, e-mails

10:10:16    18   concerning the acquisition of YouTube?

10:10:24    19      A    The -- any -- there -- there are documents

10:10:25    20   related to the YouTube, absolutely.

10:10:27    21      Q    And are there also, for example, documents

10:10:30    22   relating to DoubleClick?

10:10:32    23      A    Yes.

10:10:32    24      Q    Okay.  And those e-mails were collected for

10:10:37    25   the purposes of this litigation?

1                              KORDESTANI

2  10:38:09    Q    So if an advertiser wants to understand how

3  10:38:11 to advertise on Google, this explains the process;

4  10:38:15 isn't that right?

5  10:38:16    A    Yes.

6  10:38:16    Q    And there's -- in addition to AdWords, if you

7  10:38:32 go to the last page of this document, there is

8  10:38:35 something called "AdSense"; is that correct?

9  10:38:38    A    Yes.

10 10:38:39    Q    And how does AdSense differ from AdWords?

11 10:38:45    A    AdSense is the program that website owners or

12 10:38:50 publishers who want to have Google advertisers appear

13 10:38:55 on their website use, so they earn money by using our

14 10:38:59 system to have our ads appear on their site.

15 10:39:03    Q    And does Google earn revenue from

16 10:39:06 contextualized -- contextualized ads on third-party

17 10:39:12 sites?

18 10:39:12         MR. MANCINI:  Objection to form.

19 10:39:13         THE WITNESS:  Yes.

20 10:39:14         MS. KOHLMANN:  Okay.

21 10:39:14    Q    And how -- how exactly does AdSense work?

22 10:39:16 Can you describe the process to me?

23 10:39:18    A    It's basically a website identifies an area

24 10:39:27 on their website where they like to have ads appear,

25 10:39:30 and ads are either targeted based on keywords, if they

1  KORDESTANI

2  10:39:33 have a search page, or if they have content on their

3  10:39:38 page, we have a system that identifies relevant ads to

4  10:39:42 the content on that page.

5  10:39:44    Q    So, for example, if you go to the last page

6  10:39:46 of this Exhibit 2 that I've put in front of you, in

7  10:39:54 the middle of page it says, "AdSense for content

8  10:39:57 automatically crawls the content of your pages and

9  10:40:00 delivers text and image ads that are relevant to your

10 10:40:01 audience and your site content."

11 10:40:03    A    Yes.

12 10:40:03    Q    Is that what you were describing, it crawls

13 10:40:06 the content?

14 10:40:09    A    Yes.

15 10:40:09    Q    And what are the factors that go into an

16 10:40:21 AdSense for content determination about which ads to

17 10:40:25 display on a particular site?

18 10:40:27        MR. MANCINI:  Objection to form.

19 10:40:28        THE WITNESS:  What -- what do you mean by

20 10:40:34 that?  What is the question?

21 10:40:35        MS. KOHLMANN:  Q.  So how -- what -- if I

22 10:40:39 understood your testimony, and I understand the last

23 10:40:42 page of Exhibit 2, there is a crawl of the content

24 10:40:46 which then generates an ad; correct?

25 10:40:51    A    Is it --

1                             KORDESTANI

2  11:36:07 to Google.

3  11:36:07          Do you recall seeing any documents where

4  11:36:09 "Yellow" would refer to YouTube and "Green" to

5  11:36:13 Google --

6  11:36:13          MR. MANCINI:  Objection.

7  11:36:13          MS. KOHLMANN:  Q.  -- in the context of the

8  11:36:14 acquisition by Google of YouTube?

9  11:36:17          MR. MANCINI:  Objection to form.

10 11:36:18          THE WITNESS:  I don't recall the documents,

11 11:36:20 but I remember the keywords.

12 11:36:22          MS. KOHLMANN:  Okay.

13 11:36:24     Q    So turning to page nine, which is "Key

14 11:36:28 Yellow," that is revenue -- that is YouTube revenue

15 11:36:31 assumptions.  You see the -- there's a column of "Key

16 11:36:38 Variable"; do you see that?

17 11:36:41     A    Yes.

18 11:36:41     Q    All the way on the right.

19 11:36:43          And those variables include "Videos Viewed,"

20 11:36:47 "Pages Viewed," "Premium Video," High Value

21 11:36:50 Non-Premium Video," Run of Site Ads," and Sponsored

22 11:36:54 Ads"; do you see that?

23 11:36:55     A    Uh-huh.

24 11:36:56     Q    And under "Premium Video," do you see -- next

25 11:36:59 to "Premium Video" there is a column

KORDESTANI

11:37:05 "Description/2007E Traffic Assumptions"; do you see

11:37:09 that?

11:37:11    A    Where is that?  Sorry.

11:37:13    Q    The -- the -- the second column next to "Key

11:37:15 Variable."

11:37:16    A    Yes.

11:37:16    Q    You see that?

11:37:17         And under -- for the "Key Variable Premium

11:37:23 Video," you see where it says "60 percent of total

11:37:26 video streams on Yellow website are 'Premium'"?

11:37:29    A    Yes.

11:37:29    Q    What's your understanding of "Premium"?

11:37:33         MR. MANCINI:  Objection to form.

11:37:34         THE WITNESS:  I'm not sure what they were

11:37:36 using in this term.  I've heard the use of "Premium"

11:37:40 before.

11:37:40         MS. KOHLMANN:  Q.  What's your understanding

11:37:41 of "Premium"?

11:37:43    A    Professional content.

11:37:44    Q    And just -- do you have any reason to believe

11:37:52 that that number is incorrect?

11:37:54         MR. MANCINI:  Objection; lacks foundation.

11:37:57         THE WITNESS:  I -- I have no idea where --

11:37:59 about that --

|          | 1  | KORDESTANI |

12:10:49    2    12.

12:10:50    3          Actually, you know what, let's do this one

12:10:55    4    first, so 18.  Can you give me 12, too?  Maybe I'll

12:11:39    5    just go to this.  You got 12?  Let's start with that.

12:11:54    6    Okay.  Here you go.  Sorry.

12:12:20    7          MS. WILSON:  Thank you.

12:12:28    8          MR. HAREN:  This is 12?

12:12:29    9          MS. KOHLMANN:  Uh-huh.

12:12:33    10          (Document marked Kordestani Exhibit 8

12:12:44    11           for identification.)

12:12:44    12          MS. KOHLMANN:  Q.  Tell me when you've had a

12:12:45    13    chance to review it; okay?

12:13:07    14     A    Okay.

12:13:07    15     Q    Okay.  Mr. Kordestani, I've marked as

12:13:09    16    exhibit -- what am I up to?

12:13:16    17          THE REPORTER:  8.

12:13:17    18          MS. KOHLMANN:  8.

12:13:18    19     Q    A document, it's an e-mail exchange, and it

12:13:22    20    bears the Bates No. GOO001-00496651 through 496654,

12:13:34    21    and this is an e-mail exchange.

12:13:39    22          First of all, this -- can you briefly

12:13:41    23    describe this document on the record?

12:13:43    24     A    It's an e-mail exchange between Eric Schmidt,

12:13:47    25    David Eun, and me.

fb970580-dc85-4292-af65-65ccf487cba5

KORDESTANI

| | | |
|---|---|---|
| 12:13:48 | 2 | Q And you? |
| 12:13:49 | 3 | A (Witness nods head.) |
| 12:13:49 | 4 | Q And what's the date? |
| 12:13:51 | 5 | A It's the 12th of May 2006. |
| 12:13:55 | 6 | Q And the subject? |
| 12:13:58 | 7 | A "Video GPS - Content." |
| 12:13:59 | 8 | Q Okay. And the first-in-time e-mail is an |
| 12:14:10 | 9 | e-mail from David to Eric in which you're copied; is |
| 12:14:14 | 10 | that right? |
| 12:14:14 | 11 | A Yeah. |
| 12:14:17 | 12 | Q And it refers to a video GPS that is going to |
| 12:14:20 | 13 | occur some time later; correct? |
| 12:14:26 | 14 | A Yes. |
| 12:14:26 | 15 | Q And at this point in time, you may have said |
| 12:14:31 | 16 | this earlier, what was Mr. Eun's duties and |
| 12:14:32 | 17 | responsibilities? |
| 12:14:33 | 18 | A He was working for me, in charge of content |
| 12:14:37 | 19 | partnerships. |
| 12:14:38 | 20 | Q And he states here that "The Video team --" |
| 12:14:44 | 21 | would that be the Google Video essentially? |
| 12:14:48 | 22 | A Yes. |
| 12:14:48 | 23 | Q "The Video team has focused on two questions |
| 12:14:51 | 24 | in preparation for the GPS: How we 'beat YouTube' in |
| 12:14:57 | 25 | the short term; and 2) how we went over time." |

                    1              KORDESTANI

12:14:59         2          Do you see that?

12:15:01         3     A    Yes.

12:15:01         4     Q    Does that refresh your recollection that

12:15:05         5     Google Video did want to beat YouTube?

12:15:09         6     A    Sure, yes.  The team was in charge of video

12:15:13         7     service and felt competitive with YouTube.

12:15:15         8     Q    And in the next paragraph, there's reference

12:15:22         9     to a heated debate about whether, quote, "we should

12:15:26        10     relax enforcement of our copyright policies in an

12:15:29        11     effort to stimulate traffic growth, despite the

12:15:31        12     inevitable damage it would cause to relationships with

12:15:35        13     content owners"; do you see that?

12:15:35        14     A    Yes.

12:15:37        15          MR. MANCINI:  Objection; the document speaks

12:15:39        16     for itself.

12:15:39        17          MS. KOHLMANN:  Q.  Do you recall a debate

12:15:40        18     about relaxing the enforcement of copyright policies?

12:15:45        19     A    I don't know how big the debate was, but some

12:15:48        20     people had that opinion.

12:15:49        21     Q    What was your opinion?

12:15:51        22     A    That we -- we need to know the facts, and

12:15:53        23     these are opinions by teams that were under pressure

12:15:56        24     to build a service that works, and they had different

12:16:01        25     theories.

fb970580-dc85-4292-af65-65ccf487cba5

                              KORDESTANI

12:16:01   2        Q    Well, did -- was it -- did you disagree with

12:16:07   3   Mr. Eun, that -- where he says, "We should beat

12:16:13   4   YouTube - and all competitors - but not at all costs,"

12:16:16   5   and "A large part of their," referring to YouTube,

12:16:19   6   "traffic is from pirated content"?

12:16:27   7        A    I don't --

12:16:27   8             MR. MANCINI:  Objection to form.

12:16:28   9             THE WITNESS:  This -- this -- essentially,

12:16:29   10   this was their opinions.  They didn't have any facts,

12:16:31   11   and we always believed that it's important to be

12:16:35   12   comprehensive and also honor copyright holders' rights

12:16:40   13   so --

12:16:40   14             MS. KOHLMANN:  So --

12:16:42   15             THE WITNESS:  -- it was debating something

12:16:44   16   without facts and it was just opinions.

12:16:46   17             MS. KOHLMANN:  Q.  Well, he goes on in the

12:16:47   18   next sentence to say, we are comparing our traffic

12:16:50   19   numbers to their -- theirs.  We would acknowledge that

12:16:52   20   we are comparing our, quote, "legal traffic," close

12:16:55   21   quote, "to their mix of traffic from legal and illegal

12:16:58   22   content"; do you see that?

12:16:59   23        A    Yes, I see that.

12:17:00   24             MR. MANCINI:  Objection; the document speaks

12:17:01   25   for itself.

fb970580-dc85-4292-af65-65ccf487cba5

1                          KORDESTANI

12:17:02    2          MS. KOHLMANN:  Q.  Did you agree with that?

12:17:04    3          MR. MANCINI:  Objection to form.

12:17:07    4          THE WITNESS:  We did not -- if you read

12:17:10    5    later, we believed there was a lot of also just noise

12:17:14    6    in the industry.  That's what one senior media

12:17:18    7    executive told me, and there was no fact-based

12:17:21    8    information here.  It was opinions.

12:17:23    9          MS. KOHLMANN:  Q.  But a media executive

12:17:26   10    would be a potential content owner; correct?

12:17:29   11          A    Yes.

12:17:29   12          Q    And you would listen if a media executive

12:17:32   13    said, as they say here, that they refer to YouTube as

12:17:35   14    a, quote, "Video Grokster"; correct?

12:17:37   15          A    They were also --

12:17:37   16          MR. MANCINI:  Objection to form.

12:17:38   17          THE WITNESS:  Media -- media executives are

12:17:40   18    also doing deals with YouTube at the time, so this

12:17:44   19    is -- again, this was just one opinion here.

12:17:46   20          MS. KOHLMANN:  Q.  At the -- at the top of

12:17:54   21    the e-mail, Eric Schmidt says, "While I understand

12:18:01   22    your points and generally agree I don't see a winning

12:18:04   23    strategy from any of the video camps."

12:18:08   24          Did you have any discussions with Mr. Schmidt

12:18:10   25    about Mr. Eun's e-mail that you recall?

fb970580-dc85-4292-af65-65ccf487cba5

```
                    1                    KORDESTANI

12:18:17            2        A    There were lots of discussions.  I don't

12:18:19            3    remember a specific discussion about this e-mail.

12:18:20            4        Q    Yeah, okay.

12:18:38            5             To your knowledge, did Google Video ever

12:18:41            6    engage in pre-upload review of content?

12:18:45            7             MR. MANCINI:  Objection to form.

12:18:46            8             THE WITNESS:  I was not close enough to -- to

12:18:50            9    know that.

12:18:51           10             MS. KOHLMANN:  Okay.  Should have 12?  No.

12:18:57           11    I'm sorry.  Right.

12:19:25           12             MR. HAREN:  Are you sure you don't have it?

12:19:27           13             MS. KOHLMANN:  Oh, I'm sorry.  What number is

12:19:28           14    it?

12:19:29           15             MR. HAREN:  11.

12:19:42           16             MS. KOHLMANN:  Is it back here?  No.  I think

12:20:04           17    it's 150, maybe.  11.  That one is 11.  Actually, 11

12:20:13           18    is what I should do first.  Okay.  Is this the next

12:20:33           19    one?

12:20:34           20             (Document marked Kordestani Exhibit 9

12:20:37           21              for identification.)

12:20:37           22             MS. KOHLMANN:  I'm going to show you what's

12:20:38           23    been marked as Kordestani Exhibit 9.  Have you got it?

12:20:47           24    Okay.  Should I -- yeah.

12:20:53           25        Q    Mr. Kordestani, I've handed you a document
```

fb970580-dc85-4292-af65-65ccf487cba5

1                         KORDESTANI

2   13:52:09 with anyone in particular?

3   13:52:10          MR. MANCINI:  Objection to form.

4   13:52:13          THE WITNESS:  Again, same -- part of the same

5   13:52:16 updates with David Eun with discussions at these

6   13:52:19 meetings.

7   13:52:20          MS. KOHLMANN:  Q.  And what -- do you

8   13:52:23 remember any specific conversation with David Eun?

9   13:52:29     A    Again, general conversations about getting

10  13:52:33 ready for a product review or what happened at the

11  13:52:35 product review, briefings after meetings.

12  13:52:38     Q    This is about copyright policy in particular,

13  13:52:40 I'm asking.

14  13:52:41     A    No.  One of --

15  13:52:42          MR. MANCINI:  Objection to form.

16  13:52:43          THE WITNESS:  -- copyright policy is one of

17  13:52:44 many items.

18  13:52:45          MS. KOHLMANN:  Q.  But you don't remember, as

19  13:52:45 you -- I'm trying to -- what I'm trying to determine

20  13:52:47 is whether you remember, as you sit here today, any

21  13:52:50 specific conversation -- let's start with Mr. Eun --

22  13:52:54 with Mr. Eun about copyright policy?

23  13:52:57          MR. MANCINI:  Objection to form.

24  13:52:58          THE WITNESS:  I remember having discussed it,

25  13:53:00 yes.

1                               KORDESTANI

2   13:53:01        MS. KOHLMANN:  Q.  What do you remember about

3   13:53:02 those conversations?

4   13:53:04    A    Same kinds of things you pointed to here,

5   13:53:07 that their theory is that different policy approaches

6   13:53:13 could result in different success rates in user

7   13:53:19 activity and adoption of video service.

8   13:53:22    Q    How would you define "success rate"?

9   13:53:29    A    Popularity of the service.

10  13:53:32    Q    Revenue?

11  13:53:35    A    No.

12  13:53:35        MR. MANCINI:  Objection to form.

13  13:53:36        THE WITNESS:  Never discussed revenue in that

14  13:53:37 context.

15  13:53:38        MS. KOHLMANN:  Q.  And how would a different

16  13:53:40 policy approach affect popularity of the service?

17  13:53:43        MR. MANCINI:  Objection; lacks foundation.

18  13:53:47        THE WITNESS:  It's what you pointed to in the

19  13:53:49 documents.  I'm referring to those same conversations,

20  13:53:52 the theory that YouTube is different because some

21  13:53:55 people think there is a different policy to have.

22  13:54:00        MS. KOHLMANN:  Q.  Do you -- do you remember

23  13:54:01 any specific conversation with Mr. Eun about that

24  13:54:03 topic?

25  13:54:05        MR. MANCINI:  Objection to form.

14:01:35    Q    I'm sorry.  I didn't hear you.

14:01:36    A    It's not significant for Google right now.

14:01:38    Q    It's not significant?  I can't hear you.  I'm

14:01:42 sorry.

14:01:42    A    It's not a significant revenue contribution

14:01:45 to Google right now.

14:01:45    Q    Right now?  Is that what you said?

14:01:47    A    Right.

14:01:48    Q    I'm sorry.

14:01:49         What -- but they -- I believe you said it was

14:01:51 $40 to $50 million a quarter; correct?

14:01:53    A    Right now.

14:01:53    Q    How do they generate that revenue?

14:01:56    A    Selling advertising on -- on Homepages, on

14:02:01 brand channels, experimenting with new formats, just

14:02:07 some on partner pages.  Not significant enough yet.

14:02:11    Q    Okay.  Can -- can -- you said Homepages.

14:02:14 What other pages do they sell ads on?

14:02:17    A    Brand channels they're called, where you make

14:02:21 a special page for advertisers, special content.

14:02:24    Q    Is the Homepage the same as a search page?

14:02:28    A    No.

14:02:28    Q    Do they sell advertising on search pages?

14:02:31    A    I think we're experimenting with that.

1                                    KORDESTANI

2  14:02:33   Q   What other kind of pages are there?

3  14:02:38   A   Watch Pages.

4  14:02:39   Q   And do they sell advertising on Watch Pages?

5  14:02:42   A   There are some, some advertising sold, and

6  14:02:47 some are sold by partners.

7  14:02:50   Q   Do you know where the majority of -- of the

8  14:02:52 revenue that you have identified, the 40 to 50 million

9  14:02:58 a quarter, comes from with respect to each of these

10 14:03:00 pages?

11 14:03:01   A   I think primarily, I believe, most of it is

12 14:03:03 still Homepages and these brand channels and so forth.

13 14:03:07   Q   Who does the -- who -- do you know who did

14 14:03:23 the financial modeling at the time of the acquisition?

15 14:03:27       MR. MANCINI:  Objection; asked and answered.

16 14:03:29       THE WITNESS:  Probably a combination of our

17 14:03:31 finance team and corporate development team.

18 14:03:33       MS. KOHLMANN:  Q.  Would corporate

19 14:03:34 development be you?

20 14:03:34   A   No, David Drummond.

21 14:03:36   Q   David Drummond.

22 14:03:37       So what part of the acquisition of YouTube

23 14:03:41 did you analyze, if any?

24 14:03:44       MR. MANCINI:  Objection; lacks foundation.

25 14:03:47       THE WITNESS:  Just over -- I just -- as part

1                              KORDESTANI

2  15:43:36 mischaracterize of the documents and that is not in

3  15:43:39 the record.  We have not seen that, Susan.  You are

4  15:43:41 offering testimony now by a question that is totally

5  15:43:43 improper.

6  15:43:44          MS. KOHLMANN:  You can answer.

7  15:43:45          THE WITNESS:  I agree with my attorney.  I

8  15:43:46 never said anything like that.  I didn't --

9  15:43:48          MS. KOHLMANN:  I didn't say you did.  You

10 15:43:49 wanna read -- should I repeat the question?

11 15:43:53          THE WITNESS:  I don't know where that comment

12 15:43:54 comes from.

13 15:43:55          MS. KOHLMANN:  Q.  From the documents that

14 15:43:56 you saw, the term sheets and the signed agreements in

15 15:44:00 the fall of 2006, there were available fingerprinting

16 15:44:07 technologies which you did not offer content owners

17 15:44:12 who had not entered into negotiations; is that --

18 15:44:15    A    I don't agree with that.

19 15:44:17          MR. MANCINI:  Same objections.

20 15:44:18          MS. KOHLMANN:  Q.  You had offered it to

21 15:44:19 content owners?

22 15:44:20    A    I don't know, and now you're asking me

23 15:44:21 specifics.

24 15:44:21          MR. MANCINI:  Same objections.

25 15:44:22          MS. KOHLMANN:  Q.  Who at Google or YouTube