UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------X
VIACOM INTERNATIONAL, INC., COMEDY
PARTNERS, COUNTY MUSIC
TELEVISION, INC., PARAMOUNT
PICTURES CORPORATION, and BLACK
ENTERTAINMENT TELEVISION, LLC,

            Plaintiffs,
              vs.          No. 07-CV-2203

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

            Defendants.
-----------------------------------X
THE FOOTBALL ASSOCIATION PREMIER
LEAGUE LIMITED, BOURNE CO., et al.,
on behalf of themselves and
all others similarly situated,

            Plaintiffs,
              vs.          No. 07-CV-3582

YOUTUBE, INC., YOUTUBE, LLC,
and GOOGLE, INC.,

Defendants.
-----------------------------------X

HIGHLY CONFIDENTIAL
VIDEOTAPED DEPOSITION OF ZAHAVAH LEVINE
SAN FRANCISCO, CALIFORNIA
THURSDAY, APRIL 2, 2009

BY:  KATHERINE E. LAUSTER, CSR 1894, RPR, CRR, CLR

Job No. 16721

1                              LEVINE

2                          APRIL 2, 2009

3                           10:23 A.M.

4

5           HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF

6      ZAHAVAH LEVINE, at SHEARMAN & STERLING, 525 Market

7      Street, Suite 1500, San Francisco, California, pursuant

8      to notice, before me, KATHERINE E. LAUSTER, CLR, CRR,

9      RPR, CSR License No. 1894.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LEVINE

A P P E A R A N C E S:


FOR THE LEAD PLAINTIFFS AND PROSPECTIVE CLASS:

    PROSKAUER ROSE, LLP

    BY:  WILLIAM M. HART, Esq.

    1585 Broadway

    New York, New York  10036-8299

    phone:   212.969.3095

    fax:   212.969.2900

    whart@proskauer.com


FOR THE PLAINTIFFS VIACOM INTERNATIONAL, INC.:

    JENNER & BLOCK, LLP

    BY:  JAY C. COX, Esq.

    1099 New York Avenue, NW

    Suite 900

    Washington, DC  20001

    phone:  202.639-6000

    fax:   202.661.4998

    JamesCox@jenner.com

LEVINE

A P P E A R A N C E S:  (Continued)


FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE and GOOGLE:

WILSON, SONSINI, GOODRICH & ROSATI

BY:  MAURA L. REES, Esq.

DAVID H. KRAMER, Esq.

650 Page Mill Road

Palo Alto, California  94304-1050

phone:  650.493.9300

fax:    650.565.5100

mrees@wsgr.com

dkramer@wsgr.com


FOR THE DEFENDANT GOOGLE, INC.:

GOOGLE, INC.

BY:  TIMOTHY L. ALGER, Esq.

Deputy General Counsel

1600 Amphitheatre Parkway

Mountain View, California  94043

phone:  650.214.3174

fax:    650.887.1765

timalger@google.com


Also Present:  Lou Meadows, Videographer

1                           LEVINE

2                   SAN FRANCISCO, CALIFORNIA

3             THURSDAY, APRIL 2, 2009; 10:23 A.M.

4

5

6

7   10:23:32          THE VIDEOGRAPHER:  On the record.

8   10:23:33          This is today's videotaped deposition of

9   10:23:37 Zahavah Levine, taken on April 2nd, 2009, at

10  10:23:42 Shearman & Sterling, 525 Market Street, 15th floor,

11  10:23:46 in San Francisco, California.

12  10:23:47          In the matter of Viacom International vs.

13  10:23:49 YouTube, Inc., and The Football Association Premier

14  10:23:49 League Limited, et al., vs. YouTube, Inc., et al.,

15  10:23:56 Case Number 07-CV-2103 and 07-CV-3582, in the United

16  10:24:06 States District Court For the Southern District of

17  10:24:06 New York.

18  10:24:09          My name is Lou Meadows, and I represent

19  10:24:12 David-Feldman Worldwide, located at 600 Anton

20  10:24:16 Boulevard, Suite 1100, in Costa Mesa, California.

21  10:24:23          We are now commencing at 10:22 a.m.

22  10:24:23          Will all present please identify

23  10:24:25 themselves and state whom they represent.

24  10:24:28          MR. HART:  Bill Hart, Proskauer Rose, for

25  10:24:29 the class plaintiffs.

1          LEVINE

2    10:24:32          MR. COX:  Jay Cox, Jenner and Block, for

3    10:24:33 the Viacom Company.

4    10:24:35          MR. KRAMER:  Dave Kramer for YouTube and

5    10:24:37 Google.  With me is Maura Rees from my firm, and Tim

6    10:24:38 Alger of Google.

7    10:24:41          THE VIDEOGRAPHER:  Sir, I can barely hear

8    10:24:44 you.  Could you raise your microphone up?

9    10:24:46          MR. KRAMER:  Yeah.  Hm, that's never

10   10:24:46 happened.

11   10:24:46          Dave Kramer, Wilson Sonsini, for Google

12   10:24:51 and YouTube.  With me is Maura Rees from my firm and

13   10:24:56 Tim Alger from Google.

14   10:24:57          THE VIDEOGRAPHER:  Okay.

15   10:25:00          THE WITNESS:  Zahavah Levine from YouTube.

16   10:25:01          THE VIDEOGRAPHER:  If there are no

17   10:25:01 stipulations, the court reporter may now administer

18   10:25:01 the oath.

19   10:25:01          THE REPORTER:  Will you raise your right

20   10:25:01 hand, please.

21   10:25:01          Do you solemnly state, under penalty of

22   10:25:01 perjury, the testimony you are about to give will be

23   10:25:01 the truth, the whole truth, and nothing but the

24   10:25:01 truth?

25   10:25:10          THE WITNESS:  I do.

1                            LEVINE

2  10:25:10                 ZAHAVAH LEVINE,

3  10:25:10          having been sworn as a witness

4  10:25:10              testified as follows:

5  10:25:10

6  10:25:10                 EXAMINATION

7  10:25:10 BY MR. HART:

8  10:25:12    Q.    Good morning, Miss Levine.

9  10:25:15    A.    Morning.

10 10:25:15    Q.    Are you employed?

11 10:25:16    A.    Yes.

12 10:25:17    Q.    By whom?

13 10:25:18    A.    Google.

14 10:25:19    Q.    How long have you been employed by

15 10:25:21 Google?

16 10:25:24    A.    Since Google acquired YouTube in, I

17 10:25:28 believe, November 2006.

18 10:25:30    Q.    Okay.  What's your current job title?

19 10:25:33    A.    Associate general counsel for YouTube of

20 10:25:37 Google.

21 10:25:42    Q.    Has your job title changed in any way

22 10:25:44 since you have been employed by Google?

23 10:25:48         MR. KRAMER:  Objection.  Vague.

24 10:25:53         THE WITNESS:  Yes.  So I was associate

25 10:25:57 general counsel.

1                              LEVINE

2   10:25:57 BY MR. HART:

3   10:25:58     Q.   Uh-huh.

4   10:25:58     A.   For Google.  Then I was associate general

5   10:26:01 counsel, YouTube, for Google.

6   10:26:05     Q.   Uh-huh.

7   10:26:06     A.   And I also have the title of chief

8   10:26:08 counsel, YouTube.

9   10:26:10     Q.   Okay.  And when did you assume the title

10  10:26:13 of chief counsel, YouTube?

11  10:26:15     A.   That was -- so I have two titles.  One is

12  10:26:19 a YouTube title, and one is a Google title.  So the

13  10:26:23 chief counsel, YouTube was immediately prior -- post

14  10:26:26 the acquisition.

15  10:26:27     Q.   Got you.  Thank you.

16  10:26:34          I'm going to mark and ask the court

17  10:26:36 reporter to mark Exhibit 1, and she'll show that to

18  10:26:39 you as soon as she marks it.

19  10:26:50          (Levine Exhibit Number 1 was marked for

20  10:26:50          identification.)

21          BY MR. HART:

22  10:26:51     Q.   And just take a brief minute to page

23  10:26:54 through it, and the question will be, or is:  Would

24  10:26:58 you identify this document, Exhibit 1 for us,

25  10:27:01 please?

1                                    LEVINE

2  10:27:02    A.    This is a resume that I prepared after --

3  10:27:08 or immediately, I think, before the acquisition

4  10:27:11 closed, so Google could determine how to place me in

5  10:27:16 its organization.

6  10:27:17    Q.   Got you.  And does it accurately reflect

7  10:27:19 your employment history prior to the acquisition by

8  10:27:25 Google?

9  10:27:25           MR. KRAMER:  Are you just asking her

10 10:27:29 whether each of the jobs that she's had is reflected

11 10:27:32 accurately --

12 10:27:33           MR. HART:  Yeah.

13 10:27:34           MR. KRAMER:  -- or are you asking if the

14 10:27:35 entire thing is accurate?

15 10:27:37           MR. HART:  You know, we'll stick with the

16 10:27:39 prior point of history right now.

17 10:27:41           MR. KRAMER:  Yes.

18 10:27:41 BY MR. HART:

19 10:27:41    Q.   Is it accurately reflected in this resume,

20 10:27:45 Exhibit 1?

21 10:27:46    A.    I don't, upon looking at this now, see any

22 10:27:48 inaccuracies.

23 10:27:49    Q.   Okay.  Fair enough.

24 10:27:52           It says under the heading "Associate

25 10:27:58 General Counsel RealNetworks, Inc.," on page 1 -- do

|       |                                                      |
|-------|------------------------------------------------------|
|       | 1          LEVINE                                    |
| 11:17:17 | 2   pornography?                                  |
| 11:17:18 | 3        A.    At -- at -- at some point, yes.    |
| 11:17:20 | 4        Q.    Okay.  And is -- how are those guidelines |
| 11:17:25 | 5   effectuated or implemented at YouTube, other than |
| 11:17:28 | 6   having a guideline?                            |
| 11:17:31 | 7             MR. KRAMER:  So in answering this    |
| 11:17:34 | 8   question, I'd like you to be careful not to reveal |
| 11:17:38 | 9   privileged communications between yourself, other |
| 11:17:40 | 10  lawyers, and your client, that is, employers of |
| 11:17:43 | 11  YouTube.                                       |
| 11:17:44 | 12            I think he's asking -- not asking for you |
| 11:17:45 | 13  to do so.                                      |
| 11:17:46 | 14            MR. HART:  No.                       |
| 11:17:46 | 15            MR. KRAMER:  I think he's asking for the |
| 11:17:47 | 16  facts about --                                 |
| 11:17:48 | 17            MR. HART:  Uh-huh.                   |
| 11:17:48 | 18            MR. KRAMER:  -- what goes on at YouTube to |
| 11:17:49 | 19  implement the -- the pornography policy.       |
| 11:17:52 | 20            MR. HART:  Uh-huh.                   |
| 11:17:54 | 21            THE WITNESS:  So generally speaking, the |
| 11:17:57 | 22  way that we handle pornography on YouTube is through |
| 11:18:02 | 23  a -- a system of community flagging.           |
| 11:18:05 | 24  BY MR. HART:                                   |
| 11:18:06 | 25       Q.    Uh-huh.  What is that?              |

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022   (212)705-8585

1                              LEVINE

2  11:18:12    A.   Users, viewers of YouTube --

3  11:18:16    Q.   Uh-huh.

4  11:18:16    A.   -- have the ability to flag content when

5  11:18:21 they're watching it, or that they believe is --

6  11:18:25 violates our terms of service.

7  11:18:27    Q.   Okay.

8  11:18:27    A.   And then that content goes into a re- --

9  11:18:33 gets reviewed --

10 11:18:34    Q.   Uh-huh.

11 11:18:35    A.   -- by --

12 11:18:39         MR. HART:  David's giving me hints.

13 11:18:41         MR. KRAMER:  No, you're -- you're saying

14 11:18:41 "okay" and "uh-huh" as she's answering the question,

15 11:18:44 rather than letting her finish the answer.

16 11:18:48         MR. HART:  Sorry.

17 11:18:50         MR. KRAMER:  I know it's not intentional.

18 11:18:50 I am sure I do stuff like that too, but I'd just

19 11:18:52 like her to be able to finish the answer without

20 11:18:55 being interrupted by an "uh-huh" or an "okay."  I

21 11:18:58 know you didn't do it on purpose.

22 11:19:00 BY MR. HART:

23 11:19:01    Q.   I'm not saying a thing.  Please continue.

24 11:19:04    A.   So there are -- there -- a group of

25 11:19:06 employees --

1                                        LEVINE

2  11:19:07    Q.   Uh-huh.

3  11:19:08    A.   -- who will review flagged content and do

4  11:19:10 their best to make a determination as to whether it,

5  11:19:13 in fact, violates the terms of service policy at

6  11:19:19 issue, in this example, whether it's pornography.

7  11:19:25    Q.   Okay.  Have you completed your answer?

8  11:19:27    A.   Yes.

9  11:19:27    Q.   Thank you.

10 11:19:34         When you say content is "flagged," is it

11 11:19:37 flagged by the user?  And in doing so, does the flag

12 11:19:43 send some message of some sort to somebody

13 11:19:50 internally, YouTube, to review the flagged content?

14 11:19:59         MR. KRAMER:  The question is vague as to

15 11:20:00 "user."

16 11:20:01         THE WITNESS:  Yeah, there is -- there's

17 11:20:03 many parts -- there's many parts of that.

18         BY MR. HART:

19 11:20:06    Q.   Uh-huh.

20 11:20:07    A.   So why don't you ask each part separately?

21 11:20:09    Q.   Okay.  I -- my question is actually

22 11:20:10 simpler than it sounded.  So let me just rephrase

23 11:20:13 it, which is:  Can you just explain very briefly how

24 11:20:16 the flagging system operates functionally?

25 11:20:19    A.   Yes.

                                        LEVINE

11:20:20   2            MR. KRAMER:  Calls for -- doesn't call for
11:20:22   3    speculation.
11:20:22   4            THE WITNESS:  Well --
11:20:22   5            MR. KRAMER:  Go ahead.
11:20:22   6            THE WITNESS:  -- at a -- at a general
11:20:24   7    level, I mean, I'm not an engineer.  I'm not
11:20:25   8    qualified --
11:20:25   9    BY MR. HART:
11:20:26   10           Q.   No, no, no.
11:20:28   11           A.   General level, a -- somebody viewing --
11:20:30   12    anybody that's viewing content --
11:20:32   13           Q.   Uh-huh.
11:20:32   14           A.   -- has the ability to check a box that
11:20:35   15    says -- indicates they believe it's a violation of
11:20:39   16    YouTube's terms of service.
11:20:42   17           And such checking -- generally speaking,
11:20:49   18    there's -- it gets a little complicated, but,
11:20:52   19    generally speaking, might result in the review of
11:20:55   20    that content by an employee of YouTube.
11:20:59   21           Q.   Okay.  That -- that was really the point
11:21:01   22    of my question.  You mean by a viewer checking
11:21:05   23    something or flagging something, does it, in some
11:21:09   24    way, send a signal to someone at YouTube to take a
11:21:14   25    look at the particular video that has been so

1ea7c5cb-479c-4e31-8931-30253eb85aec

```
              1                        LEVINE
11:23:19      2      speculation.
11:23:20      3                 THE WITNESS:  I believe in the early days
11:23:21      4      it -- it may have.
11:23:23      5      BY MR. HART:
11:23:23      6           Q.   Do you -- do you know when that changed?
11:23:30      7                 MR. KRAMER:  Calls for speculation and
11:23:32      8      lacks foundation.
11:23:42      9                 THE WITNESS:  I'm not exactly sure.
11:23:44     10      BY MR. HART:
11:23:48     11           Q.   Can you approximate in relation to the
11:23:51     12      Google acquisition?
11:23:54     13                 MR. KRAMER:  Same objections.  Calls for
11:23:55     14      speculation, lacks foundation.
11:24:02     15                 THE WITNESS:  No.
11:24:03     16      BY MR. HART:
11:24:05     17           Q.   Okay.  How does YouTube implement its
11:24:10     18      content policy against violent videos?
11:24:17     19           A.   It's the same way that I already
11:24:20     20      described.
11:24:21     21           Q.   Community flagging?
11:24:22     22           A.   Yes.
11:24:23     23           Q.   Okay.  Was there, at any time, any person
11:24:28     24      or persons functioning at YouTube who were
11:24:31     25      proactively looking on YouTube for violent videos
```

1ea7c5cb-479c-4e31-8931-30253eb85aec

1                              LEVINE

2  13:23:58          (Levine Exhibit Number 4 was marked for

3  13:23:58          identification.)

4  13:23:59 BY MR. HART:

5  13:24:38      Q.   I guess, to save time, to the extent that

6  13:24:42 you can --

7  13:24:42      A.   Okay.

8  13:24:43      Q.   -- the two threshold questions are whether

9  13:24:45 you can identify what we've just marked as Exhibit

10 13:24:48 4, and whether you were involved in any way in its

11 13:24:52 negotiation.

12 13:24:53          MR. KRAMER:   Take those one at a time.

13 13:25:03          THE WITNESS:   Yes, this appears to be a

14 13:25:05 content license with Wind-Up Records.

15 13:25:08 BY MR. HART:

16 13:25:09      Q.   And were you involved in negotiating any

17 13:25:11 sort of content license with Wind-Up Records for

18 13:25:15 YouTube?

19 13:25:15      A.   I don't think I was the primary negotiator

20 13:25:16 on this deal, but I may have been consulted a couple

21 13:25:20 of times.

22 13:25:21      Q.   You were aware that a deal --

23 13:25:22      A.   I am aware that we had --

24 13:25:22      Q.   -- had to be struck --

25 13:25:22      A.   Yeah.   Yes, I was aware that a deal had

1                              LEVINE

2  16:00:37 don't know how they were able to discern.

3  16:00:40    Q.   Uh-huh.  And do you have any knowledge

4  16:00:50 about what search terms were used, or -- yeah, what

5  16:00:58 search terms were used?

6  16:01:00    A.   Specifically?

7  16:01:02    Q.   Or generally, how did -- how did -- you

8  16:01:04 said they searched metadata.  I guess my question

9  16:01:10 is:  Do you know how they knew what to search?

10 16:01:15         MR. KRAMER:  Objection.  Assumes facts,

11 16:01:17 calls for speculation.

12 16:01:19         And again, he's not asking -- he's not

13 16:01:24 asking you to reveal the substance of

14 16:01:26 attorney-client communications.  So you -- to the

15 16:01:31 extent he is, I instruct you not to answer the

16 16:01:34 question.

17 16:01:34 BY MR. HART:

18 16:01:35    Q.   I'm not --

19 16:01:36    A.   Yeah.  I don't know specifically any

20 16:01:41 particular searches.

21 16:01:43    Q.   Uh-huh.

22 16:01:43    A.   I can speculate as to what I think they

23 16:01:46 probably or might have done.

24 16:01:47    Q.   And what's that?

25 16:01:48    A.   Perhaps they would have put in "American

1                          LEVINE

2  16:01:51 Idol," for example, if they were scanning for

3  16:01:57 American Idol.

4  16:01:58    Q.   And why do you speculate that they might

5  16:02:01 have done that?

6  16:02:11    A.   Because if somebody did upload an

7  16:02:13 unauthorized copy of American Idol and wanted other

8  16:02:17 people to view it, they might use that -- those

9  16:02:23 words in the metadata so other -- so it would come

10 16:02:26 up among other results in the search results.

11 16:02:30    Q.   Right.  But why would someone at YouTube

12 16:02:36 decide to search for American Idol, as opposed to

13 16:02:40 all of the other possible searches that they could

14 16:02:44 do?

15 16:02:45    A.   I think I --

16 16:02:46        MR. KRAMER:  Hang on.  Calls for

17 16:02:47 speculation.  Incomplete hypothetical.  The question

18 16:02:57 is vague.

19 16:02:57 BY MR. HART:

20 16:03:00    Q.   But other than that, Miss Levine?

21 16:03:04    A.   Well, for -- so with respect to American

22 16:03:12 Idol --

23 16:03:13    Q.   Uh-huh.

24 16:03:13    A.   -- American Idol -- American Idol, I -- I

25 16:03:23 recall was a company --

1                          LEVINE

2  16:15:57          THE WITNESS:  I -- I don't recall any

3  16:15:58 conversations --

4           BY MR. HART:

5  16:15:59    Q.   Okay.

6  16:15:59    A.   -- about it.

7  16:16:00    Q.   Now, did there come a point at YouTube

8  16:16:02 when there was a decision made to stop any sort of

9  16:16:05 proactive scanning of content for potential

10 16:16:10 copyright infringement?

11 16:16:28          MR. KRAMER:  I'll object to the form of

12 16:16:29 the question.

13 16:16:30          You can answer.

14 16:16:35          THE WITNESS:  I -- I don't recall a

15 16:16:37 specific time where a decision was made --

16 16:16:40 BY MR. HART:

17 16:16:40    Q.   Uh-huh.

18 16:16:40    A.   -- not to do that.

19 16:16:42    Q.   Uh-huh.  Did there come a point in time

20 16:16:45 when YouTube, in fact, stopped proactively scanning

21 16:16:49 for potentially copyright infringing content on the

22 16:16:54 YouTube site?

23 16:17:07    A.   There's a sort of an assumption in your

24 16:17:09 question that there was an ongoing policy to do

25 16:17:13 that, which I don't necessarily think was the

1                          LEVINE

2  16:17:16 ongoing policy.  I think that in the early days

3  16:17:19 there were some efforts made to do that on behalf

4  16:17:25 of -- at certain times, you know, and at some point

5  16:17:31 we stopped making those efforts.

6  16:17:34    Q.   Uh-huh.  Do you know why, when you say

7  16:17:38 "we," YouTube stopped making those efforts?

8  16:17:41          MR. KRAMER:  Let me object to that

9  16:17:42 question to the extent it calls for the disclosure

10 16:17:45 of confidential legal communications between

11 16:17:48 counsel, and between you and your client.  To the

12 16:17:50 extent there is a non-legal reason, you can answer

13 16:17:53 the question.

14 16:17:57          MR. HART:  Right now I just asked her if

15 16:17:59 she knows why.  I didn't ask her to tell me what the

16 16:18:02 why was.

17 16:18:03          MR. KRAMER:  Okay.

18 16:18:05          THE WITNESS:  More or less.

19 16:18:06 BY MR. HART:

20 16:18:07    Q.   Okay.  Can you tell me why?

21 16:18:13          MR. KRAMER:  Same instruction.

22 16:18:17          THE WITNESS:  We found that we were

23 16:18:19 not very good at determining when content on the

24 16:18:24 site was or was not authorized by the copyright

25 16:18:31 owner.

1                              LEVINE

2    17:30:40 BY MR. HART:

3    17:30:41    Q.   Okay.  Let me show you what we've marked

4    17:30:43 as Exhibit 24, and ask you if you have ever seen

5    17:30:50 that document before.

6    17:31:56         Have you had a chance to read that e-mail

7    17:31:58 yet?

8    17:31:58    A.   Yes, I have.

9    17:31:59    Q.   Okay.  See where it says:

10   17:32:01         Even if a video of a certain program is

11   17:32:03         deleted, the same content is uploaded

12   17:32:06         again, over and over?

13   17:32:07    A.   Yes.

14   17:32:09    Q.   Is that a problem at YouTube?

15   17:32:11         MR. KRAMER:  Wait.  The question is vague.

16   17:32:14 It's vague -- the question is vague.  I'll object to

17   17:32:17 the form of the question.

18   17:32:33         THE WITNESS:  I don't know what this

19   17:32:35 gentleman is talking about, because I can't read his

20   17:32:38 mind -- or her.  I don't know if it's a man or a

21   17:32:41 woman.

22   23:59:57 BY MR. HART:

23   17:32:43    Q.   Uh-huh.

24   17:32:45    A.   But I don't -- my guess is that they're

25   17:32:48 not talking about identical content being uploaded

1                              LEVINE

2   17:32:51 again and again.

3   17:32:52     Q.   Uh-huh.  Because otherwise an MD5 hash

4   17:32:58 would catch it?

5   17:33:00     A.   Correct.

6   17:33:00     Q.   And what if the first video is three

7   17:33:05 minutes of a program, and the next upload of

8   17:33:13 essentially the same content is edited to be two

9   17:33:16 minutes and 59 seconds?  I think you told us earlier

10  17:33:21 the MD5 hash won't catch that, will it?

11  17:33:25     A.   Probably not.

12  17:33:27     Q.   Does YouTube fingerprint content that has

13  17:33:34 been identified pursuant to DMCA take-downs --

14  17:33:39 notices?

15  17:33:40          MR. KRAMER:  Objection to the term

16  17:33:42 "fingerprinting" as vague.

17  17:33:44          MR. HART:  Uh-huh.

18  17:34:01          THE WITNESS:  Not as a general matter, no.

19  17:34:03 BY MR. HART:

20  17:34:05     Q.   Does it do that for premium content

21  17:34:08 partners?

22  17:34:10     A.   No, no, not as a general matter, no.

23  17:34:13     Q.   Okay.  Does the three strike rule apply to

24  17:34:22 your premium content partners?

25  17:34:28          MR. KRAMER:  Objection.  Today?

1                               LEVINE

2  18:11:27        MR. KRAMER:  She can answer.

3  18:11:27 BY MR. HART:

4  18:11:28    Q.   Uh-huh.

5  18:11:30    A.   I'm aware of the decision being discussed

6  18:11:33 in this e-mail.

7  18:11:34    Q.   Okay.  Did you take part in that decision?

8  18:11:43        MR. KRAMER:  Objection.  Question is

9  18:11:44 vague.

10 18:11:45        You can answer.

11 18:11:48        THE WITNESS:  So I think it was the

12 18:11:50 process of that decision, the attorney-client

13 18:11:53 privilege.

14 18:11:54        MR. KRAMER:  To the extent -- okay.  Let

15 18:11:56 me --

16 18:11:58        THE WITNESS:  And that how the decision

17 18:11:58 was made, I think was attorney-client privilege.

18 18:12:00 BY MR. HART:

19 18:12:01    Q.   I simply asked whether you took part in

20 18:12:03 the decision so far.

21 18:12:05        MR. KRAMER:  Right.  I think the question

22 18:12:07 simply is whether or not you participated in the

23 18:12:09 decision over whether to continue to show ads on all

24 18:12:15 watch pages for user-generated content.

25 18:12:18        I would instruct you not, in the course --

1                              LEVINE

2    18:12:22 in the course of answering this or future questions,

3    18:12:24 reveal attorney-client privileged communications,

4    18:12:28 that is, communications of a legal nature, but if

5    18:12:32 there are other communications or discussions in

6    18:12:34 which you participated that do not reflect

7    18:12:37 confidential attorney-client communications, those

8    18:12:40 you can reveal.  I don't think this question calls

9    18:12:43 for it, but I --

10   18:12:46          MR. HART:  I don't think so either.

11   18:12:48          THE WITNESS:  You don't think the question

12   18:12:50 calls for what?  Attorney --

13   18:12:54          MR. KRAMER:  I don't the question here is

14   18:12:56 calling -- sorry.

15   18:12:56          THE WITNESS:  Sorry.

16   18:12:56          MR. HART:  Go ahead.

17   18:12:57          MR. KRAMER:  I don't the question here is

18   18:12:57 calling for you to disclose attorney-client

19   18:12:58 communications at all.  I think he's simply asking

20   18:13:01 whether you were involved in the process by which

21   18:13:03 the decision discussed in this exhibit were --

22   18:13:07 was --

23   18:13:07          THE WITNESS:  Uh-huh.

24   18:13:07          MR. KRAMER:  -- was reached.

25   18:13:08          THE WITNESS:  I -- I may have been

1                               LEVINE

2    18:13:09 involved in it.

3    18:13:10 BY MR. HART:

4    18:13:12    Q.  Do you know the reason why that decision

5    18:13:14 was made?

6    18:13:15         MR. KRAMER:  Okay.  So same instruction.

7    18:13:17         MR. HART:  All right.

8    18:13:18         MR. KRAMER:  To the extent that there are

9    18:13:19 legal -- to the extent that there are privileged

10   18:13:21 communications to which you were a party, you're not

11   18:13:24 to reveal those, but to the extent there were

12   18:13:27 communications of a nonlegal nature, you can -- you

13   18:13:30 can disclose -- discuss those.

14   18:13:32         THE WITNESS:  Okay.  That's sort of hard

15   18:13:33 in my head, so I need to think about this for a

16   18:13:36 second.

17   18:13:37 BY MR. HART:

18   18:13:39    Q.  Keep in mind, all I asked right now is:

19   18:13:41 Do you know the reason why the decision was made?

20   18:13:44    A.    Well --

21   18:13:45    Q.    Not --

22   18:13:45    A.    Okay.

23   18:13:46         MR. KRAMER:  Not what the decisions were?

24   18:13:48         MR. HART:  Didn't ask that yet.

25   18:13:49         MR. KRAMER:  Okay.  You're right.

1                              LEVINE

2  18:14:48 business.

3  18:14:49      Q.   Uh-huh.  Okay.  Does YouTube currently

4  18:14:51 feature advertising on the search results pages of

5  18:14:55 the YouTube site?

6  18:14:57           MR. KRAMER:  Objection.  The question is

7  18:14:58 vague as to "feature."

8  18:14:59 BY MR. HART:

9  18:15:02      Q.   All right.  Fair enough.  Let me rephrase

10 18:15:04 that question.  David's been such a nice guy today.

11 18:15:08           Does YouTube currently have advertising on

12 18:15:11 the search results pages of the YouTube website?

13 18:15:16           MR. KRAMER:  Calls for speculation.

14 18:15:18           MR. HART:  That's where I draw the line,

15 18:15:20 David.

16 18:15:20 BY MR. HART:

17 18:15:21      Q.   Go ahead.

18 18:15:22      A.   Oftentimes it does.

19 18:15:23      Q.   Uh-huh.  And I show you what had been

20 18:15:25 previously marked as Exhibit 15 (sic) at the Reider

21 18:15:31 or Reider -- Reider deposition?

22 18:15:40           (Hands document.)  One for you, two for

23 18:15:43 you.

24 18:15:51           And ask you if this Reider Exhibit 13 is a

25 18:15:58 fair representation of an ad appearing on a search

273

1                          LEVINE

2  18:17:09 answer, but a nontechnical one would be better --

3  18:17:12 why the advertising that's shown on Reider Exhibit

4  18:17:16 13 is sports-related, and the content that the

5  18:17:19 advertising is being shown with on the search

6  18:17:24 results page is English Premier League content,

7  18:17:29 which is also generally sports-related?

8  18:17:34          MR. KRAMER:  Calls for speculation, lacks

9  18:17:36 foundation, assumes facts.

10 18:17:43          THE WITNESS:  Can you ask a shorter

11 18:17:44 question or --

12          BY MR. HART:

13 18:17:45    Q.   Uh-huh.

14 18:17:46    A.   -- be more specific?

15 18:17:47    Q.   Is it just a coincidence that the

16 18:17:49 advertising is Puma or for Puma, which is a

17 18:17:53 sports -- sportswear company, and it appears in

18 18:18:01 conjunction with search results that are for the

19 18:18:03 English Premier League, which is a British football,

20 18:18:08 sports-oriented subject?

21 18:18:10          MR. KRAMER:  Same objections.  That is,

22 18:18:12 assumes facts, calls for speculation, lacks

23 18:18:15 foundation.

24 18:18:19          THE WITNESS:  So the advertising that we

25 18:18:21 run in search results --

1                              LEVINE

2  18:18:22 BY MR. HART:

3  18:18:22    Q.   Uh-huh.

4  18:18:23    A.   -- to my knowledge, does not have anything

5  18:18:25 to do with the search results.

6  18:18:27    Q.   So your testimony is that, to your

7  18:18:28 knowledge, this is just a coincidence?

8  18:18:31         MR. KRAMER:   Same objections.

9  18:18:32         THE WITNESS:   No, I'm going to repeat what

10 18:18:34 I said.   It has nothing to do with the search

11 18:18:36 results.

12 18:18:36         MR. KRAMER:   I -- I -- go ahead.

13 18:18:40         THE WITNESS:   It's not tied to the search

14 18:18:42 results.

15 01:59:57 BY MR. HART:

16 18:18:43    Q.   Okay.   What is it tied to?

17 18:18:45         MR. KRAMER:   Objection.   Calls for

18 18:18:46 speculation, assumes facts, lacks foundation to the

19 18:18:50 extent you're referring to this document.   I just --

20 18:18:52 I don't know what this document is.

21 18:18:54 BY MR. HART:

22 18:18:55    Q.   Uh-huh.   Do you know what it is tied to?

23 18:19:04    A.   I believe that it is tied in some way, I

24 18:19:07 don't know exactly how, to the search term that the

25 18:19:10 user enters.