UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC            )
TELEVISION, INC., PARAMOUNT        )
PICTURES CORPORATION, and BLACK    )
ENTERTAINMENT TELEVISION, LLC,     )
                                   )
              Plaintiffs,          )
                                   )
vs.                                ) NO. 07-CV-2203
                                   )
YOUTUBE, INC., YOUTUBE, LLC,       )
and GOOGLE, INC.,                  )
                                   )
              Defendants.          )
_____    )
                                   )
THE FOOTBALL ASSOCIATION PREMIER   )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all   )
others similarly situated,         )
                                   )
              Plaintiffs,          )
vs.                                ) NO. 07-CV-3582
                                   )
YOUTUBE, INC., YOUTUBE, LLC, and   )
GOOGLE, INC.,                      )
                                   )
              Defendants.          )
_____    )


VIDEOTAPED DEPOSITION OF CHRIS MAXCY
SAN FRANCISCO, CALIFORNIA
THURSDAY, AUGUST 28, 2008


BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CLR
CSR LICENSE NO. 9830
JOB NO. 15485

1          AUGUST 28, 2008

2            10:04 a.m.

3

4          VIDEOTAPED DEPOSITION OF CHRIS MAXCY,

5      SHEARMAN & STERLING, 525 Market Street,

6      San Francisco, California, pursuant to notice,

7      before ANDREA M. IGNACIO HOWARD, CLR, RPR, CSR

8      License No. 9830.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022   (212)705-8585

1    A P P E A R A N C E S:

2

3       FOR THE PLAINTIFFS VIACOM INTERNATIONAL, INC.:

4            JENNER & BLOCK

5            By:  MELISSA COX, Esq.

6            1099 New York Avenue, NW, Suite 900

7            Washington, D.C. 20001

8            (202) 639-6000  melissacox@jenner.com

9

10      FOR THE LEAD PLAINTIFFS AND PROSPECTIVE CLASS:

11           PROSKAUER ROSE LLP

12           By:  HAL S. SHAFTEL, Esq.

13           1585 Broadway

14           New York, New York 10036-8299

15           (212) 969-3230  hshaftel@proskauer.com

16

17      FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE, LLC and

18      GOOGLE, INC.:

19           MAYER BROWN LLP

20           By:  JOHN MANCINI, Esq.

21               ERIC D. DOWELL, Esq.

22           1675 Broadway

23           New York, New York 10019

24           (212) 506-2146  jmancini@mayerbrown.com

25

1    A P P E A R A N C E S  (Continued.)

2

3       ALSO PRESENT:

4          GOOGLE INC.

5          By:  ADAM L. BAREA, Litigation Counsel

6          1600 Amphitheater Parkway

7          Mountain View, California 94043

8          (650) 214-4879  adambarea@google.com

9

10         KELLY TRUELOVE, Ph.D., Consultant

11         LOU MEADOWS, Videographer

12

13                    ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

|          | 1  | MAXCY |
|----------|----|-------|
| 10:53:31 | 2  | A    Warner Music Group. |
| 10:53:38 | 3  | Q    I believe you testified YouTube seeks to |
| 10:53:39 | 4  | generate revenue from advertising; is that fair? |
| 10:53:43 | 5  | MR. MANCINI:  Objection; asked and answered. |
| 10:53:46 | 6  | THE WITNESS:  Yes. |
| 10:53:47 | 7  | MR. SHAFTEL:  Q.  And when you began in |
| 10:54:03 | 8  | December '05 or early '06, where was YouTube |
| 10:54:14 | 9  | displaying advertising on its site? |
| 10:54:16 | 10 | MR. MANCINI:  Objection to form. |
| 10:54:17 | 11 | THE WITNESS:  I don't recall the specifics. |
| 10:54:25 | 12 | I think you'd have to talk to somebody else about |
| 10:54:28 | 13 | that, but I do recall that we had advertising on the |
| 10:54:33 | 14 | home page. |
| 10:54:34 | 15 | MR. SHAFTEL:  Q.  Do you recall if there was |
| 10:54:39 | 16 | advertising anywhere else? |
| 10:54:44 | 17 | MR. MANCINI:  Same objection. |
| 10:54:45 | 18 | THE WITNESS:  At that time, I can't recall |
| 10:54:47 | 19 | exactly where it was, so I -- I don't want to |
| 10:54:51 | 20 | speculate. |
| 10:54:52 | 21 | MR. SHAFTEL:  Q.  Do you recall there came a |
| 10:54:53 | 22 | point in time when there was advertising beyond the |
| 10:54:55 | 23 | home page? |
| 10:54:57 | 24 | A    Yes. |
| 10:54:57 | 25 | Q    When?  When was that? |

|          | 1  | MAXCY |
| 10:54:59 | 2  | A    I don't recall exact dates. |
| 10:55:00 | 3  | Q    Where -- can -- can you approximate a time |
| 10:55:07 | 4  | frame when you can first recall advertising somewhere |
| 10:55:09 | 5  | other than the home page? |
| 10:55:10 | 6  | MR. MANCINI:  Objection to form. |
| 10:55:11 | 7  | THE WITNESS:  I can't recall specific dates, |
| 10:55:13 | 8  | no. |
| 10:55:13 | 9  | MR. SHAFTEL:  Q.  What do you mean by the |
| 10:55:14 | 10 | "home page" by the way? |
| 10:55:16 | 11 | A    The youtube.com front page. |
| 10:55:19 | 12 | Q    Well, you know today, am I correct, that |
| 10:55:23 | 13 | there's advertising beyond the home page? |
| 10:55:25 | 14 | A    That's correct. |
| 10:55:25 | 15 | Q    Now, does the home page display any content |
| 10:55:34 | 16 | that has been provided by a third party to YouTube? |
| 10:55:43 | 17 | MR. MANCINI:  Objection to form. |
| 10:55:44 | 18 | THE WITNESS:  All of the content that we have |
| 10:55:49 | 19 | on our site has been provided by a third-party, |
| 10:55:51 | 20 | uploaders. |
| 10:55:52 | 21 | MR. SHAFTEL:  Q.  Well, you described a home |
| 10:55:54 | 22 | page as a page, in essence, which said YouTube.com or |
| 10:55:58 | 23 | something like that. |
| 10:55:59 | 24 | A    Right. |
| 10:55:59 | 25 | Q    So what I'm trying to distinguish is on that, |

                        1                          MAXCY

17:08:07    2    the status of their approval, whether they had

17:08:10    3    approved or not approved.

17:08:14    4        Q    And after a contract is executed, does it

17:08:17    5    continue to reside within the Simba system?

17:08:19    6        A    To my understanding, yes.

17:08:24    7        Q    Are there any fields for comments within the

17:08:30    8    Simba system?

17:08:35    9        A    Yes.

17:08:35    10       Q    So somebody, for example, who's reviewing a

17:08:40    11   potential agreement that is captured within Simba is

17:08:44    12   able to relate comments that she or he has about the

17:08:49    13   proposed agreement?

17:08:51    14       A    That's correct.

17:08:51    15       Q    And is this something which is accessible

17:08:54    16   from your computer in your office?

17:08:55    17       A    Yes.

17:08:56    18       Q    Okay.  Let me mark as Exhibit 21 the next

17:09:01    19   document, 10746.

17:09:01    20            (Document marked Maxcy Exhibit 21

17:09:23    21             for identification.)

17:09:32    22            MR. SHAFTEL:  Q.  Let me know when you've had

17:09:34    23   a chance to review it, Mr. Maxcy.

17:10:08    24       A    Okay.

17:10:11    25       Q    The top -- the only e-mail on this page,

21b70149-76c5-4fc4-becb-92d0fd08eedd

                    1                          MAXCY

17:10:17     2     you're writing to Mr. Eun, and you're providing a

17:10:20     3     summary of apparently what you discussed on, quote,

17:10:28     4     the "H.264 encoding question."  What are you referring

17:10:31     5     to by "H.264 encoding"?

17:10:36     6          A    This is an e-mail describing how YouTube

17:10:46     7     encodes video.  So there's different -- I have a very

17:10:52     8     basic understanding of this, but apparently there are

17:10:55     9     different formats that you can convert a file into

17:10:58    10     when it's been uploaded to YouTube, and H.264 is a

17:11:05    11     format that is compatible with viewing through mobile

17:11:11    12     devices and other devices.

17:11:12    13          Q    So this process relates to YouTube's

17:11:19    14     syndication of content to third parties?

17:11:23    15               MR. MANCINI:  Objection to form.

17:11:24    16               THE WITNESS:  Could you rephrase?

17:11:25    17               MR. SHAFTEL:  Yeah.

17:11:26    18          Q    Am I correct that YouTube engages in the

17:11:30    19     H.264 encoding in order to then syndicate the content

17:11:35    20     to third parties?

17:11:41    21          A    That is one reason.  As far as I'm aware,

17:11:46    22     H.264 is also a higher quality format, even when video

17:11:50    23     is being delivered through a web page.  And again,

17:11:54    24     from what I've been told, this was something that was

17:11:59    25     done to improve the viewing experience, not just on

|    |    |
|----|----|
|  | 1 |

MAXCY

17:12:03    2    mobile and devices, but on the YouTube website.

17:12:09    3    Q   So the content undergoes H.264 encoding even

17:12:19    4    when the content stays on the YouTube site, it is not

17:12:25    5    distributed or syndicated to third parties?

17:12:28    6    MR. MANCINI:  Objection to the extent that

17:12:29    7    this witness has any knowledge of that technical --

17:12:32    8    THE WITNESS:  I don't know the answer to

17:12:33    9    that.

17:12:33    10    MR. SHAFTEL:  Q.  Is that your understanding?

17:12:35    11    A   I -- I don't want to speculate.  I think the

17:12:39    12    best person to talk to would be the engineering team.

17:12:47    13    Q   In your summary here, you refer to -- to

17:12:52    14    date, and this is August '07, "YouTube engineering

17:12:57    15    team has re-encoded approximately 30,000 of the top

17:13:00    16    watched videos on YouTube."

17:13:02    17    A   Yes.

17:13:02    18    Q   How was that 30,000 selected?

17:13:13    19    A   I don't know.

17:13:13    20    Q   Do you know who selected it?  What person or

17:13:19    21    group of people?

17:13:22    22    A   I don't.  I think that the engineering team

17:13:24    23    would probably be the best to tell you.  The way I

17:13:27    24    read this, it was probably an algorithm based on the

17:13:33    25    top viewed videos.

```
                   1                        MAXCY

17:13:34           2        Q    Do you know how much of YouTube's content has

17:13:40           3    been H.264 encoded today?

17:13:44           4        A    It's my understanding that the entire catalog

17:13:48           5    at this point has been converted.

17:13:49           6        Q    Where does that -- where does that process

17:13:56           7    take place?

17:13:57           8        A    I have no idea.

17:14:00           9        Q    There's also a reference in your summary to a

17:14:05           10   WAP, in caps, site.  What is that?

17:14:10           11       A    That's an acronym standing for Wireless

17:14:13           12   Access Protocol or a mobile site, a mobile website

17:14:18           13   that would be viewable on a mobile device.

17:14:24           14            MR. SHAFTEL:  I'm told we need to change

17:14:26           15   the -- the tape.

17:14:28           16            THE VIDEOGRAPHER:  Okay.  This marks the end

17:14:31           17   of videotape number three.  Off the record.

17:14:33           18            The time is 5:14 p.m.

17:14:34           19            (Recess taken.)

17:26:40           20            THE VIDEOGRAPHER:  On the record.  This marks

17:26:42           21   the beginning of videotape number four in the

17:26:44           22   deposition of Chris Maxcy on August 28, 2008.  The

17:26:47           23   time is 5:26 p.m.

17:26:48           24            Please continue.

17:26:50           25            MR. SHAFTEL:  Q.  Sticking with Exhibit 21,
```

1          MAXCY

2  17:26:54 Mr. Maxcy, before the break for the video change, we

3  17:26:59 were talking about the re-encoding by August of '07 of

4  17:27:06 approximately 30,000 of the top watched videos on

5  17:27:11 YouTube, and you had mentioned that the engineers may

6  17:27:14 have applied some algorithm you were not -- you were

7  17:27:17 not sure of, I think was your testimony.

8  17:27:19          Were you involved or are you aware of what

9  17:27:23 directions anybody in the engineering department was

10 17:27:26 given in terms of selecting the 30,000?

11 17:27:31          MR. MANCINI: Objection to form.

12 17:27:33          THE WITNESS: No, I wasn't aware of how they

13 17:27:37 determined this or the directions they were given.

14 17:27:40          MR. SHAFTEL: Q. With regard to any of the

15 17:27:45 content syndicated by YouTube to third parties, are

16 17:27:50 you aware of any efforts by YouTube to either review

17 17:27:58 or select only a portion of content to provide to the

18 17:28:03 third party?

19 17:28:05          MR. MANCINI: Objection to form.

20 17:28:06          THE WITNESS: Could you be more specific?

21 17:28:11          MR. SHAFTEL: Q. In the deals where YouTube

22 17:28:14 is syndicating content, are you aware of any instances

23 17:28:17 where the third party received only a selection of the

24 17:28:26 content that had been encoded for transmittal?

25 17:28:33          MR. MANCINI: Objection to form.

MAXCY

1

2 17:28:34        THE WITNESS:  Yes.

3 17:28:41        MR. SHAFTEL:  Q.  What do you recall about

4 17:28:42 those instances?  What was the selection criteria?

5 17:28:48    A    We --

6 17:28:49        MR. MANCINI:  Objection to form; compound

7 17:28:50 question.

8 17:28:52        THE WITNESS:  We had a partnership, or we

9 17:28:55 have a partnership with Verizon VCAST in which we made

10 17:29:04 available videos that were featured on YouTube's

11 17:29:09 website for the VCAST platform.  So any video that had

12 17:29:14 been featured by YouTube on its front page was

13 17:29:17 available for display on VCAST.

14 17:29:21        MR. SHAFTEL:  Q.  And other YouTube videos,

15 17:29:23 meaning videos displayed on YouTube, were not

16 17:29:26 accessible or available on the Verizon VCAST?

17 17:29:30    A    That's correct.

18 17:29:30    Q    Did you have discussions with Verizon about

19 17:29:34 that restriction?

20 17:29:37    A    Yes.

21 17:29:37    Q    And why did Verizon want that restriction?

22 17:29:42    A    Verizon was concerned about the

23 17:29:45 appropriateness of the content.  More specifically,

24 17:29:50 they were worried about pornography, child

25 17:29:55 pornography, or illegal acts.

1                           MAXCY

2  17:29:58   Q    And when you say that it was featured content

3  17:30:04 that was accessible or available on Verizon VCAST, did

4  17:30:10 YouTube personnel play a role in selecting that

5  17:30:13 content to put on the home page?

6  17:30:15        MR. MANCINI:   Objection to form.

7  17:30:16        THE WITNESS:   Yes.   The YouTube site has a

8  17:30:21 functionality that allows users to notify YouTube of

9  17:30:29 content that they find interesting that says "Please

10 17:30:34 feature that content," and that content is then sent

11 17:30:39 to YouTube personnel, editorial personnel, for review

12 17:30:42 and consideration for featuring on the front page of

13 17:30:45 YouTube.

14 17:30:46        MR. SHAFTEL:   Q.   And do the YouTube

15 17:30:47 editorial personnel review for copyright issues?

16 17:30:51   A    Not to my knowledge, no.

17 17:30:52   Q    Did you speak to Verizon VCAST about this

18 17:30:58 limitation or the scope of content that would be

19 17:31:01 supplied to Verizon?

20 17:31:03   A    Could you be more specific?

21 17:31:08   Q    Yeah.

22 17:31:08        Did you yourself have a role in the

23 17:31:10 discussions with Verizon VCAST about the scope of

24 17:31:15 content being limited to featured content?

25 17:31:17   A    Tangentially, I didn't complete the Verizon

1                         MAXCY

2 17:31:20 deal.  Someone on my team did.

3 17:31:22    Q    Who?

4 17:31:23    A    Kelly Liang, L-I-A-N-G.

5 17:31:26    Q    You said you didn't complete the deal.  Were

6 17:31:29 you yourself involved in any discussions with Verizon

7 17:31:34 about the scope of content?

8 17:31:36    A    Yes.

9 17:31:36    Q    Who did you speak with at Verizon?

10 17:31:42    A    I don't recall all the people, but there was

11 17:31:45 one individual named Jennifer Byrne at Verizon who is

12 17:31:51 a business development person there.

13 17:31:52    Q    She was your principal contact there?

14 17:31:55    A    Yes.

15 17:31:55    Q    Were there any discussions about copyright

16 17:31:57 issues with Verizon that you were party to?

17 17:32:04    A    I believe so, yes.

18 17:32:05    Q    What do you recall about those?

19 17:32:10    A    Honestly, I don't recall the details.  I do

20 17:32:12 recall that there were conversations about copyright.

21 17:32:15    Q    And Verizon expressed concerns about having

22 17:32:19 unauthorized copyrighted content displayed on Verizon

23 17:32:26 VCAST?

24 17:32:27    A    Yes.

25 17:32:27    Q    And did that factor into other interests as