UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC )
TELEVISION, INC., PARAMOUNT )
PICTURES CORPORATION, and BLACK )
ENTERTAINMENT TELEVISION LLC, )
              Plaintiffs, )
vs. )Case No. 1:07CV02103
 )
YOUTUBE, INC., YOUTUBE, LLC, )
and GOOGLE, INC., )
 )
              Defendants. )
_____)
 )
THE FOOTBALL ASSOCIATION PREMIER )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all )
others similarly situated, )
 )
              Plaintiffs, )
vs. )Case No. 07CV3582
 )
YOUTUBE, INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
 )
              Defendants. )
_____)


DEPOSITION OF MICAH SCHAFFER

SAN FRANCISCO, CALIFORNIA

WEDNESDAY, JULY 23, 2008


REPORTED BY:

YVONNE FENNELLY, CRP, CSR NO. 5495

JOB NO. 15376

1
2
3
4
5  JULY 23, 2008
6  10:00 a.m.
7
8  VIDEOTAPED DEPOSITION OF MICAH SCHAFFER,
9  held at the offices of SHEARMAN & STERLING,
10 525 Market Street, San Francisco, California,
11 pursuant to notice, before YVONNE FENNELLY, CRP,
12 CSR License No. 5495.

A P P E A R A N C E S

FOR THE LEAD PLAINTIFFS AND PROSPECTIVE CLASS:

    PROSKAUER ROSE, LLP
    By:  HAL S. SHAFTEL, Attorney at Law
    1585 Broadway
    New York, California  90067-3206
    (212) 969-3230
    (212) 969-2900
    hshaftel@proskauer.com


FOR THE PLAINTIFF VIACOM INTERNATIONAL, INC.:

    JENNER & BLOCK, LLP
    By:  JAMES COX, Attorney at Law
    1099 New York Avenue, NW
    Suite 900
    Washington, DC  20001
    (202) 639-6000
    (202) 661-4916
    JamesCox@jenner.com


FOR THE CLASS PLAINTIFFS:

    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    By:  DAVID S. STELLINGS, Attorney at Law
    780 Third Avenue
    48th Floor
    New York, New York  10017-2024
    (212) 355-9500
    (212) 355-9592
    dstellings@lchb.com

```
                                                                    4
 1

 2       APPEARANCES (Continued):

 3


 4       FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE, LLC and
         GOOGLE, INC.:
 5
             MAYER BROWN, LLP
 6           BY:  ANDREW H. SCHAPIRO, Attorney at Law
                  DAVID McGILL, Attorney at Law
 7           1675 Broadway
             New York, New York  10019
 8           (212) 506-2500
             aschapiro@mayerbrown.com
 9


10
         FOR GOOGLE, INC.:
11
             GOOGLE, INC.
12           BY:  ADAM L. BAREA, Litigation Counsel
             1600 Amphitheatre Parkway
13           Mountain View, California  94043
             (650) 214-4879
14           (650) 618-1806
             adambarea@google.com
15


16
         ALSO PRESENT:  Kelly Truelove, consultant;
17       Lou Meadows, Videographer

18                              --oOo--

19

20

21

22

23

24

25
```

02:03 Premier League content?

02:03     A.   These are very different times, 02:03 chronologically.  This e-mail is from May 2006.  Our 02:03 site was a very different size then, and we were a small 02:03 company still figuring out exactly what the appropriate 02:03 balance was and how to scale things like this.

02:03          So one of the things that we discovered as we 02:03 were doing this -- and of course we were doing this 02:03 because -- we were doing this for the RIAA because we 02:03 wanted to be helpful; right?  We wanted to work with 02:03 content owners, and especially when they first signed up 02:03 for it, I imagine, you know, there was somewhat of a 02:04 backlog when they first began removing their content 02:04 from YouTube.  There has got to be, you know, some extra 02:04 content that had been previously uploaded, and we 02:04 didn't -- you know, we felt that it would be a good 02:04 service to provide to them to, you know, to try to help 02:04 them with that burden.

02:04          But what we found over time was that, first, we 02:04 weren't very good at it.  We couldn't tell, you know, 02:04 what was authorized or not.  We really wouldn't know 02:04 necessarily who had uploaded it.  We wouldn't know 02:04 whether particular videos were authorized or if, like, 02:04 NBC -- NBC is a great example of someone who was using

1
2    02:10   scans, sure.
3    02:10       Q.   Do you recall any discussions about whether or
4    02:10   not to continue the practice?
5    02:10       A.   I don't recall.
6    02:10       Q.   You mentioned that one aspect of proactive
7    02:10   scanning involves the potential misidentifications or
8    02:10   incorrect decisions; is that right?
9    02:10       A.   Absolutely.
10   02:10       Q.   Were you involved in or aware of any analysis
11   02:10   that YouTube did as to the extent of misidentifications
12   02:10   from proactive scanning?
13   02:10       A.   I don't recall any specifically.
14   02:10       Q.   To be more particular about the point, do you
15   02:10   recall anybody at YouTube doing any analysis to see
16   02:11   quantitatively how often misidentifications occurred
17   02:11   from proactive scanning?
18   02:11       A.   I think it was more anecdotal.
19   02:11       Q.   You referred to difficulties with scalability
20   02:11   as videos on the site grew; is that correct?
21   02:11       A.   Sure.
22   02:11       Q.   Do you recall any analysis at YouTube as to the
23   02:11   viability of proactive scanning to remove content with
24   02:11   the increased traffic and number of videos at the site?
25   02:11       A.   I think it was more of a general notion that

<pre>                                                                  Page 97
            1
02:29       2                In fact, you know, you meant generally?
02:29       3    Customer support, responding to copyright takedown
02:29       4    notices is a big part of it, removing inappropriate
02:29       5    content that had been flagged, support e-mails, those
02:29       6    types of tasks.
02:29       7        Q.   And did Ms. Gillette have a practice of
02:29       8    creating a priority list for each day?
02:30       9        A.   I don't think so.
02:30      10        Q.   Do you recall what her practice was in terms of
02:30      11    generating priorities lists or what circumstances she
02:30      12    would do it?
02:30      13        A.   Probably whenever she felt the need maybe.  It
02:30      14    changed.  I don't know.  I wouldn't -- I might be on the
02:30      15    list that would receive them, but they wouldn't
02:30      16    typically define my work, so I'm not too familiar with
02:30      17    the logistics of the priorities lists.
02:30      18        Q.   You recall that they were conveyed to you as
02:30      19    priorities for your work?
02:30      20        A.   No.  For other members of the team, but I might
02:30      21    be privy to them.
02:30      22        Q.   There is a reference in item 12 here, Proactive
02:30      23    scans copyright scans (don't forget American Idol)?
02:30      24        A.   Yes.
02:30      25        Q.   Do you recall whether the operations team</pre>

<pre>                   DAVID FELDMAN WORLDWIDE, INC.
      805 Third Avenue, New York, New York 10022   (212)705-8585</pre>

```
02:30   2    scanned for American Idol?
02:31   3         A.   On occasions.
02:31   4         Q.   Were you involved in proactive scans for
02:31   5    American Idol?
02:31   6         A.   On occasions.
02:31   7         Q.   And what occasions would give rise to the
02:31   8    proactive scans?
02:31   9         A.   We had been in -- some of this is probably
02:31  10    privileged.
02:31  11              MR. SCHAPIRO:  Can you give as much of an
02:31  12    answer as you can without discussing any legal advice
02:31  13    that you received or sought?
02:31  14              THE WITNESS:  Yes, I can try to be general
02:31  15    enough.
02:31  16              So we had been working with -- I believe it's
02:31  17    Fremantle owns American Idol.  They were very adamant --
02:32  18    they were very upset by the presence of content that
02:32  19    they felt -- or content that they owned that was being
02:32  20    uploaded to YouTube.  And we would ask them, plead with
02:32  21    them really for URL's, for specific links, for specific
02:32  22    indications what content they were talking about, and
02:32  23    they were not very cooperative.  They refused to provide
02:32  24    on most occasions specific information and were
02:32  25    threatening to sue us on a fairly regular basis on very
```

```
02:32   2    strong terms.  And particularly this would happen, you
02:32   3    know, right around the time -- of course it's a cyclical
02:32   4    show; right, it's a series.  So right during the time a
02:33   5    show would air they would come down; they would get
02:33   6    particularly more upset.
02:33   7            And, you know, in August we were still -- you
02:33   8    know, we hadn't been bought by Google yet.  We were very
02:33   9    resource constrained.  And even though we were operating
02:33   10   within the law, my feeling at least, and I imagine the
02:33   11   feeling of others was that a lawsuit would be very bad
02:33   12   and that we might not be able to adequately defend
02:33   13   ourselves.  So even though I don't think we were
02:33   14   obligated to go scan and guess which content was
02:33   15   American Idol, and I know mistakes were made because
02:34   16   there is many different idol shows around the world,
02:34   17   there are parodies, there are lots of videos.  I mean,
02:34   18   people, you know, singing in their bathrooms or their
02:34   19   bedrooms, and they would tag it American Idol because
02:34   20   they are doing their best, you know, or they're
02:34   21   commenting on American Idol, and things like that.  And
02:34   22   sometimes, you know, inevitably those videos would get
02:34   23   swept up in this, but we kept doing those scans for a
02:34   24   time simply because it was -- you know, if we had gotten
02:34   25   sued at that point, even though we were doing nothing
```

1
02:34   2   wrong, it wouldn't necessarily matter that we were in
02:34   3   the right because we didn't necessarily have the
02:34   4   resources to adequately defend ourselves, so, you know,
02:34   5   they bullied us. And even though we really -- and the
02:34   6   irony is we really wanted to cooperate. We really
02:34   7   genuinely wanted their content down; and, that's why in
02:35   8   the end we'd grudgingly do these searches for them even
02:35   9   though it really wasn't the most effective use.
02:35   10          We offered them the tool repeatedly, you know,
02:35   11  our content verification program. We pleaded with them
02:35   12  to work with us. And we really, you know, sort of, in
02:35   13  the absence of their cooperation, we bent over backwards
02:35   14  trying to accommodate them.
02:35   15      Q.  Did you speak to anyone at Fremantle?
02:35   16          MR. SCHAPIRO:  When?
02:35   17  BY MR. SHAFTEL:
02:35   18      Q.  By August of 2006, about their concerns over
02:35   19  the infringing content on the site?
02:35   20      A.  I don't know if I personally had contact with
02:35   21  them directly. And again, getting into privilege, I
02:35   22  would be hesitant to characterize my knowledge of other
02:35   23  communications.
02:35   24          MR. SCHAPIRO:  Don't answer further.
02:35   25  BY MR. SHAFTEL:

```
02:41    2       A.   I didn't see the second page.  Hang on a
02:41    3   moment.
02:41    4            No.
02:41    5       Q.   Have you ever seen a document in which the
02:41    6   format resembles this?
02:41    7       A.   No, I don't recall ever seeing a document that
02:41    8   looked like this.
02:41    9       Q.   Do you see in the middle of the page there is a
02:41   10   number of what appears to be TV shows or other
02:41   11   entertainment content identified that begins with
02:41   12   American Idol, Simpsons, Family Guy?
02:41   13       A.   Yes.
02:41   14       Q.   Does that grouping of content have any meaning
02:42   15   to you?
02:42   16            And specifically, were those videos that at
02:42   17   this point in time were being proactively scanned for?
02:42   18       A.   In the context of the document, I'm not sure if
02:42   19   they're necessarily search terms.  I think it's probably
02:42   20   a reasonable assessment that they are related to content
02:42   21   to proactively look for.
02:42   22       Q.   In August of 2006, how many videos do you
02:42   23   recall approximately being on the YouTube site?
02:42   24       A.   I have no idea.  Lots.
02:42   25       Q.   Do you recall whether YouTube engaged in any
```

```
02:43   2    proactive scanning to remove content after the
02:43   3    acquisition by Google in November of 2006?
02:43   4         A.   I don't recall specifically.  I guess it comes
02:43   5    back to exactly what we mean by "proactive."
02:43   6              If being threatened and prompted and instructed
02:43   7    by Fremantle, for instance, and then taking action based
02:43   8    on the information they provided and conveyed and
02:43   9    requested, I would say, then, I do recall that
02:44  10    happening.  I forget the level of detail.  I know
02:44  11    eventually they began providing us with more detailed
02:44  12    information about what they would like removed, and we
02:44  13    responded, you know, to those requests.
02:44  14              I don't recall with regard specifically to
02:44  15    proactively searching for content without prompting in
02:44  16    that regard.
02:44  17         Q.   So I can understand, you recall searching for
02:44  18    Fremantle content to remove without specific URL's from
02:45  19    Fremantle or DMCA notice after the Google acquisition;
02:45  20    is that correct?
02:45  21         A.   I believe so.
02:45  22              I believe there were instances where they
02:45  23    provided -- I know at some point they began -- I
02:45  24    remember receiving, I think it was like a printout of
02:45  25    search results that Fremantle had provided and doing
```

```
02:45   1
02:45   2    removals based on that.  And I know there was some back
02:45   3    and forth around that.
02:45   4         Q.   Do you recall doing that for anyone else
02:45   5    besides Fremantle after the Google acquisition?
02:45   6         A.   I believe there were probably others.
02:45   7         Q.   Who do you recall?
02:45   8         A.   And to varying degrees, of course; right?  As I
02:45   9    said earlier, we regularly remove content without
02:46  10    fully -- without fully formed technically valid DMCA
02:46  11    takedown notices.  And it's kind of a spectrum of, you
02:46  12    know, of the amount of specificity and the amount of
02:46  13    technical accuracy, and we try to respond appropriately
02:46  14    based on the circumstances.  And I know we've removed a
02:46  15    substantial amount of Viacom content without fully
02:46  16    formed DMCA notices as well.
02:46  17         Q.   Do you recall removing Viacom content that was
02:46  18    uploaded after the date of whatever communication you're
02:47  19    relying on, even if it's not, as you put it, a fully
02:47  20    formed DMC notice?
02:47  21              MR. SCHAPIRO:  Objection; vague, ambiguous.
02:47  22    BY MR. SHAFTEL:
02:47  23         Q.   You've described the situation where a content
02:47  24    owner submits a notification that I believe you put it,
02:47  25    is not fully formed; it may have some technical defect.
```

```
03:27   2    know, fraud detection and spam and things like that.
03:28   3             YouTube has not yet fully integrated with
03:28   4    Google's account management system.  I believe we have
03:28   5    plans to in the near term, and it involves a lot of
03:28   6    other moving pieces, but to the extent possible, we try
03:28   7    to leverage that system.
03:28   8    BY MR. SHAFTEL:
03:28   9         Q.   Thank you.
03:28   10             You had testified earlier today about MD5
03:28   11   hashes.
03:28   12            Am I correct that when content is removed
03:28   13   pursuant to the DMCA process, YouTube then takes some
03:28   14   action based on MD5 hashes?
03:28   15        A.   Yes.
03:28   16        Q.   How does it work?
03:28   17        A.   So when content is removed for terms of use
03:29   18   violation or in response to a copyright notification,
03:29   19   our system automatically implements a block on the
03:29   20   originally uploaded files, MD5 hash.
03:29   21        Q.   Do the MD5 hashes, have they ever at YouTube
03:29   22   operated to delete videos that were existing on the
03:29   23   system before the video that is taken down?
03:29   24        A.   So the question is about preexisting?
03:29   25        Q.   Exactly.
```

```
1
2    04:56           Are you aware of any ideas that were expressed
3    04:56   within YouTube or then Google post-acquisition to detect
4    04:56   or exclude copyrighted infringing material on a site
5    04:56   that the company didn't implement?
6    04:56       A.   You said "detect," or is there another part?
7    04:56       Q.   Exclude.  Block.
8    04:56       A.   So it involved blocking as a result of
9    04:56   detecting?
10   04:56       Q.   (Nods head.)
11   04:56       A.   None that I can recall.
12   04:56       Q.   I'd asked you earlier about private videos or
13   04:57   Friend Share videos.
14   04:57       A.   Yes.
15   04:57       Q.   Do you understand that to be a program where
16   04:57   the uploader can limit the number of visitors to the
17   04:57   uploader's video or site page?
18   04:57       A.   I'm sorry?
19   04:57       Q.   What's the private -- what's the private video
20   04:57   program?  What does it mean?
21   04:57       A.   Users can designate a video as private either
22   04:57   when they upload it or subsequently by altering their
23   04:57   preferences and allows the video to be viewed by a
24   04:57   limited audience of their choosing.
25   04:57       Q.   And how are private videos monitored for your
```

183

```
 1
 2   05:40           MR. McGILL:  Are we up to Exhibit 17 or 15?
 3   05:40           THE WITNESS:  The last one was 15.
 4   05:40           MR. McGILL:  So this should be 16.
 5   05:41           THE WITNESS:  Okay.
 6   05:41  BY MR. COX:
 7   05:41     Q.   In this declaration, Mr. Chen states that
 8   05:41  YouTube does not manually screen videos before they are
 9   05:41  made available through the service.
10   05:41           Do you agree with that statement?
11   05:41     A.   So at the time of this declaration -- actually,
12   05:41  I see the date of the hearing.  I'm not sure when the
13   05:41  declaration was executed.
14   05:41           January 5th, apparently, 2007.  I don't believe
15   05:41  that was our standard practice, no.
16   05:41     Q.   I'm sorry.  To clarify, you don't believe that
17   05:41  screening videos manually before they were made
18   05:41  available was your standard practice?  So you agree with
19   05:42  the statement?
20   05:42     A.   I don't believe that was our practice.
21   05:42     Q.   Do you know of any other time when that was
22   05:42  your practice?
23   05:42     A.   I think the sentence is slightly ambiguous.  I
24   05:42  wouldn't want to preclude the kinds of things we
25   05:42  discussed earlier with regards to private videos, though
```

1

2   05:42   I suppose those were available.  So no, I guess I'm not

3   05:42   aware of any circumstances.

4   05:42       Q.   After the videos were made available through

5   05:42   the service at the time of this declaration, were you

6   05:42   aware of efforts YouTube was making to manually screen

7   05:43   videos?

8   05:43            MR. SCHAPIRO:  Objection to the form of the

9   05:43   question.

10  05:43            THE WITNESS:  Well, again, I think the term

11  05:43   "manually screen videos" is ambiguous.

12  05:43   BY MR. SHAFTEL:

13  05:43       Q.   In what way?

14  05:43       A.   So I'm not sure -- it could mean any number of

15  05:43   things.

16  05:43       Q.   What are the different things you think it

17  05:43   could mean?

18  05:43       A.   It could refer to -- and again, we're talking

19  05:43   about after they're available through the service?

20  05:43       Q.   Yes.

21  05:43       A.   It could refer to when a content owner sends in

22  05:43   a nonspecific takedown notice, perhaps involving search

23  05:43   terms, or even search results that would require us to

24  05:44   go through and manually look through the content that's

25  05:44   being referred to.