To:        "Fricklas, Michael" <Michael.Fricklas@viacom.com>, "rick.cotton@nbcuni.com"
<rick.cotton@nbcuni.com>
From:      "Kent Walker"  ███████████
Cc:
Bcc:
Received Date:  2007-02-17 04:12:10 CST
Subject:   Getting Back re YouTube Content Issues

Hey guys --
Sorry this is so late -- it's been a busy week/day, but wanted to get you
something before the week was out. Thanks very much for your recent letters
re YouTube and your copyrighted works. I wanted to share our thoughts on
the legal issues raised by your letters, address your description of several
violations of YouTube's policy against copyright infringement, and respond
to your interest in furthering our discussion of automated tools and other
issues. (As we've discussed, I appreciate your continued consideration in
keeping our discussion confidential.) Let me start with the legal issues:

Specification of Potentially Infringing Items. Because this question has
come up several times, it's probably useful to note at the outset that
copyright owners can't indiscriminately take down items merely by providing
a list of items that may be infringed. Under the safe harbor of the Digital
Millennium Copyright Act (17 U.S.C. Section 512(c)), copyright owners must
provide specific identification of any infringing items and their location,
not merely a "representative list".

Among other requirements, 17 U.S.C. Section 512(c)(iii) says that a DMCA
takedown notice must include, "Identification of the copyrighted work
claimed to have been infringed, or, if multiple copyrighted works at a
single online site are covered by a single notification, a
representativelist of such works at that site." Note
that this section applies to the copyrighted works that you own, not
potentially infringing works. The very next section (Section 512(c)(iii))
deals with potentially infringing works -- a copyright owner must also
provide a service provider with "[i]dentification of the material that is
claimed to be infringing or to be the subject of infringing activity and
that is to be removed or access to which is to be disabled, and information
reasonably sufficient to permit the service provider to locate the
material".

In other words, identification of what has been infringed can be
accomplished with a "representative list" of the works infringed, but there
is no parallel provision for identification of "the material that is claimed
to be infringing." Congress specifically stated that a representative list
of infringed works suffices; its decision not to state specifically that a
representative list of infringing works shows its intent to require that a
DMCA notice identify the location of infringing material that the copyright
owner wants a service provider to remove.

Financial Benefit. Section 512(c)(1)(B) provides that, in order to take
advantage of the 512(c) safe harbor, a service provider cannot "receive a
financial benefit directly attributable to the infringing activity, in a
case in which the service provider has the right and ability to control such
activity." The first half of this clause requires a financial benefit
"directly
attributable to the infringing activity." The legislative history notes
that "where the infringer makes the same kind of payment as non-infringing



Highly Confidential

users of the provider's service," that is not a financial benefit "directly attributable to the infringing activity." And Congress made clear that service providers offering a general-purpose platform can directly receive payment from an infringer and still not be deemed to have received "a financial benefit directly attributable to the infringing activity." The legislative history allows service providers to receive set-up fees, periodic payments, and traffic fees for hosting content that may include infringing material. YouTube does not receive any sort of financial benefit due to infringing content that is different in kind from the any financial benefit it receives due to non-infringing content.

Right & Ability to Control. Under the DMCA, even a financial benefit directly attributable to infringing conduct is not necessarily disqualifying unless a service provider has the "right and ability to control" the infringing activity. Just the existence of content on YouTube's system, with YouTube being capable of removing, it is not enough, since that situation is true of every service provider and would render the words surplusage. So a number of courts have simply refused to interpret the "right and ability to control" in section 512(c)(1)(B) that broadly. Reflecting the reasonableness standard embodied in the DMCA's allocation of responsibilities between copyright owners and service providers, the words are better read as saying that a service provider has to have both the legal right and the reasonable ability to control content.

Repeat Infringer Policy. Under Section 512(i)(1)(A) of the DMCA, in order to rely on the 512(c) safe harbor, a service provider must have "adopted and reasonably implemented, and inform[] subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." YouTube's "three strikes" policy meets this test by banning users after YouTube receives a third infringement notice regarding a user, regardless of whether a court ultimately finds that the posted content was actually infringing. (We currently deem all URL's processed within any two-hour period to be part of the same "notice.")

This policy actually goes beyond what the law requires. The legislative history is clear that Section 512(i) was not intended to require that the service provider "make difficult judgments as to whether conduct is or is not infringing." YouTube could legally require a court judgment prior to branding its users "infringers." Instead, YouTube regularly terminates user accounts based on mere allegations of infringement. Further, Congress did not intended "repeat" simply to mean "twice." The legislative history states that Section 512(i) is intended to address users who "repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others," and that such users should know "that there is a realistic threat of losing that access." YouTube's repeat infringer policy is completely consistent with these aims.

Finally, the statute requires termination of repeat infringers "in appropriate circumstances" -- the mere fact of being a repeat infringer does not require termination. Under YouTube's policy, users will generally receive two warnings before being terminated. Because not all of YouTube's users are IP lawyers, and some may not fully understand types of postings are legal or illegal under the complexities of copyright law, giving two warnings before taking the severe step of terminating a user seems reasonable.

YouTube's Pre-Existing Tools & Policies. YouTube already has a number of tools and policies designed to protect copyright that go well beyond the requirements of the DMCA. It has an industry-leading content verification tool that helps copyright owners identify content and file DMCA notices. Also, YouTube already implements "automated filtering" to the extent feasible, by making a unique "hash" of every video removed for copyright infringement and blocking any attempts to re-upload of identical video files. (The possible identification and blocking of content that is similar to or overlaps with allegedly infringing content raises lots of complexities and challenges, including important legal and technical issues discussed below.) As you know, YouTube also has a 10-minute limit on user-uploaded videos for the overwhelming majority of user accounts, which helps stop unauthorized uploads of full-length commercial programming.

Other Tools to Locate Potentially Infringing Content. As you recognize, the allocation of responsibility under the DCMA requires copyright owners to handle the identification of infringing materials, while requiring service providers to promptly remove identified infringements. The DCMA doesn't require service providers to use all possible technological measures to police their sites and filter out infringing content, or require YouTube to invest substantial resources to develop, deploy, and distribute to every copyright owner in the world complex audio fingerprinting technology services. Nor has YouTube promised to do so. YouTube announced its commitment to work collaboratively with a handful of partners to develop, test, and launch audio fingerprinting optimized for the context of those specific business partnerships. Deploying audio fingerprinting technologies is a complex undertaking that will necessarily have unintended consequences and overbroad results, as I mentioned above. Moreover, the rapid scaling of any such system introduces significant technical challenges and costs. We are currently working with some of our music label partners to help us develop, test, and ultimately run filtering tools that address their unique needs.

Note that all of the identification technologies you mention - Audible Magic, Gracenote, Auditude - are primarily designed for use with music recordings, and rely on "fingerprinting" of the audio track only. For a wide variety of content, this can result in significant numbers of false positives and false negatives (see, for example, the scenario I noted in the previous paragraph regarding soundtracks that are multiply licensed). We continue to test these technologies and expect to be able to refine our assessment of their feasibility and application in the near future. Filtering for TV content has its own unique challenges, which we are just beginning to understand and address.

Moreover, available tools may be able to identify (with some number of errors) the use of specific content -- but cannot identify whether the use of that content infringes a copyright interest. For example, you can imagine a technological tool that could tell (to some degree of certainty) that a video clip includes some or all of a specific song. But that isn't the same as infringement, since the producer of the video may have licensed that song, or the use of the song (or an excerpt of the song) may be fair use (e.g., the song or excerpt may be newsworthy or the video may be a critical commentary on the song). It is quite common for video to be accompanied by soundtracks that are separately copyrighted. So while the content owner may own the copyright to a video as a whole, someone else could easily own the rights to the soundtrack standing alone. That other rights owner might have licensed that soundtrack to many other video content producers. The audio fingerprint of one video work could thus easily flag

Highly Confidential

GOO001-08050274

as potentially infringing many other entirely different and entirely lawful works. As a result, we expect that any technological tool that we develop will be both underinclusive (it will not catch all infringing uses of a work) and overinclusive (it will flag material that is not infringing, e.g., because it's licensed or fair use). YouTube may offer the use of such a tool while knowing it may block users from posting some legal content. YouTube is not, however, required by any legal principle to offer this imperfect service.

Going beyond fingerprinting, we have also made private commitments to develop a couple of more-advanced and more-targeted content filtering tools with a handful of partners. One of these tools is an enhanced metadata search tool, which enables partners to define search terms via XML feeds and automatically and regularly receive search results matching the defined search terms. The tool displays thumbnail images of the videos in the search results to enable the copyright owner to determine ownership and submit removal requests with the click of a mouse. This tool is in the early stages of testing, but we would like to talk with you about whether you might like to be among our first partners to help us test and further develop it.

Identified Violations of YouTube's Policies. As discussed, YouTube has traditionally had a policy against the posting of unauthorized copyrighted material. We appreciate your bringing to our attention instances of specific potential violations of those policies, and your concerns about whether some of those policies may need to be even more rigorous. We'll investigate your reports of violations, and keep refining our policies and fine-tuning the enforcement of those policies on the YouTube site.

Further Discussions. Re your request that we expand our existing tools (capable of blocking digitally identical copies) to include tools that may be capable of identifying or blocking audibly similar but digitally dissimilar copies, we are continuing to evaluate those tools and are open to discussing your possible participation in these tests. I will leave it to our business teams to move forward with those discussions, and understand that our representatives will be in touch.

Best,
-- Kent

Kent Walker
VP & General Counsel
Google Inc.
1600 Amphitheatre Parkway
Mountain View, California 94043
<span style="background:black;color:black">████████</span>

GOO001-08050275