UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

VIACOM INTERNATIONAL INC.,
COMEDY PARTNERS,
COUNTRY MUSIC TELEVISION, INC.,
PARAMOUNT PICTURES CORPORATION, and
BLACK ENTERTAINMENT TELEVISION LLC,

Plaintiffs,                                        07 Civ. 2103 (LLS)

v.

YOUTUBE INC., YOUTUBE LLC,
and GOOGLE INC.,

Defendants.
-------------------------------------------------------------x
THE FOOTBALL ASSOCIATION PREMIER
LEAGUE LIMITED, et al., on
behalf of themselves and all
others similarly situated,

Plaintiffs,                                        07 Civ. 3582 (LLS)

v.

YOUTUBE INC., YOUTUBE LLC,
and GOOGLE INC.,

Defendants.
-------------------------------------------------------------x

**BRIEF OF AMICI CURIAE
AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF COLLEGE AND
RESEARCH LIBRARIES, ASSOCIATION OF RESEARCH LIBRARIES, CENTER
FOR DEMOCRACY AND TECHNOLOGY, COMPUTER AND COMMUNICATIONS
INDUSTRY ASSOCIATION, ELECTRONIC FRONTIER FOUNDATION, HOME
RECORDING RIGHTS COALITION, INTERNET ARCHIVE, NETCOALITION, AND
PUBLIC KNOWLEDGE
IN SUPPORT OF DEFENDANTS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

TABLE OF CONVENTIONS ................................................................................... iv

I.   STATEMENT OF AMICI CURIAE ................................................................1

II.   INTRODUCTION ...........................................................................................3

III.   CONGRESS PASSED SECTION 512 TO REDUCE LEGAL UNCERTAINTY
       FACING ONLINE SERVICE PROVIDERS, AND THEREBY ENCOURAGE
       GROWTH OF THE INTERNET AND E-COMMERCE .....................................4

   A.   In Resolving the Legal Issues Disputed by the Parties, the Court Should be
        Guided by Congress' Goal of Reducing for Online Service Providers the
        Legal Uncertainty Stemming from Copyright. ..................................................4

   B.   Congress Intended Section 512 to Reduce Legal Uncertainty and Thus Foster
        the Growth of the Internet. ................................................................................5

   C.   Plaintiffs' View of Section 512 Contradicts Congress' Intention to Limit the
        Legal Risks Faced by Online Service Providers ............................................ 10

      1.   Plaintiffs' Interpretation of the Knowledge Disqualifier Would Increase,
           not Decrease, the Legal Uncertainties Facing Online Service Providers. ............. 11

      2.   Plaintiffs' Interpretation of the Control and Benefit Disqualifier Cannot
           be Reconciled with the Statutory Language or Purpose........................................ 14

      3.   Plaintiffs' Interpretation of the Scope of Section 512(c) is Too Narrow to
           Provide Any Legal Certainty to Service Providers. ............................................. 16

IV.   SECTION 512 HAS BEEN SUCCESSFUL IN ACHIEVING CONGRESS'
       GOALS ......................................................................................................... 18

   A.   Internet-Based Technologies Protected by Section 512 Have Greatly
        Contributed to the U.S. Economy ................................................................... 19

   B.   Section 512 Has Stimulated the Creation of New and Effective Platforms for
        Free Speech ..................................................................................................... 21

   C.   Section 512 Has Permitted Copyright Holders and Internet-Based Technology
        Companies to Work Together to Solve Piracy Issues Without Judicial
        Intervention ..................................................................................................... 22

V.   CONCLUSION ............................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2000) ........................................ 20

*Corbis Corp. v. Amazon.com Inc.,* 351 F. Supp. 2d 1090 (W.D. Wash. 2004) .......... 14, 19

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) ........................................................ 3

*Frank Music Corp. v. CompuServe, Inc.* No. 93 Civ. 8153 (S.D.N.Y 1993) ................. 17

*Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082 (C.D. Cal. 2001) ................................ 20

*Io Group, Inc. v. Veoh Network, Inc.,* 586 F. Supp. 2d 1132 (N.D. Cal. 2008) .......... 18, 22

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) .................. 14

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ............................. 10

*Perfect 10, Inc. v. CCBill, LLC,* 488 F.3d 1102 (9th Cir. 2007) ................................ 13, 16

*Perfect 10, Inc. v. VISA Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007) ......................... 10

*Sony Corp. of Amer. v. Universal City Studios, Inc.*, 464 U. S. 417 (1984) .............. 14, 16

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,  665  F.Supp.2d  1099  (C.D. Cal. 2009)
.................................................................................................................................. 13, 15

**Statutes**

17 U.S.C. § 512 ...................................................................................................... passim

Digital Millennium Copyright Act of 1998, Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998) ...................................................................................................................... 3

**Legislative History**

144 Cong. Rec. H10618 (daily ed. Oct. 12, 1998) ............................................................ 8

144 Cong. Rec. H7092 (daily ed. Aug. 4, 1998) ............................................................... 8

*Copyright Infringement Liability of Online and Internet Service Providers: Hearing Before the S. Judiciary Comm. on S. 1146*, S. Hrg. 105-366 September 4, 1997 ...... 6, 7

H.R. Rep. 105-551 Part 1 (1998) ...................................................................................... 9

H.R. Rep. 105-551 Part 2 (1998) .............................................................................. passim

H.R. Rep. 105-796 (1998) ................................................................................... 9, 10, 22

S. Rep. 105-190 (1998) .............................................................................................. passim

*WIPO Copyright Treaties Implementation Act; and Online Copyright Liability Limitation*

*Act: Hearing Before the H. Judiciary Subcomm. on Courts and Intel. Property on H.R. 2281 and H.R. 2280*, Serial No. 33, 105th Cong. 123 (1997) ............................... 6, 7, 8

**Other Authorities**

3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12B.01 (2009). 5, 9

Jonathan Band & Matthew Schruers, *Safe Harbors Against the Liability Hurricane: the Communications Decency Act and the Digital Millennium Copyright Act*, 20 CARDOZO ARTS & ENTER. L.R. (2002) ........................................................................... 10, 12, 15

Joseph V. Meyers III, Note, *Speaking Frankly about Copyright Infringement on Computer Bulletin Boards: Lessons to be Learned from Frank Music, Netcom, and The White Paper*, 49 VAND. L. REV. 439 (1996) ................................................................ 17

### TABLE OF CONVENTIONS

Viacom
: Plaintiffs Viacom International Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television LLC (in Case No. 07 Civ. 2103) (collectively)

Class Plaintiffs
: Plaintiffs the Football Association Premier League Limited, et al., on behalf of themselves and all others similarly situated (in Case No. 07 Civ. 3582) (collectively)

Plaintiffs
: Viacom and the Class Plaintiffs, collectively

YouTube
: Defendant YouTube, Inc.

Google
: Defendant Google, Inc.

Defendants
: Defendants YouTube, YouTube LLC and Google, collectively

Viacom Br.
: Viacom's Memorandum of Law in Support of Viacom's Motion for Partial Summary Judgment on Liability and Inapplicability of the Digital Millennium Copyright Act Safe Harbor Defense, filed March 18, 2010

Class Plaintiffs Br.
: Class Plaintiffs' Memorandum of Law in Support of Class Plaintiffs' Motion for Partial Summary Judgment Dismissing Defendants' First Defense (DMCA Safe Harbor Defense), filed March 18, 2010

YouTube Br.
: Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed March 18, 2010

## I.     STATEMENT OF AMICI CURIAE

The Association of Research Libraries (ARL) is a nonprofit organization of 123 research libraries in North America, including university, public, governmental, and national libraries. The American Library Association (ALA) is a nonprofit professional organization of more than 67,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society. The Association of College and Research Libraries (ACRL), the largest division of the ALA, is a professional association of academic and research librarians and other interested individuals. Collectively, these three library associations represent over 139,000 libraries in the United States increasingly being called upon to serve the needs of their patrons in the digital age. As a result, the associations share a strong interest in the balanced application of copyright law to new digital dissemination technologies.

The Center for Democracy & Technology (CDT) is a nonprofit public interest group that seeks to promote free expression, privacy, individual liberty, and technological innovation on the open, decentralized Internet. CDT advocates balanced copyright policies that provide appropriate protections to creators without curtailing the openness and innovation that have been vital to realizing the democratizing potential of new digital media.

The Computer & Communications Industry Association (CCIA) is an international, nonprofit trade association dedicated to open markets, open systems, and open networks. CCIA members participate in the information and communications technology industries, ranging from small entrepreneurial firms to the largest in the business. CCIA members employ nearly one million people and generate annual revenues exceeding $200 billion. A complete list of CCIA's members is available online at <http://www.ccianet.org/members.html>.

The Electronic Frontier Foundation (EFF) is a nonprofit civil liberties organization that has worked for over 20 years to protect consumer interests, innovation, and free expression in the digital world.  EFF and its more than 14,000 dues-paying members have a strong interest in assisting the courts and policy-makers in striking the appropriate balance between copyright law

and the public interest.

The Home Recording Rights Coalition (HRRC), an unincorporated association, is a leading advocacy group for consumers' rights to use home electronics products for private, non-commercial purposes. The members of HRRC include consumers, retailers, manufacturers and professional servicers of consumer electronics products. The HRRC was founded in 1981, in response to the Ninth Circuit's ruling in *Sony Corp. of America v. Universal City Studios*, later overturned by the Supreme Court, that distribution of consumer video recorders constituted contributory copyright infringement.

The Internet Archive is a 501(c)(3) non-profit founded in 1996 to build an Internet library. Its purposes include offering permanent access for researchers, historians, scholars, people with disabilities, and the general public to historical collections that exist in digital format. The Internet Archive's collections include digital audio, video, software and texts contributed by individuals, including more than 200,000 digital audio recordings and 60,000 live concert recordings. Accordingly, the Archive has a direct interest in the proper application of copyright law to Internet intermediaries.

NetCoalition is an industry association that serves as the public policy voice for some of the world's most innovative Internet companies on legislative and administrative proposals affecting the online realm. NetCoalition's members include Amazon.com, Bloomberg LP, eBay, IAC, Google, Wikipedia, and Yahoo!.[1]

Public Knowledge is a non-profit public interest 501(c)(3) corporation, working to defend citizens' rights in the emerging digital culture. Its primary mission is to promote innovation, protect the legal rights of all users of copyrighted works, and ensure that any copyright legislation remains balanced and does not slow technology innovation, unduly burden free speech, shrink the public domain, or prevent fair use.

---

[1] Defendant Google Inc. is a member of CCIA and NetCoalition, but did not participate in authoring this brief or make a monetary contribution intended to fund its preparation.

## II.     INTRODUCTION

As is now abundantly evident, the Internet has grown into an unprecedented, global, accessible, vibrant platform for free speech and creative expression. Never before have so many citizens been able to reach an audience across so many mediums, at such low cost. All of this activity depends in turn upon a thriving marketplace of service providers—including YouTube, MySpace, Facebook, Blogger, and Flickr, to name a few—providing inexpensive (or free) public fora for speech and innovation. Changes to the legal climate for these service providers can have profound consequences for the future of free expression online. Thus, proper interpretation of copyright laws as applied to online service providers is a matter of crucial public interest.

Congress enacted Title II of the Digital Millennium Copyright Act (DMCA),[2] codified in Section 512 of the Copyright Act,[3] in order to stimulate and shelter the growth and expansion of the Internet and electronic commerce. Congress chose to accomplish this goal by creating a set of "safe harbors" that would "provide '*greater certainty* to service providers concerning their legal exposure for infringements that may occur in the course of their activities.'" *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (*quoting* S. Rep. 105-190, at 20 (1998)) (emphasis added). Congress' desire to establish a predictable legal environment is amply reflected in the statutory language, structure, and legislative history.

In their motions for summary judgment, however, Plaintiffs attempt to thwart Congress' intent and reintroduce the very climate of uncertainty it sought to ameliorate—a climate that would inevitably hamper innovation and free expression.  Plaintiffs argue that the safe harbors do not reach secondary liability claims at all, contrary to Section 512's statutory scheme, legislative history, and judicial precedents. They also press a conception of "red flag knowledge" and "control" that would render most of the detailed provisions of the safe harbors superfluous. And Plaintiffs' construction of Section 512 is so narrow that service providers would find

---

[2] Digital Millennium Copyright Act of 1998 ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998); *see generally* U.S. Copyright Office Summary, The Digital Millennium Copyright Act of 1998, available at http://www.copyright.gov/legislation/dmca.pdf.

[3] All statutory references are to Title 17 of the U.S. Code.

themselves facing strict liability for direct infringement for their everyday activities.

Were Plaintiffs' views to be endorsed by this (or any other) Court, the profusion of online services that have benefited the public (as well as future ventures) would be imperiled by the threat of multi-billion dollar statutory damages awards like the ones Plaintiffs seek here. This is precisely the result that Congress meant to avoid when enacting the DMCA's safe harbor provisions. Nor, contrary to Plaintiffs' intimations, is a radical reinterpretation of Section 512 necessary to protect the interests of copyright owners. As demonstrated by YouTube's own continuing development and deployment of technologies to combat infringement, YouTube Br. at 93-94, the availability of the statutory safe harbors has also left ample room for voluntary cooperation between content owners and service providers.

Undermining the Section 512 safe harbors would be both dangerous and unnecessary. *Amici* urge the Court to reject Plaintiffs' interpretation of Section 512.[4]

## III. CONGRESS PASSED SECTION 512 TO REDUCE LEGAL UNCERTAINTY FACING ONLINE SERVICE PROVIDERS, AND THEREBY ENCOURAGE GROWTH OF THE INTERNET AND E-COMMERCE.

### A. In Resolving the Legal Issues Disputed by the Parties, the Court Should be Guided by Congress' Goal of Reducing for Online Service Providers the Legal Uncertainty Stemming from Copyright.

The heart of the dispute between the parties regarding the applicability of the 512(c) safe harbor boils down to a dispute over the interpretation of three statutory provisions:

- Section 512(c)(1)(A): The "knowledge disqualifier," which provides that the safe harbor is available only so long as "the service provider does not have actual knowledge that the material or an activity using the material on the system or network is infringing; in the absence of such actual knowledge, is not aware of facts and circumstances from which infringing activity is apparent; or upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material";
- Section 512(c)(1)(B): The "control and benefit disqualifier," which provides that the safe harbor is available only so long as "the service provider … does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity"; and

---

[4] With respect to the interpretation of the DMCA safe harbors, the Class Plaintiffs expressly adopt the arguments set forth by Viacom. Class Plaintiffs Br. at 2 ("Class Plaintiffs join in Viacom's motion for summary judgment on the inapplicability of the 'safe harbor' defense….").

- Section 512(c)(1): The scope of the safe harbor, which applies to infringement liability incurred "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."

In addressing these disputed issues, this Court should be guided by Congress' stated desire to reduce legal uncertainty for online service providers that might otherwise hamper the growth of the Internet and e-commerce.

### B.    Congress Intended Section 512 to Reduce Legal Uncertainty and Thus Foster the Growth of the Internet.

The statutory structure and legislative history[5] of the DMCA make it clear that Congress intended Title II's safe harbor provisions to "facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education." S. Rep. 105-190, at 1-2.  For example, the July 1998 House Report accompanying the near-final version of the bill stated:

PROMOTING ELECTRONIC COMMERCE

The Committee on Commerce is in the midst of a wide-ranging review of all issues relating to electronic commerce, including the issues raised by this legislation.  The growth of electronic commerce is having a profound impact on the nation's economy.  Over the past decade, the information technology sector of our economy has grown rapidly and is seen by many as playing a leading role in the current economic expansion.  According to The Emerging Digital Economy, a recent Department of Commerce report on electronic commerce, the information technology sector now constitutes 8.2 percent of the Nation's gross domestic product, up from 4.5 percent in 1985.  At the end of 1997, approximately 7.4 million Americans were employed in this field.  It is expected that estimates of the total value of economic activity conducted electronically in 2002 will range from $200 billion to more than $500 billion, compared to just $2.6 billion in 1996.

H.R. 2281 is one of the most important pieces of legislation affecting electronic commerce that the 105th Congress will consider.  It establishes a wide range of

---

[5] Most of the DMCA's legislative history has been compiled by *Amicus* Home Recording Rights Coalition at http://hrrc.org/index.php?id=20&subid=3.

Particularly helpful are the four committee reports that accompanied the statute: (1) Senate Judiciary Committee, S. Rep. 105-190 (1998); (2) House Judiciary Committee, H.R. Rep. 105-551 Part 1 (1998); (3) House Commerce Committee, H.R. Rep. 105-551 Part 2 (1998); and (4) Conference Committee Report, H.R. Rep. 105-796 (1998).

Note, however, that the safe harbors discussed in the House Judiciary Committee report, H.R. Rep. 105-551 Part 1, were significantly different in important respects from those ultimately adopted in Section 512. *See* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12B.01[C][3] (2009) ("Nimmer") (describing evolution of conference reports).

> rules that will govern not only copyright owners in the marketplace for electronic commerce, but also consumers, manufacturers, distributors, libraries, educators, and on-line service providers.  H.R. 2281, in other words, is about much more than intellectual property.  It defines whether consumers and businesses may engage in certain conduct, or use certain devices, in the course of transacting electronic commerce.  Indeed, many of these rules may determine the extent to which electronic commerce realizes its potential.

H.R. Rep. 105-551 Part 2, at 22; *see also Copyright Infringement Liability of Online and Internet Service Providers: Hearing Before the S. Judiciary Comm. on S. 1146*, S. Hrg. 105-366, 105th Cong. 24 (1997)[6] (testimony by George Vradenburg of the Ad Hoc Copyright Coalition, noting that the "Internet promises great economic and social benefits"); *WIPO Copyright Treaties Implementation Act; and Online Copyright Liability Limitation Act: Hearing Before the H. Judiciary Subcomm. on Courts and Intel. Property on H.R. 2281 and H.R. 2280*, Serial No. 33, 105th Cong. 123 (1997) (testimony of Marc Jacobson, General Counsel, Prodigy, "The U.S. network services industry has built itself into the undisputed international leader in the development of the Internet.  This industry has the potential to become an enormous contributor to our economy.").

Congress recognized that the legal uncertainty surrounding the application of copyright law to new Internet technologies was a significant impediment to investment and growth. As the Senate Report put it:

> At the same time, without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet.  In the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability.  For example, service providers must make innumerable electronic copies by simply transmitting information over the Internet.  Certain electronic copies are made to speed up the delivery of information to users.  Other electronic copies are made in order to host World Wide Web sites.  Many service providers engage in directing users to sites in response to inquiries by users or they volunteer sites that users may find attractive.  Some of these sites might contain infringing material. In short, by limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand.

---

[6] Transcripts of the Sept. 4, 1997 hearings are available at: http://www.eric.ed.gov:80/ERICDocs/data/ericdocs2sql/content_storage_01/0000019b/80/15/68/11.pdf.

S. Rep. 105-190, at 8.

Thus, Congress correctly understood that the application of copyright principles intended for the analog world to new Internet technologies put fledgling online service providers in an almost impossible position. In order to provide services to potentially millions of users, service providers necessarily must make multiple copies of content at several stages of their technical processes. These myriad copies might arguably infringe one or more of the display, performance, distribution, reproduction, or other rights in copyrighted content. At the September 4, 1997, Senate Judiciary Committee hearings, Roy Neel of the United States Telephone Association stated the problem as follows:

> We have no way of knowing what those trillions of bits of information are flowing over our networks.  We simply cannot do it, and to be held liable for those transmissions is simply nonsense and it will tie us up in court, create more litigation and more work for lawyers, but won't do anything to advance the construction and deployment of the Internet, nor will it protect copyright owners to any significant degree.

*Copyright Infringement Liability of Online and Internet Service Providers: Hearing Before the S. Judiciary Comm. on S. 1146*, S. Hrg. 105-366 at 29; *see also id.* at 30 (Neel testimony noting that "ISPs risk being held liable for massive damages for copyright infringement perpetrated by individuals without the knowledge of the ISP"). Threats of litigation were already in the air at that time. *See WIPO Copyright Treaties Implementation Act; and Online Copyright Liability Limitation Act: Hearing Before the H. Judiciary Subcomm. on Courts and Intel. Property on H.R. 2281 and H.R. 2280*, Serial No. 33, at 84-85[7] (Neel statement noting threats of lawsuits against ISPs by the Recording Industry Ass'n of America (RIAA) and Software Publishers Ass'n (SPA)); *id.* at 123-24 (Jacobson statement noting same threats of lawsuits).

Members of Congress also recognized that the legal uncertainties facing online service providers could encourage them to censor for fear of liability. In the words of Rep. Barney

---

[7] Mr. Neel's testimony at this hearing can be found online at: http://judiciary.house.gov/legacy/4006.htm.

Frank:

> One of the things we do here is to say: "If you are an on-line service provider, if you are responsible for the production of all of this out to the public, you will not be held automatically responsible if someone misuses the electronic airway you provide to steal other people's property." …
>
> But one of the things that was a potential danger here was that by protecting intellectual property, a very important job, we would have imposed on the on-line service providers such a degree of liability as, in fact, to diminish to some extent the freedom they felt in presenting things. What I am most happy about in this bill is I think we have hit about the right balance. We have hit a balance which fully protects intellectual property, which is essential to the creative life of America, to the quality of our life, because if we do not protect the creators, there will be less creation. But at the same time we have done this in a way that will not give to the people in the business of running the online service entities and running Internet, it will not give them either an incentive or an excuse to censor.

144 Cong. Rec. H7092 (daily ed. Aug. 4, 1998)[8] (floor statement of Rep. Barney Frank); *see also* House Floor Debate on Conference Report on H.R. 2281, 144 Cong. Rec. H10618 (daily ed. Oct. 12, 1998)[9] (Rep. Barney Frank: "As Members have mentioned, we have a tough situation here in which we want to protect intellectual property rights but not interfere with freedom of expression.").

In order to encourage investment in Internet businesses, and thereby foster free expression online, Congress intended to—and needed to—provide service providers with greater legal predictability with respect to copyright infringement claims. The resulting focus on reducing legal risk for service providers is a theme that stretches throughout the legislative history. For example, it was a repeated theme in testimony before Congress regarding the legislation that would become the DMCA. *See WIPO Copyright Treaties Implementation Act; and Online Copyright Liability Limitation Act: Hearing Before the H. Judiciary Subcomm. on Courts and Intel. Property on H.R. 2281 and H.R. 2280*, Serial No. 33, at 102 (statement of Representative Boucher about providing "stability in the law" and giving "the Internet service providers the assurances they need" to invest in the Internet). The emphasis on reducing legal uncertainty also appears in the legislative committee reports that accompanied the DMCA. *See*

---

[8] Available at http://hrrc.org/File/2281HouseDebateAug4.pdf.

[9] Available at http://hrrc.org/File/HR2281StearnsOct12.pdf.

H.R. Rep. 105-796, at 72 (Section 512 "provides greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities."); H.R. Rep. 105-551 Part 2, at 49-50 (same); S. Rep. 105-190, at 20 (same); H.R. Rep. 105-551 Part 1, at 11 (1998) ("While several judicially created doctrines currently address the question of when liability is appropriate, providers have sought greater certainty through legislation as to how these doctrines will apply in the digital environment.").

The structure of the 512 statutory scheme also clearly reflects Congress' intention to reduce legal uncertainty. Congress crafted four statutory safe harbors with detailed provisions setting out "rules of the road," that provide both rightsholders and service providers with a more definite alternative to the doctrinal ambiguities that characterized early judicial efforts to apply evolving copyright principles and judge-made secondary liability doctrines to new Internet contexts. *See* 3 NIMMER § 12B.01[A][1] (describing conflicting jurisprudence prior to 1998). So long as their activities fell within one of the four safe harbors, service providers could essentially "opt in" to this alternate, more definite, set of rules by meeting the statutory prerequisites: registering a Copyright Agent, 17 U.S.C. § 512(c)(2), implementing a notice-and-takedown policy, 17 U.S.C. § 512(c)(1)(C), accommodating standard technical measures, 17 U.S.C. § 512(i)(1)(B), and adopting a policy of terminating repeat infringers, 17 U.S.C. § 512(i)(1)(A).

The statute also clarifies the outer limits of a service provider's obligations—for example, by making it clear that a service provider need not monitor its service or affirmatively seek facts indicating infringing activity in order to enjoy the safe harbor. *See* 17 U.S.C. § 512(m)(1). Copyright owners, for their part, were given not only an expedited, extra-judicial procedure for obtaining redress against alleged infringement, but also explicit statutory guidance regarding the information that must be provided in an "effective" takedown notice to take advantage of this procedure. *See* 17 U.S.C. § 512(c)(3)(A).[10]  This level of statutory detail stands

---

[10] The importance of these procedures is underscored by 17 U.S.C. § 512(c)(3)(B)(i), which states that infringement notices that fail to meet these standards are not to be considered when evaluating a service provider's knowledge under the knowledge disqualifier set forth in § 512(c)(1)(A).

in stark contrast to the ambiguous legal standards that would otherwise govern the activities of service providers. *Compare Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170-75 (9th Cir. 2007) (discussing secondary liability principles applicable to online service providers) *with Perfect 10, Inc. v. VISA Int'l Serv. Ass'n*, 494 F.3d 788, 811-22 (9th Cir. 2007) (Kozinski, J., dissenting) (pointing out logical inconsistencies in secondary liability standards as applied to service providers).

### C.    Plaintiffs' View of Section 512 Contradicts Congress' Intention to Limit the Legal Risks Faced by Online Service Providers

Plaintiffs' view of Section 512 flies in the face of Congress' intent to reduce legal uncertainty for online service providers. At the heart of Plaintiffs' argument is the view that the safe harbors simply do not apply to secondary liability claims: "If Defendants are liable for infringement under these long established standards, they thereby also lose resort to the DMCA." Viacom Br. at 48. This view, however, directly contradicts Congress' clear, repeated instruction that "Section 512(c) limits the liability of qualifying service providers for claims of direct, *vicarious* and *contributory* infringement…." H.R. Rep. 105-551 Part 2, at 53 (emphasis added); *accord* H.R. Rep. 105-796, at 73; S. Rep. 105-190, at 20; H.R. Rep. 105-551 Part 2, at 50. It also defies logic: "If the safe harbors from vicarious and contributory liability were available only to providers who were not vicariously or contributorily liable, a service provider could only qualify for the safe harbor when it didn't need one, and any provider needing the safe harbor would be ineligible." Jonathan Band & Matthew Schruers, *Safe Harbors Against the Liability Hurricane: the Communications Decency Act and the Digital Millennium Copyright Act*, 20 CARDOZO ARTS & ENTER. L.R. 295, 305 (2002). This error, moreover, fatally undermines Plaintiffs' interpretation of the statute's scope and the two "disqualifiers" set forth in Section 512(c)(1)(A) and (B). Plaintiffs' interpretation would effectively render the safe harbors superfluous, leaving online service providers vulnerable to precisely the legal risks and uncertainties that Congress intended Section 512 to limit.

1.  **Plaintiffs' Interpretation of the Knowledge Disqualifier Would Increase, not Decrease, the Legal Uncertainties Facing Online Service Providers.**

The "knowledge disqualifier" set forth in Section 512(c)(1)(A) provides that a service provider enjoys the safe harbor only so long as it:

> "(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts and circumstances from which infringing activity is apparent [referred to in the legislative history as "red flags"]; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material…"

17 U.S.C. § 512(c)(1)(A).

Plaintiffs contend that YouTube has both actual and "red flag" knowledge of infringing activity on YouTube's service, based on YouTube's general awareness that some users post infringing works on YouTube. Plaintiffs further conclude that YouTube's failure to do enough to prevent those infringements evinces "willful blindness" that amounts to "actual knowledge."

This conception of the knowledge disqualifier is flatly inconsistent with the statute's language and purpose. The statute itself states that the service provider must have knowledge that "*the* material or an activity using *the* material" is infringing. 17 U.S.C. § 512(c)(1)(A)(i) (emphasis added). As Defendants correctly point out, this statutory formulation necessarily presupposes that particular material (*i.e.*, a particular copyrighted work) has been identified and brought to the service provider's attention. YouTube Br. at 32. In other words, Plaintiffs' invite this Court to construe the statute as if Congress had written "*any* material" in place of "*the* material."

Defendants also correctly observe that the statute uses actual and "red flag" knowledge to trigger a duty to remove infringing material—something that would be impossible without particularized knowledge regarding what material should be removed. YouTube Br. at 32. If generalized knowledge of infringement were enough to trigger this duty, it would impose on the service provider an obligation to monitor its system and somehow determine whether material

11

provided by users infringed anyone's copyrights. Congress expressly refused to impose such an obligation: "As stated in [Section 512(m)], a service provider need not monitor its service or affirmatively seek facts indicating infringing activity…, in order to claim this limitation on liability…." S. Rep. 105-190, at 44. Plaintiffs' construction of the statute would leave service providers who become aware in general terms of infringing activities on their services with an undefined and on-going duty to somehow seek out and prevent infringement. *See* Band & Schruers, *Safe Harbors Against the Liability Hurricane*, 20 CARDOZO ARTS & ENTER. L.Rev. at 316 ("knowledge" should not be interpreted to mandate monitoring). This would transform the Section 512(c) safe harbor into a *new* source of, rather than a respite from, legal uncertainty.

In addition, if general knowledge of infringement on a service provider's system were enough to trigger the knowledge disqualifier, then the "notice-and-takedown" provisions of the statute would be rendered superfluous. A copyright owner could simply commission a survey inquiring generally into the incidence of infringing activity on a service, provide it to the service provider, and thereby strip the provider of the safe harbor. This, in turn, would trigger (in Plaintiffs' view) an ongoing and undefined "proactive obligation" to "look into the matter further." Viacom Br. at 53. There would be no need for rightsholders to abide by the carefully tailored statutory prerequisites for a compliant DMCA takedown notice—including specific identification of the work infringed, the online location of the infringing activity, and a statement that the activity was not authorized by the copyright owner. See 17 U.S.C. § 512(c)(3)(A).  Such a result cannot be squared with the statute, which provides that infringement allegations falling short of the specificity requirements set out in Section 512(c)(3)(A) shall not be considered "as evidence of whether the service provider has actual knowledge, is aware of facts or circumstances, or has received notification for purposes of subsection (c)(1)(A)." H.R. Rep. 105-551 Part 2, at 56 (explaining Section 512(c)(3)(B)).

The requirement that "red flags" relate to a particular infringing activity, rather than general awareness of infringement, is also borne out by the examples Congress chose when illustrating the concept of "red flag" knowledge. Describing "red flag" knowledge in the context

of the information location tools safe harbor set forth in Section 512(d), Congress stated:

> For instance, the copyright owner could show that the provider was aware of facts from which infringing activity was apparent if the copyright owner could prove that the location was clearly, at the time the directory provider viewed it, a "pirate" site of the type described below, where sound recordings, software, movies or books were available for unauthorized downloading, public performance or public display. Absent such "red flags" or actual knowledge, a directory provider would not be similarly aware merely because it saw one or more well known photographs of a celebrity at a site devoted to that person. The provider could not be expected, during the course of its brief cataloguing visit, to determine whether the photograph was still protected by copyright or was in the public domain; if the photograph was still protected by copyright, whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine.

S. Rep. 105-190, at 48 (emphasis added). In other words, in the context of providing a directory of links to websites, Congress believed that "red flags" required information on a site-by-site basis. This implies that general knowledge that an index contains infringing links would not constitute a "red flag" knowledge triggering an on-going obligation to search the index for such links.

Plaintiffs' expansive notion of the knowledge disqualifier would invite every copyright owner to sidestep the detailed statutory requirements for takedown notices in favor of manufacturing generalized evidence of infringing activities, thereby imposing on service providers an undefined and on-going duty to monitor their users' activities. In fact, in Plaintiffs' view, if an employee of a service provider were to come across a newspaper article stating that a substantial amount of infringing activity were going on somewhere on her service, her "knowledge" would potentially strip the service provider of the safe harbor. Section 512 neither mandates nor encourages such an outcome, which is why numerous courts have rejected similar expansive interpretations of the knowledge disqualifier. *See, e.g., Perfect 10, Inc. v. CCBill, LLC,* 488 F.3d 1102, 1114 (9th Cir. 2007) (noncompliant notices do not count toward knowledge, and use of "illegal" or "stolen" in domain name does not create red flag knowledge for hosting service); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F.Supp.2d 1099, 1111-12 (C.D. Cal. 2009) (general awareness of infringement is not "red flag" knowledge, nor does a service provider have an obligation to "ferret out" infringements); *Corbis Corp. v. Amazon.com*

*Inc.,* 351 F. Supp. 2d 1090, 1108-09 (W.D. Wash. 2004) (neither general knowledge of infringement on the site nor third-party notices are enough to constitute a "red flag").

Plaintiffs do not argue merely that generalized knowledge of infringement strips a service provider of the 512(c) safe harbor; they also contend that operating a service with general awareness that some users infringe triggers liability under *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005). Basing secondary liability on such knowledge, in addition to damaging Internet commerce, would also severely chill innovation in new devices and in software applications. Coupled with the overhang of statutory damages for each work found to be secondarily infringed as a result of consumer use of the service, device, or software application, the legal consequence would be devastating to any new product, and to the financial future of its marketer or developer, once they became aware of infringing uses of their multi-purpose product. This would severely damage innovation. It would run counter to the Supreme Court's determination in the *Betamax* case (*Sony Corp. of Amer. v. Universal City Studios, Inc.*, 464 U. S. 417 (1984)) and care in *Grokster* to protect innovation in the absence of any specific intent to infringe copyright.[11]

### 2.   Plaintiffs' Interpretation of the Control and Benefit Disqualifier Cannot be Reconciled with the Statutory Language or Purpose.

Plaintiffs' view of the statutory "control and benefit disqualifier" fares no better when measured against Section 512(c)'s language and purpose. The "control and benefit disqualifier" provides that a service provider enjoys the safe harbor only so long as it:

> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity.

17 U.S.C. § 512(c)(1)(B).

Plaintiffs' interpretation of this provision amounts to a rehash of their erroneous contention that the safe harbors have no application to vicarious liability claims. Viacom Br. at

---

[11]   In addition to ruinous contributory liability, such a doctrine would open up threats of vicarious liability that would create crippling legal uncertainty for technology innovators. *See* discussion in subsection III.C.2, *infra*.

57 ("Defendants are liable for the infringement on YouTube under the common law of vicarious liability. Therefore … Defendants cannot use the DMCA to escape liability."). As pointed out above, this interpretation contradicts the stated intention of Congress: "Section 512(c) limits the liability of qualifying service providers for claims of direct, *vicarious* and contributory infringement…." H.R. Rep. 105-551 Part 2, at 53 (emphasis added); *see also* Band & Schruers, *Safe Harbors Against the Liability Hurricane*, 20 CARDOZO ARTS & ENTER. L.REV. at 318 (rejecting conflation of vicarious liability standards under common law and 512(c)).

With respect to the control element of Section 512(c)(1)(B), Defendants correctly note that YouTube's general ability to control its servers cannot amount to control over particular infringements of Plaintiffs' works. YouTube Br. at 58-59. Their view follows directly from the statutory scheme, which requires that service providers be able to terminate repeat infringers and expeditiously remove infringing materials, both of which presuppose general control over a service provider's systems. Plaintiffs' contrary view has already been rejected by multiple courts. *See UMG v. Veoh*, 665 F.Supp.2d at 1112-16 (collecting and discussing cases).

With respect to the financial benefit element of Section 512(c)(1)(B), Congress recognized that the varied business models of service providers will generate revenue from a number of sources, not all of which could result in liability:

> In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one.  In general, a service provider conducting a legitimate business would not be considered to receive a "financial benefit directly attributable to the infringing activity" where the infringer makes the same kind of payment as non-infringing users of the provider's service. Thus, receiving a one-time set-up fee and flat, periodic payments for service from a person engaging in infringing activities would not constitute receiving a "financial benefit directly attributable to the infringing activity." Nor is subsection (c)(1)(B) intended to cover fees based on the length of the message (e.g., per number of bytes) or by connect time. It would however, include any such fees where the value of the service lies in providing access to infringing material.

H.R. Rep. 105-551 Part 2, at 54; *accord* S. Rep. 105-190, at 44-45. *Amici* agree with Defendants that the benefit conferred by YouTube advertising is insufficiently direct to satisfy Section 512(c)(1)(B), particularly in light of YouTube's many noninfringing videos and overall

legitimate business model. YouTube Br. at 73-78.[12]

Plaintiffs' conception of the control and benefit disqualifier must be rejected for another reason: it would radically increase the legal risks facing online service providers. If the DMCA safe harbors have no application to vicarious liability claims, as Plaintiffs contend, then service providers are left to ask what those judge-made[13] vicarious liability principles might demand of their services.

The answers provided in Plaintiffs' briefs provide one chilling potential response. Plaintiffs contend that vicarious liability should apply because YouTube reserved the right to remove videos and could have done more human review, more keyword searching, more community flagging, and more digital fingerprinting. Class Plaintiffs Br. at 31-32; Viacom Br. at 33-37. In the face of this cavalcade of ill-defined "legal requirements," how can a service provider ever be certain it had done enough to satisfy every copyright owner intent on shifting the burden of copyright enforcement onto it? It was precisely to reduce this "you'll find out after years of expensive litigation" approach to copyright infringement that Congress enacted the Section 512 safe harbors.

### 3. Plaintiffs' Interpretation of the Scope of Section 512(c) is Too Narrow to Provide Any Legal Certainty to Service Providers.

Plaintiffs contend that Section 512(c)'s scope should be read narrowly to apply only where defendants "passively provide server storage as an empty vessel for someone else's websites or other activities." Viacom Br. at 63. This reading not only renders the safe harbor a dead letter for most "user generated content" services today, but would have deprived even many service providers in 1998 of its protections. This could not be what Congress had in mind.

Section 512(c) provides that "[a] service provider shall not be liable for monetary relief,

---

[12] *Amici* further agree with Defendants that the Ninth Circuit erred when it suggested in *Perfect 10 v. CCBill*, 488 F.3d at 1117, that the "financial benefit" element of 512(c)(1)(B) should be read as coextensive with the requirements of vicarious liability. YouTube Br. at 73 n.39.

[13] Vicarious liability does not exist in the Copyright Act itself, and is solely a judge-made doctrine. *See Sony Corp. of Amer. v. Universal City Studios, Inc.*, 464 U.S. 417, 434-35 (1984).

or … for injunctive or other equitable relief, for infringement of copyright *by reason of the storage at the direction of a user of material* that resides on a system or network controlled or operated by or for the service provider….” 17 U.S.C. § 512(c)(1) (emphasis added). “Examples of such storage include providing server space for a user's web site, for a chatroom, or other forum in which material may be posted at the direction of users.” S. Rep. 105-190, at 43.

Plaintiffs argue that Section 512(c) only applies to businesses that provide raw server space, and not to entities that “actively operate the websites.” Viacom Br. at 63. This bizarre construction would have excluded many online service providers in 1998, which already were operating websites that provided forums for user-authored materials. For example, Yahoo! had already launched its Yahoo! Message Boards, where users posted materials onto a website operated by Yahoo!.[14] Similarly, Compuserve had been sued by music publishers as early as 1993 for user uploaded music files that appeared on AOL's online bulletin boards.[15] There is nothing in the statutory language suggesting that these early “user generated content” sites were to be excluded from the scope of Section 512—they are all examples of “storage at the direction of a user of material” on the service provider's system.

Today's “user generated content” sites are simply more advanced versions of the same hosting activities that service providers were already providing in 1998. Thanks in part to the availability of the Section 512(c) safe harbor, there has been strong growth in this segment of the Internet. Services no longer merely host simple text and images on websites, in chatrooms, and in discussion forums, but now also offer myriad platforms for speech and commerce, including web stores (e.g., Amazon ZShops); e-commerce listings (e.g., eBay); blogs (e.g., Blogger); tweets (e.g., Twitter); photographs (e.g., Flickr); documents (e.g., Scribd); video (e.g.,

---

[14] Courtney Macavinta, *Yahoo Message Board Users Sued*, CNET NEWS, Sept. 9, 1998, http://news.cnet.com/2100-1023-215292.html.

[15] *See* Joseph V. Meyers III, Note, *Speaking Frankly about Copyright Infringement on Computer Bulletin Boards: Lessons to be Learned from Frank Music, Netcom, and The White Paper*, 49 VAND. L. REV. 439, 478-81 (1996) (discussing *Frank Music Corp. v. CompuServe, Inc*. No. 93 Civ. 8153 (S.D.N.Y 1993), involving AOL bulletin board service allowing users to upload and download music files).

YouTube); and audio (e.g., SoundCloud) on behalf of tens of millions of Internet users. *Amicus* Internet Archive, for example, hosts text, audio, and video content contributed to its online library by users—without the legal certainty provided by Section 512(c), these activities would be difficult for a small nonprofit to manage.

If Plaintiffs' cramped interpretation of the scope of Section 512(c) were correct, very few modern Internet enterprises that provide storage "in the cloud" for a vast array of different kinds of information would enjoy any safe harbor protection from copyright infringement claims. This reading is not only inconsistent with the statutory language, but also with Congress' goal of providing the legal predictability necessary to foster economic growth and free expression on the Internet. *See Io Group, Inc. v. Veoh Network, Inc.*, 586 F. Supp. 2d 1132, 1147 (N.D. Cal. 2008) ("To begin, the structure and language of [Section 512] indicate that service providers seeking safe harbor under Section 512(c) are not limited to merely storing material."). Congress meant to protect more than just the most primitive kinds of "plain vanilla" web hosting services. Rather, a principal goal of Title II of the DMCA was to foster the growth of *new* businesses on the Internet. The flourishing of innovative services to host user generated content online has, in turn, afforded the public unprecedented opportunities for free expression online.

## IV.    SECTION 512 HAS BEEN SUCCESSFUL IN ACHIEVING CONGRESS' GOALS

Congress' experiment in reducing legal risk by creating detailed safe harbors for online service providers has proved an extraordinary success. The safe harbors have provided enough legal certainty to get many Internet start-up ventures off the ground. As these same start-ups have matured into larger businesses, the DMCA's safe harbor provisions have also "left enough on the table" for copyright owners and online service providers to negotiate over, stimulating cooperative voluntary efforts to address the challenges of online copyright infringement. Plaintiffs' erroneous interpretations of the Section 512 safe harbors would dramatically upset this track record of success.

A.    **Internet-Based Technologies Protected by Section 512 Have Greatly Contributed to the U.S. Economy**

Since the passage of Section 512 in 1998, the Internet's growth has exceeded Congress' most optimistic expectations.  Congress had estimated that electronic-based commerce would grow to perhaps $200-500 billion by 2002.  H.R. Rep. 105-551 Part 2, at 22.  In fact, by 2007, the U.S. Census Bureau reported total U.S. electronic-based commerce at $3.333 trillion.[16] According to the National Economic Council, expert estimates indicate that the Internet adds $2 trillion to the annual GDP.[17] A Harvard Business School study found that Internet advertising alone generated $300 billion in economic activity in the United States in 2008, and is responsible for 3.1 million jobs (1.9 million jobs directly, and 1.2 million indirectly through support positions).[18] Internet retail sales reached $178 billion in 2008.[19]

Many of the U.S.-based Internet companies that contributed to that economic growth directly benefit from—and indeed rely on—Section 512's protections. Some examples include:

- Defendant Google Inc., which had $23.65 billion in revenue and 19,835 full-time employees in 2009.[20]
- Amazon.com had 24,300 employees and $24.51 billion in sales in 2009.[21] Amazon.com has relied on Section 512 in building its business.  *See Corbis Corp. v. Amazon. com, Inc.*, 351 F. Supp. 2d 1090 (W. D. Wa. 2004).
- eBay Inc., which had 16,200 employees as of 2008 and revenue of $8.7 billion in

---

[16] U.S. Census Bureau, E-Stats, May 28, 2009, available at http://www.census.gov/econ/estats/2007/2007reportfinal.pdf (see table on page 2).

[17] Exec. Ofc. of the President, Nat'l Econ. Council/OSTP, A Strategy for American Innovation: Driving Towards Sustainable Growth and Quality Jobs, Sept. 2009, at 5, available online at http://www.whitehouse.gov/administration/eop/nec/StrategyforAmericanInnovation.

[18] Lucian Parfeni, "Internet Advertising Generating $300 Billion of Economic Activity in the US," Softpedia.com, June 11, 2009, available at http://news.softpedia.com/news/Internet-Advertising-Generating-300-Billion-of-Economic-Activity-in-the-US-113867.shtml  (citing study available at http://hbswk.hbs.edu/item/6268.html).

[19] Mark Brohan, *Online Retailing Weathered the Storm in 2008 and Finished as the Retail Market's Only Growth Driver*, INTERNET RETAILER (June 2009) at 35.

[20] Press Release, "Google Announces Fourth Quarter and Fiscal Year 2009 Results," January 21, 2010, available at http://investor.google.com/releases/2009Q4_google_earnings.html.

[21] Press Release, "Amazon.com Announces Fourth Quarter Sales Up 42% to 9.5 Billion," Jan. 28, 2010, available at http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MzY2NTcwfENoaWxkSUQ9MzYxODIxfFR5cGU9MQ==&t=1.

2009.[22]  eBay has also successfully relied on Section 512. *See Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082 (C.D. Cal. 2001).

- Yahoo! Inc. had 13,900 employees as of 2009 and revenue of $6.46 billion in 2009.[23] Many of Yahoo!'s lines of business are protected by Section 512, such as Yahoo!'s Flickr subsidiary, which hosts photographs submitted by users.

Google, Amazon, eBay and Yahoo! are representative of the many U.S. companies that have made the United States the world leader in Internet commerce. All rely on the enhanced legal certainty created by the Section 512 safe harbors.[24]

Moreover, the legal certainty provided by Section 512 also has the distinct advantage of being equally available to enterprises large and small, in contrast to Plaintiffs' view that state of the art filtering and monitoring technologies are required once a service provider is exposed to general awareness of infringing activity. Indeed, small, entrepreneurial start-up companies especially need the protections of Section 512, as the expense of copyright litigation can be enough to swamp a small enterprise dependent on personal or venture capital.[25] Those small businesses are crucial components of the U.S. economy, particularly as they grow into mature businesses; Google, Amazon, eBay and Yahoo! each started as a small start-up company.

---

[22] Press Release, "eBay Inc. Reports Fourth Quarter and Full Year 2009 Results," January 20, 2010, available at http://files.shareholder.com/downloads/ebay/868988682x0x345224/b455630d-4bb9-4ba5-adb1-40dcf29e82ce/eBay_Q409EarningsRelease.pdf; eBay Inc. Investor FAQs, http://investor.ebayinc.com/faq.cfm.

[23] Press Release, "Yahoo! Reports Fourth Quarter 2009 Results," January 26, 2010, http://files.shareholder.com/downloads/YHOO/873845058x0x346541/b65f2a96-cb5e-4ded-856f-76494a65f42a/YHOO_Q409PressRelease.pdf; Yahoo!, Inc. Frequently Asked Questions, http://yhoo.client.shareholder.com/faq.cfm.

[24] The importance of the DMCA's safe harbors is made all the more plain by the paucity of Internet companies in areas outside the safe harbors' reach. In the area of peer-to-peer technologies, for example, the lack of a copyright safe harbor has resulted in a great deal of litigation, stunting investment in this promising technology. *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1025 (9th Cir. 2000) (Napster failed to establish Section 512 defense).

[25] In fact, even with the DMCA safe harbors, litigation has driven some start-ups out of the market. In one example, a video hosting provider similar to YouTube successfully invoked the safe harbor but was nevertheless forced into bankruptcy in part due to the "distraction" of defending multiple copyright infringement suits. Andrew Morse, *Veoh Networks to Liquidate*, WALL ST. J., Feb. 11, 2010 (available at http://online.wsj.com/article/SB10001424052748703382904575060142323993752.html).

**B.**     **Section 512 Has Stimulated the Creation of New and Effective Platforms for Free Speech.**

The success of online service providers has, in turn, created unprecedented opportunities for free expression for citizens around the world. Defendants describe several of the ways that the YouTube service has contributed to free speech in this country and throughout the world. YouTube Br. at 5-7; February 28, 2010 Declaration of Hunter Walk in support of YouTube's motion. The following are illustrative examples of the ways companies entitled to Section 512 protection have served as a platform for valuable free expression:

- *Amicus* Internet Archive, a nonprofit that provides online hosting for audio and video content and relies on Section 512(c), has seen its service used for a wide variety of educational and political purposes, including in 2004 to distribute Eminem's protest video against the reelection of President Bush, "Mosh."[26] Also in 2004, the Internet Archive became one of the leading sites for amateur videos documenting the tsunamis in Indonesia and Thailand, with one video attracting more than 700,000 downloads.[27] Since 2006, a volunteer community known as Metavid has been distributing legislative video from both houses of the U.S. Congress through the Internet Archive.[28]

- YouTube became an important part of our nation's political process in 2006.[29]  One year later, by the time of the 2007 primary election cycle, CBS News remarked, "'everybody' is going the YouTube route this campaign season."[30]

- Twitter, a service that service hosts short user-generated messages, has played a major role in the Iranian protestors' efforts to bring democratic reforms to that country.[31]

---

[26] *See* http://en.wikipedia.org/wiki/Mosh_(song).

[27] *See* http://www.archive.org/details/tsunami_phuket.

[28] *See* http://www.archive.org/details/metavid_congress.

[29] YouTube was an important part of the 2006 elections.  Ryan Lizza, "The YouTube Election," N.Y. Times, August 20, 2006, available at: http://www.nytimes.com/2006/08/20/weekinreview/20lizza.html (YouTube video showing Virginia Senator George Allen making racial slur brought widespread negative attention to his campaign; the "Macaca" video is available here: http://www.youtube.com/watch?v=r90z0PMnKwI).  *See also* Guy Raz, "YouTube Emerges as Political Tool in Campaigns," NPR, October 24, 2006, http://www.npr.org/templates/story/story.php?storyId=6376579 ("Many candidates running for office this season are jumping on a new bandwagon.  It's called YouTube.").

[30] "YouTube Emerging as Campaign Tool," CBS News, October 11, 2007, http://www.cbsnews.com/stories/2007/10/11/earlyshow/main3356715.shtml.

[31] Damien McElroy, "Iran protest news travels fast and far on Twitter," Telegraph (UK), June 16, 2009, http://www.telegraph.co.uk/news/worldnews/middleeast/iran/5549955/Iran-protest-news-travels-fast-and-far-on-Twitter.html; Lev Grossman, "Iran Protests: Twitter, the Medium of the Movement," Time Magazine, June 17, 2009, http://www.time.com/time/world/article/0,8599,1905125,00.html (State Department requests Twitter reschedule maintenance to avoid downtime for Iranian protesters).

C.   **Section 512 Has Permitted Copyright Holders and Internet-Based Technology Companies to Work Together to Solve Piracy Issues Without Judicial Intervention**

Section 512 has reduced the need for copyright litigation by offering copyright owners a rapid "notice-and-takedown" mechanism for removing infringing materials without the need for judicial intervention. *See* YouTube Br. at 57 (YouTube took down about 100,000 videos in a single business day after Viacom delivered compliant DMCA takedown notices). The statute provides "strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." H.R. Rep. 105-796, at 72; *accord* H.R. Rep. 105-551 Part 2, at 49.

In addition, provided that the law does not penalize them for doing so—as Plaintiffs attempt to do here—service providers have strong market incentives to voluntarily develop better technologies to detect and prevent copyright infringements on their web sites. While the safe harbors provide an important baseline of legal protections and "rules of the road" for fledgling service providers, they do not give service providers reliable access to big-budget entertainment content (particularly where the content owner is sending hundreds of thousands of takedown notices, as Plaintiffs have here). Accordingly, the DMCA safe harbors leave intact business incentives for online service providers to police for copyright infringement as part of voluntary commercial arrangements struck with major content owners in exchange for authorized access to their content.

YouTube itself has devoted substantial efforts to such new technologies, including its "Content ID" system. YouTube Br. at 91-95. These technologies are apparently so effective that Viacom no longer asserts claims against YouTube for alleged infringements occurring after May 2008.  *See* Viacom Br. at 2 n.1.  Other service providers have also agreed to implement new technologies on a voluntary basis to limit intellectual property infringements. *See Io Group, Inc. v. Veoh Network, Inc.*, 586 F. Supp. 2d at 1138 (defendant voluntarily implemented a "hash," or digital "fingerprint," technology to prevent infringements); Principles for User Generated Content Services, http://www.ugcprinciples.com (joint statement of principles by major

22

technology and entertainment industry companies that includes voluntary commitment to deploy copyright enforcement tools).

## V.   CONCLUSION

For the foregoing reasons, *Amici* ask the Court to reject Plaintiffs' misguided view of the Section 512(c) safe harbor.

Dated: April 12, 2010                    By:   /s/ Edward Hernstadt

Edward Hernstadt
HERNSTADT ATLAS LLP
11 Broadway, Suite 615
New York, NY 10004
(212) 809-2501
*Attorney for Amici Curiae*

*Of counsel:*

Jonathan Band
AMERICAN LIBRARY ASSOCIATION,
ASSOCIATION OF RESEARCH
LIBRARIES, ASSOCATON OF
COLLEGE AND RESEARCH LIBRARIES
& NETCOALITION
Jonathan Band PLLC
21 Dupont Circle, NW
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com

David Sohn
CENTER FOR DEMOCRACY AND
TECHNOLOGY
1634 Eye Street, NW #1100
Washington, D.C. 20006
(202) 637-9800 x317
dsohn@cdt.org

Matthew Schruers
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOC.
900 17th Street, NW, Suite 1100
Washington, D.C. 20006
(202) 783-0070 x109
mschruers@ccianet.org

Fred von Lohmann
Michael Barclay
ELECTRONIC FRONTIER FOUNDATION
& INTERNET ARCHIVE
454 Shotwell Street
San Francisco, CA 94110-1914
(415) 436-9333 x123
fred@eff.org

Robert S. Schwartz
HOME RECORDING RIGHTS
COALITION
Constantine Cannon LLP
1301 K Street, NW, Suite 1050 East
Washington, D.C. 20005
(202) 204-3508
rschwartz@constantinecannon.com

Sherwin Siy
PUBLIC KNOWLEDGE
1875 Connecticut Avenue, NW
Suite 650
Washington, D.C. 20009
(202) 518-0020
ssiy@publicknowledge.org