1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


VIACOM INTERNATIONAL, INC., COMEDY )
PARTNERS, COUNTRY MUSIC.              )
TELEVISION, INC., PARAMOUNT           )
PICTURES CORPORATION, and BLACK       )
ENTERTAINMENT TELEVISION, LLC,        )
                                      )
                Plaintiffs,           )
                                      )
vs.                                   ) NO. 07-CV-2203
                                      )
YOUTUBE, INC., YOUTUBE, LLC,          )
and GOOGLE, INC.,                     )
                                      )
                Defendants.           )
_____)
                                      )
THE FOOTBALL ASSOCIATION PREMIER   )
LEAGUE LIMITED, BOURNE CO., et al.,)
on behalf of themselves and all    )
others similarly situated,            )
                                      )
                Plaintiffs,           )
vs.                                   ) NO. 07-CV-3582
                                      )
YOUTUBE, INC., YOUTUBE, LLC, and      )
GOOGLE, INC.,                         )
                                      )
                Defendants.           )
_____)


VIDEOTAPED DEPOSITION OF FRANCK CHASTAGNOL

SAN FRANCISCO, CALIFORNIA

WEDNESDAY, DECEMBER 10, 2008

2

1                    DECEMBER 10, 2008

2                        9:57  a.m.

3

4         VIDEOTAPED DEPOSITION OF FRANCK CHASTAGNOL,

5         SHEARMAN & STERLING, 525 Market Street,

6         San Francisco, California, pursuant to notice,

7         before ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR,

8         CSR License No. 9830.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      A P P E A R A N C E S:

2

3        FOR THE PLAINTIFFS VIACOM INTERNATIONAL INC.:

4           JENNER & BLOCK

5             By:  MICHAEL DESANCTIS, Esq.

6                 SARAH A. MAGUIRE, Esq.

7             1099 New York Avenue, NW, Suite 900

8             Washington, D.C., 20001

9             (202) 637-6357 mdesanctis@jenner.com;

10           smaguire@jenner.com

11

12       FOR THE LEAD PLAINTIFFS AND PROSPECTIVE CLASS:

13         BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

14          By:  BENJAMIN GLADSTON, Esq.

15          12481 High Bluff Drive, Suite 300

16          San Diego, California 92130-3188

17          (858) 720-3188  beng@blbglaw.com

18

19

20

21

22

23

24

25

```
                                                                    4
 1          A P P E A R A N C E S  (Continued.)

 2

 3             FOR THE DEFENDANTS YOUTUBE, INC., YOUTUBE, LLC and

 4          GOOGLE, INC.:

 5                  MAYER BROWN LLP

 6                  By:  MATTHEW D. INGBER, Esq.

 7                       BRIAN WILLEN, Esq.

 8                  1675 Broadway

 9                  New York, New York 10019

10                  (212) 506-2146  mingber@mayer.com

11                  bwillen@mayer.com

12

13                  WILSON SONSINI GOODRICH & ROSATI

14                  By:  MICHAEL H. RUBIN, Esq.

15                  650 Page Mill Road

16                  Palo Alto, California 94304-1050

17                  (650) 849-3311  mrubin@wsgr.com

18

19             ALSO PRESENT:

20                  ADAM L. BAREA, Litigation Counsel, Google

21                  KELLY TRUELOVE, Consultant

22                  KEN REESER, Videographer.

23

24                           ---oOo---

25
```

1                              CHASTAGNOL

2    11:34:19    Q   But if -- if the future -- if the piece of

3    11:34:23 content in the future instance is in any way different

4    11:34:28 from the original piece of content, then it would have

5    11:34:33 its own hash code; correct?

6    11:34:35        MR. INGBER:  Objection to form.

7    11:34:37        THE WITNESS:  What I know is that -- what I

8    11:34:49 know is that the hash code is -- is a unique

9    11:34:57 identifier of a particular video file, and that if the

10   11:35:09 file is slightly different, the hash code will be

11   11:35:13 different.

12   11:35:16        MR. DESANCTIS:  Q.  And, therefore, the --

13   11:35:17 the hash code that was assigned to the initial piece

14   11:35:21 of content would not be useful in finding the

15   11:35:24 subsequent piece of content that is a little bit

16   11:35:27 different; correct?

17   11:35:29        MR. INGBER:  Objection; vague.

18   11:35:33        THE WITNESS:  So if you take one file and you

19   11:35:35 generate a hash code, then you take the second file,

20   11:35:38 which is slightly different, and you generate a hash

21   11:35:40 code, then the hash code won't -- won't match.

22   11:35:44        MR. DESANCTIS:  Okay.

23   11:35:45        THE WITNESS:  That's -- that's the way I

24   11:35:47 understand hash code to -- to work.

25   11:35:50        MR. DESANCTIS:  Q.  Are there other tools

80

1                          CHASTAGNOL

2  12:28:34        But this document, which comes from Kevin

3  12:28:38 Donahue and Chris Maxcy, who are part of the business

4  12:28:41 development team, states "The goal of this feature is

5  12:28:46 to encourage content partners to leave more of their

6  12:28:48 content on the site."

7  12:28:50    Q   My question to you is, do you recall ever

8  12:28:55 hearing or being told that the goal of the feature was

9  12:29:00 to encourage content partners to leave more of their

10 12:29:03 content on the site?

11 12:29:14    A   It -- that was one of the goal when we

12 12:29:26 launch, one of the goal.

13 12:29:28    Q   Okay.  Thank you.  That was the question.

14 12:29:33        You said this was one of the goals.  Were

15 12:29:36 there other goals that were discussed at the time of

16 12:29:38 launch?

17 12:29:41    A   Yes.

18 12:29:41    Q   What were those?

19 12:29:46    A   So I will walk -- walk you through the -- I

20 12:29:53 think the -- the -- the best way from -- you know,

21 12:29:58 again, I'm on the engineering side, you know.

22 12:30:00    Q   Yes.

23 12:30:01    A   And I -- my -- my view is only on the

24 12:30:05 engineering side, and when I look at the Claim Your

25 12:30:09 Content tool that, you know, that -- that my team and

88
1                          CHASTAGNOL

2   12:42:43 specific time?

3   12:42:43         MR. DESANCTIS:  In -- at the -- at the launch

4   12:42:47 in 2007.

5   12:42:48         THE WITNESS:  So --

6   12:42:49         MR. DESANCTIS:  Let me -- let me withdraw the

7   12:42:50 question.

8   12:42:50         THE WITNESS:  So what is the question again?

9   12:42:52         MR. DESANCTIS:  Yeah, let me withdraw the

10  12:42:53 question.  It was confusing.

11  12:42:54    Q    I'm not talking about specific to YouTube.

12  12:42:56 In general, how does a fingerprint -- how does an

13  12:42:59 audio fingerprint system compare two pieces of

14  12:43:05 content?  How does it do it?

15  12:43:06         MR. INGBER:  Objection to form; it's

16  12:43:08 overbroad.

17  12:43:08         You can try to answer.

18  12:43:10         THE WITNESS:  I mean, so it -- you know,

19  12:43:17 first of all, every single system is -- you know, is

20  12:43:21 different, but at a high level, you know, a

21  12:43:23 fingerprinting system would extract characteristics of

22  12:43:29 the reference content and characteristics of the probe

23  12:43:38 and use these characteristics and would compare these

24  12:43:45 characteristics to determine the likeliness of -- of a

25  12:43:52 match.

Page 180

1                          CHASTAGNOL

16:18:06    2    Audible Magic.

16:18:06    3         A    Uh-huh.

16:18:07    4         Q    Were you coordinating with the business

16:18:08    5    development team as you were doing that?

16:18:10    6         A    We had some discussions.

16:18:11    7         Q    Okay.  So with whom?

16:18:14    8         A    So a number of people.  Probably Chris Maxcy.

16:18:18    9         Q    Okay.

16:18:21   10         A    And a number of other people in the team.  I

16:18:28   11    don't -- I -- I don't recall, you know, the -- you

16:18:31   12    know, the -- who was or the list of people who were

16:18:36   13    involved, but yeah there were -- there were a number

16:18:41   14    of BD, you know, BD folks involved in the -- in these

16:18:48   15    deals.

16:18:49   16         Q    Let's look at this.  68.

16:19:18   17              (Document marked Chastagnol Exhibit 13

16:19:19   18                for identification.)

16:19:19   19              MR. DESANCTIS:  Let me show you what's been

16:19:20   20    marked -- being mark as Chastagnol Exhibit 13.  This

16:19:29   21    is a document Bates labeled AM 001241 through 1244,

16:19:43   22    and the cover e-mail, the top e-mail, is from you to

16:19:48   23    Jim Schrempp dated Friday December 22nd, 2006, and I'd

16:20:14   24    like to direct your attention to the bottom of page

16:20:16   25    one.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022  (212)705-8585

56a8b142-ff67-42b5-ae0a-a53420f915db

Page 181

CHASTAGNOL

16:20:25  2      Actually, let me back up.  On page one you're

16:20:35  3  sending an e-mail to Jim Schrempp and below your

16:20:39  4  e-mail is the heading "Requirements for integration

16:20:42  5  with Audible Magic," and that's the document that goes

16:20:46  6  on for the next four pages.

16:20:51  7      Q   Are these the terms of the deal between

16:20:53  8  YouTube and Audible Magic as they existed at that --

16:20:56  9  on that date?

16:20:58  10     A   I don't remember.

16:21:01  11     Q   Okay.  I'd like to direct your attention to

16:21:23  12  the bottom of page one.  It's under the heading

16:21:29  13  "Requirements for integration with Audible Magic,

16:21:35  14  Phase 1."  Next line, "Database setup," and the text

16:21:43  15  reads, "AM should host and setup 2 reference

16:21:48  16  fingerprint databases:  One populated with Warner

16:21:50  17  content (referenced as 'WarnerDB' hereafter)," and

16:21:56  18  "One populated by YouTube via the new fingerprint add

16:22:00  19  API (this DB is referenced as 'YouTubeDB' hereafter)."

16:22:08  20      Were you involved in negotiating these terms

16:22:14  21  with Audible Magic?

16:22:17  22     A   I was involved on the engineering side.

16:22:21  23     Q   What is -- can you describe what that

16:22:26  24  involvement was?

16:22:28  25     A   Making sure that the requirements would meet

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022  (212)705-8585

56a8b142-ff67-42b5-ae0a-a53420f915db

```
                    1                    CHASTAGNOL
16:22:32            2     the needs that we had for -- for our product.  So
16:22:38            3     meeting the needs on the engineering side of what I
16:22:42            4     was tasked with building.
16:22:43            5         Q    Okay.  So why, then, did or how did a
16:22:52            6     database populated with Warner content satisfy the
16:22:57            7     needs?  Well, actually, there's two databases here.
16:23:00            8     One is populated with Warner content.  One is
16:23:03            9     populated by YouTube.
16:23:05           10             Can you describe what the database populated
16:23:08           11     by YouTube was and what YouTube was populating it
16:23:12           12     with?
16:23:12           13             MR. INGBER:  Objection to form; vague as
16:23:19           14     to -- as to time and compound.
16:23:24           15             MR. DESANCTIS:  At the time -- at the time of
16:23:25           16     this document, which is September 22nd, 2006.
16:23:31           17             THE WITNESS:  Yes, I can describe the ad API.
16:23:34           18             MR. DESANCTIS:  Yeah.
16:23:35           19         Q    Well, right.  I'm -- I'm wondering, yes, can
16:23:40           20     you please describe the database that was populated by
16:23:41           21     YouTube and what it was populated with?
16:23:45           22         A    Okay.
16:23:51           23             MR. INGBER:  Same objections.
16:23:52           24             Go ahead.
16:23:54           25             THE WITNESS:  So -- so this -- I mean, first
```

Page 183

1                       CHASTAGNOL

16:23:57     2     of all, this was the -- the design of the system.  So

16:24:01     3     these are the requirements for designing the system.

16:24:04     4     The system wasn't in place yet, and so, yeah, the --

16:24:12     5     the idea of this add API which, by the way, was

16:24:17     6     something that Audible Magic didn't have and that we

16:24:20     7     specifically requested for our needs as an addition to

16:24:25     8     the standard solution, was the ability for YouTube to

16:24:30     9     generate reference fingerprints and submit them to

16:24:35     10    Audible Magic, and these fingerprints would get stored

16:24:41     11    in what is referred here in this document as YouTube

16:24:45     12    DB.  That's -- so that's what it was.

16:24:50     13            MR. DESANCTIS:  Q.  Well, why was YouTube

16:24:52     14    submitting reference fingerprints to Audible Magic?

16:24:55     15    What purpose did that serve?

16:24:57     16            MR. INGBER:  Objection to form; lacks

16:24:59     17    foundation.

16:25:00     18            MR. DESANCTIS:  Sorry.

16:25:01     19        Q   Does it serve any purpose?

16:25:04     20            MR. INGBER:  Same objection.

16:25:06     21            THE WITNESS:  Yes.  I mean, it -- I mean, on

16:25:12     22    the engineering side, it served a purpose of being

16:25:18     23    able to, itself, add fingerprints to the Audible Magic

16:25:22     24    database without relying on the -- the content owner

16:25:25     25    having any sort of relationship with Audible Magic.

DAVID  FELDMAN  WORLDWIDE,  INC.
805 Third Avenue, New York, New York 10022   (212)705-8585

56a8b142-ff67-42b5-ae0a-a53420f915db

Page 184

CHASTAGNOL

16:25:31  2   We wanted to be in control of being able to augment

16:25:35  3   this database.

16:25:38  4        MR. DESANCTIS:  I see.

16:25:39  5    Q   So -- so what -- what fingerprints were -- it

16:25:47  6   sounds to me like YouTube was generating its own

16:25:50  7   fingerprints that it was submitting to Audible Magic

16:25:53  8   for inclusion in this YouTube database; is that

16:25:56  9   correct?

16:25:57  10   A   That's correct.

16:25:57  11   Q   So what was YouTube generating fingerprints

16:26:01  12  of that it was submitting to Audible Magic for

16:26:04  13  inclusion in the reference database?

16:26:08  14   A   So again, it -- yeah.

16:26:11  15       MR. INGBER:  Go ahead.  You can answer.

16:26:13  16       THE WITNESS:  So again, the system wasn't in

16:26:15  17  place at that time, but when we launched the system,

16:26:19  18  content owners were able to -- to provide content

16:26:24  19  directly to -- to YouTube and -- and we would -- we

16:26:36  20  would, ourself, generate fingerprints and add them to

16:26:38  21  the Audible Magic database as opposed to content

16:26:44  22  owner.

16:26:44  23       It was the choice of the content owner;

16:26:46  24  right.  I mean, giving them options.  You want to work

16:26:53  25  with Audible Magic to augment, you know, to -- to put

DAVID  FELDMAN  WORLDWIDE,  INC.
805 Third Avenue, New York, New York 10022   (212)705-8585

56a8b142-ff67-42b5-ae0a-a53420f915db

Page 185

1                    CHASTAGNOL

16:26:55    2    your reference in their database.  You can, you know,

16:26:59    3    either work directly with them, if it's more

16:27:01    4    convenient for you, or you can do it with us.  It's --

16:27:05    5    you have a choice.

16:27:08    6         We just, you know, on the engineering side,

16:27:11    7    you know, I -- I wanted to make sure that we had this

16:27:15    8    ability to -- to put this -- this data in Audible

16:27:21    9    Magic database and not relying on them to -- to add

16:27:24    10   the data.

16:27:31    11        MR. DESANCTIS:  Q.  So I still want to stay

16:27:32    12   on this notion of the -- of what YouTube was

16:27:37    13   fingerprinting for inclusion in the YouTube database.

16:27:40    14   A    Uh-huh.

16:27:41    15   Q    Was it all videos on YouTube?

16:27:49    16   A    No.

16:27:50    17   Q    How did -- therefore, it's some subset of all

16:27:57    18   videos on YouTube; is that correct?

16:27:59    19   A    Yes.

16:27:59    20   Q    How is the decision made what would be

16:28:04    21   fingerprinted and what would not be fingerprinted?

16:28:06    22        MR. INGBER:  Objection to form; lacks

16:28:08    23   foundation.

16:28:09    24        THE WITNESS:  The content which was

16:28:19    25   fingerprinting was the content provided to YouTube by

DAVID  FELDMAN  WORLDWIDE,  INC.
805  Third  Avenue,  New  York,  New  York  10022   (212)705-8585

56a8b142-ff67-42b5-ae0a-a53420f915db

Page 186

CHASTAGNOL

16:28:24  2   content owners as opposed to we didn't want to

16:28:29  3   generate reference fingerprints of user-uploaded

16:28:34  4   content, which we didn't know what it was and didn't

16:28:38  5   have any idea of a policy associated with.

16:28:43  6        MR. DESANCTIS:  I see.

16:28:43  7   Q    So if a -- if a content owner itself posts

16:28:52  8   its own content to YouTube for monetization purposes,

16:28:59  9   it could -- it could have asked YouTube to generate a

16:29:03  10  fingerprint for the Audible Magic reference database?

16:29:14  11  A    This is not correct.

16:29:15  12  Q    Okay.  Please tell me how, because I must not

16:29:18  13  have understood your last answer.

16:29:21  14  A    The system was designed in such a way that a

16:29:27  15  content owner could provide content to YouTube whether

16:29:31  16  it's -- if it's for monetization, whether it's for

16:29:35  17  track or for block -- could provide content to YouTube

16:29:41  18  and we would generate reference fingerprint regardless

16:29:45  19  of the -- the policy.

16:29:52  20  Q    I see.

16:29:53  21       Okay.  I'm told we need to change the tape,

16:30:06  22  so let's break and change the tape.

16:30:09  23       MR. INGBER:  Okay.

16:30:10  24       THE VIDEOGRAPHER:  This is the end of DVD

16:30:15  25  No. 3 in the continuing deposition of Franck

DAVID  FELDMAN  WORLDWIDE,  INC.

805  Third  Avenue,  New  York,  New  York  10022   (212)705-8585

56a8b142-ff67-42b5-ae0a-a53420f915db

205
1                                CHASTAGNOL

2    17:14:34          MR. INGBER:  Video fingerprinting technology

3    17:14:37 or are you talking about the Video ID tool?

4    17:14:39          MR. DESANCTIS:  Video fingerprinting

5    17:14:40 technology.

6    17:14:44          THE WITNESS:  I don't recall the specific

7    17:14:48 dates.  It -- the time frame was Q1 2007, to my

8    17:14:58 recollection.

9    17:14:59          MR. DESANCTIS:  Okay.

10   17:15:07     Q    And at that time there were a number of

11   17:15:12 third-party companies who were providing video

12   17:15:16 fingerprinting solutions; correct?

13   17:15:22          MR. INGBER:  Objection; lacks foundation.

14   17:15:24          THE WITNESS:  That might be, yeah.  Yes.

15   17:15:31          MR. DESANCTIS:  Q.  You don't --

16   17:15:32     A    There may be some companies.

17   17:15:34     Q    You don't know if there were?

18   17:15:35     A    I -- I know there were some companies working

19   17:15:39 on -- on building a -- a video fingerprinting system.

20   17:15:46 I -- yeah.

21   17:15:48     Q    But you didn't use any of them; did you?

22   17:15:52     A    No, we did not.

23   17:15:53     Q    Why not?

24   17:15:56          MR. INGBER:  Objection; lacks foundation.

25   17:16:00          MR. DESANCTIS:  You can answer the question.

1                             CHASTAGNOL

2   17:31:14 answer your questions.

3   17:31:16   Q   No, that's okay.

4   17:31:37        Do you recall that part of the reason that --

5   17:31:47 that you and I -- now I mean you, Franck Chastagnol,

6   17:31:52 didn't want your team researching the video

7   17:31:58 fingerprinting technologies that existed in early 2007

8   17:32:04 was because you wanted your own development to be sort

9   17:32:09 of untainted by the other technologies that are out

10  17:32:12 there?

11  17:32:16        MR. INGBER:  Objection to the extent the

12  17:32:17 first part of your question mischaracterizes the

13  17:32:20 witness's prior testimony.

14  17:32:22        You can answer.

15  17:32:30        THE WITNESS:  Right.

16  17:32:30        So in early 2007, my entire team was focusing

17  17:32:38 on building the Video ID tool, and so I had several

18  17:32:42 things in my mind.  I wanted them to, you know, focus

19  17:32:46 on that, get it done.  I knew we could build the best

20  17:32:51 system in the world with the type of outstanding

21  17:32:53 Google engineers that just joined us.  I wanted to go

22  17:32:58 full speed.  We have to get it done.

23  17:33:01        I mean, many thoughts I was, you know, being

24  17:33:02 very aggressive with the deadlines for my team, and

25  17:33:07 first -- sorry, excuse me -- first thing.

```
 1                              CHASTAGNOL

 2   17:33:10        Second thing is at that time literally nobody

 3   17:33:15 had a system out there; right.  You know, to my

 4   17:33:19 recollection, there was no -- nobody having, you know,

 5   17:33:23 scalable production ready system, you know, being used

 6   17:33:28 by any website or any serious -- serious company.

 7   17:33:34        So I had all the reasons to -- to believe

 8   17:33:40 that what we -- that -- that was reinforcing --

 9   17:33:42 reinforcing my belief that we had to focus on our own,

10   17:33:46 right.  Competition is still, you know, working on it.

11   17:33:48 They don't have a product; right.  Let's not look in

12   17:33:51 the mirror.  Let's get it done; right.

13   17:33:53        And so -- so, yeah, what I recall is me

14   17:33:58 giving clear priority that was -- you know, at that

15   17:34:02 time, I was tech lead for several engineers, and I had

16   17:34:05 to tell them, okay, to be clear on the priorities.

17   17:34:08        Like we have our priority number one is to --

18   17:34:12 to get this product done.  We -- we might have been

19   17:34:15 approached by different video ID vendors in the

20   17:34:18 process of developing their own tool and wanting us

21   17:34:21 to, you know, evaluate or use it; and, you know, and

22   17:34:26 my guidelines were very clear to -- to my team.

23   17:34:29 let's -- let's get it done.  Let's get our solution

24   17:34:33 done.

25   17:34:33        MR. DESANCTIS:  Okay.
```

211

1                          CHASTAGNOL

2   17:34:38    Q    And within the context of telling your team

3   17:34:40 to get the solution done, isn't it the case that you

4   17:34:48 didn't even research the extent to which some of the

5   17:34:54 companies -- some of the third-party companies that

6   17:34:58 were providing video fingerprinting solutions would

7   17:35:00 have worked as an interim solution for Google?

8   17:35:03       MR. INGBER:  Objection to form.

9   17:35:05       THE WITNESS:  So, you know, in addition to

10  17:35:11 the points, you know, I made earlier, and -- and to

11  17:35:14 your point, you know, one other consideration is IP

12  17:35:17 tainting; right.  You don't want, you know, your --

13  17:35:20 your team to be exposed with technology from third

14  17:35:24 party, because then you could end up in a lawsuit and

15  17:35:26 have to do depositions.

16  17:35:31       And so that was -- you know, yeah, that was

17  17:35:34 one -- one consideration, and the other consideration,

18  17:35:40 again, is priority.  Doing research, evaluating,

19  17:35:43 testing, you know, look at Audible Magic.  It -- it

20  17:35:46 took a while.

21  17:35:47       I knew it would take a while to look at these

22  17:35:50 guys.  I mean like, you know, who knows how many out

23  17:35:54 there, you know, were claiming to have a solution.

24  17:35:56 Evaluating every single one of them would have been

25  17:35:59 just, you know, major engineering time investment, and

```
                                                              212
 1                         CHASTAGNOL

 2  17:36:05 at that point, you know, I had several engineers, but

 3  17:36:09 it was still -- you know, I still wanted to -- to make

 4  17:36:12 sure they all focus on -- on -- on this one goal,

 5  17:36:15 clear priority, you know, everyone get this done;

 6  17:36:19 right.

 7  17:36:19        MR. DESANCTIS:  Okay.

 8  17:36:21    Q   You said it would have been -- hold on.

 9  17:36:40        Talking about third-party video fingerprint

10  17:36:42 companies that existed at that time, you just said

11  17:36:46 that "Evaluating every single one of them would have

12  17:36:49 been just, you know, major engineering time

13  17:36:51 investment."

14  17:36:53        Did you investigate any of them?

15  17:36:58        MR. INGBER:  Objection; asked and answered.

16  17:37:04        MR. DESANCTIS:  Q.  I'm asking about you,

17  17:37:06 Franck Chastagnol.

18  17:37:07    A   Me personally, no.

19  17:37:11    Q   Okay.  You said you commissioned someone to

20  17:37:13 look into Vobile, but you did not remember what you

21  17:37:17 had asked them to do.

22  17:37:20        How about a company called Avestigo?  Did

23  17:37:27 your team research the capabilities -- the video

24  17:37:30 fingerprinting capabilities of a company called

25  17:37:33 Avestigo?
```

213

1                         CHASTAGNOL

2  17:37:34    A    Not that I remember.

3  17:37:35    Q    Okay.  A company called Auditude?

4  17:37:42    A    Not that I remember in this time frame.

5  17:37:44    Q    Okay.  Did you look at Gracenote for their

6  17:37:49 video fingerprinting offerings the way you had with

7  17:37:53 their audio finger -- fingerprinting offerings?

8  17:37:57    A    Not that --

9  17:37:58         MR. INGBER:  Object to form.

10 17:38:00         THE WITNESS:  No, I don't -- I don't remember

11 17:38:01 looking at Gracenote video fingerprinting solution at

12 17:38:05 that time.

13 17:38:05         MR. DESANCTIS:  Okay.

14 17:38:05    Q    How about -- are there any others?  Any --

15 17:38:09 any others that -- any besides Vobile that you

16 17:38:15 researched or had someone on your team research?

17 17:38:19         MR. INGBER:  Objection to form.

18 17:38:21         THE WITNESS:  So -- so just to be clear on

19 17:38:22 Vobile, I -- my -- my memory, I don't -- I don't

20 17:38:28 recall any details on Vobile, so I'd like to take this

21 17:38:31 out of the question, what you asked.

22 17:38:34         MR. DESANCTIS:  Okay.

23 17:38:38         THE WITNESS:  I -- I'm just being very

24 17:38:39 confused at this point which Vobile, so I don't want

25 17:38:42 to make any statement because --

214

                              CHASTAGNOL
 1

 2  17:38:43        MR. DESANCTIS:  Well, I'm sorry.

 3  17:38:44        THE WITNESS:  -- I'm not able to, so can you

 4  17:38:46 rephrase?

 5  17:38:47        MR. DESANCTIS:  Q.  I want to make sure I --

 6  17:38:48 I want to make sure I understand.  You -- you're not

 7  17:38:49 clear now as to what company -- what Vobile is?

 8  17:38:56    A   Yes.  At this point on the -- in the

 9  17:38:58 deposition, I'm not.

10  17:38:59    Q   Okay.

11  17:39:04    A   So could you please rephrase your question,

12  17:39:07 which was perfectly fine, without Vobile in it; right?

13  17:39:11    Q   Sure.  Actually, I think I did, but I'll do

14  17:39:16 it again.

15  17:39:19    A   Sorry.

16  17:39:19        MR. INGBER:  There was an assumption in your

17  17:39:20 question about Vobile, I think, that made the witness

18  17:39:24 uncomfortable.

19  17:39:38        MR. DESANCTIS:  Q.  Well, I think it would go

20  17:39:40 like this:  Do you recall researching or having

21  17:39:49 someone on your team research any third-party provider

22  17:39:57 of video fingerprinting?

23  17:40:01    A   I don't remember engineers in my team doing

24  17:40:05 research on video fingerprinting solutions.  There

25  17:40:08 might have been, you know, business development guys

215
1                                    CHASTAGNOL

2    17:40:14 or product managers doing that.  That's entirely

3    17:40:17 possible.

4    17:40:19    Q    But not the engineering team?

5    17:40:20    A    But not on the -- not on the engineering

6    17:40:22 team.  We didn't spend time, significant amount of

7    17:40:26 time on doing research in 2000 -- in Q1 of 2007

8    17:40:32 research on other -- on -- on third-party video ID

9    17:40:35 vendor, for the reason I mentioned previously.

10   17:40:39    Q    Okay.  Let's go ahead and mark 30.  Actually,

11   17:41:09 wait.

12   17:42:10         Do you recall, Mr. Chastagnol, a time when

13   17:42:16 Viacom or Paramount conducted tests of the YouTube

14   17:42:27 video fingerprinting solution?

15   17:42:29    A    Yes, I do.

16   17:42:30    Q    When was that?

17   17:42:33    A    It was in summer 2007.

18   17:42:36    Q    Do you remember what the results of those

19   17:42:38 tests were?

20   17:42:39         MR. INGBER:  Objection to form.

21   17:42:40         THE WITNESS:  No, I don't recall the result

22   17:42:44 of the testing of Paramount.

23   17:42:48         MR. DESANCTIS:  Q.  Do you recall whether you

24   17:43:05 were -- whether you -- well, actually, let me take

25   17:43:09 that back.