UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

VIACOM INTERNATIONAL INC.,                    :
COMEDY PARTNERS, COUNTRY MUSIC
TELEVISION, INC., PARAMOUNT                    :
PICTURES CORPORATION,
and BLACK ENTERTAINMENT                        :      Case No. 1:07-CV-02103-LLS
TELEVISION LLC,                                       (Related Case No. 1:07-CV-03582-LLS)
                                              :
          Plaintiffs,
                                              :      ECF Case
          v.
                                              :      ELECTRONICALLY FILED
YOUTUBE, INC., YOUTUBE, LLC, and
GOOGLE INC.,                                   :

          Defendants.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## BRIEF OF AMICI CURIAE
### AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, BROADCAST MUSIC, INC., SESAC, INC., DISNEY ENTERPRISES, INC., NBC UNIVERSAL, INC., WARNER BROS. ENTERTAINMENT INC., ASSOCIATION OF AMERICAN PUBLISHERS, CENTER FOR THE RULE OF LAW, INSTITUTE FOR POLICY INNOVATION, THE MEDIA INSTITUTE, PICTURE ARCHIVE COUNCIL OF AMERICA, PROFESSIONAL PHOTOGRAPHERS OF AMERICA, ROSETTA STONE LTD., AND ZUFFA, LLC IN SUPPORT OF PLAINTIFFS

Clifford M. Sloan (*pro hac vice*)
Mary E. Rasenberger
Christopher G. Clark
SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

Counsel for American Society of Composers,
Authors And Publishers, Broadcast Music, Inc.,
SESAC, Inc., Disney Enterprises, Inc., NBC
Universal, Inc., Warner Bros. Entertainment Inc.,
Association of American Publishers, Center for the
Rule of Law, Institute for Policy Innovation,
The Media Institute, Picture Archive Council of
America, Professional Photographers of America,
Rosetta Stone Ltd. and Zuffa, LLC

Dated:  May 7, 2010

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

STATEMENT OF INTEREST OF AMICI CURIAE ................................................... 1

INTRODUCTION ....................................................................................................... 5

ARGUMENT ............................................................................................................... 6

I.      CONGRESS ENACTED THE DMCA TO ENSURE
       VIGOROUS COPYRIGHT PROTECTION FOR DIGITAL WORKS ............................. 6

        A.     Congress Passed The DMCA In  Response To Pervasive Piracy
              And The Potential  For Massive Copyright Infringement On The Internet ............ 6

        B.     Congress Recognized The Need To
              Limit The Liability Of Innocent Service Providers
              Investing In The Development And Expansion Of Internet Services ..................... 8

        C.     The Narrow Safe Harbors Congress
              Created Did Not Establish Broad Exemptions Authorizing
              Intentional And Knowing Copyright Infringement On The Internet ................... 11

II.     THE COURT SHOULD NOT PERMIT
       SERVICE PROVIDERS THAT INTENTIONALLY
       ENCOURAGE INFRINGEMENT TO HIDE BEHIND SECTION 512 ......................... 12

        A.     Section 512 Does Not Provide A Defense
              To Liability Under Grokster For Inducing Copyright Infringement ................... 13

        B.     Section 512(c)(1)(A) Does Not Require "Specific Knowledge" ........................... 15

             1.     The Actual Knowledge Standard
                     In Section 512(c)(1)(A) Is Not "Specific Knowledge" ............................. 16

             2.     The "Red Flags" Knowledge Standard In
                     Section 512(c)(1)(A) Is Not "Specific Knowledge"
                     And Encompasses A General Awareness Of Infringement ....................... 17

        C.     Complying With Notice And Takedown Is Not Enough ....................................... 19

III.    THE "RIGHT AND ABILITY TO CONTROL"
       MUST BE CONSTRUED IN A MANNER CONSISTENT WITH
       THE MEANING GIVEN THAT TERM IN THE COMMON LAW .............................. 21

CONCLUSION ........................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                                           <u>PAGE(S)</u>

<u>A&M Records, Inc. v. Napster, Inc.</u>,
    239 F.3d 1004 (9th Cir. 2001) .......................................................................16, 23

<u>Arista Records LLC v. USENET.com, Inc.</u>,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009) .............................................16, 17, 24

<u>Columbia Pictures Industries, Inc. v. Fung</u>,
    No. CV 06-5578, 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) ....................................15

<u>FDIC v. Meyer</u>,
    510 U.S. 471 (1994) ...........................................................................16

<u>Fonavisa, Inc. v. Cherry Auction, Inc.</u>,
    76 F.3d 259 (9th Cir. 1996) ...........................................................................18

<u>In re Aimster Copyright Litigation</u>,
    334 F.3d 643 (7th Cir. 2003) ...................................................................18, 19

<u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>,
    545 U.S. 913 (2005)................................................................... *passim*

<u>Neder v. United States</u>,
    527 U.S. 1 (1999) ...........................................................................22

<u>Perfect 10, Inc. v. Amazon.com, Inc.</u>,
    487 F.3d 701 (9th Cir. 2007) ...................................................................23, 24

<u>Perfect 10, Inc. v. CCBill LLC</u>,
    488 F.3d 1102 (9th Cir. 2007) ...........................................................................22

<u>Perfect 10, Inc. v. Visa International Service Association</u>,
    494 F.3d 788 (9th Cir. 2007) ...........................................................................22

<u>Playboy Enterprises, Inc. v. Webbworld, Inc.</u>,
    968 F. Supp. 1171 (N.D. Tex. 1997) ...................................................................9

<u>Religious Technology Center v. Netcom On-Line Communication Services, Inc.</u>,
    907 F. Supp. 1361 (N.D. Cal. 1995) ...................................................................9

<u>Reno v. ACLU</u>,
    521 U.S. 844 (1997)...........................................................................6

<u>Sega Enterprises Ltd. v. MAPHIA</u>,
    857 F. Supp. 679 (N.D. Cal. 1994) ...................................................................9

**RULES AND STATUTES**                                                    **PAGE(S)**

17 U.S.C. § 512(c) ........................................................................................... *passim*

17 U.S.C. § 512(c)(1) ....................................................................................11, 15

17 U.S.C. § 512(c)(1)(A) ................................................................................. *passim*

17 U.S.C. § 512(c)(1)(B) ..........................................................................21, 22, 23

17 U.S.C. § 512(c)(1)(C) ...................................................................................23

17 U.S.C. § 512(c)(3)...........................................................................13, 19, 20

17 U.S.C. § 512(i) ..............................................................................................19

Digital Millennium Copyright Act,
    Pub. L. No. 105-304, 112 Stat. 2860 (1998).......................................................6


**OTHER AUTHORITIES**                                                     **PAGE(S)**

H.R. 2281, 105th Cong. (1998).............................................................................22

H.R. Conf. Rep. No. 105-796 (1998), reprinted in 1998 U.S.C.C.A.N. 639.................................11

H.R. Rep. No. 105-551 (Part I) (1998) ..............................................................17, 22

H.R. Rep. No. 105-551 (Part II) (1998).............................................................8, 18

S. Rep. No. 105-190 (1998) ........................................................................... *passim*

144 Cong. Rec. 9234 (1998).................................................................................8

144 Cong. Rec. 9239 (1998).................................................................................7

144 Cong. Rec. 9242 (1998).................................................................................7

144 Cong. Rec. 18770 (1998)...............................................................................8

144 Cong. Rec. 18774 (1998)...............................................................................10

144 Cong. Rec. 18775 (1998)...............................................................................6

144 Cong. Rec. 18778 (1998)...............................................................................7

144 Cong. Rec. 24464 (1998) ..........................................................................................7

144 Cong. Rec. 25806 (1998) ..........................................................................................6

144 Cong. Rec. 25808 (1998) ..........................................................................................7

The Copyright Infringement Liability of Online and Internet Service Providers:
      Hearing on S.1146, 105th Cong. (1997) .............................................................7

Transcript of Oral Argument, Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,
      545 U.S. 913 (2005) (No. 04-480), 2005 WL 832356 ......................................5

Peter S. Mennel, Indirect Copyright Liability and Technological Innovation,
      32 Colum. J.L. & Arts 375 (2009) .............................................................10, 11

Stephen E. Siwek, Copyright Industries in the U.S. Economy: The 2003-2007 Report
      (June 2009), available at http://www.iipa.com/pdf/IIPASiwekReport2003-07.pdf ...........8

## STATEMENT OF INTEREST OF AMICI CURIAE

American Society of Composers, Authors and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI"), and Society of European Stage Authors & Composers, Inc. ("SESAC"), are performing rights organizations ("PROs") that represent the public performing right in millions of musical works in their three repertories. Collectively, the PROs represent the rights of hundreds of thousands of composers, songwriters and publishers.[1] The PROs often file copyright infringement claims against music users who refuse to obtain public performance licenses. In attempting to license Internet sites and services that perform music publicly, PROs have been confronted with claims that a license is not required because of asserted DMCA safe harbor immunity. Therefore, this Court's interpretation of the scope of Section 512(c) is of critical importance to the PROs.

Disney Enterprises, Inc., NBC Universal, Inc., Warner Bros. Entertainment Inc., and/or their subsidiaries and affiliated companies, are leading producers and distributors of filmed entertainment in the domestic and international theatrical, television, and home entertainment markets.

Association of American Publishers ("AAP") is the national trade association of the book publishing industry in the United States. Its membership of over 300 companies and

---

[1] The licensing activities of amici ASCAP and BMI are largely governed by separate consent decrees entered by this Court, which provide, among other things, that music users may obtain a license for the repertories of these PROs automatically, upon written request. See United States v. Am. Soc'y of Composers, Authors & Publishers, 2001-2 Trade Cases (CCH) 73, 474 (S.D.N.Y. 2001); see also United States v. Broad. Music, Inc., 1996 Trade Cases (CCH) 71, 941 (S.D.N.Y. 1966), amended by 1996-1 Trade Cases (CCH) 71, 378 (S.D.N.Y. 1994). In a rate court proceeding, the issue presented to the court is the value of a performing right license, not whether damages can be assessed for infringement of the public performing right. YouTube and ASCAP are currently engaged in such a rate court proceeding to determine the appropriate license fees covering performances through the YouTube service. See United States v. ASCAP, In re Application of YouTube, LLC, 41 Civ. 1395 (DLC), related to 09 Civ. 7073 (DLC) (S.D.N.Y). YouTube has made an application for a BMI license pursuant to the BMI consent decree.

other organizations includes most of the major commercial book publishers in the United States,
as well as smaller and non-profit publishers, university presses, and scholarly societies.  AAP
members publish hardcover and paperback books and journals in every field of human interest,
including textbooks and other instructional materials for the elementary, secondary, and
postsecondary educational markets; reference works; and scientific, technical, medical,
professional and scholarly books and journals.  They also publish e-books and computer
programs, and produce a variety of other multimedia products and services.  Adequate copyright
protection and effective copyright enforcement, both in the United States and abroad, are critical
to the success of AAP member publishers.

Center for the Rule of Law ("Center") is an independent, non-profit educational
corporation.  The Center's work is pursued by internationally recognized scholars from the
United States and abroad writing and speaking on issues relating to the rule of law, including
property rights, legal process, intellectual property, regulation, and competition law matters
implicating rule of law concerns.  Center scholars include those with special interest in and
understanding of communications, copyright, and related fields.

Institute for Policy Innovation ("IPI") is a non-profit, non-partisan public policy
think tank founded in 1987 and based in Lewisville, Texas.  IPI maintains an active interest in
intellectual property law and policy.  The Institute is an accredited observer NGO with the World
Intellectual Property Organization ("WIPO") in Geneva, Switzerland and participates regularly
in WIPO deliberations.  IPI maintains an extensive program of research and education of policy
makers and the public on intellectual property issues, testifies before Congress and state
legislatures on intellectual property issues, files comments with regulatory agencies, sponsors
briefings in Washington, D.C. and around the world on developments in intellectual property

2

policy, and regularly publishes scholarly papers on intellectual property policy.  IPI sponsors the

major World IP Day event in Washington, D.C. on each April 26th.  IPI has partnered with the

United States Patent and Trademark Office on a variety of projects related to intellectual

property protection.  IPI believes that robust intellectual property protection is the basis of

markets in inventions and creative works, and believes that intellectual property protection is of

compelling national interest because it is critical to the continued economic growth and

innovation of the American economy.

The Media Institute ("Institute") is an independent, nonprofit research

organization located in Arlington, Virginia.[2]  Through conferences, publications, and filings with

courts and regulatory bodies, the Institute advocates for a strong First Amendment, a competitive

communications industry, and journalistic excellence.  The Institute has participated as an

amicus curiae in numerous court proceedings, including cases before the United States Supreme

Court and federal Courts of Appeal.

The Picture Archive Council of America, Inc.'s ("PACA") membership is

comprised of over 150 stock imagery companies worldwide that are engaged in licensing

millions of images, illustrations, film clips and other content on behalf of thousands of individual

creators.

Professional Photographers of America ("PPA"), the world's largest photographic

trade association, represents photographers and photographic artists from dozens of specialty

areas including portrait, wedding, commercial, advertising, and art.  The professional

photographers represented by the PPA have been the primary caretakers of world events and

---

[2]     Plaintiff Viacom International Inc. ("Viacom") is a member of the board of trustees of the Institute.  Viacom did not participate in the Institute's decision to join this brief or make a monetary contribution towards funding its preparation.

family histories for the last 150 years, and have shared their creative works with the public

secure in the knowledge that their rights in those works would be protected.  PPA is joined in its

support by its allied associations under the Alliance of Visual Artists umbrella:  Society of Sport

& Event Photographers ("SEP"), Commercial Photographers International ("CPI"), Evidence

Photographers International Council ("EPIC"), Stock Artists Alliance ("SAA") and Student

Photographic Society ("SPS").

Rosetta Stone Ltd. develops, markets, and provides technology-based language

learning solutions for use by individuals, schools, and other governmental and private institutions.

Zuffa, LLC ("Zuffa") is a Nevada sports promotion company specializing in

mixed martial arts.  It is the parent company of Ultimate Fighting Championship ("UFC"), a

mixed martial arts promotion company.  UFC organizes and promotes popular spectator sporting

events, and creates significant amounts of copyrighted entertainment content based on both live

and recorded events.  UFC distributes this content to its fans across multiple platforms, including

pay-per-view, online and mobile media.  Since 2006, UFC has been the largest pay-per-view

content provider in the world, with over 22 million residential transactions during that time.  It

presently distributes programming content to over 400 million households in over 125 countries

and territories.  With the advent of online video and live streaming technology, copyrighted UFC

content can be uploaded on the Internet to any number of websites, where it is downloaded or

streamed to an unlimited number of unauthorized viewers.  As a result of this online piracy,

Zuffa and UFC have suffered significant revenue losses, and will continue to suffer such losses

in the future.

## INTRODUCTION

This is an important copyright case addressing a developing issue in the law that likely will have nationwide implications for copyright holders, recording artists, content producers, and new Internet ventures that are built on the use of copyrighted content provided by others.  Specifically, this Court must decide whether a safe harbor created by the Digital Millennium Copyright Act ("DMCA"), and now codified at Section 512(c) of the Copyright Act, immunizes an Internet business even if the record evidence shows that the business intentionally relied on the facilitation of copyright infringement to grow its business, knowingly contributed to the infringing conduct of its users, and declined to exercise its right and ability to control that infringement while seeking to benefit directly from it.  Amici respectfully submit that this is not the result Congress intended or enacted.

As Justice Kennedy observed to counsel for defendants during the oral argument in Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913 (2005), "from an economic standpoint and a legal standpoint, [it] sounds wrong to me" to suggest "that unlawfully expropriated property can be used by the owner of the instrumentality as part of the startup capital for his product."  Transcript of Oral Argument at 36, Grokster, 545 U.S. 913 (No. 04-480), 2005 WL 832356.  Neither the DMCA nor any other statutory provision countenances such a proposition.  Amici are concerned about establishing a precedent that would encourage enterprises to rely on infringing copyrighted content to attract traffic and build up a user base in order to create value for their sites.

**ARGUMENT**

**I.      CONGRESS ENACTED THE DMCA TO ENSURE
        VIGOROUS COPYRIGHT PROTECTION FOR DIGITAL WORKS**

In the 1990s, as the Internet was growing in popularity, millions of citizens obtained Internet access at work, school, and home.  See generally Reno v. ACLU, 521 U.S. 844 (1997).  This new medium posed challenges as well as opportunities, including the potential for widespread copyright piracy due to the relative ease with which near-perfect copies could be made and sent around the globe.  In this context, Congress held hearings to evaluate the state of copyright piracy, obtain testimony on the issues facing copyright holders and technology service providers, and consider the proper balance between rights holders and the service providers investing in the infrastructure necessary to develop the Internet.  Congress then carefully crafted a law, the DMCA, to address these serious issues.

**A.      Congress Passed The DMCA In
        Response To Pervasive Piracy And The Potential
        For Massive Copyright Infringement On The Internet**

Congressional supporters hailed the DMCA as "the most comprehensive copyright bill since 1976."  144 Cong. Rec. 25806 (1998) (Rep. Coble).  Among other things, the DMCA implemented two international copyright treaties, strengthened copyright protection for digital works, and balanced the rights of copyright holders against the needs of companies investing in core infrastructure technologies and services necessary to develop the Internet.  See DMCA, Pub. L. No. 105-304, 112 Stat. 2860 (1998); see also 144 Cong. Rec. 18775 (Rep. Boucher) ("I am pleased to rise today in support of the passage of H.R. 2281, which will extend new protections against the theft of their works to copyright owners.").

From the earliest committee hearings on the DMCA, Congress recognized that the Internet had the potential to "recklessly facilitate infringement," and that Congress needed to

understand how to "best combat the risk of copyright infringement facing content providers on the Internet." The Copyright Infringement Liability of Online and Internet Service Providers: Hearing on S.1146, 105th Cong. 1-2 (1997) (Sen. Hatch).

During its deliberations, Congress repeatedly highlighted the significant damages copyright holders suffer each year—billons of dollars in lost revenue—due to piracy:

- "Piracy is a large and growing problem for many content providers, but particularly to our software industry.  Billions of dollars in pirated material is lost every year and [a]n impact is felt directly to our national bottom line." 144 Cong. Rec. 9239 (Sen. Ashcroft).

- "What has been plaguing this huge and important industry is piracy, the outright theft of copyrighted works.  Not piracy on the high seas, it is today's version, piracy on the Internet.  American companies are losing nearly $20 billion yearly because of the international piracy of these copyrighted on-line works, and that is what this bill helps to stop."  144 Cong. Rec. 18778 (Rep. Foley).

- "[A]s we look at the problems that we face as a Nation, and as we move rapidly towards this global economy, it is difficult to imagine an issue that is much more important than theft of intellectual property."  144 Cong. Rec. 25808 (Rep. Dreier).

During the final floor debates, members of Congress characterized the DMCA as copyright legislation designed to stem the tide of piracy:

- "[W]e need this measure to stop an epidemic of illegal copying of protected works—such as movies, books, musical recordings, and software—and to limit, in a balanced and thoughtful way, the infringement liability of online service providers."  144 Cong. Rec. 24464 (Sen. Kohl).

- "Unscrupulous copyright violators can use the Internet to more widely distribute copyrighted material without permission.  To maintain fair compensation to the owners of intellectual property, a regime for copyright protection in the digital age must be created."  144 Cong. Rec. 9242 (Sen. Thompson).

- "While digital dissemination of copies will benefit owners and consumers, it will unfortunately also facilitate pirates who aim to destroy the value of American intellectual property."  144 Cong. Rec. 18770-71 (Rep. Coble).[3]

**B.    Congress Recognized The Need To
Limit The Liability Of Innocent Service Providers
Investing In The Development And Expansion Of Internet Services**

Against this backdrop of strengthening copyright protections for rights holders,

Congress also recognized the need to address the liability of service providers investing in the

technological infrastructure necessary to expand the Internet.  See S. Rep. No. 105-190, at 8

(1998) ("[W]ithout clarification of their liability, service providers may hesitate to make the

necessary investment in the expansion of the speed and capacity of the Internet."); 144 Cong.

Rec. 9234 (Sen. Hatch) ("American companies are losing $18 to $20 billion annually due to the

international piracy of copyrighted works.  But the potential of the Internet, both as information

highway and marketplace, depends on its speed and capacity.  Without clarification of their

liability, service providers may hesitate to make the necessary investment to fulfill that

potential.").

Congress recognized that, solely by virtue of the use of computers, service

providers such as telephone companies, long distance carriers, and Internet access companies

"must make innumerable electronic copies by simply transmitting information over the Internet.

Certain electronic copies are made to speed up the delivery of information to users.  Other

electronic copies are made in order to host World Wide Web sites."  S. Rep. No. 105-190, at 8;

H.R. Rep. No. 105-551 (Part II), at 23 (1998).  Those incidental, automatically generated

---

[3]       Piracy affects the nation's bottom line because the copyright industries are a substantial part of our nation's economy.  According to a 2007 study, 11.7 million people were employed by the copyright industries, or 8.51 percent of the United States workforce.  Moreover, these industries add a value of $1.52 trillion, or 11.05 percent of the GDP.  Steven E. Siwek, Copyright Industries in the U.S. Economy: The 2003-2007 Report (June 2009), http://www.iipa.com/pdf/IIPASiwekReport2003-07.pdf.

"copies" constituted direct copyright infringement, resulting in potentially infinite copyright liability.

Shortly before Congress considered the DMCA, several federal district courts considered the application of copyright principles to the online world.  In Religious Technology Center v. Netcom On-Line Communication Services, Inc., 907 F. Supp. 1361, 1372 (N.D. Cal. 1995), a district court held that Netcom could not be held liable for direct copyright infringement because it did "not create or control the content of the information available to its subscribers; it merely provide[d] access to the Internet."

Other courts had attempted to identify the appropriate scope of liability for website and bulletin board operators who controlled and profited from copyrighted works.  In Sega Enterprises Ltd. v. MAPHIA, 857 F. Supp. 679, 683 (N.D. Cal. 1994), a court imposed copyright infringement liability on the operators of a bulletin board who knowingly profited from the uploading and downloading of unauthorized copies of Sega's copyrighted video games. Similarly, in Playboy Enterprises, Inc. v. Webbworld, Inc., 968 F. Supp. 1171, 1175 (N.D. Tex. 1997), a court imposed liability on the operator of a subscription-based bulletin board system that provided access to digitized versions of Playboy's copyrighted images.  The Playboy court imposed liability, reasoning that the defendant website operator "gets paid for selling the [copyrighted] images it stores on its computers."  Id.

The crucial distinction between these two categories of conduct—companies that provide Internet services described in the safe harbors and may occasionally unknowingly transmit, store, or link to infringing content versus companies that knowingly make infringing content available online and benefit from the infringement—drove Congress's drafting and ultimate passage of the Section 512 safe harbors.  See S. Rep. No. 105-190, at 19.

Although Amici Supporting Defendants repeatedly stress that the DMCA was intended to "reduce legal uncertainty" and provide "greater legal predictability" for service providers (Amici Supporting Defendants' Brief at 3, 5, 8, 9, 16, 18 & 20),[4] they fail to acknowledge that the DMCA also reflects Congress's determination to bolster and ensure copyright protections on the Internet.  See, e.g., 144 Cong Rec. 18774 (Rep. Goodlatte) ("If America's creators do not believe that their works will be protected when they put them on-line, then the Internet will lack the creative content it needs to reach its true potential; and if America's service providers are subject to litigation for the acts of third parties at the drop of a hat, they will lack the incentive to provide quick and sufficient access to the Internet.").  On this score, Amici Supporting Defendants erroneously cast the DMCA as a broad statute providing Internet businesses with expansive immunity from copyright liability—all under the banner of "legal predictability."  Amici ASCAP et al. respectfully submit that this distorted reading of the DMCA fails to comport with Congress's expressed legislative intent.

Amici Supporting Defendants further argue that enforcing traditional standards of secondary copyright liability online will "damage[e] Internet commerce" and "chill innovation." (See Amici Supporting Defendants Brief at 14.)  On the contrary, innovation is best promoted by respecting the rights of content creators and the proper enforcement of copyright.[5]  Businesses

---

[4]      Amici American Library Association, Association of College and Research Libraries, Association of Research Libraries, Center for Democracy and Technology, Computer and Communications Industry Association, Electronic Frontier Foundation, Home Recording Rights Coalition, Internet Archive, Netcoalition, and Public Knowledge are collectively referred to herein as "Amici Supporting Defendants."  The brief filed by those Amici (Docket No. 240) is cited herein as "Amici Supporting Defendants' Brief at __."

[5]      See, e.g., Peter S. Mennel, Indirect Copyright Liability and Technological Innovation, 32 Colum. J.L. & Arts 375, 400 (2009) ("The Chilled Innovation conjecture downplays the beneficial effects of indirect copyright liability on the development of balanced technologies (those that tend to balance incentives to create copyrighted works with advances in information

built on the backs of others' content cannot be said to be "innovation" in any constructive sense
of the word, whereas the copyright industries are a catalyst for enormous creativity and
innovation.  See Mennell, 32 Colum. J.L. & Arts at 379, 394.

> **C.**     **The Narrow Safe Harbors Congress**
> **Created Did Not Establish Broad Exemptions Authorizing**
> **Intentional And Knowing Copyright Infringement On The Internet**

Following hearings and extensive debate in both the Senate and the House of
Representatives, Congress enacted four safe harbors to structure and limit the potential exposure
of Internet service providers.  Specifically, Congress provided immunity from monetary damages
for service providers engaged in four core Internet functions:  (a) digital network
communications, (b) system caching, (c) information residing on a network or system at the
direction of a user, and (d) information location tools.  See S. Rep. No. 105-190, at 19.  As the
four Section 512 safe harbors confirm, Congress focused on immunizing service providers
against claims of infringement predicated on passive, neutral technological services.  Congress
clearly did not intend to eviscerate settled principles of copyright protection and of liability for
infringing activities.  See H.R. Conf. Rep. No. 105-796, at 72 (1998), reprinted in 1998
U.S.C.C.A.N. 639, 648-49.

The safe harbor at issue in this case, Section 512(c), applies to "infringement of
copyright by reason of storage at the direction of a user."  17 U.S.C. § 512(c)(1); see S. Rep.
No. 105-190, at 43 ("Examples of such storage include providing server space for user's web site,
for a chatroom, or other forum in which material may be posted at the direction of users.").  In
crafting this exemption, the Senate Judiciary Committee noted that the Section 512(c) safe
harbor was not intended to apply to service providers who knowingly make content available to

---

dissemination) while ignoring the adverse effects of broad immunity, which fosters deployment
of parasitic technologies that tend to drive out balanced technologies.").

the public for the service provider's own benefit: "Information that resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user does not fall within the liability limitation." Id. As with the other Section 512 safe harbors, Congress was concerned with limiting the liability of Internet services, while at the same time protecting the legitimate interests of rights holders. A defendant that knowingly facilitates use of its site as a haven for infringing content, especially one that makes affirmative decisions to encourage infringing content to be uploaded to and viewed on its website for its own financial benefit, is not partaking in the type of activity covered by Section 512(c). See Part II.A, infra.

*      *      *

In sum, the DMCA Section 512 safe harbors do not immunize from liability enterprises predicated on the inducement of, or knowing contribution to, copyright infringement, or those that decline to exercise the right and ability to control infringing activity from which they directly benefit financially. See S. Rep. No. 105-190, at 8, 48 (confirming that the safe harbors are not intended to apply to "pirate" websites "where sound recordings, software, movies or books [are] available for unauthorized downloading, public performance or public display"). Instead, Congress intended to create specific safeguards for service providers operating legitimate services necessary for the growth of the Internet—not to confer blanket immunity for monetary damages on entities intentionally using infringing content as seed capital and an ongoing draw to build their businesses.

## II.   THE COURT SHOULD NOT PERMIT SERVICE PROVIDERS THAT INTENTIONALLY ENCOURAGE INFRINGEMENT TO HIDE BEHIND SECTION 512

This Court faces several significant questions of statutory interpretation relating to Section 512. First, whether an entity that can be shown to have intentionally facilitated the use

12

of infringing content to build an audience and is thus liable for inducing infringement under the Supreme Court's decision Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913 (2005), can avoid liability by relying on Section 512.  Amici believes that nothing in Section 512 shields such an entity from liability in such an instance.

Second, what is the appropriate knowledge standard to apply under Section 512(c)(1)(A).  Defendants erroneously ask this Court to collapse the Section 512(c)(1)(A) knowledge standard with a separate requirement to respond to a takedown notice under Section 512(c)(3).  They argue that the specific information provided in a notice is required for knowledge.  Interpreting Section 512 in this manner would misconstrue the statute and effectively eliminate the independent Section 512(c)(1)(A) knowledge and "red flags" requirement Congress created.

Third, whether under Section 512(c), a service provider is shielded from liability, regardless of other proof regarding knowledge of infringing activity, simply because it complies with statutory takedown notices by promptly removing the identified infringing material.  Amici submit that this novel theory would undermine the very purposes of Section 512 by improperly permitting an enterprise built on infringement to continue to profit from copyrighted works— with no liability—unless and until a copyright holder complains with respect to each instance of infringement.  If the Court were to adopt such a theory of Section 512 immunity, then Congress's careful work will have been undone and the DMCA safe harbors will be transformed into a license to commit piracy.

**A.    Section 512 Does Not Provide A Defense To Liability
Under Grokster For Inducing Copyright Infringement**

In Grokster, the Supreme Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other

affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by

third parties."  545 U.S. at 936.  The Court further stated that the "inducement rule [] premises

liability on purposeful, culpable expression and conduct, and thus does nothing to compromise

legitimate commerce or discourage innovation having a lawful promise."  Id. at 937.  The

Supreme Court found that the "evidence of the distributors' words and deeds going beyond

distribution as such shows a purpose to cause and profit from third-party acts of copyright

infringement.  If liability for inducing infringement is ultimately found, it will not be on the basis

of presuming or imputing fault, but from inferring a patently illegal objective from statements

and actions showing what that objective was."  Id. at 941.

        The Supreme Court emphasized that inducement liability is not confined to

situations in which a message encouraging infringement is actually communicated.  Id. at 938

("Whether the message were communicated is not to the point on this record.  The function of

the message in the theory of inducement is to prove by a defendant's own statements that his

unlawful purpose disqualifies him from claiming protection . . . .  Proving that a message was

sent out, then, is the preeminent but not exclusive way of showing that active steps were taken

with the purpose of bringing about infringing acts, and of showing that infringing acts took place

by using the device distributed.").  An enterprise is liable under Grokster whenever it operates

with a purpose of facilitating infringement—regardless of whether it communicates that message

externally.

        The critical issue before the Court is whether Section 512(c) somehow immunizes

a defendant from the legal consequences of evidence of an unlawful intent and purposeful

conduct directed to the promotion of infringing conduct.  Section 512(c) provides no protection

for at least two reasons.  First, Section 512(c) provides a limitation on remedies "for

infringement of copyright <u>by reason of the storage at the direction of a user</u> of material that resides on a system or network controlled or operated by or for the service provider."  17 U.S.C. § 512(c)(1) (emphasis added).  <u>Grokster</u> liability is predicated on the intent to promote and facilitate copyright infringement by third parties—acts that go beyond the mere storage at the direction of a user.  In such a case, liability is not predicated on the act of storage, but on the statements or actions directed to promoting infringement.  Section 512 provides no limitation on remedies for such manifestly unlawful conduct.  <u>See Columbia Pictures Indus., Inc. v. Fung</u>, No. CV 06-5578, 2009 WL 6355911, at *18 (C.D. Cal. Dec. 21, 2009) ("[I]nducement liability and the Digital Millennium Copyright Act safe harbors are inherently contradictory.  Inducement liability is based on active bad faith conduct aimed at promoting infringement; the statutory safe harbors are based on passive good faith conduct aimed at operating a legitimate internet business.").  Second, <u>Grokster</u> liability necessarily demonstrates a level of knowledge and awareness that precludes safe harbor protection under Section 512(c)(1)(A).  Consequently, the Section 512(c) safe harbor is unavailable in such cases.

### B.    <u>Section 512(c)(1)(A) Does Not Require "Specific Knowledge"</u>

Defendants and Amici Supporting Defendants argue that it is "not sufficient for the plaintiff to show a provider's general awareness of infringement," and instead assert that a copyright holder must demonstrate that the service provider had the type of specific knowledge of particular infringing material provided in a DMCA-compliant notice.  (<u>See</u> Defendants' Brief at 31; Amici Supporting Defendants' Brief at 11-14.)  Amici respectfully submit that the language of Section 512(c)(1)(A), the legislative history, and the understanding of "knowledge" and "awareness" in the established case law confirm that Congress did not mandate this type of specific knowledge.

15

1.      **The Actual Knowledge Standard
         In Section 512(c)(1)(A) Is Not "Specific Knowledge"**

        The actual knowledge standard in Section 512(c)(1)(A) is not, by its plain terms,

confined to specific knowledge of individual acts of infringement of the type required in a

DMCA notice:  namely, identification of the infringed work, the infringing content, and its

location.  Such an interpretation would read into the statutory language a limitation that Congress

did not enact.  Had Congress intended "actual knowledge" in the context of Section 512 to have

the constricted meaning advanced by Defendants, it would have said so in the carefully drafted

statutory language.  See FDIC v. Meyer, 510 U.S. 471, 476 (1994) (holding that in the absence

of a specific statutory definition, a statutory term is construed "in accordance with its ordinary or

natural meaning").  Rather, the common law understanding of actual knowledge in the case law

relating to contributory liability should be applied.

        Not surprisingly, courts have found that a defendant's knowledge that it is hosting

large amounts of infringing content comprises "actual knowledge," especially where there is

knowledge of individual instances of infringing content on the website—whether or not a

DMCA-compliant notice was provided.  See, e.g., A&M Records, Inc. v. Napster, Inc., 239 F.3d

1004, 1020 n.5 (9th Cir. 2001) (finding knowledge where Napster knew of significant amounts

of infringing files on its server and internal documents demonstrated that executives were aware

that users were engaging in the unauthorized transfer of copyrighted music).

        This Court has likewise concluded that knowledge under the contributory liability

standard does not require knowledge of specific acts of infringement.  In Arista Records LLC v.

USENET.com, Inc., 633 F. Supp. 2d 124, 154 (S.D.N.Y. 2009), this Court held that "knowledge

of specific infringements is not required to support a finding of contributory infringement."  In

that case, a service provider had actual knowledge of the widespread availability of copyrighted

entertainment media, employee knowledge of user downloads of infringing content, a policy of promoting popular copyrighted content, and employees downloading copyrighted content.  Id. at 155.

Consistent with the plain language of the statute and the persuasive reasoning in Arista Records, Amici respectfully submit that this Court should conclude that the Section 512(c)(1)(A) knowledge requirement does not require specific knowledge of each act of infringement.  See, e.g., Part II.A., supra.

### 2. The "Red Flags" Knowledge Standard In Section 512(c)(1)(A) Is Not "Specific Knowledge" And Encompasses A General Awareness Of Infringement

As described above, Congress created two separate knowledge standards in Section 512(c)(1)(A):  (1) "actual knowledge" and (2) awareness "of facts or circumstances from which infringing activity is apparent," referred to as "red flags."  This red flag standard clearly must be different from the "actual knowledge" standard that Congress separately provided.

Nevertheless, Defendants argue that they cannot be "charged with" "red flags" knowledge because red flags must be "blatant."  (Defendants' Brief at 33-34.)  But that is not the standard that is embedded in the legislation.  Defendants and Amici Supporting Defendants also state that a service provider, even one aware of massive infringement on its site, does not need to "affirmatively seek facts indicative of infringement."  (Id. at 33; Amici Supporting Defendants' Brief at 9.)  On the contrary, Congress's expressed intention was that "[o]nce one becomes aware of such information [] one may have an obligation to check further."  H.R. Rep. No. 105-551 (Part I), at 26; see also S. Rep. No. 105-190, at 48 ("[A] service provider…would not qualify for the safe harbor if it had turned a blind eye to 'red flags' of obvious infringement.").

For this reason, Section 512(c)(1)(A) provides that the service provider must take measures to promptly remove or disable access to the material to qualify for limited liability

once it obtains either actual or "red flag" knowledge.  Otherwise, it may be contributorily liable for that infringement.  See In re Aimster Copyright Litig., 334 F.3d 643, 650 (7th Cir. 2003); H.R. Rep. No. 105-551 (Part II), at 58 (recognizing that when "the infringing nature" of the site "would be apparent from even a brief and causal viewing, safe harbor status . . . would not be appropriate").

Amici urge this Court not to adopt an artificially narrow "red flags" standard that would effectively authorize websites built on infringing activity to adopt an "ostrich-like refusal to discover the extent to which [their] system[s] [were] being used to infringe copyright."  See In re Aimster Copyright Litig., 334 F.3d at 655.  Adopting this reasoning would create a system in which a website operator that intentionally provides a platform for infringing content could hide behind Section 512 and escape all monetary liability for copyright infringement—even though it is profiting enormously from the availability of those works on its website.  This is not the rule of law Congress intended and enacted.[6]

Accepting Defendants' faulty reasoning would undermine Congress's intent in enacting the DMCA safe harbors.  Congress recognized that there would exist a class of service providers that would intentionally or otherwise knowingly host infringing content for their own purposes.  As Judge Posner stated:  "The [DMCA] does not abolish contributory liability."  See

---

[6]     One instructive decision is Fonavisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 262, 264 (9th Cir. 1996), in which the Ninth Circuit held Cherry Auction liable for contributory and vicarious liability.  Cherry Auction operated a swap meet at which vendors paid daily fees for booth space, and it was aware that some vendors were selling counterfeit sound recordings.  Id. at 261.  Cherry Auction had the right to terminate vendors and had the ability to patrol the site and vendor booths.  Id. at 262.  The Court found that Cherry Auction intentionally provided the environment for counterfeit recording sales to thrive.  Id. at 264.  Holding that a website operator needs information regarding the specific works being infringed and the location of each copy is equivalent to saying Cherry Auction needed to know precisely what counterfeit recordings were being sold on any given day in order to have knowledge.  A website operator is as capable of scrutinizing its site as Cherry Auction was of scrutinizing its vendor booths for infringement.

<u>In re Aimster Copyright Litig.</u>, 334 F.3d at 655.  Rather, on its face, Section 512(c)(1)(A) is intended to retain contributory liability in the online environment where there is knowledge of infringing activity or "red flags."

### C.     **Complying With Notice And Takedown Is Not Enough**

A website operator is not exonerated from liability to which it would otherwise be subject simply because it complies with the DMCA takedown notices it receives.  (Defendants' Brief at 57-61.)  Such a construction rests on an erroneous conception of Section 512(c) as purely a takedown provision, and incorrectly treats two separate requirements for the Section 512(c) safe harbor as though they embody a single requirement.

A service provider must comply with all of the separate and independent requirements of Section 512(c) (and Section 512(i)) to avoid monetary damages for copyright infringement.  Among the threshold requirements, the knowledge requirement— Section 512(c)(1)(A)—provides that if a service provider has actual knowledge of infringing activity or is aware of facts or circumstances from which infringing activity is apparent, it must expeditiously remove or disable access to the infringing content.  A completely different provision, the notice and takedown requirement—Section 512(c)(3)—provides that, if a service provider receives a takedown notice it must remove or disable access to the material under the statutory procedures to maintain its eligibility for the statutory safe harbor.

As a matter of statutory interpretation, the structure of Section 512 and the fact that Congress adopted two separate requirements within the same subsection confirm that Congress intended two entirely separate requirements, not one.  If Congress had intended the actual knowledge required under Subsection 512(c)(1)(A) to require the information to be provided in a Subsection 512(c)(3) notice it would have so stated.

Defendants advance a construction of the statute that would shield them from liability unless they possessed actual knowledge or awareness of facts or circumstances of the kind contained in a notice compliant with Section 512(c)(3).  (See Defendants' Brief at 10.)  This argument treats the separate requirements as though they were one, and renders the threshold lack of knowledge standard in Section 512(c)(1)(A) meaningless.

Defendants' interpretation of the safe harbor in Section 512(c) is unfounded, has no basis in the language of the statute or the legislative history, and misconstrues the purpose and intent of Section 512(c) as a whole.  The argument emanates from two errors:  (1) it confuses case law regarding compliance with the Section 512(c)(3) notice requirements with the Section 512(c)(1)(A) "lack of knowledge" requirement; and (2) it rests on the assumption that the only "knowledge" and "awareness" that would disqualify a service provider under Section 512(c)(1)(A) is knowledge of a specific infringing activity on its site.

Section 512(c) is not intended, however, to give a service provider broad immunity just because it complies with notice-and-takedown.  Congress afforded service providers protection from liability under Section 512(c) only if they cooperated with rights holders in the following two ways:  (1) an otherwise innocent service provider—one that has no reason to be aware of the infringing content on its site but may have the occasional infringing content uploaded to the site—can escape monetary liability if it follows the notice and takedown procedures in Section 512(c)(3); and (2) a service provider that hosts infringing content that it knows of, or should be aware of from the facts, can also avoid monetary damages if it acts expeditiously upon receiving such knowledge or awareness to take down such infringing content—in addition to complying with any takedown notices it has received.  Under the statutory structure, a defendant's conduct under these two different requirements should be

analyzed separately.  In any event, neither of these provisions protects an online enterprise that is wholly aware of widespread infringement on its site and does not take such content down—regardless of whether it received notice.

**III.  THE "RIGHT AND ABILITY TO CONTROL"
       MUST BE CONSTRUED IN A MANNER CONSISTENT WITH
       THE MEANING GIVEN THAT TERM IN THE COMMON LAW**

      A service provider also loses the Section 512(c) limitation on liability when it receives "a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  17 U.S.C. § 512(c)(1)(B).  This standard reflects the established standard of common law vicarious liability.  Under the common law standard and the DMCA, a business that derives a direct financial benefit from infringing conduct that it has both the right and ability to control is vicariously liable for such infringement.[7]  To be clear, the "right and ability to control" the infringing activity will, in and of itself, not disqualify a provider from the safe harbor under Section 512(c)(1)(B).  Whether they also receive a financial benefit directly attributable to the infringing activity is a separate factual question that must be answered in the affirmative to disqualify the service provider from the Section 512(c) safe harbor.

      As an initial matter, the language of Section 512(c)(1)(B) directly tracks—and incorporates within Section 512(c)—the elements of the common law vicarious liability standard: (1) "a financial benefit directly attributable to the infringing activity" and (2) "the right and

---

[7]     This brief does not address the financial benefit prong of the Section 512(c)(1)(B) analysis, except to briefly address Amici Supporting Defendants' flawed argument that "advertising is insufficiently direct . . . particularly in light of [the] many noninfringing videos and overall legitimate business model."  (Amici Supporting Defendants' Brief at 15-16.)  First, any revenue generated from "noninfringing videos" is entirely irrelevant to, and in no way offsets, the direct financial benefit received from infringing activity.  Second, as discussed above, a business model founded on the use of stolen content for personal profit is anything but legitimate.  (See Part II, supra.)

ability to control such activity."  The vicarious liability standard thus is the correct standard to apply to Section 512(c)(1)(B) because, as noted above, where Congress uses terms in a statute that have a settled meaning in the common law, that meaning must be inferred, unless the statute states otherwise.[8]  See Grokster, 545 U.S. at 930 n.9 (stating that a vicarious liability theory "allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer"); Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 805 (9th Cir. 2007) (stating that "[f]or vicarious liability to attach, [] the defendant must have the right and ability to supervise and control the infringement").

Moreover, the legislative history confirms Congress's intent to incorporate the common law vicarious liability standard in Section 512(c)(1)(B):

> The financial benefit standard in subparagraph (B) is intended to codify and clarify the direct financial benefit element of vicarious liability. . . . The "right and ability to control" language in Subparagraph (B) codifies the second element of vicarious liability.

H.R. Rep. No. 105-551 (Part I), at 25-26 (emphasis added).[9]  Consistent with the plain language of the statute and clear legislative history, other courts have likewise concluded that Section 512(c)(1)(B) reflects the common law standard for vicarious liability.   See, e.g., Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1117 (9th Cir. 2007) (recognizing that the "direct financial benefit" element "should be interpreted consistent with the similarly-worded common law standard for vicarious copyright liability").

---

[8]    See generally Neder v. United States, 527 U.S. 1, 21 (1999) (recognizing the "well-established rule of [statutory] construction that where Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms" (alteration in original) (internal quotation marks omitted)).

[9]    Although this House Committee report related to an earlier version of the DMCA than the final version adopted, the identical "right and ability to control" language was codified in Section 512(c)(1)(B).  Compare H.R. 2281, 105th Cong. § 202(a) (1998), with 17 U.S.C. § 512(c)(1)(B).

Despite the plain language of the statute and this legislative history, Amici Supporting Defendants assert that "multiple courts" have "already [] rejected" the argument that Section 512(c)(1)(B) codifies the common law vicarious liability standard and suggest that "something more" is required.  (<u>See</u> Amici Supporting Defendants' Brief at 15.)  In doing so, Amici Supporting Defendants ignore the Court of Appeals and Supreme Court authority addressing the "right and ability to control" prong of vicarious liability.  <u>See</u> <u>Grokster</u>, 545 U.S. at 930; <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d at 1024; <u>Perfect 10, Inc. v. Amazon.com, Inc.</u>, 487 F.3d 701, 730 (9th Cir. 2007).  Instead, they rely on a few district court cases concluding that if the vicarious liability common law understanding of "right and ability" applied, it would mean that any service provider who complied with the takedown requirements in Section 512(c)(1)(C) would lose immunity because it had the "right and ability" to take the content down.  Amici Supporting Defendants' analysis is flawed because "the right and ability to control" is only one prong of the Section 512(c)(1)(B) requirement.  A service provider is disqualified only if it has both "the right and ability to control" <u>and</u> "does not receive a financial benefit directly attributable to the infringing activity."

In analyzing the right and ability to control under the vicarious liability standard, the Ninth Circuit in <u>A&M Records, Inc. v. Napster, Inc.</u> held that the Napster service "retains the right to control access to its system," and that "[t]urning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability."  239 F.3d at 1023.  In assessing Napster's ability to police, the Ninth Circuit emphasized the technological capabilities available to Napster, including its "ability to locate infringing material listed on its search indices, and the right to terminate users' access to the system."  <u>Id.</u> at 24.

In a later decision, the Ninth Circuit again interpreted the right and control prong and held (consistent with the Supreme Court's intervening holding in <u>Grokster</u>) that a service provider "exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so."  <u>Amazon.com, Inc.</u>, 487 F.3d at 730.

In <u>Arista Records LLC v. USENET.com, Inc.</u>, this Court found evidence of the right and ability to control where "Defendants expressly reserve[d] the right, in their sole discretion, to terminate, suspend, or restrict users' subscriptions, thereby limiting their access to uploading or downloading content to or from Defendants' servers."  633 F. Supp. 2d at 157. Even if the Court were to adopt a more stringent requirement under Section 512(c), a service provider that encourages and knowingly tolerates the uploading and viewing of infringing content, and that has the right and ability to filter, tag or takedown such content, and that controls whether and when content is allowed to remain on this site may not avail itself of Section 512(c).

## CONCLUSION

For the foregoing reasons, the Court should conclude that the Section 512(c) safe

harbor does not apply in this case.

Dated:  May 7, 2010                          Respectfully submitted,
        Washington, D.C.

                                              /s/ Mary E. Rasenberger
                                             Clifford M. Sloan (*pro hac vice*)
                                             (cliff.sloan@skadden.com)
                                             Mary E. Rasenberger
                                             (mary.rasenberger@skadden.com)
                                             Christopher G. Clark
                                             (christopher.clark@skadden.com)
                                             SKADDEN, ARPS, SLATE,
                                               MEAGHER & FLOM LLP
                                             1440 New York Avenue, N.W.
                                             Washington, D.C. 20005
                                             (202) 371-7000

                                             Counsel for American Society of Composers,
                                             Authors And Publishers, Broadcast Music, Inc.,
                                             SESAC, Inc., Disney Enterprises, Inc., NBC
                                             Universal, Inc., Warner Bros. Entertainment Inc.,
                                             Association of American Publishers, Center for the
                                             Rule of Law, Institute for Policy Innovation,
                                             The Media Institute, Picture Archive Council of
                                             America, Professional Photographers of America,
                                             Rosetta Stone Ltd., and Zuffa, LLC