UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
VIACOM INTERNATIONAL, INC.,
COMEDY PARTNERS,
COUNTRY MUSIC TELEVISION, INC.,
PARAMOUNT PICTURES CORPORATION, and
BLACK ENTERTAINMENT TELEVISION, LLC

Plaintiffs                                                          07 Civ. 2103 (LLS)

v.

YOUTUBE, INC., YOUTUBE, LLC
And GOOGLE, INC.

Defendants.
---------------------------------------------------------------x

# BRIEF OF AMICI CURIAE
# AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, DIRECTORS GUILD OF AMERICA, INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES, AND SCREEN ACTORS GUILD
# IN SUPPORT OF PLAINTIFFS

**TABLE OF CONTENTS**

                                     **Page**

I.   Statement of Amici Curiae ................................................................................. 1

II.   Introduction ......................................................................................................... 2

III.   The Systematic Infringement of Copyrighted Works by Entities Such as YouTube Jeopardizes Our Members' Earnings, Benefits and Jobs, and our Nation's Motion Picture and Sound Recording Industries. ............................................................ 4

    A.   On-line Theft Threatens Our Members' Jobs .................................................... 4

    B.   On-line Theft Directly Impacts Our Members' Earnings and Benefits .......... 7

    C.   On-line Theft Poses a Serious Threat to America's Creative Output ............ 10

IV.   Conclusion ........................................................................................................ 11

I.      **Statement of Amici Curiae**

*Amici* (collectively, the "Guilds and Unions") are labor unions that represent artists in the theatrical motion picture, television, commercial and new media industries.

*Amicus* American Federation of Television and Radio Artists ("AFTRA") represents the people who entertain and inform America. In 32 Locals across the country, AFTRA represents actors, broadcast journalists, singers, dancers, announcers, hosts, comedians, disc jockeys and other performers who work in the entertainment and media industries. With over 70,000 professional performers, AFTRA members are working together to protect and improve their jobs, lives, and communities in the 21st century. From new art forms to new technology, AFTRA members embrace change in their work and craft to enhance American culture and society.

*Amicus* Directors Guild of America ("DGA") was founded in 1936 to protect the economic and creative rights of Directors. Over the years, its membership has expanded to include the entire directorial team, including Unit Production Managers, Assistant Directors, Associate Directors, Stage Managers, and Production Associates. DGA's over 14,000 members live and work throughout the United States and abroad, and are vital contributors to the production of feature films, television programs, documentaries, news and sports programs, commercials, and content made for the Internet and other new media. DGA seeks to protect the legal, economic, and artistic rights of directorial teams, and advocates for their creative freedom.

*Amicus* International Alliance of Theatrical Stage Employees ("IATSE") is the labor union that represents technicians, artisans and craftspersons in the entertainment industry, including live theater, motion picture and television production, and trade shows. IATSE was formed in 1893 and has over 110,000 members in the United States, U.S. territories, and Canada. Through its international organization and its autonomous local unions, IATSE seeks to

1

represent every worker employed in its crafts and to help them obtain the kind of wages, benefits, and working conditions they need for themselves and their families.

*Amicus* Screen Actors Guild ("SAG") is the nation's largest labor union representing working actors. Established in 1933, SAG represents over 120,000 actors who work in film and digital television, industrials, commercials, video games, music videos and all other new media formats. The Guild exists to enhance actors' working conditions, compensation and benefits and to be a powerful, unified voice on behalf of artists' rights.

The Guilds and Unions have collective bargaining agreements with all of the major motion picture and television production companies, television networks, and commercial producers. These collective bargaining agreements govern the wages, hours and working conditions of our members.

The Guilds and Unions' members, and their pension and health plans, rely on residuals – deferred compensation based on the continuing use of the creative works on which they were employed – as an important source of income. As the revenues generated by these works in certain markets are diminished or eliminated, so too are the incomes, benefits and jobs of the Guilds and Unions' members. Accordingly, the Guilds and Unions and their members have a significant interest in the outcome of this litigation.

## II.     Introduction

The opening sentence of the Statute of Anne, which was enacted in the United Kingdom in 1710 and is the predecessor to Article I, Section 8, Clause 8 of the United States Constitution, premises the establishment of copyright on the following statement:

> Whereas Printers, Booksellers, and others have of late frequently taken the Liberty of Printing, Reprinting, and Publishing, or causing to be to be Printed, Reprinted, and Published Books, and other Writings, without the Consent of the Authors or Proprietors of such Books and Writings, to their very great Detriment, and too

> often to the Ruin of them and their families: For preventing therefore such practices for the future, and for the Encouragement of Learned Men to Compose and Write Useful Books. . .[1]

The technology may be different, but the story remains the same. In the year that marks the three-hundredth anniversary of the Statute of Anne, the law should not stray from this fundamental principle: those who take or facilitate the taking of the creative works of others without consent cause detriment and ruin to the families that rely on the revenues derived from those works and undermine the economic incentive for the creation of new works.

The Guilds and Unions represent over 300,000 workers who rely on the revenues generated by copyrighted works to earn their livings and support their families and communities. Our members play a vital role in creating audiovisual works and sound recordings that are in demand both in the United States and around the world. Contrary to popular misconception, our members are overwhelmingly middle-class, freelance workers who rely on downstream revenues and royalties to provide them with the compensation and health and pension benefits that keep their families afloat and secure.

On-line theft, or piracy, poses an existential threat to the entertainment industry. On-line theft has already decimated the record business. As the on-line theft of motion pictures and television programs becomes technologically more feasible, it threatens to seriously impact the production of audio-visual content as well. This brief aims to provide the Court with some insight into how our business works to help it better understand some of the broader implications of allowing YouTube's systematic theft and facilitation of theft of copyrighted works to go unpunished.

---

[1] Statute of Anne, 1710, 8 Anne C. 19 (Eng.).

**III. The Systematic Infringement of Copyrighted Works by Entities Such as YouTube Jeopardizes Our Members' Earnings, Benefits and Jobs, and our Nation's Motion Picture and Sound Recording Industries.**

On-line theft threatens grave harm to the output of our nation's creative industries, and to the artists and craftspeople who make up the Guilds and Unions' memberships. Our members' earnings, benefits and jobs are reliant on the preservation and proper enforcement of our nation's intellectual property laws. That is why the Guilds and Unions have each made the fight against on-line theft a top priority.[2] Our members' ability to support their families and their contributions to American culture are at stake.

**A. On-line Theft Threatens Our Members' Jobs**

On-line theft is not a "victimless" crime -- theft costs jobs. To see how this is so, one must first have a basic understanding of how the audiovisual works and sound recordings that our members create come into existence.

---

[2] *See, e.g.*, Brent Lang, *Entertainment Groups Praise Capitol Confab with Biden*, THE WRAP (Dec. 15, 2009), *available at:* http://www.thewrap.com/ind-column/entertainment-groups-praise-capitol-confab-biden-11831 (reporting on a recent meeting among representatives of the Guilds and Unions and top U.S. Executive Branch officials, including Vice President Biden, and noting the high priority placed on combating piracy); Directors Guild of America, *Taylor Hackford Elected DGA President*, DGA MONTHLY, at 4 (Sept. 2009) (reporting that Mr. Hackford's top legislative priority for the Guild would be protecting the work of its members in the new digital age from "Internet theft"); Dave McNary, *AFTRA In No Hurry To Merge*, VARIETY (Aug. 9, 2009) *available at:* http://www.variety.com/article/VR1118007077.html?categoryId =18&cs =1&nid=2248 (noting that the AFTRA convention unanimously passed a resolution urging the government to strengthen protection against intellectual property theft on the Internet); International Association of Theatrical Stage Employees*, IATSE Convention Re-elects Matthew D. Loeb International President*, Press Release (July 31, 2009) *available at*: http://www.iatse-intl.org/news/pr_073109.html (IATSE President Loeb stressed that digital piracy is one of the two top issues for the union); IATSE Quadrennial Convention Resolution No. 9, adopted July 28, 2009 (on file with IATSE) (resolving to "take measures to lobby government, promote legislative and regulatory safeguards and partner with the industry at large in securing the motion picture business from piracy"); Screen Actors Guild, *SAG Advocates for Actors Against Digital Theft, available at* http://www.sag.org/digital-theft (providing examples of activity SAG has undertaken over the last 12 months to combat online theft of copyrighted works).

The financiers and producers of creative content make decisions regarding what projects to "greenlight" based on settled understandings about various markets and the revenues that can be generated from them. In making these decisions, potential financiers and producers calculate a project's value based on projections of the estimated revenues that will be derived from a series of discrete exploitation windows. For example, the typical life cycle of a motion picture would include windows for the initial theatrical release, followed by a release to the home video market and pay-per-view, then pay television (including video-on-demand), and finally broadcast and basic cable television; the foregoing all occur in both domestic and foreign markets.[3] Many films are also made available for licensed, legal paid download and streaming on the Internet, concurrent to or overlapping with other distribution windows. These distribution windows recur, so projects generate revenues for many years, sometimes even for the duration of copyright.

The motion picture and television industry's financial models and well-being, and that of the employees represented by the Guilds and Unions, heavily rely on "downstream" revenue, or revenue from the exploitation of its products subsequent to the theatrical release or first television run.[4] This was never truer than it is today – 75% of a typical motion picture's

---

[3] A typical television series will run first on a television or cable network and might re-run multiple times within that same season. A recent practice is for episodes of the series to be available for viewing on the Internet – either via ad-supported streaming or through paid downloads – as early as the next day following its first run. Frequently, successful television series are released to DVD after one season ends and before the next one begins. A successful series will eventually be syndicated to other broadcast or basic cable channels.

[4] Downstream revenue sources include home video (e.g., DVD) sales, repeat airings on broadcast and basic cable television and premium pay television, new media (e.g., paid Internet downloads) and others, both domestic and foreign.

5

revenues derive from exploitation after the initial theatrical release, as do more than 50% of a program's revenues after the initial television run.

Given the significant importance of downstream revenues to the financial success of films and television programs, if these markets experience a decrease in revenues, financiers and producers will invest in fewer new works, resulting in fewer jobs in the audiovisual arts.  As the prospects for downstream revenues have diminished, motion picture investors have become more likely to fund only "blockbuster" movies with a high likelihood of success in their initial theatrical release.  Financing has become more constrained for more diverse films that typically draw a greater percentage of their revenues from post-theatrical distribution, thus impacting the number of jobs available to our members.[5]

Any unauthorized use of a copyrighted work upsets the economic foundation of our industry's commercial structure.  This is true when pirated DVDs are sold at swap meets.  It is also true when new technologies emerge offering alternatives that contravene the legal rights of copyright owners to millions of Internet users around the world.  And it is particularly destabilizing when a new technology bears a patina of legitimacy, while underneath that shiny surface it threatens to supplant existing, lawfully licensed windows of exploitation.  YouTube's

---

[5] *See, e.g.,* Michael Hiltzik, *Casual Purchase of a Counterfeit DVD Shines Light on Piracy*, L.A. TIMES, Jan. 4, 2010, *available at:* http://www.latimes.com/business/la-fi-hiltzik4-2010jan04,0,3438848.column (noting that the cost of piracy of motion pictures is greatest for independent film producers, who rely more heavily on foreign distribution than the large U.S. studios, and who have been getting only "a fraction of what they used to" from foreign distributors because piracy has dramatically diminished their own revenue expectations).

This trend has the potential not only to erode jobs and earnings in our industry, but also to deprive consumers of high-quality content that reflects a diversity of viewpoints.  One need only look to the music industry to understand how a successful content-based business model can be substantially eroded by a failure to effectively regulate or combat on-line theft.  *See, e.g.,* Bono, Op-Ed., *Ten for the Next Ten*, N.Y. TIMES, Jan. 3, 2010, at WK10.

longstanding policy of displaying and distributing works in contravention of copyright constituted precisely such a destabilizing and illegitimate use of new technology.

### B. On-line Theft Directly Impacts Our Members' Earnings and Benefits

Not only are the number of jobs available to our members impacted by on-line theft, but our members' earnings and benefits are also directly impacted by it. The freelance nature of employment in the motion picture and television businesses, and the integral contribution of our members who work in them, have been a way of life for over 60 years. Similarly, in sound recordings, many artists struggle for years before they are able to support themselves by making music. As an acknowledgement of these realities, our members share directly in the revenue that their work generates long after its initial release by way of a long-standing system of additional compensation known as "residuals."

The Guilds and Unions and copyright owners/holders have collectively bargained residuals formulas for over six decades. Some residuals, particularly for the home video, basic cable and pay television markets, are based on a percentage of the revenues received by the work's producer (which is typically the copyright owner or holder) or its distributor for licensing the work in that market.[6] As a result, any reduction in the revenue received by the legal licensors of the work from lawful exploitation directly affects the residuals received by our members and their pension and health plans.

---

[6] For example, Section 5.2.A. of the Producer-SAG Codified Basic Agreement of 2005 provides that, "Producer agrees to pay to [SAG], for rateable distribution to the performers appearing in said pictures, deferred compensation equal to… (2) From the distribution of such pictures on 'cassettes,' as defined herein, four and five-tenths percent (4.5%) of the first one million dollars ($1,000,000) of 'Distributor's gross receipts,' and five and four-tenths percent (5.4%) of 'Distributor's gross receipts" thereafter." "Cassettes" includes DVDs.

DGA 2005-2008 Basic Agreement Paragraph 18-104 provides that for, "distribution in Supplemental Markets. . .by mean of cassettes. . .Employer shall pay additional compensation of one and five tenths percent (1.5%) of 'Employer's Gross' [up to $1,000,000]. . .[and] one and eight-tenths percent (1.8%). . .in excess of $1,000,000."

These residuals formulas have frequently been the subject of heated negotiations and, on more than one occasion, strikes. Residuals formulas for re-use in new media, such as distribution via the Internet, mobile phones, and other forms of emerging technology, have been the subject of considerable effort in the Guilds' most recent round of negotiations for their television and theatrical contracts. In fact, residuals were at the forefront of the recent Writers Guild of America strike and in SAG's extended negotiations with the content owners.[7]

Income from residuals typically takes two forms: First, a film, television or recording artist derives compensation from residuals or royalties. Because residual compensation is paid throughout the lifetime of a project as it is released in a succession of exploitation windows, it can provide a flow of income to the Guilds and Unions' members whose work is freelance in nature, and often intermittent.

In 2008:

- For AFTRA recording artists, 90% of income derived from sound recordings was directly linked to royalties from physical CD sales and paid digital downloads;
- DGA members derived 18% of their compensation from residual payments;[8] and
- SAG members who worked under the feature film and television contract derived 43% of their compensation from residuals.[9]

Second, residuals and royalties also play a significant role in funding the pension and health plans that benefit our members. These benefits provide a guaranteed safety net for

---

[7] The Writers Guild of America's negotiations with the content owners concluded with members ratifying its agreement on February 25, 2008 after a 100-day strike. SAG's negotiations with the content owners lasted a full year, ending with ratification of its agreement on June 9, 2009. Certain residuals, particularly residuals for content distributed in new media and on DVD, were among the key points of discussion between the parties.

[8] Reported initial compensation earnings are subject to caps.

[9] Reported initial compensation earnings are subject to caps.

8

our members and their families, and are a fundamental part of our industry's long-established and collectively bargained agreements.

In 2008, residuals derived from the sale of features films to free television and features films and free television programs to "supplemental markets" (pay television, home video (e.g., DVD), etc.) funded:

- 70% of DGA's Basic Pension Plan
- 65% of the MPI Health Plan (for IATSE members); and
- 36% of SAG's Health and Pension Plan.

The distribution of infringing audiovisual works and sound recordings by entities such as YouTube reduces the revenues generated by these works. For audiovisual works, this illegal distribution primarily affects downstream revenues, the ones that give rise to our members' residuals payments. The media pays great attention to the growth of theatrical or box office revenues[10], but it is revenues from the shrinking DVD market[11] and other downstream markets that generate residuals that compensate our members and finance our health and pension plans. When an entity such as YouTube distributes content on-line with a disregard for copyright laws, its distribution of infringing content directly and materially impacts our members by depriving them of both compensation and pension and health benefits that are funded by residuals.

---

[10] *See, e.g.*, Alex Dobuzinskis, *Global movie box office nears $30 billion in 2009,* Reuters, Mar. 10, 2010, available at http://www.reuters.com/article/idUSTRE62955520100310.

[11] *See* Eric D. Snider, *The Incredible Shrinking DVD Sales,* Film.com, May 6, 2009, http://www.film.com/ features/story/the-incredible-shrinking-dvd-sales/27993283.

### C. On-line Theft Poses a Serious Threat to America's Creative Output

In addition to jeopardizing our members' jobs and livelihoods, the court also should be concerned with the serious threat that on-line theft poses to the future creative output of this country. As previously discussed, preventing on-line theft is essential to promoting the robust availability to consumers of diverse and high-quality content. When an entity such as YouTube knowingly engages in the distribution of infringing content on a systematic, institution-wide basis, its actions have broad repercussions.

YouTube's systemic disregard for copyright and its attempts to profit from copyright infringement undoubtedly had tremendous ramifications both in the U.S. and throughout the world. A simple Google search, "Watch Lost," reveals approximately 65,500,000 links related to the television program "Lost," including countless links to illegally downloadable and streaming versions of copyrighted episodes of that popular program.[12] In recent years, the rampant trafficking in on-line copies of contraband audiovisual works has been linked to organized criminal enterprises.[13]

YouTube was one of the initial distributors of infringing content via streaming technology, and is arguably the most famous. Its influence on the proliferation of this technology and the societal effects of its conscious provision of a platform that allowed its early users to exhibit a "rampant disregard for copyright law"[14] cannot be overlooked. YouTube was

---

[12] Google.com, User Search for "Watch Lost", http://www.google.com/#hl=en&source=hp&q=watch+lost &aq=f&aqi=&aql=&oq=&gs_rfai=&fp=2edb0d09f429b650 (last visited April 27, 2010).

[13] *See* "Film Piracy, Organized Crime, and Terrorism," Rand Center for Global Risk and Security (2009) at xii ("[T]his report provide[s] compelling evidence of a broad, geographically dispersed, and continuing connection between film piracy and organized crime.")

[14] Daniel B. Wood, *The YouTube world opens an untamed frontier for copyright law*, The Christian Science Monitor, Dec. 18, 2006, available at http://www.csmonitor.com/2006/1218/p01s03-usju.html.

more than a widespread infringer of copyrights; it was a catalyst and engine for copyright infringement on a global scale, unleashing a Pandora's box of illegal activity that will continue to threaten the output of America's creative industries for years to come.

## IV. Conclusion

YouTube's rampant, systematic distribution of content that violated the exclusive rights of copyright holders caused and continues to cause harm to the entertainment industries and the Guilds and Unions' members working in them.  We urge the court to consider the full ramifications of YouTube's actions, and request that the Court grant Viacom's motion for partial summary judgment and deny YouTube's motion for summary judgment.

Dated: May 5, 2010

/s/ Peter D. DeChiara
Peter D. DeChiara
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6976
(212) 563-4100

*Of Counsel:*
Thomas R. Carpenter
American Federation of Television
and Radio Artists, AFL-CIO
260 Madison Avenue
New York, NY 10016-2401
(212) 532-0800

David Korduner
Daniel Stone
Directors Guild of America, Inc.
7920 Sunset Boulevard
Los Angeles, California 90036-0800
(310) 289-2000

Dale W. Short
Short Shepherd & Stanton
24461 Detroit Road, Suite 340
Westlake, Ohio 44145
Counsel for International Association of
Theatrical
and Stage Employees
(440) 899-9990

Duncan Crabtree-Ireland
Danielle Van Lier
Screen Actors Guild, Inc.
5757 Wilshire Boulevard, 7th Floor
Los Angeles, California 90036
(323) 549-6627