# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIACOM INT'L INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> YOUTUBE, INC., ET AL., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) <br> ECF Case <br> Civil No. 07-CV-2103 (LLS) |
| THE FOOTBALL ASSOCIATION PREMIER LEAGUE LIMITED, ET AL., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> YOUTUBE, INC., ET AL., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br> ECF Case <br> Civil No. 07-CV-3582 (LLS) |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

David H. Kramer
Maura L. Rees
Michael H. Rubin
Bart E. Volkmer
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

Andrew H. Schapiro
A. John P. Mancini
Matthew D. Ingber
Brian M. Willen
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................ 1

COUNTERSTATEMENT OF THE FACTS.......................................... 3

    A.   Viacom Extensively Used YouTube To Market Its Content. ..................... 4

    B.   YouTube's Founding Purpose And Operations Were Legitimate.............. 6

    C.   YouTube's Early Monitoring Efforts Show Its Good Faith. ...................... 8

    D.   The Founders' Early Debates About "Stupid Videos" Do Not Reflect A Purpose To Exploit Infringing Material.................................................. 12

    E.   The Founders Did Not Upload Or Celebrate Infringing Videos. ............. 15

    F.   Viacom's "Smoking Gun" Is Anything But. ............................................. 18

    G.   YouTube Transitioned From An Ineffective Community Flagging Process To A Robust DMCA Regime......................................................... 19

ARGUMENT ............................................................................................. 21

I.    VIACOM'S MOTION ESTABLISHES NO ACTUAL INFRINGEMENTS...... 21

    A.   Viacom's Motion Does Not Allow The Court To Make A Proper Infringement Determination........................................................................ 21

    B.   Viacom's Failure Of Proof Is Not A Technicality. .................................... 23

II.    YOUTUBE IS ENTITLED TO DMCA SAFE-HARBOR PROTECTION ........ 25

    A.   Plaintiffs' Claims Involve "Storage At The Direction Of A User."........... 27

        1.   Plaintiffs' Storage Argument Has No Support In The Case Law. ....................................................................................................... 27

        2.   Plaintiffs' Storage Argument Is Contrary To The DMCA's Text And Purpose.................................................................................. 28

    B.   YouTube Did Not Have Disqualifying Knowledge Of The Alleged Infringing Activity. ..................................................................................... 31

        1.   Plaintiffs Equate DMCA Compliance With "Willful Blindness."............................................................................................ 32

        2.   The DMCA Requires Particularized Knowledge, Not Viacom's Amorphous "Inquire-Further" Standard......................................... 36

        3.   DMCA Takedown Notices Require Service Providers To Remove Identified Material, Not Search For Unidentified Material. ................................................................................................ 39

        4.   The Absence Of A Separately Negotiated Licensing Agreement Does Not Establish Knowledge Of Infringement. ........ 41

    a. The DMCA does not require service providers to engage in rights-clearing on its users' behalf. ..................... 41

    b. YouTube does not "ignore" information about publishing rights. .................................................................... 43

C. YouTube Did Not Have Control Coupled With A Financial Benefit Directly Attributable To The Infringing Activity. ..................... 46

    1. The DMCA's "Control" And "Financial Benefits" Tests Do Not Codify The Common Law Of Vicarious Liability. ............................ 46

    2. As A Matter Of Law, Plaintiffs' Allegations Of "Control" And "Financial Benefit" Cannot Close The Safe Harbor. ...................... 48

        a. The ability to remove material is not "control." ...................... 48

        b. The DMCA does not require service providers to affirmatively police their users' conduct. ................................ 49

        c. Moving from user flagging to reliance on the DMCA is not a failure to "control" infringing activity. ........................... 51

        d. The DMCA rejects the "draw" test for financial benefit. ........ 53

III. YOUTUBE IS NOT LIABLE FOR DIRECT INFRINGEMENT. ..................... 56

A. Direct Infringement Requires Volitional Conduct. ................................... 56

B. YouTube Has Engaged In No Relevant Volitional Conduct. ................... 58

    1. YouTube's Processes For Storing, Formatting, And Displaying User-Submitted Videos Are Automated And Non-Volitional. ......... 58

    2. Liability For Direct Infringement Cannot Rest On Functions Unrelated To Plaintiffs' Actual Infringement Claims. .................... 60

IV. YOUTUBE IS NOT LIABLE FOR VICARIOUS INFRINGEMENT. .............. 62

A. YouTube Did Not Have The Ability To Effectively Supervise The Activities of Its Users. ................................................................. 63

    1. The Availability Of Various Forms Of Human Review Does Not Constitute The Practical Ability To Prevent Infringement. ..................................................................... 64

    2. Plaintiffs' Selective-Fingerprinting Allegations Are Baseless. ....... 68

        a. YouTube never withheld Audible Magic's technology based on a copyright owner's unwillingness to license content. ..................................................................... 68

b. YouTube did not refuse to cooperate with the MPAA.............. 73

c. Class plaintiffs' claims about filtering are untrue and irrelevant. ................................................................................. 75

d. Viacom's claim that YouTube withheld its video-fingerprinting technology until May 2008 is false. ................ 78

B. YouTube Did Not Have An Obvious And Direct Financial Interest In The Alleged Infringing Activity............................................. 80

V. VIACOM'S INDUCEMENT CLAIM FAILS AS A MATTER OF LAW. .......... 82

A. Viacom's Effort To Rewrite The *Grokster* Standard For Promoting Infringement Is Unsustainable.................................................. 82

B. Viacom Cannot Satisfy The Actual *Grokster* Standard. ......................... 84

1. YouTube Did Not Take Active Steps With The Object Of Promoting Infringement. .................................................... 86

2. Google Did Not Take Active Steps With The Object Of Promoting Infringement. .................................................... 89

3. The Supplemental Indications Of Inducement Relied On In *Grokster* Point In The Opposite Direction Here. ........................... 92

a. YouTube has an overwhelming array of non-infringing uses............................................................................... 93

b. YouTube has taken many steps to combat copyright abuse. ............................................................................. 97

c. YouTube's advertising practices are legitimate. ..................... 97

CONCLUSION............................................................................. 99

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&M Records, Inc. v. Napster,*
239 F.3d 1004 (9th Cir. 2001) ..................................................................passim

*ALS Scan, Inc. v. RemarQ Communities, Inc.,*
239 F.3d 619 (4th Cir. 2001) ............................................................... 37, 40

*Arista Records LLC v. Usenet.com, Inc.,*
633 F. Supp. 2d 124 (S.D.N.Y. 2009) ..................................... 85, 86, 96

*Bourne v. Walt Disney Co.,*
68 F.3d 621 (2d Cir. 1995)............................................................... 24

*Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,*
331 U.S. 519 (1947) ............................................................................ 51

*Cartoon Network LP, LLP v. CSC Holdings, Inc.,*
536 F.3d 121 (2d Cir. 2008)................................................ 56, 57, 58, 60

*Columbia Pictures Industries, Inc. v. Fung,*
06-cv-5578, U.S. Dist. LEXIS 122661 (N.D. Cal. Dec. 21, 2009) ........ 85, 86, 96, 98

*Corbis Corp. v. Amazon.com, Inc.,*
351 F. Supp. 2d 1090 (W.D. Wash. 2004) .............................. 27, 37, 48

*Costar Group Inc. v. Loopnet, Inc.,*
164 F. Supp. 2d 688 (D. Md. 2001) ....................................... 27

*CoStar Group, Inc. v. LoopNet, Inc.,*
373 F.3d 544 (4th Cir. 2004) ............................................. 47, 57, 58, 62

*Davis v. Blige,*
505 F.3d 90 (2d Cir 2007).................................................... 42

*Ellison v. Robertson,*
357 F.3d 1072 (9th Cir. 2004) ............................................. 80, 82

*FASA Corp. v. Playmates Toys, Inc.,*
869 F. Supp. 1334 (N.D. Ill. 1994) ...................................... 23

*Field v. Google, Inc.,*
412 F. Supp. 2d 1106 (D. Nev. 2006) ................................... 57, 89

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) ............................................................ 54, 80

*Gal v. Viacom Int'l Inc.*,
  518 F. Supp. 2d 526 (S.D.N.Y. 2007) ............................................ 22, 69

*Hendrickson v. eBay, Inc.*,
  165 F. Supp. 2d 1082 (C.D. Cal. 2001)................................. 27, 37, 48, 49

*In re Aimster Copyright Litig.*,
  334 F.3d 643 (7th Cir. 2003) ......................................................... 37, 62

*Io Group, Inc. v. Veoh Networks, Inc.*,
  586 F. Supp. 2d 1132 (N.D. Cal. 2008) ........................................passim

*Jorgensen v. Epic/Sony Records*,
  351 F.3d 46 (2d Cir. 2003)............................................................. 21, 24

*Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*,
  191 F.3d 229 (2d Cir. 1999)........................................................... 29, 48

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006)................................................................. 29

*Marobie-FL, Inc. v. National Ass'n of Fire Equipment Distribs.*,
  983 F. Supp. 1167 (N.D. Ill. 1997) ....................................................... 57

*Matthew Bender & Co., Inc. v. West Pub. Co.*,
  158 F.3d 693 (2d Cir. 1998)................................................................. 23

*MGM Studios. Inc. v. Grokster, Ltd.*,
  454 F. Supp. 2d 966 (C.D. Cal. 2006)................................................... 96

*MGM Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ......................................................................passim

*Neder v. United States*,
  527 U.S. 1 (1999) ............................................................................... 48

*Newborn v. Yahoo!, Inc.*,
  391 F. Supp. 2d 181 (D.D.C. 2005) ...................................................... 57

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007) ........................................................ 63, 67

*Perfect 10, Inc. v. CCBill LLC,*
  488 F.3d 1102 (9th Cir 2007) ........................................................ passim

*Perfect 10, Inc. v. Google, Inc.,*
  416 F. Supp. 2d 828 (C.D. Cal. 2006) .................................................... 60

*Prudent Pub. Co., Inc. v. Myron Mfg. Corp.,*
  722 F. Supp. 17 (S.D.N.Y. 1989) .......................................................... 87

*Religious Technology Center v. Netcom On-Line Commc'ns Servs., Inc.,*
  907 F. Supp. 1361 (N.D. Cal. 1995) ...................................................... 30

*Repp v. Webber,*
  132 F.3d 882 (2d Cir. 1997) .............................................................. 24

*Seiler v. Lucasfilm, Ltd.,*
  808 F.2d 1316 (9th Cir. 1986) ............................................................ 23

*Shapiro, Bernstein & Co. v. H. L. Green Co.,*
  316 F.2d 304 (2d Cir. 1963) .............................................................. 62

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  446 U.S. 417 (1984) ...................................................................... 84

*Sony Discos, Inc. v. E.J.C. Family P'ship,*
  2010 WL 1270342 (S.D. Tex. Mar. 31, 2010) ............................................ 36

*Stewart v. Wachowski,*
  574 F. Supp. 2d 1074 (C.D. Cal. 2005) ................................................... 23

*Tiffany (NJ) Inc. v. eBay Inc.,*
  2010 WL 1236315 (2d Cir. April 1, 2010) ............................................ 37, 38

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.,*
  526 F.3d 63 (2d Cir. 2008) ................................................................. 3

*UMG Recordings, Inc. v. Veoh Networks, Inc.,*
  620 F. Supp. 2d 1081 (C.D. Cal. 2008) ("*UMG I*") .................................... passim

*UMG Recordings Inc. v. Veoh Networks, Inc.*,
   665 F. Supp. 2d 1099 (C.D. Cal. 2009) ("*UMG II*") ........................................passim

*Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*,
   373 F.3d 241 (2d Cir. 2004)...................................................................................... 21

*Warner Bros. Enter. Inc. v. RDR Books*,
   575 F. Supp. 2d 513 (S.D.N.Y. 2008) ...................................................................... 22

**STATUTES**

17 U.S.C. § 512(c)....................................................................................... 38, 40, 49, 95

17 U.S.C. § 512(k)(1) ............................................................................................... 28

17 U.S.C. § 512(m) .................................................................................... 32, 35, 50, 51

**OTHER AUTHORITIES**

H.R. Rep. 105-551 (Part I) (May 22, 1998) ........................................................... 47, 51

H.R. Rep. 105-551 (Part II) (July 22, 1998)............................................. 38, 47, 54, 55

Jane C. Ginsburg, *Separating The* Sony *Sheep From The* Grokster *Goats*, 50
   Ariz. L. Rev. 577 (2008) ..................................................................................... 28, 38

S. Rep. 105-190 (May 11, 1998)..........................................................................passim

# TABLE OF CONVENTIONS

YouTube Br.

Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Viacom Br.

Memorandum of Law in Support of Viacom's Motion for Partial Summary Judgment on Liability and Inapplicability of the Digital Millennium Copyright Act Safe Harbor Defense, filed March 5, 2010

Class Br.

Memorandum of Law in Support of Class Plaintiffs' Motion for Partial Summary Judgment Dismissing Defendants' First Defense (DMCA Safe Harbor Defense), filed March 5, 2010

VSUF

Viacom's Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment on Liability and Inapplicability of the Digital Millennium Copyright Act Safe Harbor Defense, filed March 5, 2010

CSUF

Class Plaintiffs' Statement of Uncontroverted Material Facts in Support of Their Motion for Partial Summary Judgment, filed March 5, 2010

Schapiro Opening Decl.

Declaration of Andrew H. Schapiro in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Rubin Opening Decl.

Declaration of Michael Rubin in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Botha Opening Decl.

Declaration of Roelof Botha, filed March 5, 2010

Chan Opening Decl.

Declaration of Arthur Chan, filed March 5, 2010

C. Hurley Opening Decl.

Declaration of Chad Hurley in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

King Opening Decl.

Declaration of David King in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Levine Opening Decl.

Declaration of Zahavah Levine, filed March 5, 2010

Maxcy Opening Decl.

Declaration of Christopher Maxcy in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Ostrow Opening Decl.

Declaration of Daniel Ostrow, filed March 5, 2010

Reider Opening Decl.

Declaration of Suzanne Reider in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Schaffer Opening Decl.

Declaration of Micah Schaffer in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Solomon Opening Decl.

Declaration of Michael Solomon in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

# TABLE OF CONVENTIONS
(continued)

| | |
|---|---|
| Walk Opening Decl. | Declaration of Hunter Walk in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010 |
| Hohengarten Decl. | Declaration of William M. Hohengarten in Support of Viacom's Motion for Partial Summary Judgment, filed March 5, 2010 |
| Solow Decl. | Declaration of Warren Solow in Support of Plaintiffs' Motion for Partial Summary Judgment, filed March 5, 2010 |
| Figueira Decl. | Declaration of Elizabeth Anne Figueira in Support of Class Plaintiffs' Statement of Uncontroverted Material Facts, filed March 5, 2010 |
| Defendants' Motion to Strike | Defendants' Memorandum of Law in Support of Objections to Evidence and Motion to Strike Material from Viacom's Summary Judgment Submissions Putative Class Plaintiffs' Rule 56.1 Statement, filed herewith |
| CVSUF | YouTube's Response to Viacom's Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment on Liability and Inapplicability of the Digital Millennium Copyright Act Safe Harbor Defense, filed herewith |
| CCSUF | Defendants' Counterstatement to Class Plaintiffs' Statement of Uncontroverted Material Facts in Support of Their Motion for Partial Summary Judgment, filed herewith |

Schapiro Opp. Decl.

Declaration of Andrew H. Schapiro in Support of Defendants' Motion for Summary Judgment, filed herewith

Chen Opp. Decl.

Declaration of Steve Chen in Support of Defendants' Opposition to Plaintiffs' Motions for Partial Summary Judgment, filed herewith

B. Hurley Opp. Decl.

Declaration of Brent Hurley in Opposition to Plaintiffs' Motions for Summary Judgment, filed herewith

C. Hurley Opp. Decl.

Declaration of Chad Hurley in Support of Defendants' Opposition to Plaintiffs' Motions for Partial Summary Judgment, filed herewith

King Opp. Decl.

Declaration of David King in Support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment, filed herewith

Levine Opp. Decl.

Declaration of Zahavah Levine in Support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment, filed herewith

Gordon Opp. Decl.

Declaration of Michael Gordon, filed herewith

Maxcy Opp. Decl.

Declaration of Christopher Maxcy in Support of Defendants' Opposition to Plaintiffs' Motions for Partial Summary Judgment, filed herewith

Schaffer Opp. Decl.

Declaration of Micah Schaffer in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed herewith

Solomon Opp. Decl.

Declaration of Michael Solomon in Support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment, filed herewith

Weibell Opp. Decl.

Declaration of Anthony Weibell in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed herewith

## INTRODUCTION

Plaintiffs propose an exceedingly narrow view of the DMCA and an exceedingly broad view of inducement liability. Neither has any support. With the law firmly against them, plaintiffs try to tar YouTube's founders as bad people who wanted their site to be a haven for infringement. But plaintiffs can tell that story only by systematically mischaracterizing the evidence and substituting rhetoric for legal analysis. The Court should reject plaintiffs' approach, deny their motions, and grant summary judgment to YouTube.

As a threshold matter, Viacom has failed to present evidence satisfying the most basic burden of any copyright plaintiff: proving that a work that it owns was unlawfully copied. Viacom has not submitted even one of the copyrighted works that it claims were infringed or any of the clips posted on YouTube that supposedly infringed those works, preventing the Court from engaging in the analysis required to evaluate an infringement claim. Based on that failure of proof alone, Viacom's motion should be denied.

Moreover, plaintiffs cannot overcome the DMCA safe harbor, which shields YouTube (and similar platforms for user-generated content) from liability for the type of infringing activity alleged in this case. In seeking to deprive YouTube of those statutory protections, plaintiffs advance the radical legal position that Section 512(c) protects service providers only against claims of *direct* infringement (not secondary liability). Even then, plaintiffs claim, the statute covers only a narrow class of Internet services that "passively provide server storage," not those that operate websites that make user-stored material accessible to the public. And

plaintiffs seek to transform the DMCA's clear instructions to service providers to take down known infringing material into a hopelessly vague obligation, based merely on generalized awareness of possible infringement, to "look into the matter further." Plaintiffs' approach would render Section 512(c) a virtual dead letter, threatening the existence of a wide array of socially valuable websites that have flourished since the DMCA was enacted. Plaintiffs' tortured reading of the statute has never been accepted by any court and should be rejected here.

Viacom's motion on its direct and secondary infringement claims (which the class plaintiffs do not join) fails even without the DMCA safe harbor. *First*, the "volitional conduct" required for direct infringement does not exist where a technology provider's computer systems respond in an automated fashion to user commands. That is precisely the situation here. The volitional decisions that cause the allegedly infringing acts at issue are the requests of YouTube's users to post and watch videos. Under clear Second Circuit authority, YouTube cannot be held liable as a direct infringer for the automatic processes that its systems perform in response to those user requests.

*Second*, Viacom cannot succeed on its vicarious liability theory because it cannot establish that YouTube had the practical means to stop infringement and a direct financial interest in the infringing conduct alleged. The various forms of human review that plaintiffs propose are impractical and ineffective—as shown by plaintiffs' difficulties identifying which of their *own* material was posted without authorization. As for automated tools, YouTube has been a pioneer in deploying

such technologies to help copyright owners protect their rights. The story that plaintiffs tell of YouTube selectively deploying filtering tools in exchange for content licenses is both untrue and legally irrelevant.

*Finally*, Viacom's theory of inducement would require the Court to water down the strict standard imposed by the Supreme Court and to accept an extended series of factual misstatements. But the law and the evidence are clear. The holding of *Grokster*, which Viacom conspicuously fails to quote, allows inducement liability only where the defendant acts with the "object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." YouTube did not operate with an intent to promote infringement, never communicated any inducing message, and took no affirmative steps to foster piracy. To the contrary, YouTube consistently *discouraged* its users from infringing and worked with rights holders to deter copyright abuse. YouTube has put in place an ever-expanding array of tools to help copyright owners protect their rights, including industry-leading content-identification technologies. YouTube has succeeded in its founding purpose of becoming the Internet's leading destination for personal, user-created, or other authorized video clips. On these undisputed facts, Viacom's inducement allegations fail as matter of law.

## COUNTERSTATEMENT OF THE FACTS

When "deciding a summary judgment motion, a court must construe all the evidence in the light most favorable to the nonmoving party . . . and draw all inferences and resolve all ambiguities in that party's favor." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). A motion for summary

3

judgment is not the place to take liberties with the evidence, but plaintiffs do that and far more. Plaintiffs repeatedly misstate what documents say, omit other documents providing necessary context, and take snippets from a handful of the millions of emails produced, stringing them together with brackets and ellipses to create a fabricated picture of YouTube's conduct and motives. While YouTube should prevail on the law alone, the actual evidence belies plaintiffs' story of "unlawful objectives," "willful blindness," and "high-tech extortion."

**A.  Viacom Extensively Used YouTube To Market Its Content.**

Perhaps the most critical of Viacom's misrepresentations is its attempt to downplay its widespread practice of placing and leaving its content on YouTube. Viacom keeps silent about these marketing activities, except for a single footnote in which it pretends that "virtually all" of the clips it authorized to appear were "uploaded to YouTube using official Viacom account names and YouTube was fully aware of this fact." Viacom Br. 20-21 n.13. The only support that Viacom provides for this assertion are a few cursory (and hedging) paragraphs in a foundationless declaration submitted by a Viacom employee, Warren Solow. *See* Solow Decl. ¶¶ 30-32; *see also* Defendants' Motion to Strike; CVSUF ¶ 9.

In his deposition, Solow disclaimed the very knowledge of Viacom's authorized uploading activity to which he now declares. Schapiro Opp. Ex. 1 (424:25-425:12). But even the knowledge that Solow does have undermines any claim that Viacom's marketing activities were "limited," conducted openly, or that their true scope was "known to YouTube." *See, e.g.*, Schapiro Opening Ex. 140; Schapiro Opp. Ex. 2 (documents showing Solow's knowledge of obscure YouTube

accounts authorized by Viacom to upload content to YouTube).[1]  Those assertions are also refuted by the overwhelming evidence showing that Viacom (and other media companies) flooded YouTube with all manner of authorized content, using a wide variety of accounts and agents not revealed to YouTube.  *See* Rubin Opening Decl. ¶ 2 & Exs. 1, 3-33, 37, 39, 42-68; Chan Opening Decl. ¶¶ 4, 10; Ostrow Opening Decl. ¶ 5; Maxcy Opening Decl. ¶¶ 3-7; Schaffer Opening Decl. ¶ 6; Schapiro Opp. Exs. 5-67.

Again relying only on Solow's declaration, Viacom also claims that "none of the infringing clips at issue in this lawsuit were uploaded to YouTube by Viacom and its authorized agents."  Viacom Br. 20 n.13 (citing Solow Decl. ¶ 26).  That is wrong: hundreds of clips that Viacom has identified as infringing in this case— including some that Viacom *still* claims as clips in suit—were posted on YouTube by Viacom or its agents.  Rubin Opening Decl. ¶ 14 & Exs. 87, 117-28; *see also* Notice of Dismissal of Specified Clips With Prejudice (Mar. 10, 2010).  For example, Viacom is currently suing YouTube over several clips from the television show *Human Giant* that were uploaded to the YouTube account "clelltickle"; these clips in suit were posted pursuant to a Viacom-authorized marketing effort by the comedy troupe

---

[1] The following are just some of those cryptic YouTube account names that were shared internally with Solow: "bestweekevertv," "BroadwayJoe," "BroadwayJoe415," "Damonjohnson," "FiveChemical," "jerseymouth1," " isitfridayyet," "ParkMyVibe," "Reaction2006," "snackboard," "thatsfunny," "thatisalsofunny," and "thatsnotfunny." Schapiro Opening Ex. 140; Schapiro Opp. Ex. 4; Rubin Opening Decl. Ex. 87.  The registration data for most of these accounts further obscures their connection to Viacom.  *See, e.g.*, Schapiro Opp. Ex. 417.

responsible for creating them. *See* VCSUF ¶ 332; Schapiro Opp. Exs. 410A/410B, 416; Hohengarten Decl. Ex. 2 (Solow Decl. Ex. F, Clips 29292, 29295 & 29331).

These clips (and others like them) remain despite Viacom's elaborate efforts to prevent authorized videos from getting into the case and to withdraw such videos as the case proceeded. YouTube Br. 66-67. The fact that Viacom still cannot identify all the YouTube videos that it was responsible for posting confirms how difficult it is even for content owners themselves to determine authorization. Viacom's longstanding practice of allowing its material to appear on YouTube—and the struggles of its own employees, agents, and lawyers to distinguish authorized from unauthorized clips—are fatal to Viacom's claims about YouTube's knowledge, ability to control, and inducement of infringement. *Id*. at 39-48, 64-66.

## B. YouTube's Founding Purpose And Operations Were Legitimate.

When YouTube launched in April 2005, it announced itself as "the first online community site that allows members to post and share personal videos." Schapiro Opp. Ex. 68; *see also* C. Hurley Opening Decl. ¶¶ 2-8. The documents from the period leading up to and following YouTube's launch—including hundreds of emails among the founders—confirm YouTube's legitimate purpose and operation. C. Hurley Opening Decl. ¶¶ 4-12. In those documents, the founders (Chad Hurley, Steve Chen, and Jawed Karim) consistently stated their vision for the site:

- YouTube is "a community site of videos about 'you' . . . ." C. Hurley Opening Decl. Ex. 4.

- "We want to force users to feature 'You' in the video." *Id.*

- "We are a Personal Video site. . . . We want to create a community around connections made by users viewing one another's videos." Schapiro Opp. Ex. 69.

- "I think the key to our success is personal videos." C. Hurley Opp. Decl. Ex. A.

- "I really think we should focus on real personal clips that are taken by everyday people. . . . [W]e aren't a film site, but a personal video clips site, for people to upload, store, search, and share their personal video clips. . . . I want real people, real videos." C. Hurley Opening Decl. Ex. 6.

- "[W]e will further grow our audience and reach to secure our position as the #1 place for personal videos on the internet." Figueira Decl. Tab 60.

- Statement of YouTube's purpose: "To become the primary outlet of user-generated content on the Internet, and to allow anyone to upload, share, and browse this content." *Id.* Ex. 15.

C. Hurley Opening Decl. ¶¶ 4-7; C. Hurley Opp. Decl. ¶¶ 2, 6. YouTube's early marketing materials and advertisements similarly encouraged the public to post *personal* videos. *See* YouTube Br. 85-89; C. Hurley Opening Decl. ¶¶ 9-10.

Ignoring this extensive record of YouTube's lawful intent, Viacom contends that YouTube's founders "consciously tried to attract users" by "emulating notorious pirate services like 'napster,' 'kazaa,' and 'bittorrent.'" Viacom Br. 5 (citing Hohengarten Ex. 5). That is a fabrication. The unedited text of Jawed Karim's February 2005 email reads: "I want an innovation that at least *in the number of users and popularity*, would firmly place us among a list like this: eBay, PayPal, BitTorrent, Napster, Friendster, E-Trade, Yahoo, Google, Winamp, Kazaa, WinZip, ICQ, Jasc Paint Shop Pro, Match.com, Wikipedia." *Id.* (emphasis added). Karim's stated goal was to match the *popularity* of the websites he mentioned, not their business models. YouTube did not want to become a pirate site any more than it

intended to become a search engine (Google, Yahoo), an auction site (eBay), an electronic payment service (PayPal), an encyclopedia (Wikipedia), or a brokerage (E-Trade). *See also* C. Hurley Opp. Decl. Ex. A (June 2005 email from Hurley to Chen and Karim: "We are not another 'StupidVideos' or 'Bittorrent.'").

### C. YouTube's Early Monitoring Efforts Show Its Good Faith.

During YouTube's first few months, the site's small scale made it possible to review user-uploaded videos individually. C. Hurley Opening Decl. ¶ 17. The founders occasionally came across what looked like professionally produced content that may have been posted without proper authorization. Rather than encouraging such postings, the founders repeatedly rejected such videos. *See* C. Hurley Opening Decl. ¶¶ 15-17; C. Hurley Opp. Decl. ¶ 6. For example:

- June 26, 2005: rejecting clips from the television show *Charmed* (Schapiro Opp. Ex. 70);

- July 2, 2005: rejecting a Britney Spears music video (C. Hurley Opening Decl. Ex. 18);

- July 2, 2005: rejecting music videos (C. Hurley Opp. Decl. Ex. D);

- July 3, 2005: Rejecting video for copyright and telling user that "we are trying to build a community of real user-generated content" (C. Hurley Opening Decl. Ex. 22);

- July 4, 2005: rejecting music videos and footage from Major League Baseball (C. Hurley Opp. Decl. Ex. E);

- July 4, 2005: rejecting "blatant copyrighted stuff" (C. Hurley Opening Decl. Ex. 21);

- July 16, 2005: rejecting clips from the movie *Initial D* (*id.* Ex. 20);

- August 1, 2005: rejecting clips from *Family Guy* (Hohengarten Ex. 6).

Viacom asserts that YouTube "repeatedly mentioned" *South Park*. Viacom Br. 6 (citing VSUF ¶¶ 31-32). "Mentioning" a television show is hardly unlawful, and the evidence that Viacom cites contradicts its suggestion that YouTube was knowingly leaving infringing content on the site. That evidence consists of testimony that YouTube was looking for *South Park* clips in order to *remove* them (Hohengarten Ex. 334; Schapiro Opp. Ex. 71 (46:20-48:15)) and an email in which Hurley, having discovered that a user's uploads included a clip from *South Park*, suggested that it be *removed* (Hohengarten Ex. 206). Chen agreed with Hurley that "we should get rid of some of his videos," precisely because hosting such content was not YouTube's objective: "It's going to be really important that the first set of videos in there set an example of the videos we'd like to see on our site." *Id.*[2]

Viacom nevertheless insists that the founders' emails "unambiguously show" that they "wanted to continue exploiting infringing videos to rapidly expand their user base." Viacom Br. 6.[3] The evidence does not support these breathless

---

[2] *South Park* is an ironic example. *See* CVSUF ¶ 31. In October 2006, a senior Viacom executive publicly blessed users' practice of uploading clips from *South Park* to YouTube, claiming that it drove viewers to the program. Schapiro Ex. 61. That echoed the statement from the show's creators that was featured for years on the official *South Park* website: "Matt [Stone] and Trey [Parker] do not mind when fans download their episodes off the Internet; they feel that it's good when people watch the show no matter how they do it." Schapiro Opp. Ex. 72. CNN reported on that statement in October 2006, and it was cited by YouTube users to explain why they were posting *South Park* content. Schapiro Opp. Exs. 73, 74. The statement was removed from the website just hours after a Viacom witness was questioned about it in this case. Declaration of Anthony Weibell (Apr. 29, 2010).

[3] Viacom says that within two months "infringement was so blatant that YouTube's own Internet service provider complained that YouTube was violating its user agreement." Viacom Br. at 6. The actual documents show that the ISP's complaint was about someone sending junk email from YouTube's IP address, "not about our

allegations.  A cited exchange between the founders about "Bud Light" commercials does not remotely evince a decision to exploit "obviously infringing" materials. Hohengarten Ex. 211.  Television commercials are by definition promotional, and YouTube had every reason to think that advertisers—whose goal is to attract as many viewers as possible—would welcome their dissemination.  Even after filing this suit, Viacom itself instructed its agents not to remove commercials and trailers from YouTube.  Schapiro Ex. 51.

Viacom also cites an email chain among the founders in July 2005 discussing whether to approve a news clip concerning an election scandal in the Philippines. Hohengarten Ex. 213.  In that email, Karim (a non-lawyer) advocated continuing to reject materials for copyright reasons but allowing news clips based on an untutored belief that such clips were fair use.  *Id*.[4]  That was reasonable: a Viacom executive expressed the very same view about a clip on YouTube: "I don't know if it was authorized, but it looks like a news clip, which my understanding of news clips is that there was fair use of news clips."  *Id*. Ex. 78 (260:24-261:3).  These kinds of internal debates do not reflect a service bent on encouraging massive piracy, but rather good-faith efforts by young non-lawyers in a start-up operation.

---

content" or any copyright issues.  Schapiro Opp. Ex. 75; *see* Chen Opp. Decl. at 1-2. Viacom wrongly alleges that "the founders did nothing in response" to Chen's short-lived belief that YouTube's ISP was complaining about "copyrighted content." Viacom Br. 6.  In fact, Hurley responded saying, "we need to figure this out soon . . . this could be very CRITICAL!"  Schapiro Opp. Ex. 76.

[4] The clip is still available on YouTube; its owner has never asked that it be taken down.  *See* http://www.youtube.com/watch?v=E3WqfFI-K_U.  Viacom's claim that Hurley's joking response about leaving this clip up ("save your meal money for some lawsuits") represents a "get-rich-quick scheme through piracy" (Viacom Br. 7) is not worthy of serious litigants.

Plaintiffs further manipulate the evidence to fit their story when they cite a September 7, 2005 email from Chen. Chen was responding to an inquiry from board-member Roelof Botha about "racy" videos. Botha asked: "Should we create a 'mature' section for this content? Or should we put in the equivalent of a 'safe search' function (just like Google has) so we don't alienate the moms that are uploading videos on the site?" Viacom mangles Chen's response:

| How Viacom quotes the document | What the document actually says |
| --- | --- |
| "That way, the perception is that we are concerned about this type of material and we're actively monitoring it. [But the] actual removal of this content will be in varying degrees. <u>That way . . . you can find truckloads of . . . copyrighted content . . . [if] you [are] actively searching for it.</u>" | I think it's an accepted [sic] that in an environment such as YouTube, relying on user-generated content, copyrighted and inappropriate content will find its way onto the site. On the dev environment, we've implemented a flagging system so you can flag videos as being inappropriate or copyrighted. That way, the perception is that we are concerned about this type of material and we're actively monitoring it.<br><br>The actual removal of this content will be in varying degrees. We may want to keep some of the borderline content on the site but just remove it from the browse/search pages. That way, you can't find the content easily. Again, similar to Flickr, if you search for the right tags on Flickr, you can find truckloads of adult and copyrighted content. It's just that you can't stumble upon it, you have to be actively searching for it. |

Hohengarten Ex. 230; Figueira Tab 63.

Viacom claims that this document shows that YouTube's founders "deliberately and intentionally chose to leave up other infringing clips when they thought the additional site traffic was worth the legal risk." Viacom Br. 6-7. To manufacture that charge, Viacom turns Chen's reference to "borderline" content into "infringing" content. It turns a thought ("we may want to keep") into an

implemented plan. Chen Opp. Decl. at 2 (explaining that YouTube never adopted Chen's idea). And it turns Chen's statement about "truckloads" of content available *on Flickr* (a photo-sharing site owned by Yahoo!) into a description of what was on YouTube. Viacom also suggests something sinister about Chen's reference to "perception"—but there is nothing wrong with being concerned about how a site is perceived by the "moms" who may want to use it. *See* Schapiro Opp. Ex. 222 (141:4-23).[5]

**D. The Founders' Early Debates About "Stupid Videos" Do Not Reflect A Purpose To Exploit Infringing Material.**

Viacom also claims that the "founders could not bring themselves to reject their reliance on the infringing videos that were critical to fueling the site's explosive growth." Viacom Br. 6 (citing Hohengarten Ex. 216). But the cited document (a July 2005 email between the founders) says nothing like that. In it, the founders discussed what to do about so-called "stupid videos." They used that term to refer to amateur "prank" or "stunt" videos that circulated virally on the Internet, often with the blessing of their creators. C. Hurley Opp. Decl. ¶ 3. "Stupid videos" were not network television shows or feature films, nor was the

---

[5] Nor do the other documents that Viacom cites indicate that YouTube intentionally left up "infringing" clips. In fact, many of those documents show the founders working to *prevent* copyright abuse. *See* CVSUF ¶¶ 43-45. Viacom cites another discussion among the founders about whether to keep "short news clips," this one concerning the Space Shuttle. Hohengarten Ex. 224. Even beyond the fair-use concerns described above, it is facially implausible to suggest that the founders were hoarding such videos in a bad faith effort to increase traffic, while simultaneously rejecting "stuff like movies/tv shows." CVSUF ¶¶ 46-48, 52.

term code for "infringing" videos. *Id*. & Ex. A (distinguishing "viral videos" from videos that "come from a network or movie"); Schapiro Opp. Ex. 77 (169:8-169:15).[6]

The recurring debates among the founders concerned whether YouTube should allow only personal videos or whether they should be more willing to have some "stupid videos" on the site as well. C. Hurley Opp. Decl. ¶ 3; C. Hurley Opening Decl. ¶ 12; Schapiro Opp. Exs. 81, 82, 83 (77:20-78:9) (explaining that "stupid videos" of people "jumping off buildings" or "drinking a gallon of milk" were "not what we wanted the site to be about"). These debates were not about whether to allow infringing videos: none of the founders wanted videos whose creators objected to being on the site. C. Hurley Opp. Decl. ¶ 3. In the email that Viacom cites, Hurley proposed allowing users to select among various descriptors when posting videos (including "personal" and "viral"). Hohengarten Ex. 216. His idea was that if the creators of "viral" videos someday objected to their presence, such videos could be removed easily. C. Hurley Opp. Decl. ¶ 5. This exchange has nothing to do with "exploiting" professional media clips or "infringing videos."

The debate about "stupid videos" continued in an extended September 2005 email chain. Hohengarten Ex. 215. Viacom ascribes to Chen a statement that 80% of traffic on YouTube "depended on pirated videos." Viacom Br. 7-8. Not so. Chen was responding to Hurley's concern that YouTube was receiving too many "stupid" videos ("we are becoming another big-boys or stupidvideos"). Here again, Viacom distorts Chen's response with selective quotation and ellipses.

---

[6] Viacom's own online services urged users to post "stupid" videos and described the importance of such videos to their businesses. Schapiro Opp. Exs. 79, 80.

| How Viacom quotes the document | What the document actually says |
|---|---|
| "if you remove the potential copyright infringements . . . site traffic and virality will drop to maybe 20% of what it is." | in a way, if you remove the potential copyright infringements, wouldn't you still say that these are 'personal videos?' |
| | If you define personal videos to be videos on your personal hard drive that you want to upload and share with people? |
| | Anyway, if we do remove that stuff, site traffic and virality will drop to maybe 20% of what it is. I think, as people hear about the site, a good amount of the materials on the site is still personal – they'll start recognizing that it's a place to share their own personal videos. |

Hohengarten Ex. 215. Chen's prediction that removing "that stuff" would reduce traffic by 80% concerned the "stupid videos" mentioned in Hurley's original email. Chen Opp. Decl. at 2-3. It had nothing to do with professionally produced clips from movies or television shows. (It was also a sheer guess, supported by no actual research or analysis, and is evidence of nothing. *Id*.)

That is confirmed by Karim's response later in the thread, which Viacom ignores. Karim advocated the following policy:

> take down whole movies. we don't get many of those. and we SHOULD take down entire TV shows, like an entire family guy episode. we've also been taking down clips of TV shows, like family guy . . . we should probably continue doing that, otherwise youtube will look like a dumping ground for copyrighted stuff. ***If we keep that policy, I don't think our views will decrease at all.***

Hohengarten Ex. 215 (emphasis added; ellipses in original). Chen expressly *agreed* with Karim's observations ("i agree with you") and reaffirmed that YouTube should "take down whole movies. take down entire TV shows." *Id*. Read as a whole, this exchange does not remotely support plaintiffs' claim that YouTube decided "to keep

substantially all infringing videos on the site as a draw to users." Viacom Br. 7-8. To the contrary, it is another example of the founders taking copyright issues seriously and trying to figure out what the appropriate policies should be.

### E.    The Founders Did Not Upload Or Celebrate Infringing Videos.

Viacom cites two documents to claim that YouTube's founders "uploaded infringing videos themselves." Viacom Br. 7. The first relates to an occasion on which Karim posted videos that he had found on other websites. Hohengarten Ex. 217 (VSUF ¶ 40). Karim explained that these clips were not from movies or television shows—but amateur videos filmed by airplane enthusiasts:

> They were not stolen videos. I would . . . browse on the Web for airplane-related videos on aviation community Web sites, and these were user-generated videos created by aviation enthusiasts. So, for example, this would be like a 10-second shaky video camera clip of a 747 taking off, and these clips were usually already on multiple aviation Web sites.

Schapiro Opp. Ex. 77 (166:8-18); *see also* Schapiro Opp. Ex. 84. There is no evidence that the creators of these airplane videos objected to their further posting.

While the videos are not what plaintiffs suggest, Chen's reaction further undermines Viacom's story: (1) Chen unequivocally told Karim to "*stop*" posting such videos (Schapiro Opp. Ex. 85)—which Viacom elides by misleadingly replacing the word "stop" with "was" (Viacom Br. 7); (2) Chen told Karim that YouTube was not a "stupid videos site" and that "we want to promote personal videos" (Schapiro Opp. Ex. 86); and (3) Chen asked "what were you thinking" (*id.* Ex. 87). And there is no indication that Karim did anything like that again. These emails confirm that

the founders wanted YouTube to host personal videos, and when Karim strayed even slightly, Chen was quick to admonish him.

Likewise, Chen's email to Hurley in an apparent reference to a video on filecabi.net (another "stupid" videos site) shows the opposite of what Viacom claims. Hohengarten Ex. 223. Chen's statement ("steal it") was not a serious proposal (as indicated by his follow up: "haha"), and even his joking suggestion was expressly *vetoed* by Hurley. Moreover, in a portion of the email that Viacom leaves out, Hurley made clear that he did not want YouTube to be another "stupidvideos.com-type of site," but instead was trying "to build something more valuable and more useful . . . that people will talk about and changes they [sic] way people use video on the internet." *Id.* (ellipses in original); Chen Opp. Decl. at 3. Viacom also omits Chen's response to Hurley: "another thing, still a fundamental difference between us and most of those other sites. ***we do have a community and it's ALL user generated content***." C. Hurley Opening Decl. ¶ 12 & Ex. 14 (emphasis added). No factfinder could conclude that these documents reflect an intent to encourage piracy, much less "contempt for copyright." Viacom Br. 7.

Nor did YouTube "emphasize[] the popularity of known infringing videos to potential investors." Viacom Br. 11. We respectfully invite the Court to examine the document that Viacom cites (Hohengarten Ex. 302), which lists a series of clips that had been posted on YouTube by or with the consent of their creators— including a video from Viacom's *Andy Milonakis* show that MTV uploaded; a video from the show *Angry Kid* that was uploaded by its creator Atom Films (later

acquired by Viacom); and a clip featuring the soccer star Ronaldhino that Nike uploaded. *Id.* The presentation showed that professional content creators, as well as amateurs, were embracing YouTube. *See also* Schaffer Opening Decl. ¶¶ 2-5; Botha Opening Decl. ¶ 11.

Viacom emphasizes the document's reference to "Lazy Sunday." But the story of that video only highlights YouTube's good faith. Schaffer Opening Decl. ¶¶ 3-4; C. Hurley Opening Decl. ¶¶ 24-25; Botha Opening Decl. ¶¶ 12-14 (telling "Lazy Sunday" story). Not long after a skit called "Lazy Sunday" aired on NBC's *Saturday Night Live* in December 2005, it was uploaded on YouTube. It became very popular and generated press attention. YouTube did not know whether it was authorized, but Chad Hurley wrote to NBC on December 28, 2005, asking whether NBC wanted the video on YouTube or not. C. Hurley Opening Decl. ¶ 24 & Ex. 30. More than a month passed before NBC wrote back thanking Hurley "for opening a dialogue with us" and stating that "NBC Universal has not authorized these postings and we thank you for agreeing to remove them." C. Hurley Opening Decl. ¶ 25 & Ex. 31.[7] YouTube promptly removed the video; it also posted a notice telling users that "YouTube respects the rights of copyright holders" and that they could still watch

---

[7] NBC's lengthy delay was apparently due to the perceived promotional value of having the clip available on YouTube. Schaffer Opening Decl. ¶ 3. Executives at Viacom thought that NBC's ultimate decision to take down "Lazy Sunday" was "web-stupid." Schapiro Opp. Ex. 88. "Lazy Sunday" had also been posted on Viacom's iFilm site (without express authorization from NBC)—and a Viacom presentation noted that it had "been seen more times on iFilm than on YouTube." Schapiro Opp. Ex. 89 (81:25-82:7); Schapiro Opening Ex. 175.

the video "for free on NBC's website." Schaffer Opening Decl. ¶ 4. Why Viacom

thinks this story helps its case is a mystery.

###    F.    Viacom's "Smoking Gun" Is Anything But.

Viacom characterizes as a "true smoking gun" an informal memo that Karim

passed out before a YouTube board meeting in March 2006. Viacom Br. 11-12. In

his memo, Karim (who was no longer working at YouTube (Schapiro Opp. Ex. 77

(19:10-25)) suggested that clips from various television shows (including *South

Park*, *Reno 911*, and *Chappelle's Show*) could be found on YouTube. Hohengarten

Ex. 237. Observing that YouTube had no legal obligation to monitor the site and

that YouTube complied with DMCA takedown requests, Karim thought that for

public relations reasons YouTube should "preemptively" remove what he called

"blatantly illegal" content. (He also noted that "much of this content does not even

seem to attract many views." *Id*.)

Given the contemporaneous public statements of *South Park's* creators

encouraging fans to "download" episodes from the Internet, clips of *South Park* on

YouTube certainly were not "blatantly illegal." *See supra* 9 n. 2. The same is true

of clips from shows like *Reno 911* and *Chappelle's Show*, which Viacom and its

agents were covertly posting to YouTube. *See* CVSUF ¶¶ 110. While Karim's memo

was not discussed at the board meeting (Schapiro Opp. Ex. 77 (179:8-180-9),

Viacom's claim that YouTube "did nothing" about the kinds of issues that Karim

raised, which is not supported even by a *citation* to evidence (Viacom Br. 12),

ignores the record. *See* Botha Opening Decl. ¶¶ 14-16. That very month, YouTube

hired an in-house lawyer with extensive copyright expertise and rolled out a series

of features aimed at helping content owners remove unauthorized materials, including a tool allowing them to send DMCA notices at the click of a button. Levine Decl. ¶¶ 2-4, 12, 18, 25. At the same time, YouTube was conducting spot reviews to attempt to identify and remove clips of shows like *Family Guy* and *South Park*. Schapiro Opp. Ex. 71 (46:20-48:15, 120:8-124:16, 128:7-131:11); Schaffer Decl. ¶¶ 11-12. Viacom's "smoking gun" shoots blanks.

### G. YouTube Transitioned From An Ineffective Community Flagging Process To A Robust DMCA Regime.

In September 2005, YouTube briefly experimented with a feature allowing ordinary users to flag videos that they believed contained unauthorized copyrighted material. C. Hurley Opening Decl. ¶ 20. Plaintiffs claim that YouTube discontinued this "community flagging" tool because it undermined YouTube's supposed "willful blindness strategy." Viacom Br. 9-10; *see also id.* at 26, 32-33, 40; Mem. Of Law In Support of Class Plaintiffs' Motion For Partial Summary Judgment ("Class Br.") 15.

Plaintiffs' story does not make sense: if YouTube's founders wanted to foster infringement, they would never have *launched* a feature aimed at removing unauthorized material. And plaintiffs cite to no evidence to support their charge that user flagging worked "all too well" in identifying infringing material. Viacom Br. 9. In fact, copyright flagging did not work well at all. In the two weeks that the feature was operative, users flagged a total of 53 videos. Schapiro Opp. Ex. 90 at Response to Interrog. No. 2. Looking at those videos confirms the significant problems with relying on users with no insight into videos' authorization status to

make guesses about potential copyright infringement. Among the clips that were flagged are ones that seem to be personal videos; others were music videos; still others were television commercials. They include: a video of a parakeet (Schapiro Opp. Ex. 387A/387B); a video of girls playing (*id*. Ex. 388A/388B); a video of cat chasing a ball (*id*. Ex. 389A/389B); a video of two hamsters (*id*. Ex. 390A/390B); a movie-maker's demo reel (*id*. Ex. 391A/391B); a Chinese music video (*id*. Ex. 392A/392B); and a Pepsi commercial (*id*. Ex. 393A/393B). What YouTube's experiment with community flagging showed was that users had little ability to distinguish authorized from unauthorized content.

YouTube's decision to move away from community flagging was part of a broader embrace of the DMCA, which relies on sworn notices from actual copyright holders rather than unverified claims from random users. C. Hurley Opening Decl. ¶¶ 20-21; Figueira Decl. Tab 39 (explaining that YouTube removed community flagging because "we don't want random users to flag things as copyrighted because they don't own the content."). The DMCA is Congress' solution to the questions that the founders had been grappling with for months (without investors or legal guidance). In the fall of 2005, after securing advice and a financial commitment from Sequoia Capital, YouTube implemented a formal DMCA regime. C. Hurley Opening Decl. ¶ 21; Botha Opening Decl. ¶ 8. YouTube registered an agent to receive takedown notices, posted instructions for copyright owners about how to send such notices, and instituted a repeat-infringer policy. C. Hurley Opening Decl. ¶ 21; Levine Opening Decl. ¶¶ 14-17, 27-28. YouTube also replaced the community

copyright flag with a flag that allowed rights holders to send automated DMCA takedown notices for any video that they believed contained their unauthorized material. Levine Opp. Decl. ¶ 10. YouTube not only upheld its end of the DMCA bargain, it became the standard-setter among online services. *See* Levine Opening Decl. ¶¶ 2-12, 17-19, 23-27, 30-33; King Opening Decl. ¶¶ 2-3; Schapiro Opp. Ex. 71 (36:8-37:7).

## ARGUMENT

## I.  VIACOM'S MOTION ESTABLISHES NO ACTUAL INFRINGEMENTS.

Unlike the putative class plaintiffs (whose motion is limited to the DMCA), Viacom seeks summary judgment "on defendants' liability for copyright infringement." Viacom Br. 1. Viacom's motion suffers from a total failure of proof with respect to its underlying claims. Viacom has failed to put into evidence its actual copyrighted works or any of the allegedly infringing clips—the essential evidence that forms the basis of any infringement claim. For this reason alone, Viacom's motion must be denied. *See, e.g.*, *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

### A.  Viacom's Motion Does Not Allow The Court To Make A Proper Infringement Determination.

"In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003). "In the absence of direct evidence, copying is proven by showing (a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectable material in the

two works." *Gal v. Viacom Int'l Inc.*, 518 F. Supp. 2d 526, 536-37 (S.D.N.Y. 2007)

(quoting *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996)). Thus, "once copying

has been shown, a plaintiff must still demonstrate 'substantial similarity' between

the defendant's work and the protectable elements of plaintiff's work, because 'not

all copying results in copyright infringement.'" *Id.* at 537 n.4 (quoting *Boisson v.

Banian, Ltd.*, 273 F.3d 262, 273 (2d Cir. 2001)).

Rather than submitting copies of its works and the allegedly infringing clips

(which Viacom has in its possession), Viacom offers only a conclusory employee

declaration. Solow Decl. ¶¶ 16-27. That declaration attaches a chart purporting to

list copyright registration numbers and URLs of YouTube videos. The declarant

avers that "[a] team working under my supervision matched each Clip in Suit listed

on Exhibit F to the Work in Suit listed on Exhibit F by watching and listening to

each clip and comparing it to the work the clip infringed." *Id.* ¶ 24. Putting aside

the inadmissibility of pronouncements about the activities of the declarant's

unnamed "team" and the lack of foundation for his statements, the declaration is

not sufficient evidence to establish what Viacom must show to prove infringement.

Courts require evidence consisting of the copyrighted work and the allegedly

infringing material in order to compare the two items. "Plaintiffs cannot establish

infringement of [the alleged copyrighted] works" where the works have not been

"entered into evidence, and they are not before the Court." *Warner Bros. Enter. Inc.

v. RDR Books*, 575 F. Supp. 2d 513, 534 (S.D.N.Y. 2008) (refusing to consider any

infringement claim for works not introduced as evidence). That rule is important:

> There can be no proof of "substantial similarity" and thus of copyright infringement unless [plaintiff's] works are juxtaposed with [defendant's] and their contents compared. Since the contents are material and must be proved, [plaintiff] must either produce the original or show that it is unavailable through no fault of his own.

*Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986); *see also Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1103 (C.D. Cal. 2005) (requiring "side-by-side comparison of the protected and accused works" on summary judgment); *FASA Corp. v. Playmates Toys, Inc.*, 869 F. Supp. 1334, 1349 n.24 (N.D. Ill. 1994) ("The court knows of no other copyright infringement case in which the plaintiff did not submit the subject copyrighted works for the court's review."). Because Viacom failed to submit the evidence necessary to prove its claims, the inquiry ends there.[8]

## B. Viacom's Failure Of Proof Is Not A Technicality.

The history of this litigation gives reason to be skeptical of charges of "mass infringement" supported only by Viacom's say-so. Viacom has asserted infringement claims for hundreds of clips that YouTube's discovery efforts showed were not infringing. *See* Notice of Dismissal of Specified Clips With Prejudice (Mar. 10, 2010). In its summary judgment motion, Viacom has abandoned claims as to *another* 408 clips relating to works for which it does not own a registered copyright. Solow Decl. Ex. G. But Viacom nevertheless asks that the Court presume without evidence that the remaining clips are infringing. That is improper, as highlighted by some examples from Viacom's remaining clips in suit.

---

[8] Viacom's failure of proof is fatal both to its claims for direct infringement and secondary liability. *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 940 (2005); *Matthew Bender & Co., Inc. v. West Pub. Co.*, 158 F.3d 693, 706 (2d Cir. 1998).

Viacom claims infringement of the film *It's a Wonderful Life*. Solow Decl. Ex. F. The copyright that Viacom purports to own is for the *colorization* of that film (the original black-and-white version is in the public domain). Schapiro Opp. Ex. 92. But the YouTube clips over which Viacom is suing are from the *black-and-white* version. *See id.* Exs. 394A/394B, 395A/395B, 396A/396B. Viacom has no plausible claim that these clips are infringing, because there is no copying of the elements of the work that are purportedly original and copyrighted (the colorization). Viacom's failure to submit as evidence the actual copyrighted work alongside the allegedly infringing clips concealed this fatal defect.

That missing evidence is also important for evaluating other aspects of Viacom's infringement case. A claim of copyright infringement requires the plaintiff to show "unauthorized" copying. *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003); *see also Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997); *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995) (plaintiff bears burden of proving that copying was unauthorized where there is no dispute about the existence of a license). There is no dispute that Viacom authorized numerous videos to appear on YouTube, including clips in suit. *See supra* 4-6. Evidence of the actual contents of those clips is highly relevant to evaluating whether they fall within the scope of Viacom's licenses to YouTube. For example, one clip in suit, purportedly from the film *Jackass Number Two*, begins with one of the stars of the film saying on the video: "Thank you for watching us on YouTube and check out *Jackass Number Two* available on DVD now." Schapiro Opp. Ex. 397A/397B.

In addition, Viacom's clips in suit do not consist only of identical copies of snippets of works Viacom claims to own. Many clips differ from the original work (whether in length or content), which implicates factual questions on everything from substantial similarity to defenses like fair use and *de minimis* use.[9] Had Viacom submitted evidence to satisfy its burden of production, moreover, YouTube would have had occasion to rebut Viacom's claims with various affirmative defenses. Laches, estoppel, waiver, unclean hands, and implied license apply to many videos due to Viacom's broad "leave up" policies and its active encouragement to users to upload certain of its content. YouTube Br. 39-48. Fair use and *de minimis* use also must be evaluated as to individual clips. *Id.* at 53-55; Mem. Of Law In Support of Class Plaintiffs' Motion for Class Certification 17 (April 9, 2010). For these reasons, any suggestion that the underlying infringement of the Viacom copyrights at issue is so "obvious" that it should be presumed without valid proof is wrong. Viacom's motion should be denied for these reasons alone.

## II. YOUTUBE IS ENTITLED TO DMCA SAFE-HARBOR PROTECTION

Even if Viacom met its burden of proving that its copyrights had been infringed, its motion for summary judgment must be denied under the DMCA. As discussed in YouTube's moving papers, which are incorporated by reference here, Section 512(c) protects YouTube against plaintiffs' direct and secondary

---

[9] *See, e.g.,* Schapiro Opp. Exs. 398A/398B, 399A/399B, 400A/400B, 401A/401B, 402A/402B (clips with dialog altered to foreign languages and/or text overlays), 403A/403B, 404A/404B (footage from handcams with TV playing in background), 405A/405B (video about volunteering at church with one minute of alleged movie footage)].

infringement claims.  YouTube Br. 21-78.  Plaintiffs now try to close the safe harbor with three arguments that diverge markedly from the DMCA's text and purpose.

*First*, plaintiffs argue that YouTube is excluded from Section 512(c)—regardless of anything else that it does—because it operates a website that has functions beyond mere "storage."  Plaintiffs' claim that the DMCA covers only passive web hosts, not websites that facilitate access to user-stored content, has been repeatedly rejected in other cases, as it should be here.

*Second*, plaintiffs argue that YouTube had disqualifying knowledge of infringement not because it actually knew—or came across "red flags" indicating—that any of the clips at issue were infringing, but instead because it was supposedly "willfully blind" to what was happening on the service.  Plaintiffs' invocation of willful blindness is rhetoric dressed up as legal analysis, which improperly treats compliance with the DMCA as a basis for losing the statute's protections.  Section 512(c)'s knowledge requirements do not impose the amorphous "further-inquiry" test that Viacom proposes.  They require service providers to remove specific material that they know (or could only reasonably conclude) is infringing.  That demands a degree of particularized knowledge that plaintiffs have not even attempted to show.

*Third*, plaintiffs' argument that YouTube had disqualifying "control" over the alleged infringing activity coupled with a financial benefit directly attributable to that activity relies entirely on the claim that the DMCA merely codifies the common law of vicarious liability.  That position is at odds with the statute's text and

disregards its legislative history, which says the opposite. As a matter of law, service providers cannot be excluded from DMCA protection based on the broad assertions of "control" and "financial benefit" that plaintiffs make in this case.

## A. Plaintiffs' Claims Involve "Storage At The Direction Of A User."

Viacom's sweeping storage argument posits that Section 512(c) applies only to passive "web hosts"—not websites that store user-submitted material in ways that make it more accessible to users. Viacom Br. 60-64. That approach would strip protection from countless successful websites that operate in reliance on Section 512(c). Fortunately, plaintiffs' position is not the law.

### 1. Plaintiffs' Storage Argument Has No Support In The Case Law.

Nearly every Section 512(c) decision has involved a website that offered functions beyond mere storage, including processes for making user-stored material more accessible to the public.[10] Under Viacom's approach, every one of those cases was wrong, and sites such as Amazon, eBay, and Veoh should have been denied safe-harbor protection without any further analysis. The two most recent of these decisions, which involved a video-hosting service similar to YouTube, expressly rejected the position that Viacom advances. Based on a detailed analysis of the DMCA's text, structure, and legislative history, those decisions held that Section 512(c) applies to service providers whose software performs "functions for the

---

[10] *See UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1092 (C.D. Cal. 2008) ("*UMG I*"); *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1146 (N.D. Cal. 2008); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1099-1100 (W.D. Wash. 2004)*; Hendrickson v. eBay, Inc.,* 165 F. Supp. 2d 1082, 1088 (C.D. Cal. 2001); *Costar Group Inc. v. Loopnet, Inc.,* 164 F. Supp. 2d 688, 701-02 (D. Md. 2001).

purpose of facilitating access to user-stored material." *UMG I*, 620 F. Supp. 2d at

1088; *Io*, 586 F. Supp. 2d at 1148; *see also* YouTube Br. 28-30. There is no basis for

reaching a different conclusion here.

2. Plaintiffs' Storage Argument Is Contrary To The DMCA's Text And Purpose.

Viacom's argument that Section 512(c) applies only to web hosts that

"passively provide server storage" (Viacom Br. 62) conflicts with the text of the

DMCA. The applicable definition of "service provider" covers any "provider of online

services" or the "operator of facilities for online services" and is expressly *not* limited

to those who refrain from making "modification" to user-stored content. 17 U.S.C. §

512(k)(1)(B). That definition unquestionably includes website operators like

YouTube. *See Io*, 586 F. Supp. 2d at 1143 & n.7. Had Congress wanted to allow

only passive web hosts to avail themselves of Section 512(c), it would not have

defined "service provider" so broadly. Cf. § 512(k)(1)(A) (applying more limited

definition of "service provider" to the 512(a) safe harbor).[11]

Viacom's claim that Section 512(c) does not cover functions that make user-

stored material accessible through a website is at odds with the DMCA's text in

another way. The statute presupposes that materials stored by service providers

---

[11] Viacom relies on the examples in the House Report of some of the services that would be covered by Section 512(c). Viacom Br. 61. But nothing in this legislative history suggests that these examples were meant to be exhaustive or that any service not mentioned was categorically excluded from the DMCA safe harbor. Not even the law review article that Viacom cites goes so far. *See* Jane C. Ginsburg, *Separating The* Sony *Sheep From The* Grokster *Goats*, 50 Ariz. L. Rev. 577, 594 (2008) (concluding that the statutory language "may be broad enough to encompass more internet entities than Congress specifically contemplated in 1998").

can be made accessible—after all, one of the prerequisites for safe-harbor eligibility is that the service provider "disable access" to material that it learns is infringing. § 512(c)(1)(C). The DMCA would be self-contradictory if making stored material accessible to users was itself sufficient to take the service provider outside the safe harbor. *See UMG I*, 620 F. Supp. 2d at 1089-90.

Viacom points to Section 512(c)'s "by reason of" language, arguing that it incorporates some notion of proximate cause between the "storage" and the alleged infringement. Viacom Br. 62. Even if that were right, it would not bolster Viacom's reading.[12] The infringement claims made here *do* have a sufficient causal link to YouTube's storage of user-submitted material. The functions that supposedly give rise to liability—the copying and conversion of user-posted videos into various file formats; the streaming of those videos in response to playback requests—are all designed to facilitate access to user-stored material. Infringement claims targeting such functions thus arise "by reason of the storage at the direction of users of material"—no matter what precise concept of causation applies. *UMG I*, 626 F.

---

[12] The premise of Viacom's argument is dubious. It is unclear how the proximate cause analysis developed in the RICO and Clayton Act cases that Viacom cites is to be imported into the DMCA. Proximate cause is confusing enough in those contexts (*see Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 284 (2d Cir. 2006)), as it is elsewhere in the law (*see Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235 (2d Cir. 1999) ("no topic is subject to more disagreement or such confusion")). Viacom's effort to introduce the concept into Section 512(c) complicates the inquiry without illuminating anything.

Supp. 2d at 1092 (holding that "providing access to materials stored at the direction of users, as Veoh does, is closely related to, and follows from, the storage itself").[13]

Plaintiffs' argument is also inconsistent with their own story about the DMCA's origins. *Netcom*, the case that Viacom says "inspired" the DMCA (Viacom Br. 47; *see also* Class Br. 21-23), involved *both* a webhost and a website operator, and the court applied the same legal principles to both. *See Religious Technology Center v. Netcom On-Line Commc'ns Servs., Inc.*, 907 F. Supp. 1361, 1365-66, 1381-82 (N.D. Cal. 1995). Moreover, the conduct at issue in *Netcom* was not limited to storage, but included: (1) making copies of user-posted materials to facilitate their storage or transmission to others (*id*. at 1368-69, 1370-71, 1381-82); (2) allowing public access to copies of user-stored materials (*id*. at 1372); and (3) transmitting copies of user-posted materials to other users (*id*.). The statute enacted in *Netcom*'s wake must, at a minimum, be understood to cover the same kinds of service providers and software functions at issue in that case.

Finally, Viacom mischaracterizes the DMCA's "fundamental purpose." Viacom Br. 62. "One of the stated purposes of the DMCA was to 'facilitate the

---

[13] Viacom argues that YouTube's processes for formatting videos so that they can be viewed on devices other than personal computers fall outside Section 512(c) because they are done "without any user input at all." Viacom Br. 64. It is a false premise that each step of the functions covered by 512(c) must occur based on a specific user-request. Veoh's system copied files to allow them to be distributed on various mobile devices, but the safe harbor still applied. *UMG I*, 620 F. Supp. 2d at 1084. In any event, users *do* have a say as to whether the videos they upload should be made available through mobile platforms. *See* CVSUF ¶¶ 320-21, 330. Viacom also alludes to certain functions—including ad placement and search (*see* Viacom Br. 63)—that are irrelevant to the Section 512(c) analysis because they are not functions on which plaintiffs' infringement claims are based.

robust development and worldwide expansion of electronic commerce, research, development, and education in the digital age." *Io*, 586 F. Supp. 2d at 1148 (quoting S. Rep. 105-190, at 1-2 (May 11, 1998)). Most of the websites that have come to prominence in reliance on Section 512(c) do more than passively provide server storage.[14] Categorically excluding those sites (including Facebook, MySpace, eBay, Amazon.com, Veoh—and YouTube) from the safe harbor would be contrary to the statute's purpose. Plaintiffs' radical effort to undermine one of the basic legal pillars of the Internet should be rejected.

> ### B. YouTube Did Not Have Disqualifying Knowledge Of The Alleged Infringing Activity.

Neither Viacom nor the putative class plaintiffs point to a single one of their clips in suit that YouTube knew was infringing yet failed to take down. That failure of proof entitles YouTube to summary judgment on the DMCA's knowledge element. YouTube Br. 30-57. Lacking evidence to meet the standard required by the statute, plaintiffs ask the Court to rewrite the law.

*First*, plaintiffs argue that, even though the DMCA puts the burden of policing infringement squarely on copyright owners, a service provider's decision not to affirmatively monitor for potential infringement amounts to "willful blindness." *Second*, Viacom seeks to alter Section 512(c)'s red-flag knowledge test so that a service provider's generalized awareness of the presence of copyrighted materials triggers a vague duty to "look into the matter further." Viacom Br. 52. *Third*, the

---

[14] Viacom itself has long claimed DMCA protection for a host of sites that, like YouTube, enable users to search for and access content uploaded by other users. See Schapiro Opp. Ex. 91.

putative class argues that the receipt of a DMCA takedown notice requires a service provider to take down not just the material identified but also to seek out and remove other material not identified in the notice. *Fourth*, the class contends that service providers are required to engage in rights-clearing on their users' behalf, equating the absence of a negotiated licensing deal between YouTube and a copyright owner with knowledge of infringement. Class Br. 29-30. These arguments are contrary to the DMCA's text, legislative history, and case law.

### 1. Plaintiffs Equate DMCA Compliance With "Willful Blindness."

Plaintiffs repeatedly invoke the concept of "willful blindness." Viacom Br. 8-10, 50-54; Class Br. 27-28. But what plaintiffs attack is actually *compliance* with the DMCA. The DMCA's knowledge provisions clearly set out what service providers must do—and what they need not do. Service providers who wish to claim the safe harbor must respond to takedown notices by removing the material identified. § 512(c)(1)(C). They must also remove material that they know is infringing, whether because they have "actual knowledge" or because they become aware of "facts or circumstances from which infringing activity is apparent." § 512(c)(1)(A). But service providers have no obligation to monitor their services or otherwise "affirmatively seek[] facts indicating infringing activity." § 512(m); S. Rep. 105-190, at 44; *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir 2007); *UMG Recordings Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1110 (C.D. Cal. 2009) ("*UMG II*"). To the contrary, the DMCA places "the burden of policing copyright infringement—identifying the potentially infringing material and

adequately documenting infringement—squarely on the owners of the copyright."

*CCBill*, 488 F.3d at 1113.

That is the regime YouTube embraced in the fall of 2005, when it registered a DMCA agent, created a formal process for receiving and responding to takedown notices, and instituted a repeat-infringer policy.  C. Hurley Opening Decl. ¶ 21; Levine Opening Decl. ¶¶ 14-31.  Taking those steps did not mean ignoring known infringing material.  *See* Schapiro Opp. Ex. 93 (231:14-232:13).[15]  None of the evidence that Viacom cites suggests that YouTube's policy was to "refuse to remove" videos that it knew were infringing unless it received a specific takedown notice. Viacom Br. 55.[16]

---

[15] While plaintiffs gloss over the fact, throughout 2006 YouTube continued to do some proactive review in the hopes of identifying and removing unauthorized copyrighted material.  *See* Schaffer Decl. ¶ 11; Schapiro Opp. Ex. 71 (120:8-124:16, 128:7-131:11); CVSUF ¶ 272; Hohengarten Ex. 56.  This effort was doomed to failure not just because it did not scale to YouTube's ever-increasing growth, but also because the marketing activities of content owners made the already difficult task of distinguishing authorized from unauthorized videos doubly so.  *See* Schaffer Decl. ¶¶ 12-13; Schapiro Opp. Ex. 71 (53:10-54:23, 58:24-59:6, 64:11-67:14); *id.* Ex. 94 (86:24-89:13, 90:22-94:3); *see infra* 64-67.  In fact, YouTube's proactive copyright review frequently resulted in mistaken removal of materials that were authorized to be on the service.  *See, e.g.,* Schapiro Exs. 95, 96, 97, 98 (numerous mistaken takedowns resulting from proactive review for *American Idol* content), 99 (reflecting mistaken proactive takedowns for NBC, Adult Swim, and *American Idol*), 100, 101.

[16] Viacom relies on Steve Chen's declaration from another case, which explains that pre-screening all videos uploaded to YouTube was impracticable and ineffective. The declaration does not describe a policy of "willful blindness" to infringement. Hohengarten Exs. 356, 351; *see* CVSUF ¶ 189.  Nor does the cited letter from YouTube's outside counsel (Hohengarten Ex. 370).  *See* CVSUF ¶ 220.  Viacom also cites YouTube's founders' discussion of a short news clip about a Filipino political scandal.  Hohengarten Ex. 213.  As described above, documents like this show the founders wrestling in good faith (and without the benefit of counsel) with difficult copyright questions and striking what they thought was an appropriate balance, which included decisions to "remove stuff like movies/tv shows" while keeping some

YouTube also went well beyond the DMCA baseline in seeking to deter infringement. It made the notice-and-takedown process easier for copyright owners to use. Levine Opening Decl. ¶¶ 16-18. It repeatedly warned users about copyright violations and tried to educate them to make sure they were not inadvertently posting infringing material. *Id.* ¶¶ 5-10, 23-24. It rolled out technology to remove identical copies of videos removed for copyright reasons. *Id.* ¶ 25. It imposed a 10-minute limit on most user uploads to prevent the posting of full-length movies and television shows. *Id.* ¶ 12. It implemented audio-fingerprinting technology, and shortly thereafter began building (and successfully developed) its own video fingerprinting tool. King Opening Decl. ¶¶ 2-28.[17]

YouTube also honored the basic principle animating the DMCA, which is that service providers are not required to affirmatively monitor their sites for infringement. Viacom's own lawyers have embraced that principle. As a Viacom in-house counsel explained:

> There is no duty to monitor your site's activities. So that's been an interesting part of a lot of these cases because if you have no duty to look, you're not going to look. Therefore you have no knowledge. But if you look and try to make, you know, some kind of deterrence policy, then you have knowledge. So there is sort of a Catch 22 that many online service providers have sort of thrown their hands up at and

---

"short news clips for now." Hohengarten Ex. 224; *supra* 8-15; C. Hurley Opening Decl. ¶ 15. Nothing in these discussions reflects the alleged conscious decision to ignore and profit from "[m]assive infringement." Viacom Br. 55; *see* CVSUF ¶ 38.

[17] Viacom distorts not only YouTube's policies but also its legal position. YouTube has never argued that the DMCA is "just a takedown statute" (Viacom Br. 48; *see also id.* at 54-55). And Viacom's claim that our pre-motion letter "assert[s]" that YouTube has "no obligation to take action in the face of red flags of infringement" (*id.* at 52-53) is completely made up. *See* Pre-Motion Letter at 2 (Dec. 28. 2009).

basically said, you know, we are just not going to look. Otherwise, we risk, you know, being liable for some reason.

Schapiro Opp. Ex. 102 (135:14-136:4; *see also* 140:19-141:6). A policy manual for one of Viacom's own video websites similarly told employees "something that can't bear enough repeating"—"User generated content should never be monitored." Schapiro Opp. Ex. 103.[18] Following that advice is not willful blindness and cannot disqualify a service provider from the safe harbor. *See* 17 U.S.C. § 512(m).

Refraining from proactive monitoring for potential infringement is not only consistent with the DMCA, it is makes perfect sense. It keeps service providers from having to guess whether particular materials are or are not authorized. That avoids hooking them on the horns of an intractable dilemma: either remove material that is legitimate—impinging on the rights of users (*see CCBill*, 488 F.3d at 1112 (describing First Amendment implications of erroneous takedowns))—or leave up material that is unauthorized—putting the safe harbor at risk. While these are serious concerns for any service provider, they are particularly acute for YouTube. Media companies like Viacom have put vast amounts of their content on YouTube and deliberately allowed many other clips to remain there. YouTube Br.

---

[18] Viacom's website adopted that policy at the direction of counsel, who instructed that reviewing user-uploaded content would forfeit DMCA protection. *See* Schapiro Opp. Ex. 104 (65:15-23). As the CEO publicly described that advice: "According to the Digital Millennium Copyright Act, a site like ours has to be a passive conduit. We cannot be monitoring it or actively moderating it." *Id.* Ex. 105, 104 (55:6-8); *see also id.* Ex. 106 ("Actively monitoring the site or exercising editorial control over the content that gets uploaded violates the DMCA and has tremendously bad implications for the company."). Viacom continued to mandate the very approach it now condemns as "willful blindness" until roughly the time it filed this lawsuit. Schapiro Opp. Ex. 107; *id.* Ex. 104 (210:23-213:11).

39-48.  A number of other factors—including the obscurity of much of the content posted on YouTube; the complex array of licensing and co-ownership issues attending much professional content; and fair use—make it even more difficult for YouTube to determine whether a given video is illegitimate.  *Id*. at 35-38, 49-55. Copyright holders are far better positioned to make those determinations, and it is fitting that Congress allocated to them the burden of seeking out and identifying infringement.  Cf. *Sony Discos, Inc. v. E.J.C. Family P'ship*, 2010 WL 1270342, at *5 (S.D. Tex. Mar. 31, 2010) ("The essential trade in the Copyright Act is monopoly and policing: the grant of exclusivity comes with the duty to protect it.").

2.  <u>The DMCA Requires Particularized Knowledge, Not Viacom's Amorphous "Inquire-Further" Standard</u>.

In claiming that YouTube is disqualified from safe-harbor protection under the DMCA's red-flag knowledge provision (§ 512(c)(1)(A)(ii)), Viacom does not contend that YouTube was aware of "facts or circumstances" from which the infringement of any of Viacom's actual clips in suit was "apparent."  Instead, Viacom argues that a service provider's generalized awareness that unspecified material might be infringing requires it to "inquire further and act to clean up the site" (Viacom Br. 54) or, even more vaguely, to "look into the matter further" (*id*. at 52).  It says that any other approach would "read the concept of willful blindness out of copyright law and the DMCA statute."  *Id*. at 51.  But Viacom misunderstands the DMCA.  The red-flag knowledge provision defines with precision the circumstances in which a service provider's state of mind short of actual knowledge

can trigger liability.  That provision must be applied as its text and legislative history demand, and as the case law has consistently required.

An unbroken line of cases makes clear that the DMCA's knowledge standards are specific and focus on the particular material that the plaintiff is suing about.  *See Io*, 586 F. Supp. 2d at 1149; *Corbis*, 351 F. Supp. 2d at 1108; *Hendrickson v. eBay*, 165 F. Supp. 2d at 1093.  Those cases include *CCBill*, which rejected a reading of the knowledge test that would impose "investigative duties on service providers."  488 F.3d at 1114.  And they include *UMG II*, which expressly held that generalized knowledge is *not* sufficient to create red-flag knowledge.  665 F. Supp. 2d at 1111.  Plaintiffs cannot cite a single case holding that under the DMCA's knowledge provisions a service provider's generalized awareness of infringing activity creates a proactive duty to "inquire further."[19]

Requiring that a service provider have particularized knowledge of infringement is consistent with the trend of the law even outside the DMCA context.  *See Tiffany (NJ) Inc. v. eBay Inc.*, 2010 WL 1236315, at *11 (2d Cir. April 1, 2010) (holding that "a service provider must have more than a general knowledge or reason to know that its service is being used" to be liable for contributory trademark infringement).  In *Tiffany*, the Second Circuit agreed with Judge

---

[19] Neither *Aimster* nor *ALS Scan* addresses the DMCA's knowledge standards. *Aimster* held that the defendant was not eligible for safe-harbor protection because it not only failed to terminate repeat infringers but actively encouraged them.  *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003).  The only issues in *ALS Scan* were what constitutes a proper *takedown notice* and what a service provider must do upon receiving one.  *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 622-26 (4th Cir. 2001).  These cases do not speak to the requirements for red-flag knowledge or provide any support for Viacom's "inquire-further" standard.

Sullivan that "specific knowledge of individual instances of infringement" is required before imposing on a service provider a duty to take remedial action.  *Id*. at *10-11 (quoting *Tiffany (NJ) Inc. v. eBay Inc.*, 576 F. Supp. 2d 463, 508 (S.D.N.Y. 2008)).  And the court rejected the argument that eBay's failure to act in the face of generalized knowledge of infringement amounted to "willful blindness."  *Id*. at *13 (citing *Tiffany*, 576 F. Supp. 2d at 513-15).

Viacom's argument also contradicts the text and structure of the DMCA.  The statute makes clear what a service provider must do upon obtaining knowledge: it must "act[] expeditiously to remove, or disable access to, the material."  17 U.S.C. § 512(c)(1)(A)(iii); *see also* H.R. Rep. 105-551 (Part II), at 54 (July 22, 1998).  The statutory duty triggered by awareness of a "red flag" is a precise one.  It is a duty to promptly remove the material at issue.  It is not some amorphous duty to "look into the matter further" or take unspecified steps to "clean up" the site.  And the obligation that the statute imposes is dischargeable only where the service provider knows with particularity what material it must remove.  Generalized awareness that some unspecified material might be infringing is not enough to allow the service provider to do what the statute requires.[20]

---

[20] Lacking support in the DMCA's text, legislative history, or case law, Viacom turns to the academic literature.  Viacom Br. 52.  But not even the article it cites says that generalized awareness of possible infringement requires some kind of further inquiry.  The "proactive obligation" described by Professor Ginsburg is simply the obligation to "block access" to the particular material that is the source of the red flag; it is not some nebulous duty "to look into the matter further."  Ginsburg, *supra*, 50 Ariz. L. Rev. at 596.

3. <u>DMCA Takedown Notices Require Service Providers To Remove Identified Material, Not Search For Unidentified Material.</u>

The putative class plaintiffs make a related argument, claiming that YouTube was obliged not just to remove the videos identified in DMCA takedown notices, but also to affirmatively search for additional material *not* identified. Class Br. 29-30. This argument similarly disregards the statute. Section 512(c) defines a proper takedown notice and describes what a service provider must do upon receiving one. Most importantly, the copyright holder must include in any DMCA notice an "[i]dentification of the material that is claimed to be infringing . . . and information reasonably sufficient to permit the service provider to locate the material." § 512(c)(3)(A)(iii).[21] As with red-flag knowledge, the DMCA imposes a clear and specific requirement on service providers: they must "respond[] expeditiously to remove, or disable access to, *the material that is claimed to be infringing.*" § 512(c)(1)(C) (emphasis added). A service provider who does so discharges its duty under the notice-and-takedown regime.

Class plaintiffs do not claim that YouTube failed to remove any videos actually identified in their takedown notices. *See* YouTube Br. 55-57. Instead, they argue that YouTube was required to do more—including conducting searches and other patrol efforts, or perhaps implementing filtering, to affirmatively identify

---

[21] The DMCA's "representative list" provision applies only to the identification of the copyrighted *works* that the rights owner claims have been infringed. § 512(c)(3)(A)(ii). It does not relax the separate requirement that a takedown notice must sufficiently identify the material that is "claimed to be infringing" so that the service provider can readily locate it. § 512(c)(3)(A)(iii). By its terms, the latter requirement cannot be satisfied by providing merely a "representative list" of allegedly infringing materials that the service provider is supposed to remove.

*additional* materials not identified in those notices.[22]  That argument has no basis in the DMCA or in any case construing it.[23]  The idea that plaintiffs can use takedown notices identifying certain clips to claim that YouTube has disqualifying knowledge of *other* clips is rejected by the statute, which makes clear that a non-compliant takedown notice "shall not be considered . . . in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent."  § 512(c)(3)(b)(i); *see also CCBill*, 488 F.3d at 1112-13 (holding that "knowledge of infringement may not be imputed" to service provider based on notices that do not comply with the DMCA's standards).[24]

---

[22] Plaintiffs acknowledge that YouTube does not just remove the videos identified in takedown notices, but also goes beyond the DMCA by using hashing technology to ensure that identical copies of removed videos are not reposted.  Class Br. 29.  Even if that technology has limits, YouTube's use of it is further evidence refuting any claim of "willful blindness" or desire to let unauthorized videos remain on the site. *See* Levine Opening Decl. ¶ 25; King Opening Decl. ¶ 4.

[23] Class plaintiffs rely on *Napster*, which is not a DMCA case and says nothing about what service providers must do in response to takedown notices.  *A&M Records, Inc. v. Napster*, 239 F.3d 1004, 1023 (9th Cir. 2001).  They also cite *ALS Scan*, which held that because a particular takedown notice satisfied Section 512(c)(3), the defendant's failure to do *anything* in response to that notice disqualified it from safe harbor protection.  239 F.3d at 624-26.  *ALS Scan* did not purport to impose a proactive-monitoring requirement on service providers to prevent the subsequent posting of material that was the subject of a prior notice.

[24] Insofar as putative class plaintiffs are trying to argue that their takedown notices were sufficient to alert YouTube to other unspecified clips that were not taken down, their motion suffers from a clear failure of proof.  With the exception of Cherry Lane (*see* CCSUF ¶ 32), none of the class plaintiffs has put before the Court *any* actual takedown notices, making it impossible to assess their adequacy under Section 512(c)(3).

4. <u>The Absence Of A Separately Negotiated Licensing Agreement
Does Not Establish Knowledge Of Infringement.</u>

Focusing primarily on music publishing, putative class plaintiffs also contend that if YouTube has not directly negotiated a licensing deal with a given rights owner, YouTube knows that any video that includes that rights owner's content is infringing. Class Br. 7-13, 26.[25] That argument is wrong for many reasons.

a. *The DMCA does not require service providers to engage in rights-clearing on its users' behalf.*

Both professional and amateur content creators regularly authorize their copyrighted material to appear on YouTube without a specific, negotiated licensing agreement. They do so whenever they upload videos pursuant to YouTube's standard terms of service, and they do so by knowingly and deliberately allowing videos uploaded by others to remain on YouTube. YouTube Br. 39-48; *see also* Levine Opening Decl. ¶¶ 6, 8 & Exs. 1, 2, 5 (describing YouTube terms of service).

In addition, the rights holder may have licensed *the person posting the video* to use the content. Levine Opp. Decl. ¶ 3. The music-publisher plaintiffs know this well. They frequently grant licenses to third parties to use their compositions in

_____

[25] Viacom asserts that "[d]uring the negotiations" between Viacom and Google about a potential licensing deal, it "made clear that without such a license, the appearance of Viacom works on YouTube was unauthorized." Viacom Br. 18. That assertion is mystifying. The only support Viacom offers is a letter its General Counsel sent to Google on February 2, 2007—*after the negotiations had broken down*. Hohengarten Ex. 244. That letter was sent contemporaneously with a set of DMCA takedown requests (*id.*), which YouTube promptly honored (*see* Schaffer Opening Decl. ¶ 14). Before that, Viacom had deliberately refrained from sending takedown notices for much of its content. Schapiro Opening Ex. 4 (132:19-133:24, 193:19-194:11, 200:14-201:18); Rubin Opening Decl. ¶ 5; Schapiro Opening Exs. 55, 57. And Viacom expressly told YouTube that it wanted its content to remain on YouTube while the parties' negotiations were ongoing. Maxcy Opp. Decl. ¶ 8; *see also* CVSUF ¶ 204.

various media, including on the Internet or specifically on YouTube. YouTube Br. 49-52, 68-69. In that scenario, YouTube might not have a direct licensing deal with the publisher, but the use of a composition in a video posted to YouTube nonetheless would be properly authorized. Beyond licensing, there are other ways that a video may legitimately use copyrighted material, including fair and *de minimis* uses. *Id.* 53-55. The publisher plaintiffs also ignore that they are not necessarily the only ones who can grant rights to their compositions. Publishing rights for a single song are frequently shared among several different owners (called "co-publishers"),[26] and each co-publisher has the independent right to license use of the whole work. *See Davis v. Blige*, 505 F.3d 90, 98, 100-01 (2d Cir 2007); YouTube Br. 51-52.

Plaintiffs' suggestion that YouTube has knowledge of infringement as to any content that YouTube itself has not directly licensed from a rights owner is also contrary to the DMCA. By protecting service providers against liability for hosting infringing material that its users might post, the DMCA obviates the need for service providers to engage in rights clearing on their users' behalf. Service providers instead are permitted to rely on users to possess or secure the necessary rights to the material they upload. That is what YouTube does: every time a video is posted to YouTube, the uploader expressly represents that he or she owns all copyrights in that video or is otherwise authorized to upload it. Levine Opening Decl. ¶ 8 & Ex. 5. Plaintiffs' argument that YouTube is disqualified from the safe

---

[26] That includes many of the publisher-plaintiffs' works in suit. *See, e.g.*, Schapiro Opening Ex. 98 at Response 25; *id.* Ex. 83 at Response 68; *id.* Ex. 103 at Response 33; Schapiro Opp. Ex. 108 (46:22-49:12); *id.* Ex. 109 (101:6-102:6).

harbor because YouTube itself has not affirmatively cleared the rights to every piece of content that users might upload turns the DMCA on its head.

Equally mistaken is class plaintiffs' suggestion that YouTube's direct licensing deals with certain content owners (including a number of music publishers) show that YouTube "knows" it needs a license. Class Br. 7, 11. YouTube negotiates direct license agreements to ensure the availability of particular content from certain rights holders—content that otherwise might not appear on the site at all. Levine Opp. Decl. ¶ 2; *see also* Schapiro Opp. Ex. 110 (90:13-17, 91:2-10, 126:4-10, 234:24-235:8). Those agreements incentivize rights owners to post their material to YouTube or to allow it to remain when posted by others. Levine Opp. Decl. ¶ 2. The absence of such a deal does not suggest that a video is infringing—much less that YouTube has "knowledge" of infringement.

b.     *YouTube does not "ignore" information about publishing rights.*

Class plaintiffs' knowledge argument is particularly off-base in the music-publishing context, given the complexity of those rights and their often fragmented and overlapping nature. Finding accurate and timely information about publishing rights is notoriously difficult. *See Kohn on Music Licensing*, 14-22 (3d ed. 2002).[27] YouTube has no ready access to data identifying who the publishers are for any

---

[27] That is often true even for the publishers themselves, and even about their own works. *See, e.g.*, Schapiro Opp. Ex. 109 (90:24-92:16), Ex. 108 (70:5-22). Even where YouTube has entered into commercial relationships with music publishers (as it has with the four "major" U.S. publishers), YouTube has been unable to fully correlate those publishers' compositions with the videos on the service. Levine Opp. Decl. ¶ 4. Thus, many videos on YouTube likely fall under YouTube's existing music-publishing licenses even though YouTube does not know which they are. *Id.*

given song and often has no way of knowing what composition is incorporated into any particular video that appears on the service. Levine Opp. Decl. ¶¶ 4, 7-8.[28]

Plaintiffs point to YouTube's use of Audible Magic to identify certain music videos (Class Br. 12-13, 27, 33), but they misunderstand how that technology works. Audible Magic identifies sound recordings, not compositions; its database contains "fingerprints of commercially available musical sound recordings received from record companies, majors and independents." Schapiro Opp. Ex. 113 (33:22-24). Audible Magic was not set up to correlate the sound recordings it identifies to music-publisher information.[29] Levine Opp. Decl. ¶ 5. While Audible Magic attempted to identify the sound recordings in some videos, and provide information to YouTube about who owned those sound recordings and what that owner wanted YouTube to do with the matched videos, it did not provide information about the underlying *composition*. *Id.* ¶ 5; King Opp. Decl. ¶ 3. Audible Magic never provided any publisher-ownership information to YouTube, despite requests from YouTube for such information. Levine Opp. Decl. ¶ 5; King Opp. Decl. ¶ 3. As it relates to publishing, therefore, the claim that YouTube's content-identification systems "are sufficient to determine not only that the song is infringing, but also which rights

---

[28] The public databases that plaintiffs refer to (Class Br. 12) are no solution. They include express disclaimers that the information cannot be relied upon. *See, e.g,* Schapiro Opp. Exs. 111, 112; *see also* CCSUF ¶ 24. Even if they were accurate, those databases are impracticable. They are available to the public only for manual, song-title-by-song-title look-ups. And a search for a given title in these databases often yields multiple results—with no way to determine which of the results are related to the actual song in question. *See* Levine Opp. Decl. ¶ 6.

[29] Only recently has Audible Magic attempted to link sound recordings to publisher information, and publisher data still remains unavailable for the majority of music fingerprints in its system. Schapiro Opp. Ex. 113 (208:19-209:7), Ex. 114 (37:2-17).

holder owned or controlled the relevant rights to it" (Class Br. 13) is simply wrong.

*See* YouTube's Counterstatement to Class SUF ("CCSUF") ¶¶ 24, 28, 29.[30]

YouTube does not ignore publisher information when it has it. YouTube promptly removes any video that a publisher identifies (usually in a DMCA notice) as using its composition in an unauthorized manner. Levine Opp. Decl. ¶ 3, 7. That is true no matter how small that publisher's share of the composition and even if all other rights holders have consented to the video's presence. *Id.* ¶ 7. In the absence of such information, however, the publishing status even of videos identified by Audible Magic remains unknown. YouTube generally has no information about who owns the publishing rights that may be associated with such videos, much less whether those publishers have licensed the use of the composition or whether they would even want the video removed. *Id.* ¶ 8. Lack of knowledge does not impose on YouTube a duty to remove a video without a request from a rights holder. Plaintiffs' argument that YouTube must exhaustively research ownership and authorization information for the musical compositions underlying every sound recording found on the service is antithetical to the DMCA's allocation of responsibilities between rights holders and service providers.

The publisher-plaintiffs' argument fails for a more basic reason as well: none of them has offered evidence that any of their clips in suit were actually identified

---

[30] Plaintiffs similarly mischaracterize YouTube's agreement with SESAC. Class Br. 13. Under that agreement, ███████████████████████████████████████ ███████████████████████████████████████████████████████ █████████ Levine Opp. Decl. ¶ 9. ████████████ ███████████████████████████████████████████████████████ *Id.*

to YouTube by Audible Magic and allowed to remain.[31]   Thus, even assuming that YouTube's identification of a sound recording did somehow confer knowledge that the underlying publishing rights are being infringed, plaintiffs have made no showing that the videos actually at issue in this case were ever so identified.

### C.   YouTube Did Not Have Control Coupled With A Financial Benefit Directly Attributable To The Infringing Activity.

Plaintiffs contend that YouTube is ineligible for the safe harbor under Section 512(c)(1)(B) because: (1) YouTube has the right and ability to remove videos and users from its service; (2) YouTube did not take certain additional proactive steps to combat infringement; and (3) unauthorized copyrighted material on YouTube supposedly acts as a "draw" for some users.   Viacom Br. 37-41, 55-60; Class Br. 33-35.   Plaintiffs rely on a stark legal proposition: that any service provider subject to vicarious liability at common law is necessarily excluded from DMCA protection.   Plaintiffs' allegations fail even in the common-law context (*infra* 62-82), but their claim that the DMCA simply codified the common law is wrong.

### 1.   The DMCA's "Control" And "Financial Benefits" Tests Do Not Codify The Common Law Of Vicarious Liability.

The DMCA was enacted on the explicit understanding that some service providers who might be held vicariously liable at common law would nevertheless

---

[31] That showing would be difficult given that many of the publisher-plaintiffs' clips in suit do not contain commercial sound recordings—but instead consist of amateur "covers" or performances, which Audible Magic's technology would not be able to identify in the first place.   Levine Opp. Decl. ¶ 5; *see, e.g.,* Schapiro Opp. Exs. 406A/406B, (amateur band playing "Beer Drinkers and Hell Raisers"), 407A/407B (amateur performance of "Some Enchanted Evening"), 408A/408B (amateur performance of "Soul Bossa Nova"), 409A/409B (amateur performance of "A Fool For Your Stockings").

be protected by the safe harbor. The statute's legislative history makes clear that "Section 512(c) limits the liability of qualifying service providers for claims of direct, *vicarious* and contributory infringement." H.R. Rep. 105-551 (Part II), at 53 (emphasis added); *see also id.* at 50; S. Rep. 105-190, at 20 (same).

In trying to override this unambiguous statement, Viacom relies on legislative history relating to a preliminary version of the bill. Viacom Br. 58 (citing H.R. Rep. 105-551 (Part I), at 26 (May 22, 1998)).[32] But the idea that the DMCA would codify the control element of vicarious liability was not included in the legislative reports describing the law as it was ultimately enacted. In the final statute, Congress decided not to "embark[] upon a wholesale clarification" of vicarious liability, but "instead, to create a series of 'safe harbors'" that would function independently of the common law. S. Rep. 105-190, at 19; *see also* H.R. Rep. 105-551 (Part II), at 49-50. That allows service providers to turn to the DMCA even where their conduct might run afoul of the common law. *See CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004); 17 U.S.C. § 512(*l*).

The court in *UMG II* thus correctly held that "relying on one early House report to adopt the common law standard for 'the right and ability to control' would undermine and contradict the statutory provisions" that Congress actually enacted.

---

[32] The early House Report that Viacom cites actually undermines its argument. That report described the aim of *changing* the common law, not codifying it: "the current criteria for finding contributory or vicarious liability are made clearer and somewhat more difficult to satisfy." H.R. Rep. 105-551 (Part I), at 13 (May 22, 1998); *see also id.* at 25 (describing how the bill "modifies and clarifies the knowledge element of contributory liability and the financial benefit element of vicarious liability").

*UMG II* , 665 F. Supp. 2d at 1116.[33]  Viacom's approach—to argue for the broadest form of vicarious liability, then claim that those standards are engrafted into the DMCA—is precisely what Congress rejected.

2.  As A Matter Of Law, Plaintiffs' Allegations Of "Control" And "Financial Benefit" Cannot Close The Safe Harbor.

Because the DMCA's control and financial-benefit standards do not simply duplicate the common law, their application "requires its own statutory analysis," one guided by the text and structure of Section 512.  *UMG II*, 665 F. Supp. 2d at 1115.  Whatever their common-law merit, plaintiffs' allegations of "control" and "financial benefit" are legally insufficient to deprive YouTube of DMCA protection.

a.  *The ability to remove material is not "control."*

Courts applying Section 512(c) have uniformly held that "the right and ability to control infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to block or remove access to materials posted on its website or stored on its system." *Io*, 586 F. Supp. 2d at 1151; *see also UMG II*, 665 F. Supp. 2d at 1112-13; *Corbis*, 351 F. Supp. 2d at 1110; *Hendrickson*, 165 F. Supp. 2d at 1093-94.  There is an obvious reason for that: the DMCA presupposes

---

[33] Viacom's codification argument (and its reliance on *Neder v. United States*, 527 U.S. 1, 21 (1999)) is premised on the notion that the DMCA simply adopts "common law terminology." Viacom Br. 55, 59. But that is not correct. In *Napster*, the case on which Viacom chiefly relies (*id*. at 38-40), the question was whether "Napster has the right and ability to supervise its users' conduct." *A&M Records, Inc. v. Napster*, 239 F.3d 1004, 1023 (9th Cir. 2001). The DMCA's language is different: it asks whether the service provider has the "right and ability to control" "the infringing activity." § 512(c)(1)(B). The statute's focus on *control* over *the infringing activity* (as opposed to supervision over users' conduct more generally) departs from the expansive common-law formulations that Viacom prefers.

that service providers have the ability to remove or block access to material on their systems (§ 512(c)(1)(A)(iii)) and to terminate abusive users (§ 512(i)(1)(A)). "Congress could not have intended for courts to hold that a service provider loses immunity under the safe harbor provision because it engages in acts that are specifically required by the DMCA." *Hendrickson*, 165 F. Supp. 2d at 1093-94; *see also Io*, 586 F. Supp. 2d at 1151. *Napster*'s suggestion that the "ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise" (239 F.3d at 1023), thus has no place in an application of the DMCA's control test. *See UMG II*, 665 F. Supp. 2d at 1115.

Viacom argues that the DMCA presupposes only the ability to remove allegedly infringing material "<u>in response to takedown notices,</u>" whereas the common law speaks about removing material for any reason. Viacom Br. 57-58. Viacom's premise is wrong; the DMCA requires service providers to remove specific material that they know is infringing, even without a takedown notice. More importantly, the statutory test is whether the service provider has "control" over "the infringing activity." Given that such control cannot come merely from the right and ability to remove *infringing* material, it would make no sense to think that it could come from the right and ability to remove material that is *not* infringing.

      b.      *The DMCA does not require service providers to affirmatively police their users' conduct.*

Again relying on *Napster*, Viacom claims that YouTube is ineligible for the safe harbor based on its supposed "failure to police" the conduct of its users "to the fullest extent" (*Napster*, 239 F.3d at 1023)—whether by doing additional manual

review of videos or implementing a particular filtering system on a particular timetable. Even assuming *arguendo* that service providers seeking to avoid vicarious liability must proactively police their users to stop them from infringing, those affirmative measures are not required by the DMCA. Section 512(m) expressly bars courts from construing the statute "to condition the applicability" of any of the safe harbors on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." *UMG II* thus correctly held that "the availability of superior filtering systems or the ability to search for potentially infringing files" cannot establish the right and ability to control under the DMCA. *UMG II*, 665 F. Supp. 2d at 1113; *see also Io*, 586 F. Supp. 2d at 1154 ("Declining to change business operations is not the same as declining to exercise a right and ability to control infringing activity.").

Viacom complains that *UMG*'s reading of Section 512(m) "is so sweeping that it deprives 'the right and ability' to control of <u>all</u> meaning." Viacom Br. 58. *UMG II* merely applied 512(m) as its plain text requires and held that DMCA protection cannot turn on service providers' willingness to seek facts about possible infringing activity, including by manually reviewing user-submitted material or using fingerprinting technology.[34] The only "tension" between 512(c) and 512(m) comes from Viacom's insistence that the former be read as incorporating the broadest

---

[34] Viacom argues that imposing a filtering requirement is consistent with Section 512(m) because "filtering and blocking uploads before they hit the site is not the same as monitoring users' viewing of videos." Viacom Br. 60 n.23. Even if that were true (which is far from obvious), 512(m) is not limited to "monitoring," but also includes "affirmatively seeking facts indicating infringing activity." Filtering user uploads for possible infringements would clearly be an example of the latter.

reaches of the common law—something that would read the latter out of existence.[35]

Once that faulty premise is rejected, the two provisions work in harmony.

Viacom suggests that Section 512(m)'s title ("Protection of Privacy") limits its application. Viacom Br. 59. But, as explained by the very case that Viacom cites, "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947). Here, "the text of subsection (m) could hardly be more straightforward." *UMG II*, 665 F. Supp. 2d at 1113 n.17. Viacom asserts (without elaboration) that the word "monitor" is ambiguous. It is not, but even if it were, the statute's reference to "affirmatively seeking facts indicating infringing activity" is perfectly clear. That language extends beyond monitoring users' emails or other private communications. *UMG II*, 665 F. Supp. 2d at 1113 n.17 (concluding that Section 512(m) applies "even when privacy is not an issue raised by the parties").

      c.    *Moving from user flagging to reliance on the DMCA is not a failure to "control" infringing activity.*

Plaintiffs next suggest that YouTube's decision to stop "community flagging" for copyright took it outside the safe harbor. Class Br. 31-32; Viacom Br. 32-33. We have already explained the practical problems with user flagging (and refuted the

---

[35] Viacom says that there is no inconsistency between 512(m) and the common law because a committee report suggested that an earlier version of the bill, which included a similar provision, would codify the control element of vicarious liability. Viacom Br. 58. But that report described the provision at issue as limiting only the *knowledge inquiry*, not the control test. H.R. Rep. 105-551 (Part I), at 26. It cannot be inferred, therefore, that the committee saw the language of 512(m) as consistent with the common law of vicarious liability. No limitation on 512(m) appears in the reports relating to the DMCA as it was actually enacted. S. Rep. 105-190, at 44.

baseless claim that YouTube stopped such flagging because it worked "too well").

*See supra* 19-20. As a matter of law, moreover, the absence of copyright flagging

does not disqualify a service provider from DMCA protection.

In moving from community flagging to a notice-and-takedown regime,

YouTube decided to rely on sworn statements from right holders rather than

unverified claims made by random users. C. Hurley Opening Decl. ¶¶ 20-21;

Figueira Decl. Tab 39. That decision to embrace the DMCA cannot be the basis for

stripping YouTube of the safe harbor. *Cf. CCBill*, 488 F.3d at 1112 (DMCA's

requirements for takedown notices are "not superfluous"). Indeed, user flagging is

yet another (particularly ineffective) way of seeking facts indicating potential

infringing activity, which falls within Section 512(m)'s mandate. That is why

plaintiffs' argument was rejected by the only court to have addressed it. *Io*, 586 F.

Supp. 2d at 1150 (holding that Veoh's decision to stop users from flagging videos as

copyrighted did not make it "willfully blind" to infringement).



████████████████████████████████████████

       d.     *The DMCA rejects the "draw" test for financial benefit.*

Turning finally to plaintiffs' "draw" argument, here too the DMCA's text and legislative history cannot be reconciled with the outer reaches of the common law. First, the statutory language diverges from the looser formulations used in some vicarious liability cases. The test applied in *Napster* was whether the defendant "has a direct financial interest in the infringing activity," which the court found could be satisfied "where the availability of infringing material acts as a draw for customers." *Napster*, 239 F.3d at 1023 (internal quotation marks omitted). That standard is more expansive than the DMCA's: whether the service provider "*receive[s]* a financial benefit *directly attributable* to the infringing activity." 17 U.S.C. § 512(c)(1)(B). By using this language, Congress asserted the importance of a direct and demonstrable link between the financial benefit and particular

---

[36] It makes sense that even after it stopped community flagging for copyright, YouTube continued to use that feature for *pornographic* content. Users can identify pornography on sight from a video's content alone (Schapiro Opp. Ex. 116 (195:14-20)), whereas infringement cannot be detected from the video alone and requires knowledge of (among other things) the identity and rights of the uploader (*id*. (195:21-197:3); *id*. Ex. 94 (67:23-68:6, 70:3-10)). A Viacom executive directly involved in monitoring efforts on one of Viacom's own video websites acknowledged the crucial differences between identifying videos that are pornographic and those that are infringing. *See id*. Ex. 117 (199:24-203:8).

infringing activity—even if the common law might be applied in a looser fashion. *Cf.* Nimmer on Copyright § 12.04[A][1], 12-77.

That result is confirmed by the legislative history, which makes clear that Congress wanted to reject the "draw" test, not to codify it. In describing the DMCA's financial-benefit provision, neither the Senate nor the House Report refers to the common-law standard; instead, they indicate that courts "should take a common sense, fact-based approach, not a formalistic one." H.R. Rep. 105-551 (Part II), at 54; S. Rep. 105-190, at 44. The reports set out Congress' expectation of what would, and would not, constitute a financial benefit under Section 512(c):

> In general, a service provider conducting a legitimate business would not be considered to receive a "financial benefit directly attributable to the infringing activity" *where the infringer makes the same kind of payment as non-infringing users of the provider's service*. Thus, receiving a one-time set-up fee and flat, periodic payments for service from a person engaging in infringing activities would not constitute receiving a "financial benefit directly attributable to the infringing activity." Nor is subsection (c)(1)(B) intended to cover fees based on the length of the message (e.g., per number of bytes) or by connect time. It would however, include any such fees where the value of the service lies in providing access to infringing material.

H.R. Rep. 105-551 (Part II), at 54; S. Rep. 105-190, at 44-45 (emphases added).

The outcomes that Congress endorsed cannot be squared with the vicarious liability cases on which plaintiffs rely. In *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996), the court allowed a vicarious liability claim to proceed against a swap meet owner who rented booths at which vendors sold infringing items—despite the fact that infringing vendors and customers made the same kind of payment as did non-infringers. Whatever the merits of this approach at common law (*see infra* 80-82), it is wrong under the DMCA. Nor does an expansive "draw"

test fit with the other examples given in the legislative history. Fees based on "connect time" could be condemned under that test (after all, the more time an infringer spends on a site, the more money a service provider charging connect-time fees would make). Yet the reports make clear that such fees are not a "financial benefit directly attributable to the infringing activity."[37]

Plaintiffs' attempt to override this legislative history would treat as a potentially disqualifying financial benefit virtually any revenue model that a legitimate service provider might use. That would include subscription payments, fees-for-service, or—as in the case of YouTube and most other service providers—advertising. That approach is contrary to the statute's text and would undermine its purpose. Under the proper test, YouTube's advertising practices provide a legitimate revenue model that does not run afoul of the DMCA. YouTube Br. 71-78.

\* \* \*

For the reasons given above, and those given in YouTube's moving papers (YouTube Br. 21-78), plaintiffs' motions should be denied, and YouTube is entitled to summary judgment that it qualifies for the Section 512(c) safe harbor. Because the DMCA protects against all claims of "direct, vicarious and contributory infringement" (H.R. Rep. 105-551 (Part II), at 50), if the Court grants YouTube's motion, it need not address plaintiffs' underlying infringement allegations. But

---

[37] Accordingly, the Ninth Circuit erred when it suggested, without briefing or analysis, that the DMCA's financial benefit test simply tracks the common law. (*CCBill*, 488 F.3d at 1117). *See* YouTube Br. 72-73. The court's statement was unnecessary to its conclusion that the plaintiff had not "raised a genuine issue of material fact that [defendant] receives a direct financial benefit from infringing activity." *CCBill*, 488 F.3d at 1118.

even without regard to the DMCA, Viacom's claims of direct infringement, vicarious liability, and inducement lack merit.

## III.    YOUTUBE IS NOT LIABLE FOR DIRECT INFRINGEMENT.

Viacom seeks summary judgment that YouTube is a direct infringer based on the activities of its users and the automated functions of its systems. But the law is settled: service providers like YouTube do not engage in the "volitional acts" necessary for direct infringement by employing computer processes that respond automatically to user requests.

### A.    Direct Infringement Requires Volitional Conduct.

Under Second Circuit precedent, website operators are not liable for direct infringement based on automated processes that their computer systems take in response to the actions of their users. *Cartoon Network LP, LLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008). That is true even if those processes result in the reproduction, display, or distribution of copyrighted material.

The "volitional conduct" doctrine was first recognized in *Netcom*, a case involving an online bulletin board. The court held that direct infringement requires "some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." *Netcom*, 907 F. Supp. at 1369 (citations omitted). *Netcom* shielded service providers from liability for "automatic" acts of their computer systems in response to user requests, including the copying of user-submitted material to computers, the display of that material to users who requested it, and the distribution of that material to users for downloading. *Id.* at 1365 & n. 4, 1368, 1369 & n.11, 1372, 1381-82.

The Second Circuit, along with every other circuit to address this issue, has agreed with *Netcom*. *Cartoon Network*, 536 F.3d at 130-33 (2d Cir. 2008); *see also CoStar*, 373 F.3d at 555; *Parker v. Google, Inc.*, 242 Fed. App. 833, 836 (3d Cir. 2007).[38]  To face liability for direct infringement, therefore, a defendant must itself engage in "the volitional conduct that causes the copy to be made." *Cartoon Network*, 536 F.3d at 131.  Such conduct does not occur by virtue of a user "issuing a command directly to a system, which automatically obeys commands." *Id.* at 131.  Nor can it arise from the defendant's "conduct in designing, housing, and maintaining a system that exists only to produce a copy"—instead, the direct infringer is "the person who actually presses the button to make the recording." *Id.*

*Cartoon Network* followed the Fourth Circuit's ruling in *CoStar*, which held that a website operator "who owns an electronic facility that responds automatically to users' input is not a direct infringer." *CoStar*, 373 F.3d at 550.  That case involved a website that allows users to post photographs of real estate.  As with YouTube, "the materials posted are of a type and kind selected by the subscriber and at a time initiated by the subscriber." *Id.* at 555.  The court concluded that such a website "should not be found liable as a direct infringer when its facility is used by a subscriber to violate copyright without intervening conduct of the ISP." *Id.* at 550.  These cases squarely apply here.

---

[38] *See also Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006); *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 186 n.3 (D.D.C. 2005); *Marobie-FL, Inc. v. National Ass'n of Fire Equipment Distribs.*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997).

### B.    YouTube Has Engaged In No Relevant Volitional Conduct.

Like the defendants in *Netcom*, *Cartoon Network*, and *CoStar*, YouTube operates an electronic facility that responds automatically to users' input.  It is undisputed that YouTube's users, not YouTube itself, select the videos that are uploaded and appear on YouTube.  Viacom Br. 41; Solomon Opening Decl. ¶¶ 2-4. Those users' decisions, rather than any volitional conduct on YouTube's part, are what cause copies of videos to be made and stored on YouTube's system.

### 1.    YouTube's Processes For Storing, Formatting, And Displaying User-Submitted Videos Are Automated And Non-Volitional.

By pressing the "upload" button, a YouTube user sets in motion various automated computer processes: (1) the storage of a copy of the user's uploaded video; (2) the automatic reformatting (or "transcoding") of the user's video file into other standard formats, including Flash; and (3) the posting of the user's video so that viewers around the globe can view it by visiting YouTube.com, or by using mobile phones or other devices capable of accessing videos stored on YouTube's system.  YouTube Br. 27-28; Solomon Opening Decl. ¶¶ 2-8.  Similar user requests to watch videos on YouTube's system cause YouTube's automated systems to "stream" the requested video to the specific individual seeking to view it, sometimes using a so-called "content delivery network" ("CDN").  Solomon Opening Decl. ¶¶ 9-10; Solomon Opp. Decl. ¶¶ 4-5; Gordon Opp. Decl. ¶¶ 12-21.  Under the case law described above, YouTube is not liable for direct infringement simply because its systems convert videos into various formats and stream them back to users when they request them.  Viacom Br. 41-43.

Viacom also refers to YouTube's use of a CDN in connection with the playback of videos.  Viacom Br. 42.  But a CDN is simply an automated file-serving infrastructure that helps YouTube respond to the requests of a large number of users all over the world.  Solomon Opp. Decl. ¶ 5.  Using an algorithmic formula, YouTube's system determines that certain streams are more efficiently handled from a CDN than from YouTube's regular servers.  *Id.*  That process lessens the burden on YouTube video servers and enhances the user's experience by speeding playback.  *Id.*  Streaming videos via a CDN involves no more "volitional" conduct than does any other form of video playback.[39]

Nor does it matter whether users elect to watch a video on a personal computer or on a mobile device, such as an iPhone.  In both cases, the playback request is initiated by the user, and YouTube's system responds automatically to that request.  Solomon Opp. Decl. ¶ 3.  That YouTube's system makes it possible for users to request such playback on various devices by encoding user-uploaded videos into different file formats is not the kind of "volitional" conduct that can support an infringement claim.  YouTube's adoption of those encoding formats merely facilitates the intent that users express in uploading their videos in the first place— to make them viewable by others.  Solomon Opening Decl. ¶ 7; Solomon Opp. Decl. ¶ 3; Schapiro Opp. Ex. 120.  YouTube does not actively distribute videos to the third parties (like Apple) on whose devices YouTube users can view videos.  Instead,

---

[39] Using a CDN is a standard Internet practice, including on Viacom's own video-hosting sites, which use the same CDN that YouTube used.  Schapiro Opp. Ex. 118 (9:3-11), Ex. 119; M. Gordon Decl. ¶¶ 2-7; Schapiro Opp. Decl. Exs. 414, 415 (video attesting to Viacom's reliance on CDNs for its own websites).

using what are known as "application protocol interfaces" ("APIs"), these third parties' computer platforms access videos on YouTube automatically, just like a user's Internet browser does. Solomon Opp. Decl. ¶ 3.[40]

In short, YouTube's core operations, including its processes for copying, storing, and formatting videos, as well as making them available for viewing, are computer functions that occur automatically in response to user requests. Solomon Opp. Decl. ¶¶ 2-8. The volitional conduct that causes the infringing activity alleged in this case is attributable to YouTube's users, not to YouTube itself. YouTube cannot be held liable for direct infringement based on the actions of those users.[41]

    2.    <u>Liability For Direct Infringement Cannot Rest On Functions Unrelated To Plaintiffs' Actual Infringement Claims</u>.

Viacom tries to avoid the result compelled by *Cartoon Network* by alluding to several of YouTube's other operations, which are tangential to the upload and playback functions. Those include: (i) YouTube's search functionality; (ii) YouTube's system for automatically populating lists of "most viewed" and "most favorited" videos; (iii) the system that shows thumbnails on YouTube's homepage of a random

---

[40] It is neither true nor legally relevant that YouTube "distributes a complete copy" of a video to a user's computer in response to a playback request. Viacom Br. 42. While some users' Internet browsers may be configured to temporarily save (or "cache") the most recently viewed content they view on the Internet, including the videos they choose to watch on YouTube or any other website, that does not mean that YouTube "distributes" durable copies of the video its users post. Solomon Opp. Decl. ¶ 4. This so-called "local browser caching" has nothing to do with YouTube's system; it is merely an incident of how the Internet and browser software works. *See Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828, 853 n.17 (C.D. Cal. 2006) (explaining local browser caching and holding that it is a fair use).

[41] Viacom tries to distinguish *Cartoon Network* by claiming that YouTube is liable for intentionally inducing infringement. Viacom Br. 45-46. That argument fails for the same reason that Viacom's inducement claim fails. *See infra* 82-99.

selection of videos that users are watching "now"; and (iv) the functionality that presents users with a list of thumbnails associated with "related videos" when the user chooses to watch a video on YouTube. Viacom Br. 42-44.

These functions cannot make YouTube liable as a direct infringer because none of them results in activity that implicates Viacom's exclusive rights under Section 106 of the Copyright Act. Solomon Opp. Decl. ¶¶ 6-8 (discussing the operation of these functions). Indeed, Viacom has made no showing that any of its actual clips in suit were ever subject to those functions. But even if these auxiliary functions were somehow implicated in the copying, display, distribution, or performance of Viacom's clips in suit, they too occur based on the automatic operation of YouTube's computer systems in response to user input, without the active involvement of YouTube employees. *Id.*; Schapiro Opp. Ex. 121 (111:24-114:24); Ex. 122 (118:3-124:25, 126:1-130:25). None of them involves the kind of volitional conduct on YouTube's part required for direct infringement.

The fact that YouTube employees have at times "featured" certain videos on YouTube's homepage is equally irrelevant. In its Statement of Undisputed Facts, Viacom points to the only two clips in suit that were ever "featured." VSUF ¶ 332. But these clips were unquestionably *authorized* to be on YouTube at the time that YouTube featured them and thus were not infringed at all. *See* CVSUF ¶ 332. That YouTube might have engaged in volitional conduct with respect to certain (authorized) videos does not allow Viacom to assert direct-infringement claims as to other videos that were never subject to such conduct.

Finally, Viacom claims that YouTube concedes that it directly infringes by seeking assurances from users that they hold the rights to the videos they upload and by negotiating partnerships with various content owners. Viacom Br. 44. YouTube's good-faith efforts to ensure that particular content will appear (and remain) on the site is not an admission that it would otherwise be infringing. Levine Opp. Decl. ¶ 2; Maxcy Opening Decl. ¶¶ 1-2, 9-10. *Cf. CoStar*, 373 F.3d at 556 (holding that a "perfunctory gatekeeping process, which furthers the goals of the Copyright Act," does not create direct-infringement liability).[42]

## IV.     YOUTUBE IS NOT LIABLE FOR VICARIOUS INFRINGEMENT.

The doctrine of vicarious liability "allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer." *Grokster*, 545 U.S. at 930 n.9. It is an application of *respondeat superior* principles, which may be imposed "[w]hen the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials." *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963); *see also Aimster*, 334 F.3d at 654 (vicarious liability requires that the defendant have a "relationship to the direct infringer that is analogous to the relation of a principal to an agent"). While the Court need not

---

[42] Viacom's assertion that YouTube "know[s] the purported 'licenses' they obtain from uploading users are shams" (Viacom Br. 44) is unsupported and ironic, given that the licenses Viacom obtains from users of its own websites are virtually identical. Schapiro Opp. Ex. 123, Ex. 124 (57:3-10). So too were those received by Veoh. *UMG I*, 620 F. Supp. 2d at 1084. And, of course, Viacom and its agents have used YouTube's standard upload process to genuinely license numerous videos to YouTube. Rubin Opening Decl. ¶¶ 2-3, 18.

reach the issue because YouTube is protected by the DMCA (*see supra* 46-56),

Viacom is not entitled to summary judgment on its vicarious-liability claim.

### A.      YouTube Did Not Have The Ability To Effectively Supervise The Activities of Its Users.

Viacom claims that the test for the "right and ability to supervise" is supplied

by the Ninth Circuit's decision in *Napster*, 239 F.3d at 1023, which suggested in the

peer-to-peer context that the "ability to block infringers' access to a particular

environment for any reason whatsoever is evidence of the right to supervise."

Viacom Br. 39-40. But *Napster*'s expansive approach has not been followed by the

Second Circuit, and as Viacom itself acknowledges, more recent cases in the Ninth

Circuit have emphasized that the defendant must have failed to exercise the

"practical ability" to "stop or limit the directly infringing conduct." *Perfect 10, Inc.

v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007). That is particularly true

in a case like this. "Napster existed solely to provide the site and facilities for

copyright infringement," such that "its control over its system was directly

intertwined with its ability to control infringing activity." *Io*, 586 F. Supp. 2d at

1153. Where that is not true, as here, the practical ability to limit infringement

cannot be found based on a service provider's ability to control its system. *Id.*

Viacom's argument is premised on the allegation that YouTube "always had

the <u>practical ability</u> to prevent a large amount of the blatant copyright infringement

on the site – if it wanted to." Viacom Br. 32. Viacom points to various forms of

human review as well as to digital fingerprinting. *Id.* at 32-37, 40-41. Viacom's

discussion amounts to a series of misstatements about what YouTube did (or did not

do).  Viacom's widespread and often covert authorization of content to appear on YouTube defeats any claim that YouTube had the practical ability to use human review to prevent the infringement that Viacom now alleges.  And Viacom ignores YouTube's industry-leading fingerprinting efforts, telling a made-for-litigation story about "high-tech extortion" that is contradicted by the record.

    1.    <u>The Availability Of Various Forms Of Human Review Does Not Constitute The Practical Ability To Prevent Infringement</u>.

Viacom's discussion of human review begins with its claim that YouTube had the ability to prevent infringement by simply pre-screening all videos posted on the service.  Viacom Br. 32.  But that is not a practical solution, not least because it ignores the sheer scale at which YouTube operates.  YouTube Br. 62-63.  As one of Viacom's own agents testified, on "a big website such as YouTube's . . . the volume would preclude any process that involves a manual review of videos."  Schapiro Opening Ex. 132; *see also* Schapiro Opening Ex. 133.  As with Veoh (a service far smaller than YouTube), "no reasonable juror could conclude that a comprehensive review of every file would be feasible."  *Io*, 586 F. Supp. 2d at 1153.

Viacom's suggestion is also flawed because it incorrectly assumes that human reviewers would be able to effectively distinguish infringing from non-infringing content.  Determining whether a video is infringing is not just a matter of looking at the video; it requires background knowledge about who uploaded it, the copyright status of the material in the video, who owns the relevant copyright(s), whether one of the copyright owners authorized the use of the content, and whether that use is fair or otherwise permitted by law.  *See* YouTube Br. 35, 37-55, 63-70.  And,

particularly given the widespread practice of content owners authorizing their material to be on YouTube in ways that are not fully transparent, human reviewers employed by YouTube are not in a position to reliably determine what videos are properly posted on YouTube and which may not be. That uncertainty defeats plaintiffs' facile claim that such reviewers would have the practical ability to control the infringements alleged here.[43]

Similar problems doom keyword searching and community flagging. To administer a comprehensive keyword-searching program, YouTube would have to know what content to search for. The range of potential searches for the innumerable copyrights in existence (not only those associated with large media companies, but also the copyrights that inhere in nearly any amateur video) is limitless. It would include virtually every television show, movie, song, and sporting event in the world, but it would not stop there. YouTube then would have to determine which keywords are likely to find relevant videos. The wide-ranging list of keywords that the plaintiffs in this case have said are linked to their narrow slice of content—terms such as "bar-b-q," "blake," "bus chase," "chevrolet," "federer," "gary, "gaz," "liverpool," "money," "nestor," "smile," "stages," "subways," and "williams," among others—illustrates just how hopeless those tasks would be.

---

[43] As described above, YouTube used various forms of human review throughout 2006, but found that its own uninformed guesswork frequently led to the removal of videos that content owners wanted on the site. *See supra* 33 n.15. Viacom's own experience using human review confirms these problems. Viacom's agent BayTSP requested the removal of numerous videos that Viacom itself had uploaded (or that it did not own at all), and it had to keep in constant contact with Viacom to try to avoid mix-ups. YouTube Br. 64-68.

Schapiro Opp. Ex. 125. And even if those obstacles could somehow be overcome, those reviewing the results of the searches still would not be in a position to determine which videos were or were not authorized to be on YouTube.

Viacom also suggests that YouTube could have instituted some kind of "automated" keyword filter to ensure that certain videos were never uploaded to the site at all. Viacom Br. 33-34. Viacom apparently thinks that YouTube should take words associated with its programs and block all uploads containing those words. Even putting aside the problems with keyword filtering discussed above, that is an unworkable proposal, which would be both wildly over- and under-inclusive, as BayTSP's experience again confirms. As BayTSP explained: "Keyword enforcement is something we as a company would never employ because it would create a series of false positives." Schapiro Opp. Ex. 126 (149:15-21). BayTSP told Viacom that more than 80% of the videos found using keyword searches targeted for a given show would not actually contain content from the show. *Id.* Ex. 127, Ex. 126 (147:3-148:15).[44] Instituting a keyword filter thus would block countless videos that are not infringing, including commentaries, parodies, authorized promotional clips, or videos that have nothing to do with the content at issue. *See, e.g.,* Schapiro Opp. Ex. 131 (254:21-25). Viacom has no right to insist that YouTube take such a step.

---

[44] In practice, the number of false positives that BayTSP found using keyword searches was even higher. For example, in January 2007, when it searched YouTube for the term "Colbert," BayTSP found 400 videos, only 44 of which were determined to actually contain content from *The Colbert Report*. Schapiro Opp. Ex. 128; *see also id.* Ex. 129 (only one of 346 videos returned in response to search looking for clips from *The Daily Show* determined to match), Ex. 130 (cumulative statistics on BayTSP keyword searches for various Viacom various programs).

Rather than confront these problems, Viacom makes a series of irrelevant and inaccurate claims. It speculates that YouTube "almost implemented an automated search tool, but abandoned it precisely because it would be effective." Viacom Br. 34; *see also* Class Br. 16. That assertion is false and unsupported by the document plaintiffs cite (a March 2006 "chat" between two employees). *See* CVSUF ¶¶ 112-15. By March 2006, YouTube had already launched features that operated in the same way as the one discussed in the chat and were freely available to content owners. B. Hurley Opp. Decl. ¶¶ 2-3. Far from "abandoning" or "killing" the idea (Viacom Br. 26-27), YouTube later adopted it. B. Hurley Opp. Decl. ¶ 4.[45] Viacom also asserts that YouTube "deliberately decided not to remove even 'blatantly' or 'obviously' infringing videos." Viacom Br. at 32, 33, 40. That accusation is also untrue and unsupported. Many of the documents that Viacom does cite (to say nothing of all the evidence it ignores) show precisely the opposite. *See* VSUF ¶¶ 43, 45; CVSUF ¶¶ 31, 54-58; *see supra* 8-12.

Viacom's suggestions for how YouTube should have used human review suffer from "imprecision and overbreadth," and thus cannot be the basis for a finding that YouTube is subject to vicarious liability. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1174 (9th Cir. 2007).

---

[45] In any event, the feature at issue is a minor one; it allows users to set up keyword searches and receive alerts when videos with tags matching those keywords were uploaded. B. Hurley Opp. Decl. ¶¶ 5-6. That duplicated the features that were already available. *Id.* ¶ 5. The feature certainly did not have the ability to send automated alerts "when illegal content was uploaded" (Viacom Br. 11) or to "identify likely infringing content" (Class Br. 16). B. Hurley Opp. Decl. ¶ 6.

2.   Plaintiffs' Selective-Fingerprinting Allegations Are Baseless.

The final piece of plaintiffs' "supervision" argument is the allegation that YouTube "refused' to use digital-fingerprinting technology "for a content owner to prevent theft of its intellectual property <u>unless</u> the owner agreed to grant YouTube a content partnership license." Viacom Br. 36; *see also id*. at 2, 18-19, 34-37, 40, 60; Class Br. 19-20. These allegations are totally unfounded. Witness after witness confirmed that plaintiffs' selective-fingerprinting story is not true. *See* Schapiro Opp. Ex. 132 (46:4-11, 83:5-85:9), Ex. 133 (51:14-53:3).[46] Plaintiffs nevertheless offer several variations on this theme, all of which ignore the record.

a.   *YouTube never withheld Audible Magic's technology based on a copyright owner's unwillingness to license content.*

Viacom does not contend that YouTube conditioned the availability of its homegrown video-fingerprinting technology ("Content ID") on a content-licensing deal. Nor could it. *See infra* 78-80. Viacom focuses primarily on Audible Magic (Viacom Br. 34-36), but even in that limited context, its allegations are unfounded.

Viacom ignores important facts about Audible Magic. During YouTube's first years of operation, Audible Magic's application was to identify sound recordings on "peer-to-peer networks" (in which users exchange audio files); it was not to identify

---

[46] *See also* Schapiro Opp. Ex. 134 (140:20-142:25) (CEO of Google describing decision that fingerprinting tools "would be available to media companies independent of whether they did a deal with us"), Ex. 83 (268:10-14) (CEO of YouTube testifying that "[w]e want to make our tools available generally to anyone. They don't need to enter a licensing agreement because of it"), Ex. 110 (171:22-172:19) ("it was always the policy that this suite of tools should be made available to anyone who wanted to use them, whether they were licensing content to YouTube or not").

television or movie content that might be uploaded to video hosting websites like YouTube. *See* Hohengarten Ex. 359 ¶¶ 11-13, 19, 21. When YouTube licensed Audible Magic's technology in October 2006 (Hohengarten Ex. 141), *it was the very first user-generated-content website to have done so.* Schapiro Opp. Ex. 113 (12:16-13:12, 225:5-226:2). At that time, although Audible Magic had millions of fingerprints from sound recordings in its system, it did not have a single television show or movie. *Id.* Ex. 135, Ex. 136 (95:16-20); King Opening Decl. ¶ 6.[47] Audible Magic was not a tool that Viacom was using to protect its content. Viacom had no contact with Audible Magic until December 2006—when *YouTube* introduced the two companies. Schapiro Opp. Ex. 136 (111:22-112:3), Ex. 139); *see also id.* Ex. 136 (98:6-9). The suggestion that YouTube could have flipped a switch and started using Audible Magic to locate Viacom content is a fantasy.

In the spring of 2006, at the suggestion of some of the record labels, YouTube investigated whether Audible Magic might be able to help identify sound recordings in videos posted on YouTube. Maxcy Opp. Decl. ¶ 2; Schapiro Opp. Ex. 140. YouTube tested Audible Magic's technology and ultimately signed an agreement to start using it. Maxcy Opp. Decl. ¶ 3; Schapiro Opp. Ex. 141. YouTube then set out to incorporate Audible Magic into its new Claim Your Content ("CYC") system. Maxcy Opp. Decl. ¶ 4. Doing so was technologically complicated, and during the initial set-up and testing phase, YouTube worked with its record-label partners to

---

[47] The fact that Audible Magic was unproven in identifying television and movie content on video websites in late 2006 and early 2007 is driven home by the fact that the MPAA was trying to organize a *test* of Audible Magic to see how it might perform at that task. VSUF ¶¶ 227-28, Schapiro Opp. Exs. 137, 138.

make sure that the unproven Audible Magic technology would work and be able to handle the load it would face. *Id*. ¶¶ 5-6; Schapiro Opp. Ex. 132 (83:7-14).

Once the technology was up and running, YouTube made it broadly available to copyright owners, with no requirement of a partnership deal. Maxcy Opp. Decl. ¶ 7; Schapiro Opp. Ex. 132 (79:5-11, 83:5-16, 85:1-9); King Opening Decl. ¶ 9.[48] There is no truth to plaintiffs' assertion that YouTube "only used Audible Magic's reference databases to identify content on behalf of content owners from whom YouTube obtained licenses to exploit their work." Class Br. 19-20. Many content owners used Audible Magic solely to block content on YouTube without any content-partnership. Schapiro Opp. Ex. 133 (51:14-53:10, 183:20-185:3, 186:8-17), Ex. 132 (49:14-50:18, 83:5-16); King Opening Decl. ¶ 10. Whatever internal debates YouTube may have had about how best to roll out Audible Magic, YouTube *never* relied on a copyright holder's unwillingness to license content as a basis for refusing access to filtering technology. Maxcy Opp. Decl. ¶ 7.

Plaintiffs cannot point to a single written communication from YouTube to any content owner evidencing YouTube's supposed unwillingness to make Audible Magic available in the absence of a licensing deal.[49] The only document that

---

[48] The fact that YouTube offered Audible Magic to several content owners in the context of negotiated partnership agreements (Viacom Br. 35-36) is neither surprising nor nefarious. The inclusion of a term about audio fingerprinting in such an agreement in no way suggests that fingerprinting was unavailable in the absence of such a partnership.

[49] Class plaintiffs rely on an unauthenticated email fragment that a Google employee apparently sent to himself. Class Br. 20 (citing Figueira Decl. Tab 13). The email was not sent to anyone outside of YouTube and, in any event, was not an accurate statement of YouTube's policy. *See* CCSUF ¶ 29.

Viacom cites to support its allegation that YouTube "rejected cooperation and refused to use fingerprinting technologies for Viacom" is a February 17, 2007 letter from Google's General Counsel Kent Walker to Viacom's General Counsel Michael Fricklas.  Viacom Br. 18-19 (citing VSUF ¶ 217); *see also id.* at 36-37.  But the letter says the opposite.  Mr. Walker explained that YouTube was working on audio fingerprinting with a few record labels and described the "unique challenges" of using audio fingerprinting to identify television content like Viacom's.  Mr. Walker closed by saying that YouTube was "continuing to evaluate" its fingerprinting tools and was "open to discussing [Viacom's] possible participation in those tests."  Schapiro Opp. Ex. 142.  That is not a rejection of cooperation; it is an invitation.

The concerns described in Mr. Walker's letter were real.  Based on its experience, YouTube had concluded that Audible Magic had significant limits in reliably matching against things like television shows and movies.  King Opening Decl. ¶¶ 11-12; Schapiro Opp. Ex. 133 (132:19-134:11) (describing the problems).  Viacom's own monitoring agent BayTSP had come to the same conclusion about Audible Magic, and repeatedly told Viacom so.[50]  But YouTube certainly did not ignore filtering solutions aimed at audiovisual content.  To the contrary, YouTube had already started building its own video-fingerprinting technology, one specifically designed to identify television and movie content.  *Id.* (122:12-20, 138:15-19); King Opening Decl. ¶¶ 13-14.  YouTube decided to build that technology

---

[50] *See* Schapiro Opp. Ex. 143 (Oct. 2006 email: "We have not found [Audible Magic] to be very effective in video content recognition"), Ex. 144 (Nov. 2006 report: "Utilizing this technology on non music content ex: television or movies has not produced an acceptable level of results").

precisely because it believed that it would offer a better, more sophisticated tool for helping rights holders find and manage such content. *Id.* ¶ 13; Schapiro Opp. Ex. 133 (141:9-22, 143:4-10).[51]

There is yet another problem with Viacom's story. Audible Magic can only identify content for which it has a reference fingerprint. King Opening Decl. ¶ 5; Schapiro Opp. Ex. 146 (215:20-216:4). Viacom did not even *start* providing fingerprints to Audible Magic until April 2007. Schapiro Opp. Ex. 136 (110:7-13), Ex. 147 (50:3-12). Before then, Audible Magic would not have been able to locate Viacom content on YouTube (or any other website). *Id.* Ex. 147 (50:23-51:25), Ex. 146 (220:22-221:6).[52] Thus, during the period when YouTube was supposedly "refusing" to use Audible Magic to "stem the infringement of Viacom's copyrights" (Viacom Br. 36), Viacom had failed to take the basic step of getting its content into Audible Magic's system.[53]

---

[51] During the few months after YouTube started using Audible Magic but before Content ID launched, YouTube did not refuse to make filtering available to Viacom. The parties were in frequent contact, and Viacom appeared more interested in the advanced video-based technology that YouTube was building than the more limited Audible Magic system. Schapiro Opp. Ex. 133 (59:3-21), Ex. 145 (66:1-71:22), Ex. 146 (222:14-223:16).

[52] Even when Paramount first gave content to Audible Magic in May 2007, it did so solely as an "initial test." Schapiro Opp. Ex. 148, Ex. 147 (53:4-20). After that test, Paramount never provided any additional content to Audible Magic. *Id.* (54:22-55:4); *see also id.* Ex. 146 (223:6-16, 224:13-225:8) (explaining that Paramount never "made a systematic attempt to use or move towards using, with Paramount content . . . an actual in-place process with Audible Magic," in part because Audible Magic "didn't necessarily stand out at a technology level").

[53] Viacom does not point to any evidence that, once it finally provided fingerprints to Audible Magic, it informed YouTube or asked YouTube to use Audible Magic to scan for Viacom content. *Cf.* Schapiro Opp. Ex. 146 (227:23-228:13) (Paramount CTO unaware of Paramount ever asking YouTube to use Audible Magic).

Viacom's story—that YouTube was running a "high-tech extortion" scheme using Audible Magic, while *at the same time* devoting enormous engineering resources to building a more advanced video-based filtering technology, which would be made available to *all* copyright holders—makes no sense. That would be the silliest protection racket imaginable. The undisputed evidence shows that YouTube went to extraordinary lengths to develop and deploy fingerprinting tools for the benefit of all rights holders. YouTube's efforts are the antithesis of what a "pirate" site would do.

> b. *YouTube did not refuse to cooperate with the MPAA.*

Viacom also claims that YouTube "rebuffed" efforts by the Motion Picture Association of America ("MPAA") to test Audible Magic. Viacom Br. 19-20, 27, 36. While not legally relevant, Viacom's allegations are demonstrably false.

In April 2006, shortly after telling the press that "YouTube has been a good corporate citizen and taken off copyrighted material" (Schapiro Opp. Ex. 149), the MPAA reached out to YouTube to discuss copyright protection. Schapiro Exs. 150, 420, 152. Over the following months, the companies engaged in friendly discussions. *See, e.g.*, *Id.* Exs. 151,153, 154, 155.

In September 2006, YouTube reached out to the MPAA "to take you up on your offer to do some testing for your members." *Id.* Ex. 156 (MPAA012776). Dean Garfield of the MPAA then sent YouTube a proposal for a test to see whether Audible Magic could be used to identify video content. *Id.* Ex.157. YouTube thanked the MPAA "for working with us on a pilot test" and explained the steps it was taking to help copyright owners. *Id.* Ex.158. Garfield told YouTube "[t]he

system you are developing sounds very strong." *Id.* Ex. 425. After further

conversations, the MPAA sent a revised testing proposal. *Id.* The parties continued

productive discussions in late 2006 and January 2007. *Id.* Exs.160, 161.

Ignoring this extensive documentary record and citing only Garfield's

deposition testimony, Viacom now claims that in January 2007, YouTube "flatly

rejected cooperation or filtering to prevent piracy unless the studios granted

Defendants licenses and revenue sharing agreements." Viacom Br. 20.[54] That

allegation is contradicted by Garfield's own correspondence. On January 31, 2007,

Garfield wrote to Viacom's General Counsel Michael Fricklas:

> We recently contacted YouTube to pick up our file-removal and
> filtering discussion where we left off last year. YouTube's position has
> not changed. ***They are willing to move forward with a pilot*** that
> would involve YouTube using a list of 1,000 titles to (a) remove any
> content that we identify as being unlicensed, and (b) using the hash
> from those titles to create a "blacklist" of files that will not be
> permitted onto the system in the future.
>
> In addition to removing motion picture and television shows
> based on a title list and then blacklisting those files, ***YouTube is
> willing to prevent the posting of content that is registered with
> Audible Magic***. YouTube has an agreement with Audible Magic.
> Thus, the extent your content is registered with Audible Magic,
> YouTube will include those registered fingerprints in a directory that
> is checked before any materials are posted.

---

[54] In deposition, Garfield claimed that someone at YouTube told him that YouTube
would not cooperate because "copyrighted content on YouTube was a major lure for
their users." Viacom Br. 19. That testimony is entitled to no weight. *See*
Defendants' Motion to Strike III.H; CVSUF ¶ 226. Garfield could not say *when* the
comment was made, *who* made it, or even whether that person was male or female.
Schapiro Opp. Ex. 162 (122:25-126:20, 128:3-9). And the supposed statement, which
is not documented, is at odds with the written record that does exist. Garfield's
testimony is not corroborated by the unrelated Google Video document that Viacom
cites. Hohengarten Ex. 45; CVSUF ¶ 141.

Schapiro Opp. Ex. 163 (emphases added). ████████████████████

████████████████████████████████████████████████████

████████████████████████████ *Id.* This document confirms that

Viacom's claim that YouTube refused to cooperate with the MPAA is untrue.[55]

    c.    *Class plaintiffs' claims about filtering are untrue and irrelevant.*

In addition to suffering from all the problems described above, putative class plaintiffs' version of the "selective fingerprinting" story faces an additional obstacle. They contend that YouTube "had access to Audible [sic] huge database of reference files that could identify the content owner of the video being uploaded" (Class Opp. 19), but the class plaintiffs offer no evidence that Audible Magic would have been able to find any material on YouTube that actually belonged to them.

In fact, most of the class plaintiffs never used Audible Magic's technology, and no fingerprints associated with those plaintiffs' copyrighted works were ever in Audible Magic's databases.[56] There is no evidence that Audible Magic ever had in its system *any* information about publishing rights owned by any of the publisher-plaintiffs (or, if it did, when that information became available). That complete failure of proof is fatal to plaintiffs' "selective fingerprinting" argument. No matter

---

[55] Later that year, YouTube gave the MPAA an early crack at testing its new video-fingerprinting technology. The MPAA's praise was effusive: "Imagine the temperature of the Sun. Google results are hotter." Schapiro Ex. 164.

[56] *See* Schapiro Opp. Exs. 165 (230:8-231:22) (Premier League), 166 (106:13-22) (FFT), 167 (352:12-18) (Cherry Lane), 168 (52:5-11) (Carlin), 169 (92:24-293:6) (Music Force), 170 (77:24-78:5) (Dec. 18, 2009), 108 (227:12-15) (Cal IV); 171 (153:9-154:13) (Stage 3), 172 (248:18-249:10).

how YouTube used Audible Magic's technology, Audible Magic could not have identified a single video as containing material owned by any of the class plaintiffs.

Class plaintiffs also make a few half-hearted attacks on YouTube's Content ID tool. Class Br. 20-21. *First*, they suggest that YouTube developed its own fingerprinting technology "to create a product to license to third parties." That is untrue and entirely unsupported by the "evidence" that plaintiffs cite. CCSUF ¶ 30; King Opening Decl. ¶¶ 14-16 (explaining why YouTube decided to develop fingerprinting technology). It is also irrelevant. Even if YouTube *had* built Content ID intending to offer it to other websites to help them more effectively address copyright issues, that would not advance plaintiffs' claims; indeed, it would further undermine them.

*Second*, the notion that YouTube has "made it impossible" for content owners to avail themselves of its fingerprinting technology is belied by the undisputed fact that over 1,000 content owners, including several of the plaintiffs in this case, are currently using the tool to identify their content on YouTube. King Opening Decl. ¶¶ 21-22.

*Third*, class plaintiffs' attempt to fault YouTube for not fingerprinting every video taken down through a DMCA takedown notice is mystifying. YouTube *does* fingerprint all videos removed via takedown notices and blocks subsequent uploads that are identical. King Opening Decl. ¶ 4. What YouTube does not do is haphazardly use fingerprinting to block all uploads that match even a *portion* of a video previously removed. There is a good reason for that—copyright owners can

(and often do) take down videos without owning rights in the entire clip. Schapiro Opp. Ex. 133 (69:10-70:20, 85:15-86:8) (describing YouTube's policy and the reasons for it). For YouTube to block all videos that match even a snippet of a video previously removed via takedown notice would lead to countless videos being blocked that the sender of the original notice had no right to remove. *Id.* 87:3-17.[57]

There is no better illustration of the problems with plaintiffs' proposal than Viacom's own abuse of the DMCA process. In February 2007, Viacom requested the removal of over 100,000 videos from YouTube. Schapiro Opp. Ex. 221 (120:12-16). To inflate that number, Viacom adopted a liberal view (to put it mildly) about what should be taken down. In particular, Viacom improperly requested the removal of tens of thousands of videos in which it now concedes it had no valid copyright claim at all. These were music videos that supposedly had been aired on MTV. Viacom did not own those videos; instead, the supposed basis for issuing takedown notices was the presence of an MTV logo, which is not a copyright interest. *Id.* at 229:19-233:18. Had YouTube been following the policy of blocking all subsequent uploads that match any portion of DMCA-removed videos, the result would have been to block countless other videos that Viacom had no rights to control and that were expressly authorized by YouTube's record-label partners.

---

[57] YouTube *does* allow copyright holders to request that videos they take down be used to create fingerprint reference samples. Schapiro Opp. Ex. 133 (69:10-75:11, 86:14-20, 88:16-19, 175:6-176:2). To do so, the rights holder must simply "represent and warrant to YouTube that the entirety of the videos that they're asking us to turn into a reference file is indeed their property." *Id.* at 72:19-21.

d.  *Viacom's claim that YouTube withheld its video-fingerprinting technology until May 2008 is false.*

Viacom takes a different tack with Content ID.  Viacom appears to recognize that YouTube's development of an advanced video-fingerprinting system—and its own successful use of YouTube's technology—refutes the story it wants to tell.  *See* King Opening Decl. ¶¶ 2, 11-31 (describing Content ID and Viacom's use of it).

Viacom thus cuts off its bid for summary judgment in May 2008, effectively conceding that it has no viable claims after that date.  It justifies using that cutoff by suggesting that it was not until then that YouTube stopped "refusing" to apply that technology to protect Viacom in the absence of a content-licensing agreement.  Viacom Br. 2 & n.1.  But Viacom's May 2008 date bears no relationship to YouTube's deployment of Content ID, the availability of that technology to Viacom, or to any conceivable claim of "extortion."

Viacom offers no evidence whatsoever that YouTube *ever* conditioned the availability of Content ID on a content-licensing agreement.  Nor could it.  *See* King Opp. Decl. ¶¶ 5-8; King Opening Decl. ¶¶ 22, 29.  Viacom's discussion of the timeline by which YouTube developed Content ID (Viacom Br. 36-37) similarly ignores the undisputed record.  YouTube started background work on video fingerprinting in the fall of 2006 and began actively developing Content ID in January 2007.  King Opp. Decl. ¶ 2.  In the following months, YouTube kept Viacom up to speed about its efforts to make sure the new tool would be effective for Viacom's needs.  *Id*. ¶ 4 & Exs. 1-6; Schapiro Opp. Exs. 136 (167:14-23), 221 (59:3-21).  In June 2007, YouTube asked Viacom to participate in the first testing of

Content ID, and Viacom did so understanding that it would have full access to the tool once it launched. King Opp. Decl. ¶¶ 5-6; Schapiro Opp. Exs. 136 (161:24-162:10), 146 (122:6-123:25), 218.[58] When Content ID launched in October 2007, YouTube expressly invited Viacom to start using it. King Opp. Decl. ¶ 7 & Ex. 8; Schapiro Opp. Ex. 146 (163:8-164:8). On February 1, 2008, Viacom signed an agreement formally giving it access to Content ID. King Opp. Decl. ¶¶ 9-10 & Ex. 9. Among other things, that agreement expressly provides that "[Viacom] does not agree to license and monetize content, and elects only to block or track content." *Id.* ¶ 9.

In the face of this evidence, there is no basis for Viacom to suggest that YouTube was withholding its technology from Viacom until May 2008. Viacom Br. 26-27. Viacom relies merely on an employee declaration that does not even say as much. *See* Solow Decl. ¶¶ 28-29; CVSUF ¶ 222. The only thing that happened that month is that Viacom finally started providing the fingerprints needed for Content ID to be able to identify Viacom content. King Opp. Decl. ¶ 10. Viacom could have done that sooner, and its delay is not chargeable to YouTube and reflects no bad faith on YouTube's part. *Id.*; Schapiro Opp. Ex. 146 (165:22-167:17) (Paramount CTO attributing delay to "internal considerations" part of the "normal course of business").[59]

---

[58] Viacom's suggestion (Viacom Br. 33) that the July 27, 2007 status conference was the "first time" that YouTube announced it would implement video fingerprinting technology is incorrect. *See* CVSUF ¶ 314; King Opp. Decl. ¶ 6 & Exs. 1-7.

[59] Even after Viacom finally began providing reference fingerprints, Viacom decided not to provide YouTube with references for anything close to Viacom's full library of

While even a May 2008 cutoff is significant, resulting in the abandonment of some 15,000 claims of alleged infringement (Schapiro Opp. Decl. ¶ 8), Viacom's use of an artificial date to attribute some supposed change in YouTube's conduct cannot stand. From the time that YouTube first began developing video-fingerprinting technology, its purpose was the same: to create a industry-leading tool to help all content owners better control the appearance of their material on YouTube. King Opening Decl. ¶¶ 5, 14, 18, 25. These facts cut off Viacom's "high-tech extortion" tale not in May 2008, but at the start.

## B. YouTube Did Not Have An Obvious And Direct Financial Interest In The Alleged Infringing Activity.

Turning to the financial-benefit prong of vicarious liability, Viacom premises its arguments on the "draw" theory derived from the Ninth Circuit's decisions in *Fonovisa* and *Napster*. Viacom Br. 37-39; *see also* Class Br. 34. While this theory of vicarious liability has not been adopted by the Second Circuit, even assuming its applicability, Viacom's claim must be rejected.

Viacom contends that users were attracted to YouTube by the presence of allegedly infringing Viacom clips. But the mere presence of infringing content does not by itself create an inference of drawing power. The plaintiff must actually prove that the infringement is an actual draw, and "not just an added benefit." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004). Viacom has not offered evidence

content—*or even for all of its works in suit.* Schapiro Opp. Exs. 147 (77:12-16, 79:3-82:21), 136 (184:21-185:11).

sufficient to show that YouTube's traffic was actually attributable to users coming to view material that was infringing its copyrights.

This is not a case involving a service devoted nearly entirely to infringement. YouTube Br. 5-8, 74-75, 90. Where that predicate finding is made, some courts have allowed plaintiffs to prove the necessary causal link by showing merely that the defendant earned revenue (or expected to earn revenue). Viacom Br. 38. But that is not possible here. Beyond the vast array of popular videos on YouTube that no one has ever contended are infringing (*see* YouTube Br. 5-8), any draw analysis in this case would have to account for the vast quantity of clips that plaintiffs themselves posted, authorized or deliberately allowed to remain on YouTube. Even if plaintiffs could prove that users came to YouTube to find their clips, they would still have to show that the "draw" was to the allegedly unauthorized ones, rather than the clips that plaintiffs had authorized in one way or another. Plaintiffs have not presented any such evidence.[60]

The record actually undermines plaintiffs' draw allegations, suggesting that the presence of Viacom content has no appreciable effect on YouTube's traffic. After Viacom took down over 100,000 clips in February 2007, YouTube's views and popularity continued to grow. C. Hurley Opp. Decl. ¶ 7. YouTube's traffic also continued to increase after Viacom started using Content ID to block Viacom content. *Id.* The absence of proof of a "causal relationship between the infringing

---

[60] Viacom's claim that "infringing videos were the major draw for the site" (Viacom Br. 38) is not supported by the evidence Viacom cites—or by any other evidence. *See infra* 93-97.

activity and any financial benefit" precludes summary judgment on Viacom's vicarious liability claim. *Ellison*, 357 F.3d at 1079 (granting summary judgment for defendant where plaintiff failed to present sufficient evidence that the service "attracted or retained subscriptions because of the infringement or lost subscriptions because of [the] eventual obstruction of the infringement").[61]

## V.  VIACOM'S INDUCEMENT CLAIM FAILS AS A MATTER OF LAW.

The Supreme Court in *Grokster* announced a clear—and strict—standard for inducement: "We hold that one who distributes a device with the *object of promoting its use to infringe copyright*, as shown by clear expression or other *affirmative steps taken to foster infringement*, is liable for the resulting acts of infringement by third parties." *Grokster*, 545 U.S. at 919 (emphases added). *Grokster* requires that the defendant act with the specific purpose of promoting infringing uses and that it take affirmative steps to foster infringement. Plaintiffs cannot make that showing. Perhaps for that reason, Viacom rests its inducement motion on (1) an unsupportable effort to dilute the *Grokster* standard; and (2) a series of factual misrepresentations.

### A.  Viacom's Effort To Rewrite The *Grokster* Standard For Promoting Infringement Is Unsustainable.

Viacom ignores *Grokster*'s actual holding. Instead, it tries to shift the legal playing field, disavowing the term "inducement" and contending that liability "rests

---

[61] In any event, as explained above and in our moving papers, even if plaintiffs could make out a viable claim for vicarious liability, YouTube would still be protected by the DMCA safe harbor. Under the DMCA, the "draw" test does not apply and YouTube's legitimate (and industry standard) advertising offerings are not a disqualifying financial benefit. *See supra* 53-56; YouTube Br. 71-78.

on the existence of the unlawful purpose itself." Viacom Br. 23. Viacom suggests that businesses "are liable for infringement when they operate a website with the unlawful intention, purpose, or objective that it will be used, **at least in part** for infringing activity." *Id*. at 25 (emphasis added). The murky standard that Viacom proposes diverges from *Grokster* in two critical respects.

First, Viacom glosses over the point, repeatedly emphasized by the Supreme Court, that inducement liability is not based on some amorphous bad purpose, but instead requires that the defendant have the specific objective of "promoting" the use of its service "to infringe copyright." *Grokster*, 545 U.S. at 936-37. Second, Viacom ignores the Supreme Court's admonitions that the inducer must not simply possess that unlawful objective, but must actively seek to further it "by clear expression or *other affirmative steps* taken to foster infringement." *Id*. at 936-37 (emphasis added).[62] To establish inducement, therefore, there must be a "showing that *active steps* were taken with the purpose of bringing about infringing acts." *Id*. at 938 (emphasis added). Viacom tries to read these elements out of *Grokster* to create a new species of "passive" inducement that has no basis in the law.

---

[62] *Grokster* is replete with statements to that effect. *See* 545 U.S. at 931 ("evidence of stated or indicated intent to *promote* infringing uses"); *id*. at 935 ("statements or actions directed to *promoting* infringement"); *id*. at 936 ("Evidence of active steps taken to *encourage* direct infringement"); *id*. at 937 (inducement rule "premises liability on purposeful, culpable expression *and conduct*"); *id*. at 938 (describing evidence that the defendant "acted with a *purpose to cause* copyright violations"); *id*. at 940 ("intent to *bring about* infringement"); *id*. at 940 n.13 ("evidence shows that the distributor *intended and encouraged* the product to be used to infringe"); *id*. at 941 (evidence of "words and deeds" that show "a purpose to *cause* and profit from third-party acts of copyright infringement"); *id*. (inducement requires "*statements and actions* showing what" the unlawful objective was) (emphases added).

Viacom's effort must be rejected not just because it conflicts with what *Grokster* says, but because it threatens to undermine the careful balance that the Supreme Court struck in delineating the contours of the inducement rule. The Court was "mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential." *Grokster*, 545 U.S. at 937. *Grokster* recognized that ensuring "breathing room for innovation and a vigorous commerce" had been a central focus of the Court's prior decision in *Sony*. *Id.* at 933 (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 446 U.S. 417, 442 (1984)). And only by insisting on a strict standard could the Court be assured that inducement liability "does nothing to compromise legitimate commerce or discourage innovation having a lawful purpose." *Id.*; *see also id.* at 939 n.12. Viacom's attempt to radically broaden that standard threatens exactly the adverse consequences that the Court wanted to avoid and that *Sony* precludes. *See id.* at 957-66 (Breyer, J., concurring).

### B. Viacom Cannot Satisfy The Actual *Grokster* Standard.

Viacom cannot make the showing that *Grokster* demands. Evidence that an inducing message was broadcast is the "preeminent" way of showing that "active steps were taken with the purpose of bringing about infringing acts." *Grokster*, 545 U.S. at 938. Viacom does not even try to establish that "classic instance of inducement" (*id.* at 937). Viacom Br. 25. Nor could it; the undisputed record on this point is precisely to the contrary. YouTube consistently solicited the posting of personal videos or other authorized materials, not infringing ones. *See supra* 6-7; C. Hurley Opening Decl. ¶¶ 5, 9-10. And the communications from YouTube to its

users have always sought to *discourage* infringement. *See supra* 8-9; YouTube Br. 85-89. As Hurley wrote to his co-founders in September 2005: "we should **never** promote piracy or tell [users] how to do it." C. Hurley Opening Decl. ¶ 20 & Ex. 25 (emphasis added).[63]

Nor is there any other evidence that YouTube took "active steps" in order to promote infringement. The affirmative measures that YouTube took were to *combat* copyright abuse:

- YouTube's founders adopted a name and slogan for their site designed to emphasize the personal nature of the videos they wanted users to upload (C. Hurley Opening Decl. ¶ 7);

- YouTube's founders repeatedly removed videos that looked to them like infringing material (*id.* ¶¶ 15, 17; *see supra* 8-9);

- YouTube's founders repeatedly wrote to users reminding them not to upload professional material that they did not have the rights to post (C. Hurley Opening Decl. ¶ 17; Levine Opening Decl. ¶ 23);

- YouTube provides extensive information about copyright to help educate users about how to stay on the right side of the law (*id.* ¶¶ 5-10);

- YouTube implemented a rigorous DMCA notice-and-takedown program, which included building a set of tools to make it easier for copyright owners to send takedown notices (Levine Opening Decl. ¶¶ 16-20);

- YouTube provides detailed instruction to copyright owners about how to send DMCA takedown notices (*id.* ¶¶ 15-17);

---

[63] Such evidence of advertising or solicitation that "broadcasts a message designed to stimulate others to commit violations" played a central role in *Grokster* (545 U.S. at 937-38), as it has in the subsequent cases on which Viacom relies. *See Columbia Pictures Industries, Inc. v. Fung*, 06-cv-5578, U.S. Dist. LEXIS 122661, slip op. 25-28 (N.D. Cal. Dec. 21, 2009); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 152-53 (S.D.N.Y. 2009). The contrast between the powerful evidence on that point in those cases and Viacom's absence of proof here is telling. We are aware of no case in which inducement of copyright infringement has been found without some evidence that the defendant communicated an inducing message.

- YouTube has received repeated praise for its copyright policies, including its rapid responses to takedown notices (*id*. ¶¶ 22, 32-33);

- YouTube implemented hashing technology to prevent the uploading of files identical to those taken down for copyright reasons (*id*. ¶ 25);

- YouTube terminates the accounts of users who receive multiple copyright "strikes" and removes all videos posted from those accounts (*id*. ¶¶ 27-31);

- YouTube implemented a 10-minute limit on most user-uploads to prevent the posting of full length movies and television shows (*id*. ¶ 12);

- YouTube built its own fingerprinting tools to help copyright owners more easily find and manage their content (King Opening Decl. ¶¶ 2-3).

*None* of these things was true about the defendants in *Grokster*—or about those in *Fung* or *Usenet.com*. Viacom would have the Court brand as an inducer a service has never encouraged infringement, has taken no affirmative steps to foster infringement, that has consistently communicated a message of respect for copyright, has held itself out as a repository for user-created video, has entered into partnership deals with numerous content owners, and has taken a host of other steps to help prevent copyright violations before developing its own industry-leading filtering technology. There has never been a finding of copyright inducement where the defendant took *any* meaningful action to deter infringement, let alone where the defendant did all that YouTube has done.

       1.     <u>YouTube Did Not Take Active Steps With The Object Of Promoting Infringement</u>.

Viacom nevertheless contends that "the evidence of YouTube's and Google's unlawful objective of operating the YouTube site as a haven for infringement *is even more powerful* than in *Grokster*, *Usenet*, or *Fung*." Viacom Br. 26 (emphasis added). It is difficult to take that assertion seriously. It is certainly at odds with what

Viacom's General Counsel privately acknowledged in 2006: "Mostly YouTube behaves – and why not – user generated content appears to be what's driving it right now. Also the difference between YouTube's behavior and Grokster's is staggering." Schapiro Opp. Ex. 173; *see also id.* Ex. 174 (Viacom executive contrasting YouTube and Napster); Schapiro Opp. Ex. 175 (Viacom CEO: "We have nothing against YouTube. It's a wonderful service."). Viacom does not support its claim with a sober presentation of undisputed evidence, but with more rhetoric and distortions of evidence.[64]

Viacom asserts that "YouTube's founders made a conscious decision to build their user base 'as aggressively as we can through whatever tactics, however evil.'" Viacom Br. 26. Viacom omits the part of the document (a "chat" involving Steve Chen) immediately before and after the language it quotes: "***If I were running the show***, I'd say, we concentrate all of our efforts in building up our numbers as aggressively as we can through whatever tactics, however evil, ***i.e. scraping MySpace***." Hohengarten Ex. 192 (emphases added). The text that Viacom elides makes clear that Chen (then YouTube's CTO) was not "running the show" and that his idea was to deploy a computer "scraping" program so that YouTube could gather information about MySpace users. Chen Opp. Decl. at 4. Chen's fleeting remark had nothing whatsoever to do with copyright (much less with exploiting

---

[64] *See Prudent Pub. Co., Inc. v. Myron Mfg. Corp.*, 722 F. Supp. 17, 21 (S.D.N.Y. 1989) ("arguments or statements by counsel unsupported by the record cannot raise a genuine issue of fact requiring a trial").

unauthorized copyrighted material), but in any event YouTube did not act on it. *Id*. The document is irrelevant. *See* CVSUF ¶ 85.

We have already explained why Viacom's other allegations about YouTube's purpose (Viacom Br. 26-27) are similarly unsupported by—and contradicted by—the evidence: (1) that YouTube's founders decided not to block "obviously" infringing material; (2) that YouTube "killed simple engineering fixes" that would have prevented infringement; (3) that the founders "celebrated the popularity of known infringing clips to investors"; or (4) that they placed infringing videos on YouTube and urged each other to "steal" videos. *See supra* at 8-18; 19-21; 67.[65]

Stripped of its distortions and evaluated against the proper legal standard, the rest of Viacom's evidence is insufficient to render YouTube liable for inducement. Viacom alleges that YouTube knew about infringing uses of its service. Viacom Br. 26 (citing VSUF ¶¶ 54-58). While that conclusion is unsupported (as discussed below), any dispute on that point is immaterial. The Supreme Court could not have been clearer that "mere knowledge of infringing potential or of actual infringing uses" is not enough to create inducement liability. *Grokster*, 545 U.S. at 937. As a matter of law, an unlawful purpose to foster infringement cannot be inferred from knowledge of it.

Viacom also asserts that YouTube employees "sneered at rights holders as 'copyright bastards' and 'a-holes,'" (Viacom Br. 26), but that too is not inducement.

---

[65] As for Viacom's assertion that Hurley was "concerned" with the ruling in *Grokster*, it is laudable that Hurley was attuned to developments in the law and prudent for him to have thought about the meaning of the Supreme Court's decision. *See supra* 13; CVSUF ¶¶ 38-39.

At most, these two or three stray comments—some jocular, some offered in late-night "chats," none of which show any desire to promote infringement—are the type of "equivocal conduct" that cannot give rise to liability. *Grokster*, 545 U.S. at 932-33.[66] *Grokster* liability turns not on some ill-defined bad intent (much less intemperate language), but instead requires proof that the defendant took "active steps . . . with the purpose of bringing about infringing acts." *Grokster*, 545 U.S. at 938. Viacom's approach would improperly transform the clear and narrow standard laid out by the Supreme Court into a nebulous and far-reaching thought-tort.

2. Google Did Not Take Active Steps With The Object Of
   Promoting Infringement.

Viacom's suggestion that *Google* is independently liable for inducement is equally flimsy. Viacom Br. 12-18, 27-28. As a threshold matter, Viacom ignores three critical aspects of the record. *First*, Google's reasons for acquiring YouTube (and the reasons other companies, including Viacom, wanted to do so) had nothing to do with exploiting copyright infringement. *See* Schapiro Opp. Exs. 134 (112:13-113:14), 183 (94:8:12), 184 (53:9-55:5), Schapiro Opp. Ex. 175 (describing why

---

[66] Viacom cannot plausibly complain about the use of such language. *See, e.g.*, Schapiro Opp. Exs. 176 (Viacom employee calling YouTube "bastards" after YouTube questioned whether the employee had the rights to upload Viacom content), 177 (top Viacom executive: "fuck you, you Google bastards"), 178 (Viacom executive: "Bastards at Google are harassing me"), 179 (Viacom executive saying about YouTube: "Fuck those mother fuckers"), 180 (Viacom executive forwarding memo about suit against YouTube and saying "F*k'em"), 181 (email from Viacom to content owner referring to Viacom's suit against YouTube: "Fuck them. We need money from them to pay you."), 182 (Viacom VP calling YouTube "fucking assholes" for enforcing its repeat-infringer policy concerning a Viacom marketing account that had received multiple take-down notices from Viacom's legal department).

Viacom wanted to buy YouTube).[67]  *Second*, following the acquisition, Google

implemented a conservative monetization strategy for YouTube: it chose to run ads

against only videos for which it had an individually negotiated partnership

agreement.  Reider Opening Decl. ¶¶ 3, 10;  Schapiro Opp. Ex. 196 (50:5-7).  By

enacting this policy, Google elected not to monetize *millions* of lawfully uploaded

videos to ensure that it did not profit from occasions where users might upload

unauthorized clips.  *Id.* (44:23-46:25).  *Third*, almost immediately after the

acquisition, Google began building a cutting-edge video fingerprinting tool

specifically for YouTube.  King Opening Decl. ¶¶ 14-15.  This undisputed evidence is

inconsistent with any conclusion that Google acted with the unlawful purpose of

fostering infringement.[68]

---

[67] Among many Viacom executives, the desire to acquire YouTube bordered on the obsessive.  *See, e.g.,* Schapiro Opp. Exs. 185 ("We (MTVN/Viacom) have to buy YouTube."), 186 ("I WANT TO OWN YOUTUBE, I think it's critical"),  187 ("Help us get YouTube.  We cannot see it go to Fox/NBC), 188 (MTVN Chairman: "If we get UTube....I wanna run it" Viacom CEO: "You'll have to kill me to get to it first"), 189 ("YouTube!  I'm banging my shoe"),  190 ("Google and YouTube....shouldn't Viacom/MTVN get into this deal?  Throw in our ENTIRE library.").  Those executives complained bitterly when Viacom's internal dysfunction helped scuttle a deal between the companies.  *See id.* Exs. 191, ("This is EXACTLY how we lost MySpace and IGN, over-negotiation and torturous interference from Viacom corporate"),  192 ("we can't let this fall apart because of the organization's incompetence"), 193 ("Should have taken the deal weeks ago.  Fuck."), 194 (Viacom CEO: "No M&A team in recent history could have a poorer record than us.  We are a joke...and our failed judgments and heavy handed behavior have cost us HUGELY"), 195.

[68] Viacom almost concedes as much when it says that its decision to negotiate a license for the appearance of its works on YouTube after the Google acquisition was inspired by "Google's earlier history of respecting copyright."  Viacom Br. 18.  That is a remarkable claim given the indisputable fact that Viacom had engaged in extensive licensing negotiations with YouTube *long before the acquisition*.  Maxcy Opp. Decl. ¶ 8; Schapiro Opening Exs. 6-7; Schapiro Opp. Exs. 197, 198, 199, 200.  If

Viacom falls back on misstatements and irrelevancies. It asserts that Google "decided to buy" YouTube after being warned about infringing content by Google Video employees. Viacom Br. 27. The documents that Viacom relies on, created many months before the acquisition while Google Video was competing with YouTube, do little more than parrot self-serving and foundationless guesses by third parties about the alleged availability of infringing content on YouTube. *See* CVSUF ¶¶ 133-165; Defendants' Motion to Strike III.C.[69] Every relevant Google witness testified that he or she had no way of actually assessing infringement on YouTube and that third-party statements purporting to do so were unreliable.[70] In any case,

---

Viacom's willingness to negotiate a licensing deal reflects its view of whether a company has a "history of respecting copyright," Viacom's negotiations with YouTube speaks volumes.

[69] For example, Viacom cites an instance in April 2006 when it was "reported" that a Fox media executive said that "more than 80 percent of video on [YouTube] is copyrighted content." Viacom Br. 8 . Putting aside the multiple layers of hearsay, the evidence refutes any claim that the executive's speech was taken within Google as an assessment of "infringement" on YouTube. CVSUF ¶ 145. To the contrary, Google Video personnel viewed the remark as relating to videos that were "premium, just not copyright infringed ones." Schapiro Opp. Ex. 201. And the Google employee who circulated the story expressed his disagreement with it: "I don't believe the 80% number. My own analysis points to a much lower # (5%)." *Id.* Ex. 202.

[70] *See* Schapiro Opp. Exs. 204 (30:10-13, 80:9-85:10, 97:9-99:19, 62:4-20, 140:13-141:10, 160:2-24), 184 (118:16-119:8), 208 (85:9-86:5), 183 (133:17-134:19, 141:3-17), 207 (59:7-22), 203 (153:5-155:24); *see also id.* Exs. 205 (36:25-38:8, 41:9-43:20), 206 (175:21-181:17). These Google employees also testified that they later learned not only that YouTube's copyright policies were in many respects as strong as Google Video's, but also that YouTube was filled with authorized material that content owners had uploaded or had deliberately allowed to remain on the site. *See id.* Exs. 205 (160:10-20, 165:13-19), 206 (175:20-177:19), 203 (117:10-25).

there is no evidence that Google executives relied upon (or even saw) these documents in deciding to purchase YouTube. All the evidence is to the contrary.[71]

Viacom also claims that a Credit Suisse fairness opinion documented "the vast scope" of infringement on YouTube. Viacom Br. 16. It did nothing of the kind, as discussed below. Even if Viacom's description of the report were accurate, the document still would not support an inducement claim. It would at most show knowledge of alleged infringement, not a desire to promote it. But the document actually shows the opposite. It reflects Google's plan to monetize *only* videos on YouTube uploaded pursuant to an express content-partnership agreement. *See* CVSUF ¶¶ 174, 176, 181-82. In other words, the premise of the Credit Suisse report was that unauthorized uploads had no financial value. *Id.* That undermines Viacom's story about the motives for the acquisition and is antithetical to a finding that Google acted with "a purpose to cause and profit from third-party acts of copyright infringement." *Grokster*, 545 U.S. at 941.

3. The Supplemental Indications Of Inducement Relied On In *Grokster* Point In The Opposite Direction Here.

This takes us to the three features that the Supreme Court used to confirm its conclusion that the *Grokster* defendants could be found liable. *Grokster*, 545 U.S. at 939-40. They compel the opposite conclusion in this case, as shown in YouTube's

---

[71] *See* Schapiro Opp. Exs. 208 (53:22-56:3, 74:19-75:12, 80:14-88:14), 209 (44:10-48:23), 134 (79:21-87:4, 82:13-83:8, 89:20-96:6, 101:15-24, 222:20-225:19), 184 (114:7-119:20, 121:9-124:5, 125:8-126:20), 183 (130:10-135:3, 135:22-138:3, 141:24-144:21), 210 (127:21-138:14), 207 (53:19-61:4, 62:19-68:3, 75:15-77:20), 204 (114:8-117:16, 122:22-129:23, 130:12-133:22), 206 (128:3-25, 139:2-7, 173:4-9). Indeed, the Google Video team was deliberately *excluded* from internal discussions about Google's acquisition of YouTube. *See id.* Ex. 204 (137:23-138:8).

moving papers. YouTube Br. 89-97. Viacom's effort to conscript those factors (Viacom Br. 28-29) requires it to take yet further liberties with the record.

           a.    *YouTube has an overwhelming array of non-infringing uses.*

*First*, Viacom musters no evidence that YouTube was "aiming to satisfy a known source of demand for copyright infringement." *Grokster*, 545 U.S. at 939. Instead, Viacom points to various guesses made at different times about the amount of material on YouTube that could be described as "premium" or "professional" or "copyrighted." Viacom Br. 28. This "evidence" does not speak to the question at hand—whether YouTube intentionally held itself out as a place to post or view infringing material—but in any event, these off-the-cuff estimates have no probative value. For one, they show at most "mere knowledge of infringing potential or of actual infringing uses"—which is not enough for inducement. *Id.* at 937. But the documents that Viacom points to do not show even that.

Viacom cites two isolated statements that appear in discussions between YouTube employees. Hohengarten Exs. 193, 228. Neither Steve Chen's speculation in September 2005 that removing certain "stupid" or "viral" videos would cause site traffic to drop by 80%, nor Maryrose Dunton's "little exercise" in which she estimated that 70% of the videos that were "hot" on one particular day in February 2006 appeared to have "copyrighted" material, are estimates of "infringement-driven traffic." Viacom Br. 28. Chen was not opining about the traffic from "infringing" videos—indeed, in the very exchange that Viacom cites he *agreed* with Karim's statement that the founders should "continue" "taking down clips of TV shows" and that "if we keep that policy, I don't think our views will decrease at all."

*See supra* 13-15; CVSUF ¶ 55.  This exchange is hardly evidence of the amount of unauthorized material on YouTube.

Nor was Dunton's "little exercise" anything like a "quantification of the vast extent of piracy on the site."  Viacom Br. 10.  Viacom substitutes a conclusion ("piracy") for a description ("copyrighted").  Dunton testified that she used the term "copyrighted" to refer to "material that looks to be professionally produced." Schapiro Opp. Ex. 211 (84:3-5).  And, as Viacom's own actions show, the fact that professional material was on YouTube does not mean that it was infringing. Viacom and other media companies were working actively to have their content accessible and featured on YouTube.  *See* Rubin Opening Decl. ¶¶ 2, 18.[72]  In any event, Dunton's exercise was hardly scientific; the videos in the categories she looked at changed every day.  Schapiro Opp. Ex. 211 (80:22-81:21).

Viacom relies finally on the Credit Suisse fairness opinion, but it does not remotely show that 54% of the video streams on YouTube were infringing. Hohengarten Ex. 293.  Credit Suisse predicted that 60% of YouTube video streams in 2007 would come from "premium" content and that 10% of premium content owners would "allow [YouTube] to monetize their content in 2007."  *Id.* at CSSU003570.  It does not follow that 54% of video views would come from content

---

[72] Viacom claims that Dunton "cynically mocked" the idea of flagging these videos "for removal."  Viacom Br. 27.  The document itself shows and Dunton herself testified that what was "derided" was the idea that employees should flag every piece of seemingly professional content on the site for further review.  That idea was unworkable, especially because YouTube was then being flooded with authorized professional content, and no YouTube reviewer would be in a position to readily distinguish authorized videos from unauthorized ones.  *See* Schapiro Opp. Ex. 212 (89:19-91:2).

"that was admittedly unauthorized by the content owner."  Viacom Br. 15.[73]  The

10% projection concerned videos subject to individually negotiated partnership

agreements.  VCSUF ¶¶ 174, 176.  Credit Suisse did not purport to quantify the

percentage of "premium" content that was legitimately on YouTube in other ways.

It made no effort to discern which "professional" videos appeared on YouTube as a

result of media companies' marketing campaigns, or whether content owners may

have deliberately acquiesced to their content appearing on YouTube.  Nor did it

perform any fair-use analysis.  Credit Suisse had no reason to do any of these

things.  It was evaluating the fairness of Google's purchase price, not trying to

divine how many videos on YouTube were infringing.  Schapiro Opp. Ex. 212 (60:1-

2, 209:18-19).

While Viacom's at-best anecdotal evidence does not come close to showing

"the staggering scale of infringement" that existed in *Grokster* (Viacom Br. 28), the

evidence Viacom has *not* presented is equally revealing.  In *Grokster*, the plaintiffs

hired experts, who used a "random sampling procedure" to conclude that nearly

---

[73] Viacom also mischaracterizes the cursory survey that underlay Credit Suisse's 60% projection (Hohengarten Ex. 291).  Google (not Credit Suisse) analyzed 301 YouTube video streams; it did not determine that those streams were "representative," but instead chose them randomly.  Schapiro Opp. Ex. 212 (89:16-90:25).  The 189 videos deemed "premium" were ones that appeared to be "copyrighted" or had been removed from YouTube.  *Id*. (86:18-87:15); Hohengarten Ex. 291.  Viacom's claim that the removed videos were "plainly infringing" is baseless.  Viacom Br. 15.  There is no support for Viacom's premise that the "removed" videos that Google surveyed were taken down because of DMCA notices.  Videos are removed from YouTube for any number of non-copyright reasons, as plaintiffs themselves have recognized.  Pls.' Joint Reply In Support of Pls.' Joint Mot. to Compel 29 n.23 (Mar. 14, 2008).  And any videos that were the subject of DMCA notices were merely "claimed" to be infringing.  17 U.S.C. § 512(c)(3).

90% of the files offered for distribution on StreamCast's service and almost 97% of the files actually downloaded were infringing. *MGM Studios. Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 985 (C.D. Cal. 2006). Plaintiffs in other inducement cases introduced similar evidence. *See Fung*, *supra*, slip op. 10-11; *Usenet.com*, 633 F. Supp. 2d at 151-52. In all those cases, summary judgment was supported by (among other things) statistical evidence purporting to establish that an overwhelming majority of the material made available through the defendants' services was infringing. Although Viacom retained some of those same experts in this case (Schapiro Opp. Ex. 419), it decided not to submit a report from them in support of its summary judgment motion. The record here thus is devoid of the kind of evidence relied on in *Grokster*, *Fung*, and *Usenet.com*.[74]

There is an obvious explanation for Viacom's choice: no serious expert could come to the conclusion that YouTube was "overwhelmingly used to infringe." *Grokster*, 545 U.S. at 948 (Ginsburg, J., concurring); *see* Walk Opening Decl. ¶¶ 6-22. Before it filed this suit, Viacom certainly did not think that was the case:

- Viacom's research noted that "the single most popular clips on YouTube were largely user generated." Schapiro Opp. Ex. 214 (48:5-17).

- A Viacom study concluded that "of YouTube's top 100 viewed clips of all time, nearly ALL are user-generated." Schapiro Opp. Ex. 215.

- Viacom's "best minds" reported that "[c]onsumption of 'branded' content on Y[ouTube] is low." Schapiro Opp. Ex. 216, Ex. 217 (188:25-190:13).

---

[74] This is not suggest that such "expert" evidence is reliable or properly admitted. YouTube reserves all objections in the event that plaintiffs belatedly seek to introduce such evidence here. This evidence only highlights that plaintiffs in this case have not even *attempted* to support their motion in that way.

- Viacom's General Counsel stated that "user generated content appears to be what's driving" YouTube. Schapiro Opp. Ex. 173.

    b.    *YouTube has taken many steps to combat copyright abuse.*

*Second*, Viacom's assertion that YouTube "refused" to implement readily available filtering tools until May 2008 is a fiction. *See supra* 68-80. But beyond misrepresenting the facts, Viacom ignores the law. It was not just the failure to implement filtering technology that the Supreme Court relied on to condemn Grokster and StreamCast. It was those defendants' unwillingness to do *anything* to "impede the sharing of copyrighted files"—including the fact that neither defendant ever "blocked anyone from continuing to use its software to share copyrighted files." *Grokster*, 545 U.S. at 926-27.[75] StreamCast went so far as to actively *impede* third parties' efforts to monitor unlawful use of its network. *Id.* at 927.

YouTube's extensive copyright-enforcement apparatus is worlds away from *Grokster* or any other inducement case. And, although the overwhelming majority of videos on YouTube and YouTube users have never been the subject of any copyright complaint, YouTube has responded forcefully when alerted to such issues. It has removed millions of videos for copyright reasons and terminated hundreds of thousands of user accounts. Levine Opening Decl. ¶¶ 26-31.

    c.    *YouTube's advertising practices are legitimate.*

*Third*, YouTube's advertising practices provide no support for Viacom's inducement claim. Viacom's arguments about advertising would condemn virtually

---

[75] Even then, the Court emphasized that "in the absence of other evidence of intent, a court would be unable to find contributory liability merely based on a failure to take affirmative steps to prevent infringement." *Grokster*, 545 U.S. at 939 n.12.

any Internet business. In nearly all such businesses, the more the service is used, the more advertising revenue it can generate. The Supreme Court did not suggest that any advertising-based revenue model is presumptively unlawful. *Grokster*, 545 U.S. at 940 ("this evidence alone would not justify an inference of unlawful intent"). This factor comes into play only where a company's business model confirms that its "principal object" is that its technology be used to violate copyright. *Id.* at 926. That is not the situation with YouTube's advertising offerings—ones that Viacom was only too happy to use and benefit from, both before and after filing this lawsuit. Reider Opening Decl. ¶ 4.

Viacom asserts that if "Defendants stopped the infringement, it would slash site traffic and with it current as well as future advertising revenue." Viacom Br. 29. Here again, Viacom's claim is undercut by the actual facts: after YouTube implemented its Content ID technology—the latest step in technological efforts that even Viacom says cuts off any inducement claim—site traffic and advertising revenue continued to soar. C. Hurley Opp. Decl. ¶ 7.[76] That is hardly surprising. Unlike the services at issue in *Grokster* and *Fung*, YouTube has a vast array of legitimate uses—from user-generated content to licensed professional content—that keeps its millions of users coming to the site. Such a service can run advertising without raising an inference of unlawful intent.

---

[76] Even before that, YouTube decided not to display advertising on pages where users watch videos—except where the video in question was expressly claimed by one of YouTube's content partners. Reider Opening Decl. ¶¶ 9-10. That is hardly the decision of a service determined to profit from unauthorized material.

Viacom's inducement claim is not only unsupported by the facts and the law, it is defeated by them.

**CONCLUSION**

For the reasons given above (and in YouTube's memorandum of law in support of its motion for summary judgment), which YouTube incorporates by reference here, plaintiffs' motions for summary judgment should be denied.

Dated: May 10, 2010
New York, NY

Respectfully submitted,

Andrew H. Schapiro
A. John P. Mancini
Matthew D. Ingber
Brian M. Willen
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

David H. Kramer
Maura L. Rees
Michael H. Rubin
Bart E. Volkmer
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

*Attorneys for Defendants*