Subject to Protective Order – HIGHLY CONFIDENTIAL

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

VIACOM INTERNATIONAL INC., )
COMEDY PARTNERS, )
COUNTRY MUSIC TELEVISION, INC., )
PARAMOUNT PICTURES CORPORATION, )
and BLACK ENTERTAINMENT TELEVISION )
LLC, )
 )
                              Plaintiffs, )  Case No. 1:07-cv-02103 (LLS)
                   v. )  (Related Case No. 1:07-cv-03582 (LLS))
 )  ECF Case
YOUTUBE INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
 )
                              Defendants. )
 )
_____)

## VIACOM'S COUNTER-STATEMENT IN RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Stuart J. Baskin (No. SB-9936)
John Gueli (No. JG-8427)
Kirsten Nelson Cunha (No. KN-0283)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY   10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

Paul M. Smith (No. PS-2362)
William M. Hohengarten (No. WH-5233)
Scott B. Wilkens (*pro hac vice*)
Matthew S. Hellman (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, DC   20001
Telephone:  (202) 639-6000
Facsimile:  (202) 639-6066

Susan J. Kohlmann (No. SK-1855)
JENNER & BLOCK LLP
919 Third Avenue
New York, NY   10022
Telephone:  (212) 891-1690
Facsimile:  (212) 891-1699

*Attorneys for Plaintiffs*

Subject to Protective Order – HIGHLY CONFIDENTIAL

## LEGEND

Pursuant to Local Rule 56.1, Viacom submits the following counter-statement in response to Defendants' Local Rule 56.1 Statement.

This Counter-Statement contains a two-column table. The left-hand column contains Defendants' factual assertions and citations to evidence, and the right column contains Viacom's response to each factual assertion, including evidence and references to evidentiary objections, as appropriate.

As used herein:

"Defs. SUF" refers to Defendants' Rule 56.1 Statement, filed in support of Defendants' Motion for Summary Judgment.

"Kohlmann Decl." refers to the Declaration of Susan J. Kohlmann, filed herewith.

"Hohengarten Decl." refers to the Declaration of William M. Hohengarten, filed under seal March 5, 2010, in support of Viacom's Motion for Summary Judgment.

"Solow Decl." refers to the declaration of Warren Solow, filed under seal March 5, 2010, in support of Viacom's Motion for Summary Judgment.

"Viacom SUF" refers to Viacom's Statement of Undisputed Facts In Support of Its Motion for Partial Summary Judgment on Liability and Inapplicability of the Digital Millennium Copyright Act Safe Harbor Defense, filed under seal March 5, 2010. Citations to the "Viacom SUF" incorporate by reference any exhibit cited therein.

"Viacom Evid. Obj." refers to Viacom's Evidentiary Objections and Motion to Strike Submitted in Support of Defendants' Motion for Summary Judgment.

**Subject to Protective Order – HIGHLY CONFIDENTIAL**

Exhibits to any declaration are indicated as "[Declarant Name] Ex." followed by the exhibit number.  Citations to paragraphs in any declaration or the Viacom SUF incorporate by reference any exhibit cited therein.

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.  Plaintiffs in the action *Viacom Int'l Inc., et al. v. YouTube, Inc. et al.*, Civil No. 07-CV-2103 (LLS), are Viacom International, Inc. ("Viacom"), Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television, Inc.  Viacom Am. Compl. ¶¶ 15-19. | Uncontroverted. |
| 2.  The putative class plaintiffs in the action *The Football Association Premier League Limited, et al. v. YouTube, Inc., et al.*, Civil No. 07-CV-3582 (LLS), are Bourne Co. ("Bourne") and its affiliate Murbo Music Publishing, Inc. ("Murbo"); Cherry Lane Music Publishing Company, Inc. ("Cherry Lane"); Cal IV Entertainment, LLC ("Cal IV"); The Rodgers & Hammerstein Organization ("R&H"); Stage Three Music (US), Inc. ("Stage Three"); Edward B. Marks Music Company, Freddy Bienstock Music Company d/b/a Bienstock Publishing Company and Alley Music Corporation (collectively, "Carlin"); X-Ray Dog Music, Inc. ("X-Ray Dog"); and The Music Force Media Group LLC, The Music Force LLC and Sin-Drome Records, Ltd. (collectively, "Music Force").  Second Am. Class Action Compl. ¶¶ 16, 18-20, 24-30, 33. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 3.  Defendants are YouTube, Inc., YouTube, LLC, and Google Inc. (collectively, "YouTube"). | Uncontroverted. |
| 4.  YouTube operates a website located on the Internet at http://www.youtube.com.  Decl. of Michael Solomon in Support of Defs. Mot. for Summary Judgment ("Solomon Decl.") ¶ 2. | Uncontroverted. |
| 5.  YouTube was founded in February 2005 by Chad Hurley, Steve Chen, and Jawed Karim. Decl. of Chad Hurley in Support of Defs. Mot. for Summary Judgment ("Hurley Decl.") ¶ 2. | Uncontroverted.  *Accord* Viacom SUF ¶ 10. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 6.  The founders created YouTube to provide a platform for users to conveniently share personal videos and to build a community around users posting and viewing such videos. *Id.* & Exs. 4, 15; Decl. of Andrew H. Schapiro in Support of Defs. Mot. for Summary Judgment ("Schapiro Decl.") Ex. 158. | Controverted.  As shown in Viacom's moving papers, it is undisputed, based on internal YouTube emails, that YouTube's co-founders sought to build up YouTube's user base through infringing content, which they knew from the outset was being uploaded to the site in large quantities.  *See* Viacom SUF ¶¶ 29-132.  The founders decided to turn a blind eye to the massive infringement so that they and YouTube could continue to benefit from it. *Id.* <br><br> The evidence cited by Defendants does nothing to contradict the clear intent shown through the co-founders' emails. <br><br> Hurley Decl. ¶ 2 & Schapiro Ex. 158:  Chad Hurley's self-serving and conclusory declaration, dated five years after the events in question, does not even attempt to address or diminish the damning internal emails that show the co-founders' true intent in operating the YouTube service.  Similarly irrelevant is the brief, selective excerpt of Mr. Hurley's deposition testimony.  Mr. Hurley could not recall many of the internal emails that contemporaneously memorialize the co-founders' intent.  *See, e.g.*, Kohlmann Ex. 88 (C. Hurley Dep.) at 68:17-69:14, 80:23-81:6, 82:14-83:8.  He even testified that he could not "even remember what [YouTube's copyright] policies were," *id.* at 57:16-17, 59:23-25, and explained that he could not "speak for" his co-founders in analyzing their statements in an email exchange.  *See, e.g.*, *id.* at 61:16-18 ("I can't speak for -- for Jawed, you know.  I -- I don't know, you  know, the situation that we were in at that time."). <br><br> Hurley Ex. 4:  Defendants rely on a document containing a quote from Steve Chen stating that YouTube should be a "blend of Flickr and Hot-Or-Not."  Flickr is the very website that Chen later explained to Roelof Botha |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | contained "truckloads" of copyrighted material.  Viacom SUF ¶ 60 ("Again, similar to Flickr . . . you can find truckloads of adult and copyrighted content."). |
| | Hurley Ex. 15: This document shows that, from its earliest days, YouTube had a plan to "possess[] the fastest-growing audience," amass an "audience reach [that] rivals that of traditional media networks," and then to "position[] [itself] to syndicate traditional media content (news, entertainment, MTV, etc.)."  Hurley Ex. 15, JK00009892, at JK00009894. |
| | Further, while Mr. Hurley in his declaration describes an email exchange that purportedly shows the founders' benign intent, that exchange in fact shows nothing of the sort.  *See* Hurley Decl. ¶ 12 (citing Hurley Ex. 14).  Mr. Hurley's characterization of the exchange is misleading.  In the same e-mail exchange, Mr. Chen openly suggested stealing movies directly from another site; as he said, "steal it!"  Mr. Hurley responded, "hmm, steal the movies?"  Mr. Chen responded "haha ya.  or something."   The statements Mr. Hurley quotes in his declaration merely reflect a potential business decision not to steal content from a "stupidvideos.com-type of site" because "sites like this and bigboys.com will never go public."   The founders thus openly considered stealing content based on whether it made business sense -- something entirely consistent with Defendants' intent to grow the site using infringement.  *See, e.g.*, Viacom SUF ¶¶ 55-58, 84, 85, 86, 91, 99, 104, 128, 152, & 156. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 7. The founders named the new company "YouTube" to emphasize their goal that the site become a hub of short, personal videos emphasizing "you." Hurley Decl. ¶ 7; Schapiro Ex. 162. | Controverted. *See supra* ¶ 6. Indeed, none of the evidence Defendants cite addresses the period from late April 2005 forward. Furthermore, none of the evidence cited supports the contention that users' videos were supposed to be "short." To the contrary, Schapiro Ex. 162 and Hurley Ex. 7 both expressly state that "[t]here is no time limit on your video." |
| 8. The founders chose the slogan "Broadcast Yourself" so that users would "understand what the site is supposed to be when they visit." Hurley Decl. ¶ 7. | Controverted. *See supra* ¶¶ 6, 7. |
| 9. YouTube's message to the public and to its users consistently has been that users should post only videos that they had created themselves or otherwise had the right to post. *Id.* ¶ 9; Decl. of Zahavah Levine ("Levine Decl.") ¶¶ 5, 7. | Controverted. Defendants' message to users and the public, especially throughout 2005 and 2006, has been that YouTube will do nothing to prevent infringement except respond to takedown notices that identify videos specifically by URL. *See e.g.*, Hohengarten Ex. 356 at ¶¶ 14-18 (publicly filed declaration of YouTube founder Steve Chen); Hohengarten Ex. 28, GOO001-00558783 (email from YouTube to user stating "YouTube does not regularly monitor our members' videos for instances of copyright videos . . . . We remove videos when we receive a complaint from a rights holder."); Kohlmann Ex. 10, GOO001-00561391 (similar email to YouTube user); Kohlmann Ex. 11, GOO001-00561394 (same); Kohlmann Ex. 12, GOO001-00607526 (same).<br><br>This has served as an invitation to millions of users to upload whatever infringing videos they choose, because most content owners will not quickly find the content that infringes their copyrights, a view Steve Chen shared. *Accord* Viacom SUF ¶ 47 ("what? someone from cnn sees it? he happens to be someone with power? he happens to want to take it down right away. he get in touch with cnn legal. 2 |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | weeks later, we get a cease & desist letter. we take the video down."). |
| 10.  On April 23, 2005, YouTube launched the "beta" version of the website, describing itself to the public as "the first online community site that allows members to post and share personal videos."  Hurley Decl. ¶¶ 4-5. | Controverted only to the extent that "beta" implies anything less than a fully functional website.  YouTube was a fully functional and operable website whose user base was growing significantly each day long before what Defendants claim was the site's "official" launch.  *See* Hurley Decl. ¶ 23. |
| 11.  In April 2005, YouTube's founders publicized their new website to the blog "Video Link" as follows: "A site called 'YouTube' has just launched. It allows members to post and share personal videos they've made. The site aims to become a community of digital video authors and their videos."  Schapiro Ex. 163. | Uncontroverted, but immaterial. |
| 12.  In April 2005, YouTube ran the following advertisement on the website "Craigslist": "YouTube.com is a web-based community based around creative and fun videos. We are seeking folks who possess a dash of technical know-how and a truckload of flare."  *Id.* Ex. 165. | Immaterial, but controverted to the extent that the cited document does not show that the text of Mr. Chen's email ever actually appeared on the Craigslist website. |
| 13.  In early May 2005, YouTube told the online technical publication *The Register*: "We just launched a new website, www.YouTube.com, based on the idea of video blogging where members would take clips ranging from the mundane to the fascinating. Our hope is that a community would be built around 'channels' such as 'Sports', 'Kids', 'Vacations', 'Cars', etc."  *Id.* Ex. 164. | Controverted, but immaterial.  The cited evidence is inadmissible hearsay.  *See* Evid. Obj. at 1. |
| 14.  On December 14, 2005, YouTube officially launched its website.  Hurley Decl. ¶ 23. | Controverted to the extent that "officially launched" is meant to suggest that the YouTube website was not yet fully functioning.  *See supra* ¶ 10. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 15.  The YouTube website allows users from around the world to upload videos free of charge to computer servers owned or leased by YouTube.  Solomon Decl. ¶ 2. | Uncontroverted. |
| 16.  The process of uploading a video to YouTube is initiated by YouTube's users.  *Id.* ¶ 2. | Controverted to the extent that "initiated by YouTube's users" obscures the full nature of the uploading process.  The process by which videos are uploaded to the YouTube website is a process designed and implemented by YouTube.  With respect to what occurs when a user uploads a video using that YouTube-designed process, Viacom does not dispute that a YouTube user chooses which video to upload and uses YouTube's upload functionality to complete the task, so long as that language accounts for the following:  (1) YouTube's co-founders and employees themselves uploaded videos to YouTube and thus are included within the term "users"; (2) YouTube has solicited users to upload videos; and (3) YouTube has compensated users for advertising run next to videos those users uploaded.  *See* Viacom SUF ¶ 78; Hohengarten Ex. 133, GOO001-02027618; Hohengarten Ex. 182, GOO001-02866493-512; Kohlmann Ex. 75 (Karim Dep.) at 131:12-24; Kohlmann Ex. 88 (Hurley Dep.) at 26:25-28:13; Kohlmann Ex. 51, JK00004875. |
| 17.  A user uploads a video by visiting the YouTube website, creating an account, selecting a video file from the user's computer or other storage device, and then clicking a button to instruct the YouTube system to upload that video.  *Id.* ¶ 3. | Uncontroverted. |
| 18.  YouTube does not control which videos a user chooses to upload to the site.  *Id.* ¶¶ 3, 9. | Controverted to the extent that the asserted fact implies that YouTube does not control which videos are uploaded to the site.  Although a YouTube user can select a video to upload to YouTube, YouTube determines whether the video will appear on the site.  For example, if a user selects a video in a format |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | that YouTube's upload process does not support, that video will be rejected.  If a user selects a video that is identical to a video that YouTube had previously blocked, that video will be blocked using YouTube's MD5 Hash technology.  *See* Viacom SUF ¶¶ 274-276.  And starting in February 2007, YouTube also began blocking videos for certain content owners using digital fingerprinting.  *See* Viacom SUF ¶¶ 293-298. |
| 19.  Uploaded video files are automatically processed by YouTube's computer systems and converted into file formats that are supported by a variety of viewing devices.  *Id.* ¶¶ 6-7. | Controverted.  Viacom denies Defendants' characterization of YouTube's file conversion process as "automatic" insofar as it implies that Defendants lack control over the process.  Videos uploaded to YouTube are copied and transcoded pursuant to a process that YouTube designed and implemented for its own benefit.  *See* Viacom SUF ¶¶ 315-321.  Further, YouTube manually transcoded a variety of videos that already were on YouTube into formats suitable for mobile platforms.  *See* Viacom SUF ¶ 330; Hohengarten Ex. 324 (Doig 30(b)(6) Dep.) at 43:2-48:21. |
| 20.  The series of events that is triggered by a user's decision to upload a video to YouTube and ends with the user's video being made playable on YouTube is fully automated and does not involve the intervention or active involvement of YouTube personnel.  *Id.* ¶ 2. | Controverted.  Viacom denies Defendants' characterization of YouTube's file conversion process as "automatic" insofar as it implies that Defendants lack control over the process.  *See supra* ¶ 19. |
| 21.  Anyone with Internet access and standard Internet browsing software can view for free the videos that users have stored on YouTube.  *Id.* ¶ 9. | Controverted.  The video files that users submit to YouTube's upload process are stored by YouTube in their original format, and those video files are not viewable by the public.  *Accord* Solomon Decl. ¶¶ 6, 7.  Only the transcoded copies that YouTube creates and stores are made accessible to the public on the YouTube website.  *See* Viacom SUF ¶¶ 315-323. |
| 22.  A user initiates playback of a YouTube video by selecting the video that the user wishes to view on the YouTube service.  *Id.* | Controverted to the extent that the asserted fact suggests that YouTube does not control which videos the user can select, or that |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | YouTube is not involved in the user's selection process.  YouTube not only controls the videos that are available for viewing, *see supra* ¶ 18, but also suggests which videos the user should select for playback.  *See* Viacom SUF ¶¶ 261, 331, 333-336, 338-342. |
| 23.  In response to a playback request, the YouTube system automatically streams a copy of the requested video from one of its video servers to the user's computer or other viewing device.  *Id.* | Controverted to the extent that the word "stream[ing]" is meant to suggest that YouTube does not send a complete copy of the video to the user's device.  YouTube does in fact send a complete, durable copy of the video to the user's device.  *See* Hohengarten Decl. ¶ 408. |
| 24.  In almost all cases, YouTube prohibits users from downloading videos from the site, and does not offer that functionality to users. *Id.* ¶ 10. | Controverted.  It is undisputed that when a user plays a YouTube video, YouTube downloads a complete, durable copy of the video to the user's device.  *See supra* ¶ 23. |
| 25.  Users may search the YouTube website for videos by entering a query of terms the user deems relevant into search fields provided on various pages throughout the site. *Id.* ¶ 11. | Controverted to the extent that this fact as stated implies that there are no other ways to search YouTube for videos.  To the contrary, YouTube provides a variety of ways— including browse and category pages and the suggested search function—for users to search YouTube.  *See, e.g.*, Viacom SUF ¶¶ 261, 331, 333, 338-42. |
| 26.  In response to the query, the service automatically returns a results page that shows the user a page or pages containing single, reduced-size images of the video clips that the search algorithm identifies as being responsive to the user's query, accompanied by a portion of the text the user who uploaded the video provided to describe the video.  *Id.* | Controverted.  Viacom denies Defendants' characterization of YouTube's search query process as "automatic" insofar as it implies that Defendants lack control over the process.  YouTube's search function is designed and controlled by Defendants.  The index of information that the search function draws upon to deliver search results is constantly and actively updated by Defendants.  *See* Viacom SUF ¶¶ 279, 337.  Furthermore, the ranking of search results is determined by Defendants. *See, e.g.*, Kohlmann Ex. 19, GOO001- |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | ███████████████████<br><br>Further, while it is correct that users who upload videos provide information that YouTube incorporates into the search function, it is YouTube that has required users to provide that information.  *See* Hohengarten Ex. 364 (deposition "cheat sheet" prepared by Cuong Do listing data YouTube maintains regarding videos); Hohengarten Ex. 344 (Liu Dep.) at 63:22-64:23 (describing how YouTube requires the entry of certain information during the upload process). |
| 27.  When YouTube officially launched in December 2005, it was receiving approximately 6,000 new video uploads each day, and its users were watching nearly 2.5 million videos each day.  Hurley Decl. ¶ 23 & Ex. 28. | Controverted.  *See supra* ¶ 14. |
| 28.  By February 2006, the number of daily video uploads to YouTube was 25,000.  *Id.* | Uncontroverted. |
| 29.  In July 2006, users uploaded to YouTube more than 2.1 million videos to the site, and watched more than 3 billion videos.  *Id.* | Uncontroverted. |
| 30.  By December 2007, users were uploading to YouTube more than 300,000 videos each day and site traffic had reached 800 million daily video views.  *Id.* ¶ 23. | Uncontroverted. |
| 31.  By July 2008, uploads to YouTube had reached more than 400,000 videos per day.  *Id.* | Uncontroverted. |
| 32.  More than 500 million videos have been posted to YouTube.  Levine Decl. ¶ 26. | Controverted.  The cited evidence is inadmissible as it contains improper lay opinions and generalized and conclusory statements.  *See* Evid. Obj. at 15-16. |

**Subject to Protective Order – HIGHLY CONFIDENTIAL**

| Asserted Undisputed Fact | Response |
|---|---|
| 33.  Less than 1% of the more than 500 million videos posted to YouTube have been the subject of a DMCA takedown notice or an equivalent takedown request sent to YouTube by a copyright owner.  *Id.* | Controverted, and in any event immaterial to any issue before the Court.  To the extent that the asserted fact is intended to indicate the percentage of videos uploaded to YouTube that infringe copyright, it is contradicted by Defendants' own contemporaneous internal assessments that the volume of infringement on YouTube ranged from 54% to 80% from YouTube's launch in mid-2005 through late 2006, when YouTube first began to enter into licensing agreements with content owners.  *See* Viacom SUF ¶¶ 55, 95, 104, 153, 170, 171, 173, 174, 176, 181.<br><br>The asserted fact is also misleading in that it ignores all evidence of infringement other than what YouTube has considered to be a "DMCA takedown notice or an equivalent takedown request," under YouTube's flawed interpretation of the DMCA.   For example, Defendants have refused copyright holders' requests to remove videos unless the copyright holder identifies specific URLs to YouTube.  *See* Hohengarten Ex. 382, GOO001-08050272 (rejecting Mr. Fricklas's request that YouTube respond to representative lists); *see also* Kohlmann Ex. 13, GOO001-00707687 ("I will need the specific URL to the video"); Kohlmann Ex. 3, GOO001-00040895 ("Please understand that we need the links to the videos themselves."), Kohlmann Ex. 31, GOO001-02975607-08 (August 2007 email from Pim Dubbeldam, who "heads up the copyright pod" within YouTube's content review department, identifying three videos of the same content, only two of which were the subject of a takedown notice, and noting that "[i]n order for the active video to be blocked, we need to receive a separate DMCA request from the content owner").  The asserted fact also ignores the millions of videos that have been blocked or removed from YouTube in 2007-2010 by YouTube's digital fingerprinting technology.  *See* Kohlmann Ex. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | 30, GOO001-02925393 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Kohlmann Ex. 14, GOO001-00730943, at GOO001-00730974 ("one of the conclusion that I think we should also draw from these tests is that it seems we have a pretty high percentage of our content that will be flagged as copyrighted as soon as we start using fingerprinting technology.").<br><br>Furthermore, the asserted fact is not supported by the cited evidence, Levine Decl. ¶ 26.  Ms. Levine's declaration states that "YouTube has removed approximately 4.7 million videos from the service *in response to* DMCA take down notices and equivalent take down requests." *Id.* (emphasis added).  Her declaration does not state how many videos were "*the subject of* a DMCA takedown notice and equivalent takedown requests."  Further, her declaration does not state how many videos were the subject of a DMCA takedown notice, but were not removed, nor does her declaration state how many videos would have been alleged to infringe copyright had YouTube treated such notices as "representative lists."<br><br>Finally, the cited evidence is inadmissible as it contains improper lay opinions and generalized and conclusory statements.  *See* Evid. Obj. at 15-16. |
| 34.  YouTube hosts hundreds of millions of videos that no one has ever alleged to infringe any copyright. *Id.* | Controverted.  The cited evidence is inadmissible as it contains improper lay opinions and generalized and conclusory statements.  *See* Evid. Obj. at 15-16. |
| 35.  At present, more than 24 hours of new video is uploaded to YouTube every minute, or almost four years worth of new video every day.  Hurley Decl. ¶ 26. | Uncontroverted. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 36.  YouTube does not manually prescreen or review each of the videos uploaded to the service by its users.  Levine Decl. ¶ 26; Hurley Decl. ¶ 18; Decl. of Micah Schaffer in Support of Defs. Mot. for Summary Judgment ("Schaffer Decl.") ¶ 11. | Controverted.  YouTube co-founder Jawed Karim testified that YouTube likely did pre-screen videos for some period of time.  He also stated that YouTube's doing so later in YouTube's existence would have been a "one-line code change."  *See* Viacom SUF ¶ 280.<br><br>Levine Decl. ¶ 26 is inadmissible as it contains improper lay opinions and generalized and conclusory statements.  *See* Evid. Obj. at 15-16.<br><br>Hurley Decl. ¶ 18 is inadmissible as it contains improper lay opinions.  *See* Evid. Obj. at 3. |
| 37.  YouTube is a platform for aspiring artists and filmmakers.  Decl. of Hunter Walk in Support of Defs. Mot. for Summary Judgment ("Walk Decl.") ¶ 16. | Uncontroverted, but immaterial to any issues before the Court.  YouTube traffic also consisted overwhelmingly of infringement, as quantified by Defendants themselves.  *See, e.g.*, Viacom SUF ¶¶ 57, 60, 95, 104, 153, 170, 171, 173, 174. |
| 38.  YouTube is a source of political information.  *Id.* ¶¶ 6, 8, 9. | Uncontroverted.  *See supra* ¶ 37. |
| 39.  Governments and other official bodies have established channels on, and posted videos to, YouTube, including the Vatican, the Kremlin, the Queen of England, the United Nations, and the governments of Iraq, Israel, South Korea, and Estonia.  Walk Decl. ¶ 8. | Uncontroverted.  *See supra* ¶ 37. |
| 40.  Colleges and universities have posted videos to YouTube, including tens of thousands of video-lectures on academic subjects.  *Id.* ¶ 12. | Uncontroverted.  *See supra* ¶ 37. |
| 41.  Nonprofit organizations have posted videos to YouTube to publicize their causes.  *Id.* ¶¶ 10-11. | Uncontroverted.  *See supra* ¶ 37. |
| 42.  Law enforcement officials have posted videos to YouTube seeking the public's help in identifying criminal suspects.  *Id.* ¶ 19. | Uncontroverted.  *See supra* ¶ 37. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 43.  Movie and television studios (including CBS, NBC/Universal, BBC, and Lions Gate), sports leagues (including the NBA and NHL), record labels (including Universal Music Group, Sony, Warner Music Group, and EMI), and music publishers have entered into content partnership arrangements with YouTube. Decl. of Christopher Maxcy in Support of Defs. Mot. for Summary Judgment ("Maxcy Decl.") ¶ 9. | Uncontroverted. |
| 44.  Viacom executives and employees have uploaded and watched videos on YouTube. Schapiro Ex. 127 (129:21-130:14), Ex. 128 (79:7-80:3, 81:17-24, 83:12-16, 84:14-18), Ex. 129 (215:25-218:8, 224:2-225:13), Ex. 130 (19:10-14, 55:21-24), Ex. 25 (253:10-19), Ex. 112 (16:19-25). | Uncontroverted as to the specific Viacom personnel identified in the cited documents, but immaterial to any issues before the Court. |
| 45.  Employees of the putative class plaintiffs have uploaded and watched videos on YouTube.  Schapiro Ex. 20 (100:12-103:9), Ex. 78 (235:1-238:7), Ex. 131. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 46.  Viacom considered buying YouTube.  *See* Schapiro Ex. 3 (77:7-15). | Uncontroverted that in or about July 2006, Viacom personnel considered whether an acquisition of YouTube would be desirable and feasible from a financial perspective.  *See* Kohlmann Ex. 61, VIA00613146; Kohlmann Ex. 71 (Freston Dep.) at 72:9-16.  After a preliminary evaluation, they concluded that an acquisition could not be justified financially. *See* Kohlmann Ex. 59, VIA00258309 (Bob Bakish writing to Jason Witt on July 17, 2006, stating that there was "less than one tenth of a percent chance" of going forward with an acquisition); Kohlmann Ex. 85 (Wolf Dep.) at 84:24-87:2 (testifying that "we could [not] build a sufficient business model that would justify an acquisition").<br><br>Controverted to the extent that the asserted fact suggests that Viacom personnel conducted |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | any diligence beyond the above-described activities.  Defendants have presented no evidence that they produced any acquisition materials to Viacom or even that Viacom sought due diligence materials, engaged with any legal analysis or prepared a term sheet for a potential acquisition – let alone offered to buy YouTube.  Indeed, Viacom made no such offer to acquire YouTube.  Kohlmann Ex. 71 (Freston Dep.) at 94:6-8.  The asserted fact is immaterial to any issues before the Court. |
| 47.  Senior executives at Viacom viewed the prospect of acquiring YouTube as a "transformative acquisition."  *Id.* | Controverted as misleading.  *See supra* ¶ 46. |
| 48.  Beginning with its launch and continuing today, YouTube requires its users to agree to Terms of Service before being permitted to upload a video to the site.  Hurley Decl. ¶ 8; Levine Decl. ¶ 6. | Uncontroverted. |
| 49.  YouTube's Terms of Service have always prohibited users from submitting copyrighted material that they are not authorized to upload. Hurley Decl. ¶ 8; Levine Decl. ¶ 6. | Controverted to the extent that the asserted fact implies that the prohibition on infringement in the Terms of Service has been effective in keeping users from uploading infringing material to YouTube.  It is undisputed that in 2005 and 2006, YouTube's co-founders and other employees knew that YouTube users were uploading massive amounts of infringing material.  *See* Viacom SUF ¶¶ 29-132.  It is also undisputed that Defendants decided to turn a blind eye toward that infringement so that YouTube's user base would continue to grow rapidly.  *Id.* |
| 50.  Virtually every page of the YouTube website contains a direct link to YouTube's Terms of Service.  *Id.* | Uncontroverted. |
| 51.  Since October 2006, YouTube has displayed "Community Guidelines" on its site instructing users to "respect copyright" and only to "upload videos that you made or that you are authorized to use."  *Id.* ¶ 7. | Controverted to the extent that the stated fact implies that YouTube has displayed the Community Guidelines to all users, when in fact they are seen only by users who click on the "Community Guidelines" link on the YouTube website.  *See* Kohlmann Decl. at ¶ |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | 103.<br><br>Further controverted to the extent that the asserted fact implies that displaying a link to the Community Guidelines has been effective in keeping users from uploading infringing material to YouTube.  The undisputed evidence establishes that YouTube's co-founders and other employees knew that YouTube users were uploading massive amounts of infringing material, and that YouTube turned a blind eye to that infringement.  *See supra* ¶¶ 37, 49. |
| 52.  Since at least March 2006, each time a user seeks to upload a video, YouTube informs its users, via multiple messages displayed in the upload process, that they are prohibited from uploading copyrighted content unless they have the right or authorization to do so.  *Id.* ¶ 8. | Controverted to the extent that the asserted fact implies that these messages have been effective in keeping users from uploading infringing material to YouTube.  The undisputed evidence establishes that YouTube's co-founders and other employees knew that YouTube users were uploading massive amounts of infringing material, and that YouTube turned a blind eye to that infringement.  *See supra* ¶¶ 37, 49. |
| 53.  Since at least March 2006, YouTube has provided a "Copyrights Tips" page that gives users guidance on copyright issues and describes the consequences to users of copyright infringement on the site.  *Id.* ¶¶ 9, 15. | Controverted to the extent that the stated fact implies that YouTube has displayed the "Copyright Tips" page to all users.  In fact, YouTube only displays the "Copyright Tips" page to those users who see the "Copyright Tips" link on the YouTube website and who choose to click on that link.  Kohlmann Decl. ¶ 104.<br><br>Further controverted to the extent that the asserted fact implies that displaying a link to the Copyright Tips page has been effective in keeping users from uploading infringing material to YouTube.  The undisputed evidence establishes that YouTube's co-founders and other employees knew that YouTube users were uploading massive amounts of infringing material, and that YouTube turned a blind eye to that infringement.  *See supra* ¶¶ 37, 49. |

**Subject to Protective Order – HIGHLY CONFIDENTIAL**

| **Asserted Undisputed Fact** | **Response** |
|---|---|
| 54.  The Copyrights Tips page links to other pages containing additional information about copyright.  *Id.* ¶ 9. | Uncontroverted. |
| 55.  Since at least March 2006, YouTube has required that users submit a valid and working email address to YouTube before uploading any videos.  *Id.* ¶ 11. | Controverted to the extent that the asserted fact implies that requiring users to submit a valid and working email address to YouTube before uploading any videos has been effective in keeping users from uploading infringing material to YouTube.  The undisputed evidence establishes that YouTube's co-founders and other employees knew that YouTube users were uploading massive amounts of infringing material, and that YouTube turned a blind eye to that infringement.  *See supra* ¶¶ 37, 49. |
| 56.  Since at least March 2006, YouTube has verified the accuracy of its users' email addresses to ensure there is a mechanism for warning users of improper use of the YouTube service.  *Id.* | Controverted to the extent that the asserted fact implies that verifying the accuracy of user's email addresses is effective in keeping users from uploading infringing material to YouTube.  The undisputed evidence establishes that YouTube's co-founders and other employees knew that YouTube users were uploading massive amounts of infringing material, and that YouTube turned a blind eye to that infringement.  *See supra* ¶¶ 37, 49. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 57.  Since March 2006, YouTube has limited the duration of videos uploaded by most users to 10 minutes to prevent users from uploading a video consisting of an entire television show or feature-length film.  *Id.* ¶ 12. | Controverted to the extent that the asserted fact implies that the ten minute limit has been effective in keeping users from uploading infringing material to YouTube.  The undisputed evidence establishes that YouTube's co-founders and other employees knew that YouTube users were uploading massive amounts of infringing material, and that YouTube turned a blind eye to that infringement.  *See supra* ¶ 49.  The undisputed evidence also shows that YouTube users have uploaded infringing works longer than ten minutes by chopping them up into several ten minute parts, a process known as serial uploading.  YouTube considered taking steps to address this problem but did not do so.  *See* Viacom SUF ¶¶ 109, 125, 131; *see also* Wilkens Decl. ¶¶ 3, 4(b) (regarding serial uploading of Viacom's clips in suit). <br><br> Further controverted to the extent that the asserted fact implies that Defendants imposed the ten minute limit solely to prevent copyright infringement.  The ten minute limit provided YouTube with significant cost savings on bandwidth and storage space.  *See* Kohlmann Ex. 68 (Dunton Dep.) at 211:13-23. |
| 58.  YouTube has never instructed users to engage in copyright infringement.  Hurley Decl. ¶ 20. | Controverted.  It is undisputed that YouTube's co-founders and employees have uploaded infringing videos to YouTube, have shared infringing YouTube videos with others, and have encouraged users to leave infringing videos on YouTube.  *See* Hohengarten Ex. 229, JK00007423 (Karim responding with laughter to clear infringement); Hohengarten Ex. 218, JK00009595 (Chen chastising Karim for "put[ting] up 20 videos of pornography and obviously copyrighted materials and then link[ing] them from the front page"); Hohengarten Ex. 217, JK00006166 (Chen chastising Karim for "blatantly stealing content from other sites and trying to get everyone to see it"); Viacom SUF ¶ 78 (discussing awarding an infringing user with |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
|  | an iPod Nano); Hohengarten Ex. 197, GOO001-00507331, at 2-3 & at GOO001000507331-32 (Maryrose Dunton starting "5 groups based on copyrighted material"); Hohengarten Ex. 377, GOO001-07169928, at 2 & at GOO001-07169928 (Matt Liu encouraging his friend to leave infringing content on the site); Hohengarten Ex. 32, GOO001-03631419 (*Daily Show* clip); Hohengarten Ex. 72, GOO001-03383629 (*Colbert Report* clip); Hohengarten Ex. 73, GOO001-01364485 (*South Park* clip); Hohengarten Ex. 75, GOO001-00217336 (*Daily Show* clip); and Hohengarten Ex. 77, GOO001-05154818 (*Daily Show* clip); Kohlmann Ex. 6, GOO001-00241682 (YouTube engineer Cuong Do urging other YouTube personnel to watch the Lazy Sunday clip, noting that "[t]his was the original upload that made headlines," and that while it was public "I was too busy keeping the video streaming to our users"); Kohlmann Ex. 33, GOO001-03630988 (Jawed Karim sharing a MTV News clip); Kohlmann Ex. 52, JK00008527 (Jawed Karim sharing a *Saturday Night Live* clip); Kohlmann Ex. 53, JK00008555 (Jawed Karim sharing a *Late Night with Conan O'Brien* clip); Kohlmann Ex. 54, JK00008591 (Jawed Karim sharing a *Late Night with Conan O'Brien* clip); Kohlmann Ex. 55, JK00008595 (Jawed Karim sharing a *Late Night with Conan O'Brien* clip); Kohlmann Ex. 56, JK00008614 (Jawed Karim sharing a *Saturday Night Live* clip); Kohlmann Ex. 57, JK00008621 (Jawed Karim sharing a *60 Minutes* clip); Kohlmann Ex. 58, JK00008631 (Jawed Karim sharing a *Daily Show* clip). Furthermore, it is undisputed that YouTube encourages users to watch infringing videos through the "related videos" and "suggested search" features, which often direct users to infringing content. *See* Viacom SUF ¶¶ 332, |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | 335, 339. |
| 59.  YouTube has never encouraged users to engage in copyright infringement.  *Id.* | Controverted.  *See supra* ¶ 58. |
| 60.  Since September 2005, YouTube has displayed information on its website instructing copyright holders how to provide notice to YouTube's designated agent of allegedly unauthorized materials uploaded by users.  Hurley Decl. ¶ 21; Levine Decl. ¶¶ 15-16. | Uncontroverted but immaterial.  Defendants' DMCA Defense requires Defendants to have a designated agent registered with the Copyright Office.  17 U.S.C. § 512(c)(2).  Defendants concede that they did not register an agent with the Copyright Office until October 21, 2005.  *See* Defs. SUF ¶ 61; Hurley Ex. 26. |
| 61.  YouTube formally registered its DMCA agent with the Copyright Office in October 2005.  Hurley Decl. ¶ 21. | Uncontroverted. |
| 62.  YouTube's DMCA agent's contact information is accessible through YouTube's "Copyright Infringement Notification" page. Levine Decl. ¶ 15. | Controverted as to any period of time prior to October 21, 2005, as YouTube did not have a registered DMCA agent at that time.  *See supra* ¶¶ 60-61. |
| 63.  Since at least March 2006, a link to the Copyright Infringement Notification page has been included at the bottom of virtually every page of the YouTube website.  *Id.* | Uncontroverted as to March 2006 and later. Controverted prior to March 2006, as Defendants have offered no evidence relevant to that period of time. |
| 64.  YouTube removes or disables access to allegedly infringing videos whenever it receives a DMCA-compliant takedown notice. *Id.* ¶ 19; Schaffer Decl. ¶ 10. | Controverted.  Ms. Levine's testimony covers only the period from March 2006 to the present, while she has been at YouTube. Levine Decl. ¶¶ 19, 4.  Furthermore, Mr. Schaffer's testimony is too general to support the proposition that YouTube has removed or disabled access to every infringing video for which YouTube has received a DMCA-compliant takedown notice.  Schaffer Decl. ¶ 10.  More importantly, it is undisputed that YouTube has not removed or disabled access to infringing videos identified in "representative lists," as required by 17 U.S.C. § 512(c)(3)(A)(ii), *see supra* ¶ 33. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 65.  YouTube removes almost all videos identified in DMCA notices within 24 hours of receipt.  Levine Decl. ¶ 19. | Controverted.  *See supra* ¶ 64. |
| 66.  For approximately 85% of the DMCA notices it has received, YouTube removes the identified videos within a few minutes.  *Id.* | Controverted.  *See supra* ¶ 64. |
| 67.  YouTube employs a dedicated team throughout the world to process manually-submitted DMCA notices and to assist copyright holders and users with issues arising from the notice process.  *Id.* | Uncontroverted that Defendants currently employ such a team.  Defendants have not proffered any evidence regarding earlier periods. |
| 68.  On February 2, 2007, Viacom (through its agent, BayTSP) sent DMCA notices requesting that YouTube remove more than 100,000 videos from the service.  Levine Decl. ¶ 20; Schaffer Decl. ¶ 14. | Uncontroverted. |
| 69.  YouTube removed virtually all of the videos identified in Viacom's February 2, 2007 mass takedown notices before the next business day.  Levine Decl. ¶ 20; Schaffer Decl. ¶ 14. | Controverted.  As noted, YouTube has not removed or disabled access to infringing videos not identified in "representative lists," as required by 17 U.S.C. § 512(c)(3)(A)(ii), *see supra* ¶ 33.  Indeed, Viacom's General Counsel demanded that YouTube treat the February 2, 2007 notice as a representative list:  "[T]ake down all instances of the copyrighted programming identified in today's take down notices, whether or not the particular file has been specifically identified in an individual notice.  In other words, differing excerpts and full length copies of each of the works identified in a notice must be taken down immediately. . . .  [R]emove all infringing Viacom copyrighted content that can reasonably be identified based on the representative lists provided thus far."  Hohengarten Ex. 244, VIA01475466, at VIA01475466-67.  Google's General Counsel refused to remove any content other than the specific URLs listed in Viacom's notice.  *See* Hohengarten Ex. 382, GOO001-08050272 ("[C]opyright owners must provide specific |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | identification of any infringing items and their location, not merely a 'representative list.'"). |
| 70.  YouTube's responsiveness to DMCA takedown requests has drawn praise from content owners.  Levine Decl. ¶ 22; Schapiro Ex. 120. | Controverted, to the extent that the asserted fact implies that content owners have not criticized YouTube's responsiveness to takedown requests.  *See, e.g.*, Hohengarten Ex. 244 (Letter from Viacom General Counsel Michael Fricklas criticizing YouTube's position "that it has no obligation to implement measures to prevent or reduce the rampant infringement on its site, other than to delete or block access to specific infringing videos identified in notices provided by a rights holder"); Kohlmann Ex. 29, GOO001-02826791, at GOO001-02826794 (Letter from NBC Universal General Counsel Rick Cotton: "For many months, NBCU has been incurring the burden and expense of attempting to locate video clips from copyrighted works owned by NBCU entities and sending 'takedown notices' to YouTube to remove from its site thousands of such clips.  Yet, in what has become an 'evergreen' cycle of infringement, the same content frequently reappears on YouTube's site almost as quickly as it is removed. . . .  Indeed, despite substantial efforts at sending takedown notices on a daily basis, the infringing clips on which NBCU sent takedown notices in January 2007 alone had generated more than 28 million page views on YouTube."); Kohlmann Ex. 1, GOO001-00005708 (Email from representative of the musical artist Prince, stating: "This list below isn't even 1/8th of the illegal Prince videos on your site. I suggest YouTube either start policing itself or else face legal ramifications. . . . You cannot expect copyright holders to police your website for you on their time while YouTube gets away with breaking the law repeatedly."); Kohlmann Ex. 7, GOO001-00448911 (Email from content owner stating:  "You were good enough to remove the last bunch of pictures |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | pirated from us and put up on your site or a site operating through YouTube, and I thank you.  However, within a week someone at YouTube has helped themselves to 31 more of our pictures. . . .   YouTube's apparent lack of understanding or respect for copyright law is not my problem.  I have neither the time nor the patience to continue policing your site for the illegal use of our property.").  Indeed, in handwritten notes on a printout of a document containing complaints from a content owner, YouTube's DMCA agent Heather Gillette set out the philosophy that the founders recognized would grow YouTube's user base the most:  "the users [are] violating the law[,] not us."  Kohlmann Ex. 1, GOO001-00005708.<br><br>Moreover, Levine Decl. ¶ 22 contains inadmissible hearsay.  *See* Evid. Obj. at 14. |
| 71.  Since at least March 2006, when YouTube has removed a video pursuant to a DMCA notice, YouTube has contacted the user who uploaded the video to apprise that user of the allegation in the notice.  Levine Decl. ¶ 23. | Uncontroverted. |
| 72.  Since at least March 2006, when YouTube has removed a video pursuant to a DMCA notice, YouTube has contacted the user who uploaded the video to remind that user of YouTube's policy prohibiting the uploading of unauthorized copyrighted material.  *Id.* | Uncontroverted. |
| 73.  Since at least March 2006, when YouTube has removed a video pursuant to a DMCA notice, YouTube has contacted the user who uploaded the video to warn that user that repeated acts of copyright infringement will result in the termination of the user's YouTube account.  *Id.* | Uncontroverted. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 74.  Since at least March 2006, when YouTube removes a video pursuant to a DMCA notice, it sends this message to the user who posted the video:<br><br>Repeat incidents of copyright infringement will result in the deletion of your account and all videos uploaded to that account. In order to avoid future strikes against your account, please delete any videos to which you do not own the rights, and refrain from uploading additional videos that infringe on the copyrights of others. For more information about YouTube's copyright policy, please read the Copyright Tips guide.<br><br>Levine Decl. ¶ 23 & Ex. 12. | Uncontroverted. |
| 75.  Since at least March 2006, after an allegedly infringing video is removed from the site, YouTube has posted a notice at the video's prior location on the site stating that the video is no longer available due to a copyright claim.  *Id.* ¶ 24. | Uncontroverted. |
| 76.  Since at least October 2005, YouTube has had a policy for terminating the accounts of repeat infringers, which it has posted on its website.  Hurley Decl. ¶ 21; Levine Decl. ¶ 27. | Controverted, to the extent that the asserted fact implies that YouTube had adopted a repeat infringer policy prior to October 2005. Defendants have not proffered any evidence regarding the pre-October 2005 period. Further controverted in that Defendants did not begin applying the policy until early 2006. *See* Kohlmann Ex. 18, GOO001-00830262 (December 28, 2005 email from Steve Chen stating: " i created a UserAbuse table and it's being used to track each time the user gets a video dinged (there are two types of dings, one is just rejecting the video but doesn't increment the three strikes rule, the other one does increment the three strikes rule).  the thing is, this part hasn't been hooked up yet to actually closing the account."); Hohengarten Ex. 22, GOO001-00762173, at GOO001- |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | 00762187 (February 17, 2006 YouTube Board presentation, noting that as part of a January 19, 2006 set of site features YouTube released "[a]ccount suspension after 3 video rejections."). |
| 77.  Under YouTube's repeat-infringer policy, a "strike" is issued to a user when YouTube receives a takedown notice for material that the user has uploaded.  Levine Decl. ¶ 27. | Controverted.  Defendants have regularly counted multiple infringing clips uploaded by the same user as a single "strike" against that user.  Defendants have counted multiple infringing acts by the same user as a single "strike" as a matter of course in two situations: (a) where multiple infringing clips uploaded by the same user are all identified in the same notice of infringement, and (b) where multiple infringing clips uploaded by the same user are identified in different notices of infringement, but those notices are all received by YouTube within the same two-hour period.  *See, e.g.*, Levine Decl. ¶ 28 ("YouTube assesses a single strike per notice, including in circumstances where a DMCA notice identifies more than one allegedly infringing video for the same user"); Hohengarten Decl. Ex. 382, GOO001-08050272 (February 17, 2007 K. Walker email to M. Fricklas, stating:  "YouTube's 'three strikes' policy meets this test by banning users after YouTube receives a third infringement notice regarding a user . . . .  (We currently deem all URL's processed within any two-hour period to be part of the same 'notice.')"). <br><br> Further, for approximately six months in 2007, Defendants failed to adequately inform users – including content owners – of their repeat infringer policy not to give strikes in response to a CYC block.  *See infra* ¶ 83. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 78.  When an account receives three strikes, in virtually all cases YouTube terminates that account.  *Id.* | Controverted.  YouTube did not begin terminating accounts that received three strikes until at least January 2006.  *See supra* ¶¶ 76-77.<br><br>Further controverted because Defendants have regularly counted multiple infringing clips uploaded by the same user as a single "strike" against that user, as described at *supra* ¶ 77. |
| 79.  When YouTube terminates a user's account, the account can no longer be used for any purpose on the site.  Levine Decl. ¶ 30. | Uncontroverted that this is YouTube's current practice.  With regard to earlier periods, Viacom lacks knowledge to admit or controvert the alleged fact.  In any event, the asserted fact is immaterial, because even after YouTube terminates a repeat infringer, the repeat infringer can sign up for a new account merely by using a different email address.  *See, e.g.*, Kohlmann Ex. 80 (Schaffer Dep.) at 127:25-128:17 (testifying that strikes are allocated by email address and that all a user need do to bypass YouTube's repeat infringer policy is "know to create a new e-mail address").  Opening a new email account is very simple and can be done using Google's own free email service, Gmail.  *See supra* ¶ 56, *infra* ¶ 82. |
| 80.  When YouTube terminates a user's account, YouTube terminates all other accounts associated with that user's email address.  *Id.* | Uncontroverted. |
| 81.  When YouTube terminates a user's account, YouTube removes all of the videos uploaded to the site from the terminated account, including videos that were not subject to any DMCA notice.  *Id.* | Uncontroverted. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 82.  When YouTube terminates a user's account, YouTube seeks to prevent the user from subsequently creating another account by recording and blocking the email address associated with the terminated account.  *Id.* | Uncontroverted. |
| 83.  YouTube's Terms of Service set forth YouTube's repeat-infringer policy.  Levine Decl. Exs. 1, 2. | Controverted for the period prior to December 2005.  Defendants have not proffered any Terms of Service for period prior to December 2005.  Furthermore, YouTube did not apply its repeat infringer policy by terminating repeat infringers until early 2006.  *See supra* ¶ 76.<br><br>Further, for approximately six months in 2007, Defendants failed to adequately inform users – including content owners – of their repeat infringer policy.  During that period, Defendants secretly implemented a policy of not assigning any copyright strikes to users who uploaded tens of thousands of infringing clips that were blocked by YouTube's Claim Your Content fingerprinting tool.  *See, e.g.*, Kohlmann Ex. 28, GOO001-02604740, at GOO001-02604741 (March 2007 email chain in which Chastagnol says:  "currently we do not give user a strike if content is taken down via CYC"); Kohlmann Ex 49, GOO001-01519246 (June 4, 2007 email from Justin Gupta to Jacob Pruess and others) ("The BBC definitely think that their CYC takedowns are actioning the strikes. . . I'll hold them at bay until such time that it actually is."); Kohlmann Ex. 50, GOO001-05611423 ("This is something I would rather not announce to the world."); Kohlmann Ex. 86 (Chastagnol Dep.) at 97:10-99:15 (testifying that his understanding in March 2007 was that YouTube did not impose strikes for content removed using the CYC tool); Kohlmann Ex. 2, GOO001-00035137 (July 26, 2007 email) ("I understand that we don't count strikes against users when their videos are taken down through the CYC tool."). |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 84.  YouTube communicates its repeat-infringer policy to its users via its website, including on the "Copyright Tips" page and the "Help" section of the site. *Id.* ¶ 27. | Uncontroverted that this is YouTube's current practice.  However, for approximately six months in 2007, during which Defendants failed to adequately inform users – including content owners – of their repeat infringer policy not to give strikes in response to a CYC block.  *See supra* ¶ 83. |
| 85.  Users also are notified of YouTube's repeat-infringer policy when they receive an email notifying them that a video they uploaded to YouTube has been removed due to alleged copyright infringement. *Id.* ¶ 23 & Ex. 12. | Uncontroverted that this is YouTube's current practice.  Controverted because for approximately six months in 2007 Defendants secretly implemented a policy of not assigning any copyright strikes to users who uploaded tens of thousands of infringing clips that were blocked by YouTube's CYC fingerprinting tool.  For each such infringing clip that was not counted as a strike, YouTube did not notify the uploading user that a video they uploaded to YouTube was removed due to alleged copyright infringement.  *See supra* ¶ 83. |
| 86.  Applying its repeat-infringer policy, YouTube has terminated more than 400,000 (of the more than 250,000,000) user accounts based at least in part for copyright strikes. *Id.* ¶ 31. | Controverted to the extent that the asserted fact is intended to imply that only approximately 400,000 of YouTube's user accounts have been used to commit copyright infringement.  As noted *supra* ¶ 76, YouTube did not begin applying its repeat infringer policy until January 2006.  Even after that time, Defendants have regularly counted multiple infringing clips uploaded by the same user as a single "strike" against that user.  *Supra* ¶ 77.  Thus, the number of accounts terminated for repeat infringement is likely substantially lower than the number of accounts that have been used to commit repeat infringement. |
| 87.  YouTube has received praise from content owners for its efforts to restrict and address copyright infringement by its users. *Id.* ¶¶ 32-33. | Controverted to the extent that Defendants imply that YouTube's responsiveness to copyright infringement on its site has been only or even primarily subject to praise.  YouTube's policies with respect to copyright infringement on its site have drawn significant criticism from copyright owners, the media, |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | and even Google prior to the acquisition.  *See* Viacom SUF ¶¶ 33, 89-91, 100, 122, 140, 142, 144, 145, 151, 152, 153, 157, 164, 165, 209, 225; Kohlmann Ex. 29, GOO001-02826792-98, at GOO001-02826792-98 (letter from NBC Universal Executive VP and General Counsel Richard Cotton).<br><br>Defendants also rely on inadmissible hearsay to support the alleged fact.  *See* Evid. Obj. at 14. |
| 88.  In March 2006, YouTube began using MD-5 hash technology to create a digital "fingerprint" of every video that YouTube removes in response to a DMCA takedown notice.  *Id.* ¶ 25; Decl. of David King ("King Decl.") ¶ 4. | Controverted.  MD-5 hash technology does not create a digital fingerprint.  Hash-based identification cannot prevent re-upload of the same infringing content to YouTube if the second video clip differs in even the slightest degree (*e.g.*, in length or resolution) from the first clip that was removed.  *See* Viacom SUF ¶ 275.<br><br>"Digital fingerprinting" refers to audio fingerprinting or video fingerprinting.  *See* Viacom SUF ¶ 281.  YouTube did not employ audio fingerprinting – from a vendor called Audible Magic – until February 2007, and even then provided it only to those content owners who agreed to enter into licensing deals with YouTube.  YouTube never employed Audible Magic audio fingerprinting for Viacom.  *See* Viacom SUF ¶¶ 293-296.  Furthermore, YouTube did not employ video fingerprinting until late 2007, and did not provide it to Viacom until May 2008.  *See* Viacom SUF ¶ 222; Kohlmann Ex. 5, GOO001-00241143 (showing launch of video fingerprinting for Hearst Argyle, LinTV, and Tribune on October 5, 2007).<br><br>Further controverted because Levine Decl. ¶ 25 confuses the issues in violation of Fed. R. Evid. 403.  *See* Evid. Obj. at 15. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 89.  The MD-5 technology automatically prevents any user from uploading a video file identical to one that had previously been removed in response to a DMCA takedown notice.  Levine Decl. ¶ 25. | Controverted.  Viacom denies Defendants' characterization of YouTube's hash technology as "automatic" insofar as it implies that Defendants lack control over the process. In fact, Defendants determine when and how the hash technology will be employed. Additionally, hash-based identification cannot prevent re-upload of the same infringing content to YouTube if the second video clip differs in even the slightest degree (*e.g.*, in length or resolution) from the first clip that was removed. *See* Viacom SUF ¶ 275. |
| 90.  In March 2006, YouTube launched its Content Verification Program ("CVP").  *Id.* ¶ 18. | Uncontroverted. |
| 91.  CVP is open to any copyright owner.  *Id.* | Uncontroverted. |
| 92.  CVP enables copyright owners to locate and flag their videos on YouTube and send DMCA notices electronically.  *Id.* | Controverted, to the extent that the asserted fact implies that CVP assists copyright owners in locating infringing content on YouTube. Even when signed up for the CVP program, copyright owners must still use YouTube's basic search function to attempt to locate infringing content—the same search function that YouTube users use to find videos they want to watch.  *See* Viacom SUF ¶¶ 214, 215. |
| 93.  More than 3,000 content owners have registered to use CVP.  *Id.* ¶ 18. | Uncontroverted. |
| 94.  In February 2007, YouTube launched in beta form its Claim Your Content ("CYC") system.  King Decl. ¶¶ 7-8. | Uncontroverted. |
| 95.  CYC used audio-fingerprinting technology to enable participating rights holders to find videos containing their content that users had uploaded to YouTube.  *Id.* ¶ 7. | Uncontroverted, but Viacom denies any implication that YouTube's CYC tool was available to Viacom or any other content owner in the absence of a licensing deal. YouTube expressly refused to provide CYC to Viacom in the absence of a licensing deal.  *See* Hohengarten Ex. 382 (February 17, 2007 email Google Vice President and General |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | Counsel Kent Walker).  Defendants did not offer any digital fingerprinting technology to Viacom until May 2008.  *See* Viacom SUF ¶¶ 207-222.<br><br>That refusal is not called into doubt by the ambiguous statement in King Decl. ¶ 10 that four content owners used YouTube's CYC tool to block their content from appearing on YouTube.  Defendants do not cite and have not produced evidence showing when those four companies began using CYC.  The scant evidence Defendants have produced indicates that none of these companies were offered CYC until well after this action was filed.<br><br>YouTube considered offering ▇ access to CYC in March 2007, but did not because "[r]ight now we have not been giving the tool to partners without a revenue share contract in place."  Kohlmann Ex. 21 at GOO001-00943107.  ▇ was offered CYC in August 2007 in exchange for ▇'s agreement to license content for a YouTube "branded channel," but no agreement was reached. Kohlmann Ex. 41, GOO001-00850320; Kohlmann Ex. 42, GOO001-00850304.<br><br>▇ licensed content to YouTube on a "branded channel" in June 2007, but in September 2007 YouTube had not agreed to use fingerprinting for ▇.  Kohlmann Ex. 43, GOO001-04500216; Kohlmann Ex. 44, GOO001-01620064, at GOO001-01620082.<br><br>There is no evidence that YouTube gave ▇ access to CYC for more than a 3-day test period during which YouTube severely capped their CYC usage, explaining: "If they want to use our tools to help them monitor copyright content . . . , they will have to work with us as a partner."  Kohlmann Ex. 45, GOO001-09612404; Kohlmann Ex. 46, GOO001-06072619.  YouTube had not agreed |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | to provide fingerprinting for either as of July 2007.  Kohlmann Ex. 46, GOO001-06072619; Kohlmann Ex. 47, GOO001-05944464, GOO001-05944475. |
| 96.  Once CYC found a video, a rights holder could apply one of three YouTube policies in response to a match: (1) "block" (*i.e.*, instruct YouTube to remove the video from YouTube); (2) "track" (*i.e.*, leave it up on YouTube and receive reports about the video); or (3) "monetize" (*i.e.*, leave it up on YouTube and share in advertising revenue). *Id.* ¶ 7. | Uncontroverted, but Viacom denies any implication that YouTube's CYC tool was available to Viacom or any other content owner in the absence of a licensing deal.  *See supra* ¶ 95. |
| 97.  In January 2007, YouTube began full-scale development of a video-based identification technology called "Video ID." King Decl. ¶ 17. | Uncontroverted. |
| 98.  YouTube officially launched Video ID in October 2007.  *Id.* ¶ 18. | Controverted to the extent that the alleged fact implies that Video ID was available to all content owners at that time.  Viacom was not given access until May 2008.  *See* Viacom SUF ¶ 222. |
| 99.  Between January and October 2007, YouTube had between 15 and 20 engineers and other technical personnel working full or part time on Video ID. *Id.* ¶ 17. | Uncontroverted. |
| 100.  Video ID was the first video-based content identification technology to be deployed on any website dedicated to user-submitted content.  *Id.* ¶ 19; Schapiro Ex. 169 (287:16-288:4). | Controverted.  King Decl. ¶ 19 is inadmissible because it is not based on Mr. King's personal knowledge, and the cited deposition testimony does not support the alleged fact.  *See* Evid. Obj. at 4. |
| 101.  In April 2008, YouTube supplemented Video ID by launching an audio-based content identification technology called Audio ID.  *Id.* ¶ 20. | Controverted.  The term "launching" is misleading because Defendants developed their own audio fingerprinting technology as early as November 2006, but did not start using it on the YouTube site to prevent infringement of any copyrighted content for over a year.  *See* Viacom SUF ¶ 313. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 102.  YouTube makes Video ID and Audio ID (collectively, "Content ID") available to content owners to allow them to identify their content on the YouTube website.  *Id.* | Controverted prior to May 2008.  *See* Viacom SUF ¶¶ 216, 222, 287, 293-299; *supra* ¶ 88; *infra* ¶¶ 106, 107, 109.  Uncontroverted that this is YouTube's current practice. |
| 103.  Content ID works by identifying videos on YouTube that match reference files supplied by participating rights holders.  *Id.* ¶ 23. | Uncontroverted. |
| 104.  As of December 2009, right holders had supplied YouTube with approximately 3 million reference files for Content ID.  *Id.* | Uncontroverted. |
| 105.  If Content ID identifies a video as matching one of those reference files, the rights holder can block/remove the video, allow the video to appear and share any revenue generated from advertising shown alongside it, or allow the video to appear with no monetization.  *Id.* ¶ 24. | Uncontroverted. |
| 106.  Since its launch in October 2007, every video that a user has attempted to post to YouTube has been screened using Content ID.  *Id.* ¶ 26. | Controverted to the extent that the alleged fact implies that "screened using Content ID" means anything more than that uploaded videos were compared to fingerprints of content owned by those content owners permitted to participate in Content ID.  Videos were not compared to content owned by content owners, like Viacom, who were not provided access to the tool prior to May 2008.  *See supra* ¶ 102. |
| 107.  Content ID scans the back catalogue of videos posted on YouTube.  *Id.* ¶ 27. | Controverted to the extent that the alleged fact implies that "Content ID scans" means anything more than that backlogged videos are compared to fingerprints of content owned by those content owners permitted to participate in Content ID.  Videos were not compared to content owned by content owners, like Viacom, who were not provided access to the tool prior to May 2008.  *See supra* ¶ 102. |
| 108.  YouTube currently has a team of 40 technical staff working on Content ID.  *Id.* ¶ 28. | Uncontroverted, but immaterial to any issues before the Court. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 109.  YouTube has always made Content ID available to rights holders free of charge.  *Id.* ¶ 22. | Controverted prior to May 2008.  Prior to May 2008, Defendants used Audible Magic digital fingerprinting to prevent infringement, but only for those copyright holders who would agree to sign a license agreement.  *See* Viacom SUF ¶¶ 216, 222 287, 293-299. |
| 110.  More than 1,000 content owners worldwide use Content ID.  *Id.* ¶ 21. | Uncontroverted but immaterial. |
| 111.  Viacom participated in the pre-launch testing of Video ID in mid-2007.  *Id.* ¶¶ 18, 29; Schapiro Ex. 171. | Uncontroverted, but misleading.  This testing period, which took place in the summer of 2007, did not involve any protection against infringement on YouTube for any participating content owners.  *See, e.g.*, Kohlmann Ex. 40, GOO001-09603446 (June 15, 2007 email stating "We are on track for opening up the trial to select partners on July 16. Since the press coverage, many companies have voiced interest in being included. Note that this is a test period and that we will not be actively filtering during the trial period"). |
| 112.  Viacom signed up to use Video ID in February 2008.  King Decl. ¶ 29. | Uncontroverted, but misleading because Defendants did not actually begin protecting Viacom's content using Video ID until May 2008.  *See* Viacom SUF ¶ 222. |
| 113.  Plaintiffs collectively have identified approximately 79,000 video clips that they allege to be infringing on the YouTube service ("clips in suit").  Decl. of Michael Rubin in Support of Defs. Mot. for Summary Judgment ("Rubin Decl.") ¶¶ 7, 16. That total represents less than .02% of the more than 500 million videos ever uploaded to YouTube. Levine Decl. ¶ 26. | Uncontroverted but misleading and immaterial.  Calculating the clips in suit as a percentage of all videos ever uploaded to YouTube is misleading because it does not account for the tens of millions of videos that infringed the copyrights of content owners who are not plaintiffs in the *Viacom* and *Premier League* actions, *see supra* ¶ 33, including videos that were removed from YouTube after receipt of a takedown notice, and videos blocked or removed through YouTube's CYC tool (which included Audible Magic fingerprinting), and YouTube's Content ID system (which includes Defendants' proprietary Video ID and Audio ID fingerprinting systems), *see* Hohengarten Ex. 388.  The numbers are also misleading in that they are heavily weighted toward the period after the *Viacom* and *Premier League* lawsuits |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | were filed.  It is undisputed that from April 2005 until the filing of those suits, the infringing content on YouTube accounted for 54 to 80% of all video views on YouTube.  *See* Viacom SUF ¶¶ 55, 95, 104, 153, 170, 171, 173, 174, 176, 181. |
| 114.  The majority of Viacom's clips in suit are under four minutes long.  Rubin Decl. ¶ 15. | Uncontroverted but immaterial. |
| 115.  Certain of Viacom's clips in suit are fewer than 10 seconds long.  *Id.* | Controverted.  None of Viacom's clips in suit is shorter than 10 seconds long.  Only one clip is 10 seconds long, 97% of Viacom's clips in suit are over 30 seconds long, and 55% are over three minutes long.  The Declaration of Michael Rubin is incorrect in citing two clips as 3 and 5 seconds long, respectively.  In fact, those clips are 226 and 288 seconds long, as reflected in data produced by Defendants, and as reflected in copies of the videos themselves that Viacom obtained prior to issuing takedown notices for them.  *See* Wilkens Decl. ¶ 6. |
| 116.  The Premier League is suing YouTube over dozens of clips that are under five seconds long, including one that is one second in length.  *Id.* ¶ 16. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 117.  Most of the clips in suit were the subject of DMCA takedown notices.  Schapiro Exs. 18 (141:10-19; 148:8-18), 17 (186:9-187:7). | Uncontroverted. |
| 118.  Some of the putative class plaintiffs' clips in suit were never the subject of any takedown request prior to being identified as alleged infringements in this case.  Schapiro Exs. 20 (94:19-95:6), 21 (26:15-21), 22 (Response 35). | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 119.  Viacom's clips in suit were identified from a pool of videos removed pursuant to DMCA takedown notices sent by Viacom.  Schapiro Ex. 18 (148:8-18). | Uncontroverted. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 120.  All of the clips in suit have been removed from the YouTube website.  Levine Decl. ¶ 21. | Uncontroverted. |
| 121.  Within months of YouTube's launch, major media companies, including Viacom, used YouTube to promote their content by uploading clips of their movies and television shows to the service.  Decl. of Arthur Chan ("Chan Decl.") ¶¶ 4, 5, 9; Decl. of Daniel Ostrow ("Ostrow Decl.") ¶¶ 2, 4, 5, 6; Schaffer Decl. ¶ 5; Decl. of Rubin Decl. ¶ 2 & Exs. 1-41. | Controverted.  Viacom first uploaded a handful of trailers and other specially chosen marketing clips to YouTube in February 2006, almost a year after YouTube first displayed videos to the public on its website, and after YouTube had gained substantial market power through a strategy of exploiting copyright infringing content, *see* Viacom SUF ¶¶ 29-132, 140-182.  Regarding the activities of other content owners, Plaintiffs lack knowledge to admit or controvert Defendants' assertion, but note that the purported evidence Defendants cite does not indicate any authorized uploads of clips of movies or television shows before May 2006.

Further controverted to the extent that the asserted fact implies that YouTube was less than fully aware that the content at issue that was being uploaded by major media companies and was authorized to be on YouTube.  *See infra* ¶¶ 123, 126.

Further the following cited evidence is inadmissible:  Chan Decl. ¶¶ 4, 5, 9, *see* Evid. Obj. at 1-2; Ostrow Decl. ¶¶ 4, 5, 6, *see* Evid. Obj. at 5-6; Schaffer Decl. ¶ 5, *see* Evid. Obj. at 9; Rubin Decl. ¶ 2 & Exs. 32-41, *see* Evid. Obj. at 7. |
| 122.  Viacom has allowed Viacom content uploaded by other users to remain on YouTube.  Schapiro Exs. 4 (194:8-11), 51 (VIA 11787096). | Controverted. Defendants distort the cited evidence to misrepresent decisions to prioritize efforts to take down some content decisions to leave up other content.  *See infra* ¶ 128. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 123.  Viacom has uploaded to YouTube thousands of videos to market and promote hundreds of its movies and/or television shows, including many that are works in suit. Rubin Decl. ¶¶ 2, 14, 18 & Exs. 3-31. | Controverted, and immaterial because Defendants were fully aware of Viacom's uploading activities.<br><br>Further, Rubin Decl. ¶¶ 2, 18 & Exs. 32-41 contain inadmissible evidence.  *See* Evid Obj. at 7-8.<br><br>It is undisputed that Viacom uploaded trailers and other carefully selected marketing clips to YouTube in order to drive viewers to watch the full versions of Viacom's films and television shows in theaters, on television, and on Viacom's websites.  Viacom itself uploaded approximately 600 clips to YouTube up to May 2008 using accounts that Viacom set up with YouTube's assistance and encouragement.  Wilkens Decl. ¶ 19(a). Third-party marketing firms well known to YouTube, working on behalf of Viacom and other media companies, uploaded additional trailers and carefully selected marketing clips to YouTube, again using accounts well known to YouTube.  *See infra* ¶ 124.<br><br>The asserted fact is immaterial to Defendants' culpable intent under *Grokster* and the DMCA.  Defendants were aware of the overwhelming majority of Viacom's activities. *See* Wilkens Decl. ¶¶ 7-17, 19.  The six YouTube account names that Defendants identify as having been used to upload Viacom content, but that had no discernable connection to Viacom, accounted in aggregate for 25 clips.  Wilkens Decl. ¶ 19(b). Even assuming that Defendants were confused about whether those clips were authorized by Viacom – an assumption the evidence contradicts, *see infra* ¶ 125 – that could not plausibly negate Defendants' intent to infringe, and willful blindness toward the massive infringement occurring on the site. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 124.  Viacom has used marketing agents to upload its content to YouTube.  Schapiro Exs. 35-44, 45 (28:6-7); Chan. Decl. ¶¶ 3-5; Ostrow Decl. ¶ 5. | Uncontroverted but misleading and in any event immaterial.  *See supra* ¶ 123.  The overwhelming majority of uploading activity by third-party marketing companies was done with YouTube's knowledge and encouragement.  *See, e.g.*, Kohlmann Ex. 67 (T. Donohue Dep.) at 115:9-116:6; Kohlmann Ex. 25, GOO001-02463138 (showing that marketing company Wiredset, at YouTube's suggestion, created and used "director account"); Rubin Ex. 30 (showing that of approximately 250 clips of Viacom content uploaded by marketing company Fanscape in 2008, all but three were uploaded to four accounts well known to YouTube: "fanscapevideos," "fanscapevideos4u," "fanscapevids," and "fanscapemtv"); Kohlmann Ex. 64, FS043563; Kohlmann Ex. 23, GOO001-01984461, Kohlmann Ex. 24, GOO001-02299635, Kohlmann Ex. 25, GOO001-02302174, Kohlmann Ex. 26, GOO001-02302195 (samples from extensive communications between YouTube and marketing company Palisades Media Group); Kohlmann Exs. 15, GOO001-00744627, Kohlmann Ex. 32, GOO001-03419774-78, Kohlmann Ex. 35, GOO001-04731508 (samples from extensive communications between YouTube and marketing company Total Assault).  None of that activity was conducted so as to hide the identity of the marketing company or the content owner from YouTube.  *See* Kohlmann Ex. 67 (T. Donohue Dep.) at 123:9-124:2; Hohengarten Ex. 2, at ¶ 32.

Further controverted because the following evidence is inadmissible:  Chan Decl. ¶¶ 4, 5, *see* Evid Obj. at 2; Ostrow Decl. ¶ 5, *see* Evid. Obj. at 5. |
| 125.  Viacom has taken steps to conceal that it was the source of certain videos that it uploaded to YouTube for marketing purposes. Chan Decl. ¶¶ 4, 5, 9; Ostrow Decl. ¶¶ 2, 4, 5, | Controverted.  *See supra* ¶ 123.  None of the evidence cited by Defendants shows that YouTube was unaware of any of the authorized uploading of Viacom content. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 6; Schapiro Exs. 33, 34, 46, 47 (158:20-22), 48, 49, 50; Rubin Decl. ¶ 5(a)-(f) & Exs. 4, 14, 15, 19, 22, 26. | Indeed, the evidence shows that Viacom informed YouTube regarding the six accounts Defendants portray as "stealth." *See, e.g.*, Kohlmann Ex. 84 (Wahtera Dep.) at 32:8-11, 184:16-187:2, Kohlmann Ex. 60, VIA00378149, at VIA00378150, Kohlmann Ex. 63, VIA12603576 (regarding YouTube's knowledge of "MysticalGirl8" account); Rubin Ex. 10 (regarding YouTube's knowledge of "demansr" account). Moreover, none of the cited evidence shows an intent to conceal activity from YouTube. Kohlmann Ex. 82 (Teifeld Dep.) at 47:11-48:2; Kohlmann Ex. 84 (Wahtera Dep.) at 150:12-24, 167:7-168:8. |
| 126. Other media companies have taken steps to conceal that they were the source of certain videos that they uploaded to YouTube for marketing purposes. Ostrow Decl. ¶ 6; *see also* Chan Decl. ¶¶ 3, 4, 9, 10; Rubin Decl. ¶ 2 & Exs. 2, 32-41; Schapiro Ex. 28 (GOO001-05161257-58). | Viacom lacks knowledge to admit or controvert this alleged fact, but notes that the alleged fact is unsupported by the cited evidence. The evidence cited shows that other media companies authorized the uploading of their copyrighted content to YouTube, but not that these media companies concealed authorized uploads of their content from YouTube. Indeed, many of the documents cited reflect exactly the opposite: content owners explicitly informed YouTube of authorized uploads. *E.g.*, Schapiro Ex. 28, GOO001-05161257 (responding to email from marketing company Wiredset regarding YouTube uploads, YouTube employee Julie Supan writes: "Sounds like another [partnership] opp except paid ;)"); Rubin Ex. 32, GOO001-01021878, at GOO001-01021879 (YouTube document stating to content owners: "If you have questions or would like to discuss a custom marketing solution, please **contact us** and we'll be glad to assist you") & at GOO001-01021880 (describing communications between YouTube and media companies regarding authorized uploads); Rubin Ex. 34, GOO001-09595002 (in email message to YouTube employee Heather Gillette, NBC Universal executive writes: "In order to avoid any |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | confusion or misunderstanding, I wanted to make sure you are aware that NBC is permitting YouTube to host this content . . .").<br><br>Further controverted because Rubin Decl. ¶ 2, Ex. 2, and Exs. 32-41, Ostrow Decl. ¶ 6, and Chan Decl. ¶¶ 4 and 9 contain inadmissible evidence.  *See* Evid. Obj. at 2-3, 5, 7. |
| 127.  YouTube was aware of promotional activities occurring on its service.  Schaffer Decl. ¶¶ 7-8; Botha Decl. ¶¶ 11-12; Maxcy Decl. ¶¶ 3-7; Schapiro Ex. 53; Rubin Decl. ¶ 1, Exs. 2, 32-41. | Controverted because Botha Decl. ¶¶ 11-12, Maxcy Decl. ¶¶ 3, 4, and 7, Schapiro Ex. 53, and Rubin Exs. 32-41 contain inadmissible evidence.  *See* Evid. Obj. at 11-12.<br><br>In particular, Defendants' reliance on Botha Declaration ¶ 11 is misplaced.  Mr. Botha's testimony that "[v]ery early on, professional content creators began to use YouTube as a promotional outlet" has no basis, as he references only a promotional video that Nike (a shoe and athletic company, not a "professional content creator") uploaded.  Mr. Botha testified in deposition that, other than Nike, he could not recall a single other company using YouTube for promotional purposes in 2005.  Kohlmann Ex. 65 (Botha Dep.) at 107:3-7.  And, YouTube was aware of Nike's upload and met with Nike personnel about that specific video.  Kohlmann Ex. 65 (Botha Dep.) at 106:13-16.<br><br>Further, contrary to Defendants' suggestions, Botha Decl. ¶ 12 (and related ¶ 13) merely confirm Defendants' Grokster intent to keep infringing content on the site as long as possible to build up the user base.  Mr. Botha claims that "YouTube did not know who held the copyright in the Lazy Sunday clip," Botha Decl. ¶ 13, and that NBCU (the content owner) "chose simply to leave [the clip] on the service."  But Mr. Botha's declaration, his deposition testimony, and the documentary evidence belie that claim.  YouTube did know that NBCU was the content owner.  Mr. Botha testifies clearly that "Chad Hurley wrote to |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | NBC Universal asking whether NBC was aware of the clip . . . ."  Botha Decl. ¶ 13; *see also* Kohlmann Ex. 65 (Botha Dep.) at 153:11-12 ("we notified the owners of that show").  Indeed, when Hurley wrote to NBCU, NBCU responded that it believed that the clip was unauthorized but would check further.  Hurley Ex. 30.  Hurley—illustrating that he understood the benefit of keeping infringing premium content on the site as long as possible—forwarded that response to Chris Maxcy, stating:  "this is good.  it's not a yes or a no.  we'll see if they follow up or just ignore the request."  *Id.  See also* Hohengarten Ex. 242, JK00006689 ("what? someone from cnn sees it? he happens to be someone with power?"); Hohengarten Ex. 17, GOO001-00629474 ("next time we have another lazy sunday hit, it would hurt us if the user suddenly removed the video"). |
| 128.  Viacom has knowingly left up on YouTube thousands of clips containing its content.  Schapiro Exs. 57, 62, 75, 76. | Controverted.  It is undisputed that Viacom did not grant YouTube an express or implied license to display user uploads of its copyrighted works.  *See* Viacom Opp. at 57-62.  From October 2006 through January 2007, while negotiating with Defendants regarding a licensing deal, Viacom enforced its rights only for the most egregious instances of infringement, and the documents Defendants cite show that Viacom worked with its takedown agent BayTSP to implement its enforcement priorities.

BayTSP thus began by issuing takedown notices for full episodes of Viacom television shows, which would not have been covered by the license Viacom was seeking, and subsequently also began taking down clips that were more than several minutes in length.  Kohlmann Ex. 73 (Hallie Dep.) at 53:14-54:25; Kohlmann Ex. 66 (Cahan Dep.) at 216:14-217:5.  Given the massive volume and scope of infringement of Viacom content on YouTube, there was a "ramp up" period as |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
|  | BayTSP gained more experience and hired and trained more employees.  Kohlmann Ex. 73 (Hallie Dep.) at 109:7-17, 118:6-17, 183:24-184:5, 194:13-195:3; Kohlmann Ex. 81 (Solow Dep.) at 113:12-114:5, 341:12-23; Kohlmann Ex. 66 (Cahan Dep.) at 225:10-23.<br><br>As negotiations progressed, Viacom continued to expand its efforts to identify infringing content on YouTube, but generally abstained from issuing takedown notices in the expectation that Viacom's infringement claims would be settled as part of an overall licensing deal.  *See* Kohlmann Ex. 72 (Fricklas Dep.) at 25:5-18; Kohlmann Ex. 81 (Solow Dep.) at 148:23-149:22, 196:9-199:11, 206:21-207:10, 226:8-227:17; Kohlmann Ex. 74 (Ishikawa Dep.) at 112:13-113:18, 228:3-229:13.  When negotiations reached an impasse, on February 2, 2007, Viacom sent Defendants a takedown notice for all of the infringing content that Viacom had identified on YouTube.  Viacom SUF ¶ 210. |
| 129.  YouTube gave instructions to its agent, BayTSP, about which clips to take down from YouTube and which clips to leave up on YouTube.  *Id.* Exs. 11 (115:6-118:1), 54 (BAYTSP 001093412), 55 (BAYTSP 003724704), 56 (214:25-215:6), 57 (BAYTSP 001125605-08), 59, 60, 63-64, 65 (BAYTSP 003718201). | Viacom assumes that Defendants intend to state that "Viacom gave instructions to its agent, BayTSP," not that YouTube gave such instructions.  Subject to that assumption, Plaintiffs respond:<br><br>Regarding "which clips to take down from YouTube," uncontroverted.<br><br>Regarding "which clips to leave up on YouTube," controverted.  *See supra* ¶¶ 122, 128. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 130.  Viacom did not share with YouTube the takedown instructions it provided to BayTSP. *Id.* Ex. 11 (118:10-19). | Uncontroverted, but immaterial.  Viacom's instructions to BayTSP did not alter the fact that user-uploaded clips of Viacom's content were unauthorized and infringed Viacom's copyrights.  *See supra* ¶¶ 122, 128-29.  Moreover, there was no reason for Viacom to share its instructions to BayTSP with YouTube, given YouTube's refusal to work with Viacom to prevent infringement unless the parties reached a licensing deal.  *See* Viacom SUF ¶¶ 209-220. |
| 131.  Through at least October 2006, Viacom had an internal policy of declining to issue takedown notices for user-submitted clips on YouTube containing MTV Networks ("MTVN") content that were less than five minutes long.  *Id.* Exs. 59, 60. | Controverted.  *See supra* ¶¶ 128-130. |
| 132.  In October 2006, Viacom told BayTSP to leave up on YouTube any clips containing MTVN content that were shorter than 2.5 minutes in length, regardless of who had posted them.  *Id.* Ex. 54. | Controverted.  *See supra* ¶¶ 128-130. |
| 133.  Later in October 2006, Viacom told BayTSP that all videos containing MTVN content should be left up on YouTube unless the videos were "full episodes."  *Id.* Exs. 55 (BAYTSP 003724704), 56 (214:25-215:6). | Controverted.  *See supra* ¶¶ 128-130. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 134.  Viacom instructed BayTSP to leave up on YouTube "full episodes" of certain of its programs (some of which are works in suit). *Id.* Exs. 11 (115:6-118:1), Ex. 57 (BAYTSP 001125605-08). | Controverted as well as immaterial.  As discussed in detail earlier, *see supra* ¶ 128, Viacom specified the content BayTSP should identify and take down, but did not explicitly or implicitly authorize the display of other content on the YouTube site.  Furthermore, the evidence Defendants cite does not support the proposition that Viacom asked BayTSP to monitor YouTube for its programs but leave up full episodes of those programs; indeed, it shows exactly the opposite.  *See* Schapiro Ex. 11 (Nieman Dep.) at 117:22-23 (as of November 6, 2006, taking down "full assets is the rule for the YouTube page"); Schapiro Ex. 57, BAYTSP 001125563, at BAYTSP 001125605 (indicating that as of November 6, 2006 BayTSP was instructed to take down full episodes of listed shows). |
| 135.  Viacom has stated publicly that it was choosing to allow some if its content to remain on YouTube.  *Id.* Ex. 77. | Controverted.  As discussed in detail above, *see supra* ¶ 128, Defendants falsely portray Viacom's decision to prioritize the removal of some infringing content as implying authorization to display other infringing content. <br><br> Additionally, the fact is unsupported by admissible evidence.  The only reference to a public statement in Schapiro Ex. 77, an email exchange between Viacom employees Michele Ganeless and Jason Witt, is quoted from an unidentified news report, which is inadmissible hearsay not falling within any exception.  *See* Evid. Obj. at 1. |
| 136.  The putative class plaintiffs have licensed their content to appear on YouTube, including Rodgers & Hammerstein ("R&H"), which has issued numerous licenses that allow licensees to post R&H musical compositions on the Internet (including on YouTube).  *Id.* Exs. 22 (Responses 26-29), 78 (132:24-135:13), 79 (29:22-30:22, 31:6-32:12). | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 137.  Cal IV has licensed its musical compositions, including certain works that the clips in suit are alleged to have infringed ("works in suit"), for general dissemination on the Internet. *Id.* Ex. 81. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 138.  Cal IV has authorized certain of its works in suit to appear on YouTube for promotional purposes. *Id.* Ex. 82. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 139.  Stage Three has issued licenses allowing its musical compositions, including works in suit, to appear on YouTube. *Id.* Ex. 83 (Response 17, 19). | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 140.  Cherry Lane has authorized its musical compositions, including works in suit, to be posted to YouTube. *Id.* Exs. 86 (Response 17), 87. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 141.  Tur, Bourne, Carlin, and X-RAY DOG have licensed third parties to put their content, including works in suit, on YouTube. *Id.* Exs. 88; 89 (Responses 16-18), 90 (Responses 17, 19), 91 (Responses 17, 19), 92 (124:7-125:5), 93. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 142.  FFT and Music Force have posted their content on YouTube or authorized others to do so. *Id.* Exs. 94 (188:5-197:24), 95-97, 98 (Responses 30, 40, 41, 44), 99. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 143.  Certain of the soccer clubs that are members of and have ownership interests in the Premier League have created official YouTube "channels" to which they have uploaded videos, including footage of matches. *Id.* Exs. 17 (276:9-297:7, 100, 101. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 144.  Certain of the putative class plaintiffs' content, including certain of their works in suit, are co-owned by other parties.  *Id.* Exs. 83 (Response 68), 98 (Response 25), 103 (Response 33), 104 (48:16-49:12). | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 145.  Viacom has sent DMCA takedown notices for videos that Viacom itself uploaded or otherwise authorized to appear on YouTube.  Rubin Decl. ¶ 3 & Exs. 42-68 (retracted takedowns); Schaffer Decl. ¶¶ 15-18; Schapiro Exs. 149-150. | Controverted, as Schaffer Decl. ¶¶ 15-18 contain inadmissible evidence.  *See* Evid. Obj. at 8-10.  However, the alleged fact is immaterial to any issue before the Court.  Any errors Viacom made in seeking the removal of infringing videos taken from its movies and television programs displayed by YouTube are irrelevant to YouTube's culpable intent under Grokster and the DMCA.  Furthermore, the misidentifications Defendants cite in this fact comprise less than 0.05% of the takedown notices Viacom sent.  *Compare* Defendants' cited evidence (purporting to show fewer than 50 inadvertent takedowns of authorized content) *with* Viacom SUF ¶ 210 (Viacom requested that Defendants remove over 100,000 videos on February 2, 2007 alone). |
| 146.  Viacom has sent DMCA takedown notices to YouTube that resulted in the termination of Viacom's own YouTube accounts.  Schaffer Decl. ¶¶ 15-16 & Ex. 4; Rubin Decl. ¶ 3 & Exs. 42, 56-67. | Controverted but immaterial to any issue before the Court.  *See supra* ¶ 145.  Viacom quickly worked with YouTube to rectify these mistakes.  *See* Kohlmann Ex. 67 (Donohue Dep.) at 122:16-123:8; Kohlmann Ex. 87 (Hurwitz Dep.) at 78:12-80:15; Kohlmann Ex. 69 (Eddow Dep.) at 124:25-125:16; Kohlmann Ex. 83 (Tipton Dep.) at 175:22-176:2.  Further, Schaffer Decl. ¶ 15 is inadmissible as improper lay opinion and contains inadmissible generalized and conclusory statements.  *See* Evid. Obj. at 10. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 147.  Viacom has requested the takedown of clips that other content owners had authorized to be on YouTube.  Schaffer Decl. ¶ 17 & Exs. 5-7. | Controverted, as the cited evidence is inadmissible as hearsay.  *See* Evid. Obj at 8.  *See supra* ¶ 145.  Further, the alleged fact is immaterial to any issue before the Court.  The small number of errors Viacom made in seeking the removal of clips that other content owners had authorized to be on YouTube were regrettable, but were all but inevitable given the massive scale of copyright infringement on the YouTube site.  *See* Kohlmann Ex. 81 (Solow Dep.) at 252:2-18; Kohlmann Ex. 73 (Hallie Dep.) at 184:17-25.  Viacom worked quickly to rectify the errors.  *See* Kohlmann Ex. 67 (Donohue Dep.) at 122:16-123:8; Kohlmann Ex. 79 (Nieman Dep.) at 270:17-272:2. |
| 148.  Viacom engaged in a "multi-step procedure designed to accurately identify" the clips in suit.  Schapiro Decl. Ex. 178. | Uncontroverted, but immaterial to any issue before the Court. |
| 149.  Dozens of Viacom's clips in suit were uploaded by Viacom.  Rubin Decl. ¶ 9. | Controverted.  The alleged fact is not supported by the cited evidence.  The cited paragraph of Mr. Rubin's declaration addresses clips that Viacom has already *withdrawn* as clips in suit, with permission of the Court.  *See* Order Denying Partial Judgment, Dec. 18, 2009 (dkt. no. 162); Letter from Defs. Requesting Partial Judgment as to Withdrawn Clips, Dec. 1, 2009 (dkt. no. 163). |
| 150.  In October 2009, after completing a "quality check" of the clips in suit, Viacom sought to withdraw 241 clips in suit, more than 100 of which Viacom had uploaded to YouTube.  Rubin Decl. ¶ 9 & Exs. 119-120. | Uncontroverted, but immaterial.  These clips have already been withdrawn with permission of the Court.  *See supra* ¶ 149. |
| 151.  On February 26, 2010 Viacom requested dismissal with prejudice of the 241 clips that it had originally sought to withdraw, plus an additional 193 clips, six of which were uploaded by Viacom's marketing agent, WiredSet.  Rubin Decl. ¶¶ 12-13 & Exs. 122-123. | Uncontroverted, but misleading.  *See supra* ¶¶ 149-50. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 152.  Following Viacom's request for dismissal with prejudice of 434 clips on February 26, 2010, there remain clips in suit that Viacom had authorized to appear on YouTube.  Rubin Decl. ¶ 14 & Ex. 128. | Uncontroverted but misleading.  The five clips Defendants reference make up only 0.005 percent of the total clips in suit, and will be withdrawn by Viacom. |
| 153.  The putative class plaintiffs have sent DMCA takedown notices to YouTube that they eventually retracted because of claims by other rights holders.  Schapiro Exs. 103 (Response 23), 154, 155 (68:9-72:14), 156 (ST00105023-26), 102 (151:21-154:17). | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 154.  Cal IV withdrew a DMCA takedown notice it had sent to YouTube after another rights holder filed a counter-notice.  *Id.* Exs. 154, 103 (Response 23), 155 (68:9-72:14). | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 155.  Stage Three withdrew a DMCA takedown notice after one of its licensees informed Stage Three that it was authorized to post the clip on YouTube.  *Id.* Exs. 102 (151:21-154:17), 156. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 156.  Certain of the putative class plaintiffs rely on a global network of subpublishers to license their content.  *Id.* Exs. 79 (100:7-15), 92 (150:13-22, 102 (61:25-63:22), 152 (20:15-22), 117 (153:15-154:10). | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 157.  Plaintiff X-RAY DOG could not immediately determine whether a clip posted to YouTube that contained its content was or was not authorized to be there.  *Id.* Ex. 92 (158:11-160:7) | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 158.  Plaintiff R&H could not immediately determine whether a clip posted to YouTube that contained its content was or was not authorized to be there.  *Id.* Ex. 79 (13:23-18:20; 114:3-14). | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 159.  Plaintiff Stage Three has retained professional musicologists to determine whether certain YouTube clips contain content that was copied from one of its musical compositions. *Id.* Exs. 85 (219:0-220:11), 102 (171:23-172:21), 157. | The alleged fact is not relevant to the *Viacom* action and to the extent it is disputed it is addressed in the *Premier League* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. |
| 160.  YouTube is a free service.  Hurley Decl. ¶ 2. | Uncontroverted but immaterial to any issues before the Court.  Although YouTube does not charge users, the undisputed evidence clearly shows that YouTube receives and has received a direct financial benefit from the presence of infringing content on its site by attracting more users and more advertising revenue. *See* Viacom Opening Mem. at 30-32. |
| 161.  YouTube does not charge a subscription fee and does not charge users to upload or to view video clips. *Id.* | Uncontroverted but immaterial to any issues before the Court. *See supra* ¶ 160. |
| 162.  YouTube generates revenue from advertising.  Reider Decl. ¶ 5. | Uncontroverted. *Accord* Viacom SUF ¶¶ 236, 238-240, 256, 257. |
| 163.  YouTube's advertising offerings are consistent with prevailing industry standards.  Reider Decl. ¶ 12. | Controverted.  Reider Decl. ¶ 12 contains inadmissible improper lay opinion and generalized and conclusory statements. *See* Evid. Obj. at 13-14. |
| 164.  Between 2006 and 2009, YouTube entered into thousands of direct partnership agreements that provide for YouTube to run advertising against videos claimed by those owners and to share the revenue from that advertising.  Maxcy Decl. ¶ 9-10. | Uncontroverted but misleading to the extent the alleged fact implies that Defendants entered into partnership agreements before late 2006. *See* Viacom SUF ¶¶ 95, 104, 171, 173, 174, 181. |
| 165.  YouTube's revenue-sharing deals generated approximately ▮▮▮▮▮ of YouTube's overall revenue between 2007 and 2009.  Reider Decl. ¶ 5. | Uncontroverted but immaterial. |
| 166.  Most of YouTube's other revenue comes from advertisements that run on the YouTube homepage and on the pages that list the results of users' search queries. *Id.* ¶ 5. | Controverted.  Prior to January 2007 YouTube earned advertising revenue by displaying ads on all watch pages, including the watch pages for infringing content. *See* Viacom SUF ¶¶ 247-249. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 167.  YouTube does not seek to earn revenue from users' potentially infringing activities. *Id.* ¶ 11. | Controverted.  It is undisputed that Defendants sought to build up YouTube's user base through massive copyright infringement and then monetize that user base through advertising.  *See* Viacom SUF ¶¶ 230-266.<br><br>Further, Reider Decl. ¶ 11 is inadmissible because it is not based on personal knowledge and contains legal conclusions.  *See* Evid. Obj. at 13. |
| 168.  None of YouTube's advertising offerings in any way favors videos that may not have been authorized to appear on YouTube over authorized videos.  *Id.* ¶ 11. | Controverted.  Reider Decl. ¶ 11 is inadmissible because it is not based on personal knowledge and contains legal conclusions.  *See* Evid. Obj. at 13.<br><br>However, the alleged fact is immaterial to any issue before this Court.  Viacom denies any inference that Defendants did not receive a direct financial benefit because they were not paid more for ads linked to infringing material.  It is undisputed that Defendants have earned advertising revenue from ads displayed on watch pages for infringing videos, on search pages displaying infringing videos as search results, and on upload pages where users upload infringing content.  *See* Viacom SUF ¶¶ 247-249, 258, 259, 262. |
| 169.  Most of the nation's top 100 advertisers purchase advertising on YouTube.  *Id.* ¶ 4. | Uncontroverted that this is currently the case but immaterial to any issues before the Court. |
| 170.  Large media companies run advertisements on YouTube.  *Id.* ¶2. | Uncontroverted that this is currently the case but immaterial to any issues before the Court. |
| 171.  Viacom has spent more than one million dollars advertising on YouTube.  *Id.* ¶ 4. | Uncontroverted but immaterial to any issues before the Court. |

**Subject to Protective Order – HIGHLY CONFIDENTIAL**

Respectfully submitted,

By: _____/s/_____        By: _____/s/_____

Stuart J. Baskin (No. SB-9936)                Paul M. Smith (No. PS-2362)
John Gueli (No. JG-8427)                      William M. Hohengarten (No. WH-5233)
Kirsten Nelson Cunha (No. KN-0283)            Scott B. Wilkens (*pro hac vice*)
SHEARMAN & STERLING LLP                       Matthew S. Hellman (*pro hac vice*)
599 Lexington Avenue                          JENNER & BLOCK LLP
New York, NY   10022                          1099 New York Avenue, NW
Telephone:  (212) 848-4000                    Washington, DC   20001
Facsimile:  (212) 848-7179                    Telephone:  (202) 639-6000
                                              Facsimile:  (202) 639-6066

                                              Susan J. Kohlmann (No. SK-1855)
                                              JENNER & BLOCK LLP
                                              919 Third Avenue
                                              New York, NY   10022
                                              Telephone:  (212) 891-1690
                                              Facsimile:  (212) 891-1699