**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIACOM INT'L INC., ET AL., <br><br>        Plaintiffs, <br><br>   v. <br><br> YOUTUBE, INC., ET AL., <br><br>        Defendants. | ECF Case <br> Civil No. 07-CV-2103 (LLS) |
| THE FOOTBALL ASSOCIATION PREMIER LEAGUE LIMITED, ET AL., on behalf of themselves and all others similarly situated, <br><br>        Plaintiffs, <br><br>   v. <br><br> YOUTUBE, INC., ET AL., <br><br>        Defendants. | ECF Case <br> Civil No. 07-CV-3582 (LLS) |

### YOUTUBE'S COUNTERSTATEMENT TO VIACOM'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY AND INAPPLICABILITY OF THE DIGITAL MILLENNIUM COPYRIGHT ACT SAFE HARBOR DEFENSE

| | |
|---|---|
| David H. Kramer <br> Maura L. Rees <br> Michael H. Rubin <br> Bart E. Volkmer <br> WILSON SONSINI GOODRICH & ROSATI PC <br> 650 Page Mill Road <br> Palo Alto, California 94304 <br> (650) 493-9300 | Andrew H. Schapiro <br> A. John P. Mancini <br> Matthew D. Ingber <br> Brian M. Willen <br> MAYER BROWN LLP <br> 1675 Broadway <br> New York, New York 10019 <br> (212) 506-2500 |

*Attorneys for Defendants*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Pursuant to Local Civil Rule 56.1(b), defendants YouTube, Inc. and Google, Inc. (collectively "Defendants" or "YouTube") hereby submit their counterstatement to Viacom's Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment on Liability and Inapplicability of the Digital Millennium Copyright Act Safe Harbor Defense ("Statement of Undisputed Facts").

## GENERAL OBJECTIONS

Viacom's Statement of Undisputed Facts is replete with inadmissible evidence, improper argument in the guise of headings, and highly editorialized snippets of the record.

The vast majority of Viacom's proposed statements of undisputed facts are not facts at all, but rather selectively excerpted portions of documents styled as "undisputed facts." In many instances, Viacom uses multiple excerpts from the same document as distinct statements of undisputed fact. Viacom also excerpts sound bytes from different pieces of evidence and presents them as a uniform proposition or offers assertions of fact that are flatly unsupported by the evidence upon which Viacom relies. And many of Viacom's purported "undisputed facts" are supported by inadmissible evidence. Although YouTube's Response to Viacom's Statement of Undisputed Facts highlights the most egregious examples of Viacom's improper reliance on inadmissible evidence in violation of Local Rule 56.1(d), the

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

full catalog of YouTube's evidentiary objections appear in YouTube's Motion to Strike.[1]

Those among Viacom's 347 "undisputed facts" that fail to adhere to the requirements of Local Rule 56.1 and otherwise fail to aid the Court in its determination of Viacom's Motion for Partial Summary Judgment on Liability and Inapplicability of the Digital Millennium Copyright Act Safe Harbor Defense ("Motion for Summary Judgment"), should be stricken and disregarded by the Court. *See* Local R. 56.1(a) (requiring a *"short and concise* statement . . . of the *material* facts to which the moving party contends there is no genuine issue to be tried.") (emphasis added); *Bey v. City of New York*, No. 99 Civ. 3873(LMM), 2009 WL 2060076, *2-6 (S.D.N.Y. July 15, 2009) (striking statements of fact unsupported by the cited evidence); *LaPine v. Seinfeld*, No. 08 Civ. 128(LTS)(RLE), 2009 WL 2902584, at *4 (S.D.N.Y. Sept. 10, 2009) (striking elements of Rule 56.1 statement that constitute legal argument); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union Number 3*, No. 00 Civ. 4763 RMB JCF, 2006 WL 2136249, at *19 (S.D.N.Y. Aug. 1, 2006) (striking paragraphs in Rule 56.1 statement that cite to evidence that is unauthenticated or rests on hearsay); *Pacenza v. IBM Corp.*, No. 04 Civ. 5831 (SCR), slip op., (S.D.N.Y. July 26, 2007) (striking "impermissible argument" and "conclusory allegations" from Rule 56.1 Statement) (attached as Schapiro Opp. Ex. 3); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir.

---

[1]     By not addressing the full scope of its evidentiary objections in the context of its Response to Viacom's Statement of Undisputed Facts, YouTube does not waive, but rather expressly reserves, all of its evidentiary objections.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").

\*       \*       \*

## I.      VIACOM'S OWNERSHIP OF THE WORKS IN SUIT.

**Disputed.**  Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken.  *See* Local R. 56.1.  YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

1.      *Viacom creates and acquires exclusive rights in copyrighted audiovisual works, including motion pictures and television programming. Hohengarten Decl. ¶ 3 & Ex. 2 (Solow Decl. ¶ 2).*

   **Undisputed.**

2.      *Viacom distributes its copyrighted television programs and motion pictures through various outlets, including cable and satellite services, movie theaters, home entertainment products (such as DVDs and Blu-Ray discs) and digital platforms.  Hohengarten Decl. ¶ 3 & Ex. 2 (Solow Decl. ¶ 3).*

   **Undisputed.**

   **Additional Material Facts:**



*See, e.g.,* Schapiro Opp.[2]    Exs.  223 (VIA15293051) 224  (VIA11495652) (VIA11495836)

---

[2]      The defined terms in Defendants' Opposition to Plaintiffs' Motions for Partial Summary Judgment are adopted herein.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

226
(VIA15154378)
227  (VIA16675005)
;   228
(VIA15293234)
; 229 (VIA11920130)
230  (VIA11494297)
; 231
(VIA12619583) (same); *see also* Schapiro Opp. Exs. 232 (VIA10942639)
;   233   (VIA13670459)

3.      *Viacom owns many of the world's best known entertainment brands, including Paramount Pictures, MTV, BET, VH1, CMT, Nickelodeon, Comedy Central, and SpikeTV.  Hohengarten Decl. ¶ 3 & Ex. 2 (Solow Decl. ¶ 4).*

     **Disputed.**  There is no foundation for the claim that Viacom owns many of the "world's best known" entertainment brands.  *See* Defendants' Motion to Strike.

4.      *Viacom's thousands of copyrighted works include the following famous movies:  Braveheart, Gladiator, The Godfather, Forrest Gump, Raiders of the Lost Ark, Breakfast at Tiffany's, Top Gun, Grease, Iron Man, and Star Trek.  Hohengarten Decl. ¶ 3 & Ex. 2 (Solow Decl. ¶ 5).*

     **Disputed.**  Viacom does not own all of the cited movies.  *See infra*, YouTube's Response and Additional Material Facts in Response to SUF ¶ 6.  Viacom's characterization of these works as "famous" is vague and foundationless.

5.      *Viacom's thousands of copyrighted works include the following famous television shows: The Daily Show with Jon Stewart, The Colbert Report, South Park, Chappelle's Show, Spongebob Squarepants, The Hills, iCarly, and Dora the Explorer.  Hohengarten Decl. ¶ 3 & Ex. 2 (Solow Decl. ¶ 6).*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Disputed.**  First, the cited evidence provides no support for Viacom's claim of ownership over the works referenced in this proposed fact.  *See infra*, YouTube's Response and Additional Material Facts in Response to SUF ¶ 6.  Second, Viacom's characterization of these works as "famous" is vague and foundationless.

6.  *Viacom owns or controls the copyrights or exclusive rights under copyright in the 3,085 audiovisual works identified in Exhibits A-E to the Solow Decl. filed herewith ("Works in Suit").  Hohengarten Decl. ¶ 3 & Ex. 2 (Solow Decl. ¶¶ 7-14, 17).*

**Disputed.**  First, this proposed fact relies on inadmissible evidence.  See YouTube's Motion to Strike.  Second, YouTube disputes that Viacom owns the rights to all of the listed works.  For example, Viacom does not own the digital clip rights to Star Trek.  Schapiro Opp. Ex. 234 (VIA16421052). As another example, the copyright registrations submitted by Viacom for Iron Man show a different owner:  MVL Film Finance.  *Id.* Exs. 235 (VIA08766210); 236 (VIA14012942); *see also id.* Ex. 237 (VIA 17063901-37 at 17063925) (describing Iron Man as "Third Party Product"); *see also infra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 31 (in relation to South Park).

## II.    INFRINGEMENT OF THE WORKS IN SUIT ON YOUTUBE

**Disputed.**  Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken.  *See* Local Rule 56.1.  YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

7.  *Defendants have reproduced and distributed for viewing, and performed on the YouTube website, 62,637 video clips that infringe the Works in Suit ("Clips in Suit"); the Clips in Suit are identified in Attachment F to the Solow Decl. filed herewith.  Hohengarten Decl. ¶ 3 & Ex. 2 (Solow Decl. ¶¶ 16-26).*

**Disputed.**  This proposed fact calls for legal conclusions with respect to the terms "reproduced and distributed for viewing, and performed" and "infringe."  The cited evidence provides no support for the assertion that the referenced clips infringed any Works in Suit. Numerous Clips in Suit were uploaded or otherwise authorized by Viacom and its agents.  *See* Rubin Opening Decl. ¶ 2 & Exs. 1, 3-33, 37, 39, 42-68; Chan. Opening Decl. ¶¶ 4, 10; Ostrow Opening Decl. ¶ 5; Maxcy Opening Decl. ¶¶ 3-7; Schaffer Opening Decl. ¶ 16.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Additional Material Facts:**

Viacom and its agents have had difficulty determining whether Viacom clips uploaded to YouTube are authorized. Schapiro Opening Decl. Exs. 149, 43, 141, 146, 63; Rubin Opening Decl. Exs. 43, 49, 55; Schapiro Opp. Exs. 238-256; 257 (91:14-92:23; 93:20-94:10); 258 (36:10-18); 259 (99:21-100:12); 260 (157:17-24); 261 (135:6-12); 262 (83:21-84:23); 78 (241:14-242:14); 264 (259:11-262:2; 267:3-10; 303:9-20); 265 (134:16-24); 266 (168:23-169:5); 267 (301:4-24); 268 (158:14-21); 269 (147:20-151:2); 270 (120:4-121:21); 1 (536:7-542:23); 271 (50:14-51:6), 214 (45:2-46:4; 178:23-179:12; 282:19-283:23).

8.  *The Clips in Suit were collectively viewed on the YouTube website more than 507 million times. Hohengarten Decl. ¶ 4.*

    **Disputed.** First, to the extent that Viacom purports to define "Clips in Suit" as "video clips that infringe the Works in Suit," YouTube disputes this proposed fact for reasons cited in its response to SUF ¶ 7. Second, the data produced by YouTube does not indicate the number of times videos are viewed, but only the number of playbacks initiated. *See* Solomon Opp. Decl. ¶¶ 3-4.

9.  *Viacom has not authorized the distribution or reproduction or performance of the Clips in Suit on Defendants' YouTube.com service. Hohengarten Decl. ¶ 3 & Ex. 2 (Solow Decl. ¶ 26).*

    **Disputed.** *See supra*, YouTube's Response and Additional Material Facts in Response to SUF ¶ 7.

## III.  DEFENDANTS' KNOWLEDGE AND INTENT CONCERNING INFRINGEMENT ON YOUTUBE.

### A.  The YouTube Founders' Knowledge and Intent Concerning Infringement on YouTube

**Background Facts Regarding the Founding of YouTube, the Founders of YouTube, and Google's Acquisition of YouTube**

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

10. *YouTube was founded in February 2005 by Chad Hurley, Steve Chen, and Jawed Karim.  Hohengarten ¶ 393 & Ex. 356 (January 5, 2007 Declaration of Steve Chen in Support of [YouTube's] Motion for Summary Adjudication of [YouTube's] First Affirmative Defense of DMCA Safe Harbor, Robert Tur v. YouTube, Inc., Case No. CV 06-4436 FMC) ("declaration of Steve Chen dated January 5, 2007") at ¶ 2. Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 12:21-13:7.*

**Undisputed.**

11. *Prior to founding YouTube, Chad Hurley, Steve Chen, and Jawed Karim worked together at the Internet start-up PayPal.  Hohengarten ¶ 222 & Ex. 204, JK00009887, at JK00009890-91; Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 16:20-17:16); Hohengarten ¶ 402 & Ex. 365. Hohengarten ¶ 347 & Ex. 313 (Karim Dep.) at 8:24-9:14, 16:3-16:23.*

**Undisputed.**

12. *When eBay acquired PayPal for $1.5 billion in 2002, PayPal's stockholders, including YouTube co-founders Chad Hurley, Steve Chen, and Jawed Karim, received substantial profits from the deal. Hohengarten ¶ 6 & Ex. 3, GOO001-00303096, at GOO001-00303100; Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 19:11-21:12; Hohengarten ¶ 347 & Ex. 313 (Karim Dep.) at 8:24-10:9.*

**Disputed.**  The phrase "substantial profits" never appears in the cited evidence.  Hohengarten Exs. 3, 312, 313.

13. *The YouTube website first became publicly accessible in a "beta" version in April 2005.  Hohengarten ¶ 393 & Ex. 356 (declaration of Steve Chen dated January 5, 2007) at ¶ 3; Hohengarten ¶ 7 & Ex. 4, GOO001-00011355, GOO001-00011357.*

**Undisputed.**

14. *YouTube publicized the "official launch" of the YouTube website in December 2005.  Hohengarten ¶ 307 & Ex. 279 (YouTube page entitled "YouTube Company History").*

**Undisputed.**

15. *A December 15, 2005 YouTube press release described YouTube as a "consumer media company" that "deliver[s] entertaining, authentic and informative videos across the Internet."  Hohengarten ¶ 299 & Ex. 271 (YouTube press release dated December 15, 2005).*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

**Undisputed** that the language quoted in the proposed fact appears in the cited press release, but Viacom's selective excerption omits the full context. The press release describes YouTube as "a consumer media company for people to watch and share original videos through a Web experience, today launches its new service that allows people to watch, upload, and share personal video clips at www.YouTube.com and across the Internet." Hohengarten Ex. 271.

16. *On October 9, 2006, Google announced its agreement with YouTube for Google to acquire YouTube for $1.65 billion in Google stock. Hohengarten ¶ 304 & Ex. 276 (Google press release dated October 9, 2006).*

   **Undisputed.**

17. *Google's acquisition of YouTube closed on November 13, 2006. Hohengarten ¶ 305 & Ex. 277 (Google press release dated November 13, 2006); Hohengarten ¶ 366 & Ex. 332 (Eun Dep.) at 58:3-14.*

   **Undisputed.**

18. *In connection with the acquisition, Google issued an aggregate of 3,217,560 shares, and restricted stock units, options and a warrant exercisable for or convertible into an aggregate of 442,210 shares, of Google Class A common stock. Hohengarten ¶ 305 & Ex. 277 (Google press release dated November 13, 2006).*

   **Undisputed.**

19. *On November 13, 2006, the closing date of the transaction, Google Class A common stock closed at a price of $481.03; at that price, the 3,659,770 shares issued and issuable in connection with Google's acquisition of YouTube were worth an aggregate $1.77 billion. Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the closing price for Google shares on November 13, 2006 was $481.03).*

   **Disputed.** First, as confirmed by Google's October 9, 2006 press release, the number of shares issued by Google in the transaction was based on the 30-day average closing price two trading days prior to the completion of the acquisition. Hohengarten Ex. 276. Second, the number of shares issued by Google was "calculated by dividing $1.65 billion less certain amounts (approximately $15 million) funded to YouTube by Google between signing and closing by the average closing price for the 30 day trading days ending on November 9, 2006." Hohengarten Ex. 277. Thus, Viacom's proposed fact not only inaccurately assumes that the number of shares issued in transaction

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

was premised on the stock valuations as of November 13, 2006, but it also uses the wrong methodology for calculating the aggregate value of the transaction.

20.    *12.5 percent of the equity issued and issuable pursuant to Google's acquisition of YouTube was placed in escrow to secure indemnification obligations.  Hohengarten ¶ 305 & Ex. 277 (Google press release dated November 13, 2006).*

**Undisputed.**

**Additional Material Facts:**

According to the press release, the equity issued to secure certain indemnification obligations was subject to escrow for one year. Hohengarten Ex. 277.

21.    *As a result of Google's acquisition of YouTube, YouTube co-founder Chad Hurley received Google shares worth approximately $334 million at the November 13, 2006 closing price.  Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement dated February 7, 2007)) at 5 (page numbers at bottom center) (showing 694,087 issued to Chad Hurley); Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the closing price for Google shares on November 13, 2006 was $481.03); Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 22:8-18 (stating that as a result of the sale of YouTube to Google his net worth increased by around $300 million).*

**Disputed.**  *See supra*, YouTube's Response to SUF ¶ 19.

22.    *As a result of Google's acquisition of YouTube, YouTube co-founder Steve Chen received Google shares worth approximately $301 million at the November 13, 2006 closing price.  Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement (February 7, 2007)) at 5 (page numbers at bottom center) (showing 625,366 issued to Steve Chen).; Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the closing price for Google shares on November 13, 2006 was $481.03).*

**Disputed.**  *See supra*, YouTube's Response to SUF ¶ 19.

23.    *As a result of Google's acquisition of YouTube, YouTube co-founder Jawed Karim received Google shares worth approximately $66 million at the November 13, 2006 closing price.  Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement (February 7, 2007)) at 5 (page numbers at bottom center) (showing 137,443 issued to Jawed*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*Karim).  Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the closing price for Google shares on November 13, 2006 was $481.03).  Hohengarten ¶ 347 & Ex. 313 (Karim Dep.) at 106:20-107:8 (stating that as a result of the sale of YouTube to Google, he received Google shares worth "[a]bout $60 million").*

**Disputed.**  *See supra*, YouTube's Response to SUF ¶ 19.

24.  *As a result of Google's acquisition of YouTube, Sequoia Capital, the largest venture capital investor in YouTube, received Google shares worth approximately $516 million at the November 13, 2006 closing price.  Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement dated February 7, 2007)) at 6, 10 (page numbers at bottom center) (showing 941,027 shares issued to Sequoia Capital XI, L.P.; 102,376 shares issued to Sequoia Capital XI Principals Fund; and 29,724 shares issued to Sequoia Technology Partners XI); Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the closing price for Google shares on November 13, 2006 was $481.03).*

**Disputed.**  *See supra*, YouTube's Response to SUF ¶ 19.

25.  *Sequoia Capital invested approximately $9 million in YouTube in late 2005 and early 2006.  Hohengarten ¶ 329 & Ex. 297, SC008711, at SC008781 (showing that Sequoia Capital invested $4.99 million in Series B financing); Hohengarten ¶ 328 & Ex. 296, SC008403, at SC008470-71 (showing approximately $3.4 million invested in cash and over $100,000 invested as debt conversion in Series A financing); Hohengarten ¶ 351 & Ex. 317 (Botha Dep.) at 53:20-54:5; 137:15-24.*

**Disputed.**  The cited evidence indicates that the total amount invested by Sequoia Capital in YouTube in late 2005 and early 2006 was actually $8.49 million.

26.  *As a result of Google's acquisition of YouTube, Artis Capital, another venture capital investor in YouTube, received Google shares worth approximately $85 million at the November 13, 2006 closing price. Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement dated February 7, 2007)) at 5 (page numbers at bottom center) (showing 176,621 shares issued to Artis Capital entities); Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the closing price for Google shares on November 13, 2006 was $481.03); Hohengarten ¶ 390 & Ex. 384 (D. Lamond Dep.) at 148:14-149:5 (agreeing that the YouTube acquisition was worth $57.5 million to Artis Capital, based on the opening Google stock price on*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*November 13, 2006); Hohengarten ¶ 332 & Ex. 300, AC005772, at AC005772.*

**Disputed.** *See supra*, YouTube's Response to SUF ¶ 19. In addition, Viacom cites conflicting evidence for this proposed fact. *Compare* SUF ¶ 26 (representing that Artis Capital received approximately $85M in Google shares) *with* Hohengarten ¶ 390 & Ex. 384 (D. Lamond Dep.) at 148:14-149:5 (stating that the YouTube acquisition was worth $57.5 million to Artis Capital).

27. *Artis Capital invested approximately $3 million in YouTube in early 2006. Hohengarten ¶ 329 & Ex. 297, SC008711, at SC008781-83 (showing that Artis Capital invested $3 million in Series B financing).*

**Undisputed.**

28. *"As of December 31, 2006," Google's "cash, cash equivalents, and marketable securities were $11.2 billion." Hohengarten ¶ 303 & Ex. 275 (Google Investor Relations page announcing Fourth Quarter and Fiscal Year 2006 Results).*

**Undisputed.**

### YouTube's Founders' and Other Employees' Knowledge of and Intent to Benefit From Massive Copyright Infringement on YouTube

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

29. *In a February 11, 2005 email to YouTube co-founders Chad Hurley and Steve Chen, with the subject "aiming high," YouTube co-founder Jawed Karim wrote that, in terms of "the number of users and popularity," he wanted to "firmly place [YouTube] among" "napster," "kazaa," and "bittorrent." Hohengarten ¶ 8 & Ex. 5, GOO001-02757578, at GOO001-02757578.*

**Disputed.** Viacom's selective quotation of the document distorts its meaning. The full text of the document states: "I want an innovation that at least in the number of users and popularity, would firmly place us among a list like this: eBay, PayPal, BitTorrent, Napster, Friendster, E-Trade, Yahoo, Google, Winamp, Kazaa, WinZip, ICQ, Jasc Paint Shop Pro, Match.com, Wikipedia." Hohengarten Ex. 5.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Additional Material Facts:**

(1)     In the same timeframe as the cited email, Viacom recognized that Napster had become a legitimate company and wanted to acquire it in an initiative called Project Foxhunt.  Schapiro Opp. Ex. 272.

(2)     Paramount had a content license agreement with Bittorrent. Schapiro Opp. Ex. 273.

(4)     MTV Networks had a content license agreement with Bittorrent. Schapiro Opp. Ex. 274.

(5)     YouTube aimed to differentiate itself from sites that did not respect copyright.  *See, e.g.*, Hohengarten Ex. 223 (JK00006392); C. Hurley Opp. Decl. Ex. A ("I think the key to our success is personal videos.  If we are going to build this service, I think we should do it right and start enforcing this rule.  We are not another 'StupidVideos' or 'Bittorrent.'").

(6)     YouTube's founders intended YouTube to be a platform that would give users a convenient way to share personal videos and build a community around posting and viewing those videos.  Hurley Decl. ¶ 2; C. Hurley Opening Decl. Ex. 4 (YouTube is "a community site of videos about 'you' . . . ."; "We want to force users to feature 'You' in the video.") Schapiro Opp. Ex. 69 ("We are a Personal Video site. . . . We want to create a community around connections made by users viewing one another's videos."); Hurley Opening Decl. Ex. 6 (JK4918) ("[I] really think we should focus on real personal clips that are taken by everyday people.  We'll still allow short films like this, but I think what would set us apart from all the other movie sites out there, would be the flickr aspect... so we aren't a film site, but a personal video clips site, for people to upload, store, search, and share their personal video clips. . . . I want real people, real videos." ); Hurley Opening Decl. Ex. 15 (JK9892) (Statement of YouTube's purpose: "To become the primary outlet of user-generated content on the Internet, and to allow anyone to upload, share, and browse this content." ).

30.     *In an April 23, 2005 email to YouTube co-founders Steve Chen and Chad Hurley, YouTube co-founder Jawed Karim wrote: "It's all 'bout da videos, yo.  We'll be an excellent acquisition target once we're huge." Hohengarten ¶ 223 & Ex. 205, JK00009137, at JK00009137.*

**Undisputed** that the language quoted in this proposed fact appears in the cited email.

**Additional Material Facts:**

13

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

Karim's reference to "videos" in the above-referenced email was shorthand for his desire to "focus on real personal clips that are taken everyday by people . . . so we aren't a film site, but a personal video clips site, for people to upload, store, search, and share their personal video clips . . . I want real people, real videos." Hurley Opening Decl. Ex. 6 (JK4918).

31. *In an April 25, 2005 email to YouTube co-founders Steve Chen and Jawed Karim, YouTube co-founder Chad Hurley noted the presence of a "South Park" clip on YouTube and questioned whether it should be left on the site because "its [sic] copyrighted material." Hohengarten ¶ 224 & Ex. 206, JK00004704, at JK00004704.*

**Disputed.** Viacom's selective quotation of the document distorts its meaning. The email indicates that, when Hurley first encountered a video that he suspected might be unauthorized, a clip from the television show *South Park*, he suggested to his co-founders that they remove it. Hohengarten Ex. 206. Chen concurred: "I agree, we should get rid of some of his videos. It's going to be really important that the first set of videos in there set an example of the videos we'd like to see on our site." *Id.*

**Additional Material Facts:**

(1)    From approximately August 2003 through at least December 2009, the official web site for the South Park television show (at www.southparkstudios.com) maintained a list of questions and answers about the show. Schapiro Opp. Ex. 72. In this "Frequently Asked Questions," or FAQ, the site supplied the official position of the show's creators on people accessing content from the show online that had not been expressly authorized: "Matt [Stone] and Trey [Parker] do not mind when fans download their episodes off the Internet; they feel that it's good when people watch the show no matter how they do it." *Id.* During at least some of the time that this position was published on the show's official website, the operator of the site was South Park Digital Studios a joint venture between Viacom and the show's creators that held the rights to copy and distribute the show's content online. Schapiro Opp. Ex. 276 (August 2007 press release announcing formation of South Park Digital Studios joint venture); *Id.* Ex. 277 (August 2007 agreement between Viacom and South Park creators granting exclusive digital rights for South Park to the joint venture) The statement on the website about accessing South Park content online was quoted in a CNN article in October 2006. Schapiro Opp. Ex. 73.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

(2)     At roughly the same time, an October 2006 article in Multichannel News reported MTVN Chairman Judy McGrath as saying that YouTube users could continue to upload clips from South Park to YouTube, and that the presence of such clips on YouTube created attention and drove potential viewership for the show. Schapiro Opening Ex. 61. Shortly after these articles appeared, a YouTube user informed YouTube that South Park's creators were encouraging users to share the show's content through the service. Schapiro Opp. Ex. 74.   The statement on the South Park website encouraging the public to access clips of the South Park show anywhere online was removed from the site just hours after the joint venture's corporate designee was questioned about it during her deposition on January 28, 2010.   Weibell Decl. ¶¶ 1-5.

32.   *YouTube's content review manager Heather Gillette testified that early in YouTube's existence "South Park" was "the content that appeared to be most popular and shared at that stage that we suspected could be unauthorized." Hohengarten ¶ 368 & Ex. 334 (Gillette Dep.) at 7:22-9:20, 46:20-47:24; Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement (February 7, 2007)) at 16 (page numbers at bottom center) (stating Heather Gillette's job title).*

**Disputed.** Viacom misstates Gillette's job title.  Hohengarten Ex. 334 (7:22-9:20) (testifying that she held four different titles over the course of her career at YouTube, none of which was "content review manager").  Viacom selectively quotes Gillette's testimony and omits the portion of her testimony confirming that "pre-acquisition we did do – we did scan portions of the site to try and locate what we thought might be unauthorized content."  *Id.* 46:25-47:3.

**Additional Material Facts:**

All of the South Park clips that YouTube removed on its own were authorized to be on YouTube.  Schapiro Opp. Ex. 279; Ex. 280 (BAYTSP001093518); Schapiro Opp. Ex. 217 (134:19-136:10, 138:25-139:14).

33.   *In a June 15, 2005 email to YouTube co-founders Chad Hurley and YouTube co-founder Jawed Karim, YouTube co-founder Steve Chen stated "we got a complaint from someone that we were violating their user agreement.  i \*think\* it may be because we're hosting copyrighted content.  instead of taking it down – i'm not about to take down content because our ISP is giving us shit – we should just investigate moving www.youtube.com." Hohengarten ¶ 225 & Ex. 207, JK00005039, at JK00005039.*

15

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

**Undisputed** that the cited email contains the language quoted in this proposed fact.

**Additional Material Facts:**

(1)     The ISP's complaint was about someone sending junk email from YouTube's IP address, "not about our content" or any copyright issues.  Schapiro Opp. Ex. 75; *see* Chen Opp. Decl. at 1-2 .

(2)     Hurley responded to Chen's email by writing, "we need to figure this out soon . . . this could be very CRITICAL!"  Schapiro Opp. Ex. 76.

34.   *In a June 15, 2005 email to YouTube co-founders Steve Chen and Jawed Karim, YouTube co-founders Chad Hurley stated: "so, a way to avoid the copyright bastards might be to remove the 'No copyrighted or obscene material' line and let the users moderate the videos themselves. legally, this will probably be better for us, as we'll make the case we can review all videos and tell them if they're concerned they have the tools to do it themselves."  Hohengarten ¶ 226 & Ex. 208, JK00005043, at JK00005043.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

**Additional Material Facts:**

(1)     Hurley was proposing YouTube implement a user flagging system similar to those employed by other well-established user-generated sites – namely, craigslist,com and hotornot.com.  *See* Hohengarten Ex. 208.

(2)     For the first seven months of YouTube's existence, YouTube had no investors, no revenue, no employees and no counsel.  Hurley Opening Decl. ¶ 15.

(3)     In September 2005, YouTube implemented a feature allowing ordinary users to flag videos that they believed contained unauthorized copyrighted material because YouTube' founders wanted to take steps to address potential copyright violations.  Hurley Opening Decl. ¶ 20.

(4)     In September 2005, the founders secured financing and guidance from Sequoia Capital.  Botha Opening Decl. ¶¶ 5-8. & Ex. 1; Hurley Opening Decl. ¶¶ 21-22; Hohengarten Ex. 204.

(5)     Following Sequoia Capital's investment in YouTube, YouTube implemented a formal DMCA policy, registering an agent to receive

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

takedown notices, posting instructions for content owners on how to send such notices, and instituting a policy of terminating the accounts of repeat infringers.  Hurley Opening Decl. ¶ 21.

(6)  YouTube replaced the user-flagging feature with one that displays alongside every video a link to an automated DMCA takedown form.  Levine Opp. Decl. ¶ 10.

(7)  YouTube has developed a suite of policies and tools to combat copyright infringement.  Levine Opening Decl. ¶¶ 5-12, 17-19, 23-27, 30-33; King Opening Decl. ¶¶ 2-28.

(8)

35.   *In a June 20, 2005 email to YouTube co-founders Chad Hurley and Steve Chen, YouTube co-founder Jawed Karim wrote: "If we want to sign up lots of users who keep coming back, we have to target the people who will never upload a video in their life.  And those are really valuable because they spend time watching.  And if they watch, then it's just like TV, which means lots of value." Hohengarten ¶ 228 & Ex. 210, JK00009383, at JK00009383.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

36.   *On June 21, 2005, YouTube co-founder Jawed Karim stated in an email to YouTube co-founders Chad Hurley and Steve Chen that "Where our value comes in is USERS.  . . . [O]ur buy-out value is positively affected by . . . more Youtube users . . . .  The only thing we have control over is users.  We must build features that sign up tons of users, and keep them coming back." Hohengarten ¶ 227 & Ex. 209, JK00009381, at JK00009381.*

**Disputed.**      Viacom    selectively    excerpts    and    otherwise mischaracterizes the cited email.  Viacom omits the following portion of the cited email:

> It may be obvious, but we should be all about users, users, users, ***and much more so than about videos!***  That's why Chad, I

17

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

would encourage you to make our interface more focused on the USERS **and less the VIDEOS.  The users have to be the stars of the site….**

Hohengarten Ex. 209 (emphasis added).

37.     *On July 4, 2005, YouTube co-founder Chad Hurley sent an email to YouTube co-founders Steve Chen and Jawed Karim titled "budlight commercials," stating "we need to reject these too"; Steve Chen responded by asking to "leave these in a bit longer?  another week or two can't hurt;" Jawed Karim subsequently stated that he "added back all 28 bud videos.  stupid . . .," and Steve Chen replied:  "okay first, regardless of the video they upload, people are going to be telling people about the site, therefore making it viral.  they're going to drive traffic. second, it adds more content to the site.  third, we're going to be adding advertisements in the future so this gets them used to it.  I'm asking for a couple more weeks."  Hohengarten ¶ 229 & Ex. 211, JK00005928, at JK00005928; Hohengarten ¶ 230 & Ex. 212, JK00005929, at JK00005929.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

**Additional Material Facts:**

Viacom itself instructed its agents not to remove from YouTube commercials and trailers promoting its content.  Schapiro Opening Ex. 51.

38.     *In a July 10, 2005 email to YouTube co-founders Chad Hurley and Steve Chen, YouTube co-founder Jawed Karim reported that he had found a "copyright video" and stated: "Ordinarily I'd say reject it, but I agree with Steve, let's ease up on our strict policies for now.  So let's just leave copyrighted stuff there if it's news clips.  I still think we should reject some other (C) things tho . . ."; Chad Hurley replied, "ok man, save your meal money for some lawsuits! ;)  no really, I guess we'll just see what happens."  Hohengarten ¶ 231 & Ex. 213, JK00006057, at JK00006057.*

**Disputed.**  Viacom's selective excerpting of the cited email distorts its meaning.  The copyright video that Karim discovered was "a recording of a news clip."  Hohengarten Ex. 213.

**Additional Material Facts:**

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

(1)    The clip referenced by Karim is a news clip concerning an election scandal involving the president of the Philippines.  The clip is still available on YouTube; its owner has never asked that it be removed.   *See* http://www.youtube.com/watch?v=E3WqfFI-K_U; *see also* Schapiro Opp. Ex. 412A/B & 413.

(2)    Karim advocated continuing to reject materials for copyright reasons, but allowing news clips based on his belief at the time that such clips were fair use.  Schapiro Opp. Ex. 77 (198:11-199:16).

(3)    A Viacom executive said:  "[M]y understanding of news clips is that there was fair use of news clips."  Schapiro Opp. Ex. 78 (260:24-261:3).

39.   *In a July 10, 2005 email to YouTube co-founders Jawed Karim and Steve Chen, YouTube co-founder Chad Hurley wrote: "yup, we need views.  I'm a little concerned with the recent supreme court ruling on copyrighted material though."  Hohengarten ¶ 234 & Ex. 216, JK00006055, at JK00006055.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email, but Viacom selective excerption of the cited email omits important context.  The full email reads:

> yup, we need views.  I'm a little concerned with the recent supreme court ruling on copyrighted material though.  perhaps, when we add the video type drop down, we do add 'viral videos', so it's easier to take out later if it is a problem.
>
> Video type:
> -Personal
> - Blog
> - Viral
> - 'For Sale'
>
> It would also really give us a chance to customize the fields for uploads to each.
>
> ???

Hohengarten Ex. 216.

**Additional Material Facts:**

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

Hurley proposed allowing users to select among various descriptors when uploading videos (including "personal" and "viral") because he thought that, if "viral" videos ever became a source of copyright problems, this mechanism would allow YouTube to more easily remove them. Hurley Opp. Decl. ¶ 5.

40. *In a July 19, 2005 email to YouTube co-founders Chad Hurley and Jawed Karim, YouTube co-founder Steve Chen wrote: "jawed, please stop putting stolen videos on the site. We're going to have a tough time defending the fact that we're not liable for the copyrighted material on the site because we didn't put it up when one of the co-founders is blatantly stealing content from other sites and trying to get everyone to see it." Hohengarten ¶ 235 & Ex. 217, JK00006166, at JK00006166.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

**Additional Material Facts:**

(1)    Karim testified that these clips were not stolen:

They were not stolen videos. I would . . . browse on the Web for airplane-related videos on aviation community Web sites, and these were user-generated videos created by aviation enthusiasts. So, for example, this would be like a 10-second shaky video camera clip of a 747 taking off, and these clips were usually already on multiple aviation Web sites.

Schapiro Opp. Ex. 77.

(2)    When Karim populated YouTube with aviation clips, Hurley and Chen complained. *See id.* Ex. 84 (JK00000226, at JK000000231).

41. *On July 19, 2005, YouTube co-founder Steve Chen sent an email to YouTube co-founder Jawed Karim, copying YouTube co-founder Chad Hurley, stating "why don't i just put up 20 videos of pornography and obviously copyrighted materials and then link them from the front page. what were you thinking." Hohengarten ¶ 236 & Ex. 218, JK00009595, at JK00009595.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

42. *On July 22, 2005, YouTube co-founder Steve Chen forwarded to all YouTube employees a "YouTube Marketing Analysis" stating that "users not only upload their own work, but can potentially upload publicly*

20

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*available content for viewing.  Risk area here is copyright as many videos which are uploaded are not the property of the uploader. . . . Although the policy when uploading states that the video must be legit, YouTube may be liable for any damages which copyright holders may press."   Hohengarten ¶ 239 & Ex. 221, JK00006259, at JK00006266, JK00006268.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

**Additional Material Facts:**

The cited document was a "topline marketing analysis" drafted in "a few hours" by a Yahoo employee that stated in relation to YouTube:  "I really think there is huge potential, and I'm excited about the possibilities." Hohengarten Ex. 221, at JK00006259.

43.   *In a July 23, 2005 email to YouTube co-founders Steve Chen and Jawed Karim, YouTube co-founder Chad Hurley responded to a YouTube link sent by Jawed Karim by saying: "if we reject this, we need to reject all the other copyrighted ones. . . . should we just develop a flagging system for a future push?"; Karim responded: "I say we reject this one, but not the other ones.  This one is totally blatant." Hohengarten ¶ 240 & Ex. 222, JK00009668, at JK00009668.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

44.   *In a July 29, 2005 email about competing video websites, YouTube co-founder Steve Chen wrote to YouTube co-founders Chad Hurley and Jawed Karim, "steal it!", and Chad Hurley responded: "hmm, steal the movies?"  Steve Chen replied: "we have to keep in mind that we need to attract traffic.  how much traffic will we get from personal videos? remember, the only reason why our traffic surged was due to a video of this type. . . . viral videos will tend to be THOSE type of videos." Hohengarten ¶ 241 & Ex. 223, JK00006392, at JK00006392.*

**Disputed.**  Viacom selectively excerpts and omits the portion of the email that makes clear that Chen was joking.  When Hurley responded: "hmm, steal the movies?," Chen actually replied: "haha ya. Or something.  Just something to watch for.  Check out their alexa ranking."  Hohengarten Ex. 223; *see also* Hurley Opening Decl. ¶ 12.

**Additional Material Facts:**

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

In Hurley's final response to Chen in the cited email exchange, he made it clear that he intended to differentiate YouTube from competing sites built on infringement: "i know [www.filecabi.net] are getting a lot of traffic... but its because they are a stupidvideos.com-type of site . . . . I would really like to build something more valuable and more useful... actually build something that people will talk about and changes they way people use video on the internet." Hohengarten Ex. 223.

45. *In an August 1, 2005 email to all YouTube employees, YouTube co-founder Chad Hurley stated: "This user is starting to upload tons of 'Family Guy' copyrighted clips... I think it's time to start rejecting some of them. Any objections?" Hohengarten ¶ 9 & Ex. 6, GOO001-00660588, at GOO001-00660588.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

46. *In an August 9, 2005 email to YouTube co-founders Steve Chen and Jawed Karim, YouTube co-founder Chad Hurley stated: "we need to start being diligent about rejecting copyrighted/inappropriate content. we are getting serious traffic and attention now, I don't want this to be killed by a potentially bad experience of a network exec or someone visiting us. like there is a cnn clip of the shuttle clip on the site today, if the boys from Turner would come to the site, they might be pissed? these guys are the ones that will buy us for big money, so lets make them happy. we can then roll a lot of this work into a flagging system soon." Hohengarten ¶ 242 & Ex. 224, JK00006689, at JK00006689-90.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email, but Viacom's proposed fact omits material portions of the email chain. At the end of the email, the founders agreed to "remove stuff like movies/tv shows" while keeping "short news clips." Hohengarten Ex. 224.

**Additional Material Facts:**

(1) Karim proposed keeping news clips on the site on the assumption that they reflected fair use. Hohengarten Ex. 224; Schapiro Opp. Ex. 77 (198:11-199:16).

(2) A Viacom executive expressed that very same view about news clips on YouTube. Schapiro Opp. Ex. 78 (260:24-261:3).

47. *In response to YouTube co-founder Chad Hurley's August 9, 2005 email (see SUF ¶ 46) YouTube co-founder Steve Chen stated: "but we should*

22

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*just keep that stuff on the site. I really don't see what will happen. what? someone from cnn sees it? he happens to be someone with power? he happens to want to take it down right away. he get in touch with cnn legal. 2 weeks later, we get a cease & desist letter. we take the video down"; Chad Hurley replied: "I just don't want to create a bad vibe... and perhaps give the users or the press something bad to write about." Hohengarten ¶ 242 & Ex. 224, JK00006689, at JK00006689.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email, but Viacom's proposed fact omits material portions of the email chain. *See supra*, YouTube's Response and Additional Material Facts in Response to SUF ¶ 46.

48.    *On August 10, 2005, YouTube co-founder Jawed Karim responded to YouTube co-founder Chad Hurley (see SUF ¶ [previous para]): "lets remove stuff like movies/tv shows. lets keep short news clips for now. we can become stricter over time, just not overnight. like the CNN space shuttle clip, I like. we can remove it once we're bigger and better known, but for now that clip is fine." Steve Chen replied, "sounds good." Hohengarten ¶ 242 & Ex. 224 JK00006689, at JK00006689.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

**Additional Material Facts:**

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 46.

49.    *On August 11, 2005, YouTube co-founders Chad Hurley, Steve Chen, and Jawed Karim met with Sequoia Capital regarding a possible investment by Sequoia Capital in YouTube. Hohengarten ¶ 243 & Ex. 225, JK00006627, at JK00006627. Hohengarten ¶ 10 & Ex. 7, GOO001-01907664, at GOO001-01907664. Hohengarten ¶ 244 & Ex. 226 at JK00009791.*

**Undisputed.**

50.    *On August 11, 2005, outside Sequoia's offices in Palo Alto, YouTube co-founder Jawed Karim asked the two other YouTube co-founders, as captured on video, "At what point would we tell them our dirty little secret, which is that we actually just want to sell out quickly," and Chad Hurley responded, "we'll have to erase the file." Hohengarten ¶ 261 & Ex. 240, JK00010387_MVI_0922.avi; Hohengarten ¶ 262 & Ex. 241 (true and correct transcript of Hohengarten Ex. 240); Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) 106:11-108:20.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Disputed.** First, Viacom misquotes the cited transcript. As the transcript reveals, Hurley actually responded "you're going to have to erase this file." Second, this proposed fact is not supported by any admissible evidence. *See* Defendants' Motion to Strike; Fed. R. Evidence ("FRE") 401, 402 ("Evidence which is not relevant is not admissible.") and 403; Local Rule 56.1(a).

**Additional Material Facts:**

As evidenced by the founder's laughter on the video, Karim's reference to "our dirty little secret" and Hurley's response were jokes. Hohengarten Ex. 240.

51.    *In an August 14, 2005 email YouTube co-founder Jawed Karim reported to the two other YouTube co-founders Chad Hurley and Steve Chen that the three co-founders (using YouTube user names "steve," "jawed," and "Chad") were among the top six most active viewers on YouTube, in terms of number of videos watched. Hohengarten ¶ 188 & Ex. 185, GOO001-01949763, at GOO001-01949763; Hohengarten ¶ 258 & Ex. 379, JK00004669, at JK00004669 (making clear that Steve Chen, Jawed Karim, and Chad Hurley used YouTube user names "steve," "jawed," and "chad," respectively).*

**Undisputed** that, on August 14, 2005, Jawed Karim sent an email indicating that the three co-founders were among the top six most active viewers on YouTube.

52.    *In a September 1, 2005 email to YouTube co-founder Steve Chen and all YouTube employees, YouTube co-founder Jawed Karim stated, "well, we SHOULD take down any: 1) movies 2) TV shows. we should KEEP: 1) news clips 2) comedy clips (Conan, Leno, etc) 3) music videos. In the future, I'd also reject these last three but not yet." Hohengarten ¶ 11 & Ex. 8, GOO001-01424049, at GOO001-01424049.*

**Disputed.** Viacom's selective excerption of the cited email omits the full context. The email shows that YouTube's founders proactively contacted a YouTube user asking the user to "tak[e] down the family guy videos . . . because it's copyrighted content." When the user pointed to other *Family Guy* videos posted by another user, Karim concluded, "we should take down the other family guy clips." Hohengarten Ex. 8.

53.    *On September 2, 2005, in response to an email from YouTube co-founder Chad Hurley reporting that he had taken down clips of the TV show "Family Guy," YouTube co-founder Steve Chen stated: "should we just assume that a user uploading content really owns the content and*

24

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*is agreeing to all the terms of use?  so we don't take down anything other than obscene stuff?"  Hohengarten ¶ 245 & Ex. 227, JK00007378, at JK00007378.*

**Disputed.**  Viacom's selective excerption of the cited document distorts its meaning.  The full email reads:

> i just went through the admin stuff to review the videos we have on site now.  one thing that struck me, you know how sites like metro, mph online, and gamefly are actually using our site as the platform for serving up their video ads/content?   well, over time, more established places will start using us.

> should we just assume that a user uploading content really owns the content and is agreeing to all the terms of use?  so we don't take down anything other than obscene stuff?

Hohengarten Ex. 227.

**Additional Material Facts:**

After this e-mail exchange, YouTube continued to remove videos from Family Guy and other television shows and movies when notified of their existence.  *See* Schapiro Opp. Ex. 282 (November 18, 2005 e-mail noting that "Family Guy cartoon clips are deleted"); *see also* Hurley Opening Decl. ¶ 17; Schapiro Opp. Ex. 283; Hurley Opening Decl. Exs. 18, 22; Hohengarten Ex. 224.

54.   *In a September 3, 2005 email to the two other YouTube co-founders with the subject line "copyrighted material!!!", YouTube co-founder Chad Hurley wrote, "aaahhhhh, the site is starting to get out of control with copyrighted material... we are becoming another big-boys or stupidvideos."  Hohengarten ¶ 233 & Ex. 215, JK00007416, at JK00007418.  See also Hohengarten ¶ 259 & Ex. 380, JK00005597, at JK00005597 ("I really want to start rejecting copyrighted material now. . . . We are not another 'StupidVideos' or 'Bittorrent.'").*

**Disputed.**  Viacom's selective excerpt of Hohengarten Ex. 215 distorts its meaning.  The full email chain reads:

> From:        Steve Chen <steve@youtube.com>
> Sent:        Saturday, September 3, 2005  1:03 AM
> To:          Jawed<███████████>
> Cc:          Chad Hurley <chad@youtube.com>

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Subject:      Re:  copyrighted material!!!

yes, then I agree with you.  take down whole movies.  take down entire TV shows. take down XXX stuff.

everything else keep including sports, commercials, news, etc.

keeping it, we improve video uploads, videos viewed, and user registrations.  by removing it, we may taint our reputation, but, where else are these people going to upload personal videos?

-s

On Sept, 3, 2005, at 2:00 AM, Jawed wrote:

my suggested policy is really lax though.  all I'm saying is:  take down whole movies.  we dont get many of those. and we SHOULD take down entire TV
shows, like an entire family episode.

We've also been taking down clips of TV shows, like family guy… we should probably continue doing that, otherwise youtube will just
look like
a dumping ground for copyrighted stuff.  if we keep that policy, I don't
think our reviews will decrease at all.

XXX stuff we should never allow. at least, not until we have a way to separate it via tagging as "R-rated".

Jawed

_____
http://www.jawed.com/

On Sat, 3 Sept 2005, Steve Chen wrote:

ya, i know that if remove all that content.  We go from 100,000 views a day down to about 20,000 views or maybe even lower.

the copyright infringement stuff.  i mean, we can presumably claim that we don't know who owns the rights to that video and by uploading, the user is claiming they own that video.  we're

26

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

protected by DMCA for that.  we'll take it down if we get a "cease and desist".

What I mean is, potentially, any of this content could be the user's videos  maybe it's david sacks uploading a clip/preview of some movie.

why don't we just remove the XXX stuff for now?

On Step, 3, 2005, at 1:53 AM, Jawed wrote:

well I'd just remove the obviously copyright infringing stuff.

movies and tv shows, I'd get rid of.  we are not a glorified putfile, right?

none of the most favorites videos are movies or tv shows, we're ok cracking
down on this content.  we'll leave music videos, news clips, and clips of
comedy shows for now.

I think that's a pretty good policy for now, no?

Jawed

_____

http://www.jawed.com/


On Sat, 3 Sept 2005, Steve Chen wrote:

I'm thinking it's still okay.

what's the difference between big-boys/stupidvideos vs youtube? isn't it the community and user aspect?

if you look at the top videos on the site, it's all from this type of
content.  in a way, if you remove the potential copyright infringements, wouldn't you still say these are still "personal" videos?

27

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

If you define "personal" videos to be videos on your personal hard
drive to maybe 20% of what it is.  i think, as people hear about the
site, a good amount of the materials on the site is still personal --
they'll start recognizing that it's a place to share their own personal videos.

i'd hate to prematurely attack a problem and end up just losing growth due to it.

also, doesn't the DMCA cover us from a lot of this, as the guy said?

-s

On Sep 3, 2005, at 12:22 AM, Chad Hurley wrote:

aaahhhhh, the site is starting to get out of control with copyrighted material… we are becoming another big-boys or stupidvideos. if you came to the site now, that is what you would think the site is all about… just look at the recent videos in the admin tool.

i think we may need to start enforcing the restrictions soon and implement the flagging feature.

-chad

Hohengarten Ex. 215.

55.    *In a September 3, 2005 email responding to YouTube co-founder Chad Hurley's concern that "the site is starting to get out of control with copyrighted material" (see SUF ¶ 54), YouTube co-founder Steve Chen stated to the other two YouTube co-founders that, "what's the difference between big-boys/stupidvideos vs youtube? . . . if you look at the top videos on the site, it's all from this type of content.  in a way, if you remove the potential copyright infringements, wouldn't you still say these are 'personal' videos?  if you define 'personal' to be videos on your personal hard drive that you want to upload and share with people? anyway, if we do remove that stuff, site traffic and virality will drop to maybe 20% of what it is . . . i'd hate to prematurely attack a problem and end up just losing growth due to it." Hohengarten ¶ 233 & Ex. 215, JK00007416, at JK00007417-18.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Disputed.** *See supra*, YouTube's Response to SUF ¶ 54.

56.  *In response (see SUF ¶ 55), YouTube co-founder Jawed Karim wrote: "well I'd just remove the obviously copyright infringing stuff. movies and tv shows, I'd get rid of. . . . we'll leave music videos, news clips, and clips of comedy shows for now. I think thats a pretty good policy for now, no?" Hohengarten ¶ 233 & Ex. 215, JK00007416, at JK00007417.*

**Disputed.** *See supra*, YouTube's Response to SUF ¶ 54.

57.  *In a September 3, 2005 email to the two other YouTube co-founders, YouTube co-founder Steve Chen responded to Jawed Karim's suggestion that YouTube remove "obviously copyright infringing stuff" (see SUF ¶ 56) by stating that "i know that if [we] remove all that content. we go from 100,000 views a day down to about 20,000 views or maybe even lower. the copyright infringement stuff. i mean, we can presumably claim that we don't know who owns the rights to that video and by uploading, the user is claiming they own that video. we're protected by DMCA for that. we'll take it down if we get a 'cease and desist'"; Jawed Karim replied: "my suggested policy is really lax though. . . . if we keep that policy I don't think our views will decrease at all." Hohengarten ¶ 233 & Ex. 215, JK00007416, at JK00007416.*

**Disputed.** *See supra*, YouTube's Response to SUF ¶ 54.

58.  *On September 3, 2005, YouTube co-founder Steve Chen stated in response to YouTube co-founder Jawed Karim's "really lax" policy (see SUF ¶ 57): "yes, then i agree with you. take down whole movies, take down entire TV shows, take down XXX stuff. everything else keep including sports, commercials, news, etc. keeping it, we improve video uploads, videos viewed, and user registrations"; Chad Hurley replied: "lets just work in that flagging feature soon . . . then we won't be liable." Hohengarten ¶ 233 & Ex. 215, JK00007416, at JK00007416; Hohengarten ¶ 246 & Ex. 228, JK00007420, at JK00007420.*

**Disputed.** *See supra*, YouTube's Response to SUF ¶ 54.

59.  *In a September 4, 2005 email to YouTube co-founder Jawed Karim and others at YouTube, a YouTube user stated: "Jawed - You have a lot of people posting Chappelle Show clips and stuff like that. Aren't you guys worried that someone might sue you for copywrite [sic] violation like Napster?"; Karim replied: "ahaha." Hohengarten ¶ 247 & Ex. 229, JK00007423, at JK00007423.*

**Disputed.** The assertion that Karim replied "ahaha" is not supported by the cited evidence. *See* Hohengarten Ex. 229.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

60. *In a September 7, 2005 email, YouTube co-founder Steve Chen wrote to YouTube co-founders Chad Hurley and Jawed Karim, and Roelof Botha of Sequoia Capital (and later a YouTube board member) that YouTube had "implemented a flagging system so you can flag a video as being inappropriate or copyrighted. That way, the perception is that we are concerned about this type of material and we're actively monitoring it. The actual removal of this content will be in varying degrees. We may want to keep some of the borderline content on the site but just remove it from the browse/search pages. that way, you can't find the content easily. Again, similar to Flickr, . . . you can find truckloads of adult and copyrighted content. It's just that you can't stumble upon it, you have to be actively searching for it." Hohengarten ¶ 248 & Ex. 230, JK00007479, at JK00007479; Hohengarten ¶ 351 & Ex. 317 (Botha Dep.) at 8:19-9:12 (describing Roelof Botha's position at Sequoia), 53:16-53:21 (describing Sequoia's investment in YouTube), 93:19-93:21 (identifying Roelof Botha as a YouTube board member).*

**Disputed.** Viacom selectively excerpts from and misrepresents the cited evidence. The email string actually reads:

> Roelof:
> On the dev environment, the first phase of solving this problem is implemented.
>
> I think it's an accepted that in an environment such as YouTube, relying on user-generated content, copyrighted and in appropriate content will find its way onto the site. On the dev environment, we've implemented a flagging system so you can flag videos as being inappropriate or copyrighted. That way, the perception is that we are concerned      about this type of material and we're actively monitoring it.
>
> The actual removal of this content will be in varying degrees. We may want to keep      some of the borderline content on the site but just remove it from the browse/search      pages. That way, you can't find the content easily. Again, similar to Flickr, if you search for the right tags Flickr, you can find truckloads of adult and copyrighted content. It's just that you can't stumble upon it, you have to be actively searching for it.
>
> -s
>
> On Sep 6, 2005, at 11:18PM, Roelof Botha wrote:
>
> > Hi guys,

30

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

I've noticed that are a few recent 'racy' videos (e.g., http://www.youtube.com/?v=TTFPt_Jpks0).  Should we create a 'mature' section for this content? Or should we put in the equivalent of a 'safe search' function (just like Google has) so we don't alienate the moms that are uploading videos on the site?

Best,
Roelof

Hohengarten Ex. 230.

61.    *In a September 8, 2005 email to all YouTube employees with the subject line "committed changes," YouTube co-founder Steve Chen wrote: "Flagging for Inappropriate/ Copyrighted Content: . . . this is hooked up now." Hohengarten ¶ 260 & Ex. 381, JK00007560, at JK00007560.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

62.    *On September 12, 2005, the "Official YouTube Blog" stated: "We are ecstatic to announce the changes we made to the site last night. . . . First up, video flagging. At the bottom of the video watch page, you will notice a new section for flagging a video. If you encounter a video that's inappropriate or copyrighted, please use this feature to notify us. We will aggressively monitor these submissions and respond as quickly as we can." Hohengarten ¶ 298 & Ex. 270 (September 12, 2005 YouTube Blog entry) (emphasis in original).*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

63.    *YouTube's community flagging system originally allowed users to flag videos as copyrighted or as otherwise inappropriate, for reasons such as sexual content or violence, by clicking a button at the bottom of the video watch page and selecting the reason for the flagging from a menu of options supplied by YouTube.  See supra SUF ¶¶ 61-62; Hohengarten ¶ 368 & Ex. 334 (Gillette Dep.) at 94:12-96:23, 148:17-150:7; Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 191:10-192:11.*

**Disputed.**  Viacom mischaracterizes the flagging options available to users at the time.  Hohengarten Ex. 316  (191:10-19) (noting that users had the option of flagging videos as "front page, inappropriate, miscategorized, and copyright").

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

64.    *On September 23, 2005, YouTube co-founder Chad Hurley emailed YouTube co-founders Steve Chen and Jawed Karim, stating: "can we remove the flagging link for 'copyrighted' today?  we are starting to see complaints for this and basically if we don't remove them we could be held liable for being served a notice.  it's actually better if we don't have the link there at all because then the copyright holder is responsible for serving us notice of the material and not the users.  anyways, it would be good if we could remove this asap."   Hohengarten ¶ 250 & Ex. 232, JK00008043, at JK00008043.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

**Additional Material Facts:**

(1)    Community flagging for copyright was discontinued in September 2005 "when YouTube concluded that users were not in a position to correctly distinguish between authorized and potentially unauthorized material on the YouTube service, and in light of concerns that users would use the functionality as a means of censorship, to seek removal of content that they found undesirable, regardless of whether it was authorized to be on the service." *See* Schapiro Opp. Ex. 90 (Defs.' Am. Resp. to First Set of Interrog., Resp. to Interrog. No. 2); *see also* Hurley Opening Decl. ¶ 20.

(2)    YouTube identified the 53 videos flagged by users during the period in which community flagging for copyright was active.  *See* Schapiro Opp. Ex. 90.

(3)    YouTube replaced the user copyright flag with a feature that allowed copyright owners to flag videos and send DMCA takedown notices for those containing their content.  Levine Opp. Decl. ¶ 10.

(4)    In October 2005, YouTube registered a DMCA agent.  Hurley Opening Decl. ¶ 21.

(5)    *See supra,* YouTube's Additional Material Facts in Response to SUF ¶ 34.

65.    *On or shortly after September 23, 2005, YouTube discontinued community flagging for copyright infringement, while retaining community flagging for inappropriate content and other types of terms of use violations. Hohengarten ¶ 397 & Ex. 360 (Defendants' Amended Reponses and Objections to Plaintiffs' First Set of Interrogatories, Interrogatory No. 2 (Set 1)) at 8-9; Hohengarten ¶ 368 & Ex. 334 (Gillette Dep.) at 94:12-97:15; 148:17-150:7 (testifying about the way a*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*user flags a video and the manner in which YouTube's personnel review every flagged video); Hohengarten ¶ 376 & Ex. 342 (Levine Dep.) at 50:21-53:20, 56:17-22.*

**Undisputed.**

**Additional Material Facts:**

*See also supra,* YouTube's Additional Material Facts in Response to SUF ¶ 64.

66.   *When a YouTube user flags a video, the video is put into a queue for review by a team of YouTube reviewers who make a decision whether to remove the video from YouTube. Hohengarten ¶ 368 & Ex. 334 (Gillette Dep.) at 42:2-5, 92:14-17, 150:23-151:8; Hohengarten ¶ 376 & Ex. 342 (Levine Dep.) at 51:24-52:6, 56:17-22; Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 191:10-192:11; Hohengarten ¶ 12 & Ex. 9, GOO001-05951723, at GOO001-05951725, GOO001-05951729; Hohengarten ¶ 301 & Ex. 273 (October 8, 2006 YouTube Blog post entitled "How Flagging Works").*

   **Disputed.** YouTube disputes this proposed fact to the extent that it implies the review process described by the cited evidence had anything to do with potential copyright violations. YouTube only reviews flagged videos for inappropriate videos, such as those containing "profanity, violence, adult content etc." Hohengarten Ex. 273.

67.   *YouTube employs an "army of content reviewers" who review flagged videos "24 hours a day, 365 days a year." Hohengarten ¶ 13 & Ex. 10, GOO001-02482760, at GOO001-02482760 ("army of content reviewers"); Hohengarten ¶ 14 & Ex. 11, GOO001-00561567, at GOO001-00561577 ("24 hours a day, 365 days a year").*

   **Disputed.** YouTube disputes the proposition that YouTube employs an "army of content reviewers." As of August 2006, YouTube employed fewer than 10 reviewers. Schapiro Opp. Ex. 94 (112:14-19). Neither of the documents that Viacom cites purports to describe YouTube's operations as they exist today. Hohengarten Exs. 10, 11.

   **Additional Material Facts:**

   YouTube employs a dedicated team throughout the world to process manually-submitted DMCA notices and to assist copyright holders and users with issues arising from the notice process. Levine Opening Decl. ¶ 19.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

68. *YouTube has issued guidelines to content reviewers regarding the approval and rejection of flagged videos.  Hohengarten ¶ 15 & Ex. 12, GOO001-00744094, at GOO001-00744095-152.*

   **Undisputed.**

69. *The February 23, 2007 guidelines issued by YouTube to its content reviewers instructed them regarding the approval and removal of videos that depict children, sexual content, body parts, crude content, and various illegal acts, but not copyright; one of the examples of "PG-13 sexual content" that reviewers were supposed to approve was a clip from the Daily Show.   Hohengarten ¶ 15 & Ex. 12, GOO001-00744094, at GOO001-00744096, GOO001-00744120.*

   **Disputed.**  Viacom mischaracterizes the cited evidence.  The title of the page in which the Daily Show clip is referenced is "YouTube's policy on Sexual Content," and the slide instructs reviewers to approve "non-SG, implied, PG-13 sexual content" similar to the content in that clip. *See* Hohengarten Ex. 12, at GOO001-00744120. The Daily Show clip was used only as an example of the type of sexual content that is permitted on YouTube.  *Id.*  The document does not say that Daily Show clips would otherwise be appropriate for approval. *Id.*

70. *Community flagging has expedited removal of pornography and other content YouTube regards as undesirable.  Hohengarten ¶ 12 & Ex. 9, GOO001-05951723, at GOO001-05951728; Hohengarten ¶ 16 & Ex. 13, GOO001-00044974, at GOO001-00044979; Hohengarten ¶ 368 & Ex. 334 (Gillette Dep.) at 150:8-18 (testifying that she was "confident" that pornography is typically flagged and removed within the first 100 views).*

   **Disputed.**  Viacom mischaracterizes the cited evidence.  First, the cited evidence does not state that community flagging "expedited" the process of removing pornography.  The cited evidence only offers statistics regarding the percentage of flagged videos that are removed within certain time periods.  *See* Hohengarten Exs. 9, 13.  Second, the parenthetical quotation attributed to Gillette is inaccurate.  Gillette actually testified that she was "confident" in the accuracy of a "one-off report" regarding the removal of pornography from YouTube.  *See* Hohengarten Ex. 334 (150:8-18).

71. *During the two-week period that community flagging for copyright infringement was available on YouTube, users identified and flagged unauthorized copyrighted material that YouTube reviewed and removed.   Hohengarten ¶ 397 & Ex. 360 (Defendants' Amended*

34

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*Responses and Objections to Plaintiffs' First Set of Interrogatories, Interrogatory No. 2) at 8-9.*

**Disputed.** Viacom's purported summary of the cited evidence omits material context. *See supra,* YouTube's Additional Material Facts in Response to SUF ¶ 64.

72. *Some YouTube employees advocated bringing back community flagging for copyright infringement, but that tool was never reinstated after it was disabled on or about September 23, 2005. Hohengarten ¶ 17 & Ex. 14, GOO001-07167907, at GOO001-07167907; Hohengarten ¶ 397 & Ex. 360 (Defendants' Amended Response and Objections to Plaintiffs' First Set of Interrogatories, Interrogatory No. 2) at 8-9.*

**Disputed.** First, Viacom distorts Hohengarten Ex. 14 by characterizing a suggestion that users be "allowed" to flag videos as inappropriate or copyrighted as "advocacy." Hohengarten Ex. 14. Second, Viacom fails to provide the full context in relation to YouTube's interrogatory response. *See supra,* YouTube's Response to SUF ¶ 64.

73. *YouTube has touted the success of the community flagging system in expediting removal of videos flagged as inappropriate. Hohengarten ¶ 12 & Ex. 9, GOO001-05951723, at GOO001-05951728; Hohengarten ¶ 16 & Ex. 13, GOO001-00044974, at GOO001-00044979; Hohengarten ¶ 368 & Ex. 334 (Gillette Dep.) at 150:8-18.*

**Disputed.** The cited evidence does not support the proposition that YouTube "touted the success of the community flagging system in expediting removal of videos flagged as inappropriate". *See* Hohengarten Exs. 9, 13, 334.

**Additional Material Facts:**

One of the cited presentations notes that YouTube had a "50 minutes [sic] average time to remove infringing content when notified during business hours." Hohengarten Ex. 9, at GOO001-05951728.

74. *On October 11, 2005, YouTube director of finance Brent Hurley suggested to YouTube co-founders Chad Hurley, Steve Chen, and Jawed Karim: "[i]f we reject a video, flag the user who uploaded it so that anytime they upload a new video, we need to approve it before going live"; YouTube never implemented that suggestion. Hohengarten ¶ 232 & Ex. 214, JK00000382, at JK00000382; Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 10:9-10:18 (stating Brent Hurley's title). See also Hohengarten ¶ 184 & Ex 181, GOO001-00827716, at GOO001-*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*00827716-17 (Roelef Botha of Sequoia Capital asking whether YouTube could "queue[] high risk tags . . . so that they are reviewed before going live?" and YouTube product manager Maryrose Dunton writing to YouTube co-founder Chad Hurley, "I think we can add this fairly easily").*

**Disputed.** First, the cited evidence does not support the proposition that the Hurley's proposal was never implemented. Second, Viacom's use of ellipsis omits the fact that Botha was inquiring about "queueing high risk tags" *for pornographic content.* Hohengarten Ex. 181, at GOO001-00827716-17.

75.   *In the same October 11, 2005 email, YouTube director of finance Brent Hurley also suggested that YouTube should build a tool that would automatically flag for review "any video with \*hot\* tags, such as Family Guy, Angry Kid, etc. (We can add to this \*hot\* list as needed)," but such a tool was never implemented. Hohengarten ¶ 232 & Ex. 214, JK00000382, at JK00000382.*

**Disputed.** Viacom misrepresents the cited email. There is no discussion in the email of a "tool that would automatically flag" anything. *See* Hohengarten Ex. 214.

**Additional Material Facts:**

(1)   In December 2005, YouTube launched a feature known as "Subscribe to Tags," which allows a YouTube user to define their own "tags" consisting of words or short phrases. B. Hurley Opp. Decl. ¶ 2. When the user accesses their YouTube account, the user receives alerts of any new videos uploaded to the site that contained that tag in its title, in the written description of the video that the uploader supplied, or in the tags that the uploader had associated with the video. *Id.* That feature continues to be active on the YouTube website.

(2)   In January 2006, YouTube extended the Subscribe to Tags functionality to enable any user to receive automated alerts about new videos matching words or phrases the user defined, even if the user was not visiting YouTube at the time. *Id.* ¶ 3. This ability to receive automatic updates was later packaged as part of YouTube's copyright protection system specifically for content owners. *Id.* ¶ 4. This aspect of the system duplicated the "subscribe to tags" and "RSS" functionality that had been available to both content owners and ordinary YouTube users. *Id.*

(3)   The functionality of allowing users to set keywords and receive alerts when new videos matched those keywords was a convenience.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Users and content owners could obtain the same information simply by entering terms into the YouTube search function and reviewing the results. *Id.* ¶ 5.

(4)    This functionality is limited in two respects. First, while it can alert users when videos are uploaded with selected tags, it cannot tell users whether the uploaded video actually contains content related to those tags. In addition, the functionality could not enable users to receive alerts when unauthorized videos or professional videos were uploaded to the site because it had no ability to make such determinations. *Id.* ¶ 6.

76. *In an October 11, 2005 email, YouTube director of finance Brent Hurley suggested to YouTube co-founders Chad Hurley, Steve Chen, and Jawed Karim that YouTube should "flag/highlight any video with a run time >10 minutes, since most of those are copyrighted shows." Hohengarten ¶ 232 & Ex. 214, JK00000382, at JK00000382.*

**Undisputed.**

**Additional Material Facts:**

YouTube prohibited ordinary users from uploading videos greater than 10 minutes in length. Levine Opening Decl. ¶ 12.

77. *On October 18, 2005, YouTube director of finance Brent Hurley sent an email to YouTube co-founder Steve Chen, Chad Hurley, Jawed Karim and YouTube software engineer Mike Solomon stating: "Yes, I rejected all of the videos that were listed in this email yesterday. Looks like the users simply uploaded the videos again today. **We need to beef up admin. Create a tag watch list, like Family Guy, Baker skateboarding, etc. Also, once we reject a video, flag the user so that we must review all of their new videos before they go live. Otherwise, this will continue to happen. :(" Hohengarten ¶ 251 & Ex. 233, JK00008331, at JK00008331. Hohengarten ¶ 392 & Ex. 386 at (Solomon Dep.) at 12:5-14:2 (testifying to Solomon's job description).*

**Undisputed** that the language quoted in this proposed fact appears in the cited email.

78. *In a November 8, 2005 email regarding a contest in which an uploading YouTube user would be awarded an iPod Nano, YouTube product manager Maryrose Dunton, the YouTube employee responsible for the user functionality of the YouTube website, asked whether user "Bigjay" was eligible; YouTube interface designer Christina Brodbeck responded, "Cool . . . . However, most of his stuff is copyrighted," and*

37

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*added, "Does this matter?  Probably not, as UCBearcats1125 is almost entirely copyrighted.  Heh."; in response, Maryrose Dunton stated:   "Ya . . . I don't think we care too much if they've posted copyrighted videos." Hohengarten ¶ 18 & Ex. 15, GOO001-00504044, at GOO001-00504044. Hohengarten ¶ 363 & Ex. 329 (Dunton Dep.) at 10:23-23:21 (describing Maryrose Dunton's job responsibilities).  Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement (Feb. 7, 2007)) at 16 (page numbers at bottom center) (stating Christina Brodbeck's job title).*

**Undisputed** that the language quoted in this proposed fact appears in the cited email.

79.    *As a result of Google's acquisition of YouTube, YouTube interface designer Christina Brodbeck received Google shares worth $9.09 million.    Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement (Feb. 7, 2007)) at 5 (page numbers at bottom center) (showing 18,898 shares issued to Christina Brodbeck); Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the closing price for Google shares on November 13, 2006 was $481.03).*

**Disputed.**   First, Viacom inaccurately assumes that the number of shares issued in the transaction was premised on the stock valuations as of November 13, 2006.  *See supra*, YouTube's Response to SUF ¶ 19. Second, this proposed fact is irrelevant.  *See* Defendants' Motion to Strike.

80.    *On November 18, 2005, a YouTube user with the email address "anonymousdude@ gmail.com" sent an email to YouTube co-founders Chad Hurley, Steve Chen, and Jawed Karim, YouTube director of finance Brent Hurley, and YouTube engineering manager Cuong Do stating: "How is it that 'Family Guy' cartoon clips are deleted, [but] ECW, WWE, WCW, clips and other TV clips are free to watch?  What is the difference with the copyright?"  Hohengarten ¶ 252 & Ex. 234, JK00000824, at JK00000824; Hohengarten ¶ 357 & Ex. 323 (Do 30(b)(6) Dep.) at 8:15-9:15 (stating Cuong Do's title).*

**Undisputed** that the language quoted in this proposed fact appears in the cited email, but an unauthenticated email from "anonymousdude" is not admissible.  *See* Defendants' Motion to Strike.

81.    *On Monday, November 21, 2005, a YouTube user with the email address "lvpsganchito@ hotmail.com" sent an email to YouTube co-founders Chad Hurley, Steve Chen, Jawed Karim, YouTube director of finance Brent Hurley, and YouTube engineering manager Cuong Do,*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*stating: "I'm a little confused about the rejection of my last and other videos. I have seen other 'family guy' videos on here and when I put one on here its against the rules. Please explan. [sic] I also have other vids that are cartoons from TV Funhouse from SNL, that are still active and live. What is the difference?" Hohengarten ¶ 253 & Ex. 235, JK00000836, at JK00000836.*

**Undisputed** that the language quoted in this proposed fact appears in the cited email, but an unauthenticated email from an anonymous user is not admissible. *See* Defendants' Motion to Strike.

82. *In a November 24, 2005 email, YouTube director of finance Brent Hurley asked all YouTube employees for "help" reviewing videos "over the long weekend," and instructed them that, "[a]s far as copyright stuff is concerned, be on the look out for Family Guy, South Park, and full-length anime episodes," but that "music videos and news programs are fine to approve." Hohengarten ¶ 19 & Ex. 16, GOO001-00629095, at GOO001-00629095. Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 80:18-82:8.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

83. *In a January 2, 2006 email, YouTube co-founder Jawed Karim recommended adding "a very simple feature that temporarily prevents a user from removing a video" because "next time we have another lazy sunday hit, it would hurt us if the user suddenly removed the video, either out of stupidity, or by accident. . . . what if we add a flag to certain videos so that when the owner tries to remove the hugely popular video it just gives some error message and does not remove the video." Hohengarten ¶ 20 & Ex. 17, GOO001-00629474, at GOO001-00629474.*

**Undisputed** that the language quoted in the proposed fact appears in the cited email.

84. *In a January 3, 2006 instant message exchange between YouTube product manager Maryrose Dunton (IM user name maryrosedunton) and YouTube software engineer Jake McGuire (IM user name oJAKEMo) Dunton stated: "between [a YouTube-MySpace dispute] and the Saturday Night Clips that got put on our site (which also made the Times) we're now getting close to 7 million views a day." Hohengarten ¶ 206 & Ex. 194 GOO001-00507405, at 3 & at GOO001-00507405; Hohengarten ¶ 198 & Ex. 374, GOO001-06010126, at GOO001-06010126 (confirming that oJAKEMo is Jake McGuire's IM user name);*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*Hohengarten ¶ 363 & Ex. 329 (Dunton Dep.) at 34:15-18 (testifying that maryrosedunton is Maryrose Dunton's IM user name); Hohengarten ¶ 356 & Ex. 322 (Do Dep.) at 136:19-137:2 (stating Jake McGuire's job title).*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

85.  *In a January 25, 2006 instant message exchange, YouTube co-founder Steve Chen (IM user name tunawarrior) told his colleague YouTube product manager Maryrose Dunton (IM user name maryrosedunton) that he wanted to "concentrate all of our efforts in building up [YouTube's] numbers as aggressively as we can through whatever tactics, however evil," including "user metrics" and "views," and "then 3 months, sell it with 20m views per day and like 2m users or something . . . I think we can sell for somewhere between $250m - $500m . . . in the next 3 months . . . and there \*is\* a potential to get to $1b or something." Hohengarten ¶ 204 & Ex. 192, GOO001-00507525, at 4-5 & at GOO001-00507526-27; Hohengarten ¶ 363 & Ex. 329 (Dunton Dep.) at 35:14-15 (confirming that tunawarrior is Steve Chen's IM user name).*

**Disputed.** Viacom selectively excerpts and therefore misrepresents the cited email. Chen stated: "If I were running the show, I'd say, we concentrate all of our efforts in building up our numbers as aggressively as we can through whatever tactics, however evil, i.e. scraping MySpace." Hohengarten Ex. 192; Chen Opp. Decl. at 4.

86.  *In late January 2006 email exchange, YouTube co-founder Steve Chen expressed concern about "our most popular videos" being removed from YouTube; YouTube content review manager Heather Gillette responded with an email about "the manual process that we have now in rejecting videos for copyright," and stated "if a really popular video is about to be rejected there [should be] a pop-up that says, 'this video has been viewed 20,000 times, are you sure you want to reject?'" Hohengarten ¶ 21 & Ex. 18, GOO001-00839842, at GOO001-00839843-44.*

**Disputed.** Viacom selectively excerpts and therefore misrepresents the cited email. Chen expressed concern about "one of our most popular videos (matt dancing)" being "accidentally removed from our system." Hohengarten Ex. 18. As the full context of the exchange makes clear, the discussion between Chen and Gillette concerned preventing mistaken removals of videos. *Id.*

87.  *In a February 4, 2006 instant message conversation, YouTube product manager Maryrose Dunton (IM user name maryrosedunton) told*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*YouTube systems administrator Bradley Heilbrun (IM user name nurblieh) that YouTube co-founder Chad Hurley sent her an email "and told me we can't feature videos or have contest winners with copyrighted songs in them"; Heilbrun responded "man. That's like half our videos"; Dunton replied "I know." Hohengarten ¶ 210 & Ex. 198, GOO001-01931799, at 5 & at GOO001-01931806; Hohengarten ¶ 363 & Ex. 329 (Dunton Dep.) at 30:23-31:2 (stating Bradley Heilbrun's job title); 35:16-23 (confirming that nurblieh is Bradley Heilbrun's IM user name).*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

88.    *In a February 4, 2006 instant message conversation, YouTube product manager Maryrose Dunton (IM user name maryrosedunton) told YouTube systems administrator Bradley Heilbrun (IM user name nurblieh) that YouTube director of finance Brent Hurley told her to take down a copyrighted Ed Sullivan show clip that she uploaded to YouTube, and she said "maybe I'll just make it private ;)." Hohengarten ¶ 210 & Ex. 198, GOO001-01931799, at 4-5 & at GOO001-01931806.*

**Disputed**.  The cited document does not support the statement that Dunton uploaded "a copyrighted Ed Sullivan show clip" onto YouTube. Hohengarten Ex. 198.

89.    *In early February 2006, NBC Universal sent letters to YouTube requesting the removal of the "Lazy Sunday: Chronicles of Narnia" clip from the television show Saturday Night Live.  Hohengarten ¶ 22 & Ex. 19, GOO001-00007027, at GOO001-00007028-29; Hohengarten ¶ 23 & Ex. 20, GOO001-02403826, at GOO001-02403826-27.*

**Disputed.**  The cited evidence does not support the proposed fact.

**Additional Material Facts:**

When the "Lazy Sunday" clip was uploaded to YouTube, YouTube did not know whether it was authorized.  Schaffer Opening Decl. ¶¶ 3-4; Botha Opening Decl. ¶¶ 12-13.  But on December 28, 2005, Hurley reached out to NBC and wrote "This video has become extremely popular on our site with well over 1 million views in a week. But if this was posted without your consent, we can immediately remove the video at your request. Also, if you would wish to continue the clip's massive popularity, we would be happy to continue streaming this content with your approval."  Hurley Opening Decl. ¶ 24 & Ex. 30. Although Hurley contacted NBC on December 28, 2005, YouTube did not hear back about NBC's position regarding the video until February

41

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

3, 2006, when he received a letter from NBC stating "We thank you for opening a dialogue with us and for agreeing in advance to remove our content from the Site."  Hurley Opening Decl. ¶ 25 & Ex. 31.  YouTube promptly removed the video and searched for and removed other versions of Lazy Sunday on YouTube.  Schaffer Opening Decl. ¶ 4.  YouTube also posted a notice telling users that "YouTube respects the rights of copyright holders" and that they could still watch the video "for free on NBC's website."  *Id.*

90.  *YouTube refused to remove the Lazy Sunday clips unless NBC Universal provided specific URLs for the clips.  Hohengarten ¶ 22 & Ex. 29, GOO001-00007027, at GOO001-00007028-29; Hohengarten ¶ 23 & Ex. 20, GOO001-02403826, at GOO001-02403826-27.*

**Disputed.**  The cited evidence does not support the proposed fact.  On December 28, 2005, Hurley reached out to NBC Universal regarding the Lazy Sunday clip and wrote "This video has become extremely popular on our site with well over 1 million views in a week. But if this was posted without your consent, we can immediately remove the video at your request. Also, if you would wish to continue the clip's massive popularity, we would be happy to continue streaming this content with your approval."  Hurley Opening Decl. ¶ 24 & Ex. 30.  YouTube did not hear back about NBC's position regarding the video until February 3, 2006, when he received a letter from NBC stating "We thank you for opening a dialogue with us and for agreeing in advance to remove our content from the Site."  Hurley Opening Decl. ¶ 25 & Ex. 31.  NBC also requested the removal of videos containing *Will & Grace, The Tonight Show with Jay Leno, Late Night with Conan O'Brien, Surface, Dateline, The Today Show* and *Law & Order.  Id.* Ex. 31.  YouTube promptly removed the Lazy Sunday clip and searched for and removed other versions of Lazy Sunday on YouTube.  Schaffer Opening Decl. ¶ 4.  YouTube also posted a notice telling users that "YouTube respects the rights of copyright holders" and that they could still watch the video "for free on NBC's website."  *Id.*

On February 14, 2006, YouTube's counsel wrote NBC Universal, requesting that NBC "provide detailed information, such as all the URL links, to the infringing content and we will promptly remove the infringing content.  If you choose to provide search links, please be sure to include the exceptions within the search that do not infringe on your copyrighted material, i.e. parodies or other original works that happen to share the name of your shows, but do not infringe upon them.  We are happy to work with you to remove NBC Universal properties on the YouTube website."  Hohengarten Ex. 19 (GOO001-00007027-29, at GOO001-00007028-29).

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

91. *On February 14, 2006, YouTube vice president of marketing and programming Kevin Donahue emailed YouTube product manager Maryrose Dunton stating: "I just got off the phone with NBC and I'm trying to get them to let us keep the Lazy Sunday clip on the site. I need to convince them of the promotional value of doing that considering the fact that their legal dept. is having us remove ALL of their stuff. Julie and I are worried that if Lazy Sunday is taken down, then it could be taken as a bad sign by the journalists who are writing about us now and may search for it." Hohengarten ¶ 24 & Ex. 21, GOO001-02824049, at GOO001-02824049. Hohengarten ¶ 359 & Ex. 325 (Donahue Dep.) at 20:23-21:3, 75:11-76:4 (stating Kevin Donahue's job title).*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

**Additional Material Facts:**

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 89.

92. *On February 16, 2006, YouTube informed its users in a YouTube Official Blog post titled "Lazy Sunday": "Hi Tubers! NBC recently contacted YouTube and asked us to remove Saturday Night Live's 'Lazy Sunday: Chronicles of Narnia' video. We know how popular that video is but YouTube respects the rights of copyright holders. You can still watch SNL's 'Lazy Sunday' video for free on NBC's website"; in the same blog post, YouTube informed its users of "[s]ome good news: we are happy to report that YouTube is now serving up more than 15 million videos streamed per day- that's nearly 465M videos streamed per month with 20,000 videos being uploaded daily." Hohengarten ¶ 300 & Ex. 272 (February 16, 2006 YouTube Blog entry "Lazy Sunday").*

**Undisputed.**

**Additional Material Facts:**

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 89.

93. *In a February 17, 2006 instant message conversation, YouTube systems administrator Bradley Heilbrun (IM user name nurblieh) asked YouTube product manager Maryrose Dunton (IM user name maryrosedunton), "was it me, or was the lawyer thing today a cover-your-ass thing from the company?" Dunton responded, "oh totally . . . did you hear what they were saying? it was really hardcore . . . if we*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*even see copyrighted material on the site, as employees we're supposed [sic] to report it"; Heilbrun replied, "sure, whatever," and Dunton said "I guess the fact that I started like 5 groups based on copyrighted material probably isn't so great"; in response Heilbrun said "right exactly . . . but it's a cover your ass . . . so the board can say we told maryrose not to do this."     Hohengarten ¶ 209 & Ex. 197, GOO001-00507331, at 2-3 & at GOO001-00507331-32.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

94.     *In an instant message exchange between YouTube co-founder Steve Chen (IM user name tunawarrior) and YouTube product manager Maryrose Dunton (maryrosedunton) dated February 28, 2006, Steve Chen stated that, "we're the first mass entertainment thing accessible from the internet," that YouTube was "revolutionizing entertainment," and that "we are bigger than the internet, . . . we should be comparing ourselves to, say, abc/fox/whatever."  Hohengarten ¶ 205 & Ex. 193, GOO001-00507535, at 6-7 & at GOO001-00507538.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

95.     *In the same instant message conversation, YouTube product manager Maryrose Dunton (IM user name maryrosedunton) reported the results of a "little exercise" she performed wherein she "went through all the most viewed/most discussed/top favorites/top rated to try and figure out what percentage is or has copyrighted material.  it was over 70%." She added, "what I meant to say is after I found that 70%, I went and flagged it all for review."  Hohengarten ¶ 205 & Ex. 193, GOO001-00507535, at 8 & at GOO001-00507539.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

**Additional Material Facts:**

Dunton testified:

> I can tell you at one time I looked at the most viewed, top rated content for that day and determined that it was premium content.  I -- I have to add, whatever is on the most viewed varies wildly, wildly depending on whatever is going on, the popular culture in the news at the time.  So to look at that at any point in time and try to make a determination on what is generally being viewed on YouTube would be incorrect.  I'm sure

44

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

> if you looked at it yesterday, it would be all Barrack Obama, and I can look at it yesterday and say 'Everything on YouTube is Barrack Obama.' So when I did this that day, I looked at the most viewed, most discussed, top rated for that day, and I believe I came, by looking at the stills, the determination that around 70 percent of it was premium content.

Schapiro Opp. Ex. 211 (81:5-21). Dunton further testified:

> What I can tell you is, we had discussed having a policy where employees would need to flag premium content. I am -- I -- I thought that was a ridiculous policy, and so I believe I'm being sarcastic here. I thought it was ridiculous, because there's premium content on YouTube. There are people who upload -- Nike was one of the first users who uploaded content to our site, right. NBC, CBS, VH1, whatever. I thought that that was a ridiculous policy for us to go and try and flag every single piece of premium content that we saw. . . . It would be ridiculous because -- so what was being discussed is, we would flag it, and then somebody would try and look at it and determine who uploaded it. I thought that that was nearly impossible, because since the beginning of YouTube, we have had premium content. Like I said, Nike was one of the first users. It was one of our first viral videos. NBC, VH1, MTV too, at the time. We had no idea. We -- there was no way we could determine who had uploaded a piece of content.

*Id.* 89:19-91:2.

96.   *When deposed, YouTube product manager Maryrose Dunton confirmed in reference to the February 28, 2006 instant message exchange with YouTube co-founder Steve Chen (see SUF ¶ 95) that she was being sarcastic and did not actually flag any of the copyrighted videos for review. Hohengarten ¶ 363 & Ex. 329 (Dunton Dep.) at 84:12-85:9.*

**Undisputed.**

**Additional Material Facts:**

Dunton testified "What I can tell you is, we had discussed having a policy where employees would need to flag premium content. I am -- I -- I thought that was a ridiculous policy, and so I believe I'm being sarcastic here. I thought it was ridiculous, because there's premium content on YouTube. There are people who upload -- Nike was one of the first users who uploaded content to our site, right. NBC, CBS, VH1, whatever. I thought that that was a ridiculous policy for us to go

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

and try and flag every single piece of premium content that we saw."
Schapiro Opp. Ex. 211 (90:2-13).

97. *As a result of Google's acquisition of YouTube, YouTube product manager Maryrose Dunton received Google shares worth $4.13 million. Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement dated February 7, 2007) at 5 (showing 8,590 shares issued to "Mayrose Dunton" [sic]); Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the closing price for Google shares on November 13, 2006 was $481.03).*

**Disputed.**  Viacom inaccurately assumes that the number of shares issued in the transaction was premised on the stock valuations as of November 13, 2006.  *See supra*, YouTube's Response to SUF ¶ 19.  In addition, this proposed fact is irrelevant.  *See* Defendants' Motion to Strike.

98. *A February 2006 YouTube Board Presentation noted that YouTube received 20 million views per day and expressly pointed out the day when the "SNL Narnia clip," also known as "Lazy Sunday," was "added" to YouTube.  Hohengarten ¶ 25 & Ex. 22, GOO001-00762174, at GOO001-00762181.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

**Additional Material Facts:**

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 89.

99. *A March 2006 YouTube company presentation to potential investor TriplePoint Capital touted the success of the "NBC/SNL 'Lazy Sunday' clip" as one example of "Incredible Results with Branded Video" and noted that the clip "[r]eceived 5 million views in about a month."  Hohengarten ¶ 334 & Ex. 302, TP000479, at TP000490.*

**Disputed**.  Viacom selectively excerpts from and misrepresents the cited evidence.  The evidence does not stand for the proposition that YouTube "touted the success" of the "Lazy Sunday" clip.  The document lists "Lazy Sunday" among five other clips, including a video from Viacom's *Andy Milonakis* show that MTV had uploaded; a video from the show *Angry Kid* that had been uploaded by its creator Atom Films (later acquired by Viacom); and a clip featuring the soccer star Ronaldhino that Nike had uploaded.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Additional Material Facts:**

*See supra,* YouTube's Additional Material Facts in Response to SUF ¶ 89.

100. *On March 1, 2006, Newsweek published an article titled "Video Napster?" with the subheading "Only a year old, YouTube has already rocketed past Google and Yahoo to become No. 1 in Web video. But can it survive the fear of a copyright crunch?"; the article discusses the presence on YouTube of infringing content from major media companies. Hohengarten ¶ 26 & Ex. 23, GOO001-07728393, at GOO001-07728393.*

    **Disputed.** The evidence is inadmissible hearsay. *See* Defendants' Motion to Strike.

101. *In response to the March 1, 2006 Newsweek article, YouTube vice president of marketing and programming Kevin Donahue sent an email asking another YouTube employee to "please go through the newsweek article and work with heather to remove all of the listed copyright infringing video." Hohengarten ¶ 27 & Ex. 24, GOO001-00522244, at GOO001-00522244.*

    **Undisputed** that the language quoted in the proposed fact appears in the cited document.

102. *In an instant message conversation discussing the March 1, 2006 Newsweek article, Bradley Heilbrun (IM user name nurblieh) stated to YouTube product manager Maryrose Dunton (IM user name maryrosedunton) in an instant message: "this affects my chance at being rich, and that upsets me." Hohengarten ¶ 207 & Ex. 195, GOO001-01931840, at 3 & at GOO001-01931841.*

    **Undisputed** that the language quoted in the proposed fact appears in the cited document, but YouTube disputes that this proposed fact is relevant to Viacom's motion. *See* Defendants' Motion to Strike.

103. *As a result of Google's acquisition of YouTube, YouTube systems administrator Bradley Heilbrun received Google shares worth $6.2 million. Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement (February 7, 2007)) at 5 (page numbers at bottom center) (showing 12,885 shares issued to "Bradley Heilburn" [sic]); Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the closing price for Google shares on November 13, 2006 was $481.03).*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

**Disputed.**  Viacom inaccurately assumes that the number of shares issued in the transaction was premised on the stock valuations as of November 13, 2006.  *See supra*, YouTube's Response to SUF ¶ 19.  This proposed fact is irrelevant.  *See* Defendants' Motion to Strike.

104.  *In a March 1, 2006 instant message conversation with YouTube systems administrator Bradley Heilbrun (IM user name nurblieh), YouTube product manager Maryrose Dunton (IM user name maryrose dunton) said "the truth of the matter is, probably 75-80% of our views come from copyrighted material."  She agreed that YouTube has some "good original content" but "it's just such a small percentage."  Hohengarten ¶ 207 & Ex. 195, GOO001-01931840, at 6-7 & at GOO001-01931843.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document, but disputed that the document provides any evidence of the percentage of copyrighted or infringing videos available on YouTube.

**Additional Material Facts:**

Content owners, including Viacom, frequently uploaded clips to YouTube for promotional purposes or allowed their content to remain on the site when uploaded by ordinary users.  *See* Rubin Opening Decl. ¶ 2, 3, 5(a)-(f) & Exs. 1, 3-68; Chan Opening Decl. ¶¶ 4, 5, 10; Ostrow Opening Decl. ¶ 5-6; Maxcy Opening Decl. ¶¶ 3-7; Schaffer Opening Decl. ¶ 6-8; Botha Opening Decl. ¶¶ 11-12; Schapiro Opp. Ex. 305 (194:8-11, 199:22-201:2); 269 (115:6-118:19, 134:19-136:10, 138:25-139:14), 221 (83:6-84:8), 78 (43:17-22), 131 (23:3-24:23, 205:17-206:20, 207:9-22); Schapiro  Opening Exs. 24 (22:11-22:20, 70:16-71:24), 26; 29 (38:10-21), 30, 31 (26:20-27:10), 32 (151:17-152:20), 33, 34, 47-49, 51-77.

105.  *In a March 8, 2006 email, a YouTube employee sent a message to other YouTube employees attaching a screenshot of a search for "dailyshow."  Hohengarten ¶ 254 & Ex. 236, JK00002261, at JK00002261-62.*

**Undisputed.**

**Additional Material Facts:**

The screenshot is preceded by a cover e-mail that states "Notice the search result span wider than the masthead (875px) and the right side ad is therefore way off to the right."  Hohengarten Ex. 236.  The correspondence is related only to the design of the YouTube website.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

106. *In a March 14, 2006 email, YouTube engineer Matt Rizzo stated: "this is some ugly javascript so these copyright cop assholes can click through the pages and store what they checked. I hope they die and rot in hell!" Hohengarten ¶ 28 & Ex. 25, GOO001-05172407, at GOO001-05172407.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document. YouTube disputes that this proposed fact is relevant to Viacom's motion. *See* Defendants' Motion to Strike.

**Additional Material Facts:**

At her deposition, Dunton explained "I can tell you that the Copyright Cop Content Management Tool that we rolled out was actually severely abused by some content owners, and yeah, that made us angry . . ." Schapiro Opp. Ex. 211 (276:6-9).

107. *In a March 15, 2006 instant message conversation YouTube engineer Matt Rizzo (IM user name mattadoor) described copyright owners as "fucking assholes," asking "just how much time do you guys want to give to these fucking assholes," and YouTube product manager Maryrose Dunton (IM user name maryrosedunton) responded: "hah. not any time really." Hohengarten ¶ 213 & Ex. 201, GOO001-00829681, at 9-10 & at GOO001-00829687. Hohengarten ¶ 363 & Ex. 329 (Dunton Dep.) at 261:20-261:21 (confirming that mattadoor is Matt Rizzo's IM user name); 275:13-276:10 (confirming that "fucking assholes" refers to copyright owners). Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement (February 7, 2007)) at 16 (page numbers at bottom center) (listing Matt Rizzo's job title).*

**Disputed.** The proposed fact misrepresents the cited document. At her deposition, Dunton explained that she was referring not to copyright owners generally, but to "people who were abusing the features that we gave them." Schapiro Opp. Ex. 211 (275:25-276:2). YouTube also disputes that this proposed fact is relevant to Viacom's motion.

**Additional Material Facts:**

Dunton further explained "I can tell you that the Copyright Cop Content Management Tool that we rolled out was actually severely abused by some content owners, and yeah, that made us angry . . ." *Id.*

108. *As a result of Google's acquisition of YouTube, YouTube engineer Matt Rizzo received Google shares worth $3.7 million. Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement (February 7, 2007)) at 6 (page numbers at bottom center) (showing 7,731 shares*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*issued to Matt Rizzo).  Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the closing price for Google shares on November 13, 2006 was $481.03).*

**Disputed.**  Viacom inaccurately assumes that the number of shares issued in the transaction was premised on the stock valuations as of November 13, 2006.  *See supra*, YouTube's Response to SUF ¶ 19.  This proposed fact is irrelevant.  In addition, Hohengarten Ex. 201 is also irrelevant and therefore inadmissible.  *See* Defendants' Motion to Strike.

109.  *In a March 22, 2006 memorandum distributed to the members of YouTube's Board of Directors at a board meeting, YouTube co-founder Jawed Karim wrote under the heading "Copyrighted content": "Although the new 10-minute length restriction [on clips uploaded to YouTube] serves well to reinforce the official line that YouTube is not in the business of hosting full-length television shows, it probably won't cut down the actual amount of illegal content uploaded since standard 22-minute episodes can still easily be uploaded in parts, and users will continue to upload the 'juiciest' bits of television shows." Hohengarten ¶ 255 & Ex. 237, JK00000173, at JK00000173; Hohengarten ¶ 347 & Ex. 313 (Karim Dep.) at 178:18-179:19.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

**Additional Material Facts:**

Karim testified that while the memo was distributed at the board meeting, it was not read or discussed at the time of distribution or at subsequent board meetings.  Schapiro Opp. Ex. 77 (178:19-183:14).

110.  *In the same March 22, 2006 memorandum, YouTube co-founder Jawed Karim wrote: "As of today episodes and clips of the following well-known shows can still be found:  Family Guy, South Park, MTV Cribs, Daily Show, Reno 911, Dave Chapelle.  This content is an easy target for critics who claim that copyrighted content is entirely responsible for YouTube's popularity.  Although YouTube is not legally required to monitor content (as we have explained in the press) and complies with DMCA takedown requests, we would benefit from preemptively removing content that is blatantly illegal and likely to attract criticism.  This will help to dispel YouTube's association with Napster (Newsweek: "Is YouTube the Napster of Video?", "Showbiz unsure if YouTube a friend or foe.")."  Hohengarten ¶ 255 & Ex. 237, JK00000173, at JK00000173.*

50

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

**Additional Material Facts:**

(1)    Viacom content has been the subject of widespread internet promotion, including being uploaded by Viacom or its agents to YouTube openly and covertly. *See* Rubin Opening Decl. ¶¶ 2, 5,18. The Viacom content Karim referenced in the cited document was all subject to that practice. *See, e.g.*, Schapiro Opp. Ex. 285 (Hurwitz Ex. 24) (listing "viral placements" for 11 shows, including Reno 911 and Chappelle). Karim would not have been able to tell whether or not the content at issue was authorized or not.

(2)    Viacom mistakenly brought suit over clips from three of the shows listed in the cited document that were uploaded by Viacom and/or its agents. *See, e.g.*, Rubin Opening Exs. 117 & 120 (rf3BHTB2RAY, -X5-m56U_Go, Le52xv31TTM, Le52xv31TTM&NR1, bdRNAUTDBqY, cR5BCbGyTkc (withdrawn clips in suit of Dave Chappelle); BrCI7t5SU-s, 0-G9U7tWTY (withdrawn clips in suit of Reno911); X-8UmL4lpPI, S5pUWE1WGKw, eijhloJjg50, DkXAfEiZCs0, Xo9TWFRIUN8, hSdMtP8qztA, RRrB_hitU-c, CxVxzXCbeOw, 8v8vhNKIAZ4, hhXlVDxYzvg, Vj9rdT-t8Lc, Pvz66FuaHso, QrROfhjqpDs, sIXfcdZbnUw, -kXHBY2-A962, uJg2geqHK5U, N-4MT9u6LUs, USds5DhScmg, 29le85Vp8vI, yVUAvM3fvXQ, lz0JZvlMrOA, p1i1wcUpTbU, Ppm3MIsqsK4, L8GYvvm_3bE, 5Esm9Mlt5Xo, 0mZ8VNkSPaU, NdpArPebjFY, Q-VvGxYDGm0, Wqq-lfH3NNc, nyLj0T9EKAo, N0QCkXfxJs4 (withdrawn clips in suit of South Park)). *See also supra*, YouTube's Additional Material Facts in Response to SUF ¶¶ 32, 109.

(3)    Viacom has refused to identify the full scope of its uploading practices on YouTube, either by work in suit or time. *See* Schapiro Opp. Ex. 286 (Viacom's Supplemental Response to YouTube Interrogatory No. 23); Schapiro Opp. Ex. 284; Schapiro Opp. Exs. 5-67; Rubin Opening Decl. ¶ 2 & Exs. 1, 3-33, 37, 39, 42-68.

111.    *At his deposition, YouTube co-founder Jawed Karim stated that he distributed his March 22, 2006 memorandum at a YouTube board meeting. Hohengarten ¶ 347 & Ex. 313 (Karim Dep.) at 178:19-183:4.*

**Undisputed.**

**Additional Material Facts:**

51

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 109.

In and around March 2006, YouTube and its board were in the process of implementing numerous additional steps to address compyright issues.   Botha Opening Decl. ¶¶ 14-16; Levine Opening Decl. ¶¶ 2-4, 12, 18, 25.

112.   *In March 2006, YouTube considered implementing an automated tool that would search the metadata for each uploaded video to identify potentially infringing clips and send emails to content owners to notify them of the potential infringement so that they could review the video and request its removal.  Hohengarten ¶ 363 & Ex. 329 (Dunton Dep.) at 303:4-305:9, 307:18-308:4.*

**Disputed.**   Viacom mischaracterizes the feature that is discussed in the cited document.   Content owners could receive email alerts notifying them when the metadata of videos uploaded to the service contained designated keywords.   Schapiro Opp. Exs. 116 (216:21-217:20), 287.

**Additional Material Facts:**

(1)    By March 2006, YouTube had already launched features that operated in the same way and were freely available to users of the service including content owners.  B. Hurley Opp. Decl. ¶¶ 2-3.

(2)    In December 2005, YouTube launched a feature known as "Subscribe to Tags," which allows a YouTube user to define their own "tags" consisting of words or short phrases.  *Id.* ¶ 2.   When the user accesses their YouTube account, the user receives alerts of any new videos uploaded to the site that contained that tag in its title, in the written description of the video that the uploader supplied, or in the tags that the uploader had associated with the video.  *Id.*  That feature continues to be active on the YouTube website.

(3)    In January 2006, YouTube extended the Subscribe to Tags functionality to enable any user to receive automated alerts about new videos matching words or phrases the user defined, even if the user was not visiting YouTube at the time.  *Id.* ¶ 3.   This ability to receive automatic updates was later packaged as part of YouTube's copyright protection system specifically for content owners.  *Id.* ¶ 4.  This aspect of the system duplicated the "subscribe to tags" and "RSS" functionality that had been available to both content owners and ordinary YouTube users.  *Id.*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

(4)    The functionality of allowing users to set keywords and receive alerts when new videos matched those keywords was a convenience. Users and content owners could obtain the same information simply by entering terms into the YouTube search function and reviewing the results. *Id.* ¶ 5.

(5)    This functionality is limited in two respects. First, while it can alert users when videos are uploaded with selected tags, it cannot tell users whether the uploaded video actually contains content related to those tags. In addition, the functionality could not enable users to receive alerts when unauthorized videos or professional videos were uploaded to the site because it had no ability to make such determinations. *Id.* ¶ 6.

113.    *At his deposition, YouTube director of finance Brent Hurley testified that the automated video metadata search tool would have allowed content owners to "define at their direction what . . . keywords that they would like to save as sort of a predefined search," that the tool would have sent those content owners "emails . . . daily, weekly, monthly . . . at their direction," and that his 'vision' of the tool would have allowed Viacom to search for terms like "Daily Show."   Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 216:21-218:17; Hohengarten ¶ 29 & Ex. 26, GOO001-00630641, at GOO001-00630641.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

**Additional Material Facts:**

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 112.

114.    *In a March 11, 2006 instant message exchange, YouTube engineer Matt Rizzo (IM user name mattadoor) told YouTube product manager Maryrose Dunton (IM user name maryrosedunton), that implementing the tool "isn't hard" and would only "take another day or w/e [weekend] . . . but I still don't understand why we have to cater to these guys"; Dunton voiced her opposition to the tool, stating "[I] hate this feature. I hate making it easier for these a-holes," "ok, forget about the email alerts stuff," and "we're just trying to cover our asses so we don't get sued." Hohengarten ¶ 214 & Ex. 202, GOO001-00829702, at 4 & at GOO001-00829704.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Additional Material Facts:**

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 112. In addition, at her deposition, Dunton explained that "I was not in favor of the e-mail alerts. . . . I felt that letting people -- letting content owners take down content without even looking at it based on an e-mail alert for a keyword was an improper balance. That's why I was not in favor of it." Schapiro Opp. Ex. 211 (310:14-19).

115. *YouTube never implemented the search tool described in SUF ¶ 114. Hohengarten ¶ 214 & Ex. 202, GOO001-00829702, at 4 & at GOO001-00829704 ("forget about the email alerts stuff.").*

**Disputed.** *See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 112.

116. *In an April 3, 2006 email, a YouTube employee characterized a Fort Worth Star-Telegram article as a "great regional piece . . . that really captured the passion of the YouTube user and would have convinced me as her reader to check out the service." The article described "South Park" and "Daily Show" videos on YouTube. Hohengarten ¶ 30 & Ex. 27, GOO001-03060898, at GOO001-03060899.*

**Disputed.** The evidence is inadmissible hearsay. *See* Defendants' Motion to Strike.

117. *In a May 14, 2006 email exchange with YouTube's copyright personnel, a YouTube user whose South Park clip had been taken down wrote: "You guys have TONS of South Park Clips... is mine the only one in violation? You have WWF/WWE Media. WCW Media. Tons of Media that is liable for infringement of copyrights and your site promotes it. Seems odd." Hohengarten ¶ 31 & Ex. 28, GOO001-00558783, at GOO001-00558783-84.*

**Disputed.** The evidence lacks foundation and is inadmissible hearsay. *See* Defendants' Motion to Strike.

**Additional Material Facts:**

In 2006, in consultation with certain companies, including World Wrestling Entertainment, YouTube spot checked uploaded videos and removed content on behalf of those companies. Schaffer Opening Decl. ¶ 11. *See also supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 32.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

118. *In a May 14, 2006 email exchange with YouTube's copyright personnel, a YouTube user responded to YouTube's claim that it "remove[s] videos when we receive a complaint from a rights holder" by saying: "knowing that you contain a lot of copywrighted [sic] media, why don't you guys remove it instead of wait around for a complaint?  Basically everyone else gets away with it while I am now warned about it.  Seems odd again.  So what would happen if I report the entire youtube website and it's content?  Would you guys remove your illegal media then?" Hohengarten ¶ 31 & Ex. 28, GOO001-00558783, at GOO001-00558783-84.*

**Disputed.**  The evidence is inadmissible as it lacks foundation and is hearsay.  *See* Defendants' Motion to Strike.  Viacom also selectively omits materials facts and misrepresents the cited document.  The document states: "You Tube does not regularly monitor our members' videos for instances of copyright infringement just as we do not under any circumstances assist members in producing their own videos. We do, however, take copyright laws seriously, and so when we are notified that a video uploaded to our site infringes another's copyright, we respond promptly.  Please check out the YouTube's Copyright Tips at: http://www.youtube.com/t/howto_copyright where you can learn more about YouTube's Terms of Use as well as guidelines that help you determine whether your video infringes someone else's copyright." Hohengarten Ex. 28.

119. *In a May 25, 2006 instant message conversation, YouTube product manager Matthew Liu (IM user name coda322) stated: "one of the vids in my playlist got removed . . . for copyright infringement . . . assholes . . . im going [sic] to go hit the customer service lady." Hohengarten ¶ 216 & Ex. 376, GOO001-07169708, at 8 & at GOO001-07169713; Hohengarten ¶ 200 & Ex. 278, GOO001-07181365, at GOO001-07181365 (noting that coda322 is Matthew Liu's AOL account name); Hohengarten ¶ 193 & Ex. 190, GOO001-06525907, at GOO001-06525907 (noting that coda322 is a YouTube account name used by Matthew Liu).*

**Undisputed** that the language quoted in the proposed fact appears in the cited document. YouTube disputes that this proposed fact is relevant to Viacom's motion.  *See* Defendants' Motion to Strike.

120. *In a June 4, 2006 instant message conversation, YouTube product manager Matthew Liu (IM user name coda322) directed a friend to two YouTube profile playlist pages containing content that he recognized as infringing, stating, "go watch some superman . . . dont show other people though . . . it can get taken off"; Liu's friend asked, "why would it*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*get taken off[?]"; Liu responded, "cuz its copyrighted . . . technically we shouldn't allow it . . . but we're not going to take it off until the person that holds the copyright . . . is like . . . you shouldnt have that . . . then we'll take it off ."  Hohengarten ¶ 217 & Ex. 377, GOO001-07169928, at 2 & at GOO001-07169928.*

**Disputed.**  The cited evidence does not support the statement that Liu "recognized [the content] as infringing."

121.    *In a June 26, 2006 instant message conversation with an unknown individual, YouTube product manager Matthew Liu responded to the question "what percentage of the videos on youtube are violating copyright infringement" by stating, "its a lot lower than you would think . . . but in terms of . . . percentage of videos that are watched . . . it is significantly higher."  Hohengarten ¶ 215 & Ex. 203, GOO001-07169720, at 2 & at GOO001-07169720.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document. YouTube disputes that Hohengarten Ex. 203 is relevant to Viacom's motion.  *See* Defendants' Motion to Strike.

122.    *On June 27, 2006, YouTube co-founders Chad Hurley and Steve Chen, YouTube product manager Maryrose Dunton and YouTube senior software engineer Erik Klein received a Wall Street Journal article about YouTube that stated: "critics say the most-viewed items often involve some type of copyright infringement.  On a recent day, top-viewed videos included clips from . . . 'The Daily Show.'"  Hohengarten ¶ 32 & Ex. 29, GOO001-02761607, at GOO001-02761607; Hohengarten ¶ 33 & Ex. 30, GOO001-00420319, at GOO001-00420321; Hohengarten ¶ 392 & Ex. 386 (Solomon Dep.) at 18:13-18:23 (testifying to Erik Klein's job title).*

**Disputed.**  The evidence is inadmissible hearsay and irrelevant to Viacom's motion.  *See* Defendants' Motion to Strike.

123.    *When a user uploads a video the user may choose whether to make the video public (viewable to any user unless restricted by age or geography) or private (viewable to only the uploading user and users invited by the uploading user).  Hohengarten ¶ 356 & Ex. 322 (Do Dep.) at 172:16-173:8, 180:8-181:4; Hohengarten ¶ 347 & Ex. 313 (Karim Dep.) at 134:3-16; Hohengarten ¶ 368 & Ex. 334 (Gillette Dep.) at 154:8-21; Hohengarten ¶ 385 & Ex. 351 (Schaffer Dep.) at 162:19-24.*

**Disputed.**  As Viacom itself states in SUFs 126 and 127, YouTube administrators may view private videos.  Accordingly, it is false that

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

private videos are viewable "only" by the uploading user and users invited by the uploading user.

124.  *Private videos are not searchable by a content owner seeking to identify instances of infringement on YouTube.  Hohengarten ¶ 88 & Ex. 85, GOO001-00827503, at GOO001-00827503; Hohengarten ¶ 57 & Ex. 54, GOO001-02055019, at GOO001-02055019; Hohengarten ¶ 361 & Ex. 327 (Drummond Dep.) at 195:13-20.*

**Disputed.**  The MD-5 technology employed by YouTube automatically prevents any user from uploading a video file identical to one that had previously been removed in response to a DMCA takedown notice. Levine Opening Decl. ¶ 25.  Further, YouTube makes Content ID available to content owners to allow them to identify their content on the YouTube website.  King Opening Decl. ¶ 20.  Content ID works by identifying videos on YouTube that match reference files supplied by participating rights holders.  *Id.* ¶ 23.  Every video that anyone attempts to post on YouTube—whether private or not—is screened using Content ID.  *Id.* ¶¶ 26-27.  Users whose videos are blocked by a rights holder using Content ID may dispute the rights holder's claim. Schapiro Opp. Ex. 263 (Salem Reply Decl. ¶¶ 2-3).

When a user's private video is subject to dispute, YouTube does not provide the private video to the rights holder during the dispute resolution process unless it receives the express consent of the user who designated the video as private to do so.  *Id.* ¶ 4.  If the user does not consent to the disclosure of his or her private video during the dispute resolution process, the user may not dispute the claim and the video at issue will remain blocked on the site.  *Id.*

125.  *YouTube co-founder Chad Hurley testified in deposition that it is possible for a user to serially upload an entire movie as several private videos and that then the "content owner can't see them."  Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 238:18-239:9.*

**Disputed.**  Viacom selectively excerpts the deposition testimony and omits material facts.  Hurley stated: "I don't know technically the capabilities that we've enabled for the private videos.  I mean, obviously those private videos are limited to a set of people, so you can't share them broadly, and we also now, you know, as we continue to improve the -- the content tools that we can provide, we have audio and video fingerprinting, which I think may scan those videos, even though a content owner can't see them."  Hohengarten Ex. 312 (239:2-9).  *See also supra,* YouTube's Response to SUF ¶ 124.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

126. *In June 2006 YouTube employees proactively reviewed private videos uploaded by the 40 users who uploaded the most private videos over a two-day period, concluded that 17 of those user accounts contained copyrighted private videos, and consequently closed those 17 accounts. Hohengarten ¶ 58 & Ex. 55, GOO001-02693804, GOO001-02693808; Hohengarten ¶ 59 & Ex. 56, GOO001-05150988, at GOO001-05150988.*

**Disputed.** The evidence is inadmissible as it lacks foundation. *See* Defendants' Motion to Strike. It is not clear from the cited evidence (and Viacom does not cite any additional evidence for) the nature of the review described or the meaning of "copyrighted" as used in the cited document.

127. *In June 2006 YouTube employees proactively reviewed private videos uploaded by the 40 users who uploaded the most total videos over a two-day period, concluded that 22 of those user accounts contained copyrighted private videos, and closed 17 of those 22 accounts. Hohengarten ¶ 58 & Ex. 55, GOO001-02693804, at GOO001-02693808; Hohengarten ¶ 59 & Ex. 56, GOO001-05150988, at GOO001-05150988.*

**Disputed.** The evidence is inadmissible as it lacks foundation. *See* Defendants' Motion to Strike. It is not clear from the document (and Viacom does not cite any additional evidence for) the nature of the review described or the meaning of "copyrighted" as used in the document.

128. *In an August 3, 2006 instant message conversation with YouTube engineer Matthew Rizzo (IM user name mattadoor), YouTube product manager Maryrose Dunton (IM user name maryrosedunton) said "so \*technically\* if you even perform a copyrighted song, it's considered infringement. but we can leave this up until someone bitches." Hohengarten ¶ 208 & Ex. 196, GOO001-07585952, at 2 & at GOO001-07585952.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document, but YouTube disputes that this proposed fact is relevant to Viacom's motion.

129. *A YouTube board meeting presentation dated August 23, 2006 stated: "YouTube has become the next generation media AND advertising platform." Hohengarten ¶ 330 & Ex. 298, SC011742, at SC011760.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document, but YouTube disputes that this proposed fact is relevant to Viacom's motion.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

130. *In an August 24, 2006 email to other YouTube employees, YouTube systems administrator Paul Blair provided a link to a Daily Show clip on YouTube.  Hohengarten ¶ 35 & Ex. 32, GOO001-03631419, at GOO001-03631419; Hohengarten ¶ 36 & Ex. 33, GOO001-03406085, at GOO001-03406086 (stating Paul Blair's job title).*

**Disputed.**  The cited document does not support the proposed fact that the link is actually to a clip of *The Daily Show.*

**Additional Material Facts:**

(1)     After allowing all of its content to remain on YouTube, in the fall of 2006 MTVN began selectively removing narrow sets of content falling within specified rules.  Schapiro Opening Ex. 66 (Engagement letter); Schapiro Opp. Exs. 221 (65:22-66:15), 1 (335:13-339:3).

(2)     On October 5, 2006, Viacom instructed BayTSP only to take down full episodes of a television show called "Avatar" and to leave up all other clips.  Schapiro Opening Ex. 66.

(3)     On October 7, 2006, Viacom told BayTSP to take down only full episodes of 14 additional specified shows and leave up all other clips. Schapiro Opening Ex. 67.

(4)     On October 11, 2006, Viacom informed BayTSP that it now had permission to take down clips 2.5 minutes and longer from specified shows only; shorter clips were to remain up.  Schapiro Opening Ex. 68.

(5)     On October 27, 2006, Viacom changed the instruction to leave up clips of 2.5 minutes and shorter for certain shows, but to leave up clips of 5 minutes and shorter of *The Daily Show with Jon Stewart* and *The Colbert Report*. Schapiro Opening Ex. 69.

(6)     On October 30, 2006, Viacom changed the instruction for *The Daily Show with Jon Stewart* and *The Colbert Report* to leave up clips of 3 minutes and shorter. Schapiro Opening Ex. 70.  Five days later, Viacom countermanded all of these rules and said to leave up everything with the exception of full episodes. Schapiro Opening Ex. 71.

(7)     On November 14, 2006, Viacom went back to a rule of leaving up clips of 2.5 minutes and shorter for most shows, but 3 minutes and shorter for *The Daily Show with Jon Stewart* and *The Colbert Robert*. Schapiro Opening Ex. 72. On November 17, 2006, the rule for *The Daily Show with Jon Stewart* and *The Colbert Report* changed to leave up clips of 2.5 minutes and shorter.  Schapiro Opening Ex. 73.  Viacom

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

then reversed itself the same day and instructed BayTSP that the 2.5 minute rule should apply only to shows other than *The Daily Show with Jon Stewart* and *The Colbert Report*, which should still have the 3 minute rule. Schapiro Opening Ex. 74.  BayTSP then asked Viacom to agree to provide 24 hour lead time for all rule changes.  *Id.*

131. *YouTube recognized that users might break up a movie or television episode into multiple parts and upload the parts to YouTube, and considered creating a queue for human review of videos close to ten minutes long, but never implemented such a queue.  Hohengarten ¶ 37 & Ex. 34, GOO001-00988969, at GOO001-00988970; Hohengarten ¶ 368 & Ex. 334 (Gillette Dep.) at 49:23-50:10, 216:2-10, 217:15-19; Hohengarten ¶ 38 & Ex. 35, GOO001-00953867, at GOO001-00953868.*

**Disputed.**  The cited evidence does not support the proposed fact.  The evidence does not support that YouTube, as a company, "considered" creating the described queue.  The evidence Viacom cites indicates only that Kevin Donahue asked "Can we do an automatic search/filter uploads of approximately 10 min. into a queue for Heather's team to review?"  Hohengarten Ex. 34.

**Additional Material Facts:**

(1)     There are many situations in which a video that a YouTube user is authorized to upload may be longer than 10 minutes.  *See* Schapiro Opp. Ex. 121 (64:3-12) ("there are so many different cases where a user should be able to upload a video longer than ten minutes.  You know, for example, you know, you know wedding videos are -- unless things go very badly, it's longer than ten minutes, right. . . . that is something where the uploader is, you know, very likely to own the copyright to that and should be able to upload that.")

(2)     In the evidence cited by Viacom, Gillette wrote that "it is actually an abuse of our Terms of Use when a user uploads what we call 'serial uploads' which is basically a piece of long form content that they have broken up into parts and then uploaded segments of onto YouTube to get past our ten minute limit."  Hohengarten Ex. 35.

(3)     YouTube has taken numerous steps to deter users from uploading unauthorized copyrighted material and to assist content owners in policing their copyrights. *See* Levine Opening Decl. ¶¶ 5-10, 12, 14, 17-19; Hurley Opening Decl. ¶¶ 20-21; King Opening Decl. ¶¶ 7-8.

132. *A YouTube list of the "top keyword searches" in the United States for September 19, 2006 listed many Viacom shows and movies, including*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*"south park"* ███████████ *"flavor of love"* ██████████████, *"dave chappelle"* (██████████████ *"daily show"* ████████████████, *"jon stewart"* ██████████████, *"colbert"* ████████████ *"transformers"* ███████████████, *and "southpark"* █████████████ Hohengarten ¶ 41 & Ex. 38, GOO001-03045959, at GOO001-03045960-63.

**Disputed.** YouTube disputes the characterization of the document. Viacom misleadingly submits only an excerpt of the document. The entire document is 2,286 pages, and lists more than 132,000 search queries, showing words that users entered into the YouTube search function during a one-day period. *See* Schapiro Opp. Ex. 110 (213:14-214:5) ("raw query stream data is just a stream of the keywords that users are entering into a search engine to look for something"). The search queries identified in Viacom's proposed fact do not necessarily correspond to "Viacom shows and movies." *See* Schapiro Opp. Ex. 131 (254:21-25) ("Transformers is the name of our movie but it's also the name of toys that have been created and an animated feature that's been in the marketplace for a long time and many other things.").

**B.    Google's Knowledge and Intent Concerning Infringement on YouTube**

**Google's Knowledge of Infringement on YouTube Prior to Acquiring It**

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

133.    *Before acquiring YouTube, Google had its own Internet video site, Google Video, which allowed users to upload videos. Hohengarten ¶ 366 & Ex. 332 (Eun Dep.) at 57:3-58:2; Hohengarten ¶ 381 & Ex. 347 (P. Walker Dep.) at 240:6-240:14.*

**Undisputed.**

134.    *Until September 2006, Google Video employees reviewed each video uploaded to the Google Video site for copyright infringement and other terms of use violations before allowing the video to be displayed to users of the site. Hohengarten ¶ 366 & Ex. 332 (Eun Dep.) at 118:19-121:25, 130:3-130:17; Hohengarten ¶ 42 & Ex. 39, GOO001-00794737, at GOO001-00794742-43 (attachment); Hohengarten ¶ 194 & Ex. 191, GOO001-00923210, at GOO001-00923210; Hohengarten ¶ 381 & Ex. 347 (P. Walker Dep.) at 69:6-75:7; Hohengarten ¶ 380 & Ex. 346*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*(Narasimhan Dep.) at 13:25-16:8, 51:16-53:6; Hohengarten ¶ 44 & Ex. 41, GOO001-03114019, at GOO001-03114019; Hohengarten ¶ 46 & Ex. 43, GOO001-06555098, at GOO001-06555098.*

**Disputed.**  Google Video reviewed thumbnail images only of certain videos uploaded to the site prior to making those videos available to users on the site.  The review was for all terms of use violations, including potential copyright violations.  Schapiro Opp. Ex. 205 (36:25-38:8, 41:9-43:20, 51:20-56:6, 62:17-63:19).  Prior to May 2006, Google Video reviewed thumbnail images of certain videos uploaded to the site prior to making those videos available to any user.  *Id.* (12:5-14:24, 18:17-19:23).

In or about May 2006, Google Video launched "Instant Live", in which the url for a video was made available to the uploader prior to Google Video review.  Schapiro Opp. Ex. 288 (G-00925742-43).  The Google Video reviewers had no way of knowing by looking at the video or its thumbnails whether the user uploading the video was authorized to do so.  Schapiro Opp. Exs. 205 (36:25-38:8, 41:9-43:20), 204 (30:10-13, 80:9-85:10, 97:9-99:19, 160:2-24), 206 (175:21-181:17).

135.  *Until September 2006, all videos uploaded to the Google Video website were placed in a "video approval bin, essentially a video review queue," and were reviewed by a Google employee before being made available for viewing on the Google Video website.  Hohengarten ¶ 380 & Ex. 346 (Narasimhan Dep.) at 12:5-16:8.*

**Disputed**.  Google Video only reviewed thumbnail images of the videos uploaded to the site.  *See supra*, YouTube's Response to SUF ¶ 134.

136.  *Each video uploaded to Google Video and placed in the video review queue was reviewed by a Google employee for copyright infringement, porn, violence, and other reasons.  Hohengarten ¶ 366 & Ex. 332 (Eun Dep.) at 68:15-71:8, 130:1-130:17; Hohengarten ¶194 & Ex. 191, GOO001-00923210, at GOO001-00923210. (Narasimhan email GV Ops); Hohengarten ¶380 & Ex. 346 (Narasimhan Dep.) at 41:16-22, 50:9-53:6; Hohengarten ¶ 44 & Ex. 41, GOO001-03114019, at GOO001-03114019.*

**Disputed**.  Google Video only reviewed thumbnail images of the videos uploaded to the site.  The review was for all terms of use violations, including potential copyright violations.  The Google Video reviewers had no way of knowing by looking at the video or its thumbnails whether the user uploading the video was authorized to do so.  *See supra*, YouTube's Response to SUF ¶ 134.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

137. *In a June 26, 2006 email titled "illegal uploads," Google vice president of content partnerships David Eun asked Google Video content review manager Bhanu Narasimhan, who was in charge of the team reviewing videos in the video review queue: "In the swirl of discussions around copyright enforcement policies, can you tell me how many illegal videos we catch each week on average and what types/kinds/categories they fall into?  How do they correspond to the stuff that gets uploaded to YouTube?"; Ms. Narasimhan responded:  "We catch around 10% of all online user uploaded videos during review.  Of these approximately 90% is disapproved due to copyright violation, and the rest due to policy (porn, violence, etc.)."  Hohengarten ¶ 42 & Ex. 39, GOO001-00794737, at GOO001-00794737; Hohengarten ¶ 380 & Ex. 346 (Narasimhan Dep.) at 8:12-10:5 (stating Bhanu Narasimhan's job title), 10:24-11:3, 148:2-148:8, 152:5-152:20; Hohengarten ¶ 366 & Ex. 332 (Eun Dep.) at 25:7-25:19 (stating David Eun's job title).*

**Undisputed** that the cited email contains the language quoted in the proposed fact.

**Additional Material Facts:**

Both Bhanu Narasimhan and David Eun testified that any review the Google Video team did was for presumed or potential copyright violations—defined as content the individual reviewer personally recognized—because the reviewers had no way of knowing by looking at the video or its thumbnails whether the user uploading the video was authorized to do so.  Schapiro Opp. Exs. 205 (36:25-38:8, 41:9-43:20, 62:5-64:11), 206 (175:21-181:17).

138. *Google Video stopped proactively reviewing for copyright infringement on or about September 1, 2006.  Hohengarten ¶ 45 & Ex. 42, GOO001-00802317, at GOO001-00802317; Hohengarten ¶ 380 & Ex. 346 (Narasimhan Dep.) at 13:25-16:8; Hohengarten ¶ 46 & Ex. 43, GOO001-06555098, at GOO001-06555098.*

**Disputed**.  In or about September 2006, Google Video stopped screening videos that were under 11 minutes in length for terms of use violations, including potential copyright violations.  Google Video continued to pre-screen videos over 11 minutes.  Schapiro Opp. Ex. 205 (74:17-76:14); Hohengarten Ex. 43.

**Additional Material Facts:**

(1)  Google Video modified the way it implemented its content policies to cease screening videos under 11 minutes because it concluded from its experience that pre-screening was inefficient,

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

ineffective in enforcing Google Video's terms of use and generally resulted in a poor user experience. Schapiro Opp. Ex. 205 (36:25-38:8, 41:16-43:20); Schapiro Opp. Ex. 204 (80:3-85:10, 160:2-24); *see also* Schapiro Opp. Ex. 208 (76:3-24); Schapiro Opp. Ex. 145 (38:6-21); Schapiro Opp. Ex. 207 (46:17-47:24).

(2)    In lieu of continuing its screening practices for videos under 11 minutes, Google Video implemented two different processes for addressing potential terms of use violations:  (1) a community flagging feature that would allow users to flag content they deemed inappropriate, such as pornography, violence or hate, so that Google Video could review those videos for policy violations; and (2) an automatic DMCA takedown tool to facilitate copyright owners' ability to quickly take down their own content.  Schapiro Opp. Ex. 205 (75:25-77:11); Schapiro Opp. Ex. 204 (155:7-18, 156:22-157:17, 160:2-24).

(3)    Based on its experience, Google Video concluded that using the community to identify inappropriate content, like pornography, and partnering with content owners to identify and remove unauthorized content were the most efficient and effective methods of enforcing its content policies.  *Id.* (80:9-85:10, 97:9-99:19, 160:2-24); Schapiro Opp. Ex. 205 (36:25-38:8, 41:9-43:20).

139.    *Google Video also used keyword searching for terms such as "Daily Show," "Jon Stewart," "Dave Chappelle," and "Comedy Central" to locate videos that infringed Viacom's and others' copyrights. Hohengarten ¶ 47 & Ex. 44, GOO001-00990640, at GOO001-00990641.*

**Disputed**.  First, the proposed fact calls for a legal conclusion to the extent it refers to "videos that infringed Viacom's and others' copyrights."  Second, the purported evidence does not support the proposition that Google Video used keyword terms to locate videos that "infringed Viacom's and others' copyrights."  The initial keyword list in Hohengarten 44 was created in connection with an effort to review videos for potential copyright violations that were under two minutes in length. *See* Hohengarten Ex. 44.  Third, Google Video reviewers had no way of knowing by looking at the video or its thumbnails whether the user uploading the video was authorized to do so, whether the content owner had acquiesced to the presence of the content on the site or whether any videos identified by these initial keyword searches were subject to the doctrine of fair use.  Schapiro Opp. Ex. 204 (30:10-13, 80:9-85:10, 97:9-99:19, 160:2-24); *see also* YouTube's Response to SUF ¶ 134.  Google Video concluded that this type of review was ineffective. *See supra*, YouTube's Response to SUF ¶ 138.

64

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

140. *In a January 15, 2006 email Google executive Peter Chane responded to a colleague who emailed him a link to a YouTube video by saying: "google video doesn't have this one b/c we have a zero tolerance policy for copyrighted content." Hohengarten ¶ 48 & Ex. 45, GOO001-03592968, at GOO001-03592968; Hohengarten ¶ 353 & Ex. 319 (Chane Dep.) at 8:18-10:25 (stating Peter Chane's job title).*

**Disputed**. First, Peter Chane is not an executive. Schapiro Opp. Exs. 204 (10:5-16), 205 (102:23-103:7). Second, the proposed fact omits material context. In relation to this clip, Peter Chane goes on to explain: "I think it's a problem that we dont have videos like this where the owner (NBC in this case) doesn't seem to care that it's online. We took the SNL Lazy Sunday video down and YouTube still has it up. NBC is giving the vide= [sic] away for free on their site and on iTunes so I think our policy may need some recalibration." Hohengarten Ex. 45.

**Additional Material Facts:**

(1)    The referenced video is "Lazy Sunday." At the time this email was sent, NBC was aware that the clip was on YouTube, but had not requested its removal. *See supra*, YouTube's Response to SUF ¶ 89.

(2)    Google Video employees were specifically excluded from the YouTube acquisition discussions. Schapiro Opp. Ex. 204 (137:23-138:8).

141. *In the same January 15, 2006 email, Google executive Peter Chane continued, in reference to a discussion he had with YouTube co-founder Chad Hurley and another YouTube executive Chris Maxcy: "youtube is at an advantage b/c they aren't the target that we are with issues like this. they are aware of this (I spoke with them on friday) and they plan on exploiting this in order to get more and more traffic." Hohengarten ¶ 48 & Ex. 45, GOO001-03592968, at GOO001-03592968; Hohengarten ¶ 353 & Ex. 319 (Chane Dep.) at 8:18-10:25, 48:10-50:18.*

**Disputed**. First, Peter Chane is not an executive. *See supra*, YouTube's Response to SUF ¶ 140. Second, the proposed fact is misleading and omits material context. It is clear from the exchange that the kind of materials discussed were not "infringing" videos, but were those "where the owner … doesn't seem to care that it's online." *See supra*, YouTube Response to Viacom SUF ¶ 140. According to Chane, neither Hurley, nor Maxcy said that they planned on "exploiting this in order to get more and more traffic." Schapiro Opp.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Ex. 204 (53:19-54:8).  They did communicate that "certain videos got very, very popular, and generated a lot of traffic on their site." *Id.*

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions.  *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

142.    *In a February 7, 2006 email Google executive Peter Chane wrote to several Google colleagues: "my concern with youtube is their inclusion of clearly copyrighted content in their index.  if you query for SNL or Jon Stewart you'll see what I'm talking about. . . . if they were to be a part of google I assume we'd impose our zero tolerance policy with respect to copyright infringement which would significantly reduce their index size and traffic." Hohengarten ¶ 49 & Ex. 46, GOO001-03594244, at GOO001-03594244.*

**Disputed**.    First, Peter Chane is not an executive.  *See supra,* YouTube's Response to SUF ¶ 140.    Second, the proposed fact selectively excerpts from the email and omits material context.  Chane goes on to acknowledge that YouTube "claims to support DMCA takedowns but on a reactive basi= [sic] only."  Third, any statements by Google Video personnel as to the nature of the content on YouTube are speculation; Google Video employees who were deposed testified when questioned that they had no way of knowing whether the content on YouTube was authorized by the content owner.  *See* Schapiro Opp. Exs. 204 (62:4-20, 140:13-141:10), 184 (118:16-119:8), 208 (85:9-86:5), 183 (133:17-134:19, 141:3-17), 207 (59:7-22), 203 (153:5-155:24); *see also, e.g.*, Schapiro Opp. Exs. 205 (36:25-38:8, 41:9-43:20, 204 (30:10-13, 80:9-85:10, 97:9-99:19, 160:2-24), 206 (175:21-181:17).  Finally, statements by Google Video about the nature of the content on YouTube lack foundation and, if offered for their truth, are hearsay. *See* Defendants' Motion to Strike.

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions.  *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

143.    *In a February 7, 2006 email Google executive Peter Chane wrote to several Google colleagues: "my concern about youtube is their dependence upon copyrighted content for traffic." Hohengarten ¶ 50 & Ex. 47, GOO001-05084213, at GOO001-05084213.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Disputed**.  *See supra*, YouTube's Response to SUF ¶ 142.  Viacom presents the evidence cited in support of this proposed fact as if it is separate and distinct from the evidence cited in support of SUF ¶ 142. The email cited appears to be a draft response to the same email described in SUF ¶ 142 and, in any event, it does not represent a new or distinct purported fact.

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions.  *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

144.  *On March 4, 2006 Google executive Patrick Walker emailed Google Video Product Manager Hunter Walk, the business product manager of Google Video, that he was "baffled" by comparisons between YouTube and Google Video because YouTube was "doing little to stem its traffic growth on the back of pirated content," calling that choice "unsustainable and irresponsible."  Hohengarten ¶ 51 & Ex. 48, GOO001-00562962, at GOO001-00562962; Hohengarten ¶ 381 & Ex. 347 (P. Walker Dep.) at 144:15-145:10 (testifying to Hunter Walk's job title); Hohengarten ¶ 366 & Ex. 332 (Eun Dep.) at 166:20-167:12 (testifying to Hunter Walk's job title).*

**Disputed**.  First, Patrick Walker is not an executive.  Schapiro Opp. Ex. 203 (7:7-19, 40:9-41:22).  Second, the proposed fact is misleading and omits material testimony.  Walker testified that at the time he wrote this email he assumed that any content that was not clearly branded must be unauthorized, but later learned that many content owners used YouTube for stealth marketing.  Walker also testified that he had no way of knowing whether the content on YouTube was authorized by the content owner.  *Id.* (153:5-155:24); *see also supra*, YouTube's Response to SUF ¶ 142.  Third, statements by Google Video about the nature of the content on YouTube lack foundation and, if offered for their truth, are hearsay.  *See* Defendants' Motion to Strike.

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions.  *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

145.  *On April 27, 2006, Google executive Peter Chane sent an email to the Video Team at Google forwarding the statement by Peter Chernin, then CEO of Fox Entertainment, about YouTube:  "Exciting as it shows the potential pent up demand.  we did a survey and more than 80 percent of*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*video on this site is copyrighted content"; Google Video business product manager Ethan Anderson replied, "Holy cow." Hohengarten ¶ 52 & Ex. 49, GOO001-00566289, at GOO001-00566289.*

**Disputed**. First, the purported Fox "survey" lacks any foundation and is subject to multiple levels of hearsay. *See* Defendants' Motion to Strike. Second, Peter Chane is not an "executive." *See supra,* YouTube's Response to SUF ¶ 140. Third, the proposed fact is misleading and omits material facts. The evidence refutes any implication that the Chernin's alleged statements were perceived by Google as an assessment of "infringement" on YouTube. Google Video personnel viewed this remark as relating to videos that were "premium, just not copyright infringed ones." Schapiro Opp. Ex. 201. And the Google employee who circulated the news blurb clearly expressed his disagreement with it: "I don't believe the 80% number. My own analysis points to a much lower # (5%)." *Id.* Ex. 202 (G-00566305). Google Video team members understood that this type of third party commentary about the nature of the content on YouTube was not reliable. *See* Schapiro Opp. Exs. 204 (140:4-141:10), 203 (163:12-20), 207 (79:7-22), 183 (133:17-134:19, 141:3-17).

**Additional Material Facts:**

(1)    A few months later, ███████████████████████████████████████████████████████████ Schapiro Opp. Exs. 289; 290.

(2)    Google Video employees were specifically excluded from the YouTube acquisition discussions. *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

146. *By May 2006 YouTube had far surpassed Google Video in terms of number of users, number of playbacks, and number of videos. Hohengarten ¶ 53 & Ex. 50, GOO001-00495746, at GOO001-00495746 (Eric Schmidt stating: "My primary concern is that . . . we are behind Youtube."); Hohengarten ¶ 54 & Ex. 51, GOO001-00496021, at GOO001-00496024; Hohengarten ¶ 55 & Ex. 52, GOO001-00496614, at GOO001-00496633.*

**Undisputed.**

147. *In May 2006, Google held a Google Product Strategy (or "GPS") meeting attended by top executives, including Google CEO Eric Schmidt; the meeting focused on Google Video. Hohengarten ¶ 384 & Ex. 350 (Rosenberg Dep.) at 50:15-51:7; Hohengarten ¶ 56 & Ex. 53 GOO001-01495915, at GOO001-01495915; Hohengarten ¶ 348 & Ex. 314*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*(Schmidt Dep.) at 76:20-78:10; Hohengarten ¶ 353 & Ex. 319 (Chane Dep.) at 114:22-115:6.*

**Disputed**.  The evidence cited does not support the claim that top executives attended a May 2006 GPS meeting.  Dr. Schmidt testified that he normally attended GPS meetings but could not recall this meeting; Rosenberg did not recall attending this meeting, and Chane did not recall that top executives attended the meeting.  Schapiro Opp. Exs. 134 (76:20-79:19), 207 (50:15-52:20), 204 (115:19-117:16).

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions.  *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

148.  *An early May 2006 draft information sheet about YouTube created for Google co-founder Larry Page discussed YouTube's "Fast-start history" and stated that YouTube's "[l]ack of focus on copyright violation (especially early on) created Napster-type adoption increases: 'good content' available for free without delay." Hohengarten ¶ 60 & Ex. 57 GOO001-04430721, at GOO001-04430722.002; Hohengarten ¶ 349 & Ex. 315 (Page Dep.) at 10:22-10:24 (testifying to Larry Page's job title).*

**Disputed**.  First, the evidence does not support that the document referenced was "created for" Larry Page or was ever provided to Larry Page. Second, the proposed fact selectively excerpts from the email and omits material context. The section of this document entitled "Fast-start history" is offered as the last of several explanations for why YouTube has more users, including ease of upload, ease of viewing, ease of emailing, ease of publishing and community features. Third, any statements by Google Video personnel as to the nature of the content on YouTube are speculation; Google Video employees who were deposed testified when questioned that they had no way of knowing whether the content on YouTube was authorized by the content owner. *See supra*, YouTube's Response to SUF ¶ 142.  Finally, statements by Google Video about the nature of content on YouTube lack foundation and, if offered for their truth, are hearsay.  *See* Defendants' Motion to Strike.

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions.  *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

149. *In a May 2, 2006, email to Google executive Susan Wojcicki, Google vice president of content partnerships David Eun stated that he "ran into Peter and he had this idea to 'beat YouTube' by calling quits on our copyright compliance standards"; in his deposition Eun identified "Peter" as Google executive Peter Chane; Hohengarten ¶ 53 & Ex. 50, GOO001-00495746, at GOO001-00495746; Hohengarten ¶ 366 & Ex. 332 (Eun Dep.) 115:8-116:5, 201:2-201:9 (testifying to Susan Wojcicki's job description); Hohengarten ¶ 353 & Ex. 319 (Chane Dep.) at 9:5-10:4; Hohengarten ¶ 366 & Ex. 332 (Eun Dep.) at 201:2-201:9.*

**Disputed**. First, Peter Chane is not an "executive." *See supra,* YouTube's Response to SUF ¶ 140. Second, the proposed fact is misleading and omits material testimony. Peter Chane testified that Eun's description did not accurately portray Chane's position. Schapiro Opp. Ex. 204 (95:13-99:19). Chane believed that Google Video should stop pre-screening uploads to Google Video because it was inaccurate, inefficient, did not scale and negatively impacted the user experience. *Id.* While Google Video employees engaged in a healthy debate over the best strategy for improving the Google Video product and competing in an increasingly competitive online video market (Schapiro Opp. Exs. 206 (111:24-115:3; 160:22-163:20), 204 (92:3-94:20; 95:3-22), 203 (112:12-117:25), at no point in time did they consider any option they believed to be unlawful. Schapiro Opp. Exs. 204 (96:19-98:15); 206 (86:16-87:23, 112:5-120:12), 207 (46:4-49:10).

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions. *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

150. *A May 3, 2006 Google Video document stated: "Why is YouTube the Key Competitor? Not all traffic is created equal. Traffic is high but content is mostly illegal content (copyright infringing but not porn); how would comparable usage stats look for consumption of just legal content?" Hohengarten ¶ 61 & Ex. 58, GOO001-02361246, at GOO001-02361247.*

**Disputed**. First, the proposed fact mischaracterizes the cited document, which appears on its face to be a draft. Second, any statements by Google Video personnel as to the nature of the content on YouTube are speculation; Google Video employees who were deposed testified when questioned that they had no way of knowing whether the content on YouTube was authorized by the content owner. *See supra*, YouTube's Response to SUF ¶ 142. Third, statements by

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Google Video about the content on YouTube lack foundation and, if offered for their truth, are hearsay. *See* Defendants' Motion to Strike.

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions. *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

151. *A May 5, 2006 draft presentation from Google vice president of content partnerships David Eun for the GPS meeting summarized the "Views of Premium Content Owners On YouTube" and stated: "YouTube is perceived as trafficking mostly illegal content -- 'it's a video Grokster.'" Hohengarten ¶ 62 & Ex. 59, GOO001-00496065, at GOO001-00496086.*

**Disputed**. First, the selected citation to "it's a video Grokster" lacks foundation and is inadmissible hearsay. *See* Defendants' Motion to Strike. Second, Viacom repeatedly cites to different drafts of the same presentation (containing the same language) as if they were separate, distinct statements. *See* SUF ¶¶ 146, 157 (Hohengarten Ex. 52); ¶ 151 (Hohengarten Ex. 59); ¶ 152 (Hohengarten Ex. 60). Third, the proposed fact selectively excerpts from the cited document and omits material context. The document demonstrates the nature of the comparisons between Google Video and YouTube: Google Video believed that YouTube was adhering to the DMCA, but questioned the viability of that business model. Namely, the presentation notes that: (a) it is "risky" to rely on the DMCA because the law could be overturned, (b) YouTube is at the "mercy" of content owners sending takedown requests, and (c) YouTube's business model is not monetizable. G-00496614. The question at Google Video was whether to continue pre-screening or to focus on new techniques to enforce Google Video's terms of use. Schapiro Opp. Exs. 206 (111:24-115:3; 160:22-163:20), 204 (93:4-95:22, 95:3-22; 97:19-98:15), 203 (112:2-117:25). Google Video concluded that pre-screening both negatively impacted the user experience and was ineffective in enforcing Google Video's terms of use. *See supra*, YouTube's Response to SUF ¶ 138.

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions. *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

152. *A May 9, 2006 Google Video presentation titled "Content Acquisition Strategy Update" stated that "YouTube's business model is completely sustained by pirated content," and recommended that "we should beat*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*YouTube by improving features and user experience, not being a 'rogue enabler' of content theft." Hohengarten ¶ 63 & Ex. 60, GOO001-00502665, at GOO001-00502674, GOO001-00502684.*

**Disputed**. First, the selected citation to "rogue enabler" lacks foundation and is inadmissible hearsay. Hohengarten Ex. 60 (term "rogue enabler" in quotation marks), Schapiro Opp. Ex. 206 (148:3-149:10); *see* Defendants' Motion to Strike. Viacom repeatedly cites to different drafts of the same presentation (containing the same language) as if they were separate, distinct statements. *See* SUF ¶¶ 146, 157 (Hohengarten Ex. 52); 151 (Hohengarten Ex. 59); 152 (Hohengarten Ex. 60). Second, any statements by Google Video personnel as to the nature of the content on YouTube are speculation; Google Video employees who were deposed testified when questioned that they had no way of knowing whether the content on YouTube was authorized by the content owner. *See supra*, YouTube's Response to SUF ¶ 142. Third, the proposed fact selectively excerpts from the document and omits material context. The presentation notes: "YouTube is going after one slice of the internet video market – funny, user-made videos." Hohengarten Ex. 60. And the document demonstrates the nature of the comparisons between Google Video and YouTube: Google Video believed that YouTube was adhering to the DMCA, but questioned the viability of that business model. Namely, the presentation notes that: (a) it is "risky" to rely on the DMCA because the law could be overturned, (b) YouTube is at the "mercy" of content owners sending takedown requests, and (c) YouTube's business model is not monetizable. *See supra*, YouTube's Response to SUF ¶ 151. The question at Google Video was whether to continue pre-screening or to focus on new techniques to enforce of Google Video's terms of use. *Id.* Google Video had concluded that pre-screening both negatively impacted the user experience and was ineffective in enforcing Google Video's terms of use. *See supra*, YouTube's Response to SUF ¶ 138.

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions. *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

153. *In a May 10, 2006 email to Google executive Patrick Walker, Google Video business product manager Ethan Anderson stated: "I can't believe you're recommending buying YouTube. . . . they're 80% illegal pirated content" Hohengarten ¶ 64 & Ex. 61, GOO001-00482516, at*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*GOO001-00482516; Hohengarten ¶ 381 & Ex. 347 (P. Walker Dep.) at 87:6-87:12 (testifying to Ethan Anderson's job title).*

**Disputed**.  First, the citation to the 80 percent figure lacks foundation and is inadmissible hearsay if offered for its truth.  *See* Defendants' Motion to Strike.  Second, based on the context and timing of this email, it is obvious that Anderson was simply parroting the unsubstantiated 80 percent figure attributed to Fox's CEO, Peter Chernin.  *See* Schapiro Opp. Ex. 203 (163:12-164:10).  Third, Patrick Walker is not an executive.  *See supra,* YouTube's Response to SUF ¶ 144.  Finally, any statements by Google Video personnel as to the nature of the content on YouTube are speculation; Google Video employees who were deposed testified when questioned that they had no way of knowing whether the content on YouTube was authorized by the content owner.  *See supra*, YouTube's Response to SUF ¶ 142.

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions.  *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

154.  *A May 11, 2006 draft presentation for the GPS titled "Google Video" by Google executive Peter Chane stated that YouTube had more daily video uploads and daily video views than Google Video.  Hohengarten ¶ 54 & Ex. 51, GOO001-00496021, at GOO001-00496024, GOO001-00496031.*

**Disputed**.  Peter Chane is not stating anything; he is merely referenced as the proposed presenter of the draft presentation.  Hohengarten Ex. 51.  He did not recall presenting this material at the alleged GPS meeting.  Schapiro Opp. Ex. 204 (114:22-115:18).  Peter Chane also is not an executive.  *See supra,* YouTube's Response to SUF ¶ 140.  YouTube does not dispute that, as of May 2006, YouTube had more daily video uploads and daily video views than Google Video.

155.  *The same May 11, 2006 draft presentation stated that "YouTube is growing" in part because of its "Liberal copyright policy," including "No proactive screening; reactive DMCA only," making "YouTube better for users."  Hohengarten ¶ 54 & Ex. 51, GOO001-00496021, at GOO001-00496031.*

**Disputed**.  First, the proposed fact selectively excerpts from and misrepresents the cited evidence.  Google Video's speculation about YouTube's supposed "Liberal copyright policy" referred to: "10 min, 100 meg limit on uploads from anyone – No proactive screening; reactive DMCA only[.]"  Hohengarten Ex. 51, at G-00496031.  The presentation

73

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

lists a number of reasons why Google Video believed YouTube was growing, including effortless upload, simple view experience, easy to discovery new videos, easy to share content. *Id.*; *see also* Schapiro Opp. Exs. 205 (89:25-90:14); 204 (85:12-86:15, 87:24-88:15). Second, any statements by Google Video personnel as to the nature of the content on YouTube are speculation; Google Video employees who were deposed testified when questioned that they had no way of knowing whether the content on YouTube was authorized by the content owner. *See supra*, YouTube's Response to SUF ¶ 142. In any event, Google Video's speculation about YouTube's copyright protection policies was incorrect. *See infra*, YouTube's Response to SUF ¶ 272. Finally, statements by Google Video about the content on YouTube lack foundation and, if offered for their truth, are hearsay. *See* Defendants' Motion to Strike.

156. *The same May 11, 2006 draft presentation included a "Copyright policy parity analysis" stating that on YouTube, "Partial works [are] accepted[;] CSPAN, Family Guy, John Stewart, NBA clips, music videos posted on the site[;] YouTube gets content when it's hot (Lazy Sunday, Stephen Colbert, Lakers wins at the buzzer)"; and stating with respect to Google Video that it "[t]akes us too long to acquire content directly from the rights holder." Hohengarten ¶ 54 & Ex. 51, GOO001-00496021, at GOO001-00496035 (emphasis in original).*

**Disputed**. First, the proposed fact selectively excerpts from and misrepresents the cited evidence. As noted, the document itself demonstrates that the comparison between Google Video and YouTube was based on incorrect speculation that YouTube was not pre-screening any uploads. *See supra*, YouTube's Response to SUF ¶ 155. Google Video's speculation about YouTube's copyright protection policies was incorrect. *See infra*, YouTube's Response to SUF ¶ 272. The presentation also demonstrates that Google Video's reference to "Colbert" related to a speech on CSPAN rather than any Viacom programs. Hohengarten Ex. 51. Second, any statements by Google Video personnel as to the nature of the content on YouTube are speculation; Google Video employees who were deposed testified when questioned that they had no way of knowing whether the content on YouTube was authorized by the content owner. *See supra*, YouTube's Response to SUF ¶ 142. Finally, statements of Google Video about the content on YouTube lack foundation and, if offered for their truth, are hearsay. *See* Defendants' Motion to Strike.

157. *In a May 11, 2006 document titled "Video GPS content pages FINAL," sent to Google executive Peter Chane, Google vice president of content partnerships David Eun, and others for integration into the material*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*prepared for the GPS, the Google Video team stated: "Premium Content Owners . . . (mainly) perceive YouTube as trafficking mostly illegal content -- 'it's a video Grokster'"; "we should beat YouTube by improving features and user experience, not being a 'rogue enabler' of content theft"; "YouTube's content is all free, and much of it is highly sought after pirated clips"; and "YouTube's business model is completely sustained by pirated content. They are at the mercy of companies not responding with DMCA requests." Hohengarten ¶ 55 & Ex 52, GOO001-00496614, at GOO001-00496627, GOO001-00496633, GOO001-00496637.*

**Disputed**.   First, the cited document is not final, and there is no evidence supporting the implication that this presentation was used during a GPS meeting.  Schapiro Opp. Exs. 208 (46:12-21; 80:14-88:14), 134 (89:20-96:6), 183 (135:22-138:3), 184 (112:9-124:5), 207 (53:19-61:4), 204 (122:22-129:23).  Numerous slides of the presentation are empty, except for placeholders noting what type of slide is to be added at a later date.  *See* Hohengarten Ex. 52, at G-00496616-18.  Second, the selected citations to "it's a video Grokster" and "rogue enabler" lack foundation and are inadmissible hearsay.  *See* Defendants' Motion to Strike.  Third, Viacom repeatedly cites to different drafts of the same presentation (containing the same language) as if they were separate, distinct statements.  *See* SUF ¶¶ 146, 157 (Hohengarten Ex. 52); 151 (Hohengarten Ex. 59); 152 (Hohengarten Ex. 60).  Fourth, Peter Chane is not an executive.  *See supra,* YouTube's Response to SUF ¶ 140. Fifth, any statements by Google Video personnel as to the nature of the content on YouTube are speculation; Google Video employees who were deposed testified when questioned that they had no way of knowing whether the content on YouTube was authorized by the content owner. *See supra*, YouTube's Response to SUF ¶ 142.  Finally, the proposed fact selectively excerpts from and misrepresents the cited evidence. The document demonstrates the nature of the comparisons between Google Video and YouTube:  Google Video believed that YouTube was adhering to the DMCA, but questioned the viability of that business model.  Namely, the presentation notes that: (a) it is "risky" to rely on the DMCA because the law could be overturned, (b) YouTube is at the "mercy" of content owners sending takedown requests, and (c) YouTube's business model is not monetizable.  *See supra*, YouTube's Response to SUF ¶ 151.  The question at Google Video was whether to continue pre-screening or to focus on new techniques to enforce Google Video's terms of use.  *Id.*  Google Video had already determined that pre-screening both negatively impacted the user experience and was ineffective in enforcing Google Video's terms of use.  *See supra*, YouTube's Response to SUF ¶ 138.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions.  *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

158.  *In a May 12, 2006 email to Google CEO Eric Schmidt and Google senior vice president Omid Kordestani, Google vice president David Eun stated that "the Video team" at Google "has focused on two questions . . . 1) how we 'beat YouTube' in the short term; and 2) how we win over time"; and that "there was heated debate about whether we should relax enforcement of our copyright policies in an effort to stimulate traffic growth, despite the inevitable damage it would cause to relationships with content owners.  I think we should beat YouTube . . . -- but not at all costs."  Hohengarten ¶ 65 & Ex. 62, GOO001-00496651, at GOO001-00496651; Hohengarten ¶ 375 & Ex. 341 (Kordestani Dep.) at 20:14-21:7 (testifying to Omid Kordestani's job title).*

**Disputed**.  The proposed fact is misleading and omits material testimony.  As Eun explained, while Google Video employees engaged in a healthy debate over the best strategy for improving the Google Video product and competing in an increasingly competitive online video market, including modifying how its copyright policies were enforced, at no point did Google Video consider an option it believed to be unlawful.  Schapiro Opp. Ex. 206 (86:16-87:23, 112:5-120:12, 160:22-163:20); *see also supra*, YouTube's Response to SUF ¶ 149.  The internal debate at Google Video focused on whether to continue with pre-screening all uploads or to focus on new techniques to enforce Google Video's terms of use.  *See supra*, YouTube's Response to SUF ¶ 151.  Google Video had already determined that pre-screening both negatively impacted the user experience and was ineffective in enforcing Google Video's terms of use.  *See supra*, YouTube's Response to SUF ¶ 138.  Eun also explained that he wrote this email when he was new to Google and was feeling defensive because of the effusive praise that YouTube was receiving from outsiders.  He later learned that Google Video could not reliably determine whether the content on YouTube was authorized just by viewing the videos.  Schapiro Opp. Ex. 206 (160:1-165:22, 175:20-177:19).

159.  *In the same May 12, 2006 email, Google vice president of content partnerships David Eun stated, regarding YouTube, that a "large part of their traffic is from pirated content.  When we compare our traffic numbers to theirs, we should acknowledge that we are comparing our 'legal traffic' to their mix of traffic from legal and illegal content.  One*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*senior media executive told me they are monitoring YouTube very closely and referred to them as a 'Video Grokster.'" Hohengarten ¶ 65 & Ex. 62, GOO001-00496651, at GOO001-496652.*

**Disputed**.   First, the selected citation to "Video Grokster" lacks foundation and is inadmissible hearsay.  In addition, statements by Google Video about the nature of the content on YouTube lack foundation.  *See* Defendants' Motion to Strike.  Second, the proposed fact is misleading and omits material testimony.  *See supra*, YouTube's Response to SUF ¶ 158.   Third, any statements by Google Video personnel as to the nature of the content on YouTube are speculation; Google Video employees who were deposed testified when questioned that they had no way of knowing whether the content on YouTube was authorized by the content owner.  *See supra*, YouTube's Response to SUF ¶ 142.

**Additional Material Facts:**

Google Video employees were specifically excluded from the YouTube acquisition discussions.  *See supra*, YouTube's Additional Material Facts in response to Viacom SUF ¶ 140.

160.   *In a June 2, 2006 instant message conversation, Google vice president of content partnerships David Eun (IM user name deun@google.com) told another Google executive Patrick Walker (IM user name pwalker@google.com) that although Eun and Google co-founder Sergey Brin opposed relaxing Google Video's copyright policies, Google's CEO Eric Schmidt supported the change.  Hohengarten ¶ 211 & Ex. 199, GOO001-02363217, at 2 at & at GOO001-02363217; Hohengarten ¶ 352 & Ex. 318 (Brin Dep.) at 7:15-7:17 (testifying to Sergey Brin's job title).  See also Hohengarten ¶ 67 & Ex. 64, GOO001-00563430, at GOO001-00563431 ("Shouldn't the lesson here be [t]o play faster and looser and be aggressive until either a court says ["]no" or a deal gets struck.  I don't think there can be an in [b]etween").*

**Disputed**.   First, Patrick Walker is not an executive.  *See supra*, YouTube's Response to SUF ¶ 144.   Second, the proposed fact misrepresents the content of the instant message and omits material facts.   Nowhere in the exchange is there a reference to "relaxing" Google Video's copyright policies; the exchange refers to a potential "copyright policy change", with no further context. Third, the proposed fact attributes comments to Dr. Schmidt that have not been verified. There is no evidence that Dr. Schmidt made this statement, nor is this consistent with the testimony of Dr. Schmidt, who confirmed that he was not a part of the debate surrounding potential changes to Google

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Video's copyright policy. Schapiro Opp. Ex. 134 (82:13-83:8; 101:15-24; 222:20-225:19). Finally, the citation to Hohengarten Ex. 64 is irrelevant and extraneous; the document has no connection to the proposed fact.

161. *On June 8, 2006, Google senior vice president Jonathan Rosenberg, Google Senior Vice President of Product Management, emailed Google CEO Eric Schmidt and Google co-founders Larry Page and Sergey Brin a Google Video presentation that stated the following: "Pressure premium content providers to change their model towards free[;] Adopt 'or else' stance re prosecution of copyright infringement elsewhere[;] Set up 'play first, deal later' around 'hot content.'" The presentation also stated that "[w]e may be able to coax or force access to viral premium content," noting that Google Video could "Threaten a change in copyright policy" and "use threat to get deal sign-up." Hohengarten ¶ 66 & Ex. 63, GOO001-00791569, at GOO001-00791575, GOO001-00791594 (emphasis in original); Hohengarten ¶ 384 & Ex. 350 (Rosenberg Dep.) at 12:9-12:18 (testifying to Jonathan Rosenberg's position).*

    **Disputed**. The proposed fact selectively excerpts from the cited document and omits material context. Viacom omits the full sentence: "Threaten a change in copyright policy as part of a PR campaign complaining about harm to users' interests through content owner foot-dragging." The document contains a number of suggestions from low-level employees as to potential negotiation strategies. There is no evidence that anyone else from Google Video agreed with these suggestions or that such suggestions were ever adopted. The witnesses questioned about this document had no recollection of its contents or of any discussions relating to the quoted language. *See* Schapiro Opp. Exs. 209 (102:19-105:23), 207 (70:6-71:19), 291 (117:7-119:2).

162. *In a June 28, 2006 email to numerous other Google executives, Google vice president of content partnerships David Eun stated: "as Sergey pointed out at our last GPS, is changing policy [t]o increase traffic knowing beforehand that we'll profit from illegal [d]ownloads how we want to conduct business? Is this Googley?" Hohengarten ¶ 67 & Ex. 64, GOO001-00563430, at GOO001-00563430.*

    **Disputed**. The proposed fact is misleading and omits material testimony. The comments attributed to Sergey Brin are not verified; Brin testified that he would not have made these comments and that Eun was providing an inaccurate characterization of something Brin said. Schapiro Opp. Ex. 208 (74:19-75:12). Eun admitted in his deposition that this email was premised on unsubstantiated

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

supposition and his own misconceptions and that his description of Brin's alleged comments did not reflect Brin's actual opinions but was more likely Eun's own description of Brin's efforts to summarize the arguments being made by others. Schapiro Opp. Ex. 206 (169:6-173:9); *see also* Schapiro Opp. Ex. 207 (75:15-77:20); Schapiro Opp. Ex. 204 (130:2-133:22).

163. *In his deposition, Google vice president of content partnerships David Eun identified the "Sergey" referred to in his June 28, 2006 email (see SUF ¶ 162) as Google founder Sergey Brin. Hohengarten ¶ 366 & Ex. 332 (Eun Dep.) at 170:4-8.*

**Undisputed.**

164. *On June 17, 2006, Google Video business product manager Ethan Anderson sent Google executive Patrick Walker an email listing the "Top 10 reasons why we shouldn't stop screening for copyright violations," including: "1. It crosses the threshold of Don't be Evil to facilitate distribution of other people's intellectual property, and possibly even allowing monetization of it by somebody who doesn't own the copyright"; "2. Just growing any traffic is a bad idea. This policy will drive us to build a giant index of pseudo porn, lady punches, and copyrighted material . . ."; "3. We should be able to win on features, a better [user interface] technology, advertising relationships - not just policy. It's a cop out to resort to dist-rob-ution"; and "7. It makes it more difficult to do content deals with you have an index of pirated material." Hohengarten ¶ 68 & Ex. 65, GOO001-00563469, at GOO001-00563469; See also Hohengarten ¶ 317 & Ex. 387 (Google Investor Relations page entitled "Google Code of Conduct") ("The Google Code of Conduct is one of the ways we put 'Don't be evil' into practice.").*

**Disputed**. First, Patrick Walker is not an executive. *See supra*, YouTube's Response to SUF ¶ 144. Second, the proposed fact is misleading and omits material testimony. The quoted email reflects the opinions of one low-level employee relating to the internal debate at Google Video regarding whether to continue pre-screening uploads. *See* Schapiro Opp. Ex. 205 (102:23-103:7) (stating that Ethan Anderson was one of four product managers at Google Video). Google Video employees engaged in a healthy debate over the best strategy for improving the Google Video product and competing in an increasingly competitive online video market, at no point in time did Google Video consider any option it believed to be unlawful. *See supra*, YouTube's Response to SUF ¶ 149. The internal debate at Google Video focused on whether to continue with pre-screening all uploads or to focus on new techniques to enforce Google Video's terms of use. *See supra*,

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

YouTube's Response to SUF ¶ 151. But Google Video had already concluded that pre-screening both negatively impacted the user experience and was ineffective in enforcing Google Video's terms of use. *See supra*, YouTube's Response to SUF ¶ 138.

165. *On September 24, 2006, less than three weeks before Google announced its acquisition of YouTube, a Google employee sent an email that included a link to a Daily Show video that had been uploaded to YouTube, stating: "Good old YouTube - copyright, schmoppyright." Hohengarten ¶ 69 & Ex. 66, GOO001-00792297, at GOO001-00792297.*

**Disputed**. First, there is no verification in the record of the contents of this email. *See* Defendants' Motion to Strike. Second, any statements by Google Video personnel as to the nature of the content on YouTube are speculation; Google Video employees who were deposed testified when questioned that they had no way of knowing whether the content on YouTube was authorized by the content owner. *See supra*, YouTube's Response to SUF ¶ 142.

**Additional Material Facts:**

Viacom has made no claims of infringement with respect to this clip. During this time period, Viacom was allowing Daily Show clips to remain on the site. *See supra*, YouTube's Response to SUF ¶ 130.

### Google's Knowledge and Intent Concerning Infringement on YouTube Through Pre-Acquisition Due Diligence

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

166. *Prior to Google's announcement of its acquisition of YouTube on October 9, 2006, a team of Google employees performed due diligence relating to the proposed acquisition of YouTube. Hohengarten ¶ 361 & Ex. 327 (Drummond Dep.) at 23:5-26:8.*

**Undisputed.**

167. *Google hired Credit Suisse to perform a valuation of YouTube and to render a fairness opinion regarding the proposed $1.65 billion purchase price. Hohengarten ¶ 362 & Ex. 328 (Duncan 30(b)(6) Dep.) at 60:16-68:25; Hohengarten ¶ 321 & Ex. 290, CSSU 002845 at, CSSU 002847.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Disputed**. Credit Suisse did not perform a valuation of YouTube. Google hired Credit Suisse to provide a fairness opinion as to the consideration to be paid by Google for the acquisition of YouTube, namely the stock Google issued to YouTube as payment for the acquisition. Hohengarten Exs. 328 (60:16-68:25); 290.

168. *Google's due diligence team analyzed a random sample of hundreds of videos provided by YouTube that Google believed to be representative of the types of content on YouTube. Hohengarten ¶ 322 & Ex. 291 CSSU 002686, at CSSU 002686; Hohengarten ¶ 362 & Ex. 328 (Duncan 30(b)(6) Dep.) at 87:3-91:8.*

**Disputed**. Google performed a back-of-the-envelope analysis of 301 video streams on YouTube during the due diligence leading up to Google's acquisition of YouTube, but the videos were not considered "representative of the types of content on YouTube." These videos were randomly selected. Hohengarten Ex. 328 (89:24-90:6).

169. *This random sample of YouTube videos was given to the Google due diligence team by YouTube co-founder Steve Chen. Hohengarten ¶ 70 & Ex. 67, GOO001-04736644, at GOO001-04736644.*

**Disputed**. Chen did not send Google the sample of random videos evaluated by Google during the due diligence leading up to Google's acquisition of YouTube. Schapiro Opp. Exs. 292-295.

170. *Google's analysis of the random sample of YouTube videos determined that 63% of the videos on YouTube were "Premium/removed," meaning that the content was "copyright (either in whole or substantial part)" or "removed [and] taken down." Hohengarten ¶ 322 & Ex. 291 CSSU 002686, at CSSU 002686; Hohengarten ¶ 362 & Ex. 328 (Duncan 30(b)(6) Dep.) at 89:4-7, 95:18-98:19.*

**Disputed**. The cited testimony of Storm Duncan has no apparent relevance to the proposed statement of fact. Google performed a back-of-the-envelope analysis of 301 video streams on YouTube during the due diligence leading up to Google's acquisition of YouTube, but the analysis was not intended to be, and was not, scientific. The 189 videos that Google deemed "premium" were simply those that appeared to be professionally produced or ones that had been removed from YouTube. There is no breakdown between these two categories. Hohengarten Ex. 291. The analysis did not include an evaluation of who owned the videos, who uploaded the videos, why the videos were taken down, or whether the videos were authorized by the content owner. *Id*.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

**Additional Material Facts**:

Videos are removed from YouTube for any number of non-copyright reasons, including other terms of use violations, at the request of a user, voluntary removal by a user, or as a result of the application of YouTube's three-strikes policy. *See* Levine Opening Decl. ¶ 30; Pls.' Joint Reply In Support of Pls.' Joint Mot. to Compel 29 n.23 (Mar. 14, 2008).

171. *Storm Duncan, managing director of Credit Suisse and part of Google's YouTube acquisition due diligence team, wrote in hand-written notes that "60% is premium," which he defined as "Professionally Produced" and categorized as "Legitimate" and "Illegitimate." Hohengarten ¶ 320 & Ex. 289, CSSU 001863, at CSSU 001957; Hohengarten ¶ 362 & Ex. 328 (Duncan 30(b)(6) Dep.) at 199:24-200:5, 207:25-210:13.*

**Disputed**. First, the cited material is inadmissible hearsay. *See* Defendants' Motion to Strike. Second, the proposed fact is misleading and omits material facts. Duncan confirmed that the quoted material consists of his handwritten notes from the due diligence, but he specifically testified that he was not defining "Professionally Produced", and that these notes do not reflect his personal thoughts. Duncan explained that someone else provided him with this information, but he did not recall who provide this information and he provided no context for the discussion. Schapiro Opp. Ex. 212 (199:22-202:8).

172. *Credit Suisse used Google's analysis of YouTube videos as an input to its valuation of YouTube. Hohengarten ¶ 362 & Ex. 328 (Duncan 30(b)(6) Dep.) at 90:23-91:4.*

**Disputed**. First, the cited testimony of Storm Duncan has no apparent relevance to the proposed statement of fact. Second, the proposed fact is misleading and omits material testimony. Credit Suisse did not conduct a valuation of YouTube. *See supra*, YouTube's Response to SUF ¶ 167. Credit Suisse utilized a rough summary of Google's back-of-the-envelope analysis of a random sampling of YouTube playbacks as one factor in projecting YouTube's future revenue. Schapiro Opp. Ex. 212 (105:2-107:11); *see supra*, YouTube's Response to SUF ¶¶ 168, 170.

173. *Credit Suisse's valuation model for YouTube estimated that 60% of the video views on YouTube were of "premium" content. Hohengarten ¶ 323 & Ex. 292, CSSU 004069, at CSSU 004071.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Disputed**.  The proposed fact mischaracterizes the document, omits material facts and is misleading.  Viacom repeatedly cites to different drafts of the same Credit Suisse presentation as if each was an independent, complete and distinct analysis.  *See* SUF ¶¶ 173, 174 (Hohengarten Ex. 292); 175, 176, 178, 180, 181, 182 (Hohengarten Ex. 293); 177 (Hohengarten Ex. 294).  Credit Suisse did not perform a valuation of YouTube.  *See supra*, YouTube's Response to SUF ¶ 167.  Duncan testified that this document was a draft of a model projecting the potential future financial performance of YouTube.  Schapiro Opp. Ex. 212 (96:6-107:15).  In that model, Credit Suisse predicted that 60% of future YouTube video streams in each of the identified years would come from "premium" content.  *Id.*; Hohengarten Ex. 292.  This number was a rough estimate derived from the back-of-the-envelope analysis conducted by Google of a random sampling of YouTube playbacks.  Schapiro Opp. Ex. 212 (96:6-107:15); *see supra*, YouTube's Responses to SUF ¶¶ 168, 170, 172.

174.  *Credit Suisse's valuation model for YouTube estimated that in 2007, only 10% of the video views of premium content would be of content that was authorized to be on YouTube.  Hohengarten ¶ 323 & Ex. 292, CSSU 004069, at CSSU 004071.*

**Disputed**.  Viacom repeatedly cites to different drafts of the same Credit Suisse presentation as if each was an independent, complete and distinct analysis.  *See supra*, YouTube's Response to SUF ¶173.  In addition, the proposed omits material facts and is misleading.  Credit Suisse did not perform a valuation of YouTube.  *See supra*, YouTube's Response to SUF ¶ 167.  Duncan testified that this document was a draft of a model projecting the potential future financial performance of YouTube.  *See supra,* YouTube's Response to SUF ¶ 173.  In that model, Credit Suisse predicted that 10% of premium content would be "permissioned content from partners" in 2007, meaning that 10% of "premium" videos would be subject to individually negotiated partnership agreements.  *See, e.g.*, Hohengarten 294; Hohengarten 293; Schapiro Opp. Ex. 212 (144:5-145:9, 159:10-160:7).  This 10% projection concerned only one category of authorized videos that could be monetized and reflects Google's plan to monetize *only* videos on YouTube subject to individually negotiated content-partnership agreements.  Schapiro Opp. Ex. 212 (144:5-145:9).  Credit Suisse did not quantify the percentage of "premium" content that was legitimately on YouTube in other ways, to discern which "premium" videos appeared on YouTube as a result of media companies' marketing campaigns, or to evaluate whether content owners may have deliberately acquiesced to their content appearing on YouTube.  Nor did it perform any fair-use analysis.  It was evaluating the

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

fairness of Google's proposed consideration, not trying to determine the authorization status of YouTube videos. *See id.* (60:1-2, 209:18-19).

175. *Credit Suisse prepared a presentation regarding its valuation of YouTube and presented it to Google's board of directors on October 9, 2006, before the board voted to acquire YouTube. Hohengarten ¶ 324 & Ex. 293, CSSU 003560, at CSSU 003561-86; Hohengarten ¶ 362 & Ex. 328 (Duncan 30(b)(6) Dep.) at 117:11-119:15; Hohengarten ¶ 361 & Ex. 327 (Drummond Dep.) at 15:20-16:2.*

**Disputed.** Credit Suisse did not perform a valuation of YouTube. *See supra*, YouTube's Response to SUF ¶ 167. Credit Suisse prepared a presentation regarding its fairness opinion as to the consideration to be paid by Google for the acquisition of YouTube, namely the stock Google issued to YouTube as payment for the acquisition, and presented it to Google's board of directors prior to Google's acquisition of YouTube. *See supra*, YouTube's Response to SUF ¶ 166; Schapiro Opp. Ex. 212 (114:1-25).

176. *Credit Suisse's October 9, 2006 presentation to Google's board of directors estimated that "60% of total video streams on [the YouTube] website are 'Premium,'" and that "10% of premium content providers allow [YouTube] to monetize their content in 2007E." Hohengarten ¶ 324 & Ex. 293 CSSU 003560, at CSSU 003570. Hohengarten ¶ 375 & Ex. 341 (Kordestani Dep. at 109:24-110:22); Hohengarten ¶ 362 & Ex. 328 (Duncan 30(b)(6) Dep. at 158:13-159:1).*

**Disputed**. First, the cited testimony of Storm Duncan has no apparent relevance to the proposed statement of fact. Second, Viacom repeatedly cites to different drafts of the same Credit Suisse presentation as if they were each independent, complete and distinct analyses. *See supra*, YouTube's Response to SUF ¶ 173. Third, the proposed fact material fact is misleading. The Credit Suisse presentation did predict that 60% of future YouTube video streams in each of the identified years would come from "premium" content. *See supra*, YouTube's Response to SUF ¶ 173. This number was derived from the back-of-the-envelope analysis conducted by Google of a random sampling of YouTube playbacks. *See supra*, YouTube's Responses to SUF ¶¶ 168, 170, 172. Credit Suisse also predicted that "10% of premium content providers allow [YouTube] to monetize their content" in 2007, meaning that 10% of "premium" videos would be subject to individually negotiated partnership agreements. *See supra,* YouTube's Response to SUF ¶ 174. This 10% projection concerned only one category of authorized videos that could be monetized and reflects Google's plan to monetize *only* videos on YouTube subject to

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

individually negotiated content-partnership agreements. *Id.* Credit Suisse did not purport to quantify the percentage of "premium" content that was legitimately on YouTube in other ways, to discern which "premium" videos appeared on YouTube as a result of media companies' marketing campaigns, or to evaluate whether content owners may have deliberately acquiesced to their content appearing on YouTube. Nor did it perform any fair-use analysis. It was evaluating the fairness of Google's proposed consideration, not trying to determine the authorization status of YouTube videos. *Id.*

177. *An October 8, 2006 draft of Credit Suisse's presentation defined "[p]remium content [a]s copyrighted content such as movies/TV trailers, music videos, etc." Hohengarten ¶ 325 & Ex. 294 CSSU 003326, at CSSU 003335.*

**Disputed**. Viacom repeatedly cites to different drafts of the same Credit Suisse presentation as if they were each independent, complete and distinct analyses. *See supra*, YouTube's Response to SUF ¶ 173. The email attaching this draft presentation was sent on October 7, 2009. The use of term "premium content" in the draft presentation is not the same as the use of the term in the final version of the Credit Suisse board presentation. Schapiro Opp. Ex. 212 (157:13-159:6).

178. *The October 9, 2006 Credit Suisse presentation emphasized the "tremendous growth" in YouTube's userbase and its "loyal global following." Hohengarten ¶ 324 & Ex. 293 CSSU 003560, at CSSU 003569 (emphasizing YouTube's "tremendous growth" and "loyal global following").*

**Disputed.** The proposed fact selectively excerpts from the cited evidence and omits material context. One factor – among many – listed in the Credit Suisse board presentation on the slide titled "[YouTube] Transaction Rationale and Positioning" was: "[YouTube] is one of the leading and fastest growing Web 2.0 companies - [YouTube] has exhibited tremendous growth and established a loyal global following - There are very few internet companies exhibiting this type of growth and traction with users." Hohengarten Ex. 293. This factor was no more emphasized than any other in the presentation.

179. *The October 9, 2006 Credit Suisse presentation projected that there would be 126 billion views of YouTube watch page views in 2007, and more than 154 billion views of YouTube home and search results pages in 2007. Hohengarten ¶ 324 & Ex. 293 CSSU 003560, at CSSU 003570 (45% of 280 billion; 55% of 280 billion).*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Undisputed.**

180. *In the October 9, 2006 presentation, Credit Suisse advised Google's board that the base case financial value of YouTube was $2.7 billion, derived from Google's ability to monetize YouTube's user base in the future. Hohengarten ¶ 324 & Ex. 293 CSSU 003560, at CSSU 003573.*

**Disputed**. Credit Suisse's October 9, 2006 presentation indicates that the base case valuation of YouTube was estimated at approximately $2.7 billion based on potential revenue growth and EBITDA. This revenue growth was not based on an ability to monetize YouTube's user base, nor does the presentation indicate that this was the case. Hohengarten Ex. 293.

181. *The October 9, 2006 presentation informed Google's board that "60% of total video streams on yellow [their code name for the YouTube website] are 'Premium.'" Hohengarten ¶ 324 & Ex. 293 CSSU 003560, at CSSU 003570; see also id. at CSSU 003569 (listing "[u]ncertain legal issues" under "[i]ssues for [c]onsideration"); Hohengarten ¶ 362 & Ex. 328 (Duncan 30(b)(6) Dep.) at 24:22-25:16 (confirming that "Yellow" was the code name for YouTube and "green" was the code name for Google).*

**Disputed**. *See supra*, YouTube's Responses to SUF ¶¶ 173, 174, 176.

182. *In the October 9, 2006 presentation Credit Suisse advised Google's board that Credit Suisse's valuation "[a]ssumes 10% premium content providers allow [YouTube] to monetize their content in [fiscal year 2007]." Hohengarten ¶ 324 & Ex. 293, CSSU 003560, at CSSU 003570.*

**Disputed**. *See supra*, YouTube's Responses to SUF ¶¶ 173, 174, 176.

## YouTube's Agreement to Indemnify Google For Copyright Infringement Liability

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

183. *On October 4, Google sent YouTube a term sheet offering to buy YouTube for $1.65 billion in Google stock; in the term sheet, Google proposed that YouTube and its stockholders "indemnify and hold Google harmless for any losses and liabilities (including legal fees)*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*relating to copyright lawsuits filed against the Company or Google" for up to 12.5% of the purchase price, which was to be held in escrow. Hohengarten ¶ 326 & Ex. 295 CSSU 002982, at CSSU 002985-86.*

**Disputed**.  First, the draft term sheet is inadmissible under FRE 411 to the extent it is being offered as evidence of indemnification.  *See* Defendants' Motion to Strike.  Second, the proposed fact does not accurately describe the cited document.  The term sheet sent by Google to YouTube included a potential indemnification provision in which 12.5% of the Consideration (here, Google stock) for the deal would be placed in escrow for future legal liabilities, including inaccuracies in or breaches of representations, warranties and covenants or other provisions of the merger agreement or ancillary documents and copyright lawsuits.  Hohengarten Ex. 295.  The term sheet indicates that up to 5% of the 12.5% of the Consideration placed in escrow would be used to reimburse Google for losses related to copyright lawsuits.  *Id.*  The fact that the term sheet for Google potential acquisition of YouTube included an indemnification provision is probative of nothing; indemnification provisions are typically included in merger agreements.  Schapiro Opp. Ex. 296 (162:1-165:17) (generally stating that indemnification provisions are common in merger agreements and that he has seen indemnification provisions for potential copyright liability in a number of merger agreements); Schapiro Opp. Ex. 134 (65:10-66:20) (stating that it is common to have holdback provisions in merger agreements).

**Additional Material Facts:**

Viacom's own merger agreement with Atom Entertainment contained an escrow provision in which a portion of the proceeds of the sale were set aside in the event that certain claims were brought against Viacom after the merger.  Schapiro Opp. Ex. 104 (99:7-105:10).  As Salmi, Atom Entertainment's CEO at the time of the merger and later President, Global Digital Media at Viacom, explained, such provisions are typical in merger agreements, "[l]ike a standard checkbox."  *Id.*

184.  *During negotiations, YouTube pushed for a smaller escrow amount. Hohengarten ¶ 388 & Ex. 354 (Yu Dep.) at 107:4-108:3.*

**Disputed.**  The cited testimony is inadmissible under FRE 411 to the extent it is being offered as evidence of indemnification.  *See* Defendants' Motion to Strike.  As is typical in any type of merger negotiation, the acquirer (Google) wanted to have a larger escrow and the seller (YouTube) wanted to have a smaller escrow.  Schapiro Opp.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Ex. 296 (104:24-108:3); *see also supra*, YouTube's Response to SUF ¶ 183.

**Additional Material Facts:**

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 183.

185.   *The October 9, 2006 Google/YouTube merger agreement included indemnification and escrow provisions providing that 12.5 percent of the consideration Google paid for YouTube would he held in escrow to satisfy legal claims made against YouTube and Google, including copyright infringement claims.   Hohengarten ¶ 335 & Ex. 303, TP000055, at TP000079-80 (¶ 2.9); Hohengarten ¶ 348 & Ex. 314 (Schmidt Dep.) at 65:10-65:23 (testifying that he is "aware of what I'm going to call a holdback . . . that . . . includes areas of copyright" and that the Google board of directors discussed the "holdback" around the time of the acquisition).*

**Disputed.**   First, the Google/YouTube merger agreement is inadmissible under FRE 411 to the extent it is being offered as evidence of indemnification.   *See* Defendants' Motion to Strike. Second, the proposed fact does not accurately describe the cited document.   The merger agreement specified that 12.5% of the Consideration for the merger would be placed in escrow to indemnify Google against a variety of potential damages, including, *inter alia*, inaccuracies in or breaches of representations, warranties and covenants or other provisions of the merger agreement or ancillary documents and copyright lawsuits. Hohengarten Ex. 303.   The merger agreement states that 5% of the escrow amount would be held in reserve for Indemnified Copyright Action.   *Id.*

**Additional Material Facts:**

The provision in the October 9, 2006 merger agreement stating that 5% of the escrow amount would be held in reserve for Indemnified Copyright Action was a scrivener's error that did not reflect the parties' actual agreement and was later corrected by the parties.   The correct amount to be held in escrow for potential copyright lawsuits was consistent with Google's original term sheet:   5% of the Consideration for the merger. Schapiro Opp. Ex. 184 (82:15-92:4); Hohengarten Ex. 295; Hohengarten Ex. 299.

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 183.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

186. *In April 2007, Defendants executed an amendment to the Google/YouTube merger agreement to correct a "scrivener's error"; the correction increased the proportion of the escrowed merger consideration that could be used to cover copyright infringement claims brought against Defendants in connection with the YouTube website. Hohengarten ¶ 331 & Ex. 299, SC 010022, at SC 010023; Hohengarten ¶ 361 & Ex. 327 (Drummond Dep.) at 89:7-92:6; Hohengarten ¶ 333 & Ex. 301, AC007823, at AC007824.*

**Disputed.** First, the Google/YouTube merger agreement is inadmissible under FRE 411. *See* Defendants' Motion to Strike. Second, the proposed fact does not accurately describe the cited document. In April 2007, the parties executed an Amendment to Merger Agreement to correct a scrivener's error in paragraph 9.6(b) of the Amended & Restated Merger Agreement. Honhengarten Ex. 299. The correction replaced the words "recovery of up to 5% of the total number of Escrow Shares" in 9.6(b) with "up to 5% of the Aggregate Share Consideration." *Id.* This correction did not increase the amount of escrow for Indemnified Copyright Action, it simply reflected the actual agreement between the parties that had been incorrectly memorialized. Hohengarten Ex. 295; Schapiro Opp. Ex. 184 (82:15-92:4). The agreement as reflected in the Amendment to Merger Agreement was consistent with Google's original term sheet. Hohengarten Ex. 295.

**Additional Material Facts:**

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 183.

### Defendants' Knowledge and Intent Concerning Infringement on YouTube After Google Acquired YouTube

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

187. *The press release issued by Google announcing the acquisition of YouTube stated: "With Google's technology, advertiser relationships and global reach, YouTube will continue to build on its success as one of the world's most popular services for video entertainment." Hohengarten ¶ 71 & Ex 68, GOO001-03548410, at GOO001-03548410.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

188. *A September 14, 2007 email from Google vice president of content partnerships David Eun to Google sales director Suzie Reider, YouTube's Chief Marketing Officer, Eun stated: "If we think back to last Nov. you are chad [Hurley], your head is spinning and Eric Schmidt, CEO of the most powerful company in the world tells you your only focus is to grow playbacks to 1B/day. . . . that's what you do." Hohengarten ¶ 72 & Ex. 69, GOO001-02021241, at GOO001-02021241; Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 254:11-255:22; Hohengarten ¶ 382 & Ex. 348 (Reider Dep.) at 8:24-12:24.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document, but YouTube disputes that this document is relevant to Viacom's motion. *See* Defendants' Motion to Strike.

**Additional Material Facts:**

The email preceding Eun's response explains: "We've been pushing all these deals by creating scalable partnership approaches to access content in the face of a company-wide goal of 1 BB views/day." As an Internet website, it was always YouTube's goal to increase its user base. Schapiro Opp. Ex. 134 (109:10-110:2).

189. *Google did not apply Google Video's earlier policy of proactively reviewing for copyright infringement to YouTube; instead, Google adopted YouTube's policy of allowing substantially all infringing video to remain freely available on YouTube until a copyright owner could detect it and send a takedown notice. Hohengarten ¶ 393 & Ex. 356 at ¶¶ 14-15 (Declaration of Steve Chen dated January 5, 2007); Hohengarten ¶ 385 & Ex. 351 (Schaffer Dep.) at 183:7-184:3; Hohengarten ¶ 74 & Ex. 71, GOO001-01271624, at GOO001-01271624. See also Hohengarten ¶ 88 & Ex. 85 GOO001-00827503, at GOO001-00827503 ("[T]he general YT policy has shifted to be, 'Never police anything pro-actively, all content reviews should be reactive.'").*

**Disputed.** First, the proposed fact is argumentative and contains an improper and unsupported legal conclusion that videos on YouTube were infringing copyright. Second, the proposed fact misrepresents both Google Video's and YouTube's terms of use and copyright enforcement procedures and is not supported by the cited evidence.

Third, the proposed fact's purported description of Google Video's policies and adoption of YouTube's policies after the acquisition is false. In or about September 2006, before Google acquired YouTube,

90

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Google Video modified the way it implemented its content policies for all terms of use violations, including potential copyright violations. *See supra,* YouTube's Response to SUF ¶ 138. Google Video stopped pre-screening videos under 11 minutes for terms of use violations because it realized that pre-screening was inefficient, ineffective in enforcing Google Video's terms of use and generally resulted in a poor user experience. *Id.* In lieu of continuing its pre-screening practice for videos under 11 minutes, Google Video implemented two different processes for addressing potential terms of use violations: (1) a community flagging feature that would allow users to flag content they deemed inappropriate, such as pornography, violence or hate, so that Google Video could review those videos for policy violations; and (2) an automatic DMCA takedown tool to facilitate copyright owners' ability to quickly take down their own content. *Id.* Google Video had concluded that utilizing the community to identify inappropriate content, like pornography, and partnering with content owners to identify and remove unauthorized content were the most efficient and effective methods for enforcing its content policies. *Id.*

Finally, the statement that YouTube only removed videos in response to takedown notices is also false. YouTube has removed *millions* of videos for copyright reasons that were never the subject of DMCA notices. Defendants' "Highly Confidential" Amended Responses and Objections to Plaintiffs' First Set of Interrogatories, dated January 11, 2010; *see also* Schapiro Opp. Ex. 93 (228:7-232:3). At the time of the acquisition, as Google learned, YouTube had a number of measures in place to deter users from uploading unauthorized copyrighted material and to assist content owners in policing their copyrights. Levine Opening Decl. ¶¶ 5-10, 12, 14, 17-19, 25; Hurley Opening Decl. ¶¶ 20-21; Schapiro Opp. Ex. 205 (160:10-20, 165:13-19); Schapiro Opp. Ex. 206 (175:20-177:19); Schapiro Opp. Ex. 203 (117:10-25); *see also* Schapiro Opp. Ex. 297. And after the acquisition, YouTube continued to devote substantial resources toward developing even better tools to assist content owners in identifying their content on YouTube. *See, e.g.,* King Opening Decl. ¶¶ 2, 3, 14-20, 23-26.

190. *In an October 13, 2006 email to other Google employees, Google Video Product Manager Hunter Walk provided a link to a Colbert Report clip on YouTube. Hohengarten ¶ 75 & Ex. 72 GOO001-03383629, at GOO001-03383629.*

**Disputed.** The cited document does not support the proposed fact that the link is actually to a clip of The Colbert Report.

**Additional Material Facts:**

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Greg Clayman, Executive Vice President of Digital Distribution and Business Development at MTV Networks, sent the same clip to Viacom executives on  October 16, 2006.  Schapiro Opp. Ex. 298.  Viacom has not asserted an infringement claim with respect to this YouTube video. Hohengarten Ex. 2 (Solow Decl. Ex. F & G).  *See also infra*, YouTube's Additional Material Facts in Response to SUF ¶ 130.

191.  *In a March 9, 2007 email to YouTube employees, a Google employee provided a link to a "Funny south park" video on YouTube. Hohengarten ¶ 76 & Ex. 73, GOO001-01364485, at GOO001-01364485.*

**Disputed.**  The cited document does not support the proposed fact that the link is actually a link to a clip of South Park.

**Additional Material Facts:**

*See supra,* YouTube's Additional Material Facts in Response to SUF ¶ 31.

192.  *In a March 15, 2007 instant message conversation YouTube product manager Virginia Wang (IM user name missveeandchip) discussed her attempts to find videos on YouTube to put in a "cute video" category and stated that "it was hard to find anything i thought was vote worthy . . . that we could use . . . since so much of it involves copywritten stuff."  In an email the same day, Wang stated, "we're running into issues finding enough videos because they have so many copyright violations." Hohengarten ¶ 212 & Ex. 200, GOO001-07738864, at 2-3 & at GOO001-07738864; Hohengarten ¶ 199 & Ex. 375, GOO001-06669529, at GOO001-06669529 (noting that missveeandchip is Virginia Wang's IM user name); Hohengarten ¶ 77 & Ex. 74, GOO001-07155101, at GOO001-07155101; Hohengarten ¶ 378 & Ex. 344 (Liu Dep.) at 60:6-61:8 (testifying to Virginia Wang's job description).*

**Undisputed** that the language quoted in the proposed fact appears in the cited document, but YouTube disputes that Hohengarten Ex. 200 is relevant to Viacom's motion**.  *See* Defendants' Motion to Strike.

193.  *In a March 23, 2007 email to other Google employees, a Google employee provided a link to a Daily Show clip on YouTube. Hohengarten ¶ 78 & Ex. 75, GOO001-00217336, at GOO001-00217336.*

**Disputed.**  The cited document does not support the proposed fact that the link is actually a link to a clip of The Daily Show.

**Additional Material Facts:**

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

Viacom employee Jeremy Zweig sent this clip to executive vice president Carl Folta on March 23, 2007. Schapiro Opp. Ex. 299. Viacom has not asserted an infringement claim with respect to this YouTube video. Hohengarten Ex. 2 (Solow Decl. Ex. F & G).

194. *In an April 2, 2007 email, Google employee Matthew Arnold wrote to two other Google employees (Crosby Freeman and Hugh Moore), highlighting a "Daily Show" clip on YouTube. Hohengarten ¶ 80 & Ex. 77, GOO001-05154818, at GOO001-05154818.*

**Disputed.** The cited document does not support the proposed fact that the link is actually a clip of The Daily Show. The clip appears to be commentary about Viacom's lawsuit against YouTube. *See* Schapiro Opp. Ex. 421A/B (NpqgWW0Z7vM).

**Additional Material Facts:**

Viacom has not asserted an infringement claim with respect to this YouTube video. Hohengarten Ex. 2 (Solow Decl. Ex. F & G). Viacom employee Warren Solow expressly requested that this video not be removed from YouTube when it was brought to his attention. Schapiro Opp. Ex. 300.

195. *A draft May 2007 presentation prepared by Shashi Seth, YouTube's head of monetization, and distributed to Google vice president of content partnerships David Eun, YouTube co-founder Chad Hurley, and others, reported that* ▇ *of YouTube searches are directed toward music videos, movies, celebrities, and TV programs, but that only* ▇ *of videos watched by users consisted of authorized professional content. The same presentation stated that "[u]sers are searching for lots of things, but primarily for premium content." Hohengarten ¶ 81 & Ex. 78, GOO001-05943950, at GOO001-05943951-55. Hohengarten ¶ 387 & Ex. 353 (Seth Dep.) at 15:15-17:2 (testifying to Shashi Seth's job title), 157:13-24. See also Hohengarten ¶ 82 & Ex. 79, GOO001-01016844, at GOO001-01016844 (statement from YouTube head of monetization Shashi Seth that based on an analysis of the top search queries on YouTube, "*▇ *fall under entertainment - not surprising."). See also Hohengarten ¶ 83 & Ex. 80, GOO001-00225766, at GOO001-00225767 (analysis by Google executive Alex Ellerson of the top 100 search queries, determining that approximately* ▇ *of the queries were for premium content, and that of the queries for premium content,* ▇ *of those were for "Entertainment TV.").*

**Disputed.** The proposed fact misrepresents the cited evidence and omits material facts. Search queries on YouTube are not reflective of

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

the content that is returned in response to those queries. *See* Schapiro Opp. Ex. 301 (103:12-104:3); Schapiro Opp. Ex. 110 (213:14-214:15; 231:4-235:8). The document cited as Hohengarten Ex. 78 is a draft presentation titled "Partnership Evaluation" and evaluates search queries and views of premium content uploaded by partners or identified by YouTube's CYC program. Shashi Seth explains in his email and deposition testimony that the purpose of the evaluation was to determine what users were searching for—but not finding—on the site, so that YouTube could determine whether to attempt to acquire that content via partnerships. *See* Schapiro Opp. Ex. 301 (138:12-162:18); Schapiro Opp. Ex. 302; *see also* Schapiro Opp. Ex. 110 (231:4-235:8, 257:2-260:20). The document does *not* "report[] that ▮▮ of YouTube searches are directed toward music videos, movies, celebrities, and TV programs, but that only ▮▮ of videos watched by users consisted of authorized professional content." The document states that although ▮▮ of all queries are for "premium content", only ▮▮ of *all content being watched by users* is "premium content."

The other purported evidence cited in support of this proposed fact, Hohengarten Ex. 79 and 80, also relates solely to search queries and does not purport to assess what videos are being watched by users or whether any content identified by such queries is authorized. *See, e.g.*, Hohengarten Ex. 80 ("Our users are absolutely searching for premium content. Now they likely arent [sic] finding much of it, since we havent [sic] licensed the entire world of name-brand, hit content, but they're definitely searching for it.").

196. *An analysis by Google in May 2007 showed that while the average YouTube video was viewed 110 times, videos that had been removed for copyright infringement were viewed an average of 765 times. Hohengarten ¶ 84 & Ex. 81, GOO001-02414976, at GOO001-02414980; Hohengarten ¶ 85 & Ex. 82, GOO001-03241189, at GOO001-03241189; see also id. at GOO001-03241191 (showing that premium content is selected by users as "favorite" content an average of 14.98 times per video, while original user-generated content is selected as "favorite" an average of only 3.67 times); Hohengarten ¶ 387 & Ex. 353 (Seth Dep.) at 143:17-144:23, 146:12-150:18.*

**Disputed.** The proposed fact misrepresents the cited evidence and omits material facts. The report does not purport to discuss videos that had been removed for copyright infringement, it discusses videos removed based on a copyright claim. And the report also did not purport to quantify the view counts for the "average YouTube video"; it quantified the view counts for all YouTube videos. Hohengarten Ex. 81. The survey not only demonstrates: (a) that the number of views of

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

videos subject to purported copyright claims that particular week was small compared to the total number of views on the site (1%) and (b) the actual number of videos subject to purported copyright claims viewed was small compared to the total number of videos viewed (.14%), but also that YouTube was removing allegedly infringing videos.  *Id.*  The other purported evidence cited does not support the proposed fact; it purports to compare the number of times licensed content was favorited by users to the number of times UGC was favorite by users.  Hohengarten Ex. 82.

197.  *In a June 13, 2007 email, YouTube head of monetization Shashi Seth stated that based on his review of the top 10,000 search queries on YouTube: "[C]onsistent with my earlier findings, music video (being searched mostly by artist names . . .) are being searched a lot, as are TV shows, . . . and celebrities. . . . Going down the list of 10k [search terms], it seems that the queries do reflect the popularity of the artists, songs, celebrities . . . Music, TV Shows, Movies, Celebrities, Sports, etc. are definitely our top categories to attack;" Mr. Seth further stated that "Searches do reflect popularity pretty well." Hohengarten ¶ 86 & Ex. 83, GOO001-00747816, at GOO001-00747816.  Hohengarten ¶ 387 & Ex. 353 (Seth Dep.) at 103:12-20.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

**Additional Material Facts:**

Search queries on YouTube are not reflective of the content that is returned in response to those queries.  *See supra*, YouTube's Response to SUF ¶ 195.

198.  *A June 2007 "YouTube Profile Study" showed that 36% of all YouTube users and 59% of users who visit YouTube daily watch "television shows" on YouTube.  Hohengarten ¶ 87 & Ex. 84, GOO001-02201131, at GOO001-02201132.0002 (study index stating that Table 31 is about the "Kind of Video" users "Typically Watch"), GOO001-02201132.0061 (Table 31 page containing percentage totals for YouTube users generally); GOO001-02201132.0062 (Table 31 page containing percentage totals for users who visit YouTube with varying frequencies).*

**Disputed.**    The proposed fact selectively excerpts from and misrepresents the cited evidence.  Viacom submits only a small portion of Hohengarten Ex. 84 to the Court, not the complete document.  *See* Defendants' Motion to Strike.  The complete version of Hohengarten Ex. 84 shows that the majority of all users and the majority of users

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

who visit YouTube daily indicated that they did not prefer to watch professionally produced video and that they did prefer to watch content that "is developed by people like me." Hohengarten Ex. 84 (G-02201132.0002, G-02201131.0081, G-02201131.0089).

199. *In a July 18, 2007 email YouTube employee Julie Havens wrote: "A trend we see is that people upload copyrighted videos to their private videos (which are not reviewed unless flagged), and then invite large numbers of people to view the video which bypasses our copyright restrictions." Hohengarten ¶ 88 & Ex. 85, GOO001-00827503, at GOO001-00827503.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

**Additional Material Facts**:

YouTube restricts private video sharing so that a private video can be shared with a maximum of 25 users. Schapiro Opp. Decl. 303.

200. *A February 19, 2008 Google presentation titled "EMG Deal Review -- YouTube & South Park Studios" stated that based on YouTube search "query data," there was "proven interest on YouTube" for clips of South Park; the presentation further stated that South Park was "the 4th most queried TV show." Hohengarten ¶ 89 & Ex. 86, GOO001-01998134, at GOO001-01998136.*

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

**Additional Material Facts:**

Search queries on YouTube are not reflective of the content that is returned in response to those queries. *See supra*, YouTube's Response to SUF ¶ 195.

*See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 31.

201. *In March 2008, YouTube co-founder Chad Hurley sent an email to Google executives Susan Wojcicki and Google Video Product Manager Hunter Walk stating that "three weeks ago Eric shifted his thinking on YouTube's focus. So, since that time we have rapidly been redirecting our efforts from user growth to monetization." Hohengarten ¶ 73 & Ex. 70, GOO001-01395950, at GOO001-01395950; Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 253:18-254:5.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Undisputed** that the language quoted in the proposed fact appears in the cited document.

202. *A YouTube user survey from April 2008 showed that 63% of users watch music videos on YouTube, 52% of users surveyed watch comedy on YouTube, 26% of users surveyed watch "Full length TV programs" on YouTube, and 21% of users watch "Full length movie[s]" on YouTube. Hohengarten ¶ 90 & Ex. 87, GOO001-00829227, at GOO001-00829229.0002.*

**Disputed.** The proposed fact mischaracterizes the document. The document cited purports to be only a survey of teens in the United Kingdom, not YouTube users generally. The slide referenced does not purport to relate to YouTube; it refers generally to "Type of online video watched." The document does not support the conclusion that the numbers referenced are percentages.

## Defendants' Knowledge and Intent Concerning Infringement on YouTube Through Licensing Negotiations with Viacom

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

203. *From November 2006 until February 2007, Viacom negotiated with Google over a possible "content partnership" agreement under which Viacom would license some of its copyrighted works to appear on YouTube. Hohengarten ¶ 348 & Ex. 314 (Schmidt Dep.) at 173:22-174:23; Hohengarten ¶ 91 & Ex. 88, GOO001-00797774, at GOO001-00797774; Hohengarten ¶ 195 & Ex. 371, GOO001-01529251, at GOO001-01529251; Hohengarten ¶ 201 & Ex. 382, GOO001-08050272, at GOO001-08050272.*

**Disputed.** First, Viacom started developing a plan for negotiating with Google concerning content on YouTube immediately after Google's proposed acquisition of YouTube was announced. Schapiro Opp. Ex. 304. Second, as of November 27, 2006, Viacom was preparing a lawsuit against YouTube and Google. Schapiro Opp. Ex. 305 (176:17-20). Google's negotiations with Viacom are inadmissible under FRE 408. *See* Defendants' Motion to Strike.

**Additional Material Facts:**

97

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

(1) Michael Wolf, Viacom's lead negotiator and COO of MTVN, testified that Google was conducting the negotiations in good faith. Schapiro Opp. Ex. 305 (185:2-10).

(2) Prior to Google's acquisition of YouTube, Viacom was negotiating a licensing deal with YouTube. Those negotiations went back to at least the summer of 2006, when Viacom approached YouTube about a potential partnership. Maxcy Opening Decl. ¶ 8; Schapiro Opening Exs. 6-7; Schapiro Opp. Ex. 197, 198. After initial discussions, on July 24, 2006, YouTube sent a term sheet to Viacom outlining the structure of a potential deal. Schapiro Opp. Ex. 198; *see also* Schapiro Opp. Ex. 199; Schapiro Opp. Ex. 200.

204. *During the negotiations, Viacom made clear that without such a license, the appearance of Viacom works on YouTube was unauthorized. Hohengarten ¶ 270 & Ex. 244, VIA01475465, at VIA01475465-76.*

**Disputed.** First, the evidence cited by Viacom does not support the proposed fact. Hohengarten Ex. 244 is a self-serving letter sent by Viacom to Google after negotiations broke down. It does not even purport to claim that "[d]uring the negotiations, Viacom made clear" that the appearance of Viacom content on YouTube was unauthorized. During the negotiations, Viacom expressly told YouTube not to remove Viacom content from the site. Maxcy Opp. Decl. ¶ 8. Second, Viacom and its authorized marketing agents were posting a wide array of Viacom clips on YouTube for promotional purposes, or affirmatively leaving up Viacom content uploaded by ordinary users, before, during, and after the licensing negotiations. Rubin Decl. ¶¶ 3, 5 (a)-(f), 18; Rubin Ex. 43-68, 86-114; Schapiro Opp. Ex. 305 (132:19-133:24, 193:19-194:11; 200:14-201:18); Schapiro Opening Ex. 55, 57. Finally, Google's negotiations with Viacom are inadmissible under FRE 408. *See* Defendants' Motion to Strike.

205. *Viacom also insisted on compensation for past infringement of its works as part of any license. Hohengarten ¶ 92 & Ex. 89, GOO001-05942431, at GOO001-05942431.*

**Disputed.** The proposed fact is inadmissible under FRE 408. *See* Defendants' Motion to Strike.

206. *Google offered a package that it valued at more than $590 million for a content license from Viacom. Hohengarten ¶ 93 & Ex. 90, GOO001-02057400, at GOO001-02057400.*

**Disputed.** First, the proposed fact misstates and oversimplifies the nature of Google's partnership negotiations with Viacom. The

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

document references an estimated total value to Viacom from the

██████████████████████████████████████

██████████████████████████████████████

██████████████████████  Second, Google's negotiations with Viacom are inadmissible under FRE 408. *See* Defendants' Motion to Strike.

207. *Google's offer and term sheet included an explicit guarantee that Google would use digital fingerprinting technology to prescreen all uploads to YouTube and block any videos from Viacom works not licensed under the agreement. Hohengarten ¶ 271 & Ex. 245, VIA00727696, at VIA00727696; Hohengarten ¶ 94 & Ex. 91, GOO001-00984825, at GOO001-00984837.*

**Disputed.** The proposed fact misrepresents the contents of the term sheet. The term sheet, by its nature, was a proposal, not a final agreement. It did not include an "explicit guarantee". The term sheet does not provide that YouTube would "prescreen all uploads to YouTube" and "block" any videos that were not licensed under the agreement. Rather, it provides that Google would █████████

████████████████████████████████████████

████████████████████████████████████████

████████  Hohengarten Ex. 91. Google's negotiations with Viacom are inadmissible under FRE 408. *See* Defendants' Motion to Strike.

In addition, one of the documents Viacom cites in support of its proposed fact as to *Google's* offer is actually *YouTube's* original offer to Viacom, sent in July 2006. Hohengarten Ex. 245. That offer contemplated the development of an automated system using fingerprinting technology to identify Viacom content on the site. *Id.*

208. *Ultimately negotiations broke down and Defendants never obtained a license from Viacom. Hohengarten ¶ 270 & Ex. 244, VIA01475465, at VIA01475465-76.*

**Disputed.** The evidence cited does not support the statement that "Defendants never obtained a license from Viacom." Pursuant to YouTube's terms of use, when Viacom uploads its content to YouTube, it grants YouTube a license to that content. *See* Levine Ex. 1; *see also* Rubin Opening Decl. ¶¶ 3, 18. In addition, pursuant to clear corporate policies, Viacom deliberately left up content uploaded by ordinary users. *See, e.g.*, Schapiro Opp. Ex. 305 (194:8-11, 199:22-201:2); Schapiro Opp. Ex. 269 (115:6-118:19, 134:19-136:10, 138:25-139:14); Schapiro Opp. Ex. 221 (83:6-84:8); Schapiro Opp. Ex. 131 (205:17-

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

206:2), Schapiro Opening Ex. 54-77; Rubin Decl. ¶ 5(a)-(f), 17; Rubin Exs. 12, 28.   Finally, Google's negotiations with Viacom are inadmissible under FRE 408.  *See* Defendants' Motion to Strike.

209.   *After the parties' license negotiations ended in impasse, Viacom's General Counsel, Michael Fricklas, wrote Google on February 2, 2007, pressing Defendants to use fingerprinting technology to prevent infringement of Viacom's works, and offering to have Viacom technology experts cooperate with Defendants as needed to that end.  Hohengarten ¶ 270 & Ex. 244, VIA01475465, at VIA01475465-76.*

**Disputed.**  The proposed fact calls for a legal conclusion to the extent it refers to the "infringement of Viacom's works."  The proposed fact also mischaracterizes the cited evidence.  Fricklas concluded his letter by stating that he believed it would be beneficial for "our companies to collaborate" concerning fingerprinting technology.

**Additional Material Facts:**

*See infra*, YouTube's Response to SUF ¶ 213.

210.   *On February 2, 2007, Viacom issued a request to YouTube to remove over 100,000 videos from the YouTube website.  Hohengarten ¶ 270 & Ex. 244, VIA01475465, at VIA01475465.*

**Undisputed** that Viacom sent a take down request for approximately 100,000 videos.

**Additional Material Fact:**

(1)   In its effort to reach 100,000 takedowns, Viacom had BayTSP search YouTube for music artists, seeking music videos.  Schapiro Opp. Ex. 275; Schapiro Opp. Ex. 278; Schapiro Opp. Ex. 306; Schapiro Opp. Ex. 310; Schapiro Opp. Ex. 313.

(2)   Viacom added to its 100,000 takedown list tens of thousands of videos found from artist searches.  Schapiro Opp. Ex. 306.

(3)   The sole basis for Viacom's request to take down the music videos was the presence of an Viacom "bug", or logo (such as MTV, VH1, BET) superimposed on the video.  Schapiro Opp. Ex. 306; Schapiro Opp. Ex. 221 (229:19-233:18).

(4)   On February 2, 2007, Viacom sent takedown notices to YouTube for tens of thousands of videos over which it had no copyright claim.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Schapiro Opp. Ex. 221 (229:19-233:18); Schapiro Opp. Ex. 306; Schaffer Opening Decl. ¶¶ 17-18; Schapiro Opp. Ex. 316.

211.  *On February 2, 2007, after Viacom requested that Defendants remove over 100,000 videos from the YouTube website, Chris Maxcy stated that he would provide Viacom with access to a new search tool that was "still in alpha" to assist Viacom in taking down content from the YouTube website.  Hohengarten ¶ 192 & Ex. 189, GOO001-00746412, at GOO001-00746412.*

      **Disputed.**  Maxcy offered to get Viacom "set up" on the tool and said that "[i]f we get going quickly Viacom would be the first to use the tool (still in alpha)."  The tool being referenced by Maxcy was not yet operational.  King Opp. Decl. ¶ 7.

212.  *On February 2, 2007, Maxcy agreed to speak to a technical team at Viacom about the new takedown tool by phone on February 5, 2007. Hohengarten ¶ 273 & Ex. 383, VIA17716283, at VIA17716284-85.*

      **Disputed.**  The evidence cited does not support the proposition that Maxcy agreed to speak to Viacom's technical team.

213.  *On February 5, 2007, Maxcy cancelled the scheduled conference call with Viacom's technical team and informed Adam Cahan that Defendants would not provide Viacom with access to the new takedown tool without a content partnership deal.  Hohengarten ¶ 273 & Ex. 383, VIA17716283, at VIA17716283.*

      **Disputed.**  The email cited does not support the proposition that Maxcy informed Cahan that YouTube would not provide Viacom with access to the new takedown tool without a content partnership deal. Cahan's own emails show that he had not even spoken to Maxcy at the time he sent the email in Hohengarten Ex. 383.  On February 5, 2007 at 22:19:34, Cahan responded to an email from Lana Areton asking if Chris Maxcy had gotten in touch with Cahan by responding, "Nope." Schapiro Opp. Ex. 307.  Immediately thereafter, at 22:19:41, Cahan wrote an email to Maxcy stating, "Pretty urgent that we get on the phone to discuss your proposed solution.  Have a very large team that is waiting on our end."  Schapiro Opp. Ex. 308.  Less than two minutes later, at 22:21:22, Cahan wrote the email referenced by Viacom at Hohengarten Ex. 383.

      In addition, YouTube never told Viacom that it would only provide access to its fingerprinting tools in connection with a content-partnership deal.  Google's General Counsel, Kent Walker, explicitly told Viacom's General Counsel that Google was "open to discussing

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

[Viacom's] possible participation" in Google's testing of its nascent fingerprinting tools. Schapiro Opp. Ex. 142. And YouTube decided to offer Viacom the soon-to-be-released audio fingerprinting tool because it believed that Viacom should be the very first company to use the tool, which would send a powerful message that YouTube took Viacom's concerns seriously and that did not want Viacom content on YouTube if Viacom itself did not want it there. *See* Maxcy Opp. Decl. ¶ 9. That offer was made on February 2, 2007. *Id.* at ¶ 10. However, shortly thereafter Viacom issued a massive takedown request for approximately 100,000 clips, which requested the removal of many clips that were not owned by Viacom. That included music videos that had supposedly aired on MTV where Viacom did not own the rights to the audio tracks. *Id.* at ¶ 11; *see also* Schaffer Opening Decl. ¶¶ 15-19. This was a source of concern for YouTube, because if Viacom used the audio fingerprinting tool to automatically block any YouTube video containing the audio track from a music video, that would prevent YouTube's music label partners from distributing their content on YouTube and would prevent users from uploading videos they had every right to share. Maxcy Opp. Decl. ¶ 11. YouTube concluded that it would need to develop additional protocols to ensure that content owners would use its audio fingerprinting tools to block only materials that they actually owned. *Id.* As a result, YouTube decided to postpone the meeting with Viacom. *Id.* at ¶ 12. But YouTube's offer to Viacom to have Viacom use its audio fingerprinting tool never closed and Viacom never followed up with YouTube to continue those discussions. *Id.* at ¶ 13.

214. *On February 6, 2007, instead of providing Viacom with access to the new takedown tool, Maxcy provided Viacom with access to YouTube's Content Verification Program, a system that had been in place for nearly a year and allowed content owners to check boxes to designate individual videos for take down. Hohengarten ¶ 95 & Ex. 92, GOO001-00746418, at GOO001-00746418. Hohengarten ¶ 96 & Ex. 93, GOO001-00751570, at GOO001-00751570. Hohengarten ¶ 97 & Ex. 94, GOO001-00869300, at GOO001-00869300. See also Hohengarten ¶ 394 & Ex. 357 (Declaration of Zahavah Levine dated January 5, 2007) at ¶ 14. See also Hohengarten ¶ 309 & Ex. 281 (YouTube page entitled "Content Verification Program"). See also Hohengarten ¶ 310 & Ex. 282 (YouTube "Copyright Infringement Notification" page linked to from YouTube "Content Verification Program" page as "instructions" for submitting "removal requests" through YouTube's Content Verification Program).*

**Disputed.** YouTube did not offer CVP "instead of the new takedown tool". The email cited simply reflects YouTube's response to Viacom's

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

specific request for access to CVP; it does not indicate that CVP was being offered "instead" of some other alternative.  Maxcy Opp. Decl. ¶ 13; s*ee also supra*, YouTube's Response to SUF ¶ 213.

215.  *The Content Verification Program is separate from Google's audio and video fingerprinting tools and does not include access to those tools. Hohengarten ¶ 394 & Ex. 357 (Declaration of Zahavah Levine dated January 5, 2007) at ¶ 14 ("We have even created a content verification program . . . that enables content owners to search for their content on the site.  The tool allows content owners to easily notify us that they wish specific content to be removed simply by checking a box."); Hohengarten ¶ 318 & Ex. 388 (YouTube page entitled "YouTube Content ID System") (distinguishing "content verification program" from "audio ID" and "video ID"); Hohengarten ¶ 309 & Ex. 281 (YouTube page entitled "Content Verification Program") (describing content verification program); Hohengarten ¶ 147 & Ex. 144 GOO001-01511226, at GOO001-01511226.*

**Disputed.**  The documents cited to do not support the proposed fact. Hohengarten Ex. 388 accurately shows that YouTube's Content ID system includes both CVP and audio and video fingerprinting.

216.  *In a February 15, 2007 email, Google vice president of content partnerships David Eun stated that YouTube's "CYC tools," including an "Audio fingerprinting system whereby the content partner can send 'reference fingerprints' to Audible Magic's database," "are now live as well and are only offered to partners who enter into a revenue deal with us."  Hohengarten ¶ 147 & Ex. 144, GOO001-01511226, at GOO001-01511226.*

**Disputed.**  The proposed fact is misleading and omits material facts. There is no evidence to support Viacom's contention that Eun made these statements.  The email includes angle brackets indicating that the text came from another source.  It was never Google's policy to make fingerprinting available only to content owners who entered into revenue deals with Google.  King Opening Decl. ¶ 9; Schapiro Opp. Ex. 134 (140:20-142:25); Schapiro Opp. Ex. 83 (268:10-14); Schapiro Opp. Ex. 110 (171:22-179:19); *see also* Maxcy Opp. Decl. 7.  Indeed, multiple content owners used Audible Magic solely to block content on YouTube without any content-partnership deal.  *See* Schapiro Opp. Ex. 133 (51:14-53:10, 183:20-185:3, 186:8-17); Schapiro Opp. Ex. 132 (49:14-50:18, 83:5-16); King Opening Decl. ¶ 10.

217.  *In a February 16, 2007 email, Google Vice President and General Counsel Kent Walker informed Viacom General Counsel Michael*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*Fricklas and NBC General Counsel Rick Cotton that although YouTube was responding to takedown notices and had implemented "automated filtering" in the form of "a unique hash" that "block[s] any attempt to re-upload [] identical video files," YouTube had agreed to provide "audio fingerprinting technology services" only to a "handful of partners," and would not provide audio fingerprinting to Viacom or NBC. Hohengarten ¶ 201 & Ex. 382, GOO001-08050272, GOO001-08050272; Hohengarten ¶ 371 & Ex. 337 (K. Walker Dep.) at 8:2-9:23 (testifying to Kent Walker's job title).*

**Disputed.**  The proposed fact misrepresents the cited email.  Walker does not state that YouTube would only provide fingerprinting to a handful or partners, nor does he refuse to provide audio fingerprinting to either Viacom or NBC.  The letter states the exact opposite.  Walker explained that YouTube was working with a handful of partners to develop, test and launch audio fingerprinting, and explicitly stated that Google was "open to discussing [Viacom's] possible participation" in Google's testing of its nascent fingerprinting tools.  *Id.*

218.  *Instead of agreeing to provide Viacom and NBC with audio fingerprinting, Walker instead offered to speak with Viacom and NBC about possibly providing them with access to a "metadata search tool" that enables users to "define search terms via XML feeds and automatically and regularly receive search results matching the defined search terms."  Hohengarten ¶ 201 & Ex. 382, GOO001-08050272, at GOO001-08050272.*

**Disputed.**  The proposed fact misrepresents the cited email and omits material facts.  *See supra*, YouTube's Responses to SUF ¶¶ 213-14, 216-17.

219.  *On June 28, 2007 Donald Verrilli, then a partner at Jenner & Block, counsel for Viacom, sent a letter to Mark Ouweleen of Bartlit Beck Herman Palenchar & Scott LLP and David Kramer of Wilson Sonsini Goodrich & Rosati, counsel for Defendants.  The letter highlighted ongoing infringement on YouTube of many Viacom works, reiterated that Viacom had not authorized the upload of these works to YouTube, and demanded their removal.  Hohengarten ¶ 406 & Ex. 369 (2007-06-28 Verrilli to Ouweleen and Kramer) at 1-2.*

**Disputed.**  The proposed fact calls for a legal conclusion to the extent it refers to "ongoing infringement on YouTube."  The cited letter also is irrelevant hearsay.  *See* Defendants' Motion to Strike.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

220. *On June 29, 2007 Mark Ouweleen responded to Donald Verrilli's June 28, 2007 letter. In his response Ouweleen represented that YouTube would not use a list of Viacom works to locate future infringing videos on YouTube and stated: "If in the future someone posts a video Paramount claims to infringe a copyright on one of those movies, and Paramount would like it removed, Paramount can use the Content Verification Program tools or send a DMCA takedown notice." The letter did not offer Viacom access to any digital fingerprinting technology or any YouTube-provided tool other than the Content Verification Program tool. Hohengarten ¶ 407 & Ex. 370 (2007-06-29 Ouweleen to Verrilli) at 1-2.*

**Disputed.** The proposed fact selectively excerpts from the cited letter and is misleading. Ouweleen points out that: (1) Verrilli's June 28, 2007 letter did not substantially comply with the requirements for takedown notices under the DMCA; (2) all of the videos referenced in Verrilli's June 28, 2007 letter had been removed *before* Verrilli sent his letter; and (3) the expeditious takedown of those videos was made possible by the Content Verification Program that YouTube developed and made available to Viacom and its agents.

In addition, the letter to which Ouweleen is responding did not request access to or otherwise raise the issue of fingerprinting. There was no reason for Ouweleen to discuss fingerprinting in his letter. YouTube had already made its audio fingerprinting technology available to Viacom, and was in frequent communications with Viacom about its efforts to develop and implement fingerprinting technologies and Viacom's potential involvement. *See* YouTube's Responses to SUF ¶¶ 213-14, 216; Schapiro Opp. Ex. 133 (59:3-21); Schapiro Opp. Ex. 145 (66:1-71:22); Schapiro Opp. Ex. 146 (222:14-223:16).

221. *On February 20, 2008, Google executed an agreement with Viacom under which Google was, for the first time, obligated to implement digital fingerprinting to protect against infringement of Viacom's copyrighted works on YouTube. Hohengarten ¶ 98 & Ex. 95, GOO001-02244041, at GOO001-02244041.*

**Disputed**. First, the proposed fact calls for a legal conclusion to the extent it refers to the "infringement of Viacom's copyrighted works on YouTube." Second, the proposed fact is misleading and is not supported by the cited evidence. YouTube first offered to make its nascent fingerprinting tools available to Viacom in February 2007. *See supra*, YouTube's Responses to SUF ¶¶ 213-14, 216-17.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

YouTube's proprietary Content ID system was launched in October 2007.  At that time, Content ID was open for Viacom to use, free of charge.  King Opp. Decl. ¶ 6.  On October 15, 2007, YouTube wrote to Viacom to confirm that Content ID was operational and invited Viacom to start using it:

> Our updated Video ID system has been running on live YouTube uploads for 2 weeks now.  If you would like to use the actual Video ID system that is now operational, your Technical Account Manager can supply the necessary contract.  We at YouTube would like to thank you for your participation and look forward to having you use the live Video ID system.

King Opp. Decl. Ex. 8.

In or about February 2008, Google and Viacom entered into an agreement governing Viacom's use of the Content ID system.  The agreement provides that, after Viacom provided reference files to Google, Google would use its proprietary fingerprinting system to "compare all videos uploaded to YouTube, including all videos designated as 'private,' . . . and apply the Usage Policies assigned by the Rights Owner to any matches."  Hohengarten Ex. 95.

222.   *Defendants did not implement digital fingerprinting to prevent the infringement of Viacom's copyrighted works on the YouTube website until May 2008.  Hohengarten ¶ 3 & Ex. 2 (Solow Decl. ¶¶ 29).*

**Disputed.**  First, the proposed fact calls for a legal conclusion to the extent it refers to "infringement of Viacom's copyrighted works on the YouTube website."  Second, the evidence cited does not support the proposed fact.  The single statement in the Solow Declaration offered in support of the proposed fact is an unsupported legal conclusion.  *See* Defendants' Motion to Strike.  Third, Content ID was available to Viacom in October 2007 when it launched.  *See supra*, YouTube's Response to SUF ¶ 221.  Viacom did not sign the Content Identification Management Agreement until February 2008.  *Id.* Viacom did not provide the necessary reference samples to YouTube until May 2008.  King Opp. Decl. ¶ 9.

**Additional Material Facts:**

Even after Viacom started providing reference fingerprints to YouTube in connection with Content ID, Viacom did not provide YouTube with references associated with many of Viacom's works in suit.  Schapiro Opp. Ex. 147 (77:12-16, 79:3-82:21); Schapiro Opp. Ex. 136 (184:21-185:11).

106

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

## Defendants' Knowledge and Intent Concerning Infringement on YouTube Through Discussions with the Motion Picture Association of America

**Disputed.**  Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken.  *See* Local Rule 56.1.  YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

223.  *Beginning in April 2006, the Motion Picture Association of America ("MPAA"), an organization that advocates for all movie studios, including Paramount Pictures Corporation, engaged in negotiations with YouTube in order to obtain YouTube's cooperation in preventing infringement of the copyrighted works of the MPAA's members, including Paramount.  Hohengarten ¶ 367 & Ex. 333 (Garfield Dep.) at 14:14-15:4, 15:10-12 ("there was a lot of copyrighted content on the site that was owned or controlled by the motion picture studios"); Hohengarten ¶ 383 & Ex. 349 (Robinson Dep.) at 23:12-24:10 (testifying that the MPAA represents movie studios, including Paramount).*

**Disputed.**  First, the proposed fact calls for a legal conclusion to the extent it refers to "preventing infringement of the copyrighted works of the MPAA's members, including Paramount."  Second, the testimony of Dean Garfield should be stricken in its entirety.  The MPAA, in consultation with Viacom, refused to seat a witness for deposition on the following topic: "Your communications with YouTube regarding online copyright protection."  Schapiro Opp. Ex. 375 (1/10/2010 Rule 30(b)(6) Deposition Notice, Topic No. 11); *see* Defendants' Motion to Strike.  The MPAA does not advocate "for all movie studios," but rather acts as an agent for six leading motion picture companies, including Viacom-owned Paramount Pictures.  Schapiro Opp. Ex. 162 (72:24-74:18).  Third, Viacom's characterization of the discussions between YouTube and the MPAA is inaccurate and argumentative. YouTube engaged in collaborate discussions, not negotiations, with the MPAA about copyright protection.  Schapiro Opp. Ex. 153 (MPAA to YouTube on April 12, 2006: "I also enjoyed our conversation"); Schapiro Opp. Ex. 154 (MPAA to YouTube on April 20, 2006: "thanks for arranging today's call.  We appreciate your willingness to work together to address the issues we discussed"); Schapiro Opp. Ex. 151 (MPAA to Audible Magic on May 8, 2006: "I did talk with [YouTube] and it went very well."); Schapiro Opp. Ex. 155 (MPAA to YouTube on July 27, 2006: "I would like to pick up our discussion and learn more about where YouTube is headed.").

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

224. *The MPAA was represented in the negotiations by its Executive Vice President and Chief Strategic Officer. Hohengarten ¶ 367 & Ex. 333 (Garfield Dep.) at 13:16-15:4.*

**Disputed.** The testimony of Dean Garfield should be stricken in its entirety. *See* YouTube's Response to SUF ¶ 223. YouTube engaged in collaborate discussions, not negotiations, with the MPAA about copyright protection. *See supra*, YouTube's Response to SUF ¶ 223.

225. *The negotiations between the MPAA and YouTube were about encouraging YouTube to remove infringing content belonging to MPAA members, and "relatedly integrating filtering software that would address that copyrighted content." Hohengarten ¶ 367 & Ex. 333 (Garfield Dep.) at 14:19-15:4 ("The discussion was about encouraging YouTube to do two things: deal with the content that we identified on the site that was copyrighted, infringement content from the motion picture studios; and two, and relatedly integrating filtering software that would address that copyrighted content").*

**Disputed.** First, the proposed fact calls for a legal conclusion to the extent it refers to "infringing content." Second, the testimony of Dean Garfield should be stricken in its entirety. *See* YouTube's Response to SUF ¶ 223. Third, YouTube engaged in collaborate discussions, not negotiations, with the MPAA about copyright protection. *See supra*, YouTube's Response to SUF ¶ 223. Finally, with respect to filtering technologies, YouTube's discussions with the MPAA included efforts to work together to test the viability of Audible Magic's technology. Schapiro Opp. Ex. 156; Schapiro Opp. Ex. 157; Schapiro Opp. Ex. 158; Schapiro Opp. Ex. 159; Schapiro Opp. Ex. 160; Schapiro Opp. Ex. 161.

226. *After months of discussions, YouTube informed the MPAA that it refused to work with the MPAA to utilize or even test digital fingerprinting and filtering technologies because the rampant piracy on YouTube was acting as a "major lure" for YouTube's users, drawing them to the site. Hohengarten ¶ 367 & Ex. 333 (Garfield Dep.) at 28:2-30:3, 53:4-7 ("for those companies who were not and did not develop a licensing agreement with Google, they weren't going to be doing this sort of a pilot initiative or filtering").*

**Disputed.** First, the testimony of Dean Garfield should be stricken in its entirety. *See* YouTube's Response to SUF ¶ 223. Second, the cited testimony does not support that there was "rampant piracy" on YouTube. Third, Garfield's testimony is inadmissible hearsay. *See* Defendants' Motion to Strike. Garfield's claim that someone at YouTube told him that "the copyrighted content on YouTube was a

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

major lure for their users," lacks any reliability because Garfield could not identify: (1) the person who made the statement; (2) whether the speaker was a man or a woman; (3) when the statement was made; (4) whether the statement was made before or after the Google acquisition; or (5) where he was when the statement was made. Schapiro Opp. Ex. 162 (122:25-126:20; 128:3-19).  In addition, there is not a single written communication between YouTube and the MPAA—which otherwise cover every aspect of the discussions between YouTube and the MPAA—that memorializes this supposed statement. *Id.* at 127:15-25.

Finally, Garfield's claim that YouTube "refused to work with the MPAA to utilize or even test digital fingerprinting and filtering technologies" is false based on his own words.  On January 31, 2007, Garfield wrote to Viacom's General Counsel:

> We recently contacted YouTube to pick up our file-removal and filtering discussion where we left off last year. YouTube's position has not changed.  They are willing to move forward with a pilot that would involve YouTube using a list of 1,000 titles to (a) remove any content that we identify as being unlicensed, and (b) using the hash from those titles to create a "blacklist" of files that will not be permitted onto the system in the future.
>
> In addition to removing motion picture and television shows based on a title list and then blacklisting those files, YouTube is willing to prevent the posting of content that is registered with Audible Magic.  YouTube has an agreement with Audible Magic.  Thus, the extent your content is registered with Audible Magic, YouTube will include those registered fingerprints in a directory that is checked before any materials are posted.

Schapiro Opp. Ex. 163.

227. *After Google's acquisition of YouTube was announced, on October 13, 2006, the MPAA sent a written proposal to Defendants calling for cooperation and testing of filtering technologies, including the technology of a company called Audible Magic; the MPAA agreed to pay for the test.  Hohengarten ¶ 341 & Ex. 307, MPAA012777, at MPAA012777; Hohengarten ¶ 367 & Ex. 333 (Garfield Dep.) at 32:15-34:2*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

**Disputed.**  First, the testimony of Dean Garfield should be stricken in its entirety.  *See* YouTube's Response to SUF ¶ 223.  Second, the cited evidence provides no support for the proposition that the MPAA agreed to pay for a test of Audible Magic's technology.  Third, the written proposal sent by the MPAA on October 13, 2006 was a response to Chris Maxcy's message of September 25, 2006 stating, "[w]e are very close to getting our fingerprinting systems licensed and wanted to take you up on your offer to do some testing for your members."  Schapiro Opp. Ex. 156.  Maxcy's message was sent to the MPAA prior to Google's acquisition of YouTube.  *Id.*

228.  *On November 9, 2006, the MPAA transmitted another written proposal to Defendants calling for cooperation and testing of filtering technologies, including Audible Magic technology; the MPAA again agreed to pay for the test.  Hohengarten ¶ 342 & Ex. 308, MPAA012806, at MPAA012806; Hohengarten ¶ 367 & Ex. 333 (Garfield Dep.) at 41:14-46:25.*

**Disputed.**  The testimony of Dean Garfield should be stricken in its entirety.  *See* YouTube's Response to SUF ¶ 223.  The cited evidence also provides no support for the proposition that the MPAA agreed to pay for a test of Audible Magic's technology.  *See also* YouTube's Responses to SUF ¶¶ 223, 225-26.

229.  *Google did not respond to the MPAA's proposal until early 2007, when Google rejected cooperation with the MPAA and its member studios, and rejected the deployment of filtering to prevent the uploading of the studios' works in the absence of the studios executing a licensing and revenue sharing agreements with Google.  Hohengarten ¶ 367 & Ex. 333 (Garfield Dep.) at 52:7-53:7.*

**Disputed.**  First, the testimony of Dean Garfield should be stricken in its entirety.  *See* YouTube's Response to SUF ¶ 223.  Second, the testimony from Garfield is false.  As Garfield told Viacom's General Counsel on January 31, 2007, YouTube was "willing to more forward with a pilot" and  "willing to prevent the posting of content that is registered with Audible Magic"  Schapiro Opp. Ex. 163; *See also* YouTube's Responses to SUF ¶¶ 223, 225-26.

**Additional Material Facts:**

YouTube's policy was to make its fingerprinting tools available to all content owners, even without a content partnership agreement.  *See supra,* YouTube's Response to SUF ¶ 216.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

## IV.   DEFENDANTS' DIRECT FINANCIAL BENEFIT FROM INFRINGEMENT

### Building Up YouTube's User Base Through the Popularity of Infringing Content

**Disputed.**  Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken.  *See* Local Rule 56.1.  YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

230.   *A draft 2007 strategy document from Google's company wide monetization team noted that "pornographic and copyright infringed content" were "among the primary drivers of YouTube traffic"; the document further noted that "[b]y developing and [sic] audience following the users first, YouTube has created advertiser and monetization value."  Hohengarten ¶ 107 & Ex. 104, GOO001-00330654, at GOO001-00330658.*

**Disputed.**  This proposed fact selectively excerpts from and therefore misrepresents the cited evidence.  The document is not from 2007; it is dated October 11, 2006, before Google's acquisition of YouTube.  Viacom pulls quotes from the cited document out of context and presents them in the opposite order to which they appear in the document.  The document states, "[w]e recognize and support the Google-like drive toward end-user benefit first, and monetization only indirectly second.  By developing and [sic] audience following the users first, YouTube has created advertiser and monetization value, as evidenced by their recent large media company deals."  The full quote regarding the pornographic and copyrighted content is, "[c]hallenges from both a business model perspective and a legal liability perspective in terms of pornographic and copyright infringed content as among the primary drivers of YouTube traffic."   The document also states, "community/UGC is critical and should be pursued and supported on multiple fronts."   In addition, the cited evidence is irrelevant to Viacom's motion, lacks foundation and contains an improper lay opinion regarding "copyright infringed content."   *See* Defendants' Motion to Strike.  *See also* YouTube's Response to SUF ¶¶ 142, 144-45, 148, 150-51, 153, 155-56, 157-58.

231.   *In a draft July 2006 presentation, YouTube co-founder Chad Hurley stated that YouTube "provide[s] the best experience on the Internet for both user-generated and professional content," and he described*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*YouTube's growth in terms of the growth in the number of videos being watched every day, the number of unique users on YouTube, and the "amount of time each of the 20M users spends daily on YouTube." Hohengarten ¶ 108 & Ex. 105, GOO001-05164894, at GOO001-05164894.*

**Disputed** to the extent there is no evidence that YouTube co-founder Chad Hurley drafted this presentation. *See* Schapiro Opp. Ex. 311 (presentation was drafted and edited by others). YouTube does not dispute that the cited document includes the language quoted in the proposed fact.

232. *Wendy Chang, a Google finance manager, stated in her deposition that "Advertisers want eyeballs. . . . so you can't make money from the advertisers unless you have the users, and you're only going to have -- have users if you have the right content." Hohengarten ¶ 354 & Ex. 320 (Chang Dep.) at 7:18-10:3 (testifying to Wendy Chang's job title), 134:3-7.*

**Disputed.** Viacom selectively excerpts from and therefore misrepresents the cited evidence. In the cited portion of her deposition, Ms. Chang stated: "The way I always think about it is you have to have users, you have to have advertisers, and you have to have your partners. Users want to see content on the site whether it may be in the form of premium content or whether it may be in the form of user-generated content. Advertisers want eyeballs, and content providers want to make money. So you can't make money from the advertisers unless you have the users, and you're only going to have -- have users if you have the right content, so I would say all of it is an equal." Schapiro Opp. Ex. 291 (133:22-134:8). The cited evidence also is not relevant to Viacom's motion. *See* Defendants' Motion to Strike.

233. *In notes from a meeting that occurred on October 12, 2006, Google executive Susan Wojcicki stated: "Interesting lesson from YouTube and Google Print, we always need to be able to rely on DMCA . . . Focus on the users and get the traffic. . . . Be comprehensive: index everything . . . YouTube as well--opt out, DMCA afterward for takedown . . . Then you have audience, and monetization will follow." Hohengarten ¶ 109 & Ex. 106, GOO001-00330681, at GOO001-00330682.*

**Disputed.** Viacom selectively excerpts from and misrepresents the cited evidence. The cited document is described as notes purporting to describe what was said by others at a meeting. According to the notes, the focus of the meeting was on Google sites, rather than YouTube. The cited document also states, "Importance of community/UGC that

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

traditional media companies do not have." In addition, the cited evidence is hearsay, lacks foundation and is not relevant to Viacom's motion. *See* Defendants' Motion to Strike.

234. *In her deposition, Google finance manager Wendy Chang agreed with the statement that "Then you have an audience and monetization will follow," adding that the three core elements of YouTube's business model are "the audience, the content, and the monetization." Hohengarten Decl. ¶ 354 & Ex. 320 (Chang Dep.) at 138:15-139:12.*

**Disputed** to the extent that Ms. Chang did not describe "the audience, the content, and the monetization" as the three core elements of YouTube's business model. *See* Hohengarten Ex. 320. The cited evidence also is irrelevant to Viacom's motion. *See* Defendants' Motion to Strike.

**Additional Material Facts:**

(1) YouTube had no reason to believe any particular watch page on which an ad may have appeared was displaying a video that was not properly authorized to be on YouTube. Reider Opening Decl. ¶ 10.

(2) YouTube does not serve ads against videos of unknown authorization. Schapiro Opp. Ex. 291 (103:21-104:1).

235. *By October 2006, when Google's board of directors approved the acquisition of YouTube, the number of video views per month on YouTube had grown to 180 million. Hohengarten ¶ 324 & Ex. 293, CSSU 003560, at CSSU 003565-66.*

**Disputed.** The cited document states that YouTube was receiving 180 million video views per day, not per month, in October 2006. This fact also relies on evidence that is irrelevant, unauthenticated and inadmissible hearsay. *See* Defendants' Motion to Strike.

**Monetizing YouTube's User Base Through Advertising**

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

236. *In his deposition, YouTube director of finance Brent Hurley stated that YouTube's "primary" business model was an advertising based business*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*model and that the goal of such a business model is: "you get traffic, people come to you, the site, and then you can insert ads onto those pages and -- and earn revenue from those ads." Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 53:4-56:4.*

**Disputed.**    The proposed fact selectively excerpts from and therefore misrepresents the cited evidence.  In the cited excerpt, Mr. Hurley was testifying that an advertising business model was the primary possibility for YouTube at its inception.  Hurley also states that YouTube's primary focus was on the user experience.  In addition, the cited evidence is not relevant to Viacom's motion.  *See* Defendants' Motion to Strike.

237.   *As a result of Google's acquisition of YouTube, YouTube director of finance Brent Hurley received Google shares worth approximately $10.74 million.  Hohengarten ¶ 400 & Ex. 363 (Google Inc., S-3ASR Registration Statement (February 7, 2007)) at 5 (page numbers at bottom center) (showing 22,334 shares issued to Brent Hurley); Hohengarten ¶ 306 & Ex. 278 (screenshot of Google's finance webpage showing that the high price for Google shares on November 13, 2006 was $481.03).*

**Disputed.**  *See supra*, YouTube's Response to SUF ¶ 19.  The cited evidence is also not relevant to Viacom's motion.  *See* Defendants' Motion to Strike.

238.   *In a January 5, 2007 declaration, YouTube co-founder Steve Chen stated that "YouTube earns revenue through the display of banner advertising on pages throughout our website.  At various times, ads have appeared, for example, on our homepage, on pages displaying thumbnail images of clips responsive to users' search queries, on pages displaying the most popular (or highest rated) clips for the day, and on 'watch pages.'"  Hohengarten ¶ 393 & Ex. 356 (Declaration of Steve Chen dated January 5, 2007) at ¶ 19.*

**Undisputed.**

239.   *In December 2005, YouTube began earning advertising revenue from banner advertisements displayed across the YouTube website. Hohengarten ¶ 110 & Ex. 107, GOO001-00633965, at GOO001-00633965; Hohengarten ¶ 111 & Ex. 108, GOO001-05920388, at GOO001-05920388-89.*

**Disputed**.  The cited evidence does not support the proposed fact. Banner ads were not displayed "across the YouTube website" beginning in December 2005, and nothing in Hohengarten Exhibits

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

107 and 108 suggests that.   In December 2005, YouTube was not displaying banner ads on watch pages.  *See* Schapiro Opp. Ex. 312 (YouTube's Supplemental Response to Plaintiffs' Second Set of Interrogatories, No. 1).

240.   *Google's 2007 Annual Report stated "We recognize as revenue the fees charged advertisers each time an ad is displayed on the YouTube site." Hohengarten ¶ 315 & Ex. 287 (Google 2007 Annual Report) at 40.*

**Undisputed** that the cited document includes the language quoted in the proposed fact**.**

241.   *From early 2006 until January 2007, advertisements appeared on the "watch page" on YouTube for substantially all videos.  Hohengarten ¶ 382 & Ex. 348 (Reider Dep.) at 50:23-53:5; 54:24-25; Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 226:5-14; Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 151:1-23; Hohengarten ¶ 112 & Ex. 109, GOO001-00763354, at GOO001-00763364-76; Hohengarten ¶ 387 & Ex. 353 (Seth Dep.) at 25:18-26:15; Hohengarten ¶ 111 & Ex. 108, GOO001-05920388, at GOO001-05920388-89; Hohengarten ¶ 398 & Ex. 361 (Defendants' Reponses and Objections to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 1) at 7.*

**Disputed.**     Advertisements   appeared   on   watch   pages   from approximately April 2006 to January 2007. *See* Schapiro Opp. Ex. 312 (YouTube's Supplemental Response to Plaintiffs' Second Set of Interogatories, No. 1).   The cited evidence does not support the proposed fact that ads appeared on watch pages for "substantially all videos" during the referenced time period in that advertisements may not have been available for each view of a watch page.   *See* Hohengarten Ex. 112 (GOO001-02338182).

242.   *The "watch page" is the page on the YouTube website where a user views a video.   Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 113:25-114:6.*

**Undisputed.**

243.   *In an October 7, 2006 email from YouTube director of finance Brent Hurley to Google executive Sean Dempsey and Credit Suisse managing director Storm Duncan, Brent Hurley stated "Yes, we are running ROS ads on both the search, watch and browse pages." Hohengarten ¶ 113 & Ex. 110, GOO001-00658376, at GOO001-00658376; Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 155:21-157:16; Hohengarten ¶ 362 & Ex. 328 (Duncan 30(b)(6) Dep.) at 10:18-11:10 (testifying to Storm Duncan's job title).*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Disputed.** The cited evidence does not demonstrate that Sean Dempsey was a Google executive. The cited evidence also is not relevant to Viacom's motion. *See* Defendants' Motion to Strike.

244. *A "run of site" advertisement on YouTube is an advertisement the placement of which is not guaranteed to the advertiser, and which YouTube can place anywhere on YouTube at YouTube's discretion. Hohengarten ¶ 382 & Ex. 348 (Reider Dep.) at 282:20-283:5.*

**Disputed.** Viacom paraphrases the cited evidence in a manner that does not accurately reflect the testimony to the extent it implies that the testimony relates to specific advertisements as opposed to advertising generally. The testimony included the statement, "[t]here's no commitment about where the ad is gonna show up."

245. *Credit Suisse's October 9, 2006 presentation to Google's board of directors stated that YouTube watch pages constituted "45% of total page views," that "run of site ads" ran on YouTube's search and watch pages, and that "sponsored advertising" ran on YouTube's home page. Hohengarten ¶ 324 & Ex. 293, CSSU 003560, at CSSU 003570.*

**Disputed.** Viacom misrepresents the cited evidence. The document cited contains forward-looking projections, estimates and assumptions regarding total pages views and pages on which advertisements might run in a future calendar year, not descriptions of the actual state of the YouTube website. The evidence also does not support that this presentation was actually given to Google's board of directors. Hohengarten Exhibit 293 is inadmissible hearsay. *See* Defendants' Motion to Strike.

246. *Credit Suisse's October 9, 2006 presentation to Google's board of directors estimated that in 2007 there would be approximately 126 billion YouTube watch page views in 2007. Hohengarten ¶ 324 & Ex. 293, CSSU 003560, at CSSU 003570 (estimating 280 billion total page views, 45% from watch pages).*

**Disputed.** The evidence does not support that this presentation was actually given to Google's board of directors. In addition, Hohengarten Exhibit 293 is inadmissible hearsay, lacks foundation and is irrelevant. *See* Defendants' Motion to Strike.

247. *Prior to January 2007, when a viewer watched an infringing clip taken from Viacom's hit program "South Park," an advertisement appeared next to the video and YouTube earned revenue from that advertising. Hohengarten ¶ 284 & Ex. 256, VIA14375466, at VIA14375466.*

116

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Disputed.** The evidence cited does not establish that the video purportedly shown in the cited screenshot is in fact a clip from "South Park" and that it was not authorized to be on YouTube. The evidence cited also does not establish that an advertisement appeared on every watch page for this video. *See* Hohengarten Ex. 112 (GOO001-02338182). The evidence cited also does not establish that YouTube necessarily earned revenue from advertisements displayed. For CPC ads, revenue is only earned in the event the ad is affirmatively clicked by the user. Reider Opening Dec. ¶ 7. In some cases, CPM ads can be shown without accruing revenue. Schapiro Opp. Ex. 312 (YouTube's Supplemental Response to Viacom's Second Set of Interrogatories, No. 2). The proposed fact also contains an improper and unsupported legal conclusion regarding infringement.

In addition, Viacom has authorized the upload of its content to YouTube. *See supra*, YouTube's Response to SUF ¶ 31. Hohengarten Exhibit 256 is inadmissible because it lacks authentication and foundation, is irrelevant and more prejudicial than probative.. *See* Defendants' Motion to Strike.

**Additional Material Facts:**

Viacom has not asserted an infringement claim with respect to this purported YouTube video. Hohengarten Ex. 2, at Ex. F.

248. *In January 2007, YouTube stopped advertising on substantially all watch pages. Hohengarten ¶ 398 & Ex. 361 (Defendants' Reponses and Objections to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 1) at 7 ("[A]dvertisements . . . on watch pages associated with user-uploaded video clips . . . ceased to appear on or about January 1, 2007"). See also infra SUF ¶ 250.*

**Disputed.** The evidence cited does not support the claim that advertising stopped on "substantially all watch pages." Since January 2007, YouTube has only allowed advertisements to be displayed on watch pages for videos uploaded or "claimed" by one of YouTube's many content partners. Reider Opening Decl. ¶ 3.

249. *From January 2007 forward, YouTube has advertised only on those watch pages displaying content belonging to one of YouTube's "content partners." Hohengarten ¶ 398 & Ex. 361 (Defendants' Reponses and Objections to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 1) at 7 ("[A]dvertisements . . . on watch pages associated with user-uploaded video clips . . . ceased to appear on or about January 1,*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*2007”); Hohengarten ¶ 382 & Ex. 348 (Reider Dep.) at 50:23-54:25.  See infra SUF ¶ 250.*

**Undisputed.**

250. *A November 30, 2006 email from Google sales director Suzie Reider to Google advertising executive Tim Armstrong stated, “A major decision in the works that you should be aware of -- for legal reasons (that I don't fully understand what has changed, and our GC will be back in SF on Monday to articulate) all ads/monetization on the watch pages for user generated content will need to come down.  This will have a tremendous impact on inventory.”  Hohengarten ¶ 114 & Ex. 111, GOO001-02656593, at GOO001-02656593.*

**Undisputed** that the cited document includes the language quoted in the proposed fact, but Hohengarten Exhibit 111 is inadmissible pursuant to FRE 407 and lacks foundation.  *See* Defendants' Motion to Strike.

251. *During the period when YouTube was advertising on substantially all watch pages, advertisements regularly appeared on watch pages for Viacom's content, including works in suit in this action.  Hohengarten ¶ 284 & Ex. 256, VIA14375466, at VIA14375466; Hohengarten ¶ 276 & Ex. 248, VIA14375471, at VIA14375471; Hohengarten ¶ 277 & Ex. 249, VIA14375444, at VIA14375444; Hohengarten ¶ 278 & Ex. 250, VIA14375526, at VIA14375526; Hohengarten ¶ 279 & Ex. 251, VIA14375557, at VIA14375557; Hohengarten ¶ 280 & Ex. 252, VIA14375446, at VIA14375446.*

**Disputed.**  *See, supra,* YouTube's Responses to SUF ¶¶ 241, 247.  Viacom has provided no evidence that the videos purportedly shown in the cited screenshots are in fact Viacom content.  The six cited screenshots also do not demonstrate that advertisements “regularly” appeared on watch pages for Viacom's purported content.  Finally, Hohengarten Exhibits 248, 249, 250, 251, 252 and 256 are inadmissible because they lack authentication and foundation, and are irrelevant.  *See* Defendants' Motion to Strike.

**Additional Material Facts:**

Viacom has not asserted any infringement claims with respect to the purported YouTube videos in Hohengarten Exhibits 248 and 254.  Hohengarten Ex. 2, at Ex. F.

252. *Before and after January 2007, Defendants sold ads appearing on the YouTube homepage.  See supra SUF ¶ 238.  Hohengarten ¶ 366 & Ex.*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*332 (Eun Dep.) at 315:14-316:14; Hohengarten ¶ 112 & Ex. 109 GOO001-00763354, at GOO001-00763364-76 (chart of advertising revenue listing advertisements by site page, referring to "home right" as the right side of YouTube's home page); Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 154:25-155:4; Hohengarten ¶ 354 & Ex. 320 (Chang Dep.) at 185:17-185:25; Hohengarten ¶ 375 & Ex. 341 (Kordestani Dep.) at 174:14-175:12; Hohengarten ¶ 115 & Ex. 112, GOO001-02338150, at GOO001-02338170.*

**Undisputed.**

**Additional Material Facts:**

Viacom purchased homepage ads on YouTube. *See* Schapiro Opp. Ex. 314 (GOO001-01607047-50) (invoice from YouTube to Paramount for Freedom Writers ads on YouTube website in the amount of ███████, including █████ for homepage ads); *see also* Reider Opening Dec. ¶ 4.

253.  *The home page on YouTube is the page that first appears when a user accesses www.youtube.com over the Internet.  Hohengarten ¶ 379 & Ex. 345 (Maxcy Dep.) at 43:9-11.*

**Undisputed.**

254.  *Before and after January 2007, Defendants sold ads that appear on YouTube search results pages.  Hohengarten ¶ 354 & Ex. 320 (Chang Dep.) at 185:5-186:10; Hohengarten ¶ 376 & Ex. 342 (Levine Dep.) at 271:11-18; Hohengarten ¶ 111 & Ex. 108, GOO001-05920388, at GOO001-05920388-89; Hohengarten ¶ 115 & Ex. 112, GOO001-02338150, at GOO001-02338170.*

**Disputed.**  YouTube sells advertising space, not ads, on search results pages.  Reider Opening Decl. Ex. 3.

**Additional Material Facts:**

Viacom placed ads on YouTube search results pages. Reider Opening Decl. ¶ 4.

255.  *Search results pages on YouTube are the pages where YouTube displays results of user searches using YouTube's search function.  Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 114:23-115:8; Hohengarten ¶ 313 & Ex. 285 (screenshot of search results pages); Hohengarten ¶ 393 & Ex. 356 (Declaration of Steve Chen dated January 5, 2007) at ¶ 5.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Undisputed.**

256.  *Advertisements on YouTube search results pages were the largest revenue source for YouTube in 2007. Hohengarten ¶ 116 & Ex. 113, GOO001-02439050, at GOO001-02439050-53; Hohengarten ¶ 117 & Ex. 114, GOO001-00255239, at GOO001-00255240; Hohengarten ¶ 118 & Ex. 115, GOO001-00237661, at GOO001-00237662.*

**Disputed.**    The cited evidence does not support the proposed fact. Hohengarten Exs. 113, 114, 115.    The cited evidence also is not relevant to Viacom's motion.  *See* Defendants' Motion to Strike.

257.  *A YouTube monetization planning document from May 2007 prepared for Google CEO Eric Schmidt states: "From a monetization perspective, the largest opportunity for revenue resides on the YouTube search pages." Hohengarten ¶ 119 & Ex. 116, GOO001-01295801, at GOO001-01295802.*

**Disputed.**    The cited document appears on its face to be a draft. Viacom provides no evidence it is a monetization planning document or that it was actually presented to Eric Schmidt, and it contains no statements made by Eric Schmidt.    The cited evidence also is not relevant to Viacom's motion.  *See* Defendants' Motion to Strike.

**Additional Material Facts:**

Advertisements on watch pages associated with user-uploaded video clips ceased to appear on YouTube on or about January 1, 2007. Schapiro Opp. Ex. 312 (YouTube's Supplemental Response to Viacom's Second Set of Interrogatories, No. 1).

258.  *YouTube enables advertisers to target their advertisements on YouTube's search pages to the search terms entered by a YouTube user. Hohengarten ¶ 376 & Ex. 342 (Levine Dep.) at 273:15-274:25; Hohengarten ¶ 314 & Ex. 286; Hohengarten ¶ 382 & Ex. 348 (Reider Dep.) at 199:24-200:12; Hohengarten ¶ 378 & Ex. 344 (Liu Dep.) at 24:3-26:17.*

**Disputed.**    The cited evidence does not support the proposed fact in terms of advertisements being directly targeted to search terms entered by a YouTube user.  *See* Schapiro Opp. Ex. 196 (176:19-177:4). In addition Hohengarten Exs. 286, 342 and 348 are not admissible. *See* Defendants' Motion to Strike.

259.  *When a YouTube user searches YouTube for Viacom content, YouTube displays advertising next to the search results for that content.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*Hohengarten ¶ 378 & Ex. 344 (Liu Dep.) at 24:3-26:17; 181:16-182:20; 185:24-186:7; Hohengarten ¶ 287 & Ex. 259, VIA14375204, at VIA14375204; Hohengarten ¶ 313 & Ex. 285, at 3, 7, 9; Hohengarten ¶ 288 & Ex. 260, VIA14375664, at VIA14375664; Hohengarten ¶ 289 & Ex. 261, VIA14375611, at VIA14375611; Hohengarten ¶ 290 & Ex. 262, VIA14375671, at VIA14375671; Hohengarten ¶ 291 & Ex. 263, VIA14375620, at VIA14375620; Hohengarten ¶ 292 & Ex. 264, VIA14375635, at VIA14375635; Hohengarten ¶ 293 & Ex. 265, VIA14375638, at VIA14375638.*

**Disputed.**    First, the cited screenshots provide no evidence that the searches entered, such as for "grease" and "honeymooners," are for Viacom content.  *See* Schapiro Opp. Ex. 131 (254:21-25).   Second, Viacom's attempts to search for its own content using keywords routinely returned search results for content Viacom did not own.  As Viacom's agent BayTSP explained: "Keyword enforcement is something we as a company would never employ because it would create a series of false positives."  Schapiro Opp. Ex. 126 (149:15-21).  BayTSP told Viacom that more than 80 percent of the videos found using keyword searches targeted for a given show would not actually contain content from the show.  Schapiro Opp. Ex. 127; Schapiro Opp. Ex. 126 (147:3-148:15).   In January 2007, when BayTSP searched YouTube for the term "Colbert," BayTSP found 400 videos, only 44 of which were determined to actually contain content from *The Colbert Report*. Schapiro Opp. Ex. 128; *see also* Schapiro Opp. Ex. 129 (only one of 346 videos returned in response to search looking for clips from *The Daily Show* determined to match); Schapiro Opp. Ex. 130 (cumulative statistics on BayTSP keyword searches for various Viacom various programs).  Finally, Hohengarten Exs. 259, 260, 261, 262, 263, 264, 265, 285 and 344 are inadmissible because they lack authentication and foundation, and are irrelevant. *See* Defendants' Motion to Strike.

**Additional Material Facts:**

(1)     As Viacom's exhibits demonstrate, keyword searches return videos in the search results that were uploaded by Viacom and its agents to YouTube as part Viacom's viral and stealth marketing.  The "The Olsen Twins Walk Into a Bar" video, which is the first search result on the third page of Hohengarten Ex. 285 for the search term "comedy central," was uploaded by user "funnyvids222."    *See* Hohengarten Ex. 285.  This username is on one of Viacom's whitelists of authorized accounts under the heading "Viral White-list."  VIA-Schapiro Opening Ex. 140.  Viacom also mistakenly took down this video and asked YouTube to retract that takedown.  Schapiro Opp. Ex. 315  (GOO001-09681182-83);    *see  also*  Schapiro  Opp.  Ex.  422A/B.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

(Video ID x8wOTcv5E38).    The email address associated with the FunnyVids222 account is michelles@wiredset.com.  Schapiro Opp. Ex. 417 (GOO DB DATA 025-3).    That email address belongs to an employee of WiredSet, a viral marketing agency that uploaded authorized clips on behalf of Viacom.  Schapiro Opp. Ex. 317; Rubin Opening Ex. 123.

(2)     The "Bob Saget gets roasted at Comedy Central Roast of Bob Saget" video, which is the purported fifth search result on the third page of Hohengarten Ex. 285 for the search term "comedy central," was uploaded by user "mahalodotcom."  *See* Hohengarten Ex. 285.  This username is on one of Viacom's whitelists of authorized accounts under the heading "Viral White-list."  Schapiro Opening Ex. 140.

(3)     Hohengarten Exhibits 259, 262-65, and 285 purport to be screenshots from 2009.  Viacom does not seek summary judgment of infringement as to any clips uploaded after May 2008.  *See* Viacom's Motion for Summary Judgment, at 2 n.1.

260.    *Before and after January 2007, Defendants also sold advertisements on the browse pages of the YouTube website.    Hohengarten ¶ 393 & Ex. 356 (Declaration of Steve Chen dated January 5, 2007) at ¶ 19; Hohengarten ¶ 112 & Ex. 109, GOO001-00763354, at GOO001-00763364; Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 152:21-152:24; Hohengarten ¶ 113 & Ex. 110, GOO001-00658376, at GOO001-00658376.*

   **Disputed.**    YouTube sells advertising space, not advertisements. Reider Opening Dec. ¶ 3.

261.    *The browse pages on YouTube are the pages where YouTube suggests videos for users to watch, including "Most Viewed." "Top Favorites," "Most Discussed," "Recent Videos," and "Top Rated."  Hohengarten ¶ 363 & Ex. 329 (Dunton Dep.) at 79:5-10; Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 115:19-116:9.*

   **Disputed.**  The cited evidence does not support the proposed fact that "Recent Videos" is a browse page.  The cited evidence also does not support that browse pages "suggest" videos for users to watch.  On browse pages "you can just look at videos by category."  Hohengarten Ex. 312.

262.    *Before and after January 2007, YouTube has also sold advertising on the video upload page, the page where users upload videos to YouTube. Hohengarten ¶ 115 & Ex. 112, GOO001-02338150, at GOO001-*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*02338182; Hohengarten ¶ 120 & Ex. 117, GOO001-08030008, at GOO001-08030009.*

**Disputed.**    YouTube sells advertising space, not advertisements. Reider Opening Decl. ¶ 3.

263.  *A "house advertisement" on YouTube is an advertisement that appears on a YouTube page, promotes some other aspect of YouTube, and directs the user to the corresponding YouTube page.  Hohengarten ¶ 182 & Ex. 179, GOO001-02034326, at GOO001-02034326.*

**Disputed.**  The cited evidence does not support the proposed fact that house advertisements direct the user to a corresponding YouTube page.

264.  *Even after YouTube decided to limit its use of advertisements on watch pages, YouTube placed "house advertisements" on watch pages, without limiting these advertisements to watch pages of authorized content. Hohengarten ¶ 182 & Ex. 179, GOO001-02034326, at GOO001-02034326; Hohengarten ¶ 183 & Ex. 180, GOO001-06811230, at GOO001-06811230.*

**Disputed.**  The cited evidence does not support the proposed fact that house advertisements were placed on watch pages without limiting them to watch pages of authorized content.  The cited documents only refer to house ads as shown next to user generated content or non-partner content on watch pages, meaning that house ads are not limited to partner watch pages.  *See* Hohengarten Exs. 179, 180.

265.  *House advertisements have appeared on watch pages of Viacom-owned content that was uploaded without Viacom's consent, including as recently as September 14, 2009.  Hohengarten ¶ 286 & Ex. 258 (screenshot, taken September 14, 2009, of YouTube watch page titled "Kanye West shits on Taylor Swift - 2009 VMA's" showing a house advertisement in the upper right corner); Hohengarten ¶ 378 & Ex. 344 (Liu Dep.) at 177:25-179:2 (testifying that Liu Dep. Ex. 11 appears to be a YouTube watch page and that the box in the upper right corner containing the text "Gundam 00" appears to be a house ad for YouTube.com/shows).*

**Disputed.**  The cited screenshot and testimony provide no evidence that the content appearing on the watch page is Viacom-owned content or that it was uploaded without Viacom's consent.   In addition, Hohengarten Exs. 258 and 344 are inadmissible because they lack foundation, and are irrelevant.  *See* Defendants' Motion to Strike.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Additional Material Facts**:

(1) Viacom does not seek summary judgment of infringement as to any clips uploaded after May 2008. *See* Viacom's Motion for Summary Judgment, at 2 n.1.

(2) The video purportedly referenced in Hohengarten Ex. 258 is not a clip in suit.

(3) Viacom frequently uploaded clips to YouTube for promotional purposes or allowed their content to remain on the site when uploaded by ordinary users. *See* Rubin Opening Decl. ¶ 2, 3, 5(a)-(f) & Exs. 1, 3-68; Chan Opening Decl. ¶¶ 4, 5, 10; Ostrow Opening Decl. ¶ 5-6; Maxcy Opening Decl. ¶¶ 3-7; Schaffer Opening Decl. ¶ 6-8; Botha Opening Decl. 11-12; Schapiro Opp. Ex. 305  (194:8-11, 199:22-201:2);  269 (115:6-118:19,  134:19-136:10,  138:25-139:14);  221  (83:6-84:8);  78 (43:17-22); 131 (23:3-24:23, 205:17-20, 207:9-22); Schapiro Opening Ex. 24 (22:11-22:20, 70:16-71:24), 26; 29 (38:10-21), 30, 31 (26:20-27:10), 32 (151:17-152:20), 33, 34, 47-49, 51-77.

266. *From 2006 until today, if a user went to YouTube looking for clips that infringe Viacom's copyrights in popular shows such as "South Park," "The Daily Show With Jon Stewart," or "The Colbert Report," either via YouTube's home page, search results page, or browse page, YouTube earned revenue from the ads served to that user on those pages. See supra SUF ¶¶ 238-241, 247, 251, 252, 254, 256-261, 265.*

**Disputed.**  YouTube incorporates its responses to SUF ¶¶ 238-241, 247, 251, 252, 254, 256-261, 265.  YouTube also disputes this proposed fact because Viacom cites no evidence supporting the existence of copyright infringement as to any clip on YouTube, that users went to YouTube looking for clips that infringe Viacom's copyrights, that Viacom owns copyrights in the shows listed, or that YouTube earned revenue from advertisements served on pages encountered by users searching for unauthorized Viacom content.  YouTube further disputes this proposed fact to the extent it includes an improper legal conclusion and argument.  Finally, this proposed fact is irrelevant to Viacom's motion.

**Additional Material Facts:**

(1) Viacom does not seek summary judgment of infringement as to any clips uploaded after May 2008. *See* Viacom's Motion for Summary Judgment, at 2 n.1.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

(2) Viacom frequently uploaded clips to YouTube for promotional purposes or allowed their content to remain on the site when uploaded by ordinary users. *See* Rubin Opening Decl. ¶ 2, 3, 5(a)-(f) & Exs. 1, 3-68; Chan Opening Decl. ¶¶ 4, 5, 10; Ostrow Opening Decl. ¶ 5-6; Maxcy Opening Decl. ¶¶ 3-7; Schaffer Opening Decl. ¶ 6-8; Botha Opening Decl. 11-12; Schapiro Opp. Ex. 305  (194:8-11, 199:22-201:2);  269 (115:6-118:19,  134:19-136:10,  138:25-139:14);  221  (83:6-84:8);  78 (43:17-22); 131 (23:3-24:23, 205:17-20, 207:9-22); Schapiro Opening Ex. 24 (22:11-22:20, 70:16-71:24), 26; 29 (38:10-21), 30, 31 (26:20-27:10), 32 (151:17-152:20), 33, 34, 47-49, 51-77.

(3) *See also* YouTube's Response to SUF ¶ 130.

## V.   DEFENDANTS' RIGHT AND ABILITY TO CONTROL INFRINGEMENT

### YouTube's Terms of Use, Termination of Users, and Removal of Videos

**Disputed.**  Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1.  YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

267.   *YouTube's Terms of Use have always given YouTube sole discretion to remove any video from YouTube for any reason and to terminate any YouTube user account for any reason.  Hohengarten ¶ 121 & Ex. 118, GOO001-00421229, at GOO001-00421231 (YouTube Terms of Use, dated February 3, 2006 per metadata); Hohengarten ¶ 122 & Ex. 119, GOO001-02826891, at GOO001-02826893 (YouTube Terms of Use, dated March 14, 2006 per metadata); Hohengarten ¶ 123 & Ex. 120, GOO001-00824855, at GOO001-00824857 (YouTube Terms of Use, dated July 26, 2006 per metadata); Hohengarten ¶ 124 & Ex. 121, GOO001-02829970, at GOO001-02829972 (YouTube Terms of Use, dated August 18, 2006 per metadata); Hohengarten ¶ 196 & Ex. 372 GOO001-02316969, at GOO001-02316970 (YouTube Terms of Use, dated November 20, 2006); Hohengarten ¶ 394 & Ex. 357 (Declaration of Zahavah Levine dated January 5, 2007) at Ex. A ¶ 5.C; Hohengarten ¶ 127 & Ex. 124, GOO001-07056597, at GOO001-07056600 (YouTube Terms of Use, dated February 26, 2007 per metadata); Hohengarten ¶ 128 & Ex. 125, GOO001-01232697, at GOO001-01232700 (YouTube Terms of Use, dated June 19, 2007 per metadata).*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

**Disputed.** YouTube's Terms of Use give YouTube sole discretion to remove any video from YouTube or terminate any YouTube user account for uploading material in violation of YouTube's Terms of Use. *See* Hohengarten Ex. 118 (GOO001-00421231); Hohengarten Ex. 119 (GOO001-02826893); Hohengarten Ex. 120 (GOO001-00824857); Hohengarten Ex. 121 (GOO001-02829972); Hohengarten Ex. 372 (GOO001-02316970); Hohengarten Ex. 357 at Ex. A ¶ 5.C; Hohengarten Ex. 124 (GOO001-07056600); Hohengarten Ex. 125 (GOO001-01232700). YouTube's Terms of Use also expressly prohibit users from uploading copyrighted material that they do not have the right or authorization to share. Levine Opening Decl. ¶ 6.

268. *In her deposition, YouTube content review manager Heather Gillette testified that "The terms of use states specifically that we have the right to remove content at our sole discretion for any reason whatsoever." Hohengarten ¶ 368 & Ex. 334 (Gillette Dep.) at 110:25-111:3.*

**Disputed.** Ms. Gillette's job title is misstated. *See* Schapiro Opp. Ex. 71 (8:2-14) (testifying that she held the title of Director of Customer Support). And while Ms. Gillette's testimony is accurately quoted, YouTube's Terms of Use give YouTube sole discretion to remove any video from YouTube or terminate any YouTube user account for uploading material in violation of YouTube's Terms of Use. *See supra*, YouTube's Response and Additional Material Facts in Response to SUF ¶ 267.

269. *Until late November 2005, just before YouTube's official launch, YouTube employees reviewed thumbnail images for every video uploaded to YouTube and removed videos that violated YouTube's terms of use, including for reasons of violence, pornography, and copyright infringement. Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 66:17-67:3, 137:7-12, 164:3-12; Hohengarten ¶ 19 & Ex. 16, GOO001-00629095, at GOO001-00629095.*

**Disputed.** The proposed statement is not supported by the evidence cited. Neither the deposition testimony nor the document that Viacom cites says that YouTube employees reviewed thumbnail for "every" video until late November 2005. Brent Hurley testified that, prior to November 2005, he "did his best" to look at a thumbnail of every uploaded video. Schapiro Opp. Ex. 116 (66:17-67:3, 137:7-12, 164:3-12). Nor do the cited documents support the contention that YouTube was reviewing thumbnails of videos to determine whether they were "copyright infringement." In screening for copyright in 2005, YouTube removed videos that it guessed were unauthorized. C. Hurley Opening Decl. ¶ 17; *see also* Schapiro Opp. Ex. 116 (195:21-197:3).

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Additional Material Facts:**

(1)     As of December 2005, YouTube was receiving approximate 6,000 new video uploads each day.  C. Hurley Opening Decl. ¶ 23.

(2)     Brent Hurley testified that it "would be impossible" for him to have watched all the videos uploaded to the site as of November 2005. Schapiro Opp. Ex. 116 (66:23).

270.   *After November 2005, YouTube employees stopped reviewing thumbnails of every video uploaded to YouTube.  Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 66:17-67:3, 164:9-12.*

**Disputed.**  As stated in YouTube's Response to SUF ¶ 269, Viacom has cited no evidence establishing that thumbnails of every video uploaded were being reviewed prior to November 2005.  Brent Hurley testified that "we stopped reviewing all videos earlier around Thanksgiving time period because it was – it was impossible to do so."

**Additional Material Facts:**

(1)     *See supra*, YouTube's Additional Material Facts in Response to SUF ¶ 269.

(2)     In September 2005, YouTube posted additional information on the site setting forth the prohibition on unauthorized copyrighted material, informed users that posting such materials would result in the termination of their account, and displayed clear instructions to copyright holders on how to provide notice to YouTube's designated agent of allegedly unauthorized materials that users had uploaded. Shortly thereafter, YouTube formally registered its DMCA agent with the U.S. Copyright Office.  C. Hurley Opening Decl. ¶ 21.

271.   *On November 24, 2005, YouTube director of finance Brent Hurley instructed YouTube employees to look for and remove some infringing material, such as clips of "Family Guy, South Park, and full-length anime episodes."  Hohengarten ¶ 19 & Ex. 16, GOO001-00629095, at GOO001-00629095; Hohengarten ¶ 350 & Ex. 316 (B. Hurley Dep.) at 81:5-82:2.*

**Disputed.**  First, the proposed fact is argumentative and contains an improper and unsupported legal conclusion as to whether certain videos were "infringing" copyright.  Second, that legal conclusion is not supported by the cited documents.  In the cited email, Brent Hurley states: "As far as copyright stuff is concerned, be on the look out for

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Family Guy, South Park, and full-length anime episodes." He does not use the term "infringing."

272. *Sporadically during 2005 and 2006, YouTube employees proactively searched the YouTube site for infringing clips belonging to certain content owners and removed thousands of such clips. Hohengarten ¶ 129 & Ex. 126, GOO001-02768034, at GOO001-02768034; Hohengarten ¶ 368 & Ex. 334 (Gillette Dep.) at 46:20-47:17, 54:2-63:23, 72:24-73:7; Hohengarten ¶ 130 & Ex. 127, GOO001-01027757, at GOO001-01027766; Hohengarten ¶ 363 & Ex. 329 (Dunton Dep.) at 163:5-14; Hohengarten ¶ 376 & Ex. 342 (Levine Dep.) at 211:19-212:5; Hohengarten ¶ 385 & Ex. 351 (Schaffer Dep.) at 97:25-100:13, 104:25-106:6.*

**Disputed.** First, the proposed fact is argumentative and contains an improper and unsupported legal conclusion as to whether certain video clips were "infringing" copyright. Second, that legal conclusion is not supported by the cited documents. For example, Ms. Gillette testified that YouTube employees could only remove "what we thought might be unauthorized content." Schapiro Opp. Ex. 71 (46:20-47:17); *see also id.* at 52:18-21, 54:2-63:23, 72:24-73:7. Viacom cites no admissible evidence to support the proposition that YouTube removed "thousands" of clips after conducting proactive searches of the site. *See* Schapiro Opp. Ex. 71 (54:10-13) ("I do not have any record of the numbers. . . . I don't even know a ballpark in this instance."), (60:19-61:2) ("I don't know what the number or even could estimate what the number is.")

**Additional Material Facts:**

YouTube made many mistakes in its proactive reviews. *See* Hohengarten Ex. 329 (163:5-164:16); Hohengarten Ex. 342 (211:19-212:5); Hohengarten Ex. 351 (97:25-100:13, 104:25-106:6); Schapiro Opp. Ex. 71 (53:10-54:23, 58:24-59:6, 64:11-67:14); Hurley Decl. ¶ 18.

273. *When it was in YouTube's interest to do so, YouTube personnel manually screened narrow subsets of YouTube videos to ensure that they did not infringe copyright. Hohengarten ¶ 132 & Ex. 129, GOO001-04431787, at GOO001-04431787; Hohengarten ¶ 133 & Ex. 130, GOO001-00509640, at GOO001-00509640; Hohengarten ¶ 134 & Ex. 131, GOO001-00222797, at GOO001-00222797; Hohengarten ¶ 135 & Ex. 132, GOO001-02754251, at GOO001-02754251; Hohengarten ¶ 79 & Ex. 76, GOO001-03037036, at GOO001-03037043-44; Hohengarten ¶ 136 & Ex. 133, GOO001-02027618, at GOO001-02027618; Hohengarten ¶ 185 & Ex. 182, GOO001-02866493, at GOO001-02866501, GOO001-02866503; Hohengarten ¶ 187 & Ex. 184,*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*GOO001-06361166, at GOO001-06361173, GOO001-06361175; Hohengarten ¶ 387 & Ex. 353 (Seth Dep.) at 17:17-24:11, 34:4-35:12, 54:11-56:21, 61:2-18, 68:5-11; Hohengarten ¶ 131 & Ex. 128, GOO001-01535521, at GOO001-01535521.*

**Disputed.**  First, the proposed fact is argumentative, not supported by the cited evidence, and contains an improper and unsupported legal conclusion that YouTube screened videos "to ensure that they did not infringe copyright."  Second, YouTube engaged in spot checks of videos in various contexts and removed videos that they suspected might be unauthorized.  Schaffer Opening Decl. ¶ 11.  YouTube was not making infringement determinations about videos they removed in these circumstances and often made mistakes when engaging in manual video review.  *See* YouTube's Responses to SUF ¶¶ 272, 280; Schaffer Opening Decl. ¶¶ 11-13.  Given the scale of the YouTube website, it quickly grew infeasible to review all videos uploaded to the site.  *See* Schapiro Opening Ex. 132 (Viacom witness testifying that for "a big website such as YouTube's . . . the volume would preclude any process that involves a manual review of videos.").

**YouTube's Ineffective "Hash Based Identification" Technology**

**Disputed.**  Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken.  *See* Local Rule 56.1.  YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

274.   *YouTube employed a technology called hash-based identification to prevent a user from uploading a video clip to YouTube that is exactly identical in every respect to a video clips that YouTube had previously removed pursuant to a takedown notice.   Hohengarten ¶ 393 & Ex. 356 (Declaration of Steve Chen dated January 5, 2007) at ¶ 12.*

**Undisputed.**

275.   *Hash-based identification cannot prevent re-upload of the same infringing content to YouTube if the second video clip differs in even the slightest degree (e.g., in length or resolution) from the first clip that was removed.   Hohengarten ¶ 393 & Ex. 356 (Declaration of Steve Chen dated January 5, 2007) at ¶ 12; Hohengarten ¶ 355 & Ex. 321 (Chastagnol Dep.) at 56:2-22; Hohengarten ¶ 376 & Ex. 342 (Levine Dep.) at 254:24-255:11.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Disputed.** The proposed fact is argumentative and contains an improper and unsupported legal conclusion as to whether videos removed from YouTube were in fact "infringing." That statement is also unsupported by the evidence that Viacom cites. Videos identified in DMCA takedown notices are merely "claimed" to be infringing. *See* 17 U.S.C. § 512(c)(3).

276. *And even this minimal protection against infringement generally was triggered only if a copyright owner first sent a takedown notice. Hohengarten ¶ 385 & Ex. 351 (Schaffer Dep.) at 132:17-20; Hohengarten ¶ 137 & Ex. 134 GOO001-00561601, at GOO001-00561605.*

**Disputed.** Viacom's proposed statement that "hash-based" identification provides only "minimal protection against infringement" is vague and argumentative. That statement is also unsupported by the evidence that Viacom cites. Neither the document nor the deposition testimony characterize the protection provided by hash-based identification as "minimal." The document describes YouTube's purpose in implementing such technology: "YouTube has implemented technology to prevent videos removed for copyright reasons from being uploaded again." Hohengarten Ex. 134 (GOO001-00561605); *see also* Levine Opening Decl. ¶ 25. A "hash" was created for every video removed from the site for alleged copyright infringement. *See* Hohengarten Ex. 134 (GOO001-00561605); Levine Opening Decl. ¶ 25.

## YouTube's Ability to Use Keyword Searching to Root Out Infringement

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

277. *YouTube has always had the ability to find infringing clips after they are made available for viewing on the YouTube website by searching for keywords associated with copyrighted content. See SUF infra ¶¶ 278, 280, 300, 302, 305; supra ¶¶ 112, 113, 139.*

**Disputed.** The proposed fact is argumentative and contains an improper and unsupported legal conclusion as to YouTube's ability to find "infringing clips" using keyword searching. That conclusion is not supported by the cited evidence. *See also* YouTube's Responses to SUF ¶¶ 112, 113, 139, 259, 272, 278, 280, 300, 302, 305. The proposed

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

finding is also vague as to the phrase "keywords associated with copyrighted content."

278.   *Viacom and other copyright owners use keyword searching to find videos that infringe their copyrights on YouTube in order to send takedown notices.  Hohengarten ¶ 369 & Ex. 335 (Housley Dep.) at 36:22-37:8; Hohengarten ¶ 3 & Ex. 2 (Solow Decl. ¶ 2).*

**Disputed.**   The proposed fact is argumentative and contains an improper and unsupported legal conclusion as to whether certain videos "infringe" Viacom's and other copyright owners' copyrights. Viacom has also cited no evidence that any copyright owners other than Viacom use keyword searches to locate their content on YouTube.

279.   *However, until mid-2008, copyright holders such as Viacom could search for infringing videos on YouTube only after YouTube made the videos publicly searchable, resulting in inevitable delay before the copyright holders can search for and find the infringing content and then send a takedown notice.  Hohengarten ¶ 136 & Ex. 133 (YouTube Help page entitled "Solve a Problem: Video not in search"); Hohengarten ¶ 138 & Ex. 135, GOO001-08643428, at GOO001-08643428.*

**Disputed**. The proposed fact is argumentative, not supported by the cited evidence and contains an improper and unsupported legal conclusion about the alleged presence of "infringing" content on YouTube. Viacom's reference to an "inevitable delay" in videos being uploaded to YouTube cites only to a document stating that "changes to video information can take 8 hours or more to show up in the search index." Hohengarten Ex. 135 (GOO001-08643428).  The cited evidence also does not reference "mid-2008." YouTube made available copyright protection tools that prevented the upload of potentially unauthorized materials prior to them going live on the website prior to "mid-2008" in the form of MD5 filtering and audio and video fingerprinting. Levine Opening Decl. ¶ 25; King Opening Decl. ¶¶ 4-28.

280.   *YouTube has always had the ability to apply keyword searching or filtering (human or automated) to identify and block infringing videos before they are made available for viewing on YouTube.  Hohengarten ¶ 347 & Ex. 313 (Karim Dep.) at 119:4-121:24; Hohengarten ¶ 256 & Ex. 238, JK00009130, at JK00009130.*

**Disputed**.   The proposed fact is argumentative and contains an improper and unsupported legal conclusion as to YouTube's ability to identify "infringing videos" using keyword searching.  That conclusion

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

is also unsupported by the evidence that Viacom cites. The document is an email from Jawed Karim dated April 20, 2005, which says: "If videos get flooded with porn we can always approve videos first BEFORE they are shown anywhere, that's a one-line code change." The document says nothing about YouTube's "ability to use keyword searching or filtering" or about YouTube's ability to "identify and block infringing videos." Nor does the deposition testimony in which Mr. Karim was asked about that document.

**Additional Material Facts:**

(1)     Since 2006, YouTube has used hash-based technology to block videos identical to those previously removed for copyright reasons from being uploaded to YouTube. Levine Opening Decl. ¶ 25; King Opening Decl. ¶ 4.

(2)     Since 2007, YouTube has used video-based fingerprinting technology to block videos from being uploaded to YouTube that match reference files supplied by copyright owners who do not want their content to appear on YouTube. King Opening Decl. ¶¶ 23-24, 26-27.

## YouTube's Refusal to Employ Digital Fingerprinting to Stop Infringement

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

281.   *A digital fingerprint is a software-generated digital identifier of the content in the audio and/or video track of an audio-visual work. Hohengarten ¶ 140 & Ex. 136, GOO001-02493069, at GOO001-02493070-71; Hohengarten ¶ 370 & Ex. 336 (Ikezoye Dep.) at 15:15-16:11; Hohengarten ¶ 395 & Ex. 358, at ¶¶ 3-4; Hohengarten ¶ 396 & Ex. 359, at ¶¶ 4-5.*

   **Disputed.** Digital fingerprints are not limited to audiovisual works. *See* King Opening Decl. ¶¶ 5, 13.

282.   *Digital fingerprinting service providers such as Audible Magic maintain reference databases of the digital fingerprints of copyrighted works. Hohengarten ¶ 370 & Ex. 336 (Ikezoye Dep.) at 23:13-19.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Undisputed** that Audible Magic maintains reference databases of the digital fingerprints of works. The cited evidence says nothing about services other than Audible Magic.

283. *When a video is uploaded to a website such as YouTube, digital fingerprinting technology can take the digital fingerprint of the uploaded video and compare it to reference databases of fingerprints of copyrighted works to determine whether there is a match. Hohengarten ¶ 370 & Ex. 336 (Ikezoye Dep.) at 15:15-16:11; Hohengarten ¶ 395 & Ex. 358, at ¶¶ 10-12; Hohengarten ¶ 396 & Ex. 359, at ¶¶ 4-6, 10, 15; Hohengarten ¶ 355 & Ex. 321 (Chastagnol Dep.) at 88:18-25; Hohengarten ¶ 399 & Ex. 362 (July 27, 2007 Status Conference Transcript) at 17:2-5.*

**Undisputed.**

284. *If there is a fingerprint match -- indicating that the audio and/or video track of the uploaded video matches a copyrighted work in whole or in part -- then a website such as YouTube can automatically discard the upload or take another action, such as flagging the video for review by an employee. Hohengarten ¶ 395 & Ex. 358, at ¶ 11; Hohengarten ¶ 396 & Ex. 359, at ¶¶ 15-19.*

**Disputed.** Hohengarten Exs. 358 and 359 (declarations submitted in unrelated cases) are inadmissible hearsay. *See* Defendants' Motion to Strike. Those declarations do not support the proposed statement of fact. They discuss Audible Magic's ability to identify sound recordings on peer-to-peer file sharing networks; they do not discuss the application of fingerprint technologies to websites such as YouTube. They do not address matching the "video track" of any "uploaded video." And they do not say anything about the actions that "a website such as YouTube" can take in response to a fingerprint match.

285. *Computers can readily accomplish this fingerprint matching function so that infringing videos never go live on the site. Hohengarten ¶ 395 & Ex. 358, at ¶ 11; Hohengarten ¶ 396 & Ex. 359, at ¶¶ 11-12.*

**Disputed**. Hohengarten Exs. 358 and 359 are inadmissible hearsay. *See* Defendants' Motion to Strike. The proposed fact contains an improper and unsupported legal conclusion that videos matching a reference file are infringing. The cited evidence does not support the proposed fact. The two declarations that Viacom cites do not address matching for audiovisual content or the application of fingerprint technologies to websites such as YouTube. Neither declaration makes any reference to preventing videos from "going live" on websites.

133

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

286.  *Audible Magic began providing audio fingerprinting to clients in 2004. Hohengarten ¶ 370 & Ex. 336 (Ikezoye Dep.) at 11:15-19, 109:14-25.*

**Undisputed.**

**Additional Material Facts:**

(1)     Before 2007, Audible Magic's clients were peer-to-peer networks and universities seeking to monitor traffic on peer-to-peer networks. Schapiro Opp. Ex. 113 (11:15-19); Hohengarten Ex. 359 at ¶¶ 11, 12 and 19.

(2)     Audible Magic did not provide audio-fingerprinting services to user-generated content websites until 2007.  Schapiro Opp. Ex. 113 (12:16-13:12, 225:5-226:2).

(3)     Before 2007, none of Audible Magic's customers were websites that hosted user-submitted content.  Schapiro Opp. Ex. 113 (12:16-13:12).

(4)     YouTube was the first user-generated content website to sign an agreement with Audible Magic to license its audio-fingerprinting technology.  Hohengarten Ex. 141; Schapiro Opp. Ex. 113 (12:16-13:12, 225:5-226:2).

(5)     As of late 2006 to early 2007, virtually all of the reference files that Audible Magic had in its database related to sound recordings owned by major record labels.  Schapiro Opp. Ex. 135; King Opening Decl. ¶ 6.

(6)     Viacom had not been in contact with Audible Magic until December 2006.  Schapiro Opp. Ex. 136 (111:22-112:3); Schapiro Opp. Ex. 139.

(7)     Viacom did not begin providing fingerprints of its content to Audible Magic until April 2007.  Schapiro Opp. Ex. 136 (110:7-13); Schapiro Opp. Ex. 147 (50:3-12).

(8)     Viacom could not have used Audible Magic's fingerprinting technology to identify its content without first providing reference files to Audible Magic. Schapiro Opp. Ex. 147 (50:23-51:25); Schapiro Opp. Ex. 146 (220:22-221:6).

287.  *Audible Magic could have deployed its audio fingerprinting services on YouTube as early as February 2005, when YouTube was founded, and*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*April 2005, when the YouTube website was launched in beta form. Hohengarten ¶ 370 & Ex. 336 (Ikezoye Dep.) at 109:22-110:22.*

**Disputed.** Hohengarten Ex. 336 is inadmissible hearsay and speculation. *See* Defendants' Motion to Strike. In addition, there is no support for the proposition that Audible Magic could have applied its audio-fingerprinting technology in either February 2005 or April 2005. *See also supra,* YouTube's Response to SUF ¶ 286.

288. *By February 2006, Audible Magic was conducting over five million fingerprint match requests, or "look ups," a day and could easily have handled tens of millions of such requests. Hohengarten ¶ 396 & Ex. 359, at ¶ 21; Hohengarten ¶ 370 & Ex. 336 (Ikezoye Dep.) at 21:21-22:7.*

**Disputed**. Hohengarten Ex. 359 is inadmissible hearsay and speculation. *See* Defendants' Motion to Strike. The evidence cited relates to the number of lookups that Audible Magic could handle in February 2006 from its peer-to-peer clients. That evidence is irrelevant. In addition, in 2006, Audible Magic was only providing look ups for peer-to-peer sites, not video-sharing sites. *See* YouTube's Response to SUF ¶¶ 286, 287; Schapiro Opp. Ex. 113 (21:21-22:7).

289. *At no time in YouTube's history have anywhere close to five million videos been uploaded to YouTube in a single day. Hohengarten ¶ 324 & Ex. 293 CSSU 003560, at CSSU 003561, CSSU 003565; Hohengarten ¶ 140 & Ex. 137, GOO001-02930251, at GOO001-02930256.*

**Undisputed**, but the cited evidence is irrelevant to Viacom's motion. *See* Defendants' Motion to Strike.

290. *Between 2006 and mid-2009, Audible Magic had approximately 30 website customers, including video sites MySpace, Grouper, and Microsoft Soapbox, who deployed Audible Magic's fingerprinting technology to identify and block unauthorized audio or audiovisual content on their respective sites. Hohengarten ¶ 370 & Ex. 336 (Ikezoye Dep.) at 13:5-14:13; Hohengarten ¶ 383 & Ex. 349 (Robinson Dep.) at 61:13-62:7; Hohengarten ¶ 343 & Ex. 309, MPAA0011721, at MPAA0011721; Hohengarten ¶ 143 & Ex. 140, GOO001-09612201, at GOO001-09612201.*

**Disputed**. First, the cited evidence is inadmissible hearsay. *See* Defendants' Motion to Strike. Second, Audible Magic's filtering technology was not deployed on any websites, including the ones listed in this proposed fact, until the first quarter of 2007. Schapiro Opp. Ex. 113 (12:16-13:12). Finally, the proposed fact omits that Audible

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Magic's fingerprinting technology was used to track and monetize authorized content on video websites.  King Decl. ¶¶ 7-10.

291.   *Starting early in 2006, copyright owners urged YouTube to use fingerprinting technology, such as Audible Magic, to stop infringement. Hohengarten ¶ 367 & Ex. 333 (Garfield Dep.) at 14:1-28:12; Hohengarten ¶ 337 & Ex. 304, AM 002090, at AM 002091.*

**Disputed.**  First, the cited evidence is inadmissible hearsay.  *See* Defendants' Motion to Strike.  Second, the testimony of Dean Garfield should be stricken.  The MPAA, in consultation with Viacom, refused to seat a witness for deposition on the following topic: "Your conversations with YouTube regarding online copyright protection." Schapiro Opp. Ex. 375 (1/10/2010 Rule 30(b)(6) Deposition Notice, Topic No. 11); Defendants' Motion to Strike.  Third, the proposed fact contains an improper and unsupported legal conclusion concerning infringement.    Fourth, the cited evidence does not support the proposition that any copyright owners were urging YouTube to use fingerprinting technology.  Fifth, the MPAA is a trade organization, not a copyright owner.  Schapiro Opp. Ex. 318 (23:12-17).  Finally, Hohengarten Ex. 304 does not support the contention that copyright owners were urging YouTube to use fingerprinting technology.    It simply states that "George White at Warner Music forwarded your contact information to me."  Hohengarten Ex. 304 at AM 002091.

**Additional Material Facts**:

(1)    YouTube first became aware of Audible Magic in mid-2006 through some of the record labels with whom it was negotiating a partnership.  Maxcy Opp. Decl. ¶ 2.

(2)    In mid-2006, Audible Magic's technology had not been used to scan video files on a user-generated content website like YouTube. Maxcy Opp. Decl. ¶ 2.

(3)    YouTube followed up with Audible Magic to learn more about its technology and determine whether it might be useful for its needs. Maxcy Opp. Decl. ¶ 2.

(4)    YouTube was the first user-generated content website to sign an agreement with Audible Magic to license its audio-fingerprinting technology.  Hohengarten Ex. 141; Schapiro Opp. Ex. 113 (12:16-13:12, 225:5-226:2).

292.   *On October 5, 2006, YouTube and Audible Magic signed an agreement for Audible Magic to provide audio fingerprinting services to YouTube.*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*Hohengarten ¶ 144 & Ex. 141, GOO001-03427120, at GOO001-03427120.*

**Undisputed.**

293.  *YouTube did not begin using Audible Magic's audio fingerprinting service until February 2007. Hohengarten ¶ 142 & Ex. 139, GOO001-01950611, at GOO001-01950611; Hohengarten ¶ 370 & Ex. 336 (Ikezoye Dep.) at 57:6-16; Hohengarten ¶ 145 & Ex. 142, GOO001-02867502, at GOO001-02867502.*

**Disputed.**  YouTube began using Audible Magic's fingerprinting technology in a testing capacity starting in mid-2006.  Maxcy Opp. Decl. ¶ 3.  After licensing the Audible Magic technology in October 2006, YouTube worked closely with Audible Magic and various record labels over a period of months to integrate the Audible Magic technology into YouTube's systems in a manner that would scale to YouTube's operations.  Maxcy Opp. Decl. ¶¶ 5-6.  That process was a significant technical challenge because Audible Magic had never been used on a user-generated content website before.  Maxcy Opp. Decl. ¶ 5.

294.  *From 2007 through the end of 2009, YouTube used Audible Magic to check every video uploaded to the YouTube site, but only against a limited set of audio and audiovisual works specified by YouTube. Hohengarten ¶ 374 & Ex. 340 (King 30(b)(6) Dep.) at 96:22-97:3.  See SUF infra ¶¶ 295-298.*

**Disputed.** The proposed fact is argumentative and unsupported by the cited evidence.  YouTube did not specify the reference files in the Audible Magic database that uploaded videos would be checked against.  King Decl. ¶ 7.  Content owners decided which videos they wished to "claim" and would provide YouTube with a policy about what to do when a matching video was found: block, track, or monetize.  *Id.* Between February 2006 and 2009, approximately 50 different rights holders used Audible Magic to claim videos on YouTube.  *Id.* ¶ 8.   The Audible Magic technology was made available to any content owner who wished to use it and those content owners were free to apply whatever usage policy they desired with respect to claimed videos.  *Id.* ¶ 9.

295.  *Audible Magic was capable of identifying millions of copyrighted works, but YouTube directed Audible Magic to limit its searches to identifying only specific content belonging to content owners who had agreed to licensing and revenue sharing deals with YouTube.  See SUF*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*infra* ¶¶ *296-298; Hohengarten* ¶ *370 & Ex. 336 (Ikezoye Dep.) at 33:4-9, 48:18-22; Hohengarten* ¶ *141 & Ex. 138, GOO001-02604786, at GOO001-02604789-90; Hohengarten* ¶ *144 & Ex. 141, GOO001-03427120, at GOO001-03427122, GOO001-03427124; Hohengarten* ¶ *146 & Ex. 143, GOO001-02493328, at GOO001-02493328-29; Hohengarten* ¶ *355 & Ex. 321 (Chastagnol Dep.) at 182:19-186:19; Hohengarten* ¶ *370 & Ex. 336 (Ikezoye Dep.) at 64:15-66:6, 79:4-16, 80:15-81:16, 93:20-94:9; Hohengarten* ¶ *146 & Ex. 143, GOO001-02493328, at GOO001-02493328-29; Hohengarten* ¶ *355 & Ex. 321 (Chastagnol Dep.) at 182:19-186:19; Hohengarten* ¶ *338 & Ex. 305, AM001241, at AM001241-42.*

**Disputed**.  The proposed fact is unsupported by the cited evidence. Content owners with whom YouTube did not have licensing and revenue-sharing agreements used Audible Magic to identify their content on YouTube.  Schapiro Opp. Ex.133 (51:14-53:10, 183:20-185:3, 186:8-17); Schapiro Opp. Ex. 132 (49:14-50:18, 83:5-16); King Opening Decl. ¶¶ 9-10.   YouTube's policy is not, and was not, to make fingerprinting technology (including Audible Magic) available only to content owners that entered into revenue-sharing agreements. *Id*.; Schapiro Opp. Ex. 134 (140:20-142:25) (CEO of Google describing decision that YouTube's fingerprinting tools "would be available to media companies independent of whether they did a deal with us"); *id.* 150:12-17; Schapiro Opp. Ex. 83 (286:10-14) (CEO of YouTube testifying that "[w]e want to make our tools available generally to anyone.  They don't need to enter a licensing agreement because of it"); Schapiro Opp. Ex. 110 (171:22-172:19) ("it was always the policy that this suite of tools should be made available to anyone who wanted to use them, whether they were licensing content to YouTube or not"); Maxcy Opp. Decl. ¶ 7 ("To my knowledge, YouTube *never* relied on a copyright holder's unwillingness to license content as a basis for refusing access to Audible Magic or any other fingerprinting technology that we had available.").

296.    *YouTube also used Audible Magic to create fingerprints of audio and audiovisual works belonging to content owners who had agreed to licensing and revenue sharing deals with YouTube, and then to search for those works on the YouTube site, but YouTube did not use this ability to fingerprint or search for content owned by Viacom. Hohengarten* ¶ *339 & Ex. 306, AM000917, at AM000917; Hohengarten* ¶ *370 & Ex. 336 (Ikezoye Dep.) at 65:20-66:14; Hohengarten* ¶ *374 & Ex. 340 (King 30(b)(6) Dep.) at  47:16-50:14; Hohengarten* ¶ *338 & Ex. 305, GOO001-01511226, at GOO001-01511226; Hohengarten* ¶ *142 & Ex.  139,  GOO001-01950611,  at  GOO001-01950613;  GOO001-01202238Hohengarten* ¶ *361 & Ex. 327 (Drummond Dep.) at 158:12-*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*17, 159:13-160:18; Hohengarten ¶ 137 & Ex. 134, GOO001-00561601, at GOO001-00561607-08, GOO001-00561612-15; Hohengarten ¶ 148 & Ex. 145, GOO001-02506828, at GOO001-02506828.0003, GOO001-02506828.0005; Hohengarten ¶ 149 & Ex. 146, GOO001-01202238, at GOO001-01202240-41; Hohengarten ¶ 375 & Ex. 341 (Kordestani Dep.) at 244:13-23; Hohengarten ¶ 348 & Ex. 314 (Schmidt Dep.) at 156:3-24; Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 271:17-288:15.*

**Disputed**.  The proposed fact is argumentative and unsupported by the cited evidence.  Content owners used Audible Magic technology to identify their content on YouTube and would provide YouTube with one of three usage policies: block, track, or monetize.  King Opening Decl. ¶ 7.  The first rights holder to use Audible Magic to "claim" a video on YouTube was the Universal Music Group on February 14, 2006. King Opening Decl. ¶ 8.  In the following months, other rights holders signed up to use Audible Magic technology to identify their content on YouTube, and YouTube would apply their usage policies as directed.  *Id.*  Content owners with whom YouTube did not have a licensing and revenue-sharing agreement used Audible Magic to identify their content on YouTube.  *See* YouTube's Response to Viacom's SUF No. 295.  Viacom did not have any reference files in Audible Magic until April 2007.  Schapiro Opp. Ex. 136 (110:7-13); Schapiro Opp. Ex. 147 (50:3-12).

Viacom could not have used Audible Magic's fingerprinting technology to identify its content without first providing reference files to Audible Magic. Schapiro Opp. Ex. 147 (50:23-51:25); Schapiro Opp. Ex. 146 (220:22-221:6).  Viacom has not presented any evidence, and YouTube is aware of none, that Viacom requested that YouTube use Audible Magic at time when Viacom had reference files in the Audible Magic database.  To identify its content on YouTube, Viacom elected to use a different audio fingerprinting vendor called Auditude, which it thought was superior to Audible Magic.  Schapiro Opp. Ex. 319; Schapiro Opp. Ex. 320 (71:7-16, 74:20-75:2).  Auditude created fingerprints of nearly all the videos on YouTube, and its technology compared those fingerprints to a library of Viacom content that Viacom provided to Auditude starting in May 2007.  Schapiro Opp. Ex. 320 (96:20-97:20, 100:17-19, 104:2-106:12, 122:13-22, 130:4-16);  Schapiro Opp. Ex. 319. YouTube did not have a commercial relationship with Auditude, but allowed the company to scan the YouTube website on Viacom's behalf. Schapiro Opp. Ex. 321.  On some occasions when Auditude identified a match of Viacom content on YouTube, Viacom would request that YouTube remove certain matching videos.  Schapiro Opp. Ex. 320 (149:25-150:21, 196:7-16); Schapiro Opp. Ex. 322.  YouTube would then remove the identified videos as requested.  Levine Decl. ¶ 19.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

297.    *YouTube used Audible Magic to block taken-down videos from being re-uploaded to the site, but only on behalf of some content owners who had entered agreements with YouTube, and not on behalf of content owners who had not, such as Viacom.  Hohengarten ¶ 374 & Ex. 340 (King 30(b)(6) Dep.) at 67:10-68:15, 70:22-78:3, 84:21-88:23, 89:20-90:9, 95:7-95:25.*

**Disputed**.  The proposed fact is argumentative and unsupported by the cited evidence.  YouTube did not condition access to Audible Magic on a content partnership agreement. *See* YouTube's Responses to SUF ¶¶ 294-296.  Content owners who used YouTube's copyright protection tools, including Audible Magic's technology, agreed in advance to use those tools responsibly. Schapiro Opp. Ex. 133 (74-75, 77).  Viacom itself entered into an agreement with YouTube governing its use of YouTube's video fingerprinting technology without a content partnership deal in place between the parties.  Hohengarten Ex. 95.

298.    *Even after Defendants began using Audible Magic fingerprinting on YouTube, they refused requests by copyright owners to use that technology to prevent infringement of any copyright owner's copyrights unless the owner first granted YouTube a content license and revenue sharing deal.  Hohengarten ¶ 201 & Ex. 382 GOO001-08050272, at GOO001-08050272; Hohengarten ¶ 348 & Ex. 315 (Schmidt Dep.) at 156:3-24; Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 271:17-288:15.*

**Disputed.**    The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement.  Content owners with whom YouTube did not have licensing and revenue-sharing agreements used Audible Magic to identify their content on YouTube.  Schapiro Opp. Ex. 133 (51:14-53:10, 183:20-185:3, 186:8-17); Schapiro Opp. Ex. 132 (49:14-50:18, 83:5-16); King Opening Decl. ¶¶ 9-10.  *See* YouTube's Responses to SUF ¶¶ 295-97.

299.    *In a September 2006 licensing and revenue-sharing agreement, YouTube offered to use digital fingerprinting to prevent the infringement of copyrighted works owned by Warner Music Inc. Hohengarten ¶ 191 & Ex. 188, GOO001-09684752, at GOO001-09684765-66, GOO001-09684803-05; Hohengarten ¶ 40 & Ex. 37, GOO001-01627276, at GOO001-01627276.*

**Disputed.**    The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement.  In the cited agreement between YouTube and Warner

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

Music, Warner Music granted YouTube a license to certain of its content. Hohengarten Ex. 188. Digital fingerprinting was a term of the agreement. *Id.* Every major U.S. television broadcaster, movie studio and record label, including Viacom, uses fingerprinting to identify its content on YouTube. Id. at ¶¶ 21, 29-31. Content owners who do not have content partnership agreements with YouTube use fingerprinting to identify their content on YouTube. King Opening Decl. ¶¶ 21-22.

300. *In a September 2006 licensing and revenue-sharing agreement, YouTube offered to use metadata tag searching to prevent the infringement of copyrighted works owned by Warner Music Inc. Hohengarten ¶ 191 & Ex. 188, GOO001-09684752, at GOO001-09684805-06.*

**Disputed.** The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement. Metadata and tag searching was a term of the agreement under which YouTube agreed to provide Warner Music with the results of keyword searches that Warner Music designated. Hohengarten Ex. 188.

**Additional Material Facts:**

YouTube made metadata and tag searching available to content owners as part of YouTube's suite of copyright protection tools. B. Hurley Opp. Decl. ¶ 4. YouTube also made available to content owners and ordinary users a similar functionality called "subscribe to tags" in late 2005 and early 2006. *Id.* ¶¶ 2-3.

301. *In an October 2006 licensing and revenue-sharing agreement, YouTube offered to use fingerprinting to prevent the infringement of copyrighted works owned by CBS Digital Media. Hohengarten ¶ 190 & Ex. 187, GOO001-09684647, at GOO001-09684660-61; Hohengarten ¶ 151 & Ex. 148, GOO001-01870875, at GOO001-01870876.*

**Disputed.** The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement. In the cited agreement between YouTube and CBS Digital Media, CBS Digital Media granted YouTube a license to certain of its content. Hohengarten Ex. 187. Digital fingerprinting was a term of the agreement. *Id.* Every major U.S. television broadcaster, movie studio and record label, including Viacom, uses fingerprinting to identify its content on YouTube. King Opening Decl. ¶¶ 21, 29-31. Content owners who do not have content partnership agreements with

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

YouTube use fingerprinting to identify their content on YouTube.  King Opening Decl. ¶¶ 21-22.

302.  *In an October 2006 licensing and revenue-sharing agreement, YouTube offered to use metadata tag searching to prevent the infringement of copyrighted works owned by CBS Digital Media.   Hohengarten ¶ 190 & Ex. 187, GOO001-09684647, at GOO001-09684660.*

**Disputed.** The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement.   Metadata and tag searching was a term of the agreement under which YouTube agreed to provide CBS Digital Media with the results of keyword searches that CBS Digital Media designated.  Hohengarten Ex. 187 (GOO001-09684660).

**Additional Material Facts:**

YouTube made metadata and tag searching available to content owners as part of YouTube's suite of copyright protection tools.  B. Hurley Opp. Decl. ¶ 4.  YouTube also made available to content owners and ordinary users a similar functionality called "subscribe to tags" in late 2005 and early 2006.  *Id.* at ¶¶ 2-3.

303.  *In negotiations for a licensing and revenue-sharing agreement YouTube offered to use fingerprinting to prevent the infringement of copyrighted works owned by Turner Broadcasting Inc. in October 2006. Hohengarten ¶ 152 & Ex. 149, GOO001-02826036, at GOO001-02826039.*

**Disputed.**  The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement.  In the draft term sheet between YouTube and Turner Broadcasting, Turner Broadcasting proposed granting YouTube a license to certain of its content.  Hohengarten Ex. 149.  Fingerprinting was a term of the proposed agreement.  *Id.* at GOO001-02826039.  Every major U.S. television broadcaster, movie studio and record label, including Viacom, uses fingerprinting to identify its content on YouTube.  King Opening Decl. ¶¶ 21, 29-31.  Content owners who do not have content partnership agreements with YouTube use fingerprinting to identify their content on YouTube.  King Opening Decl. ¶¶ 21-22.

304.  *In an October 2006 Memorandum of Understanding, YouTube offered to use fingerprinting to prevent the infringement of copyrighted works owned by Sony BMG Music Entertainment.  Hohengarten ¶ 189 & Ex.*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*186, GOO001-09684681, at GOO001-09684705-08; Hohengarten ¶ 151 & Ex. 148 GOO001-01870875, at GOO001-01870879.*

**Disputed** The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement.   In the Memorandum of Understanding between YouTube and Sony BMG, SonyBMG proposed granting YouTube a license to certain of its content.  Hohengarten Ex. 149.  Fingerprinting was a term of the proposed agreement.  *Id.* (GOO001-01870879). Every major U.S. television broadcaster, movie studio and record label, including Viacom, uses fingerprinting to identify its content on YouTube.  King Opening Decl. ¶¶ 21, 29-31.  Content owners who do not have content partnership agreements with YouTube use fingerprinting to identify their content on YouTube.  King Opening Decl. ¶¶ 21-22.

305.   *In an October 2006 Memorandum of Understanding, YouTube offered to use metadata tag searching to prevent the infringement of copyrighted works owned by Sony BMG Music Entertainment. Hohengarten ¶ 189 & Ex. 186, GOO001-09684681, at GOO001-09684705, GOO001-09684709.*

**Disputed.**  The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement.  Metadata and tag searching was a proposed term under which YouTube would agree to provide Sony BMG with the results of keyword searches that Sony BMG designated.  Hohengarten Ex. 186 (GOO001-09684705, GOO001-09684709).

**Additional Material Facts:**

YouTube made metadata and tag searching available to content owners as part of YouTube's suite of copyright protection tools.  B. Hurley Opp. Decl. ¶ 4.  YouTube also made available to content owners and ordinary users a similar functionality called "subscribe to tags" in late 2005 and early 2006.  *Id.* ¶¶ 2-3.

306.   *In negotiations for a licensing and revenue-sharing agreement YouTube offered to use fingerprinting to prevent the infringement of copyrighted works owned by The Walt Disney Company in December 2006. Hohengarten ¶ 197 & Ex. 373, GOO001-02502815, at GOO001-02502819 (deal framework between YouTube and The Walt Disney Company agreeing to provide audio fingerprinting services).*

**Disputed**.  The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

infringement.  In the deal framework between YouTube and Disney, Disney proposed granting YouTube a license to certain of its content. Hohengarten Ex. 373.  Fingerprinting was a term of the proposed agreement.  *Id.* (GOO001-02502819).  Every major U.S. television broadcaster, movie studio and record label, including Viacom, uses fingerprinting to identify its content on YouTube.  King Opening Decl. ¶¶ 21, 29-31.  Content owners who do not have content partnership agreements with YouTube use fingerprinting to identify their content on YouTube.  *Id.* at ¶¶ 21-22.

307.  *In negotiations for licensing and revenue-sharing agreements YouTube offered to use fingerprinting for Viacom in July 2006 and for Viacom's MTV Networks in February 2007.  Hohengarten ¶ 271 & Ex. 245, VIA00727695, at VIA00727696; Hohengarten ¶ 94 & Ex. 91, GOO001-00984825, at GOO001-00984837.*

**Disputed**.  The proposed fact is argumentative and unsupported by the cited evidence.  In negotiations between YouTube and Viacom, Viacom proposed granting YouTube a license to certain of its content. Hohengarten Exs. 91, 245.  Fingerprinting was a term of the proposed agreement.  Hohengarten Ex. 245 (VIA00727696), Ex. 91 (GOO001-00984837).  Every major U.S. television broadcaster, movie studio and record label, including Viacom, uses fingerprinting to identify its content on YouTube.  King Opening Decl. ¶¶ 21, 29-31.  Content owners who do not have content partnership agreements with YouTube use fingerprinting to identify their content on YouTube.  *Id.* at ¶¶ 21-22.

308.  *In negotiations for a licensing and revenue-sharing agreement YouTube offered to use fingerprinting to prevent the infringement of copyrighted works owned by NBC Universal in February 2007.  Hohengarten ¶ 155 & Ex. 152, GOO0001-02874326, at GOO0001- 02874326.*

**Disputed.**  The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement.  In negotiations between YouTube and NBC, NBC proposed granting YouTube a license to certain of its content. Hohengarten Ex. 152.  Fingerprinting was a term of the proposed agreement.  Hohengarten Ex. 152 (GOO0001-02874326).  Every major U.S. television broadcaster, movie studio and record label, including Viacom, uses fingerprinting to identify its content on YouTube.  *Id.* ¶¶ 21, 29-31.  Content owners who do not have content partnership agreements with YouTube use fingerprinting to identify their content on YouTube.  King Opening Decl. ¶¶ 21-22.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

309.   *In negotiations for a licensing and revenue-sharing agreement YouTube offered to use fingerprinting to prevent the infringement of copyrighted works owned by EMI in March 2007.  Hohengarten ¶ 156 & Ex. 153, GOO001-02240369, at GOO001-02240369; Hohengarten ¶ 157 & Ex. 154, GOO001-02524911, at GOO001-02525000.*

**Disputed.**   The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement.  In the cited agreement between YouTube and EMI, EMI granted YouTube a license to certain of its content.  Hohengarten Ex. 154.  Digital fingerprinting was a term of the agreement.  *Id.*  Every major U.S. television broadcaster, movie studio and record label, including Viacom, uses fingerprinting to identify its content on YouTube.  King Opening Decl. ¶¶ 21, 29-31.  Content owners who do not have content partnership agreements with YouTube use fingerprinting to identify their content on YouTube.  *Id.* at ¶¶ 21-22.

310.   *In negotiations for a licensing and revenue-sharing agreement YouTube offered to use fingerprinting to prevent the infringement of copyrighted works owned by Universal Music in June 2007.  Hohengarten ¶ 181 & Ex. 178, GOO001-06147947, at GOO001-06147947 (draft agreement between YouTube and Universal Music Group Recordings, Inc. dated October 6, 2006); Hohengarten ¶ 151 & Ex. 148, GOO001-01870875, at GOO001-01870882.  See also Hohengarten ¶ 158 & Ex. 155, GOO001-02241782, at GOO001-02241782 (amending October 6, 2006 agreement).*

**Disputed.**   The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement.  In the cited agreement between YouTube and Universal Music, Universal Music granted YouTube a license to certain of its content.  Hohengarten Ex. 155.  Digital fingerprinting was a term of the agreement.  *Id.*  Every major U.S. television broadcaster, movie studio and record label, including Viacom, uses fingerprinting to identify its content on YouTube.  *Id.* ¶¶ 21, 29-31.  Content owners who do not have content partnership agreements with YouTube use fingerprinting to identify their content on YouTube.  King Opening Decl. ¶¶ 21-22.

311.   *The October 5, 2006 agreement between Audible Magic and YouTube required YouTube to pay Audible Magic $200,000 in service fees for 2007 and $300,000 in service fees for 2008.  Hohengarten ¶ 144 & Ex. 141, GOO001-03427120, at GOO001-03427122, GOO001-03427126.*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

**Disputed.** The cited agreement required a payment of approximately ███████ for Audible Magic's services in 2007.

312.  *The cost to YouTube of using Audible Magic's entire reference database of fingerprints of film and TV works would have been approximately twice the amount that Audible Magic was charging YouTube each month under the October 5, 2006 contract.   Hohengarten ¶ 370 & Ex. 336 (Ikezoye Dep.) at 105:21-106:3.*

**Disputed**.   The cited evidence does not support the proposition. Audible Magic's Vance Ikezoye guessed in his deposition that if YouTube were to use Audible Magic's film and television database (the "soundtrack database") on September 10, 2009, it would cost "at least double the price" of what YouTube was then paying Audible Magic. Schapiro Opp. Ex. 113 (105:21-106:3).  Ikezoye's testimony was based on a hypothetical question from counsel, not a real-world proposal.  *Id.* Audible Magic's actual proposal to YouTube to access the soundtrack database indicated that the price would be twenty times what YouTube was paying for access to Audible Magic's music database of sound recording fingerprints.  Schapiro Opp. Ex. 133 (119:12-120:6). Audible Magic also did not provide YouTube with any service level guarantees concerning YouTube's access to the soundtrack database. *Id.*

**Additional Material Facts:**

(1)  The Audible Magic film and television database was not populated with any reference files until December of 2006.  Schapiro Opp. Ex. 135.   Viacom did not provide reference files for the soundtrack database until April 2007.  *Id.*

(2)   Audible Magic's music database of sound recording fingerprints had over 7 million references as of September 2009, and its soundtrack database had only 129,171 reference files as of that date.  Schapiro Opp. Ex. 135; Schapiro Opp. Ex. 113 (33:19-34:5).

(3)  In early 2007, YouTube focused on developing its own video-based fingerprinting technology specifically designed to identify television and movie content.  Schapiro Opp. Ex. 133 (122:12-20, 138:15-19); King Opening Decl.  ¶¶  13-14.    YouTube determined that video-fingerprinting tools were more effective than audio-only tools like Audible Magic in locating television and movie content on YouTube. King Opening Decl. ¶ 13; Schapiro Opp. Ex. 133 (141:9-22, 143:4-10).

313.  *Google developed its own audio fingerprinting tool as early as November 2006, but did not start using it on the YouTube site to*

146

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*prevent infringement of any copyrighted content until approximately February 2008. Hohengarten ¶ 151 & Ex. 156, GOO001-02354601, at GOO001-02354601; Hohengarten ¶ 160 & Ex. 157, GOO001-09612078, at GOO001-09612078; Hohengarten ¶ 373 & Ex. 339 (King Dep.) at 125:15-126:10.*

**Disputed.** The proposed fact is argumentative, unsupported by the cited evidence and contains an improper legal conclusion concerning infringement. The cited document states that Google had built a prototype audio-fingerprinting technology, that to determine its efficacy Google would need "to get more data," and that it might be operational in "3-4 months." Hohengarten Ex. 156. YouTube licensed Audible Magic's audio-fingerprinting technology starting in October of 2006 and began using that technology in February 2007. Maxcy Opp. Decl. ¶ 3. Google and YouTube engineers developed their own custom-built audio-fingerprinting technology that launched in April 2008. King Opening Decl. ¶ 20. YouTube makes that technology available for free to any content owner who wants to use it to identify content on YouTube. *Id.* ¶ 22.

314.  *At the first status conference before this Court in July 2007, Defendants' counsel announced for the first time that Defendants would implement their own proprietary video fingerprinting technology and would make it available to all copyright holders, not just those who had agreed to licensing deals with Defendants. Hohengarten ¶ 399 & Ex. 362 (July 27, 2007 Status Conference Transcript) at 15:15-17:7.*

**Disputed.** As of June 2007, Viacom was aware that YouTube publicly announced that it would be implementing its own video-fingerprinting technology. *See* Schapiro Opp. Ex. 219. In June 2007, YouTube invited Viacom to test YouTube's video-fingerprinting technology, and Viacom signed a test agreement on June 13, 2007. *See* King Opp. Decl. 5-6; Schapiro Opp. Ex. 323. Prior to the July 27, 2007 status conference, Viacom and YouTube also had several discussions about Viacom's testing and use of YouTube's video fingerprinting technology, including a "Video Fingerprinting Partner Kickoff Meeting" held on July 19. *See* King Opp. Decl. ¶¶ 4, 6 & Exs. 1-6.

## VI.   DEFENDANTS' CONDUCT AS DIRECT INFRINGEMENT AND AS BEYOND STORAGE AT THE DIRECTION OF A USER

### Defendants' Copying and Transcoding of Videos Uploaded to YouTube

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

information for the Court violates Local Rule 56.1 and those statements should be stricken.  *See* Local Rule 56.1.  YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

315.    *When a user submits a video for upload, YouTube makes one or more exact copies of the video in its original file format (i.e., the format in which it is uploaded by the user).  Hohengarten ¶ 356 & Ex. 322 (Do Dep.) at 19:21-20:6.*

**Undisputed.**

316.    *YouTube makes one or more additional copies of every video during the upload process in a different encoding scheme and different file format called Flash.  Hohengarten ¶ 357 & Ex. 323 (Do 30(b)(6) Dep.) at 85:18-86:10; Hohengarten ¶ 356 & Ex. 322 (Do Dep.) at 19:21-20:6.*

**Undisputed.**

317.    *Making copies of a video in a different encoding scheme is called "transcoding."  Hohengarten ¶ 356 & Ex. 322 (Do Dep.) at 17:4-15.*

**Undisputed.**

318.    *In a July 11, 2006 email, YouTube product manager Matthew Liu states that all YouTube videos are transcoded for delivery in Flash format.  Hohengarten ¶ 161 & Ex. 158, GOO001-05175716, atGOO001-05175716.*

**Undisputed** that the cited document includes the information in the proposed fact.

319.    *Via delivery in the Flash format of videos to users, YouTube ensures that its videos are viewable over the Internet to most users.  Hohengarten ¶ 257 & Ex. 239, JK00008859, at JK00008859 ; Hohengarten ¶ 222 & Ex. 204, JK00009887, at JK00009887.  Hohengarten ¶ 356 & Ex. 322 (Do. Dep.) at 18:2-6; Hohengarten ¶ 162 & Ex. 159, GOO001-00889264, at GOO001-00889266.*

**Disputed.**  The cited evidence does not support the proposed fact. YouTube transcodes videos uploaded by its users into the Flash format so that they can be playable by most users at their request. Hohengarten    Ex.    239    (JK00008859);    Hohengarten    Ex.    204 (JK00009887).   Hohengarten Ex. 322 (18:2-6); Hohengarten Ex. 159 (GOO001-00889266).

148

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

320.  *The uploading user does not have any choice whether YouTube transcodes the video, or instead stores the video in the original format chosen by the user.  Hohengarten ¶ 356 & Ex. 322 (Do Dep.) at 25:14-27:18.  See infra SUF ¶ 321.*

**Disputed.**  The cited evidence does not support the proposed fact. Before uploading a video to YouTube, each user consents to YouTube's Terms of Service in which they agree to the steps that the YouTube system takes, including the modification of the videos they upload. Levine Opening Decl. Ex. 1; Solomon Opening Decl. ¶ 6.  By proceeding to upload a video, users direct YouTube to transcode their uploaded videos to make them playable for visitors to YouTube.  *Id.*

321.  *YouTube engineering manager Cuong Do stated in his deposition, "[t]he system performed . . . the replication as a course of its normal operation, . . . uninstructed by the user."  Hohengarten ¶ 356 & Ex. 322  (Do Dep.) at 27:16-18.*

**Undisputed** that the proposed fact contains excerpts from a deposition of Cuong Do.

**Additional Material Facts:**

One of the automated processes undertaken by the YouTube system in response to a user's decision to upload a video is to make at least one copy of the stored version of the user's video file to increase the utility and reliability of the service for YouTube's users.  Solomon Opening Decl. ¶ 8.

322.  *In the past, "for particularly popular videos that are watched very frequently" on YouTube, YouTube sen[t] "a replica" of the video "to a third-party content distribution partner to facilitate timely streaming to all users."  Currently, YouTube uses some of Google's own services to perform that function.  Hohengarten ¶ 191 & Ex. 188, GOO001-09684752, at GOO001-09684711-12; Hohengarten ¶ 357 & Ex. 323 (Do 30(b)(6) Dep.) at 90:16-92:1.*

**Undisputed** that the cited document includes the language quoted in the proposed fact**.**

**Additional Materials Facts:**

(1) The use of content distribution networks ("CDN") is commonplace. Schapiro Opp. Ex. 118 (89:11-17).  A CDN is an automated file-serving network that assists websites, such as YouTube and some of those owned and operated by Viacom, in responding to large numbers

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

requests from users distributed across the world. Solomon Opp. Decl. ¶ 5; Gordon Opp. Decl. ¶¶ 2-8; Schapiro Opp. Ex. 117 (117:20-118:11, 283:10-16); Schapiro Opp. Ex. 118 (91:16-23); Schapiro Opp. Exs. 414 & 415.

(2) YouTube's system employed an automated algorithmic formula to analyze the size of video files and the frequency with which they are requested for viewing by its users to determine which videos would be more efficiently served via a CDN than from YouTube's regular video servers. Solomon Opp. Decl. ¶ 5. YouTube often referred to videos meeting this criteria as "popular" videos. Serving such videos via a CDN lessens the burden on the YouTube system and enhances the user's experience by speeding playback of the requested video. *Id.*

323. *YouTube performs videos by streaming them to users' computers. As part of that process, YouTube also distributes a complete and durable copy of a video to the computer of any user who views it. Hohengarten ¶ 186 & Ex. 183 GOO001-00718495, at GOO001-00718495. Hohengarten ¶ 408.*

**Disputed.** None of the cited evidence supports the proposed fact and Hohengarten ¶ 408 is foundationless speculation. *See* Defendants' Motion to Strike. Whether a video is "performed" or "distributed" in response to a user payback request is a legal conclusion, not a proposed fact. When a video is played in response to a user request, a copy of that video may be stored in the requesting user's browser cache, as any Internet content would be. Solomon Opp. Decl. ¶ 4. This depends on how that user's computer is configured to store information, not on YouTube's system. *Id.* If the user's browser is configured to temporarily save Internet content, the duration of how long that content will be in the user's cache also depends. *Id.* That copy of the video may or may not be complete depending on whether the user viewed the entire video. *Id.*

324. *YouTube has contracts with Apple to distribute videos over iPhones and AppleTV devices. Hohengarten ¶ 163 & Ex. 160, GOO001-09684557, at GOO001-09684557-79; Hohengarten ¶ 164 & Ex. 161, GOO001-02276277, at GOO001-02276277; Hohengarten ¶ 165 & Ex. 162, GOO001-07726987, at GOO001-07726987.*

**Disputed**. Whether a video is "distributed" in response to a user payback request is a legal conclusion. YouTube does not distribute videos to Apple iPhones or the AppleTV. YouTube has an agreement with Apple to allow users of iPhones and AppleTV to access YouTube videos via those devices, in a way similar to how users access YouTube

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

via an Internet browser on a PC.  Hohengarten Ex. 160 (GOO001-09684557) (allowing Apple to develop an interface in order to allow its devices to access YouTube videos); Solomon Opp. Decl. ¶¶ 3-4.

325.  *YouTube has a contract with Sony to distribute YouTube videos over Sony devices.  Hohengarten ¶ 166 & Ex. 163, GOO001-02243231, at GOO001-02243231.*

**Disputed**.  Whether a video is "distributed" in response to a user payback request is a legal conclusion.  YouTube does not distribute videos to Sony.  YouTube has an agreement with Sony to allow users of certain Sony devices to access YouTube videos via those devices, in a way similar to how users access YouTube via an Internet browser on a PC.  Hohengarten Ex. 163, at ¶ 2.1 (allowing Sony to develop an interface in order to allow its devices to access YouTube videos); Solomon Opp. Decl. ¶¶ 3-4.

326.  *YouTube has a contract with Panasonic to distribute YouTube videos over Panasonic devices.  Hohengarten ¶ 168 & Ex. 165, GOO001-02242506, at GOO001-02242506-23.*

**Disputed**.  Whether a video is "distributed" in response to a user payback request is a legal conclusion.  YouTube does not distribute videos to Panasonic.  YouTube has an agreement with Panasonic to allow users of Panasonic devices to access YouTube videos via those devices, in a way similar to how users access YouTube via an Internet browser on a PC.  Hohengarten Ex. 165, at ¶ 2.1 (allowing Panasonic to develop an interface in order to allow its devices to access YouTube videos); Solomon Opp. Decl. ¶¶ 3-4.

327.  *YouTube has a contract with TiVo to distribute YouTube videos over TiVo devices.  Hohengarten ¶ 169 & Ex. 166, GOO001-02242907, at GOO001-02242907-24.*

**Disputed.**  Whether a video is "distributed" in response to a user payback request is a legal conclusion.  YouTube does not distribute videos to TiVo.  YouTube has an agreement with TiVo to allow users of TiVo devices to access YouTube videos via those devices, in a way similar to how users access YouTube via an Internet browser on a PC.  Hohengarten Ex. 166, at ¶ 2.1 (allowing TiVo to develop an interface in order to allow its devices to access YouTube videos); Solomon Opp. Decl. ¶¶ 3-4.

328.  *YouTube has contracts with major cellular telephone companies including AT&T, Verizon Wireless, and Vodafone.  Hohengarten ¶ 170 & Ex. 167, GOO001-02392607, at GOO001-02392607-43; Hohengarten*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*¶ 171 & Ex. 168, GOO001-06176212, at GOO001-06176212-24; Hohengarten ¶ 172 & Ex. 169, GOO001-06176368, at GOO001-06176368-86; Hohengarten ¶ 173 & Ex. 170, GOO001-02552363, at GOO001-02552363.*

**Undisputed.**

329.  *As part of YouTube's agreement with Verizon Wireless, YouTube provided Verizon with copies of the YouTube videos that Verizon wished to make available on its mobile devices, which consisted solely of videos YouTube had selected for prominent placement as featured videos on YouTube.  Hohengarten ¶ 379 & Ex. 345 (Maxcy Dep.) at 219:21-222:13; Hohengarten ¶ 391 & Ex. 385 (Patterson Dep.) at 37:20-38:7. See also infra SUF ¶ 331.*

**Undisputed.**  The cited evidence is not relevant to Viacom's motion because there is no evidence any of the clips in suit were provided to Verizon.

**Additional Material Facts:**

Only two clips in suit were ever featured videos.  Defendants' Reponses and Objections to Plaintiffs' Second Set of Interrogatories, No. 4.  Each of the videos was authorized to be on YouTube at the time it was featured.  *See infra* YouTube's Response to SUF ¶ 332.  In all, Group Product Manager Patterson testified that only approximately 2000 videos were provided to Verizon, "on very small scale."  Schapiro Opp. Ex. 325 (37:13-17; 38:25-39:6).

330.  *In 2007, without any request from the uploading users, Defendants created copies of all previously uploaded videos in two formats other than Flash so that the videos could be viewed on additional platforms, including Apple devices and non-Apple mobile phones.  Hohengarten ¶ 356 & Ex. 322 (Do Dep.) at Tr. 215:21-217:25; Hohengarten ¶ 379 & Ex. 345 (Maxcy Dep.) at 215:25-218:13; Hohengarten ¶ 174 & Ex. 171, GOO001-00010746, at GOO001-00010746; Hohengarten ¶ 391 & Ex. 385 (Patterson Dep.) at 57:18-62:22.*

**Disputed.**  The cited evidence does not support the proposed fact.  Before uploading a video to YouTube, each user consents to YouTube's Terms of Service in which they agree to the steps that the YouTube system takes, including the modification of the videos they upload.  Levine Opening Decl. Ex. 1.  By proceeding to upload videos and by allowing them to remain on YouTube, users are directing that YouTube make those videos accessible through all platforms that can access the service and to be transcoded into any necessary format.  *Id.*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Users are free to remove or delete uploaded videos at any time, terminating that authorization. *Id.* In October 2007, YouTube provided its users with the specific option to prevent their videos from being made playable on mobile devices. *See* Hohengarten Ex. 361; Solomon Opp. Decl. ¶ 3.

**Defendants' Use of Features to Make YouTube an Entertainment Site**

**Disputed.** Viacom's inclusion of argumentative, conclusory headings in its Statement of Undisputed Facts under the guise of "organizing" the information for the Court violates Local Rule 56.1 and those statements should be stricken. *See* Local Rule 56.1. YouTube disputes all such headings and the characterizations contained therein even if not expressly stated in response to each Viacom SUF.

331. *YouTube employs "editors" to scour the YouTube site for interesting videos that YouTube on its own initiative then "features" with conspicuous positioning on its home page. Hohengarten ¶ 363 & Ex. 329 (Dunton Dep.) at 29:23-30:6, 94:14-100:4 (testifying that she selected videos to feature on YouTube's home page, to highlight "relevance" and "entertaining content" to users); Hohengarten ¶ 359 & Ex. 325 (Donahue Dep.) at 140:11-25 (testifying that Donahue, Chen, and Dunton selected featured videos to appear on YouTube's homepage).*

   **Undisputed** that YouTube employs editors who choose relevant and entertaining videos to feature on the YouTube home page.

332. *Some of the videos identified by Viacom as infringing Viacom's copyrights were selected and promoted by YouTube employees as featured videos. Hohengarten ¶ 398 & Ex. 361 (Defendants' Reponses and Objections to Plaintiffs' Second Set of Interrogatories, Interrogatory No. 4) at 10 (identifying two clips in suit that were promoted or featured by YouTube).*

   **Disputed.** The cited evidence does not support the proposd fact, which is argumentative and reaches the unsupported legal conclusion that certain videos on YouTube infringe Viacom's alleged copyright. The two clips in suit in YouTube's response to Viacom's Interrogatory No. 4 (Video IDs YYeJEFa-xCA and HPB9tq7f_1k) were authorized by their uploaders to be on YouTube at the time that YouTube featured them.

   The first video (YYeJEFa-xCA) was the premiere of Amp'd Mobile's Internet show "Lil' Bush," whose creators made it available on YouTube. *See* Schapiro Opp. Exs. 411A/B & 416 (YYeJEFa-xCA).

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

Certain Viacom employees were aware of this. Schapiro Opp. Exs. 326 (VIA10432652, VIA10432654); 327. The Viacom employees who were involved in demanding the removal of the video were apparently unaware of the video's authorized history. Schapiro Opp. Exs. 328-330.

The second video (HPB9tq7f_1k) is a promotional video from comedy group *Human Giant* entitled "Illuminators!" that was uploaded to YouTube account "clelltickle". *See* Schapiro Opp. Exs. 410A/B & 416. (HPB9tq7f_1k & WSGR User Data); Schapiro Opp. Ex. 331. The uploader described the video as "Human Giant (the makers of Clell Tickle) would like you to prepare your mind...for a MIND EXPLOSION," and the video bears the comedy group's website URL throughout its duration (www.humangiant.com). Schapiro Opp. Ex. -416. It was featured on YouTube only *Human Giant*\'s agent asked YouTube employee Micah Schaffer if YouTube would feature the video, as YouTube had done for Human Giant's first video in August 2006. Schaffer Opp. Decl. ¶ 2. Mr. Schaffer referred the request to others at YouTube in charge of such decisions, who decided to feature the video on YouTube's homepage on February 17, 2007. *Id.* ¶ 3.

Plaintiffs have presented no evidence that any unauthorized clip from any work in suit was ever featured on YouTube.

333. *YouTube gives prominent placement to videos that are most viewed, most frequently tagged as "favorites" by users, or currently being watched on the site. Hohengarten ¶ 312 & Ex. 284 (screenshot of youtube.com website showing prominent placement of "videos being watched right now"); Hohengarten ¶ 356 & Ex. 322 (Do. Dep.) at 112:22-118:20, 121:24-123:16.*

   **Disputed.** The cited evidence does not support the proposed fact, which is vague as to the phrase "prominent placement." Without the active involvement of  it employees, YouTube's automated computer systems use certain generic information stored in response to user input to populate lists of "most viewed" videos, videos most frequently tagged as "favorites" by users, and to show thumbnail images of videos currently being watched by YouTube users. Solomon Opp. Decl. ¶¶ 6-8. In addition, Hohengarten Ex. 284, which purports to be a screenshot of the YouTube website from 2009, is inadmissible for lack of foundation. *See* Defendants' Motion to Strike.

334. *YouTube uses an algorthm that it designed to identify videos that are "related" to a video that a user watches, and links to videos identified by that tool appear both in a box on the right-hand side of the watch page*

154

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*of the video to which they are related (the "related videos" box) and also within the video player after the video that the user watches ends. Hohengarten ¶ 346 & Ex. 312 (C. Hurley Dep.) at 173:25-174:23. Hohengarten ¶ 175 & Ex. 172, GOO001-00243149, at GOO001-00243149; Hohengarten ¶ 282 & Ex. 254, VIA14375701, at VIA14375701 (screenshot of conclusion of South Park clip showing other "related" South Park clips); Hohengarten ¶ 176 & Ex. 173, GOO001-09684201, at GOO001-09684202-05.*

**Disputed.** The cited evidence does not support the proposed fact and is ambiguous as the phrase "YouTube uses an algorithm that it designed to identify videos that are 'related' to a video that a user watches." YouTube has used more than one algorithm for this purpose, both of which are referenced in the cited exhibits. *See* Hohengarten Decl. Ex. 172, 173; Schapiro Opp. Ex. 424 (186:21-24); Schapiro Opp. Ex. 122 (118:2-119:11). Otherwise undisputed that YouTube uses an algorithm to identify videos that are "related" to a video that a user watches, and links to videos it identifies both in a box on the right-hand side of the watch page of the video to which they are related (the "related videos" box) and also within the video player after the video that the user watches ends.

Hohengarten Ex. 254, purportedly a screenshot showing Viacom content on the YouTube website in 2009, is inadmissible for lack of foundation. When YouTube's Content ID tool launched in October 2007, it was open for Viacom to use to block any of its content that Viacom wished not to appear on YouTube. *See* King Opp. Decl. ¶ 7 & Ex. 8. Viacom does not seek summary judgment for any clips after May 2008. *See* Viacom's Motion for Summary Judgment at 2 fn1.

**Additional Material Facts**

The algorithm used by the YouTube system to determine "related videos" is fully automated and operates solely in response to user input without the active involvement of YouTube employees. Solomon Opp. Dec. ¶¶ 7-8. ███████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████ Schapiro Opp. Ex. 122 (118:2-119:1; 126:11-130:25). ████████████ ███████████████

Schapiro Opp. Ex. 122 (122:5-124:7).

335.    *When a user views an infringing clip from a major media company like Viacom on a YouTube watch page, YouTube's related videos tool likely will direct the user to other similar infringing videos. Hohengarten ¶*

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

*280 & Ex. 252, VIA14375446, at VIA14375446; Hohengarten ¶ 281 & Ex. 253 VIA14375721, at VIA14375721; Hohengarten ¶ 282 & Ex. 254, VIA14375701, at VIA14375701; Hohengarten ¶ 283 & Ex. 255, VIA14375674, at VIA14375674; Hohengarten ¶ 284 & Ex. 256, VIA14375466, at VIA14375466; Hohengarten ¶ 285 & Ex. 257, VIA14375535, at VIA14375535.*

**Disputed.** The proposed fact is a mix of argument, legal conclusion and unfounded speculation that is not supported by the cited evidence. The inclusion of legal conclusion that clips are "infringing" is improper and likewise unsupported by the cited evidence. The speculation about the operation of the algorithm used to locate related videos is unsupported by the cited evidence. *See supra*, YouTube's Response to Viacom's SUF ¶ 334.

Hohengarten Exs. 252, 256 and 257 are inadmissible for lack of foundation and because they are not true and correct copies of screenshots of the YouTube website; they are facially incomplete. *See* Defendants' Motion to Strike. Hohengarten Exs. 253, 254 and 255, purported screenshots showing Viacom content on the YouTube website in 2009, are likewise inadmissible for lack of foundation. When YouTube's Content ID tool launched in October 2007, it was open for Viacom to use to block any of its content that Viacom wished not to appear on YouTube. *See* King Opp. Decl. ¶ 7 & Ex. 8. Finally, Viacom does not seek summary judgment for any clips after May 2008. *See* Viacom's Motion for Summary Judgment at 2 n.1.

336.    ▮▮▮▮▮▮▮▮ *of all video views on YouTube come from use of the related videos tool. Hohengarten ¶ 176 & Ex. 173, GOO001-09684201, at GOO001-09684205.*

**Disputed.** The cited evidence does not support the proposed fact, and is vague both as to time and as to meaning of the central point of the proposed fact. The cited document identifies the "▮▮▮" number not as a percentage of "all video views on YouTube," but rather "the ratio of related plays over all plays" in some unspecified timeframe. Hohengarten Ex. 173 (GOO001-09684205).

337.    *YouTube indexes and categories [sic] videos using information supplied by the uploading user and provides a search function so that viewers can find videos using search terms. Hohengarten ¶ 393 & Ex. 356 (Declaration of Steve Chen dated January 5, 2007) at ¶¶, 4,5. Defendants' Answer at ¶ 31. Hohengarten ¶ 177 & Ex. 174, GOO001-02338330, at GOO001-02338330, GOO001-02338340-42; Hohengarten ¶ 357 & Ex. 323 (Do 30(b)(6) Dep.) at 104:1-17, 105:11-19, 111:12-20;*

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

*Hohengarten ¶ 401 & Ex. 364; Hohengarten ¶ 378 & Ex. 344 (Liu Dep.) at 62:21-63:8, 63:22-64:23.*

**Undisputed.**

338. *As a user types search terms into YouTube's search field, YouTube suggests additional search terms to "help [YouTube users] more quickly find the videos [they're] looking for." Hohengarten ¶ 378 & Ex. 344 (Liu Dep.) at 183:4-9; Hohengarten ¶ 302 & Ex. 274.*

**Undisputed.**

339. *YouTube's suggested search terms assist users in locating infringing works by providing variations of the complete name or content owner of a copyrighted work even though the user has not typed the work's or owner's full name. Hohengarten ¶ 294 & Ex. 266, VIA14375228, at VIA14375228; Hohengarten ¶ 295 & Ex. 267, VIA14375363, at VIA14375363; Hohengarten ¶ 296 & Ex. 268, VIA14375413, at VIA14375413; Hohengarten ¶ 297 & Ex. 269, VIA14375207, at VIA14375207.*

**Disputed.** The proposed fact is a mix of argument and legal conclusion that is not supported by the cited evidence and omits material facts. The conclusions that any clip on YouTube is "infringing," or that the search terms appearing on the purported screenshots represent "copyrighted works" or the "names of content owners" are foundationless and not supported by the evidence. Hohengarten Exs. 266-269. The suggested search system on YouTube does not use any information about content owners in it operation. Schapiro Opp. Ex. 122 (97:19-23). No search query term or search query is reflective of the content available on YouTube, nor indicative that a user is searching for infringing content *See* Schapiro Opp. Ex. 301 (103:12-104:3); Schapiro Opp. Ex. 110 (213:14-214:15, 231:4-235:8).

Hohengarten Exs. 266 though 269, purported screenshots showing Viacom content on the YouTube website in 2009, are inadmissible for lack of foundation. *See* Defendants' Motion to Strike. When YouTube's Content ID tool launched in October 2007, it was open for Viacom to use to block any of its content that Viacom wished not to appear on YouTube. *See* King Opp. Decl. ¶ 7 & Ex. 8.

Finally, Viacom does not seek summary judgment for any clips after May 2008. *See* Viacom's Motion for Summary Judgment at 2 n.1.

340. *YouTube also provides many different ways for users to browse through the site. See supra SUF ¶¶ 261, 334.*

157

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

**Undisputed.**

341. *When YouTube first instituted "categories" for videos in September 2005, YouTube employees reviewed and categorized the videos that had been previously uploaded to YouTube, without any input from the users who had uploaded those videos. Hohengarten ¶ 178 & Ex. 175, GOO001-01177848, at GOO001-01177848; Hohengarten ¶ 298 & Ex. 270 (September 12, 2005 YouTube Blog entry).*

**Disputed**. The cited evidence does not support the proposed fact. Hohengarten Ex. 175 is a single email from two days in September 2005 that states "can you help me categorize some of the videos (log in as yourselves and go to http://www.youtube.com/admin_categorize.php). i've [sic] just gone through 850 videos. Only about 15000 more." Hohengarten Ex. 270 states "[w]ith the release of Channels, similar content will be categorized and grouped into common channels." Neither document states all videos were categorized, or that the categorization took place without user input.

342. *Once YouTube had instituted "categories" for videos, YouTube thereafter required users who uploaded videos to choose a "category" for the video, such as "Entertainment" or "Comedy." Hohengarten ¶ 357 & Ex. 323 (Do 30(b)(6) Dep.) at 117:14-20.*

**Undisputed.**

343. *YouTube makes and stores four "thumbnails" from each uploaded video without any input from or opportunity to opt out for the uploading user. Hohengarten ¶ 357 & Ex. 323 (Do 30(b)(6) Dep.) at 97:20-98:25; Hohengarten ¶ 356 & Ex. 322 (Do Dep.) at 38:8-20. Defendants' Answer at ¶ 31.*

**Disputed.** The cited evidence does not support the proposed fact. Before uploading a video to YouTube, each user consents to YouTube's Terms of Service in which they agree to all automated steps that the YouTube system takes. Levine Opening Decl. Ex. 1. When a user uploads a video to the site, three thumbnails of that video are automatically created by YouTube's system so that they can be used to represent the video in various places throughout YouTube's website. Solomon Opp. Decl. ¶ 8; Hohengarten Ex. 323 (98:13-18). This occurs without the active involvement of YouTube employees. *Id*. The user then selects which thumbnail will represent the video on the service. *Id*.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

344.    *Defendants display the "thumbnail images" of uploaded videos at various places on the YouTube site, including on search results pages. Hohengarten ¶ 179 & Ex. 176, GOO001-00508644, at GOO001-00508646; Hohengarten ¶ 354 & Ex. 320 (Chang Dep.) at 187:2-18.*

**Undisputed.**

345.    *YouTube requires uploading users to accept Terms of Service providing that the user "grant[s] YouTube a worldwide, non-exclusive, royalty-free, sublicenseable and transferable license to use, reproduce, distribute, prepare derivative works of, display, and perform" each uploaded video. See supra SUF ¶ 267.*

**Undisputed.**

346.    *YouTube also requires a user to warrant that he or she owns the copyright for the videos a user uploads, or has permission from the copyright owner to upload the videos. See supra SUF ¶ 267.*

**Undisputed.**

347.    *In seeking content partnership licenses from content owners, Defendants demanded a release for their prior infringing activities "arising out of or in connection with, the unauthorized reformatting, duplication, distribution, hosting, performance, transmission or exhibition of" the content owners' intellectual property. Hohengarten ¶ 156 & Ex. 153, GOO001-02240369, at GOO001-02240393; Hohengarten ¶ 180 & Ex. 177, GOO001-09531942, at GOO001-09531954; Hohengarten ¶ 181 & Ex. 178, GOO001-06147947, at GOO001-06147947.*

**Disputed.**    The proposed fact is a mix of argument and legal conclusions that are not supported by the cited evidence, which is inadmissible pursuant to FRE 408.  *See* Defendants' Motion to Strike. The cited documents do not evidence that YouTube has engaged in "infringing" activities.  *See* Hohengarten Exs. 153, 177, 178. Hohengarten Ex. 178 also does not support the claim that YouTube inserted the alleged release language.  The cover email for the documents indicates that the redlined version was transmitted to YouTube.  Schapiro Opp. Ex. 332.

\*          \*          \*

159

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

## DEFENDANTS' ADDITIONAL MATERIAL FACTS IN OPPOSITION TO VIACOM'S MOTION FOR PARTIAL SUMMARY JUDGMENT

348.    ███████████████████████████████████████
███████████████████████████████.

349.    Atom Entertainment operated a website called Atom Films.  Schapiro Opp. Ex. 334 (405:7-16); Schapiro Opp. Ex. 335 (164:13-19).

350.    Atom Films began as a marketer and distributor of content licenses from independent creators.  Schapiro Opp. Ex. 117 (14:3-15).

351.    Atom Films respected the rights of copyright holders, and Atom Entertainment employee Scott Roesch testified he would not have advocated a direction for the business that deviated from that respect.  Schapiro Opp. Ex. 117 (18:3-19:25).

352.    Atom Entertainment received venture financing from Sequoia Capital.  Schapiro Opp. Ex. 117 (20:5-14); Schapiro Opp. Ex. 104 (106:7-24).

353.    Atom Entertainment operated a website that allowed users to upload user generated content called Addicting Clips.  Schapiro Opp. Ex. 268 (22:7-19); Schapiro Opp. Ex. 117 (65:20-66:6).

354.    The first version of AddictingClips was a directory of links pointing out to third-party content on third-party websites that launched in December 2005.  Schapiro Opp. Ex. 117 (66:15-17, 70:17-71:4).

355.    AddictingClips advertised on the page with the directory of links.  Schapiro Opp. Ex. 117 (71:5-72:8).

356.    AddictingClips employees watched each video to which the site linked, and placed them into categories such as "Jackass," "TV," "Movies," and "Music."  Schapiro Opp. Ex. 117 (74:25-75:14); Schapiro Opp. Ex. 336.

357.    Addicting Clips employees linked to the YouTube website for content they wanted to feature on their own site.  Schapiro Opp. Ex. 268 (168:7-170:6).

358.    AddictingClips linked to the "Lazy Sunday" clip on YouTube.  Schapiro Opp. Ex. 117 (105:2-9).

359.    In the spring of 2006, AddictingClips began allowing users to upload user generated content to the site.  Schapiro Opp. Ex. 117 (70:14-16).

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

360. AddictingClips allowed users to upload videos from mobile phones. Schapiro Opp. Ex. 117 (142:13-14); Schapiro Opp. Ex. 337.

361. In launching the new user generated content form of AddictingClips, Atom's goal was not to profit from infringing videos, even though one of the decision-makers, Scott Roesch, recognized users might upload infringing content to the service. Schapiro Opp. Ex. 117 (69:14-23).

362. Atom Entertainment employee Scott Roesch believed the AddictingClips upload site was operating within the law. Schapiro Opp. Ex. 117 (69:25-70:12; 94:21-96:9; 98:18-99:5, 101:18-102:3).

363. In creating the AddictingClips upload site, Atom did not engage in the same rights clearance process it had utilized on Atom Films because "the Atom staff was not involved in the publication of – of the video. It was – the end user published it themselves." Schapiro Opp. Ex. 117 (163:5-164:13); Schapiro Opp. Ex. 104 (24:2-8).

364. In the video upload process, AddictingClips received assurances from its users that they read and agreed to the site's terms of use. Schapiro Opp. Ex. 117 (164:14-164:22).

365. Atom's founder, Mika Salmi, was concerned that unauthorized copyrighted materials would be uploaded to AddictingClips. Schapiro Opp. Ex. 104 (21:4-8).

366. Atom executives believed AddictingClips was operating lawfully. Schapiro Opp. Ex. 104 (22:4-9); Schapiro Opp. Ex. 117 (98:18-99:5).

367. AddictingClips claimed the protection of the Digital Millennium Copyright Act. Schapiro Opp. Ex. 117 (112:21-113:5).

368. In early 2006, the AddictingClips terms of service permitted it to remove content from its service, prohibited the upload of material that infringed copyright, and granted AddictingClips a license to content uploaded by users. Schapiro Opp. Ex. 117 (129:18-130:5, 135:17-23); Schapiro Opp. Ex. 338.

369. AddictingClips users were asked to enter a title, description, tags and to select up to three preset channels for each video uploaded. Schapiro Opp. Ex. 117 (127:4-129:3); Schapiro Opp. Ex. 118 (29:8-18, 35:5-13).

370. Reality Digital provided various backend services to AddictingClips, including software development, hosting, website support, and managing AddictingClips streaming vendor. Schapiro Opp. Ex. 117 (117:9-19); Schapiro Opp. Ex. 118 (22:3-16).

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

371. Reality Digital transcoded videos uploaded to the Addicting Clips site in order to display them in Flash format. Schapiro Opp. Ex. 268 (31:2-32:8, 33:16-34:1); Schapiro Opp. Ex. 117 (130:15-131:6); Schapiro Opp. Ex. 118 (25:4-26:1, 35:5-13).

372. On AddictingClips' behalf, Reality Digital stored both the original uploaded video and at least one transcoded copy. Schapiro Opp. Ex. 117 (130:23-132:7); Schapiro Opp. Ex. 118 (25:4-26:1, 35:5-13).

373. Reality Digital retained the original file for videos uploaded to AddictingClips so that the video could be re-encoded to a new format if a new standard format developed. Schapiro Opp. Ex. 118 (27:21-28:2).

374. AddictingClips used the Limelight content delivery network or CDN. Schapiro Opp. Ex. 117 (117:20-118:11; 283:10-16); Schapiro Opp. Ex. 118 (91:16-20, 93:17-94:16).

375. AddictingClips created thumbnails of user-submitted videos. Schapiro Opp. Ex. 117 (140:5-10); Schapiro Opp. Ex. 118 (79:17-20).

376. AddictingClips indexed the data entered by users when they uploaded videos and used that data to allow users to search for videos on the service. Schapiro Opp. Ex. 118 (85:7-86:12).

377. AddictingClips users could rate, comment on, recommend, and search for clips. Schapiro Opp. Ex. 117 (137:16-139:23, 151:12-18); Schapiro Opp. Ex. 118 (29:25-30:8, 35:5-13, 79:21-25, 82:6-11).

378. Atom Films looked to YouTube for ideas on website features. Schapiro Opp. Ex. 117 (32:9-33:16).

379. AddictingClips employees featured certain videos on the site. Schapiro Opp. Ex. 117 (142:10-12); Schapiro Opp. Ex. 268 (47:21-23).

380. Addicting Clips organized videos into channels based on the category either the uploading user or an Atom employee applied to the video. Schapiro Opp. Ex. 268 (53:16-18, 54:3-18).

381. AddictingClips allowed users to view clips in categories such as "most viewed," "most discussed," and "highly rated." Schapiro Opp. Ex. 118 (84:17-85:5).

382. Addicting Clips allowed users to embed videos. Schapiro Opp. Ex. 268 (58:20-60:5); Schapiro Opp. Ex. 117 (142:15-21); Schapiro Opp. Ex. 337; Schapiro Opp. Ex. 118 (86:13-24).

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

383. AddictingClips allowed users to flag content for review.  Schapiro Opp. Ex. 117 (142:22-143:11).

384. Addicting Clips allowed users to upload private videos, and to change private videos to public videos.  Schapiro Opp. Ex. 268 (60:12-61:1); Schapiro Opp. Ex. 117 (146:4-5); Schapiro Opp. Ex. 337; Schapiro Opp. Ex. 118 (83:20-84:9).

385. In March 2007, twenty-five percent of the videos on Addicting Clips were set to private.  Schapiro Opp. Ex. 268 (62:3-14); Schapiro Opp. Ex. 339.

386. The purpose of the private videos feature on AddictingClips was not to provide a haven for copyright infringement.  Schapiro Opp. Ex.  268 (63:13-15).

387. Addicting Clips gave certain employees administrative access to the site that allowed them to see information that a "typical user couldn't see" and to remove videos from the site.  Schapiro Opp. Ex. 268 (37:7-38:10; 64:22-65:6); Schapiro Opp. Ex. 117 (158:13-159:4, 161:18-162:18; 102:15-103:14, 108:21-109:23).

388. Giving employees administrative access to a website is a standard approach.  Schapiro Opp. Ex.  268 (37:19-22).

389. From the time of the creation of the upload version of the AddictingClips site, advertisements were displayed on various pages of the website including the homepage, search results pages and pages on which videos were displayed ("watch pages").  Schapiro Opp. Ex. 117 (151:22-152:15, 157:6-158:12); Schapiro Opp. Ex. 104 (19:8-15).

390. AddictingClips displayed various types of ads on its site, including banner ads, text ads, CPM ads, and CPC ads.  Schapiro Opp. Ex. 117 (151:22-152:15, 157:6-158:12).

391. In October 2006, MTV Networks advocated on-site paid search and contextual ad monetization for its various websites, including iFilm and AddictingClips.  Schapiro Opp. Ex. 340

392. The mission of Addicting Clips was to grow the website, traffic and content in order to grow the business.  Schapiro Opp. Ex. 268 (24:14-25:1).

393. Brendan Jackson, former product manager for Addicting Clips, stated, "[t]he more content, more traffic equals more advertising which is more revenue for the company."  Schapiro Opp. Ex. 268 (24:24-25:1).

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

394.    In general, the more people who visited the AddictingClips website, the more money Atom could earn from advertising on the service. Schapiro Opp. Ex. 104 (20:5-9).

395.    Atom did not hope to generate revenue by virtue of having unauthorized copyrighted materials uploaded to AddictingClips. Schapiro Opp. Ex. 104 (20:10-17).

396.    Atom did not hope to draw uses to AddictingClips by allowing them access to unauthorized copyrighted materials uploaded by its users. Schapiro Opp. Ex. 104 (20:18-23).

397.    AddictingClips implemented a size limit on the videos file that could be uploaded to the site to limit bandwidth costs and in an attempt to prevent users from uploading "extremely long and possibly infringing works."  Schapiro Opp. Ex. 117 (183:12-23); Schapiro Opp. Ex. 118 (59:16-23).

398.    AddictingClips could not prevent a user whose account had been terminated from registering for another account on the site and uploading the same content to that different account.  Schapiro Opp. Ex. 117 (181:5-8).

399.    Atom did not develop its own proprietary technology to help content owners locate potentially infringing content on AddictingClips. Schapiro Opp. Ex. 117 (182:6-19).

400.    In April 2006, user-uploaded content was immediately published to the AddictingClips public site without editorial review.  Schapiro Opp. Ex. 104 (42:17-43:2); Schapiro Opp. Ex. 341.

401.    AddictingClips provided end users with a platform for self-expression and creativity without being subject to editorial control by a third party.  Schapiro Opp. Ex. 104 (44:15-19).

402.    In June 2006, Addicting Clips had a deliberate policy of not reviewing content on the site.  Schapiro Opp. Ex. 268 (180:21-182:7).

403.    A 2006 Atom Entertainment "User Abuse Manual" for AddictingClips and other sites informed employees, "User generated content should never be monitored.  Something that can't bear enough repeating is that the User Abuse Team, and Atom Entertainment in general, does not, and should not, actively monitor any of its Web sites for content violations regarding content submitted or generated by its users." Schapiro Opp. Ex. 103 (VIA17607537).

164

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

404. Atom's founder Mika Salmi believed it would have been cost-prohibitive to manually review each video uploaded to the AddictingClips website. Schapiro Opp. Ex. 104 (36:23-37:16).

405. Before acquiring Atom Entertainment, Viacom conducted due diligence regarding its various web properties, which included inquiring about legal risks and understanding that AddictingClips was a user-generated content site. Schapiro Opp. Ex. 335 (164:20-165:5, 167:11-21).

406. Viacom acquired Addicting Clips in August 2006. Schapiro Opp. Ex. 268 (90:17-21).

407. When it acquired AddictingClips, Viacom was aware the site hosted user-generated content. Schapiro Opp. Ex. 104 (69:14-21); Schapiro Opp. Ex. 342.

408. When it was acquired by Viacom, AddictingClips warranted that it complied with the requirements of the DMCA. Schapiro Opp. Ex. 343 (page 26).

409. Addicting Clips was not applying any filtering to videos when Viacom acquired it in August 2006. Schapiro Opp. Ex. 268 (90:22-91:1).

410. Addicting Clips did not implement content filtering when it launched its upload site in early 2006 because it may not have known about such services, and it did not have the time or resources to implement filtering. Schapiro Opp. Ex. 117 (237:12-24; 241:9-13).

411. AddictingClips was not trying to foster the upload of infringing content to its site by not employing content filtering when it launched in early 2006. Schapiro Opp. Ex. 117 (241:14-25).

412. Addicting Clips discussed implementing Audible Magic filtering in March 2007. Schapiro Opp. Ex. 268 (94:5-14); Schapiro Opp. Ex. 344.

413. Prior to implementing Audible Magic, AddictingClips had no copyright filtering technology operating on the website. Schapiro Opp. Ex. 118 (47:20-48:2).

414. In March 2007, MTV Networks entered into an agreement with Audible Magic under which Audible Magic would provide content identification services for MTV Network's user generated content upload sites. Schapiro Opp. Ex. 345; Schapiro Opp. Ex. 113 (189:22-25).

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

415.  When Viacom filed this lawsuit against YouTube, the pressure increased on Viacom's user generated content sites to implement Audible Magic's filtering technology. Schapiro Opp. Ex. 346.

416.  Through a statement of work dated June 29, 2007, AddictingClips requested that Reality Digital implement Audible Magic's filtering system. Schapiro Opp. Ex. 118 (Jean Dep. 46:23-47:10, 48:4-16); Schapiro Opp. Ex. 347.

417.  Addicting Clips did not deploy Audible Magic filtering technology on the site until August 2007 – five months after Viacom filed this lawsuit, and a year after Viacom acquired Atom Entertainment. Schapiro Opp. Ex. 268 (98:4-13); Schapiro Opp. Ex. 348.

418.  AddictingClips product manager Brendan Jackson agreed that, by failing to implement this Audible Magic filtering earlier, Addicting Clips was not making it easier to upload infringing content or failing to exercise reasonable care to prevent infringement on Addicting Clips. Schapiro Opp. Ex. 268 (147:21-148:6; 149:17-150:19).

419.  In early 2007, Addicting Clips instituted human review of uploaded video clips, which was colloquially called "porn patrol." Schapiro Opp. Ex. 268 (101:9-102:19); Schapiro Opp. Ex. 117 (198:4-199:12, 199:24-201:8); Schapiro Opp. Ex. 262 (68:18-69:2); Schapiro Opp. Ex. 349.

420.  Two AddictingClips employees, Scott Roesch and Brendan Jackson, estimated that the number of videos uploaded daily to Addicting Clips varied from 50 to 200, averaging around 100. Schapiro Opp. Ex. 268 (175:6-10); Schapiro Opp. Ex. 117 (206:13-18).

421.  The porn patrol reviewed videos after they went live on the site. Schapiro Opp. Ex. 268 (103:1-13).

422.  In determining what videos to remove from the site, AddictingClips porn patrol reviewers used their own personal judgment, knowledge of popular movies, TV shows and music, and guidelines provided by their legal team. Schapiro Opp. Ex. 268 (104:13-105:3, 110:18-23, 111:20-112:2; 125:14-21, 129:24-130:2, 133:11-17, 138:4-8, 17-21, 140:11-141:12, 144:14-23, 145:23-147:8, 153:10-167:15, 172:21-173:16); Schapiro Opp. Ex. 350; Schapiro Opp. Ex. 351; Schapiro Opp. Ex. 262 (72:12-73:2).

423.  During the porn patrol review, AddictingClips review guidelines did not require review of clips shorter than 2.5 minutes for potential copyright infringement. Schapiro Opp. Ex. 268 (156:23-158:5); Schapiro Opp. Ex. 350.

HIGHLY CONFIDENTIAL
FILED UNDER SEAL

424.  AddictingClips product manager Brendan Jackson recalled instances when content was uploaded to Addicting Clips with a copyright notice, or a third party logo, or a bug, but that content turned out to be authorized even though such authorization was not apparent on the face of the content.  Schapiro Opp. Ex.  268 (163:9-17).

425.  AddictingClips employee Scott Roesch, who participated in porn patrol at AddictingClips, understood that it was more difficult to identify potentially infringing content than pornography on the site because AddictingClips reviewers did not always have access to information about the uploader or the rights the uploader might hold to the content.  Schapiro Opp. Ex. 117 (201:9-203:8).

426.  AddictingClips employee Scott Roesch, who participated in porn patrol at AddictingClips, agreed that AddictingClips porn patrol's form of manual review was "not very scalable."  Schapiro Opp. Ex. 117 (209:17-210:11).

427.  The porn patrol ceased operating in mid-May 2007.  Schapiro Opp. Ex. 268 (180:2-9); Schapiro Opp. Ex. 352.

428.  Addicting Clips considered and rejected third party moderation solutions for the site.  Schapiro Opp. Ex. 268 (195:18-209:19, 222:18-224:12, 225:3-15, 226:20-227:10); Schapiro Opp. Ex. 353; Schapiro Opp. Ex. 354; Schapiro Opp. Ex. 355; Schapiro Opp. Ex. 356.

429.  In May 2007, Addicting Clips, which was being rebranded as Atom Uploads, began reviewing videos prior to their going live on the site.  Schapiro Opp. Ex. 268 (177:4-14); Schapiro Opp. Ex. 117 (190:5-25, 192:15-21, 193:4-19); Schapiro Opp. Ex. 357.

430.  Pre-publication review of videos on AddictingClips was implemented in May 2007, ten months after Viacom acquired Atom in August 2006 and two months after Viacom filed this lawsuit.  Schapiro Opp. Ex. 117 (193:23-195:12); Schapiro Opp. Ex. 268 (90:17-21).

431.  Viacom has claimed the protection of the Digitial Millennium Copyright Act for over 800 of its affiliated sites, including: addictingclips.com (VIA17711859), addictinggames.com (VIA17711859), atom.com (VIA17711859), atomfilms.com (VIA17711859), cmt.com (VIA17711824), comedycentral.com (VIA17711867), flux.com (VIA17711811), gameblast.com (VIA17711859), ifilm.com (VIA17711901), mtv.com (VIA17711832), nick.com (VIA17711842), socialproject.com (VIA17711811), shockwave.com (VIA17711859), spiketv.com (VIA17711849), southparkstudious.com (VIA17711892), tvland.com (VIA17711852),

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

vh1.com (VIA17711853), viacom.com (VIA17711854), and xfire.com (VIA17711858). *See* Schapiro Opp. Ex. 91.

432. While giving a continuing legal education seminar, Stanley Pierre-Louis, who is now Viacom's in-house counsel, advised that there is no duty to monitor under the DMCA. Schapiro Opp. Ex. 102 (135:10-136:5, 138:25-141:22).

433.

434. Flux, a Viacom-owned online service, listed YouTube on its video upload page as the first source from which users could search for and embed YouTube videos into their profiles on their Flux-generated community pages. Schapiro Opp. Ex. 360 (87:5-89:11, 91:5-24); Schapiro Opp. Ex. 361; Schapiro Opp. Ex. 104 (220:11-23).

435. Viacom acquired a video site called iFilm that allowed users to upload videos. Schapiro Opp. Ex. 102 (144:18-24); Schapiro Opp. Ex. 362 (20:10-12).

436. Viacom wanted to make iFilm more like YouTube. Schapiro Opp. Ex. 363.

437. ████████████████████. Schapiro Opp. Ex. 291 (227:21-228:3); Schapiro Opp. Ex. 364 (May 2006 profit and loss statement).

438. In 2007, less than five percent of content on YouTube matched content in Auditude's fingerprinting references. Schapiro Opp. Ex. 320 (134:24-135:25).

439. Using the username "MiramaxFilm" and with authorization from its client Miramax Films, Palisades Media Group, Inc., a media and marketing company, uploaded video clips to YouTube to promote the film "No Country for Old Men." Chan Opening Dec. ¶¶ 5-6.

440. Micah Schaffer, while he was employed at YouTube, understood that the YouTube video with video id HPB9tq7f_1k  was a promotional video from the comedy team called "Human Giant" because their agent told him that the video had been uploaded by the group. Schaffer Opp. Dec. ¶¶ 1-2.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

441. Micah Schaffer referred Human Giant's request that YouTube feature the video with video id HPB9tq7f_1k, and YouTube subsequently did. Schaffer Opp. Dec. ¶¶ 1-3.

442. Viacom did not provide any references for YouTube's Content ID system until May 2008. King Opp. Dec. ¶ 10.

443. In a December 10, 2007, binding term sheet, Viacom and Microsoft agreed that both parties support and comply with the Principles for User Generated Content Services (www.ugcprinciples.com). Schapiro Opp. Ex. 365, 366 (Principles for User Generated Content Services).

444. In September 2007 Atom Films made available to approved online and mobile partners a broad range of programming, including user-generated videos uploaded to Atom by users. Schapiro Opp. Ex. 365 (VIA15809235; VIA15809187, at 210).

445. In an August 2006 "Content Hosting Services Agreement" between MTV Networks and Google Inc., Google is allowed to ██████ ████████████████████████████████████████████ ████████████████████ Schapiro Opp. Ex. 367 (VIA02066757).

446. In December 2007, MTV Networks entered into a license, distribution and marketing agreement with Veoh Networks, Inc., a video hosting website, in which MTV Networks agreed to provide video content to Veoh for display on its site in exchange for, among other things, a share of the revenue from the advertising displayed in connection with that content. Schapiro Opp. Ex. 368.

447. In 2006, YouTube was a hub where young people put their material in front of their peers by sharing user-generated videos. Schapiro Opp. Ex. 369.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Dated: May 10, 2010
      New York, New York

                     Respectfully submitted,

                     Andrew H. Schapiro
                     A. John P. Mancini
                     Matthew D. Ingber
                     Brian M. Willen
                     Mayer Brown LLP
                     1675 Broadway
                     New York, New York 10019
                     (212) 506-2500

                     David H. Kramer
                     Maura L. Rees
                     Michael H. Rubin
                     Bart E. Volkmer
                     Wilson Sonsini Goodrich & Rosati P
                     650 Page Mill Road
                     Palo Alto, California 94304
                     (650) 493-9300

                     *Attorneys for Defendants*