Subject to Protective Order – HIGHLY CONFIDENTIAL

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

VIACOM INTERNATIONAL INC., )
COMEDY PARTNERS, )
COUNTRY MUSIC TELEVISION, INC., )
PARAMOUNT PICTURES CORPORATION, )
and BLACK ENTERTAINMENT TELEVISION )
LLC, )
     )
         Plaintiffs, )  Case No. 1:07-cv-02103 (LLS)
           v. )  (Related Case No. 1:07-cv-03582 (LLS))
     )  ECF Case
YOUTUBE INC., YOUTUBE, LLC, and )
GOOGLE, INC., )
     )
         Defendants. )
     )
_____)

## VIACOM'S SUPPLEMENTAL COUNTER-STATEMENT IN RESPONSE TO FACTS ASSERTED IN DEFENDANTS' SUMMARY JUDGMENT MEMORANDUM OF LAW BUT OMITTED FROM DEFENDANTS' LOCAL RULE 56.1 STATEMENT

Stuart J. Baskin (No. SB-9936)
John Gueli (No. JG-8427)
Kirsten Nelson Cunha (No. KN-0283)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY   10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

Paul M. Smith (No. PS-2362)
William M. Hohengarten (No. WH-5233)
Scott B. Wilkens (*pro hac vice*)
Matthew S. Hellman (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, DC   20001
Telephone:  (202) 639-6000
Facsimile:  (202) 639-6066

Susan J. Kohlmann (No. SK-1855)
JENNER & BLOCK LLP
919 Third Avenue
New York, NY   10022
Telephone:  (212) 891-1690
Facsimile:  (212) 891-1699

*Attorneys for Plaintiffs*

Subject to Protective Order – HIGHLY CONFIDENTIAL

## LEGEND

Pursuant to Local Rule 56.1, Viacom submits this Counter-Statement in response to factual allegations that Defendants made in their Motion for Summary Judgment but omitted from their Local Rule 56.1 Statement.[1]

This Counter-Statement responds to factual allegations that Defendants made in their Motion for Summary Judgment but omitted from their Local Rule 56.1 Statement.  Because Defendants omitted these allegations from their Local Rule 56.1 Statement, they have failed to identify them as undisputed and material to summary judgment.  Consequently, the Court should disregard the omitted allegations.  *See Pharm., Inc. v. Am. Pharm. Partners, Inc.*, 511 F. Supp. 2d 324, 332 (E.D.N.Y. 2007) ("Pursuant to Local Rule 56.1, the movant is required to include not just some but all of the facts material to its motion that movant contends are undisputed, properly supported by citation to evidence"); *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").  To the extent that the Court nonetheless entertains these factual assertions in ruling on Defendants' summary judgment motion, Viacom submits responses in this Counter-Statement.  The left-hand column contains Defendants' factual assertions and citations to evidence, and the right column contains Viacom's response to each factual assertion, including evidence and references to evidentiary objections, as appropriate.

---

[1] Viacom also incorporates by reference the facts included its own Local Rule 56.1 Statement, which demonstrate not only that Defendants' asserted facts are disputed but that the material facts supporting Viacom's motion for summary judgment are undisputed.

Subject to Protective Order – HIGHLY CONFIDENTIAL

As used herein:

"Defs. SUF" refers to Defendants' Rule 56.1 Statement, filed in support of Defendants' Motion for Summary Judgment.

"Kohlmann Decl." refers to the Declaration of Susan J. Kohlmann, filed herewith.

"Hohengarten Decl." refers to the Declaration of William M. Hohengarten, filed under seal March 5, 2010, in support of Viacom's Motion for Summary Judgment.

"Solow Decl." refers to the declaration of Warren Solow, filed under seal March 5, 2010, in support of Viacom's Motion for Summary Judgment.

"Viacom SUF" refers to Viacom's Statement of Undisputed Facts In Support of Its Motion for Partial Summary Judgment on Liability and Inapplicability of the Digital Millennium Copyright Act Safe Harbor Defense, filed under seal March 5, 2010.   Citations to the "Viacom SUF" incorporate by reference any exhibit cited therein.

"Viacom Evid. Obj." refers to Viacom's Evidentiary Objections and Motion to Strike Submitted in Support of Defendants' Motion for Summary Judgment.

"Resp. to Defs. SUF" refers to Viacom's Counter-Statement in Response to Defendants' Local Rule 56.1 Statement in Support of Defendants' Motion for Summary Judgment, filed herewith.

"Wilkens Decl." refers to the Declaration of Scott B. Wilkens, filed herewith.

Exhibits to any declaration are indicated as "[Declarant Name] Ex." followed by the exhibit number.  Citations to paragraphs in any declaration or the Viacom SUF incorporate by reference any exhibit cited therein.

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.1.  YouTube was named Time Magazine's "Invention of the Year" for 2006.<br><br>Defs. Opening Mem. at p. 4 (citing Schapiro Ex. 1). | Uncontroverted but immaterial to any issues before the Court. |
| 1.2.  In November of that year [2006] Google acquired YouTube.<br><br>Defs. Opening Mem. at p. 4. | Uncontroverted.  *Accord* Viacom SUF ¶¶ 16, 17. |
| 1.3.  Although it only scratches the surface, a short video called "This is YouTube" . . . provides a useful introduction to the array of creative and inspiring material found on YouTube.<br><br>Defs. Opening Mem. at p. 5 (citing Schapiro Ex. 2). | Controverted.  Contrary to the portrayal in this self-serving, highly selective video created by Defendants for purposes of this litigation, the undisputed evidence shows that YouTube has hosted a vast multitude of infringing content.  *See, e.g.*, Viacom SUF ¶¶ 193, 195, 215, 292. |
| 1.4.  YouTube's users have filled the service with personal videos of endless variety:  from amateur dance and comedy routines to raw video footage taken on the streets of Tehran as the Iranian government clashed with students; from clips of cats playing the piano to instructional videos teaching people how to fix a leaky faucet or bake a chocolate cake.<br><br>Defs. Opening Mem. at pp. 5-6 (citing Walk Decl. ¶¶ 9, 14, 20). | Controverted, but immaterial to any issues before the Court.  *See supra* ¶ 1.3.  Further, Walk Decl. ¶ 9 contains inadmissible generalized and conclusory statements.  *See* Evid. Obj. at 6. |
| 1.5.  [D]uring the 2008 election, all the major candidates for President posted videos to YouTube.<br><br>Defs. Opening Mem. at p. 6 (citing Walk Decl. ¶ 6). | Uncontroverted. |
| 1.6.  [I]n two of the 2008 presidential debates, Americans were able to pose questions directly to the candidates through videos uploaded to YouTube.<br><br>Defs. Opening Mem. at p. 6 (citing Walk Decl. ¶ 6). | Uncontroverted. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.7.  [T]he White House posts a weekly video address on YouTube, and the President recently sat down for an interview in which he answered questions from ordinary people submitted through YouTube, an event the *New York Times* described as "the 21st century equivalent of Roosevelt's fireside chats."<br><br>Defs. Opening Mem. at p. 6 (citing Walk Decl. ¶ 6). | Uncontroverted. |
| 1.8.  [T]he 111th Congress created a "hub" on YouTube for members of the House and Senate to post videos about the issues of the day, and hundreds of members of Congress have set up their own channels on YouTube.<br><br>Defs. Opening Mem. at p. 6 (citing Walk Decl. ¶ 6). | Uncontroverted. |
| 1.9.  John McCain's presidential campaign congratulated YouTube for its "groundbreaking contributions" to the democratic process:  "By providing a platform for political candidates and the American public to post, view, share, discuss, comment on, mash-up, re-mix, and argue over campaign-related videos, YouTube has played a prominent and overwhelmingly positive role in the 2008 election."<br><br>Defs. Opening Mem. at pp. 6-7 (citing Levine Decl. ¶ 29 & Ex. 13). | Controverted to the extent Defendants rely on inadmissible hearsay.  *See* Evid. Obj. at 14.  Immaterial to any issues before the Court. |
| 1.10.  Students seeking admission to those colleges, and colleges seeking to recruit students, have likewise turned to YouTube.<br><br>Defs. Opening Mem. at p. 7 (citing Walk Decl. ¶ 13). | Uncontroverted. |
| 1.11.  Under [YouTube's content partnership agreements], [content owners] make content available to YouTube by uploading it directly . . . . | Controverted to the extent that the asserted fact implies that this activity occurred throughout YouTube's existence.  It is undisputed that YouTube did not enter into its first content partnership agreement with any |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| Defs. Opening Mem. at p. 8 (citing Walk Decl. ¶ 10). | major media company until late in the third quarter of 2006.  *See* Viacom SUF ¶¶ 299, 300. |
| 1.12.  By February 2006 . . . users were watching more than 18 million videos per day.<br><br>Defs. Opening Mem. at p. 8 (citing Hurley Decl. ¶ 23 & Exs. 28, 29). | Uncontroverted. |
| 1.13.  In 2006, the Motion Picture Association of America (the anti-piracy association for the major movie studios) told the press: "YouTube has been a good corporate citizen and has taken off copyrighted material."<br><br>Defs. Opening Mem. at p. 11 (citing Levine Decl. ¶ 32 & Ex. 14). | Controverted in that the undisputed evidence shows that, in 2006, YouTube repeatedly refused to work with the MPAA to prevent the infringement of the copyrighted works of MPAA's members, including Paramount.  *See* Viacom SUF ¶¶ 225-229 (citing deposition testimony of former MPAA President Dean Garfield).<br><br>The cited evidence is also inadmissible hearsay.  *See* Evid. Obj. at 14. |
| 1.14.  That same year, NBC hailed YouTube as a "bright light" on copyright protection and proclaimed that:  "YouTube is the perfect online media partner . . . We are thrilled to be partnering with this forward-thinking company."<br><br>Defs. Opening Mem. at p. 11 (citing Levine Decl. ¶ 33 & Exs. 15, 16). | Controverted to the extent that Defendants are seeking to rely on the out of court statements of a third party for the truth of the matter asserted.  *See* Evid. Obj. at 14.<br><br>Further controverted to the extent that the asserted fact implies that NBC Universal was satisfied with YouTube's compliance with the copyright laws.  NBC Universal Executive VP and General Counsel Richard Cotton complained to YouTube about "the persistent infringement of NBC Universal . . . copyrighted content on the YouTube.com website."  Kohlmann Ex. 29, GOO001-02826792-98 (letter from NBC Universal General Counsel Richard Cotton).  NBC Universal also submitted an amicus brief in opposition to YouTube's motion of summary judgment in *Tur v. YouTube*, pointing out the numerous flaws in YouTube's copyright policy.  *See* Brief of *Amicus Curiae* NBC Universal, Inc. in Support of Plaintiff's Opposition to YouTube Inc.'s Motion for |

3

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | Partial Summary Judgment, *Tur v. YouTube Inc.*, 06-cv-04436, 2007 WL 1893635 (C.D. Cal. June 20, 2007) (Dkt. No. 75). |
| 1.15.  Warner Music similarly lauded YouTube's "commitment to creating a framework in which the needs of [its] users and copyright holders can coexist in a mutually beneficial environment."<br><br>Defs. Opening Mem. at p. 11 (citing Levine Decl. ¶ 33 & Ex. 17). | Controverted to the extent that Defendants purport to rely on this statement for the truth of the matter asserted.  *See* Evid. Obj. at 14.<br><br>Further controverted as misleading, in that the quoted statement was made only after Warner Music and YouTube reached an agreement in which YouTube agreed to provide Warner with digital fingerprinting.  *See* Viacom SUF ¶ 299. |
| 1.16.  [D]ozens of separate third-party marketing agencies working on [Viacom's] behalf have posted a host of clips from Viacom television programs and movies to YouTube.<br><br>Defs. Opening Mem. at pp. 11-12. | Controverted as unsupported by the proffered evidence and as misleading.  Defendants have alleged only that over the past four years, Viacom's various divisions have worked with 18 marketing agencies to promote one or more Viacom's films or television programs—not "dozens of agencies"—and the evidence proffered by Defendants does not even demonstrate that.  *See infra* ¶ 1.59.  This purported fact is also immaterial to any issue before the Court. |
| 1.17.  To the frustration of many within [Viacom], Viacom's efforts to acquire YouTube proved unsuccessful.<br><br>Defs. Opening Mem. at p. 12 (citing Schapiro Ex. 5). | Controverted.  While some Viacom employees briefly considered the idea of exploring a possible acquisition of YouTube, Defendants dramatically overstate the seriousness of Viacom's consideration of such an acquisition.  *See* Resp. to Defs. SUF ¶ 46. |
| 1.18.  [I]n early 2006, Viacom proposed the idea of a content-partnership agreement with YouTube, which the parties negotiated for months.<br><br>Defs. Opening Mem. at p. 12 (citing Maxcy Decl. ¶ 8, Schapiro Exs. 6, 7). | Controverted to the extent that the asserted facts suggests that Viacom was willing to enter a licensing agreement in the absence of being properly compensated for the use of its content and for settling its copyright infringement claims.  Further controverted as misleading to the extent that the asserted fact suggests that Viacom was willing to enter into a licensing agreement in the absence of YouTube's agreement to prevent the infringement of Viacom's works, through digital fingerprinting and other means.  *See* Viacom SUF ¶¶ 203-210. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.19.  Before a deal could be struck, however, Google announced that it was acquiring YouTube.<br><br>Defs. Opening Mem. at p. 12. | Uncontroverted, but immaterial to any issues before the Court. |
| 1.20.  With Google now sitting at the table, Viacom opted for a "strong arm approach" under which it would "push for significantly better terms."<br><br>Defs. Opening Mem. at p. 12 (citing Schapiro Exs. 8 and 9). | Controverted to the extent that the asserted fact is intended to suggest that Viacom failed to negotiate in good faith.  It is undisputed that Viacom negotiated in good faith but was unable to reach an agreement with Defendants.  Hohengarten Ex. 314 (Schmidt Dep.) at 179:9-18 (agreeing that Viacom negotiated in good faith).  Moreover, internal YouTube emails show that Defendants ██████████████████████████ |
| 1.21.  During these negotiations, Viacom deliberately allowed its content to remain on YouTube, in part because it thought that "having the content there was valuable in terms of helping the rating of our shows."<br><br>Defs. Opening Mem. at p. 12 (citing Schapiro Ex. 4 (132:19-133:24)). | Controverted.  Not supported by admissible evidence in light of the witness's testimony that he was speculating.  *See* Evid. Obj. at 1.<br><br>Further, misleading because the purported fact uses a speculative statement by one witness to distort the evidence regarding Viacom's forbearance of enforcement of its rights during the pendency of the parties' licensing negotiations.  *See* Resp. to Defs. SUF ¶ 128. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.22.  After the negotiations stalled, Viacom developed a plan to send YouTube a large DMCA takedown notice in the hopes of gaining leverage and "provide [Viacom] the economics" it had requested.<br><br>Defs. Opening Mem. at p. 12 (citing Schapiro Ex. 10). | Controverted.  The cited document refers to the mass takedown Viacom issued to YouTube, which was implemented in an attempt to combat the massive infringement of Viacom's works on YouTube.  Viacom opted not to remove all of the clips that it was able to locate on YouTube during the pendency of the negotiations between Viacom and YouTube because of the expectation that Viacom's infringement claims would be settled as part of an overall licensing deal. *See* Resp. to Defs. SUF ¶ 128. |
| 1.23.  Viacom wanted a mass takedown to occur in "one dramatic event (as opposed to drips)."<br><br>Defs. Opening Mem. at pp. 12-13 (citing Schapiro Ex. 10). | Controverted, but immaterial to any issues before the Court.  *See supra* ¶ 1.22. |
| 1.24.  To that end, Viacom put in place a "find and hold" strategy:  For months it searched YouTube for videos allegedly containing Viacom content, but instead of promptly requesting their removal, Viacom added the clips to an internal list.<br><br>Defs. Opening Mem. at p. 13 (citing Schapiro Ex. 11 (161:9-21, 167:10-18, 202:14-19)). | Controverted, but immaterial to any issues before the Court.  *See supra* ¶ 1.22. |
| 1.25.  Despite Viacom's apparent expectations that YouTube's traffic would decrease and traffic to Viacom's own websites would soar after those videos were removed, neither prediction came true.<br><br>Defs. Opening Mem. at p. 13 (citing Hurley Decl. ¶ 26; *see also* Schapiro Exs. 13 (234:17-288:14), 14, 15). | Controverted.  Viacom personnel did believe that once many videos infringing Viacom's copyrights were removed from YouTube, more videos would be viewed on Viacom's own sites.  And that is precisely what took place.  Indeed, video views did increase on a variety of Viacom online properties in the month following the February 2, 2007 takedown. *See, e.g.*, Kohlmann Ex. 62, VIA01108775.<br><br>Further controverted to the extent that Defendants have provided no evidence to suggest that Viacom believed that YouTube traffic would decrease following the February |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | 2, 2007 takedown. |
| 1.26.  Some of Viacom's executives soon came to doubt the wisdom of [this lawsuit].<br><br>Defs. Opening Mem. at p. 13 n.2 (citing Schapiro Ex. 16). | Uncontroverted with respect to the two Viacom employees in the last-in-time email in Schapiro Ex. 16, but immaterial to any issues before the Court. |
| 1.27.  Viacom alleges that 63,497 user-uploaded video clips that once appeared on YouTube infringed copyrights in approximately 500 different television programs and motion pictures that Viacom claims to own.<br><br>Defs. Opening Mem. at p. 14 (citing Rubin Decl. ¶ 7). | Controverted.  The correct number of clips in suit is 62,632. *See* Viacom SUF ¶ 7.  Viacom is withdrawing the five clips identified by Defendants as authorized by Viacom, at Rubin Decl. ¶ 14.  The correct number of infringed Viacom works is 3,085, not 500. *See* Viacom SUF ¶ 6. |
| 1.28.  These clips have been removed from YouTube; most were the subject of DMCA notices, and taken down in response.<br><br>Defs. Opening Mem. at pp. 14-15 (citing Schapiro Ex. 18 (141:10-19, 148:8-18); Levine Decl. ¶¶ 19-21). | Uncontroverted. |
| 1.29.  [M]any of the clips in suit are under one minute long.<br><br>Defs. Opening Mem. at p. 15 (citing Rubin Decl. ¶ 15). | Controverted.  Less than 14 percent of the clips in suit are under one minute long.  *See* Wilkens Decl. ¶ 3. |
| 1.30.  Many other clips in suit, even if not themselves directly uploaded to YouTube by Viacom, are identical to or indistinguishable from the promotional materials that Viacom has authorized to appear on YouTube.<br><br>Defs. Opening Mem. at p. 15. | Controverted.  *See infra* ¶ 1.63. |
| 1.31.  The YouTube website has consistently offered detailed instructions about the information that copyright holders should include in any notices that they wish to send to YouTube's designated agent.<br><br>Defs. Opening Mem. at p. 22 (citing Levine | Controverted.  The cited evidence deals primarily with the instructions currently available on YouTube's website, with only Hurley Decl. ¶ 21 containing the vaguest of statements regarding historical instructions.  The current instructions are not detailed and merely state the "elements of notification" |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| Decl. ¶¶ 15-16; Hurley Decl. ¶ 21). | requirements of the DMCA, with only the following additional text: "Providing URLs in the body of an email is the best way to help us locate content quickly." *Compare* Kohlmann Ex. 90 (screenshot of YouTube Copyright Infringement Notification page) *with* 17 U.S.C. § 512(c)(3).  Plaintiffs lack knowledge to admit or controvert the alleged fact as to any moments in time in which an earlier version of the current instructions appeared on YouTube's site. |
| 1.32.  YouTube has taken pains to make its notification system easy and efficient for copyright holders to use.<br><br>Defs. Opening Mem. at p. 25 (citing Levine Decl. ¶¶ 17-18). | Controverted, in that Defendants have refused copyright owners' requests that Defendants comply with the "representative lists" requirement under the DMCA.  *See* Hohengarten Ex. 244, VIA01475466-67 (letter from Viacom General Counsel Mike Fricklas and NBCU General Counsel Rick Cotton to Google General Counsel Kent Walker and Google Senior Vice President David Drummond asking that YouTube respond to representative lists).  But YouTube takes the extreme position that content owners must point to the URLs of specific infringing videos before YouTube takes action to remove them.  *See* Hohengarten Ex. 382, GOO001-08050272 (rejecting Mr. Fricklas's request that YouTube respond to representative lists); *see also* Kohlmann Ex. 13, GOO001-00707687 ("I will need the specific URL to the video"); Kohlmann Ex. 3, GOO001-00040895 ("Please understand that we need the links to the videos themselves."); Kohlmann Ex. 31, GOO001-02975607 (August 2007 email from Pim Dubbeldam, who "heads up the copyright pod" within YouTube's content review department, identifying three videos of the same content, only two of which were the subject of a takedown notice, and noting that "[i]n order for the active video to be blocked, we need to receive a separate DMCA request from the content owner"). |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | Further controverted to the extent the alleged fact rests on inadmissible testimony in Levine Decl. ¶ 18.  *See* Evid. Obj. at 14. |
| 1.33.  Early in its existence, YouTube created a first-of-its-kind automated tool that lets copyright holders click a button to send electronic DMCA notices directly to YouTube's agent.<br><br>Defs. Opening Mem. at p. 25 (citing Levine Decl. ¶ 18). | Controverted, but immaterial to any issue before the Court.  Plaintiffs deny Defendants' characterization of YouTube's CVP tool as "automatic" insofar as it implies that Defendants lack control over the process.  Further, this tool was not available until March 2006 and was not specifically offered to Viacom until February 5, 2007.  *See* Levine Decl. ¶ 18; Hohengarten Ex. 93, GOO001-00751570, at GOO001-00751570.<br><br>Further controverted to the extent the alleged fact rests on inadmissible testimony in Levine Decl. ¶ 18.  *See* Evid. Obj. at 14. |
| 1.34.  [W]here YouTube determines that a particular user who has received fewer than three strikes is nonetheless flagrantly abusing the service's terms of use, YouTube terminates the account and removes all of the user's videos.<br><br>Defs. Opening Mem. at p. 25 (citing Levine Decl. ¶ 30). | Controverted to the extent that the asserted fact suggests that Defendants terminate some users for infringing copyright fewer than three times.  Defendants have proffered no evidence to support such an assertion.  Uncontroverted to the extent that the asserted fact implies that Defendants sometimes terminate users for violations of the Terms of Service that do not involve copyright infringement.  The asserted fact is immaterial to any issue currently before the Court. |
| 1.35.  YouTube also sends an email message to any user whose videos are the subject of a takedown notice, giving the user an opportunity to challenge the notice . . . .<br><br>Defs. Opening Mem. at p. 25 (citing Levine Decl. ¶ 23). | Uncontroverted but immaterial to any issue before the Court. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.36.  A computerized system [] tallies the number of strikes that each user's account receives.<br><br>Defs. Opening Mem. at p. 25 (citing Levine Decl. ¶ 28). | Controverted to the extent that the asserted fact implies that the system for tallying strikes does not involve human interaction by Defendants' employees.  First, Defendants' employees designed the system for tallying strikes and have made continuous modifications to it over time.  *See* Resp. to Defs. SUF ¶¶ 77-78.  Second, Defendants' employees have substantial discretion in deciding whether strikes should be applied in particular cases.  *See, e.g.*, Levine Decl. ¶¶ 27-29; Kohlmann Ex. 48, GOO001-00515036 (noting that admin users had the option to "Reject & Strike (copyright)" or merely to "Reject (copyright)"); Kohlmann Ex. 9, GOO001-00515280 (same); Kohlmann Ex. 39, GOO001-06674342 ("Not to be obvious here, but [there is an] inconsistency in how we as an entity handle/decide strikes & suspensions per our users  . . . too much random discretion is being used by us, thus the inconsistency"). |
| 1.37.  The required standards-setting process [for the development of "standard technical measures"] has never occurred.<br><br>Defs. Opening Mem. at p. 26. | Controverted.  To the extent that Defendants are offering a conclusion about whether the standards-setting process described in the DMCA has occurred, they are offering an impermissible legal conclusion.<br><br>Moreover this purported fact is not relevant to any issues before the Court. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.38.  The facts concerning how such videos come to be stored on YouTube's system, and what happens to them once they are there, are undisputed.<br><br>Defs. Opening Mem. at p. 27 (citing Solomon Decl. ¶¶ 2-10).[2]<br><br>YouTube operates a website located on the Internet at http://www.youtube.com, where users around the world can upload videos free of charge to computer servers owned or leased by YouTube. YouTube's systems are capable of simultaneously playing millions of these authorized, user uploaded videos at the same time to YouTube users around the world.  The process of uploading a video to YouTube is initiated by YouTube users.  As has always been the case since I began working on the YouTube service, the series of events that is triggered by a user's decision to upload a video to YouTube and ends with the user's video being made playable on YouTube is fully automated and does not involve the intervention or active involvement of YouTube personnel.<br><br>Solomon Decl. ¶ 2. | Controverted.  *See* Resp. to Defs. SUF ¶¶ 16, 18, 19, and 20. |

---

[2] Defendants' Memorandum of Law asserts:  "The facts concerning how such videos come to be stored on YouTube's system, and what happens to them once they are there, are undisputed." The allegedly undisputed facts Defendants reference are stated only in Mr. Solomon's declaration, not in Defendants' Memorandum of Law or Rule 56.1 Statement.  For the Court's convenience, Viacom responds separately to Paragraph 2 of Mr. Solomon's declaration in this paragraph, and to Paragraphs 3-10 in ¶¶ 1.39-1.46, *infra*.

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.39.  Before being able to upload a video to YouTube, a user must first register and create an account with the service.  Once that one-time registration process has been completed and the user is signed-in to his YouTube account, the first step a user takes to upload a video involves navigating to the upload portion of the YouTube website. The user then selects a video file to upload to the YouTube system from the selection available on the user's personal computer, webcam, mobile phone, or other storage device, depending on how the user is accessing the service. Having selected the video he wishes to upload, the user then instructs the YouTube system to upload that video by clicking on a virtual upload "button."<br><br>Solomon Decl. ¶ 3 (cited in Defs. Opening Mem. at 27, *see supra* n.1). | Controverted to the extent that the asserted fact implies that YouTube plays no role in the video upload process.  To the contrary, YouTube designed and controls every step of the upload process.  *See* Resp. to Defs. SUF ¶¶ 16, 18-20. |
| 1.40.  When a user uploads a video, the user also provides a title of his own making for the video and chooses "tags," or keywords, that the user believes describe the video. For instance, a surfing video might be tagged with "surfing," "water," and "waves," and be titled "Sarah's 30th Birthday." Like the title the user provides for the video, the choice of tags is completely up to the user. Similarly, the user selects a category from the broad selection of categories presented by the YouTube system that the user believes fits the uploaded video. The selection of category is entirely within the user's discretion.<br><br>Solomon Decl. ¶ 4 (cited in Defs. Opening Mem. at p. 27, *see supra* n.1). | Controverted.  Viacom does not dispute that, pursuant to the processes Defendants designed, users provide titles and tags for videos they upload, and that users choose to place those videos into categories chosen and provided by Defendants.   But Viacom controverts Defendants' contention that providing a title or tags, or choosing categories, is "entirely within the user's discretion" or "completely up to the user." Defendants have carefully worded this factual statement, leaving out the fact that YouTube has required users to provide this information. *See* Viacom SUF ¶ 342; Hohengarten Ex. 344 (Liu Dep.) at 63:18-64:23.  Defendants also omit that they have designed a system that suggests tags to users.  *See* Kohlmann Ex. 90 (Screenshot of November 14, 2007 Official YouTube Blog post) (stating: "SUGGESTED TAGS You can choose from a set of new 'suggested tags' when you upload or edit a video."). |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.41.  I have confirmed that each one of the video clips at issue in this lawsuit was uploaded to YouTube by a user of the service in a process similar to the one I just described.<br><br>Solomon Decl. ¶ 5 (cited in Defs. Opening Mem. at p. 27, *see supra* n.1). | Uncontroverted. |
| 1.42.  YouTube users are able to upload video files in a number of common and widely-used file formats, including Windows Media Video (WMV), .3GP, .AVI, .MOV, .MP4, .MPEG, and Flash (.FLV). Because most Internet browsers are not able to easily play video files in all of these formats, a user's video upload prompts the YouTube system to convert the user's video into the Flash file format, which is a more common file format that most Internet browsers can play. This conversion process is known as "transcoding," and it occurs automatically and without any human intervention.<br><br>Solomon Decl. ¶ 6 (cited in Defs. Opening Mem. at p. 27, *see supra* n.1). | Controverted.  *See* Resp. to Defs. SUF ¶ 19. |

13

Subject to Protective Order – HIGHLY CONFIDENTIAL

| **Asserted Undisputed Fact** | **Response** |
|---|---|
| 1.43.  In light of the increasing popularity of using mobile phones and other consumer electronics devices to view Internet content, the YouTube system began allowing users to view videos from mobile phones and other consumer electronics devices, in addition to their personal computers. These devices typically have different file format requirements than personal computer-based Internet browsers and often cannot play Flash files. Using an automated transcoding process similar to the one used to convert user-uploaded videos into Flash, the YouTube system now transcodes user-uploaded videos into several other file formats supported by a variety of viewing devices. One such example is the transcoding of user-uploaded video files into the H.264 format, which is playable on Apple's iPhone. Adopting new encoding formats is an example of YouTube's efforts to remain current and compatible with evolving technology, enabling the user uploaded videos it stores to be accessible to the largest number of users in the most efficient manner.<br><br>Solomon Decl. ¶ 7 (cited in Defs. Opening Mem. at p. 27, *see supra* n.1). | Controverted.  Viacom does not dispute that YouTube's transcoding process creates transcoded copies in Flash format of videos uploaded to YouTube, though the use of the word "converts" is misleading, because the system in fact creates several new copies, *see* Viacom SUF ¶¶ 315-16.  However, Viacom disputes that YouTube's transcoding process does so "[b]ecause most Internet browsers are not able to play video files in all of these formats."  In fact, it does so because Defendants chose to design their system that way so that videos would "display[] nicely everywhere."  Hohengarten Ex. 239, JK00008859.  Further controverted that the process occurs automatically.  *See* Resp. to Defs. SUF ¶ 19. |

14

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.44.  After a user uploaded video has been transcoded, the original video file and any transcodes are stored by YouTube on its network of computers and servers. As a part of this process, the YouTube system makes more than one copy of the stored version of the user's video files in order to increase the utility and reliability of the service for YouTube's users. This process also ensures that users' uploaded videos can remain playable in instances where any single storage device fails, and enables YouTube to efficiently distribute the load of storing millions of videos and speeding their playback in response to requests coming from users across the globe.<br><br>Solomon Decl. ¶ 8 (cited in Defs. Opening Mem. at p. 27, *see supra* n.1). | Controverted to the extent that the reference to "the YouTube system" suggests that YouTube employees are not involved in deciding how many copies of videos should be made and stored by YouTube, and in what format.  *See* Resp. to Defs. SUF ¶ 19.<br><br>Further controverted to the extent that Defendants claim that making more copies of a video makes storing that video more "efficient."  *See infra* ¶ 1.47. |
| 1.45.  Anyone with Internet access and standard Internet browsing software can view for free the videos that other users have stored on YouTube. As noted above, YouTube users can also access the YouTube service from mobile or other consumer electronics devices. Users initiate video playback of a YouTube video by visiting YouTube and selecting the video that they wish to view. Like the choice of whether and which video to upload to YouTube, the decision of which video to view is made entirely by the user.<br><br>Solomon Decl. ¶ 9 (cited in Defs. Opening Mem. at p. 27, *see supra* n.1). | Controverted.  As noted, "the videos that . . . users have stored" are *not* the videos that are viewable on YouTube.  The transcoded copies that YouTube creates are viewable on YouTube.  *See* Resp. to Defs. SUF ¶ 21. Further, while a user may choose which video to click, YouTube promotes particular videos in a variety of ways, including (but not limited to):  (1) sorting videos into browse pages, *see* Viacom SUF ¶¶ 261, 333; (2) categorizing videos, *see* Viacom SUF ¶ 341-42; (3) giving videos prominent placement on the site, including on its home page, *see* Viacom SUF ¶¶ 329, 331, 333; and (4) directing a user to videos that are "related" to a video on a watch page that a user views, which accounts for 58 percent of YouTube's video views, *see* Viacom SUF ¶¶ 334-36. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.46.  The YouTube system allows users to view videos stored on YouTube's servers through a process known as "streaming." The streamed files can begin playing on a user's computer before the complete video file has been fully transmitted.  In response to a playback request, the YouTube system automatically streams a copy of the requested video from one of its video servers to the user's personal computer (or other device, such as an iPhone), where it plays for the user to watch.  In almost all cases, YouTube prohibits users from downloading videos off the site, and does not offer that functionality to users. In the context of viewing YouTube videos on a personal computer, for example, streaming differs from downloading because during streaming a complete copy of the video being streamed is not stored on the end user's computer before viewing can begin.<br><br>Solomon Decl. ¶ 10 (cited in Defs. Opening Mem. at p. 27, *see supra* n.1). | Controverted.  As stated in Viacom's response to ¶¶ 23-24 of Defendants' SUF, YouTube does create a full and durable copy of a video on a user's computer. |
| 1.47.  [D]uring the upload, storage, and playback processes, a certain number of copies of videos . . . are made to facilitate the efficient storage and viewing of user-submitted videos.<br><br>Defs. Opening Mem. at p. 27 (citing Solomon Decl. ¶¶ 6-8). | Controverted as to Defendants' claim that YouTube's act of copying every uploaded video facilitates efficient storage.  As Defendants also retain the original copy of these videos, *see* Viacom SUF ¶ 315, the claim that additional copies make the storage of the videos more efficient is nonsensical.<br><br>Viacom does not controvert the fact that YouTube makes copies of all videos uploaded to its site in order to facilitate the viewing of these videos.  *Accord* Viacom SUF ¶¶ 315, 316. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
| --- | --- |
| 1.48.  [D]uring the upload, storage, and playback processes, a certain number of copies of those videos are made automatically by operation of YouTube's system.<br><br>Defs. Opening Mem. at p. 27 (citing Solomon Decl. ¶¶ 6-8). | Controverted.  *See* Resp. to Defs. SUF ¶¶ 16, 19, 23, 24. |
| 1.49.  YouTube employees have never even seen the overwhelming majority of the more than 500 million videos that have been posted to the service.<br><br>Defs. Opening Mem. at p. 34 (citing Levine Decl. ¶ 28; Schaffer Decl. ¶ 11; Hurley Decl. ¶ 18). | Controverted, as Levine Decl. ¶ 28 contains inadmissible generalized and conclusory statements and Hurley Decl. ¶ 18 contains inadmissible lay opinion testimony.  *See* Evid. Obj. at 3, 15.<br><br>However, the alleged fact is immaterial to any issues before the Court. Whether Defendants viewed most or all videos displayed on the YouTube site is irrelevant to Defendants' culpable intent under *Grokster* and the DMCA.  *See, e.g., A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021-22 (9th Cir. 2001).<br><br>The alleged fact is also misleading. It is undisputed that, in YouTube's early days, YouTube's founders were among the top six most active viewers of videos on YouTube, having watched nearly 8,000 videos by August 2005.  *See* Viacom SUF ¶ 51. Moreover, only two days before opposition papers were to be filed, Defendants produced non-anonymized YouTube viewing records for certain YouTube employee accounts. Although Defendants notably refused to produce any viewing records for YouTube co-founder Jawed Karim beyond October 2005, the newly produced data could show that YouTube's founders and other employees did know of and watch many specific infringing videos.  The Viacom Plaintiffs have not yet been able to analyze this data.  *See* Wilkens Decl. ¶ 20. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.50.  Ordinarily, therefore, no one at YouTube will know that a given video has been posted at all, let alone actively viewed that video.<br><br>Defs. Opening Mem. at p. 34 (citing Levine Decl. ¶ 26; Schaffer Decl. ¶ 11; Hurley Decl. ¶ 18). | Controverted.  The cited evidence does not support the proposition.  Paragraph 28 of Ms. Levine's declaration says only that YouTube tracks notices and administers strikes in an automated fashion.  Paragraph 11 of Mr. Schaffer's declaration says that while YouTube did not review *every* video during his time at the company, it did "spot check" videos and remove content on behalf of several companies, but not Viacom.  This demonstrates that YouTube was perfectly capable of using human review to police its site for copyright infringement when it chose to do so.  Viacom SUF ¶¶ 272-273.<br><br>Paragraph 18 of Mr. Hurley's declaration says—without any documentary support whatsoever—that screening videos was "not scalable and was ineffective in identifying unauthorized material," and that YouTube ceased screening "as a general matter."  Moreover, YouTube's founders and early employees were among the most frequent watchers of YouTube videos during key periods relevant to the case.  *See* Hohengarten Ex. 185.  *See also supra* ¶ 1.49, *infra* ¶ 1.102.<br><br>Moreover, the cited evidence is inadmissible, because Levine Decl. ¶ 26 contains generalized and conclusory statements and Hurley Decl. ¶ 18 contains improper lay opinion testimony.  *See* Evid. Obj. at 3, 15. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.51.  Among Viacom's works in suit are: *Call to Greatness*, *Distraction*, *Dog Bites Man*, *Gerhard Reinke's Wanderlust*, *The Hollow Men*, *Human Giant*, *Insomniac with Dave Attell*, *Noah's Arc*, *Premium Blend*, *Rob and Big*, *Run's House*, *Shorties Watchin' Shorties*, *Stardust*, *A Shot At Love*, *The Shot*, *Trick My Truck*, *True Life: I'm An Alcoholic*, *Viva Hollywood*, *Viva La Bam*, *The White Rapper Show*, *Wildboyz*, and *Wonder Showzen*.<br><br>Defs. Opening Mem. at p. 37 (footnote 11) (citing Rubin Decl. ¶¶ 117, 120). | Uncontroverted. |
| 1.52.  [A] Viacom employee explained to *The Wall Street Journal*:  "you almost can't find a better place than YouTube to promote your movie."<br><br>Defs. Opening Mem. at p. 39-40 (citing Schapiro Exs. 23 at 3; 24 (70:16-71:24); Rubin Exs. 3, 9 (GOO001-01855886)). | Controverted to the extent that the asserted fact is meant to suggest that Viacom favored the upload of infringing clips of its films and television shows to YouTube.  In making the quoted statement, Andrew Lin, a former Paramount employee, was referring to two specially created marketing clips that he uploaded to YouTube with YouTube's assistance to the official YouTube accounts "ParamountClassics" and "ParamountVantage."  Kohlmann Ex. 77 (Lin Dep.) at 76:18-77:15.  In any event the alleged fact is immaterial to any issue before the Court. |
| 1.53.  [A]n MTV marketing executive described posting clips to YouTube as a "no brainer" and raved that the benefits of placing content on YouTube were "overwhelming."<br><br>Defs. Opening Mem. at p. 40 (citing Schapiro Exs. 25 (43:17-22), 26). | Controverted to the extent that the asserted fact is meant to suggest that MTV Networks favored the uploading of infringing clips of its programs to YouTube.  The cited evidence does not support - and indeed controverts - any such suggestion.   Tina Exarhos, the MTV Networks marketing executive quoted in the alleged fact, testified that she was referring to the carefully selected trailers and other marketing clips that MTV Networks uploaded to YouTube as part of marketing campaigns.  *See* Kohlmann Ex. 70 (Exarhos Dep.) at 44:4-45:10; 48:12-16; 50:13-17; 56:11-15; 105:4-24 ;165:11-15.  In any event the alleged fact is immaterial to any issue before the Court. |

19

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.54.  [T]he filing of this lawsuit did not curtail [Viacom's] uploading of clips to YouTube.<br><br>Defs. Opening Mem. at p. 40 (citing Rubin Decl. ¶¶ 2, 3 & Exs. 23-31, 60-66; Schapiro Ex. 27 (23:3-24:23)). | Uncontroverted but immaterial to any of the issues before the Court.  Viacom is not suing YouTube for any clips that Viacom authorized to appear on YouTube.  YouTube was fully aware of the vast majority of Viacom's uploading of authorized trailers and other marketing clips.  *See* Resp. to Defs. SUF ¶¶ 123, 124. |
| 1.55.  As one of Viacom's own marketing agents explains in a sworn declaration accompanying this motion, the "practice by viral marketers of using YouTube to promote music, television programs, and motion pictures is widespread."<br><br>Defs. Opening Mem. at p. 40 (citing Ostrow Decl. ¶ 6; Chan Decl. ¶¶ 3, 4, 9; Rubin Decl. ¶ 2 & Exs. 2, 32-41; Schapiro Ex. 28 (GOO001-05161257-58)). | Controverted.  Rubin Decl. ¶ 2, Ex. 2, and Exs. 32-41, Ostrow Decl. ¶ 6, and Chan Decl. ¶¶ 4 and 9 contain inadmissible evidence.  *See* Evid. Obj. at 2, 5-7.<br><br>Further controverted in that Defendants' characterization of Mr. Chan as Viacom's agent is misleading.  Mr. Chan is an employee of Palisades Media Group, a company that briefly did marketing work for Viacom.  Mr. Chan submitted a declaration in this case at YouTube's behest, and as documents produced by Defendants show, Mr. Chan's relationship with Defendants has been a longstanding and close one.  *See* Kohlmann Ex. 23, GOO001-01984461, Kohlmann Ex. 24, GOO001-02299635, Kohlmann Ex. 25, GOO001-02302174, Kohlmann Ex. 26, GOO001-02302195 (samples from extensive communications between YouTube and marketing company Palisades Media Group); *see also* Kohlmann Decl. ¶ 54. |
| 1.56.  Viacom sometimes places material on YouTube openly.<br><br>Defs. Opening Mem. at p. 40 & n.14 (citing Schapiro Exs. 29 (38:10-21), 30, 31 (26:20-27:10), 24 (22:11-22:20), 32 (151:17-152:20)). | Uncontroverted that Viacom places material on YouTube openly.  Controverted to the extent that "sometimes" is meant to suggest that Viacom uploads clips to YouTube in a manner that conceals their origin from YouTube.  *See* Resp. to Defs. SUF ¶¶ 123-125. |
| 1.57.  Viacom and its agents use accounts that lack any discernable connection to Viacom (such as "MysticalGirl8," "Demansr," "tesderiw," "GossipGirl40," "Snackboard," and "Keithhn"). | Controverted, to the extent it implies that YouTube does not know that such accounts are being used to upload authorized Viacom content.  For example, it is undisputed that Viacom informed YouTube the following day that it had uploaded an authorized clip using |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| Defs. Opening Mem. at p. 41 (citing Ostrow Decl. ¶ 6; Chan Decl. ¶ 4; Rubin Decl. ¶ 5(a)-(f)). | the account MysticalGirl8. *See* Kohlmann Ex. 84 (Wahtera Dep.) at 32:8-11.  Further controverted to the extent that the asserted fact suggests that numerous clips of Viacom content were uploaded to these accounts.  In total, 25 clips were uploaded to the six accounts identified in the asserted fact.  *See* Wilkens Decl. ¶ 19(b).  The asserted fact is immaterial to any issues before the Court.

Further controverted as Ostrow Decl. ¶ 6 is inadmissible because it contains improper lay opinion testimony and is not based on personal knowledge, and as Chan Decl. ¶ 4 is inadmissible because it is not based on personal knowledge and because there is insufficient evidence to demonstrate its relevance.  *See* Evid. Obj. at 2, 5-6. |
| 1.58.  Viacom has deliberately used email addresses that "can't be traced to [Viacom]" when registering for YouTube accounts.

Defs. Opening Mem. at p. 41-42 (citing Schapiro Ex. 46, Rubin Exs. 22 & 26). | Controverted to the extent that the asserted fact implies that it was Viacom's general practice to upload clips using such accounts. The cited evidence shows that this practice occurred on one occasion and involved only one clip.  Further controverted, to the extent that the asserted fact implies that Viacom's intent was to conceal the source of the uploads from YouTube, or that YouTube was unaware that the accounts were affiliated with Viacom.  In fact, YouTube was well aware of the accounts and the clips uploaded to them. *See* Resp. to Defs. SUF ¶ 125; *see also supra* at ¶ 1.57. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.59.  Viacom has used at least 18 separate firms to upload content to YouTube on its behalf:  ICED Media, Special Ops Media, M80, WiredSet, New Media Strategies, Cornerstone Promotions, Fan2Band, Fanscape, Total Assault, Filter Creative Group, Carat, T3, BuzzFeed, ADD Marketing, TViral, Deep Focus, Red Interactive, and Palisades Media Group.<br><br>Defs. Opening Mem. at p. 41 n.16 (citing Schapiro Exs. 36-45, Chan Decl. ¶¶ 3-4). | Controverted.  At least as to New Media Strategies, T3, and BuzzFeed, the purported fact is not supported by the cited evidence. It is also immaterial to any issue before the Court. |
| 1.60.  Viacom's employees have made special trips away from the company's premises (to places like Kinko's) to upload videos to YouTube from computers not traceable to Viacom.<br><br>Defs. Opening Mem. at p. 42 (citing Schapiro Ex. 47 (158:20-22), Schapiro Exs. 48, 49). | Controverted as well as immaterial.  The cited evidence shows only that one Paramount employee, on one occasion, uploaded a video to YouTube from a Kinko's copy shop.  It is undisputed that the Paramount employee did not attempt to hide the origin of the clip from YouTube, and that within a few days of the upload, Paramount informed YouTube that the upload was authorized.  *See* Kohlmann Ex. 84 (Wahtera Dep.) at 32:8-11; *see also supra* at ¶ 1.57. |
| 1.61.  Viacom has altered its own videos to make them appear stolen, like "footage from the cutting room floor, so users feel they have found something unique."<br><br>Defs. Opening Mem. at p. 42 & n.17 (citing Rubin Ex. 4; Rubin Exs. 20, 14; Schapiro Ex. 50 (VIA10406143)). | Controverted as misleading, and in any event immaterial to any issues before the Court.  None of the cited evidence refers to any content made to appear to YouTube as if it was "stolen," and none of the cited evidence even uses that word.  To the contrary, the cited evidence refers to the use of outtakes – footage from the cutting room floor – to attract viewers, a practice that is common and hardly nefarious.  In any event, Defendants were entirely capable of determining the origins of clips given their extensive communications with Viacom and third-party marketing companies.  *See* Resp. to Defs. SUF ¶¶ 123-125. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.62.  Viacom has further obscured the line between authorized and unauthorized clips by broadly releasing various videos featuring its content.  These videos are designed to spread virally over the Internet to generate publicity for Viacom's television shows and movies.  When users post these videos, as Viacom hopes that they will, on sites like YouTube, Viacom acknowledges that their presence is authorized.<br><br>Defs. Opening Mem. at p. 42 (citing Schapiro Ex. 27 (205:17-206:2) & (206:4-20)) (internal citation omitted). | Controverted as misleading, and in any event immaterial to any issues before the Court.  The "broadly releas[ed]" videos Defendants reference are trailers and other carefully selected marketing clips included in the Paramount "Electronic Press Kits" that are prepared for Paramount motion pictures.  Kohlmann Ex. 83 (Tipton Dep.) at 16:5-16; *see also id.* at 28:5-7 (testifying that any distributed clips were approved "through the publicity team, through filmmakers, through the creative team, and through the interactive [team]"); Kohlmann Ex. 84 (Wahtera Dep.) at 101:9-10 (describing "EPK materials" as akin to "trailers").  There is no evidence to suggest that Paramount authorized the online distribution of any clips except these specifically chosen trailers and marketing clips. |
| 1.63.  Viacom itself was confused . . . . when selecting its clips in suit, many of which turned out to be identical to Viacom's authorized promotional videos.<br><br>Defs. Opening Mem. at p. 43 (citing Rubin Decl. ¶ 17). | The evidence submitted by Defendants supports only the claim that 100 clips in suit closely resemble trailers and other marketing videos that Viacom authorized to appear on various websites as part of its marketing strategy.  The fact that Viacom authorized a trailer to appear on one website does not mean that Viacom authorized the trailer to appear on YouTube.<br><br>Further controverted because is Rubin Decl. ¶ 17 inadmissible as irrelevant.  *See* Evid. Obj. at 7. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.64.  YouTube knew that the promotional activities of which it was aware were just the tip of the iceberg, and that Viacom and a wide variety of major media companies were extensively using the service for promotional purposes without telling YouTube (or anyone else) what they were doing.<br><br>Defs. Opening Mem. at p. 43 (citing Schaffer Decl. ¶ 6; Maxcy Decl. ¶¶ 3-7; Schapiro Ex. 53; Botha Decl. ¶¶ 11-12). | Controverted.  With respect to Viacom's marketing practices, the evidence shows that YouTube was aware of the overwhelming majority of Viacom clips authorized to appear on YouTube.  *See* Wilkens Decl. ¶ 19; Resp. to Defs. SUF ¶¶ 123-125.  With respect both to Viacom's practices and those of other "major media companies," this alleged fact is unsupported by admissible evidence.  Despite the voluminous discovery in this case from Viacom and third parties, and despite their own analysis of the data that they maintain for every YouTube account and every YouTube video, Defendants have cited no evidence to support their "tip of the iceberg" claim, or to support the claim that they been unaware of the authorized uploading activities of Viacom and other major media companies. *See* Resp. to Defs. SUF ¶¶ 123-125.<br><br>Further controverted because some of the cited evidence is inadmissible.  *See* Evid. Obj. at 1, 3, 9-12. |
| 1.65.  YouTube routinely received takedown requests that were subsequently withdrawn after the media companies who sent them realized that their notices had been targeted to content that they themselves had uploaded or authorized.<br><br>Defs. Opening Mem. at p. 44 (citing Rubin Decl. ¶ 4 & Exs. 69-83). | Controverted as to "routinely."  Defendants claim that YouTube has removed 4.7 million videos pursuant to takedown requests, *see* Levine Decl. ¶ 26, and the evidence Defendants cite shows fewer than a hundred mistaken takedowns of authorized content. Even if the number of mistakes was 50 times what Defendants have demonstrated, that would still represent only one tenth of one percent of the total takedowns of infringing material content owners have submitted to YouTube.  Given the massive scale of infringement on the YouTube site and the problem content owners face in dealing with a site that refuses to take down infringing content unless it is identified specifically by URL, some mistakes are all but inevitable.<br><br>Also controverted because Rubin Decl. ¶ 4 and Exs. 69-83 are inadmissible as hearsay. *See* Evid. Obj. at 7. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.66.  [T]he former President of MTV candidly explained:  "While we were issuing takedown notices against some of the content, there was other content which we were allowing to continue to be on YouTube."<br><br>Defs. Opening Mem. at p. 45 (citing Schapiro Ex. 4 (194:8-11)). | Controverted.  Viacom temporarily abstained from sending takedown notices for some infringing content while negotiating with YouTube regarding a potential licensing deal and compensation for past copyright infringement, but sent those notices when negotiations broke down.  Viacom never authorized YouTube to display that infringing content.  *See* Resp. to Defs. SUF ¶ 128. |
| 1.67.  Viacom's executives felt "very strongly that [they didn't] want to stop the colbert and daily clips" on YouTube.<br><br>Defs. Opening Mem. at p. 46 (citing Schapiro Ex. 58 (VIA01676948)). | Uncontroverted that the one cited document, an email exchange between two Comedy Central executives, includes the quoted language.  Controverted insofar as the alleged fact misleadingly suggests this was the view of Viacom as a whole.  It is undisputed that Viacom did not authorize YouTube to display user uploaded clips from *The Daily Show* and *The Colbert Report*.  *See* Resp. to Defs. SUF ¶ 128. |
| 1.68.  The former President of MTV testified that Viacom did not want to take down "clips from Jon Stewart and Stephen Colbert" because "we were concerned that Jon Stewart and Stephen Colbert believed that their presence on YouTube was important for their ratings as well as for their relationship with their audience."<br><br>Defs. Opening Mem. at p. 46 (citing Schapiro Ex. 4 (199:22-201:2)). | Controverted.  First, the cited evidence is inadmissible as it is not based on personal knowledge.  *See* Evid. Obj. at 1.<br><br>Second, the purported fact is misleading insofar as Viacom *did* send takedown notices for content from *The Daily Show* and *The Colbert Report* during the fall of 2006, the period at issue in Mr. Wolf's testimony, and temporarily abstained from sending takedown notices for other infringing content while negotiating with Defendants regarding a licensing deal and compensation for past copyright infringement.  *See* Resp. to Defs. SUF ¶ 128. |
| 1.69.  Accordingly, through at least October 2006, Viacom had a specific internal policy of declining to issue takedown notices for clips of [*The Daily Show* and *The Colbert Report*] that were less than five minutes long.<br><br>Defs. Opening Mem. at p. 46 (citing Schapiro Exs. 59, 60). | Controverted to the extent that the asserted fact is intended to imply that during the pendency of the parties licensing negotiations in October 2006, Viacom authorized infringing content to appear on YouTube.  *See* Resp. to Defs. SUF ¶¶ 128, 129-133.  Immaterial as to any issues before the Court. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.70.  Viacom later adjusted that rule and confidentially instructed its agent BayTSP to leave up all clips of these shows shorter than three minutes.<br><br>Defs. Opening Mem. at p. 46 (citing Schapiro Exs. 59, 60). | Controverted and immaterial to any issue before the Court.  *See* Resp. to Defs. SUF ¶ 129. |
| 1.71.  Not only did Viacom apply its various leave-up rules to clips of the show, but one of Viacom's most senior executives publicly blessed users' practice of uploading clips from *South Park* to YouTube.<br><br>Defs. Opening Mem. at p. 46 (citing Schapiro Ex. 61). | Controverted.  Viacom did not in fact authorize users to upload videos taken from *South Park* to YouTube, and it is undisputed that Viacom did not give YouTube an implied license for any user-uploaded clips from *South Park* or any other work in suit. Defendants' allegation to the contrary is unsupported by admissible evidence.  The only statement Defendants cite suggesting that Viacom "publicly blessed" such uploads is a news report of an imprecise "passing comment" made by an MTV Networks executive on her way into an event.  *See* (McGrath Dep.) at 256:19-21 ("A passing comment on the way into the dinner, I have no recollection of this."); *id.* at 259:4-6 ("I don't recall this at all, so I can't verify whether [the story] is accurate or inaccurate.").  In her deposition, that executive clarified that, if she had made any comment about user uploads of *South Park* content to YouTube, it was only that Viacom was not currently issuing takedown notices for all user uploaded *South Park* clips "during a period when we [were] trying to do a deal to legitimately be compensated for the use of our content on YouTube," *see* Kohlmann Ex. 78 (McGrath Dep.) at 256:9-13, not that Viacom accepted or encouraged such infringing activity.  *See id.* at 269:5-13 (testifying that YouTube was violating Viacom's copyright by displaying South Park clips at the time).<br><br>Further controverted because Schapiro Ex. 61 is inadmissible hearsay.  *See* Evid. Obj. at 1. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.72.  [I]n November 2006, when Viacom found 316 *South Park* clips on YouTube, it requested removal of only one, and chose to leave up or "pass on" the remaining 315.<br><br>Defs. Opening Mem. at p. 46-47 (citing Schapiro Ex. 62 (BAYTSP001093518), Ex. 11 (134:19-136:10, 138:25-139:14)). | Controverted to the extent that the asserted fact suggests that Viacom authorized any of the infringing clips to appear on YouTube.  It is undisputed that the parties were in licensing negotiations at the time, and that Viacom did not give Defendants an express or implied license to exploit *South Park* or any other work.  *See* Resp. to Defs. SUF ¶ 128. |
| 1.73.  Viacom's confidential instructions to BayTSP about what to take down and what to leave up grew so detailed and complex that the Viacom employee responsible for overseeing the BayTSP relationship compared them to *Crime and Punishment*.<br><br>Defs. Opening Mem. at p. 47 & n.19 (citing Schapiro Ex. 12 (83:6-84:8); Schapiro Exs. 63, 64, 65) (BAYTSP003718201). | Controverted as misleading, in that the witness was referring to counsel's request that he recite from memory policies that were several years old, and that he was not responsible for at the time.  *See* Schapiro Ex. 12 (83:6-84:8); Kohlmann Ex. 81 (Solow Dep.) at 286:16-21.  Immaterial to any issues before the Court.  *See* Viacom Resp. to Defs. SUF ¶ 130. |
| 1.74.  Viacom came up with new rules every few days—sometimes even changing the rules within the same day.<br><br>Defs. Opening Mem. at p. 47 (citing Schapiro Exs. 66-74). | Controverted and immaterial.  *See* Viacom Resp. to Defs. SUF ¶ 128.  Further, the purported fact is misleading and inaccurate in its description of changes to the instructions.  For example, the evidence does not support the proposition that Viacom changed the "rules" it provided to BayTSP within the same day.  *See* Schapiro Exs. 73 & 74 (showing only that Viacom in one instance gave an instruction and then "clarified [a] misunderstanding" regarding that instruction). |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.75.  Viacom even crafted marketing campaigns around its decisions to leave up certain user-posted videos.<br><br>Defs. Opening Mem. at p. 47 (citing Rubin Ex. 28). | Controverted and immaterial to any issues before the Court.  Contrary to the misleading wording of the asserted fact, the evidence cited by Defendants pertains to a single decision not to remove from YouTube copies of the official trailer for one film, Cloverfield.  As reflected in the cited document, Paramount had already released the official trailer in order to encourage viewers to see the full motion picture.  *See* Rubin Ex. 28.  Having released the trailer, Paramount decided not to issue takedown notices for copies of that specific marketing clip appearing on YouTube.  There is no evidence that Viacom crafted a marketing campaign around pirated clips of the film itself, as Defendants suggest. |
| 1.76.  The vast majority of the takedown notices that YouTube receives are processed through this tool [CVP] and thus are removed within minutes.<br><br>Defs. Opening Mem. at pp. 55-56 (citing Levine Decl. ¶ 19). | Uncontroverted. |
| 1.77.  A number of the plaintiffs have signed up for YouTube's automated takedown tool and have used it for years to secure the removal of videos containing their content.<br><br>Defs. Opening Mem. at p. 56 n.25 (citing Schapiro Exs. 17 (205:25-210:23), 105, 106, 107 (94:13-95:11), 108 (80:22-83:16, 84:8-16, 109). | Controverted to the extent that the asserted fact implies that the CVP tool assists copyright owners in locating infringing clips on YouTube, or that the CVP tool is an adequate means to prevent copyright infringement.  *See* Resp. to Defs. SUF ¶ 92.  Indeed, when YouTube offered CVP to Viacom in February 2007, YouTube at the same time refused to use digital fingerprinting technology to prevent infringement of Viacom's works absent a licensing deal.  *See, e.g.*, Viacom SUF ¶¶ 211, 214-217. |
| 1.78.  Viacom's agent for sending takedown notices (BayTSP), has repeatedly acknowledged that YouTube makes it easy to send DMCA notices and that it removes the material identified quickly and effectively.<br><br>Defs. Opening Mem. at pp. 56-57 (citing Schapiro Exs. 120, 121). | Controverted to the extent that the asserted fact implies that YouTube adequately responds to all takedown notices.  It is undisputed that Defendants refuse to respond to takedown notices that provide Defendants with "representative lists" of infringements.  *See* Resp. to Defs. SUF ¶ 33. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.79.  For months, Viacom had been accumulating these notices because it wanted, for strategic reasons, to send them all at one time.<br><br>Defs. Opening Mem. at p. 57 (citing Schapiro Ex. 4 (149:4-25;195:9-196:14), Ex. 123, Ex. 124, Ex. 125). | Controverted as misleading regarding Viacom's forbearance from enforcing its rights during the pendency of the parties' licensing negotiations.  *See* Resp. to Defs. SUF ¶ 128.  Irrelevant to any issues before the Court. |
| 1.80.  It is not remotely the case that YouTube exists "solely to provide the site and facilities for copyright infringement." . . . Even the plaintiffs do not (and could not) suggest as much.  Indeed, they have repeatedly acknowledged the contrary.<br><br>Defs. Opening Mem. at p. 60 & n.28 (citing Schapiro Exs. 126, 127 (129:21-130:14), 128 (79:7-80:3, 81:17-24, 83:12-16, 84:14-18), 129 (215:25-218:8, 224:2-225:13), 130 (19:10-14, 55:21-24), 25 (253:10-19), 112 (16:19-25), 20 (100:12-103:9), 131, 78). | Uncontroverted but immaterial to any issues before the Court.  Defendants cannot claim protection under the DMCA safe harbor merely because their site had some legal functions. |
| 1.81.  YouTube could not manually review the massive volume of videos uploaded to its site in an effort to determine what those videos are and whether they infringe plaintiffs' copyrights.  Various witnesses unaffiliated with YouTube have recognized as much.<br><br>Defs. Opening Mem. at p. 62 n.29 (citing Schapiro Exs. 132 (92:15-21), 133 (36:23-37:16)). | Controverted to the extent that the asserted fact suggests that YouTube was incapable of engaging in any manual review.  Before Google acquired YouTube, Google's own video service manually reviewed each video uploaded to its service without difficulty, except of course that it was losing the war for traffic to YouTube.  *See* Viacom SUF ¶¶ 134-138.  More broadly, rather than review *every* video, YouTube could have performed targeted review using various methods that YouTube considered and either never adopted or adopted only briefly, including community flagging for copyright infringement, reviewing videos with "hot tags," and reviewing videos close to ten minutes long. *See* Viacom SUF ¶¶ 63, 75-77, 131. Defendants' own documents show that they review *millions* of videos each year as part of their existing flagging system.  *See* Hohengarten Ex. 13, GOO001-00044974, at GOO001-00044979 (May 2007 presentation noting that 19,000 flagged videos were |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | reviewed per day). The cited testimony does not dispute that manual review could have played a meaningful role in YouTube's copyright protection efforts when combined with other techniques. |
| 1.82. The varied uses that plaintiffs have made of YouTube make it difficult even for them to easily determine whether videos containing their content are actually unauthorized to be on YouTube.<br><br>Defs. Opening Mem. at p. 64 n.30 (citing Schapiro Exs. 47 (45:14-46:17), 25 (239:14-242:11), 27 (55:2-56:12) (244:2-19), 134 (159:7-21), 11 (150:12-151:2)). | Controverted and immaterial to any issue before the Court. The cited evidence does not show any connection between Viacom's marketing practices—of which YouTube was aware, *see* Resp. to Defs. SUF ¶ 125—and Viacom employees' ability to determine whether a clip infringes its copyrights. Furthermore, the cited evidence does not have any bearing on Defendants' culpable intent to infringe, or their ability to prevent infringement. |
| 1.83. Viacom recognized that without detailed instructions and elaborate record-keeping, even its own monitoring agents would be unable to effectively distinguish clips that Viacom wanted to remain on YouTube (and other sites) from those that it wished to take down.<br><br>Defs. Opening Mem. at p. 64-65 & n.31 (citing Schapiro Ex. 135, 136 (109:19-112:3), 27 (172:4-173:1), 57, 137 (BAYTSP003742451), 138 (BAYTSP001125473)). | Controverted to the extent Defendants imply that Viacom's communications with its monitoring agent have any bearing on Defendants' ability to distinguish infringing from non-infringing content. Viacom offered to work with Defendants to remove infringing content from the YouTube site, but Defendants rejected that offer and refused to take down videos displayed on the YouTube site that infringed Viacom's copyright unless Viacom sent a takedown notice listing the URL of the specific video. *See* Viacom SUF ¶¶ 209-220. Moreover, when Viacom and its agents occasionally made errors in taking down infringing content, they worked quickly to rectify those mistakes. *See* Resp. to Defs. SUF ¶ 146. |
| 1.84. In an effort to prevent the removal of videos that Viacom had authorized (and to avoid the continued embarrassment of misdirected takedown notices), Viacom has tried to maintain internal "whitelists" of approved YouTube user accounts.<br><br>Defs. Opening Mem. at p. 65 & n.32 (citing Schapiro Ex. 122 (414:24-420:6), 139 (162:6-10, 167:22-168:7); Rubin Decl. ¶ 5(a)-(f); | Uncontroverted that Viacom maintained internal whitelists, but controverted as to Defendants' characterization of those whitelists. *See supra* ¶ 1.83. Further controverted as to the claim that "whitelists" are "of approved YouTube user accounts." The names on the whitelist include account names used to upload authorized content as well as account names against which Viacom elected not to send takedown notices, |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| Schapiro Ex. 140). | including, for example, accounts that Viacom determined were used to upload content that may have constituted fair use.  *See, e.g.*, GOO001-04945320 (correspondence from Viacom's agent regarding reinstatement of videos to YouTube account LiberalViewer); Rubin Exs. 101 & 106 (whitelists including LiberalViewer account). |
| 1.85.  Despite Viacom's efforts, however, its whitelists consistently were incomplete and inaccurate.<br><br>Defs. Opening Mem. at p. 65 (citing Rubin Decl. ¶ 5(a)-(f) & Exs. 84-116). | Controverted to the extent Defendants imply that Viacom's records as communicated to its copyright enforcement agents had any bearing on Defendants' ability to distinguish infringing from non-infringing content. *See supra* ¶ 1.83. |
| 1.86.  [O]ne frustrated company [] complain[ed] to YouTube about Viacom's "blatant abuse of the DMCA takedown statute."<br><br>Defs. Opening Mem. at p. 66 (citing Schaffer Decl. ¶ 17 & Exs. 5-7). | Controverted to the extent that the evidence on which Defendants rely is inadmissible hearsay.  *See* Evid. Obj. at 8. |
| 1.87.  Each day, a single advertiser is allowed to purchase an ad that runs for a 24-hour period on the YouTube home page.<br><br>Defs. Opening Mem. at p. 76 (citing Reider Decl. ¶ 3). | Uncontroverted that this is the current practice.  Viacom lacks information to confirm or deny the asserted fact, but notes that the prices of YouTube's home page ads have risen along with the size of YouTube's user base, confirming that Defendants derive a direct financial benefit from infringement. Kohlmann Ex. 34, GOO001-03676696, at GOO001-03676712.  In any event the asserted fact is immaterial to any issue before the Court. |
| 1.88.  YouTube allows advertisers to purchase advertising on the pages where the results of users' search queries are displayed.<br><br>Defs. Opening Mem. at p. 76 (citing Reider Decl. ¶ 3). | Uncontroverted. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.89.  [T]he ads that appear on search-results pages have nothing to do with the presence of any video on YouTube, or even with the particular videos that are listed in response to a user's search.<br><br>Defs. Opening Mem. at p. 76 (citing Schapiro Ex. 159 (172:21-25)). | Controverted.  Defendants' wording of the asserted fact is misleading.  It is undisputed that the advertisements on YouTube's search pages are targeted to the search terms that a user employs to find videos.  *See* Viacom SUF ¶ 258.  Thus, when a user searches for infringing content on YouTube by entering search terms like "South Park" or "Daily Show," the search results page will list infringing clips and will also display advertisements that are targeted to users who like to watch *South Park* or *The Daily Show*. *See* Viacom SUF ¶ 259. |
| 1.90.  The revenue earned from the homepage ads, for example, is fixed based on how long the ad runs and has no connection to the presence of any given video (or kind of videos) that may be available for viewing on YouTube at any given time.<br><br>Defs. Opening Mem. at p. 76 (citing Reider Decl. ¶ 6). | Controverted.  Defendants may sell their home page ad at a fixed price in a given quarter, but there is no doubt that that price has increased over time as the size of YouTube's user base grew exponentially.  *See* Kohlmann Ex. 34, GOO001-03676696, at GOO001-03676712 (showing an increase in the per-day price of a homepage ad from ███ in Q4 2007 to ███ in Q2 2008); Kohlmann Ex. 37, GOO001-05311155, at GOO001-05311159 (projecting growth in cost-per-1,000 impressions ("CPM") for home-page ads as total homepage impressions increase from Q4 2006 through Q4 2007).  As more users have seen the home page in a given day, the daily price of the ads YouTube displays on that page has increased, which shows a clear relationship between the volume of YouTube's traffic and the site's revenue. |
| 1.91.  As for "watch-page" ads, YouTube allows such advertising to appear only alongside videos that have been posted or claimed by a content partner who has affirmatively instructed YouTube to display advertising next to its videos.<br><br>Defs. Opening Mem. at pp. 76-77 (citing Reider Decl 9). | Controverted.  This was not true prior to January 1, 2007.  As Viacom made clear in its opening filing, on that date YouTube "for legal reasons" removed advertising from watch pages containing content that had not been posted or claimed by a YouTube content partner. *See* Viacom SUF ¶¶ 249-50.  As a result, prior to that date, YouTube frequently showed advertisements next to, and earned revenue directly from, videos that infringed Viacom's copyrights. *See* Viacom SUF ¶ |

| Asserted Undisputed Fact | Response |
|---|---|
|  | 251.<br><br>Defendants' own calculations with respect to advertisements displayed using a single advertising network (Google's AdSense network) from April 2006 through December 2006 show that YouTube showed advertising on the watch pages of 11,013 clips in suit. *See* Defendants' Supplemental "Highly Confidential" Responses and Objections To Plaintiffs' Second Set of Interrogatories at 3-4. |
| 1.92.  At certain times prior to January 2007, watch-page ads were not limited (as they have been since) to pages displaying videos affirmatively claimed and designated for advertising by a content partner.<br><br>Defs. Opening Mem. at p. 77 (citing Reider Decl. ¶ 10). | Uncontroverted.  *See supra* ¶ 1.91. |
| 1.93.  YouTube received the same rates from ads that appeared on watch pages regardless of what videos those ads appeared next to.<br><br>Defs. Opening Mem. at p. 77 (citing Reider Decl. ¶ 10). | Uncontroverted but immaterial to any issue before the Court.  It is undisputed that the massive infringement on YouTube attracted additional users to the site and that those additional users generated additional advertising revenue for YouTube.  *See, e.g.*, Viacom SUF ¶¶ 35, 36, 57, 85, 95, 171, 173, 174, 232, 233, 236, 240. |
| 1.94.  Other video-hosting services such as Daily Motion, Vimeo, Veoh, and Atom (which Viacom operates), as well as many other popular websites relying on user-submitted content (including MySpace and Facebook), all earn revenue from advertising and offer ad products comparable to those allowed by YouTube.<br><br>Defs. Opening Mem. at p. 77 (citing Reider Decl. ¶ 12). | Controverted because the cited testimony is inadmissible.  *See* Evid. Obj. at 13-14. |
| 1.95.  YouTube was in no way intended or designed to lure users of any "pirate" service or to encourage any of its own users to infringe. | Controverted.  Defendants in their earliest communications showed a desire that their site be as big, in terms of usage, as some of the most popular infringing services— |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| Defs. Opening Mem. at p. 85 (citing Hurley Decl. ¶¶ 11, 16-22, 24-25). | "napster," "kazaa," and "bittorrent"—and implemented that plan by turning a blind eye to rampant infringement and removing infringing videos only after receiving DMCA notices from content owners. *See* Viacom SUF ¶¶ 29-132. That Defendants intended to build their service based on infringement, but may not have intended to lure users of a *particular infringing service*, is immaterial. |
| 1.96. In an internal email from April 2005, for instance, Hurley explained his hope "that our site would become the hub of short, personal videos."<br><br>Defs. Opening Mem. at p. 85-86 (citing Schapiro Ex. 160, Schapiro Ex. 161, Schapiro Ex. 162, and Hurley Decl. ¶ 7). | Undisputed that Schapiro Ex. 160 contains the quoted language, but Viacom denies any inference that the statement fully encompasses the co-founders' intentions when they founded YouTube. In that same e-mail exchange, Steve Chen and Jawed Karim both advocate YouTube becoming a "Flickr-like video site"; Steve Chen (in an email on which Chad Hurley and Jawed Karim are copied) later described "Flickr" to Roelof Botha as a site on which "you can find truckloads of adult and copyrighted content," *see* Hohengarten Ex. 230, JK00007479. *Accord* Viacom SUF ¶¶ 29-132.<br><br>Further controverted because Schapiro Ex. 160 and Schapiro Ex. 161 contain inadmissible hearsay. *See* Evid. Obj. at 1. |
| 1.97. As Steve Chen put the point in an internal email from April 2005: "The 'broadcast yourself' is such a succin[c]t and exact slogan for what we want."<br><br>Defs. Opening Mem. at p. 86 (citing Hurley Ex 8; Botha Decl. ¶ 6 & Ex. 1). | Uncontroverted that Hurley Ex. 8 contains the quoted language. Similar statements in Botha Decl. ¶ 6 and Botha Ex. 1 are inadmissible hearsay. *See* Evid. Obj. at 11.<br><br>Further controverted with respect to Defendants' misleading reliance on materials from the Botha Declaration. In ¶ 6, Mr. Botha purports to describe Sequoia Capital's "pre-investment meetings with the YouTube founders," but at Mr. Botha's deposition Defendants' counsel blocked, on privilege grounds, all questioning regarding a known meeting about copyright issues. Kohlmann Ex. 65 (Botha Dep.) at 42:12-46:17. That privilege assertion is baseless, *see id.* at 35:14-37:22 (testifying that Mr. Botha's |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | company was still in arms length negotiations with YouTube when he attended the meeting), but regardless of its merit it precludes Mr. Botha from testifying now regarding the YouTube founders' pre-investment statements.  Furthermore, Botha Ex. 1 (a document identical to Hurley Ex. 15) does not support Defendants' claims.  *See* Resp. to Defs. SUF ¶ 6. |
| 1.98.  [A]fter seeing one of the site's early ads, a woman discovered YouTube and reported:  "My son-in-law is serving in Iraq right now, but his server won't let him open videos through email. My daughter has been burning DVDs of their new baby to send to him, but I wanted to find a faster way to get him in touch with his son, so I started googling for 'video blogs' and 'free video blogs' etc. Your site was listed to the right as a sponsored link. We've only just started today, so the jury is still out on whether he can open the website from there or not—still, your site is an incredible and a wonderful public service. It's easy to use too."  Defs. Opening Mem. at p. 87 (citing Schapiro Ex. 166). | Uncontroverted but immaterial to any issues before the Court. |
| 1.99.  When [instances in which YouTube users disregard YouTube's rules and warnings about copyright infringement] are brought to its attention, YouTube takes them seriously and firmly reminds users that the posting of unauthorized copyrighted material is prohibited.  Defs. Opening Mem. at p. 88 (citing Levine Decl. ¶ 23). | Controverted.  YouTube accepted "notice"— and thus only allowed infringement to be "brought to its attention"—through DMCA notices that complied with YouTube's rigid, narrow interpretation of the DMCA.  *See* Resp. to Defs. SUF ¶ 33.  Further, there is no evidence that YouTube's messages to users were effective at reducing infringement, and Defendants' internal communications belie such a claim.  *See* Viacom SUF ¶¶ 29-132; Kohlmann Ex. 20, GOO001-00839838. |
| 1.100.  Such warnings have long been part of YouTube's communications with users suspected of violating YouTube's copyright policies. | Controverted.  Defendants' use of the word "suspected" is misleading because they responded only to takedown notices according to their rigid, narrow interpretation of the DMCA.  *See* Resp. to Defs. SUF ¶ 33.  In |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| Defs. Opening Mem. at p .88 (citing Levine Decl. ¶ 23). | other ways, Defendants assiduously sought to hide from facts that would make them suspicious. *See, e.g.*, Hohengarten Exs. 202, GOO001-00829702, at 4 & at GOO001-00829704; Hohengarten Ex. 214, JK00000832; Hohengarten Ex. 232, JK00008043; Hohengarten Ex. 233, JK00008331; Viacom SUF ¶¶ 294-310. Further, there is no evidence that Defendants' messages to users were effective at reducing infringement. *See supra* ¶ 1.99. |
| 1.101. As early as April 2005, the founders created an email message that would be automatically sent to users whose videos were rejected for violating YouTube's Terms of Service; the email made clear YouTube's "rules" for what types of videos users were allowed to upload, including "No copyrighted material."<br><br>Defs. Opening Mem. at p. 88 (citing Hurley Decl. ¶ 8 & Ex. 9; *id.* ¶ 11 & Ex. 13). | Uncontroverted, except that Defendants have not provided any evidence that Defendants ever sent this email to any YouTube user. Further, the purported fact is immaterial to any issue before the Court. |
| 1.102. In YouTube's early days, when it was sufficiently small that one-on-one communications with users seemed practical, YouTube's founders sent similar messages to users who tried to post material forbidden by the service's rules. For instance, in July 2005, Chad Hurley wrote to a user whose video was rejected, explaining that "it was rejected because it was copyrighted material. We are trying to build a community of real user-generated content."<br><br>Defs. Opening Mem. at p. 88 n.41 (citing Hurley Decl. ¶ 17 & Ex. 22). | Uncontroverted that Chad Hurley sent to one user the e-mail described in the asserted fact. Controverted to the extent that the asserted fact implies that the e-mail is truthful and that YouTube actually carried out the measures set forth in the email. The email states that "moving forward we are going to be more proactive about screening videos upfront. Some early videos were not properly screened, so you may see some violations on the current site. We are going to be reviewing and removing these shortly." *See* Hurley Ex. 22. In other words, Mr. Hurley represented to the user that YouTube would begin doing exactly what Google Video did before Google relaxed its copyright enforcement policies to compete with YouTube: "screen[] videos upfront." *Id.; see also* Viacom SUF ¶¶ 134-37 (describing Google Video's practices until September 1, 2006). YouTube's practice has |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | not been to pre-screen videos but instead has been to wait for DMCA notices from content owners. |
| 1.103.  The President's weekly video addresses are available for viewing on YouTube.<br><br>Defs. Opening Mem. at p. 89. | Uncontroverted and immaterial to any issue before the Court. |
| 1.104.  [A]vailable for viewing on YouTube are: . . . highlights of the Stanley Cup Playoffs, NBA Finals, and U.S. Open, uploaded by the NHL, NBA, and USTA; videos posted by users of their pets performing tricks; music videos uploaded or claimed by major record labels including Sony Music, EMI, Universal Music, and Warner Music Group; amateur video footage of an amazing confrontation between lions, crocodiles, and buffalo in Kruger National Park that has been viewed nearly 50 million times; holiday greetings home from soldiers stationed around the world to their families back home; videos of astronauts giving a tour of the International Space Station and responding from outer space to questions posed by YouTube users; lectures given by professors from leading universities on subjects ranging from particle physics to Shakespeare; and even a presentation given at the Library of Congress about YouTube's impact on society and culture.<br><br>Defs. Opening Mem. at pp. 89-90 (citing Walk Decl. ¶¶ 6, 7, 12, 17, 18, 20, 21). | Controverted to the extent that Walk Decl. ¶ 12 contains improper lay opinion.  *See* Evid. Obj. at 6. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.105.  [P]laintiffs' own analyses of YouTube suggest that it consists overwhelmingly of user-generated material and videos appearing pursuant to YouTube's license agreements with its array of content partners.<br><br>Defs. Opening Mem. at p. 90 n.42 (citing Schapiro Exs. 167 (VIA00316621), 168 (VIA00857223), 180 (¶ 16)). | Controverted, but immaterial.  It is undisputed that Defendants' own analyses of the volume of infringing content on YouTube put the figure between 54% and 80%.  *See* Viacom SUF ¶¶ 55, 95, 104, 153, 170, 171, 173, 174, 176, 181.  The documents cited by Defendants do not create a material dispute on this point.  Schapiro Ex. 167 was a presentation prepared in August 2006, stating nearly all of YouTube's "top 100 viewed clips of all time" were user-generated.  *Id.* at VIA00316621.  Because YouTube screened its "most viewed" page to remove infringing clips, *see* Hohengarten Ex. 128, GOO001-01535521, Hohengarten Ex. 198, GOO001-01931799, at 5 & at GOO001-01931806, this quote does not in any way quantify the volume of infringement on YouTube.  Furthermore, Schapiro Ex. 168 says nothing about the quantity of infringement or non-infringement on YouTube.  Schapiro Ex. 180 is Robert Tur's *complaint* against YouTube; the cited paragraph says that "substantial use of YouTube's website was and is made by users uploading their own homemade videos," but it also says that "consumers viewed, millions of times, copyrighted material from major television networks, e.g., NBC, Fox, and cable networks." |
| 1.106.  [T]he number of YouTube accounts terminated in whole or in part based on allegations of infringement represents less than *two-tenths of one percent* of the overall number of accounts registered since YouTube was founded in 2005.<br><br>Defs. Opening Mem. at p. 91 n.43 (citing Levine Decl. ¶ 31). | Controverted as misleading.  *See* Resp. to Defs. SUF ¶ 86. |
| 1.107.  In early 2007, YouTube began using audio-fingerprinting technology from Audible Magic.<br><br>Defs. Opening Mem. at p. 94 (citing King Decl. ¶ 4). | Controverted to the extent that the asserted fact implies that YouTube began using Audible Magic to prevent infringement of all copyrighted content on YouTube.  In fact, YouTube only deployed Audible Magic to protect the copyrighted content of those |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| | content owners who agreed to license their content to YouTube.  *See* Viacom SUF ¶¶ 294-310. |
| 1.108.  YouTube devoted over 50,000 man-hours and spent millions of dollars developing this sophisticated copyright-protection tool [Video ID].  Defs. Opening Mem. at p. 94 (citing King Decl. ¶¶ 11, 13-17). | Controverted to the extent the purported fact relies on King Decl. ¶¶ 11, 13, 14, and 16, which are or contain inadmissible evidence. *See* Evid. Obj. at 4-5. |
| 1.109.  YouTube was the first (and to our knowledge the only) website dedicated to user-submitted video that built its own video fingerprinting system.  Defs. Opening Mem. at p. 94 (citing King Decl. ¶ 19; Schapiro Exs. 169 (287:16-288:4), 170 (202:23-203:3). | Controverted.  The cited deposition testimony does not support the purported fact, and King Decl. ¶ 19 is inadmissible because it is not based on Mr. King's personal knowledge. *See* Evid. Obj. at 4; *see also* Resp. to Defs. SUF ¶ 100. |
| 1.110.  [M]ost major television networks, movie studios, and record labels, as well as most major sports leagues in the United States and abroad have started using Content ID to find and manage their content on YouTube.  Defs. Opening Mem. at p. 94-95 (citing King Decl. ¶ 21). | Uncontroverted but immaterial to any issues before the Court. |
| 1.111.  In the site's first months, YouTube's twenty-something founders grappled with how best to address situations where it seemed that users had uploaded videos in violation of YouTube's rules.  Defs. Opening Mem. at p. 95 (citing Hurley Decl. ¶¶ 15-18). | Controverted.  Defendants' internal communications make unambiguous their intent to grow the site by turning a blind eye to rampant infringement.  *See, e.g.*, Viacom SUF ¶¶ 29-132. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.112.  Working out of Hurley's garage, and lacking legal training or counsel, the founders first installed an ad hoc monitoring program under which they removed videos they came across that they thought might be unauthorized.<br><br>Defs. Opening Mem. at p. 95 (citing Hurley Decl. ¶ 17). | Controverted.  The founders' intent was to give only the "perception" of copyright compliance while still allowing "truckloads" of infringing content on the site.  Hohengarten Ex. 230, JK00007479.  For example, Steve Chen explained that he wanted only to remove "whole movies" and "entire TV shows," but that he wanted to keep "everything else." Hohengarten Ex. 228, JK00007420.<br><br>Defendants have not supported that the founders worked out of Hurley's garage during this period, or that they were unsophisticated.  All had long histories at PayPal, another Internet startup.  *See* Viacom SUF ¶¶ 11-12.  They had already had several meetings with venture capital firms, *see, e.g.*, Viacom SUF ¶ 49, and they either had already or soon thereafter moved into office space provided by Sequoia Capital.  *See* Kohlmann Ex. 65 (Botha Dep.) at 91:4-92:21; Kohlmann Ex. 38, GOO001-05639863, at GOO001-05639864.<br><br>Further, Defendants blocked testimony into the substance of non-privileged conversations between Mr. Hurley, Mr. Botha, and counsel about copyright infringement issues.  *See supra* ¶ 1.97.  Defendants waived an advice-of-counsel defense in this action, so they cannot rely on that advice to establish their good faith.  *See* Viacom Opp. at 12. |
| 1.113.  For a short period of time in the fall of 2005, the founders tried to rely on a "community flagging" system, whereby users could flag videos as being "copyrighted" for YouTube to review and remove based on guesses about what was unauthorized.<br><br>Defs. Opening Mem. at p. 95 (citing Hurley Decl. ¶ 20). | Controverted to the extent that the words "tried to rely" and "guesses" are intended to suggest that community flagging was ineffective or flawed, or that YouTube was unable to distinguish infringing content from legitimate content.  *See infra* ¶ 1.114. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.114. Quickly realizing that those approaches were flawed, and having secured financial backing from investors, YouTube consulted with outside counsel, installed a formal DMCA program, and brought in an in-house lawyer with a background in copyright law.<br><br>Defs. Opening Mem. at p. 95 (citing Hurley Decl. ¶ 21; Levine Decl. ¶¶ 3-4, 13). | Controverted. Other than self-serving testimony in this litigation, there is no documentary evidence *whatsoever* in the record to suggest that anybody at YouTube believed that community flagging for copyright infringement was "flawed," or that any of the numerous approaches considered but never implemented (*see* Viacom SUF ¶¶ 75-77, 112-115) would have been flawed in practice. Rather, the documentary evidence shows conclusively that community flagging was shut down to avoid putting YouTube on "notice," *see* Hohengarten Ex. 232, JK00008043, and that other measures never were taken because YouTube employees "hate[d] making it easier for these a-holes" -- referring to copyright owners -- and were "just trying to cover our asses so we don't get sued." Hohengarten Ex. 202, GOO001-00829702, at 4 & at GOO001-00829704.<br><br>Further controverted because Levine ¶¶ 3 and 13 are inadmissible. *See* Evid. Obj. at 14-15. |
| 1.115. The mainstays of the Internet economy—sites such as Google, Facebook, MySpace, Twitter, Yahoo—and Internet sites for traditional media like *The New York Times* and CNN—all use [a "free public access supported by advertising"] model.<br><br>Defs. Opening Mem. at p. 96 (citing Reider Decl. ¶ 12). | Controverted because Ms. Reider's testimony on this issue is inadmissible. *See* Evid. Obj. at 13-14. |
| 1.116. So do Viacom's own video-sharing services.<br><br>Defs. Opening Mem. at p. 96 (citing Schapiro Ex. 172 (22:10-24)). | Uncontroverted but immaterial to any issues before the Court. |

Subject to Protective Order – HIGHLY CONFIDENTIAL

| Asserted Undisputed Fact | Response |
|---|---|
| 1.117.  Most of the nation's top 100 advertisers have purchased advertising on YouTube, including Procter & Gamble, General Electric, PepsiCo, American Express, Bank of America, Kraft Foods, and Sears.<br><br>Defs. Opening Mem. at p. 97 (citing Reider Decl. ¶ 2). | Uncontroverted but immaterial to any issues before the Court. |
| 1.118.  Large media companies and other prominent copyright owners (Time Warner, Walt Disney, News Corp., Lions Gate Entertainment, and the NBA, among many others) also routinely run ads on YouTube (and have done so for years).<br><br>Defs. Opening Mem. at p. 97 (citing Reider Decl. ¶ 2; Schapiro Ex. 173). | Uncontroverted but immaterial to any issues before the Court. |
| 1.119.  Viacom's marketing personnel raved about the successful promotions they were able to achieve using YouTube.<br><br>Defs. Opening Mem. at p. 97 (citing Schapiro Exs. 25 (43:17-22), 26). | Controverted.  *See supra* ¶ 1.53. |
| 1.120.  Viacom's executives and employees regularly use YouTube—posting, watching, and sharing personal videos, just like millions of other YouTube users around the world.<br><br>Defs. Opening Mem. at p. 98 (citing Defs. Opening Mem. at 60 n.28; Schapiro Ex. 174). | Controverted to the extent that the asserted fact implies that Viacom executives and employees "regularly" engage in these practices, or that most or all of them do.  The cited evidence does not support that claim.  In any event, the asserted fact is immaterial to any issues before the Court.<br><br>Further controverted to the extent the alleged fact relies on Schapiro Ex. 174, which is inadmissible hearsay.  *See* Evid. Obj. at 1. |

Subject to Protective Order – **HIGHLY CONFIDENTIAL**

Respectfully submitted,

By: _____

Stuart J. Baskin (No. SB-9936)
John Gueli (No. JG-8427)
Kirsten Nelson Cunha (No. KN-0283)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY  10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

By: _____

Paul M. Smith (No. PS-2362)
William M. Hohengarten (No. WH-5233)
Scott B. Wilkens (*pro hac vice*)
Matthew S. Hellman (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, DC  20001
Telephone:  (202) 639-6000
Facsimile:  (202) 639-6066

Susan J. Kohlmann (No. SK-1855)
JENNER & BLOCK LLP
919 Third Avenue
New York, NY  10022
Telephone:  (212) 891-1690
Facsimile:  (212) 891-1699