## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIACOM INT'L INC., ET AL., | ) |
| | ) |
| Plaintiffs, | ) ECF Case |
| | ) |
| v. | ) Civil No. 07-CV-2103 (LLS) |
| | ) |
| YOUTUBE, INC., ET AL., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| THE FOOTBALL ASSOCIATION PREMIER LEAGUE LIMITED, ET AL., on behalf of themselves and all others similarly situated, | ) |
| | ) |
| | ) ECF Case |
| | ) |
| | ) Civil No. 07-CV-3582 (LLS) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| YOUTUBE, INC., ET AL., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL
## FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Civil Rule 56.1(a) of the Local Rules of Civil Procedure for the Southern District of New York, Defendants YouTube, Inc., YouTube, LLC, and Google Inc. hereby submit the following Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried.

## The Parties

1.      Plaintiffs in the action ***Viacom Int'l Inc., et al. v. YouTube, Inc. et al.***, Civil No. 07-CV-2103 (LLS), are Viacom International, Inc. ("Viacom"), Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television, Inc.   Viacom Am. Compl. ¶¶ 15-19.

2.      The putative class plaintiffs in the action ***The Football Association Premier League Limited, et al. v. YouTube, Inc., et al.***, Civil No. 07-CV-3582 (LLS), are Bourne Co. ("Bourne") and its affiliate Murbo Music Publishing, Inc. ("Murbo"); Cherry Lane Music Publishing Company, Inc. ("Cherry Lane"); Cal IV Entertainment, LLC ("Cal IV"); The Rodgers & Hammerstein Organization ("R&H"); Stage Three Music (US), Inc. ("Stage Three"); Edward B. Marks Music Company, Freddy Bienstock Music Company d/b/a Bienstock Publishing Company and Alley Music Corporation (collectively, "Carlin"); X-Ray Dog Music, Inc. ("X-Ray Dog"); and The Music Force Media Group LLC, The Music Force LLC and Sin-Drome Records, Ltd. (collectively, "Music Force").  Second Am. Class Action Compl. ¶¶ 16, 18-20, 24-30, 33.

3.    Defendants are YouTube, Inc., YouTube, LLC, and Google Inc. (collectively, "YouTube").

**The Founding and Launching of YouTube**

4.    YouTube operates a website located on the Internet at http://www.youtube.com.  Decl. of Michael Solomon in Support of Defs.' Mot. for Summary Judgment ("Solomon Decl.") ¶ 2.

5.    YouTube was founded in February 2005 by Chad Hurley, Steve Chen, and Jawed Karim.  Decl. of Chad Hurley in Support of Defs.' Mot. for Summary Judgment ("Hurley Decl.") ¶ 2.

6.    The founders created YouTube to provide a platform for users to conveniently share personal videos and to build a community around users posting and viewing such videos.  *Id.* & Exs. 4, 15; Decl. of Andrew H. Schapiro in Support of Defs.' Mot. for Summary Judgment ("Schapiro Decl.") Ex. 158.

7.    The founders named the new company "YouTube" to emphasize their goal that the site become a hub of short, personal videos emphasizing "you."  Hurley Decl. ¶ 7; Schapiro Ex. 162.

8.    The founders chose the slogan "Broadcast Yourself" so that users would "understand what the site is supposed to be when they visit."  Hurley Decl. ¶ 7.

9.    YouTube's message to the public and to its users consistently has been that users should post only videos that they had created themselves or otherwise had the right to post.  *Id.* ¶ 9; Decl. of Zahavah Levine ("Levine Decl.") ¶¶ 5, 7.

10.     On April 23, 2005, YouTube launched the "beta" version of the website, describing itself to the public as "the first online community site that allows members to post and share personal videos."  Hurley Decl. ¶¶ 4-5.

11.     In April 2005, YouTube's founders publicized their new website to the blog "Video Link" as follows: "A site called 'YouTube' has just launched.  It allows members to post and share personal videos they've made.  The site aims to become a community of digital video authors and their videos."  Schapiro Ex. 163.

12.     In April 2005, YouTube ran the following advertisement on the website "Craigslist": "YouTube.com is a web-based community based around creative and fun videos.  We are seeking folks who possess a dash of technical know-how and a truckload of flare."  *Id*. Ex. 165.

13.     In early May 2005, YouTube told the online technical publication *The Register*: "We just launched a new website, www.YouTube.com, based on the idea of video blogging where members would take clips ranging from the mundane to the fascinating.  Our hope is that a community would be built around 'channels' such as 'Sports', 'Kids', 'Vacations', 'Cars', etc."  *Id*. Ex. 164.

14.     On December 14, 2005, YouTube officially launched its website. Hurley Decl. ¶ 23.

## How YouTube Works

15.     The YouTube website allows users from around the world to upload videos free of charge to computer servers owned or leased by YouTube.  Solomon Decl. ¶ 2.

16.    The process of uploading a video to YouTube is initiated by YouTube's users.  *Id.* ¶ 2.

17.    A user uploads a video by visiting the YouTube website, creating an account, selecting a video file from the user's computer or other storage device, and then clicking a button to instruct the YouTube system to upload that video.  *Id.* ¶ 3.

18.    YouTube does not control which videos a user chooses to upload to the site.  *Id.* ¶¶ 3, 9.

19.    Uploaded video files are automatically processed by YouTube's computer systems and converted into file formats that are supported by a variety of viewing devices.  *Id.* ¶¶ 6-7.

20.    The series of events that is triggered by a user's decision to upload a video to YouTube and ends with the user's video being made playable on YouTube is fully automated and does not involve the intervention or active involvement of YouTube personnel.  *Id.* ¶ 2.

21.    Anyone with Internet access and standard Internet browsing software can view for free the videos that users have stored on YouTube.  *Id.* ¶ 9.

22.    A user initiates playback of a YouTube video by selecting the video that the user wishes to view on the YouTube service.  *Id.*

23.    In response to a playback request, the YouTube system automatically streams a copy of the requested video from one of its video servers to the user's computer or other viewing device.  *Id.*

24.    In almost all cases, YouTube prohibits users from downloading videos from the site, and does not offer that functionality to users.  *Id.* ¶ 10.

25.    Users may search the YouTube website for videos by entering a query of terms the user deems relevant into search fields provided on various pages throughout the site.  *Id.* ¶ 11.

26.    In response to the query, the service automatically returns a results page that shows the user a page or pages containing single, reduced-size images of the video clips that the search algorithm identifies as being responsive to the user's query, accompanied by a portion of the text the user who uploaded the video provided to describe the video.  *Id.*

**The Quantity and Diversity of Videos Available on YouTube**

27.    When YouTube officially launched in December 2005, it was receiving approximately 6,000 new video uploads each day, and its users were watching nearly 2.5 million videos each day.  Hurley Decl. ¶ 23 & Ex. 28.

28.    By February 2006, the number of daily video uploads to YouTube was 25,000.  *Id.*

29.    In July 2006, users uploaded to YouTube more than 2.1 million videos to the site, and watched more than 3 billion videos.  *Id.*

30.    By December 2007, users were uploading to YouTube more than 300,000 videos each day and site traffic had reached 800 million daily video views.  *Id.* ¶ 23.

31.     By July 2008, uploads to YouTube had reached more than 400,000 videos per day.  *Id.*

32.     More than 500 million videos have been posted to YouTube.  Levine Decl. ¶ 26.

33.     Less than 1% of the more than 500 million videos posted to YouTube have been the subject of a DMCA takedown notice or an equivalent takedown request sent to YouTube by a copyright owner.  *Id*.

34.     YouTube hosts hundreds of millions of videos that no one has ever alleged to infringe any copyright.  *Id*.

35.     At present, more than 24 hours of new video is uploaded to YouTube every minute, or almost four years worth of new video every day.  Hurley Decl. ¶ 26.

36.     YouTube does not manually prescreen or review each of the videos uploaded to the service by its users.  Levine Decl. ¶ 26; Hurley Decl. ¶ 18; Decl. of Micah Schaffer in Support of Defs.' Mot. for Summary Judgment ("Schaffer Decl.") ¶ 11.

37.     YouTube is a platform for aspiring artists and filmmakers.  Decl. of Hunter Walk in Support of Defs.' Mot. for Summary Judgment ("Walk Decl.") ¶ 16.

38.     YouTube is a source of political information.  *Id*.  ¶¶ 6, 8, 9.

39.     Governments and other official bodies have established channels on, and posted videos to, YouTube, including the Vatican, the Kremlin, the Queen of England, the United Nations, and the governments of Iraq, Israel, South Korea, and Estonia.  Walk Decl. ¶ 8.

40.    Colleges and universities have posted videos to YouTube, including tens of thousands of video-lectures on academic subjects.  *Id.* ¶ 12.

41.    Nonprofit organizations have posted videos to YouTube to publicize their causes.  *Id.* ¶¶  10-11.

42.    Law enforcement officials have posted videos to YouTube seeking the public's help in identifying criminal suspects.  *Id.* ¶ 19.

43.    Movie and television studios (including CBS, NBC/Universal, BBC, and Lions Gate), sports leagues (including the NBA and NHL), record labels (including Universal Music Group, Sony, Warner Music Group, and EMI), and music publishers have entered into content partnership arrangements with YouTube.  Decl. of Christopher Maxcy in Support of Defs.' Mot. for Summary Judgment ("Maxcy Decl.") ¶ 9.

44.    Viacom executives and employees have uploaded and watched videos on YouTube.  Schapiro Ex. 127 (129:21-130:14), Ex. 128 (79:7-80:3, 81:17-24, 83:12-16, 84:14-18), Ex. 129 (215:25-218:8, 224:2-225:13), Ex. 130 (19:10-14, 55:21-24), Ex. 25 (253:10-19), Ex. 112 (16:19-25).

45.    Employees of the putative class plaintiffs have uploaded and watched videos on YouTube.  Schapiro Ex. 20 (100:12-103:9), Ex. 78 (235:1-238:7), Ex.131.

46.    Viacom considered buying YouTube.  *See* Schapiro Ex. 3 (77:7-15).

47.    Senior executives at Viacom viewed the prospect of acquiring YouTube as a "transformative acquisition."  *Id.*

**YouTube's Copyright Policies and User Education**

48.     Beginning with its launch and continuing today, YouTube requires its users to agree to Terms of Service before being permitted to upload a video to the site.  Hurley Decl. ¶ 8; Levine Decl. ¶ 6.

49.     YouTube's Terms of Service have always prohibited users from submitting copyrighted material that they are not authorized to upload.  Hurley Decl. ¶ 8; Levine Decl. ¶ 6.

50.     Virtually every page of the YouTube website contains a direct link to YouTube's Terms of Service.  *Id*.

51.     Since October 2006, YouTube has displayed "Community Guidelines" on its site instructing users to "respect copyright" and only to "upload videos that you made or that you are authorized to use."  *Id*. ¶ 7.

52.     Since at least March 2006, each time a user seeks to upload a video, YouTube informs its users, via multiple messages displayed in the upload process, that they are prohibited from uploading copyrighted content unless they have the right or authorization to do so.  *Id*. ¶ 8.

53.     Since at least March 2006, YouTube has provided a "Copyrights Tips" page that gives users guidance on copyright issues and describes the consequences to users of copyright infringement on the site.  *Id*. ¶¶ 9, 15.

54.     The Copyrights Tips page links to other pages containing additional information about copyright.  *Id*. ¶ 9.

55.    Since at least March 2006, YouTube has required that users submit a valid and working email address to YouTube before uploading any videos.  *Id.* ¶ 11.

56.    Since at least March 2006, YouTube has verified the accuracy of its users' email addresses to ensure there is a mechanism for warning users of improper use of the YouTube service.  *Id.*

57.    Since March 2006, YouTube has limited the duration of videos uploaded by most users to 10 minutes to prevent users from uploading a video consisting of an entire television show or feature-length film.  *Id.* ¶ 12.

58.    YouTube has never instructed users to engage in copyright infringement.  Hurley Decl. ¶ 20.

59.    YouTube has never encouraged users to engage in copyright infringement.  *Id.*

## YouTube's Registration of a DMCA Agent

60.    Since September 2005, YouTube has displayed information on its website instructing copyright holders how to provide notice to YouTube's designated agent of allegedly unauthorized materials uploaded by users.  Hurley Decl. ¶ 21; Levine Decl. ¶¶ 15-16.

61.    YouTube formally registered its DMCA agent with the Copyright Office in October 2005.  Hurley Decl. ¶ 21.

62.    YouTube's DMCA agent's contact information is accessible through YouTube's "Copyright Infringement Notification" page.  Levine Decl. ¶ 15.

63.     Since at least March 2006, a link to the Copyright Infringement Notification page has been included at the bottom of virtually every page of the YouTube website.  *Id.*

## DMCA Notice and Takedown Procedure

64.     YouTube removes or disables access to allegedly infringing videos whenever it receives a DMCA-compliant takedown notice.  *Id.* ¶ 19; Schaffer Decl. ¶ 10.

65.      YouTube removes almost all videos identified in DMCA notices within 24 hours of receipt.  Levine Decl. ¶ 19.

66.     For approximately 85% of the DMCA notices it has received, YouTube removes the identified videos within a few minutes.  *Id.*

67.     YouTube employs a dedicated team throughout the world to process manually-submitted DMCA notices and to assist copyright holders and users with issues arising from the notice process.  *Id.*

68.     On February 2, 2007, Viacom (through its agent, BayTSP) sent DMCA notices requesting that YouTube remove more than 100,000 videos from the service. Levine Decl. ¶ 20; Schaffer Decl. ¶ 14.

69.     YouTube removed virtually all of the videos identified in Viacom's February 2, 2007 mass takedown notices before the next business day.  Levine Decl. ¶ 20; Schaffer Decl. ¶ 14.

70.     YouTube's responsiveness to DMCA takedown requests has drawn praise from content owners.   Levine Decl. ¶ 22; Schapiro Ex. 120.

71.     Since at least March 2006, when YouTube has removed a video pursuant to a DMCA notice, YouTube has contacted the user who uploaded the video to apprise that user of the allegation in the notice.  Levine Decl. ¶ 23.

72.     Since at least March 2006, when YouTube has removed a video pursuant to a DMCA notice, YouTube has contacted the user who uploaded the video to remind that user of YouTube's policy prohibiting the uploading of unauthorized copyrighted material.  *Id*.

73.     Since at least March 2006, when YouTube has removed a video pursuant to a DMCA notice, YouTube has contacted the user who uploaded the video to warn that user that repeated acts of copyright infringement will result in the termination of the user's YouTube account.  *Id*.

74.     Since at least March 2006, when YouTube removes a video pursuant to a DMCA notice, it sends this message to the user who posted the video:

> Repeat incidents of copyright infringement will result in the deletion of your account and all videos uploaded to that account.  In order to avoid future strikes against your account, please delete any videos to which you do not own the rights, and refrain from uploading additional videos that infringe on the copyrights of others.  For more information about YouTube's copyright policy, please read the Copyright Tips guide.

Levine Decl. ¶ 23 & Ex. 12.

75.     Since at least March 2006, after an allegedly infringing video is removed from the site, YouTube has posted a notice at the video's prior location on the site stating that the video is no longer available due to a copyright claim.  *Id*. ¶ 24.

## YouTube's Repeat-Infringer Policy

76.     Since at least October 2005, YouTube has had a policy for terminating the accounts of repeat infringers, which it has posted on its website. Hurley Decl. ¶ 21; Levine Decl. ¶ 27.

77.     Under YouTube's repeat-infringer policy, a "strike" is issued to a user when YouTube receives a takedown notice for material that the user has uploaded. Levine Decl. ¶ 27.

78.     When an account receives three strikes, in virtually all cases YouTube terminates that account. *Id*.

79.     When YouTube terminates a user's account, the account can no longer by used for any purpose on the site. Levine Decl. ¶ 30.

80.     When YouTube terminates a user's account, YouTube terminates all other accounts associated with that user's email address. *Id*.

81.     When YouTube terminates a user's account, YouTube removes all of the videos uploaded to the site from the terminated account, including videos that were not subject to any DMCA notice. *Id*.

82.     When YouTube terminates a user's account, YouTube seeks to prevent the user from subsequently creating another account by recording and blocking the email address associated with the terminated account. *Id*.

83.     YouTube's Terms of Service set forth YouTube's repeat-infringer policy. Levine Decl. Exs. 1, 2.

84.     YouTube communicates its repeat-infringer policy to its users via its website, including on the "Copyright Tips" page and the "Help" section of the site. *Id.* ¶ 27.

85.     Users also are notified of YouTube's repeat-infringer policy when they receive an email notifying them that a video they uploaded to YouTube has been removed due to alleged copyright infringement.  *Id.* ¶ 23 & Ex. 12.

86.     Applying its repeat-infringer policy, YouTube has terminated more than 400,000 (of the more than 250,000,000) user accounts based at least in part for copyright strikes.  *Id.* ¶ 31.

87.     YouTube has received praise from content owners for its efforts to restrict and address copyright infringement by its users.  *Id.* ¶¶ 32-33.

## YouTube's Copyright Enforcement Tools

88.     In March 2006, YouTube began using MD-5 hash technology to create a digital "fingerprint" of every video that YouTube removes in response to a DMCA takedown notice.  *Id.* ¶ 25; Decl. of David King ("King Decl.") ¶4.

89.     The MD-5 technology automatically prevents any user from uploading a video file identical to one that had previously been removed in response to a DMCA takedown notice.  Levine Decl. ¶25.

90.     In March 2006, YouTube launched its Content Verification Program ("CVP").  *Id.* ¶ 18.

91.     CVP is open to any copyright owner.  *Id.*

92.     CVP enables copyright owners to locate and flag their videos on YouTube and send DMCA notices electronically.  *Id.*

93.     More than 3,000 content owners have registered to use CVP.  *Id.*  ¶ 18.

94.     In February 2007, YouTube launched in beta form its Claim Your Content ("CYC") system.  King Decl. ¶¶ 7-8.

95.     CYC used audio-fingerprinting technology to enable participating rights holders to find videos containing their content that users had uploaded to YouTube.  *Id.*  ¶ 7.

96.     Once CYC found a video, a rights holder could apply one of three YouTube policies in response to a match: (1) "block" (*i.e.*, instruct YouTube to remove the video from YouTube); (2) "track" (*i.e.*, leave it up on YouTube and receive reports about the video); or (3) "monetize" (*i.e.*, leave it up on YouTube and share in advertising revenue).  *Id.* ¶ 7.

97.     In January 2007, YouTube began full-scale development of a video-based identification technology called "Video ID."  King Decl. ¶17.

98.     YouTube officially launched Video ID in October 2007.  *Id.* ¶ 18.

99.     Between January and October 2007, YouTube had between 15 and 20 engineers and other technical personnel working full or part time on Video ID.  *Id.* ¶ 17.

100.     Video ID was the first video-based content identification technology to be deployed on any website dedicated to user-submitted content.  *Id.* ¶ 19; Schapiro Ex. 169 (287:16-288:4).

101.    In April 2008, YouTube supplemented Video ID by launching an audio-based content identification technology called Audio ID.  *Id.* ¶ 20.

102.    YouTube makes Video ID and Audio ID (collectively, "Content ID") available to content owners to allow them to identify their content on the YouTube website.  *Id.*

103.    Content ID works by identifying videos on YouTube that match reference files supplied by participating rights holders.  *Id.* ¶ 23.

104.    As of December 2009, right holders had supplied YouTube with approximately 3 million reference files for Content ID.  *Id.*

105.    If Content ID identifies a video as matching one of those reference files, the rights holder can block/remove the video, allow the video to appear and share any revenue generated from advertising shown alongside it, or allow the video to appear with no monetization.  *Id.* ¶ 24.

106.    Since its launch in October 2007, every video that a user has attempted to post to YouTube has been screened using Content ID.  *Id.* ¶ 26.

107.    Content ID scans the back catalogue of videos posted on YouTube.  *Id.* ¶ 27.

108.    YouTube currently has a team of 40 technical staff working on Content ID.  *Id.* ¶ 28.

109.    YouTube has always made Content ID available to rights holders free of charge.  *Id.* ¶ 22.

110.    More than 1,000 content owners worldwide use Content ID.  *Id.* ¶ 21.

111.    Viacom participated in the pre-launch testing of Video ID in mid-2007. *Id.* ¶¶ 18, 29; Schapiro Ex. 171.

112.    Viacom signed up to use Video ID in February 2008.  King Decl. ¶ 29.

**Plaintiffs' Clips in Suit**

113.    Plaintiffs collectively have identified approximately 79,000 video clips that they allege to be infringing on the YouTube service ("clips in suit").  Decl. of Michael Rubin in Support of Defs.' Mot. for Summary Judgment ("Rubin Decl.") ¶¶ 7, 16.  That total represents less than .02% of the more than 500 million videos ever uploaded to YouTube.  Levine Decl. ¶ 26.

114.    The majority of Viacom's clips in suit are under four minutes long. Rubin Decl. ¶ 15.

115.    Certain of Viacom's clips in suit are fewer than 10 seconds long.  *Id.*

116.    The Premier League is suing YouTube over dozens of clips that are under five seconds long, including one that is one second in length.  *Id.* ¶ 16.

117.    Most of the clips in suit were the subject of DMCA takedown notices. Schapiro Exs. 18 (141:10-19; 148:8-18), 17 (186:9-187:7).

118.    Some of the putative class plaintiffs' clips in suit were never the subject of any takedown request prior to being identified as alleged infringements in this case.  Schapiro Exs. 20 (94:19-95:6), 21 (26:15-21), 22 (Response 35).

119.    Viacom's clips in suit were identified from a pool of videos removed pursuant to DMCA takedown notices sent by Viacom.  Schapiro Ex. 18 (148:8-18).

120.    All of the clips in suit have been removed from the YouTube website. Levine Decl. ¶ 21.

### Viacom's Use of YouTube for Marketing Purposes

121.    Within months of YouTube's launch, major media companies, including Viacom, used YouTube to promote their content by uploading clips of their movies and television shows to the service.  Decl. of Arthur Chan ("Chan Decl.") ¶¶4, 5, 9; Decl. of Daniel Ostrow ("Ostrow Decl.") ¶¶2, 4, 5, 6; Schaffer Decl. ¶ 5; Decl. of Rubin Decl. ¶ 2 & Exs. 1-41.

122.    Viacom has allowed Viacom content uploaded by other users to remain on YouTube.  Schapiro Exs. 4 (194:8-11), 51 (VIA 11787096).

123.    Viacom has uploaded to YouTube thousands of videos to market and promote hundreds of its movies and/or television shows, including many that are works in suit.  Rubin Decl. ¶¶ 2, 14, 18 & Exs. 3-31.

124.    Viacom has used marketing agents to upload its content to YouTube. Schapiro Exs. 35-44, 45 (28:6-7); Chan. Decl. ¶¶ 3-5; Ostrow Decl. ¶5.

125.    Viacom has taken steps to conceal that it was the source of certain videos that it uploaded to YouTube for marketing purposes.  Chan Decl. ¶¶4, 5, 9; Ostrow Decl. ¶¶2, 4, 5, 6; Schapiro Exs. 33, 34, 46, 47 (158:20-22), 48, 49, 50; Rubin Decl. ¶ 5(a)-(f) & Exs. 4, 14, 15, 19, 22, 26.

126.    Other media companies have taken steps to conceal that they were the source of certain videos that they uploaded to YouTube for marketing purposes.

Ostrow Decl. ¶ 6; *see also* Chan Decl. ¶¶ 3, 4, 9, 10; Rubin Decl. ¶ 2 & Exs. 2, 32-41;

Schapiro Ex. 28 (GOO001-05161257-58).

127.    YouTube was aware of promotional activities occurring on its service.

Schaffer Decl. ¶¶ 7-8; Botha Decl. ¶¶ 11-12; Maxcy Decl. ¶¶ 3-7; Schapiro Ex. 53;

Rubin Decl. ¶ 1, Exs. 2, 32-41.

## Viacom's "Leave-Up" Practices for Viacom Content Uploaded to YouTube

128.    Viacom has knowingly left up on YouTube thousands of clips

containing its content.  Schapiro Exs. 57, 62, 75, 76.

129.    YouTube gave instructions to its agent, BayTSP, about which clips to

take down from YouTube and which clips to leave up on YouTube.  *Id.* Exs. 11

(115:6-118:1), 54 (BAYTSP 001093412), 55 (BAYTSP 003724704), 56 (214:25-215:6),

57 (BAYTSP 001125605-08), 59, 60, 63-64, 65 (BAYTSP 003718201).

130.    Viacom did not share with YouTube the takedown instructions it

provided to BayTSP.  *Id.* Ex. 11 (118:10-19).

131.    Through at least October 2006, Viacom had an internal policy of

declining to issue takedown notices for user-submitted clips on YouTube containing

MTV Networks ("MTVN") content that were less than five minutes long.  *Id.* Exs.

59, 60.

132.    In October 2006, Viacom told BayTSP to leave up on YouTube any

clips containing MTVN content that were shorter than 2.5 minutes in length,

regardless of who had posted them.  *Id.* Ex. 54.

133.    Later in October 2006, Viacom told BayTSP that all videos containing MTVN content should be left up on YouTube unless the videos were "full episodes." *Id.* Exs. 55 (BAYTSP 003724704), 56 (214:25-215:6).

134.    Viacom instructed BayTSP to leave up on YouTube "full episodes" of certain of its programs (some of which are works in suit).  *Id.* Exs. 11 (115:6-118:1), Ex. 57 (BAYTSP 001125605-08).

135.    Viacom has stated publicly that it was choosing to allow some if its content to remain on YouTube.  *Id.* Ex. 77.

### The Putative Class Plaintiffs' Authorized Uses and Complex Ownership Issues

136.    The putative class plaintiffs have licensed their content to appear on YouTube, including Rodgers & Hammerstein ("R&H"), which has issued numerous licenses that allow licensees to post R&H musical compositions on the Internet (including on YouTube).  *Id.* Exs. 22 (Responses 26-29), 78 (132:24-135:13), 79 (29:22-30:22, 31:6-32:12).

137.    Cal IV has licensed its musical compositions, including certain works that the clips in suit are alleged to have infringed ("works in suit"), for general dissemination on the Internet.  *Id.* Ex. 81.

138.     Cal IV has authorized certain of its works in suit to appear on YouTube for promotional purposes.  *Id.* Ex. 82.

139.    Stage Three has issued licenses allowing its musical compositions, including works in suit, to appear on YouTube.  *Id.* Ex. 83 (Response 17, 19).

140.    Cherry Lane has authorized its musical compositions, including works in suit, to be posted to YouTube.  *Id.* Exs. 86 (Response 17), 87.

141.    Tur, Bourne, Carlin, and X-RAY DOG have licensed third parties to put their content, including works in suit, on YouTube.  *Id.* Exs. 88; 89 (Responses 16-18), 90 (Responses 17, 19), 91 (Responses 17, 19), 92 (124:7-125:5), 93.

142.    FFT and Music Force have posted their content on YouTube or authorized others to do so.  *Id.* Exs. 94 (188:5-197:24), 95-97, 98 (Responses 30, 40, 41, 44), 99.

143.    Certain of the soccer clubs that are members of and have ownership interests in the Premier League have created official YouTube "channels" to which they have uploaded videos, including footage of matches.  *Id.* Exs. 17 (276:9-297:7, 100, 101.

144.    Certain of the putative class plaintiffs' content, including certain of their works in suit, are co-owned by other parties.  *Id.* Exs. 83 (Response 68), 98 (Response 25), 103 (Response 33), 104 (48:16-49:12).

**Plaintiffs' Difficulties in Distinguishing Authorized from Unauthorized Content**

145.    Viacom has sent DMCA takedown notices for videos that Viacom itself uploaded or otherwise authorized to appear on YouTube.  Rubin Decl. ¶ 3 & Exs. 42-68 (retracted takedowns); Schaffer Decl. ¶¶ 15-18; Schapiro Exs. 149-150.

146.    Viacom has sent DMCA takedown notices to YouTube that resulted in the termination of Viacom's own YouTube accounts.  Schaffer Decl. ¶¶ 15-16 & Ex. 4; Rubin Decl. ¶ 3 & Exs. 42, 56-67.

147.    Viacom has requested the takedown of clips that other content owners had authorized to be on YouTube.  Schaffer Decl. ¶ 17 & Exs. 5-7.

148.    Viacom engaged in a "multi-step procedure designed to accurately identify" the clips in suit.  Schapiro Decl. Ex. 178.

149.    Dozens of Viacom's clips in suit were uploaded by Viacom.  Rubin Decl. ¶ 9.

150.    In October 2009, after completing a "quality check" of the clips in suit, Viacom sought to withdraw 241 clips in suit, more than 100 of which Viacom had uploaded to YouTube.  Rubin Decl. ¶ 9 & Exs. 119-120.

151.    On February 26, 2010 Viacom requested dismissal with prejudice of the 241 clips that it had originally sought to withdraw, plus an additional 193 clips, six of which were uploaded by Viacom's marketing agent, WiredSet.  Rubin Decl. ¶¶ 12-13 & Exs. 122-123.

152.    Following Viacom's request for dismissal with prejudice of 434 clips on February 26, 2010, there remain clips in suit that Viacom had authorized to appear on YouTube.  Rubin Decl. ¶ 14 & Ex. 128.

153.    The putative class plaintiffs have sent DMCA takedown notices to YouTube that they eventually retracted because of claims by other rights holders. Schapiro Exs. 103 (Response 23), 154, 155 (68:9-72:14), 156 (ST00105023-26), 102 (151:21-154:17).

154.    Cal IV withdrew a DMCA takedown notice it had sent to YouTube after another rights holder filed a counter-notice. *Id.* Exs. 154, 103 (Response 23),155 (68:9-72:14).

155.    Stage Three withdrew a DMCA takedown notice after one of its licensees informed Stage Three that it was authorized to post the clip on YouTube. *Id.* Exs. 102 (151:21-154:17), 156.

156.    Certain of the putative class plaintiffs rely on a global network of sub-publishers to license their content. *Id.* Exs. 79 (100:7-15), 92 (150:13-22, 102 (61:25-63:22), 152 (20:15-22), 117 (153:15-154:10).

157.    Plaintiff X-RAY DOG could not immediately determine whether a clip posted to YouTube that contained its content was or was not authorized to be there. *Id.* Ex. 92 (158:11-160:7)

158.    Plaintiff R&H could not immediately determine whether a clip posted to YouTube that contained its content was or was not authorized to be there. *Id.* Ex. 79 (13:23-18:20; 114:3-14).

159.    Plaintiff Stage Three has retained professional musicologists to determine whether certain YouTube clips contain content that was copied from one of its musical compositions. *Id.* Exs. 85 (219:0-220:11), 102 (171:23-172:21), 157.

**<u>YouTube's Revenue Model</u>**

160.    YouTube is a free service.  Hurley Decl. ¶ 2.

161.    YouTube does not charge a subscription fee and does not charge users to upload or to view video clips.  *Id.*

162.    YouTube generates revenue from advertising.  Reider Decl. ¶ 5.

163.    YouTube's advertising offerings are consistent with prevailing industry standards.  Reider Decl. ¶ 12.

164.    Between 2006 and 2009, YouTube entered into thousands of direct partnership agreements that provide for YouTube to run advertising against videos claimed by those owners and to share the revenue from that advertising.  Maxcy Decl. ¶ 9-10.

165.    YouTube's revenue-sharing deals generated approximately ▮ percent of YouTube's overall revenue between 2007 and 2009.  Reider Decl. ¶ 5.

166.    Most of YouTube's other revenue comes from advertisements that run on the YouTube homepage and on the pages that list the results of users' search queries.  *Id.* ¶ 5.

167.    YouTube does not seek to earn revenue from users' potentially infringing activities.  *Id.* ¶ 11.

168.    None of YouTube's advertising offerings in any way favors videos that may not have been authorized to appear on YouTube over authorized videos.  *Id.* ¶ 11.

169.    Most of the nation's top 100 advertisers purchase advertising on YouTube.  *Id.* ¶ 4.

170.    Large media companies run advertisements on YouTube.  *Id.* ¶2.

171.    Viacom has spent more than one million dollars advertising on YouTube.  *Id.* ¶ 4.

Dated:  March 5, 2010
        New York, New York

                              Respectfully submitted,

                              Andrew H. Schapiro
                              A. John P. Mancini
                              Matthew D. Ingber
                              Brian M. Willen
                              MAYER BROWN LLP
                              1675 Broadway
                              New York, New York 10019
                              (212) 506-2500

                              David H. Kramer
                              Maura L. Rees
                              Michael H. Rubin
                              Bart E. Volkmer
                              WILSON SONSINI GOODRICH & ROSATI P
                              650 Page Mill Road
                              Palo Alto, California 94304
                              (650) 493-9300

                              *Attorneys for Defendants*