UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
VIACOM INTERNATIONAL INC., COMEDY
PARTNERS, COUNTRY MUSIC TELEVISION,
INC., PARAMOUNT PICTURES CORPORATION,
and BLACK ENTERTAINMENT TELEVISION LLC,

                  Plaintiffs,       07 Civ. 2103 (LLS)

     -against-

YOUTUBE, INC., YOUTUBE, LLC, and
GOOGLE, INC.,

                  Defendants,
----------------------------------------X  **OPINION AND ORDER**
THE FOOTBALL ASSOCIATION PREMIER
LEAGUE LIMITED, et al., on
behalf of themselves and all
others similarly situated,

                  Plaintiffs,

     -against-
                        07 Civ. 3582 (LLS)
YOUTUBE, INC., YOUTUBE, LLC, and
GOOGLE, INC.,

                  Defendants.
----------------------------------------X


      Defendants move for summary judgment that they are

entitled to the Digital Millennium Copyright Act's ("DMCA"), 17

U.S.C. § 512(c), "safe harbor" protection against all of

plaintiffs' direct and secondary infringement claims, including

claims for "inducement" contributory liability, because they had

insufficient notice, under the DMCA, of the particular

infringements in suit.

Plaintiffs cross-move for partial summary judgment that defendants are not protected by the statutory "safe harbor" provision, but "are liable for the intentional infringement of thousands of Viacom's copyrighted works, . . . for the vicarious infringement of those works, and for the direct infringement of those works . . . because: (1) Defendants had 'actual knowledge' and were 'aware of facts and circumstances from which infringing activity [was] apparent,' but failed to 'act[] expeditiously' to stop it; (2) Defendants 'receive[d] a financial benefit directly attributable to the infringing activity' and 'had the right and ability to control such activity;' and (3) Defendants' infringement does not result solely from providing 'storage at the direction of a user' or any other Internet function specified in section 512." (See the parties' Notices of Motion).

Resolution of the key legal issue presented on the parties' cross-motions requires examination of the DMCA's "safe harbor" provisions, 17 U.S.C. § 512(c), (m) and (n) which state:

**(c) Information residing on systems or networks at direction of users.—**
**(1) In general.—**A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

**(A)(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

**(ii)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

**(iii)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

**(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

**(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

**(2) Designated agent.**—The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

**(A)** the name, address, phone number, and electronic mail address of the agent.

**(B)** Other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, in both electronic and hard copy formats, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

**(3) Elements of notification.—**

**(A)** To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

    **(i)** A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

    **(ii)** Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

    **(iii)** Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

    **(iv)** Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

    **(v)** A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

    **(vi)** A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**(B)(i)** Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

**(ii)** In a case in which the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the person making the notification or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A).

\*       \*       \*

**(m)  Protection  of  privacy.**—Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on—

**(1)** a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or

**(2)** a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited by law.

**(n)  Construction.**—Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section.  Whether a

> service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.

Defendant YouTube, owned by defendant Google, operates a website at http://www.youtube.com onto which users may upload video files free of charge.  Uploaded files are copied and formatted by YouTube's computer systems, and then made available for viewing on YouTube.  Presently, over 24 hours of new video-viewing time is uploaded to the YouTube website every minute.  As a "provider of online services or network access, or the operator of facilities therefor" as defined in 17 U.S.C. § 512(k)(1)(B), YouTube is a service provider for purposes of § 512(c).

From plaintiffs' submissions on the motions, a jury could find that the defendants not only were generally aware of, but welcomed, copyright-infringing material being placed on their website.  Such material was attractive to users, whose increased usage enhanced defendants' income from advertisements displayed on certain pages of the website, with no discrimination between infringing and non-infringing content.

Plaintiffs claim that "tens of thousands of videos on YouTube, resulting in hundreds of millions of views, were taken unlawfully from Viacom's copyrighted works without

authorization" (Viacom Br., Dkt. No. 186, p. 1), and that "Defendants had 'actual knowledge' and were 'aware of facts or circumstances from which infringing activity [was] apparent,' but failed to do anything about it." (Id. at 4) (alteration in original).

However, defendants designated an agent, and when they received specific notice that a particular item infringed a copyright, they swiftly removed it.  It is uncontroverted that all the clips in suit are off the YouTube website, most having been removed in response to DMCA takedown notices.

Thus, the critical question is whether the statutory phrases "actual knowledge that the material or an activity using the material on the system or network is infringing," and "facts or circumstances from which infringing activity is apparent" in § 512(c)(1)(A)(i) and (ii) mean a general awareness that there are infringements (here, claimed to be widespread and common), or rather mean actual or constructive knowledge of specific and identifiable infringements of individual items.

1.

Legislative History

The Senate Committee on the Judiciary Report, S. Rep. No. 105-190 (1998), gives the background at page 8:

Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy. Legislation implementing the treaties provides this protection and creates the legal platform for launching the global digital on-line marketplace for copyrighted works. It will facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of American creative genius. It will also encourage the continued growth of the existing off-line global marketplace for copyrighted works in digital format by setting strong international copyright standards.

At the same time, without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet. In the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability. For example, service providers must make innumerable electronic copies by simply transmitting information over the Internet. Certain electronic copies are made in order to host World Wide Web sites. Many service providers engage in directing users to sites in response to inquiries by users or they volunteer sites that users may find attractive. Some of these sites might contain infringing material. In short, by limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand.

It elaborates:

There have been several cases relevant to service provider liability for copyright infringement. Most have approached the issue from the standpoint of contributory and vicarious liability. Rather than embarking upon a wholesale clarification of these doctrines, the Committee decided to leave current law in its evolving state and, instead, to create a series of "safe harbors," for certain common activities of

> service providers.  A service provider which qualifies
> for a safe harbor, receives the benefit of limited
> liability.

Id. at 19 (footnote omitted).

The Senate Judiciary Committee Report and the House Committee on Commerce Report, H.R. Rep. No. 105-551, pt. 2 (1998), in almost identical language describe the DMCA's purpose and structure (Senate Report at 40-41, House Report at 50):

> New section 512 contains limitations on service
> providers' liability for five general categories of
> activity set forth in subsections (a) through (d) and
> subsection (f).  As provided in subsection (k),
> section 512 is not intended to imply that a service
> provider is or is not liable as an infringer either
> for conduct that qualifies for a limitation of
> liability or for conduct that fails to so qualify.
> Rather, the limitations of liability apply if the
> provider is found to be liable under existing
> principles of law.
>    The limitations in subsections (a) through (d)
> protect qualifying service providers from liability
> for all monetary relief for direct, vicarious and
> contributory infringement.  Monetary relief is defined
> in subsection (j)(2) as encompassing damages, costs,
> attorneys' fees, and any other form of monetary
> payment.  These subsections also limit injunctive
> relief against qualifying service providers to the
> extent specified in subsection (i).  To qualify for
> these protections, service providers must meet the
> conditions set forth in subsection (h), and service
> providers' activities at issue must involve a function
> described in subsection (a), (b), (c), (d) or (f),
> respectively.  The liability limitations apply to
> networks "operated by or for the service provider,"
> thereby protecting both service providers who offer a
> service and subcontractors who may operate parts of,
> or an entire, system or network for another service
> provider.

They discuss the "applicable knowledge standard" (Senate Report at 44-45, House Report at 53-54):

*Subsection (c)(1)—In general.*—Subsection (c)(1)(A) sets forth the applicable knowledge standard. This standard is met either by actual knowledge of infringement or in the absence of such knowledge by awareness of facts or circumstances from which infringing activity is apparent. The term "activity" is intended to mean activity using the material on the system or network. The Committee intends such activity to refer to wrongful activity that is occurring at the site on the provider's system or network at which the material resides, regardless of whether copyright infringement is technically deemed to occur at that site or at the location where the material is received. For example, the activity at an online site offering audio or video may be unauthorized public performance of a musical composition, a sound recording, or an audio-visual work, rather than (or in addition to) the creation of an unauthorized copy of any of these works.

Subsection (c)(1)(A)(ii) can best be described as a "red flag" test. As stated in subsection (l), a service provider need not monitor its service or affirmatively seek facts indicating infringing activity (except to the extent consistent with a standard technical measure complying with subsection (h)), in order to claim this limitation on liability (or, indeed any other limitation provided by the legislation). However, if the service provider becomes aware of a "red flag" from which infringing activity is apparent, it will lose the limitation of liability if it takes no action. The "red flag" test has both a subjective and an objective element. In determining whether the service provider was aware of a "red flag," the subjective awareness of the service provider of the facts or circumstances in question must be determined. However, in deciding whether those facts or circumstances constitute a "red flag"—in other words, whether infringing activity would have been apparent to a reasonable person operating under the same or similar circumstances—an objective standard should be used.

Subsection (c)(1)(A)(iii) provides that once a service provider obtains actual knowledge or awareness of facts or circumstances from which infringing material or activity on the service provider's system or network is apparent, the service provider does not lose the limitation of liability set forth in subsection (c) if it acts expeditiously to remove or disable access to the infringing material. Because the factual circumstances and technical parameters may vary from case to case, it is not possible to identify a uniform time limit for expeditious action.

Subsection (c)(1)(B) sets forth the circumstances under which a service provider would lose the protection of subsection (c) by virtue of its benefit from the control over infringing activity. In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one. In general, a service provider conducting a legitimate business would not be considered to receive a "financial benefit directly attributable to the infringing activity" where the infringer makes the same kind of payment as non-infringing users of the provider's service. Thus, receiving a one-time set-up fee and flat periodic payments for service from a person engaging in infringing activities would not constitute receiving a "financial benefit directly attributable to the infringing activity." Nor is subparagraph (B) intended to cover fees based on the length of the message (per number of bytes, for example) or by connect time. It would however, include any such fees where the value of the service lies in providing access to infringing material.

and at Senate Report 45, House Report 54:

Section 512 does not require use of the notice and take-down procedure. A service provider wishing to benefit from the limitation on liability under subsection (c) must "take down" or disable access to infringing material residing on its system or network of which it has actual knowledge or that meets the "red flag" test, even if the copyright owner or its agent does not notify it of a claimed infringement. On the other hand, the service provider is free to refuse to "take down" the material or site, even after receiving a notification of claimed infringement from

- 11 -

the copyright owner; in such a situation, the service provider's liability, if any, will be decided without reference to section 512(c). For their part, copyright owners are not obligated to give notification of claimed infringement in order to enforce their rights. However, neither actual knowledge nor awareness of a red flag may be imputed to a service provider based on information from a copyright owner or its agent that does not comply with the notification provisions of subsection (c)(3), and the limitation of liability set forth in subsection (c) may apply.

The reports continue (Senate Report at 46-47, House Report at 55-56):

Subsection (c)(3)(A)(iii) requires that the copyright owner or its authorized agent provide the service provider with information reasonably sufficient to permit the service provider to identify and locate the allegedly infringing material. An example of such sufficient information would be a copy or description of the allegedly infringing material and the URL address of the location (web page) which is alleged to contain the infringing material. The goal of this provision is to provide the service provider with adequate information to find and address the allegedly infringing material expeditiously.

\*     \*     \*

Subsection (c)(3)(B) addresses the effect of notifications that do not substantially comply with the requirements of subsection (c)(3). Under this subsection, the court shall not consider such notifications as evidence of whether the service provider has actual knowledge, is aware of facts or circumstances, or has received a notification for purposes of subsection (c)(1)(A). However, a defective notice provided to the designated agent may be considered in evaluating the service provider's knowledge or awareness of facts and circumstances, if (i) the complaining party has provided the requisite information concerning the identification of the

copyrighted work, identification of the allegedly
infringing material, and information sufficient for
the service provider to contact the complaining party,
and (ii) the service provider does not promptly
attempt to contact the person making the notification
or take other reasonable steps to assist in the
receipt of notification that substantially complies
with paragraph (3)(A).  If the service provider
subsequently receives a substantially compliant
notice, the provisions of paragraph (1)(C) would then
apply upon receipt of the notice.

When discussing section 512(d) of the DMCA which deals
with information location tools, the Committee Reports contain
an instructive explanation of the need for specificity (Senate
Report at 48-49, House Report at 57-58):

Like the information storage safe harbor in section
512(c), a service provider would qualify for this safe
harbor if, among other requirements, it "does not have
actual knowledge that the material or activity is
infringing" or, in the absence of such actual
knowledge, it is "not aware of facts or circumstances
from which infringing activity is apparent." Under
this standard, a service provider would have no
obligation to seek out copyright infringement, but it
would not qualify for the safe harbor if it had turned
a blind eye to "red flags" of obvious infringement.
For instance, the copyright owner could show that
the provider was aware of facts from which infringing
activity was apparent if the copyright owner could
prove that the location was clearly, at the time the
directory provider viewed it, a "pirate" site of the
type described below, where sound recordings,
software, movies or books were available for
unauthorized downloading, public performance or public
display. Absent such "red flags" or actual knowledge,
a directory provider would not be similarly aware
merely because it saw one or more well known
photographs of a celebrity at a site devoted to that
person. The provider could not be expected, during
the course of its brief cataloguing visit, to
determine whether the photograph was still protected
by copyright or was in the public domain; if the

photograph was still protected by copyright, whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine.

The important intended objective of this standard is to exclude sophisticated "pirate" directories—which refer Internet users to other selected Internet sites where pirate software, books, movies, and music can be downloaded or transmitted—from the safe harbor.  Such pirate directories refer Internet users to sites that are obviously infringing because they typically use words such as "pirate," "bootleg," or slang terms in their uniform resource locator (URL) and header information to make their illegal purpose obvious to the pirate directories and other Internet users. Because the infringing nature of such sites would be apparent from even a brief and casual viewing, safe harbor status for a provider that views such a site and then establishes a link to it would not be appropriate.  Pirate directories do not follow the routine business practices of legitimate service providers preparing directories, and thus evidence that they have viewed the infringing site may be all that is available for copyright owners to rebut their claim to a safe harbor.

In this way, the "red flag" test in section 512(d) strikes the right balance.  The common-sense result of this "red flag" test is that online editors and catalogers would not be required to make discriminating judgments about potential copyright infringement.  If, however, an Internet site is obviously pirate, then seeing it may be all that is needed for the service provider to encounter a "red flag."  A provider proceeding in the face of such a red flag must do so without the benefit of a safe harbor.

Information location tools are essential to the operation of the Internet; without them, users would not be able to find the information they need. Directories are particularly helpful in conducting effective searches by filtering out irrelevant and offensive material.  The Yahoo! Directory, for example, currently categorizes over 800,000 online locations and serves as a "card catalogue" to the World Wide Web, which over 35,000,000 different users visit each month.  Directories such as Yahoo!'s usually are created by people visiting sites to categorize them.  It is precisely the human judgment

and editorial discretion exercised by these cataloguers which makes directories valuable.

This provision is intended to promote the development of information location tools generally, and Internet directories such as Yahoo!'s in particular, by establishing a safe-harbor from copyright infringement liability for information location tool providers if they comply with the notice and takedown procedures and other requirements of subsection (d). The knowledge or awareness standard should not be applied in a manner which would create a disincentive to the development of directories which involve human intervention. Absent actual knowledge, awareness of infringement as provided in subsection (d) should typically be imputed to a directory provider only with respect to pirate sites or in similarly obvious and conspicuous circumstances, and not simply because the provider viewed an infringing site during the course of assembling the directory.

The tenor of the foregoing provisions is that the phrases "actual knowledge that the material or an activity" is infringing, and "facts or circumstances" indicating infringing activity, describe knowledge of specific and identifiable infringements of particular individual items. Mere knowledge of prevalence of such activity in general is not enough. That is consistent with an area of the law devoted to protection of distinctive individual works, not of libraries. To let knowledge of a generalized practice of infringement in the industry, or of a proclivity of users to post infringing materials, impose responsibility on service providers to discover which of their users' postings infringe a copyright would contravene the structure and operation of the DMCA. As

stated in <u>Perfect 10, Inc. v. CCBill LLC</u>, 488 F.3d 1102, 1113 (9th Cir. 2007):

> The DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright.  We decline to shift a substantial burden from the copyright owner to the provider . . . .

That makes sense, as the infringing works in suit may be a small fraction of millions of works posted by others on the service's platform, whose provider cannot by inspection determine whether the use has been licensed by the owner, or whether its posting is a "fair use" of the material, or even whether its copyright owner or licensee objects to its posting. The DMCA is explicit:  it shall not be construed to condition "safe harbor" protection on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity . . . ." <u>Id.</u> § 512(m)(1); <u>see</u> Senate Report at 44, House Report at 53.

Indeed, the present case shows that the DMCA notification regime works efficiently:  when Viacom over a period of months accumulated some 100,000 videos and then sent one mass take-down notice on February 2, 2007, by the next business day YouTube had removed virtually all of them.

2.

Case Law


In CCBill LLC, supra, the defendants provided web hosting and other services to various websites.  The plaintiff argued that defendants had received notice of apparent infringement from circumstances that raised "red flags": websites were named "illegal.net" and "stolencelebritypics.com," and others involved "password-hacking."  488 F.3d at 1114 (internal quotation marks omitted).  As to each ground, the Ninth Circuit disagreed, stating "We do not place the burden of determining whether photographs are actually illegal on a service provider"; and "There is simply no way for a service provider to conclude that the passwords enabled infringement without trying the passwords, and verifying that they enabled illegal access to copyrighted material.  We impose no such investigative duties on service providers."  Id.

The District Court in UMG Recordings, Inc. v. Veoh Networks, Inc., 665 F. Supp. 2d 1099, 1108 (C.D. Cal. 2009), concluded that "CCBill teaches that if investigation of 'facts and circumstances' is required to identify material as infringing, then those facts and circumstances are not 'red flags.'"  That observation captures the reason why awareness of pervasive copyright-infringing, however flagrant and blatant,

does not impose liability on the service provider.  It furnishes at most a statistical estimate of the chance any particular posting is infringing — and that is not a "red flag" marking any particular work.

In Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1108 (W.D. Wash. 2004) the court stated that "The issue is not whether Amazon had a general awareness that a particular type of item may be easily infringed.  The issue is whether Amazon actually knew that specific zShops vendors were selling items that infringed Corbis copyrights."  It required a "showing that those sites contained the type of blatant infringing activity that would have sent up a red flag for Amazon."  Id. at 1109.  Other evidence of "red flags" was unavailing, for it "provides no evidence from which to infer that Amazon was aware of, but chose to ignore, red flags of blatant copyright infringement on specific zShops sites."  Id.

A similar recent decision of the Second Circuit involved analogous claims of trademark infringement (and therefore did not involve the DMCA) by sales of counterfeit Tiffany merchandise on eBay, Inc.'s website.  In Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93 (2d Cir. April 1, 2010) the Court of Appeals affirmed the dismissal of trademark infringement and dilution claims against eBay's advertising and listing practices.  The sellers on eBay offered Tiffany sterling silver

jewelry of which a significant portion (perhaps up to 75%) were counterfeit, although a substantial number of Tiffany goods sold on eBay were authentic.  (Id. at 97-98).  The particular issue was "whether eBay is liable for contributory trademark infringement — i.e., for culpably facilitating the infringing conduct of the counterfeiting vendors" (id. at 103) because "eBay continued to supply its services to the sellers of counterfeit Tiffany goods while knowing or having reason to know that such sellers were infringing Tiffany's mark."  (Id. at 106.)  Tiffany alleged that eBay knew, or had reason to know, that counterfeit Tiffany goods were being sold "ubiquitously" on eBay, and the District Court had found that eBay indeed "had *generalized* notice that some portion of the Tiffany goods sold on its website might be counterfeit" (id.; emphasis in original).  Nevertheless, the District Court (Sullivan, J.) dismissed, holding that such generalized knowledge was insufficient to impose upon eBay an affirmative duty to remedy the problem.  It held that "for Tiffany to establish eBay's contributory liability, Tiffany would have to show that eBay 'knew or had reason to know of specific instances of actual infringement' beyond those that it addressed upon learning of them."  (Id. at 107).

The Court of Appeals held (Id.):

We agree with the district court.  For contributory trademark infringement liability to lie, a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods.  Some contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary.

And at p. 110:

eBay appears to concede that it knew as a general matter that counterfeit Tiffany products were listed and sold through its website.  Tiffany, 576 F.Supp.2d at 514.  Without more, however, this knowledge is insufficient to trigger liability under Inwood.[1]

Although by a different technique, the DMCA applies the same principle, and its establishment of a safe harbor is clear and practical:  if a service provider knows (from notice from the owner, or a "red flag") of specific instances of infringement, the provider must promptly remove the infringing material.  If not, the burden is on the owner to identify the infringement.  General knowledge that infringement is "ubiquitous" does not impose a duty on the service provider to monitor or search its service for infringements.

---

[1]  See Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 102 S. Ct. 2182 (1982).

3.

The <u>Grokster</u> Case


<u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913 (2005) and its progeny <u>Arista Records LLC v. Usenet.com, Inc.</u>, 633 F. Supp. 2d 124 (S.D.N.Y. 2009) (dismissing DMCA defense as sanction for spoliation and evasive discovery tactics), <u>Columbia Pictures Industries, Inc. v. Fung</u>, No. 06 Civ. 5578, 2009 U.S. Dist. LEXIS 122661 (C.D. Cal. Dec. 21, 2009), and <u>Arista Records LLC v. Lime Group LLC</u>, No. 06 Civ. 5936 (KMW), ___ F. Supp. 2d ___, 2010 WL 2291485 (S.D.N.Y. May 25, 2010), which furnish core principles heavily relied on by plaintiffs and their supporting <u>amici</u>, have little application here. <u>Grokster</u>, <u>Fung</u>, and <u>Lime Group</u> involved peer-to-peer file-sharing networks which are not covered by the safe harbor provisions of DMCA § 512(c). The <u>Grokster</u> and <u>Lime Group</u> opinions do not even mention the DMCA. Fung was an admitted copyright thief whose DMCA defense under § 512(d) was denied on undisputed evidence of "'purposeful, culpable expression and conduct' aimed at promoting infringing uses of the websites" (2009 U.S. Dist. LEXIS 122661, at *56).

<u>Grokster</u> addressed the more general law of contributory liability for copyright infringement, and its application to the particular subset of service providers

protected by the DMCA is strained.  In a setting of distribution of software products that allowed computer-to-computer exchanges of infringing material, with the expressed intent of succeeding to the business of the notoriously infringing Napster (see 545 U.S. at 923-26) the Grokster Court held (id. at 919, 936-37):

> . . . that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.

On these cross-motions for summary judgment I make no findings of fact as between the parties, but I note that plaintiff Viacom's General Counsel said in a 2006 e-mail that ". . . the difference between YouTube's behavior and Grokster's is staggering."  Ex. 173 to Schapiro Opp. Affid., Dkt. No. 306, Att. 4.  Defendants asserted in their brief supporting their motion (Dkt. No. 188, p.60) and Viacom's response does not controvert (Dkt. No. 296, p.29, ¶ 1.80) that:

> It is not remotely the case that YouTube exists "solely to provide the site and facilities for copyright infringement." . . . Even the plaintiffs do not (and could not) suggest as much.  Indeed, they have repeatedly acknowledged the contrary.

The Grokster model does not comport with that of a service provider who furnishes a platform on which its users post and access all sorts of materials as they wish, while the provider is unaware of its content, but identifies an agent to receive complaints of infringement, and removes identified

material when he learns it infringes.  To such a provider, the
DMCA gives a safe harbor, even if otherwise he would be held as
a contributory infringer under the general law.  In this case,
it is uncontroverted that when YouTube was given the notices, it
removed the material.  It is thus protected "from liability for
all monetary relief for direct, vicarious and contributory
infringement" subject to the specific provisions of the DMCA.
Senate Report at 40, House Report at 50.

4.

Other Points

(a)

Plaintiffs claim that the replication, transmittal and
display of videos on YouTube fall outside the protection §
512(c)(1) of the DMCA gives to "infringement of copyright by
reason of the storage at the direction of a user of material" on
a service provider's system or network.  That confines the word
"storage" too narrowly to meet the statute's purpose.

In § 512(k)(1)(B) a "service provider" is defined as
"a provider of online services or network access, or the
operator of facilities therefor," and includes "an entity
offering the transmission, routing, or providing of connections

for digital online communications."  Surely the provision of
such services, access, and operation of facilities are within
the safe harbor when they flow from the material's placement on
the provider's system or network:  it is inconceivable that they
are left exposed to be claimed as unprotected infringements.  As
the Senate Report states (p. 8):

> In the ordinary course of their operations service
> providers must engage in all kinds of acts that expose
> them to potential copyright infringement liability. .
> . . In short, by limiting the liability of service
> providers, the DMCA ensures that the efficiency of the
> Internet will continue to improve and that the variety
> and quality of services on the Internet will continue
> to expand.

As stated in Io Group, Inc. v. Veoh Networks, Inc.,
586 F. Supp. 2d 1132, 1148 (N.D. Cal. 2008), such "means of
facilitating user access to material on its website" do not cost
the service provider its safe harbor.  See also UMG Recordings,
Inc. v. Veoh Networks, Inc., 620 F. Supp. 2d 1081, 1089 (C.D.
Cal. 2008):

> Although Veoh correctly observes that the
> language of § 512(c) is "broad," it does not venture
> to define its outermost limits.  It is unnecessary for
> this Court to do so either, because the critical
> statutory language really is pretty clear.  Common
> sense and widespread usage establish that "by reason
> of" means "as a result of" or "something that can be
> attributed to . . . ."  So understood, when
> copyrighted content is displayed or distributed on
> Veoh it is "as a result of" or "attributable to" the
> fact that users uploaded the content to Veoh's servers
> to be accessed by other means.  If providing access
> could trigger liability without the possibility of
> DMCA immunity, service providers would be greatly

deterred from performing their basic, vital and salutary function—namely, providing access to information and material for the public.

To the extent defendants' activities go beyond what can fairly be characterized as meeting the above-described collateral scope of "storage" and allied functions, and present the elements of infringements under existing principles of copyright law, they are not facially protected by § 512(c). Such activities simply fall beyond the bounds of the safe harbor and liability for conducting them must be judged according to the general law of copyright infringement. That follows from the language of § 512(c)(1) that "A service provider shall not be liable . . . for infringement of copyright by reason of the storage . . . ." However, such instances have no bearing on the coverage of the safe harbor in all other respects.


(b)


The safe harbor requires that the service provider "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity . . . ." § 512(c)(1)(B). The "right and ability to control" the activity requires knowledge of it, which must be item-specific. (See Parts 1 and 2 above.) There may be arguments whether revenues

from advertising, applied equally to space regardless of whether its contents are or are not infringing, are "directly attributable to" infringements, but in any event the provider must know of the particular case before he can control it. As shown by the discussion in Parts 1 and 2 above, the provider need not monitor or seek out facts indicating such activity. If "red flags" identify infringing material with sufficient particularity, it must be taken down.

                              (c)


        Three minor arguments do not singly or cumulatively affect YouTube's safe harbor coverage.

        (1) YouTube has implemented a policy of terminating a user after warnings from YouTube (stimulated by its receipt of DMCA notices) that the user has uploaded infringing matter (a "three strikes" repeat-infringer policy). That YouTube counts as only one strike against a user both (1) a single DMCA take-down notice identifying multiple videos uploaded by the user, and (2) multiple take-down notices identifying videos uploaded by the user received by YouTube within a two-hour period, does not mean that the policy was not "reasonably implemented" as required by § 512(i)(1)(A). In Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1105 (W.D. Wash. 2004), in

evaluating whether Amazon complied with § 512(i), the Court stated that even DMCA-compliant notices "did not, in themselves, provide evidence of blatant copyright infringement."  In UMG Recordings, Inc. v. Veoh Networks, Inc., 665 F. Supp. 2d 1099, 1116, 1118 (C.D. Cal. 2009), the Court upheld Veoh's policy of terminating users after a second warning, even if the first warning resulted from a take-down notice listing multiple infringements.  It stated:

> As the Corbis court noted, "[t]he key term, 'repeat infringer,' is not defined. . . . The fact that Congress chose not to adopt such specific provisions when defining a user policy indicates its intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined." Corbis, 351 F.Supp.2d at 1100-01.  This Court finds that Veoh's policy satisfies Congress's intent that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access." H.R. Rep. 105-551(II), at 61.

Id. at 1118. (alteration and omission in original).

(2)  In its "Claim Your Content" system, YouTube used Audible Magic, a fingerprinting tool which removed an offending video automatically if it matched some portion of a reference video submitted by a copyright owner who had designated this service.  It also removed a video if the rights-holder operated a manual function after viewing the infringing video.  YouTube assigned strikes only when the rights-holder manually requested the video to be removed.  Requiring the rights-holder to take

that position does not violate § 512(i)(1)(A).   See UMG
Recordings, 665 F. Supp. 2d at 1116-18 (automated Audible Magic
filter "does not meet the standard of reliability and
verifiability required by the Ninth Circuit in order to justify
terminating a user's account"); see also Perfect 10, Inc. v.
CCBill LLC, 488 F.3d 1102, 1112 (9th Cir. 2007) ("We therefore
do not require a service provider to start potentially invasive
proceedings if the complainant is unwilling to state under
penalty of perjury that he is an authorized representative of
the copyright owner, and that he has a good-faith belief that
the material is unlicensed.").

　　　　YouTube's initial hesitation in counting such rights-
holder requests as strikes was reasonable:  the six month delay
was needed to monitor the system's use by rights-holders, and
for engineering work to assure that strikes would be assigned
accurately.

　　　　(3) Plaintiffs complain that YouTube removes only the
specific clips identified in DMCA notices, and not other clips
which infringe the same works.  They point to the provision in §
512(c)(3)(A)(ii) that a notification must include
"Identification of the copyrighted work claimed to have been
infringed, or, if multiple copyrighted works at a single online
site are covered by a single notification, a representative list
of such works at that site."   This "representative list"

reference would eviscerate the required specificity of notice (see discussion in Parts 1 and 2 above) if it were construed to mean a merely generic description ("all works by Gershwin") without also giving the works' locations at the site, and would put the provider to the factual search forbidden by § 512(m). Although the statute states that the "works" may be described representatively, 512(c)(3)(A)(ii), the subsection which immediately follows requires that the identification of the infringing material that is to be removed must be accompanied by "information reasonably sufficient to permit the service provider to locate the material." 512(c)(3)(A)(iii). See House Report at 55; Senate Report at 46: "An example of such sufficient information would be a copy or description of the allegedly infringing material and the so-called "uniform resource locator" (URL) (i.e., web site address) which allegedly contains the infringing material." See also UMG Recordings, 665 F. Supp. 2d at 1109-10 (DMCA notices which demanded removal of unspecified clips of video recordings by certain artists did not provide "'information reasonably sufficient to permit the service provider to locate [such] material.'") (alteration in original).

4.

Conclusion

Defendants are granted summary judgment that they qualify for the protection of 17 U.S.C. § 512(c), as expounded above, against all of plaintiffs' claims for direct and secondary copyright infringement. Plaintiffs' motions for judgment are denied.

The parties shall meet and confer about any issues requiring judicial attention remaining in these cases, and submit a report (jointly, if possible) by July 14, 2010.


So ordered.

Dated: June 23, 2010
       New York, New York

_____
Louis L. Stanton
U.S.D.J.

- 30 -