HIGHLY CONFIDENTIAL—FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| VIACOM INT'L INC., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | ECF Case |
| v. | ) | Civil No. 07-CV-2103 (LLS) |
| | ) | |
| YOUTUBE, INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| THE FOOTBALL ASSOCIATION | ) | |
| PREMIER LEAGUE LIMITED, ET AL., | ) | |
| on behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | ECF Case |
| Plaintiffs, | ) | Civil No. 07-CV-3582 (LLS) |
| | ) | |
| v. | ) | |
| | ) | |
| YOUTUBE, INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

David H. Kramer
Maura L. Rees
Michael H. Rubin
Bart E. Volkmer
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

Andrew H. Schapiro
A. John P. Mancini
Matthew D. Ingber
Brian M. Willen
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................. 3

I.   YOUTUBE IS ENTITLED TO DMCA SAFE-HARBOR PROTECTION. ......... 3

     A.   YouTube Did Not Fail To Act On Knowledge Of Infringement. ............... 3

          1.   The DMCA Does Not Require Investigation In Response To
               Generalized Awareness Of Possible Infringement. .......................... 3

          2.   Plaintiffs' Invocation Of "Willful Blindness" Has No Merit. ........... 5

               a.   Plaintiffs' claims of willful blindness disregard the
                    DMCA. ................................................................................ 5

               b.   Plaintiffs cannot even meet the strict standard for
                    willful blindness that applies in non-DMCA cases. ............ 7

          3.   The "Track" Feature Did Not Create Knowledge Of
               Infringement. ................................................................................. 8

          4.   Obscurity, Licensing, And Fair Use Undermine Knowledge. ......... 11

          5.   YouTube Did Not Fail To Act On Knowledge Of Specific
               Infringements. ............................................................................... 14

     B.   Viacom's Posting And Leaving Content On YouTube Confirm
          YouTube's Right To The Safe Harbor. .................................................. 16

          1.   The Evidence Of Viacom's Extensive Uploading Confirms
               YouTube's Lack of Knowledge And Control. .................................. 16

          2.   Viacom's Deliberate Decisions To Leave Its Content On
               YouTube Further Undermine Any Claim Of Knowledge Or
               Control. .......................................................................................... 22

               a.   Clips that Viacom chose to leave up are not "red flags." ........ 23

               b.   Clips Viacom deliberately left on YouTube were
                    authorized. ......................................................................... 25

               c.   Viacom had many reasons for leaving up its material. .......... 26

     C.   YouTube Responds Appropriately To Takedown Notices. ...................... 27

          1.   A Takedown Notice Must Provide Specific Location
               Information. ................................................................................... 27

          2.   Viacom's Marketing Activities Further Undermine Its
               Argument. ...................................................................................... 29

     D.   YouTube Lacks Control Over The Alleged Infringing Activity. .............. 32

          1.   Plaintiffs' Reliance On Manual Review Is Misplaced. ..................... 32

# TABLE OF CONTENTS
(continued)

**Page**

2. Plaintiffs' Selective-Fingerprinting Story Remains Baseless. ........ 33

3. Content ID Is Not A Basis For A Finding Of Control. .................... 34

4. Keyword-Based Ad Targeting Does Not Provide Control. .............. 35

E. YouTube Did Not Earn A Disqualifying Financial Benefit. ................... 36

1. YouTube Has A Legitimate Business Model. .................................. 36

2. Search-Page Ads Are Not A Direct Financial Benefit. ................... 38

F. YouTube's Repeat-Infringer Policy Is More Than Adequate. ................. 40

G. Plaintiffs' Claims Arise From Storage At The Direction Of Users. ......... 42

II. YOUTUBE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' INDUCEMENT CLAIMS. ................................................................. 43

A. *Grokster* Requires A Purpose To Promote Infringement And Evidence Of Affirmative Steps Taken To Foster Infringement. .............. 44

B. Overwhelming Evidence of YouTube's Lawful Purpose And Operation Defeats Inducement As A Matter Of Law. ............................ 47

C. Plaintiffs' Distortions Cannot Save Their Inducement Claims. .............. 53

CONCLUSION ................................................................................. 55

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ALS Scan, Inc. v. RemarQ Communities, Inc.*,
 239 F.3d 619 (4th Cir. 2001) .................................................................................. 29

*Arista Records LLC v. Lime Group LLC*,
 06-cv5936, 2010 WL 1914816 (S.D.N.Y. May 11, 2010) ..................... 45, 46, 48, 51

*Arista Records LLC v. Usenet.com, Inc.*,
 633 F. Supp. 2d 124 (S.D.N.Y. 2009) ..................................................................... 46

*Campbell v. Acuff-Rose Music, Inc.*,
 510 U.S. 569 (1994) ................................................................................................ 13

*Columbia Pictures Indus., Inc. v. Fung*,
 No. CV 06-5578 SVW(JCx),
 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009)............................................. 43, 45, 48

*Corbis Corp. v. Amazon.com, Inc.*,
 351 F. Supp. 2d 1090 (W.D. Wash. 2004) ......................................... 24, 40, 41, 42

*DeCarlo v. Archie Comic Publ'ns, Inc.*,
 127 F. Supp. 2d 497 (S.D.N.Y. 2001) ..................................................................... 26

*Ellison v. Robertson*,
 357 F.3d 1072 (9th Cir. 2004) ................................................................................ 38

*Field v. Google Inc.*,
 412 F. Supp. 2d 1106 (D. Nev. 2006) ............................................................... 25, 26

*Graham v. James*,
 144 F.3d 229 (2d Cir. 1998) ................................................................................... 25

*Hendrickson v. eBay Inc.*,
 165 F. Supp. 2d 1082 (C.D. Cal. 2001) .................................................................. 35

*In re Aimster Copyright Litig.*,
 334 F.3d 643 (7th Cir. 2003) .................................................................................... 4

*Io Group, Inc. v. Veoh Networks, Inc.*,
 586 F. Supp. 2d 1132 (N.D. Cal. 2008) .......................................................*passim*

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Keane Dealer Servs., Inc. v. Harts,*
  968 F. Supp. 944 (S.D.N.Y. 1997) .......................................................... 25

*MGM Studios, Inc. v. Grokster, Ltd.,*
  454 F. Supp. 2d 966 (C.D. Cal. 2006) ("*Grokster II*") ................................ 45, 46, 48

*MGM Studios Inc. v. Grokster, Ltd.,*
  545 U.S. 913 (2005) .........................................................................*passim*

*Parker v. Yahoo!, Inc.,*
  No. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008).................................... 26

*Perfect 10, Inc. v. CCBill LLC,*
  488 F.3d 1102 (9th Cir. 2007) ................................................... 6, 21, 42

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
  213 F. Supp. 2d 1146 (C.D. Cal. 2002)................................................. 29

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.,*
  211 F.3d 21 (2d. Cir. 2000)............................................................ 25

*Tiffany (NJ) Inc. v. eBay, Inc.,*
  576 F. Supp. 2d 463 (S.D.N.Y. 2008), *aff'd* 600 F.3d 93 (2d Cir. 2010)............. 7, 8

*UMG Recordings Inc. v. Veoh Networks, Inc.,*
  665 F. Supp. 2d 1099 (C.D. Cal. 2009) ("*UMG II*") ........................................*passim*

**STATUTES**

17 U.S.C. § 504............................................................................ 13

17 U.S.C. § 512.........................................................................*passim*

**OTHER AUTHORITIES**

3 Nimmer on Copyright § 10.03[A][7] ....................................................... 25

H.R. Rep. 105-551 .................................................................. 29, 36, 38, 41

S. Rep. 105-190 ......................................................................... 6, 29

# TABLE OF CONVENTIONS

YouTube Br.

Memorandum of Law in Support of
Defendants' Motion for Summary
Judgment, filed March 5, 2010

Viacom Br.

Memorandum of Law in Support of
Viacom's Motion for Partial Summary
Judgment on Liability and
Inapplicability of the Digital
Millennium Copyright Act Safe
Harbor Defense, filed March 5, 2010

YouTube Opp.

Defendants' Opposition to Plaintiffs'
Motions for Partial Summary
Judgment, filed April 30, 2010

Viacom Opp.

Viacom's Memorandum of Law in
Opposition to Defendants' Motion for
Summary Judgment, filed April 30,
2010

Class Opp.

Class Plaintiffs' Memorandum of Law
in Opposition to Defendants' Motion
for Summary Judgment, filed April
30, 2010

Class Cert Opp.

YouTube's Memorandum of Law in
Opposition to Class Plaintiffs' Motion
for Class Certification, filed May 21,
2010

YouTube 56.1

Defendants' Local Rule 56.1
Statement of Material Facts as to
Which There Is No Genuine Issue to
Be Tried, filed March 5, 2010

CVSUF

YouTube's Response to Viacom's
Statement of Undisputed Facts in
Support of Its Motion for Partial
Summary Judgment on Liability and
Inapplicability of the Digital
Millennium Copyright Act Safe
Harbor Defense, filed April 30, 2010

v

## TABLE OF CONVENTIONS
(continued)

CCSUF                          Defendants' Counterstatement to
                               Class Plaintiffs' Statement of
                               Uncontroverted Material Facts in
                               Support of Their Motion for Partial
                               Summary Judgment, filed April 30,
                               2010

VCS                            Viacom's Counter-Statement in
                               Response to Defendants' Local Rule
                               56.1 Statement in Support of
                               Defendants' Motion for Summary
                               Judgment, filed April 30, 2010

VSCS                           Viacom's Supplemental Counter-
                               Statement in Response to Facts
                               Asserted in Defendants' Summary
                               Judgment Memorandum of Law But
                               Omitted from Defendants' Local Rule
                               56.1 Statement, filed April 30, 2010

CCS                            Class Plaintiffs' Counterstatement Of
                               Controverted Material Facts In
                               Opposition To Defendants' Motion
                               For Summary Judgment, filed April
                               30, 2010

RVCS                           Reply To Viacom's Counter-
                               Statement In Response To
                               Defendants' Local Rule 56.1
                               Statement In Support Of Defendants'
                               Motion For Summary Judgment, filed
                               herewith

RVSCS                          Response to Viacom's Supplemental
                               Counter-Statement, filed herewith

RCCS                           Defendants' Reply to Class Plaintiffs'
                               Counterstatement of Controverted
                               Material Facts in Opposition to
                               Defendants' Motion for Summary
                               Judgment, filed herewith

## TABLE OF CONVENTIONS

(continued)

| | |
|---|---|
| Schapiro Opening Decl. / Schapiro Opening Ex. | Declaration of Andrew H. Schapiro in Support of Defendants' Motion for Summary Judgment, and exhibits attached thereto, filed March 5, 2010 |
| Schapiro Opp. Decl. / Schapiro Opp. Ex. | Declaration of Andrew H. Schapiro in Support of Defendants' Opposition to Plaintiffs' Motions for Partial Summary Judgment and Defendants' Objections to Evidence and Motion to Strike Material from Viacom's Summary Judgment Submissions and Putative Class Plaintiffs' Rule 56.1 Statement, and exhibits attached thereto, filed April 30, 2010 |
| Schapiro Reply Decl. / Schapiro Reply Ex. | Declaration of Andrew H. Schapiro in Further Support of Defendants' Motion for Summary Judgment, and exhibits attached thereto, filed herewith |
| Rubin Opening Decl. / Rubin Opening Ex. | Declaration of Michael Rubin in Support of Defendants' Motion for Summary Judgment, and exhibits attached thereto, filed March 5, 2010 |
| Rubin Reply Decl. / Rubin Reply Ex. | Declaration of Michael Rubin in Further Support of Defendants' Motion for Summary Judgment, and exhibits attached thereto, filed herewith |
| Botha Opening Decl. | Declaration of Roelof Botha, filed March 5, 2010 |
| C. Hurley Opening Decl. | Declaration of Chad Hurley in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010 |

# TABLE OF CONVENTIONS

(continued)

C. Hurley Opp. Decl.

Declaration of Chad Hurley in Support of Defendants' Opposition to Plaintiffs' Motions for Partial Summary Judgment, filed April 30, 2010

King Opening Decl.

Declaration of David King in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

King Opp. Decl.

Declaration of David King in Support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment, filed April 30, 2010

King Reply Decl.

Declaration of David King in Further Support of Defendants' Motion for Summary Judgment, filed herewith

Levine Opening Decl.

Declaration of Zahavah Levine, filed March 5, 2010

Levine Opp. Decl.

Declaration of Zahavah Levine in Support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment, filed April 30, 2010

Maxcy Opening Decl.

Declaration of Christopher Maxcy in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Maxcy Opp. Decl.

Declaration of Christopher Maxcy in Support of Defendants' Opposition to Plaintiffs' Motions for Partial Summary Judgment, filed April 30, 2010

Ostrow Opening Decl.

Declaration of Daniel Ostrow, filed March 5, 2010

# TABLE OF CONVENTIONS
(continued)

Reider Opening Decl.

Declaration of Suzanne Reider in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Schaffer Opening Decl.

Declaration of Micah Schaffer in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Solomon Opening Decl.

Declaration of Michael Solomon in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Walk Opening Decl.

Declaration of Hunter Walk in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Hohengarten Ex.

Declaration of William M. Hohengarten in Support of Viacom's Motion for Partial Summary Judgment, and exhibits attached thereto, filed March 5, 2010

Solow Decl.

Declaration of Warren Solow in Support of Plaintiffs' Motion for Partial Summary Judgment, filed March 5, 2010

Figueira Decl. Tab

Declaration of Elizabeth Anne Figueira in Support of Class Plaintiffs' Statement of Uncontroverted Material Facts, and Tabs 1-187 attached thereto, filed March 5, 2010, and Declaration of Elizabeth Anne Figueira in Opposition to Defendants' Motion for Summary Judgment, and Tabs 189-338 attached thereto, filed April 30, 2010

# TABLE OF CONVENTIONS
(continued)

Kohlmann Ex.                    Declaration of Susan J. Kohlmann in
                               Support of Viacom's Opposition to
                               Defendants' Motion for Summary
                               Judgment, and exhibits attached
                               thereto, filed April 30, 2010

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

## INTRODUCTION

YouTube's users post a full day's worth of videos every minute.  The briefs in this case present two different visions of how YouTube should handle those videos.

In plaintiffs' view, service providers should presume that material is infringing and proactively determine the ownership and authorization status of every piece of content stored on their services.  Congress rejected that approach in enacting the DMCA. It recognized that requiring service providers to engage in an arduous screening process for every user-posted picture, video, or piece of text would inhibit free expression and stifle the growth of the Internet.  The statute makes copyright owners responsible for identifying and, if they choose, requesting the removal of infringing material.  YouTube is not, could not be, and was not intended by Congress to become the rights-clearing, research, and rights-management arm of every content owner in the world.

This case demonstrates the wisdom of that approach.  Plaintiffs are in by far the best position to know what works they own, what clips they have authorized, and whether they want any given video containing their content to appear on YouTube.  And even they have difficulty making those determinations.  Plaintiffs' marketing and "leave-up" practices, their complex licensing and ownership arrangements, and serious issues of fair use refute any claim that YouTube can determine just by looking at a clip whether it is infringing.  The task of distinguishing authorized from unauthorized clips has proven so challenging that Viacom has now submitted two documents under penalty of perjury that incorrectly swore that none of its clips in suit were ones that Viacom had posted on YouTube.  And to this day Viacom is still suing on clips that it authorized.

1

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

The facts about YouTube further confirm the soundness of the DMCA's design. The videos users upload are in dozens of languages, come from amateurs and professionals alike, and cover every topic under the sun. YouTube's non-infringing uses are vast—and indisputable. Because plaintiffs come from a world dominated by professionally produced material, they have a hard time believing that YouTube grew because of the amateur videos that they dismiss as a "sideshow." But the facts are undisputed. Fewer than one percent of videos ever posted on YouTube have been the subject of DMCA notices, and plaintiffs' clips in suit constitute less than *two hundredths* of one percent of the videos ever uploaded to YouTube. Viacom's 63,000 clips in suit are fewer videos than are returned by a search on YouTube for "funny cats" or "human rights." Plaintiffs' material is not what YouTube is about.

Nor do plaintiffs offer any practical alternative for how YouTube should have operated its service. Manually pre-screen videos? Use keywords to search for material that might belong to any rights owner in the world? Both are demonstrably ineffective, unscalable, and not contemplated by the DMCA. Invent Content ID sooner? Use Audible Magic to screen for plaintiffs' material? While the DMCA does not require filtering, YouTube was the first user-generated content website to develop its own fingerprinting technology, which it made freely available to all rights owners (including plaintiffs) as soon as it launched. Content ID supplanted YouTube's use of Audible Magic, a problematic tool for screening video content that none of the plaintiffs was even using before they filed this lawsuit (and most never used at all).

The courts that have decided online infringement cases have gotten it right. Legitimate services like Veoh, Amazon and eBay—services with substantial non-

2

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

infringing uses, that do not encourage infringement, and take steps to address it—have won on summary judgment. Pirate sites—which have very little non-infringing material, intentionally help users infringe, and make no serious effort to comply with the DMCA—have been held liable. In opposing YouTube's motion, plaintiffs distort a few early documents, but even those show a good-faith effort by YouTube's founders to comply with the law and no intent to promote infringement. Those documents, and countless others that plaintiffs ignore, constitute overwhelming evidence of YouTube's legitimate purpose and operation. YouTube is no pirate site, and from its earliest days it has consistently added new ways to help rights holders discourage, detect, and block unauthorized content. YouTube is entitled to summary judgment.

## ARGUMENT

## I.     YOUTUBE IS ENTITLED TO DMCA SAFE-HARBOR PROTECTION.

Plaintiffs raise no genuine issue of material fact as to any element of the DMCA.

### A.     YouTube Did Not Fail To Act On Knowledge Of Infringement.

Plaintiffs do not point to a single clip in suit that YouTube supposedly knew was infringing yet failed to remove. That failure of proof disposes of their knowledge arguments. Plaintiffs offer various theories about how generalized awareness should give rise to disqualifying knowledge, but those theories, as we have explained, are contrary to the DMCA and its case law. YouTube Opp. 31-38, 41-46.

> 1.     The DMCA Does Not Require Investigation In Response To Generalized Awareness Of Possible Infringement.

Courts have uniformly concluded that the DMCA's knowledge provisions are triggered by *specific* infringing activity, not by a "provider's general awareness of infringement." *UMG Recordings Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1111

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

(C.D. Cal. 2009) ("*UMG II*"); *see* YouTube Br. 31-32; YouTube Opp. 37-38.  Viacom's only response is to point to *Grokster* (Viacom Opp. 27-28), but *Grokster* said nothing about the DMCA.  *Grokster* did not even say that generalized knowledge is sufficient for liability outside the DMCA.  To the contrary, it made clear that "mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability."  *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005).  While the Court found that an "actual *purpose* to cause infringing use" can sometimes give rise to *inducement* liability even without specific knowledge (*id*. at 934 (emphasis added)), that provides no support for plaintiffs' very different claim that general knowledge disqualifies a service provider from the DMCA safe harbor.[1]

Viacom also ignores what the DMCA requires of service providers that have the requisite knowledge of infringement.  The statute charges them with a specific duty: to "act[] expeditiously to remove, or disable access to, the material" that they know is infringing.  § 512(c)(1)(A)(iii).  That presupposes knowledge of *particular* infringing material.  A service provider with only generalized awareness that infringing content may be somewhere on its site cannot expeditiously remove "the material" as the statute directs.  Viacom seeks to replace that clear statutory mandate with a vague and unworkable duty "to inquire further as is reasonable."  Viacom Opp. 26, 28, 30.  Viacom's proposed "further inquiry" approach to red-flag knowledge is contrary to the statute and its legislative history.  YouTube Opp. 38 & n.20.  It also conflicts directly with the case

---

[1] *Aimster* similarly did not address the DMCA's knowledge provisions; the court rejected a safe-harbor defense—not based on general knowledge—but because the service provider failed to terminate repeat infringers and instead encouraged them.  *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003).

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

law, which makes clear that "if investigation of 'facts and circumstances' is required to identify material as infringing, then those facts and circumstances are not 'red flags.'" *UMG II*, 665 F. Supp. 2d at 1108.

>2.   <u>Plaintiffs' Invocation Of "Willful Blindness" Has No Merit.</u>

Viacom argues that YouTube is trying to use the DMCA "to legitimize willful blindness in copyright law." Viacom Opp. 25. That argument misunderstands the statute, the record, and even the concept of willful blindness.

>a.   *Plaintiffs' claims of willful blindness disregard the DMCA.*

Despite repeatedly using the term, Viacom never actually says what it means by "willful blindness." The closest it comes is its suggestion that YouTube failed to work with Viacom and the MPAA to use filtering technology. Viacom Opp. 28, 30-32. That is false: YouTube made extensive efforts to implement filtering, starting with the hashing tool it has used since early 2006, continuing with Audible Magic, and culminating in its development of advanced Content ID technology. YouTube did not refuse to make its fingerprinting tools available to Viacom (or other rights holders) in the absence of a content-licensing deal. YouTube Opp. 68-75, 78-80; *infra* 33-34.

But even if YouTube had not implemented any filtering technology, that could not have constituted willful blindness. The DMCA expressly forbids conditioning the safe harbors on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." § 512(m); *see* YouTube Opp. 49-51 & n.34. As a matter of law, a service provider's decision not to use filtering cannot strip it of DMCA protection.

5

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

*UMG II*, 665 F. Supp. 2d at 1113.[2]   Mischaracterizing such a decision as "willful blindness" does not change that result.   *Id.* at 1111 (rejecting claim that "Veoh avoided gaining knowledge of infringement by delaying implementation of the Audible Magic fingerprinting system").[3]

At bottom, plaintiffs' invocation of an ill-defined notion of willful blindness is an attempt to undo the bargain struck by the DMCA.   YouTube Opp. 32-36.   Although the statute does not allow service providers to willfully ignore specific instances of "readily apparent infringement" (*UMG II*, 665 F. Supp. 2d at 1108), it imposes no obligation to "investigate possible infringements, monitor its service, or make difficult judgments as to whether conduct is or is not infringing" (S. Rep. 105-190, at 52).   The DMCA instead places "the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright."   *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007); *see also UMG II*, 665 F. Supp. 2d at 1111.   It is not willful blindness for a service provider to

---

[2] Viacom's filtering argument also ignores that the DMCA identifies the particular "technical measures" that service providers must "accommodate." 17 U.S.C. § 512(i). Digital fingerprinting is not a "standard technical measure" (YouTube Br. 26), and the DMCA does not require YouTube to implement technology that has not been established through the standard-setting process that Congress prescribed.

[3] Viacom tries to distinguish the Veoh cases on the ground that YouTube supposedly had "knowledge of widespread copyright infringement." Viacom Opp. 32. While that is not true of YouTube, it is also not a basis for distinguishing *UMG II*, which assumed *arguendo* that Veoh's "founders, employees, and investors knew that widespread infringement was occurring on the Veoh system." 665 F. Supp. 2d at 1111. Viacom also asserts that Veoh did not "disable a mechanism to diminish infringement like community flagging which they previously implemented." Viacom Opp. 32. But that is precisely what Veoh did—and *Io* expressly rejected the argument that ceasing user-copyright flagging amounted to willful blindness. *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1150 (N.D. Cal. 2008).

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

adhere to those principles. *Cf.* Schapiro Reply Ex. 1 (314:3-18) (Viacom lawyers instructed video service not to look into whether users' clips were authorized).

Viacom says that it merely wants "cooperation." Viacom Opp. 30-31, 33. But YouTube always has cooperated with copyright owners and has gone beyond its obligations under the DMCA to do so. Viacom's former CEO testified that he could not think of a single thing YouTube did not do that "it should have done to help protect Viacom's content." Schapiro Reply Ex. 2 (142:25-143:11). Viacom's demand for what it deems "cooperation" cannot change the statute's allocation of responsibilities—and it does not change the fact that YouTube did everything the DMCA requires of it and more.

> b.   *Plaintiffs cannot even meet the strict standard for willful blindness that applies in non-DMCA cases.*

Although there is no basis for importing the common-law concept of willful blindness into the DMCA, there is a strict standard for willful blindness where it applies, and plaintiffs have not even tried to show that YouTube meets it.

The recent rulings in *Tiffany v. eBay* illustrate how difficult it is to make a showing of willful blindness in the online context. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463 (S.D.N.Y. 2008), *aff'd* 600 F.3d 93 (2d Cir. 2010). In that case, the district court found (and the Second Circuit agreed) that eBay was not willfully blind to the infringement of Tiffany's trademarks even though (1) it was "generally aware" of such infringement on its site and (2) it did not investigate "the extent of counterfeit Tiffany jewelry on its website" or analyze its data "to prevent further infringement." *Id*. at 514-15. Such evidence did not show that eBay "purposefully contrived to avoid learning of counterfeiting on its website." *Id*. at 515. Judge Sullivan cautioned that allowing Tiffany to prevail on a willful-blindness theory would impermissibly impose "an

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

affirmative duty to take precautions against potential counterfeiters, *even when eBay had no specific knowledge of individual counterfeiters*." *Id.* (emphasis added). Even without regard to the DMCA, therefore, a finding of willful blindness requires proof that the defendant purposefully ignored information about *specific* infringing activity. Plaintiffs cannot make such a showing here. Assuming *arguendo* that the common-law concept of willful blindness applied under the DMCA—something no court has ever held—YouTube could not be found liable. Given that the DMCA expressly rejects any affirmative-monitoring requirement and requires specific knowledge of infringing activity, *Tiffany*'s concern about an expansive willful-blindness rule applies with even greater force in this case.

                        3.     The "Track" Feature Did Not Create Knowledge Of Infringement.

Putative class plaintiffs suggest that the "track" feature of YouTube's content-management systems gives YouTube knowledge of the supposed infringement of their works. Class Opp. 9, 18-19. That argument is frivolous. *See* YouTube Opp. 43-46.

YouTube's content-management systems are designed to make it easier for rights holders to "claim" videos that may contain their content and to instruct YouTube what to do with those videos. King Opening Decl. ¶¶ 2-3, 7-10, 22-25. Copyright owners have three basic options for each claimed video: (1) "block" the video from appearing on YouTube; (2) "track" the video without monetizing it; or (3) monetize the video by allowing advertising to be run alongside it. *Id.* ¶¶ 7, 24; Maxcy Opp. Decl. ¶ 4; Levine Opp. Decl. ¶ 7. There is nothing sinister about the tracking option. In choosing to "track" a video, a copyright owner is telling YouTube that *it wants to leave the video up*— but does not want advertising displayed. *Id.* A video that is "tracked" is, by definition,

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

authorized to remain on YouTube.  *See* Viacom Opp. 40-41 (describing how the track feature is used "for authorized clips").

There are any number of reasons why copyright holders choose to track videos: they may want their works to generate promotional exposure but have contractual limits on their ability to monetize those videos; or they may have licensed a work to a third party and want to ensure that they are being compensated.  Levine Opp. Decl. ¶ 7; King Opening Decl. ¶ 31.  The track option can also be used where YouTube's policies do not allow monetization.  YouTube only allows ads to be displayed on video watch-pages where a content partner has expressly designated the videos for monetization.  Reider Opening Decl. ¶¶ 3, 9.  For music videos, YouTube goes further in securing the interests of publishers by allowing its record-label partners to monetize videos only where the label represents that it has accounted for the publishing rights.  *See* Figueira Decl. Tabs 66, 206, 318.

Class plaintiffs' effort to transform YouTube's conservative monetization policy into knowledge of infringement is meritless.  A rights claim by the owner of a sound recording does not give YouTube knowledge about who owns other rights, including rights in the musical composition, and whether those unknown owners object to the use of that composition.  YouTube Opp. 43-45.  That does not mean that the composition is being infringed.  The user who created the video may have a license that authorizes the posting of the work on YouTube.  Class Cert Opp. 18 n.18; Levine Opp. Decl. ¶ 4. (During the upload process, the user represented to YouTube that he or she had all relevant rights.  *See* Levine Opening Decl. ¶¶ 6-8.)  In other cases, YouTube itself may have a license with the relevant publisher(s) but may not have been able to identify the

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

composition to allow it to be monetized.  Levine Opp. Decl. ¶ 4; YouTube Opp. 41-43.  Or the use of the music may be a fair use.  YouTube Br. 53-55.  While YouTube chooses to avoid monetizing certain videos if their authorization status is unknown, that lack of knowledge does not create an obligation under the DMCA for YouTube to unilaterally remove those videos.[4]

When YouTube does acquire knowledge that a composition is being used without authorization, it responds as required by the DMCA using the various tools that YouTube makes available for that purpose.  Music publishers can always request that YouTube block or remove any video that they believe infringe their copyrights.  Levine Opening Decl. ¶¶ 16-26.[5]  YouTube honors publishers' takedown requests—even where the owner of an associated sound recording or other relevant rights holders have given their blessing to the video.  Levine Opp. Decl. ¶¶ 3, 7; Figueira Decl. Tab 157.  That a record label may be tracking a video in no way prevents the publisher from removing it.  It is undisputed that YouTube removed each of class plaintiffs' clips in suit promptly upon receiving notice from plaintiffs.  CCS ¶¶ 118, 120.

---

[4] The documents that plaintiffs cite (Class Opp. 13) simply describe YouTube's monetization policies for music videos; they illustrate that the track feature is available where YouTube has chosen not to monetize but has no information indicating that the composition is unauthorized.  *See* RCCS ¶ 96.

[5] Plaintiffs' complaints about Content ID (Class Opp. 7-8) are meritless.  YouTube has never "demanded" that content owners using Content ID track videos rather than block them.  King Opening Decl. ¶¶ 9, 21-25, 31; King Opp. Decl. ¶¶ 8-9; Levine Opp. Decl. ¶¶ 3, 7.  Indeed, none of the documents that plaintiffs cite even *relates* to Content ID.  *See* RCCS ¶ 96.  Of course, content owners that have entered into partnerships with YouTube generally do not want to block, preferring instead to promote and monetize their videos on YouTube.  But rights holders are always free to use Content ID (or YouTube's other tools) to block unauthorized videos.  King Opp. Decl. ¶ 8.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

Finally, class plaintiffs' claims about the "track" feature are entirely hypothetical. Plaintiffs offer no evidence that any of their clips in suit was ever identified and subjected to a "track" instruction. *See* YouTube Opp. 45-46 & n.31. That failure of proof alone is fatal to plaintiffs' argument.

4. <u>Obscurity, Licensing, And Fair Use Undermine Knowledge</u>.

We identified numerous other reasons—including the obscurity of their content, licensing and co-ownership questions, and fair-use—why plaintiffs cannot establish that YouTube had knowledge of the infringements they allege. YouTube Br. 37-38, 49-55, 68-69. Plaintiffs offer no serious response to those points.

First, class plaintiffs concede our general point by discussing only *two* of the clips that YouTube highlighted as obscure. Class Opp. 21-22. Even with respect to those two clips, plaintiffs' arguments are unpersuasive. The first depicts child poverty with instrumental music in the background. Schapiro Opening Ex. 192A/192B. Plaintiffs do not suggest that the music itself is recognizable but instead that it could be identified because a description entered by the user includes the phrase "Theme of American Beauty." Such descriptions are often unreliable, as this video illustrates: it turns out that the composition is not "Theme of American Beauty," but another song called "Any Other Name." *Compare* Schapiro Opening Ex. 192A/192B *with* Schapiro Reply Ex. 156 (Original Motion Picture Score at Track 18, "Any Other Name"). But even the correct title would not have made the music more recognizable, much less indicated who owns the work, whether it is authorized, or anything else needed to determine infringement. (In fact, discovery has shown that this work is owned by Dreamworks Music Publishing; plaintiff Cherry Lane has merely non-exclusive administration rights. Class Cert. Opp.

11

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

11-12.)  The second video is so blurry that it is not even recognizable as a soccer match, let alone a Premier League match.  Schapiro Opening Ex. 191A/191B.  The idea that this clip is a "blatant" infringement of a work owned by Premier League is absurd on its face.  *Cf.* Class Cert Opp. 33-35 (Premier League lacks ownership of footage shot by fans).[6]

The putative class' responses about their licensing practices are equally anemic.[7] Plaintiffs claim that their content was licensed to be on YouTube only "as part of a specifically identifiable online promotion or advertisement."  Class Opp. 22.  Plaintiffs do not explain what that even means, but the record is clear that most of what they have licensed to appear on YouTube is pursuant to blanket "all media" licenses that would not be known to YouTube, rather than some kind of special online promotion.  Class Cert Opp. 18 n.18.  If plaintiffs are suggesting that their authorized content is inherently identifiable as such, they offer no support for that claim, and it is not true.[8]  Plaintiffs themselves have had difficulties distinguishing licensed from unlicensed clips.  *Id*. at 18-19 & nn.20-22.  And the undisputed evidence shows that plaintiffs never informed YouTube of the existence of their supposed "online promotions" or told YouTube what

---

[6] Viacom says nothing in response to our observation that many of its works in suit are obscure and many of its clips unrecognizable.  YouTube Br. 37-38 nn.11 & 13.  That is not surprising, as even Viacom's Chairman conceded the point.  Schapiro Reply Ex. 146 (37:20-38:21) ("Q.  Who or what is the Human Giant?  A. The Human Giant?  Are you talking about a fairy tale?  No, I don't know what you're referring to."); *id*. 40:2-43:13.

[7] Class plaintiffs (except for Tur, FFT, and Premier League) concede that they have licensed content to be on YouTube.  But Tur unquestionably *has* issued such licenses (Schapiro Opening Ex. 88); FFT employees have uploaded FFT content on YouTube (*id*. Exs. 94 (188:5-197:24), 97); and several Premier League clubs have posted videos (including match footage) to YouTube (*id*. Exs. 17 (276:9-297:7), 100, 101).

[8] For example, R&H routinely authorizes licensees to post clips of R&H productions on YouTube.  YouTube Br. 49-50.  Those authorized clips are indistinguishable from many of R&H's clips in suit.  *See, e.g.,* Schapiro Reply Exs. 165A/165B, 166A/166B, 167A/167B, 168A/168B, 169A/169B, 170A/170B (R&H clips in suit).

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

particular works or clips were licensed.  YouTube Br. 51.  In short, plaintiffs offer no explanation of how YouTube was supposed to have known which clips containing their content were or were not licensed.[9]

Finally, although we pointed to a number of the class plaintiffs' clips in suit as examples of fair use, they discuss only a single one: a parody of "My Favorite Things." Class Opp. 24.  This is a particularly bad example for plaintiffs, given the controlling authority indicating that such parodies are likely fair uses.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).  In any event, the point here is not whether this (or any other clip) is definitively a fair use, but rather that debatable fair uses are not red flags. Plaintiffs do not argue otherwise, except to suggest that a service provider may be entitled to reduced damages by showing that it "was not aware and had no reason to believe that [its] acts constituted an infringement of copyright."  17 U.S.C. § 504(c)(2). That argument is inscrutable.  A service provider able to make the showing required by Section 504 could not have a level of knowledge of specific infringements that would disqualify it from DMCA protection in the first place.

Viacom contends that its clips in suit are not even debatable fair uses.  Viacom Opp. 62.  That is incorrect.  Viacom is suing over clips posted to YouTube by members of Congress, a presidential candidate on the campaign trail, reporters covering the news,

---

[9] Class plaintiffs acknowledge that under U.S. law any co-owner of a work may license the work without the consent of other co-owners, but argue that because the law may be different in certain foreign countries, it can be assumed that any co-owner who issued a YouTube license would have "necessarily" obtained the consent of the other co-owners. Class Opp. 23.  Plaintiffs offer no factual support for this argument, and it is directly contradicted by the record, which shows that plaintiffs often do not even know the identity of their co-owners, let alone coordinate licensing practices.  Schapiro Opp. Exs. 108 (70:5-71:2), 109 (90:24-92:16).

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

and movie reviewers.[10]  Such clips raise substantial fair-use issues.  In addition, most of

Viacom's clips are short and contain only a small portion of the underlying work.  VCS ¶

114; RVCS ¶ 115; RVSCS ¶ 1.29.  In a different case, Viacom itself argued that such

short clips are, by definition, fair uses: "4% to 8% of the copyrighted work . . . constitutes

use of a small or insignificant portion that requires a fair use finding as a matter of law."

Schapiro Reply Ex. 3 (Br. for Defendants-Appellees at 22, *Kane v. Comedy Partners*, No.

03-9136 (2d Cir. Feb. 4, 2004)).  Viacom also ignores that it sued YouTube over dozens of

clips that it now *concedes* are fair uses.[11]  While Viacom dismissed those clips on the eve

of summary judgment (*see* Notice of Dismissal of Specified Clips with Prejudice (Mar. 10,

2010)), that proves our point: YouTube should not be charged, on pain of losing safe-

harbor, with making difficult fair-use calls when even Viacom's lawyers could not make

those determinations consistently.  *See infra* 31-32.

> 5.   <u>YouTube Did Not Fail To Act On Knowledge Of Specific
> Infringements</u>.

In a single sentence, Viacom alludes to "substantial evidence" that YouTube knew

of "numerous" videos "pirated" from Viacom's content, yet its brief cites no actual

evidence to support that claim.  Viacom Opp. 27 & n.14.  Viacom points only to a memo

that Jawed Karim wrote in March 2006 (when he was no longer working at YouTube)

---

[10] *See, e.g.,* Schapiro Reply Ex. 171A/171B (clip uploaded to the YouTube page of Rep.
Maxine Waters); Ex. 172A/172B (clip uploaded to the YouTube page of Sen. Ben Nelson);
Ex. 173A/173B (clip uploaded to Barack Obama's official YouTube account); Ex.
174A/174B (interview with Tom Vilsack during his presidential campaign uploaded by
the political website "Talking Points Memo"); Ex. 175A/175B (clip from interview with
Hillary Clinton uploaded by the AP); Ex. 176A/176B (clip from *Margot at the Wedding*
used in a movie review).

[11] *See, e.g.,* Schapiro Reply Ex. 177A/177B (school project about the KKK); Ex. 178A/178B
(video mimicking Howard Dean's "scream"); Ex. 179A/179B (mashup of *South Park*).

**HIGHLY CONFIDENTIAL—FILED UNDER SEAL**

mentioning various television shows.  Hohengarten Ex. 237.  Karim's memo identified no specific videos, and there is no evidence of what clips (if any) he actually saw or what happened to those clips after Karim might have seen them.  There is no way to tell, for example, whether a clip from a show that Karim mentioned was one that Viacom posted on YouTube or decided not to take down—or a clip that Viacom sued over only to later dismiss with prejudice.   YouTube Opp. 18-19; CVSUF ¶ 110; Schapiro Reply Ex. 4 (Viacom not taking down clips from *Reno 911!* or *Chappelle Show* as of November 2006).

Viacom also suggests that YouTube's "watch data" will provide evidence that YouTube's "founders and other key personnel" had specific knowledge of infringement.  Viacom Opp. 27 n.14.  That data, which reflects only playback initiations, not actual watches, does not support Viacom's case.  ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[12] ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

And, as we have explained in great detail, YouTube was in no position to determine just by seeing a clip containing Viacom content that it was unauthorized.

### B. Viacom's Posting And Leaving Content On YouTube Confirm YouTube's Right To The Safe Harbor.

We explained in our moving papers how Viacom's (and other content owners') practices of posting content on YouTube, deliberately leaving up videos posted by others, and licensing material to appear on YouTube negate any conceivable showing that YouTube had disqualifying knowledge or control. YouTube Br. 39-52, 63-70. Viacom has no good response. It admits some of what it has done, seeks to limit the damage with various distortions, and claims that it is all beside the point. But the indisputable facts about Viacom's marketing activities directly undermine its core legal arguments.

### 1.   The Evidence Of Viacom's Extensive Uploading Confirms YouTube's Lack of Knowledge And Control.

Viacom tries to minimize the extent of its uploading and to suggest that the clips it authorized were recognizable promotional materials (Viacom Opp. 53-57), but the record—including a mountain of evidence that Viacom ignores—speaks for itself.

*First*, Viacom's posting of content to YouTube was extensive, both in quantity and diversity. Viacom's own documents reveal that it posted a "boatload" of clips to YouTube and was "VERY aggressively providing clips on an ongoing basis." Rubin Opening Ex. 17; Schapiro Opp. Ex. 32.[13] Viacom does not dispute that its uploading started early in YouTube's existence and that it continued even after Viacom sued. VSCS ¶ 1.54. As an

---

[13] *See also* Schapiro Reply Ex. 5 (Viacom lawyer reporting based on discussions with VH1 that "there are A LOT of clips they have seeded to you tube"); *id*. Ex. 6; *id*. Ex. 154 (VH1 marketer: "it would be a significant task to keep you updated on each and every clip we post ongoing"); Rubin Opening Decl. Exs. 3-33, 37, 39; Schapiro Opp. Exs. 5-67.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

MTV lawyer explained months after this litigation began: "Actually we're okay with uploading our own material on youtube for promotional purposes." Schapiro Opp. Ex. 53; *see also* Schapiro Reply Ex. 7 (Paramount executive: "It's official.  Please continue to 'place' authorized clips on YouTube.").  Viacom now claims that its employees uploaded "approximately" 600 clips through May 2008 (Viacom Opp. 55), but that does not help its position.  Even assuming (counterfactually) that someone with knowledge had sworn to that figure and that it was accurate, 600 would be a significant number of authorized uploads.  But that number is a sham: it omits Viacom's extensive use of third-party agents, who uploaded thousands of additional clips at Viacom's direction, and it ignores Viacom's acknowledged inability to provide a full accounting of its uploading.  *See* Rubin Reply Decl. ¶¶ 2-7, 23, Exs. 1-71, 250A-355B; Rubin Opening Decl. ¶ 2, Exs. 1, 3-31.

Viacom and its agents posted a wide range of clips on YouTube—not just movie trailers and TV commercials.  Viacom uploaded clips ranging from full episodes of its television shows (sometimes broken into multi-part segments) to clips taken directly from its works with nothing to indicate their origins.  *See* Rubin Reply Decl. ¶ 2, Exs 1, 250-355B (examples of Viacom-uploaded clips from works in suit); *see also* Schapiro Reply Ex. 8; Ostrow Opening Decl. ¶¶ 3-4.  Viacom also posted what its documents describe as footage from the "cutting room floor" and clips "rough[ed] up" to "add to the 'hijacked' effect"—all of which it now tellingly describes as "ordinary marketing activities."  Viacom Opp. 57 n.32; VSCS ¶ 1.61; Rubin Opening Exs. 4, 14, 15, 20, 25; Rubin Reply Decl. ¶ 2(ii).

The nature of the clips that Viacom posted is best illustrated by looking at the videos that Viacom has dismissed with prejudice because they were authorized.  Many of

17

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

those authorized clips are identical to—or effectively indistinguishable from—clips that Viacom is *still* suing over.  *Compare* Rubin Reply Ex. 291A/291B (DUTtBxd2KPQ) (Viacom-authorized clip from *Iron Man*) *with* Rubin Reply Ex. 272A/272B (7FZx2Ykf0l0) (identical clip in suit); *see also* Rubin Reply Decl. ¶¶ 10-11 (other examples); VSCS ¶ 1.63; RVSCS ¶¶ 1.62-1.63; *infra* 20 n.15.  Nothing on their face identifies Viacom's authorized clips as authorized or the clips in suit as unauthorized.

*Second*, while YouTube knew that Viacom was posting some clips, that only confirms our point: knowledge of Viacom content being on YouTube is not knowledge of *infringement*.  RVCS ¶ 127.  At the same time, the evidence is overwhelming that YouTube neither knew nor could have known anything like the full extent of Viacom's YouTube-related marketing activities.  Viacom may have uploaded certain clips using its "official" YouTube accounts, but it did more of its posting using obscure accounts and agents.  Rubin Reply Decl. ¶¶ 3-6, Exs. 14-71; RVCS ¶¶ 125; *see also* YouTube Br. 40-42; YouTube Opp. 4-5 & n.1; Schapiro Opp. Exs. 4, 417.  Blurring the connection between Viacom and the videos it was authorizing was an important part of Viacom's marketing strategy.  For example, in March 2006, an MTV employee wrote: "Spoke with Jeff [another MTV employee] and we are both going to submit clips to YouTube.com - him *through his personal account so it seems like a user[] of the site* and me through 'mtv2.'" Schapiro Reply Ex. 9 (emphasis added); *see also* Schapiro Reply Ex. 67 (52:1-55:18) (VH1 posted clips of *Flavor of Love* to YouTube using account "Reaction2006").[14]

---

[14] Other examples abound.  In June 2007, Paramount uploaded a clip that it said "should definitely not be associated with the studio – should appear as if a fan created and posted it."  Schapiro Opening Ex. 34.  A Paramount employee was instructed to use a "NON-PARAMOUNT" YouTube account.  *Id.* Ex. 46; Schapiro Reply Ex. 10.  MTV's agent

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

Viacom now suggests that YouTube has identified "only six YouTube accounts" lacking a "discernable connection to Viacom" that it used to upload content. Viacom Opp. 55. But the account names identified in our moving papers (YouTube Br. 41)—and the additional accounts identified in our opposition (YouTube Opp. 4-5 n.1)—were merely illustrative. Although YouTube's discovery efforts only scratch the surface, they have uncovered no fewer than 50 Viacom stealth-marketing accounts that collectively uploaded many thousands of clips to YouTube. *See* Rubin Reply Decl. ¶¶ 2-7, Exs. 1-71, 250A-355B (listing Viacom-authorized accounts including "gooddrugy," "ultrasloppyjoe," and "waytobluefrance"); Schapiro Reply Ex. 68 (at Resps. 22-109). There is no way to tell from the names of these accounts that they were linked to Viacom or to distinguish them other YouTube accounts that had no connection to Viacom. That problem extends even to accounts that might appear "official." For example, Viacom admitted in discovery that the accounts "ParamountGermany" and "ParamountVantage" are its own, but denies that "ParamountPictures" and "ParamountViacom" are authorized. Schapiro Reply Ex. 68 (at Resps. 80-83). What should YouTube have concluded if it encountered videos posted to these accounts?

*Third*, Viacom's claim that distinguishing "between legally uploaded (including promotional) and illegal videos was entirely feasible" (Viacom Opp. 54) is refuted not just

---

Fanscape uploaded a clip that was designed to appear as though it had been "leaked"— Fanscape explained that "no one can know that Fanscape or MTV is involved in this." Schapiro Reply Exs. 11, 12; *id.* Ex. 13 (74:20-76:1, 76:22-77:9); Schapiro Opp. Ex. 62. We described a similar episode in which a Paramount employee uploaded a clip from a Kinko's store using an account ("mysticalgirl8") that was not linked to Paramount. YouTube Br. 41-42. Viacom now asserts that YouTube knew all along that this clip was authorized (Viacom Opp. 56-57), but the undisputed evidence undermines that claim and Viacom's more general assertions about the transparency of its marketing practices. *See* RVCS ¶ 125; RVSCS ¶ 1.60.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

by the evidence above but by Viacom's own experiences.  Viacom ignores or has no good response to these facts: (i) even Viacom's employees and agents could not tell whether clips were infringing just by viewing them (RVCS ¶ 1.49); (ii) Viacom had to maintain elaborate internal records of authorized clips and accounts even to try to keep track of what it had authorized (VSCS ¶ 1.83; Schapiro Opening Exs. 27, 54, 57, 135-138); (iii) the confidential "white lists" Viacom maintained to track accounts authorized to post Viacom content on YouTube were incomplete and unreliable (VSCS ¶¶ 1.84-1.85; Rubin Reply Decl. ¶¶ 27-29; Rubin Opening Decl. ¶ 5); (iv) Viacom erroneously demanded that YouTube take down many clips that Viacom had authorized (VCS ¶¶ 145-46; Rubin Opening Decl. ¶ 3 & Exs. 42-68 ); (v) Viacom mistakenly sued YouTube over hundreds of "legally uploaded" videos, despite elaborate vetting by its litigation team (VCS ¶¶ 148-151); and (vi) even after Viacom's lawyers tried repeatedly to dismiss authorized videos, they failed each time to identify all the clips that Viacom has posted (*id*. ¶ 152).  *See* YouTube Br. 64-68; YouTube Opp. 4-5.[15]

---

[15] One vivid example of Viacom's confusion involves a YouTube account called "Tastefullymine."  In 2008, that account posted clips from the film *Drillbit Taylor* (a work in suit).  YouTube received a takedown request for those clips from Paramount and removed them.  Paramount then asked YouTube to retract the takedown and restore the clips, explaining: "the account 'Tastefullymine' has authorization to post all of the videos regarding *Drillbit Taylor* it has posted to date."  YouTube restored the clips.  Schapiro Reply Ex. 14.  Remarkably, Viacom later sued YouTube over four of those authorized videos.  Viacom belatedly realized its error, and dismissed those clips with prejudice.  *See* Notice of Dismissal of Specified Clips with Prejudice (Mar. 10, 2010).  But even as it did so, Viacom continues to claim as infringing (1) a clip *identical* to one of the withdrawn "Tastefullymine" clips and (2) several other clips indistinguishable in form from the authorized clips (short clips of scenes from the movie with no studio branding).  *Compare* Rubin Reply Ex. 269A/B *with id.*, Ex. 255A/B; *compare also* Rubin Reply Ex. 269A/B *with id.*, Ex. 260A/B; *see* Rubin Reply Decl. ¶¶ 10-11, Ex. 81.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

Viacom now concedes that "there remain clips in suit that Viacom had authorized to appear on YouTube"—an admission that directly contradicts the sworn declaration Viacom submitted with its opening brief, as well as its verified interrogatory response, both of which falsely stated that Viacom had not authorized any of the current clips in suit. *Compare* VCS ¶152 *with* Solow Decl. ¶ 26 and Schapiro Opening Ex. 179 (Interrog. No. 23). Viacom says it will eventually drop those clips as well and promises that there are no more. Viacom Opp. 53 n.29. Viacom is wrong again: it is still suing on clips that turn out to have been uploaded with Viacom's authorization. Rubin Reply Decl. ¶ 11; YouTube Opp. 5-6. Viacom made these mistakes, despite full knowledge of its marketing activities and against the backdrop of Rule 11. That alone rebuts Viacom's blithe assertion that a "proactive obligation" for YouTube "to identify and remedy infringement" would have been "particularly easy to implement in this case." Viacom Opp. 28.

This case illustrates why the DMCA insists on a "high bar for finding 'red flag' knowledge" (*UMG II*, 665 F. Supp. 2d at 1111) and imposes no "investigative duties on service providers" (*CCBill*, 488 F.3d at 1114). Given Viacom's own actions (and those of other content owners, *see* CVSUF ¶ 126) YouTube was in no position to identify which clips were on the service without authorization. An elaborate investigation (of the kind conducted in discovery) would be required for YouTube even to *begin* to determine whether a given clip was infringing. With only general knowledge that Viacom content was on its service, YouTube could not have "expeditiously" identified and removed the particular videos that Viacom had not authorized—not even Viacom was able to do that. That reality precludes any finding of red-flag knowledge in this case.

21

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

Viacom's suggestion that "filtering" would have solved the problem is incorrect. Viacom now points to Audible Magic, but Viacom failed to provide any of its works to Audible Magic for fingerprinting until April 2007.   Schapiro Reply Ex. 15 (110:7-13). Viacom also has no evidence that it *ever* used Audible Magic to successfully identify its content on any video website.[16]  The idea that Viacom might use Audible Magic to distinguish authorized from unauthorized content is undermined by Viacom's own corporate witness, who testified that Paramount considered but (with one narrow exception) never used fingerprinting to identify content as promotional.  Schapiro Reply Ex. 16 (63:2-68:8).   That is not surprising.   Filtering can compare clips to identify matches, but cannot by itself distinguish between authorized and unauthorized content. The copyright owner must make those determinations, and Viacom struggled to do so, even with fingerprinting.  *See, e.g.,* Schapiro Opp. Ex. 322 (illustrating complex process following a fingerprint match to determine authorization).[17]

2.    Viacom's Deliberate Decisions To Leave Its Content On YouTube Further Undermine Any Claim Of Knowledge Or Control.

In addition to uploading clips, it is undisputed that Viacom deliberately decided to "leave up" countless videos that it found on YouTube after they were posted by third parties.    YouTube Br. 45-48; VCS ¶ 128.    Viacom describes those decisions as "forbearance in enforcing its rights" and claims that this somehow makes them

---

[16] Viacom does not "use Audible Magic to identify Viacom content on other sites" (Schapiro Reply Ex. 15 (39:17-18)), and Viacom has only the most minimal information about the success (or lack thereof) that websites have had finding Viacom content using Audible Magic (*id*. 221:7-225:4; Schapiro Reply Ex. 16 (56:16-20)).

[17] For YouTube to use fingerprinting to identify Viacom's promotional clips would also have required Viacom to share internal information about its authorization decisions and approved YouTube accounts—something Viacom never did and resisted even in discovery.  Rubin Reply Decl. ¶¶ 27-30; VCS ¶ 130; Schapiro Reply Ex. 17 (422:6-424:19).

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

irrelevant.  Viacom Opp. 57-62.  But Viacom's decision to leave up videos that it could easily have removed further undermines any claim of red-flag knowledge and also amounts to authorization of the clips that Viacom let stay.

> a.    *Clips that Viacom chose to leave up are not "red flags."*

Viacom hired BayTSP to monitor YouTube and other sites and send takedown notices where appropriate.  On YouTube, BayTSP could with the click of a button secure the removal of any unauthorized videos it found.  Levine Opening Decl. ¶ 18; RVSCS ¶ 1.33.  Viacom provided BayTSP with detailed (and variable) instructions about which clips should and should not be taken down.  *E.g.,* CVSUF ¶ 130; VSCS ¶¶ 1.66, 1.69-70; Schapiro Opening Exs. 59-60 (instructions re *The Daily Show*); Schapiro Reply Ex. 18.  In 2006 and early 2007, BayTSP looked at, but refrained from taking down, thousands of videos identified as containing Viacom material.  Schapiro Reply. Exs. 19-21; *id.* Ex. 22 (BayTSP to Viacom: "we are leaving a majority of the content on YouTube").

Even after commencing this litigation, Viacom continued to leave up clips on YouTube.  In June 2007, for example, Paramount instructed BayTSP to "turn a blind eye" to a list of clips from the movie *Transformers* posted by YouTube users, even though "they don't look like teasers or trailers."  Schapiro Reply Ex. 23; Rubin Opening Ex. 27 (Paramount deciding to leave up over 100 *Iron Man* clips it found on YouTube).  Viacom also left up the clips it kept uploading to YouTube.  When Paramount decided that it would "continue to 'place' authorized clips on YouTube," it needed to instruct its marketers to "make sure that prior to doing so BayTSP has received the user name/other identifiers necessary to detect and therefore not send notices for the authorized content."  Schapiro Reply Ex. 7; *see also* Schapiro Opp. Ex. 53; Schapiro Opening Ex. 63.  Viacom

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

also left up "many, many clips that use material from our shows and movies" that it decided were fair uses. Schapiro Reply Ex. 24; s*ee also id.* Ex. 25 (explaining that MTV's takedown "actually excepted content under 2:30 (ie, stuff that is promotional[)]").

Viacom insists that these undisputed facts are irrelevant, claiming that its "forbearance" does not amount to an implied license. Viacom Opp. 59-62. That is wrong, but it also misses the point. The issue is whether YouTube had knowledge that any specific clip at issue was infringing such that the DMCA required YouTube to remove it without a takedown notice. Like its uploads, Viacom's leave-ups undermine the claim that a given Viacom video was a "red flag." Viacom's explanation that it was requesting the takedown only of what it calls "egregious instances of infringement" (Viacom Opp. 59; VCS ¶ 128) confirms that. Viacom's story effectively admits that the videos it left up were not such "blatant" infringements to trigger red-flag knowledge. *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1108 (W.D. Wash. 2004). If Viacom didn't think that a clip was so clearly infringing that BayTSP should request its immediate takedown, it cannot be that YouTube had to unilaterally remove that clip or lose the safe harbor.

That is particularly so given that Viacom told YouTube that it wanted its content to stay up. Maxcy Opp. Decl. ¶ 8. Viacom also went to great lengths to reassure the public that even while it was taking down some clips from YouTube, it was leaving up many others. RVCS ¶ 135. Far from a red flag, therefore, the appearance of Viacom material on YouTube would very often have indicated that Viacom had uploaded the clip or decided that it should remain.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

> b. *Clips Viacom deliberately left on YouTube were authorized.*

Viacom's leave-up decisions defeat red-flag knowledge even if they did not result in an implied license. But Viacom's arguments about implied license are incorrect. Viacom relies on dicta suggesting that courts have found implied licenses "'only in narrow circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'" Viacom Opp. 59-61 (citing *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 24 (2d. Cir. 2000)). In *SmithKline*, the court declined to "address either the fair use or implied license defenses." 211 F.3d at 25. The court did not hold that an implied license is limited to a narrow factual situation, and the doctrine is not so constrained. *See Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998) ("licenses may . . . be granted orally, or may even be implied from conduct"); 3 Nimmer on Copyright § 10.03[A][7], at 10-43.

Nothing in the law justifies Viacom's categorical suggestion that its intentional leave-ups do not result in an implied non-exclusive license merely because the work at issue were not created at YouTube's request. *See Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (finding implied license based on plaintiff's "knowledge of, and acquiescence in, [defendants'] use of the software," applying the rule that "consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license"). Viacom's position certainly is not the law on the Internet, where courts have repeatedly recognized that "[c]onsent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it." *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (license implied where plaintiff knew that his copyrighted material would be

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

accessible and "that he could prevent such use," but "instead made a conscious decision to permit it"); s*ee also Parker v. Yahoo!, Inc.*, No. 07-2757, 2008 WL 4410095, at *4 (E.D. Pa. Sept. 25, 2008) (same). That is the situation here: Viacom knew its material was on YouTube, could have had that material removed with the click of a button, but made a conscious decision to forbear. That is authorization.[18]

At a minimum, Viacom's illogical position—that YouTube was obligated to remove the very clips that Viacom had deliberately decided *not* to remove—is no basis for depriving YouTube of the DMCA safe harbor.

### c.  *Viacom had many reasons for leaving up its material.*

While Viacom's "forbearance" undermines its claims regardless of what motivated it, Viacom tells an incomplete story about why it chose to leave up videos. Viacom Opp. 58-59. Viacom's effort to gain leverage in negotiations with Google may have been *one* reason, but it certainly was not the only one. RVCS ¶ 128.[19] Viacom also wanted to keep clips on YouTube to reap promotional benefits. Schapiro Reply Ex. 28 ("leave random clips up because they are promotional").[20] Viacom wanted to use other user-posted clips

---

[18] Implied license is not the only doctrine implicated here. By acquiescing in user-uploads—and exhorting users to share videos (VCS ¶ 31)—Viacom also subjected itself to an equitable estoppel (and other equitable defenses, including laches and waiver). *E.g., DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001); *Field*, 412 F. Supp. 2d at 1116-17. Viacom cannot hold YouTube liable for the very conduct in which Viacom acquiesced.

[19] In the negotiations, Viacom wanted to use the threat of a large takedown to force Google to "provide us the economics we have requested." Schapiro Opening Ex. 10. To make a possible takedown more "dramatic" (*id.*), Viacom refrained from sending takedown notices so that it could "amass as much as possible in one go." Schapiro Reply Ex. 26; *see also id.* Ex. 27.

[20] *See, e.g.,* Schapiro Opening Ex. 142 (Paramount deciding to leave clips from *MI:3* on YouTube after determining that they were "part of normal online publicity before the release of the film"); Schapiro Reply Ex. 29 (MTV leaving up clips of *The Hills* because

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

in its marketing campaigns.   Rubin Opening Exs. 12, 28.   Viacom also had trouble distinguishing user-posted clips from marketing clips, and it wanted to err on the side of leaving up its authorized videos.[21]   While this explains Viacom's leave-up decisions, what matters here is the undisputed fact that Viacom deliberately left up on YouTube an enormous number of clips that it could have easily removed.   Such clips are not red flags.

## C.   YouTube Responds Appropriately To Takedown Notices.

YouTube complies with the DMCA's takedown provision by promptly removing allegedly infringing videos identified in DMCA notices.   YouTube Br. 55-57; Levine Opening Decl. ¶¶ 16-26; VCS ¶¶ 117, 119-120; VSCS ¶ 1.76.   Neither Viacom nor the class points to any clip in suit identified in a DMCA notice that YouTube did not take down expeditiously.   VCS ¶¶ 64-66; *see, e.g.,* Schapiro Reply Ex. 31.   Viacom nevertheless faults YouTube for not seeking out and removing *other* clips not specifically identified in its notices.   Viacom Opp. 48-52.   Viacom misunderstands the DMCA.

### 1.   A Takedown Notice Must Provide Specific Location Information.

A valid takedown notice must identify the "copyrighted work claimed to have been infringed"—if multiple works are covered, the copyright owner may provide "a

---

"it's all good for the show"); Schapiro Opp. Ex. 43 (Paramount deemed "a lot of duplicates" of *Transformers* clips on YouTube "a good thing"); Schapiro Reply Ex. 2 (147:17-148:5) (former Viacom CEO agreeing that "[s]ometimes a decision to leave up on the Internet material that may have been posted by a third party can be a promotional decision" and stating that he was "sure" Viacom had made such decisions).

[21] *See, e.g.,* Schapiro Opening Ex. 65 (Oct. 2006 instruction from Paramount to BayTSP to "err on the side of leaving up some infringing material rather than being overly aggressive and taking down one of the many approved clips"); Schapiro Opening Ex. 64 (Feb. 2007 directive to leave up clips under 8 minutes due to "the problem with the marketing clips"); Schapiro Reply Ex. 30 (Dec. 2006 directive from MTV to "stop taking down Comedy Central Presents clips immediately" to avoid removing clips posted by "the comedians who performed on the show").

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

representative list of such works at that site." 17 U.S.C. § 512(c)(3)(A)(ii). Identifying the allegedly infringed *works* is only one aspect of a proper notice. The DMCA also requires copyright owners to identify (and provide the location of) the material "that is claimed to be infringing," *i.e.,* the material "that is to be removed" by the service provider. § 512(c)(3)(A)(iii). This separate requirement makes no provision for a representative list. Nothing in the statute allows a copyright owner to provide merely a sample of *allegedly infringing videos* (or of the locations where those videos can be found) and demand that service providers find and remove other ones that are not identified. To the contrary, a takedown notice must contain "information reasonably sufficient to permit the service provider to locate the material." *Id.*

Given the scale of YouTube and its vast array of authorized videos, it is not "reasonably sufficient" for a takedown notice to identify the YouTube website as the location on which allegedly infringing material can be found. To allow an appropriate response, notices must identify the particular clip (or clips) that the rights holder wishes YouTube to remove (typically by reference to the "URL" at which the video appears). *E.g.,* Schapiro Reply Ex. 32 (Viacom attorney's presentation stating that a takedown notice should "[i]nclude exact URL where your work is found"). The legislative history confirms that:

> New subsection (c)(3)(A)(iii) requires that the copyright owner or its authorized agent provide the service provider with information reasonably sufficient to permit the service provider to identify and locate the allegedly infringing material. ***An example of such sufficient information would be a copy or description of the allegedly infringing material and the so-called "uniform resource locator" (URL)*** (i.e., web site address) which allegedly contains the infringing material. The goal of this provision is to provide the service provider with adequate information to find and examine the allegedly infringing material expeditiously.

28

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

H.R. Rep. No 105-551 (Part II), at 55; S. Rep. 105-190, at 46 (emphasis added).  Ignoring these principles, Viacom now claims that YouTube was required to respond to takedown notices not just by removing the material identified but by searching for an inchoate set of additional videos and then making difficult judgments about which ones infringe. Even if that were practicable, which it is not, nothing in the DMCA contemplates such an approach, and Section 512(m) expressly *rejects* it.  YouTube Opp. 34-36.

Viacom's approach is also at odds with the case law.  *UMG II* held that Veoh had no obligation to search "its system for all videos by the artists identified in the [plaintiffs'] notices."  *UMG II*, 665 F. Supp. 2d at 1110.  The court ruled that those notices (which demanded that Veoh search for unspecified clips associated with various artists) did not provide "information reasonably sufficient to permit the service provider to locate [infringing] material."  *Id*. at 1109-10.  Noting that one of those artists had uploaded a video to Veoh, the court reasoned that keyword searches for that artist's works would "not necessarily unearth only unauthorized material."  *Id*. at 1110 & n.13.[22]

2.   Viacom's Marketing Activities Further Undermine Its Argument.

Plaintiffs' authorization of their materials to be on YouTube exceeds anything in *UMG II*.  To say that running keyword searches for Viacom's works on YouTube would lead to false positives is a considerable understatement.  YouTube Opp. 64-66 & n.44; *see*

---

[22] *ALS Scan* involved a service provider that refused to take *any* action in response to a notice that identified two particular sites "created for the sole purpose" of infringing the plaintiff's copyrights and asserted that "virtually all the images at [those] sites were its copyrighted material."  *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001).  That notice provided specific location information and did not require the service provider to run its own proactive searches for the identified material and make judgment calls about what was infringing.  *Cybernet Ventures* did not address Section 512(c)(3)(A)(iii) at all.  *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1179-80 (C.D. Cal. 2002).

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

*infra* 35-36, 39-40.[23]   Viacom's bare assertion that YouTube would be able to locate "additional clips that infringed Viacom's works just as easily or better than Viacom itself could" (Viacom Opp. 52) ignores reality.   Viacom, not YouTube, kept the "white lists" that identified accounts authorized to post Viacom material (or that Viacom otherwise did not want to take down).   YouTube Br. 64-66; VSCS ¶¶ 1.84-1.85.   Viacom, not YouTube, knew which clips Viacom itself had posted, what kinds of marketing campaigns it was running at any given time, and which clips it wanted to "forebear" from taking down.   *See supra* 16-27; VCS ¶¶ 128-30.   Given all that, a list of titles was not "reasonably sufficient" for YouTube to expeditiously identify the particular clips that Viacom might contend are infringing.

The infirmities in Viacom's position are illustrated by the very takedown notice on which that it relies.   *See* Viacom Opp. 50.   On February 3, 2007, Viacom requested that YouTube remove approximately 100,000 clips, and YouTube did so by the next business day.   YouTube 56.1 ¶ 69.   It turns out, however, that *tens of thousands* of the videos that Viacom identified did not infringe Viacom's copyrights.   Many of those were music videos for which Viacom later conceded it had no copyright interest.   CVSUF ¶ 210.   It is undisputed that those improper takedown demands led YouTube to remove material that was fully authorized, causing one record label to complain about Viacom's "blatant abuse of the DMCA takedown statute."   Schaffer Opening Decl. ¶¶ 17-18 & Exs. 5-7; VCS ¶ 147.   Viacom also mistakenly requested the removal of videos that Viacom *itself* had

---

[23] In a 2006 test, BayTSP found that only 1.78% of YouTube videos identified using "MPAA provided keywords" were likely infringing.   Schapiro Reply Ex. 33; *see also id*. Ex. 34 (fewer than 6% of videos reviewed using Viacom keyword searches resulted in takedown notices); Ex. 35.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

posted, which led YouTube to assign strikes to (and even suspend) Viacom's own accounts. Schaffer Opening Decl. ¶¶ 15-16 & Ex. 4; *see also* Rubin Opening Decl. ¶ 3 & Exs. 46-48, 56-57, 60-61; VCS ¶145-46. Viacom later had to retract many of its erroneous requests. Schafffer Decl. ¶ 18; Rubin Opening Ex. 62; VCS ¶ 147; VSCS ¶ 1.83.

Given all the errors and abuses associated just with the set of clips that Viacom specifically identified in its February 2007 takedown notice, Viacom cannot now fault YouTube for not removing *other* clips that Viacom did *not* identify. Complying with Viacom's demand would have led to the improper removal of countless other videos that Viacom had no basis to claim were infringing. That is confirmed by a letter that Viacom sent to the ACLU shortly after the February 2007 takedowns. Noting that "YouTube is an important and vibrant forum for creativity and commentary," the ACLU expressed concern about the removal of material covered by fair use. Schapiro Reply Ex. 36. Viacom's General Counsel responded:

> There are ***many, many clips that use material from our shows and movies that have not been removed*** because it is possible that there could be a fair use claim and we did not have the resources to do the analysis. I do not have the precise numbers, but it is estimated that over a million clips were viewed in the process of preparing for the takedown. ***To see a few of the clips we did not take down, search on "Jon Stewart" or "South Park" and see the clips that remain***.

Schapiro Reply Ex. 24 (emphases added). The premise of Viacom's letter is that it had carefully considered which clips it wanted YouTube to remove—and sent takedown notices about *only* those clips. Viacom's invitation to the ACLU to "see the clips that remain" from *The Daily Show* and *South Park* directly contradicts its argument that YouTube should have searched for and taken down clips *not* identified in its takedown notices. Viacom Opp. 52. Viacom decided that those clips should stay up and trumpeted

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

that decision to the ACLU.  It cannot now claim that YouTube should lose DMCA protection for not removing videos that Viacom intentionally left on the site.

### D.    YouTube Lacks Control Over The Alleged Infringing Activity.

Plaintiffs' assertions that YouTube has the "right and ability to control" the alleged infringing activity largely retread ground covered in their moving papers.

### 1.    Plaintiffs' Reliance On Manual Review Is Misplaced.

Viacom argues that the DMCA codifies the common law of vicarious liability and that YouTube has "control" based on its supposed ability to use human review, community flagging, and keyword filtering to identify infringing videos.  Viacom Opp. 37-40.  Our opposition brief fully answers these contentions:

- The DMCA's text, legislative history, and case law make clear that the statute does not simply codify vicarious liability.  *See* YouTube Opp. 46-51.

- Both the courts and Viacom's own witnesses have acknowledged the impossibility of manually reviewing all videos on a site like YouTube.  *See id.* at 64-65 (citing *Io*, 586 F. Supp. 2d at 1153).

- Viacom's unsupported allegation that when YouTube was reviewing videos in 2005, it instructed its screeners "not to exclude videos on the ground that they constituted copyright infringement" (Viacom Opp. 39) is false and contradicted by the evidence.  YouTube Opp. 8-9; C. Hurley Opening Decl. ¶¶ 15-17; *see also, e.g.,* Schapiro Reply Ex. 37.

- The manual "spot checks" that YouTube did in 2006, which included looking for Viacom content such as *South Park*, were unscalable and generally ineffective.  YouTube Opp. 19, 33 n.15.  As a matter of law, the fact that a service provider does such occasional checks to enforce its copyright policies is not a basis for a finding of control.  *Io*, 586 F. Supp. 2d at 1151.

- YouTube stopped community flagging because it was ineffective, not because it wanted to facilitate infringement.  ██████████████████████████
██████████████████████████  YouTube Opp. 19-21, 51-53.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

2.     Plaintiffs' Selective-Fingerprinting Story Remains Baseless.

Plaintiffs also repeat their arguments about YouTube's use of fingerprinting technology, asserting that YouTube refused to make filtering available without a content-licensing deal and "rebuffed" the MPAA.  Viacom Opp. 8-9, 30-31, 40-42, 54; Class Opp. 6-8, 21.  Our prior filings (YouTube Opp. 68-80; CVSUF ¶¶ 281-314; CCSUF ¶¶ 28-30) explain in detail why those allegations are false and that these facts are undisputed:

- Audible Magic's audio-fingerprinting technology was designed to identify sound recordings, not audiovisual works or musical compositions on video websites like YouTube.  YouTube Opp. 44, 68-89.

- Audible Magic had no fingerprints from *any* movies or television shows until late 2006.  YouTube Opp. 72.

- Viacom had no contact at all with Audible Magic until late 2006—and Viacom did not register fingerprints associated with any of its content with Audible Magic until at least April 2007 (even later for Paramount).  There is no evidence that *any* of the putative class plaintiffs have ever had information about their works in Audible Magic's system.  YouTube Opp. 69, 72, 75-76.

- YouTube was the first video-hosting website to license Audible Magic.  YouTube Opp. 69.

- As of July 2007, none of Viacom's own websites that accepted user-submitted videos were using Audible Magic to identify potentially unauthorized clips from television shows or movies.  Schapiro Reply Ex. 15 (153:10-22); *see also id*. 154:9-15; *id.* Exs. 38, 39.

- Throughout 2006, YouTube engaged in discussions with the MPAA, and YouTube told the MPAA in January 2007 that it was willing to try to block the posting of content registered with Audible Magic.  YouTube Opp. 73-75.[24]

---

[24] Viacom claimed in its moving papers that "in January 2007, defendants flatly rejected cooperation or filtering to prevent piracy unless the studios granted Defendants licenses and revenue sharing agreements."  Viacom Br. 20.  After we showed that charge to be false (YouTube Opp. 68-80), Viacom changed its story, claiming that "[a]s of January 31, 2007, Defendants were *still leading the MPAA to believe* that Defendants were *willing* to launch a filtering pilot."  Schapiro Reply Ex. 40 (emphasis added).  But Viacom's new spin is equally misleading.  YouTube publicly announced on February 22, 2007 that it would make its new Content ID technology (then still in development) available to all

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

- YouTube never told Viacom that it could not have access to Audible Magic without a content-licensing deal.  Maxcy Opp. Decl. ¶¶ 9-12; Schapiro Reply Ex. 46 (52:10-54:22, 55:18-56:23); CVSUF ¶ 213.

- YouTube had concerns about the reliability of using Audible Magic's audio-based technology to identify audiovisual content; Viacom's own agent BayTSP expressed similar concerns to Viacom.  YouTube Opp. 71-72; King Opening Decl. ¶¶ 11-13; Schapiro Reply Ex. 46 (85:22-87:9).

- In part to address those concerns, YouTube began building its own video-fingerprinting technology in January 2007.  King Opening Decl. ¶¶ 11-17; King Opp. Decl. ¶ 2; Schapiro Opp. Ex. 133 (141:15-22).  Viacom participated in pre-launch testing of Content ID.  YouTube Opp. 78-80; King Opp. Decl. ¶¶ 5-6.

- YouTube always made Content ID available to all content owners, including those that wanted to use it only to block content.  King Opp. Decl. ¶ 8.  YouTube invited Viacom to start using Content ID when it launched in October 2007, and Viacom signed an agreement to do so in February 2008.  King Opp. Decl. ¶¶ 7-9.

- Thousands of content owners (including music publishers and sports leagues) use Content ID, and they can choose to monetize, track, or block content at their discretion.  King Opening Decl. ¶¶ 21-25 & Ex. 1.

While YouTube is entitled to summary judgment in any event, these undisputed facts belie any suggestion that YouTube used fingerprinting technology—which is not required by the DMCA—to run some kind of protection racket.

### 3.   Content ID Is Not A Basis For A Finding Of Control.

Class plaintiffs suggest that YouTube's implementation of its Content ID technology gave it "control" over infringing activity.  Class Opp. 25-27.  Plaintiffs also argue that YouTube's technology can "readily identify infringing content"—even if its human employees cannot.  *Id.* at 21.  But Content ID is not a magic wand for detecting infringement; it requires the active participation of rights holders.  Content ID gives owners the ability to identify their content by providing YouTube with reference

---

copyright owners.  *Id.* Exs. 41, 42.  And YouTube was not only willing to engage in fingerprinting testing with the MPAA, it did so.  *Id.* Exs. 43-45; Schapiro Opp. Ex. 164.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

fingerprints and telling YouTube what to do with videos that match.  King Opening Decl. ¶¶ 3, 5, 7, 24-25.  Without such references, Content ID cannot identify clips containing those owners' content, much less determine whether they are unauthorized.  King Opp. Decl. ¶ 10.  In any event, it would be perverse to conclude that YouTube's efforts to develop advanced fingerprinting technology—which even *Viacom* calls a "positive step" (Viacom Opp. 20)—disqualifies YouTube from the safe harbor.  *See Io*, 586 F. Supp. 2d at 1153-54; *Hendrickson v. eBay Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001).

### 4.    Keyword-Based Ad Targeting Does Not Provide Control.

Finally, class plaintiffs argue that the "same tools [YouTube] uses to target ads to users on search pages can be used to remove infringing content."  Class Opp. 18-19. Plaintiffs seem to be saying that because YouTube serves ads targeted to search queries, it has the ability to identify infringing videos using that same functionality.  That is a non-sequitur, which reflects a profound misunderstanding of the technology.  YouTube's advertising systems display ads related to the "keywords" that users enter into YouTube's search box.  Schapiro Reply Ex. 47 (113:4-26, 128:5-132:19).  Those systems are not designed to find *videos* (Schapiro Reply Ex. 48 (172:11-25))—much less identify or remove "infringing" ones—and class plaintiffs offer no explanation, and no evidence, about how they might do so.

Plaintiffs' suggestion appears to be just a repackaged version of the argument that YouTube should adopt some kind of filter that would automatically block videos associated with certain keywords, a demonstrably ineffective strategy for detecting and removing infringements.  YouTube Opp. 64-66 & n.44.  That is particularly true here. Plaintiffs cannot seriously suggest that the DMCA requires YouTube to block all (or even

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

most) of the videos linked to the various keywords they have identified—keywords that include a collection of names, places, and teams ("blake," "gulbis," "bolton," "wigan") and terms even more generic ("song parody," "uk football," "police brutality," "la riots"). Schapiro Opp. Ex. 125; Figueira Decl. Tab 173.  That would block countless videos that do not infringe plaintiffs' copyrights.  *See infra* 39-40.[25]

## E.   YouTube Did Not Earn A Disqualifying Financial Benefit.

Even assuming *arguendo* that YouTube did have "control," it still would not be disqualified from the safe harbor because YouTube does not receive a "financial benefit directly attributable to the alleged infringing activity."

### 1.   YouTube Has A Legitimate Business Model.

The DMCA's test for financial benefit asks whether the service provider has a "legitimate" business model.  YouTube Br. 72-74.  If so, then the service provider does not earn a potentially disqualifying financial benefit merely because it receives payments from infringing uses or users that are the same in kind as payments from non-infringing uses or users.  *See* H.R. Rep. 105-551 (Part II), at 54.  YouTube's business model is unquestionably legitimate.  YouTube Br. 74-78; YouTube Opp. 97-98.  Plaintiffs do not say otherwise or dispute YouTube's vast array of non-infringing uses.  VCS ¶¶ 34, 37-44, 169-71; VSCS ¶¶ 1.94, 1.98, 1.103-1.105, 1.115-118.   And Viacom concedes that

---

[25] Other keywords recommended by plaintiffs include: "chevrolet" (which would block, among many other things, videos uploaded by Chevrolet (*e.g.,* www.youtube.com/watch ?v=WoH85zHD8Sk (Schapiro Reply Exs. 157, 180A/180B))); "stages" (which would block, among many other things, satiric videos uploaded by *The Onion* (*e.*g., www.youtube.com/watch?v=TRgRz3nSG7o (Schapiro Reply Exs. 158, 181A/181B))); "chelsea" (which would block, among many other things, videos from the Premier League club of that name that has an official YouTube channel (*see* Schapiro Opening Ex. 17 (276:15-297:7); Schapiro Opp. Ex. 359)).

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

YouTube's advertising offerings have never favored unauthorized videos over authorized videos.  VCS ¶ 168; VSCS ¶ 1.93.

Plaintiffs claim that none of this matters.  They assert that the financial-benefit test expressly endorsed in the DMCA's legislative history is an "extreme position" that would protect a service provider no matter "how much revenue it derives from infringement."  Viacom Opp. 35.  That misunderstands the test.  The DMCA's financial-benefit provision distinguishes legitimate services from illegitimate ones.  Services with no real value other than facilitating infringement will fail.  Services that derive genuine benefit from legitimate activities are presumptively protected.  YouTube is the latter.  Not only does the allegedly infringing material represent a tiny fraction of the overall service (VCS ¶¶ 33, 113), it is undisputed that YouTube earns significant revenue from its enormous number of authorized videos (VCS ¶¶ 164-65) and takes the additional step of limiting watch-page ads to videos claimed by a content partner and specifically designated for monetization (Reider Opening Decl. ¶ 9; RCCS ¶ 167; VSCS ¶ 1.91).

Plaintiffs would disregard the committee reports in favor of a "draw" test mirroring an expansive version of the common law.  Viacom Opp. 34; Class Opp. 28.  That test is contrary to the legislative history (YouTube Opp. 53-55) and the statutory language that requires that the benefit be "*directly* attributable" to the infringing activity.  *Indirect* benefits—such as those associated with a hope of "attracting more users and more advertising revenue" (VCS ¶ 160)—are by definition not disqualifying.  Under plaintiffs' approach, any service that relies on advertising would have a disqualifying financial benefit if any user was attracted by unauthorized material—no matter how insignificant that draw was to the business, how many users came to view

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

authorized material, or how much value the service generated from legitimate content. That is not what Congress intended.[26]

Even if a "draw" standard applied, plaintiffs have not come forward with evidence to satisfy it. YouTube Opp. 80-82. Plaintiffs have not even tried to show that any of the clips they have put at issue actually acted as a "draw." A bare assertion that infringing activity generally drew users does not suffice (*Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004))—and Viacom's renewed efforts to distort (1) an email among YouTube founders discussing the effect of removing "stupid videos," and (2) the fairness opinion for the YouTube acquisition, do not come close. *Compare* Viacom Opp. 36 *with* YouTube Opp. 13-15, 92-95. Proof of draw would be particularly important here given the pervasive presence of *authorized* instances of plaintiffs' content, which would make it necessary to distinguish whether users who might have been looking for such content were drawn by an infringing clip, as opposed to countless authorized ones.

2. Search-Page Ads Are Not A Direct Financial Benefit.

The DMCA's requirement of a benefit "directly" attributable to the alleged infringements also excludes any revenue that YouTube receives from ads on search-results pages. Class plaintiffs emphasize search-page ads (Class Opp. 8-9, 28; CPCS ¶ 167) but omit important information about those pages. A search-results page does not display videos. It shows a list of "thumbnail" images and text describing videos returned in response to the search query. CVSUF ¶ 254-55, 344. The ads displayed are targeted

---

[26] Viacom observes that the legislative history does not discuss advertising and refers only to websites that receive payments directly from infringers. Viacom Opp. 37. That does not help Viacom. If anything, receiving money from infringers (in the form of escalating usage fees) is a *more* direct financial benefit—yet that is exactly what the legislative history says would *not* be disqualifying. H.R. Rep. 105-551 (Part II), at 54.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

to the search term the user enters, not to the videos returned.  Schapiro Reply Ex. 47 (113:4-25, 128:5-132:19); *id.* Ex. 48 (174:21-175:7).

There is no nexus at all (much less a direct one) between the allegedly infringing activity and the revenue generated from YouTube's search ads.  Entering a search query—even one somehow linked to plaintiffs' works—is not infringement, or even a likely prelude to infringement.  Given the diversity of content on YouTube, one cannot conclude from a given query that a user is looking for a particular video, and certainly not an *infringing* video.  And even if a user *were* looking for unauthorized material, there is no reason to think that he would find it, or choose to watch it instead of any of the other videos returned in response to his query.  CVSUF ¶¶ 195, 259, 339.

This is illustrated by the search terms that plaintiffs themselves identified as tied to their content.  *See* Schapiro Opp. Ex. 125; Figueira Decl. Tab 173 (highlighting terms such as "song parodies," "movie trailer," and "tennis").  How could one say that a search for "federer," "bus chase," or "movie trailer" is a search for infringing content (or even videos that plaintiffs own)?[27]  A search for a term like "daily show" may return parodies of *The Daily Show*, commentaries about the show, snippets of the show that may be fair use, or videos posted by *Daily Show* writers—all of which exist on YouTube and none of which infringe Viacom's copyrights.[28]  Searches for other terms (including "Human

---

[27] *See, e.g.,* http://www.youtube.com/watch?v=HGRFvus8v5M (video of Roger Federer highlights uploaded by the ATP) (Schapiro Reply Exs. 159, 182A/182B); http://www.youtube.com/watch?v=LwXHwDz0cXg (video of user's bus chase flip-book animation) (Schapiro Reply Exs. 160, 183A/183B); http://www.youtube.com/watch?v=PsD0Np FSADM (movie trailer posted by Fox Searchlight) (Schapiro Reply Exs. 161, 184A/184B).

[28] *See, e.g.,* http://www.youtube.com/watch?v=PzRHlpEmr0w (video created by *Daily Show* writers) (Schapiro Reply Exs. 162, 185A/185B); http://www.youtube.com/watch?v=6GQ0z5rBci4 (*Daily Show* parody with chimpanzees) (Schapiro Reply Exs. 163,

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

Giant," "Transformers," and "Sound of Music") may turn up videos that the plaintiffs have authorized, including clips uploaded by Viacom's marketers or licensed performances of R&H's musicals.  Schapiro Reply Ex. 23; CVSUF ¶¶ 259, 332; CCS ¶ 136; YouTube Br. 48-50.  Under any reading of the DMCA, revenue tied to searches is not "directly" attributable to the allegedly infringing activity.

### F.    YouTube's Repeat-Infringer Policy Is More Than Adequate.

Plaintiffs do not dispute that YouTube satisfies the DMCA's threshold requirements (YouTube Br. 21-26), with the exception of a few narrow—and insubstantial—challenges to YouTube's repeat-infringer policy (Viacom Opp. 46-48).

Viacom contends that YouTube failed to show that it had a repeat-infringer policy before early 2006.  But the undisputed evidence is that YouTube adopted such a policy in September 2005.  C. Hurley Opening Decl. ¶ 21.  YouTube's policy, under which it informed users that their accounts could be terminated for infringement, was publicly displayed at that time, and the next month was expressly incorporated into YouTube's Terms of Use.  *See* Schapiro Reply Exs. 49-51.  YouTube revised its policy in December 2005 to adopt a "three-strikes" approach, but that merely refined and enhanced the *existing* policy, which already satisfied the DMCA.  *See Corbis*, 351 F. Supp. 2d at 1102 (service provider need only "put users on notice that they face exclusion from the service if they repeatedly violate copyright laws").[29]

---

186A/186B); http://www.youtube.com/watch?v=ovugclIWMEk (commentary about *The Daily Show*) (Schapiro Reply Exs. 164, 187A/187B); *see also* VSCS ¶ 1.84 (discussing the account "LiberalViewer").

[29] YouTube's initial policy was also virtually identical to the policy that Viacom's own sites adopted.  Schapiro Reply Exs. 52, 53.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

Viacom next argues that YouTube's policy is deficient because it assesses only one "strike" when it receives a single DMCA notice listing multiple allegedly infringing videos. The court in *UMG II* rejected this very argument. *UMG II*, 665 F. Supp. 2d at 1116-18. And for good reason: service providers have wide discretion to adopt an appropriate policy, so long as they ensure that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others" face "a realistic threat of losing that access." H.R. Rep. 105-551 (Part 2), at 61. That is just what YouTube's policy does; it ensures that bad actors' accounts are terminated, without excessively punishing users who violate the rules accidentally or through ignorance. Levine Opening Decl. ¶¶ 27-28; Schapiro Reply Ex. 66 (140:6-141:3).

YouTube's approach is more protective of copyright holders than the law requires. The statute requires a policy for terminating those who *are* repeat infringers, but DMCA notices are merely *allegations* of infringement. *Corbis*, 351 F. Supp. 2d at 1105-06 & n.9; *see also UMG II*, 665 F. Supp. 2d at 1117 (service providers need not terminate users based merely on multiple DMCA notices). YouTube's decision to rely on such allegations, but count each notice as a single strike, readily satisfies the DMCA's "loosely defined" requirements for a repeat-infringer policy. *Corbis*, 351 F. Supp. 2d at 1101.[30]

Finally, Viacom tries to find fault with YouTube for not assessing strikes for videos blocked using YouTube's CYC system for a short period following CYC's launch. But YouTube had good reasons for not immediately linking CYC to its strike-tallying system.

---

[30] Viacom conjures up an extreme scenario in which YouTube receives a single notice alleging that a user uploaded hundreds of supposed infringements over an extended time. Viacom offers no evidence that such a situation ever actually arose, and a "hypothetical possibility" does not "raise a genuine fact issue as to the implementation" of a repeat-infringer policy. *Io*, 586 F. Supp. 2d at 1144.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

CYC was an untested tool that gave rights holders the ability to block videos automatically, without a sworn allegation of infringement in a DMCA notice. YouTube wanted to make sure the tool was being used properly before deciding how it would be linked to its repeat-infringer policy. King Reply Decl. ¶ 2. That is entirely appropriate. *Cf. CCBill*, 488 F.3d at 1111-13 (allegations short of a DMCA notice may be disregarded in applying repeat-infringer policy); *UMG II,* 665 F. Supp. 2d at 1116-18 (rejecting argument that "Veoh's policy is inadequate because it does not automatically terminate users who upload videos that are blocked by the Audible Magic filter"). In mid-2007, just a few months after CYC launched, YouTube linked it with its strike-tallying system. King Reply Decl. ¶ 4; Kohlmann Ex. 2.[31] At all times, copyright owners (including those using CYC) were free to send actual DMCA notices, which would result in strikes. King Reply Decl. ¶¶ 3-4. Plaintiffs raise no genuine issue of fact regarding YouTube's repeat-infringer policy.

## G.     Plaintiffs' Claims Arise From Storage At The Direction Of Users.

Plaintiffs' infringement claims target actions that YouTube's system took to facilitate access to user-posted material stored at the direction of users. Every court to have addressed this issue has found that such claims are covered by Section 512(c). YouTube Br. 27-30; YouTube Opp. 27-31. Plaintiffs contend that the re-encoding of user-stored videos into new file formats, such as those required to make videos viewable on portable computing devices, is not storage. Viacom Opp. 44. Such steps merely make users' videos viewable on a range of mobile platforms. CVSUF ¶¶ 329, 330; Solomon

---

[31] Whether YouTube revealed how it was tallying strikes is immaterial. The DMCA does not "require the service provider to reveal its decision-making criteria" for a repeat-infringer policy. *Corbis*, 351 F. Supp. 2d at 1102.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

Opening Decl. ¶¶ 6-7.  It would be illogical and contrary to the DMCA's fundamental purpose to conclude that YouTube falls out of Section 512(c) because it allows access to materials stored at the direction of users through Internet-enabled devices other than a personal computer.  Plaintiffs' arguments on this point defy precedent and, if accepted, would have grave consequences for the Internet.  Brief of *Amici Curiae* eBay Inc., et al. In Support of Defendants (May 26, 2010).

## II.   YOUTUBE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' INDUCEMENT CLAIMS.

A finding that YouTube is entitled to the safe harbor protects it from liability against all of plaintiffs' claims, including inducement.  YouTube Br. 79-80.  Plaintiffs say nothing about the language of the statute or its legislative history, which makes that clear.  In claiming that common-law inducement trumps the DMCA, plaintiffs point to *Columbia Pictures Industries, Inc. v. Fung*, No. CV 06-5578 SVW(JCx), 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009), but that case illustrates our point.  *Fung* reasoned that the DMCA and inducement are "inherently contradictory": "Inducement liability is based on active bad faith conduct aimed at promoting infringement; the statutory safe harbors are based on passive good faith conduct aimed at operating a legitimate internet business." *Id*. at *18.  The court did not hold that the defendant satisfied the DMCA's requirements, but was excluded because it had induced; it found that the same misconduct that disqualified the service from the safe harbor also illustrated its intent to induce.  *Id*. at *16-17.  Conversely, a service provider like YouTube that follows the DMCA cannot simultaneously be found to act with the purpose of fostering infringement.  Not surprisingly, no court has ever held a DMCA-compliant service liable for inducement.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

Plaintiffs' inducement claims also fail without regard to the DMCA.  Plaintiffs (1) ignore the actual standard set out in *Grokster*; (2) disregard the overwhelming evidence of YouTube's legitimate purpose and operation; and (3) repeat a familiar litany of rhetoric and irrelevancies.  They raise no genuine issue of fact.

### A.   *Grokster* Requires A Purpose To Promote Infringement And Evidence Of Affirmative Steps Taken To Foster Infringement.

Viacom claims that inducement liability turns on "whether Google and YouTube operated the YouTube website with the *intent* that it be used for infringement."  Viacom Opp. 5.  Plaintiffs cannot show that, but that is not the test.  Viacom ignores *Grokster*'s holding: "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties."  *Grokster*, 545 U.S. at 919.  Inducement requires proof that the defendant (1) had an intent to "promote" the use of its service to infringe, and (2) took "affirmative steps" to foster infringement.  Unable to meet that standard, plaintiffs seek to broaden it.  But their approach is contrary to the Supreme Court's decision and unsupported by the post-*Grokster* cases.  YouTube Opp. 82-84.[32]

Viacom argues that what we have said about inducement is "foreclosed" by *Grokster* (Viacom Opp. 12), but that misstates YouTube's position and misunderstands the Court's ruling.  *First*, YouTube has not argued that because it never encouraged third

---

[32] Viacom's several variations on its preferred standard for inducement are equally at odds with *Grokster*.  Viacom Opp. 13 ("all that matters under *Grokster*" is "the wrongful intent to profit from infringement"); *id.* at 14 ("Google and YouTube are liable under *Grokster* because they operated YouTube with the unlawful purpose of building its traffic and user base with infringing videos.").

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

parties to infringe it is *immune* from liability.  But the admitted absence of any inducing message is highly relevant.  Evidence of an actual "message designed to stimulate others to commit violations" is the "classic instance of inducement" (*Grokster*, 545 U.S. at 937-38), and has been central to every successful inducement case.  YouTube Opp. 85 n.63.[33]  Plaintiffs' lack of such evidence after years of discovery confirms YouTube's lawful intent and operation.[34]

*Second*, even if the inducing acts need not directly cause "*specific* acts of infringement" (Viacom Opp. 14), evidence of affirmative steps taken with the intent of fostering infringement is still required.  Any contrary result would disregard the Supreme Court's admonition that the inducement rule "premises liability on purposeful, culpable expression and conduct."  *Grokster*, 545 U.S. at 937.  A finding that the defendants "took active steps to encourage infringement" (*id*. at 924) was crucial in *Grokster*, *Fung*, and more recently in *Arista Records v. Lime Group*.[35]

---

[33] Contrary to what the putative class says (Class Opp. 33), the Supreme Court found that both Grokster and StreamCast "communicated a clear message" to users that they should use their technology to violate copyright.  *Grokster*, 545 U.S. at 937-38; *see also id*. at 924-25 ("each one clearly voiced the objective that recipients use it to download copyrighted works").

[34] Viacom's suggestion that YouTube can be held liable without evidence of encouragement because the service was "intentionally devoid of available antipiracy protections" (Viacom Opp. 14) runs headlong into the Supreme Court's warning that inducement cannot be "merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses." *Grokster*, 545 U.S. at 939 n.12.

[35] *See MGM Studios, Inc. v. Grokster, Ltd*., 454 F. Supp. 2d 966, 985-88 (C.D. Cal. 2006) ("*Grokster II*") (relying on the fact that StreamCast provided "technical assistance to help users enjoy copyrighted content they illegally downloaded"); *Fung*, 2009 WL 6355911, at *12 ("Defendants directly assisted users in engaging in infringement."); *Arista Records LLC v. Lime Group LLC*, 06-cv5936, 2010 WL 1914816, at *16, 17-19 (S.D.N.Y. May 11, 2010) (relying on defendant's "efforts to attract infringing users" and "efforts to enable and assist users to commit infringement" in finding inducement).

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

*Third*, Viacom does not dispute that "many" videos on YouTube are noninfringing, but claims that "[t]hese authorized uses are a sideshow."  Viacom Opp. 16.  That is a remarkable claim.  While the fact that a product is "capable of substantial lawful use" does not provide blanket immunity against inducement (*Grokster*, 545 U.S. at 933-34; YouTube Br. 89-91), that does not mean that evidence of a product's actual noninfringing uses is irrelevant in evaluating whether the plaintiff has established a proper inducement claim in the first place.  In *Grokster* (and subsequent cases), evidence of how the service was actually used was central to the inducement analysis.  *Grokster*, 545 U.S. at 922-23.  The district court emphasized that point on remand:

> Almost 97% of the files actually requested for downloading were infringing or highly likely to be infringing.  While infringing use by third parties is not by itself evidence of StreamCast's intent, ***the staggering scale of infringement*** makes it more likely that StreamCast condoned illegal use, and ***provides the backdrop against which all of StreamCast's actions must be assessed***.

*Grokster II*, 454 F. Supp. 2d at 985 (emphasis added); *see also Lime Group*, 2010 WL 1914816, at *17-19; *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 151-52 (S.D.N.Y. 2009).[36]  The inverse is equally true: the staggering scale of YouTube's noninfringing uses are the backdrop against which any inducement claim must be assessed.  They embody YouTube's legitimate founding purpose and operations, set it apart from inducing services, and defeat any inference that YouTube "depended on massive infringing use."  *Grokster II*, 454 F. Supp. 2d at 989.

---

[36] It is surprising to see Viacom suggest that the services in *Grokster* had substantial non-infringing uses.  Viacom Opp. 16 n.8.  That is at odds with what Viacom (through Paramount) told the Supreme Court: "Copyright infringement is the only commercially significant use of the Grokster and StreamCast services."  Schapiro Reply Ex. 54 (Transcript of Oral Argument at 3-4, *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) (No. 04-480)).

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

**B.    Overwhelming Evidence of YouTube's Lawful Purpose And Operation Defeats Inducement As A Matter Of Law.**

Measured against the *Grokster* standard (or even against plaintiffs' diluted standard), YouTube is entitled to summary judgment on inducement.   The lack of evidence of "statements or actions directed to promoting infringement" (*Grokster*, 545 U.S. at 935) is clear from the facts that plaintiffs concede or cannot dispute.

1.    ***YouTube was founded with the lawful purpose of allowing users to share personal videos.***   Viacom concedes that "the founders envisioned [YouTube] would be used primarily for personal videos."   Viacom Opp. 9-10.   That legitimate founding purpose is confirmed by all the contemporaneous documents.   YouTube Br. 85-87; YouTube Opp. 6-7; C. Hurley Opening Decl. ¶¶ 2-8, 16 & Exs. 1-9; C. Hurley Opp. Decl. ¶ 2.   Viacom says that this undisputed evidence "does not help [defendants] at all."   Viacom Opp. 9.   But it directly contradicts any argument that YouTube "showed itself to be aiming to satisfy a known source of demand for copyright infringement."   *Grokster*, 545 U.S. at 939.

2.    ***YouTube never communicated an inducing message.***   From the millions of pages of documents that YouTube produced in this case, plaintiffs cannot point to a single public communication in which YouTube urged or encouraged its users to infringe copyright.   YouTube Br. 85-89.[37]   Chad Hurley's September 2005 message— "we should never promote piracy or tell [users] how to do it" (C. Hurley Opening Decl. Ex.

---

[37] If plaintiffs had actual evidence that YouTube had solicited or encouraged infringement, they would have made it the focal point of their claims.   Although Viacom says that such evidence exists, it alludes to it only in passing, cites none of it in its brief, and describes its other evidence as "[m]ore important[]."   Viacom Opp. 12-13. Unsurprisingly, the evidence Viacom cites does not come close to showing that YouTube encouraged infringement.   RVCS ¶ 58.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

25)—is the antithesis of the message communicated by the services that have been found liable for promoting infringement.[38]

3.   ***YouTube consistently held itself out as a place for personal or other authorized videos.***   The affirmative message that YouTube communicated confirms its lawful purpose.   YouTube's advertisements emphasized that YouTube aimed to "become a community of digital video authors and their videos," and YouTube consistently described itself as a repository for personal (or other authorized) videos.[39]   These are not just a "few internal emails from around the time YouTube was founded."  Viacom Opp. 9. The record is replete with internal and external communications spanning the entire period from YouTube's founding until the company secured financial backing, legal counsel, and instituted a formal DMCA program in Fall 2005:

- Karim in April 2005: describing YouTube as "a repository for all kinds of personal videos on the internet" (C. Hurley Opening Decl. Ex. 3);

- Chen in May 2005: "We just launched a new website . . . based on the idea of video blogging where members would take clips ranging from the mundane to the fascinating" (Schapiro Opening Ex. 164);

- Hurley in June 2005: "I think the key to our success is personal videos" (C. Hurley Opp. Decl. Ex. A);

- Karim in July 2005: "we should kill these stupid TV ads.  They are so lame compared to genuine personal videos" (*id.* Ex. E);

---

[38] *See Grokster II*, 454 F. Supp. 2d at 987 ("StreamCast even suggested to a user that he upload copyrighted content for sharing."); *Fung*, 2009 WL 6355911, at *11 ("Defendants engaged in direct solicitation of infringing activity."); *Lime Group*, 2010 WL 1914816, at *17 ("LW purposefully marketed LimeWire to individuals who were known to use file-sharing programs to share copyrighted recordings.").

[39] Schapiro Opening Ex. 163; *see also id.* Exs. 164-65; YouTube Opp. 6-7; C. Hurley Opening Decl. ¶¶ 8, 9, 11-13, 19, 22 & Exs. 9, 10, 12-15, 23, 27; C. Hurley Opp. Decl. ¶ 4 & Ex. A; Botha Opening Decl. ¶¶ 3-6; 15-16; VSCS ¶ 1.98.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

- Chen in July 2005: "we do have a community and its ALL user generated content" (C. Hurley Opening Decl. Ex. 14);

- Hurley in July 2005: "we are trying to build a community of real user-generated content" (*id*. Ex. 22);

- Statement of purpose in August 2005: "To become the primary outlet of user-generated video content on the Internet" (*id*. Ex. 15);

- Description of YouTube's goal in August 2005: "secure our position as the #1 place for personal videos on the internet" (Figueira Decl. Tab 60);

- Sept. 2005: YouTube's "goal is to become the primary outlet of *user-generated video content* on the Internet" (Botha Opening Decl. Ex. 2);

- Hurley in Oct. 2005: "YouTube is a new service that allows people to easily upload, tag, and share personal video clips" (C. Hurley Opening Decl. Ex. 27).

4. ***YouTube's founders rejected videos that looked to them like unauthorized professional content.*** It is undisputed that throughout 2005 YouTube's founders routinely rejected videos that looked to them to be unauthorized media clips (including those from TV shows and movies).[40] Plaintiffs have nothing to say about any of this evidence, even though it undercuts their inducement story.

5. ***YouTube has consistently warned its users against violating copyright.*** Unable to dispute that YouTube's terms of service have always forbidden infringement and that YouTube prominently reminds users that unauthorized videos are not allowed,[41] Viacom tries to dismiss these warnings as "mere formalities and fig leafs." Viacom Opp. 19. That is just rhetoric. There is no evidence that YouTube secretly hoped users would disregard those warnings and upload material to which they did not have

---

[40] YouTube Opp. 8-9; YouTube Br. 88 n.41; C. Hurley Opening Decl. ¶¶ 11, 15-18 & Exs. 13, 17-22; C. Hurley Opp. Decl. ¶¶ 4, 6 & Exs. A, C-G; Schapiro Reply Ex. 37.

[41] *See* Levine Opening Decl. ¶¶ 5-10, 24, 27-28; C. Hurley Opening Decl. ¶¶ 8, 11, 21 & Exs. 9, 12-13; VCSUF ¶¶ 71-75; VSCS ¶ 1.101.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

the rights.  To the contrary, the messages that YouTube conveys to users about copyright reflect the site's purpose, and users who did not abide by the terms of use had their accounts terminated.  Levine Opening Decl. ¶¶ 26, 27-31.

6. ***YouTube has a vast array of authorized videos.***  Plaintiffs do not dispute this fact, and it is directly relevant to YouTube's purpose that it houses an overwhelming diversity of videos posted by or with the consent of their owners.  Walk Opening Decl. ¶¶ 3-22; VCS ¶¶ 34, 37-44; VSCS ¶ 1.80; *see also* Schapiro Reply Ex. 55 (http://www.youtube.com/user/FiveYear) (videos of Katie Couric, Conan O'Brien, and others discussing their favorite YouTube clips).  That includes the diverse videos posted by a small group of YouTube users who have filed an amicus brief in this case—videos that have collectively been viewed more than 3 *billion* times.  Brief of the "Sideshow Coalition" as *Amicus Curiae* in Support of Defendants at 1 (May 28, 2010).  That also includes authorized videos from studios, record labels, music publishers, news organizations, and sports leagues.  Maxcy Opening Decl. ¶¶ 9-10.  And it includes the numerous clips uploaded by Viacom and its agents, as well as the videos containing class plaintiffs' works that they (or their co-owners or sub-publishers) have licensed to be on YouTube.  YouTube 56.1 ¶¶ 136-144; VCS ¶¶ 123-124, 149-152; CCS ¶¶ 154-56, 158.

7. ***YouTube implemented a robust DMCA regime.***  YouTube Br. 22-26, 55-57.  Viacom claims that the steps YouTube took to comply with the DMCA are irrelevant to inducement.  Viacom Opp. 19.  But service providers are not required to follow the DMCA, and YouTube's good-faith implementation of a robust DMCA policy is entirely inconsistent with an intent to induce infringement.  *Cf.* Schapiro Reply Ex. 69 (9:21-

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

10:10) (Viacom General Counsel testifying that Viacom's sites registered DMCA agents because "our approach is to be respectful of copyrights").

8.   ***YouTube used hashing to prevent users from reposting videos removed for copyright reasons.***   Plaintiffs acknowledge that YouTube has used hashing technology since early 2006, before other comparable sites, but complain that it blocks only *identical* uploads.   CCS ¶ 88.   Even if the technology has its limits, it is undisputed that YouTube implemented it to prevent copyright violations and that it did so.   These actions are fundamentally inconsistent with the idea that YouTube wanted to foster infringement.[42]

9.   ***YouTube imposed a 10-minute limit to deter infringement***.   Levine Opening Decl. ¶ 12.   Viacom claims that this time-limit could be circumvented.   Viacom Opp. 19-20.   But so what?   It is indisputable that the 10-minute limit made it more difficult to post unauthorized long-form professional content and sent a clear message that such content was not welcome on YouTube.   Schapiro Reply Ex. 56; *see also id*. Ex. 57 (Viacom-commissioned report concluding that a "maximum clip length of 10 minutes helps prevent uploading of pirated video content").   That is in stark contrast to Grokster and StreamCast, which freely allowed users to download full-length professional content and made no effort to develop any "mechanisms to diminish the infringing activity using their software." *Grokster*, 545 U.S. at 939.

---

[42] *See Io*, 586 F. Supp. 2d at 1143, 1153-54 (relying on use of hashing in concluding that Veoh took steps to reduce infringement); *Lime Group*, 2010 WL 1914816, at *19 n.30 ("A hash-based filter system nevertheless has the capacity to substantially diminish unauthorized transfers through a file-sharing system.").

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

10.    ***Viacom wanted to buy YouTube.***   VCS ¶ 46.  Viacom tries to dismiss its interest in buying YouTube as the desire of "some Viacom personnel."  Viacom Opp. 63. The record establishes otherwise.  The documents showing (1) the fervor with which many of Viacom's senior-most executives (including Viacom's CEO and the Chairman of MTVN) wanted to own YouTube (YouTube Opp. 90 n.67) and (2) the conclusion of Viacom's "best minds" that YouTube's primary uses were non-infringing (Schapiro Opp. Exs. 216-17) speak for themselves.  As Viacom's former CEO testified, he "loved the idea of YouTube."  Schapiro Reply Ex. 2 (58:8-17); *see also* RVSCS ¶ 1.17.

11.    ***Viacom has spent millions of dollars advertising on YouTube.***   VCS ¶¶ 170-71.  The fact that Viacom (and other major content owners) routinely advertised on YouTube is in obvious tension with plaintiffs' effort to brand YouTube as a pirate site. No matter how many "eyeballs" they might attract, major media companies would not give millions of dollars in advertising money to websites intentionally working to facilitate the infringement of their copyrights.

12.    ***YouTube built and implemented advanced fingerprinting tools.*** Viacom concedes that YouTube's development of Content ID was "a positive step," but complains that YouTube "refused to implement" fingerprinting technology for Viacom before May 2008.  Viacom Opp. 20.  We have explained why Viacom's claims about Content ID prior to May 2008 are unfounded.  YouTube Opp. 78-80; King Opp. Decl. ¶¶ 2, 4-10.[43]  The entire chain of events relating to YouTube's implementation of Content ID belies any conceivable claim of inducement, and not just after May 2008.

---

[43] Viacom's unsupported suggestion that its access to Content ID had something to do with a shift in Google's monetization strategy in the spring of 2008 (Viacom Opp. 20-21)

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

## C.   Plaintiffs' Distortions Cannot Save Their Inducement Claims.

Given these undisputed facts, no reasonable jury could find "clear expression or other affirmative steps taken to foster infringement."  *Grokster*, 545 U.S. at 936-37. Plaintiffs respond by resorting to a now-familiar set of distortions.  Viacom Opp. 6-9, 18-19; Class Opp. 32-35.  We have responded elsewhere to plaintiffs' rhetoric:

- • Viacom's assertion that YouTube's founders "rejected all efforts to remove even the 'obviously copyrighted infringing stuff'" (Viacom Opp. 6) is contradicted by the very email to which Viacom refers.  YouTube Opp. 13-15 (citing Hohengarten Ex. 215).  Nor does anything else in the record suggest that YouTube "deliberately decided" not to remove "obvious" copyright infringements (Viacom Opp. 18).  That assertion is contradicted by a slew of evidence that the founders removed videos that looked like unauthorized media content.  YouTube Opp. 8-10.

- • YouTube's transition from an ineffective community-flagging system to a DMCA regime was not motivated by a desire to encourage infringement or to blind itself to infringing activity.  YouTube Opp. 19-21, 51-53.[44]

- • The minor keyword-notification feature that Maryrose Dunton discussed in a "chat" duplicated functionality that YouTube already had—and that was freely available to copyright holders.  YouTube Opp. 67.

- • None of the documents that Viacom cites suggests that YouTube's growth was fueled by "infringing videos"—much less that YouTube's founders intended that result.  YouTube Opp. 12-15, 93-95.  Nor is there evidence that by mid-2005 YouTube's founders "knew and embraced the fact that a huge percentage of the videos actually drawing viewers to the site were infringing media clips" (Viacom Opp. 10).  *See* YouTube Opp. 9-15.

- • Steve Chen did not tell Roelof Botha that there were "truckloads" of infringing content on YouTube.  YouTube Opp. 11-12.

- • Jawed Karim's March 2006 memo did not say that YouTube was "filled with" infringing clips.  Hohengarten Ex. 237.  In any event, Viacom posted, left up,

is bewildering.  At the time that supposed shift occurred, Viacom had *already* signed an agreement to start using YouTube's technology.  King Opp. Decl. ¶¶ 7, 9.

[44] Viacom tells the Court to "disregard" the fact that YouTube ceased community flagging after consulting with counsel because YouTube did not assert an advice-of-counsel defense.  Under this Court's privilege ruling, however, that fact is not privileged. Schapiro Reply Ex. 58 (46:4-21, 51:13-24).  YouTube's assertion of privilege does not bar it from relying on *non-privileged* information to rebut plaintiffs' baseless claims.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

and encouraged users to view clips of the very shows mentioned in Karim's memo. YouTube Opp. 9 n.2, 18-19; *supra* 16-27.

• Plaintiffs' claims that the Credit Suisse fairness opinion "apprised" Google that "infringement attracted the majority of YouTube site traffic" (Viacom Opp. 8) and that YouTube recognized "that piracy accounted for 54-80% of traffic on the site" (*id.* at 11) are false. YouTube Opp. 13-15, 92-97.

• To the extent that Viacom suggests that second-hand statements about YouTube contained in some pre-acquisition Google documents are true, it is relying on inadmissible hearsay. To the extent that Viacom suggests that Google acquired YouTube to capitalize on infringement, that allegation is false and unsupported. Google's decision to purchase YouTube had nothing to do with exploiting unauthorized videos—and no document or testimony suggests otherwise. YouTube Opp. 89-92; CVSUF ¶¶ 133-165.

• Far from "dismantling" copyright protections on YouTube, Google continued YouTube's policies and made them even more robust. Almost immediately after the acquisition, Google lent its engineering resources to help develop YouTube's advanced video fingerprinting technology. YouTube Opp. 90; King Opening Decl. ¶¶ 14-15.

• Plaintiffs' claims that YouTube "refused" to use Audible Magic to identify their content is false and unsupported by the extensive record. YouTube Opp. 68-77; *supra* 33-34.[45]

No matter how many times they are repeated, plaintiffs' distortions cannot be squared with the record or save their claims. The undisputed evidence about YouTube's legitimate purpose, its efforts to discourage copyright abuse, and the lack of any affirmative steps to foster infringement require judgment in YouTube's favor.

* * *

While the briefs in this case are long and the record extensive, there are no genuine issues of fact regarding YouTube's intent and operation or its compliance with

---

[45] Viacom says that YouTube refused to use Audible Magic to protect Viacom "<u>precisely because</u> Defendants made the decision 'to play faster and looser and be aggressive until either a court says no or a deal gets struck.'" Viacom Opp. 19. The documents that Viacom cites are pre-acquisition Google materials that have nothing to do with Audible Magic or filtering. CVSUF ¶¶ 161-162.

HIGHLY CONFIDENTIAL—FILED UNDER SEAL

the DMCA.  As in other recent cases, therefore, granting summary judgment to YouTube

is appropriate.  That result fulfills the purpose of a safe harbor designed to provide clear

operating rules for service providers and thereby to protect the interests of millions of

Internet users in this country and around the world.

## CONCLUSION

For the reasons given above, and in YouTube's opening memorandum of law (and

in YouTube's Opposition to Plaintiffs' Motions For Partial Summary Judgment),

YouTube's motion for summary judgment should be granted.

Dated:  June 14, 2010
New York, NY

Respectfully submitted,

Andrew H. Schapiro
A. John P. Mancini
Matthew D. Ingber
Brian M. Willen
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

David H. Kramer
Maura L. Rees
Michael H. Rubin
Bart E. Volkmer
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

*Attorneys for Defendants*