**ORIGINAL**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-9-2012
```

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC.,
COMEDY PARTNERS, COUNTRY
MUSIC TELEVISION, INC.,
PARAMOUNT PICTURES, CORP.,
BLACK ENTERTAINMENT
TELEVISION, LLC.

        Plaintiff's

V.

YOUTUBE, INC., GOOGLE,
INC., YOUTUBE LLC.

        Defendant's

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 7/24/12
```

CASE NO. 1:07-cv-02103 (LLS)
(Related Case)
1:07-cv-3582 (LLS)

_____/

GEORGE MAY, PLAINTIFF MOTION TO INTERVENE, MOTION TO
ENFORCE JUDGEMENT LIEN AGAINST VIACOM INTERNATIONAL,
INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC.,
PARAMOUNT PICTURES, CORP., BLACK ENTERTAINMENT
TELEVISION, LLC., LIEN AGAINST VIACOM INTERNATIONAL
INC., PARAMOUNT PICTURES, CORP. STOCK, UNDER FEDERAL
RULE OF CIVIL PROCEDURE 18, 19, 20, 21, 22, 24, FEDERAL
STATUTES 28 U.S.C. § 1367, MOTION TO ADD PARTIES
NECESSARY FOR JUST ADJUDICATION ARAB BANK, DUBAI WORLD
CORPORATION.

COMES NOW GEORGE MAY, Plaintiff and files this his motion

to intervene, motion to enforce judgement lien against Viacom

International, Inc., Comedy Partners, Country Music

Television, Inc., Paramount Pictures, Corp., Black

Entertainment, Television, LLC, Lien against Viacom

International, Inc., Paramount Pictures, Corp. Stock, under

Federal Rule of Civil Procedure 18, 19, 20, 21, 22, 24, Federal

Statutes 28 U.S.C. § 1367, Motion to add parties necessary for

just adjudication, Arab Bank, Dubai World Corporation for

-1-

*No judgment in favor of George May appearing in this application, it is denied. So Ordered.*
*Louis L. Stanton 8/8/12*

Cause Herein as Follows:

1. That on October 14, 2004 George May, Plaintiff obtained a judgement lien against Viacom, Inc., Summer Redstone, Hilton Hotels Corp., others in complicity, conspiracy named before herein by not filing any answer, response, within the required 21 days required by Florida Rule of Civil Procedure, and had judge Jeffrey A. Winikoff who by his void, invalid, unconstitutional order of October 14, 2004 was automatically disqualified by his void, invalid, unconstitutional order by Florida Statutes 38.01 issue a void, invalid, null, of no effect what-so-ever order, based on a void, invalid, null, of no effect what-so-ever order by automatically disqualified Elizabeth Maass, after default by their co-conspirators International Game Technology, Inc., Mandalay Resorts, Group, Inc., others to with evil intent, malice of aforethought, knowledge, without regard for the law Tortiously Interfere with George May, Plaintiff's Contract and Prospective Economic Advantage of November 21, 1995, causing George May damages, harm.

2. The defendant's Viacom International, Inc., Summer Redstone, Hilton Hotels, Inc., others in Case Number 502004CA 008739XXXXMB were prohibited from filing any answer or defense in George May, Plaintiff Circuit Court Case in Palm Beach County, Florida by 18 U.S.C. § 2, 2333(a)(b)(c) as Viacom

-2-

International, Inc., Summer Redstone, Hilton Hotels, Corp.
do business daily with International Terrorists who have
been convicted of Terrorism, and are on the United States
Terrorist List. See Linde v. Arab Bank, their Oil, Gas
Companies, their associates, in complicity, conspiracy,
aiders, abetters.

3. George May, Plaintiff judgement attached herein is an
automatic lien on Viacom International, Inc., Summer Redstone,
Hilton Hotels Corp. the plaintiff's in this case herein, any
judgement obtained by the Plaintiff's in this case herein
as George May, Trade Secrets robbed by Viacom International,
Inc., Summer Redstone, Hilton Hotels, Inc. are a Continuing
Contract for payment, Equitable Lien, Legal Lien, Warrant,
Secured Transaction under the Uniform Commercial Code, the
International Sale of Goods, (CISG) Laws.

4. George May, Plaintiff here objects to any Settlement
between the Parties to this case herein that does not pay his
judgement of $3.6 Billion Dollars.

5. The judgement is to be automatically trebled by Federal
Statutes 18 U.S.C. §2, §3, §4, 2333(a)(b)(c), § 2332(a), §2339
A,B,C, as Viacom International, Inc., Summer Redstone, Hilton
Hotels Corp., conspired with John Ellis (Jeb) Bush, to deprive
George May, Plaintiff of his Civil Rights, Constitutional
Rights, Tortiously Interfering with George May, Plaintiff
Contracts, Economic Advantage for Viacom International, Inc.,

-3-

Summer Redstone, Individually, Hilton Hotels Corporation Arab Bank PLC, Dubai World Corporation, their Oil, Gas companies, all Terrorist in complicity, conspiracy, Aiders, Abetters in the Theft of George May, Plaintiff, Intervener Trade Secrets.

WHEREFORE, George May, Plaintiff, Intervener requests here that Arab Babk PLC, Dubai World Corporation be added as parties, that George May, Plaintiff, Intervener be awarded damages in the amount of $3.6 Billion Dollars, plus interest from October 14, 2004, trebled, for George May, Plaintiff, Intervener, and against Viacom International, Inc., Summer Redstone, Individually, Hilton Hotels Corporation, Arab Bank PLC, Dubai World Corporation jointly and severally, that this honorable court order that George May, Plaintiff, Intervener herein receive payment of his JUdgement Lien, Equitable Lien, Legal Lien, Warrant, Secured Transaction of $3,6 Billion Dollars under the Uniform Commercial Code, the International Sale of Goods (CISG) Laws, from any Settlement, Modified Judgement in this case herein between the parties in this case herein.

Respectfully submitted

George May, Intervener
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
Ph. 561-290-4384
Fax. 561-290-4384

-4-

I hereby certify that a copy of the foregoing was mailed,
faxed this July 26, 2012 to:

The Clerk of the U.S. District
Court for the Southern District
of New York
500 Pearl Street
New York, New York 10007
Ph. 212-805-0136

Donald B. Verrilli, Jr.
JENNER & BLOCK LLP
601  13th Street N.W.
Washington, D.C. 20005
Ph. 202-639-6000
Fax. 202-639-6066

MAX W. Berger
BERNSTEIN, LITOWITZ, BERGER
& GROSSMAN
1285 Ave. of the Americas,
New York, New York 10019
Ph. 212-554-1400
Fax. 212-554-1444

Andy Schapiro
QUINN, EMANUEL
51 Madison Ave.
22nd Floor,
New York, New York 10010
Ph. 212-849-7164
Fax. 212-849-7100

Charles S. Simms
PROSKAUER ROSE, LLP
1585 Broadway
New York, New York 10036
Ph. 212-969-3000
Fax. 212-969-2900

George May
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
Ph./Fax. 561-290-4384

-5-



*Paramount Parks*

A · V I A C O M   C O M P A N Y

November 21, 1995

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL  33420

Dear Mr. May:

Your proposal for a Star Trek theme park has been forwarded to us by Thomas Byrne of Blockbuster Entertainment Group.

While we find your proposal very interesting, we regret to inform you that we are not pursuing this type of joint venture at the present time.  We thank you for your interest and wish the best of luck in your endeavor.

Sincerely,

Jane Cooper
President & CEO

JC:amw

<table>
<tr><td colspan="2"><strong>SPRING 2006</strong></td><td colspan="4"><strong>Trade Secrets</strong></td></tr>
</table>

| Course No. 9200-704-801 ID No. 16545 | W 6:30 - 9:30 p.m. | | Room W-215 | |
|---|---|---|---|---|
| Professor Jay Dratler, Jr. | Room 231D (IP Alcove) | | (330) 972-7972 | dratler@uakron.edu, dratler@neo.rr.com |

Copyright © 2000, 2002, 2003, 2006  Jay Dratler, Jr.

For permission, see

# Smith v. Dravo Corp.

203 F.2d 369, 97 U.S.P.Q. (BNA) 98 (7th Cir.1953)

Before Duffy, Lindley and Swaim, Circuit Judges.

Lindley, Jr. [*370]

*[handwritten: Intentional harm is a tort]*

**\* \* \* [*371] \* \* \***

In the early 1940s Leathem D. Smith, now deceased, began toying with an idea which, he believed, would greatly facilitate the ship and shore handling and transportation of cargoes. As he was primarily engaged in the shipbuilding business, it was quite natural that his thinking was chiefly concerned with water transportation and dock handling. Nevertheless his overall plan encompassed rail shipping as well. He envisioned construction of ships especially designed to carry their cargo in uniformly sized steel freight containers. These devices (which, it appears, were the crux of his idea) were: equipped with high doors at one end; large enough for a man to enter easily; weather and pilfer proof; and bore collapsible legs, which (1) served to lock them (a) to the deck of the ship by fitting into recesses in the deck, or (b) to each other, when stacked, by reason of receiving sockets located in the upper four corners of each container, and (2) allowed sufficient clearance between deck and container or container and container for the facile insertion of a fork of a lift tractor, and (3) were equipped with lifting eyelets, which, together with a specially designed hoist, made possible placement of the containers upon or removal from a ship, railroad car or truck, while filled with cargo. The outer dimensions of the devices were such that they would fit compactly in standard gauge North American railroad cars, or narrow gauge South American trains, or in the holds of most water vessels.

World War II effectually prevented Smith from developing his conception much beyond the idea stage. Nevertheless blue prints were drawn in 1943, and in 1944, as a result of

**Trade Regulation—Trade Secrets—Applicability of Statute of Limitations to Wrongful Appropriation of Trade Secret.**—In 1921 the plaintiff disclosed a trade secret to the defendant, pursuant to a contract which prohibited the defendant from taking advantage of the principle thus disclosed unless and until adequate compensation for the plaintiff had been agreed upon. After disclosure the defendant declared itself as not interested in the process and no agreement for compensation was made. The defendant, however, according to allegations, investigated the process, developed machinery embodying its principle, and in 1930 obtained patents thereon. The plaintiff seeks to have the patent rights assigned to him, to restrain the defendant's use of his process, and to secure an accounting. The defendant moved to dismiss on the ground that the plaintiff's action was for breach of contract and therefore barred by the statute of limitations. *Held*, motion to dismiss denied. There is a property right in the trade secret, apart from the contract, which equity will protect. As the defendant's user is in the nature of a continuing wrong, the statute of limitations is inapplicable as to those rights which arose within the statutory period. *Sachs v. Cluett, Peabody & Co., Inc.*, 31 N. Y. S.(2d) 718 (Sup. Ct. 1941).



If the rights of the plaintiff were derived solely from the contract the defendant's position would unquestionably be correct, but there are numerous cases in which, despite the absence of a contract, the court has granted equity protection for a trade secret.[1] In granting equitable relief, the majority of courts proceed on the theory that the basis of protection is the property right in a trade secret, while others state that the basis is a breach of contract or of confidential relations.[2] At the present stage in the development of the trade secrets doctrine, it seems unnecessary to tie down the grant of protection to the reasoning of the earlier cases;

1. *E.g.*, *Philadelphia Extracting Co. v. Keystone Extracting Co.*, 176 Fed. 830 (E. D. Pa. 1910) ; *Peasal v. Noxall Polish Mfg. Co.*, 268 Fed. 887 (E. D. Pa. 1920) (contract had expired) ; *Shavoir v. American Rebonded Leather Co.*, 104 Conn. 472, 133 Atl. 582 (1926) (contract had been abrogated and was not in issue) ; *Morrison v. Woodbury*, 105 Kan. 617, 185 Pac. 735 (1919) ; *Abilene Exterminating Co. v. Oser*, 125 N. J. Eq. 329, 5 A.(2d) 738 (Ch. 1939) ; *Tabor v. Hoffman*, 118 N. Y. 30, 23 N. E. 12 (1889) ; see Barton, *A Study in the Law of Trade Secrets* (1939) 13 U. of Cin. L. Rev. 507, 540. As to what may constitute a trade secret, *see* A. O. Smith Corporation v. Petroleum Iron Works Co. of Ohio, 73 F.(2d) 531, 538, 539 (C. C. A. 6th, 1934) ; Walker v. Berger, 148 Ga. 326, 96 S. E. 627 (1918) (not necessarily a patentable idea) ; Barton, *supra*, at 515, 521 ; Note, *The Projector's Remedies to Enforce a Property Right in an Idea* (1941) 15 St. John's L. Rev. 243, 247.

2. See DERENBERG, TRADE-MARK PROTECTION AND UNFAIR TRADING (1936) §8 ; Barton, *supra* note 1, at 530 *et seq.*; Notes, *Equitable Protection of Trade Secrets* (1923) 23 COLUMBIA LAW REV. 164; *Basis of Jurisdiction for the Protection of Trade Secrets* (1919) 19 COLUMBIA LAW REV. 233; *Nature of Trade Secrets and Their Protection* (1928) 42 HARV. L. REV. 254; see also (1928) 6 TEX. L. REV

# JSTOR

- 
- 
- 

- 
- 
- 

*George May*
*Business Plan*
*Trade Secret*
*Used in*
*Nevada,*
*Jordan,*
*Dubai By*
*Paramount,*
*Viacom*

You are not currently logged in through a participating institution or individual account. See            for more information.

*A void order*
*is not an*
*Answer or*
*Affirmative*
*Defense*

## Trade Regulation. Trade Secrets. Applicability of Statute of Limitations to Wrongful Appropriation of Trade Secret

*Columbia Law Review*
Vol. 42, No. 2 (Feb., 1942), pp. 317-320
Published by:
Article Stable URL:

*A continuing wrong,*
*A continuing contract*
*cannot be*
*dismissed — All*
*orders were are*
*null, of no*
*effect what so*
*ever void invalid*
*unconstitutional*

## Rights and Permissions

- 
- 

Search This Issue  for
found banner=NoAccess_CDST_PSSN
issue available=false
purchase type=none

Docket Report Search Results (DRR) - Not an Official Document          http://courtcon.co.palm-beach.fl.us/pls/jiwp/ck_public_qry_doct.cp_...



EXECUTIVE OFFICES: 301 North Olive Ave. West Palm Beach, FLORIDA  (561) 355-2996

## Report Selection Criteria

**Case ID:**          502004CA008739XXXXMB

**Docket Start Date:**

**Docket Ending Date:**

## Case Description

**Case ID:**          502004CA008739XXXXMB

**Case Caption:**     GEORGE MAY V CAROL LUMPKIN

**Division:**         AD - FRENCH

**Filing Date:**      Wednesday, September 15th, 2004

**Court:**            CA - CIRCUIT CIVIL

**Location:**         MB - MAIN BRANCH

**Jury:**             Y-Jury

**Type:**             CD - CONTRACT & DEBT

**Status:**           AS - REDISPOSED

_NO ANSWER OR AFFIRMATIVE DEFENSE FILED WITHIN THE REQUIRED 21 DAYS BY VIACOM, SUMMER REDSTONE, HILTON HOTELS CORP THEIR ATTORNEYS_

## Related Cases

_No related cases were found._

Case Event Schedule

(c) Copyright 1998 Affiliated Computer Systems, Inc. ACS and the ACS logo are registered trademarks.
CourtConnect is a trademark of ACS. This contains trade secrets and is subject to a confidentiality agreement. The unauthorized
possession, use, reproduction, distribution, display or disclosure of this material or the information contained herein is prohibited.
All rights reserved. User Accepts/Agrees to . . . . . Not for official use.

CFN 20040607732
OR BK 17683 PG 1698
RECORDED 10/26/2004 09:13:57
Palm Beach County, Florida
Dorothy H Wilken, Clerk of Court
Pgs 1698 - 1699; (2pgs)

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN
AND FOR PALM BEACH COUNTY,
FLORIDA

GEORGE MAY
    Plaintiff(s),

CASE NO CA 04 8739 AN

vs.

CAROL C. LUMPKIN et al
    Defendant(s).

CLOSED

## ORDER OF DISMISSAL

THIS MATTER came before the Court upon Defendants, Carol C.

Lumpkin, Michael C. Marsh, Hilton Hotels Corp., Barron Hilton, Viacom,

Inc., and Sumner M. Redstone's Notice to Clerk of Court of Pre-filing

Orders, Notice of Automatic Stay and Request for Dismissal by

Administrative Judge.  Upon considering the Motion and being otherwise

fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that this matter is dismissed without

prejudice to Plaintiff seeking an Order from Judge Elizabeth Maass

allowing its filing and referring same to Judge Maass for consideration of

potential sanctions for violation of her Order dated July 15, 2004.

DONE AND ORDERED in West Palm Beach, Palm Beach County,

Florida on this 14th day of October, 2004.

JEFFREY A. WINIKOFF
CIRCUIT COURT JUDGE

*[handwritten annotations:]* void, invalid, un constitutional order based on a void invalid, un constitutional order of

Book17683/Page1698          Page 1 of 2

**Copies furnished:**
George May
P O Box 32247
Palm Bch Gardens FL 33420
James M Miller Esq
Megan J Knight Esq
1 SE 3rd Ave 28th Fl
Miami FL 33131
Hilarie Bass Esq
1221 Brickell Ave
Miami FL 33131
Michael C Marsh Esq
2 S Biscayne Blvd 1500
Miami FL 33131



Book17683/Page1699

IN THE FIFTEENTH JUDICIAL CIRCUIT IN
AND FOR PALM BEACH COUNTY,
FLORIDA

CASE NO. 502004CA004938XXXXMB

GEORGE MAY
    Plaintiff,
and

PATRICK C. BARTHET, et al.,
    Defendants.
_____/

**ORDER ON PLAINTIFF, GEORGE MAY'S SWORN AND VERIFIED MOTION TO
DISQUALIFY JUDGE ELIZABETH MARIE T. MAASS FROM THIS CASE, ALL CASES
INVOLVING GEORGE MAY PURSUANT TO FLORIDA STATUTES 38.10, FLORIDA
RULE OF JUDICIAL ADMINISTRATION 2.160, 2.330 (2008), FEDERAL STATUTES 28
U.S.C. §455, HER OATH CONTRACT**

    THIS CAUSE came before the Court, in Chambers, on Plaintiff, George May's Sworn and

Verified Motion to Disqualify Judge Elizabeth Marie T. Maass from this Case, All Cases Involving

George May Pursuant to Florida Statutes 38.10, Florida Rule of Judicial Administration 2.160,

2.330 (2008), Federal Statutes 28 U.S.C. §455, Her Oath Contract. Based on a review of the

Motion, it is

    ORDERED AND ADJUDGED that Plaintiff's Motion is denied, as moot. The undersigned

does not preside in the above action.

    DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida this ___ day of

December, 2008.

                                     ELIZABETH T. MAASS
                                     Circuit Court Judge

*[Handwritten: DEFENDANTS, COMPANY, INDIVIDUALS]*

*[Handwritten: VARIOUS STATE ACTORS Both Brothers conspired together to deny my civil Rights, constitutional Rights, Interfere with my contract, business]*

# Tortious Interference with Contract and Prospective Economic Advantage

*[Handwritten: Advantage, economic advantage valued]*

This Quarterly Update[1] focuses on tortious interference with contract and tortious interference with prospective economic advantage.[2] *[Handwritten: in the billions of]*

## Introduction

*[Handwritten: dollars to take my property, trade secret without payment,]*

Claims for tortious interference with contract or prospective economic advantage can result in enormous judgments. *See, e.g., Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 4 (1987) (jury verdict in excess of $10 billion for tortious interference with contract); *JAM Sports & Entertainment, LLC v. Paradama Productions, Inc.,* 382 F. Supp. 2d 1056, 1058 (N.D. Ill. 2005) (jury verdict in excess of $90 million for tortious interference with contract and prospective economic advantage, although defendant later granted judgment as a matter of law on claim for tortious interference with prospective economic advantage). The reasons for such large potential damage awards are obvious: the underlying contract or business relationship at issue can be extremely valuable and, if the defendant's conduct is sufficiently egregious, punitive damages may be awarded in "economic interference" cases. *See, e.g., Pennzoil,* 481 U.S. at 4 (interference with acquisition of Getty Oil; jury verdict of $7.53 billion in actual damages and $3 billion in punitive damages); *Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282, 290 (2d Cir. 2003) (affirming award of punitive damages for tortious interference with prospective economic advantage).

---

[1] Meyer & O'Connor, LLC ("Meyer & O'Connor"), a trial and appellate firm focusing on complex commercial litigation, tort and general civil litigation, criminal defense and civil rights litigation, publishes a Quarterly Update that addresses significant legal developments. The Quarterly Update is an informational service for clients, friends and acquaintances of the firm (and attorney advertising) and is not legal advice and does not create an attorney-client relationship with Meyer & O'Connor. *[Handwritten: To intentionally harm me.]*

[2] "Tortious interference with prospective economic advantage" is the title used in some jurisdictions to refer to the tort claim that can arise when one wrongfully interferes with a significant business relationship that has not been reduced to contract. We refer to this tort by this title herein, but it should be noted that some jurisdictions refer to this tort by different titles. *See, e.g., Amaranth LLC v J.P. Morgan Chase & Co.,* 71 A.D.3d 40, 47, 888 N.Y.S.2d 489, 494 (Sup. Ct. App. Div. 1st Dept. 2009)(discussing "claim for tortious interference with business relations" and "complaint alleging tortious interference with prospective economic advantage" in reference to same claim).

---

Attorney advertising material. This material does not constitute legal advice or create an attorney-client relationship with Meyer & O'Connor, LLC. Please direct questions or comments regarding these materials to Timothy P. O'Connor, Meyer & O'Connor, LLC, Suite 3300, 135 South LaSalle Street, Chicago, IL 60603; (e) toconnor@meyeroconnor.com; (p) 312-346-9000.

Case 1:07-cv-02103-LLS   Document 417   Filed 08/09/12   Page 15 of 27
Intellectual Property Crimes: VIII. Theft of Commercial Trade Secrets

Página 1 de 29



# Computer Crime and Intellectual Property Section (CCIPS)

## VIII. Theft of Commercial Trade Secrets

A.      Introduction

B.      The Economic Espionage Act of 1996: 18 U.S.C.§§ 1831-1839

B.1.    Overview of the statute

B.2.    Elements common to 18 U.S.C. §§ 1831, 1832

B.2.a.  Misappropriation

B.2.b.  Knowledge

B.2.c.  Trade secret status

B.3.    Additional 18 U.S.C. § 1831 element: intent to benefit a foreign government, foreign instrumentality, or foreign agent

B.4.    Additional 18 U.S.C. § 1832 elements

B.4.a.  Economic benefit to a third party

B.4.b.  Intent to injure the owner of the trade secret

B.4.c.  Product produced for or placed in interstate or foreign commerce

B.5.    Attempts and conspiracies

B.6.    Potential defenses

B.6.a.  Parallel development

B.6.b.  Reverse engineering

B.6.c.  General knowledge

B.6.d.  The First Amendment

B.6.e.  Advice of counsel or claim of right

B.6.f.  Statutory challenges

B.7.    Criminal forfeiture

B.8.    Civil proceedings

B.9.    Confidentiality and the use of protective orders

B.10.   Extraterritoriality

Select Year: 2006     Go

JUDICIAL BRANCH     JUDGES: GENERAL PROVISIONS

**38.01 Disqualification when judge party; effect of attempted judicial acts.**--Every judge of this state who appears of record as a party to any cause before him or her shall be disqualified to act therein, and shall forthwith enter an order declaring himself or herself to be disqualified in said cause. Any and all attempted judicial acts by any judge so disqualified in a cause, whether done inadvertently or otherwise, shall be utterly null and void and of no effect. No judge shall be disqualified from sitting in the trial of any suit in which any county or municipal corporation is a party by reason that such judge is a resident or taxpayer within such county or municipal corporation.

**History.**--s. 2, ch. 16053, 1933; CGL 1936 Supp. 4155(1); s. 1, ch. 59-43; s. 205, ch. 95-147.

Disclaimer: The information on this system is unverified. The journals or printed bills of the respective chambers should be consulted for official purposes. Copyright © 2000-2005 State of Florida.

Automatically Becomes A witness, Party

Automatically Voids All orders in All CASES

Automatically is Recused not Qualified by using the Unlawful Device of void, invalid, Unconstitutional order which is Fraud on the Court, Treason, A Criminal Act

Automatically becomes A party by not Filing His/Her Yearly financial statement notarized, Her His Conflicts



Published on OpenJurist (http://openjurist.org)

Home > Printer-friendly > Printer-friendly

# 18 USC 2333 - Civil remedies

(a) Action and Jurisdiction.—
Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorneys fees.

(b) Estoppel Under United States Law.—
A final judgment or decree rendered in favor of the United States in any criminal proceeding under section 1116, 1201, 1203, or 2332 of this title or section 46314, 46502, 46505, or 46506 of title 49 shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

(c) Estoppel Under Foreign Law.—
A final judgment or decree rendered in favor of any foreign state in any criminal proceeding shall, to the extent that such judgment or decree may be accorded full faith and credit under the law of the United States, estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

Source URL: http://openjurist.org/title-18/us-code/section-2333

18 U.S.C. 2333 (a)
(b), 18 U.S.C. 2333 (c), 2339 A, 2339 (b)
18 U.S.C § 2 AUTOMATICALLY RENDERS
A DEFAULT, DEFAULT JUDGEMENT,
JUDGEMENT AS A MATTER OF LAW,
FACT, EVIDENCE. F.R.C.P. 50 (a)
CONFESSION OF JUDGEMENT by
SIGNED, WRITTEN CORROBORATED
CONFESSIONS pleading Guilty.
TO ALL PLAINTIFFS CLAIMS AGAINST
ALL DEFENDANTS

>        >        > Criminal Resource Manual 2471

# 2471  18 U.S.C. § 2

The first provision one finds in Title 18 of the United States Code regard
accessories to crime. Title 18, United States Code § 2 now provides:

(a) Whoever commits an offense against the United States or aids, abet
counsels, commands, induces or procures its commission, is punishable
a principal.

(b) Whoever willfully causes an act to be done which if directly perform
by him or another would be an offense against the United States, is
punishable as a principal.

Aider and abettor liability is distinct from accessory after the fact under
U.S.C. § 3. *United States v. James*, 998 F.2d 74, 80 (2d Cir.), *cert. denied*,
U.S. 958, 114 S.Ct. 415, 126 L.Ed.2d 362 (1993). An aider and abettor, unl
accessory after the fact, is punishable as a principal. *Id.*

[updated October 1998]



**AMEinfo.com**

Source: www.ameinfo.com
» Banking

# Arab bank assets hit $2.26trillion

Adnan Yousef, Chairman of the Union of Arab Banks has said that the total assets of banks in the Arab world grew 3.57% to $2.26 trillion in 2009 despite the global financial crisis, Khaleej Times has reported. Addressing the Emirates Bankers' Forum, Yousef said that the total assets of the top 100 Arab banks in terms of assets exceeded $1.5 trillion, deposits reached $1 trillion, total loans amounted $831bn, shareholders equities reached $164bn and net profits reached $24bn.

**Middle East:** Thursday, March 11 - 2010

The Arab banking sector currently comprises 280 commercial banks, 60 Islamic banks and 80 investment and specialised banks.

© 1996-2010 by AME Info FZ LLC / Emap Limited. All rights reserved.

This story was posted by Staff
Thursday, March 11 - 2010 at 11:20 UAE local time (GMT+4)

**Find this article at:**
http://www.ameinfo.com/226452.html

"AMEinfo.com", "AMEinfo.com/fn", "the ultimate Middle East business resource" and "the news you choose" are trademarks of AME Info FZ LLC / Emap Limited. All other products and brandnames mentioned are trademarks or registered trademarks of their respective companies. Replication or redistribution in whole or in part is expressly prohibited without the prior written consent of AME Info FZ LLC / Emap Limited.

# Counterterrorism Blog

## Arab Bank Case Ruling: A Victory for Victims of Terrorism

**By Victor Comras**

It looks like the 6 year old <u>Linde v Arab Bank</u> case may finally move into its trial on the merits phase following a ruling July 12th by US District Court Judge Nina Gershon that:

> "The factual allegations of the complaints sufficiently support an inference that Arab Bank and the terrorist organizations were participants in a common plan under which Arab Bank would supply necessary financial services to the organizations which would themselves perform the violent acts. Administering the death and dismemberment benefit plan further supports not only the existence of an agreement but Arab Bank's knowing and intentional participation in the agreement's illegal goals. No more is required."

The case had been locked in its discovery phase for some time pending rulings on Arab Bank's refusal to provide documentation concerning such financial transfers. Plaintiffs maintained that such documents, if provided, would establish that Arab Bank participated knowingly in this money raising and transferring scheme. Arab Bank's attorneys maintained that they were precluded from providing such documents because of Jordanian and other country bank secrecy laws. The ruling reflects Judge Gershon's determination that the refusal to comply with the court's order that such documents be made available to the plaintiffs pursuant to discovery requests merits legal sanctions against Arab Bank. And, the judge's instruction to the jury that they can draw the above inference from this lack of production of such documents is the appropriate remedy. This ruling is fully in line with legal precedent in such cases of non production of court ordered documents.

The Linde case was brought before the U.S. District Court for the Eastern District of New York in July 2004 by six American families, victims of Palestinian terrorism in Israel during the Al Aqsa Intifada. They sued Jordan's Arab Bank under section 2333 of the Anti Terrorism Act of 1996 alleging that Arab Bank had encouraged such terrorism by disbursing millions of dollars in support payment for families of suicide bombers, which served as a further incentive for attacks.

Section 2333 provides that "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue {in Federal Court} ... and ... recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." The District Court also permitted foreign nationals to join the lawsuit via the Alien Torts Claims Act. Currently, more than 100 families and 700 individuals in the Linde case and related cases are seeking more than $1 billion in damages based on Arab Bank's role in financially supporting terrorist activities. The foreign nationals consist mostly of Israeli citizens but also include Afghani, Argentinian, Australian, Belarusian, Canadian, French, Iranian, Iraqi, Peruvian, South African, Turkmenian, Ukranian, and Uzbeki citizens.

The payments were transferred by Arab Bank to and through several charities that allegedly serve as fronts for Hamas, the Palestinian Islamic Jihad, and Al Aqsa Martyr's Brigade and the Popular Front for the Liberation of Palestine. These funds were originally collected by two special committees established in Saudi Arabia with the stated intention of raising funds for the families of those carrying

Al-Qaeda owes $9.3 billion for 9/11 harm - NYPOST.com        http://www.nypost.com/f/print/news/local/judge_al_qaeda_



Updated: Fri., Oct. 14, 2011, 9:36 PM

# Judge: Al-Qaeda owes $9.3 billion for 9/11 harm

Last Updated: 9:36 PM, October 14, 2011
Posted: 9:36 PM, October 14, 2011

A magistrate judge in New York has recommended al-Qaeda be assessed $9.3 billion for the damage done to properties and businesses in the Sept. 11 attacks.

Federal Magistrate Judge Frank Maas in a ruling Friday sent the recommendation to a district judge presiding over a lawsuit brought by several insurance companies.

The companies in 2003 sued various defendants, seeking damages for the 2001 terror attacks, which demolished the World Trade Center's twin towers. Al-Qaeda never responded to the lawsuit and was found in default in 2006. Maas determined the actual damages and then tripled them as allowed by law.

At this time, the companies were only seeking an assessment of damages against al-Qaeda. The organization founded by Osama bin Laden is blamed for orchestrating the terror attacks.

NEW YORK POST is a registered trademark of NYP Holdings, Inc.
nypost.com, nypostonline.com, and newyorkpost.com are trademarks of NYP Holdings, Inc.
Copyright 2011 NYP Holdings, Inc. All rights reserved. Privacy | Terms of Use

# Summary

Zacarias Moussaoui, members of the Colombian drug cartels, members of organized crime, and some of the former Enron executives have at least one thing in common: they all have federal conspiracy convictions. The essence of conspiracy is an agreement of two or more persons to engage in some form of prohibited misconduct. The crime is complete upon agreement, although some statutes require prosecutors to show that at least one of the conspirators has taken some concrete step or committed some overt act in furtherance of the scheme. There are dozens of federal conspiracy statutes. One, 18 U.S.C. 371, outlaws conspiracy to commit some other federal crime. The others outlaw conspiracy to engage in various specific forms of proscribed conduct. General Section 371 conspiracies are punishable by imprisonment for not more than five years; drug trafficking, terrorist, and racketeering conspiracies all carry the same penalties as their underlying substantive offenses, and thus are punished more severely than are Section 371 conspiracies. All are subject to fines of not more than $250,000 (not more than $500,000 for organizations), most may serve as the basis for a restitution order, and some for a forfeiture order.

The law makes several exceptions for conspiracy because of its unusual nature. Because many united in crime pose a greater danger than the isolated offender, conspirators may be punished for the conspiracy, any completed substantive offense which is the object of the plot, and any foreseeable other offenses which one of the conspirators commits in furtherance of the scheme. Since conspiracy is an omnipresent crime, it may be prosecuted wherever an overt act is committed in its furtherance. Because conspiracy is a continuing crime, its statute of limitations does not begin to run until the last overt act committed for its benefit. Since conspiracy is a separate crime, it may be prosecuted following conviction for the underlying substantive offense, without offending constitutional double jeopardy principles; because conspiracy is a continuing offense, it may be punished when it straddles enactment of the prohibiting statute, without offending constitutional ex post facto principles. Accused conspirators are likely to be tried together, and the statements of one may often be admitted in evidence against all.

In some respects, conspiracy is similar to attempt, to solicitation, and to aiding and abetting. Unlike aiding and abetting, however, it does not require commission of the underlying offense. Unlike attempt and solicitation, conspiracy does not merge with the substantive offense; a conspirator may be punished for both.

An abridged version of this report without footnotes and most citations to authority is available as CRS Report R41222, *Federal Conspiracy Law: A Sketch*, by Charles Doyle.

what we do

change
language: English العربية

Taking on the world's toughest energy challenges

regional

website

# What we do



For more than 100 years, ExxonMobil has proudly worked with countries in the Middle East and North Africa to unlock new energy sources, develop new technologies, and add value along the entire energy chain. Our industry has proven that cooperation in the Middle East and North Africa brings together strengths, maximizing the value of resources for the benefit of all.

ExxonMobil is the world's largest publicly traded petroleum and natural gas company. Our company and its affiliates are present on a global scale. We operate facilities and market products around the world and explore for oil and natural gas on six continents. We lead the industry in almost every aspect of the energy and petrochemical business.

In the Middle East and North Africa, ExxonMobil uses industry-leading technology to address the region's energy challenges. We take great pride in the strong partnerships that we have built up in the region over the years, and we look forward to playing a role in helping the region grow.

For example, we are proud of our joint ventures with Qatar Petroleum and our cooperation with the State of Qatar. Our partnerships are maximizing the value of Qatar's energy resources through the development of new technologies which are opening up new natural gas markets around the world. ExxonMobil established ExxonMobil Research Qatar (EMRQ) as an anchor tenant at the Qatar Science & Technology Park (QSTP) in Education City, Qatar. ExxonMobil shares the Qatar Foundation's objectives to advance science and technology through research and development. EMRQ is conducting research in areas of common interest to the State of Qatar and ExxonMobil, including environmental management and LNG safety.

In the Kingdom of Saudi Arabia, ExxonMobil's interests include petrochemicals manufacturing and petroleum refining. And with our partners, Saudi Aramco and Sinopec, we recently celebrated the start-up of China's first fully integrated refining, petrochemical and fuels marketing joint venture with foreign participation.

In Abu Dhabi, leading-edge technology applied to the Upper Zakum development project is helping recover resources more

# Shell Oil Company

From Wikipedia, the free encyclopedia

**Shell Oil Company** is the United States-based subsidiary of Royal Dutch Shell, a multinational oil company ("oil major") of Anglo Dutch origins, which is amongst the largest oil companies in the world. Approximately 22,000 Shell employees are based in the U.S. The U.S. head office is in Houston, Texas. Shell Oil Company, including its consolidated companies and its share in equity companies, is one of America's largest oil and natural gas producers, natural gas marketers, gasoline marketers and petrochemical manufacturers.

Shell is the market leader through approximately 25,000 Shell-branded gas stations in the US which also serve as Shell's most visible public presence. Shell Oil Company is a 50/50 partner with the Saudi Arabian government-owned oil company Saudi Aramco in Motiva Enterprises, a refining and marketing joint venture which owns and operates three oil refineries on the Gulf Coast of the United States. It also holds 80% of an exploration firm called Pecten that explores and drills in various offshore locations including the oil basin near Douala, Cameroon in cooperation with the French government-owned Elf Aquitaine (now Total).[1]

Shell products include oils, fuels, and card services as well as exploration, production, and refining of petroleum products.[2] The Shell Oil Refinery in Martinez, California, the first Shell refinery in the United States,[3] supplies Shell and Texaco stations in the West and Midwest.[4]

Shell gasolines previously included the RU2000 and SU2000 lines (later there was a SU2000E) but they have been superseded by the V-Power line.[5]

In 1997, Shell and Texaco entered into two refining/marketing joint ventures. One combined their midwestern and western operations and was known as Equilon. The other, known as Motiva, combined the eastern and gulf coast operations of Shell Oil and Star Enterprise, itself a joint venture between Saudi Aramco and Texaco.[6] After Texaco merged with Chevron in 2001, Shell purchased Texaco's shares in the joint ventures.[7] In 2002, Shell began converting these Texaco stations to the Shell brand, a process that was to be

**Shell Oil Company**



| | |
|---|---|
| **Industry** | Oil, energy |
| **Headquarters** | Houston, Texas, US |
| **Key people** | Marvin E. Odum, President |
| **Revenue** | US$ 2.147 billion (2008) |
| **Employees** | 24,008 (2008) |
| **Parent** | Royal Dutch Shell |
| **Website** | Shell USA Official website (http://www.shell.us) |



One Shell Plaza, Shell Oil Company's headquarters in Houston.



Legal News & Research

☐ **Friday, July 08, 2011**

## Federal appeals court reinstates Indonesia lawsuit against Exxon Mobil

Zach Zagger at 3:13 PM ET

[JURIST] The US Court of Appeals for the District of Columbia Circuit [official website] Friday revived a lawsuit [opinion, PDF] brought by 15 Indonesian citizens against the US corporation ExxonMobil Corp. [corporate website] alleging that its wholly-owned subsidiary hired security forces that committed numerous human rights abuses. The US District Court for the District of Columbia [official website] dismissed the lawsuit in 2009. Plaintiffs alleged that ExxonMobil hired members of the Indonesian military as security that it knew had committed human rights abuses in the past. They claim that the security forces committed abuses including genocide, extrajudicial killing, torture, crimes against humanity, sexual violence and kidnapping in violation of the Alien Torture Statute (ATS) [28 USC § 1350] and the Torture Victims Protection Act of 1991 [text]. The plaintiffs appealed that decision and ExxonMobil issued a cross-appeal arguing for the first time that it was immune from the lawsuit since it is not subject to the ATS. The court held that the plaintiffs had alleged sufficient facts to prove ExxonMobil was guilty of aiding and abetting and that "neither the text, history, nor purpose of the ATS supports corporate immunity for torts based on heinous conduct allegedly committed by its agents in violation of the law of nations." One judge dissented arguing that the ATS is meant to apply to conduct within the US or on the high seas, not in foreign countries, and that the ATS does not apply to corporations since it depends on customary international law that does not recognize corporate liability.

The federal courts have recently allowed lawsuits alleging violations of the ATS and TVPA for violence overseas by paramilitary troops hired by US corporations. Last month, a judge for the US District Court for the Southern District of Florida [official website] permitted lawsuits [JURIST report] under the ATS and TVPA against Chiquita Brand International [corporate website] to move forward. Family members of several thousand victims of paramilitary violence in Colombia filed suit against Chiquita Brand International, which has admitted to funding United Self-Defense Forces of Colombia (AUC) [CDI backgrounder], a right-wing paramilitary group in Colombia. In May, the US Court of Appeals for the Ninth Circuit [official website] allowed a lawsuit by Argentine citizens against Daimler AG [official website] for the actions of Mercedes-Benz Argentina [official website, in Spanish] during the nation's 1976-1983 "Dirty War" [GlobalSecurity backgrounder; JURIST news archive]. The suit, which was dismissed by the US District Court for the Northern District of California [official website] in 2005 due to a lack of jurisdiction, alleges that Mercedes-Benz Argentina "collaborated with state security forces to kidnap, detain, torture, and kill the plaintiffs and/or their relatives."

Published on *EarthRights International* (http://www.earthrights.org)

# Wiwa v. Royal Dutch Shell Case History [1]

This case charges Royal Dutch Petroleum Company and Shell Transport and Trading Company (Royal Dutch/Shell) with complicity in human rights abuses in Nigeria. The particular abuses at issue are the November 10, 1995 hangings of Ken Saro-Wiwa and John Kpuinen, two leaders of MOSOP (Movement for the Survival of the Ogoni People), the torture and detention of Owens Wiwa, and the shooting of a woman who was peacefully protesting the bulldozing of her crops in preparation for a Shell pipeline by Nigerian troops called in by Shell. These abuses were intended to suppress the Ogoni people's peaceful opposition to defendants' long history of environmental damage and human rights abuses in the Ogoni region. EarthRights International is co-counsel for the plaintiffs, along with Judith Brown Chomsky, the Center for Constitutional Rights, Paul Hoffman, and Julie Shapiro.

Plaintiffs' action was brought under the Alien Tort Claims Act and also alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). Defendants moved to dismiss both the initial and the amended complaints on the grounds of lack of personal jurisdiction over Royal Dutch/Shell, forum non conveniens (defendants argued that the case should be heard in the Netherlands or England), and lack of subject matter jurisdiction (defendants argued, inter alia, that ATCA did not apply to a corporation and that the claim was precluded by the political question and act of state doctrines, as well as Nigerian law on corporate liability).

On September 25, 1998, Judge Kimba Wood concluded that personal jurisdiction was appropriate in New York, but also ruled that England was a more convenient forum, and therefore that defendants' motion to dismiss should be granted for forum non conveniens.

On appeal to the U.S. Court of Appeals for the Second Circuit, plaintiffs argued that a forum non conveniens dismissal would vitiate Congressional intent to allow plaintiffs' claims to be heard in U.S. courts. Defendants cross-appealed the ruling on personal jurisdiction. In a huge victory for the plaintiffs, the *Court of Appeals on September 15, 2000* reversed the district court's forum non conveniens dismissal, concluding that the United States is a proper forum. The Court also upheld the district court's ruling that jurisdiction over the defendants was proper and remanded the case back to the district court to rule on defendants' other objections to the suit.

Royal Dutch/Shell petitioned the United States Supreme Court to review the Second Circuit's decision, but on March 26, 2001, the Court declined to do so, and let the Second Circuit's decision stand. Royal Dutch/Shell had argued to the Supreme Court not only that the Second Circuit erred in finding that a New York court has jurisdiction over it and

**FedEx Express** ®

**Extremely Urgent**

SO THAT THE BAR-CODE PORTION OF THE LABEL CAN BE READ AND SCANNED. **WARNING: USE ONLY THE PRINTED ORIGINAL LABEL FOR SHIPPING. USING A PHOTOCOPY OF THIS LABEL FOR SHIPPING PURPOSES IS FRAUDULENT AND COULD RESULT IN ADDITIONAL BILLING CHARGES, ALONG WITH THE CANCELLATION OF YOUR FEDEX ACCOUNT NUMBER.

From:   Origin ID: SAPA   504-2555-3989
GEORGE MAY
GEORGE MAY
4 CALLE 2 AVE.
CASA# 269 COL. RIVERA HERNANDEZ
SAN PEDRO SULA,
HONDURAS

**FedEx** Express

Ship Date: 25JUL12
ActWgt: 0.6 LB
System#: 8944048/FWST0716
Account#: S 198311065

REF: INV 20362 KD
DESC-1: PERSONAL DOCS
DESC-2:
DESC-3:
DESC-4:

COUNTRY MFG: HN
CARRIAGE VALUE: 1 USD
CUSTOMS VALUE: 1 USD
T/C: S 198311065
SIGN: GEORGE MAY
EIN/VAT:

SHIP TO:   212-885-0136          BILL SENDER
**THE CLERK OF THE U.S. DISTRICT OF
COURT FOR THE SOUTHERN DISTRICT
OF NEW YORK
500 PEARL STREET**

**NEW YORK, NY 10007**
US



RECEIVED JUN 2 6 2012 POST OFFICE

IP ENVELOPE

TRK#  **4807 2511 1332**   FORM 0430

EWR

**10007**   -NY-US
ISR

**XA PCTA**

RECEIVED 2012 JUL 26 SDNY PRO SE OFFICE





The Warsaw Convention may apply and will govern and in most cases limit the liability of Federal Express for loss or delay of or damage to your shipment. Subject to the conditions of the contract.

CONSIGNEE COPY - PLEASE PLACE IN POUCH