CacQfooC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     VIACOM INTERNATIONAL, INC. et
3    al.
                    Plaintiffs,
4            v.                            07 CV 2103 (LLS)
     YOUTUBE, INC. et al.
5                 Defendants.
     ------------------------------x
6    THE FOOTBALL ASSOCIATION PREMIER
     LEAGUE LIMITED, et al.
7                 Plaintiffs

8            v.                            07 CV 3582 (LLS)

9    YOUTUBE, INC. et al.

10               Defendants.

11   x------------------------------x

12                                        New York, N.Y.

13                                        October 12, 2002
                                          2:30 p.m.
14
     Before:
15
                        HON. LOUIS L. STANTON,
16
                                          District Judge
17

18

19

20

21

22

23

24

25

CacQfooC

APPEARANCES

SHEARMAN & STEARLING LLP
    Attorney for Plaintiffs Viacom
STUART J. BASKIN

JENNER & BLOCK LLP
    Attorneys for Plaintiff
SUSAN J. KOHLMANN
SCOTT B. WILKENS

PROSKAUER ROSE LLP
    Attorneys for Premier League Plainiff
CHARLES SIMS
WILLIAM M. HART

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
    Attorneys for Plaintiffs co-counsel Football League
JEREMY P. ROBINSON

QUINN EMANUEL LLP
    Attorneys for Defendants
ANDREW SCHAPIRO


WILSON SONSINI GOODRICH & ROSATI PC
    Attorneys for Defendants
DAVID H. KRAMER
BRIAN N. WILLEN – Of Counsel

CacQfooC

1          (In open court)

2          THE COURT:  Familiar faces.  Welcome back.

3          Where do we stand?  Mr. Schapiro?

4          MR. SCHAPIRO:  Your Honor, the Second Circuit, after

5     sending the case back, asked what we thought were four fairly

6     clear questions or sent the case back for resolution of four

7     discrete issues, and the Court then crystallized that even

8     further in its letter to the parties of a few months ago.

9          The Second Circuit asked the Court to determine

10    whether on the current record Youtube had knowledge or

11    awareness of any specific infringement.  We think that the

12    plaintiffs have been given more than enough opportunity in the

13    flurry of letters to point to some specific clips in suit of

14    which Youtube had actual or red-flag knowledge.  They haven't

15    been able to muster it.  They seem to want to be able to ignore

16    the direction to point to specific infringements.

17         Second, the Second Circuit said that this Court should

18    determine whether on the current record Youtube willfully

19    blinded itself to specific infringements.  Again, we'll rest on

20    the letters here, but there's been a back-and-forth with many

21    letters written, and the plaintiffs seem intent on trying to

22    resurrect their general knowledge standard rather than

23    answering the question posed by the Second Circuit and this

24    court.

25         Third, the Second Circuit asked this Court to

CacQfooC

1    determine whether Youtube had the right and ability to control

2    infringing activity within the mean of Section 512(c)(1)(B),

3    and, again, the parties have laid out their positions in

4    letters before this Court, and we do not believe that the

5    plaintiffs have made any showing that would allow them to

6    survive a renewed summary judgment.

7            Then, finally, the Second Circuit asked this Court to

8    determine whether any clips in suit were syndicated to a third

9    party, and, if so, whether that syndication occurred by reason

10   of storage at the direction of the user within the meaning of

11   the statute.

12           In short, we've had this exchange, it seems like at

13   the end of the day, we're still, to some extent, talking past

14   each other, and, so, waiting for guidance from your Honor,

15   because the Second Circuit said that after we've hashed some of

16   this out, the Court should permit renewed motions for summary

17   judgment as soon as practicable.  That's from the Second

18   Circuit decision.

19           We think now is practicable, and so we think that's

20   where we need to go, but, of course, we would probably require

21   some indication from your Honor as to which of us is

22   understanding the Second Circuit's ruling accurately.

23           THE COURT:  Baskin.

24           MR. BASKIN:  Good afternoon, your Honor.  I will also

25   happily stand on the papers we presented to the Court in quite

CacQfooC

1    detailed --

2                THE COURT:  A little louder.

3                MR. BASKIN:  We presented to your Honor quite detailed

4    analysis of all four issues.  Of course, it's in the context of

5    summary judgment, so that, as your Honor knows, the standard is

6    all evidence has to be weighed in favor of the plaintiffs for

7    this purpose.

8                Our proposition to the Court -- and, again, I'm happy

9    to stand on the papers we submitted, which goes into it in

10   substantial detail, that this is not even a close case, and,

11   from a summary judgment point of view, there is no chance,

12   especially since the Second Circuit particularized that the

13   issues, specifically the issues of willful blindness, and the

14   issue of writing ability to control are factual issues which,

15   in large measure, turn on issues of intent, so they are

16   quintessentially issues that are not subject to summary

17   judgment.  We think that there's no chance of a summary

18   judgment ruling here.  We understand your Honor may well have

19   to give them the opportunity to move for summary judgment.  We

20   will answer.

21               We think, as your Honor knows, however, we should not

22   delay this case progressing in an orderly fashion towards

23   trial, and at the same time that we brief summary judgment or

24   they brief summary judgment, we believe your Honor should put

25   us on a quite accelerated schedule, accelerated in the sense a

CacQfooC

schedule with a clear trial date in mind; that we try to get to

trial within the next nine, ten, eleven months; and that you

have parties, obviously, with a lot of resources and a lot of

availability here, and the parties are perfectly capable of

proceeding on multiple tracks.  So we believe, your Honor, we

should have -- if summary judgment should proceed, let it

proceed, but since we think the likelihood of anyone getting

summary judgment on this record is, quite frankly, remote,

particularly where issues of intent are the driving issues,

your Honor should go further and should put us on an orderly

path to trial.

          THE COURT:  Mr. Sims.

          MR. SIMS:  Your Honor, I largely agree with what

Baskin had to say.  I would add that in light of the way the

Second Circuit approached these issues, class plaintiffs have

concluded that they will not move for summary judgment.  So

that should make things easier.  We understand Mr. Schapiro

intends to, and we will, of course, respond.

          We have indicated to the Court in the letters that

there is a small amount of discovery that we do want on the

issues that the Second Circuit left open for discovery.  We

don't see any reason why that can't be done consistent with --

          THE COURT:  Why hasn't it been done?  It's been months

since we met.

          MR. SIMS:  Your Honor --

CacQfooC

1        THE COURT:  There is no stay of discovery in effect.

2        MR. SIMS:  It was our understanding that you had

3   control over how we were going to proceed.  You asked for these

4   letter briefs.  We think we can get our requests in within ten

5   days or a week even and we don't see why that needs to

6   interfere with the schedule that would otherwise be reached.

7   We're prepared to --

8        THE COURT:  Baskin, I take it you are complete on

9   discovery?

10        MR. BASKIN:  Your Honor, the only discovery we ask

11   is -- the Second Circuit proposed that for reasons of the

12   storage issue, that we have to identify which of our --

13        THE COURT:  The syndication issue.

14        MR. BASKIN:  Yes, the syndication issue.

15        -- which of our clips were in fact syndicated.  It's a

16   clear factual, easy factual inquiry.  The only ones who have

17   the record are Youtube.  So, we just want their assistance in

18   identifying which of our clips they in fact syndicated, so if

19   your Honor concludes, as we think you will, that syndication

20   remains a live issue for trial, we can identify which of our

21   clips were in the process of being syndicated.  Beyond that, we

22   need no discovery, your Honor.

23        MR. SIMS:  That, your Honor, is one of the --

24        THE COURT:  Are you contemplating doing that discovery

25   after the motions for summary judgment if they're denied, or is

CacQfooC

1    there something you need for the motions for summary judgment?

2             MR. BASKIN:  Either way, your Honor.  We could do it

3    after summary judgment once the motions, as we hope, are

4    denied.

5             All we need for trial, we need to be able to

6    identify -- if we prevail on the storage issue, as we think we

7    will, for purposes of trial, we need to identify which of our

8    clips are on their system.  Only they have that information.

9             So, we are happy to wait and do that after the summary

10   judgment briefing, or, frankly, I think it's discovery we can

11   do simultaneously with the briefing.  I think it will take 30

12   days tops to compile that data.  I don't think it should be an

13   issue that slows down the Court's schedule --

14            THE COURT:  I would have thought that any necessary

15   discovery would have been accomplished by this time by able

16   counsel proceeding to get what they thought they needed, and if

17   there was some objection to it or you thought it wasn't

18   allowed, I'd hear about it.

19            MR. SIMS:  Your Honor, given how things had been

20   organized here, it never occurred to us that we were able to go

21   forward with that.  I think we would have had a response from

22   Mr. Schapiro that the Court had concluded discovery years ago.

23            So, if I misunderstood, we're wrong, but we think it

24   can be done expeditiously.  There are only five pretty targeted

25   matters that we want and we think if we can get responses back

CacQfooC

1    within 45 days, it won't delay the briefing.

2              THE COURT:  What's your response on discovery,

3    Mr. Schapiro?

4              MR. SCHAPIRO:  Your Honor, there were two years of

5    discovery in this case, 30 million pages of documents

6    exchanged, 148 depositions.

7              THE COURT:  Oh, look, that was true before this Court

8    of Appeals' opinion.  The Court of Appeals wrote what it wrote

9    bringing us up into the 21st Century.

10             What is your position on discovery with the next round

11   of summary judgment briefing in view?

12             MR. SCHAPIRO:  Our position is that on the syndication

13   question, once we receive guidance from the Court about which

14   party is understanding the Second Circuit's position on

15   syndication correctly, that we should be able to answer a few

16   interrogatories if Viacom wants to send them to us and show

17   them, we think we can establish to their satisfaction that no

18   clips in suit were manually delivered for syndication in the

19   way that the Second Circuit was thinking.  We can answer that

20   question for them.

21             Mr. Sims in the class, in one of its earlier

22   letters --

23             THE COURT:  In other words, you want to apply the

24   limiting word manually?

25             MR. SCHAPIRO:  Yes, your Honor.

CacQfooC

```
 1              THE COURT:  Baskin thinks that's immaterial.

 2              MR. SCHAPIRO:  That's why we think that before we

 3    start down the path of discovery, we would need your Honor to

 4    weigh in and clarify that issue.  We think it's quite clear,

 5    but there is a gap between the parties.

 6              THE COURT:  And with respect to Mr. Sims?

 7              MR. SCHAPIRO:  Mr. Sims, as I understand it, based on

 8    one of the early letters they sent, wants to go into discovery

 9    about all sorts of things that have nothing to do with any

10    clips in suit.

11              He wants to know about all these clips in the

12    so-called Otto declaration that they submitted, none of which

13    are clips in suit, all of which post date the time at issue in

14    this case.

15              They were asking about things that we do in Germany in

16    response to a German court order that's on appeal.  So, our

17    sense is that the class's proposed discovery is anything but

18    targeted.

19              Viacom's request for discovery on syndication do seem

20    targeted, and I'm sure if we meet and confer, assuming that

21    your Honor gives us guidance that allows us to be talking about

22    the same thing, I'm sure we can work out with Viacom targeted

23    discovery with a schedule which presumably would be with the

24    interrogatories.

25              THE COURT:  Mr. Sims.
```

CacQfooC

1              MR. SIMS:  Your Honor, I have five items here.  I

2    would suggest that we propound them to Mr. Schapiro, and if he

3    has a problem, we could try to work them out.  Otherwise, we

4    can come to you or to a magistrate.  But they're five items.

5    It's not millions of pages we're seeking.  It's not lots of

6    depositions we're seeking.

7              I do want to correct a misstatement that has been made

8    twice, which the works identified in the Otto declaration are

9    not in the lawsuit.  To the contrary, they are exactly the same

10   works in suit that we have been suing about for five years that

11   we now find out are still sitting in Youtube never having been

12   taken down and are sitting in Youtube-generated channels.

13             THE COURT:  Why don't you ask they be taken down if

14   you object to that?

15             MR. SIMS:  Well, I would have thought, number one,

16   that our letters were perfectly clear requests for those to be

17   taken down.  And, number two --

18             THE COURT:  Excuse me?  What was that?

19             MR. SIMS:  The letters that we've sent make perfectly

20   clear our position and identified precisely where they were.

21   They comply with all of the requirements of --

22             THE COURT:  Of notice.

23             MR. SIMS:  -- of that.  In addition, the point we're

24   trying to make -- one of the points in the lawsuit is that once

25   we send take-down notices, they have obligations.  What they're

CacQfooC

1    doing in Europe is they take the material identified in a

2    take-down notice, they make a reference file of it, and exclude

3    additional copies of that same work at the threshold.  Our

4    point is that's what they should be doing here.

5           The other declaration lists and provides links, if

6    your Honor wanted to see them, to exactly the works that we

7    have been suing about for five years that are still being

8    distributed to the public by Youtube on channels which they

9    admit -- because they create them -- are the most popular

10   material available.  They only create a channel when it's

11   something that's particularly popular and interesting to

12   people.

13          So, they are continuing to use the very works in suit.

14   This is not about new works.  We're not suing about new works.

15   We understand the Court's ruling years ago on that point.  But

16   these are the same old things that are still being shown on

17   Youtube, and, of course, we're allowed to talk about it in

18   connection with summary judgment and point out that they

19   have --

20          THE COURT:  You say they appear on some list of works

21   in suit that you have filed in this case.

22          MR. SIMS:  Absolutely.

23          THE COURT:  All right.

24          MR. SCHAPIRO:  Your Honor, either unintentionally or

25   artfully, Mr. Sims is conflating works in suit with clips in

CacQfooC

suit, OK?  What is at issue in this case are clips, and both

this court and the Second Circuit made that clear.  Every clip

in suit -- the Second Circuit's decision says this; your Honor

decided it.  The record is closed on that.  Every clip in suit

has been taken down.

A work in suit is a show, a television show.  So, the

show might be Sponge Bob Square Pants or it's a particular

episode of a show.

A clip is the excerpt that was posted to Youtube.  So

I need to make two things very clear.  Every clip in suit was

taken down before the Court issued its first summary judgment

ruling in this case.

Second, as soon as they sent us the Otto declaration,

we took down everything identified in the Otto declaration.

They should have sent it to us years ago, but it ultimately

doesn't matter because whatever they might say about what we're

able to do in terms of identify -- let me back up for a moment.

The class has always taken the position that we should

extrapolate, and once we take down one version of something

that belongs to them, we should find or identify other versions

and take them down.  That's what Mr. Sims is talking about

here.  And there is no reading of the Second Circuit's decision

in which that would be relevant to any renewed summary judgment

papers.  So that discovery would all be for naught.

MR. SIMS:  Your Honor, in the first place, most of

CacQfooC

```
 1    these re-posts are not different versions.  They are the same

 2    audio or the same audio and video precisely -- maybe a little

 3    longer or a little shorter -- but the same, and so one of our

 4    clients, for example, is suing on the song Smile because they

 5    wrote the song Smile.  And a copyright lawsuit is about

 6    centrally the plaintiff's work which is being sued about, and

 7    the plaintiff comes into the court and says, "You're copying

 8    this work."  The fact that they are continuing to copy the work

 9    is, of course, always relevant to injunctive relief at a

10    minimum, and also to the questions of control, and to the

11    question of willful blindness.

12          If they have our works that we've already sent them

13    take-down notices for, and they're identifying those works so

14    precisely that they are matching advertisements to them or

15    collecting all of these x-ray dog songs, for example, into

16    channels that they are finding, our submission is -- and

17    nothing that the Second Circuit or this Court has indicated is

18    to the contrary -- that that will allow a jury to find control

19    plus sufficient to defeat the safe harbor or willful blindness

20    because if they can find it for purposes of matching an ad or

21    putting in a channel, then they're consciously avoiding that

22    knowledge by pretending that they don't know it's there for

23    copyright enforcement purposes.

24          MR. SCHAPIRO:  Your Honor, Mr. Sims has again used the

25    word works in suit at every turn, but these are different --
```

CacQfooC

1          THE COURT:  Mr. Schapiro, I want to understand what

2     counsel is saying, but I don't want it to derail some other

3     important questions we have to discuss.  If I try to carry too

4     many points in my mind when I should be thinking about the

5     major things, I will not do a good job on either -- the major

6     or the minor things.

7          I think that deferring on these small issues for the

8     moment, Mr. Sims, you raised the question or you bring

9     tacitly -- there was a suggestion in I think some of your

10     correspondence, but certainly in some of the correspondence,

11     that the Premier League action you thought might be decoupled

12     from this action and possibly deferred until the outcome of, I

13     guess, the motions or if you have litigation to final judgment

14     of this action.

15          Do I misunderstand that that suggestion was floated;

16     And, if so, what is your present thinking about it?

17          MR. SIMS:  Your Honor, it had been our view months ago

18     that if the discovery we wanted would have made a trial on the

19     schedule that Viacom is seeking impossible, we might have

20     stepped back.  As we now think about it, looking at the small

21     amount of what we want and the development of the theories on

22     both sides in the briefing, I guess our position now is we

23     don't think that the small amount of discovery we want ought to

24     have that impact.  So, we're not looking to be decoupled.  We

25     would have acquiesced in it if necessary, but I don't think

CacQfooC

1      it's something we're looking for.

2              THE COURT:  Isn't a consequence of that position that

3      we should consider whether the motion for class certification

4      should or should not be addressed before the motions for

5      summary judgment?

6              MR. SIMS:  Your Honor, for the same reasons why the

7      Court didn't address the class certification before, our view

8      is that the briefing on the merits on their summary judgment

9      motion -- not really the merits, but a defense -- would be

10     much --

11             THE COURT:  It can hardly be for the same reason

12     because the last time the reason was I was dismissing all those

13     portions of the case in which the class then would have had any

14     viable interest.  That mooted the certification question.

15             MR. SIMS:  Yes.

16             THE COURT:  You don't want to argue that reason, I

17     don't think.

18             MR. SIMS:  We do think that the crystallization of the

19     issues presented by the Second Circuit can most efficiently

20     happen; and, frankly, we read the Second Circuit's decision as

21     implying that the Court should turn as the first order of

22     business to the summary judgment motion that certainly --

23             THE COURT:  I don't see any such direction.

24             MR. SIMS:  Well, they use the word expeditiously.

25     They assume that it would go forward right away.

CacQfooC

1              (Pause)

2              MR. SIMS:  The other point, your Honor, is that the

3     decision that you make on the merits of their defense will

4     really shape how we would want to pitch class certification or

5     not so that in some ways that becomes an issue which is a lot

6     easier to handle once there is more clarity on what the scope

7     of these defenses is.  So, our suggestion would be that we all

8     work hard on their summary judgment motion and turn to --

9              THE COURT:  Well, I thought you were going to pass on

10    it.

11             MR. SIMS:  No, Mr. Schapiro is not going to pass.

12    He's going to move for summary judgment, and our position would

13    be that in the course of deciding that, it will be a lot easier

14    and there will be much more focused briefing on class

15    certification than there would otherwise be.

16             THE COURT:  Mr. Schapiro?

17             MR. SCHAPIRO:  Your Honor, we set forth our position

18    on this in our letters.  We think that contrary to what

19    Mr. Sims has just said, that whatever decision your Honor would

20    ultimately make on summary judgment, no class can be certified

21    here, and that that is going to be the ultimate ruling.

22             It's within your Honor's discretion to decide, I

23    think, what's the most efficient way to order it, but as we

24    stated in our letters, we thought that it's ripe for

25    consideration now and that that would be efficient.

CacQfooC

1              MR. BASKIN:  Your Honor, may I just be heard?

2              THE COURT:  Sure.

3              MR. BASKIN:  I enjoy being a bystander, by the way.

4              THE COURT:  Excuse me?

5              MR. BASKIN:  I said, I enjoy listening to others

6    argue.  It sharpens my skill set.

7         I don't care, your Honor, whether -- happy to brief

8    summary judgment in conjunction with the class; happy to

9    decouple them if that becomes necessary; and, yet, as your

10   Honor knows, these actions are not consolidated.  We were

11   careful not to do that precisely because we do not want,

12   obviously, the class's action to slow us down.  As long as we

13   can work in tandem, that's fine.  If summary judgment proceeds

14   in tandem, that's fine with us.  If you want to go a different

15   way, that could be worked out between you and the other

16   parties, but our goal is to have our matter, which has been

17   here awhile, to proceed to trial as rapidly as possible.  And

18   these are not, as I said, consolidated lawsuits intentionally

19   for that reason because we understood there someday might be a

20   need to decouple the lawsuits once discovery got completed.

21             THE COURT:  So, in short, your position is you'd like

22   your trial as quickly as possible.

23             MR. BASKIN:  Exactly, your Honor.  Once your Honor

24   rules on summary judgment --

25             THE COURT:  And you are in disfavor of anything that

CacQfooC

1  might slow it down.

2          MR. BASKIN:  Correct.

3          THE COURT:  OK. I got that.

4          MR. SIMS:  Your Honor, in just recalling the class

5  certification briefing, it was full of the merits, and it was

6  full of different branches of the merits because it was unclear

7  which of their many directions the Court might go with respect

8  to what these various defenses mean, what the elements of them

9  mean.  So, it would really be much more efficient and certainly

10 much less likely to delay things if the class certification

11 briefing were to happen afterward.  If the Court were insistent

12 on class certification earlier, I would actually want to talk

13 to my clients about decoupling.  Maybe at that point it would

14 make more sense, but I don't have an answer now because I would

15 need to talk to clients about it.

16         THE COURT:  Well, when you talk to them about

17 decoupling, I would suggest that that concept does raise other

18 issues on which you would take to take position after

19 consideration, such as whether the whole case is stayed or

20 whether any discovery in it should continue, and about whether

21 the motions for certification should be stayed or should be

22 decided before any treatment about decoupling because after the

23 motion for certification is made, there might not be any class

24 to worry about, which, again, goes back to whether the

25 certification motion should be made before the renewed summary

CacQfooC

1    judgment motion.

2            Seeing it abstractly -- because that's the only

3    position I'm able to function in; I don't know enough about the

4    considerations to see it any other way -- an observer such as

5    myself would take note of the federal rules' preference that

6    the class questions be decided promptly and near the outset of

7    the litigation, which has now gone through one summary judgment

8    and a trip to the Court of Appeals, and it's facing another

9    round, one might say isn't it about time we knew whether there

10   was a class or not.

11           Logically, there is a good deal of sense, it seems to

12   me, that before embarking on summary judgment briefing and the

13   great amount of work that involves, it might be useful to know

14   whether there was a class or not.  And that may also involve a

15   certain amount of public interest that the facilities of all

16   the counsel and the Court are not wasted on debating questions

17   which are moot if there is no class.  And, frankly, on the

18   presentations of the parties and the review of the briefs on

19   the certification submitted the last time around, the motion to

20   not certify the class is non-frivolous.

21           MR. SIMS:  Your Honor, the one thing that's come to

22   mind while you were speaking is that as you may or may not

23   know, in one of the Google Books cases, Judge Chin, acting as

24   the District Court, did certify a class, and Google took that

25   decision on a permissive interlocutory appeal.  They applied

CacQfooC

1   for an interlocutory appeal to the Circuit, and the Circuit

2   granted review of that, quite unusually.

3          So, pending now, and being briefed sometime in the

4   future, I don't know whether you know the schedule or not, is

5   exactly the question of class certification in a copyright

6   case, and there are a lot of similarities.  So, the fact that

7   the Circuit is in the midst of thinking about that problem and

8   will come up --

9          THE COURT:  Is the class sought to be certified in

10  that case similar to the class sought to be certified here?

11         MR. SIMS:  It's a case in which Google copied millions

12  of books, and the plaintiffs are authors claiming that their

13  books were copied.  Judge Chin, in a very interesting decision

14  and acting as a district court Judge -- although he was already

15  on the bench -- did certify, but on the other hand, quite

16  unusually, the Circuit has agreed to hear that.  So, it may

17  well be that it would make more sense to get the Second

18  Circuit's views and controlling decision on that very subject.

19         THE COURT:  Well, but would it be controlled?

20         MR. SIMS:  Well, I would think that what the Circuit

21  would have to say about class certification in a copyright case

22  where the plaintiff class are various copyright holders would

23  be, if not controlling, certainly highly influential and

24  useful, and by far the leading authority on that.

25         THE COURT:  Well, this case arises under the Digital

CacQfooC

1   Millennium Copyright Act.  Was that act involved in Judge

2   Chin's case?

3           MR. SIMS:  No, but both cases are fundamentally

4   copyright infringement case.  The DMCA does present a defense,

5   to be sure, whereas the other case I think is not a DMCA case,

6   but the Circuit has never written about copyright infringement

7   class actions before.  As I read the application for the

8   interlocutory appeal and the apposition, I do think that

9   whatever the Court says there will be highly meaningful here.

10          THE COURT:  Look, inherent in the concept of the class

11  in this case is that they all have similar rights arising out

12  of a rather broad construction of the concept of notice.  That

13  invokes the Digital Millennium Copyright Act, and I don't think

14  you can sensibly consider class coherence or even the existence

15  of the class's right without looking at the Digital Millennium

16  Copyright case; and a case that decides general copyright law

17  without attention to this particular subsection of statutory

18  modification of the matters subject to that act, I don't see

19  how it could be controlling.  It might be interesting.

20  Anything the Court of Appeals says in the area is interesting,

21  but the process of controlling seems to me a long way away.

22          If I allowed you to speak, Mr. Schapiro, what would

23  you say?

24          MR. SCHAPIRO:  I would say your Honor that the Books

25  case is a totally different case, as your Honor -- I was rising

CacQfooC

1    to point out what your Honor already said; that was why I sat

2    down again.  This is a Digital Millennium Copyright Act case,

3    the case before your Honor.  The Books case has nothing to do

4    with that.  It is certainly the case that various Courts of

5    Appeals, including our own, may be considering various cases

6    that bear in one way or another on issues of class

7    certification at any given time, but it is not going to be

8    determinative of the outcome of this case.

9         What we think probably will be determinative here is

10   the U.S. Supreme Court's intervening decision in the *Walmart v.*

11   *Dukes* case, which I think makes the bar a lot higher for the

12   plaintiff to get over.

13        THE COURT:  Yes, you put great weight on that in your

14   correspondence, it drove me to read it.  What do you see as its

15   application to this case?

16        MR. SCHAPIRO:  When we went through the first round of

17   class certification briefing, the class rested its arguments

18   primarily on the suggestion that the issues in this case were

19   generalized issues that could be decided in a generalized way,

20   and they were able to make those arguments because the Court of

21   Appeals had not yet ruled in this case that the type of

22   knowledge required is knowledge of specific infringements.  And

23   Wal-Mart --

24        THE COURT:  The individuals whose employment was

25   individually affected by the practices.

CacQfooC

1          MR. SCHAPIRO:  Correct, your Honor.  Well, so *Wal-Mart*

2     *v. Dukes* now makes clear that where you have a need for

3     individualized inquiries of a nature that I think are plainly

4     present here after we view this case in light of the Second

5     Circuit's interpretation of this case, that you can't certify a

6     feasible class.

7          Whatever class certification briefing happens, whether

8     it's now, as we think it should be, or down the road, we think

9     it could be done very simply and efficiently by simply

10    supplementing the briefs that the parties put in originally

11    with an additional submission that takes into account

12    intervening law, whether it's *Wal-Mart v. Dukes* or the Books

13    case or anything else that either party wants to cite and the

14    Second Circuit's reading of the DMCA as it applies here.  That

15    would be a very efficient way to go forward and decide class

16    certification if the court agrees with the position that we've

17    taken about the timing.

18          THE COURT:  What were your last two words?

19          MR. SCHAPIRO:  Pardon me?

20          THE COURT:  What were your last two words?

21          MR. SCHAPIRO:  If the Court agrees with us with the

22    position we've taken about timing of class certification.

23          THE COURT:  You think it's about time, is that what

24    you said.

25          MR. SCHAPIRO:  I didn't say that, but I think that.  I

CacQfooC

1   said about the timing.

2              THE COURT:  I see.

3              (Pause)

4              THE COURT:  Let's go back for a moment to the topic of

5   syndication, not because I particularly want to discuss

6   syndication, but because it illustrates -- I guess it's a

7   dilemma that's hard to -- I don't know the right word -- in my

8   thinking that affects a great deal of the management of this

9   case, and I think it really has to be discussed with counsel

10  and probably now.

11             The reason that the question about syndication comes

12  up is because counsel don't know which way I would interpret

13  what the Court of Appeals said on the topic.  Whether the clips

14  in issue are restrained, restricted to those that were manually

15  handled or, as the plaintiffs put it, that syndication is

16  syndication and the way it was done is immaterial to the

17  thought and the outcome of the claim.  That issue is one that

18  obviously it would be useful to have any thinking on at around

19  this stage of the case; and that is also true about the great

20  question about the degree of specificity required to be applied

21  to such evidence as the Karim memorandum or willful

22  blindness -- and let me pause, I'll come back to willful

23  blindness -- and the other topics left open for re-visitation

24  by us all after the Court of Appeals' opinion.

25             With that, I think out of the Karim memorandum, as

CacQfooC

analogously involved in the willful blindness considerations,
it presented the fundamental question:  Willful blindness to
what?  Karim's memorandum gave notice of what?  In each case
there is a desire by the plaintiffs to say, well, it gave
notice to infringements in concrete matters at the minimum,
and, therefore, the defendants were willfully blind or were
informed by Karim to the specific titles that were being
infringed, and all they had to do was go and take it down.  I
may be oversimplifying it, but that thought runs through the
plaintiff's submissions in the case.

        The defendants say, oh, no, it's well and good to say,
as Karim did, "clips of the following well-known shows can
still be found:  Family Guy, South Park, MTV, Cribs, Daily
Show, Reno 911, The Dave Chappelle.  This content is an easy
target," and so forth.

        The plaintiffs say, well, there you are, there's the
name of the show and the confession or claim that it's riddled
with infringing matter; take it down.

        But if there were to be a conversation by the
recipients of the Karim memo with Mr. Karim, you might think it
would go along something like this:  "Well, Karim, we agree
with you; we understand what you say.  Tell us where those
clips are located, and we'll take them down."

        And he says, "Oh, gee, I found them browsing.  They're
all over the place.  It's stuff we ought not to be showing."

CacQfooC

1      My point is, the language in the memo, rather likely

2   notices to which the class plaintiff's point, is perhaps not as

3   specific as a quick reading of it might make it appear.   The

4   Court of Appeals said, "A reasonable juror could conclude from

5   the March 2006 report that Karim knew of the presence of

6   Viacom-owned material on Youtube since he presumably located

7   specific clips of the show in question before he could announce

8   that Youtube posted the content as of today.   A reasonable

9   juror could also conclude that Karim believed the clips he

10  located to be infringing, since he refers to them as blatantly

11  illegal, and that Youtube did not remove the content from the

12  web site until conducting a more thorough analysis."

13      Well, this leaves a point that is quite central to the

14  case following remand:  Is Karim's memo sufficiently specific

15  to impose a duty to locate the actual clips that Karim located

16  and their brethren insisted and take them down or does it

17  require further steps before those specific locations can be

18  made that is that specific location the statute talks about.

19      I read your submissions very carefully.   I thought

20  about it a great deal, as you would expect me too, and I formed

21  at least preliminary views on what the proper rule should be.

22  On the other hand, that brings me to the dilemma.   My dilemma

23  is, I'm not only not in, I'm forbidden to enter upon the

24  business of giving advisory opinions, and yet I feel it would

25  be helpful in this case in some way, but there are other

CacQfooC

 1   considerations:  Proper procedure, proper presentation of

 2   positions for appeal and perhaps the paramount benefits of

 3   following a well-worn procedural path so people know what to

 4   expect, but I share with you my view that most of these

 5   questions that are presented turn on that concept or its close

 6   brothers or cousins in this record.  And I would like your

 7   thoughts on what the best way is to proceed.

 8        That brings me back to the specific question of

 9   syndication because this also runs through the presentations on

10   summary judgment.  I can't really tell you which of the views

11   of the scope of discovery and what is in issue in syndication

12   without understanding more about what syndication is.  You all

13   know, but I don't, and in looking in the proposed factual

14   submissions of the parties on the motions, I'm not given the

15   kind of wisdom about what syndication is that it would help me

16   to understand the issues about manual or electronic management.

17        Now, of course I can read the Court of Appeals'

18   opinion and try to analyze what the judges had in mind in their

19   selection of words, but the process is healthier on the whole

20   if I give respect to their words but approach the question of

21   what is the proper rule with respect to syndication on a better

22   understanding of syndication and an independent analysis of

23   what should be done bearing in mind what they said about it.

24        I might conclude by saying you see that briefing has

25   been too conceptual, it's not been anchored enough in the

CacQfooC

1    evidence about the clips in suit to allow the kind of

2    discriminating ruling that the case deserves.  That leads me to

3    think that on the briefing on the motions for summary judgment

4    there should be, at least in form of an appendix, a statement

5    for each clip or work in suit.  What precise information was

6    given to or reasonably apparent to Youtube identifying the

7    location or cite of the infringing matter?  And how does that

8    information square with the requirements of the statute?

9         And a second statement:  What would Youtube have to do

10   in addition to locate and remove the infringing matter

11   disregarding the use of its own non-standard resources, because

12   the Court of Appeals, I think, excluded those.  It's that type

13   of concrete information which would allow well-based, even if

14   wrong, determinations have asked of the legal status of that

15   claim.

16        So I throw myself on your mercy.  What do you want me

17   to do?

18        MR. SCHAPIRO:  Your Honor, we would be prepared to go

19   ahead and submit --

20        THE COURT:  Let me just refer to the words of the

21   Court of Appeals on willful blindness.  The holding is

22   concisely stated:  "Because the statute does not speak directly

23   to the Willful Blindness Doctrine, Section 512(m) limits, but

24   does not abrogate the doctrine.  Accordingly, we hold that the

25   Willful Blindness Doctrine may be applied in appropriate

CacQfooC

circumstances to demonstrate knowledge or awareness of specific

instances of infringement under the DMCA."

          One may well ask, and Mr. Sims will be happy to

answer, how that leverage opens the field delineated by

Mr. Karim to successive generations of works submitted that

should have been caught by those reading Mr. Karim's

memorandum.  I think he has his work cut out for him, but he's

very, very able.

          Mr. Schapiro?

          MR. SCHAPIRO:  So, your Honor, we will, of course,

follow whatever guidance the Court has.  We would be prepared

to move to summary judgment briefing and to include whether

it's as an appendix or just as part of the briefing, answers to

the two questions that your Honor posed.

          THE COURT:  Well, in your view they are two short

answers:  None.  Second answer:  None.

          MR. SCHAPIRO:  You're right about that, your Honor.

But we think they're the right questions also, it won't

surprise you to learn.  And we could meet and confer with the

plaintiffs to come up with a schedule that seems workable.

We're more than happy to have it be a short schedule.  I think

the question is still before the Court about class

certification because the parties have made their positions

clear.

          THE COURT:  I think that the correct answer is it

CacQfooC

1    probably ought to be now.

2            MR. SCHAPIRO:  OK.

3            THE COURT:  I wouldn't want to rule finally without

4    giving -- I don't want to take anybody by surprise.  If that's

5    a wrong conclusion, so inform me in the next ten days in

6    writing, and I'll reconsider it.  But it seems to me we've

7    reached a stage in the case where all other things are equal

8    enough that it's time now to direct that the bullet in this

9    case.  I won't force you to answer now.  I want to keep it

10   tentative.  I'm not doing these things off the cuff.  I've

11   thought about them.

12           MR. SIMS:  I understand.

13           Did I understand you to be asking over the last 20

14   minutes or so whether or not we all, or any of us, thought it

15   would be useful in some way to get your preliminary views?  Was

16   that a question you were propounding to us, or did I miss hear

17   it?

18           THE COURT:  Yes, it was.  Yes, it was.  But in

19   suggesting it, I have a feeling that these questions are so

20   critical to the case as it stands that those views ought not to

21   be delivered until after whatever further submissions the

22   parties want to make, and in a form which I've not been able to

23   construct myself, which makes them effective as rulings that

24   can be appealed because thereafter they're going to have a

25   great effect on the positions that people can legitimately

CacQfooC

1    expect to survive.

2              MR. SIMS:  I, for one, would find it useful if we

3    could adjourn for five minutes, and Baskin and I could talk

4    about this.  I don't think it's necessarily impossible to find

5    a way for you to do that, and it would be helpful to all the

6    parties, but I'm not sure -- it would be helpful if we can

7    briefly confer on the question and then tell you what we think,

8    or not.

9              THE COURT:  Sure.  Adjourn for five minutes or for

10   several days.

11             MR. BASKIN:  I don't need several days, your Honor.

12             THE COURT:  Excuse me?

13             MR. BASKIN:  I'm pretty confident we don't need

14   several days.  I'm not sure we need five minutes.  As your

15   Honor said in the course of some of your discussion, I think

16   it's imperative that this be placed in a proper procedural

17   context to protect the parties' rights to appeal.  Obviously,

18   we're going to be making a very copious record on summary

19   judgment with respect to what we think the proper reading of

20   all of the issues, not just actual notice, but willful

21   blindness and the other issues are as well.  We look forward to

22   making that record.  I'm highly confident either your Honor

23   will agree with us or you won't.  And if you agree with us, the

24   case will proceed.  If you don't agree with us, we'll take it

25   up on appeal, but I think it's important that we not delay any

CacQfooC

1    longer, and I think we should give you a record that's

2    concrete.  You'll give us your best learning, your best

3    judgment on the rules and how you interpret these various

4    principles, and then, as I said, either the case will proceed

5    in an orderly fashion to trial or will proceed to an orderly

6    fashion on appeal, but I think there's no purpose in deferring

7    or doing any intermediate steps.  I think we're all entitled to

8    make our proper record, and I'm sure your Honor respects that

9    as well.

10              So, my proposal would be, your Honor, that I would

11   propose -- but I think that since we've already, or a lot of

12   us, obviously have researched it, we've briefed a lot of the

13   issues as part of our preliminary showing to you, I would

14   propose that we proceed on the following basis:  That

15   Mr. Schapiro file his opening brief by November 16, which is a

16   little more than a month.  I will respond by December 17 or 16,

17   also a month.  He could reply by January 8 or so, which would

18   be three weeks.  And then your Honor will have a record in

19   front of you that is specific and concrete.  You can rule.  If

20   you rule with us, as I think you should, then we could head

21   towards a trial roughly in July of 2013.  If you rule against

22   us, we will take an appeal as quickly as we can and get the

23   case righted, but I think it's important, your Honor, that we

24   not -- we get out of this sort of procedure we have where a

25   proper record that is not being made.  I don't think it's fair

CacQfooC

1     to the parties for a proper record not to be made.

2              MR. SCHAPIRO:  We agree in concept.  I think the

3     schedule is a little bit aggressive when I know what other

4     people's schedules and obligations are.  I'm sure if we meet

5     with Baskin and adjust it by a couple of weeks, we could do

6     that.  There are a lot of clips involved.

7              MR. BASKIN:  That will be fine, your Honor.  We can

8     meet and try and adjust it a couple of weeks, as long as we are

9     on an orderly path.

10             THE COURT:  That's fine.  A lot of what I was saying

11    was a plea for more concrete discussions informed by the facts

12    and procedures taken by the parties on what was done and not

13    done, and up until now it's been very much in terms of

14    categories of documents and assertions that are not clear on

15    what exactly they cover and what they don't.  Although they're

16    clear intellectually, they're not clear in the way that normal

17    summary judgment motions are, and I need that -- for example, I

18    need a much more clear description of why the plaintiffs think

19    that the tracking process gave knowledge to the defendants that

20    they didn't have before.  I've puzzled it out, and I think it

21    may be a derivative way that it could have been derived from

22    what was going on.  Maybe that's the meaning of the argument,

23    but I need these things clearly.  In this case after so much to

24    deny summary judgment on the grounds that perhaps it isn't

25    clear enough would really be a waste of time.

CacQfooC

```
 1          Well, then I will expect that.  You did not set a date

 2   for briefing the class certification motion, Mr. Schapiro,

 3   or -- well, you have no concern with it.

 4          MR. SCHAPIRO:  We would probably want to confer with

 5   Mr. Sims, but we could come up with a schedule as well that

 6   would be a fairly quick one.  Is your Honor amenable to --

 7          THE COURT:  A lot of it is in the briefs as of the

 8   date they spoke.

 9          MR. SCHAPIRO:  Yes.  Would your Honor endorse the

10   proposal which would be to resubmit briefs that were submitted

11   earlier with supplements updating legal developments including

12   the Second Circuit's ruling in this case?

13          THE COURT:  Sure.  You don't even have to submit them.

14   I have copies of them.

15          MR. SCHAPIRO:  Even better.  I think we can do that

16   fairly quickly, and we'll just touch base with Mr. Sims.  How

17   about we put in a letter to the Court detailing where we are

18   with scheduling within the next seven days?  And we can tell

19   you what schedules we've worked out between the parties.

20          THE COURT:  Sure.

21          MR. SIMS:  Your Honor, as I understand it -- we're

22   glad to do that, but I understand that we are also left to

23   consider whether we think decoupling was a good idea -- is a

24   good idea or not.  So, in the context of having the discussion

25   with Mr. Schapiro, we're going to address that with our clients
```

CacQfooC

1    as well.

2              THE COURT:  Yes.  And I will pray for some detail as

3    to what the word decoupling really entails.

4              MR. SIMS:  Means.  As in everything in this case, it

5    requires more specificity.

6              THE COURT:  Obviously, there are various weights and

7    measures to be taken, but your preference in that would be

8    useful.  OK.  Thank you all very much.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25