UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: -8-2013

VIACOM INTERNATIONAL, INC.,
COMEDY PARTNERS, COUNTRY
MUSIC TELEVISION, INC.,
PARAMOUNT PICTURES, CORP.
BLACK ENTERTAINMENT
TELEVISION, LLC,

                    CASE NO. 1:07-cv-02103 (LLS)
                            (Related Case)

              Plaintiff's          1:07-cv-03582 (LLS)

vs.

YOUTUBE, INC., YOUTUBE LLC,
GOOGLE, INC.,

              Defendant's

vs.

GEORGE MAY, CONTINUING
CONTRACT, TRADE SECRET
OWNER, UCC LIEN OWNER,

              INTERVENER,

_____

        GEORGE MAY, PLAINTIFF, INTERVENER, CONTINUING CONTRACT,
TRADE SECRET OWNER, UCC LIEN OWNER, GEORGE MAY ON
BEHALF OF HIS PREVIOUS ATTORNEY'S MOTION FOR SUMMARY
JUDGEMENT, JUDGEMENT AS A MATTER OF LAW, FACT, EVIDENCE,
WITH INCORPORATED MEMORANDUM OF LAW, FACT, EVIDENCE,
WITH SWORN AFFIDAVIT IN SUPPORT OF

        COMES NOW, George May, Plaintiff, Intervener, Continuing

Contract, Trade Secret Owner, UCC Lien Owner, George May on

behalf of his previous attorney's, Nicolas J. Gutierrez, Jr.,

Jo Ann Barone, Lawrence K. Fagan, Stuart L. Stein and files

this his motion for Summary Judgement, Judgement as a Matter

of Law, Fact, Evidence, with Incorporated Memorandum of Law,

Fact, Evidence, with Sworn Affidavit in Support Of for cause

-1-

as follows:

1. That on September 4, 2012 the defendant's Viacom International, Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corp., Black Entertainment Television, LLC, Arab Bank Group, Inc., Arab Bank PLC, Dubai World Corporation were defaulted by the Clerk of the United States District Court for the Southern District of New York. A true and correct copy of the Default is attached hereto as Exhibit "A" and is incorporated by reference.

2. A default is an admission of all the well-pled allegations in George May, plaintiff, intervener Continuing Contract, Trade Secret, UCC Lien Owners Claim, Complaint. No response to the default, default judgement as a matter of law filed September 4, 2012 was ever filed to this day by the defendant's before mentioned herein.

3, That to this day the defendant's before mentioned herein have not filed any response to George May, Plaintiff, Intervener Continuing Contract, Trade Secret Owner, UCC Lien Owner Motion to Modify Judgement filed November 13, 2012 for damages of $21 Billion Dollars for George May, Plaintiff, Intervener Continuing Contract, Trade Secret Owner, UCC Lien Owner, George May on behalf of his attorney's before mentioned herein, with the defendant's before mentioned herein aiders, abetters, in Conspiracy with the defendant's Arab Bank Group, Inc., Arab

Bank PLC. Dubai World Corporation added for Final Summary Judgement pursuant to 18 U.S.C. §2,§3,§4,§371,§2333, §2339A,B,C,. Attached herein is my Motion to Modify Judgement.

4. Summary Judgement is proper here as the pleadings, depositions, answers to Interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to Judgement as a matter of law, Rule 56, Federal Rules of Civil Procedure; See <u>Anderson v. Aamco Transmission of Brevard, Inc., 265 So. 2d 5 (Fla. 1972); Grissett v. Circle K. Corp. of Texas, 593 So.2d 291 (Fla. 2 DCA 1992)</u>; A party opposing a properly supported Motion for Summary Judgement may not rest upon the mere allegations or denials of his or her pleadings, but must set forth showing that there is genuine issue for trial. See <u>Anderson v. Liberty Lobby, Inc. 477 U.S. 242 (1986); Soper v. Stine, 184 So.2d 892 (Fla. 2d DCA 1966)</u>.

5. The pleadings, together with George May, Plaintiff, Intervener, Continuing Contract, Trade Secret Owner, UCC Lien Owner, George May on behalf of his previous attorney's Nicolas J. Gutierrez, Jr., Jo Ann Barone, Lawrence K. Fagan, Stuart L. Stein affidavits were filed with this Court on September 4, 2012 and those items of discovery filed with this Court show that there is no genuine issue of law, or

-3-

fact and that George May, Plaintiff, Intervener, Continuing
Contract, Trade Secret Owner, UCC Lien Owner, George May on
behalf of his previous attorney's pursuant to his Claims
for Tortious Interference with Contract and Prospective
Economic Advantage; See Pennzoil Co. v. Texaco, Inc., 481
U.S. 1,4, (1987); Queenie v. Nygard Int'l., 321 F.3d 282,
290 (2d Cir. 2003); Smith v. Dravo Corp. 203 F.2d 369 (7th
Cir. 1953); Boim v. Holy Land Foundation, 549 F.3d 685,
690-91; Venzor v. Gonzales, 936 F. Supp. 445; 18 U.S.C.
2331(1),(5)(3), RICO, 18 U.S.C. 2332b(g)(5)(B), 2333, 2339
A,B,C,; Allen v. Transok Pipe Line Company, 552 P.2d 375
(1976); are entitled to Judgement as a matter of Law in the
amount of $21 Billion Dollars, plus attorney fees, plus
interest compounded annually at the statutory rate from
September 4, 2012 and against the defendant's Viacom
International, Inc., Comedy Partners, Country Music Television,
Inc., Paramount Pictures Corporation, D/B/A Paramount
Recreation Corporation, CBS Corporation, Black Entertainment
Television LLC, Arab Bank Group, Inc., Arab Bank PLC of New
York, Dubai World Corporation, YOUTUBE, Inc., YOUTUBE LLC,
GOOGLE, Inc. jointly and severally pursuant to 18 U.S.C. §2,
§3,§4, §371, §2332, §2331(1),(5), §1831-1839, The Economic
Espionage Act of 1996, §2339A,B,C. Sua Sponte, Forthwith.

6. Based on the verified pleadings here, affidavits on
file and the record, there are no issues of fact in this

cause and final Summary Judgement should be entered against
defendant's Viacom International, Inc., Comedy Partners,
Country Music Television, Inc., Paramount Pictures
Corporation D/B/A Paramount Recreation Corporation, CBS
Corporation, Black Entertainment Television LLC, Arab Bank
Group, Inc., Arab Bank PLC New York, Dubai World Corporation,
YOUTUBE, INC., YOUTUBE LLC, GOOGLE, INC., jointly and
severally in the amount of $21 Billion Dollars and for George
May, Plaintiff, Intervener, Continuing Contract, Trade Secret
Owner, UCC Lien Owner pursuant to this verified Motion for
Summary Judgement, plus attorney fees for his previous
attorney's before mentioned herein, plus interest compounded
annually at the statutory rate from September 4, 2012 until
paid, Sua Sponte, Forthwith.

WHEREFORE George May, Plaintiff, Intervener, Continuing
Contract, Trade Secret Owner, UCC Lien Owner, George May on
behalf of his previous attorney's before mentioned herein
moves this Court for a Summary Final Judgement for George May,
Plaintiff, Intervener, Continuing Contract, Trade Secret
Owner, UCC Lien Owner, George May on behalf of his previous
attorney's before mentioned herein attorney fees, plus interest
compounded annually at the statutory rate from September 4,
2012 and against Viacom International, Inc., Comedy Partners,
Country Music Television, Inc., Paramount Pictures Corporation,

-5-

D/B/A Paramount Recreation Corporation, CBS Corporation,
Black Entertainment Television LLC, Arab Bank Group, Inc.,
Arab Bank PLC New York, Dubai World Corporation, YOUTUBE,
INC., YOUTUBE LLC, GOOGLE, INC., jointly and severally,
Sua Sponte, Forthwith.

I George May, Plaintiff, Intervener, Continuing Contract,
Trade Secret Owner, UCC Lien Owner, George May on behalf of
his previous attorney's before mentioned herein, Movant
declares, certifies, verify under the penalty of perjury
under the laws of the United states of America that the
foregoing is true and correct.
George May, Plaintiff, Intervener, Movant certifies that his
statements made herein are of his personal knowledge and are
made in good faith.

Dated this January 7, 2013.

George May, Plaintiff,
Intervener, Continuing
Contract, Trade Secret
Owner, UCC Lien Owner
P.O. Box 32247
Palm Bch. Gardens,
Fl. 33420
Ph./Fax. 561-290-4384

-6-

I hereby certify that a copy of the foregoing was mailed,

faxed this January  7,   , 2013 to:

Clerk of the U.S. District Court
United States Courthouse
500 Pearl Street
New York, NY 10007
Ph. 212-805-0252


Louis Lee Stanton
United States District Judge
500 Pearl Street
New York, NY 1007
Ph. 212-805-0252


Charles Stephen Sims
PROSKAUER, ROSE LLP
11 Times Square
New York, NY 10036
Ph. 212-969-3000
Fax. 212-969-2900


Andrew H. Schapiro
QUIN, EMANUEL, URQUHART
50 Madison Ave. Fl. 22
New York, NY 10010
Ph. 212-849-7000
Fax. 212-849-7100


Nicolas J. Gutierrez, Jr.
601 Brickell Key Dr.
Miami, Fl. 33131
Ph. 305-371-8054
Fax. 305-371-4967


Jo Ann Barone
249 Royal Palm Way
Palm Beach, Fl. 33480
Ph. 561-655-8477
Fax. 561-284-6398


Lawrence K. Fagan
2100 Florida Mango Rd.
West Palm Bch., Fl. 33409
Ph. 561-689-3745
Fax. 561-687-0154


Stuart L. Stein
P.O. Box 29598
Sante Fe, New Mexico 87592
Ph. 505-450-5002
Fax. 505-889-0953


George May


-7-

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VIACOM INTERNATIONAL, INC.,
COMEDY PARTNERS, COUNTRY
MUSIC TELEVISION, INC.,
PARAMOUNT PICTURES, CORP.
BLACK ENTERTAINMENT
TELEVISION, LLC,                    CASE NO. 1:07-cv-02103 (LLS)
                                             (Related Case)
            Plaintiff's              1:07-cv-03582 (LLS)

vs.

YOUTUBE, INC., YOUTUBE LLC,
GOOGLE, INC.,

            Defendant's

vs.

GEORGE MAY, CONTINUING
CONTRACT, TRADE SECRET
OWNER, UCC LIEN OWNER,

            INTERVENER,

_____

SWORN AFFIDAVIT OF GEORGE MAY, PLAINTIFF, INTERVENER,
CONTINUING CONTRACT, TRADE SECRET OWNER, UCC LIEN
OWNER, GEORGE MAY ON BEHALF OF HIS PREVIOUS ATTORNEY'S

I, George May, Plaintiff, Intervener, Continuing Contract,

Trade Secret Owner, UCC Lien Owner, George May on behalf of

his previous attorney's Nicolas J. Gutierrez, Jr., Jo Ann

Barone, Lawrence K. Fagan, Stuart L. Stein being duly sworn

state as follows:

1. I am the attorney for George May, Plaintiff, Intervener,

Continuing Contract, Trade Secret Owner, UCC Lien Owner, George

May on behalf of his previous attorney's mentioned herein above

-1-

in the above entitled action and I am familiar with the file, records and pleadings in this matter.

2. That on September 4, 2012 my Motion for Default, Affidavit in Support of my Motion for Default, Proposed Entry of Default, Certificate of Service, Motion for Default Judgement, Affidavit for Default Judgement, Proposed Default Judgement, Certificate of Service was filed with this Court here, that to this day the defendant's, Viacom International, Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation D/B/A Paramount Recreation Corporation, CBS Corporation, Black Entertainment Television LLC, defendant's aiding, abetting, in conspiracy Arab Bank Group, Inc., Arab Bank PLC New York, New York, Dubai World Corporation, YOUTUBE, INC., YOUTUBE LLC, GOOGLE, INC., who are committing Computer Crimes, Fraud 18 U.S.C. §1030, Wire Fraud 18 U.S.C. §1341, Mail Fraud 18 U.S.C. §1343, Theft of George May, Plaintiff, Intervener Commercial Trade Secrets, Economic Espionage 18 U.S.C. §1831–§1839, Economic Terrorist, Terrorist Acts 18 U.S.C. §2331, §2332, §2333, §2339A,B,C, against George May, Plaintiff, Intervener, his previous attorney's before mentioned herein have not filed any Court Paper, response in the required by law 21 days to my default, default judgement, modification of default, default judgement.

3. That to this day defendant's Viacom International, Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures, Inc., D/B/A Paramount Recreation

-2-

Corporation, CBS Corporation, Black Entertainment Television LLC, Arab Bank Group, Inc., Arab Bank PLC, New York, Dubai World Corporation, YOUTUBE, INC., YOUTUBE LLC, GOOGLE, INC., added as party defendant's pursuant to Federal Rule of Civil Procedure 71,77, 18 U.S.C. §1030, §1341, §1343, §1831-39, §2331, §2332, §2333, §2339A,B,C, §2, §3, §4, 28 U.S.C. §1610, 31 C.F.R. §§535.311, 535.12, 31 C.F.R. §535.201, §535.701 have not filed any response to my Motion to Modify my default, default judgement filed November 13, 2012 for George May, Plaintiff, Intervener, Continuing Contract, Trade Secret Owner, UCC Lien Owner, George May on behalf of his previous attorney's before mentioned herein and against Viacom International, Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, D/B/A Paramount Recreation Corporation, CBS Corporation, Black Entertainment Television LLC, Arab Bank Group, Inc., Arab Bank PLC New York, Dubai World Corporation, YOUTUBE, INC., YOUTUBE LLC, Google, Inc. jointly and severally in the amount of $21 Billion Dollars plus interest compounded annually at the statutory rate from September 4, 2012 until paid, Sua Sponte, Forthwith.

4. The defendant's herein above pursuant to 18 U.S.C. §2333, §2, §3, §4 are estoped from denying the essential allegations of their criminal offenses, convictions in this Civil proceeding herein.

I George May, Plaintiff, Intervener, Continuing Contract, Trade Secret Owner, UCC Lien Owner, George May on behalf of his previous attorney's before mantioned herein, Movant declares, certifies, verify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

George May, Plaintiff, Intervener, Movant certifies that his statements made herein are of his personal knowledge and are made in good faith.

Dated this January 7, 2013.

George May

—4—



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

VIACOM INTERNATIONAL, INC.
COMEDY PARTNERS, COUNTRY
MUSIC TELEVISION, INC.,
PARAMOUNT PICTURES, CORP.
BLACK ENTERTAINMENT
TELEVISION, LLC

CASE NO. 1:07-cv-02103 (LLS)
(Related Case)
1:07-cv-03582 (LLS)

Plaintiff's

V.

YOUTUBE, INC., YOUTUBE LLC,
GOOGLE, INC.,

Defendant's

---

MOTION FOR ENTRY OF DEFAULT

---

George May, Plaintiff, Intervener here requests that the
Clerk of the United States District Court, Southern District
of New York enter default against Viacom International, Inc.,
Comedy Partners, Country Music Television, Inc., Paramount
Pictures, Corp. D/B/A Paramount Recreation and CBS, Black
Entertainment Television, LLC, Arab Bank Group, Inc., Arab
Bank PLC, Dubai World Corporation, defendant's here above
pursuant to Federal Rule of Civil Procedure 55(a). In
support of this request George May, Plaintiff, Intervener
relies upon the record in this case and his affidavit
submitted herein.

-1-





*Paramount Parks*

A  V I A C O M  C O M P A N Y

November 21, 1995

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL  33420

Dear Mr. May:

Your proposal for a Star Trek theme park has been forwarded to us by
Thomas Byrne of Blockbuster Entertainment Group.

While we find your proposal very interesting, we regret to inform you that
we are not pursuing this type of joint venture at the present time.  We thank
you for your interest and wish the best of luck in your endeavor.

Sincerely,

Jane Cooper
President & CEO

JC:amw

| SPRING 2006 | Trade Secrets |
|---|---|

| Course No. 9200-704-801<br><br>ID No. 16545 | W 6:30 - 9:30 p.m. | Room W-215 | |
|---|---|---|---|
| Professor Jay Dratler, Jr. | Room 231D (IP Alcove) | (330) 972-7972 | dratler@uakron.edu, dratler@neo.rr.com |

Copyright © 2000, 2002, 2003, 2006  Jay Dratler, Jr.

For permission, see

# Smith v. Dravo Corp.

203 F.2d 369, 97 U.S.P.Q. (BNA) 98 (7th Cir. 1953)

Before Duffy, Lindley and Swaim, Circuit Judges.

Lindley, Jr. [*370]

*DETENTIONAL / HARM IS A TORT*

\* \* \* [*371] \* \* \*

In the early 1940s Leathem D. Smith, now deceased, began toying with an idea which, he believed, would greatly facilitate the ship and shore handling and transportation of cargoes. As he was primarily engaged in the shipbuilding business, it was quite natural that his thinking was chiefly concerned with water transportation and dock handling. Nevertheless his overall plan encompassed rail shipping as well. He envisioned construction of ships especially designed to carry their cargo in uniformly sized steel freight containers. These devices (which, it appears, were the crux of his idea) were: equipped with high doors at one end; large enough for a man to enter easily; weather and pilfer proof; and bore collapsible legs, which (1) served to lock them (a) to the deck of the ship by fitting into recesses in the deck, or (b) to each other, when stacked, by reason of receiving sockets located in the upper four corners of each container, and (2) allowed sufficient clearance between deck and container or container and container for the facile insertion of a fork of a lift tractor, and (3) were equipped with lifting eyelets, which, together with a specially designed hoist, made possible placement of the containers upon or removal from a ship, railroad car or truck, while filled with cargo. The outer dimensions of the devices were such that they would fit compactly in standard gauge North American railroad cars, or narrow gauge South American trains, and in the holds of most water vessels.

World War II effectually prevented Smith from developing his conception much beyond the idea stage. Nevertheless blue prints were drawn in 1943, and in 1944, as a result of



# Tortious Interference with Contract and Prospective Economic Advantage

This Quarterly Update[1] focuses on tortious interference with contract and tortious interference with prospective economic advantage.[2]

## Introduction

Claims for tortious interference with contract or prospective economic advantage can result in enormous judgments. *See, e.g., Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 4 (1987) (jury verdict in excess of $10 billion for tortious interference with contract); *JAM Sports & Entertainment, LLC v. Paradama Productions, Inc.*, 382 F. Supp. 2d 1056, 1058 (N.D. Ill. 2005) (jury verdict in excess of $90 million for tortious interference with contract and prospective economic advantage, although defendant later granted judgment as a matter of law on claim for tortious interference with prospective economic advantage). The reasons for such large potential damage awards are obvious: the underlying contract or business relationship at issue can be extremely valuable and, if the defendant's conduct is sufficiently egregious, punitive damages may be awarded in "economic interference" cases. *See, e.g., Pennzoil*, 481 U.S. at 4 (interference with acquisition of Getty Oil; jury verdict of $7.53 billion in actual damages and $3 billion in punitive damages); *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 290 (2d Cir. 2003) (affirming award of punitive damages for tortious interference with prospective economic advantage).

---

[1]   Meyer & O'Connor, LLC ("Meyer & O'Connor"), a trial and appellate firm focusing on complex commercial litigation, tort and general civil litigation, criminal defense and civil rights litigation, publishes a Quarterly Update that addresses significant legal developments. The Quarterly Update is an informational service for clients, friends and acquaintances of the firm (and attorney advertising) and is not legal advice and does not create an attorney-client relationship with Meyer & O'Connor.

[2]   "Tortious interference with prospective economic advantage" is the title used in some jurisdictions to refer to the tort claim that can arise when one wrongfully interferes with a significant business relationship that has not been reduced to contract. We refer to this tort by this title herein, but it should be noted that some jurisdictions refer to this tort by different titles. *See, e.g., Amaranth LLC v J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 47, 888 N.Y.S.2d 489, 494 (Sup. Ct. App. Div. 1st Dept. 2009)(discussing "claim for tortious interference with business relations" and "complaint alleging tortious interference with prospective economic advantage" in reference to same claim).

Attorney advertising material. This material does not constitute legal advice or create an attorney-client relationship with Meyer & O'Connor, LLC. Please direct questions or comments regarding these materials to Timothy P. O'Connor, Meyer & O'Connor, LLC, Suite 3300, 135 South LaSalle Street, Chicago, IL 60603; (e) toconnor@meyeroconnor.com; (p) 312-346-9000.

9/11/12

To: Charles S. Simms
PROSKAUER ROSE, LLP
1585 Ave. of the Americas
New York, New York 10019
Ph. 212-969-3000
Fax. 212-554-1444

Andy Schapiro
QUINN, EMANUEL
51 Madison Ave.
22nd Floor
New York, New York 10010
Ph. 212-849-7164
Fax. 212-849-7100

Re: My Copyrighted Trade Secret Business Plan contained herein.

BY LAW, INTERNATIONAL TREATIES, EVERY COPYRIGHTED, COMMON LAW
COPYRIGHTED SONG CONTAINS:

1. A TRADE SECRET BUSINESS PLAN
2. A TRADE SECRET MARKETING PLAN
3. A TRADE SECRET OWNED BY THE
SONG, MUSIC CREATOR TO MAKE MONEY

4. THE CREATORS ENGLISH
COMMON LAW INVENTION,
IDEA, WORK PRODUCT HARMED,
ROBBED BY DEFENDANT'S

GOOGLE, MEGA UPLOAD MONEY, PROFIT'S HAVE BEEN MADE BY INTENTIONAL
CAUSING OF HARM TO VIACOM, INC., OTHERS. SMITH V. DRAVO CORP.
203 F.2d 369, Restatement, Torts, Sec 757. ROBBERY IS HARM.

THE DIGITAL MILLIUMN COPYRIGHT ACT IS INVALID AS TO TRADE SECRETS
THUS:

GOOGLE, MEGA UPLOAD PROFITS MADE BY THEIR INTENTIONAL
CAUSING OF HARM TO VIACOM, INC., OTHERS OF IN EXCESS OF
$42 BILLION DOLLARS MUST BE PAID TO VIACOM, INC.,

VIACOM, INC., KNEW OF GEORGE MAY CONTRACT, CONTRACT EXPECTANCY
PROSPECTIVE BUSINESS RELATIONSHIP, ECONOMIC ADVANTAGE, AND
USED UNLAWFUL, IMPROPER MEANS, METHODS TO INTERFERE WITH GEORGE
MAY CONTRACT EXPECTANCY CAUSING GEORGE MAY DAMAGES OF $21 BILLION
DOLLARS:.

THOSE WHO GAIN THEIR INFORMATION IMPROPERLY ARE BOUGHT TO
BOOK IN RECOGNITION OF THE GENERAL PRINCIPLE THAT INTENTIONALLY
INFLICTED HARM IS ACTIONABLE. "ROBBERY BY DEFENDANT'S IS HARM"

GOOGLE, MEGA UPLOAD, VIACOM, INC., INTENTIONALLY ROBBED, HARMED.
WITH KNOWLEDGE OF AFORETHOUGHT, MALICE, EVIL PURPOSE GEORGE MAY,
OTHERS HAD KNOWLEDGE, THAT THEY WERE NOT THE ORIGINAL CREATOR,
DID NOT PAY THE PRICE IN LABOR, MONEY, OR MACHINES EXPENDED BY
THE ORIGINAL CREATOR, THUS ACTED WITH:

1. Knowledge, INTENT, MALICE OF AFORETHOUGHT, EVIL
PURPOSE, WITHOUT REGARD FOR THE LAW, RIGHTS OF THE
CREATOR, INTERFERING WITH THE CREATORS, BUSINESS.

2. TORTIOUSLY INTERFERING WITH GEORGE MAY CONTRACT
AND PROSPECTIVE ECONOMIC ADVANTAGE, BUSINESS EXPECTANCY.

P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
PH/Fax 561-290-4384

George May

TRANSMISSION VERIFICATION REPORT

TIME  : 09/11/2012 22:41
NAME  : GEORGE MAY
FAX   : 561-290-4384
SER.# : BROL9F217174

| | |
|---|---|
| DATE,TIME | 09/11  22:35 |
| FAX NO./NAME | 0012129692900 |
| DURATION | 00:06:15 |
| PAGE(S) | 08 |
| RESULT | OK |
| MODE | STANDARD |

Chnelos Simms

TRANSMISSION VERIFICATION REPORT

TIME   : 09/11/2012 19:29
NAME   : GEORGE MAY
FAX    : 561-290-4384
SER.#  : BROL9F217174

| | |
|---|---|
| DATE,TIME | 09/11  19:24 |
| FAX NO./NAME | 0012128497100 |
| DURATION | 00:05:22 |
| PAGE(S) | 08 |
| RESULT | OK |
| MODE | STANDARD |

*Andy Schapiro*

> Criminal Resource Manual 2471

# 2471 18 U.S.C. § 2

The first provision one finds in Title 18 of the United States Code regard
accessories to crime. Title 18, United States Code § 2 now provides:

(a) Whoever commits an offense against the United States or aids, abet
counsels, commands, induces or procures its commission, is punishable
a principal.

(b) Whoever willfully causes an act to be done which if directly perform
by him or another would be an offense against the United States, is
punishable as a principal.

Aider and abettor liability is distinct from accessory after the fact under
U.S.C. § 3. *United States v. James*, 998 F.2d 74, 80 (2d Cir.), *cert. denied*,
U.S. 958, 114 S.Ct. 415, 126 L.Ed.2d 362 (1993). An aider and abettor, unl
accessory after the fact, is punishable as a principal. *Id.*

[updated October 1998]

Case 1:07-cv-02103-LLS Document 435 Filed 01/08/13 Page 21 of 38

**DAILY NEWS**

World

# Google will not remove anti-Muslim YouTube video that sparked violent protests: It does not violate company's terms

**Google, YouTube's corporate parent, turned down the White House's request to reconsider keeping online the YouTube video that sparked anti-American violence in the Middle East, although the company has blocked access in some parts of the world.**

BY MICHAEL WALSH / NEW YORK DAILY NEWS

SATURDAY, SEPTEMBER 15, 2012, 1:17 PM

*Google, YouTube refuse to stop committing terrorist acts against U.S. citizens*



MUNIR UZ ZAMAN/AFP/GETTY IMAGE

Members of an Islamic party burn the U.S. flag during a protest outside Bangladesh's largest mosque in the capital Dhaka.

Google refused the White House's request to reconsider keeping online the YouTube video that sparked anti-American violence in the Middle East.

01/11/2004 12:58 a.m.

The company claimed that "Innocence of Muslims" does not violate its terms of service concerning hate speech on Wednesday — a stance it reiterated Friday, reported the New York Times.

The 14-minute video's portrayal of the Prophet Mohammad as a womanizing charlatan enraged many Muslims over the past week. But Google claimed that the footage is against Islam, not the Muslim people.

WHITE HOUSE ASKS YOUTUBE TO 'REVIEW' ANTI-MUSLIM MOVIE

Google has, however, blocked the video in Indonesia and India for breaking local laws, which forbid inciting hatred. The company does not monitor all of its videos because of the vast numbers uploaded every day. Bu it does review videos that users overwhelmingly flag as inappropriate.

*TERRORIST Acts by*

The company temporarily restricted access to the video in Libya and Egypt on its own because of the "sensitive situations" in those countries. Four Americans, including the U.S. ambassador to Libya, were killed at the American consulate in Benghazi on Tuesday.

*Google, YouTube Anti TERRORISM*

White House press secretary Jay Carney explained that the administration does not intend to limit freedom of expression in this country. *Crime And Security*

ANTI-MUSLIM FILM PROMOTER OUTSPOKEN ON ISLAM *Act of 2001*

"The White House asked YouTube to review the video to see if it was in compliance with their terms of use," Carney said. *Prohibits Inciting Hatred,*

Google claims that its decision not to completely remove the footage from YouTube is consistent with the company's policy for controversial content, as outlined in 2007. *Hate Crimes*

"We are passionate about our users so we try to take into account local cultures and needs — which vary dramatically around the world — when developing and implementing our global product policies," wrote Rachel Whetstone, the company's senior vice president for communications and public policy.

"THE INNOCENCE OF MUSLIMS" TRAILER THAT SPARKED DEADLY RIOTS IS INEPT AND HATEFUL

U.S. authorities are investigating whether the film's 55-year-old producer, Nakoula Basseley Nakoula, breached the conditions set out for his prison release, according to Reuters.

One of the film's actresses, Cindy Lee Garcia, told ABC News the filmmaker lied to the cast about his intentions and his real name.

Garcia said she thought she was acting in a film called "Desert Warriors" about life from 2,000 years ago.

"Now, I'm sick that people died over this. I'm exhausted and really hurt and angry," Garcia said.



Published on *OpenJurist* (http://openjurist.org)

Home > Printer-friendly > Printer-friendly

# 18 USC 2333 - Civil remedies

**(a) Action and Jurisdiction.—**
Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorneys fees.

**(b) Estoppel Under United States Law.—**
A final judgment or decree rendered in favor of the United States in any criminal proceeding under section 1116, 1201, 1203, or 2332 of this title or section 46314, 46502, 46505, or 46506 of title 49 shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

**(c) Estoppel Under Foreign Law.—**
A final judgment or decree rendered in favor of any foreign state in any criminal proceeding shall, to the extent that such judgment or decree may be accorded full faith and credit under the law of the United States, estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

Source URL: http://openjurist.org/title-18/us-code/section-2333

18 U.S.C. 2333 (a)
(b), 18 U.S.C. 2333 (c), 2339 A, 2339 (b)
18 U.S.C $2 AUTOMATICALLY RENDERS
A DEFAULT, DEFAULT JUDGEMENT,
JUDGEMENT AS A MATTER OF LAW,
FACT, EVIDENCE. F.R.C.P. 50 (a)
CONFESSION OF JUDGEMENT by
SIGNED, WRITTEN CORROBORATED
CONFESSIONS pleading GUILTY,
TO ALL PLAINTIFFS CLAIMS AGAINST
ALL DEFENDANTS



# Computer Crime and Intellectual Property Section (CCIPS)

---

## VIII. Theft of Commercial Trade Secrets

A.     Introduction

B.     The Economic Espionage Act of 1996: 18 U.S.C. §§ 1831-1839

B.1.    Overview of the statute

B.2.    Elements common to 18 U.S.C. §§ 1831, 1832

B.2.a.   Misappropriation

B.2.b.   Knowledge

B.2.c.   Trade secret status

B.3.    Additional 18 U.S.C. § 1831 element: intent to benefit a foreign government, foreign instrumentality, or foreign agent

B.4.    Additional 18 U.S.C. § 1832 elements

B.4.a.   Economic benefit to a third party

B.4.b.   Intent to injure the owner of the trade secret

B.4.c.   Product produced for or placed in interstate or foreign commerce

B.5.    Attempts and conspiracies

B.6.    Potential defenses

B.6.a.   Parallel development

B.6.b.   Reverse engineering

B.6.c.   General knowledge

B.6.d.   The First Amendment

B.6.e.   Advice of counsel or claim of right

B.6.f.   Statutory challenges

B.7.    Criminal forfeiture

B.8.    Civil proceedings

B.9.    Confidentiality and the use of protective orders

B.10.   Extraterritoriality

# **Hotelier**MiddleEast.com

## US $1.5bn funding secured for Star Trek attraction

**Harriet Sinclair,** *August 7th, 2011*
**US$1.5 billion of funding has been secured for a major tourism and theme park development in Jordan, featuring a Star-Trek inspired attraction.**

Construction work on the 74-hectare Red Sea Astrarium project in Aqaba, which will include four hotels and 17 entertainment developments, is expected to start early next year, *The National* reported.

The project is being funded by investors from the US and the Gulf, according to a partner in the project.

The Amman company Rubicon Group Holding, which makes animated films, said in May that it would design and produce the entertainment elements of the resort.

The "Star Trek" attraction is being creatively developed by Paramount Recreation.

TRSA is expected to generate employment for more than 500 high-skilled workers in the local community, with RGH facilitating the training for these key jobs, as well.

"At its core, Star Trek is about bringing worlds together and about a profound hope for the future," said Liz Kalodner, EVP and general manager of CBS Consumer Products.

"We are proud to bring such a unique, interactive Star Trek property to this part of the world to be a part of Jordan's future."

The themed entertainment destination will also serve as a model for "green energy," incorporating state-of-the-art renewable technologies throughout the facility, and hosting a "future" pavilion where businesses, students and attendees can learn about alternative energy sources ranging from solar and wind energy to greywater harvesting.

The Star Trek-themed centre will deliver a variety of multi-sensory 23rd-century experiences, culminating with a state-of-the-art space-flight adventure that takes real-time immersive entertainment experiences to bold new heights.

Architectural firm Callison has been engaged to work with Rubicon Group Holding and its team, including Paramount Recreation and CBS, to master plan and create a world class destination resort.

"TRSA will be a destination showcase in an extraordinary part of Jordan," said Randa S. Ayoubi, CEO of Rubicon Group Holding.

"The opportunity to lead the design on such a remarkable project and to work with such world class partners as CBS and Paramount is a dream-come-true for the entire RGH family. We are honored, elated, and proud to have our Themed Entertainment team in charge of moving this project forward."

---

©2013 ITP Business Publishing Ltd. | Use of this site content constitutes acceptance of our User Policy, Privacy Policy and Terms & Conditions.

# Star Trek resort coming soon

Trek-themed park coming to Red Sea resort in Jordan, thanks to royal Trekkie King Abdullah II.

by **Eric Mack** | August 9, 2011 5:23 PM PDT



**[http://i.i.com.com/cnwk.1d/i/tim/2011/08/09/trek-resort.PNG]**

Turns out the Final Frontier is a nice spot on the Red Sea. (Click to enlarge.)

(Credit: Rubicon Holding Group)

The Wrath of Khan is soon to be offset by the joy of Jordan. Perhaps the world's richest Trekkie, King Abdullah II of Jordan, has given the green light and some cash from one of his namesake funds to build a $1.5 billion dollar Star Trek-themed resort in his Kingdom. King Abdullah is a well-known Trek fanatic who once appeared in an episode of "Star Trek: Voyager."

The resort is part of a larger development, the Red Sea Astrarium at the port of Aqaba, which will take up a reported 184 acres. The Developer, Rubicon Group Holding, announced a licensing deal with CBS to include a Star Trek center in the resort, one of at least a dozen other themed sections (disclosure: CBS is the parent company of CNET). The entire development is also expected to be eco-friendly, a theme that



Al Bawaba
البـواية

Published on *Al Bawaba* (http://www.albawaba.com)

# Emaar International Jordan signs agreement with Arab Bank to provide ← easy finance options for Samarah Dead Sea Resort customers

Published May 29th, 2008 - 10:45 GMT

Emaar International Jordan, the country subsidiary of Emaar Properties PJSC, has signed an agreement with Arab Bank to facilitate easy home finance for customers of the Samarah Dead Sea Resort, the JD

Emaar International Jordan, the country subsidiary of Emaar Properties PJSC, has signed an agreement with Arab Bank to facilitate easy home finance for customers of the Samarah Dead Sea Resort, the JD354 million master-planned community owned by Dead Sea Touristic and Real Estate Investment Company, a venture of Emaar and a group of Jordanian and regional investors.

Mr Tarek Awad, Vice Chairman, Dead Sea Touristic and Real Estate Investment Company, and Mr Nabil Mushahwar - Regional Manager, Retail Banking Group, Arab Bank, signed the agreement in Amman. As per the agreement, customers of residences within Samarah Dead Sea Resort can obtain long-term, easy home finance options at a very competitive interest rate and repayment period of 25 years.

Mr Awad said: "The agreement with Arab Bank is a landmark in the real estate sector of Jordan as it marks the coming together of the leading names in property development and banking. Arab Bank has extensive expertise in home finance, and the flexible finance options provided by Arab Bank also highlights our commitment to be responsive of customer needs."

Mr Steve McCartt, General Manager, Emaar International Jordan, added: "Samarah Dead Sea Resort is introducing a new lifestyle to the country. The easy home finance option will further energise the property sector by providing the opportunity for a wider cross-section of the public to own homes in this pioneering development."

01/11/2004 02:08 a.m.

Case 1:07-cv-02103-LLS Document 435 Filed 01/08/13 Page 28 of 38

Mr Mushahwar explained: "Arab Bank is one of the leading financial institutions in the region enjoying the trust of thousands of investors. The home finance plans for Samarah Dead Sea Resort will offer flexibility of financial options for home buyers. This is a step forward in our efforts to build stronger relationships with customers, and highlights our trust in Emaar's development plans in Dead Sea. We look forward to a long-term relationship with Emaar in Jordan."

Samarah Dead Sea Resort has been envisaged in line with the growth plan for Jordan as outlined by the King Abdullah II Fund for Development. The project has various key components including Samarah Hillside with residences and a community centre; Samarah Beach with residences and a Spa and Wellness Village; and Samarah Rift with a Retail Village and a business hotel.

© 2010 Al Bawaba (www.albawaba.com [1])



ARAB BANK

---

**Source URL:** http://www.albawaba.com/business/emaar-international-jordan-signs-agreement-arab-bank-provide-easy-finance-options-samarah-d

**Links:**
[1] http://www.albawaba.com

*Homeland Security News Wire*

# Homeland Security News Wire

## Terrorism
## Critics charge satellite company Inmarsat violates Iran sanctions

Published 26 July 2012

Share (http://www.addthis.c
(http://www.addthis.com/bool
iran-sanctions&title=Terrorism%2
%2Fwww.google.hn%2Furl%3Fsa?
critics-charge-satellite-company-in

**A legal organizations specializing in fighting legal battles against terror sponsors — they say their goal is to bankrupt the terror groups and grind their activities to a halt, one lawsuit at a time — warned mobile satellite company Inmarsat PLC against providing prohibited guidance services to Iranian oil tankers and Iranian military vessels; in 2008, a United States Supreme Court ruling made the determination that individuals or companies that materially support terrorist organizations are liable for the murder and injuries they cause, according to *Boim v. Holy Land Foundation***



Tanker under way loaded with Iranian oil // Source: presstv.ir

Shurat HaDin—Israel Law Center (http://www.israellawcenter.org/) , an organization with a reputation for fighting legal battles against terror sponsors, the other day sent a letter (http://www.scribd.com /doc/101021494/Shurat-HaDin-s-July-25-2012-Letter-to-Inmarsat) to mobile satellite company Inmarsat PLC (http://www.scribd.com/doc/101019427/Inmarsat-Fact-Sheet) , warning it against providing prohibited guidance services to Iranian oil tankers and Iranian military vessels.

The warning letter stressed that Inmarsat's actions would expose the telecommunications giant to criminal prosecution and civil liability from Americans and others who suffer as a result of Iran's international sponsorship of terrorism.

The move followed a recent Obama administration decision to slap additional Treasury Department sanctions (http://www.scribd.com /doc/101019424/Dept-of-State-Fact-Sheet-Increasing-Sanctions-Against-Iran) on Iranian

vessels, which have been found to be facilitating Teheran's nuclear weapons program and global terrorist network. Despite this, the London-headquartered Inmarsat, with offices in Miami and Washington, D.C., continues to provide mobile satellite services to Iranian ships.

Shurat HaDin's director, and civil rights activist, Nitsana Darshan-Leitner said, "We will not tolerate Inmarsat's — or any corporation's — profiting from the blood of innocent people. Anything short of immediate and decisive action on our part would be akin to acceptance. It is a simple issue of justice: Inmarsat must uphold its legal obligations in compliance with U.S. Treasury regulations and immediately cease its support for Iran."

In 2008, a United States Supreme Court ruling made the determination that individuals or companies that materially support terrorist organizations are liable for the murder and injuries they cause, according to *Boim v. Holy Land Foundation*. Based on that ruling, Shurat HaDin submitted a letter alerting Inmarsat's leadership that its actions are illegal and serve as a civil liability to American citizens and others who suffer as a result of Iran's sponsorship of terror.

Shurat HaDin says that the action represents the latest example of the Law Center's "harnessing of American and international law to knock down the financial and technological buttresses of terrorism."

In June 2011, Shurat HaDin brought legal action (http://www.scribd.com /doc/101019445/Warning-Letters-Sent-to-Inmarsat-During-Flotilla) against Inmarsat for continuing to support ships seeking to breach Israel's naval blockade of Gaza. Shurat HaDin underlined that Inmarsat's services provided communications to the Mavi Marmara and other ships which participated in the Gaza flotilla of May 2010. The case was filed in a Federal Court in Miami.

The warning letter additionally noted that previous judgments allowed victims of terrorism to file suit against an oil and gas company, as well as against its officers, for engaging in business with a state sponsor of terrorism. Additionally, Darshan-Leitner stressed that by providing aid to Iran, Inmarsat subjects itself to forfeiture of its assets to judgment creditors who hold unenforced judgments against the Islamic regime. Shurat HaDin moreover stressed that it is prohibited for any party (including non-Americans) to transport, sell, transfer, or deal with any property (including oil) that Iran has any interest in.

Shurat HaDin says it intends on pursuing the company, its officers, and directors for providing aid to Teheran, and will continue to expose such companies to forfeitures of assets and severe financial penalties.

Shurat HaDin-Israel Law Center was established in 2003. It says its goal is to bankrupt the terror groups and grind their activities to a halt — one lawsuit at a time. The organization is based in Tel Aviv and it works together with Western intelligence agencies and volunteer lawyers around the world to file legal actions on behalf of victims of terror. Shurat HaDin says it has succeeded in winning more than $1 billion in judgments, freezing more than $600 million in terrorist assets, and in collecting $120 million in actual payments to the victims and their families.

and directors to criminal prosecution and civil liability to American citizens and others who suffer as a result of Iran's international sponsorship of terrorism. (*See Abecassis v. Wyatt*, 785 F.Supp.2d 614 (S.D. Tex. 2011) (allowing a suit to go forward against an oil and gas company and its officers and directors for engaging in business with a terrorist state.)) Additionally, by providing aid to Iran, Inmarsat subjects itself to forfeiture of its assets to judgment creditors who hold unenforced judgments against Iran. (*See* 28 U.S.C. § 1610 note and 28 U.S.C. § 1610(g) (permitting judgment creditors to execute judgments against the property of terrorist states); 31 C.F.R. §§ 535.311, 535.312 (defining "property" to include any "property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent" and defining "interest," as used in this sentence, to mean "an interest of any nature whatsoever, direct or indirect.")))

Since January 19, 1984, Iran has been and continues to be designated by the United States, pursuant to Section 6(j) of the Export Administration Act, Section 40 of the Arms Export Control Act, and Section 620A of the Foreign Assistance Act, as a State Sponsor of Terrorism. As a result of that designation, it is subject to numerous restrictions and sanctions under United States law and subjects those organizations that do business with it to numerous restrictions. According to the U.S. State Department, Iran is the world's "most active state sponsor of terrorism." Further, "Iran's financial, material, and logistic support for terrorist and militant groups throughout the Middle East and Central Asia had a direct impact on international efforts to promote peace, threatened economic stability in the Gulf, and undermined the growth of democracy.... Iran [remains] the principal supporter of groups implacably opposed to the Middle East Peace Process."

Moreover, the international economic sanctions regime imposed against Iran along with the regulations enacted by the United States Treasury and the European Union are intended to deter the Iranian government from advancing its nuclear weapons program in violation of international law.

By materially supporting Iran's oil industry, Inmarsat facilitates Iran's terrorist activities and nuclear weapons program. To the extent that Inmarsat's satellite support is utilized by Iran's military agencies, Inmarsat is a direct participator in Iran's terrorist activities and nuclear weapons program.

Provision of communications services constitutes the provision of "material support or resources" pursuant to 18 U.S.C. § 2339A. Such provision therefore subjects Inmarsat to *criminal* liability pursuant to 18 U.S.C. §§ 2339A, 2339B, 2339C and to civil liability pursuant to 18 U.S.C. § 2333 (*see Boim v. Holy Land Foundation*, 549 F.3d 685, 690-91 (7th Cir. 2008) (en banc)). The United States Supreme Court has ruled that material support liability exists without regard to the criminal or terror-inducing intent of the material supporter. Indeed, gifts to the purely charitable objectives of a terrorist state or organization are actionable because, in the words of the Court,

Money is fungible, and when foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put. But there is reason to believe that foreign terrorist organizations do not maintain legitimate financial firewalls between those funds



raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations. Thus, funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives.

*Holder v. Humanitarian Law Project*

, ___ U.S. ___, 130 S. Ct. 2705, 2720, 2729 (2010). (Internal citations and quotation marks omitted). The analysis in *Holder* is no less accurate (or binding) when applied to the business activities of a sophisticated sovereign entity that orchestrates terrorist operations globally. (A copy of *Holder* is attached to this letter for your review.)

Moreover, 31 C.F.R. § 535.201, *et seq.*, prohibits all parties (including non-Americans) from transporting, selling, transferring, exporting, or dealing with any property (including oil) that Iran has any interest of any nature whatsoever. The regulations freeze all such property within the United States and expressly prohibit any action designed to evade the regulations. Violators are subject to a civil penalty not to exceed the greater of $250,000 or an amount that is twice the amount of the transaction that is the basis of the violation and a criminal penalty not to exceed $1,000,000, twenty years in prison, or both. 31 C.F.R. § 535.701. While Inmarsat might not operate the vessels that carry Iranian property, Inmarsat's services enable those vessels to operate and is thus the proximate cause, acting pursuant to contract, of the illegal actions of another.

That Iran pretends that its vessels are owned by another sovereign is not sufficient to avoid liability under the above sections. Nor is it sufficient if Iran has actually effected legal transfer of its vessels (or reflagging) if Iran retains effective control over the vessels or if the vessels are primarily or materially dedicated to the support of Iran.

In light of the above, we request that you immediately provide us written confirmation that Inmarsat has <u>permanently</u> discontinued the provision of all services, including satellite and communications services, to Iran, all of its vessels, all vessels effectively controlled by Iran, and all vessels primarily or materially dedicated to servicing, aiding, or trading on behalf of Iran.

Absent such immediate confirmation, we will seek all available relief and remedies against Inmarsat in all relevant jurisdictions.

Very truly yours,

Nitsana Darshan-Leitner, Esq., Director
Shurat HaDin – Israel Law Center

* All references in this letter to "Inmarsat" include Inmarsat PLC and Inmarsat Inc., as well as all subsidiaries thereof and all entities affiliate therewith. Where appropriate, it also includes Inmarsat's officers and directors.

**Shurat HaDin—Israel Law Center** is an Israeli based civil rights organization and world leader in combating terrorist organizations and the regimes that support them through lawsuits litigated in courtrooms around the world. Fighting for the rights of hundreds of terror victims, Shurat HaDin seeks to bankrupt the terror groups and grind their criminal activities to a halt - one lawsuit at a time.

01/11/2004 02:38 a.m.

and goals – with a view toward detecting, preventing, and prosecuting the enterprise's criminal activities. Criminal intelligence investigations, usually of a long-term nature, may provide vital intelligence to help prevent terrorist acts.

Authorized criminal intelligence investigations are of two types: racketeering enterprise investigations (Part III.A) and terrorism enterprise investigations (Part III.B).

A racketeering enterprise investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in a pattern of racketeering activity as defined in the Racketeer Influenced and Corrupt Organizations Act (RICO). However, the USA PATRIOT ACT (Public Law 107-56) expanded the predicate acts for RICO to include the crimes most likely to be committed by terrorists and their supporters, as described in 18 U.S.C. 2332b(g)(5)(B). To maintain uniformity in the standards and procedures for criminal intelligence investigations relating to terrorism, investigations premised on racketeering activity involving offenses described in 18 U.S.C. 2332b(g)(5)(B) are subject to the provisions for terrorism enterprise investigations rather than those for racketeering enterprise investigations.

A terrorism enterprise investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of: (1) furthering political or social goals wholly or in part through activities that involve force or violence and a federal crime, (2) engaging in terrorism as defined in 18 U.S.C. 2331(1) or (5) that involves a federal crime, or (3) committing any offense described in 18 U.S.C. 2332b(g)(5)(B). As noted above, criminal intelligence investigations premised on a pattern of racketeering activity involving an 18 U.S.C. 2332b(g)(5)(B) offense are also treated as terrorism enterprise investigations.

As with the other types of full investigations authorized by these Guidelines, any lawful investigative technique may be used in terrorism enterprise investigations, including the development of sources and informants and undercover activities and operations. The "reasonable indication" standard for commencing a terrorism enterprise investigation is the same as that for general crimes and racketeering enterprise investigations. As noted above, it is substantially lower than probable cause.

In practical terms, the "reasonable indication" standard for opening a criminal intelligence investigation of an enterprise in the terrorism context could be satisfied in a number of ways. In some cases satisfaction of the standard will be apparent on the basis of direct evidence of an enterprise's involvement in or planning for the commission of a federal offense involving the use of force or violence to further political or social goals, terrorism as defined in 18 U.S.C. 2331(1) or (5), or a crime described in 18 U.S.C. 2332b(g)(5)(B). For example, direct information may be available about statements made in furtherance of an enterprise's objectives which show a purpose of committing such crimes or securing their commission by others.

In other cases, the nature of the conduct engaged in by an enterprise will justify an inference that the standard is satisfied, even if there are no known statements by participants that advocate or indicate planning for violence or other prohibited acts. For example, such activities as attempting to obtain dangerous biological agents, toxic chemicals, or nuclear materials, or stockpiling explosives or weapons, with no discernible lawful purpose, may be sufficient to reasonably indicate that an enterprise aims to engage in terrorism.

Moreover, a group's activities and the statements of its members may properly be considered in

Case 1:07-cv-02103-LLS   Document 435   Filed 01/08/13   Page 34 of 38



# Backgrounder: The Holy Land Foundation for Relief and Development

*Conviction is A Judgement*

### Introduction

The Holy Land Foundation for Relief and Development (HLF), once considered the largest Muslim charity in the U.S., has been shut down by the government for funding Hamas.

On May 27, 2009, a federal judge in Dallas handed down sentences ranging from 15 to 65 years in prison to five of the charity's founders and former fundraisers. A federal jury returned guilty verdicts on all 108 counts against the HLF and its five former officers on November 24, 2008. The federal government proved to the jury that the defendants funneled over $12 million to Hamas after the U.S. government had designated it a foreign terrorist organization in 1995.

All five defendants were convicted for providing material support to Hamas. Ghassan Elashi and Shukri Abu-Baker, former HLF chairman and chief executive, were convicted of a combined 69 counts that included charges of tax fraud and money laundering. The other defendants – Mufid Abdulqader, Abdelrahman Odeh and Mohammed El-Mezain – were also convicted on conspiracy charges.

HLF gave money to charity organizations known as zakat committees that operated in the Palestinian territories. Though these were not listed as terrorist entities, Hamas controlled them and the money they collected benefited the terrorist organization's structure. According to the Department of Justice, "HLF intentionally hid its financial support for Hamas behind the guise of charitable donations."

Public records, including documents released by the government during the trial, indicate that HLF was part of an organizational structure that was set up by the radical Muslim Brotherhood to support the Hamas terrorist organization.

HLF was shut down and its assets frozen by the government in December 2001 after it was designated as a charity that provided material and logistical support to Hamas under Executive Orders 13224 and 12947. Subsequent appeals by HLF challenging the freezing of its assets were rejected.

The U.S. Justice Department obtained an indictment against HLF in 2004, accusing the charity and its top leaders of a conspiracy to provide aid to a terrorist organization. The Justice Department contended that HLF provided more than $12 million to individuals and organizations linked to Hamas between 1995 and 2001. In addition, the group reportedly raised a total of $57 million since its incorporation in 1992, but only reported $36.2 million to the IRS.

A first trial ended in a mistrial in October 2007 when the jury failed to come to a unanimous decision on most counts. Prosecutors made significant changes in the second trial, including dropping 29 counts against two of the defendants, Mufid Abdulqader and Abdulrahman Odeh, calling new witnesses, and decreasing the overall amount of evidence presented to the jury to avoid confusion.

During the trial, several Muslim organizations joined together with an anti-war group and other organizations to form a coalition in support of HLF. The coalition, dubbed "Hungry for Justice," included the Council on American-Islamic Relations (CAIR), the Muslim American Society (MAS) and the ANSWER Coalition.

### Connections to the Muslim Brotherhood and Hamas

Documents and evidence released during the Holy Land Foundation (HLF) trial showed that the charity was part of an apparatus set up in the U.S. to support efforts by the Muslim Brotherhood and Hamas.

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**FINANCIAL CRIMES ENFORCEMENT NETWORK**

IN THE MATTER OF:        )

                        )

                        )

                        )   **Number 2005-2**

THE FEDERAL BRANCH OF     )

ARAB BANK PLC            )

NEW YORK, NEW YORK      )

*[handwritten annotation: ORDER TO PAY A CRIMINAL FINE IS A DECREE BY THE FINANCIAL CRIMES ENFORCEMENT NETWORK]*

**<u>ASSESSMENT OF CIVIL MONEY PENALTY</u>**

I.    INTRODUCTION

    The Secretary of the United States Department of the Treasury has delegated to the Director of the Financial Crimes Enforcement Network the authority to determine whether a financial institution has violated the Bank Secrecy Act and the regulations issued pursuant to that Act,[1] and what, if any, sanction is appropriate.

    In order to resolve this matter, and only for that purpose, the Federal Branch of Arab Bank plc, New York, New York ("Arab Bank – New York") has entered into a CONSENT TO THE ASSESSMENT OF CIVIL MONEY PENALTY ("CONSENT") dated August 17, 2005, without admitting or denying the determinations by the Financial Crimes Enforcement Network, as described in Sections III and IV below, except as to jurisdiction in Section II below, which is admitted.

    The CONSENT is incorporated into this ASSESSMENT OF CIVIL MONEY PENALTY ("ASSESSMENT") by this reference.

II.    JURISDICTION

    Arab Bank is a public shareholding company and banking institution, with headquarters in Amman, the capital city of the Hashemite Kingdom of Jordan. Arab Bank has approximately 400 branches, offices, and subsidiaries – members of the Arab Bank Group – in thirty countries. The Arab Bank Group employs approximately 7,500 people and provides retail, private, corporate, correspondent, and other banking services to numerous businesses, organizations, institutions, and individuals in the Middle East and throughout the world. As of December 31, 2004, the Arab Bank Group had consolidated total assets of $27 billion. For the year ending December 31, 2004, the Arab Bank Group had consolidated net income of $319 million. The Arab Bank Group is a leading provider of financial services in the Middle East and North Africa.

---

[1] 31 U.S.C. §§ 5311 <u>et seq.</u> and 31 C.F.R. Part 103.

# AMEinfo.com

Source: www.ameinfo.com
» Company News/A/Arab Bank
Plc

# Arab Bank Group enters $5bn loan agreement foi

Arab Bank Group has recently signed a $5bn loan agreement, as part of a c
banks, for the benefit of Dubai World Corporation.

**Jordan:** Sunday, December 23 - 2007

The Arab Bank plays the top role in the deal as the Mandated Lead Arranger.

The loan will be used to fund general commercial activities including acquisitions and glol

Arab Bank's Chairman and CEO Abdel Hamid Shoman said the bank is always keen on di
growing needs in the region amid an exceptional boom witnessed by the various sectors
major regional and international banks.

He also said that Arab Bank constantly seeks to be a key player by responding to the nee
end a crystal clear strategy and a unique approach. He added that the bank's participatic
potential for growth characterizing Dubai World.

Shoman also stressed that Arab Bank provides versatile and diverse packages of product:
competition within the banking sector. He also reiterated that the Bank which was establi
decades in implementing professional banking practices based on mutual trust between t
safeguards their savings and increases them.

Dubai World Corporation is a holding company which manages and supervises a diversifie
projects for the government of Dubai. It seeks to ensure the Emirate of Dubai a top notc
realm. The investments portfolio it manages spans over 100 different cities around the w
Nakheel Development, and Dubai Ports, one of the top three port operators in the world,
like tourism and financial services.

Dubai World's assets stand at $65bn and the company employs 50,000 people around th
leading regional and international companies in the fields of transport, real estate, ports

Arab Bank is based in Amman, Jordan. It is considered the biggest private sector financia
shareholder equity base of $6.6bn at the end of September 2007, and the largest Arab b
balance sheet at end of September 2007 totaled $52.6bn, assets $37.2bn, and revenues

The Group has gained prominence in key markets and financial centers in Europe, Asia-P.

The Arab Bank Group provides a wide variety of financial services to individuals, corporat
financial institutions.

© 1996-2013 by AME Info FZ LLC / 4C. All rights reserved.

Clerk of the U.S. District Court
United States Courthouse
500 Pearl Street
New York, NY 10007
Ph. 212-805-0252

RECEIVED
SDNY PRO SE OFFICE
2013 JAN -8 P 12: 40

Extremely Urgent

Insert shipping document here.

and
; and
vice
n.

Do not ship liquids, blood, or diagnostic in this package.

RECEIVED
JAN 1 8 2013
PRO SE OFFICE



A1
INTL PRIORITY
ISR
10007
NY-US
EWR

XA PCTA

TRK# 5468 2824 3730
8493

Ship Date: 07JAN13
ActWgt: 1.0 LB MAN
CAD: 649993/GSM0V483

REF: INV 72168 KO
DESC-1: BUSINESS DOCUMENTS
DESC-2:
DESC-3:
DESC-4:

COUNTRY MFG: HN
CARRIAGE VALUE: 0.00 USD
CUSTOMS VALUE: 0.00 USD
T/C: S 180131085
SIGN: GEORGE MAY
EINVAT:
PKG TYPE: ENV

FedEx Express

From: 504-2555-0835
GEORGE MAY

SECTOR RIVERA HERNANDEZ

SAN PEDRO SULA,
HONDURAS

Origin ID: S4PA

E

BILL SENDER

SHIP TO: (212) 805-0292
CLERK OF THE U.S. DISTRICT COURT
UNITED STATES COURTHOUSE
500 PEARL STREET

NEW YORK, NY 10007
US



The Warsaw Convention may apply and all goods sent in most cases limit the liability of Federal
Express for loss or delay of damage to your shipment. Subject to the conditions of the contract

Copia del destinatario – por favor Coloque en el sobre

1 Libre - al recibo "recomer" un este clarar nuas imprimir la relevada en su amerecen libre n de inversión de tinta

FedEx Express

5DOU1D08AH06C

FedEx
xpress ®