**PUBLIC VERSION**
**REDACTED**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| VIACOM INT'L INC., ET AL., ) | |
| ) | |
| ) | |
| Plaintiffs, ) | ECF Case |
| v. ) | Civil No. 07-CV-2103 (LLS) |
| ) | |
| YOUTUBE, INC., ET AL., ) | |
| ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RENEWED
## MOTION FOR SUMMARY JUDGMENT

David H. Kramer
Michael H. Rubin
Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

Andrew H. Schapiro
David B. Schwartz
QUINN EMANUEL URQUHART &
  SULLIVAN LLP
51 Madison Avenue
22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendants*

PUBLIC VERSION
REDACTED

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

GLOSSARY ..................................................................................................... vi

INTRODUCTION ............................................................................................. 1

FACTUAL AND LEGAL BACKGROUND ..................................................... 2

ARGUMENT ................................................................................................... 14

I.   YOUTUBE DID NOT HAVE ACTUAL OR RED-FLAG KNOWLEDGE
     OF INFRINGEMENT OF ANY OF VIACOM'S CLIPS-IN-SUIT .................. 14

     A.   To Satisfy The DMCA, Viacom Would Have To Show That
          YouTube Had Actual Or Red-Flag Knowledge Of Particular
          Clips-In-Suit .................................................................................. 14

     B.   The DMCA Imposes A "High Bar" For A Showing Of Knowledge ....... 16

     C.   Viacom Cannot Make The Clip-Specific Showing Of Knowledge
          Or Awareness That The DMCA Requires .............................................. 18

          1.   The Evidence That Viacom Relies On Does Not Create A Jury
               Question As To YouTube's Knowledge Of Infringement Of Any
               Clip-In-Suit .................................................................................. 19

          2.   Viacom's Posting Of And Leaving Its Own Content On YouTube
               Undermines Its Claims About YouTube's Knowledge Of
               Infringement ................................................................................ 23

II.  YOUTUBE CANNOT BE DEPRIVED OF THE DMCA SAFE
     HARBOR BASED ON VIACOM'S INVOCATION OF "WILLFUL
     BLINDNESS" .......................................................................................... 29

     A.   As Limited By The DMCA, Willful Blindness Requires Viacom
          To Show That YouTube Consciously Avoid Confirming A High
          Probability That A Specific Clip-In-Suit Was Infringing ...................... 30

     B.   Viacom's Effort To Revive Its Discredited Generalized
          Knowledge Approach In The Guise of Willful Blindness Must Be
          Rejected ....................................................................................... 32

     C.   There Is No Evidence From Which A Jury Could Find That
          YouTube Deliberately Avoided Confirming A High Probability
          That Any of Viacom's Clips-In-Suit Were Infringing ........................... 35

**PUBLIC VERSION**
**REDACTED**

III. YOUTUBE DID NOT HAVE CONTROL OVER THE INFRINGING
ACTIVITY COUPLED WITH A DIRECT FINANCIAL BENEFIT ............... 38

    A. "Control" Under The DMCA Requires A Service Provider To
Exert A Substantial Influence Over The Infringing Activity Of
Its Users ................................................................................................. 38

    B. Viacom Cannot Show That YouTube Exerted A Substantial
Influence Over The Infringement Of Any Clip-In-Suit ........................ 41

    C. YouTube Did Not Receive A Financial Benefit Directly
Attributable To The Alleged Infringement ........................................... 44

IV. VIACOM'S CLAIMS ARISE "BY REASON OF THE STORAGE AT
THE DIRECTION" OF USERS OF MATERIAL ON YOUTUBE'S
SYSTEM ............................................................................................... 46

    A. Viacom Cannot Show That Any Of Its Clips-In-Suit Were
Manually Selected For Delivery To A Third Party ............................... 48

    B. Viacom's Effort To Exclude YouTube's Ordinary Syndication
Practices From The Safe Harbor Is Contrary To The Second
Circuit's Decision And To The Purpose Of The DMCA ....................... 50

CONCLUSION............................................................................................. 56

PUBLIC VERSION
REDACTED

## TABLE OF AUTHORITIES

Page

### Cases

*Capital Records, Inc. v. MP3tunes, LLC,*
    821 F. Supp. 2d 627 (S.D.N.Y. 2011) .................................................. 17, 26, 33, 45

*Global-Tech Appliances, Inc. v. SEB S.A.,*
    131 S. Ct. 2060 (2010) ........................................................................... 30, 31

*Io Grp., Inc. v. Veoh Networks, Inc.,*
    586 F. Supp. 2d 1132 (N.D. Cal. 2008) .................................. 36, 41, 42, 46, 48, 55

*Metro-Goldwyn-Meyer Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005) ............................................................................. 9, 13, 43

*Obodai v. Demand Media, Inc.,*
    No. 11-civ-2503 (PKC), 2012 WL 2189740
    (S.D.N.Y. June 13, 2012) ...................................................................... 53

*Perfect10, Inc. v. Amazon.com, Inc.,*
    No. CV-05-4753 (C.D. Cal. Nov. 4, 2008) (Dkt. No. 221) ..................................... 15

*Perfect 10, Inc. v. CCBill LLC,*
    488 F.3d 1102 (9th Cir. 2007) ................................................................. 17

*Powerex Corp. v. Reliant Energy Servs., Inc.,*
    551 U.S. 224 (2007) ............................................................................. 41

*Tiffany (NJ) Inc. v. eBay, Inc.,*
    576 F. Supp. 2d 463 (S.D.N.Y. 2008) ...................................................... 32

*Tiffany (NJ) Inc. v eBay, Inc.,*
    600 F.3d 93 (2d Cir. 2010) .................................................................... 30, 32, 36

*UMG Recordings Inc. v. Veoh Networks, Inc.,*
    620 F. Supp. 2d 1081 (C.D. Cal. 2008) ........................................ 48, 51, 53, 54, 55

*UMG Recordings, Inc. v. Veoh Networks, Inc.,*
    665 F. Supp. 2d 1099 (C.D. Cal. 2009) ....................................... 15, 16, 17, 27

*UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
    667 F.3d 1022 (9th Cir. 2011) ...................................... 15, 16, 17, 20, 48

*United States v. Aina-Marshall,*
    336 F.3d 167 (2d Cir. 2003) ................................................................. 31

iii

PUBLIC VERSION
REDACTED

*United States v. Ben Zvi,*
    242 F.3d 89 (2d Cir. 2001) ................................................................... 14

*Viacom Int'l, Inc. v. YouTube, Inc.,*
    718 F. Supp. 2d 514 (S.D.N.Y. 2010) .......................................... 1, 9, 10, 17, 33, 43

*Viacom Int'l, Inc. v. YouTube, Inc.,*
    676 F.3d 19 (2d Cir. 2012) ................................................................ passim

*Wolk v. Kodak Imaging Network, Inc.,*
    840 F. Supp. 2d 724 (S.D.N.Y. 2012) ................................................ 45

## Statutes

17 U.S.C. § 512 ................................................................................................ 1

17 U.S.C. § 512(c) ................................................................................... passim

17 U.S.C. § 512(c)(1) ................................................................. 9, 12, 13, 46, 47, 48

17 U.S.C. § 512(c)(1)(B) ............................................................................. passim

17 U.S.C. § 512(c)(1)(A) ..................................................................................... 20

17 U.S.C. § 512(c)(1)(A)(iii) ................................................................... 21, 34, 38

17 U.S.C. § 512(c)(1)(C) ................................................................................... 38

17 U.S.C. § 512(i) ................................................................................... 12, 37

17 U.S.C. § 512(m) ......................................................... 11, 12, 34, 36, 37, 39, 40, 42

## Legislative History

H.R. Rep. No. 105-551 (II) (1998) ....................................... 16, 17, 29, 34, 44

H.R. Rep. No. 105-796 (1998) (Conf. Rep.) ...................................................... 40

S. Rep. No. 105-190 (1998) ................................................... 16, 17, 34, 44, 54

## Other

Br. for Defendants-Appellees, *Kane v. Comedy Partners,*
    98 Fed. Appx. 73 (2d Cir. Feb. 2004)
    (No 03-9136), 2004 WL 3365922 ............................................................ 8

G. Williams, Criminal Law § 57 (2d ed. 1961) .......................................... 31

**PUBLIC VERSION**
**REDACTED**

Restatement (Third) of Agency § 3.09..........................................................................19

PUBLIC VERSION
REDACTED

## <u>GLOSSARY</u>

| | |
|---|---|
| CSS | Class Plaintiffs' Counterstatement of Controverted Material Facts in Opposition to Defendants' Motion for Summary Judgment, filed May 7, 2010 |
| RVCS | Reply to Viacom's Counter-Statement in Response to Defendant's Local Rule 56.1 Statement in Support of Defendants' Motion for Summary Judgment, filed June 14, 2010 |
| RVSCS | Response to Viacom's Supplemental Counter-Statement, filed June 14, 2010 |
| SUF (¶¶ 1-171) | Defendants' Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried, filed March 5, 2010 |
| SUF (¶¶ 172-181) | Defendants' Supplemental Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried, filed December 7, 2012 |
| VRYCS | Viacom's Reply To Defendant's Counterstatement To Viacom's Statement Of Undisputed Facts In Support Of Its Motion For Partial Summary Judgment, filed June 4, 2010. |
| VCS | Viacom's Counter-Statement In Response To Defendants' Local Rule 56.1 Statement In Support Of Defendants' Motion For Summary Judgment, filed April 30, 2010 |
| VSCS | Viacom's Supplemental Counter-Statement In Response To Facts Asserted In Defendants' Summary Judgment Memorandum Of Law But Omitted From Defendants' Local Rule 56.1 Statement, filed, April 30, 2010 |
| VSUF | Viacom's Statement Of Undisputed Facts In Support Of Its Motion For Partial |

vi

PUBLIC VERSION
REDACTED

Summary Judgment On Liability And Inapplicability Of The Digital Millennium Copyright Act Safe Harbor Defense, filed March 5, 2010

YCVS — YouTube's Counterstatement To Viacom's Statement Of Undisputed Facts In Support Of Its Motion For Partial Summary Judgment Of Liability And Inapplicability Of The Digital Millennium Copyright Act Safe Harbor Defense, filed May 10, 2010

Botha Decl. — Declaration Of Roelof Botha In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010

First Amended Complaint — First Amended Complaint For Declaratory And Injunctive Relief And Damages And Demand For Jury Trial, filed April 24, 2008

Hohengarten Decl. — Declaration Of William M. Hohengarten In Support Of Viacom's Motion For Partial Summary Judgment, filed March 5, 2010

Hurley Opening Decl. — Declaration of Chad Hurley in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Hurley Opp. Decl. — Declaration Of Chad Hurley In Support Of Defendants' Opposition To Plaintiffs' Motions For Partial Summary Judgment, filed April 30, 2010

King Opening Decl. — Declaration Of David King In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010

King Opp. Decl. — Declaration of David King in Support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment, filed April 30, 2010

Levine Opening Decl. — Declaration Of Zahavah Levine, filed March 5, 2010

PUBLIC VERSION
REDACTED

| | |
|---|---|
| Maxcy Opening Decl. | Declaration of Christopher Maxcy in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010 |
| Maxcy Opp. Decl. | Declaration of Christopher Maxcy in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed April 30, 2010 |
| Order Granting Viacom's Motion to Dismiss Specified Clips with Prejudice | Notice Of Dismissal Of Specified Clips With Prejudice, Mar. 10, 2010, Dkt. No. 181 |
| Reider Decl. | Declaration Of Suzanne Reider In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010 |
| Rubin Opening Decl. | Declaration Of Michael Rubin In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010 |
| Rubin Reply Decl. | Reply Declaration Of Michael Rubin In Support Of Defendants' Motion For Summary Judgment, filed June 4, 2010 |
| Schaffer Opening Decl. | Declaration Of Micah Schaffer In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010 |
| Schapiro Opening Decl. | Declaration Of Andrew H. Schapiro In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010 |
| Schapiro Opp. Decl. | Declaration Of Andrew H. Schapiro In Support Of Defendants' Opposition To Plaintiffs' Motions For Partial Summary Judgment, filed May 10, 2010 |
| Schapiro Reply Decl. | Reply Declaration Of Andrew H. Schapiro In Support Of Defendants' Motion For Summary Judgment, filed June 14, 2010 |
| Schwartz Decl. | Declaration of David B. Schwartz in Support of Defendants' Renewed Motion for Summary Judgment, filed December 7, 2012 |

viii

PUBLIC VERSION
REDACTED

| | |
|---|---|
| Solomon Opp. Decl. | Declaration of Michael Solomon in Support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment, filed May 10, 2010 |
| Solow Decl. | Hohengarten Ex. 2 |
| Viacom 2d Cir. Br. | Brief for Plaintiffs-Appellants, filed December 7, 2010 (No. 10-3270) (Dkt. No. 63) |
| Viacom's 2d Cir. Reply Br. | Reply Brief for Plaintiffs-Appellants, filed April 28, 2011 (No. 10-3270) (Dkt. No. 387) |
| Walk Decl. | Declaration of Hunter Walk in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010 |
| YT Supp. Submission | YouTube's Supplemental Submission in Response to the Court's Request for an Appendix of Evidence of Knowledge or Awareness of Specific Infringing Activities, filed December 7, 2012 |

PUBLIC VERSION
REDACTED

Defendants YouTube, Inc., YouTube, LLC, and Google, Inc. ("YouTube")
submit this memorandum of law in support of YouTube's renewed motion for
summary judgment.  On remand from the Second Circuit's decision in *Viacom
International, Inc. v. YouTube, Inc.* (*Viacom II*), 676 F.3d 19 (2d Cir. 2012), YouTube
seeks a ruling that it is protected by the safe-harbor provisions of the Digital
Millennium Copyright Act, 17 U.S.C. § 512 ("DMCA"), as to all of Viacom's
copyright infringement claims.

## INTRODUCTION

This case returns to this Court from the Second Circuit.  On YouTube's
original motion for summary judgment, this Court found that YouTube qualified for
the DMCA § 512(c) safe harbor against the plaintiffs' claims for direct and
secondary copyright infringement.  *Viacom Int'l, Inc. v. YouTube, Inc.* (*Viacom I*),
718 F. Supp. 2d 514, 529 (S.D.N.Y. 2010).  The Second Circuit adopted much of the
Court's interpretation of the DMCA, but held that the grant of summary judgment
was "premature" because certain issues required additional consideration by this
Court.  *Viacom II*, 676 F.3d at 34, 41.  The court of appeals remanded for resolution
of four discrete questions regarding YouTube's safe-harbor eligibility in the context
of "renewed motions for summary judgment."  *Id.* at 41-42.  In its submissions on
remand, Viacom has failed to provide meaningful answers to those questions.
Instead, on each issue, Viacom has misconstrued the law as announced by the
Second Circuit and avoided making a showing linked in any meaningful way to its
"clips-in-suit"—the only allegedly infringing videos at issue in this case.  Once
Viacom's flawed view of the law is rejected, the existing record establishes that
YouTube is entitled to summary judgment on the applicability of the DMCA safe
harbor with respect to all of Viacom's clips-in-suit.

PUBLIC VERSION
REDACTED

## FACTUAL AND LEGAL BACKGROUND

### A.    YouTube's Founding And Operation

In its ruling, the Second Circuit described YouTube's founding, growth, and

the operation of its website:

> YouTube was founded in February 2005 by Chad Hurley
> ("Hurley"), Steve Chen ("Chen"), and Jawed Karim ("Karim"), three
> former employees of the internet company Paypal.  When YouTube
> announced the "official launch" of the website in December 2005, a
> press release described YouTube as a "consumer media company" that
> "allows people to watch, upload, and share personal video clips at
> www.YouTube.com."  Under the slogan "Broadcast yourself," YouTube
> achieved rapid prominence and profitability, eclipsing competitors such
> as Google Video and Yahoo Video by wide margins.  In November 2006,
> Google acquired YouTube in a stock-for-stock transaction valued at
> $1.65 billion.  By March 2010, at the time of summary judgment
> briefing in this litigation, site traffic on YouTube had soared to more
> than 1 billion daily video views, with more than 24 hours of new video
> uploaded to the site every minute.

> The basic function of the YouTube website permits users to
> "upload" and view video clips free of charge.  Before uploading a video
> to YouTube, a user must register and create an account with the
> website.  The registration process requires the user to accept
> YouTube's Terms of Use agreement, which provides, inter alia, that
> the user "will not submit material that is copyrighted ... unless [he is]
> the owner of such rights or ha[s] permission from their rightful owner
> to post the material and to grant YouTube all of the license rights
> granted herein."  When the registration process is complete, the user
> can sign in to his account, select a video to upload from the user's
> personal computer, mobile phone, or other device, and instruct the
> YouTube system to upload the video by clicking on a virtual upload
> "button."

> Uploading a video to the YouTube website triggers a series of
> automated software functions. During the upload process, YouTube
> makes one or more exact copies of the video in its original file format.
> YouTube also makes one or more additional copies of the video in
> "Flash" format, a process known as "transcoding."  The transcoding
> process ensures that YouTube videos are available for viewing by most
> users at their request. The YouTube system allows users to gain access

PUBLIC VERSION
REDACTED

to video content by "streaming" the video to the user's computer in response to a playback request. YouTube uses a computer algorithm to identify clips that are "related" to a video the user watches and display links to the "related" clips.

*Viacom II*, 676 F.3d at 28 (alterations in original) (footnote omitted).

### B.   YouTube's Efforts To Help Copyright Owners Stop Infringement

YouTube has always taken copyright issues seriously, and its founders recognized that doing so was important to building their business. SUF ¶¶ 48-59; RVSCS ¶¶ 1.111, 1.114; Botha Decl. ¶ 6; Hurley Opening Decl. ¶¶ 11-16, 19. YouTube has never solicited infringing material or encouraged users to post unauthorized videos. SUF ¶¶ 48-59; *see also* Hurley Opening Ex. 25 (Hurley: "we should never promote piracy or tell them how to do it"). To the contrary, YouTube's earliest advertisements emphasized its aim to "become a community of digital video authors and their videos." SUF ¶¶ 11-13; *see also* Hurley Opening Decl. ¶ 10 & Ex. 11. The very name of the service and its slogan ("Broadcast Yourself") reinforced YouTube's focus on personal videos. SUF ¶¶ 6-9 (citing Schapiro Opening Ex. 162 ("The videos you upload should be about you (hence, YouTube!)")).

Consistent with that message, YouTube has long worked to deter users from uploading unauthorized material and to assist content owners in protecting their copyrights.[1] In addition to its Terms of Use, which prohibit users from posting unauthorized copyrighted material (SUF ¶ 49), YouTube provides a "Copyright

---

[1] In the early days of the service, YouTube's founders occasionally came across what looked like professional media content that they were concerned may have been posted without authorization. They consistently *rejected* such videos, which they viewed as inconsistent with their vision for the site. SUF ¶ 9; *see also* Hurley Opening Decl. ¶¶11, 15-17 & Exs. 9, 13, 17, 19, 20, 21, 30; Hurley Opp. Decl. ¶6 & Exs. D-G; Hohengarten Ex. 206. In July 2005, for example, Chad Hurley wrote to tell a user that his video had been "rejected because it was copyrighted material," explaining that "[w]e are trying to build a community of real user-generated content." Hurley Opening Ex. 22.

PUBLIC VERSION
REDACTED

Tips" page to help users understand copyright law and avoid inadvertently posting infringing videos.  SUF ¶¶ 53-54.  YouTube has also registered an agent to receive notices of alleged infringement from copyright holders; expeditiously removes allegedly infringing materials upon receiving such notices; terminates the accounts of users suspected to be repeat infringers; and maintains a team of employees to assist copyright owners in removing unauthorized material.  SUF ¶¶ 60-87.  Copyright holders and anti-piracy groups like the Motion Picture Association of America have repeatedly praised YouTube for its efforts to combat copyright abuse.  SUF ¶¶ 70, 87.

From early in its operations, YouTube has also used technological measures to help content owners.  In early 2006, YouTube introduced a tool that allows copyright holders to mark allegedly infringing videos and have them removed with the click of a button.  SUF ¶¶ 90-93.  At the same time, YouTube deployed "hashing" technology that blocks any user from uploading identical copies of videos previously removed in response to takedown notices.  SUF ¶¶ 88-89.  In February 2007, YouTube started using audio-based "fingerprinting" technology licensed from a company called Audible Magic.  SUF ¶¶ 94-96.  Recognizing the limits of existing technologies, YouTube rapidly supplemented its use of Audible Magic by building its own fingerprinting system.  SUF ¶¶ 97; *see also* King Opening Decl. ¶¶ 11-28.

YouTube's pioneering technology, called Content ID, uses audio- and video-fingerprinting technology developed in-house to identify videos on YouTube.  SUF ¶¶ 97-110.  Content ID scans every single video uploaded to YouTube and compares it with reference files provided by participating copyright holders.  SUF ¶ 106.  If a match is identified in a portion of the video, the system applies the content owner's instructions about what to do with the video.  SUF ¶ 105.  YouTube was the first

PUBLIC VERSION
REDACTED

user-submitted content website to develop its own video-based fingerprinting system.  SUF ¶ 100.  Since it launched in October 2007, Content ID has been used by thousands of copyright holders to make their own choices about how, where, when, or whether they want their material to appear on YouTube.  SUF ¶¶ 104, 109-10.  YouTube offered Content ID to Viacom as soon as it launched, and Viacom signed an agreement to start using the technology in February 2008.  SUF ¶¶ 111-112; *see also* King Opp. Decl. ¶¶ 7, 9-10.[2]

## C.   Quantity And Diversity Of Videos On YouTube

YouTube hosts an extraordinary range of video content.  In YouTube's first five years of operation, more than 500 million videos were posted from over 250 million separate accounts.  SUF ¶¶ 32, 86.  Those videos are endlessly varied: amateur comedy routines, raw video footage taken in war zones or during protests in foreign capitals, clips of cats playing the piano, videos teaching people how to fix a faucet or bake a cake, and video messages sent by U.S. soldiers overseas to their families back home, to give just a few examples.  Walk Decl. ¶¶ 2-22.  In addition to its immense diversity of user-generated video content, YouTube has entered into partnerships with numerous television and movie studios, sports teams and leagues, record labels, and music publishers.  SUF ¶¶ 43, 164.  These content creators make their material available on YouTube either by uploading it directly or by "claiming" videos posted by other users.  SUF ¶¶ 121, 164.

---

[2] Acknowledging the effectiveness of Content ID, Viacom has abandoned its infringement claims for the thousands of clips-in-suit uploaded to YouTube after May 2008, the date that Viacom began using Content ID to identify its content on YouTube.  SUF ¶ 172; Schwartz Ex. 1 (7:7-12).  YouTube requests that the Court enter judgment of noninfringement for all of those clips, as well as the 408 other clips-in-suit that Viacom withdrew from its motion for summary judgment, apparently because it realized that they were taken from works that were not registered with the Copyright Office, and thus that cannot be the subject of an infringement action.  *See* Solow Decl. ¶ 27.

PUBLIC VERSION
REDACTED

**D.     Viacom And Its Relationship With YouTube**

Viacom is a media conglomerate with hundreds of subsidiaries.  It alleges copyright infringement claims against YouTube with respect to television programs appearing on various networks (including MTV, VH1, Comedy Central, CMT, BET, and Nickelodeon), as well as motion pictures owned by its subsidiary Paramount Pictures.

Notwithstanding its litigation claims, Viacom has embraced YouTube to advance its business.  Recognizing that "YouTube is a powerful marketing platform that most networks are using for promotion" (Schapiro Reply Ex. 5), Viacom and various third-party marketing agencies working on its behalf posted a wide array of clips from Viacom television programs and movies to YouTube.  SUF ¶¶ 44, 46, 121-25; *see also* Rubin Opening Ex. 102; Schapiro Opening Ex. 54; Schapiro Opp. Exs. 6, 34, 40, 43, 44, 56, 58, 64; Schapiro Reply Ex. 154.  Viacom did some of its uploading openly, but much of it was covert, using dozens of obscure YouTube accounts that bore no obvious link to Viacom.  SUF ¶ 125; RVCS ¶ 125; Rubin Opening Exs. 86, 96, 101, 106, 109, 112, 115, 116; Schapiro Opp. Ex. 4; Rubin Reply Decl. ¶¶ 2-6 & Exs. 14, 38, 39.  Viacom also issued confidential (and ever changing) instructions to its copyright-monitoring agents to leave up on YouTube a wide array of user-posted videos containing Viacom content—clips that Viacom was aware of and could easily have taken down had it wanted to.  SUF ¶¶ 130-135; RVCS ¶¶ 125,128; Rubin Opening Ex. 109; Schapiro Opening Exs. 4 (132:19-133:14, 192:18-24), 58, 62-64, 70-71, 74-76; Schapiro Reply Exs. 18, 22-23.

In 2006, Viacom tried to purchase YouTube, after concluding that it would be a "transformative acquisition."  SUF ¶¶ 46-47; Schapiro Opening Exs. 4 (64:1-65:14), 175.  Viacom executives determined that "[c]onsumption of 'branded' content on YT is low" (Schapiro Opp. Ex. 216 (at 22)) and that "user generated content appears to

PUBLIC VERSION
REDACTED

be what's driving it right now" (Schapiro Opp. Ex. 173; *see also* Schapiro Opp. Ex. 174 (Viacom executive contrasting YouTube with Napster: "Napster had effectively no non-infringing uses, YT has many, etc.")).  The same year, Viacom proposed a content partnership with YouTube.  YCVS ¶ 203; Maxcy Opening Decl. ¶ 8; Schapiro Opening Ex. 7.  When negotiations stalled in February 2007, Viacom sent YouTube takedown notices for approximately 100,000 clips, a tactic that it hoped would pressure YouTube to accept Viacom's terms.  SUF ¶ 68; YCVS ¶¶ 208-210; RVCS ¶ 128; Schapiro Opening Ex. 10.  In its zeal to inflate the number of takedown requests (Schapiro Reply Exs. 26-27), Viacom erroneously targeted many clips that Viacom itself had authorized to appear on YouTube, as well as thousands of other videos in which Viacom had no copyright interest at all.  SUF ¶ 145; Rubin Reply Decl. ¶ 4(ii) & Ex. 39; RVSCS ¶¶ 1.63-65; Schapiro Opp. Exs. 221 (229:19-233:18), 275, 278, 306, 310, 313, 316.  Even so, by the next business day, YouTube had taken down the videos that Viacom had identified.  SUF ¶ 69.  Having failed to obtain the deal that it wanted, Viacom sued YouTube in March 2007.

### E.    Viacom's Clips-In-Suit

This case concerns the alleged infringement of a closed universe of videos clips (the "clips-in-suit") posted on YouTube at various times between 2005 and 2008.  Those clips allegedly contain material taken from approximately 3,085 Viacom works (the "works-in-suit"), including television programs and motion pictures.  All of Viacom's clips-in-suit have been removed from YouTube, mostly in response to DMCA takedown notices.  *Viacom II*, 676 F.3d at 29 n.7.  As the Second Circuit explained, "only the current clips-in-suit are at issue in this litigation."  *Id.* at 34.

PUBLIC VERSION
REDACTED

Viacom originally claimed that hundreds of thousands of YouTube videos infringed its copyrights (First Amended Complaint ¶ 3), but ultimately identified a list of 63,497 clips-in-suit.  Rubin Opening Decl. ¶¶ 6-7.[3]  It turned out, however, that many of those allegedly infringing clips had actually been uploaded to YouTube by Viacom's own employees and agents, and thus were licensed to be on YouTube.  SUF ¶¶ 150-152; RVSCS ¶¶ 1.63-65; Rubin Opening Decl. ¶¶ 6-8, 10-11; Schwartz Ex. 2.  Even when Viacom realized, after years of litigation, that it had been responsible for posting a number of the clips-in-suit and tried to drop them from the case, its lawyers today remain unable to find and exclude all of the allegedly infringing clips that Viacom had uploaded or otherwise authorized.  SUF ¶ 152; RVCS ¶127; RVSCS ¶ 1.63; Rubin Reply Decl. ¶ 11.  Many remaining clips-in-suit, moreover, are identical to or indistinguishable from promotional clips that Viacom now acknowledges posting to YouTube.  RVSCS ¶ 1.63; Rubin Opening Decl. ¶ 17 & Ex. 131; Rubin Reply Decl. ¶¶ 9-10; Rubin Reply Ex. 81.

Most of Viacom's clips-in-suit are under four minutes long; many are under one minute long; and such clips reproduce very small portions of the works from which they are drawn.  SUF ¶¶ 114-115.  These short clips, like many of Viacom's other clips-in-suits raise obvious fair-use questions.[4]  *Cf.* Br. for Defendants-Appellees at 22, *Kane v. Comedy Partners*, 98 Fed. Appx. 73 (2d Cir. Feb. 4, 2004) (No. 03-9136), 2004 WL 3365922 (Viacom arguing that use of "4% to 8% of the copyrighted work … constitutes use of a small or insignificant portion that requires a fair use finding as a matter of law.").

---

[3]  As noted above, Viacom jettisoned many clips-in-suit by abandoning claims concerning videos posted after May 2008.  SUF ¶ 172.

[4]  *See also, e.g.,* Schapiro Reply Ex. 173A/173B (uploaded by Barack Obama's campaign); *id.* at 175A/175B (interview uploaded by the AP)).

PUBLIC VERSION
REDACTED

**F.   This Court's Summary Judgment Ruling**

After years of extensive discovery, the parties filed cross-motions for summary judgment on the applicability of the DMCA safe harbor.  This Court denied the plaintiffs' motions and granted summary judgment to YouTube, holding that it qualifies "for the protection of 17 U.S.C. § 512(c) … against all of plaintiffs' claims for direct and secondary copyright infringement."  *Viacom I*, 718 F. Supp. 2d at 529.  In so holding, the Court concluded that the DMCA's knowledge provisions "describe knowledge of specific and identifiable infringements of particular individual items.  Mere knowledge of prevalence of such activity in general is not enough."  *Id*. at 523.

This Court also found that YouTube's safe-harbor eligibility was not affected by the plaintiffs' arguments about inducement of infringement under the Supreme Court's decision in *Metro-Goldwyn-Meyer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005):

> The *Grokster* model does not comport with that of a service provider who furnishes a platform on which its users post and access all sorts of materials as they wish, while the provider is unaware of its content, but identifies an agent to receive complaints of infringement, and removes identified material when he learns it infringes. To such a provider, the DMCA gives a safe harbor, even if otherwise he would be held as a contributory infringer under the general law.

*Viacom I*, 718 F. Supp. 2d at 526.

The Court next rejected Viacom's argument that the replication, transmittal, and display of YouTube videos falls outside the protection that the DMCA affords for "infringement of copyright by reason of ... storage at the direction of the user." *Viacom I*, 718 F. Supp. 2d at 526-27 (quoting § 512(c)(1)).  The Court then turned to the provision requiring that the service provider "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service

PUBLIC VERSION
REDACTED

provider has the right and ability to control such activity."  § 512(c)(1)(B).  The Court held that YouTube could not be disqualified under the "control" prong because a "provider must know of the particular case before he can control it." *Viacom I*, 718 F. Supp. 2d at 527.  Based on that holding, the Court had no occasion to address the "financial benefit" prong of § 512(c)(1)(B).  *Id.*  Finally, the Court addressed various arguments that the plaintiffs had made about YouTube's policies for responding to DMCA takedown notices and terminating the accounts of repeat copyright infringers.  *Id.* at 527-29.  The Court rejected each of these arguments, explaining that they "do not singly or cumulatively affect YouTube's safe harbor coverage."  *Id.* at 527.

### G.    The Second Circuit's Decision

The Second Circuit affirmed in part, vacated in part, and remanded for further proceedings.  *Viacom II*, 676 F.3d at 26.  The court of appeals endorsed most of this Court's legal conclusions about the DMCA safe harbors, but concluded that additional questions remained as to whether summary judgment could be granted.

Initially, the Second Circuit agreed with this Court that the DMCA's actual knowledge and "red-flag" awareness provisions both "apply only to specific instances of infringement."  *Viacom II*, 676 F.3d at 31.  The court rejected Viacom's arguments that generalized knowledge was sufficient and that the statute's red-flag knowledge provision "requires less specificity" than the actual knowledge provisions.  *Id.* at 30-31 (quotation marks omitted).  The court ruled that it was "premature" to have granted summary judgment because it could not tell whether there was evidence in the record from which it might be found that YouTube had specific knowledge relating to any of the plaintiffs' clips-in-suit.  *Id.* at 32-34.  The Second Circuit therefore remanded for this Court to determine "whether any specific infringements

PUBLIC VERSION
REDACTED

of which YouTube had knowledge or awareness correspond to the clips-in-suit in these actions." *Id*. at 34.

The Second Circuit then addressed the relationship between the DMCA and the common law doctrine of willful blindness. The court explained that § 512(m)—a provision making "explicit" that "DMCA safe harbor protection cannot be conditioned on affirmative monitoring by a service provider"—"limits" the willful blindness doctrine in this context. *Viacom II*, 676 F.3d at 35. As limited, the doctrine "may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of *specific instances* of infringement under the DMCA." *Id*. (emphasis added). The Second Circuit said that whether YouTube had been willfully blind to the infringement of any of the plaintiffs' clips-in-suit remained "a fact question for the District Court to consider in the first instance on remand." *Id*.

The court next held that the DMCA's "right and ability to control" provision does not require knowledge of infringing activity, but it rejected Viacom's argument that the provision merely codifies the common law of vicarious liability. *Viacom II*, 676 F.3d at 36-38. Instead, the court found that "control" under the DMCA exists only in circumstances involving "a service provider exerting substantial influence on the activities of users." *Id*. at 38. Based on that holding, the Second Circuit instructed this Court "to consider in the first instance whether the plaintiffs have adduced sufficient evidence to allow a reasonable jury to conclude that YouTube had the right and ability to control the infringing activity and received a financial benefit directly attributable to that activity." *Id*.

The Second Circuit turned to the plaintiffs' claims that YouTube was ineligible for the safe harbor because the alleged infringements at issue did not occur "by reason of the storage at the direction of a user of material that resides on

11

PUBLIC VERSION
REDACTED

a system or network controlled or operated by or for the service provider" under § 512(c)(1). The court rejected the plaintiffs' challenge to three core YouTube software functions—the transcoding of videos into different file formats, the playback of those videos in response to user requests, and YouTube's "related videos" function—holding that each is protected by § 512(c). *Viacom II*, 676 F.3d at 39-40. With respect to a final function ("third-party syndication") the court focused on a November 2006 agreement between YouTube and Verizon Wireless. *Id*. at 40. Under that agreement, YouTube for a short time manually selected a small number of videos, copies of which were then taken off of YouTube's system and hand-delivered to Verizon so that Verizon could make them accessible from its own system to users of its devices. Schapiro Opp. Ex. 325 (37:6-38:15; 38:25-39:6); Schwartz Ex. 9 (55:8-56:17). The Second Circuit observed that it was unclear whether "business transactions" that "involve the manual selection of copyrighted material for licensing to a third party" are protected under the DMCA. *Viacom II*, 676 F.3d at 40. Rather than "render[] an advisory opinion on the outer boundaries of the storage provision," the Second Circuit remanded for fact-finding. *Id*.

The Second Circuit also affirmed this Court's ruling that YouTube's repeat-infringer policy was appropriate under § 512(i). *Viacom II*, 676 F.3d at 40-41. As part of its holding, the court of appeals addressed the plaintiffs' argument that YouTube should lose DMCA protection because it had allegedly "permitted only designated 'partners' to gain access to content identification tools by which YouTube would conduct network searches and identify infringing material." *Id*. at 40. Reading §§ 512(i) and 512(m) in conjunction, the Second Circuit rejected that argument, explaining that "YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms." *Id*. at 41.

PUBLIC VERSION
REDACTED

Finally, the court held that a "finding of safe harbor application necessarily protects a defendant from all affirmative claims for monetary relief," including a claim of inducement under *Grokster*. *Id*.

The Second Circuit ended its opinion by instructing this Court to allow the parties to brief "the following issues, with a view toward permitting renewed motions for summary judgment as soon as practicable":

> (A)  Whether, on the current record, YouTube had knowledge or awareness of any specific infringements …;
>
> (B)  Whether, on the current record, YouTube willfully blinded itself to specific infringements;
>
> (C)  Whether YouTube had the "right and ability to control" infringing activity within the meaning of § 512(c)(1)(B); and
>
> (D)  Whether any clips-in-suit were syndicated to a third party and, if so, whether such syndication occurred "by reason of the storage at the direction of the user" within the meaning of § 512(c)(1), so that YouTube may claim the protection of the § 512(c) safe harbor.

*Viacom II*, 676 F.3d at 42.

13

PUBLIC VERSION
REDACTED

## ARGUMENT

YouTube is entitled to summary judgment on each of the four issues that remain in this case after the Second Circuit's remand. On all other issues bearing on YouTube's DMCA safe-harbor eligibility, this Court has already found in YouTube's favor, and those rulings, which were not disturbed by the Second Circuit's decision, are now law of the case. *See United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001). This Court should therefore find, once again, that YouTube is protected by the § 512(c) safe harbor against all of Viacom's infringement claims.

## I.   YOUTUBE DID NOT HAVE ACTUAL OR RED-FLAG KNOWLEDGE OF INFRINGEMENT OF ANY OF VIACOM'S CLIPS-IN-SUIT

The Second Circuit's instructions on knowledge are clear: this Court is "to determine on remand whether any *specific infringements* of which YouTube had knowledge or awareness *correspond to the clips-in-suit* in these actions." *Viacom II*, 676 F.3d at 34 (emphases added). Viacom cannot make that showing. There is no evidence from which a jury could find that YouTube actually knew, or was aware of facts and circumstances from which it was apparent, that any of Viacom's clips-in-suit were infringing, let alone that YouTube failed to expeditiously remove any such clips. Summary judgment on all of these clips is therefore warranted.

### A.   To Satisfy The DMCA, Viacom Would Have To Show That YouTube Had Actual Or Red-Flag Knowledge Of Particular Clips-In-Suit

The Second Circuit held that "the basic operation of § 512(c) requires knowledge or awareness of specific infringing activity." *Viacom II*, 676 F.3d at 30. It rejected Viacom's argument that the DMCA imposes on service providers an "obligation to 'take commercially reasonable steps' in response to a generalized awareness of infringement" as one that "cannot be reconciled with the language of the statute." *Id.* at 30-31 (quoting Viacom 2d Cir. Br. at 33). The court instead

PUBLIC VERSION
REDACTED

explained that only "actual knowledge or awareness of facts or circumstances that indicate *specific and identifiable instances of infringement* will disqualify a service provider from the safe harbor." *Id*. at 32 (emphasis added).  Based on that holding, the Second Circuit instructed this Court to determine on remand "whether YouTube had knowledge or awareness of any specific instances of infringements corresponding to the clips-in-suit." *Id*. at 41.

In ordering this narrow remand, the Second Circuit also clarified what kind of evidence would be needed for the plaintiffs to establish clip-specific knowledge.[5] The court explained that "estimates regarding the presence of infringing content on the YouTube website" are "insufficient, standing alone, to create a triable issue of fact as to whether YouTube actually knew, or was aware of facts or circumstances that would indicate, the existence of particular instances of infringement." *Viacom II*, 676 F.3d at 32-33.  The plaintiffs must instead come forward with evidence in the existing record that identifies or "refer[s] to particular clips or groups of clips." *Id*. at 33.  And such evidence must relate to Viacom's actual clips-in-suit, because "[b]y definition, only the current clips-in-suit are at issue in this litigation." *Id*. at 34.

Accordingly, Viacom must identify the particular clips-in-suit for which there is evidence in the existing record from which a jury could find that YouTube knew, or was aware of facts or circumstances from which it was apparent, that those clips

---

[5]  The burden of proving that a service provider had disqualifying knowledge under § 512(c) rests with the plaintiff.  *See UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1110 (C.D. Cal. 2009) (granting summary judgment where "UMG has not provided evidence establishing that Veoh failed to act expeditiously whenever it had actual notice of infringement"), *aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1038 (9th Cir. 2011) (in applying the red-flag knowledge provision "the burden remains with the copyright holder rather than the service provider"); *Perfect10, Inc. v. Amazon.com, Inc.*, No. CV-05-4753, slip op. at 8 (C.D. Cal. Nov. 4, 2008) (Dkt. No. 221) ("[I]t is Perfect 10's burden to show that A9 had actual knowledge of infringement within the meaning of Section 512(c).").

PUBLIC VERSION
REDACTED

were infringing and that YouTube in fact failed to expeditiously failed to remove such clips.  That evidence must draw a direct connection between what YouTube knew and the specific clip at issue that was not expeditiously removed after YouTube gained such specific knowledge.[6]

### B.    The DMCA Imposes A "High Bar" For A Showing Of Knowledge

Viacom's burden must also take into account the "high bar" that the DMCA imposes for a finding of knowledge or awareness.  *UMG Recordings Inc. v. Veoh Networks, Inc.* (*UMG II*), 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009), *aff'd sub nom*. *UMG Recordings, Inc. v. Shelter Capital Partners LLC* (*Shelter Capital*), 667 F.3d 1022 (9th Cir. 2011).  As the Second Circuit explained, "the actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person."  *Viacom II*, 676 F.3d at 31.  The "common-sense result" of this test is that service providers are not "required to make discriminating judgments about potential copyright infringement."  H.R. Rep. No. 105-551 (II), at 58 (1998); S. Rep. No. 105-190, at 49 (1998).  Instead, red-flag knowledge exists only where the infringing nature of the material at issue "would be apparent from even a brief and casual viewing."  H.R. Rep. No. 105-551 (II), at 58; S. Rep. No. 105-190, at 49.  Simply put, "[i]f investigation of 'facts and

---

[6] Based on the Second Circuit's articulation of the knowledge standard, this Court indicated that the briefing on the renewed motion for summary judgment should include, for each clip-in-suit, a statement describing (1) "[w]hat precise information was given to or reasonably apparent to YouTube identifying the location or cite of the infringing matter" and (2) "[w]hat would YouTube have to do in addition[,] to locate and remove the infringing matter disregarding the use of its own non-standard resources...."  Schwartz Ex. 3 (29:2-15).  As the Court predicted (*id*. at 30:15-16), YouTube does not believe that such information exists for any of Viacom's clips-in-suit.  *See* YT Supp. Submission.

PUBLIC VERSION
REDACTED

circumstances' is required to identify material as infringing, then those facts and circumstances are not 'red flags.'" *Viacom II*, 676 F.3d at 32 (*quoting UMG II*, 665 F. Supp. 2d at 1108); *see also Capital Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 644 (S.D.N.Y. 2011) (similar).

This strict standard is integral to the operation of the DMCA. It illustrates the fact that the safe harbor provisions "do not place the burden of determining whether materials are actually illegal on a service provider." *Viacom II*, 676 F.3d at 32 (brackets omitted) (quoting *Shelter Capital*, 667 F.3d at 1038).[7] As this Court has explained, that "makes sense" given the realities faced by services like YouTube:

> [T]he infringing works in suit may be a small fraction of millions of works posted by others on the service's platform, whose provider cannot by inspection determine whether the use has been licensed by the owner, or whether its posting is a "fair use" of the material, or even whether its copyright owner or licensee objects to its posting.

*Viacom I*, 718 F. Supp. 2d at 524; *see also Shelter Capital*, 667 F.3d at 1037 ("Copyright holders know precisely what materials they own, and are thus better able to efficiently identify infringing copies than service providers like Veoh, who cannot readily ascertain what material is copyrighted and what is not."). As a matter of law, therefore, knowledge or awareness of infringement does not exist under the DMCA where the circumstances leave uncertain whether the material at issue is protected by copyright, whether a particular use is authorized or, if unauthorized, whether the use of the material is a fair use. *See* H.R. Rep. No. 105-551 (II), at 57-58; S. Rep. No. 105-190, at 48.

---

[7] *See also, e.g., Shelter Capital*, 667 F.3d at 1038 ("Congress made a considered policy determination that the 'DMCA notification procedures would place the burden of policing copyright infringement … squarely on the owners of the copyright.'") (brackets omitted) (quoting *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007)); *MP3tunes*, 821 F. Supp. 2d at 644 ("[T]he DMCA does not place the burden of investigation on the internet service provider.").

PUBLIC VERSION
REDACTED

To meet these standards with respect to any of its individual clips-in-suit, Viacom must show, first, that YouTube was actually aware of that specific clip (or the supposed "red flags" associated with it).  Viacom would then have to show that, having seen the clip (or learned information about its contents), YouTube would have been able to discern immediately that the clip was an obvious infringement of Viacom's copyright.  That would mean not only recognizing the content of the clip as material owned by Viacom, but also knowing from a "brief and casual viewing" and without having to conduct further investigations that the material was on YouTube without Viacom's consent and did not amount to a fair use.  Any clip that could reasonably appear authorized by the copyright owner to be on YouTube or that gives rise to a claim of fair use does not present sufficiently "blatant factors" to trigger a duty to remove absent an actual takedown request from the rights holder.

### C.    Viacom Cannot Make The Clip-Specific Showing Of Knowledge Or Awareness That The DMCA Requires

Viacom cannot make the requisite showing of knowledge or awareness with respect to any of its clips-in-suit.  *See* YT Supp. Submission.  For the overwhelming majority of those clips there is no evidence that anyone at YouTube even saw the clip in the first place.  But even if Viacom could show that YouTube was aware of the existence of a given clip-in-suit, that would not be enough to show awareness of *infringement*.  That is particularly true here, as the handful of documents on which Viacom relies fail to establish that any YouTube employee saw any clips-in-suit that were infringing, let alone that YouTube failed to expeditiously remove any such clips.

PUBLIC VERSION
REDACTED

1.     The Evidence That Viacom Relies On Does Not Create A Jury
       Question As To YouTube's Knowledge Of Infringement Of Any
       Clip-In-Suit

In its submissions to this Court on remand, Viacom's effort to establish a jury

question on knowledge has focused almost entirely on a March 2006 memo written

by Jawed Karim.  Viacom claims that the memo creates a triable issue as to

YouTube's knowledge of the infringing nature of some 1,500 of Viacom's clips-in-suit.

Schwartz Ex. 5 (at 5).[8]  It does not, for a number of reasons.

*First*, Viacom mistakenly conflates Mr. Karim's knowledge with YouTube's

knowledge.  It is undisputed that, when he wrote his memo, Mr. Karim was no

longer a YouTube employee (SUF ¶ 173), and there is no evidence that anyone at

YouTube even read the memo.[9]  The scope of an agency relationship ends "upon the

parties' later mutual agreement to terminate their relationship."  Restatement

(Third) of Agency § 3.09 cmt. b.  That is what happened in late 2005 when Mr.

Karim left YouTube and became an independent consultant.  As a matter of law,

whatever clips Mr. Karim may have seen in preparing his memo were not clips that

YouTube saw, and whatever belief Mr. Karim may have formed, if any, about a

particular clip is not knowledge of infringement that can be imputed to YouTube.

*Second*, even if the memo were chargeable to YouTube, it simply does not

allow Viacom to create a connection to its actual clips-in-suit.  Mr. Karim's memo

does not identify any specific clips, and certainly not any clips-in-suit.  It lists five

Viacom television programs, providing no additional information about the

---

[8] Beyond the Karim memo, Viacom does not rely on any of the other documents
mentioned by the Second Circuit in its discussion of knowledge.  *See Viacom II*, 676 F.3d at
33-34.  Nor has it identified any additional documents in the record that refer to any
"particular clips or groups of clips," *id*. at 33, that plausibly include the clips-in-suit.

[9] Mr. Karim testified that though he distributed the memo to certain members of
YouTube's board, the memo was not discussed at any meeting and he had no idea whether
anyone ever read what he had written.  Schapiro Opp. Ex. 77 (179:8-183:14).

PUBLIC VERSION
REDACTED

particular videos that Mr. Karim saw.  Hohengarten Ex. 237.  There would be no way for a jury to use the memo to find that Mr. Karim (or YouTube) actually had the knowledge of any of Viacom's clips-in-suit required by the Second Circuit's decision.  And because the memo does not show knowledge of any specific clip from the shows at issue, it certainly cannot be used to find that YouTube had knowledge of *all* clips from those shows.  Viacom's assumption—that because Mr. Karim may have seen a few (unspecified) clips from certain television shows, YouTube can be charged with knowledge of infringement as to every clip-in-suit from those shows that was on the service in March 2006—is untenable.  No reasonable jury could conclude from the memo that Mr. Karim, much less YouTube, had actual or red-flag knowledge of 1,500 separate infringements ostensibly on the service in March 2006.

*Third*, Mr. Karim's memo is insufficient because it does not demonstrate that there was any *infringing* material on YouTube.  The DMCA's focus is on "infringing," not merely "copyrighted" material (§ 512(c)(1)(A)), and the statute "do[es] not place the burden of determining whether materials are actually illegal on a service provider," *Viacom*, 676 F.3d at 32 (brackets omitted) (quoting *Shelter Capital*, 667 F.3d at 1038).  As discussed below, undisputed evidence shows that Viacom and its agents were covertly posting on YouTube authorized clips from the very programs Mr. Karim mentioned.  *See infra* Part. I.C.2; VRYCS ¶ 110.  Indeed, Viacom itself mistakenly sued over certain clips from *Chappelle's Show*, *South Park*, and *Reno 911* (programs that Mr. Karim listed in his memo) only to withdraw those clips from the case when it realized that they in fact were authorized or were examples of fair use.  SUF ¶¶ 149-151; RVCS ¶135; Rubin Opening Exs. 117, 120.  Viacom also deliberately left up on YouTube innumerable clips from those same programs, and said publicly that it wanted videos from shows such as *South Park* to

PUBLIC VERSION
REDACTED

stay up on the service.  SUF ¶¶ 128-135; RVCS ¶¶ 128, 134-35; Schapiro Opp. Ex. 72 ("[South Park creators] Matt [Stone] and Trey [Parker] do not mind when fans download their episodes off the Internet; they feel that it's good when people watch the show no matter how they do it."); Schapiro Reply Ex. 24 (letter from Viacom General Counsel inviting the ACLU to "search on 'Jon Stewart' or 'South Park' and see the clips" from those shows that Viacom chose not to take down from YouTube because it did not consider them infringing).  Indeed, just a few months after Karim's memo, MTV told BayTSP—a service Viacom hired to monitor YouTube and send takedown notices as Viacom directed (SUF ¶ 129)—to leave up *all* clips shorter than 2½ minutes, regardless of who had posted them.  SUF ¶ 132; Schapiro Opening Ex. 59.  Because it is impossible to tell whether the videos Mr. Karim saw were actually unauthorized, his memo cannot provide the necessary knowledge required under the statute.

*Fourth*, Viacom has no evidence to suggest that YouTube failed to expeditiously remove any infringing clips-in-suit that may have been brought to its attention as a result of Mr. Karim's memo.  Under the DMCA, "knowledge or awareness alone does not disqualify the service provider" because the provider "retains safe-harbor protection if it 'acts expeditiously to remove, or disable access to, the material.'"  *Viacom II*, 676 F.3d at 30 (quoting § 512(c)(1)(A)(iii)).  Absent evidence that YouTube failed to take down a given clip-in-suit after gaining knowledge that it was infringing, YouTube cannot be deprived of the safe harbor.  This point is particularly significant given that at the time of the memo, YouTube was conducting "spot reviews" to attempt to identify and remove clips of some of the very shows that Mr. Karim identified.  YCVS ¶ 271; Schaffer Opening Decl. ¶¶ 11-13; Schapiro Opp. Ex. 71 (46:20-48:15, 120:8-124:16, 128:7-131:11).

PUBLIC VERSION
REDACTED

In sum, the most that could be concluded from the memo is that Mr. Karim (not YouTube) saw unspecified clips (that may or may not be clips-in-suit) that Mr. Karim believed to be infringing (but may not have been) and that YouTube may actually have taken down upon learning about them.  That memo would not allow a reasonable jury to conclude that (1) YouTube was aware of the presence of any particular clip-in-suit from the programs mentioned in the memo, (2) YouTube actually believed (or could only have reasonably concluded) that those clips were infringing, and (3) that YouTube then declined to remove those clips from the service.  The memo therefore does not create a triable issue of fact as to whether YouTube is disqualified by the DMCA's knowledge provisions with respect to any of Viacom's clips-in-suit.

Briefly casting beyond the Karim memo, Viacom has suggested the possibility of showing knowledge based on YouTube's periodic efforts, prior to its acquisition by Google, to proactively monitor the service in an effort to remove infringing (and other objectionable) material.  Schwartz Ex. 5 (at 9).  This argument does not come close to meeting the Second Circuit's knowledge standard.  Viacom has not even tried to link its arguments about YouTube's monitoring efforts to any of its clips-in-suit.  That is not surprising, as none of the evidence relating to YouTube's monitoring efforts would allow a jury to find "any specific infringements of which YouTube had knowledge or awareness correspond to the clips-in-suit in these actions."  *Viacom II*, 676 F.3d at 34.  The type of generalized guesswork that Viacom engages in bears no resemblance to the showing of specific knowledge of clips-in-suit  that the Second Circuit demanded.[10]

_____

[10] Viacom has also cited no evidence from which a jury could conclude that, even if YouTube had gained knowledge of infringing items via its monitoring program, it failed to expeditiously remove them.  Viacom's omission is particularly significant given that the whole purpose of YouTube's program was to *remove* clips that it suspected may have been

PUBLIC VERSION
REDACTED

2.    Viacom's Posting Of And Leaving Its Own Content On YouTube
      Undermines Its Claims About YouTube's Knowledge Of
      Infringement

Viacom's arguments about knowledge are particularly flawed given the undisputed fact that Viacom, both directly and through its marketing agents, authorized countless videos containing its material to appear on YouTube, including many of the same works that Viacom has put at issue in this case.  Viacom also intentionally "left up" many other videos containing its content that were uploaded by ordinary users that Viacom easily could have had removed.  This evidence directly undermines Viacom's claims that YouTube had disqualifying knowledge of infringement.  Several aspects of Viacom's marketing practices and leave-up policies are particularly significant in this respect.

*First*, Viacom's posting of its content to YouTube was extensive.  SUF ¶¶ 121-125, 128-135.  Viacom's own documents reveal that it uploaded a "boatload of clips onto YouTube for distribution" (Rubin Opening Ex. 17), and was "VERY aggressively providing clips on an ongoing basis" (Schapiro Opp. Ex. 32).[11]  Viacom's uploading activity started early in YouTube's existence (Rubin Opening Exs. 3, 5), and even Viacom's decision to sue could not curb its desire to "continue to 'place' authorized clips on YouTube" (Schapiro Reply Ex. 7).  Indeed, Viacom kept uploading material to YouTube throughout this litigation.  SUF ¶ 174; VSCS ¶ 1.54

---

unauthorized (or that it did not want on the site).  YCVS ¶ 272; Schapiro Opp. Ex. 71 (46:20-47:3, 52:18-21, 53:10-60:16, 64:11-67:14; 72:24-73:7.); Hohengarten Exs. 128, 206 (YouTube founders removing South Park video), 224 ("let's remove stuff like movies/tv shows"); Schaffer Opening Decl. ¶ 11-12

[11]   *See also* Schapiro Reply Ex. 5 (Viacom lawyer reporting that "there are A LOT of clips they [VH1] have seeded to you tube"); Rubin Opening Ex. 39 ("We actually provide clips to YouTube quite aggressively."); Schapiro Reply Ex. 154 ("it would be a significant task to keep you updated on each and every clip we post ongoing"); Rubin Opening Decl. ¶¶ 2, 18 & Exs. 1-2; Rubin Reply Decl. ¶¶ 2-3 & Exs. 1, 14.

PUBLIC VERSION
REDACTED

(Uncontroverted that "the filing of this lawsuit did not curtail [Viacom's] uploading of clips to YouTube.").[12]

*Second*, Viacom and its agents posted a wide variety of videos on YouTube, including long excerpts (or even full episodes) of television shows and clips taken from its films with nothing indicating that they originated from Viacom.  SUF ¶¶ 125, 175; RVCS ¶125. The nature of what Viacom posted is illustrated by the clips-in-suit that Viacom withdrew after realizing that they were actually approved marketing materials.  Many of those withdrawn clips are unadorned excerpts from Viacom's works that are identical to—or effectively indistinguishable from—clips that Viacom is still suing over.  RVSCS ¶1.63; Rubin Opening Decl. ¶ 17 & Ex. 131 (describing numerous clips-in-suit from Chappelle's Show that are indistinguishable from approved Viacom promotional clips); Order Granting Viacom's Motion to Dismiss Specified Clips With Prejudice (March 10, 2010) (Viacom dismissing with prejudice clips from *Chappelle's Show*)).[13]  Moreover, many of Viacom's authorized clips were uploaded in ways intended to obscure Viacom's authorization.  Viacom uploaded what its documents describe as footage from the "cutting room floor" and clips "rough[ed] up" to "add to the 'hijacked' effect" (Rubin Opening Exs. 4, 14; Rubin Reply Decl. ¶ 2 & Ex. 1), which Viacom in this litigation described as a "common" practice (VSCS ¶1.61).  *See also* Rubin Opening Exs. 15, 25; Schapiro Opening Ex. 50.

---

[12] *See also*, *e.g.*, Schapiro Opp. Ex. 49 (Paramount in March 2007: "We are still uploading content to YouTube"); Schapiro Opp. Ex. 53 (MTV lawyer in August 2007: "Actually we're OK with uploading our own material on youtube for promotional purposes."); Schapiro Reply Ex. 6 (August 2008 email from marketer to YouTube: "We work with MTV (Viacom) on several of their shows and upload a lot of their content."); Rubin Opening Ex. 29 (MTV authorizing postings to YouTube in February 2008).

[13]    *Compare*, *e.g.*, Rubin Reply Ex. 291A/B (authorized clip from *Iron Man*) *with id*. Ex. 272A/B (identical clip-in-suit); *compare id*. 279A/B (authorized clip from *Drillbit Taylor*) *with id*. 274A/B (identical clip-in-suit)); Rubin Reply Decl. ¶ 10 & Ex. 81.

PUBLIC VERSION
REDACTED

*Third*, while YouTube knew that Viacom was posting some clips (SUF ¶ 127), YouTube did not know, and could not have known, the full extent of Viacom's marketing activities.  SUF ¶ 125; RVCS ¶ 125.  Viacom uploaded certain clips using its "official" YouTube accounts, but it did more of its posting using obscure accounts and agents.  SUF ¶ 125; RVCS ¶ 125; Rubin Opening Ex. 30; Rubin Reply Decl. ¶¶ 3-6 & Exs. 14, 38-39; Schapiro Reply Ex. 67 (52:1-55:18).  The extent of Viacom's stealth-marketing emerged only in discovery, when YouTube uncovered no fewer than 50 Viacom-related accounts that collectively uploaded thousands of clips to YouTube.  Rubin Opening Decl. ¶5(a)-(f)); Rubin Opening Exs. 86-116; Rubin Reply Decl. ¶ 4 & Exs. 14, 38-39; Schapiro Opening Ex. 140; Schapiro Opp. Ex. 4; Schapiro Reply Ex. 68 (Responses Nos. 22-107).  There is no way to tell from the names of these accounts—including "demansr," "gooddrugy," "thatsfunny," "ultrasloppyjoe," and "waytoblue"—that they were linked to Viacom or to distinguish them from run-of-the-mill YouTube accounts.  And there is no evidence that YouTube knew that all of these accounts and the videos that they uploaded traced back to Viacom.

Blurring its connection to the videos it authorized was an important part of Viacom's strategy.  RVCS ¶ 125; RVSCS ¶¶ 1.60, 1.62.  For example:

- MTV employee in 2006: "Spoke with Jeff [another MTV employee] and we are both going to submit clips to YouTube.com—him through his personal account so it seems like a user[] of the site and me through 'mtv2'" (Schapiro Reply Ex. 9);

- Paramount executive instructing marketer that clips were "to be uploaded from his personal acct and not associated with the film" (Rubin Opening Ex. 22);

- Paramount executive advising that clips posted to YouTube "should definitely not be associated with the studio—should appear as if a fan created and posted it" (Rubin Opening Ex. 26);

PUBLIC VERSION
REDACTED

- •     Paramount employee discussing uploading YouTube clip from Kinko's in order to mask its origin (Schapiro Opening Ex. 47 (158:19-159:5)).

*See also* Rubin Opening Exs. 4, 19, 29.  These marketing practices not only left YouTube users (and YouTube) at a loss to know who had posted a given video, they often made it difficult for Viacom itself to distinguish between authorized and unauthorized clips.  RVCS ¶¶ 125-27; RVSCS ¶¶ 1.49, 1.64; Schaffer Opening Decl. ¶¶ 15-18 & Ex. 5; Rubin Opening Decl. ¶ 3 &  Exs. 42, 44, 45, 47, 49, 50, 59, 62, 63, 109; Schapiro Opening Exs. 149-50; Schapiro Reply Ex. 14.[14]

This extensive evidence bears directly on the knowledge inquiry.  Given Viacom's own marketing activities, the presence on YouTube of a given clip containing Viacom's material (assuming YouTube was even aware of it) would have said nothing about whether that video was unauthorized—much less created a circumstance from which infringement was "obvious."  Even if YouTube had actually become aware of one of Viacom's clips-in-suit—and as discussed in Part I.C.1 *supra*, there is no evidence that YouTube ever had such knowledge or awareness of an infringing clip that it failed to expeditiously remove—that alone would not have constituted actual or "red flag" knowledge.  *See, e.g.*, *MP3tunes*, 821 F. Supp. 2d at 644 (holding in light of plaintiffs' own marketing practices, which included distributing works on the internet for free, that defendant had "no way of knowing for sure whether free songs on the internet are unauthorized"); *UMG II*,

---

[14] *See also, e.g.,* Schapiro Opening Ex. 65 (Paramount executive explaining that "I need to speak to the publicity dep't before confirming which [videos] should be taken down"); Schapiro Opening Ex. 141 (BayTSP informing Paramount that "[w]e are going to hold off on removing the OTH clips on YouTube cause we do not know which videos Marketing has put up"); Schapiro Opening Ex. 142 (Paramount email questioning whether YouTube clips from Paramount movie were authorized); Schapiro Opening Ex. 143 (BayTSP unable to determine whether clips from Paramount movie were authorized); Schapiro Opening Ex. 11 (150:3-23) (BayTSP representative agreeing that "[t]here's no way to tell from a full episode [on YouTube] whether or not the person that uploaded it had authority").

PUBLIC VERSION
REDACTED

665 F. Supp. 2d at 1110 & n.13 (relying on the fact that an artist affiliated with plaintiff had uploaded *one* video in finding that service provider could not be charged with knowledge of infringement).

In this case, moreover, the authorized appearance of Viacom's content on YouTube does not end with the videos Viacom and its agents posted.  As discussed, Viacom hired BayTSP to monitor YouTube and send takedown notices.  SUF ¶ 129.  But Viacom did not want to take down anything like all clips of its material, and it gave BayTSP detailed, variable, and confidential instructions about which clips should be removed and which should be allowed to remain on YouTube.  SUF ¶¶ 128-130, 132-134; RVCS ¶¶ 128, 134; VSCS ¶ 1.69; Schapiro Opening Exs. 58, 66-74, 137; Schapiro Opp. Exs. 1 (335:13-339:3), 221 (65:22-66:15).  As MTV's former president testified, "[w]hile we were issuing takedown notices against some of the content, there was other content which we were allowing to continue to be on YouTube."  Schapiro Opening Ex. 4 (194:8-11); *id.*, Ex. 75 (BayTSP to Viacom: "[w]e are leaving a majority of the content on YouTube.").[15]

Acting on Viacom's instructions, BayTSP viewed, but refrained from taking down, innumerable user-uploaded videos that BayTSP identified as containing Viacom material, including many clips from prominent works-in-suit like *The Daily Show*, *The Colbert Report*, and *South Park*, among dozens of other Viacom shows.  SUF ¶¶ 131-135; RVCS ¶ 58, 128, 134-35; Schapiro Opening Exs. 4 (199:16-201:18), 62, 76; Schapiro Reply Ex. 18.  Viacom's executives felt "very strongly that [they

---

[15] Viacom left its content on YouTube for various reasons, including because it wanted to reap the promotional benefits that having videos on YouTube provided (Schapiro Reply Exs. 25, 28, 29; Rubin Opening Ex. 28), and because it wanted to "err on the side of leaving some infringing material up rather than being overly aggressive and taking down one of the many approved clips" (Schapiro Opening Ex. 65; Schapiro Reply Ex. 30).  *See also* SUF ¶¶ 128, 131-135; RVCS ¶ 128.

PUBLIC VERSION
REDACTED

didn't] want to stop the colbert and daily clips." Schapiro Opening Ex. 58.  Viacom
told BayTSP not to issue takedown notices for such clips so long as they were less
than five minutes long (that was later changed to three minutes).  Schapiro
Opening Ex. 59; Schapiro Reply Ex. 19.  Similarly, in November 2006, Viacom
decided to leave up 315 of the 316 *South Park* clips that it found on YouTube.
Schapiro Opening Ex. 62; Schapiro Reply Ex. 21.  Even after suing YouTube,
Viacom continued its policy of deliberately allowing clips to remain on the service.
SUF ¶ 176.  In June 2007, for example, Paramount instructed BayTSP to "turn a
blind eye" to user-posted clips from *Transformers*, even though "they don't look like
teasers or trailers."  Schapiro Reply Ex. 23; Schapiro Opening Ex. 144; Rubin
Opening Ex. 27.  Viacom did not share with YouTube the detailed and ever-
changing instructions it gave to BayTSP.  SUF ¶ 130.   Given the dizzying array of
clips that Viacom intentionally uploaded or allowed to remain on YouTube, the only
way for YouTube to know which clips Viacom actually wanted to remove at any
given time was from the takedown notices it received.

   Viacom's leave-up practices further belie its claims of knowledge.  If Viacom
did not think that a clip was so clearly infringing that BayTSP, its own agent,
should request its takedown, it cannot be that YouTube was required to unilaterally
remove that clip or else lose the DMCA's safe harbor.  That is particularly so given
that YouTube was aware generally that Viacom was choosing not to request under
the DMCA that YouTube take down Viacom content that had been uploaded by
ordinary YouTube users (though of course YouTube did not know what specific clips
Viacom had instructed its agents not to remove).  SUF ¶ 135; RVCS  ¶ 135; Maxcy
Opp. Decl. ¶ 8; Schapiro Reply Ex. 24.  Given all this, even if YouTube had come
across a given video that it recognized as containing Viacom content, YouTube

PUBLIC VERSION
REDACTED

would have had no reliable way of knowing whether that clip was in fact unauthorized.  Indeed, far from constituting a red flag, the appearance of Viacom material on YouTube would just as readily suggest that Viacom had posted the video in the first place or intentionally decided to leave it up.  Either way, in light of Viacom's conduct, no reasonable juror could conclude from this record that Viacom could show what the DMCA requires for knowledge:  "obvious and conspicuous circumstances" from which YouTube could only have concluded that a given clip was an unauthorized infringement.  H.R. Rep. No. 105-551 (II), at 58.

In sum, because Viacom cannot identify any of its clips-in-suit as to which there is a triable issue regarding actual or red-flag knowledge and failure to expeditiously remove, YouTube is entitled to summary judgment on the narrow issue left open by the Second Circuit.

## II.   YOUTUBE CANNOT BE DEPRIVED OF THE DMCA SAFE HARBOR BASED ON VIACOM'S INVOCATION OF "WILLFUL BLINDNESS"

The Second Circuit held that "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA."  *Viacom II*, 676 F.3d at 35.  That holding was not a license, as Viacom seems to think, for Viacom to resurrect the same arguments about general knowledge that both this Court and the Second Circuit have squarely rejected.  Instead, under the Second Circuit's ruling, the common-law willful blindness doctrine—as "limit[ed]" by the DMCA, *id.*—is simply a way for a plaintiff to show the particularized, clip-specific knowledge of infringement that the DMCA requires.  *Id.*  Viacom cannot make that showing.  There is no evidence from which a jury could find that YouTube was aware of a high probability that any of Viacom's clips-in-suit was infringing and took deliberate steps to avoid confirming that fact.

29

PUBLIC VERSION
REDACTED

A.    **As Limited By The DMCA, Willful Blindness Requires Viacom To Show That YouTube Consciously Avoid Confirming A High Probability That A Specific Clip-In-Suit Was Infringing**

The Second Circuit's discussion of how to apply "the common law willful blindness doctrine in the DMCA context," *Viacom II*, 676 F.3d at 34, follows directly from its analysis of the statute's knowledge provisions.  That is because willful blindness is not an independent basis for liability, but rather a means of establishing that a party had the requisite knowledge of a given fact.  *See id.* at 34-35 ("willful blindness is tantamount to knowledge") (quoting *Tiffany (NJ) Inc. v eBay, Inc.*, 600 F.3d 93, 110 n.16 (2d Cir. 2010)); *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2069 (2010) ("[P]ersons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts.").

Under the DMCA, of course, the knowledge required to trigger a duty on the part of a provider to expeditiously remove material is that of "specific and identifiable instances of infringement."  *Viacom II*, 676 F.3d at 32.  In carving out a "limit[ed]" role for willful blindness within the DMCA framework, *id.* at 35, the Second Circuit in no way implied that the doctrine allows a plaintiff to avoid the DMCA's specific-knowledge requirement.  To the contrary, the court explained (twice) that willful blindness can be used "to demonstrate knowledge or awareness of *specific instances of infringement* under the DMCA."  *Id.* at 35, 41 (emphasis added).  Accordingly, whether Viacom wishes to proceed on a theory of actual knowledge, red-flag awareness, or willful blindness, it must come forward with evidence that relates to *particular* clips-in-suit—evidence from which a jury could find that YouTube had knowledge, or something tantamount to knowledge, that those specific clips were infringing and deliberately failed to take further action.

30

PUBLIC VERSION
REDACTED

That is confirmed by the very formulation that the Second Circuit used in setting out the willful blindness test.  The court explained that a "person is 'willfully blind' or engages in 'conscious avoidance' amounting to knowledge where the person 'was aware of a high probability *of the fact in dispute* and consciously avoided confirming that fact.'"  *Viacom II*, 676 F.3d at 35 (emphasis added) (internal quotation marks omitted) (quoting *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003)).  For purposes of establishing knowledge under the DMCA, the "fact in dispute" is whether specific and identifiable material on a service provider's system was infringing.  *Id.* at 32.  To make out a claim of willful blindness as to a given clip-in-suit, therefore, Viacom would have to show that YouTube (1) was actually aware of a "high probability" that the particular clip was infringing, and (2) made an "active effort[]" to deliberately avoid confirming that fact.  *Global-Tech*, 131 S. Ct. at 2070-71.

Even apart from the DMCA, the willful blindness test is not supposed to be an easy standard to satisfy.  The Supreme Court has emphasized that this formulation "gives willful blindness *an appropriately limited scope* that surpasses recklessness and negligence."  *Global-Tech*, 131 S. Ct. at 2070 (emphasis added).  "'A court can properly find willful blindness only where it can almost be said that the defendant actually knew'" the "critical facts."  *Id.* at 2070-71 (quoting G. Williams, Criminal Law § 57, p. 159 (2d ed. 1961)).  Properly applied, therefore, willful blindness under the DMCA is something very close to actual knowledge of specific infringing material.  It is *not* the equivalent of general knowledge and does not allow a service provider to lose safe-harbor protection based on a failure to act in the face of generalized awareness that infringement is or may be occurring.[16]

---

[16] Although it had no occasion to address the willful blindness doctrine as limited by the DMCA, *Tiffany v. eBay* is instructive on this point.  In that case, the district court held, and

PUBLIC VERSION
REDACTED

**B.**     **Viacom's Effort To Revive Its Discredited Generalized Knowledge Approach In The Guise of Willful Blindness Must Be Rejected**

In its submissions on remand, Viacom has consistently tried to ignore the standard for willful blindness contemplated by the Second Circuit.  Instead, Viacom has asserted that YouTube loses the safe harbor under the willful blindness doctrine because it supposedly made a "deliberate decision not to use available methods to find infringing videos, after it was aware of a high probability of massive infringement on its site."  Schwartz Ex. 5 (at 13); *see also id*. at 12 (arguing that YouTube was willfully blind because it adopted an "intentional avoidance policy in the face of its awareness of a high probability of infringement of plaintiff's works").  Based on this, Viacom has gone so far as to claim that YouTube should be charged with disqualifying knowledge of *every single one* of Viacom's clips-in-suit. *Id*. at 18-19.

Viacom's approach contradicts the Second Circuit's ruling and at least two separate provisions of the DMCA.  The standard that Viacom lays out for willful blindness is indistinguishable from the general-knowledge argument it has (unsuccessfully) made throughout this case.  Viacom claimed on appeal that once YouTube was aware "that substantial infringement is actually and regularly occurring on its site," it was required to take "feasible and commercially reasonable

the Second Circuit affirmed, that eBay was not willfully blind to the infringement of Tiffany's trademarks even though (1) it was "generally aware" of such infringement on its site and (2) it did not investigate "the extent of counterfeit Tiffany jewelry on its website" or analyze its data "to prevent further infringement." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 514 (S.D.N.Y. 2008), *aff'd in relevant part* 600 F.3d 93 (2d Cir. 2010).  The court cautioned that allowing Tiffany to prevail on a willful-blindness theory would impermissibly impose "an affirmative duty to take precautions against potential counterfeiters, *even when eBay had no actual knowledge of individual counterfeiters*." *Id*. (emphasis added).  *Tiffany* thus confirms, even without regard to the DMCA, that a finding of willful blindness requires proof that the defendant purposefully ignored information about *specific* infringing activity.

PUBLIC VERSION
REDACTED

steps" to find and remove specific infringing material.  Viacom 2d Cir. Reply Br. at 13-14.  The Second Circuit rejected that argument in no uncertain terms.  It explained that "to mandate an amorphous obligation to 'take commercially reasonable steps' in response to a generalized awareness of infringement," as Viacom suggested, "cannot be reconciled with the language of the statute."  *Viacom II*, 676 F.3d at 30-31 (quoting Viacom 2d Cir. Br. at 33); *see also, e.g.*, *MP3tunes*, 821 F. Supp. 2d at 644 ("General awareness of rampant infringement is not enough to disqualify a service provider of protection.").

Viacom cannot now resurrect that discredited argument in the guise of a claim about willful blindness.  The problem with Viacom's assertion that YouTube should be disqualified from the safe harbor for failing to take "appropriate" action in the face of generalized awareness was not that Viacom attached the wrong doctrinal label.  It was that Viacom's position would undermine the "basic operation of § 512(c)," which "requires knowledge or awareness of specific infringing activity." *Viacom II*, 676 F.3d at 30.  It is inconceivable that Congress wrote such a strict standard into the text of the DMCA while intending plaintiffs to be able to avoid making any showing of clip-specific knowledge by invoking a common law doctrine that is not mentioned in the statute or its legislative history (and, indeed, that is expressly *limited* by the statute).  As this Court has explained:  "[t]o let knowledge of a generalized practice of infringement in the industry, or of a proclivity of users to post infringing materials, impose responsibility on service providers to discover which of their users' postings infringe a copyright would contravene the structure and operation of the DMCA."  *Viacom I*, 718 F. Supp. at 523.  That remains equally true when the argument is couched in terms of willful blindness.

PUBLIC VERSION
REDACTED

Viacom's understanding of willful blindness likewise cannot be squared with § 512(m).  In discussing the interplay between willful blindness and the DMCA, the Second Circuit held that "§ 512(m) is incompatible with a broad common law duty to monitor or otherwise seek out infringing activity based on general awareness that infringement may be occurring."  *Viacom II*, 676 F.3d at 35; *see also* H.R. Rep. No. 105-551 (II), at 61; S. Rep. No. 105-190, at 52 (explaining that the "principle" established by both § 512(m) and "the knowledge standard" of § 512(c) is that a service provider is *not* required to "investigate possible infringements, monitor its service, or make difficult judgments as to whether conduct is or is not infringing").  But it is precisely such a duty to search for specific instances of infringement based on generalized awareness of infringement that Viacom now seeks to impose on YouTube.  That duty is inconsistent with willful blindness at common law, *see supra* n.16, and it is inconsistent with the DMCA.

Viacom's approach is also at odds with the DMCA's removal requirements.  Under § 512(c), a service provider that gains knowledge of infringement keeps the safe harbor so long as it expeditiously takes down "the" particular infringing items it has learned about.  *Viacom II*, 676 F.3d at 30-31 (citing § 512(c)(1)(A)(iii)).  Viacom would subvert that structure.  On its view, even if YouTube was totally unaware of any information identifying particular clips-in-suit as likely infringing, YouTube could be charged with knowledge of every clip that it might have discovered had it made an effort to actively hunt for infringing material.  But imputing knowledge in that way ignores the particularized nature of the removal obligation.  Viacom would use willful blindness to assign knowledge to YouTube where there was no possibility of expeditious removal of known infringing items.  That is precisely what the Second Circuit rejected when it explained that "the

34

PUBLIC VERSION
REDACTED

nature of the removal obligation itself contemplates knowledge or awareness of specific infringing material, because expeditious removal is possible only if the service provider knows with particularity which items to remove." *Id.* at 30.

Under the Second Circuit's ruling, therefore, the DMCA "limits" the willful blindness doctrine by requiring a showing that the service provider was aware of a high probability that some *particular* material was infringing but deliberately acted to avoid confirming that fact. *Viacom II*, 676 F.3d at 35. When that showing can be made, the doctrine allows a provider to be charged with the knowledge of "specific and identifiable instances of infringement" the statute demands. In that way, plaintiffs may, "in appropriate circumstances," *id.*, use willful blindness to establish knowledge without undermining the DMCA's core premises: that clip-specific knowledge is required; that knowledge triggers an obligation to expeditiously remove particular known material; that providers are not required to make difficult judgments about whether material is infringing; and that safe-harbor eligibility is not premised on a requirement of seeking out infringing material, even in response to a provider's general awareness that such material is on its service.

### C.   There Is No Evidence From Which A Jury Could Find That YouTube Deliberately Avoided Confirming A High Probability That Any of Viacom's Clips-In-Suit Were Infringing

Under the correct standard, Viacom cannot create a jury issue on willful blindness. First, Viacom has no evidence that YouTube was aware of a "high probability" that any of Viacom's actual clips-in-suit were infringing. *See* YT Supp. Submission. In its submissions on remand, Viacom has pointed to evidence suggesting only the most generalized awareness that unspecified Viacom material was on YouTube. Schwartz Ex. 5 (at 15) (relying on this Court's statement that defendants were "generally aware of" and "welcomed" infringing material, as well as

PUBLIC VERSION
REDACTED

YouTube's offer to license Viacom content).  Such evidence is not sufficient under any plausible conception of willful blindness.  *Viacom II*, 676 F.3d at 35 n.10 (explaining that *Tiffany* rejected a willful blindness challenge on the grounds that "although eBay 'knew as a general matter that counterfeit Tiffany products were listed and sold through its website,' such knowledge 'is insufficient to trigger liability knowledge'") (quoting *Tiffany*, 600 F.3d at 110).

Beyond that, Viacom has alluded to YouTube's alleged decisions to stop community flagging and to curtail proactive manual review of videos for possible copyright infringement.  Schwartz Ex. 5 (at 16).  But both community flagging and manual review are ways for a provider to affirmatively seek out infringing activity.  The decision not to adopt, or to stop using, those techniques does not support a willful blindness claim because § 512(m) limits any such application of the doctrine in the DMCA context.  *See Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1150 (N.D. Cal. 2008) (rejecting argument that disabling community flagging amounts to willful blindness that would disqualify service provider from § 512(c)).

In addition, Viacom's claims about flagging and monitoring do not give rise to a material dispute regarding willful blindness because they do not relate to any specific clips-in-suit.  The evidence on which Viacom relies merely reflects YouTube's broad, programmatic decisions about how to run its service.  Such evidence would not allow a jury to find that YouTube was aware of a "high probability" that some particular video (much less a clip-in-suit) was infringing and undertook a "deliberate effort" to avoid confirming that fact. *Viacom II*, 676 F.3d at 35.  There is no basis for concluding that YouTube could have located, identified, and been able to remove any of Viacom's clips-in-suit had it used the monitoring techniques that Viacom has invoked.

PUBLIC VERSION
REDACTED

Viacom has also tried to rely on YouTube's supposed refusal to implement fingerprinting technology on Viacom's preferred timetable and made claims about YouTube's alleged practice of making such technology only available to certain copyright owners.  Schwartz Ex. 5 (at 16-18).  Even if these claims were true—and they are not (*see* YouTube Opp. Br. to Pls.' Mot. for Summ. J. 68-75 (May 10, 2010))—they are equally insufficient to get the willful blindness question to a jury. Evidence about YouTube's general practices regarding content-identification technology does not speak to the issue presented on remand—whether YouTube was willfully blind to the infringing nature of any particular clips-in-suit.  Viacom cannot point to any of its clips-in-suit that YouTube's fingerprinting technology identified as infringing but that YouTube nevertheless refused to take down.

Even more fundamentally, the Second Circuit expressly rejected the plaintiffs' argument that YouTube loses DMCA protection because it supposedly "permitted only designated 'partners' to gain access to content identification tools by which YouTube would conduct network searches and identify infringing material." *Viacom II*, 676 F.3d at 40.  The court could hardly have spoken more clearly: reading §§ 512(i) and 512(m) "in conjunction," "*YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms.*"  *Id.* at 41 (emphasis added).  Viacom cannot bring this argument back to life dressed up as a claim of willful blindness.

The Second Circuit confirmed that willful blindness in the DMCA context requires evidence reflecting YouTube's awareness of a high probability that specific clips-in-suit were infringing, coupled with a deliberate effort to avoid confirming that fact.  Because the factual record, which is "now complete" on this point (*Viacom*

PUBLIC VERSION
REDACTED

*II*, 676 F.3d at 42), contains no such evidence (*see* YT Supp. Submission), YouTube is entitled to summary judgment.

## III. YOUTUBE DID NOT HAVE CONTROL OVER THE INFRINGING ACTIVITY COUPLED WITH A DIRECT FINANCIAL BENEFIT

Section 512(c)(1)(B) requires a plaintiff seeking to disqualify a service provider to show *both* that the provider received "a financial benefit directly attributable to the infringing activity" and "had the right and ability to control such activity."  The Second Circuit found that "control" for purposes of the DMCA exists only where the service provider exerted a "substantial influence" over the infringing activity of its users.  *Viacom II*, 676 F.3d at 38.  Viacom cannot make that showing.  Even if Viacom could create a jury question on control, YouTube would still be entitled to summary judgment because it did not earn a direct "financial benefit" from the alleged infringement of any of Viacom's clips-in-suit.

### A. "Control" Under The DMCA Requires A Service Provider To Exert A Substantial Influence Over The Infringing Activity Of Its Users

The Second Circuit held that § 512(c)(1)(B) does not codify the common law doctrine of vicarious liability.  *Viacom II*, 676 F.3d at 36-38.  The court observed that reading the DMCA provision as "coextensive" with the common law "would render the statute internally inconsistent."  *Id*. at 37.  Section 512(c) "presumes that service providers have the ability to block access to infringing material." *Viacom II*, 676 F.3d at 37 (quotation marks and ellipsis omitted).  Adopting Viacom's argument that blocking such access qualified as "control," the court of appeals explained, would mean that "the prerequisite to safe harbor protection under § 512(c)(1)(A)(iii) & (C) would at the same time be a disqualifier under § 512(c)(1)(B)."  *Id*.  Resolving this inconsistency, the Second Circuit held that a finding of "control" requires

38

PUBLIC VERSION
REDACTED

"something more"—more than generalized control over a website and "more than the ability to remove or block access to materials posted on a service provider's system." *Id*. at 37-38.  This "something more," under the court of appeals' construction of the DMCA, involves a "service provider exerting substantial influence on the activities of users." *Id*. at 38.

In so holding, the Second Circuit necessarily rejected Viacom's argument that "control" exists whenever a service provider *fails* to take steps to limit or prevent potentially infringing activity.  *See* Viacom 2d Cir. Reply Br. at 27.  "Control" can mean to limit and reduce ("control the bedbug problem"), or it can mean to guide and direct ("control the car").  In concluding that the DMCA's control provision restricts the common law by incorporating a "substantial influence" test, the Second Circuit confirmed that "control" under § 512(c)(1)(B) refers to the latter, affirmative type of conduct—that is, guiding, directing, and thus helping to bring about infringing activity.  *Viacom II*, 676 F.3d at 37-38.  Failing to act proactively to find and stop users who might be engaging in infringement is not enough.

This conclusion is reinforced by § 512(m).  Like willful blindness, "control" must be interpreted in conjunction with that provision, which "expressly disclaims any affirmative monitoring requirement." *Viacom II*, 676 F.3d at 41.  The Second Circuit's "substantial influence" test harmonizes those two provisions without rendering control duplicative of knowledge.  If, for example, a service provider commissioned a user to create and post a video containing certain content, it could be found to have had "control" if it turned out that the resulting video (unbeknownst to the service provider) was infringing.  In contrast, Viacom's claim that a service provider has potentially disqualifying "control" based on its failure to take

PUBLIC VERSION
REDACTED

affirmative steps to limit infringing activity is exactly the kind of construction that § 512(m) forbids.

Viacom has argued in response that the control provision is triggered, and § 512(m) does not apply, when a service provider "actually polices user conduct" by trying to enforce its prohibitions on infringement.  Schwartz Ex. 5 (at 26).  That does not make sense.  It would mean that any efforts a service provider makes to try to *limit* infringement would be a basis for *evicting* that provider from the safe harbor.  Congress could not have intended that result.  By virtue of § 512(m), a service provider that does nothing to police its service (beyond acting on takedown notices and knowledge of specific infringing material) is protected by the DMCA.  A service provider does not lose the safe harbor by going above and beyond its statutory obligations in an effort to stop at least some infringement.  *See* H.R. Rep. No. 105-796, at 73 (1998) (Conf. Rep.) ("This legislation is not intended to discourage the service provider from monitoring its service for infringing material. Courts should not conclude that the service provider loses eligibility for limitations on liability under section 512 solely because it engaged in a monitoring program.").

Under the Second Circuit's ruling, the "control" question on remand is whether Viacom can identify instances in which YouTube exerted substantial influence over its users' alleged infringement of any of Viacom's clips-in-suit. Viacom has tried to resist making that showing by arguing that a showing of control need not be linked to any specific clip-in-suit.  That is incorrect.  The DMCA's plain language makes clear that control, like knowledge, is a clip-specific inquiry.  The control provision focuses on the service provider's right and ability to control "*the infringing activity*" from which the provider receives a direct financial benefit.  § 512(c)(1)(B) (emphasis added).  Viacom itself has argued that "Congress's

PUBLIC VERSION
REDACTED

use of the definite article 'the'" in DMCA's knowledge provision "suggests that Congress was referring there to knowledge pertaining to specific, previously defined 'material.'"  Viacom 2d Cir. Reply Br. at 11.  The same is true in § 512(c)(1)(B):  the use of the definite article points unmistakably to specific acts of alleged infringement over which the service provider had control.  *Accord Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("identical words and phrases within the same statute should normally be given the same meaning").  That makes sense.  A service provider is not disqualified from the DMCA because it receives a financial gain from its service as a whole or from some material that has nothing to do with the case at hand.  It is only when it earns a direct financial benefit from "the infringing activity" that the plaintiff has alleged—and has control over "such activity" in the form of substantial influence—that the safe harbor disappears with respect to such activity.

### B.   Viacom Cannot Show That YouTube Exerted A Substantial Influence Over The Infringement Of Any Clip-In-Suit

Under the standard laid out by the Second Circuit, Viacom cannot create a jury question on control.  The "evidence" on which Viacom has tried to rely on remand is hopelessly general, unconnected to any of the clips-in-suit, and inadequate as a matter of law to support a finding that YouTube had "control" for purpose of the DMCA.

First, Viacom has suggested that as a general matter YouTube "controlled and dominated its site at the point of upload and from that point onward."  Schwartz Ex. 5 (at 27).  But the "pertinent inquiry" is not whether the service provider "has the right and ability to control its *system*, but rather, whether it has the right and ability to control *the infringing activity*."  *Io Grp.*, 586 F. Supp. 2d at 1151, *cited with approval in Viacom II*, 676 F.3d at 38.  Given the DMCA's

41

PUBLIC VERSION
REDACTED

assumption that service providers have a basic level of control over their systems, conflating those two things would "render the statute internally inconsistent." *Viacom II*, 676 F.3d at 37.  Accordingly, just as control cannot be based on a service provider's ability to remove infringing material from its site or block infringers' access to its service, *id.* at 37-38, it likewise cannot be based on a service provider exercising general control over its system or service.  The DMCA requires such general control as a precondition for safe-harbor protection; it therefore cannot "at the same time be a disqualifier under § 512(c)(1)(B)."  *Id.* at 37.

Second, Viacom has pointed to several tools that YouTube supposedly could have used (or at times did use) to identify or prevent possible infringement on the service, including digital fingerprinting, community flagging, and "manual monitoring."  Schwartz Ex. 5 (at 27-29).  But any factual disputes about YouTube's use of these tools are immaterial, as none of them, as a matter of law, gives YouTube the kind of "control" over the infringing activity that a plaintiff needs to show.  As discussed above, the failure to take what a copyright owner deems sufficient steps to try to limit infringing activity is not "control" as the Second Circuit has defined it, and any such reading of the statute would run afoul of § 512(m).  Thus, even assuming *arguendo* that YouTube declined to use certain tools to protect Viacom's copyrights, control requires "something more"—affirmative conduct that substantially influenced the allegedly infringing activities of users. *Viacom II*, 676 F.3d at 38.  That principle is not altered by Viacom's (false) assertion that YouTube made some of those tools available only to certain copyright owners.  The Second Circuit expressly held that "YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms."  *Id.* at 41.  Given that ruling, any argument about YouTube's

PUBLIC VERSION
REDACTED

"selective" use of filtering tools cannot be a basis for eliminating DMCA protection, whether under the control provision or otherwise.

Finally, noting the Second Circuit's reference to inducement as a possible instance of "substantial influence," *Viacom II*, 676 F.3d at 38, Viacom has referred to its claims that YouTube induced infringement under *Grokster*.  Schwartz Ex. 5 (at 26-27).  But, as this Court has explained, the "*Grokster* model does not comport with that of a service provider who furnishes a platform on which its users post and access all sorts of materials as they wish, while the provider is unaware of its content, but identifies an agent to receive complaints of infringement, and removes identified material when he learns it infringes."  *Viacom I*, 718 F. Supp. 2d at 526; *see also* Schwartz Ex. 8 (39:6-7, 45:13-15) (observing that *Grokster* was "a very extreme case and different on its facts in many ways" from the instant case); Schapiro Opp. Ex. 173 (Viacom's General Counsel stating that "the difference between YouTube's behavior and Grokster's is staggering").  In our original summary judgment papers, we explained at length why there is no triable issue on Viacom's inducement claim. YouTube Mem. of Law in Supp. of Defs.' Mot. for Summ. J. 80-99 (Mar. 11, 2010); YouTube Reply Br. in Supp. of Defs.' Mot. for Summ. J. 43-55 (June 14, 2010).  Rather than repeat those arguments here, we incorporate them by reference to show why Viacom's claims likewise cannot create a jury question on the "control" element of the DMCA safe harbor.

Viacom has not identified, and cannot identify, a single clip-in-suit as to which it could plausibly claim that YouTube had "control" (in the form of exerting substantial influence) over the allegedly infringing activity.  Viacom thus cannot survive summary judgment under § 512(c)(1)(B) with respect to any of its alleged infringements.

43

PUBLIC VERSION
REDACTED

## C.    YouTube Did Not Receive A Financial Benefit Directly Attributable To The Alleged Infringement

A showing of "control" would not be enough to remove YouTube from the safe harbor.  A service provider that has the right and ability to control the infringing activity at issue is not disqualified unless it also "receive[d] a financial benefit directly attributable" to that activity.  § 512(c)(1)(B).  While neither this Court nor the Second Circuit has yet addressed the "financial benefit" provision, it offers an independent basis for affirming YouTube's entitlement to the safe harbor.

As with the DMCA's control provision, the financial benefit provision nods to the common law of vicarious liability but does not codify it.  That is underscored by the statute's legislative history, which instructs courts applying the financial benefit provision to "take a common sense, fact-based approach, not a formalistic one."  H.R. Rep. No. 105-551 (II), at 54; S. Rep. No. 105-190, at 44.  The legislative history sets out in detail what does, and what does not, constitute a financial benefit under the DMCA:

> In general, a service provider conducting a legitimate business would not be considered to receive a "financial benefit directly attributable to the infringing activity" *where the infringer makes the same kind of payment as non-infringing users of the provider's service.*  Thus, receiving a one-time set-up fee and flat, periodic payments for service from a person engaging in infringing activities would not constitute receiving a "financial benefit directly attributable to the infringing activity."  Nor is [subsection (c)(1)(B)] intended to cover fees based on the length of the message (per number of bytes for example) or by connect time.

H.R. Rep. No. 105-551 (II), at 54 (emphasis added); S. Rep. No. 105-190, at 44 (emphasis added).  This test distinguishes between service providers "conducting a legitimate business" and those whose value "lies in providing access to infringing material."  H.R. Rep. No. 105-551 (II), at 54; S. Rep. No. 105-190, at 44.  Providers whose services have no real value other than by facilitating infringement, or that

PUBLIC VERSION
REDACTED

are intentionally skewed to profit from infringement, fall on the wrong side of
§ 512(c)(1)(B).  In contrast, services that have a legitimate business model—which
benefits from noninfringing activity and does not favor infringing uses or users—are
protected.  *See, e.g.*, *MP3tunes*, 821 F. Supp. 2d at 645 (relying on DMCA's
legislative history to hold that service provider did not earn financial benefit
directly attributable to the infringing activity where "infringing and noninfringing
users of Sideload.com paid precisely the same or nothing at all, for locker services");
*Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 748 (S.D.N.Y. 2012)
(finding no financial benefit under the DMCA because "there is no evidence
indicating that either [of the defendants] capitalizes specifically because a given
image a user selects to print is infringing").

YouTube is just the type of "legitimate" service that the DMCA protects.
YouTube indisputably hosts an enormous number of non-infringing videos.  SUF
¶¶ 33-34, 37-45; *see also* RVSCS ¶ 1.105; VCS ¶¶ 37-44; VSCS ¶¶ 1.103-1.104; Walk
Opening Decl. ¶¶ 1-22.  YouTube generates significant value from those authorized
videos.  YouTube has entered into thousands of partnership agreements with
content owners, under which it shares the revenue derived from advertising run
against videos claimed by those owners.  SUF ¶¶ 43, 164.  ███████████

████████████████████████████████████████████████████████

███████████████████████  Most of YouTube's other revenue comes from
advertisements run on its home page and on the pages listing the results of users'
search queries.  SUF ¶ 166.[17]  YouTube's advertising offerings have never favored

---

[17] Since January 2007, YouTube has restricted ads on pages where videos are watched
("watch-page ads") to videos expressly claimed by a content partner and designated for
monetization.  SUF ¶ 177.  Even before limiting watch-page ads in this way, YouTube
received the same rates for such ads regardless of the videos next to which the ads
appeared.  SUF ¶¶ 168, 178.

PUBLIC VERSION
REDACTED

infringing uses of the service over non-infringing ones.  SUF ¶¶ 167-168; VSCS

¶ 1.93.  Other video-hosting services, as well as most other websites relying on user-

submitted content earn revenue from advertising.  Reider Decl. ¶ 12.  The financial

benefit provision does not invalidate the accepted revenue model of most online

service providers.  The DMCA, after all, "was intended to facilitate the growth of

electronic commerce, not squelch it."  *Io Grp.*, 586 F. Supp. 2d at 1154.

In short, YouTube does not receive a "financial benefit directly attributable to

the infringing activity" under the DMCA by earning revenue the same way as

nearly all comparable service providers—through an advertising-based business

model that does not favor infringing material or seek to benefit from it.  YouTube is

therefore protected by § 512(c)(1)(B) against all of Viacom's claims.

## IV.   VIACOM'S CLAIMS ARISE "BY REASON OF THE STORAGE AT THE DIRECTION" OF USERS OF MATERIAL ON YOUTUBE'S SYSTEM

The final issue left open by the Second Circuit concerns the scope of the

DMCA safe harbor that applies to "[i]nformation residing on systems or networks at

the direction of users."  § 512(c)(1).  After holding that YouTube's *automated*

software functions fall within the safe harbor, *Viacom II*, 676 F.3d at 39-40, the

court of appeals briefly addressed YouTube's so-called "syndication" practices:

> The final software function at issue here—third-party
> syndication—is the closest case. In or around March 2007, YouTube
> transcoded a select number of videos into a format compatible with
> mobile devices and "syndicated" or licensed the videos to Verizon
> Wireless and other companies. The plaintiffs argue—with some force—
> that business transactions do not occur at the "direction of a user"
> within the meaning of § 512(c)(1) *when they involve the manual
> selection* of copyrighted material for licensing to a third party. The
> parties do not dispute, however, that none of the clips-in-suit were
> among the approximately 2,000 videos provided to Verizon Wireless. In
> order to avoid rendering an advisory opinion on the outer boundaries of
> the storage provision, we remand for fact-finding on the question of

PUBLIC VERSION
REDACTED

whether any of the clips-in-suit were in fact syndicated to any other
third party.

*Id.* at 40 (emphasis added).  The upshot of the Second Circuit's discussion is not
difficult to discern: insofar as YouTube's syndication arrangements involved manual
processes akin to what occurred in connection with the Verizon Wireless agreement,
there is an open legal question whether those processes are covered by § 512(c).

On remand, Viacom has tried to convert this passage into a holding the
Second Circuit never made: that any video stored on YouTube's system that was
made available for viewing in connection with a licensing arrangement is outside
the safe harbor—regardless of whether YouTube manually selected and delivered
the video to a third party.  Viacom's argument is wrong.  It ignores the Second
Circuit's careful emphasis on *manual* syndication and the unique attributes of
YouTube's deal with Verizon Wireless that distinguish it from ordinary
arrangements allowing mobile and other devices to access to videos residing on
YouTube's system.  Viacom also overlooks that YouTube's ordinary licensing
arrangements involve precisely the same software functions aimed at "facilitating
access to user-stored material" that the Second Circuit held to be protected by
§ 512(c).  Viacom's crabbed construction of the safe harbor has no support in the
case law and would undermine the DMCA's purpose by leaving service providers
unable to facilitate access to material stored on their systems as technology
develops.  On the proper understanding of § 512(c), YouTube is entitled to summary
judgment.  None of Viacom's clips-in-suit were manually selected for delivery to a
third party, and any other licensing arrangement that may have involved those
clips is protected by the DMCA.

PUBLIC VERSION
REDACTED

A.    **Viacom Cannot Show That Any Of Its Clips-In-Suit Were Manually Selected For Delivery To A Third Party**

The § 512(c) safe harbor applies to "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." § 512(c)(1).  Consistent with every other court to have considered the issue (including this Court), the Second Circuit rejected Viacom's argument that the safe harbor protects only the actual storage of content uploaded by users.  *Viacom II*, 676 F.3d at 39.  Instead, the court held that "the § 512(c) safe harbor extends to software functions performed 'for the purpose of facilitating access to user-stored material.'"  *Id.* (quoting *UMG Recordings, Inc. v. Veoh Networks, Inc.* (*UMG I*), 620 F. Supp. 2d 1081, 1088 (C.D. Cal. 2008), *aff'd sub nom. Shelter Capital*, 667 F.3d 1022 (9th Cir. 2011)); *see also Io Grp.*, 586 F. Supp. 2d at 1148 (provider covered by § 512(c) where it "established a system whereby software automatically processes user-submitted content and recasts it in a format that is readily accessible to its users.").

Applying that test, the Second Circuit found that three functions were indisputably protected by § 512(c):  (1) "transcoding" videos into different file formats "in order to render the video viewable over the Internet to most users;" (2) YouTube's "playback" of videos in response to user requests; and (3) the "related videos" function that "identifies and displays 'thumbnails' of clips that are 'related' to the video selected by the user."  *Viacom II*, 676 F.3d at 39-40 (some quotation marks omitted).  The court explained that these functions all were "'narrowly directed toward providing access to material stored at the direction of users.'"  *Id.* at 40 (quoting *UMG I*, 620 F. Supp. 2d at 1092).

In addressing a fourth function ("third-party syndication"), the Second Circuit proceeded cautiously.  In its broadest sense, "syndication" can refer to the

PUBLIC VERSION
REDACTED

process for making videos uploaded to YouTube available on third-party viewing devices, such as mobile phones. Schwartz Ex. 9 (16:10-15). YouTube has entered that type of syndication agreement with various device providers, including Apple, Sony, and Panasonic, allowing users of those devices to watch videos from YouTube's system in the same way that users watch videos from YouTube though an Internet browser on a personal computer. SUF ¶ 179; VRYCS ¶¶ 324-27. But the focus of the Second Circuit's short discussion was narrower than that. The court homed in on an agreement that YouTube entered into with Verizon Wireless. *Viacom II*, 676 F.3d at 40. That agreement had an unusual feature. In YouTube's normal syndication agreements, the videos at issue remain on YouTube's system and are subjected to automated processes that render them accessible to third-party devices over the Internet. SUF ¶ 179; VRYCS ¶¶ 324-27. Under the Verizon Wireless agreement, in contrast, YouTube manually selected a small number of videos that it copied, took off the YouTube system, and delivered by hand to Verizon so that Verizon could make them available from its own system. SUF ¶ 180; VRYCS ¶ 329.[18]

The Second Circuit did not hold that this aspect of the Verizon arrangement actually took it outside the safe harbor. It said merely that there was "some force" to the argument that business transactions fall outside § 512(c) "when they involve the manual selection of copyrighted material for licensing to a third party." *Viacom II*, 676 F.3d at 40. But the court recognized that this legal issue would have to be decided only if some of the plaintiffs' clips-in-suit had in fact been syndicated in that

---

[18] The manual approach used in the early days of the Verizon Wireless agreement was soon abandoned, and Verizon devices began accessing videos directly from YouTube's system in the same automated way as other mobile operators. Schapiro Opp. Ex. 325 (37:23-38:11); Schwartz Ex. 9 (55:15-57:1).

PUBLIC VERSION
REDACTED

way.  *Id.*  It was this narrow question that the court left open for proceedings on remand.  Viacom has not even attempted to make that factual showing.  It has not identified a single clip-in-suit that it contends was "manually" syndicated in a manner akin to the videos provided to Verizon Wireless.  That is not surprising. The record confirms that YouTube did not enter into any other syndication arrangements that involved manual selection of videos to be taken off YouTube's system and handed over to a third party.  SUF ¶ 181.  That should end the remand inquiry.  Because Viacom cannot create a triable issue as to whether any of its clips-in-suit were manually selected for delivery in connection with a licensing agreement, YouTube is entitled to summary judgment.

### B.    Viacom's Effort To Exclude YouTube's Ordinary Syndication Practices From The Safe Harbor Is Contrary To The Second Circuit's Decision And To The Purpose Of The DMCA

Viacom wants to read the words "manual selection" out of the Second Circuit's decision.  In Viacom's view, any licensing agreement through which a service provider makes user-submitted content accessible via third-party devices (regardless of the "methods" used to effectuate that agreement) is excluded from § 512(c) protection.  But the Second Circuit referenced "manual selection" for a reason, and it is critical to the limited remand it ordered.  The manual selection of videos for hand delivery to Verizon Wireless was the key feature of that agreement, what distinguished it from the other "automated" software functions the court addressed (and from YouTube's other syndication arrangements (SUF ¶¶ 179-81)) and gave Plaintiffs' argument "some force."  *Viacom II*, 676 F.3d at 40.[19]  It is not

---

[19]  The plaintiffs themselves highlighted the "manual selection" aspect of the Verizon Wireless agreement in an attempt to distinguish that arrangement from the normal operation of YouTube service.  In its response to YouTube's original Rule 56.1 statement, the putative class plaintiffs referenced the Verizon Wireless agreement:  "In 2007, YouTube 'manually selected' videos to 'syndicate' to mobile phone providers."  CCS ¶ 19.  Viacom

PUBLIC VERSION
REDACTED

hard to understand why the Second Circuit thought those manual aspects of the Verizon arrangement might be legally significant.  Section 512(c), by its terms, applies to "[i]nformation *residing on* systems of networks at the direction of users." § 512(c) (emphasis added).  Under the Second Circuit's ruling, the provision covers any "software functions performed 'for the purpose of facilitating access to user-stored material.'"  *Viacom II*, 676 F.3d at 39 (quoting *UMG I*, 620 F. Supp. 2d at 1088).  But when a service provider manually selects videos to be made available to a third party and delivers copies of those videos to be hosted on the third-party's system, it is arguable that resulting infringements fall outside the safe harbor's parameters.  Copies of videos that are put in the physical possession of a third party could be said to no longer be "user-stored material" "residing on" YouTube's system, and the manual-selection process could be said to have been something other than an automated "software function" directed toward making those videos more accessible.  On this understanding, the manual selection and delivery of videos might break the link with the "storage" of material "at the direction of users" that § 512(c) protects.  In suggesting that business arrangements involving this kind of manual selection might present a close call under § 512(c), however, the Second Circuit did not, as Viacom suggests, call into question the run-of-the-mill licensing agreements that YouTube (and nearly all other service providers (*see infra* n.20)) use to make user-stored material more readily available to third parties over the Internet.

---

likewise distinguished between the Verizon Wireless arrangement and YouTube's other licensing agreements.  *Compare* VRYCS ¶ 329 ("YouTube provided Verizon with copies of the YouTube videos that Verizon wished to make available on its mobile devices, which consisted solely of videos YouTube had selected for prominent placement as featured videos on YouTube") *with id.* ¶¶ 324-27 (stating that YouTube had agreements with various device providers, without suggesting that YouTube engaged in any manual selection or delivery of videos).

PUBLIC VERSION
REDACTED

Some additional background on YouTube's "syndication" practices shows why that reading of the Second Circuit's ruling—and the DMCA—must be rejected. YouTube's syndication agreements merely give users alternative ways to view videos that users have stored on YouTube's system.  They reflect the reality that people today connect to online services not just through personal computers, but through an increasingly broad range of devices, including mobile phones, tablet computers like Apple's iPad, and Internet-enabled television sets.  To ensure that users can watch videos uploaded to YouTube no matter what hardware they may be using, YouTube has entered into licenses with third-party device providers that allow users of those devices to access videos directly from YouTube's system. Solomon Opp. Decl. ¶ 3; Schapiro Opp. Ex. 325 (36:24-37:9, 39:7-13); Schwartz Ex. 9 (23:13-25:9); VRYCS ¶¶ 324-327.[20]  Because videos can be played on such devices only if they are stored in the proper file format, YouTube's system automatically transcodes user-uploaded videos into the formats compatible with various third-party devices.  Solomon Opp. Decl. ¶ 3; Schwartz Ex. 9 (48:11-16, 57:2-22); VRYCS ¶¶ 320, 330.  YouTube's standard syndication licenses thus involve no manual selection of videos by YouTube, and the videos accessible via the third-party devices at all times remain stored on and accessed only from YouTube's system.  SUF ¶ 179; Schapiro Opp. Ex. 325 (36:24-37:22); *compare* VRYCS ¶ 329 (description of Verizon Wireless agreement) *with id*. ¶¶ 324-27 (descriptions of YouTube's agreements with Apple, Sony, Panasonic, and TiVo).

---

[20] Such arrangements are not unique to YouTube.  It is common among online service providers to enter into licensing agreements that make user-submitted material stored on their systems more accessible to others, including to users of mobile devices and other third-party hardware.  Solomon Opp. Decl. ¶3; *see, e.g.*, Facebook API, *available at* http://developers.facebook.com/docs/reference/api/; Scribd API, *available at* http://www.scribd.com/developers/platform; Vimeo API, *available at* http://vimeo.com/api; Yelp API, *available at* http://www.yelp.com/developers/getting_started.

PUBLIC VERSION
REDACTED

Nothing in the Second Circuit's decision suggests that videos made accessible under these kinds of automated syndication arrangements are outside the safe harbor. Those arrangements are "directed toward providing access to material stored at the direction of users"—just what § 512(c) covers. *Viacom II*, 676 F.3d at 40. Indeed, at least where they do not entail manual selection and delivery of videos, YouTube's syndication offerings do nothing more than combine two functions that the Second Circuit has already found to be protected by the safe harbor: (1) "transcoding" videos "in a different encoding scheme in order to render the video viewable over the Internet to most users;" and (2) playing back videos "in response to a user request." *Id.* at 39 (quotation marks omitted). Those functions are equally protected when they are used to allow user-submitted videos to be accessed from YouTube's system via mobile phones and other third-party hardware.

That is confirmed by *UMG I*, a case on which the Second Circuit repeatedly relied. *See Viacom II*, 676 F.3d at 39-40. *UMG I* explained that § 512(c) allows service providers to offer their users "technically different means of accessing uploaded videos," and thus found that the service provider was protected by the safe harbor even though it converted user-submitted videos into new file formats in order to make them "playable on some portable devices." *UMG I*, 620 F. Supp. 2d at 1084, 1092; *see also Obodai v. Demand Media, Inc.*, No. 11-civ-2503 (PKC), 2012 WL 2189740, at *7 (S.D.N.Y. June 13, 2012) (rejecting plaintiffs' argument that "unprotected syndication or distribution and display acts are not tantamount to the protected storage of 512(c)").

Any other result would undermine the legitimate expectations of countless online services that use similar licensing agreements and automated software functions to make user-submitted content on their systems accessible through

53

PUBLIC VERSION
REDACTED

various Internet-enabled devices.  Under Viacom's approach, service providers would be frozen in time, unable to make their services compatible with a new generation of hardware, lest they lose DMCA protection by trying to keep pace with technological change.  That result is contrary to the purpose of the safe harbors, which were intended to ensure that "the variety and quality of services on the Internet will continue to expand."  S. Rep. No. 105-190, at 8; *see also UMG I*, 620 F. Supp. 2d at 1089 ("If providing access could trigger liability without the possibility of DMCA immunity, service providers would be greatly deterred from performing their basic, vital and salutary function—namely, providing access to information and material for the public.").

Disregarding all of this, Viacom argues that videos made accessible to third parties through these kinds of arrangements lack a sufficient causal connection to the "storage" of videos at the direction of users.  Viacom says that YouTube, not its users, choose to enter into the licensing agreements, and therefore that any videos made available based on such agreements are outside the safe harbor.  Schwartz Ex. 5 (at 32).  But the Second Circuit declined to adopt Viacom's narrow, proximate-cause construction of the § 512(c).  *Viacom II*, 676 F.3d at 40.  Under the court's ruling, what matters is not whether the user itself was directly responsible for the reproduction or display at issue, but instead whether the functions at issue retain "a sufficient causal link to the prior storage of those videos."  *Id*.  That is the situation here.  The automated software functions that YouTube uses as part of its licensing agreements "help YouTube users locate and gain access to material stored at the direction of other users" on YouTube's system.  *Id*.  Those functions are "'narrowly directed to providing access to material stored at the direction of users'"

PUBLIC VERSION
REDACTED

and thus occur "by reason of storage" under § 512(c).  *Id.* (quoting *UMG I*, 620 F. Supp. 2d at 1092).[21]

\* \* \*

The DMCA allows YouTube and other service providers to improve access to user-submitted content by entering arrangements that allow material stored on their systems at the direction of users to be viewed over the Internet.  Thus, even if YouTube's ordinary syndication agreements had implicated Viacom's clips-in-suit, the copying and display of those videos would remain fully protected by § 512(c). Either way, the safe harbor applies to all of Viacom's claims of infringement in this case.

---

[21] *See also UMG I*, 620 F. Supp. 2d at 1089 ("when copyrighted content is displayed or distributed on Veoh it is 'as a result of' or 'attributable to' the fact that users uploaded the content to Veoh's servers to be accessed by other means"); *Io Grp.*, 586 F. Supp. 2d 1132 at 1146 (rejecting plaintiffs' argument that Veoh's transcoding of user-submitted videos fell outside the 512(c) because "users never instruct or direct Veoh to create these files, except in the broadest possible sense").

55

PUBLIC VERSION
REDACTED

## CONCLUSION

For the reasons above, and in YouTube's original motion for summary judgment, YouTube is protected by Section 512(c) of the DMCA against all of Viacom's direct and secondary infringement claims.

Dated:      December 7, 2012
            New York, NY

                              Respectfully submitted,


                              _____
                              Andrew H. Schapiro
                              David B. Schwartz
                              QUINN EMANUEL URQUHART &
                              SULLIVAN LLP
                              51 Madison Avenue
                              22nd Floor
                              New York, New York 10010
                              (212) 849-7000

                              David H. Kramer
                              Michael H. Rubin
                              Brian M. Willen
                              WILSON SONSINI GOODRICH & ROSATI PC
                              650 Page Mill Road
                              Palo Alto, California 94304
                              (650) 493-9300

                              *Attorneys for Defendants*