**PUBLIC VERSION**
**REDACTED**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIACOM INT'L INC., ET AL.,<br><br>   *Plaintiffs*,<br>v.<br><br>YOUTUBE, INC., ET AL.,<br><br>   *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

       ECF Case
    Civil No. 07-CV-2103 (LLS)

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' RENEWED
## MOTION FOR SUMMARY JUDGMENT

David H. Kramer
Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

Andrew H. Schapiro
David B. Schwartz
QUINN EMANUEL URQUHART &
 SULLIVAN LLP
51 Madison Avenue
New York, New York 10010
(212) 849-7000

*Attorneys for Defendants*

**PUBLIC VERSION**
**REDACTED**

### <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ....................................................................................... ii

GLOSSARY .......................................................................................................... v

I.    VIACOM CANNOT AVOID SUMMARY JUDGMENT ON
      KNOWLEDGE BY TRYING TO SHIFT THE BURDEN OF PROOF ............. 2

      A.    Viacom's Burden-Shifting Argument Has No Merit ............................. 3

      B.    YouTube Has Shown Its Lack Of Knowledge Of Infringement .......... 10

II.    VIACOM CONTINUES TO MISCONCEIVE AND MISAPPLY THE
      WILLFUL BLINDNESS DOCTRINE AS LIMITED BY THE DMCA .......... 13

      A.    Viacom Misunderstands The Limited Nature Of Willful
              Blindness That Applies To The DMCA .................................................. 14

      B.    On The Correct Standard, Viacom's "Evidence" Of Willful
              Blindness Does Not Create A Jury Question ....................................... 17

      C.    Viacom's Effort To Minimize Its Stealth Marketing And Leave-
              Up Practices Ignores The Facts And The Law.................................... 23

III.    YOUTUBE DID NOT HAVE CONTROL OVER THE INFRINGING
      ACTIVITY COUPLED WITH A DIRECT FINANCIAL BENEFIT................ 27

      A.    Viacom Misconstrues The DMCA's "Control" Requirement................. 27

      B.    Viacom Cannot Show That YouTube Exerted A Substantial
              Influence Over The Infringement Of Any Clip-In-Suit ........................ 32

      C.    YouTube Did Not Receive A Financial Benefit Directly
              Attributable To The Alleged Infringement ........................................... 34

IV.    MAKING VIDEOS AVAILABLE FROM YOUTUBE'S SYSTEM TO
      USERS OF OTHER DEVICES IS PROTECTED BY SECTION 512(c) ........ 37

CONCLUSION........................................................................................................ 40

i

PUBLIC VERSION
REDACTED

## TABLE OF AUTHORITIES

**Page**

*ALS Scan, Inc. v. RemarQ Communities, Inc.*,
239 F.3d 619 (4th Cir. 2001) ................................................................. 8

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ............................................................ 35

*Capitol Records, Inc. v. MP3tunes, LLC*,
821 F. Supp. 2d 627 (S.D.N.Y. 2011) ............................ 7, 26, 28, 34, 36

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................... 12

*In re Chicago Rys. Co.*,
175 F.2d 282 (7th Cir. 1949) ............................................................. 11

*Corbis Corp. v. Amazon.com, Inc.*,
351 F. Supp. 2d 1090 (W.D. Wash. 2004) ................................... 5, 6, 28

*Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*,
606 F.3d 612 (9th Cir. 2010) ............................................................... 5

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
76 F.3d 259 (9th Cir. 1996) .............................................................. 36

*Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011) ...................................................................... 16

*Hendrickson v. eBay Inc.*,
165 F. Supp. 2d 1082 (C.D. Cal. 2001).................................... 13, 28, 31

*Io Grp., Inc. v. Veoh Networks, Inc.*,
586 F. Supp. 2d 1132 (N.D. Cal. 2008) .................... 6, 22, 25, 28, 33, 39

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ............................................................... 29, 30, 33

*Newton v. City of New York*,
640 F. Supp. 2d 426 (S.D.N.Y. 2009) ................................................. 12

*Noel Canning v. N.L.R.B.*,
--- F.3d ----, 2013 WL 276024 (D.C. Cir. Jan. 25, 2013) ...................... 30

PUBLIC VERSION
REDACTED

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  No. CV-05-4753 (C.D. Cal. Nov. 4, 2008) (Dkt. No. 221) ....................................... 5

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) ......................................................................... 6, 36

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002)..................................................... 28, 29, 31

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  576 F. Supp. 2d 463 (S.D.N.Y. 2008) .................................................................. 15

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  600 F.3d 93 (2d Cir. 2010)............................................................................ 14, 15

*Tur v. YouTube, Inc.*,
  No. CV064436, 2007 WL 1893635 (C.D. Cal. June 20, 2007)................................ 8

*Tur v. YouTube, Inc.*,
  562 F.3d 1212 (9th Cir. 2009) ............................................................................. 8

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  667 F.3d 1022 (9th Cir. 2011) ......................................................................... 7, 38

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
  620 F. Supp. 2d 1081 (C.D. Cal. 2008)................................................................ 39

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
  665 F. Supp. 2d 1099 (C.D. Cal. 2009)................................ 6, 11, 26, 27, 28, 29, 31

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  718 F. Supp. 2d 514 (S.D.N.Y. 2010) .................................................................. 33

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012)...........................................................................passim

*Wolk v. Kodak Imaging Network, Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012) ................................................. 7, 9, 21, 33, 36

## Statutes

17 U.S.C. § 512(a) ............................................................................................ 5

17 U.S.C. § 512(c)......................................................................................passim

17 U.S.C. § 512(i) .......................................................................................... 22

**PUBLIC VERSION**
**REDACTED**

17 U.S.C. § 512(m) ...............................................................16, 21, 22, 23, 28, 31, 33

## **Legislative History**

H.R. Rep. No. 105-551 (I) (1998) ....................................................................... 8

H.R. Rep. No. 105-551 (II) (1998)............................................................ 9, 35, 36, 37

H.R. Rep. No. 105-796 (1998) (Conf. Rep.)............................................................ 22, 23

S. Rep. No. 105-190 (1998) ............................................................ 9, 35, 36

## **Other**

3 Melville B. Nimmer & David Nimmer,
  *Nimmer on Copyright* § 12B.04.............................................................. 8, 9

6 *Patry on Copyright* § 21:85 (2012)[1] ............................................................ 35, 37

31A C.J.S. Evidence § 200 (2012)............................................................ 11

Restatement (Third) of Agency § 1.02.............................................................. 20

---

[1] Professor Patry became a Google employee in October 2006.

iv

PUBLIC VERSION
REDACTED

## GLOSSARY

| | |
|---|---|
| RVCS | Reply to Viacom's Counter-Statement in Response to Defendant's Local Rule 56.1 Statement in Support of Defendants' Motion for Summary Judgment, filed June 14, 2010 |
| RVSCS | Response to Viacom's Supplemental Counter-Statement, filed June 14, 2010 |
| SUF (¶¶ 1-171) | Defendants' Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried, filed March 5, 2010 |
| SUF (¶¶ 172-181) | Defendants' Supplemental Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried, filed December 7, 2012 |
| VCS | Viacom's Counter-Statement In Response To Defendants' Local Rule 56.1 Statement In Support Of Defendants' Motion For Summary Judgment, filed April 30, 2010 |
| VSCS | Viacom's Supplemental Counter-Statement In Response To Facts Asserted In Defendants' Summary Judgment Memorandum Of Law But Omitted From Defendants' Local Rule 56.1 Statement, filed, April 30, 2010 |
| YCVS | YouTube's Counterstatement To Viacom's Statement Of Undisputed Facts In Support Of Its Motion For Partial Summary Judgment Of Liability And Inapplicability Of The Digital Millennium Copyright Act Safe Harbor Defense, filed May 10, 2010 |
| Botha Decl. | Declaration Of Roelof Botha In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010 |

PUBLIC VERSION
REDACTED

Hohengarten Decl.

Declaration Of William M. Hohengarten In Support Of Viacom's Motion For Partial Summary Judgment, filed March 5, 2010

Hurley Opening Decl.

Declaration of Chad Hurley in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

King Opening Decl.

Declaration Of David King In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010

King Opp. Decl.

Declaration of David King in Support of Defendants' Opposition to Plaintiffs' Motions for Summary Judgment, filed April 30, 2010

Levine Opp. Decl.

Declaration of Zahavah Levine in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed April 30, 2010

Maxcy Opening Decl.

Declaration of Christopher Maxcy in Support of Defendants' Motion for Summary Judgment, filed March 5, 2010

Opp.

Viacom's Memorandum of Law in Opposition to Defendants' Renewed Motion for Summary Judgment, filed January 18, 2013

Reider Decl.

Declaration Of Suzanne Reider In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010

Rubin Opening Decl.

Declaration Of Michael Rubin In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010

Rubin Reply Decl.

Reply Declaration Of Michael Rubin In Support Of Defendants' Motion For Summary Judgment, filed June 4, 2010

Schaffer Opening Decl.

Declaration Of Micah Schaffer In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010

Schapiro Opening Decl.

Declaration Of Andrew H. Schapiro In Support Of Defendants' Motion For Summary Judgment, filed March 5, 2010

PUBLIC VERSION
REDACTED

Schapiro Opp. Decl.                     Declaration Of Andrew H. Schapiro In
                                        Support Of Defendants' Opposition To
                                        Plaintiffs' Motions For Partial Summary
                                        Judgment, filed May 10, 2010

Schapiro Reply Decl.                    Reply Declaration Of Andrew H. Schapiro
                                        In Support Of Defendants' Motion For
                                        Summary Judgment, filed June 14, 2010

Schwartz Decl.                          Declaration of David B. Schwartz in
                                        Support of Defendants' Renewed Motion
                                        for Summary Judgment, filed December 7,
                                        2012

Solomon Opp. Decl.                      Declaration of Michael Solomon in
                                        Support of Defendants' Opposition to
                                        Plaintiffs' Motions for Summary
                                        Judgment, filed May 10, 2010

Viacom 2d Cir. Br.                      Brief for Plaintiffs-Appellants, filed
                                        December 7, 2010 (No. 10-3270) (Dkt. No.
                                        63)

Viacom Resp. to YT Supp. Submission     Viacom's Response to YouTube's
                                        Supplemental Submission in Response to
                                        the Court's Request for an Appendix of
                                        Evidence of Knowledge or Awareness of
                                        Specific Infringing Activities, filed
                                        January 18, 2013

Opening Br.                             Memorandum of Law in Support of
                                        Defendants' Renewed Motion for
                                        Summary Judgment, filed December 7,
                                        2012

Reply                                   Reply Memorandum of Law in Support of
                                        Defendants' Renewed Motion for
                                        Summary Judgment, filed February 22,
                                        2013

YT SJ Opening                           Memorandum of Law in Support of
                                        Defendants' Motion for Summary
                                        Judgment, filed March 11, 2010

YT SJ Opp.                              Memorandum of Law in Support of
                                        Defendants' Opposition to Plaintiffs'
                                        Motions for Partial Summary Judgment,
                                        filed May 10, 2010

PUBLIC VERSION
REDACTED

YT SJ Reply                          Reply Memorandum of Law in Support of
                                     Defendants' Motion for Summary
                                     Judgment, filed June 14, 2010

YT Supp. Submission                  YouTube's Supplemental Submission in
                                     Response to the Court's Request for an
                                     Appendix of Evidence of Knowledge or
                                     Awareness of Specific Infringing
                                     Activities, filed December 7, 2012

Wilkens Decl.                        Declaration of Scott B. Wilkens in
                                     Opposition to Defendants' Renewed
                                     Motion for Summary Judgment, filed
                                     January 18, 2013

PUBLIC VERSION
REDACTED

YouTube submits this reply in further support of its renewed motion for summary judgment. On each of the four issues identified by the Second Circuit, the undisputed evidence makes clear that YouTube is entitled to the DMCA safe harbor as to all of Viacom's clips-in-suit.

*First*, Viacom does not even try to make the showing of clip-specific knowledge required by the Second Circuit's ruling. It instead reverses course and claims that it is YouTube's burden to affirmatively establish its lack of knowledge as to each specific clip-in-suit. Viacom's novel burden-shifting argument is wrong. It is contrary to the Second Circuit's decision, all the case law, and the structure of the DMCA itself. Viacom also ignores the record. YouTube has identified more than sufficient evidence of its lack of knowledge of infringement—including the very fact that the voluminous record in this case contains no evidence of such knowledge. Viacom's inability to offer any evidence from which a jury could find that YouTube had actual or red-flag knowledge of even a single clip-in-suit requires that summary judgment be entered in YouTube's favor.

*Second*, Viacom continues to misapply the limited form of the willful blindness doctrine that applies to the DMCA. Willful blindness is not a means for Viacom to assert the same arguments about YouTube's supposed failure to respond properly to generalized knowledge of infringement that have been rejected throughout this case. Instead, willful blindness is an alternative way to show the clip-specific knowledge that the DMCA requires. Viacom does not and cannot make the required showing as to any of the clips it has asserted here.

*Third*, Viacom distorts the Second Circuit's ruling regarding the DMCA's control-plus-financial benefit provision. A finding of "control" cannot, as Viacom claims, turn on a service provider's broad-based dominion over its system, its general policies regarding the kind of content that is allowed on its website, or its deployment of content-monitoring technologies. Instead, consistent with the Second

1

PUBLIC VERSION
REDACTED

Circuit's decision, control requires a showing that YouTube substantially influenced—that is, directed, guided, or caused—the conduct of its users that resulted in the infringing activity at issue in this case.  Viacom has made no attempt to satisfy that standard, and it cannot do so.  Viacom also misapplies the financial-benefit test.  The DMCA does not codify the common law "draw" standard, but instead ensures that services like YouTube, with legitimate business models that do not favor infringement, are protected by the safe harbor.

*Fourth*, Viacom does not claim that there are any clips-in-suit that were manually selected for delivery to a third-party in a manner similar to YouTube's early agreement with Verizon Wireless.  Instead, Viacom argues that any videos made accessible from YouTube's system to a third party pursuant to a licensing deal are categorically outside the § 512(c) safe harbor.  That argument is unsupported by the Second Circuit's ruling and contrary to the DMCA.  Section 512(c) applies to YouTube's automated processes for making user-submitted videos accessible from its system via third-party devices.  That is all that YouTube's ordinary syndication arrangements do, and videos covered by those arrangements, like other videos made available for viewing from YouTube's platform, remain within the safe harbor.

## I.   VIACOM CANNOT AVOID SUMMARY JUDGMENT ON KNOWLEDGE BY TRYING TO SHIFT THE BURDEN OF PROOF

We explained in our opening brief that there is no evidence of any clips-in-suit that YouTube knew were infringing but failed to take down.  Opening Br. 14-29.  Viacom now waves the white flag on that point.  It admits that it does not possess "the kind of evidence that would allow a clip-by-clip assessment" of knowledge.  Opp. 8.  Viacom instead tries to invert the applicable burden of proof.  It claims that YouTube cannot win summary judgment "by pointing to the absence of record evidence" indicating knowledge.  Opp. 9.  On Viacom's theory, YouTube must

PUBLIC VERSION
REDACTED

affirmatively introduce evidence that it lacked knowledge of each video at issue, apparently in the form of "viewing records" or comprehensive employee declarations disclaiming knowledge on a clip-by-clip basis.  *Id.* at 8-10 & nn. 5-6.

This is the first time that Viacom has ever made such an argument.  Never before—not in its opposition to YouTube's original summary judgment motion, nor in its arguments to the Second Circuit, nor in any of the lengthy submissions to this Court on remand—has Viacom contended that summary judgment should be denied based on YouTube's supposed failure to adduce evidence disproving its knowledge of the infringing nature of individual clips-in-suit.  It is not surprising that this burden-shifting argument has not surfaced before, because it is entirely misguided. But even if YouTube had some initial obligation to establish its lack of knowledge, it has more than discharged that duty, and Viacom's failure to show what the Second Circuit's ruling demands requires summary judgment in YouTube's favor.

### A.  Viacom's Burden-Shifting Argument Has No Merit

Viacom's attempt to invert the burden of proof is contrary to the Second Circuit's decision, other cases applying the DMCA, and the statute itself.

**The Second Circuit's Ruling.**  The Second Circuit made clear that the burden is on the plaintiffs to present evidence sufficient to raise a triable issue of fact as to YouTube's knowledge of infringement.  That is reflected in the very formulation of the court's holding:  only "actual knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement will disqualify a service provider from the safe harbor."  *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 32 (2d Cir. 2012) ("*Viacom II*").  That formulation demonstrates the court's understanding that unless the *plaintiffs* could point to evidence creating a jury question on knowledge, YouTube would be entitled to summary judgment. Thus, without even hinting at a required showing by YouTube, the court held that

PUBLIC VERSION
REDACTED

Viacom's reliance on documents estimating the amount of "premium" content on YouTube was "insufficient, standing alone, *to create a triable issue of fact* as to whether YouTube actually knew, or was aware of facts or circumstances that would indicate, the existence of particular infringement." *Id.* at 33 (emphasis added).

The same understanding of the applicable burden underlies the Second Circuit's analysis of the plaintiffs' other evidence. Reviewing that evidence, the court concluded that "*the plaintiffs may have raised* a material issue of fact regarding YouTube's knowledge or awareness of specific instances of infringement." *Id.* at 34 (emphasis added). But even that was not enough to defeat YouTube's motion unless the plaintiffs could tie it to the actual clips-in-suit. The court expressed "no opinion" about whether that would be possible, and thus whether the plaintiffs' knowledge evidence "will prove sufficient to withstand a renewed motion for summary judgment by YouTube on remand." *Id.* at 34 n.9. It instructed this Court in evaluating that motion to determine "whether any specific infringements of which YouTube had knowledge or awareness correspond to the clips-in-suit in these actions." *Id.* at 34.

Viacom would now render the Second Circuit's dictates meaningless. The court plainly did not think that Viacom could avoid summary judgment merely by asserting that "neither side possesses the kind of evidence that would allow a clip-by-clip assessment of actual knowledge." Opp. 8. Nothing in the court's ruling puts the burden on YouTube to prove a negative by conclusively demonstrating its lack of knowledge as to each clip at issue. To the contrary, the premise of the court's entire discussion is that summary judgment for YouTube is warranted unless the plaintiffs could on remand present evidence from which a jury could find that "YouTube had knowledge or awareness of any specific instances of infringement corresponding to the clips-in-suit." *Viacom II*, 676 F.3d at 41. Viacom now admits

4

that it cannot do so.  That should end the matter.  Viacom's inability to make the showing of knowledge that the Second Circuit (and this Court)[2] demanded means that YouTube is entitled to summary judgment on each of the clips at issue.

**Other DMCA Cases and Authorities.**  The Second Circuit's requirement that plaintiffs come forward with sufficient evidence of knowledge to defeat summary judgment is in line with all the DMCA case law.  Our opening brief, for example, cited *Perfect 10, Inc. v. Amazon.com, Inc.*, No. CV-05-4753 (C.D. Cal. Nov. 4, 2008) (Dkt. No. 221).  That decision explained that, even if the service provider has the ultimate burden of establishing the safe-harbor defense, "it is [plaintiff's] burden to show that [defendant] had actual knowledge of infringement within the meaning of section 512(c)."  *Amazon*, slip op. at 8.  Applying that standard, the court held that "[a]lthough [plaintiff] was given the opportunity to demonstrate that [defendant] had such knowledge, it failed to do so."  *Id.*[3]

The appropriate allocation of the burden of proof is demonstrated in a host of other cases.  Service providers are consistently granted summary judgment where, as here, the plaintiff fails to come forward with evidence of knowledge:

- ***Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090 (W.D. Wash. 2004).**[4]  In granting summary judgment to the service provider, the court

---

[2] This Court instructed Viacom to append to its opposition brief a chart that for each allegedly infringing clip-in-suit explains what "precise" information YouTube possessed that would have identified the location of the clip, along with what YouTube would have had to do to remove it.  Opening Br. 16 n.6 (quoting Schwartz Ex. 3 (29:2-15)).  Viacom has failed to provide that information for even a single one of the clips at issue, confirming YouTube's assertion that no such evidence exists.  *See* YT Supp. Submission; Viacom Resp. to YT Supp. Submission.

[3] While the court in *Perfect 10 v. Amazon* ultimately denied the defendant's motion, that result had nothing to do with the knowledge inquiry or the applicable burden of proof.  The court's ruling was based on the existence of triable issues of fact as to two different elements of the § 512(a) safe harbor, which are not at issue here.  *Amazon*, slip op. at 10-12.

[4] *Overruled on other grounds by Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612 (9th Cir. 2010).

held that the evidence *proffered by the plaintiff* "does not create a material issue of fact regarding either Amazon's actual knowledge or its apparent knowledge of infringing material." *Id.* at 1107.  The plaintiff's evidence "would only suggest that Amazon had general knowledge that photos may be the subject of online copyright infringement.  *It provides no evidence from which to infer that [defendant] was aware of, but chose to ignore, red flags* of blatant copyright infringement on specific [services]." *Id.* at 1109 (emphasis added).

•  *Perfect 10, Inc. v. CCBill LLC*, **488 F.3d 1102 (9th Cir. 2007).**  The Ninth Circuit held that there was no triable issue on the defendant's knowledge of infringement because the plaintiff "did not provide [defendant] with knowledge or awareness within the standard of § 512(c)(1)(A)." *Id.* at 1117.  (The court similarly put the burden of proof on the plaintiff under § 512(c)(1)(B), finding that summary judgment was appropriate because the plaintiff "has not raised a genuine issue of material fact that [defendant] receives a direct financial benefit from infringing activity." *Id.* at 1118.).

•  *Io Grp., Inc. v. Veoh Networks, Inc.*, **586 F. Supp. 2d 1132 (N.D. Cal. 2008).**  The court held that because the plaintiff "provided no notice to [defendant] of any claimed copyright infringement, there "is no question on the record presented that [defendant] lacked actual knowledge of the alleged infringing activity at issue." *Id.* at 1148.  In addressing red-flag awareness, the court looked at the examples of supposed red flags that the plaintiff had submitted and found each of them wanting.  *Id.* at 1148-49.  Based on that, the court explained that plaintiff's evidence "*does not give rise to a genuine issue of material fact* as to whether [defendant] had the requisite level of knowledge or awareness that plaintiff's copyrights were being violated." *Id.* at 1149 (emphasis added).

•  *UMG Recordings, Inc. v. Veoh Networks, Inc.*, **665 F. Supp. 2d 1099 (C.D. Cal. 2009) ("*UMG II*").**  The court granted summary judgment to defendant on the § 512(c) safe harbor.  As to actual knowledge, it found (1) no dispute that defendant removed allegedly infringing videos identified to it in DMCA takedown notices and in lists provided by plaintiffs during the litigation, and (2) that plaintiffs' "evidence" relating to other allegedly infringing material "falls short of establishing that defendant had actual knowledge within the meaning of the DMCA." *Id.* at 1109-10 ("[Plaintiff] has not provided evidence establishing that [defendant] failed to act expeditiously whenever it had actual notice of infringement.").  Likewise, the court found that defendant, by rebutting each basis the plaintiff asserted for red-flag knowledge, "has shown that it was not aware of 'red flags,' notwithstanding its knowledge of the general proposition that infringing

PUBLIC VERSION
REDACTED

material is often uploaded to websites, *and [plaintiff] has failed to present evidence to the contrary.*" *Id.* at 1112 (emphasis added).[5]

- ***Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627 (S.D.N.Y. 2011).** In granting defendant's motion for summary judgment in significant part, the court rejected the evidence the plaintiff offered in an effort to create a triable issue. For example, the plaintiff claimed that defendant's executives had disqualifying knowledge because they had uploaded songs from obviously infringing sites. *Id.* at 644. But the court found that the plaintiff "has not shown" that the websites were "clearly pirate," explaining that "the DMCA does not place the burden of investigation on the internet service provider." *Id.* And, even though the defendant was undoubtedly "aware that some level of infringement occurs," the court found summary judgment appropriate because the plaintiff's evidence created "no genuine dispute" that defendant had knowledge of the specific infringements at issue. *Id.* at 645.

- ***Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012).** The court granted summary judgment after finding that "[t]here is no evidence that [defendant] had actual or constructive knowledge of the copyright infringement [plaintiff] alleges." *Id.* at 746. The court held that the defendant properly responded to the plaintiff's DMCA-compliant takedown notices and that the plaintiff's other notices were not compliant and thus could not give rise to disqualifying knowledge. *Id.* at 746-47.

These decisions directly undermine Viacom's claims about how the burden of proof applies to the DMCA's knowledge provisions. None of them required the service provider to affirmatively present evidence establishing its lack of knowledge as to each allegedly infringing item at issue. The defendant prevailed in each case despite doing nothing like that. These cases thus make clear that it is the plaintiff seeking to disqualify a service provider from the DMCA based on knowledge of infringement that must come forward with evidence of that supposed knowledge.

---

[5] The ruling in *UMG II* was affirmed by the Ninth Circuit, which likewise held that Veoh was entitled to summary judgment because: (1) "[Defendant's] general knowledge that it hosted copyrightable material and that its services could be used for infringement is insufficient to constitute a red flag"; and (2) "[w]e are not persuaded that [plaintiff's] other purported evidence of [defendant's] actual or apparent knowledge of infringement warrants trial. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1038-40 (9th Cir. 2011) (explaining that plaintiffs' evidence "fails to create a genuine issue of material fact regarding [defendant's] knowledge of infringement").

PUBLIC VERSION
REDACTED

The authorities that Viacom cites (Opp. 5-6) do not suggest otherwise. Viacom's reliance on *MP3tunes* and *Wolk* is particularly misguided, given that (as discussed) both cases granted summary judgment to the service provider where the plaintiffs' evidence failed to create a genuine dispute as to actual or red-flag knowledge.[6]  Viacom also points to legislative history from an early version of the bill, which merely states that the overall burden of establishing an affirmative defense like the DMCA rests with the service provider.  H.R. Rep. No. 105-551 (I), at 26 (1998).  But that is not the question here.  The general rule that a defendant bears the burden of establishing an affirmative defense does not mean that a service provider in this context must prove a negative by coming forward with specific evidence of its lack of knowledge of each instance of alleged infringement.

Finally, Viacom relies on the Nimmer treatise, but it omits the relevant portions of the passage, which directly contradict Viacom's argument:

> As an initial matter, plaintiff bears the burden of proof.  Once it establishes its prima facie case, however, the burden shifts to defendant to establish the affirmative defense of this Section 512 safe harbor.  It would seem that defendant may do so by demonstrating that it qualifies as a service provider under the statutory definition, which has established a repeat infringer policy and follows the requisite technical measures.  In terms of mental state, the burden would then appear to shift back to plaintiff.  *To disqualify defendant from the safe harbor, the copyright claimant must show defendant's actual knowledge or a "red flag" waving in its face.*

---

[6] Viacom also relies on *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 623 (4th Cir. 2001), which addressed only the DMCA's notification element on a motion to dismiss.  The court merely held that the service provider was not eligible for the safe harbor because it failed to respond appropriately to plaintiff's takedown notices.  *Id.* at 625-26.  Likewise, the district court ruling in *Tur* did not discuss knowledge or the burden of proof on that issue.  *Tur v. YouTube, Inc.*, No. CV064436, 2007 WL 1893635, at *3 (C.D. Cal. June 20, 2007).  *Tur*'s interpretation of the DMCA's control provision was never further explored because Tur dismissed the case and thereby mooted the appeal.  *Tur v. YouTube, Inc.*, 562 F.3d 1212 (9th Cir. 2009).

PUBLIC VERSION
REDACTED

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12B.04[A][1][d] n.145 (emphasis added) (internal citations omitted).[7]

**Structure of the DMCA.**  The DMCA's basic structure also confirms this allocation of the burden of proof.  While the burden of establishing threshold safe harbor eligibility—that the defendant is a "service provider"; that it implemented a repeat-infringer policy; that it accommodates "standard technical measures"—may rest with the service provider, the situation is different with respect to the statute's knowledge requirements.  That is because those requirements echo an element of a plaintiff's secondary infringement claims.  To establish a prima facie claim of contributory infringement, a plaintiff must prove the defendant had knowledge of the infringing activity.  *See, e.g.*, *Wolk*, 840 F. Supp. 2d at 750-51 ("[t]he Plaintiff bears the burden of establishing [defendant's] knowledge of the infringing activity.").  It makes no sense to suggest that to establish a DMCA defense to that prima facie case, a service provider must affirmatively disprove the existence of an element of the plaintiff's claim, on which the plaintiff bears the burden of proof.  Congress did not provide service providers with a defense to liability that in practice would only be attainable when the claim had otherwise failed.  *See* H.R. Rep. No. 105-551 (II), at 53 (1998) (DMCA protects service providers from claims of contributory infringement); S. Rep. No. 105-190, at 20 (1998) (same).

---

[7]    Nimmer repeatedly explains that the burden of establishing disqualifying knowledge of infringement under the DMCA lies with the plaintiff.  3 Nimmer, *Nimmer on Copyright* § 12B.04[A][3] n.214 ("For having failed to serve a notification of claimed infringement, the owner will lose the case as a whole, unless it can meet the high burdens of demonstrating either a 'red flag' or actual knowledge."); *id*. §12B.04[B][4][c] ("[T]he copyright owner bears the burden of demonstrating knowledge independently of the failed notification.  To the extent that no other proof exists, the proprietor's attempt to defeat the defense fails.") (footnotes omitted).

PUBLIC VERSION
REDACTED

\* \* \*

In sum, all relevant authority, including the Second Circuit's decision, confirms that YouTube is entitled to summary judgment because Viacom has failed to make any showing that YouTube had the requisite knowledge or awareness that any of the clips-in-suit were infringing.

### B.     YouTube Has Shown Its Lack Of Knowledge Of Infringement

Even assuming *arguendo* that YouTube did have some initial duty to offer evidence of its lack of knowledge, it has most certainly done so.

While Viacom is conspicuously vague about what evidence would be sufficient to show a service provider's lack of knowledge, there is no requirement that such evidence take the form of detailed declarations or "viewing records" from the company's executives.[8]  If prevailing under the DMCA required an otherwise-eligible service provider to conclusively prove a negative by introducing company-wide affidavits or data purporting to establish that none of its (potentially hundreds of) employees recognized as infringing each individual clip at issue, the safe harbor would be a dead letter.  No court has ever suggested anything like that.  Instead, the most a service provider could be required to do is point to facts making probable that it did not have the kind of knowledge required by the statute.[9]  In *UMG II*, for

---

[8] YouTube did offer declarations in connection with its summary judgment motion  from its co-founder and CEO Chad Hurley, as well as from, among others Christopher Maxcy (Maxcy Opening Decl. ¶¶ 3-7), Micah Schaffer (Schaffer Opening Decl. ¶¶ 3, 6-9, 12-13, 15-19), Roelof Botha (Botha Decl. ¶¶ 13-14), Suzanne Reider (Reider Decl. ¶ 10), and David King (King Opening Decl. ¶¶ 11-12, 16, 29-30).  Those declarations are admissible evidence regarding YouTube's lack of disqualifying knowledge of infringement, and the Court has already rejected Viacom's objections to them.  Dkt No. 253.  Likewise, the "watch data" that Viacom references further negates YouTube's knowledge of infringement, as it shows no "watches" for over 99% of Viacom's clips-in-suit.  YT SJ Reply 15 & n.12; Rubin Reply Decl. ¶ 14.  But while this evidence supports YouTube, it is hardly essential.  After all, this Court granted YouTube's original motion without relying on such evidence of lack of knowledge, and Viacom did not argue that as a basis for reversal.

[9] That approach is consistent with the longstanding principles of evidence:

PUBLIC VERSION
REDACTED

example, the court found that Veoh had met whatever burden it had by showing "that when it did acquire knowledge of allegedly infringing material—whether from DMCA notices, informal notices, or other means—it expeditiously removed such material, and UMG has failed to rebut that showing." 665 F. Supp. 2d at 1107. YouTube has done just that, and more.

Initially, the idea that runs through Viacom's brief—that the absence of evidence that YouTube had knowledge of infringement is equivalent to an absence of evidence that YouTube *lacked* such knowledge—is wrong. Especially in a case with such a "voluminous record," *Viacom II*, 676 F.3d at 34 n.9, the total dearth of evidence suggesting that YouTube had specific knowledge of infringement is itself evidence that YouTube lacked such knowledge. But there is far more here than that. As in *UMG II*, it is undisputed that YouTube appropriately responded to Viacom's DMCA takedown notices and that it removed all allegedly infringing videos that Viacom identified to it in connection with this litigation. *Viacom II*, 676 F.3d at 29 n.7; SUF ¶¶ 64-69, 117-120; YT SJ Opening 32-33 n.9. It is also undisputed that YouTube does not as a general matter review videos uploaded to the service and that YouTube's employees do not prescreen or otherwise examine the vast majority of videos that are posted. SUF ¶ 36. Thus, as YouTube explained in its original summary judgment brief: "YouTube employees have never even seen

---

> Evidence which renders the existence of the negative probable may be sufficient in the absence of proof to the contrary. *Full and conclusive proof, however, where a party has the burden of proving a negative, is not required*, but even vague proof, or such as renders the existence of the negative probable, is in some cases sufficient to change the burden to the other party.

*In re Chicago Rys. Co.*, 175 F.2d 282, 244 (7th Cir. 1949) (emphasis added) (citation, ellipsis, and quotation marks omitted); *see also, e.g.*, 31A C.J.S. Evidence § 200 (2012) ("The court will more promptly discharge a litigant from the burden of evidence where the proposition is a negative one, and the burden of evidence is sustained by proof which renders probable the existence of the negative fact, nothing in the nature of a demonstration being required.") (footnotes omitted).

**PUBLIC VERSION**
**REDACTED**

the overwhelming majority of the more than 500 million videos that have been posted to the service." YT SJ Opening 34.

YouTube's brief further showed (citing extensive evidence) that even if someone at YouTube had been aware of certain Viacom clips-in-suit, the nature of those clips—along with Viacom's own conduct—would "negate any basis for imputing knowledge of the alleged infringements to YouTube." YT SJ Opening 35-55. Particularly significant in that respect were Viacom's extensive stealth-marketing and "leave up" practices, as a result of which there were many clips on YouTube (including clips-in-suit) that Viacom had authorized to appear or deliberately allowed to remain. *Id.* at 39-48; YT SJ Reply 16-27; Opening Br. 23-29. These practices negate any suggestion that YouTube's mere knowledge of the presence of Viacom material was tantamount to knowledge of infringement or that seeing a given Viacom clip was equivalent to seeing a "red flag."

Other than a half-hearted response about its marketing and leave-up practices (*infra* at 23-26), Viacom ignores all this evidence. But YouTube's showing readily satisfies any initial burden it might have had to make probable its lack of knowledge and thereby shift the burden to Viacom to establish that YouTube knew that particular clips-in-suit were infringing. Accordingly, Viacom's concession that it cannot point to any evidence of particularized knowledge is not a reason to deny summary judgment. It is the reason that summary judgment is required.[10] Given

---

[10] As the Supreme Court has explained:

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325; *see, e.g., Newton v. City of New York*, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("Although the moving party bears the burden to establish that there is no genuine dispute of material fact on summary

**PUBLIC VERSION**
**REDACTED**

the absence of evidence in this massive record that YouTube had knowledge of the alleged infringements at issue—on top of the significant evidence negating such knowledge—the only finding a jury could make is that YouTube did not have disqualifying knowledge as to any of Viacom's clips-in-suit.  That is true no matter how the burdens of proof are allocated.

## II. VIACOM CONTINUES TO MISCONCEIVE AND MISAPPLY THE WILLFUL BLINDNESS DOCTRINE AS LIMITED BY THE DMCA

The shift in Viacom's position continues in its discussion of willful blindness. Viacom had consistently argued that YouTube's general awareness of infringing activity, along with its supposed failure to take steps to limit that infringement, disqualified YouTube under the DMCA's knowledge provisions.  So central was that argument that the Second Circuit said that the "most important question" was whether the statute requires knowledge of specific infringements.  *Viacom II*, 676 F.3d at 30.  On that question, of course, the court rejected Viacom's approach.  But Viacom has not given up.  It has simply converted its general-knowledge arguments into a claim about willful blindness.  Viacom thus devotes nearly half of its brief to willful blindness, making essentially the same legal argument and relying on the same evidence that it previously used in an attempt to establish knowledge. Viacom's effort to do through willful blindness what the Second Circuit blocked it from doing through the knowledge provisions is meritless.  Under the DMCA, willful blindness, like the other forms of knowledge, is a clip-specific inquiry. Because Viacom cannot point to a single clip-in-suit as to which a jury could find that YouTube was willfully blind, YouTube is entitled to summary judgment.

---

judgment, the moving party cannot be forced to prove a negative."); *Hendrickson v. eBay Inc.*, 165 F. Supp. 2d 1082, 1086-87, 1092-93 (C.D. Cal. 2001) (applying *Celotex* and granting summary judgment to eBay on § 512(c) safe harbor).

PUBLIC VERSION
REDACTED

### A. Viacom Misunderstands The Limited Nature Of Willful Blindness That Applies To The DMCA

Our opening brief (at 30-31) explained that to create a triable issue on willful blindness, Viacom would have to show that YouTube (1) was aware of a high probability that a particular clip-in-suit was infringing, and (2) made a deliberate effort to avoid confirming the infringing nature of the clip. That is because willful blindness is merely a way of establishing the knowledge required by the DMCA, which must be that of "specific and identifiable instances of infringement." *Viacom II*, 676 F.3d at 32. Viacom has no good response.

To begin, Viacom distorts the willful blindness test that the Second Circuit articulated. Viacom repeatedly claims that the threshold question is whether YouTube "had 'reason to suspect' there was widespread infringement of Viacom's copyrights on YouTube." Opp. 12; *see also id.* at 11, 16-21. That is wrong. The first part of the inquiry asks whether the service provider "was aware of a high probability of *the fact in dispute*." *Viacom II*, 676 F.3d at 35 (emphasis added) (quotation marks omitted). Under the DMCA, the "fact in dispute" is not whether, as a general matter, there was infringement of Viacom's copyrights on YouTube. Instead, the disputed issue is whether there were specific Viacom clips-in-suit that were infringing. *Id.* at 30-32. Only if YouTube was aware of a high probability of *that* fact (and then deliberately avoided confirming it) could YouTube be charged with knowledge of a kind that would cost it the safe harbor, and then only as to those specific clips. Viacom does not even try to make that showing as to any clip-in-suit, and its effort to rely on willful blindness fails for that reason alone.

In an effort to avoid that result, Viacom invokes *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010), but its reliance is misplaced. *Tiffany* held that willful blindness, in the trademark context, means that when a service provider "has reason to suspect that users of its service are infringing *a protected mark*," it "may

**PUBLIC VERSION**
**REDACTED**

not shield itself from learning of the particular infringing transactions by looking the other way." *Id*. at 109 (emphasis added) (quoted in *Viacom II*, 676 F.3d at 35). In quoting this passage, Viacom omits the italicized language. Opp. 12. The unedited sentence shows that even without the limitations imposed by the DMCA, willful blindness requires a showing that a service provider was aware of the high probability of infringement relating to some specific material (or trademark), not just generalized awareness that unspecified infringement is occurring on its service.

The district court decision in *Tiffany* confirms this point. The court rejected the plaintiff's claim that eBay's general knowledge that counterfeit Tiffany jewelry was being sold on its site, coupled with its failure to investigate the extent of such counterfeiting, constituted willful blindness. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 513 (S.D.N.Y. 2008). As the court explained:

> Were Tiffany to prevail in its argument that eBay was willfully blind, the "reason to know" standard … test would be inflated into an affirmative duty to take precautions against potential counterfeiters, *even when eBay had no specific knowledge of the individual counterfeiters*. The law explicitly precludes such an expansion of the "reason to know" standard.

*Id*. at 515 (emphasis added), *aff'd*, 600 F.3d at 110. *Tiffany* thus supports YouTube's understanding of how willful blindness works, even without the limitations imposed by the DMCA. It makes clear that the doctrine cannot be used as an end-run around requiring item-specific knowledge of infringement. That principle applies with even greater force in the DMCA context.

Contrary to what Viacom claims (Opp. 13), moreover, the requirement that a showing of willful blindness be made as to specific infringing material does not render the doctrine "superfluous" or identical to red-flag knowledge. Whereas red-flag knowledge is based on an *objective* standard (whether the information that the service provider had "would have made the specific infringement 'objectively'

PUBLIC VERSION
REDACTED

obvious to a reasonable person," *Viacom II*, 676 F.3d at 31), willful blindness is based on *subjective* bad faith (whether the service provider made a "deliberate effort to avoid guilty knowledge," *id*. at 35).[11]  But, while willful blindness does independent work, it is neither surprising nor anomalous that a doctrine with an "appropriately limited scope" to begin with, *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011), which the DMCA further "limits," *Viacom II*, 676 F.3d at 35, applies only in a very narrow set of circumstances.

Viacom tries to explain away the Second Circuit's holding that § 512(m) "limits" willful blindness by claiming that the court was merely "reiterating the point that due to section 512(m), willful blindness cannot be defined as a free-standing duty to monitor."  Opp. 14 n.8.  That makes no sense.  Even outside the DMCA, the willful blindness doctrine does not impose such a free-standing duty, so § 512(m) necessarily does more than that.  The Court of Appeals explained exactly what more it does:  it precludes any effort to premise willful blindness on a service provider's decision not to "monitor or otherwise seek out" specific instances of infringing activity "based on general awareness that infringement may be occurring."  *Viacom II*, 676 F.3d at 35.  That is precisely what Viacom is trying to do here.  Viacom's characterization of YouTube's actions as "deliberate" changes nothing.  Opp. 14-15.  Under the Second Circuit's ruling, a service provider's inaction in the face of general knowledge of infringement cannot disqualify it from the safe harbor—no matter what may have motivated it and regardless of whether

---

[11] For example, if a service provider's employee came across a clip from a yet-to-be-released movie—information that, as explained in YouTube's opening brief (at 18-19), would be insufficient by itself to trigger "red flag" knowledge—and that employee then refused to open any emails regarding that clip because the employee suspected, but did not want to confirm, that it was infringing, that conduct might be characterized as "willful blindness."  The problem with Viacom's case continues to be that this hypothetical remains hypothetical:  Viacom does not (because it cannot) point to a single clip in suit as to which YouTube was willfully blind.

PUBLIC VERSION
REDACTED

the copyright owner tries to attack such conduct under the label of red-flag knowledge or willful blindness. *Viacom II*, 676 F.3d at 30-31 (the "language of the statute" precludes any claim that a service provider must take affirmative steps "in response to a generalized awareness of infringement").[12]

Finally, Viacom's generalized approach to the willful blindness standard remains incompatible with the DMCA's removal requirement. Opening Br. 34-35. Viacom's response, that "the duty to expeditiously remove the infringing materials [is triggered] from the moment the willful blindness began" (Opp. 16), only illustrates the problem. The DMCA is premised on the idea that the service provider will be in a position to expeditiously remove any infringing material of which it could be charged with knowledge. Thus, "the nature of the removal obligation itself contemplates knowledge or awareness of specific infringing material." *Viacom II*, 676 F.3d at 30. Viacom now seeks to use willful blindness to subvert that structure, imputing to a service provider knowledge of material that, by definition, it has never seen and could not remove expeditiously. That result "cannot be reconciled with the language of the statute." *Id*. at 31.

## B.   On The Correct Standard, Viacom's "Evidence" Of Willful Blindness Does Not Create A Jury Question

Our opening brief explained (at 35-38) that there is no jury issue on willful blindness. Viacom's foray into the record confirms that it is using willful blindness as a substitute for its rejected general-knowledge arguments. Almost without

---

[12] Beyond that, Viacom's claim that it is "the additional element of deliberate blinding that sets willful blindness apart from the generalized knowledge standard the Second Circuit rejected" (Opp. 14) is belied by the way that Viacom tries to apply the doctrine. What Viacom characterizes as "deliberate" blinding consists of the very decision not to investigate or otherwise seek out infringing activity in the face of general awareness of infringement. *See infra* at 21-23.   Doing precisely what the DMCA allows cannot be the basis for disqualifying a service provider from the safe harbor, whether it is characterized as willful blindness or anything else.

PUBLIC VERSION
REDACTED

exception, the "evidence" that Viacom cites (Jawed Karim's memo, estimates of the amount of "premium" content, documents reflecting YouTube's founders' efforts to remove material they thought might be infringing, allegations relating to YouTube's discussions with the MPAA and Viacom, and assorted claims about YouTube's content-filtering and monitoring efforts) is precisely the same evidence that it previously used to try to defeat summary judgment on red-flag knowledge. *Compare* Opp. 16-25 *with* Schwartz Ex. 5 at 5-9 and Viacom 2d Cir. Br. 8-17, 23-24; *see also Viacom II*, 676 F.3d at 34. This evidence no more creates a jury issue on willful blindness than it did on any other form of alleged knowledge.

As discussed above, the first question is whether YouTube was aware of a "high probability" that one or more of Viacom's clips-in-suit were infringing. But nowhere in Viacom's discussion (Opp. 16-21) is there reference to even a single clip-in-suit, much less evidence suggesting YouTube's awareness of a significant chance that clip was infringing. Instead, Viacom relies on the same "surveys" and estimates" about the amount of "copyrighted" or "premium" content on YouTube that the Second Circuit held were "insufficient" to create a triable issue of fact. *Viacom II*, 676 F.3d at 33. These surveys fail here too, as Viacom remains unable to tie them to any clip-in-suit—or even to any work-in-suit or Viacom's works more generally. In fact, most of Viacom's "evidence" has little to do with Viacom content (and certainly not with the particular material at issue). That includes a document vaguely referring to "comedy clips" and one related to YouTube's selection of videos for a "cute videos" category. Opp. 17, 20; *see* Hohengarten Exs. 8, 200.[13] Along

---

[13]   Viacom also proffers an attorney declaration purporting to show a small percentage of clips in suit were "approved" by YouTube. Wilkens Decl. ¶ 2(e) & n.3. But the attorney lacks personal knowledge for the testimony and the evidence he cites does not support it. There is no evidence that each of these clips was actually manually reviewed by anyone, and it is undisputed that any review that did occur was *not* to determine possible copyright infringement, but rather was focused on violations of YouTube's terms of service relating to pornography, violence, and the like. *See* YCVS ¶¶ 66, 68-69.

**PUBLIC VERSION**
**REDACTED**

similar lines, Viacom points to user comments associated with a handful of clips-in-suit (Opp. 17), but offers no evidence that those comments were ever seen by anyone at YouTube.  None of this comes close to creating a jury question on willful blindness, even on Viacom's watered-down conception of the doctrine.

The only document Viacom cites that refers to actual Viacom television programs is the March 2006 Karim memo.  As we have explained (Opening Br. 19-22), however, that memo does not create a genuine issue as to whether YouTube had disqualifying knowledge (whether actual knowledge, red flag awareness, or willful blindness).  That is so for various reasons, including the lack of any evidence that any of the materials Mr. Karim reviewed correspond to the clips-in-suit.  Viacom responds by offering a declaration that identifies 450 clips-in-suit associated with the programs named in Mr. Karim's memo that were uploaded to YouTube before March 22, 2006.  Wilkens Decl. ¶ 2(c).  But Viacom continues to offer no evidence that Mr. Karim saw any of those clips.  Merely because Mr. Karim mentioned certain Viacom shows, it does not follow that he saw (and recognized as infringing) every single clip from those shows that had been posted on YouTube as of the date of his memo.  Nor did the Second Circuit "recognize[]" that Mr. Karim knew of specific clips-in-suit.  Opp. 18.  To the contrary, the Court of Appeals saw the very evidentiary gap that Viacom continues to be unable to fill:  whether any clips that Mr. Karim might have "referenced" were "among the current clips-in-suit." *Viacom II*, 676 F.3d at 34.[14]

---

[14]   The record contains employee viewing data from Mr. Karim produced by YouTube. YT SJ Reply 15-16; Rubin Reply Decl. ¶¶ 13-14.  Viacom does not point to anything in that data that helps its case.  Instead, Viacom complains (Opp. 8 n.6, 18 n.12) that perhaps if it had some broader universe of viewing data it might have been able to make a better case, but that is pure speculation and in any event the evidentiary record on knowledge and willful blindness is now "complete," *Viacom II*, 676 F.3d at 42.

PUBLIC VERSION
REDACTED

We also showed that the Karim memo fails to create a triable issue because: (1) whatever knowledge Karim might have had is not chargeable to YouTube; (2) there is no evidence that the material referenced in the memo was actually infringing; and (3) there is no evidence that YouTube failed to expeditiously remove any clips identified in connection with the memo. Opening Br. 19-22. Viacom responds only to the first point (Opp. 19 n.13), but its argument concerning Karim's status as YouTube's "agent" is meritless. Viacom, as "[t]he party asserting that a relationship of agency exists … has the burden in litigation of establishing its existence," Restatement (Third) of Agency § 1.02 (2006) cmt. d, and Viacom offers no evidence to prove the *sine qua non* of agency, namely "that the party designated as principal has the right to control the party designated as agent," *id*. cmt. b.

On the second point—the failure to establish that clips from shows mentioned in the memo were actually infringing—Viacom's treatment of the television show *South Park*, mentioned in the Karim memo, is illuminating. *See* YVCS ¶ 31. The creators of the show (who actually owned the online distribution rights for it) publicly stated that they did "not mind when fans download their episodes off the Internet; they feel it's good when people watch the show no matter how they do it." Schapiro Opp. Ex 72; *see also id*. Exs. 73-74. Asked about users uploading *South Park* clips to YouTube, the CEO of MTV Networks remarked that "she would allow the uploading [of the clips] to continue" because "[i]t drives more attention and potential viewers" to the Comedy Central show. Schapiro Opening Ex. 61. And when Viacom engaged its agent BayTSP to identify and request removal of allegedly infringing clips from YouTube, Viacom left up 315 of the 316 *South Park* clips that it found. Schapiro Opening Ex. 62. Viacom fails to explain how, in light of these undisputed facts, *South Park* clips on YouTube were infringing, let alone that YouTube was aware of a high probability of that conclusion. Simply put, there

PUBLIC VERSION
REDACTED

is no evidence that the first step of the willful blindness test could be satisfied for any clip in suit.

Viacom falls equally short in its discussion at the second step of the willful blindness test.  Under the DMCA, as we have shown, failing to act on generalized knowledge of infringement does not qualify as conscious avoidance.  *Supra* at 14-17; Opening Br. 32-35.  And Viacom does not even try to show that YouTube "consciously avoided confirming" a high probability that particular clips-in-suit were infringing.[15]  *Viacom II*, 676 F.3d at 35.  Instead, Viacom again relies on broad-based claims about YouTube's alleged use (or non-use) of various copyright-monitoring tools (such as "community flagging"), its implementation of Audible Magic's fingerprinting technology, its discussions with the MPAA about filtering, and YouTube's supposed policy of not affirmatively policing its site but instead relying on DMCA takedown notices to remove allegedly infringing videos.  Opp. 21-26.  Even putting aside Viacom's misleading claims about these issues (*see* YT SJ Opp. 8-21, 51-53, 67-75; YT SJ Reply 33-34, 53-54), this evidence, as a matter of law, cannot disqualify YouTube from the safe harbor.

Everything that Viacom describes is a means by which YouTube could (theoretically) have more robustly monitored its service in a generalized effort to limit infringement.  In claiming that YouTube was willfully blind for not employing these techniques in the way Viacom prefers, Viacom is doing just what the DMCA forbids:  seeking to premise safe-harbor eligibility on a service provider "monitoring its service or affirmatively seeking facts indicating infringing activity."  § 512(m).  Viacom tries to evade this rule by claiming that § 512(m) somehow does not apply

---

[15] This problem, for example, undermines Viacom's reliance on the Karim memo.  Even if the memo did somehow establish YouTube's awareness of a high probability that certain clips-in-suit were infringing, Viacom does not and could not argue that the memo suggests that YouTube "consciously avoided" confirming that fact.  That is further reason why the memo cannot create a jury question on willful blindness.

where the service provider supposedly "purposefully disabled or modified its procedures." Opp. 26. Viacom cites no authority for that proposition, and it is not the law. "Section 512(m) is explicit: DMCA safe harbor protection cannot be conditioned on affirmative monitoring by the service provider." *Viacom II*, 676 F.3d at 35. The provision applies no matter what the provider's subjective mental state in deciding not to monitor and regardless of whether the provider had "general awareness" that infringement was occurring. *Id.* And there certainly is nothing in the DMCA, the Second Circuit's ruling, or any other case to suggest that a different result is warranted merely because a service provider at one point contemplated going beyond the DMCA by engaging in some form of monitoring, only to later change its mind.[16] To the contrary, the legislative history explains that the statute "is not intended to discourage the service provider from monitoring its service for infringing material." H.R. Rep. No. 105-796, at 73 (1998) (Conf. Rep.).

Finally, as we have shown (Opening Br. 37), Viacom's approach is contrary to the Second Circuit's ruling that "YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms." *Viacom II*, 676 F.3d at 41. Viacom argues that this ruling somehow applies only "[i]n the specific context of Section 512(i)" and is not relevant to willful blindness. Opp. 15 n.10 (emphasis omitted). That is nonsensical. The Second Circuit's conclusion about "YouTube's deployment of search technology" was expressly based

---

[16] The court in *Io* expressly rejected plaintiffs' claim that adopting and then disabling community flagging amounted to willful blindness. *Io Grp.*, 586 F. Supp. 2d at 1150. Viacom claims that case is distinguishable because "there was no evidence that community flagging was disabled in order to avoid knowledge of infringement." Opp. 22 n.15 (emphasis omitted). But nothing in *Io* turned on Veoh's subjective motive. Instead, the court relied on the fact that, after ending copyright flagging, Veoh continued to display a notice "directing copyright owners to a link with instructions for submitting a copyright infringement notice." *Io Grp.*, 586 F. Supp. 2d at 1150. The same is true here. Levine Opp. Decl. ¶ 10; Hurley Opening Decl. ¶ 20.

**PUBLIC VERSION**
**REDACTED**

on its reading of § 512(m), under which "refusing to provide access to mechanisms by which a service provider affirmatively monitors its own network" cannot expose the provider to liability. *Viacom II*, 676 F.3d at 41. And § 512(m) not only applies to the willful blindness inquiry, it directly "limits" that doctrine. *Id*. at 35. Far from taking the court's statement out of context, therefore, YouTube is simply applying it to another issue that it controls. The Second Circuit's holding refutes Viacom's arguments about the use of filtering technology, no matter what provision of the statute those arguments purport to be based.[17]

### C.   Viacom's Effort To Minimize Its Stealth Marketing And Leave-Up Practices Ignores The Facts And The Law

Our opening brief explained (at 23-29) that Viacom's effort to show disqualifying knowledge was further undermined by the undisputed evidence of Viacom's extensive practices of uploading its own material on YouTube for marketing purposes and deliberately leaving up user-posted clips containing Viacom content. Viacom's efforts to minimize the implications of these practices for its willful blindness argument fail.

*First*, Viacom concedes that its use of YouTube to promote its content was extensive, but claims that there is no evidence that YouTube was unaware of what Viacom was doing. Opp. 29-31 & n.21. That could not be more wrong. Given the wide range of obscure account names and agents that Viacom used to upload videos to YouTube, the lengths that it went through to hide its connection to many of the

---

[17] That is confirmed by Viacom's articulation of its own argument: "once Defendants became aware of a high probability of infringement of Viacom's works, they could not bury their heads in the sand to that infringement by refusing to deploy the fingerprinting tools that were available and that they were using to police YouTube for infringement of their content partners' works." Opp. 23 n.18. To accept that argument would be to do *exactly* what the Second Circuit said was impermissible under § 512(m).

PUBLIC VERSION
REDACTED

clips posted on its behalf,[18] and the simple fact that Viacom almost invariably did this uploading without YouTube's help or involvement, the evidence is overwhelming that YouTube neither knew nor could have known anything close to the full extent of Viacom's YouTube-related marketing activities.   YouTube has established as much.  Opening Br. 25-26.  Accordingly, that YouTube may have known at a high level of generality that Viacom was posting its material (or known about a few of the clips that Viacom uploaded) only confirms the point—knowledge of Viacom content being on YouTube is not knowledge of infringement.

*Second*, Viacom's claim that it would have been "entirely feasible" for YouTube to determine which videos were "legally uploaded" (Opp. 30-31) is belied by the evidence above and by Viacom's own experiences.  Opening Br. 26 & n.14; YT SJ Br. 64-68; YT SJ Opp. 4-5.  The following facts are indisputable:  (i) Viacom's employees and agents often could not tell whether clips on YouTube were infringing just by viewing them (RVCS ¶ 1.49); (ii) Viacom had to maintain elaborate internal records just to try to keep track of what YouTube videos had authorized (VSCS ¶ 1.83; Schapiro Opening Exs. 27 (55:8-56:20; 172:4-173:19; 243:2-244:24), 54, 57, 135-138); (iii) the confidential "white lists" Viacom maintained to track accounts authorized to post Viacom content on YouTube were incomplete and unreliable (VSCS ¶¶ 1.84-1.85; Rubin Reply Decl. ¶¶ 27-29; Rubin Opening Decl. ¶ 5); (iv) Viacom erroneously demanded that YouTube take down many clips that Viacom had authorized (VCS ¶¶ 145-46; Rubin Opening Decl. ¶ 3 & Exs. 42-68 ); (v) Viacom mistakenly sued YouTube over hundreds of authorized videos, despite vetting by its litigation team (VCS ¶¶ 148-51); and (vi) even after Viacom's lawyers tried to

---

[18] In response to the evidence showing that Viacom and its agents uploaded footage from the "cutting room floor" or that was made to look "hijacked," Viacom asserts that these practices are "common in the entertainment industry and hardly nefarious." Opp. 29 n.21. Nefarious or not, however, the fact remains that Viacom routinely posted clips that it had intentionally disguised to look like they were not authorized.

PUBLIC VERSION
REDACTED

dismiss authorized videos, they failed each time to identify all the clips that Viacom had posted (*id.* ¶ 152).  These facts show that not even Viacom could reliably distinguish the videos it had authorized from those it had not.  And if Viacom itself struggled to make those determinations, YouTube had no chance.  *Cf. Io Grp.*, 586 F. Supp. 2d at 1153 (relying on far less extensive evidence of stealth marketing in granting summary judgment to service provider).[19]

*Third*, Viacom argues that even if it posted many videos to YouTube, most of the actual clips-in-suit were not authorized.  Opp. 30.  That completely misses the point.  Beyond just defeating an infringement claim as to any authorized clip, Viacom's marketing activities more broadly undermine its attempt to show that YouTube had knowledge of infringement, even as to clips that Viacom may not have uploaded.  By authorizing videos containing Viacom material (including a large number of the works-in-suit), Viacom made it impossible to find that YouTube had disqualifying knowledge just because it saw a clip containing Viacom material or because it was aware that clips containing Viacom works were on the service.  That is especially so given the fact that many of the clips that Viacom's authorized were identical to or effectively indistinguishable from clips-in-suit.  Opening Br. 24 & n.13.  Given Viacom's actions, an elaborate investigation would be required for YouTube even to *begin* to analyze whether a given clip was infringing.  This

---

[19] Viacom's suggestion that "filtering" using Audible Magic's technology would have solved the problem is incorrect.  Opp. 31.  It is undisputed that Viacom failed to provide any of its works to Audible Magic for fingerprinting until April 2007 (Schapiro Reply Ex. 15 (110:7-13)), and there is no evidence that Viacom *ever* used Audible Magic to successfully identify its content on any website.  Schapiro Reply Ex. 16 (63:2-68:8).  That is not surprising.  While filtering software can compare clips to identify matches, it cannot by itself tell what content is authorized.  The copyright owner must make those determinations, and Viacom struggled to do so, even with fingerprinting.  In addition, for YouTube to use fingerprinting to identify Viacom's promotional clips would have required Viacom to share internal information about its marketing practices—something Viacom never did and resisted even in discovery.  Rubin Reply Decl. ¶¶ 27-30; VCS ¶ 130; Schapiro Reply Ex. 17 (422:6-424:19).

PUBLIC VERSION
REDACTED

precludes any finding of knowledge here, whether through willful blindness or otherwise. *Viacom II*, 676 F.3d at 32 ("[I]f investigation of 'facts and circumstances' is required to identify material as infringing, then those facts and circumstances are not 'red flags.'") (quoting *UMG II*, 665 F. Supp. 2d at 1108) (brackets omitted).[20]

*Fourth*, Viacom argues that its leave-up practices are insufficient to confer an implied license. Opp. 31-33. That is almost certainly wrong (*see* YT SJ Reply at 25-26), but a decision on that point is not necessary. Like its uploads, Viacom's leave-ups undermine any claim of knowledge. Opening Br. at 27-29. The fact Viacom knew about, but deliberately decided not to remove, "many, many clips that use material from [Viacom's] shows and movies" (Schapiro Reply Ex. 24), confirms that awareness of the presence of Viacom material on YouTube is not the same as awareness of a "high probability" that the material at issue is *infringing*. The logic of Viacom's position is that YouTube should be charged with knowledge of—and thus with a duty to expeditiously remove—the same clips that Viacom itself saw but deliberately chose to leave up. That is not a reasonable application of the DMCA, regardless of whether Viacom's conduct also amounted to an actual license.

This evidence thus confirms that YouTube is entitled to summary judgment that it did not have disqualifying knowledge of any of the Viacom clips-in-suit, regardless of whether Viacom seeks to premise such knowledge on the DMCA's actual or red-flag provisions or on the willful blindness doctrine.

---

[20] Even faced with far less robust evidence of plaintiffs' authorized posting, courts have found that such activities are inconsistent with any finding of DMCA-disqualifying knowledge. *See MP3tunes*, 821 F. Supp. 2d at 644 (holding that plaintiffs' practice of distributing its works "on the internet for free" negated a showing of knowledge because "internet users, including MP3tunes' users and executives, have no way of knowing for sure whether free songs on the internet are unauthorized"); *UMG II*, 665 F. Supp. 2d at 1110 & n.13 (C.D. Cal. 2009) (rejecting plaintiffs' effort to show knowledge under the DMCA in part because one artist had uploaded a single song to Veoh, such that searching for that artist's works "would not necessarily unearth only unauthorized material").

PUBLIC VERSION
REDACTED

## III.  YOUTUBE DID NOT HAVE CONTROL OVER THE INFRINGING ACTIVITY COUPLED WITH A DIRECT FINANCIAL BENEFIT

Viacom continues to misunderstand § 512(c)(1)(B), which denies the safe harbor only where a service provider "receive[s] a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  Under the "substantial influence" test articulated by the Second Circuit, Viacom's generalized evidence about YouTube's ability to control its service—but not the infringing content—is insufficient to defeat summary judgment.  Nor can Viacom establish that YouTube received a financial benefit "directly" from any infringing activity, and instead invokes a common law standard that is incompatible with the DMCA's text and legislative history.

### A.  Viacom Misconstrues The DMCA's "Control" Requirement

As our opening brief showed (at 38-41), to establish "control" under the DMCA, a plaintiff must show "something more" than is required by the common law.  In particular, the service provider must have exerted a "substantial influence" over the infringing conduct at issue.  *Viacom II*, 676 F.3d at 37.

Viacom's responses are unpersuasive.  It first claims that the "something more" required by the DMCA "is not a high bar."  Opp. 34-35.  That is not so.  The Second Circuit's ruling explains that the control provision cannot be applied to create tension with the rest of the DMCA.  *Viacom II*, 676 F.3d at 37-38.  Thus, "control" must go beyond "exercis[ing] dominion over its service" (Opp. 35), as any service provider eligible for the safe harbor in the first place will have "substantial control over users' access to material on their systems."  *UMG II*, 665 F. Supp. 2d at 1112.  Further, in light of § 512(m), control cannot be based on the service's failure to proactively seek out infringing users or uses.  *Id.* at 1113.

A long line of other cases confirms that the "something more" is a meaningful limitation, which is not satisfied merely because a service provider imposes rules

**PUBLIC VERSION**
**REDACTED**

about the kind of content that users are allowed to post. Courts have repeatedly granted summary judgment on "control" to service providers with policies similar to YouTube's. *See, e.g., UMG II*, 665 F. Supp. 2d at 1114-16 (Veoh); *Corbis*, 351 F. Supp. 2d at 1110 (Amazon.com); *Hendrickson*, 165 F. Supp. 2d at 1094 (eBay). These cases make clear that the DMCA's control standard is not satisfied by claims that the service provider exercised broad-based control over its system or adopted general "editorial requirements" for the material that can appear on its website. More direct involvement in and influence over the content posted is required.[21]

Ignoring all this authority, Viacom pins its hopes on *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002). But *Cybernet* involved a very different type of service—an "age verification service" ("AVS") that sold passwords to consumers allowing them access to materials on participating websites. *Id.* at 1157. The service provider had close business ties to those websites, and it carefully "reviewed and monitored" each one before accepting it into its system. *Id.* at 1160, 1163-64. That service was nothing like YouTube, or the other user-generated-content services that have consistently been found not to have disqualifying control over infringing activity. Unsurprisingly, therefore, the result in *Cybernet* was based primarily on factors not present in those cases (or here): Cybernet's "prescreening" of websites before allowing them into its system and its direct relationship with those sites, which included placing code within the websites' programming architecture, giving them "extensive advice" along with "detailed instructions regarding issues of layout, appearance, and content," and

---

[21] *See, e.g., Wolk*, 840 F. Supp. 2d at 748 (photo service lacked "control" because it did not engage in "prescreening content, rendering extensive advice to users regarding content and editing user content"); *MP3Tunes*, 821 F. Supp. 2d at 645 (music service did not have control because "users alone choose the websites they link to Sideload.com and the songs they sideload and store in their lockers"); *Io Grp.*, 586 F. Supp. 2d at 1153 ("there is no evidence that Veoh can control what content users choose to upload before it is uploaded").

**PUBLIC VERSION**
**REDACTED**

prohibiting the "proliferation of identical sites." *Id.* at 1157, 1173, 1181-82; *see also UMG II*, 665 F. Supp. 2d at 1114 (distinguishing *Cybernet*). *Cybernet* did not hold that control under the DMCA can be found based merely on a service's "general enforcement of its editorial requirements." Opp. 36. Viacom's argument to the contrary misreads the case and would put it directly in conflict with all of the other decisions applying the control provision.

That result is not required by the Second Circuit's brief reference to *Cybernet*. The Second Circuit did not endorse *Cybernet's* holding or adopt all of its reasoning. It instead simply extracted from the case—together with *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), as well as the text and structure of the DMCA—a principle that "control" under § 512(c)(1)(B) exists only in circumstances involving "a service provider exerting substantial influence" on the infringing activities of its users. *Viacom II*, 676 F.3d at 38. That statement was the centerpiece of the Second Circuit's analysis, but Viacom refuses to engage with it in any meaningful way. Despite Viacom's attempt to obscure the issue, what "substantial influence" entails is not hard to see. Under that test, a finding of control is triggered by conduct that significantly guides or directs user's infringing activity, and thus that helps bring about the particular infringements at issue.

Viacom tries to resist this conclusion by claiming that the DMCA's control standard does not apply to specific infringing material. Opp. 36-38. That is contrary to the Second Circuit's steadfast emphasis on the clips-in-suit, *Viacom II*, 676 F.3d at 34, and to statute's text. Viacom has no response to the fact that the control provision expressly refers to "*the* infringing activity." § 512(c)(1)(B) (emphasis added); *cf. Noel Canning v. N.L.R.B.*, --- F.3d ----, 2013 WL 276024, at *8 (D.C. Cir. Jan. 25, 2013) ("Unlike 'a' or 'an,' that definite article suggests specificity. . . . This is not an insignificant distinction."). Nor is there any merit to

PUBLIC VERSION
REDACTED

Viacom's claim that understanding control in reference to specific infringements renders it redundant of knowledge.  Opp. 40.  Just as a provider could be aware of an infringement without having influenced it, it can substantially influence a user to engage in conduct that results in infringement without knowing that the conduct was actually infringing.  If, for example, a service provider caused a user to create and post a particular clip, a finding of control could be appropriate, even if the provider had no idea that the clip was infringing.[22]

Viacom argues that because, in its view, the inducement liability recognized in *Grokster* did not have to be item-specific, neither does control under the DMCA.  Opp. 35, 38.  That does not follow.  In citing *Grokster* as an indicator of the kind of conduct that might amount to a substantial influence, the Second Circuit did not say that any service provider that might be liable for inducement is thereby disqualified from the DMCA.  *Viacom II*, 676 F.3d at 38.  To the contrary, the court expressly held that the DMCA protects qualifying service providers against *Grokster* claims.  *Id*. at 41.  The relationship between the common law inducement standard and the DMCA thus is necessarily more nuanced.  Whether inducement liability requires encouraging particular infringements has no bearing on how the DMCA's control provision operates.  Instead, given the language of the statute, a service provider that purposefully induces a user to engage in conduct that leads to the infringements at issue may have control, but where there is no discernible

---

[22] Likewise, the Second Circuit's ruling about the relationship between control and knowledge does not mean that control itself is generalized; it simply means that a finding of control as to a particular infringement does not require the service provider to have specific knowledge of that infringement.  *Viacom II*, 676 F.3d at 36.  Our opening brief did not argue otherwise.

PUBLIC VERSION
REDACTED

connection between the allegedly inducing conduct and the specific material at issue, there can be no such finding.[23]

Similarly misguided is Viacom's continued effort to cabin § 512(m).  Opp. 38-39.  It is not clear exactly what Viacom is arguing, but it cannot evade two basic propositions.  *First*, because "DMCA safe harbor protection cannot be conditioned on affirmative monitoring," *Viacom II*, 676 F.3d at 35, a service's failure to monitor or otherwise seek out infringing activity cannot be a basis for a finding of control.  Accordingly, YouTube cannot lose the safe harbor, under a "control" theory or any other, because it supposedly did not institute, or instituted too slowly or selectively, various filtering mechanisms (at least those that are "not standard technical measures").  *Id*. at 41; *UMG II*, 665 F. Supp. 2d at 1113 (the "'right and ability' to implement filtering software … cannot be the basis for concluding that Veoh is not eligible for the section 512(c) safe harbor").  Viacom's attempt to evade the Second Circuit's clear holding on this point remains unpersuasive.  *See supra at* 16-17.

*Second*, the fact that a service provider may go beyond what the DMCA requires and tries to monitor its service to deter infringement is not a basis for evicting it from the safe harbor.  Viacom's claim that the "actual exercise" of efforts to limit infringement amounts to control (Opp. 39 (emphasis omitted)), ignores the clear legislative history that says otherwise.  H.R. Rep. No. 105-796 at 73; *see also, e.g., Hendrickson*, 165 F. Supp. 2d at 1094 ("eBay's voluntary practice of engaging in limited monitoring of its website for 'apparent' infringements" cannot "lead the Court to conclude that eBay has the right and ability to control infringing activity within the meaning of the DMCA.").  It also ignores the bizarre incentives Viacom's approach would create:  a service provider that takes affirmative steps to prevent

---

[23] Viacom is also wrong in claiming that the finding of control in *Cybernet* did not turn on an analysis of the "specific material" at issue.  Opp. 37.  *Cybernet* in fact contained an extensive discussion of the infringing images at issue.  213 F. Supp. 2d at 1163-64.

**PUBLIC VERSION**
**REDACTED**

infringement would lose DMCA protection, whereas a service provider that did nothing beyond responding to takedown notices would be protected.  That is reason alone to reject Viacom's position and instead follow the logic of the Second Circuit's decision, under which control turns not on the general use of content-monitoring efforts but on whether YouTube exerted "substantial influence" over its users' alleged infringement of the actual Viacom's clips-in-suit.

### B. Viacom Cannot Show That YouTube Exerted A Substantial Influence Over The Infringement Of Any Clip-In-Suit

Our opening brief explained (at 41-43) that YouTube prevails on the proper understanding of the DMCA's control provision.  Viacom's response only confirms that.  Nowhere in its discussion of the record does Viacom even mention a single clip-in-suit or purport to show how a jury could find that YouTube "substantially influenced" the alleged infringement of any of those clips.  Viacom does not claim, for example, that YouTube commissioned users to create or upload the clips-in-suit, exercised editorial control over those clips, or had any direct relationship with those users that resulted in the alleged infringements at issue.

Instead, most of Viacom's recital is devoted to the theory that YouTube's use of (or failure to use) various content-monitoring technologies amounts to control. *See* Opp. 40 (alleging that YouTube "disabled community flagging for infringement"); *id.* at 41 (alleging that YouTube "refused to use the fingerprinting technology they already had in hand"); *id.* at 42 (alleging that YouTube "extensively monitored the specific videos that had been uploaded to YouTube"); *id.* at 43 (alleging that YouTube used community flagging for "terms of use violations" but not infringement); *id.* at 44 & n.27 (allegations about "YouTube's actual use of fingerprinting software"); *id.* at 45 (alleging that YouTube "agreed to implement various policies and technical tools, including keyword searches and fingerprinting"). While each of these claims is misleading, and we have already refuted them at

**PUBLIC VERSION**
**REDACTED**

length (YT SJ Opp. 8-21, 51-53, 67-75; YT SJ Reply 33-34, 53-54), they are beside the point.  As a matter of law, YouTube's decisions about monitoring, whether its choice not to employ certain tools, its allegedly selective use of other tools, or its actual implementation of still others, cannot be the basis for a finding of control under the DMCA.  Any other result is contrary to § 512(m) and the Second Circuit's ruling.  This disposes of nearly all of Viacom's "evidence."[24]

Similarly misguided is Viacom's claim that YouTube has control because it "prescribed and enforced detailed rules regarding acceptable content."  Opp. 42.  Any suggestion that a service provider loses the safe harbor because it adopts policies about the kind of material that is (and is not) allowed on its service is illogical and contrary to the case law.  A service that, like YouTube, forbids the posting of copyright-infringing material (and other objectionable content) does not thereby find its DMCA eligibility in doubt.  Every service that has been held protected by § 512(c)—from eBay, to Amazon, to Veoh—had adopted similar policies.  As in other cases where service providers were protected by the safe harbor, YouTube did not prescreen user-submitted content, provide detailed instructions to its users, edit material created by its users, or direct users to post particular items.  *See, e.g.*, *Wolk*, 840 F. Supp. 2d at 748; *Io Grp.*, 586 F. Supp. 2d at 1153.  Likewise, YouTube "does not participate" in its users' decisions about creating or uploading videos, but instead "set up a fully automated system" that allows users to post material of their choosing.  *MP3Tunes*, 821 F. Supp. 2d at 645.

---

[24] Viacom also renews its claims that YouTube engaged in inducement (Opp. 39-41), but it ignores this Court's repeated observations that the facts of *Grokster* are a far cry from this case.  *Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, at 526 (S.D.N.Y. 2010); Schwartz Ex. 8 (39:6-7, 45:13-15).  As we have explained (Opening Br. 43), nothing in the record suggests that YouTube acted "with the object of promoting" infringement or took "affirmative steps to foster infringement."  *Grokster*, 545 U.S. at 919.  Viacom thus cannot rely on *Grokster* to evict YouTube from the safe harbor.

PUBLIC VERSION
REDACTED

In short, there is no evidence that YouTube played a role in guiding or directing the users to create or post any of the clips-in-suit.  Because YouTube did not exert a "substantial influence" on the infringing activities of its users—and certainly not in connection with the clips at issue here—it is entitled to summary judgment under § 512(c)(1)(B).

### C. YouTube Did Not Receive A Financial Benefit Directly Attributable To The Alleged Infringement

YouTube would not lose the safe harbor even if it did have "control" over the infringements that Viacom has alleged, because YouTube did not receive a "financial benefit directly attributable" to those alleged infringements.  We explained in our opening brief (at 44-46) that a service provider does not earn a disqualifying financial benefit under the DMCA if it conducts a "legitimate business" that is not skewed toward or otherwise premised on earning money from infringing activity.  The summary judgment record makes clear that YouTube is just such a legitimate service, *id.* at 45-46; YT SJ Opening 74-78, and Viacom does not argue otherwise.  It argues instead that the legitimacy of YouTube's business is irrelevant because the DMCA codifies an expansive version of the "draw" test that some courts have used in evaluating claims for vicarious copyright infringement.  Viacom's effort to conflate the DMCA with the common law should be rejected.

As an initial matter, Viacom misstates YouTube's position.  We have never argued that a service provider is protected no matter how much revenue it derives from infringement, so long as it does not charge more for ads running next to infringing content.  Opp. 47.  Rather, the financial-benefit test suggested by the DMCA's text and expressly embraced in its legislative history distinguishes services with legitimate business models from those with illegitimate ones.  H.R. Rep. No. 105-551 (II), at 54; S. Rep. No. 105-190, at 44.  Services that have no real value other than facilitating infringement will fail.  In contrast, legitimate services like

34

PUBLIC VERSION
REDACTED

YouTube, which derive genuine financial benefit from non-infringing activities, are not disqualified merely for receiving payments associated with infringing uses that are the same in kind as those made by non-infringing ones.  This is the very model of a "common-sense, fact-based approach," in contrast to the "formalistic" draw test that Viacom favors.  H.R. Rep. No. 105-551 (II), at 54; S. Rep. No. 105-190, at 44.

Viacom's approach is also at odds with DMCA's text.  The statute requires that the service provider "not receive a financial benefit directly attributable to the infringing activity."  § 512(c)(1)(B).  But the "draw" standard applied in cases cited by Viacom (Opp. 46) allowed decidedly *indirect* benefits—such as "future revenue" attributable to "increases in userbase" from the greater availability of music on the service—to trigger vicarious liability.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001).  The language of the DMCA makes clear the importance of a tighter and more direct link between the financial benefit and the infringing activity at issue, even if the common law might be applied more loosely.  *See* 6 Patry on Copyright § 21:85 (2012) (explaining that "the financial benefit cannot be nondirect financial benefit, such as driving traffic to a site; in such a circumstance, it cannot be said that increased viewership by itself results in any *direct* financial benefit: to hold otherwise would be to read the term 'direct' out of the statute.").[25]

The incompatibility between the "draw" standard and the DMCA is confirmed by the legislative history.  The committee reports explain that a service

---

[25] The "evidence" that Viacom cites in an effort to apply the draw standard to this case confirms the attenuated nature of the financial benefits that it believes should disqualify YouTube from the safe harbor.  Viacom argues that YouTube built up a large user base in part by attracting users who wanted to watch "premium" content and subsequently relied on that large user base to make the site valuable to Google (and to advertisers).  Opp. 48-49.  Even putting aside Viacom's tendentious and inaccurate characterization of this evidence, the story that Viacom tells is, on its face, one in which the alleged infringing activity represented a highly *indirect* benefit.  Whatever merit such a story might have at common law, it cannot defeat the DMCA safe harbor.

PUBLIC VERSION
REDACTED

provider receiving an initial "flat" fee or "periodic payments for service from a person engaging in infringing activities" would *not* be considered to receive a disqualifying financial benefit under the DMCA.  H.R. Rep. No. 105-551 (II), at 55; S. Rep. No. 105-190, at 44.  But such payments would likely count as a financial benefit under a broad application of the draw test.  *See, e.g.*, *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996) (allowing vicarious liability claim against swap meet owner based on alleged financial benefits associated with "admission fees, concession stand sales and parking fees" paid by customers who wanted to buy counterfeit recordings).  Likewise, a service that charges fees based on usage or "connect time" may face liability under a "draw" theory; after all, the more time an infringing user spends on such a service, the more money the service likely would make.  Yet the committee reports say expressly that the financial benefit provision does not cover such fees.  H.R. Rep. No. 105-551 (II), at 55; S. Rep. No. 105-190, at 44.  As these examples make clear, Congress intended the DMCA to depart from the draw test, not to codify it.[26]

Viacom tries to get around this legislative history by observing that it does not specifically discuss services that earn revenue through advertising.  Opp. 48.  That argument is inscrutable.  Receiving revenue from advertisers is plainly a *less direct* financial benefit than is taking money straight from infringing users (such as

---

[26] The Ninth Circuit thus went astray when it suggested, without briefing or analysis, that the DMCA's financial-benefit provision simply tracks the common law.  *CCBill*, 488 F.3d at 1117.  No court in the Second Circuit has followed that aspect of *CCBill*, and there is no reason for this Court to do so.  Indeed, in a recent DMCA case, Judge Pauley rejected application of the draw test, relying instead on the statute's legislative history to find no financial benefit where the service provider (1) "has non-infringing uses" and (2) "any link between infringing activity and a direct benefit to [defendant] is attenuated because sideloaded songs were stored free of charge and infringing and noninfringing users of Sideload.com paid precisely the same or nothing at all, for locker services."  *MP3tunes*, 821 F. Supp. 2d at 645; *see also, e.g., Wolk*, 840 F. Supp. 2d at 724 (no financial benefit under the DMCA because "Defendants' profits are derived from the service they provide, not a particular infringement").

**PUBLIC VERSION**
**REDACTED**

via subscription or usage fees).  In an ad-supported model, the money is paid by third parties who are not infringers, have no relationship with infringers, and do not encourage infringement.  Given that service providers that do earn money directly from infringing users are protected absent discriminatory pricing or some other illegitimate practice, it follows that legitimate services like YouTube are not disqualified merely because they earn revenue from third-parties running ads on their websites.  *See* 6 Patry § 21:85 ("If, for example, there is infringing and non-infringing material on a site, and the benefit would have been received even if the infringing material was not present, there is no financial benefit.")

Any other result would condemn the business model of nearly every online service provider that stores and displays user-posted material.  SUF ¶ 163 (explaining that YouTube's advertising offerings are consistent with industry standards).  Under Viacom's approach, any service that relies on advertising would have a disqualifying financial benefit if any user was attracted by unauthorized material—no matter how insignificant that draw was to the business, how many users came to view authorized material, or how much value the service generated from legitimate content.  That is not what Congress intended.  H.R. Rep. No. 105-551 (II), at 21 (DMCA designed to "foster the continued development of electronic commerce and the growth of the Internet").  YouTube's advertising practices are entirely legitimate, and YouTube did not "receive a financial benefit directly attributable to the infringing activity" that Viacom has alleged.  § 512(c)(1)(B).

## IV.   MAKING VIDEOS AVAILABLE FROM YOUTUBE'S SYSTEM TO USERS OF OTHER DEVICES IS PROTECTED BY SECTION 512(c)

We have explained that YouTube's ordinary "syndication" arrangements, by which user-submitted videos are made accessible from YouTube's system to users of third-party viewing devices, fit comfortably within the § 512(c) safe harbor.

PUBLIC VERSION
REDACTED

Opening Br. 50-54.  They are another example of YouTube employing "software functions performed 'for the purpose of facilitating access to user-stored material'"— exactly what § 512(c) protects.  *Viacom II*, 676 F.3d at 39 (quoting § 512(c)).  The narrow question left open by the Second Circuit did not concern those practices. Instead, the court asked whether there were any other arrangements like YouTube's early agreement with Verizon Wireless, whereby YouTube manually selected certain videos that were taken off of YouTube's system and delivered to Verizon so that Verizon's customers could view them from Verizon's system.  *Id.* at 40.  Our opening brief answered that question:  the Verizon deal was unique, and none of Viacom's clips-in-suit were manually selected and delivered to a third party in any similar way.  Opening Br. 48-50.

Viacom does not dispute that fact.  Instead, it argues that a service provider loses the safe harbor for any material that it makes available for viewing pursuant to "business deals."  Opp. 52.  That is so, according to Viacom, because YouTube's agreements were entered into "sua sponte," rather than being directly caused by the uploading user.  *Id.* at 51-53.  We have already refuted this argument.  Opening Br. 54-55.  Under the Second Circuit's ruling (and all the other cases), what matters is simply whether the claims arise out of software functions that "retain a sufficient causal link to the prior storage of those videos," *i.e.*, functions that "help YouTube users locate and gain access to material stored at the direction of other users."  *Viacom II*, 676 F.3d at 40; *see also UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1031-34 (9th Cir. 2011) (rejecting plaintiffs' argument that under § 512(c) "infringement must be proximately caused by the storage, rather than caused by the access that the storage facilitates").  So long as that is so

PUBLIC VERSION
REDACTED

(as it is here),[27] whether users specifically asked that the copies be made, or whether they were made "sua sponte" by the service provider, is beside the point. *See Io Grp.*, 586 F. Supp. 2d at 1146-47 (holding that Veoh's creation of new copies of uploaded videos was protected by § 512(c) even though "users never instruct or direct Veoh to create these files, except in the broadest possible sense").

Viacom's only response is to assert that YouTube's argument "proves too much" and would "sweep the Verizon Wireless deal into the safe harbor." Opp. 52. But that ignores the key features distinguishing the Verizon arrangement:  the manual selection of videos, the removal of copies of those videos from YouTube's system, and their physical delivery to a third party to be made accessible from its system.  Those manual elements have not been present in YouTube's ordinary syndication offerings, including the agreements with Apple, Sony, and Panasonic. SUF ¶ 179.  Viacom says that the focus on these manual processes is "misplaced," claiming that the Second Circuit used the words "manual selection" only in "summarizing plaintiffs' argument concerning the Verizon Wireless transaction." Opp. 52.  Even if that were true, it would not matter.  The reason that the Court of Appeals picked up on the reference to manual selection is that it was the only aspect of plaintiffs' argument that it thought had even "some force."  *Viacom II*, 676 F.3d at 40.  Viacom now wants to read those words out of Second Circuit's ruling, but they are critical to the limited nature of the remand that the court ordered.

---

[27] Like the other software functions upheld by the Second Circuit, YouTube's automated syndication arrangements are "narrowly directed toward providing access to material stored at the direction of users."  *Viacom II*, 676 F.3d at 40 (quoting *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1092 (C.D. Cal. 2008)).  Indeed, the function at the heart of those arrangements is "transcoding," which the Court of Appeals expressly held to be protected by § 512(c).  *Id.* at 39.  The court's broad definition of transcoding ("making copies of a video in a different encoding scheme in order to render the video viewable over the Internet to most users," *id.* (brackets and quotation marks omitted)) covers the process used to make videos accessible from YouTube's system to users of third-party devices (Solomon Opp. Decl. ¶ 3), regardless of whether it is done pursuant to a "business deal."

PUBLIC VERSION
REDACTED

While Viacom may profess ignorance, it is easy to see why the Second Circuit believed the manual processes used in connection with the Verizon arrangement might bear on the § 512(c) inquiry.  Videos put in the physical possession of a third party could be said to no longer be "user-stored material" on YouTube's system, and the manual selection of such videos could be thought something other than a "software function" directed toward making them accessible from that system.  Opening Br. 50-51.  Ignoring these distinctions, Viacom asserts that whenever a service provider takes steps to make user-stored videos more readily accessible from its system to those using the hardware of the day, the safe harbor is lost.  Beyond all its other problems, this sweeping argument would force online services to choose between protecting their safe-harbor eligibility and adapting to changing technology.  The DMCA is not supposed to freeze service providers in time or deter them from giving users new ways to access content stored on their systems at the direction of others.  Just the opposite.  Opening Br. 53-54.  Viacom's latest effort to "eviscerate the protection afforded to service providers by § 512(c)" should be rejected.  *Viacom II*, 676 F.3d at 39.

## CONCLUSION

For these reasons, as well as those in YouTube's opening brief and its original motion for summary judgment, YouTube is entitled to summary judgment that Section 512(c) of the DMCA protects it against all of Viacom's claims.

PUBLIC VERSION
REDACTED

Dated:       February 22, 2013
             New York, NY

                                                    Respectfully submitted,

                                                    Andrew H. Schapiro
                                                    David B. Schwartz
                                                    QUINN EMANUEL URQUHART &
                                                    SULLIVAN LLP
                                                    51 Madison Avenue
                                                    22nd Floor
                                                    New York, New York 10010
                                                    (212) 849-7000

                                                    David H. Kramer
                                                    Brian M. Willen
                                                    WILSON SONSINI GOODRICH & ROSATI PC
                                                    650 Page Mill Road
                                                    Palo Alto, California 94304
                                                    (650) 493-9300

                                                    *Attorneys for Defendants*