**PUBLIC VERSION**
**REDACTED**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIACOM INT'L INC., ET AL., </br></br>        Plaintiffs, </br></br>    v. </br></br>YOUTUBE, INC., ET AL., </br></br>        Defendants. | ECF Case </br> Civil No. 07-CV-2103 (LLS) |

**REPLY TO VIACOM'S COUNTERSTATEMENT IN RESPONSE TO
DEFENDANTS' SUPPLEMENTAL STATEMENT OF
<u>FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED</u>**

PUBLIC VERSION
REDACTED

Pursuant to Civil Rule 56.1(a) of the Local Rules of Civil Procedure for the Southern District of New York, Defendants YouTube, Inc., YouTube, LLC, and Google Inc. (collectively "Defendants" or "YouTube") set forth the following Reply in Response to Viacom's Counterstatement in Response to Defendants' Supplemental Statement of Facts as to Which There Is no Genuine Issue to Be Tried.[1]

**172. Viacom has abandoned its claims concerning videos posted to YouTube after May 2008. Mem. of Law in Support of Viacom's Mot. for Partial Summ. J. at 2 n.1 (Mar. 5, 2010); Schwartz Ex. 1 (7:7-12).**

*Viacom's Response: Controverted with respect to the characterization that Viacom "abandoned" its claims concerning such videos.*

*There is no genuine dispute that Viacom's clips-in-suit posted to YouTube after May 31, 2008 are infringing. However, in light of Defendants' reversal of their longstanding refusal to use their available fingerprinting tools to protect Viacom's content (along with the content of Defendants' business partners), and given Defendants' actual deployment of fingerprinting to protect Viacom's content beginning in May 2008, Viacom elected not to pursue its infringement claims against Defendants for clips uploaded after May 31, 2008. Viacom RSUF ¶¶ 212-13, 216-18, 222, 292-310; Viacom CSUF ¶¶ 95, 106-09; Viacom Opening SJ Br. at 2 n.1.*

**YOUTUBE'S REPLY:** Viacom does not genuinely dispute the asserted fact.

Viacom admits that it is not pursuing "claims against Defendants for clips uploaded after May 31, 2008." Since Viacom once was asserting such claims, there is no dispute that those claims have been abandoned. The semantic distinction that Viacom is attempting to draw between "abandoning" and "elect[ing] not to pursue" such claims is meaningless. Acknowledging the effectiveness of Content ID, Viacom no longer contends that YouTube is liable for any clips-in-suit uploaded to YouTube after May 2008, the date that Viacom first began using Content ID to identify its content on YouTube. Viacom's decision to cut off its claims after May 2008 is arbitrary, however, because that date bears no relationship to YouTube's

---

[1] The defined terms in the Opening and Reply Briefs in Support of Defendants' Renewed Motion for Summary Judgment are adopted herein.

1

deployment of Content ID, the availability of that technology to Viacom, or the availability of other fingerprinting technology to Viacom.  *See, e.g.*, YT SJ Opp. 78-80.

Of course, YouTube fully disputes that any of the clips-in-suit are infringing, whether posted before or after May 2008.  Viacom has failed to establish its predicate claim that any clip-in-suit is infringing.  *See, e.g.*, YT SJ Opp. 21-25.

173.   **When he wrote his March 2006 memo, Jawed Karim was no longer a YouTube employee.  Schapiro Opp. Ex. 77 (19:10-25); Schapiro Reply Exs. 80 (October 5, 2005 agreement defining Karim's role as "an independent contractor to perform consulting services"), 82 (110:17-19, 115:16-24).**

Viacom's Response:  *Uncontroverted, but immaterial.*

*Whether Karim was labeled an "independent contractor" rather than an "employee" is not determinative of whether the knowledge set forth in the memo submitted to YouTube's board of directors is attributable to YouTube. Viacom Opp. Br. at 19 n.13. There is no genuine dispute that YouTube's board received the memo, and on YouTube's motion for summary judgment, the only reasonable inference is that the board read the memo and knew its contents.*

*Even assuming that the board did not read what they were given, Karim's knowledge may still be attributed to YouTube because a jury could reasonably conclude that Karim had an agency relationship with the company at the time given that he was a co-founder, remained a high-level consultant with the privilege of attending YouTube board meetings and advising the board, and retained a substantial stake in the company. Id. Pursuant to his consulting agreement with YouTube, Karim was responsible for providing "consulting and advisory services," including "written reports" informing the company of Karim's work. Schapiro Reply Ex. 80 ¶ 5 & Ex. A.*

**YOUTUBE'S REPLY:**  Viacom admits that this fact is uncontroverted.

Viacom's superfluous contentions regarding the cited evidence are fully addressed in YouTube's Reply Brief.  *See* Reply 19-20.

**174.   Viacom continued to upload material to YouTube throughout this litigation. Rubin Opening Decl. ¶¶ 2, 3 & Exs. 1, 25-26, 29-31, 42, 58-66; Schapiro Opening Ex. 27 (23:3-24:23); Schapiro Opp. Ex. 55.**

*Viacom's Response: Uncontroverted, but immaterial. Viacom's lawful marketing use of YouTube is not relevant to Defendants' DMCA defense, because Defendants were fully aware of Viacom's uploading activities, and Defendants have not pointed to a single example of their actual confusion as to whether a particular YouTube account or a particular clip-in-suit was authorized by Viacom. Furthermore, none of Viacom's marketing activity was conducted so as to hide the identity of the marketing company or the content owner from YouTube. See Viacom CSUF ¶¶ 123-26. At most, Defendants' assertions regarding Viacom's marketing practices create a jury question.*

**YOUTUBE'S REPLY:**  Viacom admits that this fact is uncontroverted.

While Viacom claims that "Defendants were fully aware of Viacom's uploading activities" (*see also* VCS ¶¶ 123-25), it simultaneously disagrees with YouTube's contention that "YouTube was aware of promotional activities occurring on its service." *See* VCS ¶ 127.  Even disregarding Viacom's inconsistent treatment of this subject, Viacom misses the point.  It is precisely because YouTube was aware, at a high level of generality, that content owners (including Viacom) were using the service to promote their works, including by uploading clips, that YouTube could not know that any given clip appearing on the site, even one that might have been recognized as including professionally produced television or movie content, was unauthorized.  *See, e.g.*, RVCS ¶ 127; RVSCS ¶ 1.64.

But any suggestion that YouTube was fully aware of all of Viacom's marketing activities or would have been able to identify which clips Viacom had and had not authorized is false and totally contrary to the record. Indeed, Viacom itself does not know which videos it has authorized to appear on YouTube.  *See, e.g.*, RVCS ¶ 127; RVSCS ¶ 1.65.  Moreover, Viacom itself has been consistently unable to discern whether it authorized a given video to appear on YouTube:  among other things, Viacom issued numerous mistaken takedown requests to YouTube regarding clips that it or its agents had uploaded; Viacom mistakenly sued YouTube over hundreds of videos uploaded by Viacom or its marketing agents, despite an elaborate vetting process by its litigation team and multiple attempts to dismiss authorized videos from the lawsuit; and Viacom *still* has not withdrawn all of the clips in suit that were uploaded by it or its agents.  *See* RVCS ¶ 127.  In short, YouTube could not possibly have known (and did not know) anything close to all of the details about the full extent of Viacom's marketing activities.  *Id.*; *see also* RVCS ¶ 125; RVSCS ¶ 1.64.  Relatedly,

Viacom's claim that "none of Viacom's marketing activity was conducted so as to hide the identity of the marketing company or the content owner from YouTube" is demonstrably incorrect. *See, e.g.*, RVCS ¶ 125; RVSCS ¶ 1.60.

175. **Viacom and its agents posted to YouTube long excerpts and full episodes of television shows, and scenes from its movies without indicating at the time that those videos were authorized by Viacom to appear on YouTube. Rubin Reply Decl. ¶ 2 & Ex. 1; Ostrow Decl. ¶¶ 3-4; Schapiro Opening Ex. 142; Schapiro Reply Ex. 8.**

*Viacom's Response: Controverted, but immaterial. See Response to No. 174 supra, which is incorporated herein by reference.*

*The asserted fact is misleading in suggesting that Viacom or its agents regularly uploaded "long excerpts" or "full length episodes" of television shows to YouTube. The cited evidence indicates only two instances in which full episodes of Viacom content were uploaded to YouTube with Viacom's authorization, and those two instances together account for only five episodes. More importantly, none of the cited evidence indicates that YouTube was <u>unaware</u> that the clips at issue were authorized by Viacom to appear on the site. Notably, Rubin Reply Decl. ¶ 2 & Ex. 1, and Ostrow Decl. ¶¶ 3-4, refer to the same four episodes of the MTV show "Jamie Kennedy Blowin' Up," that were uploaded to YouTube by the marketing firm Total Assault. It is undisputed that Defendants were fully aware of Total Assault's use of YouTube, and that they assisted Total Assault in its efforts to promote its clients' content. Viacom CSUF ¶ 124 (citing extensive communications between YouTube and Total Assault).*

**YOUTUBE'S REPLY:** Viacom does not genuinely dispute the asserted fact. Rather, Viacom admits that there were "instances in which full episodes of Viacom content were uploaded to YouTube with Viacom's authorization."

Moreover, Viacom attempts to side-step the asserted fact by discussing only full television episodes that it authorized to appear on YouTube. The cited evidence demonstrates that Viacom authorized the upload of at least twenty-one long excerpts from and full episodes of television shows, and scenes from movies. That evidence is merely illustrative and represents only a small portion of Viacom's extensive stealth marketing activity. *See, e.g.*, SUF ¶ 125; RVCS ¶ 125; Rubin Opening Decl. ¶ 5 & Exs. 86, 96, 101, 106, 109, 112, 115, 116; Schapiro Opp. Ex. 4; Rubin Reply Decl. ¶¶ 2-6 & Exs. 1, 14, 38, 39. Indeed, Viacom itself does not know which videos it has authorized to appear on YouTube. *See* Reply to Viacom's Response to No. 174, *supra*; RVCS ¶ 127; RVSCS ¶ 1.65.

4

Although Viacom artfully claims that "none of the cited evidence indicates that YouTube was unaware that the clips at issue were authorized by Viacom to appear on the site," it points to no evidence that YouTube was actually aware that these clips were authorized.  In fact, other than a few isolated instances in which YouTube happened to learn about particular Viacom marketing campaigns (such as the Total Assault campaign), YouTube was largely unaware of what specific videos Viacom and its agents were posting on YouTube, particularly when those videos were posted through the wide array of obscure account names that bore no discernible connection to Viacom, including "gossipgirl40," "mysticalgirl8," "demansr," "gooddrugy," "thatsfunny," "ultrasloppyjoe," and "waytoblue."  *See* RVCS ¶ 125; RVSCS ¶¶ 1.60, 1.64; *see also* Opening Br. 6, 25-26 (citing extensive evidence of Viacom's stealth marketing practices).

176. **Even after filing this lawsuit, Viacom continued deliberately allowing clips to remain on YouTube.  Rubin Opening Decl. ¶ 2 & Exs. 1, 24, 27-28; Schapiro Opening Ex. 144; Schapiro Reply Exs. 23, 29.**

Viacom's Response:  *Controverted, but immaterial. Controverted to the extent that the asserted fact suggests that Viacom allowed clips other than copies of official Viacom marketing clips and trailers to remain on YouTube after this suit was filed. All of the cited evidence concerns user postings to YouTube of a handful of Viacom official marketing clips and trailers that had been approved for public release. For example, Rubin Opening Decl. Ex. 24 and Schapiro Opening Ex. 144 concern the same promotional clip from the Paramount film Transformers, which was debuted on the Ellen DeGeneres Show. Id. Schapiro Reply Ex. 23 also concerns copies of official marketing clips from Transformers, which are referred to in the document as "electronic press kit" or "EPK" clips. See Viacom SCSUF ¶ 1.62 (discussing marketing of EPK clips); see also Rubin Opening Decl. Exs. 27-28 (official trailers for the Paramount films Iron Man and Cloverfield); Schapiro Reply Ex. 29 (official trailer for MTV show The Hills); SCSUF ¶ 1.63 (discussing Rubin Ex. 28 and Cloverfield).*

*Moreover, Viacom's decision to forbear from some copyright enforcement did not deprive YouTube of knowledge of infringement or create an implied license. Viacom Opp. Br. at 32-33 & n. 23.*

*See also Response to ¶ 174, supra, which is incorporated herein by reference.*

**YOUTUBE'S REPLY:**  Viacom does not genuinely dispute the asserted fact.  Viacom admits that it allowed clips from works-in-suit to remain on YouTube after it filed this lawsuit.

5

Viacom's claim that it did not allow "clips other than copies of official Viacom marketing clips and trailers to remain on YouTube after this suit was filed" is a red herring. To the extent this is meant to suggest that such clips are easily recognized as being authorized, that is belied by the fact that Viacom is actually suing YouTube over hundreds of the very "marketing clips and trailers" that it "approved for public release." Rubin Opening Decl. ¶ 17 & Exs. 131-310B; *see also* RVSCS ¶ 1.63. Thus, even though Viacom admits that it has broadly "authorized the online distribution" of "trailers and marketing clips" (VSCS ¶ 1.62; *see* also Viacom's Response to No. 176, *supra*) and that it allowed such clips "to remain on YouTube after this suit was filed" (*see* Viacom's Response to No. 176, *supra*), it nevertheless continues to pursue claims related to such clips.

177. **Since January 2007, YouTube has restricted ads on pages where videos are watched ("watch-page ads") to those videos expressly claimed by a content partner and designated for monetization. Reider Decl. ¶ 9.**

Viacom's Response: *Uncontroverted, but immaterial. It is undisputed that watch-page ads appeared in conjunction with substantially all clips from approximately April 2006 to January 2007, including on watch-pages for Viacom content. Viacom RSUF ¶¶ 241, 247, 251. Moreover, even after January 2007, Defendants continued to place ads on the home, search, and browse pages of YouTube, and thereby obtained a direct financial benefit from the users drawn to YouTube by infringing content. See Viacom RSUF ¶¶ 247-249, 258-259, 262; Viacom CSUF ¶ 168; Reider Decl. ¶ 5.*

**YOUTUBE'S REPLY:** Viacom admits that this fact is uncontroverted.

Viacom's superfluous contentions are not supported by the cited evidence, which: (1) does not support the assertion that ads appeared on watch pages for "substantially all videos" from April 2006 to January 2007 *(see* YCVS ¶ 241); (2) does not establish that YouTube necessarily earned revenue from advertisements displayed during that period (*see* YCVS ¶ 247); (3) ignores that keyword searches return videos in the search results that were uploaded by Viacom and its agents to YouTube as part of Viacom's viral and stealth marketing (s*ee* YCVS ¶ 259; *see also* YT SJ Reply 40);(4) ignores that Viacom's attempts to search for its own content using keywords routinely returned search results for content Viacom did not own (*see* YT SJ Reply 39-40; Schapiro Opp. Ex. 126 (at 149:15-21) (BayTSP CEO explaining that "[k]eyword enforcement is something that we as a company would never employ, because it would create a series of false positives."); Schapiro Opp. Ex. 129 (only one of 346 videos returned in response to search looking for clips from The Daily Show determined to match); *see also* YCVS ¶ 259); (5)

does not establish that YouTube received a disqualifying "direct financial benefit" from advertisements on YouTube's "home, search, and browse pages" (*see, e.g.*, Opening Br. 44-46; YT SJ Reply 38-40; YT SJ Opening 75-78; and (6) does not even speak to Viacom's unsupported assertion that YouTube users were "drawn to YouTube by infringing content." *See, e.g.*, YT SJ Opp. 53-55, 80-82 (discussing Viacom's "draw" theory of vicarious liability); YT SJ Reply 37-38 (same); Reply 34-37.

178.  **Even before limiting watch-page ads to those videos expressly claimed by a content partner and designated for monetization, YouTube received the same rates for such ads regardless of which videos the ads appeared next to.  Reider Decl. ¶ 10.**

Viacom's Response:  *Uncontroverted, but immaterial to whether YouTube receives a direct financial benefit from infringement under the DMCA, because infringing content, including Viacom's clips in suit, indisputably acted as a draw to YouTube users. See Viacom Opp. Br. at 48-49.*

**YOUTUBE'S REPLY:** Viacom admits that this fact is uncontroverted.

Viacom's superfluous contentions regarding the applicable standard for vicarious liability are fully addressed in YouTube's Opening and Reply Briefs.  *See* Opening Br. 44-46; Reply 34-37; *see also* YT SJ Opp. 53-55, 80-82; YT SJ Reply 37-38.  YouTube, of course, fully disputes Viacom's contention that any "infringing content . . . acted as a draw to YouTube users."  There is no evidence that any clip drew any user to YouTube for any reason.  *See, e.g.*, Reply 35 n.25; YT SJ Opp. 80-82; YT SJ Reply 38 (no evidence that users were drawn to YouTube by the presence of allegedly infringing content).

179.  **In YouTube's syndication agreements with Apple, Sony, Panasonic, TiVo, and AT&T, YouTube enabled third party technologies to access videos stored on YouTube's system.  Schapiro Opp. Ex. 325 (36:24-37:17, 39:7-13); Schwartz Ex. 9 (57:2-22); Solomon Opp. Decl. ¶ 3; Hohengarten Exs. 160 (agreement with Apple providing that YouTube will "make all YouTube videos that are available on the YouTube site accessible to Apple during the Term via the YouTube APIs"), 163 (agreement with Sony regarding application "to stream YouTube User Videos accessed through the YouTube APIs"), 165 (agreement with Panasonic re same), 166 (agreement with Tivo re same), 169 (agreement with AT&T providing that "Google will perform, at its expense, all hosting and related operational activities").**

7

*Viacom's Response: Controverted. The asserted fact is misleading to the extent it implies that by entering into syndication agreements, YouTube did nothing more than allow third parties to access videos already stored on its system at the direction of users. In order to effectuate these syndication agreements, YouTube created new copies of the videos already on its system in different formats in order to make the videos accessible to its syndication partners. See Viacom RSUF ¶ 330; Schapiro Opp. Ex. 325 (Patterson Dep.) at 39:14-19 (YouTube engineer stating that making videos available through third party syndication agreements "requires us to make the video available in multiple formats").*

**YOUTUBE'S REPLY:** Viacom does not genuinely dispute the asserted fact.

Viacom does not dispute that the YouTube videos accessed by third party technologies pursuant to YouTube's syndication agreements with Apple, Sony, Panasonic, TiVo, and AT&T are at all times stored on YouTube's system and accessed by end users from YouTube's system.  These syndication agreements do nothing more than combine two functions that the Second Circuit has already found to be protected by the safe harbor: (1) "transcoding" videos "'in a different encoding scheme' in order to render the video 'viewable over the Internet to most users'" and (2) playing back videos "in response to a user request."  *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 39 (2d Cir. 2012); Opening Br. 50-55; *see also* YCVS ¶ 330 (explaining that (1) by proceeding to upload videos and by allowing them to remain on YouTube, users are directing that YouTube make those videos accessible through all platforms that can access the service and to be transcoded into any necessary format;  (2) users are free to remove or delete uploaded videos at any time, terminating that authorization; and (3) in October 2007, YouTube provided its users with the specific option to prevent their videos from being made playable on mobile devices).

180. **Pursuant to the terms of its November 1, 2006 agreement with Verizon Wireless, YouTube manually selected a small number of videos uploaded to its system by YouTube users, took those videos from the YouTube system, and delivered them to Verizon so that Verizon could host those videos from its own system.  Schapiro Opp. Ex. 325 (37:6-38:15); Schwartz Ex. 9 (55:8-56:17); Hohengarten Ex. 167 (YouTube "shall at its own expense deliver the Company Content in a mutually agreed upon format to one or more locations reasonably designated by Verizon").**

*Viacom's Response: Controverted, but immaterial. The asserted fact is misleading to the extent it suggests that YouTube employees hand selected clips for delivery to Verizon Wireless. To the contrary, the approximately 2,000 videos YouTube provided to Verizon Wireless consisted of videos that*

8

*YouTube had previously selected for prominent placement as "featured videos" on the YouTube website. Viacom RSUF ¶ 329.*

*In any event, the precise method by which YouTube syndicated videos to Verizon is irrelevant to whether YouTube's other syndication activities fall within the scope of the Section 512(c) safe harbor. See Viacom Opp. Br. at 51-53.*

**YOUTUBE'S REPLY:** Viacom does not genuinely dispute the asserted fact.

Viacom does not dispute that the videos made available to Verizon pursuant to the November 1, 2006 agreement were taken from the YouTube system and delivered to Verizon so that Verizon could host those videos from its own system. Further, Viacom's suggestion that the clips were not "hand selected . . . for delivery to Verizon" merely because they "had [been] previously selected for prominent placement" is nonsensical. The cited evidence reflects that YouTube "manually selected a small number of videos to syndicate to . . . Verizon" and that "initially the videos that were transcoded [for Verizon] were selected by YouTube employees manually." Schwartz Ex. 9 (55:17-18, 56:13-16). Moreover, Verizon specifically requested that it only be delivered clips that had been individually selected by YouTube editorial personnel because "Verizon was concerned about the appropriateness of the content. More specifically they were worried about pornography . . ." Hohengarten Ex. 345 (220:22-24).

181. **The November 1, 2006 agreement with Verizon Wireless is the only arrangement pursuant to which YouTube has ever manually selected videos to be hosted on a third party's system. Schapiro Opp. Ex. 325 (38:12-16, 37:6-19); Schwartz Ex. 9 (53:12-53:16, 70:10-72:11).**

Viacom's Response: *Controverted, but immaterial. The asserted fact is misleading to the extent it suggests that the November 1, 2006 agreement with Verizon Wireless is the only arrangement pursuant to which YouTube selected a subset of the videos on its site for syndication. In syndicating videos to Apple, Sony, Panasonic, Tivo, and AT&T, YouTube first selected approximately 30,000 of the "top watched" clips for "prioritize[d]" syndication. See Viacom RSUF ¶ 330 & Hohengarten Ex. 171.*

*See also response to No. 180 supra, which is incorporated herein by reference.*

**YOUTUBE'S REPLY:** Viacom does not genuinely dispute the asserted fact.

Viacom does not dispute that the November 1, 2006 agreement with Verizon Wireless is the only arrangement pursuant to which YouTube videos were

9

selected to be hosted on a third party's system. The cited evidence is unequivocal that there are no "partners other than Verizon to whom YouTube delivered copies of the video[s] for syndication" (Schapiro Opp. Ex. 325 (38:12-15)), and that the only syndication arrangement in which the "videos themselves [did not] remain posted on YouTube's own servers" was "one very early case" for Verizon. *Id.* (37:6-19).

Moreover, Verizon specifically requested that it receive only clips that had been manually selected by YouTube personnel. *See* Reply to Viacom's Response to No. 180, *supra*. In contrast, YouTube's other syndication agreements provided access to all of the videos stored on YouTube's system. SUF ¶ 179; *see also* Schapiro Opp. Ex. 325 (37:6-9); Schwartz Ex. 9 (47:13-18). Those syndication agreements often allowed third party mobile technologies to access YouTube's system. Typically, such mobile technologies can only access videos available in particular formats. *See, e.g.*, Schwartz Ex. 9 (47:2-11, 48:11-16); Reply to Viacom's Response to No. 179, *supra*. Therefore, the number of videos accessible via third party mobile technologies grew as more of YouTube's video library was transcoded into a compatible format. At all times, however, the videos available via such third party mobile technologies were the same as the videos available via YouTube's own mobile website. *See* Schwartz Ex. 9 (53:12-16) (no "reason that mobile partners [other than Verizon] would have had access to only a subset of the videos that YouTube made available on its wireless site"). The evidence cited by Viacom is not to the contrary. It shows only that YouTube began transcoding videos in "an industry standard format for mobile delivery" in order to make more videos available across all mobile devices, and does not suggest that any videos were thereby selected for delivery to individual syndication partners. Hohengarten Ex. 171. It is irrelevant that the earliest videos transcoded in that process were "approximately 30,000 of the top watched videos on YouTube." *Id.*

PUBLIC VERSION
REDACTED

Dated: February 22, 2013
New York, New York

Respectfully submitted,

/s/ Andrew H. Schapiro
Andrew H. Schapiro
David B. Schwartz
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue
New York, New York 10010
(212) 849-7000

David H. Kramer
Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

*Attorneys for Defendants*