PUBLIC VERSION

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| _____ ) | |
| VIACOM INTERNATIONAL INC., ) | |
| COMEDY PARTNERS, ) | |
| COUNTRY MUSIC TELEVISION, INC., ) | |
| PARAMOUNT PICTURES CORPORATION, ) | ECF Case |
| and BLACK ENTERTAINMENT TELEVISION ) | |
| LLC, ) | |
| ) | Case No. 1:07-cv-02103 (LLS) |
| Plaintiffs, ) | (related case no. 1:07-cv-03582 (LLS)) |
| ) | |
| v. ) | |
| ) | |
| YOUTUBE, INC., YOUTUBE, LLC, and ) | |
| GOOGLE INC., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR SUMMARY JUDGMENT**

Paul M. Smith (No. PS-2362)
Scott B. Wilkens (*pro hac vice*)
Luke C. Platzer (No. LP-0734)
JENNER & BLOCK LLP
1099 New York Ave, NW
Washington, DC 20001
(202) 639-6000

Susan J. Kohlmann (No. SK-1855)
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600

Stuart J. Baskin (No. SB-9936)
Kirsten Nelson Cunha (No. KN-0283)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4000

Matthew D. McGill (No. MM-4545)
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Ave, NW
Washington, DC 20036
(202) 955-8500

PUBLIC VERSION

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. iii

GLOSSARY ...................................................................................................... vi

INTRODUCTION ............................................................................................... 1

LEGAL STANDARD ......................................................................................... 4

ARGUMENT ..................................................................................................... 7

I.   QUESTIONS OF FACT REGARDING YOUTUBE'S AWARENESS OF
     INFRINGING ACTIVITY PRECLUDE ENTRY OF SUMMARY JUDGMENT ON
     YOUTUBE'S DMCA DEFENSE................................................................ 7

     A.   YouTube Has Not Shown That It Lacked Actual Knowledge or Awareness of
          Viacom's Clips-in-Suit............................................................................ 8

     B.   Extensive Evidence of YouTube's Willful Blindness Raises Multiple Factual
          Disputes That Preclude Summary Judgment in YouTube's Favor. ..................... 10

          1.   YouTube's Motion Misconstrues The Second Circuit's Willful Blindness
               Doctrine. ......................................................................................... 10

          2.   The Summary Judgment Record Raises Numerous Genuine Disputes Of
               Material Fact as to YouTube's Willful Blindness. ................................... 16

               a.   YouTube Was Aware of a High Probability of Infringement of
                    Viacom's Copyrighted Works. ................................................. 16

               b.   YouTube Deliberately Shielded Itself From Learning Of Particular
                    Infringements of Viacom's Clips-In-Suit. ................................. 21

     C.   YouTube's Inaccurate Assertions About Viacom's Marketing and Enforcement
          Practices Do Not Demonstrate the Absence of Fact Issues on YouTube's
          Awareness of Infringement. ...................................................................... 28

          1.   Viacom's Lawful Marketing Practices Did Not Deprive YouTube of
               Knowledge of Infringement. ............................................................... 29

          2.   Viacom's Decision to Forebear from Some Copyright Enforcement Did Not
               Deprive YouTube of Knowledge of Infringement or Create an Implied
               License. ........................................................................................... 31

PUBLIC VERSION

II.   QUESTIONS OF FACT REGARDING YOUTUBE'S CONTROL OF AND DIRECT
FINANCIAL INTEREST IN THE INFRINGING ACTIVITY PRECLUDE ENTRY
OF SUMMARY JUDGMENT ON YOUTUBE'S DMCA DEFENSE. .........................33

   A.   Triable Issues of Fact Preclude Summary Judgment for YouTube on the Control
Element of the DMCA. ......................................................................................33

      1.   Control Can Exist in a Variety of Factual Circumstances Including Those
Present in *Grokster* and *Cybernet*. ...........................................................33

      2.   Triable Issues of Fact Exist as to YouTube's Control Under *Grokster* and
*Cybernet* ......................................................................................................39

   B.   Triable Issues of Fact Preclude Summary Judgment for YouTube on the Direct
Financial Benefit Element of the DMCA. .........................................................46

III.   TRIABLE ISSUES OF FACT EXIST AS TO WHETHER YOUTUBE'S
SYNDICATION OF VIACOM'S WORKS TO THIRD PARTIES FALLS OUTSIDE
THE SCOPE OF THE DMCA SAFE HARBOR. ...............................................50

CONCLUSION ...................................................................................................54

## TABLE OF AUTHORITIES

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)......................................34, 46

*ALS Scan, Inc. v. RemarQ Communities, Inc*, 239 F.3d 619 (4th Cir. 2001) .................................5

*Arista Records LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ............................................................9

*Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011) .................. 46-47

*Authors Guild v. Google, Inc.*, 282 F.R.D. 384 (S.D.N.Y. 2012).....................................25-26, 41

*Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627 (S.D.N.Y. 2011) ....................5, 48

*Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. July 10, 2012)............................................................15

*Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86 (S.D.N.Y. 1986)........................32, 33

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004)...............................................................48, 49

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)............................................46

*Gelb v. Bd. of Elections*, 224 F.3d 149 (2d Cir. 2000)...........................................................26, 40

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159 (2d
     Cir. 1971) .................................................................................................................................9

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011)...................................12, 14, 26

*Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132 (N.D. Cal. 2008).........................22

*Jackan v. New York State Department of Labor*, 205 F.3d 562 (2d Cir. 2000)............................15

*Krishna v. Colgate Palmolive Co.*, 7 F.3d 11 (2d Cir.1993) .................................................26, 40

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966 (C.D. Cal.
     2006) ......................................................................................................................................35

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ................9, 34, 35, 38

*Perfect 10, Inc. v. CCBill*, 488 F.3d 1102 (9th Cir. 2007)............................................................46

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal.
     2002) ........................................................................................34, 36, 37, 42, 43, 48, 49

*Perfect10, Inc. v. Amazon.com, Inc.*, No. CV-05-4753, slip op. (C.D. Cal. Nov. 4, 2008)............6

*Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969)  .......................8

*Psihoyos v. Pearson Education, Inc.*, 855 F. Supp. 2d 103 (S.D.N.Y. 2012) ..............................33

*Redd v. New York State Division of Parole*, 678 F.3d 166 (2d Cir. 2012) ...................................4

*Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1744 (2012)..............................................................................................................4

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012)..................................................27

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) .................................46

*Smithkline Beecham Consumer Healthcare, L.P., v. Watson Pharmaceuticals, Inc.*, 211 F.3d 21 (2d Cir. 2000)...........................................................................................................33

*Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463 (S.D.N.Y. 2008), *aff'd in part, rev'd in part*, 600 F.3d 93 (2d Cir. 2010)..................................................................................27, 28

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) ..................................10, 11, 13, 15, 16

*Tur v. YouTube*, No. CV 064436, 2007 WL 1893635 (C.D. Cal. June 20, 2007)....................6, 44

*Ulloa v. Universal Music Video & Distribution Corp.*, 303 F. Supp. 2d 409 (S.D.N.Y. 2004) ..................................................................................................................................33

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099 (C.D. Cal. 2009), *aff'd*, 667 F.2d 1022 (9th Cir. 2011).........................................................................6, 46

*Viacom International Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010), *aff'd in part, rev'd in part*, 676 F.3d 19 (2d Cir. 2012)..................................................16

*Viacom International Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) .............................. *passim*

*Vermont Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241 (2d Cir. 2004).......................6

*Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2011) .........................5, 48

**STATUTES**

17 U.S.C. § 106..............................................................................................................................53

17 U.S.C. § 512(c) .........................................................................................................................53

17 U.S.C. § 512(c)(1)(A)................................................................................................................37

17 U.S.C. § 512(c)(1)(B) ...............................................................................................................47

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 105-551(I) (1998)....................................................................................................6

PUBLIC VERSION

H.R. Rep. 105-551(II) (1998) ................................................................. 47-48

S. Rep. No. 105-190 (1998) ...................................................................48

**OTHER AUTHORITIES**

Fed. R. Civ. P. 41(a)(2) ....................................................................... 7-8

Fed. R. Civ. P. 56(a) ...........................................................................4

11 James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.40[1][C] (3d ed. 2012)............... 6-7

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12B04 (2012) .......................6

*Restatement (Third) of Agency* § 1.02 (2006) ...........................................19

PUBLIC VERSION

### GLOSSARY

| Memoranda of Law & Rule 56.1 Statements | |
|---|---|
| YT Br. | YouTube's Memorandum of Law in Support of Defendants' Renewed Motion for Summary Judgment; filed December 7, 2012 |
| YT Supp. Submission | Defendants' Supplemental Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried; filed December 7, 2012 |
| YT Reply Br. | YouTube's Reply Brief in Support of Defendants' Motion for Summary Judgment; filed June 4, 2010 |
| YT 2d Cir. Br. | Brief for Defendants-Appellees in the United States Court of Appeals for the Second Circuit, *Viacom Int'l Inc. v. YouTube, Inc.* (No. 10-3270-cv), 2011 WL 1356930; filed March 31, 2011 |
| Viacom Opening SJ Br. | Plaintiffs' Memorandum of Law in Support of Viacom's Motion for Partial Summary Judgment on Liability and Inapplicability of the DMCA Safe Harbor Defense; filed March 5, 2010 |
| Viacom SJ Reply Br. | Viacom's Reply Memorandum of Law in Support of Viacom's Motion for Partial Summary Judgment; filed June 4, 2010 |
| CSUF | Viacom's Counterstatement in Response to Defendants' Local Rule 56.1 Statement in Support of Defendants' Motion for Summary Judgment; filed April 30, 2010 |
| SCSUF | Viacom's Supplemental Counter-Statement in Response to Facts Asserted in Defendants' Motion for Summary Judgment Memorandum of Law But Omitted From Defendants' Local Rule 56.1 Statement; filed April 30, 2010 |
| RSUF | Viacom's Reply to Defendants' Counterstatement to Viacom's Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment; filed June 4, 2010 |
| CSUF (01/18/2013) | Plaintiffs' Counterstatement in Response to Defendants' Supplemental Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried; filed January 18, 2013 |
| Declarations | |
| Hohengarten Decl. | Declaration of William M. Hohengarten in Support of Viacom's Motion for Partial Summary Judgment; filed March 5, 2010 |
| Kohlmann Decl. | Declaration of Susan J. Kohlmann in Support of Viacom's Opposition to Defendants' Motion for Summary Judgment; filed April 30, 2010 |
| Wilkens Opp. Decl. | Declaration of Scott B. Wilkens in Support of Viacom's Opposition to Defendant's Motion for Summary Judgment; filed April 30, 2010 |
| Wilkens Reply Decl. | Declaration of Scott B. Wilkens in Support of Plaintiffs' Reply in Support of Viacom's Motion for Partial Summary Judgment; filed June 4, 2010 |
| Wilkens 01/18/2013 Decl. | Declaration of Scott B. Wilkens in Support of Plaintiffs' Opposition to Defendants' Renewed Motion for Summary Judgment; filed January 18, 2013 |

PUBLIC VERSION

| Declarations (continued) | |
|---|---|
| Rubin Opening Decl. | Declaration of Michael Rubin in Support of Defendants' Motion for Summary Judgment; filed March 5, 2010 |
| Rubin Reply Decl. | Declaration of Michael Rubin in Further Support of Defendants' Motion for Summary Judgment; filed June 4, 2010 |

PUBLIC VERSION

Plaintiffs Viacom International Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television LLC ("Viacom") submit this memorandum of law in opposition to YouTube's renewed motion for summary judgment on its affirmative defense under the Digital Millennium Copyright Act, 17 U.S.C. § 512(c).

## INTRODUCTION

On remand from the Second Circuit, Defendants have moved for summary judgment on their DMCA safe harbor affirmative defense, resting on the same factual record that was before the Court during the previous round of summary judgment briefing. Defendants' motion must be denied as to all Viacom clips-in-suit uploaded to YouTube on or before May 31, 2008, because it relies on erroneous interpretations of the governing legal standards, and disregards large swaths of the factual record. Defendants cannot win summary judgment by rewriting the statute or by arguing their preferred interpretation of record evidence that clearly creates multiple triable issues concerning their eligibility for the section 512(c) safe harbor. Nor can they profit from any gaps in the proof by putting the burden on Viacom to negate their eligibility for the safe harbor.

*First*, with respect to actual knowledge or awareness of specific instances of infringement, Defendants have failed to come forward with any evidence showing that they lacked such knowledge or awareness of Viacom's clips-in-suit. They offer no sworn statement from YouTube's co-founders or other key employees denying the company's awareness of the clips-in-suit and no viewing or other administrative records that might establish the absence of awareness. Instead they argue that Viacom has no evidence showing which specific Viacom clips-in-suit they knew about. *See* YT Br. at 18-23 & YT Supp. Submission. But that argument impermissibly shifts the burden of proof, which rests on Defendants to support their claimed affirmative defense. If there is no evidence allowing a jury to separate the clips-in-suit that

**PUBLIC VERSION**

Defendants were aware of from those they were not, there is no basis for applying the safe harbor affirmative defense to any of the clips. *See infra* 8-10.

*Second*, even if the record supported the conclusion that the Defendants avoided specific knowledge or awareness of all of the clips-in-suit, there is clear evidence that any such ignorance was the product of willful blindness. Under the Second Circuit standard articulated in *Viacom* and *Tiffany*, Defendants repeatedly engaged in intentional efforts to minimize knowledge of specific infringing clips, including Viacom's clips-in-suit. Unable to explain away the extensive record evidence of willful blindness, Defendants attempt to turn the doctrine on its head by claiming that it applies only when a service provider is already aware of a specific clip but avoids learning of that clip's infringing character. But that evasion misstates the law. As *Viacom* and *Tiffany* make clear, a service provider engages in willful blindness when it "has reason to suspect that users of its service are infringing a protected mark [or copyright]," but "*shield[s] itself from learning of the particular infringing transactions by looking the other way.*" The record evidence raises multiple triable issues of fact concerning whether Defendants were willfully blind when they, among other things, disabled community flagging to avoid notice, rejected proposed tools to identify and root out infringement, initially declined to provide Audible Magic filtering to protect movie studio content because copyright infringement was "a major lure" for YouTube's users, and eventually used Audible Magic filtering only to protect the content of license partners, while refusing to provide it to Viacom (with whom licensing negotiations were unsuccessful). *See infra* 10-33.

*Third*, regarding control and financial benefit, Defendants have failed to show under *Grokster* or *Cybernet* that they lacked the "something more" that the Second Circuit standard requires, or that they did not receive a direct financial benefit from the infringement that

indisputably drew users to YouTube and that enabled the founders to sell the company for $1.8 billion within 18 months of its launch.  Where, as here, a service provider takes active steps to run its site with the intent of promoting infringement, the service provider has the right and ability to control in the relevant sense under *Grokster*.  Furthermore, where, as here, a service provider controls and dominates its site by exercising actual and ultimate control over site content, it has the requisite control under *Cybernet*.  Defendants have not shown that they lacked *Grokster* intent, and they do not even address *Cybernet*.  As to financial benefit, Defendants completely ignore the prevailing "draw" standard, which they obviously cannot satisfy given that, by Defendants' own admissions, a majority of YouTube's views were of pirated content.  Instead, Defendants attempt to create a new legal standard that finds no support in the statute, case law, or legislative history.  In short, multiple triable issues of fact as to control and financial benefit preclude a grant of summary judgment in Defendants' favor as to all Viacom clips-in-suit.  *See infra* 33-49.

*Fourth*, with respect to syndication, Defendants do not dispute that Viacom clips-in-suit were syndicated to Apple, Sony, Panasonic, and other third parties.  They claim that the kind of syndication at issue in those deals falls within the scope of the safe harbor because (unlike Defendants' syndication deal with Verizon) it did not involve (1) manual selection of clips or (2) physical delivery of copies.  But the critical feature of Defendants' syndication deals that takes them outside the safe harbor is that they were entered into *sua sponte* by Defendants, for their own business purposes, and not at the direction of users.  *See infra* 50-53.[1]

---

[1] Viacom incorporates herein by reference the factual record that it proffered during the previous round of summary judgment briefing, including, without limitation, the facts set forth in Viacom's SUF, CSUF, SCSUF, and RSUF, and the facts set forth in and documents attached to the Hohengarten, Kohlmann, Wilkens Opp., and Wilkens Reply Declarations.  Furthermore, to the extent that Defendants seek to rely on portions of declarations that Viacom objected to on

## **LEGAL STANDARD**

YouTube's motion attempts to turn the long-established summary judgment burdens upside down by drawing every factual inference in YouTube's favor, relying only on YouTube's own self-serving evidence, and disregarding the evidence and inferences that favor Viacom as the non-movant.  That is simply wrong.  A grant of summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Thus, the "burden of demonstrating that no material fact exists lies with the moving party."  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1744 (2012).  In evaluating a summary judgment motion, "the evidence of the non-movant is to be believed; all permissible inferences are to be drawn in [the non-movant's] favor; and the court must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted).  As a result, "[s]ummary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit," or "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility."  *Id.* (internal quotation marks omitted).  "In sum, summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict, *i.e.*, it is quite clear what the truth is."  *Id.* (internal quotation marks omitted).

---

evidentiary grounds during the prior round of summary judgment briefing, Viacom incorporates herein and renews its Evidentiary Objections to Portions of Declarations Submitted in Support of Defendants' Opposition to Viacom's Motion for Partial Summary Judgment, filed under seal June 4, 2010.

YouTube's motion is also premised on a reversal of the applicable burdens of proof. It assumes that YouTube is entitled to summary judgment unless Viacom can negate YouTube's eligibility for the Section 512(c) safe harbor. *See, e.g.*, YT Br. at 15 n.5 (asserting Viacom bears "[t]he burden of proving that [YouTube] had disqualifying knowledge under § 512(c)").[2] But the DMCA is an affirmative defense that must be proved by the party asserting it. The Second Circuit was clear on this point: "[t]o qualify for protection under any of the safe harbors, a party must meet a set of threshold criteria" and "[b]eyond the threshold criteria, a service provider must satisfy the requirements of a particular safe harbor," in this case § 512(c). *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2012).

Moreover, other case law, the legislative history, and treatises all place the burden of proof squarely on the party asserting the DMCA safe harbor defense. *See, e.g., ALS Scan, Inc. v. RemarQ Cmtys., Inc*, 239 F.3d 619, 623 (4th Cir. 2001) ("[T]o qualify for this safe harbor protection [under § 512(c)(1)], the Internet service provider must demonstrate that it has met all three of the safe harbor requirements[.]"); *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 635-36 (S.D.N.Y. 2011) ("To prevail on a motion for summary judgment, the moving party must demonstrate each essential element of its infringement claim or defense."); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 746 (S.D.N.Y. 2011) (moving party "must show, *inter alia*, that it did not have actual knowledge that the material or an activity using the material on the system or network is infringing and was not aware of facts or circumstances from

---

[2] Nearly every subheading in the argument section of YouTube's brief reflects this reversal of the applicable burdens. *See, e.g.*, YT Br. at i-ii ("I.A. To Satisfy The DMCA, *Viacom Would Have To Show* That YouTube Had Actual Or Red-Flag Knowledge Of Particular Clips-In-Suit;" "II.A. As Limited By The DMCA, Willful Blindness *Requires Viacom To Show* That YouTube Consciously Avoid [*sic*] Confirming A High Probability That A Specific Clip-In-Suit Was Infringing;" and "III.B *Viacom Cannot Show* That YouTube Exerted A Substantial Influence Over The Infringement Of Any Clip-In-Suit") (emphasis added).

which infringing activity is apparent"); *Tur v. Youtube, Inc.*, No. CV064436, 2007 WL 1893635, at *2 (C.D. Cal. June 20, 2007) (denying summary judgment to YouTube on identical Section 512(c) defense because "YouTube's ultimate eligibility for 'safe harbor' protection depends upon whether YouTube can prove that it satisfies . . . the specific elements of subsection (c) [of Section 512].")); H.R. Rep. No. 105-551(I), at 26 (1998) ("[A] defendant asserting this exemption or limitation [codified at § 512(c)] as an affirmative defense in such a suit bears the burden of establishing its entitlement."); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12B.04 at 12B-77 n.211 (2012) ("Given that all of Section 512's limitations of liability constitute affirmative defenses, the service provider must prove its eligibility.").[3]

In short, YouTube as the movant has the burden of demonstrating that there are no triable issues of material fact, and in carrying that burden it cannot profit from the absence of evidence concerning a given issue, because it also bears the ultimate burden of proof on its affirmative defense. *See, e.g., Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." (internal quotation marks omitted))*; 11 James Wm. Moore et

---

[3] YouTube's purported legal authority for reversing the burden of proof, which YouTube relegates to a footnote, does not withstand scrutiny. *See* YT Br. at 15 n.5. In *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099 (C.D. Cal. 2009), *aff'd*, 667 F.3d 1022 (9th Cir. 2011), the court had already determined that, unlike here, the defendant had "provided substantial evidence that it fulfilled the requirements of section 512(c)(1)(A)," and only then, in the statement relied upon by YouTube, considered whether the plaintiff had adduced sufficient evidence to *rebut* the showing already made by the defendant. *Id.* at 1107, 1108, 1110. Similarly, YouTube misleadingly cites an order from *Perfect10, Inc. v. Amazon.com, Inc.*, No. CV-05-4753, slip op. at 8 (C.D. Cal. Nov. 4, 2008) (ECF. No. 221), to claim that it is plaintiff's burden to prove ineligibility under the DMCA safe harbor. YT Br. at 15 n.5. But in that order, the *Perfect10* district court concluded that the *defendant* bore the burden of proof: "the Court finds that [defendant] A9.com has not met its burden of establishing that it is eligible for the section 512(a) safe harbor and thus DENIES its motion as to that issue." *Perfect10*, slip op. at 1.

al., *Moore's Federal Practice* ¶ 56.40[1][c] (3d ed. 2012) ("If the movant bears the burden of persuasion at trial on the issue contested in the summary judgment motion, the movant may not meet its initial burden by pointing to the nonmovant's lack of evidence on a contested issue.").

## ARGUMENT

**I.    QUESTIONS OF FACT REGARDING YOUTUBE'S AWARENESS OF INFRINGING ACTIVITY PRECLUDE ENTRY OF SUMMARY JUDGMENT ON YOUTUBE'S DMCA DEFENSE.**

The Second Circuit decision makes clear that the knowledge or awareness provisions of Section 512(c)(1)(A) apply only to specific instances of infringement. *Viacom*, 676 F.3d at 31. The decision makes equally clear, however, that a service provider can obtain such knowledge or awareness in two ways: (1) through actual knowledge of specific instances of infringement or subjective awareness of facts that make specific instances of infringement objectively obvious to a reasonable person; or (2) through willful blindness, where intentional or deliberate refusal to find out about particular infringements is deemed to be knowledge of those particular infringements. On the current summary judgment record, under each of these legal theories, genuine disputes of material fact require denial of YouTube's motion as to all of Viacom's claimed infringements uploaded to YouTube on or before May 31, 2008.[4]

---

[4] As noted in Viacom's March 5, 2010 summary judgment motion, Viacom is not pressing its infringement claims against Defendants for clips-in-suit uploaded to YouTube after May 31, 2008 because Defendants changed their policy and after that date began using digital fingerprinting to block infringing uploads of Viacom's works. Viacom Opening SJ Br. at 2 n.1. According to data produced by Defendants that Viacom has not been able to verify, of Viacom's 62,637 clips-in-suit, approximately 12,141 clips were uploaded to YouTube after May 31, 2008, leaving 50,489 clips that were uploaded on or before that date. Wilkens 01/18/2013 Decl. ¶ 2(a). Defendants' request for entry of judgment of non-infringement as to the post-May 31, 2008 clips, YT Br. at 5 n. 2, is inconsistent with this Court's December 21, 2009 Order permitting Viacom to "withdraw 'accused clips' by notice of their dismissal with prejudice under Fed. R. Civ. P. 41(a)(2)," and explaining that "[p]artial judgment in defendants' favor on those claims will not be entered, lest it give an appearance of having an effect beyond that accorded by Rule 54(b)." Dkt. No. 162. Once Defendants stipulate to the accuracy of the data for the upload dates of

### A.   YouTube Has Not Shown That It Lacked Actual Knowledge or Awareness of Viacom's Clips-in-Suit.

The Second Circuit vacated this Court's grant of summary judgment regarding actual knowledge or awareness because "a reasonable juror could conclude that YouTube had actual knowledge of specific infringing activity, or was at least aware of facts or circumstances from which specific infringing activity was apparent." *Viacom,* 676 F.3d at 34.  It remanded for a further assessment of the evidence relating to whether this knowledge extended to Viacom's clips-in-suit.  *Id.*  It has now become clear that neither side possesses the kind of evidence that would allow a clip-by-clip assessment of actual knowledge.  Defendants apparently are unable to say which clips-in-suit they knew about and which they did not (which is hardly surprising given the volume of material at issue)[5] and apparently lack viewing records that could establish these facts.[6]  It follows, given the applicable burden of proof, that they cannot claim the 512(c) safe

---

Viacom's clips-in-suit, Viacom will submit the appropriate notice dismissing all clips-in-suit uploaded after May 31, 2008.

[5] Even if co-founder Chad Hurley had attempted to disclaim knowledge in the two declarations he submitted in this case – one in support of Defendants' original motion for summary judgment, and the other in opposition to Viacom's motion for summary judgment – those declarations are entitled to no weight, given that Hurley was deposed and claimed a lack of memory over 200 times with respect to the very documents that demonstrate his keen awareness of the infringing content on YouTube, including infringing Viacom content.  *See* Hohengarten Ex. 312; *see also Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) (stating sham affidavit rule).  Notably, in their renewed motion, Defendants do not even attempt to rely on the previously-submitted declaration of co-founder Steve Chen, whom Defendants never made available to be cross-examined at a deposition, thereby rendering his declaration inadmissible.

[6] Defendants produced limited, redacted records identifying videos viewed by certain YouTube employees when they were logged into their system using various administrative user names. But because this evidence does not show the videos viewed by the founders and employees of YouTube whenever they were <u>not</u> logged onto the site using those specific names, this evidence plainly does not establish as a matter of law that YouTube lacked specific knowledge of any clip not included in these records.  *See, e.g.*, Rubin Reply Decl. ¶ 14 (artfully worded paragraph in outside counsel declaration discussing watch data for "an account of Steve Chen" and "an account of Chad Hurley," while failing to indicate whether those two co-founders used other YouTube accounts, or addressing the obvious point that they did not need to log into any YouTube account in order to watch YouTube videos).

harbor – especially in light of the voluminous evidence showing that the Defendants had considerable knowledge of the clips on their website, including Viacom-owned material.  *See infra* at 17-19.

It is no answer for YouTube to complain that <u>Viacom</u> has failed to come forward with evidence establishing YouTube's knowledge of specific clips-in-suit.  *See* YT Br. at 18-23; YT Supp. Submission, Dkt. No. 432 (claiming that "for each clip in suit," Viacom must proffer evidence of YouTube's knowledge "in order to survive YouTube's motion for summary judgment").  It is not Viacom's burden to prove specific knowledge or awareness.  That factual issue is relevant only to the affirmative defense that YouTube is asserting; knowledge of specific infringements is not an element of Viacom's copyright infringement claims against YouTube.  At trial, it will be enough for Viacom to prove that the clips-in-suit were on the website, along with some other elements of infringement liability.[7]  It follows that Defendants cannot win summary judgment by pointing to the absence of record evidence that would allow a jury to

---

Notably, in a transparent effort to prevent Viacom from obtaining evidence of specific knowledge, Defendants refused to produce any records of the clips that co-founder Jawed Karim watched in March 2006 when he submitted a memorandum to YouTube's board of directors detailing rampant infringement of five named Viacom television series. *See* Wilkens April 28, 2010 Decl. ¶ 20; *see infra* at 18-19, 24 (describing Karim memo).

[7] Viacom's affirmative claims for direct infringement, *Grokster* inducement, and vicarious liability do not require proof that YouTube had knowledge of specific infringements.  To establish direct infringement, Viacom must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (quotation marks omitted).  To establish *Grokster* inducement, Viacom must prove (1) intent to bring about infringement; (2) offering of a service suitable for infringing use; and (3) evidence of actual infringement by users of the service.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 940 (2005).  Finally, to establish vicarious liability, Viacom must show that the defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities," even if he has no actual knowledge of the infringement.  *E.g.*, *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).

decide which clips-in-suit were specifically known to senior YouTube executives.  Summary

judgment should be denied on that basis.

> **B.**   **Extensive Evidence of YouTube's Willful Blindness Raises Multiple Factual Disputes That Preclude Summary Judgment in YouTube's Favor.**

Even if the record did establish that Defendants lacked specific knowledge or awareness

of the clips-in-suit (and it does not), there would remain triable issues of fact regarding the

second issue that the Second Circuit held to be relevant – willful blindness.  As the Second

Circuit made clear, willful blindness to the incriminating facts is tantamount to knowledge of

those facts and is treated as knowledge under the law.  And the record contains voluminous

evidence allowing a jury to find willful blindness to specific infringing clips-in-suit throughout

the time that Defendants operated the YouTube website prior to May 31, 2008, thus making

them legally charged with the very knowledge they willfully sought to avoid.

> 1.   YouTube's Motion Misconstrues The Second Circuit's Willful Blindness Doctrine.

Citing its holding in *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010), and other

cases interpreting the willful blindness doctrine, the Second Circuit held that willful blindness is

knowledge under the DMCA.  676 F.3d at 35.  Consequently, willful blindness may be applied

under the DMCA to establish knowledge where the defendant has "reason to suspect that users

of its service'" were infringing the plaintiff's copyrights, but "'shield[s] itself from learning of

the particular infringing transactions by looking the other way.'"  *Tiffany*, 600 F.3d at 109;

*Viacom*, 676 F.3d at 35 (quoting same passage from *Tiffany*).

Noting that this Court did not address the willful blindness doctrine in its summary

judgment ruling, the Second Circuit remanded for fact finding as to whether "defendants made a

'deliberate effort to avoid guilty knowledge.'"  *Viacom*, 676 F.3d at 35 (quoting *In re Aimster

Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003)).  The Second Circuit explained that fact

finding on this issue is particularly warranted under its recent willful blindness ruling in *Tiffany*, which was based on "extensive findings of the district court with respect to willful blindness" after a full trial on the merits. *Id.* at 35 n.10.

The Second Circuit's opinion draws heavily from *Tiffany*, which addressed the willful blindness doctrine in the context of alleged trademark infringement by an online service provider hosting infringing material. Under this doctrine, knowledge of "particular" infringements – *i.e.*, "specific" knowledge of infringements – will be legally imputed if the provider otherwise satisfies the elements of willful blindness: "aware[ness] of a high probability of the fact in dispute and consciously avoid[ing] confirming that fact." *Viacom*, 676 F.3d at 35 (quotation marks omitted). Under the Second Circuit's standard, therefore, if YouTube subjectively believed there was a high probability that videos infringing Viacom's works-in-suit were hosted on the site, yet willfully took steps to "shield itself" from learning of the "particular infringing transactions," knowledge of those specific infringements will be legally imputed to YouTube, *Tiffany*, 600 F.3d at 109, thereby depriving YouTube of the safe harbor. *Viacom*, 676 F.3d at 35 ("the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA").

YouTube seeks to limit the willful blindness doctrine articulated in the Second Circuit's decision, asserting that willful blindness would apply only where YouTube was *already* aware of a specific clip, but blinded itself to the infringing character of that clip. In support of this argument, YouTube cites the Court of Appeals' statement that "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of *specific instances of infringement* under the DMCA." YT Br. at 29, 30 (quoting *Viacom*, 676 F.3d at 35) (emphasis added by YouTube). But that holding by the Second Circuit reinforces Viacom's

position, not YouTube's.  As explained above, the Second Circuit made clear that willful

blindness applies in this context if YouTube "'ha[d] reason to suspect that users of its service are

infringing" but  "shield[ed] itself *from learning of the particular infringing transactions* by

looking the other way.'"  *Viacom*, 676 F.3d at 35 (quoting *Tiffany*, 600 F.3d at 109).

To put it another way, "persons who know enough to blind themselves to direct proof of

critical facts *in effect* have actual knowledge of those facts."  *Global-Tech Appliances, Inc. v.*

*SEB S.A.*, 131 S. Ct. 2060, 2069 (2011) (emphasis added).  Hence, YouTube's willful blindness

as to the specific transactions – its deliberate failure to learn of them – is deemed to be

knowledge of those specific transactions.  That is why the Second Circuit said that "the willful

blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or

awareness of specific instances of infringement under the DMCA," *Viacom*, 676 F.3d at 35 –

knowledge of the specific instances is established by showing willful blindness of them.

YouTube's contrary theory – that willful blindness requires proof that YouTube actually knew

about the specifics, rather than that it deliberately blinded itself to those specifics – would turn

the willful blindness doctrine on its head.

Contrary to YouTube's claims, there is no reason to adopt such a cramped view of willful

blindness just because this case involves the context of copyright and the DMCA.  Here, just as

in *Tiffany*, liability requires specific knowledge of infringing material (assuming reliance on the

"knowledge and awareness" exception to the DMCA immunity).  But here, just as in *Tiffany*,

knowledge of specific infringing clips is properly charged to a service operator that deliberately

blinds itself to the particulars of infringement it knows is occurring on its site.  Accordingly, if

YouTube had "reason to suspect" there was widespread infringement of Viacom's copyrights on

YouTube (which is not seriously disputed), but "intentionally shielded itself from discovering

the offending [postings]," then it is "charged with knowledge of those [clips]." *Tiffany*, 600 F.3d at 109.

Indeed, YouTube's contrary reading of the willful blindness doctrine would render it utterly superfluous.  On YouTube's reading, willful blindness would apply only if YouTube were already subjectively aware of a specific infringing clip and knew of a high probability that it was infringing, but blinded itself to the facts that would conclusively establish the clip's infringing character.  YT Br. at 35.  But under those circumstances, YouTube would already have knowledge under Section 512(c)(1)(a)'s "awareness" standard, which the Second Circuit held to apply when a service provider is subjectively aware of a particular clip whose infringing character would be objectively obvious to a reasonable person.  The Second Circuit endorsed the *Tiffany* willful blindness framework not as a means of demonstrating awareness under Section 512(c)(1)(a)(ii) but rather as a means of demonstrating knowledge under Section 512(c)(1)(a)(i).

None of YouTube's other arguments has merit.  First, YouTube argues that accepting *Tiffany*'s and *Viacom*'s willful blindness standard would resurrect the general knowledge standard that the Second Circuit rejected in those two cases.  YT Br. at 32-33.  But that argument is obviously incorrect, as *Tiffany* itself shows.  *Tiffany* held that generalized knowledge of infringement alone is not enough for liability; a defendant must know of specific infringing transactions.  At the same time, *Tiffany* held that such knowledge of specifics may be imputed to a defendant who engages in willful blindness to the specific transactions when it *not only* knows of widespread infringement *but also* deliberately shields itself from learning of the particular infringing transactions.  That willful blindness standard is not the same as the generalized knowledge standard that the Second Circuit rejected in both *Tiffany* and this case.  Generalized knowledge alone is not enough for willful blindness; generalized knowledge can satisfy the first

13

element of the Second Circuit's test, but not the second; the second element additionally requires the defendant to deliberately blind itself to the particulars.  It is the additional element of deliberate blinding that sets willful blindness apart from the generalized knowledge standard the Second Circuit rejected and that provides the basis for charging the defendant with knowledge of the transactions to which it blinded itself.

Second, YouTube argues that the *Tiffany* willful blindness standard is incompatible with Section 512(m).  But the Second Circuit also expressly addressed and rejected that argument, explaining that there is a difference between basing liability on an affirmative duty to monitor (which Section 512(m) might prohibit), and basing liability on a deliberate effort to avoid information that would point one to the particular transactions that are illegal.  *Viacom*, 676 F.3d at 35.  If liability could be based on an affirmative duty to monitor, then YouTube would lose the DMCA defense by failing to monitor, regardless of its motive.  But the doctrine of willful blindness is *not* predicated on a mere failure to monitor.[8]  Rather, willful blindness arises when the defendant *deliberately* avoids learning the incriminating specifics, including through a deliberate decision not to monitor *in order to* avoid finding out which specific transactions are infringing.  This intent of *deliberate avoidance of incriminating knowledge* distinguishes willful blindness from any affirmative duty to monitor that might be at issue under Section 512(m).[9]

---

[8] Although the Second Circuit commented that section 512(m) "limits" the willful blindness doctrine, 676 F.3d at 35, the context makes clear it was merely reiterating the point that due to section 512(m), willful blindness cannot be defined as a free-standing duty to monitor.

[9] YouTube's formulation of the standard is also contrary to the facts in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2071 (2011).  There, the Supreme Court affirmed a finding of willful blindness based in large part on the defendant's obtaining an opinion from an attorney concerning whether a product infringed any patents, but where the defendant withheld critical facts from the attorney necessary for the legal opinion to be complete.  *Global-Tech* thus demonstrates that where a defendant takes some measures to detect potential infringement but intentionally leaves gaps in those measures, such evidence supports a finding of willful

Thus, as the Second Circuit held, "willful blindness cannot be defined as an affirmative duty to monitor" and is not otherwise abrogated by Section 512(m). *Id.* at 35.[10]

Third, YouTube argues that the *Tiffany* willful blindness standard cannot apply under the DMCA because a service provider that willfully blinds itself to specific instances of infringement necessarily is "totally unaware of any information identifying particular clips-in-suit as infringing" and therefore cannot expeditiously remove them as the statute contemplates. YT Br. at 34-35.  This argument disregards the central feature of the willful blindness doctrine: A person who is willfully blind to incriminating facts is "charged with knowledge" of the facts that he sought to ignore. *Tiffany*, 600 F.3d at 109.  Accordingly, when a service provider

_____

blindness.  For the reasons already explained, nothing in Section 512(m) alters the force of *Global-Tech* and other appellate cases applying the willful blindness doctrine.

[10] For similar reasons, YouTube's reliance (YT Br. at 37) on the Second Circuit's separate discussion of Section 512(i)'s repeat infringer requirement also is misplaced.  In that discussion, the Second Circuit rejected the Class Plaintiffs' argument that YouTube's failure to provide all rights holders access to its proprietary monitoring activities violated Section 512(i), reasoning that to accept the Class's argument would impose the type of affirmative duty to monitor that Section 512(m) disclaims as unnecessary to maintain the benefit of the safe harbor. *Viacom*, 676 F.3d at 41.  *In the specific context of Section 512(i)*, the Court of Appeals stated:  "For that reason, YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms." *Id.*

Ripping this sentence out of context, YouTube wields it as a talisman that would place its decision to withhold its fingerprinting technology from some rights holders as completely beyond reproach under the DMCA.  But the Second Circuit's reasoning that the Class's interpretation of Section 512(i) would contravene Section 512(m) does not remotely suggest that a decision to restrict access to its filtering technology motivated by a desire to avoid learning of specific instances of infringement cannot establish willful blindness, and thus disqualifying knowledge of specific instances of infringement. *Cf. Dandamudi v. Tisch*, 686 F.3d 66, 75-76 (2d Cir. 2012) (noting "the danger of separating the words of an opinion from the context in which they were employed"); *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 567 (2d Cir. 2000) (criticizing plaintiff for "[r]elying upon isolated quotations drawn out of context from our opinion in [an earlier case]" and noting that "[b]ut when the sentence is read in the context of the preceding sentences, it clearly refers to" a different issue than the one for which plaintiffs were attempting to employ it).  Again, willful blindness is established not merely by the decision to restrict filtering technology to those who gave YouTube licenses, or YouTube's decision to end community flagging for copyright infringement, but rather those acts coupled with the intent to avoid incriminating knowledge.  Here, the documentary record raises multiple genuine disputes of material fact as to whether YouTube had that illicit intent.

engages in willful blindness to acts of infringement, it is deemed to have actual knowledge of all of those specific acts of infringement to which it blinded itself, triggering the duty to expeditiously remove the infringing materials from the moment the willful blindness began. If YouTube had acted in good faith, and had chosen not to blind itself to the specific acts of infringement that it had reason to suspect were occurring, YouTube would have been able to comply with its duty to expeditiously remove them.

> ### 2. The Summary Judgment Record Raises Numerous Genuine Disputes Of Material Fact as to YouTube's Willful Blindness.

The willful blindness theory articulated in the Second Circuit's decision permits Viacom to present to a jury evidence supporting the argument that YouTube's willful blindness of the rampant infringement occurring on its site disqualifies YouTube from the safe harbor with respect to all Viacom clips-in-suit. YouTube certainly has not proffered evidence sufficient to meet its burden of establishing as a matter of law that it was not willfully blind.

There is ample evidence in the record of this case on the basis of which a reasonable jury could – or even must – conclude that YouTube was both "aware of a high probability" of infringement of Viacom's works-in-suit and "consciously avoided confirming" such infringement, *Viacom*, 676 F.3d 35, by taking deliberate steps to "shield itself" from such knowledge of the "particular infringing transactions." *Tiffany*, 600 F.3d at 109.

> #### a. *YouTube Was Aware of a High Probability of Infringement of Viacom's Copyrighted Works.*

As this Court observed in its original summary judgment decision, "a jury could find that the defendants not only were generally aware of, but welcomed, copyright-infringing material being placed on their website." *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 518 (S.D.N.Y. 2010), *aff'd in part, rev'd in part*, 676 F.3d 19 (2d Cir. 2012). The summary judgment record is replete with evidence that YouTube's co-founders, executives, and other

PUBLIC VERSION

employees were subjectively aware of massive infringement on the site – including many clips

that they recognized as being taken from Viacom's most popular programs, such as *South Park*

and *Chappelle's Show*.

      Particularly in the initial period after YouTube's founding, the record shows that the three

founders themselves obsessively reviewed a large number of the specific clips on YouTube in

order to understand what kind of content was being uploaded to the site and was attracting

viewers, including clips of popular Viacom content.  *See, e.g.*, RSUF ¶¶ 31-32, 37-39, 43, 45-48,

51, 53-59.  The founders recognized many of those specific clips as infringing – clips accounting

for at least 80% of YouTube's site traffic by co-founder Steve Chen's estimate.  RSUF ¶¶ 55-57.

Yet, although the founders removed <u>some</u> of those infringing clips to give the appearance of

copyright compliance, they deliberately left many other infringing clips of which they were

aware on the site, including "comedy clips," a Viacom specialty, unless and until they received a

takedown notice, precisely because they knew those clips were essential for aggressively

growing YouTube and selling out quickly.  RSUF ¶¶ 30, 33-34, 36-39, 43-48, 50, 52, 54-58, 60,

78, 83, 85, 118, 120, 128; CSUF ¶¶ 6, 58.  Although hardly needed to indicate a high probability

of infringement, many of Viacom's clips-in-suit were uploaded to YouTube with a video

description provided by the uploading user admitting that the clip was pirated.  Wilkens

01/18/2013 Decl. at ¶ 3 & Ex. 4 ("I don't care if my account get's closed for this, this episode

was great, and this is the part everyone's laughing about. ^^ I did not create this material. All

contents are copyright of Comedy Central.")

      YouTube's awareness of a high probability of infringement is exemplified by "a little

exercise" that Maryrose Dunton, YouTube's lead Product Manager, performed in February 2006

and reported to Chen.  RSUF ¶¶ 94-95.  She "went through all the most viewed/most

discussed/top favorites/top rated [videos on YouTube] to try and figure out what percentage is or has copyrighted material.  it was over 70%."  *Id.*  Dunton sarcastically added she had "flagged" the infringing videos for removal, but she later admitted under oath that she did not do so, and the videos remained on the site.  RSUF ¶¶ 95-96.[11]

YouTube's awareness of the rampant infringement of Viacom's programming was highlighted again in a memorandum distributed by co-founder Jawed Karim to YouTube's board of directors at a March 2006 meeting.  Karim told the board:

> As of today episodes and clips of the following well-known shows can still be found:  Family Guy, South Park, MTV Cribs, Daily Show, Reno 911, Dave Chappelle. . . .  [W]e would benefit from preemptively removing content that is blatantly illegal and likely to attract criticism.  This will help to dispel YouTube's association with Napster (Newsweek:  "Is YouTube the Napster of Video?" . . . ).

RSUF ¶¶ 109-111.  Viacom owns the copyrights in *South Park*, *MTV Cribs*, *The Daily Show*, *Reno 911*, and *Dave Chappelle* – the "well-known shows" and "content that is blatantly illegal" on YouTube.  RSUF ¶¶ 5-6, 110.  As the Second Circuit recognized, Karim plainly had to be aware of a number of specific clips on YouTube that infringed each of these Viacom programs in order to make this statement to the board.  *Viacom*, 676 F.3d at 33.[12]  YouTube's myriad objections to the significance and relevance of the Karim memo are beside the point, as they mainly go to Karim's subjective awareness of specific infringing clips rather than to YouTube's willful blindness, and they are all premised on the misapprehensions that Viacom has the burden

---

[11] Indeed, a month later, Dunton again estimated "probably 75-80% of our views come from copyrighted material."  RSUF ¶ 104.

[12] As noted earlier, Defendants refused to produce any records of what Karim watched during this time period.  *See supra* n. 6.

of proof and that every inference must be drawn in YouTube's favor.[13]  The burden is

YouTube's, and all permissible inferences must be drawn in Viacom's favor.

Google's awareness of the large scale infringement of Viacom's copyrights began before

it acquired YouTube, when Google surveyed the content on the site and regarded YouTube as "a

'rogue enabler' of content theft," and as "completely sustained by pirated content."  RSUF ¶ 157;

*see also* RSUF ¶¶ 158-159, 165.  Furthermore, Google's due diligence prior to the acquisition,

performed by its advisor Credit Suisse, included a review of a sample of specific clips provided

by YouTube.  Based on that sample, Credit Suisse estimated that 60% of YouTube's views were

"premium" – shorthand for "copyright[ed] (either in whole or in substantial part)" or "removed

[and] taken down" pursuant to a takedown notice (and thus infringing), and that YouTube had a

license for only 10% of those premium copyrighted views.  RSUF ¶¶ 168-174.  In short, Credit

Suisse determined that 54% (90% of 60%) of YouTube views were of unauthorized premium

content, and this analysis was included into Credit Suisse's presentation to Google's board prior

to its vote to acquire YouTube.  RSUF ¶¶ 175-176, 182.

Even after YouTube experienced meteoric growth and was acquired by Google, it is clear

that Defendants' management and employees continued to look at huge numbers of specific

---

[13] YouTube protests that Karim did not know whether YouTube's board read the memo, YT Br. at 19 n.9, but the evidence clearly shows that the memo was distributed to the board, and on YouTube's motion the only permissible inference is that the memo was read by those who received it.  Notably, none of YouTube's board members has submitted a declaration denying knowledge of Karim's memo.  Even if it were credible that no one else at YouTube read the memo, the knowledge summarized therein is attributable to YouTube, given Karim's privileged attendance at board meetings and his provision of advice to YouTube's directors while he served as a consultant to the company.  Wilkens 01/18/2013 Ex. 7 (Karim Tr. at 24:9-11) Hohengarten Ex. 313 (Karim Tr. 180:17-181:5).  Contrary to YouTube's claims, Karim's formal status as a consultant does not prevent his knowledge from being attributed to YouTube, *see* YT Br. at 19, because the existence of an agency relationship is a question of fact, and Karim's job title of "consultant" rather than an "employee" is not controlling.  *E.g.*, *Restatement (Third) of Agency* § 1.02 (2006); *see also id.* at cmt. a.

PUBLIC VERSION

videos on the site and identified many of them as infringing, yet did not remove them.  For example, after Google's acquisition, an employee responsible for selecting videos for prominent placement on the site reported that "we're running into issues finding enough videos because they have so many copyright violations."  RSUF ¶ 192; *see also* RSUF ¶ 190-191, 193-194, 200.  Given Defendants' policy of removing infringing content only after receiving a take-down notice, however, Defendants must have routinely retained these "copyright violations" even when they were made aware of specific infringing videos with such violations as a part of this process.

Defendants' negotiations with the MPAA and their licensing negotiations with Viacom further underscore Defendants' awareness of a high probability of infringement of Viacom's works.  During negotiations with the MPAA in 2006 over curbing the massive infringement of member studios' (including Paramount's) works, YouTube not only was made aware of the scale of the infringement, but in a moment of candor also acknowledged that movie studio content was a "major lure" to YouTube users.  RSUF ¶¶ 223-226.  Furthermore, in licensing negotiations with Viacom, Defendants offered Viacom a package worth at least $590 million, precisely because they recognized the popularity of infringing Viacom content on YouTube.  RSUF ¶¶ 203-206.  Viacom  made clear during those negotiations that any license would have to include compensation for pre-license uploads because they were infringing, and when negotiations failed, Viacom promptly issued takedown notices for 100,000 clips that it had identified on YouTube.  RSUF ¶¶ 203-206, 208, 210; CSUF ¶ 128.  At the same time, Viacom reiterated to Google that the infringement of Viacom's works on YouTube was rampant, ongoing, and unauthorized.  RSUF ¶ 209; Hohengarten Ex. 244 (February 2, 2007 Letter from Viacom's general counsel to Google's general counsel).

In short, the record contains extensive evidence for a jury to conclude that YouTube "ha[d] reason to suspect that users of its service [were] infringing" Viacom's works.  *Cf. Viacom*, 676 F.3d at 35 (quoting *Tiffany*, 600 F.3d at 109).  On this record, summary judgment in favor of YouTube must be denied.

> b.  *YouTube Deliberately Shielded Itself From Learning Of Particular Infringements of Viacom's Clips-In-Suit.*

The record likewise contains numerous instances from which a reasonable jury could conclude that YouTube "shielded itself from learning of particular" infringements of the clips-in-suit by shutting down any mechanism that might have provided the URL-specific knowledge YouTube claims is indispensable, and did so with the express objective of depriving itself of such knowledge:

- In September 2005, the founders implemented but almost immediately dismantled "community flagging" for copyright infringement – an option for users to flag uploaded videos as likely copyright infringing for follow-up scrutiny by YouTube employees.  RSUF ¶¶ 60-65.[14]  As a YouTube co-founder explained, YouTube disabled this feature for copyright infringement *in order to avoid acquiring knowledge of infringing videos*:  "if we don't remove them we could be liable for being served a notice" and "it's actually better if we don't have the link there at

---

[14] Even at the outset, however, the founders saw copyright flagging primarily as window-dressing.  As co-founder Steve Chen explained to an early YouTube investor and board member, community flagging for copyright creates "the perception . . . that we are concerned about this type of material and we're actively monitoring it."  RSUF ¶ 60.  But, Chen continued, "the actual removal of this content will be in varying degrees."  *Id.*  Comparing YouTube to the image hosting website flickr, Chen emphasized that through this policy, "you can find truckloads of . . . copyrighted content" if you are "actively searching for it."  *Id.*

all because then the copyright holder is responsible for serving us the notice of the material and not the users."  RSUF ¶ 64.[15]

- After community flagging for copyright was discontinued, whenever an infringing clip was flagged for a potential "terms of use" violation (*e.g.*, pornography or hate speech), Defendants' employees would review and become aware of that specific infringing video, but would <u>not</u> remove it from the site for copyright infringement.  RSUF ¶¶ 65-66.  A post-acquisition "YouTube Content Policy Training" manual expressly highlighted Viacom's "Daily Show" as an example of content to "Approve" when reviewing videos for terms-of-use violations, *and data produced by Defendants indicates that thousands of Viacom's clips-in-suit – including clips of the Daily Show and other well known Viacom content – were reviewed and "approved" by YouTube's "army of content reviewers."*  RSUF ¶¶ 67-69; Hohengarten Ex. 12; Wilkens 01/18/2013 Decl. at ¶ 2(e) & Ex. 3.

- YouTube personnel stated that they rejected implementing a proposed automated anti-infringement tool that would have alerted copyright owners when suspected infringing content was uploaded, because they "hate[d] making it easier for these a-holes [copyright owners]."  RSUF ¶ 114; *see also* RSUF ¶¶ 112-113, 115.  YouTube also failed to implement multiple additional anti-infringement tools proposed by Brent Hurley, YouTube's Director of Finance.  RSUF ¶¶ 74-77, 131.

- Likewise, there is evidence in the record that YouTube initially declined to test or adopt filtering technology from Audible Magic for identifying movie studio

---

[15] Defendants cite *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1150 (N.D. Cal. 2008), for the proposition that disabling community flagging for copyright does not constitute willful blindness, YT. Br. at 36, but fail to mention that in *Io*, unlike here, there was no evidence that community flagging was disabled *in order to avoid knowledge of infringement*.

content, notwithstanding on offer by the Motion Picture Association of America ("MPAA"), because it believed that "the copyrighted content on YouTube [is] a major lure for [YouTube's] users" and did not want to be put into a position where it would need to remove it.  RSUF ¶¶ 223-226.[16]

- When YouTube did eventually implement Audible Magic filtering to identify and remove infringing content, YouTube used this tool only for content owners who would agree to license their content to YouTube, and refused to use it to protect Viacom's works.[17]  RSUF ¶¶ 212-213, 216-218, 292-310; CSUF ¶¶ 95, 106-107, 109.  Defendants did not provide any copyright filtering protection to Viacom until May 2008, when Defendants provided access to Google's proprietary Content ID system, RSUF ¶ 222, but all the while operated Audible Magic's technology exclusively for YouTube's content partners.  RSUF ¶¶ 294-298.[18]

---

[16]Defendants' self-serving efforts to dispute the MPAA representative's testimony must, of course, be disregarded on this motion for summary judgment, in which the evidence must be viewed in the light most favorable to Viacom.

[17] Defendants also attempt to dispute their withholding of Audible Magic filtering from Viacom, but on this record their self-serving interpretation of the evidence must be disregarded given that a reasonable jury could reach the opposite conclusion.  Defendants' internal documents expressly reiterated their policy of offering their "Claim Your Content" or "CYC" tool that included Audible Magic only to a handful of "partners."  Viacom SJ Reply Br. at 17-18.

[18] In briefing on the prior summary judgment motions, YT Reply Br. at 6 n.2, Defendants suggested that withholding digital fingerprinting from Viacom cannot constitute willful blindness because digital fingerprinting is not a "standard technical measure" that the DMCA requires service providers to "accommodate" under Section 512(i), and that can impose an affirmative duty to monitor under Section 512(m).  That argument is completely misplaced, however.  Viacom is not arguing here that fingerprinting was a "standard technical measure," or that Defendants had a duty to affirmatively monitor YouTube for infringement using digital fingerprinting because it was a standard technical measure.  Instead, Viacom is arguing, consistent with the Second Circuit's ruling, that once Defendants became aware of a high probability of infringement of Viacom's works, they could not bury their heads in the sand to that infringement by refusing to deploy the fingerprinting tools that were available and that they were using to police YouTube for infringement of their content partners' works.

- YouTube rejected offers from Viacom and from MPAA to have their technology
  experts assist YouTube in using technical means to identify and block
  unauthorized Viacom content from the site, and to distinguish "whitelists" of
  approved studio content from "blacklists" of unlicensed studio content.  RSUF ¶¶
  209, 217-218; Hohengarten Ex. 333 and Wilkens Reply Ex. 10 (Garfield Tr.
  43:13-53:7 (explaining MPAA's offer to YouTube to assist in testing
  fingerprinting software to recognize "whitelist" of approved studio content and
  "blacklist" of unlicensed studio content, and YouTube's eventual rejection of
  MPAA's offer)).

- The Karim memo (discussed in detail above) demonstrates YouTube's willful
  blindness as to infringing clips on YouTube from the five Viacom programs
  identified in the memo:  "South Park," "MTV Cribs," "Daily Show," "Reno 911,"
  and "Dave Chappelle."  Defendants do not dispute that there were hundreds of
  Viacom clips-in-suit from these five shows on YouTube as of the date of the
  memo, which were not removed by YouTube until months later.  YT Br. at 19-20;
  *see also* Wilkens 01/18/2013 Decl. at ¶ 2(c).  Furthermore, over the course of the
  two years following the Karim memo, until YouTube instituted filtering for
  Viacom content, thousands of additional Viacom clips-in-suit from these same
  five Viacom television programs were infringed on YouTube.  Wilkens
  01/18/2013 Decl. at ¶ 2(b).

- Furthermore, when Google acquired YouTube, Google decided not to apply to
  YouTube the anti-infringement screening tools that were in use at Google Video,

and instead adopted YouTube's policy of leaving infringing clips on the site unless and until it received a takedown notice.  RSUF ¶¶ 188-189.

By disabling, corrupting, or otherwise disregarding these measures that could have identified and stopped infringement, Defendants willfully blinded themselves both to the specific knowledge that Viacom's clips-in-suit were on its site and the knowledge that those clips were infringing.[19]  Given the indisputably high probability that Viacom's works were being infringed – the Chen and Dunton estimates that 70% - 85% of YouTube's views were of infringing content, the Karim memo, and the parties' licensing negotiations and other correspondence easily establishes that much – YouTube's conscious avoidance of knowledge of both the identity of specific clips and their infringing nature demonstrates YouTube's knowledge as to each.

Defendants' motive for turning a blind eye to the massive infringement on YouTube, and for refusing to deploy their available tools to protect Viacom's copyrighted works, is clear.  As Google's Senior Vice President, Jonathan Rosenberg, put it, the "lesson" from YouTube was to "play faster and looser and be aggressive until either a court says 'no' or a deal gets struck." Hohengarten Ex. 64; RSUF ¶ 160; *see also* RSUF ¶ 161 (presentation sent by Rosenberg to Google's CEO and co-founders stating, "Pressure premium content providers to change their model towards free," and noting that Google Video could "**Threaten** a change in copyright policy" and "use threat to get deal sign-up").  In other words, Google wanted access to premium copyrighted content on its terms, i.e. for free, in order to attract users and drive up advertising revenue, and was willing to engage in various tactics to achieve that end, including the wholesale exploitation of copyrighted works.  *See, e.g, Authors Guild v. Google, Inc.*, 282 F.R.D. 384, 387

---

[19] YouTube makes the absurd argument that "Viacom cannot point to any of its clips-in-suit that YouTube's fingerprinting technology identified as infringing but that YouTube nevertheless refused to take down," YT Br. at 37, but that is precisely because YouTube refused to use its fingerprinting technology to protect any of Viacom's works.

(S.D.N.Y. 2012) ("Millions of the books scanned by Google were still under copyright, and Google did not obtain copyright permission to scan the books").

Contrary to YouTube's characterization, the evidence identified above goes well beyond a mere decision by YouTube not to "affirmatively monitor" its service, and represents instances where a jury could reasonably conclude that YouTube in fact monitored or planned to monitor its site's content in some way, but purposefully disabled or modified its procedures to avoid obtaining clip-specific knowledge of suspected infringement.  *Cf. Global-Tech*, 131 S. Ct. 2071 (taking step to detect infringement, but doing so incompletely to create "plausible deniability," supports finding of willful blindness).

While YouTube may wish to put forth innocent explanations for each of these actions, all inferences must be drawn in Viacom's favor, and determining YouTube's true purpose and intent is a quintessential fact question for the jury.  Indeed, the Second Circuit has frequently stressed that "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles," as is the case here.  *E.g.*, *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 16 (2d Cir.1993) (internal quotation marks omitted); *see also Gelb v. Bd. of Elections*, 224 F.3d 149, 157 (2d Cir. 2000) ("summary judgment is generally inappropriate where questions of intent and state of mind are implicated").

Nor may YouTube rule out all of this evidence, as it attempts to do in its motion, by claiming that it was merely engaged in what YouTube euphemistically refers to as "broad, programmatic decisions about how to run its service."  YT Br. at 36.  As discussed above, a jury could find that YouTube instituted those so-called "programmatic" decisions precisely so that it would not acquire clip-specific knowledge of the infringement it suspected was occurring.  In short, and in marked contrast to eBay's conduct in the *Tiffany* case (discussed further below),

YouTube repeatedly and deliberately refused to use the many tools that were "technologically feasible and reasonably available" to protect Viacom's copyrighted works from infringement. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 493 (S.D.N.Y. 2008), *aff'd in part, rev'd in part*, 600 F.3d 93 (2d Cir. 2010).

As a last defense, YouTube offers self-serving readings of its own incriminating documents to argue that it was not willfully blind.  But as Viacom has shown, there is a mountain of evidence on which a reasonable jury could – and arguably even must – base a factual finding that YouTube *deliberately* shielded itself from learning which particular postings violated Viacom's copyrights.  As the Second Circuit's opinion emphasized, this is a "fact question." *Viacom*, 676 F.3d at 35.  The court noted that in *Tiffany*, where it affirmed a decision that eBay (which had engaged in substantial efforts to combat infringement) had not been willfully blind to additional instances claimed by the plaintiff, the court had "rested on the extensive findings of the district court" *reached after a full bench trial on the merits.  Id*. at 35 n.10.[20]  YouTube plainly cannot obtain summary judgment in its favor on this issue by offering self-serving and implausible readings of the reams of internal documents showing that it deliberately refrained from identifying particular infringing clips precisely because it wanted to continue to profit from that infringement.

The stark contrast between the record of YouTube's conduct in this case and the record in *Tiffany* is instructive.  In *Tiffany,* the district court found after weighing the evidence as the trier of fact that eBay "consistently took steps to improve its technology and develop anti-fraud measures as such measures became technologically feasible and reasonably available." *Tiffany*,

---

[20] The Fourth Circuit recently relied on *Tiffany* in reversing a district court's grant of summary judgment for Google, noting that *Tiffany had been a trial*, not a summary judgment decision. *See Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 164-65 (4th Cir. 2012).

576 F. Supp. 2d at 493; *see id.* at 514.  The district court found that eBay engaged in numerous anti-infringement efforts indicating that it did not deliberately turn a blind eye to infringement, including "invest[ing] as much as $20 million each year on tools to promote trust and safety on its website," assigning more than 200 individuals "exclusively on combating infringement," and spending over $5 million per year "in maintaining and enhancing its fraud engine . . . ."  576 F. Supp. 2d at 476-77.  In contrast, although YouTube implemented Audible Magic filtering, and such filtering would have eliminated a significant amount of infringing content, YouTube denied this filtering to any copyright holder who refused to license content to YouTube in order to leverage the threat of ongoing copyright infringement into a favorable business deal.  *See supra* 22-23 & *infra* 44-45.  YouTube also refused to deploy other tools that would have required little or no effort because it did not want to assist the copyright "a-holes," and even in late 2006 had only 3-5 personnel working on copyright-related issues.  *Id.* (citing RSUF ¶¶ 107, 112-14); Schapiro Opp. Ex. 71 (Gillette Tr. at 35:4-37:18).  In short, there are triable issues of fact as to YouTube's deliberate decision to turn a blind eye to rampant infringement, including the infringement of all of Viacom's clips-in-suit.

C. **YouTube's Inaccurate Assertions About Viacom's Marketing and Enforcement Practices Do Not Demonstrate the Absence of Fact Issues on YouTube's Awareness of Infringement.**

YouTube devotes a substantial portion of its brief to the assertion that Viacom's marketing and enforcement practices deprived YouTube of awareness of the infringing material on its service.  *See* YT Br. at Part I.C.2.  YouTube presented this identical argument on appeal, and the Second Circuit disregarded it entirely in determining that a reasonable jury could find that YouTube had actual knowledge or awareness of specific infringing activity on its website. 676 F.3d at 34; YT 2d Cir. Br. at *44-48, *50-53.  YouTube's inaccurate and misleading claims about Viacom's marketing efforts and so called "leave-up" practices cannot negate the genuine

disputes of material fact that exist regarding YouTube's knowledge of infringement, and if anything raise factual disputes to be resolved by a jury.

       1.   <u>Viacom's Lawful Marketing Practices Did Not Deprive YouTube of Knowledge of Infringement.</u>

YouTube claims that if it had made an effort to remove clips that infringed Viacom's copyrights, it might have been difficult to distinguish tens of thousands of unauthorized clips from the comparatively few that Viacom authorized. This, YouTube claims, would have rendered it helpless to identify and remove infringing videos and accordingly warrants a grant of summary judgment in YouTube's favor.

As a threshold matter, this argument fails as a basis for summary judgment because it is based on YouTube's tendentious and disputed view of the facts:

- YouTube quotes a Viacom employee's characterization of the upload of clips as a "boatload," but it fails to note that the document it cites identifies the supposed "boatload" as seven clips. YT Br. at 23 (citing Rubin Opening Ex. 17).

- YouTube similarly accuses Viacom of using as many as 50 obscure accounts, the names of which bore no obvious link to Viacom, but fails to identify a single account used by Viacom or its agents of which YouTube was *actually* unaware. *Id.* at 25.[21]

---

[21] In fact, YouTube was expressly aware at the time that many of these accounts were being used by Viacom or its agents. For example, four of the allegedly obscure accounts are associated with third-party marketing firm Fanscape, *see* Rubin Reply Ex. 14 (listing "fanscapemtv," "fanscapevideos," "fanscapevideos4u," and "mtvfanscape"). YouTube was in direct contact with Fanscape at the time and set up special director accounts for it. CSUF ¶ 124 & Kohlmann Ex. 64. Similarly, YouTube designated the account "wiredset," listed on Rubin Reply Ex. 14, as a director account for third-party marketing firm Wiredset. CSUF ¶ 124 & Kohlmann Ex. 27. As yet another example, YouTube set up "stangewildernessuk," listed on Rubin Reply Ex. 38, as a director account for Paramount to use in promoting the film "Strange Wilderness." Wilkens Opp. Decl. ¶ 17.

- YouTube also misrepresents Viacom's purported "stealth" marketing efforts and
  YouTube's knowledge of those efforts. Without making clear that it is talking
  about only <u>one</u> account involving <u>one</u> authorized video, YouTube's motion
  repeatedly recites evidence concerning a Paramount account to give the false
  impression that the way in which the account was set up was a regular occurrence.
  *See* YT Br. at 25-26 (series of bullet points implying that Viacom employees
  regularly uploaded videos to YouTube from computers not traceable to Viacom,
  but all involving this one account and video). <u>In fact, this account was used only
  one time, which YouTube knew about at the time.</u> CSUF ¶ 125; SCSUF ¶ 1.60.[22]

- The record shows that on the occasions when Viacom or its agents did place clips
  on YouTube, those were generally uploaded in cooperation with—indeed,
  encouragement of—YouTube, with usernames which it specifically established
  for Viacom and its agents for that purpose. CSUF ¶¶ 123-125; SCSUF ¶ 1.64.

In any event, any potential difficulty that Defendants might have faced in determining
whether one of the clips-in-suit is authorized or subject to some other affirmative defense such as
fair use is completely beside the point. Defendants nowhere contend that all of the clips-in-suit,
or even a substantial portion of them, are subject to such defenses. Their asserted difficulty with
respect to a relatively few clips does nothing to diminish their knowledge of the infringing

---

YouTube also misleadingly asserts that Viacom's alleged "stealth" marketing included
"footage from the 'cutting room floor' and clips 'rough[ed] up' to 'add to the "hijacked" effect.'"
YT Br. at 24. The cited evidence refers to the use of outtakes – footage from the cutting room
floor that is not included in a final television program or movie – to attract viewers, a practice
common in the entertainment industry and hardly nefarious. SCSUF ¶ 1.61. YouTube has
submitted no evidence that such clips in any way undermine its knowledge of the rampant
infringement occurring on its site, including of Viacom's works.

[22] That anomalous behavior is explained by the fact that the Paramount employee hoped
YouTube users – not YouTube itself – would think the clip was uploaded by an ordinary fan.
Kohlmann Ex. 84 (Wahtera Dep.) at 150:12-24; CSUF ¶ 125.

activity that pervaded YouTube. Differentiating between legally uploaded (including promotional) and illegal videos was entirely feasible – if Defendants wanted to make that differentiation – by deploying the filtering technologies they had in hand, which would have automatically identified the authorized clips and given Viacom the choice as to whether they should remain on YouTube or be removed, completely alleviating this supposed vexing difficulty. Defendants completely rebuffed Viacom's offer to collaborate regarding "automated solutions to identify infringing content and to electronically tag authorized content." Hohengarten Ex. 244; *see also* RSUF ¶¶ 209, 217. Tellingly, Defendants complain of no difficulty identifying authorized clips now that they offer Google's proprietary Content ID filtering technology to all copyright holders rather than just those agreeing to YouTube's licensing terms.

2.     <u>Viacom's Decision to Forebear from Some Copyright Enforcement Did Not Deprive YouTube of Knowledge of Infringement or Create an Implied License.</u>

Even further removed from the actual issues here is YouTube's discussion of what it dubs Viacom's "leave-up practices" – Viacom's internal decision-making about when and how to enforce its copyrights against infringing clips that (unlike the promotional clips discussed in the previous section) were pirated from Viacom's works and uploaded to YouTube without Viacom's authorization. YouTube suggests that Viacom's forbearance in enforcing its rights during Viacom's licensing negotiations with YouTube is the same thing as <u>authorizing</u> the infringing clips after the fact so that they were no longer infringing. *See* YT Br. at 27-29. The law is perfectly clear, however, that forbearance in enforcing copyrights against infringement does not result in authorization. *See infra* n. 23. Thus, regardless of Viacom's enforcement policies, clips that were infringing at upload remained infringing, unless and until Viacom actually granted YouTube a license to display those clips – something that never occurred.

31

Plainly, it is fanciful to claim that by negotiating a potential license and deferring takedown during negotiations to avoid litigation, Viacom authorized "a dizzying array of clips … to remain on YouTube." YT Br. at 28. Just the opposite is true. While it was engaged in licensing negotiations with Defendants, Viacom temporarily suspended sending most takedown notices to YouTube, but demanded that any licensing deal include compensation for pre-license uploads because they were infringing. CSUF ¶ 128; RSUF ¶¶ 203-204. When those negotiations broke down in early February 2007, Viacom promptly sent takedown notices for more than 100,000 infringing clips it had previously identified, noting the parties' failure to reach a licensing deal and Defendants' obligations to identify and remove infringing Viacom content, and filed this suit. *Id.*; RSUF ¶¶ 209-210; Hohengarten Ex. 244 (February 2, 2007 letter from Viacom's General Counsel to Google's General Counsel).

Notably, Viacom's policies regarding enforcement on YouTube and the takedown of 100,000 clips were also shaped by deliberate efforts to take potential fair use concerns into account. As Viacom explained to the ACLU of Northern California, "we took a very conservative approach and gave clear direction to all viewers of clips that they include only those that constitute clear infringements," which meant that Viacom did not remove "many, many clips that use material from [Viacom's] shows and movies" if it was even possible that fair use could be involved. Schapiro Reply Ex. 24.

In light of the foregoing, YouTube cannot and does not claim that Viacom ever actually gave it an <u>express</u> license for infringing clips on YouTube during the pendency of the parties' licensing negotiations, nor does YouTube argue that it obtained an <u>implied license</u>, which is an affirmative defense as to which YouTube bears the burden of proof. *See, e.g.*, *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 91-93 (S.D.N.Y. 1986). YouTube has not moved for

summary judgment on this defense, but in any event no implied license could possibly have arisen here.[23]

## II.   QUESTIONS OF FACT REGARDING YOUTUBE'S CONTROL OF AND DIRECT FINANCIAL INTEREST IN THE INFRINGING ACTIVITY PRECLUDE ENTRY OF SUMMARY JUDGMENT ON YOUTUBE'S DMCA DEFENSE.

YouTube's motion for summary judgment must also be denied for a second, independent reason:  under the "right and ability to control" and "direct financial benefit" prong of the DMCA, there are significant genuine disputes of material fact as to whether YouTube's control of and profit from the infringing activity on its website disqualifies it from the DMCA safe harbor entirely, for all works and clips-in-suit.

### A.   Triable Issues of Fact Preclude Summary Judgment for YouTube on the Control Element of the DMCA.

1.   Control Can Exist in a Variety of Factual Circumstances Including Those Present in *Grokster* and *Cybernet.*

The Second Circuit reversed this Court's previous grant of summary judgment with respect to the element of "control" under Section 512(c)(1)(B), holding that this Court had "erred

---

[23] The Second Circuit has cautioned that "courts have found implied licenses only in narrow circumstances where one party created a work at the [other's] request and handed it over, intending that [the other] copy and distribute it." *Smithkline Beecham Consumer Healthcare, L.P., v. Watson Pharmaceuticals, Inc.*, 211 F.3d 21, 25 (2d Cir. 2000) (alterations in original) (quotation marks omitted) (emphasis added); *see also, e.g., Ulloa v. Universal Music Video & Distrib. Corp.*, 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004).  None of those narrow circumstances is present:  (1) YouTube has offered no evidence that Viacom created the popular movies and TV programs at issue at YouTube's request – they were plainly created by Viacom on its own initiative; (2) YouTube has offered no evidence that Viacom "handed over" the clips-in-suit to YouTube – in reality they were pirated by third-party users; and (3) YouTube has not shown that Viacom intended to authorize YouTube to copy and distribute the clips-in-suit in the absence of an express written license, which the parties were in the process of negotiating.  Although some courts have relaxed the strict *SmithKline* test, even in those cases "the question comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue."  *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 124 (S.D.N.Y. 2012) (quoting *Ulloa*, 303 F. Supp. 2d at 416).  YouTube has proffered no evidence that "*both parties* to the transaction, not just the defendant, intended that the defendant could use or copy the plaintiff's work without liability for copyright infringement."  *Design Options*, 940 F. Supp. at 92.

by importing a specific knowledge requirement into the control and benefit provision."  676 F.2d

36.  In articulating the correct standard to apply on remand, the Second Circuit further held that

"control" under Section 512(c)(1)(B) is not coterminous with the common-law vicarious liability

standard, in that "control" under the DMCA "requires something more than the ability to remove

or block access to materials posted on a service provider's website."  *Id.* at 38 (quotation marks

omitted).  At the same time, the Second Circuit acknowledged that it is "difficult … to define the

'something more' that is required."  *Id.* (internal quotation marks omitted).

The appellate court offered two points of guidance for applying the "control" standard on

remand.  Critically, the Second Circuit cited *Metro-Goldwyn-Mayer Studios Inc. v. Grokster,*

*Ltd.*, 545 U.S. 913 (2005), noting that liability premised upon "'purposeful, culpable expression

and conduct' … might … rise to the level of control under § 512(c)(1)(B)."  *Viacom*, 676 F.3d at

38 (internal quotation marks omitted).  The Court further cited with approval *Perfect 10, Inc. v.*

*Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002), in which the district court held

that an age-verification service had "control" under the DMCA over third-party websites that

utilized its services.  *Id*.  In addition, the Second Circuit indicated that *Grokster* and *Cybernet* are

not the only types of control that meet the DMCA standard, but are simply "examples" of how a

service provider can "exert[] substantial influence on the activities of users, without

necessarily—or even frequently—acquiring knowledge of specific infringing activity."  676 F.3d

at 38.

In the common law vicarious liability context, the "control" element is not a high bar.

Indeed, "[t]he ability to block infringers' access to a particular environment for any reason

whatsoever is evidence of the right and ability to supervise."  *A&M Records, Inc. v. Napster,*

*Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001).  For a service provider to possess "something more"

than a mere ability to engage in blocking access to its service, therefore, is not a high bar, particularly in the context of a website like YouTube, which exercises dominion over its service that goes well beyond the mere ability to block user access.

Although YouTube contends that the control element requires "substantial influence on the activities of users" under the Second Circuit's formulation, YT Br. at 39, the Second Circuit's citation to the *Grokster* case as an example of control is instructive as to the sort of "substantial influence" the Court had in mind.  In *Grokster*, the Court held that a service provider that operates a service with the "object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties."  545 U.S. at 936-37.  Significantly, *Grokster* liability applied to all infringements on the defendants' services, regardless of whether a specific infringement had been induced in the narrow sense by a specific encouraging message.  *Id.* at 940 n. 13 (holding that "inducement liability" goes beyond "encouraging a particular consumer to infringe a copyright,"  because "the distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe"); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 984-85 (C.D. Cal. 2006) (holding that under the Supreme Court's *Grokster* decision, "liability may attach even if the defendant does not induce specific acts of infringement," and "Plaintiffs need not prove that [the defendant] undertook specific actions, beyond product distribution, that caused specific acts of infringement.  Instead, Plaintiffs need prove only that [the defendant] distributed the product with the intent to encourage infringement.").  Where, as here, a service provider takes active steps to run its site with the intent of promoting infringement, it has the right and ability to control that infringement in the relevant sense.

The Second Circuit's other example of "control," the *Cybernet* case – which YouTube does not even mention in its motion – is also instructive as to the sort of service the Second Circuit had in mind as one that exerted "substantial influence on the activities of users." *Viacom*, 676 F.3d at 38. There, the defendant operated an age-verification service, and required that, in order to utilize its services, websites that posted and hosted images (for which the participating websites were "responsible," and for which the defendant "disclaim[ed] any responsibility") were not permitted to violate various editorial guidelines promulgated by the defendant. *Cybernet*, 213 F. Supp. 2d at 1160. Specifically, the defendant exercised editorial control by, among other things, "forbid[ding] certain types of images," prohibiting "identical" sites, instructing participating websites on "layout, appearance, and content," and engaging in "prescreen[ing]" and "policing of sites" to ensure compliance with its requirements. *Id.* at 1160, 1173-74, 1181-82. There was no suggestion in *Cybernet*, however, that the defendant had induced (or had the ability to induce) the uploading of infringing images in general, or of any particular infringing images. Rather, the court found that the "control" element was satisfied based on the defendant's actual, general enforcement of its editorial requirements over participating websites. *Id.* at 1181-82.

YouTube's motion seeks to restrict the Section 512(c)(1)(B) "control" standard in two additional ways that are not supported by logic or the Second Circuit's decision. First, YouTube makes a "specificity" argument virtually identical to the very one the Second Circuit rejected, asserting that any "control, like knowledge, is a clip-specific inquiry." YT Br. at 40. At the outset, YouTube's "specificity" requirement would render the Section 512(c)(1)(B) redundant, because having knowledge of specific instances of infringement as a predicate to control would disqualify the service provider from the safe harbor under Section 512(c)(1)(A). *Viacom*, 676

F.3d at 36 ("[n]o additional service provider would be excluded by § 512(c)(1)(B) that was not already excluded by § 512(c)(1)(A)").  Moreover, the logic underlying the Second Circuit's clip-specific knowledge standard under Section 512(c)(1)(A) has no application to Section 512(c)(1)(B).  Addressing Section 512(c)(1)(A), the Second Circuit reasoned that the statute contains a specificity requirement because it imposes an obligation on the service provider to "upon obtaining such knowledge or awareness, act[] expeditiously to remove, or disable access to, the material."  17 U.S.C. § 512(c)(1)(A); *accord Viacom*, 676 F.3d at 30.  Section 512(c)(1)(B), unlike Section 512(c)(1)(A), contains no such removal requirement.

YouTube's "clip-specific" control standard is also plainly incorrect because it conflicts with the two examples of control given by the Second Circuit.  In *Cybernet*, the conclusion of control did not rest on the service provider's commissioning or inducement of particular users to post specific material that turned out to be infringing.  Rather, the conclusion of control in that case followed from the defendant's exercise of overarching editorial control by, among other things, "forbid[ding] certain types of images," prohibiting "identical" sites, instructing participating websites on "layout, appearance, and content," and engaging in "prescreen[ing]" and "policing of sites" to ensure compliance with its requirements.  213 F. Supp. 2d at 1160, 1173-74, 1181-82.[24]  Notably, YouTube in this case engages in identical or closely parallel forms of editorial control – which may explain why it makes no mention of the *Cybernet* standard and tries to replace it with a completely different "clip specific" standard.

---

[24] Hence, *Cybernet* refutes YouTube's (illogical) contention that its monitoring activities are irrelevant to control.  Such activities were directly relevant to finding control in *Cybernet*. YouTube's contrary assertion is based on a sentence torn out of context from the Second Circuit's separate discussion of the Class Plaintiffs' arguments under Section 512(i) that has no application here.  *Compare* YT Br. at 42 (quoting *Viacom*, 676 F.3d at 41) *with supra* n. 10.

Likewise, YouTube's "clip specific" standard of control is completely incompatible with

*Grokster*.  In *Grokster*, the Supreme Court held that inducement liability is *not* limited to cases of

"encouraging a particular consumer to infringe a copyright."  *Grokster*, 545 U.S. at 940 n.13.

The Court explained:

> Inducement liability goes beyond that, and the distribution of a product can itself
> give rise to liability where evidence shows that the distributor intended and
> encouraged the product to be used to infringe.  In such a case, the culpable act is
> not merely the encouragement of infringement but also the distribution of the tool
> intended for infringing use.

*Id.*; *see also id.* at 938 (liability could be imposed based on evidence that the defendants acted

with an overarching "purpose to cause copyright violations by use of software suitable for illegal

use").  Moreover, the *Grokster* defendants designed their systems in a decentralized manner such

that they did not know when any particular act of infringement was occurring, but were liable for

inducement nonetheless.  *Id.* at 923.  Hence, the Second Circuit's citation of *Grokster* as an

example of control also refutes YouTube's "clip-specific" standard.

Second, YouTube also seeks to resuscitate the exact argument it made on appeal and that

the Second Circuit declined to adopt:  that "a finding of control cannot be based on a service

provider's unwillingness to affirmatively search out potential infringement" because § 512(m)

disclaims a broad monitoring requirement.  YT 2d Cir. Br. at *62; *see also* YT Br. at 39-40.  In

so doing, YouTube misrepresents the Second Circuit's holding.  The Court did not foreclose

consideration of YouTube's "failure to take affirmative steps to limit infringing activity."  YT

Br. at 39-40.  To the contrary, the Second Circuit did not opine at all on whether the evidence of

control in the summary judgment record was sufficient to meet the Court's standard and instead

remanded for this Court to consider the evidence in the first instance.  676 F.3d at 38.

There is nothing inconsistent between (1) Section 512(m), which declines to impose an

*ab initio* duty on a service provider to monitor user activity, and (2) consideration, as part of the

"control" inquiry under Section 512(c)(1)(B), of whether the service provider actually utilizes mechanisms to edit the content uploaded to the provider's network.  That is because the latter concerns the *actual exercise* of a service provider's ability to control activity on its network, as opposed to its mere "*ability* to remove or block access to materials."  676 F.3d at 38 (emphasis added).  The Second Circuit's discussion of *Cybernet* highlights that a service provider who actually engages in dictating what content can be uploaded by users, and actually polices user conduct to enforce those restrictions, possesses the "something more" required for control, even if § 512(m) relieves the service provider of any free-standing affirmative duty to monitor.[25]

2.  Triable Issues of Fact Exist as to YouTube's Control Under *Grokster* and *Cybernet*

Under the Second Circuit's articulation of the "control" standard, and the examples the appellate court gives of *Grokster* and *Cybernet*, the evidentiary record in this case raises multiple triable issues of fact regarding YouTube's control of the infringing activity on its site.  First, as Viacom proffered in the original summary judgment record (and incorporates by reference here), there is ample evidence that YouTube is liable under *Grokster* for operating its service with the object that it be used to infringe, thereby giving rise to control under the DMCA.  *See* Viacom Opening SJ Br. at 5-29.  Although YouTube has tried to dispute some of those facts during the last round of summary judgment briefing, Viacom is entitled as the nonmoving party to have all inferences drawn in its favor, and the evidence presented by Viacom represents what the jury could reasonably find concerning Defendants' intent.  And, as noted earlier, the Second Circuit

---

[25] As discussed in note 10 *supra*, the Second Circuit did not reject, as YouTube claims, the argument that YouTube's selective use of filtering software constitutes "control" – it merely rejected the Class Plaintiffs' argument that such selective use of the systems rendered YouTube's "repeat infringer" policy inadequate under Section 512(i), which operates as a *per se* disqualification from the DMCA safe harbor.

has made clear that "summary judgment is generally inappropriate where questions of state of mind are implicated." *Gelb v. Bd. of Elections*, 224 F.3d at 157; *see also Krishna*, 7 F.3d at 16.

Specifically, the evidence shows and would allow the jury to find that YouTube's founders made a conscious decision to build their user base "as aggressively as we can through whatever tactics, however evil." RSUF ¶ 85.  As noted above, they knew the site was "out of control with copyrighted material" – including videos taken from Viacom programs they identified by name – but they decided not to block even "the obviously copyright infringing stuff," because if they did "site traffic [would] drop to maybe 20% of what it is." RSUF ¶¶ 54-58; *see also supra* at 17-18.  They disabled community flagging for infringement (but not for other improper content), to avoid obtaining knowledge of specific infringing clips, they sneered at rights holders as "copyright bastards" and "a-holes," killed simple engineering fixes that would have made it easier to detect and deter infringement, cynically mocked the very idea they would flag videos for removal after an executive identified 70 percent of the most popular clips as infringing, and celebrated the popularity of known infringing clips to investors. *See supra* 17-19, 21-22; *see also* RSUF ¶¶ 34, 74-77, 95-96, 99, 107, 112-115, 119, 131, 135.  At least one of the founders was himself "putting stolen videos on the site," while another urged his colleagues to "Steal it!" because "our traffic surged . . . due to a video of this type."  RSUF ¶¶ 40, 44; *see also id.* at ¶ 88; Wilkens 01/18/2013 Decl. at ¶ 4 & Ex. 5 (one co-founder stating to the others in response to a cease and desist letter: "haha, awesome!!! a sign of our continuing success.. we're getting [sic] ceise and desist or whatever [sic] thefuck that is emails now.").  It is no wonder YouTube founder Hurley was "concerned with the recent supreme court ruling on copyrighted material," *Grokster*.  RSUF ¶ 39.  But the allure of using infringing videos to build the user base

40

and get rich quick was too great.  Instead of stemming the floodtide of infringement, the founders

opted to "save [their] meal money for some lawsuits." RSUF ¶ 38.

Likewise, Google decided to buy YouTube after its own executives warned senior

management that YouTube was a "'rogue enabler' of content theft," a "video Grokster,"

"trafficking mostly illegal content," whose "business model is completely sustained by pirated

content," with a "large part of their traffic … from pirated content," and after Google's financial

advisor, Credit Suisse, warned Google's board that 54% of YouTube's video views were of

infringing content.  RSUF ¶¶ 151, 152, 159, 175-76, 182; *see supra* at 19.  Google then adopted

YouTube's copyright policy to "increase traffic knowing beforehand that we'll profit from illegal

[d]ownloads." RSUF ¶ 162.  And when a license from Viacom was not forthcoming, Defendants

refused to use the fingerprinting technology they already had in hand or other proactive measures

to block infringing Viacom videos, while Defendants reaped the profits.  *See supra* at 22-24.

Google's intent to profit from the distribution of the intellectual property of others is also

manifest in the Google Books case.  *See Authors Guild*, 282 F.R.D. at 387.

The jury could conclude from the facts above, as well as those detailed in Viacom's

original summary judgment submissions, that Defendants engaged in the intentional inducement

of infringement – and that such intentional inducement supplies the necessary "control" by

supporting an inference that YouTube's decisions about the design and operation of its site were

motivated in part by an intent to invite infringing activity.  YouTube has not met its burden of

showing that it lacked *Grokster* intent, and thus that it lacked the right and ability to control

under the DMCA.

Moreover, leaving aside *Grokster* intent, the record evidence also raises triable issues of

fact regarding various ways in which YouTube's control of its website went far beyond the mere

"ability to remove and block access to materials." *Viacom*, 676 F.3d at 38.  In countless ways, YouTube exercised actual and ultimate editorial control over the videos that were available on its website, both at point of upload and in subsequent efforts to remove or alter videos YouTube did not like.  But until May 2008, when Defendants finally started using digital fingerprinting to protect Viacom's copyrights, they purposefully declined to use their control to limit infringement of Viacom's works – precisely because that infringement was a draw for users and advertising revenue.  By controlling and dominating the content on its site from the point of upload onward, YouTube exercised the requisite control under the DMCA.  *See, e.g.*, RSUF ¶¶ 61-70, 269-273, 277-280.  Together, these forms of control directly mirror those cited in the Second Circuit's decision, and go far beyond a mere "general control" over the YouTube website.[26]

Precisely like the defendant in *Cybernet*, YouTube prescribed and enforced detailed rules regarding acceptable content and then enforced those rules through a "monitoring program."  213 F. Supp. 2d 1173.  YouTube's terms of service have always given the company the right to block or remove any video at the company's complete discretion, or to deem content "racy" and restrict its availability to users who satisfy age-verification requirements.  RSUF ¶¶ 267-268; Hohengarten Ex. 12 at GOO001 - 00744119 (policy to "restrict (mark as racy)" certain types of sexual content).  And YouTube has used that right extensively in order to exercise complete editorial control over the videos that appear on the site.  RSUF ¶¶ 126, 127, 269, 271-273, 277-278, 280.  As already noted, in the initial period after YouTube's founding, the founders themselves extensively monitored the specific videos that had been uploaded to YouTube in order to understand the nature of the content available on the site and to remove any

---

[26] For this reason, YouTube attacks a straw man when it suggests that Viacom's control standard rests solely on a generalized "dominion" – a phrase it rips from a single sentence in Viacom's Initial Submission, while ignoring the details that closely track *Cybernet* and *Grokster*.

videos they felt were incompatible with their own editorial preferences.  RSUF ¶ 269; *see supra* at 17-18.  For example, they removed pornographic videos and similar material they found undesirable in light of their business objectives of growing and selling YouTube quickly, but made the deliberate decision to retain on the site most of the infringing videos they found in this review process because they were a "major lure" to users and thus essential to the founders' get-rich-quick scheme.  RSUF ¶¶ 29-30, 35-47, 50-59, 269; *see supra* at 17-19, 21-25.

Later, when the volume of videos uploaded to YouTube grew large enough to make it more difficult to review every upload for editorial control, Defendants implemented their community flagging program, which engaged users to narrow the pool of videos to be reviewed by YouTube employees based on user flagging.  RSUF ¶¶ 54-62.  After a first few weeks of such community flagging, however, Defendants made the deliberate decision no longer to ask users to flag videos for copyright infringement.  RSUF ¶¶ 64-65.  At the same time, Defendants retained community flagging for other "terms of use" violations, such as pornography, hate speech, or other content that users (and investors or advertisers) might find offensive.  RSUF ¶ 65.  Through this community flagging program, which Defendants have touted as highly effective, Defendants have reviewed and removed countless videos from YouTube based on Defendants' own editorial preferences.  RSUF ¶¶ 65-71, 73; SCSUF ¶ 1.81.  Thus, YouTube, not its uploading users, exercised the ultimate editorial judgment and control over the content available on the site.  *Cf. Cybernet*, 213 F. Supp. 2d at 1173 (finding dispositive website's "monitoring program" granting "ability to control other types of images" uploaded by users of service).  YouTube also engages in extensive efforts, including both human editorial review and automated algorithms, to organize the videos on its site by subject matter and popularity and to steer

viewers towards videos that, in YouTube's judgment, will most enhance the viewers'

entertainment experience.  RSUF ¶¶ 331, 333-334, 337-339, 341-342.

YouTube's actual use of fingerprinting software to monitor its service is also directly

relevant to the element of control.  As the Central District of California observed in denying

summary judgment to YouTube on the "right and ability to control" question in *Tur v. YouTube*,

No. CV 064436, 2007 WL 1893635, at *3 (C.D. Cal. June 20, 2007), because the "control"

requirement "presupposes some antecedent ability to limit or filter copyrighted material," the

"technical capabilities needed to detect and prescreen allegedly infringing videotapes" and "the

process undertaken by YouTube from the time a user submits a video clip to the point of display

on the YouTube website" are of particular importance in determining whether YouTube

exercises the requisite "control" over its service.  *Id.* at *3.  In the *Tur* litigation, the record of

that process was still incomplete – yet Viacom has assembled evidence demonstrating that

YouTube, at various times relevant to the infringement of the clips-in-suit, screened out videos at

upload using Audible Magic fingerprinting software for the benefit of YouTube's licensing

partners to further YouTube's own business interests, but declined to utilize that very same tool

to prevent infringement of Viacom's works, even though the cost to YouTube would have been

*de minimis*.  *See* RSUF ¶¶  216, 217, 222, 287, 293-312.[27]  Even though YouTube made an

Audible Magic fingerprint of <u>every</u> video uploaded to YouTube at the time of upload in

---

[27] When Google began developing its own digital fingerprinting technology to replace Audible Magic, it likewise initially said that that this technology would only be used to prevent infringement of the copyrights of business partners who granted YouTube a license.  RSUF ¶ 313; CSUF ¶ 95.  Google and YouTube changed course only after this litigation had proceeded for several months.  Even then, the new Google technology was not used to protect Viacom's copyrights until May 2008 – even though YouTube continued to use Audible Magic to control the videos on its site for other purposes during the entire intervening timeframe.  RSUF ¶¶ 222, 292-294.

connection with this program, it refused to use these fingerprints to block videos that infringed the copyrights of Viacom and other owners who declined to grant a license to YouTube.[28]

YouTube's actual control over user activity is also shown by its licensing deals with various content owners in which YouTube agreed to implement various policies and technical tools, including keyword searches and fingerprinting, to identify and remove infringing uploads, including in some cases a requirement that YouTube successfully identify and remove infringing clips within hours, with accuracy rates approaching 100%. *See, e.g.,* RSUF ¶¶ 299-310; Hohengarten Ex. 154 at 44; Hohengarten Ex. 188 at 53. These business arrangements with third parties – and YouTube's actual implementation of their requirements – constitute admissions that YouTube had much more than the mere "ability to remove" materials from the site: it actually and actively exercised that ability for its own business purposes.[29]

To be sure, YouTube disputes each of these points as a factual matter, but such questions ultimately require resolution by the trier of fact. YouTube has not met its burden of showing that

---

[28] Audio fingerprinting was in widespread commercial use to prevent infringement over the Internet before YouTube began operations, but was not integrated into YouTube's original design. RSUF ¶¶ 286-289. A fingerprint is a unique digital identifier of the audio and/or video track of an audio-visual work. CSUF ¶ 88; RSUF ¶ 281. To identify infringement, a fingerprinting service maintains a database of fingerprints of copyrighted works (just as the FBI maintains a database of human fingerprints). RSUF ¶ 282. Then, as a video is being uploaded to a website, the technology instantaneously takes the fingerprint of that video (like a human fingerprint taken from a crime scene) and compares it to the database of fingerprints of copyrighted works. RSUF ¶ 283. A match indicates that some or all of the audio and/or video track of the uploaded video is the same as a copyrighted work. The website can then automatically block the upload, permit it if authorized by the copyright owner, or take other action such as flagging it for employee review. RSUF ¶ 284. Computers can perform this function during upload so that infringing videos never go live. RSUF ¶ 285.

[29] Because YouTube exercised this control for its own editorial and business purposes, YouTube attacks a straw man when it claims that it does not make sense to disqualify service providers for "efforts a service provider makes to try to limit infringement…" YT Br. at 40. YouTube's control arises not merely because it took steps to limit infringement, but rather because it implemented technologies and procedures to shape the available content on YouTube in ways that suited its own business and editorial purposes.

it lacked the "something more" that the Second Circuit's analysis requires, and the evidence

proffered by Viacom at least creates multiple genuine disputes of material fact.

> **B.      Triable Issues of Fact Preclude Summary Judgment for YouTube on the Direct Financial Benefit Element of the DMCA.**

In arguing that it does not receive a direct financial benefit from infringement, YouTube

ignores established case law, which unanimously recognizes that "direct financial benefit"

should be interpreted consistent with the similarly-worded common law standard for vicarious

liability. *E.g.*, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007). Even the

*UMG v. Veoh* case that YouTube relies on elsewhere recognizes that "[a]s to the phrase 'direct

financial benefit,' the DMCA does not dictate a departure from the common law standard." 665

F. Supp. 2d at 1116.

The case law is equally clear that the common law standard is satisfied if infringing

material "draws" customers from whom the defendant derives revenue. *CCBill*, 488 F.3d at

1117 (because the DMCA parallels the common law, "the relevant inquiry is whether the

infringing activity constitutes a draw for subscribers" (internal quotation marks omitted));

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) (holding

dancehall operators liable for infringing performances by bands they engaged because the

infringement provided "the proprietor with a source of customers and enhanced income");

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996) (financial benefit

exists wherever infringing material is a "draw" for customers); *A&M Records, Inc. v. Napster,

Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) (even absent any revenue, Napster had a direct

financial interest in infringement because infringing recordings were a "draw" for users, and

Napster's "future revenue [was] directly dependent upon 'increases in userbase.'"); *Arista

Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) (defendant

PUBLIC VERSION

possessed "a direct financial interest in users' infringing activity" because it "profited from its ability to attract infringing users, including through increased advertising revenue").

Against this backdrop, YouTube attempts to stake out an extreme and novel position that finds no support in the statutory text or case law, contending that under the DMCA, a service provider obtains a "financial benefit directly attributable to infringing activity" only if it receives revenue from infringing content that is greater than or different in kind from the revenue it obtains from noninfringing content. YT Br. at 44-45. Under this theory, a service provider is exempt no matter how much infringing material it hosts, how many viewers are attracted by piracy, and how much revenue it derives from that infringement, as long as it does not take the extra step (which would probably never occur in the real world) of charging more for advertisements placed next to infringing material. YT Br. at 45-46 ("YouTube's advertising offerings have never favored infringing uses of the service over non-infringing ones.")

YouTube's novel theory is contrary to the established "draw" standard, which, as previously explained, depends on whether infringement draws customers from whom the defendant derives revenue. YouTube's theory is also contrary to the plain language of the statute, which requires only a "financial benefit directly attributable to infringing activity." 17 U.S.C. § 512(c)(1)(B). A service provider that uses infringing material to generate revenue plainly obtains a "financial benefit directly attributable to infringing activity," even if the provider also derives similar revenue from noninfringing activity.

YouTube's attempt to rely on the legislative history is misplaced. Even if canons of statutory construction were reversed so that legislative history could override the statutory language, the committee reports make clear that the financial interest standard reflects a "common-sense, fact-based approach, not a formalistic one." H.R. Rep. No. 105-551(II), at 54

(1998); S. Rep. No. 105-190, at 44 (1998). The "draw" standard has been applied for decades and reflects "common sense," while YouTube's "formalistic" theory plainly does not. *See Cybernet*, 213 F. Supp. 2d at 1181 (applying draw standard as common sense, fact-based approach under DMCA). Not surprisingly, the snippet of legislative history on which YouTube relies does not support its test. YT Br. at 44. That passage has nothing to do with websites that obtain their revenues from <u>advertising</u> and use infringing material to attract viewers – the classic application of the long-established "draw" standard. *Id.* Rather, the passage addresses "cases in which customers value a service that does not 'act as a draw,'" *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004), where service providers sell their services to infringing and non-infringing users alike, for a one time set up fee and flat, periodic payments.[30] That is not what YouTube does. As YouTube itself emphasizes, it sells nothing to its users, and it is not paid by them. Instead, YouTube is supported entirely by advertising revenues, and the more users that are drawn to the site by infringing content, the more advertising revenue YouTube earns. That is a paradigmatic direct financial interest.[31]

Here, there can be no real debate that infringing material, including pirated Viacom content, was a "draw" for the YouTube audience, and at the very least, the record creates a factual dispute on this issue. YouTube's own general counsel called infringing material a "major

---

[30] Notably, the very next sentence of the legislative history after the excerpt YouTube quotes – which YouTube surprisingly omits – provides that "'where the value of the service lies in providing access to infringing material,' courts might find such 'one-time set-up and flat periodic' fees to constitute a direct financial benefit." *Ellison*, 357 F.3d at 1079 (quoting S. Rep. No. 105-90 at 44-45).

[31] YouTube's citation to *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012), is inapposite. YT Br. at 45. That case applied the draw standard, but found "no evidence in the record that the service provider 'attracted or retained subscriptions because of the infringement . . . .'" 840 F. Supp. 2d at 748 (quoting *CCBill*, 488 F.3d at 1118). Similarly, in *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 645 (S.D.N.Y. 2011), the court applied the draw standard but found the infringement too attenuated to benefit the defendant.

lure." RSUF ¶ 226.  Numerous internal memoranda admit that infringing videos attracted the

lion's share of YouTube's viewing audience during the period when YouTube established its

dominance – up to 80% by Chen's own estimate.  CSUF ¶¶ 6, 58; RSUF ¶¶ 43-48, 52, 55-57,

155-157, 160, 168-173.  And it was this large user base that made YouTube into the most

valuable video site on the Internet, allowing the founders to cash in to the tune of $1.8 billion a

year and a half after founding the site.  *See also* RSUF ¶¶ 176-182 (Credit Suisse valuation of

YouTube for Google, in which a substantial portion of the value was attributed to viewers

watching unauthorized "premium" copyrighted videos).  Thus, although "[t]here is no

requirement that the draw be 'substantial'" for there to be a direct financial interest in

infringement, *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004), here the infringing

draw was in fact enormous.

Moreover, until January 2007, YouTube profited directly from copyright infringement by

placing ads on the pages where a user viewed infringing clips ("watch pages") – a practice

ultimately discontinued for "legal reasons."  RSUF ¶¶ 241, 247, 250-251; YT Br. at 45 n.17.

Even after removing ads from watch pages, YouTube continued to profit from users drawn to the

site by infringing material by selling advertising space on YouTube's home, search, browse, and

upload pages.  RSUF ¶¶ 252-266.  By increasing the traffic on these pages, the infringing

material provided a direct financial benefit to YouTube.  *See, e.g.*, *Cybernet*, 213 F. Supp. 2d at

1181.[32]

---

[32] YouTube's self-serving statements about the number of non-infringing videos it currently
hosts, and the revenues it currently earns from ads displayed next to partner content, YT Br. at
45, do not in any way undermine the direct financial benefit YouTube received from infringing
content, including Viacom's clips-in-suit, from YouTube's inception through May 2008.

**III.  TRIABLE ISSUES OF FACT EXIST AS TO WHETHER YOUTUBE'S SYNDICATION OF VIACOM'S WORKS TO THIRD PARTIES FALLS OUTSIDE THE SCOPE OF THE DMCA SAFE HARBOR.**

YouTube's motion for summary judgment must also be denied, in part, for an additional reason: for a substantial number of the works in suit, YouTube's liability arises not as a result of its storing the infringing files on its system, but rather from proactively syndicating the works to third parties pursuant to business arrangements.  For the subset of Plaintiffs' works and files in suit that YouTube copied and syndicated in this manner, its liability arises from actions outside the scope of the DMCA safe harbor.  For any such works, therefore, YouTube has no viable claim to DMCA protection and its summary judgment motion must be denied accordingly.

The Second Circuit held that "[t]he § 512(c) safe harbor is only available when the infringement occurs 'by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider.'"  676 F.3d at 38 (quoting 17 U.S.C. § 512(c)(1)).  The Second Circuit affirmed this Court's holding that three specific "software functions" challenged by plaintiffs – "the conversion (or 'transcoding') of videos into a standard display format, the playback of videos on 'watch' pages, and the 'related videos' function" – fall within the safe harbor, reasoning that they are narrowly directed toward providing access to user-stored material.  *Id.* at 38-40.

With respect to "a fourth software function, involving the third-party syndication of videos uploaded to YouTube," however, the Second Circuit "remand[ed] for further fact finding."  *Id.* at 39.  Noting that this software function presented the "closest case," and noting that it wanted to "avoid rendering an advisory opinion on the outer boundaries of the storage provision," the Second Circuit remanded for further fact finding on the specific question of whether any of the clips-in-suit were in fact syndicated to third parties.  *Id.* at 40.  The Second Circuit excluded YouTube's business deal with Verizon Wireless from the scope of the remand,

because it was undisputed that "none of the clips-in-suit were among the approximately 2,000 videos provided to Verizon Wireless." *Id.*

What remains at issue on remand are YouTube's syndication deals – which the Second Circuit referred to as "business transactions" – with other companies including Apple, Sony, and Panasonic. Hohengarten Exs. 160, 163, 165-69. Pursuant to these business transactions, beginning in about March 2007, YouTube began "syndicating" or "licensing" those videos to third parties. Because the file format in which YouTube stored videos was designed for users accessing the website on a computer through a conventional web browser, making these deals with third-party licensees meant that YouTube needed to create *new* copies of the videos on its website in different file formats to match the needs of the various different parties to which it licensed its content, and then provide syndication partners with access to those specially-created copies so that they could be viewed on third-party devices, including mobile phones. *See* CSUF (01/18/2013) ¶ 179. At first, YouTube selected a subset of approximately 30,000 videos that it deemed "the top watched videos" for priority reformatting and syndication. Hohengarten Ex. 171. YouTube eventually worked its way through the entire body of existing YouTube videos, reformatting and syndicating them to these partners. RSUF ¶ 330. Although the parties have agreed to defer discovery that would identify the specific clips-in-suit that were syndicated in this manner, it appears, based on the time period during which YouTube began systematically syndicating videos on its service to third parties, and YouTube data showing the time periods that Viacom's clips-in-suit were on the site, that approximately 33,300 Viacom clips-in-suit may have been syndicated by YouTube to third parties. *See* Wilkens 01/18/2013 Decl. ¶ 2(d).

The critical feature of these third party syndication deals that takes them outside the scope of the safe harbor is that they were entered into *sua sponte* by YouTube for its own

business purposes, and not at the direction of users.  Although, as YouTube points out, the technological means it used to effectuate these business deals were somewhat different than in the case of Verizon Wireless, that argument misses the fundamental point that YouTube was acting *sua sponte*, in its own self-interest and for its own financial benefit, in entering into all of these business transactions.  And although YouTube argues that *any* effort to provide user access to videos falls within the safe harbor, even if such efforts are undertaken by YouTube pursuant to business deals with third parties, *see* YT Br. at 54, that argument proves too much and is thus plainly erroneous in that it would also sweep the Verizon Wireless deal into the safe harbor.  The language of Section 512(c), and the cases interpreting it, cannot be stretched that broadly.

YouTube attempts to escape the basic import of its syndication deals by interpreting the word "syndication" narrowly to apply only to the Verizon Wireless deal.  According to YouTube, "syndication" refers only to a business deal in which a service provider (1) manually selects a sub-set of the videos on its site for syndication, and (2) provides them to the third party by delivering physical copies to the third party rather than by giving the third party access to copies that reside on the service provider's system.  *See* YT Br. at 48-50.  YouTube argues that both of these conditions were met only in the Verizon Wireless deal, and therefore YouTube's business transactions with Apple, Sony, Panasonic and others simply are not "syndication" deals.  The Second Circuit, however, did not limit its syndication discussion to the Verizon Wireless deal, but rather expressly referred to "syndicat[ion] to any other third party."  676 F.3d at 40.

YouTube's focus on the words "manual selection" in the Second Circuit decision is misplaced.  The Second Circuit used those words in summarizing plaintiffs' argument concerning the Verizon Wireless transaction, not in defining the scope of syndication.  The critical inquiry under Section 512(c) is causation – whether it is the uploading user, or YouTube

PUBLIC VERSION

itself, that caused the YouTube system to "reproduce the copyrighted work in copies." 17 U.S.C. § 106. Whether YouTube selects a subset of videos for syndication, or decides to syndicate its entire library, YouTube itself – rather than the uploading user's decision to store the video – is the "reason" the transcoding and syndication occur. 17 U.S.C. § 512(c).[33]

Nor is there any conceivable relevance to the second limitation YouTube seeks to impose on syndication: physical delivery of copies to the syndication partner. Nothing in the Second Circuit opinion justifies such a limitation. Whether YouTube created new reformatted copies of the videos and then delivered those copies to its business partner, or created new reformatted copies of the videos and then allowed a business partner to access them on YouTube's servers, is neither relevant to the exclusive right in copyright being infringed (YouTube is reproducing the work without authorization from the copyright holder in either instance), nor to whether such copy was created "by reason of storage at the direction of a user." Accordingly, while YouTube's delivery of a small subset of videos to Verizon Wireless (as discussed in the Second Circuit's opinion) may be one type of syndication that falls outside the safe harbor, the other technical means YouTube used to accomplish syndication also fall outside the safe harbor.

---

[33] Even if "manual selection" were a meaningful limitation on the scope of syndication, YouTube engaged in manual selection with respect to the Apple, Sony, Panasonic and other deals, by choosing 30,000 videos from YouTube's library to syndicate on a priority basis. Hohengarten Ex. 171.

**HIGHLY CONFIDENTIAL – UNREDACTED**

## CONCLUSION

For the foregoing reasons, the record raises triable issues of fact as to each of the four issues identified by the Second Circuit on remand. Accordingly, YouTube's motion for summary judgment should be denied and this case should be scheduled for trial.

DATED: January 18, 2013

Respectfully submitted,

Paul M. Smith (No. PS-2362)
Scott B. Wilkens (*pro hac vice*)
Luke C. Platzer (No. LP-0734)
JENNER & BLOCK LLP
1099 New York Ave, NW
Washington, DC 20001
(202) 639-6000

Susan J. Kohlmann (No. SK-1855)
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600

Stuart J. Baskin (No. SB-9936)
Kirsten Nelson Cunha (No. KN-0283)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4000

Matthew D. McGill (No. MM-4545)
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Ave, NW
Washington, DC 20036
(202) 955-8500