ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/18/13
```

-------------------------------------------x

VIACOM INTERNATIONAL INC., COMEDY PARTNERS,  :
COUNTRY MUSIC TELEVISION, INC., PARAMOUNT
PICTURES CORPORATION, and BLACK              :
ENTERTAINMENT TELEVISION LLC,

                                             :

                           Plaintiffs,

                                  : 07 Civ. 2103(LLS)

              -against-

                                  :        OPINION

YOUTUBE, INC., YOUTUBE, LLC, and
GOOGLE INC.,                                 :

                     Defendants.  :

-------------------------------------------X

    Defendants having renewed their motion for summary
judgment, this Opinion responds to the April 5, 2012 direction
of the Court of Appeals, Viacom Int'l Inc. v. YouTube, Inc., 676
F.3d 19, 42 (2d Cir. 2012), remanding to

> . . . allow the parties to brief the following issues,
> with a view to permitting renewed motions for summary
> judgment as soon as practicable:
>
> (A) Whether, on the current record, YouTube had
> knowledge or awareness of any specific infringements
> (including any clips-in-suit not expressly noted in
> this opinion);
>
> (B) Whether, on the current record, YouTube willfully
> blinded itself to specific infringements;
>
> (C) Whether YouTube had the "right and ability to
> control" infringing activity within the meaning of §
> 512(c)(1)(B); and

1

(D) Whether any clips-in-suit were syndicated to a third party and, if so, whether such syndication occurred "by reason of the storage at the direction of the user" within the meaning of § 512(c)(1), so that YouTube may claim the protection of the § 512(c) safe harbor.

Familiarity with the Court of Appeals opinion, and my opinion at 718 F. Supp. 2d 514 (S.D.N.Y. 2010) is assumed.

(A)

WHETHER, ON THE CURRENT RECORD, YOUTUBE HAD KNOWLEDGE OR AWARENESS OF ANY SPECIFIC INFRINGEMENTS (INCLUDING ANY CLIPS-IN-SUIT NOT EXPRESSLY NOTED IN THIS OPINION)

Pursuant to the first item, I requested the parties to report, for each clip-in-suit, "what precise information was given to or reasonably apparent to YouTube identifying the location or site of the infringing matter?" (Tr. Oct. 12, 2012, p. 29) YouTube submitted a list of 63,060 clips-in-suit, claimed it never received adequate notices of any of those infringements, and challenged plaintiffs to fill in the blanks specifying how they claim such notice was given.

In its response,[1] Viacom stated that

It has now become clear that neither side possesses the kind of evidence that would allow a clip-by-clip assessment of actual knowledge. Defendants apparently are unable to say which clips-in-suit they knew about and which they did not (which is hardly surprising

_____

[1] Viacom's Jan. 18, 2013 Mem. Of Law in Opp. to Def.'s Renewed Mot. for Summ. J. ("Viacom Opp.").

given the volume of material at issue) and apparently lack viewing or other records that could establish these facts. (Viacom Opp. p. 8, fns omitted)

Viacom recognizes ". . . that Viacom has failed to come forward with evidence establishing YouTube's knowledge of specific clips-in-suit." (Viacom Opp. p. 9)

That does not matter, Viacom says, because it is not Viacom's burden to prove notice.  Viacom argues that YouTube claims the statutory safe harbor as a defense, and therefore has the burden of establishing each element of its affirmative defense, including lack of knowledge or awareness of Viacom's clips-in-suit, and has not done so.  Plaintiffs' thesis is stated clearly and simply:  "If there is no evidence allowing a jury to separate the clips-in-suit that Defendants were aware of from those they were not, there is no basis for applying the safe harbor affirmative defense to any of the clips."  (Viacom Opp. p. 2)

Plaintiffs elaborate (Viacom Opp. pp. 8-9):

The Second Circuit vacated this Court's grant of summary judgment regarding actual knowledge or awareness because "a reasonable juror could conclude that YouTube had actual knowledge of specific infringing activity, or was at least aware of facts or circumstances from which specific infringing activity was apparent." Viacom, 676 F.3d at 34.  It remanded for a further assessment of the evidence relating to whether this knowledge extended to Viacom's clips-in-suit. Id.  It has now become clear that neither side possesses the kind of evidence that would allow a clip-by-clip assessment of actual knowledge.

> Defendants apparently are unable to say which clips-in-suit they knew about and which they did not (which is hardly surprising given the volume of material at issue) and apparently lack viewing records that could establish these facts. It follows, given the applicable burden of proof, that they cannot claim the 512(c) safe harbor—especially in light of the voluminous evidence showing that the Defendants had considerable knowledge of the clips on their website, including Viacom-owned material.

The argument is ingenious, but its foundation is an anachronistic, pre-Digital Millennium Copyright Act (DMCA), concept. Title II of the DMCA (the Online Copyright Infringement Liability Limitation Act)[2] was enacted because service providers perform a useful function, but the great volume of works placed by outsiders on their platforms, of whose contents the service providers were generally unaware, might well contain copyright-infringing material which the service provider would mechanically "publish," thus ignorantly incurring liability under the copyright law. The problem is clearly illustrated on the record in this case, which establishes that ". . . site traffic on YouTube had soared to more than 1 billion daily video views, with more than 24 hours of new video uploaded to the site every minute", 676 F.3d at 28; 718 F. Supp. 2d at 518, and the natural consequence that no service provider could possibly be aware of the contents of each such video. To

---

[2] 17 U.S.C. § 512

encourage qualified service providers, Congress in the DMCA
established a "safe harbor" protecting the service provider from
monetary, injunctive or other equitable relief for infringement
of copyright in the course of service such as YouTube's.   The
Act places the burden of notifying such service providers of
infringements upon the copyright owner or his agent.   It
requires such notifications of claimed infringements to be in
writing and with specified contents and directs that deficient
notifications shall not be considered in determining whether a
service provider has actual or constructive knowledge.   Id. §
(3)(B)(i).  As stated in the Senate Report at pp. 46-47, House
Report at 55-56 (see 718 F. Supp. 2d at 521):

> Subsection (c)(3)(A)(iii) requires that the copyright
> owner or its authorized agent provide the service
> provider with information reasonably sufficient to
> permit the service provider to identify and locate the
> allegedly infringing material.   An example of such
> sufficient information would be a copy or description
> of the allegedly infringing material and the URL
> address of the location (web page) which is alleged to
> contain the infringing material.   The goal of this
> provision is to provide the service provider with
> adequate information to find and address the allegedly
> infringing material expeditiously.

Viacom's argument that the volume of material and "the
absence of record evidence that would allow a jury to decide
which clips-in-suit were specifically known to senior YouTube
executives" (Viacom Opp. pp. 9-10) combine to deprive YouTube of
the statutory safe harbor, is extravagant.   If, as plaintiffs'

5

assert, neither side can determine the presence or absence of specific infringements because of the volume of material, that merely demonstrates the wisdom of the legislative requirement that it be the owner of the copyright, or his agent, who identifies the infringement by giving the service provider notice.   17 U.S.C. § 512(c)(3)(A).   The system is entirely workable: in 2007 Viacom itself gave such notice to YouTube of infringements by some 100,000 videos, which were taken down by YouTube by the next business day.  See 718 F. Supp. 2d 514 at 524.

Thus, the burden of showing that YouTube knew or was aware of the specific infringements of the works in suit cannot be shifted to YouTube to disprove.  Congress has determined that the burden of identifying what must be taken down is to be on the copyright owner, a determination which has proven practicable in practice.

Plaintiffs' acknowledgement that they lack "the kind of evidence that would allow a clip-by-clip assessment of actual knowledge" (Viacom Opp. p. 8) supplies the answer to item (A): plaintiffs lack proof that YouTube had knowledge or awareness of any specific infringements of clips-in-suit.

So the case turns to whether there are substitute equivalents.

6

(B)

WHETHER, ON THE CURRENT RECORDS, YOUTUBE WILLFULLY
BLINDED ITSELF TO SPECIFIC INFRINGEMENTS

In general, the law has long included the doctrine of "willful blindness."  As the Court of Appeals stated in this case (676 F.3d at 34-5):

> "The principle that willful blindness is tantamount to knowledge is hardly novel." Tiffany (NJ) Inc. v. eBay, Inc., 600 F.3d 93, 110 n.16 (2d Cir. 2010) (collecting cases); see In re Aimster Copyright Litig., 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyright law . . . as it is in the law generally."). A person is "willfully blind" or engages in "conscious avoidance" amounting to knowledge where the person "`was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'" United States v. Aina-Marshall, 336 F.3d 167, 170 2d Cir.2003) (quoting United States v. Rodriguez, 983 F.2d 455, 458 (2d Cir.1993)); cf. Global-Tech Appliances, Inc. v. SEB S.A., ---U.S.---, 131 S. Ct. 2060, 2070-71, 179 L. Ed. 2d 1167 (2011) (applying the willful blindness doctrine in a patent infringement case).  Writing in the trademark infringement context, we have held that "[a] service provider is not . . . permitted willful blindness.  When it has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning of the particular infringing transactions by looking the other way." Tiffany, 600 F.3d at 109.

The Court recognized that:

> § 512(m) is explicit: DMCA safe harbor protection cannot be conditioned on affirmative monitoring by a service provider.  For that reason, § 512(m) is incompatible with a broad common law duty to monitor

7

> or otherwise seek out infringing activity based on
> general awareness that infringement may be occurring.

Id. at 35.  Nevertheless, willful blindness is not the same as an affirmative duty to monitor, and the Court held (ibid.) that

> . . . the willful blindness doctrine may be applied,
> in appropriate circumstances, to demonstrate knowledge
> or awareness of specific instances of infringement
> under the DMCA.

Applying the doctrine, however, requires attention to its scope.  In imputing knowledge of the willfully disregarded fact, one must not impute more knowledge than the fact conveyed. Under appropriate circumstances the imputed knowledge of the willfully-avoided fact may impose a duty to make further inquiries that a reasonable person would make -- but that depends on the law governing the factual situation.  As shown by the Court of Appeals' discussion of "red flags," under the DMCA, what disqualifies the service provider from the DMCA's protection is blindness to "specific and identifiable instances of infringement."  676 F.3d at 32.

As the Court of Appeals held (id. at 30-31):

> In particular, we are persuaded that the basic
> operation of § 512(c) requires knowledge or awareness
> of specific infringing activity.     Under     §
> 512(c)(1)(A), knowledge or awareness alone does not
> disqualify the service provider; rather, the provider
> that gains knowledge or awareness of infringing
> activity retains safe-harbor protection if it "acts
> expeditiously to remove, or disable access to, the
> material."  17 U.S.C. § 512(c)(1)(A)(iii).  Thus, the
> nature of the removal obligation itself contemplates

8

knowledge or awareness of specific infringing material, because expeditious removal is possible only if the service provider knows with particularity which items to remove. Indeed, to require expeditious removal in the absence of specific knowledge or awareness would be to mandate an amorphous obligation to "take commercially reasonable steps" in response to a generalized awareness of infringement. Viacom Br. 33. Such a view cannot be reconciled with the language of the statute, which requires "expeditious[]" action to remove or disable "the material" at issue. 17 U.S.C. § 512(c)(1)(A)(iii) (emphasis added).

Here, the examples proffered by plaintiffs (to which they claim YouTube was willfully blind) give at most information that infringements were occurring with particular works, and occasional indications of promising areas to locate and remove them. The specific locations of infringements are not supplied: at most, an area of search is identified, and YouTube is left to find the infringing clip.[3] As stated in UMG Recordings v. Shelter Capital Partners, LLC, No. 10-55732, 2013 WL 1092793, at *12 (9th Cir. Mar. 14, 2013) ("UMG III"),

> Although the parties agree, in retrospect, that at times there was infringing material available on Veoh's services, the DMCA recognizes that service providers who do not locate and remove infringing materials they do not specifically know of should not suffer the loss of safe harbor protection.

---

[3] Plaintiffs often suggest that YouTube can readily locate the infringements by using its own identification tools. It had no duty to do so. The Court of Appeals explicitly held that "YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms." 676 F.3d at 41.

9

The Karim memorandum states that infringing clips of some well-known shows "can still be found," but does not identify the specific clips he saw or where he found them.   The Wilkens declaration submitted by plaintiffs asserts that there were over 450 such clips on YouTube at the time, and presumably some of them contained the infringing matter seen by Mr. Karim.   To find them would require YouTube to locate and review over 450 clips. The DMCA excuses YouTube from doing that search.   Under § 512(m), nothing in the applicable section of the DMCA shall be construed to require YouTube's "affirmatively seeking facts indicating infringing activity."

Mr. Karim's memorandum does not tie his observations to any specific clips.   Application of the principle of willful blindness to his memorandum thus does not produce knowledge or awareness of infringement of specific clips-in-suit, out of the 450 available candidates.   Nor does any other example tendered by plaintiffs.

As the Court of Appeals stated (676 F.3d at 34):

> By definition, only the current clips-in-suit are at issue in this litigation.   Accordingly, we vacate the order granting summary judgment and instruct the District Court to determine on remand whether any specific infringements of which YouTube had knowledge or awareness correspond to the clips-in-suit in these actions.

There is no showing of willful blindness to specific infringements of clips-in-suit.

10

(C)

WHETHER YOUTUBE HAD THE "RIGHT AND ABILITY TO CONTROL"
INFRINGING ACTIVITY WITHIN THE MEANING OF § 512(c)(1)(B)

Every service provider is presumed by the DMCA to have the
ability to remove (or block access to) material posted on its
website, and to exercise that function in its daily business,
including removal of infringing material in response to take-
down notices (Viacom, 676 F.3d at 37).   So the ability to
"control infringing activity," even without knowledge of
specifics, means "something more" than just ordinary power over
what appears on the provider's website (id. at 38).   The Court
of Appeals perceived two pointers toward what that "something
more" is (ibid.) (footnote omitted):

> To date, only one court has found that a service
> provider had the right and ability to control
> infringing activity under § 512(c)(1)(B).   In Perfect
> 10, Inc. v. Cybernet Ventures, Inc., 213 F. Supp. 2d
> 1146 (C.D. Cal. 2002), the court found control where
> the service provider instituted a monitoring program
> by which user websites received "detailed instructions
> regard[ing] issues of layout, appearance, and
> content."   Id. at 1173.   The service provider also
> forbade certain types of content and refused access to
> users who failed to comply with its instructions.   Id.
> Similarly, inducement of copyright infringement under
> Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,
> 545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed.2d 781
> (2005), which "premises liability on purposeful,
> culpable expression and conduct," id. at 937, 125 S.
> Ct. 2764, might also rise to the level of control
> under § 512(c)(1)(B).   Both of these examples involve
> a service provider exerting substantial influence on
> the activities of users, without necessarily — or even

frequently — acquiring knowledge of specific infringing activity.

The Ninth Circuit in UMG III, 2013 WL 1092793, at *19, following Viacom, held that

> in order to have the "right and ability to control," the service provider must "exert[] substantial influence on the activities of users." "Substantial influence" may include, as the Second Circuit suggested, high levels of control over activities of users, as in Cybernet. Or it may include purposeful conduct, as in Grokster.

The concept is that a service provider, even without knowledge of specific infringing activity, may so influence or participate in that activity, while gaining a financial benefit from it, as to lose the safe harbor. By its example of the extreme Grokster case as what "might also rise to the level of control under § 512(c)(1)(B)" (676 F.3d at 38), the Viacom Court of Appeals kept intact its "first and most important" determination (id. at 30) that the DMCA requires "actual knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement" before disqualifying a service provider from the safe harbor (id. at 32). As quoted above, the Ninth Circuit requires "high levels of control" over activities of users as in Cybernet, or "purposeful conduct" as in Grokster. It found those elements in Columbia Indus. v. Fung, No. 10-55946, 2013 WL 1174151, at *20 (9th Cir. Mar. 21, 2013), where the record was

12

replete with instances of Fung actively encouraging infringement, by urging his users to both upload and download particular copyrighted works, providing assistance to those seeking to watch copyrighted films, and helping his users burn copyrighted material onto DVD.

In Cybernet, 213 F. Supp. 2d at 1170, 1173, 1182, the service provider presented both itself and its users as one affiliated network of websites under a "unified brand," because it provided users "extensive advice" and "detailed instructions" on content, prescreening submissions and refusing access to users "until they comply with its dictates" "to control the quality of the 'product.'"   The court held it thus participated in its users' infringing activity, and exercised the requisite "something more" (id. at 1181-1182).

But the governing principle must remain clear: knowledge of the prevalence of infringing activity, and welcoming it, does not itself forfeit the safe harbor.   To forfeit that, the provider must influence or participate in the infringement.

Thus, where the service provider's influence does not "take the form of prescreening content, rendering extensive advice to users regarding content and editing user content," Wolk v. Kodak Imaging Network, Inc., 840 F. Supp. 2d 724, 748 (S.D.N.Y. 2012), or where the service provider lists items for sale by users but "is not actively involved in the listing, bidding, sale and delivery of any item," Hendrickson v. eBay, Inc., 165 F. Supp. 2d

1082, 1094 (C.D. Cal. 2001), and "does not preview the products prior to their listing, does not edit the product descriptions, does not suggest prices, or otherwise involve itself in the sale," Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1110 (W.D. Wash. 2004), its influence on users is not participation in their infringing activity, and does not amount to the required "control" beyond the normal ability of every service provider to decide what appears on its platform.

The plaintiffs claim that the "something more" in this case is established by YouTube's willingness that its service be used to infringe, and by YouTube's exercise of "ultimate editorial judgment and control over the content available on the site" (Viacom Opp. p. 42), as shown by YouTube's decisions to remove some but not all infringing material, by its efforts to organize and facilitate search of the videos appearing on the site, and by its enforcement of rules prohibiting, e.g., pornographic content.

The plaintiffs begin with evidence that prior to its acquisition, YouTube reached internal decisions which infringing materials to identify and remove from the site[4] to avoid looking

_____

[4] YouTube employees used various methods to manually review submissions for suspected infringements (see RSUF ¶¶ 63-66, 126-127, 269, 272-273). There is no evidence that any YouTube employee viewed and failed to remove any particular infringing clip-in-suit while conducting such reviews (see Part A above at p. 6).

"like a dumping ground for copyrighted stuff" and "becoming another big-boys or stupidvideos" (E-mails between Jawed Karim, Steve Chen, and Chad Hurley dated Sept. 3, 2005) or "Bittorrent" (E-mail from Chad Hurley to Steve Chen and Jawed Karim dated June 26, 2005), without risking drops in "site traffic and virality" (E-mails between Jawed Karim, Steve Chen, and Chad Hurley dated Sept. 3, 2005). Thus, YouTube's founders decided to "take down whole movies," "entire TV shows, like an entire family guy episode" (id.), "South Park, and full-length anime episodes," "nudity/porn and any death videos," but to leave up "music videos," "news programs," (E-mail from Brent Hurley to Cuong Do dated Nov. 24, 2005), "sports, commercials" (E-mails between Jawed Karim, Steve Chen, and Chad Hurley dated Sept. 3, 2005), and "comedy clips (Conan, Leno, etc.)" (E-mail from Jawed Karim to Steve Chen dated Sept. 1, 2005). YouTube then "disabled community flagging for infringement" (Viacom Opp. at 41), declined to develop a feature "to send automated email alerts to copyright owners when illegal content was uploaded" (Viacom 2010 Br. at 11), and eventually stopped regularly monitoring its site for infringements, deciding instead "to keep substantially all infringing videos on the site as a draw to users, unless and until YouTube received a 'takedown notice' from the actual copyright owner identifying a specific

15

infringing clip by URL and demanding its removal from the site"
(id. at 7).

Plaintiffs further claim that Google "adopted YouTube's
copyright policy" (Viacom Opp. p. 41) of primarily waiting to
receive takedown notices before removing infringing material[5] in
order to "'grow playbacks to 1b/day [one billion per day]'"
(Viacom 2010 Br. at p. 17), gain advertising revenue, and enter
licensing agreements on favorable terms with content owners
including Viacom.  For certain owners (including Viacom), the
defendants streamlined the notification process by providing
access to YouTube's Content Verification Program, which "allowed
content owners to check boxes to designate individual videos for
take down" (RSUF ¶¶ 214-215).  But YouTube would only use
digital fingerprinting software, which automatically blocks
submissions matching "reference databases of fingerprints of
copyrighted works" prior to their becoming available for public
view (id. ¶¶ 283, 285), to filter "videos infringing the works

_____

[5] Plaintiffs claim that the defendants "manually screened narrow subsets of
YouTube videos" for infringing material (RSUF ¶ 273), i.e., videos uploaded
by applicants to and participants in YouTube's Director Program and its User
Partner Program.  Both programs offered certain perquisites to original
content creators, and YouTube appears to have monitored such clips to ensure
that participants were in fact uploading their own original content and not
content created by others (id.).  YouTube also monitored its site for
infringements using hash-based identification technology, which plaintiffs
claim could only remove clips "exactly identical in every respect to a video
clips that YouTube had previously removed pursuant to a takedown notice," and
thus blocked only a limited subset of infringing clips (id. at ¶ 274).

of content owners who had agreed to licensing and revenue sharing deals with YouTube"[6] (id. ¶ 295).  Thus, plaintiffs conclude, "Unless they were awarded a content license, Defendants refused to prevent illegal uploading and imposed the entire burden on Viacom and the other studios to search YouTube 24/7 for infringing clips" (Viacom 2010 Br. at p. 28).

That evidence proves that YouTube for business reasons placed much of the "burden on Viacom and the other studies to search YouTube 24/7 for infringing clips."  That is where it lies under the safe harbor (Viacom, 676 F.3d at 41):

> As previously noted, § 512(m) provides that safe harbor protection cannot be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i)." 17 U.S.C. § 512(m)(1) (emphasis added).  In other words, the safe harbor expressly disclaims any affirmative monitoring requirement — except to the extent that such monitoring comprises a "standard technical measure" within the meaning of § 512(i). Refusing to accommodate or implement a "standard technical measure" exposes a service provider to liability; refusing to provide access to mechanisms by which a service provider affirmatively monitors its own network has no such result.  In this case, the class plaintiffs make no argument that the content identification tools implemented by YouTube constitute "standard technical measures," such that YouTube would be exposed to liability under § 512(i).  For that

---

[6] Plaintiffs make the same argument concerning YouTube's deployment of metadata keyword search technology, which could conduct automated searches at regular intervals for videos matching keywords provided by content owners (RSUF ¶ 299).

reason, YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms.

YouTube's decisions to restrict its monitoring efforts to certain groups of infringing clips, like its decisions "to restrict access to its proprietary search mechanisms," do not exclude it from the safe harbor, regardless of their motivation.

Plaintiffs' remaining evidence of control goes no further than the normal functioning of any service provider, and shows neither participation in, nor coercion of, user infringement activity.

Plaintiffs point out that YouTube's search technologies facilitated access to infringing material by suggesting terms for users to add to their search query, which assists "users in locating infringing works by providing variations of the complete name or content owner of a copyrighted work even though the user has not typed the work's or owner's full name" (id. ¶¶ 338-339), and by presenting viewers with links to clips "'related' to a video that a user watches" (id. at ¶ 334), which "likely will direct" a user viewing "an infringing clip from a major media company like Viacom" to "other similar infringing videos" (id. at ¶ 335). But that evidence also establishes that YouTube's search technologies are an "automated system" where "users alone choose" to view infringing content, that YouTube

18

does "not participate in those decisions," and that YouTube therefore does not control the infringing activity.  Capitol Records, Inc. v. MP3tunes, LLC, 821 F. Supp. 2d 627, 645 (S.D.N.Y. 2011).

The only evidence that YouTube may have steered viewers toward infringing videos is as follows: YouTube employees regularly selected clips to feature "with conspicuous positioning on its homepage" (RSUF ¶ 331), and on two occasions chose to highlight a clip-in-suit.  YouTube asserts, without contradiction, that the creators of the work contained in the first clip-in-suit, "the premiere of Amp'd Mobile's Internet show 'Lil' Bush,'" made the clip available on YouTube, and that YouTube featured the second clip-in-suit, "a promotional video from comedy group Human Giant entitled "Illuminators!,"' on its homepage at the request of Human Giant's agent (id. ¶ 332).  No reasonable jury could conclude from that evidence that YouTube participated in its users' infringing activity by exercising its editorial control over the site.

Thus, during the period relevant to this litigation, the record establishes that YouTube influenced its users by exercising its right not to monitor its service for infringements, by enforcing basic rules regarding content (such as limitations on violent, sexual or hate material), by

facilitating access to all user-stored material regardless (and without actual or constructive knowledge) of whether it was infringing, and by monitoring its site for some infringing material and assisting some content owners in their efforts to do the same.   There is no evidence that YouTube induced its users to submit infringing videos, provided users with detailed instructions about what content to upload or edited their content, prescreened submissions for quality, steered users to infringing videos, or otherwise interacted with infringing users to a point where it might be said to have participated in their infringing activity.

As the Ninth Circuit stated in UMG III, 2013 WL 1092793, at *19, regarding Veoh, another online platform for user-submitted videos:

> In this case, Veoh's interactions with and conduct toward its users did not rise to such a level.   As Judge Matz recognized, "(a) the allegedly infringing material resided on Veoh's system; (b) Veoh had the ability to remove such material; (c) Veoh could have implemented, and did implement, filtering systems; and (d) Veoh could have searched for potentially infringing content." UMG II, 665 F. Supp. 2d at 1112. Such circumstances are not equivalent to the activities found to constitute substantial influence in Cybernet and Grokster. Nor has UMG, in its initial or supplemental briefing to this court, pointed to other evidence raising a genuine issue of material fact as to whether Veoh's activities involved "something more than the ability to remove or block access to materials posted on a service provider's website." Viacom, 676 F.3d at 38 (quoting Capital Records, Inc. v. MP3Tunes, LLC, 821 F. Supp. 2d 627,

635 (S.D.N.Y. Oct. 25, 2011)); cf. Obodai v. Demand
Media, Inc., No. 11 Civ. 2503 (PKC), 2012 WL 2189740
(S.D.N.Y. June 13, 2012) (citing the Viacom examples
and holding, "No evidence supports a conclusion that
the defendant exerted such close control over content
posted to [the website]. . . . Based on the evidence
at summary judgment, no reasonable jury could conclude
that  the  defendant  exercised  control  over  user
submissions  sufficient  to  remove  it  from  the  safe
harbor provision of section 512(c)(1)(B).").

YouTube  did  not  have  the  right  and  ability  to  control
infringing activity within the meaning of § 512(c)(1)(B).

(D)

WHETHER ANY CLIPS-IN-SUIT WERE SYNDICATED TO A THIRD
PARTY AND, IF SO, WHETHER SUCH SYNDICATION OCCURRED
"BY REASON OF THE STORAGE AT THE DIRECTION OF THE
USER" WITHIN THE MEANING OF § 512(c)(1) , SO THAT
YOUTUBE MAY CLAIM THE PROTECTION OF THE § 512(c) SAFE
HARBOR

The  Clips  delivered  to  Verizon  Wireless  were  not  clips-in-
suit.

There  was  no  other  instance  in  which,  as  in  the  Verizon
Wireless  agreement,  YouTube  manually  selected  videos  which  it
copied,  took  off  the  YouTube  system,  and  delivered  by  hand  so
that  the  recipient  could  make  them  available  from  its  own
system.

YouTube  has  entered  into  licenses  with  Apple,  Sony,
Panasonic, TiVo and AT&T under which YouTube provided access to
material  stored  on  its  system  at  the  direction  of  users  by

21

transcoding, to a format accessible by third party mobile and similar technology, all of the videos stored on YouTube's system.   As explained in YouTube's brief in support of its motion (Dec. 7, 2012, p. 52):

> YouTube's syndication agreements merely give users alternative ways to view videos that users have stored on YouTube's system.  They reflect the reality that people today connect to online services not just through personal computers, but through an increasingly broad range of devices, including mobile phones, tablet computers like Apple's iPad and Internet-enabled television sets.   To ensure that users can watch videos uploaded to YouTube no matter what hardware they may be using, YouTube has entered into licenses with third-party device providers that allow users of those devices to access videos directly from YouTube's system.   Solomon Opp. Decl. ¶ 3; Schapiro Opp. Ex. 325 (36:24-37:9, 39:7-13; Schwartz Ex. 9 (23:13-25:9); VRYCS ¶¶ 324-327.  Because videos can be played on such devices only if they are stored in the proper file format, YouTube's system automatically transcodes user-uploaded videos into the formats compatible with various third-party devices. Solomon Opp. Decl. ¶ 3; Schwartz Ex. 9 (48:11-16, 57:2-22); VRYCS ¶¶ 320, 330.   YouTube's standard syndication licenses thus involve no manual selection of videos by YouTube, and the videos accessible via the third-party devices at all times remain stored on and accessed only from YouTube's system.

This "syndication" serves the purpose of § 512(c) by "providing access to material stored at the direction of users," 676 F.3d at 40, quoting UMG I, 620 F. Supp.2d at 1092, and entails neither manual selection nor delivery of videos.   As YouTube argues (Defs.' Br. p. 53), the syndication does

> nothing more than combine two functions that the Second Circuit has already found to be protected by

22

the safe harbor: (1) "transcoding" videos "in a different encoding scheme in order to render the video viewable over the Internet to most users;" and (2) playing back videos "in response to user request."

YouTube points out, without contradiction, that other online service providers have equivalent licensing agreements.

Plaintiffs argue that the

critical feature of these third party syndication deals that takes them outside the scope of the safe harbor is that they were entered into sua sponte by YouTube for its own business purposes, and not at the direction of users. . . . YouTube was acting sua sponte, in its own self-interest and for its own financial benefit, in entering into all of these business transactions. (Viacom Opp. pp. 51-52)

On the contrary, the critical feature of these transactions is not the identity of the party initiating them, but that they are steps by a service provider taken to make user-stored videos more readily accessible (without manual intervention) from its system to those using contemporary hardware. They are therefore protected by the § 512(c) safe harbor.

CONCLUSION

Each of the above issues being concluded in favor of defendants, their renewed motion for summary judgment is granted.

The Clerk shall enter judgment that defendants are protected by the safe-harbor provisions of the Digital

Millennium Copyright Act, 17 U.S.C. § 512(c) from all of plaintiffs' copyright infringement claims, and accordingly dismissing the complaint, with costs and disbursements to defendants according to law.

So ordered.

DATED:    New York, New York
          April 18, 2013


_Louis L. Stanton_
LOUIS L. STANTON
U. S. D. J.