UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/12/13

VIACOM INTERNATIONAL, INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORP., BLACK ENTERTAINMENT TELEVISION, LLC,

PLAINTIFF'S,

VS.

CASE NO. 1:07-cv-02103 (LLS)
Related Case
1:07-cv-03582 (LLS)

YOUTUBE, INC., YOUTUBE LLC, GOOGLE, INC.,

DEFENDANT'S

VS.

GEORGE MAY, CONTINUING CONTRACT, TRADE SECRET OWNER, UCC LIEN OWNER, GEORGE MAY ON BEHALF OF THE UNITED STATES OF AMERICA

INTERVENER,

VS.

YOUTUBE, INC., YOUTUBE LLC, GOOGLE, VIACOM INTERNATIONAL, INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORP., BLACK ENTERTAINMENT TELEVISION LLC, ET. AL.

DEFENDANT'S

**GEORGE MAY, GEORGE MAY ON BEHALF OF THE UNITED STATES OF AMERICA AMENDED CIVIL FORFEITURE COMPLAINT BY PATRIOT ACT 18 U.S.C. §981(a)(1)(B),(G), §2331, §2332, §2339A,B,C,, 31 U.S.C. §5317(c), 5324, 5331, 18 U.S.C. §1956(c)(7)(B), 18 U.S.C. §1960, 31 U.S.C. §5332, 18 U.S.C. §1956(i)**

COMES NOW INTERVENOR, PLAINTIFF George May, Continuing Contract, Trade Secret Owner, UCC Lien Owner, George May on behalf of the United States of America, his previous Attorney's Nicolas J. Gutierrez, Jr., Stuart L. Stein, Lawrence K. Fagan, Jo Ann Barone, and files this their Amended Complaint seeking inter alia forfeiture in rem pursuant to 18 U.S.C. §981 of all Right, Title, and interest in YOUTUBE, INC., YOUTUBE LLC, GOOGLE, GOOGLE, INC., VIACOM INTERNATIONAL, INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES, CORPORATION, BLACK ENTERTAINMENT TELEVISION LLC,, ALL RIGHT, TITLE, INTEREST IN ALL REAL, AND TANAGIBLE PROPERTY that is held in the name of the defendant's herein Sponsor of Terrorist Acts, Terror or Agents, Instrumentalities, their distributors, Entities, Trusts, Joint Ventures, Group, Corporations, Sub Group, or Other Organizations, their Aiders, Abettors, those in Continuing Criminal Conspiracy pursuant to 18 U.S.C. §2, §3, §4, §241, §242, §371, (§371 is a Separate Crime), §2331, §2332, §2333, §2339, §2339A,B,C,, §981(a)(1)(B),(G), 31 U.S.C. §5317 (c), 5324, 5331, 18 U.S.C. §1956(c)(7)(B), 18 U.S.C. §1960, 31 U.S.C. §5332, 18 U.S.C. §1956(i), 18 U.S.C. §981(k), §1956(b), 31 U.S.C. §5318(k), 21 U.S.C. §853(e)(4), 28 U.S.C. §2467, 28 U.S.C. §1610, §1610(g)(1)(A-E), §1605, §1605A(c), Executive Orders 12957, 12959, 13059, 12938, 1338, the Treasury Department Iranian Transactions Regulations ("TTR"), 31 C.F.R. Part 560, and Weapons Mass Destruction Proliferation Sanctions

Regulations, 31 C.F.R. Part 544 that implement these Executive Orders collectively referred to herein as the "Seized Assets" of the defendant before mentioned herein are now by the operation of the before mentioned herein Laws, Executive Orders owned by the United States of America.

1. The Supreme Court of the United States of America has ruled that the conduct of the defendant's herein, their Management Team, Executive Officers are pursuant to the before mentioned Laws, Executive Orders are affording a "Source of influence" over a Terrorist Organization, and are engaged in Terrorism, by their Criminal Conduct. See 18 U.S.C. §981(a)(1)(B)(G), United States of America v. ALL RIGHT, TITLE AND INTEREST OF ASSA CORPORATION, 08 Civ. 10934 (RJH), In Re 650 Avenue and related properties, 08 Civ. 10934 (KBF), HOLDER, ATTORNEY GENERAL, ET. AL. V. HUMANITARIAN LAW PROJECT ET. AL. NO. 08-1498, Decided June 21, 2010, Syllabus, Attached herein.

2. The before mentioned defendant's here in their Continuing Criminal Conspiracy support Iran Sponsored Terrorism, Terrorist by Identity Theft, Trade Secret Theft, Economic Espionage, Video's that cause Violent Terrorist Acts, the Murder of United States of America citizens Incitement of Anti Semitism, that endangers human life under the Patriot Act, Sparked Deadly Riots, refused to remove racially offensive images of Michelle Obama, been found guilty of Misrepresenting Privacy by the FTC, selling to U.S. Consumers Illegally Imported Controlled and Non Controlled Prescription Drugs, Continue to

engage in public corruption, violence, conduct a money
transmitting business to Iran Terrorist without a license,
facilitating property, money, selling Counterfeit Trademarks,
Copyrights Identities to Iran Terrorist, Other Terrorist
in Countries on the United States Terrorist List, other State
Sponsored Terrorist's.

3. No Response, Answer, Affirmative Defense, Pleading is
permitted by the defendant's named herein pursuant to 18 U.S.C.
§2, §3, §4, §241, §242, §371, §2333(a)(b)(c), §2339, §2339A,B,C,
28 U.S.C. §16o5, §1610 that Automatically Establishes a Lien
on all Real, or Tangible Property that is located within the
Judicial District and is subject to Attachment in Aid of
Execution, and is held in the name of the defendant's, their
Distributor's, Instrumentalities, Entities, Trusts, Joint
Venture's, Group, Sub Group, Conduits, Organizations, Aiders,
Abettor's, all in continuing Criminal Conspiracy, and all of
the before mentioned herein defendant's have been, and are now
in default.

WHEREFORE, QUI TAM Intervenor, Plaintiff George May, George
May on Behalf of his Previous Attorney's before mentioned herein,
George May on behalf of the United States of America files this
his Amended Civil Forfeiture Complaint, pursuant to the before
mentioned herein Laws, Executive Orders, and request his reward
to Relator's George May, his Previous Attorney's, as the Qui Tam
Plaintiff's, Intervener's of the Maximum amount allowed pursuant

to 31 U.S.C. §3730(d), of the Federal False Claims Act, on the United States recovery mentioned herein, George May Intervenor, Plaintiff Request for an Order in Aid of Execution of Default, Default Judgement, Default, Default of Summary Judgement for his Sum Certain of $21 Billion Dollars, plus his previous Attorney's Fee's of 331/3 percent for Nicolas J. Gutierrez, Jr., Jo Ann Barone, Lawrence K. Fagan, Stuart L. Stein, plus interest compounded annually from September 4, 2012 at the Statutory Rate until paid, against the defendant's before mentioned herein.

I George May, Intervenor, Plaintiff, Relator hereby verify, declares, certify's under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

I George May, Intervener, Plaintiff hereby states that the foregoing is made to the best of my personal knowledge, and is made in good faith.

George May Intervenor
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
Ph./Fax. 561-290-4384

Respectfully submitted

George May, Intervenor,
Plaintiff, Continuing
Contract, Trade Secret
Owner, UCC Lien Owner
George May on behalf of
the United States of
America, on behalf of
his previous Attorney's
P.O. Box 32247
Palm Bch. Gardens,
Fl. 33420
Ph./Fax. 561-290-4384

I hereby certify that a copy of the foregoing was mailed, or faxed the December 11, 2013 to:

Clerk of the U.S.
District Court
500 Pearl Street
New York, NY 10007
Ph. 212-805-0252

Sharon Cohen Levin,
Preet Bharara
Criminal Division
United States Attorney
1 St. Andrews Plaza
New York City, NY 10007

Charles Stephen Simms
PROSKAUER, ROSE LLP
11 Times Square
New York, NY 10036
Ph. 212-969-3000
Fax. 212-969-2900

Andrew H. Shapiro
QUIN, EMANUEL, URQUHART
50 Madison Ave. Fl. 22
New York, NY 10010
Ph. 212-849-7000
Fax. 212-849-7100

Nicolas J. Gutierrez, Jr.
1401 Brickell Ave. #420
Miami, Fl. 33131
Ph. 305-373-0330
Fax 305-373-2735

Stuart L. Stein
P.O. Box 29598
Santa Fe, New Mexico
Ph. 505-889-0100
Fax. 505-889-0953

Larence K. Fagan
2100 N. Florida Mango Rd.
West Palm Bch., Fl. 33409
Ph. 561-689-3745
Fax. 561-687-0154

Jo Ann Barone
249 Royal Palm Way
Palm Beach, Fl. 33480
Ph. 561-655-8477
Fax. 561-284-6398

George May Intervenor

THE UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT *of* NEW YORK

PRESS RELEASES

Printer Frienc

# Manhattan U.S. Attorney Announces Court Judgment Finding Midtown Office Building Secretly Owned And Controlled By Government Of Iran Subject To Forfeiture For Violations Of The Iranian Transactions Regulations And Money Laundering Offenses

**FOR IMMEDIATE RELEASE** Tuesday, September 17, 20

*Seizure and Sale of 650 Fifth Avenue Would Be the Largest-Ever Terrorism-Related Forfeiture*

Preet Bharara, the United States Attorney for the Southern District of New York, announced today that United States District Judge Katherine B. Forrest has issued a decision granting summary judgment in favor of the United States' claims for forfeiture of the 36-story Midtown Manhattan office building locate at 650 Fifth Avenue, New York, New York ("the Building"), as the result of violations of the Iranian Transactions Regulations promulgated under the International Emergency Economic Powers Act ("IEEPA"), and the federal money laundering statutes. The Court found that the partners of the Building' owner, the Alavi Foundation and Assa Corp., committed the IEEPA violations and money laundering offenses.

Claims against the building in this consolidated action by private parties holding judgments against the Government of Iran remain pending.

Manhattan U.S. Attorney Preet Bharara said: "The Judge's opinion upholds what was the contention of th Office from outset: 'Assa was (and is) a front for Bank Melli, and thus a front for the Government of Iran. The Judge's ruling that Alavi and Assa committed IEEPA and money laundering violations paves the way for the largest-ever terrorism-related forfeiture, and provides a means of compensating victims of Irania sponsored terrorism."

According to the amended civil forfeiture Complaint and the oral and written opinions issued by Judge Forrest in this case:

*Overview*

Finance, Bank Melli, and the Bonyad Mostazafan, with the only change being the building will be valued a two million dollars less than as previously agreed . . . ."

The Iranian Government's control of the Alavi Foundation has continued. In 1989, Kamal Kharrazi was named as the new Iranian Ambassador to the United Nations. As a result of tension between the new Ambassador and the Alavi Foundation president, the Ambassador eventually demanded the president's resignation. According to the minutes of a May 16, 1991, board meeting held in Zurich, Switzerland, the head of the Bonyad Mostazafan explained that, as directed by the Supreme Leader, several board membe were to resign. In a letter, the Alavi Foundation's president described how, a few days later, the Ambassador called the president and another board member to his office. The Ambassador said that "the Foundation from here on out is under the oversight of Haj Agha, not Mr. Rafighdoost [then the head of th Bonyad Mostazafan]. . . . [F]rom now on, the role of the Managing Director and the role of the Board of Directors will be just a formality and he [the Ambassador] will be conducting all of its [the Foundation's] affairs." The president of the Alavi Foundation then wrote a letter to the Ayatollah cautioning that althoug the Ambassador's "appointment to a position of responsibility connected to the Foundation's affairs presents enormous political, security, and economic dangers, we feel assured that the Supreme Leader ha made this decision with discernment, unique insight, and a thorough knowledge of all pertaining aspects. In July 1991, the president resigned his position and he was replaced that August by an individual who served as president until the summer of 2007.

In 1992, the Alavi Foundation's new president met in New York and in Tehran with Bank Melli officials concerning $1.7 million in real estate taxes owed by 650 Fifth Avenue Company and $2.2 million in unpa distributions owed by the partnership to Assa Corp. The Tehran meeting was attended by a Bank Melli board member, the head of Bank Melli's Overseas Network Supervisory Department, the head of Bank Melli's New York branch, and the head of Bank Melli's Foreign Affairs. The head of the board of directors and managing director of Bank Melli forwarded the minutes of the Tehran meeting to the head of the Bonyad Mostazafan along with a cover letter stating, among other things, that "It is hoped that your firm instructions and the extra attention of the brothers from that esteemed Foundation, who are responsible f the Alavi Foundation of New York, will resolve the partnership's mutual problems quickly . . . ."

Iranian Ambassadors to the U.N. continued to direct the affairs of the Alavi Foundation and to attend meetings of the Alavi Foundation board. In the late 1990s, two Bank Melli employees sought Ambassador Kharrazi's permission for Assa Corp. to sell its interest in 650 Fifth Avenue Company. The Ambassador informed Bank Melli that the Building would be sold when the real estate market improved. Ambassador Seyed Mohammad Hadi Nejad Hosseinian, Kharrazi's successor, originated the Alavi Foundation's proje funding formula. In 2004, Hosseinian's successor told the Alavi Foundation to settle a lawsuit with a company controlled by a former Alavi Foundation president for $4 million.

In October 2007, Alavi Foundation board members met with the Ambassador and another former Irania Government official to address issues relating to the Building's management and Alavi's charitable services. According to notes taken by a board member, the Ambassador stated, among other things, that was necessary to increase the profit from the Building; the Ambassador was worried about Assa Corporation's 40 percent share; the Foundation should only allocate to Shiites; and that the Ambassador would determine the composition of the board. The Ambassador ordered a study about the possibility of increasing the Foundation's revenue and profit, stating that a business plan and comparative analysis hac to be done. The Ambassador instructed: "I have to definitely see the proposed allocations before a final decision is reached. I have to be kept informed and I have to be able to state my opinion in order for you t make a decision." The Ambassador told the board members that "[i]f there is an issue that needs to be conveyed to Tehran, let me know, I will convey it."

*The Original Complaint* 18 USC 981(a)(1)(G)

On December 17, 2008, this Office filed a civil Complaint seeking forfeiture of the 40 percent interest hel by Assa Corporation in 650 Fifth Avenue Company. In the Amended Complaint, the United States seeks t forfeit all right, title and interest in 650 Fifth Avenue Company, including the Alavi Foundation's 60

The Alavi Foundation has been providing numerous services to the Iranian Government, including managing the Building for the Iranian Government, running a charitable organization for the Iranian Government, and transferring funds from 650 Fifth Avenue Company to Bank Melli Iran ("Bank Melli"), bank wholly owned and controlled by the Government of Iran. Likewise, Assa Corporation and Assa Company Limited ("Assa Co. Ltd.") have been providing numerous services to Bank Melli in contraventio of IEEPA and the Iranian Transactions Regulations promulgated thereunder, including transferring rent income generated from 650 Fifth Avenue Company to Bank Melli, following Bank Melli's instructions wit regard to Assa Corporation's affairs, reporting back to Bank Melli on Assa Corporations's financial situation and business dealings, and managing the affairs of Assa Corporation for the benefit of Bank Mel

IEEPA confers upon the President the authority to take certain actions, defined in 50 U.S.C. § 1702, in response to declared national emergencies. The President has declared national emergencies with respec to the actions and policies of the Government of Iran: Executive Orders 12957, 12959, and 13059, and wit respect to the proliferation of weapons of mass destruction ("WMD"), Executive Orders 12938 and 1338: The Treasury Department's Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, and Weapons Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. Part 544, implement these Executive Orders.

The Building was constructed in the 1970s by the Pahlavi Foundation, a non-profit organization operated by the Shah of Iran to pursue Iran's charitable interests in the United States. The Building's construction was financed by a substantial loan from Bank Melli.

Following the Iranian revolution of 1979, the Islamic Republic of Iran established the Bonyad Mostazafar also known as the Bonyad Mostazafan va Janbazan ("Bonyad Mostazafan"), to centralize, take possession of, and manage property expropriated by the revolutionary government. The Bonyad Mostazafan was created in March 1979 by order of the Ayatollah Khomeini and approved by the Revolutionary Council of the Islamic Republic of Iran, and is controlled by the Government of Iran. The Bonyad Mostazafan sough to take control of the Shah's property, including the assets of the Pahlavi Foundation. The Bonyad Mostazafan reports directly to the Ayatollah.

Between approximately October 1978 and approximately October 1979, all five previous directors of the Pahlavi Foundation resigned, and four new directors took their places. On February 25, 1980, an amende Certificate of Incorporation for the Pahlavi Foundation was filed renaming the Foundation "The Mostazafan Foundation of New York." The Mostazafan Foundation of New York later renamed itself the Alavi Foundation.

### *The Government of Iran's Involvement in the Management of the Building*

In 1989, the Alavi Foundation and Bank Melli formed a partnership, 650 Fifth Avenue Company, in orde to avoid paying federal taxes on rental income from the Building. Bank Melli's ownership interest in 650 Fifth Avenue Company, however, was disguised through the creation of two shell companies. The Alavi Foundation transferred 35 percent of 650 Fifth Avenue Company to Assa Corporation, an entity wholly owned by Assa Co. Ltd. Assa Co. Ltd. is a Jersey, Channel Islands, United Kingdom, entity owned by Iranian citizens who represent the interests of Bank Melli. In conjunction with the transfer of the 35 perce interest in 650 Fifth Avenue Company to Assa Corp., Bank Melli cancelled its loan on the Building. Today the Alavi Foundation owns 60 percent of 650 Fifth Avenue Company, and Bank Melli owns 40 percent of 650 Fifth Avenue Company, through Assa Corp. and Assa Co. Ltd.

The decision to convert Bank Melli's mortgage on the Building into a partnership interest in 650 Fifth Avenue Company was discussed and approved by high-level Iranian Government officials. Among others, the head of the Bonyad Mostazafan (also the Deputy Prime Minister of Iran), the Office of the Prime Minister of Iran, the director of the Central Bank of Iran, and the general director of Bank Melli, as well a other Bonyad Mostazafan and Bank Melli officials, discussed and approved the partnership between the Alavi Foundation and Bank Melli. After the Alavi Foundation and Assa Corporation entered into the 650 Fifth Avenue Company partnership agreement, a Bonyad Mostazafan official forwarded the agreement tc Bank Melli official, noting that "the partnership is based on prior agreements between the Ministry of

Using the forfeiture laws in this fashion is unprecedented. The forfeiture laws cited by the Government simply do not provide for seizure of assets based on their alleged ownership. While the U.S. Treasury regulations governing OFAC blocking orders address *ownership* of assets, the forfeiture laws at issue only allow forfeiture of *proceeds* of criminal activity and assets that are involved in money laundering offenses. Here, even if the Government could prove that an Iranian entity controlled Assa Corp., neither of these bases – proceeds of crime nor involvement in money laundering – supports the Government's forfeiture of the seized assets.

The Government's Amended Complaint seeks, *inter alia*, forfeiture *in rem* pursuant to 18 U.S.C. § 981 of Assa Corp.'s 40% interest in a partnership that owns real property located at 650 Fifth Avenue (the "Minority Interest")[1] as well as unspecified amounts of money belonging to Assa Corp. seized from bank accounts in the name of 650 Fifth Avenue Company (the "650 Fifth Avenue Account Funds") and approximately $3.1 million seized from bank accounts in the name of Assa Corp. held at Citibank and JP Morgan (the "Assa Account Funds"). The "650 Fifth Avenue Account Funds" and the "Assa Account Funds" are collectively referred to herein as the "Account Funds." The Minority Interest and the Account Funds are collectively referred to herein as the "Seized Assa Assets."[2]

With respect to the Minority Interest, the Government cannot forfeit the property because Assa Corp. owned that property for more than half a decade before the alleged criminal activity purportedly supporting the forfeiture took place. The Government cannot explain how an asset

---

[1] The Amended Complaint seeks forfeiture of Assa's interest in "650 Fifth Avenue Company, including but not limited to the real property…at 650 Fifth Avenue." Separately, it seeks forfeiture of "the real property…located at 650 Fifth Avenue." (Amended Complaint ¶1) (hereinafter referred to as "Am. Compl."). Assa Corp. addresses both claims as claims against Assa Corp.'s "Minority Interest" in the 650 Fifth Avenue Company.

[2] Assa Corp. does not address the other assets that are the subject of the Amended Complaint to which Assa Corp. does not assert a claim.

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HOLDER, ATTORNEY GENERAL, ET AL. *v.* HUMANITARIAN LAW PROJECT ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–1498. Argued February 23, 2010—Decided June 21, 2010*

It is a federal crime to "knowingly provid[e] material support or resources to a foreign terrorist organization." 18 U. S. C. §2339B(a)(1). The authority to designate an entity a "foreign terrorist organization" rests with the Secretary of State, and is subject to judicial review. "[T]he term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." §2339A(b)(1). Over the years, §2339B and the definition of "material support or resources" have been amended, *inter alia*, to clarify that a violation requires knowledge of the foreign group's designation as a terrorist organization or its commission of terrorist acts, §2339B(a)(1); and to define the terms "training," §2339A(b)(2), "expert advice or assistance," §2339A(b)(3), and "personnel," §2339B(h).

Among the entities the Secretary of State has designated "foreign terrorist organization[s]" are the Partiya Karkeran Kurdistan (PKK) and the Liberation Tigers of Tamil Eelam (LTTE), which aim to establish independent states for, respectively, Kurds in Turkey and Tamils in Sri Lanka. Although both groups engage in political and humanitarian activities, each has also committed numerous terrorist attacks, some of which have harmed American citizens. Claiming

*Together with No. 09–89, *Humanitarian Law Project et al.* v. *Holder, Attorney General, et al.*, also on certiorari to the same court.

they wish to support those groups' lawful, nonviolent activities, two U. S. citizens and six domestic organizations (hereinafter plaintiffs) initiated this constitutional challenge to the material-support statute. The litigation has had a complicated 12-year history. Ultimately, the District Court partially enjoined the enforcement of the material-support statute against plaintiffs. After the Ninth Circuit affirmed, plaintiffs and the Government cross-petitioned for certiorari. The Court granted both petitions.

As the litigation now stands, plaintiffs challenge §2339B's prohibition on providing four types of material support—"training," "expert advice or assistance," "service," and "personnel"—asserting violations of the Fifth Amendment's Due Process Clause on the ground that the statutory terms are impermissibly vague, and violations of their First Amendment rights to freedom of speech and association. They claim that §2339B is invalid to the extent it prohibits them from engaging in certain specified activities, including training PKK members to use international law to resolve disputes peacefully; teaching PKK members to petition the United Nations and other representative bodies for relief; and engaging in political advocacy on behalf of Kurds living in Turkey and Tamils living in Sri Lanka.

*Held:* The material-support statute, §2339B, is constitutional as applied to the particular forms of support that plaintiffs seek to provide to foreign terrorist organizations. Pp. 8–36.

(a) This preenforcement challenge to §2339B is a justiciable Article III case or controversy. Plaintiffs face "a credible threat of prosecution" and "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298. P. 10.

(b) The Court cannot avoid the constitutional issues in this litigation by accepting plaintiffs' argument that the material-support statute, when applied to speech, should be interpreted to require proof that a defendant intended to further a foreign terrorist organization's illegal activities. That reading is inconsistent with §2339B's text, which prohibits "knowingly" providing material support and demonstrates that Congress chose knowledge about the organization's connection to terrorism, not specific intent to further its terrorist activities, as the necessary mental state for a violation. Plaintiffs' reading is also untenable in light of the sections immediately surrounding §2339B, which—unlike §2339B—do refer to intent to further terrorist activity. See §§2339A(a), 2339C(a)(1). Finally, there is no textual basis for plaintiffs' argument that the same language in §2339B should be read to require specific intent with regard to speech, but not with regard to other forms of material support. Pp. 10–12.

(c) As applied to plaintiffs, the material-support statute is not un-

BAYER, WALMART Google CAUSE MORDER OF U.S. CITIZENS BY CRIMINAL ACTS OF TERRORISM FUNDING

Syllabus

statute poses difficult questions of exactly how much direction or coordination is necessary for an activity to constitute a "service." Because plaintiffs have not provided any specific articulation of the degree to which *they* seek to coordinate their advocacy with the PKK and the LTTE, however, they cannot prevail in their preenforcement challenge. See *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. 442, 454. Pp. 13–20.

(d) As applied to plaintiffs, the material-support statute does not violate the freedom of speech guaranteed by the First Amendment. Pp. 20–34.

(1) Both plaintiffs and the Government take extreme positions on this question. Plaintiffs claim that Congress has banned their pure political speech. That claim is unfounded because, under the material-support statute, they may say anything they wish on any topic. Section 2339B does not prohibit independent advocacy or membership in the PKK and LTTE. Rather, Congress has prohibited "material support," which most often does not take the form of speech. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations. On the other hand, the Government errs in arguing that the only thing actually at issue here is conduct, not speech, and that the correct standard of review is intermediate scrutiny, as set out in *United States* v. *O'Brien*, 391 U. S. 367, 377. That standard is not used to review a content-based regulation of speech, and §2339B regulates plaintiffs' speech to the PKK and the LTTE on the basis of its content. Even if the material-support statute generally functions as a regulation of conduct, as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message. Thus, the Court "must [apply] a more demanding standard" than the one described in *O'Brien*. *Texas* v. *Johnson*, 491 U. S. 397, 403. Pp. 20–23.

(2) The parties agree that the Government's interest in combating terrorism is an urgent objective of the highest order, but plaintiffs argue that this objective does not justify prohibiting their speech, which they say will advance only the legitimate activities of the PKK and LTTE. Whether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism is an empirical question. Congress rejected plaintiffs' position on that question when it enacted §2339B, finding that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." §301(a), 110 Stat. 1247, note following §2339B. The record confirms that Congress was justified in rejecting plaintiffs' view. The

BY COMPUTER CELL PHONES Google, VERIZON PROVIDES GOODS, SERVICES TRANSFER OF MONEY TO IRAN FOR TERRORIST CONDUCT, AND IS A MONEY CONDUIT

BAYER, WALMART Google, distribute CHEMICA WEAPONS POISON DRUGS, INCITE GENOCIDE,

**Summary of the Money Laundering and Forfeiture Provisions of the USA PATRIOT Act of 2001**

Stefan D. Cassella, Deputy Chief
Asset Forfeiture and Money Laundering Section
U.S. Department of Justice

ALL ASSETS CAN BE SEIZED BY PLAINTIFF IN A CIVIL LAWSUIT

**I. Property Subject to Forfeiture**

**A. 18 U.S.C. § 981(a)(1)(G):** **PowerPoint 2**

This is a new statute is obviously a response to September 11.

--- it authorizes civil and criminal forfeiture of all assets of anyone engaged in terrorism, any property affording any person a "source of influence" over a terrorist organization, and any property derived from or used to commit a terrorist act.

— note: the "source of influence" language allows you to take the property of a person who is not himself a terrorist, but who has property that he uses to influence a terrorist organization

— this was necessary because the law previously had no forfeiture provisions tailored to terrorism

Relationship to IEEPA: **PowerPoint 3**

— Treasury has separate authority to freeze and confiscate terrorist assets under IEEPA CAN SEIZE ONLY WHAT IS ORDERED

— all the stories in the newspaper about the President freezing bank accounts of terrorists since 9/11 have been IEEPA cases

— only OFAC can do an IEEPA freeze order or confiscation

— if you have a case where freezing an asset under IEEPA would be appropriate, you should contact OFAC; otherwise use Section 981(a)(1)(G)

**B. 18 U.S.C. § 981(a)(1)(B):** **PowerPoint 4**

Section 981(a)(1)(B) allows us to forfeit property found in the United States that is the proceeds of a foreign crime

— the Patriot Act expands it to include *facilitating property* 

— more important, the statute used to be limited only to foreign drug crimes

— it has now been expanded to include any foreign offense that is one of the foreign money laundering predicates (the crimes listed in 1956(c)(7)(B)) 

**C. 31 U.S.C. § 5317(c), 5324 and 5331:**

Civil and criminal forfeiture authority for violations of the currency reporting requirements has been relocated to 31 U.S.C. § 5317(c).

--- the new statute includes, for the first time, authority to forfeit property involved in a *conspiracy* to commit the reporting violation.

Form 8300 forfeiture: **PowerPoint 5**

— once the Secretary of the Treasury issues regulations (and a typographical error in the statute is corrected), it will also include authority to forfeit property involved in a failure to file a Form 8300.

— how is that? Section 5317(c) doesn't say anything about Form 8300 or about the statute that requires that they be filed (31 U.S.C. § 5331)

— well, 31 U.S.C. § 5324(b) has been amended to make it a crime to cause a trade or business to fail to file a report on a $10,000 cash transaction

**E. Civil Forfeiture for § 1960:** **PowerPoint 6**

The civil forfeiture statute for violations of §§ 1956 and 1957 is amended to include civil forfeiture for § 1960 offenses.

— we'll come back and talk about even more significant amendments to Section 1960 in a moment

**II. Money Laundering Enforcement**

**A. 18 U.S.C. § 2332b(g)(5)(B):** **PowerPoint 7&8**

Section 2332b(g)(5)(B) contains a long list of federal crimes that have been made RICO predicates.

--- pursuant to 18 U.S.C. § 981(a)(1)(C), the proceeds of any of those offenses are now subject to civil and criminal forfeiture.

— that's interesting but not very exciting, because these offenses don't often produce proceeds

– but if you find the proceeds of any of these offense, you can commence administrative or civil judicial forfeiture

— and if you are indicting someone for one of these offenses, and the crime occurred after 10/26/01, you can forfeit the proceeds in the criminal case

Much more interesting is the fact that including the offenses listed in Section 2332b(g)(5)(B) as RICO predicates means that the laundering of the proceeds of any such offense is now a violation of §§ 1956(a)(1) and 1957,

--- and the transfer of *any funds* – not just the proceeds of an offense but *any funds* – into or out of the United States with the intent to promote any such offense is a violation of § 1956(a)(2)(A).

— so here's where we'll use this new authority: bad guy brings money not derived (as far as we know) from any criminal offense into the U.S., with the intent to use it to commit one of the acts of terrorism listed in 2332b(g)(5)(B)

— that is a 1956(a)(2)(A) violation, and the money is immediately subject to civil or criminal forfeiture because it was involved in a money laundering offense

**B. <u>18 U.S.C. § 1956(c)(7)(B)</u>:** **PowerPoint 9**

Section 1956(c)(7)(B) contains the list of foreign crimes that can be used as predicates for a money laundering offense

— previously, it included only certain crimes of violence, drug trafficking and bank fraud

– now it includes public corruption and *all* crimes of violence

--- I said before that we could forfeit all proceeds and property used to commit the crimes listed as foreign money laundering predicates

— that now includes public corruption and all crimes of violence 

--- but the addition of those offense to § 1956(c)(7)(B) also means that the laundering of the proceeds of any such offense is now a violation of §§ 1956(a)(1) and 1957,

--- and the transfer of *any funds* into or out of the United States with the intent to promote any such offense is a violation of § 1956(a)(2)(A).

**C. 18 U.S.C. § 1960:** **PowerPoint 10**

Section 1960 was enacted in 1992 to make it a crime to conduct a money transmitting business without a licence. 

— it was little used because it was too hard to prove that the defendant knew that operating without a license was a crime

The statute has been amended to allow the prosecution of a money remitter in three situations

--- when he operates without a license, whether he knows that doing so is a crime or not

--- when he operates in violation of the soon-to-be-released Treasury regs on money transmitters

---- and when he transfers money knowing that the funds being transmitted are derived from a criminal offense, or are intended to be used for an unlawful purpose.

Note: the third alternative does not require proof that the business was unlicenced.

— someone who sends money for a living, knowing it came from a criminal act, or that it is intended for a future criminal act, is guilty

— this is a more powerful tool that Section 1957, because there is no $10,000 requirement

--- and its more powerful that Section 1956, because there no specific intent

requirement if the money constitutes criminal proceeds,

--- and no proceeds requirement if the money is intended to be used to commit an unlawful act

**D. <u>31 U.S.C. § 5332</u>:** **PowerPoint 11**

This new statute makes bulk cash smuggling a criminal offense.

— see the elements of the § 5332 offense

--- of course, it was already a crime to fail to file a CMIR report,

**PowerPoint 12**

--- the practical effect of § 5332 is to enhance the ability of the Government to forfeit the unreported currency and any facilitating property

**E. <u>18 U.S.C. § 1956(i)</u>:** **PowerPoint 13**

In *United States v. Cabrales*, the Supreme Court limited our ability to prosecute money laundering cases anywhere other than the district where the financial transaction took place

– this was a nuisance because often you want to prosecute the money laundering offense and the underlying SUA in the same place

The money laundering statute now includes a venue provision allowing money laundering offenses to be charged in the district where the underlying SUA occurred

--- if the financial transaction occurred there;

--- or an act in furtherance of a money laundering conspiracy occurred there

--- or if the defendant participated in the movement of the funds from that district to another district where the financial transaction took place.

Note: participating in the transfer includes being the recipient of a wire transfer

## III. Procedural Tools

### A. 18 U.S.C. § 981(k):

In cases where the Government can show that forfeitable property was deposited into an account at a foreign bank, the Government can now recover the property by filing a civil forfeiture action against the equivalent amount of money that is found in any correspondent account of the foreign bank that is located in the United States.

- It is not necessary to trace the money in the correspondent account to the foreign deposit; nor does the foreign bank have standing to object to the forfeiture action.
- this solves the problems that occur when a foreign bank objects to the forfeiture of funds in its correspondent account, claiming that the money belongs to it, not its customer, and raising the innocent owner defense
- forfeitures under § 981(k) require approval from Main Justice

### B. 31 U.S.C. § 5318(k):

The Attorney General and the Secretary of the Treasury may subpoena foreign bank records, including records maintained overseas regarding a foreign bank transaction, by serving a subpoena on the U.S. representative of the foreign bank.

- in a way, this codifies the notion of a *Bank of Nova Scotia* subpoena

- if we want records of foreign transaction, all we have to do is to subpoena the representative in the U.S. that the foreign bank has to have appointed in order to be allowed to maintain a correspondent bank account
- but use of such subpoenas will be controversial, and so will require prior approval from Main Justice

### C. 18 U.S.C. § 1956(b):

The Government can now file a civil lawsuit against a foreign person who violates § 1956 or § 1957, or against a foreign person who converts forfeited funds to his own use, and can obtain an order restraining the U.S. assets of the defendant to ensure that they are available to satisfy a judgment.

— this will be used when we have a money laundering offense committed in the U.S. by a person whom we cannot extradite to the U.S. for criminal prosecution, but against whom we would file a civil lawsuit to take the asset the person has in the U.S. as the penalty for committing the money laundering offense

— a good example would be a foreign bank

— the statute lets us restrain the assets of the foreign defendant pending trial in the civil case

**D. 21 U.S.C. § 853(e)(4):**

Courts are now authorized to order a defendant in a criminal case to repatriate assets to the U.S. from abroad so that they may be forfeited.

— the authority may be made part of a pre-trial restraining order or as part of the post-conviction order of forfeiture.

--- failure to comply with the order can result in an increased sentence under the sentencing guidelines.

**E. 28 U.S.C. § 2467:**

The district courts may now enforce foreign forfeiture orders (in civil and criminal cases) based on any crime that would give rise to a forfeiture order under federal law if the crime were committed in the United States.

--- the courts may also register and enforce foreign pre-trial restraining orders.

— most important, the person who is contesting the foreign forfeiture in a foreign court could not object to the U.S. restraining order on grounds that he could be asserting – or is asserting – in the foreign court

— for example, if the claimant says "that money should not be restrained; it's really legitimate property," the district court in the U.S. would tell him to "tell it to the judge" in the foreign court where the forfeiture action is pending

– the U.S. court is merely acting as the agent of the foreign court in restraining the assets at the foreign court's request

DLA PIPER

## Publications

10 SEP 2009

# Do the FSIA amendments affect your business?

LATIN AMERICA NEWS

Ileana M. Blanco
Christina E. Ponig

SUBSCRIBE TO US ALERTS

Throughout 2009, news outlets have been reporting that Iran is increasing its presence in Latin America. The bonds between Iran and Venezuela are particularly notable, but a number of media outlets also report that Iran is also strengthening its ties to other Latin American countries and that Iranian-sponsored terror organizations are forming links with a number of South American guerilla movements and using Latin America as a refuge and base.

Why does this matter to your business? Because, last year, the US Congress amended the Foreign Sovereign Immunities Act (FSIA or the Act) to facilitate the ability of US terror victims and their families to collect on default judgments against designated terror states—one of which is Iran.

The new provisions, which address the so-called "state-sponsored terrorism exception," expand the scope of property that may be attached in aid of execution to satisfy these judgments. Under the new exception, Latin American companies who may, **even inadvertently**, have **commercial dealings with agencies or instrumentalities of current or former terror state designees and who also have US operations** may find themselves the target of FSIA action.

Knowledge of the amendments and their implications is important for all companies doing business in the US, but in the current political climate, such awareness bears increasing importance.

**About the Exception**

The so-called "state-sponsored terrorism exception" to the FSIA departs from the well-established rule of international law that a foreign state is immune from the jurisdiction of the courts of another state. 28 U.S.C. §1602. Created by Congress in 1996, the exception allows civil suits by US terror victims and their families against foreign states designated by the US State Department as state sponsors of terrorism. Currently, four countries are so designated: Iran, Cuba, Sudan and Syria.

While Congress intended the FSIA to aid in the attachment and execution of terrorist states' assets, numerous problems in the Act have hindered its applicability. First, soon after the Act's passage, one federal court held that the FSIA's waiver of sovereign immunity created no federal cause of action. *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998). In response, Congress passed the Flatow Amendment, by which it purportedly created such a cause of action. Years later, however, a federal appeals court held that, while the Flatow Amendment created a federal private right of action against the officials and employees of terrorist states, it created no federal private right of action against terrorist states themselves or their agencies or instrumentalities. *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004). Thus, a plaintiff's ability to obtain relief against those governments depended on state law, resulting in significant disparities in the relief available to terror victims and their families.

**The FSIA Amendments and the Federal Private Right of Action**

To correct these and other problems in the Act, in January 2008, Congress amended the FSIA by passing, among other measures, Section 1605A, which both incorporates the terrorist state exception (previously codified at 28 U.S.C. 1605(a)(7)) and creates a new federal private right of action against state sponsors of terrorism and their officials, employees or agents acting within the scope of their office, employment or agency. 28 U.S.C. §1605A(c). These recent amendments also allowed FSIA litigants who had been unsuccessful in previous actions, on account of the earlier problems in the Act, to re-file their earlier actions under the new Section 1605A within sixty days of the date of the Act's enactment. Numerous previous FSIA litigants took advantage of this new provision.

Congress also **expanded the scope of assets that may be attached** in aid of execution of an FSIA judgment. Previously, an FSIA judgment creditor could attach the US assets of *only* the foreign state itself – as opposed to an agency or instrumentality of the state – and only then if the state exercised day-to-day control over the assets (*First National Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983)). This rule, known as the *Bancec* doctrine, led to numerous roadblocks in victims' attempts to enforce FSIA awards.

Under the recent amendments, however, FSIA judgment creditors may attach those assets belonging directly to the foreign state as well as **"the property of an agency or instrumentality of such a state,** including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity." 28 U.S.C. §1610(g). Attachment and execution are permitted regardless of how much economic or daily control the government or officials exercise over the property or how much the government profits or benefits from the property. 28 U.S.C. §1610(g)(1)(A-E).

Additionally, under Section 1605A(g), upon the filing of a notice of pending action pursuant to Section 1605A, a lien of *lis pendens* is **automatically established** for all real or tangible property that is located

within the judicial district, is subject to attachment in aid of execution under Section 1610 and is held in the name of a defendant state sponsor of terror or agency or instrumentality under its control. The lien of *lis pendens* binds would-be purchasers of property that is the subject of the litigation to the outcome of the litigation as if they were parties to the lawsuit from the start.[1]

**Collecting Awards**

The concern for companies with US assets, of course, is how courts will interpret the new provisions in the Act for re-filed and newly filed cases under Section 1605A as terror victims and their families attempt to collect FSIA awards. If a company happens to do business with a designated a state sponsor of terror, or its agencies or instrumentalities, that company could find that its US assets are attached – or at a minimum could find itself in litigation over the issue, whether or not such attempts at attachment ultimately succeed. The company need not even have knowledge of the underlying situation to face such action.

Despite Congress's goal of facilitating the collection of FSIA awards – **which today total approximately $19 billion** – it remains to be seen whether the recent amendments to the FSIA will accomplish their intended effect. Certainly, the federal private right of action under the FSIA makes it possible to maintain civil suits against state sponsors of terrorism. However, once FSIA judgments are awarded, collection may still elude the plaintiffs. Through the amendments, Congress sought to ease the process of attaching property of designated terrorist states, but in reality, much of this property in the United States has already been frozen, is already subject to substantial limitations on its transfer or has already been liquidated to pay judgment creditors.

However, should the 2008 amendments fail to make it possible for terror victims and their families to collect FSIA judgments, it is highly unlikely that Congress will abandon the effort. Additional, expansive and far more aggressive amendments to the FSIA may well be forthcoming. Continuing

18 U.S.C 2,3, 4, 241, 242, 371 Conspiracy

1 To avoid losing title to property to FSIA judgment creditors and becoming embroiled in litigation over the issue, US companies may be deterred from engaging in lawful transactions with former terrorist state designees, or their agencies or instrumentalities, against whom there are still pending claims or outstanding judgments.

This information is intended as a general overview and discussion of the subjects dealt with. The information provided here was accurate as of the day it was posted; however, the law may have changed since that date. This information is not intended to be, and should not be used as, a substitute for taking legal advice in any specific situation. DLA Piper is not responsible for any actions taken or not taken on the basis of this information. Please refer to the full terms and conditions on our website.

Copyright © 2013 DLA Piper. All rights reserved.

Breaking Legal News App-lifie
Each of our 14 award-winning publications is now available as an A

THE AM LAW LITIGATION DAILY

HOME THE AM LAW DAILY LITIGATION DAILY ASIAN LAWYER SURVEYS & RANKINGS ADVERTISE

Home > Arab Bank Can't Undo Sanctions in Terror Funding Case

Font Size: + −

# Arab Bank Can't Undo Sanctions in Terror Funding Case

By **Jan Wolfe** **All Articles**

The Litigation Daily January 21, 2013

Despite the efforts of Mayer Brown's Stephen Shapiro, Amman, Jordan-based Arab Bank plc failed last week to reverse what it has called a "disastrous" ruling in its billion-dollar court battle with victims of terrorist attacks and their families.

**THIS CONTENT IS NOW AVAILABLE AT LEXISNEXIS®.**

**Click here to read this article at LexisNexis®** **Not a LexisNexis® Subscriber? Click Here**

**THE ALM® AND LEXISNEXIS® CONTENT ALLIANCE**

LexisNexis® is now the exclusive third party online distributor of the broad collection of current and archived versions of ALM's legal news publications. LexisNexis® customers will be able to access and use ALM's content by subscribing to the LexisNexis® services via *lexis.com®* and Nexis®. This includes content from *The*

Lawsuit alleging Bank of China laundered terrorists' money moves fo... http://www.foxnews.com/world/2012/03/21/case-against-bank-china...

# Lawsuit alleging Bank of China laundered terrorists' money moves forward

By Leland Vittert Published March 21, 2012 FoxNews.com

Print

Email

Share

Like 83

Tweet 77

Share 9

The Bank of China knowingly laundered money for various Islamic militant groups so they could get around transaction restrictions because of their label as a "terrorist organization" by the U.S. government, a lawsuit by Israeli victims of suicide bombings claims. Recent court decisions in the United States say the lawsuits can go forward against the Chinese bank.

Fox News has learned that Israeli intelligence officials warned the Chinese government that Iran was using Bank of China to finance its militant networks, including providing account numbers and transaction details, only to have the Chinese turn a blind eye as the money went to make bombs that would kill dozens of civilians.

An explosion at a Tel Aviv sandwich shop in April 2006 took just a second to kill nine and injure 60.

Home » Briefing Room » Justice News

distributed Poison Birth control Pills for IRAN

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE Wednesday, August 24, 2011

## Google Forfeits $500 Million Generated by Online Ads & Prescription Drug Sales by Canadian Online Pharmacies

terrorist

*Internet Search Engine Accepted Advertisements from Online Canadian Pharmacies that Targeted U.S. Consumers and Illegally Imported Controlled and Non-Controlled Prescription Drugs into the United States*

PROVIDENCE, R.I .– Online search engine Google Inc. has agreed to forfeit $500 million for allowing online Canadian pharmacies to place advertisements through its AdWords program targeting consumers in the United States, resulting in the unlawful importation of controlled and non-controlled prescription drugs into the United States, announced Deputy Attorney General James M. Cole; Peter F. Neronha, U.S. Attorney for the District of Rhode Island; and Kathleen Martin-Weis, Acting Director of the U.S. Food and Drug Administration's Office of Criminal Investigations (FDA/OCI). The forfeiture, one of the largest ever in the United States, represents the gross revenue received by Google as a result of Canadian pharmacies advertising through Google's AdWords program, plus gross revenue made by Canadian pharmacies from their sales to U.S. consumers. Incited Genocide by Speech

The shipment of prescription drugs from pharmacies outside the United States to customers in the United States typically violates the Federal Food, Drug and Cosmetic Act and in the case of controlled prescription drugs , the Controlled Substances Act. Google was aware as early as 2003, that generally, it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the United States from Canada.

The importation of prescription drugs to consumers in the United States is almost always unlawful because the FDA cannot ensure the safety and effectiveness of foreign prescription drugs that are not FDA-approved because the drugs may not meet FDA's labeling requirements; may not have been manufactured, stored and distributed under proper conditions; and may not have been dispensed in accordance with a valid prescription. While Canada has its own regulatory rules for prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority, and many sell drugs obtained from countries other than Canada which lack adequate pharmacy regulations.

"The Department of Justice will continue to hold accountable companies who in their bid for profits violate federal law and put at risk the health and safety of American consumers," said Deputy Attorney General Cole. "This settlement ensures that Google will reform its improper advertising practices with regard to these pharmacies while paying one of the largest financial forfeiture penalties in history."

"This investigation is about the patently unsafe, unlawful, importation of prescription drugs by Canadian on-line pharmacies, with Google's knowledge and assistance, into the United States, directly to U.S. consumers," said U.S. Attorney Neronha. "It is about taking a significant step forward in limiting the ability of rogue on-line pharmacies from reaching U.S. consumers, by compelling Google to change its behavior. It is about holding Google responsible for its conduct by imposing a $500 million forfeiture, the kind of forfeiture that will not only get Google's attention, but the attention of all those who contribute to America's pill problem."

"Today's agreement demonstrates the commitment of the Food and Drug Administration to protect the US



**Federal Trade Commission**
Protecting America's Consumers

For Release: 08/09/2012

## Google Will Pay $22.5 Million to Settle FTC Charges it Misrepresented Privacy Assurances to Users of Apple's Safari Internet Browser

### Privacy Settlement is the Largest FTC Penalty Ever for Violation of a Commission Order

Google Inc. has agreed to pay a record $22.5 million civil penalty to settle Federal Trade Commission charges that it misrepresented to users of Apple Inc.'s Safari Internet browser that it would not place tracking "cookies" or serve targeted ads to those users, violating an earlier privacy settlement between the company and the FTC.

The settlement is part of the FTC's ongoing efforts make sure companies live up to the privacy promises they make to consumers, and is the largest penalty the agency has ever obtained for a violation of a Commission order. In addition to the civil penalty, the order also requires Google to disable all the tracking cookies it had said it would not place on consumers' computers.

"The record setting penalty in this matter sends a clear message to all companies under an FTC privacy order," said Jon Leibowitz, Chairman of the FTC. "No matter how big or small, all companies must abide by FTC orders against them and keep their privacy promises to consumers, or they will end up paying many times what it would have cost to comply in the first place."

Google, the developer of the world's most popular Internet search engine, generates billions of dollars in revenues annually from selling online advertising services, including the delivery of targeted ads online. Cookies are small pieces of computer text that are used to collect information from computers and can be used to serve targeted ads to consumers. By placing a tracking cookie on a user's computer, an advertising network can collect information about the user's web-browsing activities and use that information to serve online ads targeted to the user's interests or for other purposes.

In its complaint, the FTC charged that for several months in 2011 and 2012, Google placed a certain advertising tracking cookie on the computers of Safari users who visited sites within Google's DoubleClick advertising network, although Google had previously told these users they would automatically be opted out of such tracking, as a result of the default settings of the Safari browser used in Macs, iPhones and iPads.

According to the FTC's complaint, Google specifically told Safari users that because the Safari browser is set by default to block third-party cookies, as long as users do not change their browser settings, this setting "effectively accomplishes the same thing as [opting out of this particular Google advertising tracking cookie]." In addition, Google represented that it is a member of an industry group called the Network Advertising Initiative, which requires members to adhere to its self-regulatory code of conduct, including disclosure of their data collection and use practices.

Despite these promises, the FTC charged that Google placed advertising tracking cookies on consumers' computers, in many cases by circumventing the Safari browser's default cookie-blocking setting. Google exploited an exception to the browser's default setting to place a temporary cookie from the DoubleClick domain. Because of the particular operation of the Safari browser, that initial temporary cookie opened the door to all cookies from the DoubleClick domain, including the Google advertising tracking cookie that Google had represented would be blocked from Safari browsers.

The FTC charged that Google's misrepresentations violated a settlement it reached with the agency in October 2011, which barred Google from – among other things – misrepresenting the extent to which consumers can exercise control over the collection of their information. The earlier settlement resolved FTC charges that Google used deceptive tactics and violated its privacy promises when it launched its social network, Google Buzz.

More information about the FTC case can be found at the Tech@FTC blog.

The Commission vote to authorize the staff to refer the complaint to the Department of Justice, and to approve the proposed consent decree, was 4-1 with Commissioner J. Thomas Rosch dissenting. The Commission issued a statement authored by Chairman Jon Leibowitz and Commissioners Edith Ramirez, Julie Brill, and Maureen Ohlhausen. In its statement, the Commission affirmed that the settlement is in the public interest because, based on staff's investigative work, there is strong reason to believe that Google violated the prior order, and the $22.5 million fine is an appropriate remedy for the charge that Google misrepresented to Safari browser users how to avoid targeted advertising by Google. In his dissenting statement, Commissioner Rosch stated that it arguably cannot be concluded that the consent decree is in the public interest if it contains a denial of liability.

This case was filed with the invaluable assistance of the DOJ, which filed the complaint and proposed consent decree on behalf of the Commission in U.S. District Court for the District of Northern California in San Jose August 8, 2012. The proposed consent decree is subject to court approval.

**NOTE:** The Commission refers a complaint to the DOJ for filing when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. The complaint is not a finding or ruling that the defendant has actually violated the law. This consent order is for settlement purposes only and does not constitute an admission by the defendant that the law has been violated. Consent orders have the force of law when signed by the District Court judge.

The Federal Trade Commission works for consumers to prevent fraudulent, deceptive, and unfair business practices and to provide information to help spot, stop, and avoid them. To file a complaint in English or Spanish, visit the FTC's online Complaint Assistant or call 1-877-FTC-HELP (1-877-382-4357). The FTC enters complaints into Consumer Sentinel, a secure, online database available to more than 2,000 civil and criminal law enforcement agencies in the U.S. and abroad. The FTC's website provides free information on a variety of consumer topics. Like the FTC on Facebook, follow us on Twitter, and subscribe to press releases for the latest FTC news and resources.

**MEDIA CONTACT:**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, or to license text, images or graphics, please visit The Daily Beast Permissions (http://www.thedailybeastpermissions.com/)

# Google Sends a Lifeline to Internet Users in Iran and China

## Starting today, an Internet user in an oppressive country can swap online identities with someone in the West. Josh Rogin on how the tech company is battling censors.

by Josh Rogin (/contributors/josh-rogin.html) | October 21, 2013 1:01 PM EDT

For years, Google has been developing ways to help people living under oppressive regimes thwart online suppression. Today, the company unveils three new tools to help advance the fight.

Starting Monday, Google users in places like Iran, Syria, China, and Russia will be able to mask their online identity with the help of a friend in a censor-free country. Human-rights groups will have a new tool to stop their governments from shutting down their websites. And the world will have a new way to watch where the most cyber attacks are coming from.

Identity Theft for Terrorist

The Enemies of Internet
Special Edition : Surveillance

REPORTE WITHOUT BORD FOR FREEDOM OF INFORM

Introduction State Enemies Corporate Enemies Cyber-censorship in 2012 over

VIACOM Google do Business Daily with IRAN

# Iran

Español Français

Iran has more than 150 Internet Service Providers or companies advertising themselves as such. Many of these services have been privatized since 2009 but that does not mean they have become fully independent of the government. The leading ones are still linked to the government and all are accountable to it. This biggest one, DCI, is owned by the Revolutionary Guards. .Novinnet,Shatel,Asretelecom,Pardis,Persian-net,Tehrandat,Neda,Askiran and Tavana are the other leading ISPs.

Whores our judgment

## Figures[1]:

- Population: 77 million
- Number of Internet users: 25.2 million

Rense.com

# Jewish Groups Calls 'The Passion' An Act Of Terrorism

Google incited Genocide

2-27-4

**WASHINGTON D.C.** (Capitol Press) - A prominent Jewish organization has denounced Mel Gibson's "The Passion" as an act of terrorism and can prove the movie violates the Patriot Act. By Speech

Jews Against Anti-Semitism, a recently formed Washington D.C. based defense league for Jews, has issued a press release pointing out sections of U.S. law which are being violated by Mel Gibson's film.

"Clearly there are laws on the books which have outlawed the inciting of riots or acts civil disobedience which endanger human life. Mel Gibson's movie will incite violence against Jews and put the lives of million of Jews in danger" said Rabbi David Feldman, a spokes person for Jews Against Anti-Semitism.

Google, YouTube

According to Rabbi Feldman "Under Section 802 of the 2001 USA Patriot Act, any crime which endangers human life is defined as an act of domestic terrorism. Mel Gibson's incitement of anti-Semitism is a civil disobedience crime which endangers human life and under the Patriot Act "The Passion" is an act of domestic terrorism"

The USA Patriot Act was signed into law by President George W. Bush shortly after the September 11th terrorist attacks in New York and

speech on Wednesday — a stance it reiterated Friday, reported the New York Times.

The 14-minute video's portrayal of the Prophet Mohammad as a womanizing charlatan enraged many Muslims over the past week. But Google claimed that the footage is against Islam, not the Muslim people.

WHITE HOUSE ASKS YOUTUBE TO 'REVIEW' ANTI-MUSLIM MOVIE

Google has, however, blocked the video in Indonesia and India for breaking local laws, which forbid inciting hatred. The company does not monitor all of its videos because of the vast numbers uploaded every day. But it does review videos that users overwhelmingly flag as inappropriate.

TERRORIST ACTS BY

The company temporarily restricted access to the video in Libya and Egypt on its own because of the "sensitive situations" in those countries. Four Americans, including the U.S. ambassador to Libya, were killed at the American consulate in Benghazi on Tuesday.

GOOGLE, YOUTUBE ANTI TERRORISM

White House press secretary Jay Carney explained that the administration does not intend to limit freedom of expression in this country.

CRIME AND SECURITY ACT

ANTI-MUSLIM FILM PROMOTER OUTSPOKEN ON ISLAM

OF 2001 PROHIBITS INCITING HATRED, HATE

"The White House asked YouTube to review the video to see if it was in compliance with their terms of use," Carney said.

CRIMES, IS TERRORISM PROHIBITED

Google claims that its decision not to completely remove the footage from YouTube is consistent with the company's policy for controversial content, as outlined in 2007.

BY SECTION 802 USA PATRIOT

"We are passionate about our users so we try to take into account local cultures and needs — which vary dramatically around the world — when developing and implementing our global product policies," wrote Rachel Whetstone, the company's senior vice president for communications and public policy.

ACT 2001, 18 U.S.C. 2331

"THE INNOCENCE OF MUSLIMS" TRAILER THAT SPARKED DEADLY RIOTS IS INEPT AND HATEFUL

U.S. authorities are investigating whether the film's 55-year-old producer, Nakoula Basseley Nakoula, breached the conditions set out for his prison release, according to Reuters.

One of the film's actresses, Cindy Lee Garcia, told ABC News the filmmaker lied to the cast about his intentions and his real name.

Prohibited by The

Garcia said she thought she was acting in a film called "Desert Warriors" about life from 2,000 years ago.

TREASON ACT OF

"Now, I'm sick that people died over this. I'm exhausted and really hurt and angry," Garcia said.

1351 ENGLISH

mwalsh@nydailynews.com

COMMON LAW



November 21, 1995

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL 33420

Dear Mr. May:

Your proposal for a Star Trek theme park has been forwarded to us by Thomas Byrne of Blockbuster Entertainment Group.

While we find your proposal very interesting, we regret to inform you that we are not pursuing this type of joint venture at the present time. We thank you for your interest and wish the best of luck in your endeavor.

Sincerely,

Jane Cooper
President & CEO

JC:amw



Published by SEYFARTH SHAW LLP ATTORNEYS

**Trading Secrets**

A Law Blog on Trade Secrets, Non-Competes, and Computer Fraud

# Department of Justice Issues Report Highlighting Trade Secret Theft Prosecutions And Need For Companies To Vigilantly Protect Their Data

ARAB BANK Guilty

VIACOM,
YOUTUBE,
Google
Guilty

By Jessica Mendelson on January 9th, 2013

By Jessica Mendelson and Robert Milligan

In December 2012, the Department of Justice released a "Summary of the Major U.S. Export Enforcement, Economic Espionage, Trade Secret and Embargo-Related Criminal Cases."

The report includes the major export enforcement, trade secret theft, economic espionage, and embargo-related criminal prosecutions handled by the United States Department of Justice between January 2007 and December 2012.

Department of Justice Issues Report Highlighting Trade Secret Theft Prosecutions And Need F... http://www.tradesecretslaw.com/2013/01/articles/trade-secrets/department-of-justice-issues-...

steal additional trade secret information. The FBI investigated the allegations, and the indictment seeks forfeiture of at least $225 million in proceeds from the alleged theft of trade secrets and charges Kolon with "one count of conspiring to convert trade secrets, four counts of theft of trade secrets and one count of obstruction of justice." A seperate civil case was brought against Kolon in Virginia and DuPont was awarded close to a billion dollars and a 20 year permanent injunction. Please see John Marsh's excellent summary of the case.

**New Legislation**—Congress just passed two amendments to the Economic Espionage Act which will protect more trade secrets and enhance the penalties for violations. The legislation directly responds to the Second Circuit's decision in *U.S. v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012), which overturned a jury verdict finding the defendant violated 18 U.S.C. 1832(a) of the Economic Espionage Act by stealing computer code from his employer. The court held that the statute did not apply because the computer code failed to satisfy the requirement that the "product" was "produced for" or "placed in" interstate or foreign commerce. The amended Section 1832(a) now applies to a trade secret "that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof."

The House of Representatives recently also passed a bill enhancing the penalties for violations of the Economic Espionage Act. Under the bill, the upper limit of penalties for individual offenses at Section 1831(a) would be increased from $500,000 to $5,000,000; the upper limit for corporate offenses at Section 1831(b) would be increased from $10,000,000 to the greater of $10,000,000 or 3 times the value of the stolen trade secret to the organization, including expenses for research and design and other costs of reproducing the trade secret that the organization has thereby avoided. The bill also passed in the Senate and is waiting for President Obama's signature.

The full Department of Justice report shows the increasing importance of criminal prosecution as a tool to dissuade theft of trade secrets. These cases highlight the importance of monitoring employee access to secure company databases and limiting access to important data to a need know basis. Furthermore, companies should consider using additional preventive means to prohibit employees from stealing trade secrets, such as configuring computers to restrict access to external devices, blocking a user from uploading information to a web-based site, and/or utilizing software that blocks employees from sending emails to certain domain names and either highlights or restricts the amount of data that can be sent out by a user. Companies may also wish to consider prohibiting employees from sending emails to certain domain names that are commonly used for personal email accounts and/or block such emails from being sent. In an era in which data is becoming increasingly portable, companies much increase their vigilance in monitoring the use and export of their data and trade secrets.

of 5 01/11/2004 01:35 a.m.

| SPRING 2006 | Trade Secrets |
|---|---|

| Course No. 9200-704-801<br><br>ID No. 16545 | W 6:30 - 9:30 p.m. | Room W-215 | |
|---|---|---|---|
| Professor Jay Dratler, Jr. | Room 231D (IP Alcove) | (330) 972-7972 | dratler@uakron.edu, dratler@neo.rr.com |

Copyright © 2000, 2002, 2003, 2006 Jay Dratler, Jr.

For permission, see

# Smith v. Dravo Corp.

203 F.2d 369, 97 U.S.P.Q. (BNA) 98 (7th Cir.1953)

Intentional harm is a tort

Before Duffy, Lindley and Swaim, Circuit Judges.

Lindley, Jr. [*370]

* * * [*371] * * *

In the early 1940s Leathem D. Smith, now deceased, began toying with an idea which, he believed, would greatly facilitate the ship and shore handling and transportation of cargoes. As he was primarily engaged in the shipbuilding business, it was quite natural that his thinking was chiefly concerned with water transportation and dock handling. Nevertheless his overall plan encompassed rail shipping as well. He envisioned construction of ships especially designed to carry their cargo in uniformly sized steel freight containers. These devices (which, it appears, were the crux of his idea) were: equipped with high doors at one end; large enough for a man to enter easily; weather and pilfer proof; and bore collapsible legs, which (1) served to lock them (a) to the deck of the ship by fitting into recesses in the deck, or (b) to each other, when stacked, by reason of receiving sockets located in the upper four corners of each container, and (2) allowed sufficient clearance between deck and container or container and container for the facile insertion of a fork of a lift tractor, and (3) were equipped with lifting eyelets, which, together with a specially designed hoist, made possible placement of the containers upon or removal from a ship, railroad car or truck, while filled with cargo. The outer dimensions of the devices were such that they would fit compactly in standard gauge North American railroad cars, or narrow gauge South American trains, and in the holds of most water vessels.

World War II effectually prevented Smith from developing his conception much beyond the idea stage. Nevertheless blue prints were drawn in 1943, and in 1944, as a result of

DAILY NEWS

Google IS HAS IRAN CONNECTIONS TERRORIST PARTNERS

World

# Google will not remove anti-Muslim YouTube video that sparked violent protests: It does not violate company's terms

**Google, YouTube's corporate parent, turned down the White House's request to reconsider keeping online the YouTube video that sparked anti-American violence in the Middle East, although the company has blocked access in some parts of the world.**

Google YouTube REFUSE to STOP COMMITTING TERRORIST ACTS AGAINST U.S. CITIZENS

BY MICHAEL WALSH / NEW YORK DAILY NEWS

SATURDAY, SEPTEMBER 15, 2012, 1:17 PM

MUNIR UZ ZAMAN/AFP/GETTY IMAGES

Members of an Islamic party burn the U.S. flag during a protest outside Bangladesh's largest mosque in the capital Dhaka.

Google refused the White House's request to reconsider keeping online the YouTube video that sparked anti-American violence in the Middle East.

The company claimed that "Innocence of Muslims" does not violate its terms of service concerning hate

# Star Trek resort coming soon

Continuing criminal conspiracy by

Trek-themed park coming to Red Sea resort in Jordan, thanks to royal Trekkie King Abdullah II.

Google, YouTube to commit internet

by **Eric Mack** | August 9, 2011 5:23 PM PDT

intentional fraud, harm George May

**[http://i.i.com.com/cnwk.1d/i/tim/2011/08/09/trek-resort.PNG]**

Turns out the Final Frontier is a nice spot on the Red Sea. (Click to enlarge.)

(Credit: Rubicon Holding Group)

The Wrath of Khan is soon to be offset by the joy of Jordan. Perhaps the world's richest Trekkie, King Abdullah II of Jordan, has given the green light and some cash from one of his namesake funds to build a $1.5 billion dollar Star Trek-themed resort in his Kingdom. King Abdullah is a well-known Trek fanatic who once appeared in an episode of "Star Trek: Voyager."

The resort is part of a larger development, the Red Sea Astrarium at the port of Aqaba, which will take up a reported 184 acres. The Developer, Rubicon Group Holding, announced a licensing deal with CBS to include a Star Trek center in the resort, one of at least a dozen other themed sections (disclosure: CBS is the parent company of CNET). The entire development is also expected to be eco-friendly, a theme that

Computer Through Cell Phones Cell towers

Home Page

Print Close

< Back

Print E-mail

## Shurat HaDin Warns the PLO's Landlord and Verizon

**January 24, 2012:** Shurat HaDin warned the landlord of the Palestine Liberation Organization's ("PLO") office in Washington, D.C. and the Verizon telephone company that providing premises, phone lines and other associated services to the PLO is illegal and will expose the landlord and Verizon to both criminal prosecution and civil liability to American citizens and others victimized by PLO-sponsored terrorism. In letters signed by American counsel Robert Tolchin of New York and myself, to Endeka Enterprises LLC, the owner of the premises that house the PLO's offices and Verizon which provides them telephone service, we demanded that Endeka and Verizon permanently discontinue providing services to the PLO.

We alleged that the PLO is an umbrella group that acts for the benefit of its constituent factions. One of the PLO's key members is the Popular Front for the Liberation of Palestine ("PFLP") organization. The infamous PFLP constitutes the second largest faction in the PLO and shares the PLO's budget. Additionally, last month the PLO reached a strategic partnership agreement with Hamas and Palestine Islamic Jihad ("PIJ") under which the PLO, Hamas and PIJ coordinate activities. The PFLP is officially designated under United States law as a "Foreign Terrorist Organization," as a "Specially Designated Terrorist," and as a "Specially Designated Global Terrorist." Both Hamas and PIJ are officially designated under U.S. law as "Foreign Terrorist Organizations."

As the letters state, "The PLO's funding is shared and distributed among its constituent members, including the PFLP. The PLO's activities are carried out specifically for the benefit of its constituent members, including the PFLP. Similarly, pursuant to their recent leadership merger agreement, Hamas and PIJ will also be recipients of these services and benefits."

Accordingly, the law is strict when it comes to aiding and abetting terrorism. In the letter we cited the United States Supreme Court's recent ruling in the case of Holder v. Humanitarian Law Project, --- U.S. ----, 130 S.Ct. 2705 (2010), which found that providing any assistance or support to terrorists, including putatively benign forms of assistance (such as providing rental space or telephone services) is criminal. As such, the provision of premises and telephone services to the PLO, which ultimately inures to the benefit and interests of the PFLP, Hamas and PIJ, all designated Foreign Terrorist Organizations, would constitute the type of seemingly innocuous material support that would render companies criminally and civilly liable. This includes liability for terrorist attacks carried out by the PLO, PFLP, Hamas or PIJ.

The PFLP, which is a designated terrorist organization that American citizens and companies are prohibited to provide services to, is an integral part of the PLO and shares the PLO's budget. Thus, by providing services to the PLO, companies like Enedka and Verizon are in fact providing services to and benefiting the PFLP, and thereby violating federal anti-terrorism laws and aiding and abetting Palestinian terrorism.

For copies of the letter to Verizon and the letter to Endeka Enterprises LLC.

For an article in the Jerusalem Post about the letters click here:

Home Page

Print Close

< Back

Print E-mail 

# Twitter lawsuit threatened over alleged Hezbollah aid

**December 30, 2011:**

**The director of an Israeli legal outfit says yes, and is threatening to sue the micro-blogging site if it doesn't change its policies.**

Nitsana Darshan-Leitner, director of the Shurat HaDin Israel Law Center, sent a letter to Twitter on Thursday asserting that the company is violating U.S. law by allowing groups such as Hezbollah and al Qaeda affiliate al-Shabaab to use its popular online network.

"It has come to our attention that Twitter Inc. provides social media and associated services to such foreign terrorist organizations," Darshan-Leitner wrote.

"Please be advised that (doing so) is illegal and will expose Twitter Inc. and its officers to both criminal prosecution and civil liability to American citizens and others victimized" by Hezbollah, al-Shabaab and other foreign terrorist entities.

Twitter declined to comment when contacted by CNN.

In her letter, Darshan-Leitner noted that Hezbollah and al-Shabaab are officially designated as terrorist organizations under U.S. law. She also cited a 2010 Supreme Court case -- Holder v. Humanitarian Law Project -- which upheld a key provision of the Patriot Act prohibiting material support to groups designated as terrorist outfits.

"Your provision of social media and associated services to Hezbollah and other foreign terrorist organizations would constitute the type of seemingly innocuous material support that would render your company and you personally criminally and civilly liable," she told Twitter CEO Richard Costolo.

Hezbollah-controlled al-Manar television currently maintains a Twitter account with roughly 7,500 followers. Other groups considered terrorist organizations by the United States also maintain accounts. Hamas, the Islamist group that rules the Gaza Strip, posts regularly on at least one government-controlled account.

Darshan-Leitner says she realizes there will be stiff opposition to a potential lawsuit from free speech advocates, but told CNN she nevertheless hopes Twitter will change its policies.

"Once you bring it to their attention, they cannot say that they don't know," she said.

Aden Fine, an attorney with the American Civil Liberties Union, told CNN that the Supreme Court "has not directly addressed the issue of whether any speech allegedly supportive of a designated terrorist organization is unlawful." But "the government can't force private companies to censor lawful speech just because the government doesn't like the speech or the people making the speech," he said.

Fine noted that since the Internet depends on private companies such as Twitter to function, any clampdown